# In the United States Court of Appeals for the Eighth Circuit

CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA; TEXAS ASSOCIATION OF BUSINESS; and LONGVIEW CHAMBER OF COMMERCE,

*Petitioners*,

v.

SECURITIES AND EXCHANGE COMMISSION,

*Respondent*.

On Petitions for Review of an Order of the Securities & Exchange Commission

## APPENDIX TO MOTION FOR STAY PENDING DISPOSITION OF PETITIONS FOR REVIEW

Brian A. Richman
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, TX 75201
(214) 698-3100

Daryl Joseffer
Tyler S. Badgley
Kevin R. Palmer
U.S. CHAMBER LITIGATION CENTER
1615 H Street, N.W.
Washington, D.C. 20062
(202) 463-5337

Eugene Scalia
  *Counsel of Record*
Jonathan C. Bond
Max E. Schulman
Brian C. McCarty
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 955-8500
EScalia@gibsondunn.com

*Counsel for Petitioners Chamber of Commerce*
*of the United States of America, Texas Association of Business,*
*and Longview Chamber of Commerce*

# TABLE OF CONTENTS

| Document | Appendix Pages |
|---|---|
| SEC, *The Enhancement and Standardization of Climate-Related Disclosures for Investors*, Release Nos. 33-11275, 34-99678 (Mar. 6, 2024) | App.1-886 |
| The White House, *Press Briefing by Principal Deputy Press Secretary Karine Jean-Pierre* (Oct. 21, 2021) | App.887-922 |
| The White House, *FACT SHEET: Renewed U.S. Leadership in Glasgow Raises Ambition to Tackle Climate Crisis* (Nov. 13, 2021) | App.923-26 |
| United Nations Framework Convention on Climate Change, *Report of the Conference of the Parties Serving as the Meeting of the Parties to the Paris Agreement on Its Third Session, Held in Glasgow from 31 October to 13 November 2021* (Mar. 8, 2022) | App.927-72 |
| Comm'r Hester M. Peirce, SEC, *Green Regs and Spam: Statement on the Enhancement and Standardization of Climate-Related Disclo-* | App.973-83 |

Appellate Case: 24-1628     Page: 2     Date Filed: 03/26/2024 Entry ID: 5377362

| | |
|---|---|
| *sures for Investors* (Mar. 6, 2024) | |
| Comm'r Mark T. Uyeda, SEC, *A Climate Regulation Under the Commission's Seal: Dissenting Statement on the Enhancement and Standardization of Climate-Related Disclosures for Investors* (Mar. 6, 2024) | App.984-88 |
| Richard Vanderford, *SEC's Gensler Bracing for Lawsuits Over Climate Rule*, Wall St. J. (Feb. 13, 2024, 5:54 PM) | App.989-91 |
| Letter from Tom Quaadman, Executive Vice President, U.S. Chamber of Commerce, to Vanessa A. Countryman, Secretary, SEC (June 16, 2022) | App.992-1132 |
| Letter from Daniel Taylor, Arthur Andersen Professor, The Wharton School, to the SEC (June 16, 2022) | App.1133-57 |
| Letter from BlackRock, Inc., to Vanessa A. Countryman, Secretary, SEC (June 17, 2022) | App.1158-79 |
| Opening Brief of the Securities and Exchange Commission, *NRDC* v. *SEC*, No. 77- | App.1180-1272 |

ii

| | |
|---|---|
| 1761 (D.C. Cir. Oct. 17, 1977) | |
| Securities and Exchange Commission's Opposition to Petitioners' Emergency Motion for Administrative Stay and Stay Pending Judicial Review, *Liberty Energy, Inc.* v. *SEC*, No. 24-60109 (5th Cir. Mar. 13, 2024) | App.1273-1304 |
| Letter from Rob Bonta, California Attorney General, *et al.*, to Vanessa A. Countryman, Secretary, SEC (June 17, 2022) | App.1305-39 |
| Letter from Tom Quaadman, Executive Vice President, U.S. Chamber of Commerce, to Vanessa A. Countryman, Secretary, SEC (Nov. 1, 2022) | App.1340-96 |
| Declaration of Edward J. Shoen (Mar. 26, 2024) | App.1397-1417 |

## CERTIFICATE OF SERVICE

I hereby certify that on March 26, 2024, an electronic copy of the foregoing appendix was filed with the Clerk of Court for the United States Court of Appeals for the Eighth Circuit using the appellate CM/ECF system, and service will be accomplished on all registered counsel by the appellate CM/ECF system.

/s/ *Eugene Scalia*
Eugene Scalia
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 955-8500
EScalia@gibsondunn.com

*Counsel of Record for Petitioners*
*Chamber of Commerce of the*
*United States of America, Texas*
*Association of Business, and*
*Longview Chamber of Commerce*

iv

**SECURITIES AND EXCHANGE COMMISSION**

**17 CFR 210, 229, 230, 232, 239, and 249**

**[Release Nos. 33-11275; 34-99678; File No. S7-10-22]**

**RIN 3235-AM87**

**The Enhancement and Standardization of Climate-Related Disclosures for Investors**

**AGENCY:** Securities and Exchange Commission

**ACTION:** Final rules.

**SUMMARY:** The Securities and Exchange Commission ("Commission") is adopting amendments to its rules under the Securities Act of 1933 ("Securities Act") and Securities Exchange Act of 1934 ("Exchange Act") that will require registrants to provide certain climate-related information in their registration statements and annual reports. The final rules will require information about a registrant's climate-related risks that have materially impacted, or are reasonably likely to have a material impact on, its business strategy, results of operations, or financial condition. In addition, under the final rules, certain disclosures related to severe weather events and other natural conditions will be required in a registrant's audited financial statements.

**DATES:** *Effective date*: These final rules are effective on [INSERT DATE 60 DAYS AFTER DATE OF PUBLICATION IN THE *FEDERAL REGISTER*].

*Compliance date*: See section II.O. for further information on transitioning to the final rules.

**FOR FURTHER INFORMATION CONTACT:** Elliot Staffin, Senior Special Counsel, and Kristin Baldwin, Special Counsel, Office of Rulemaking, at (202) 551-3430, in the Division of Corporation Finance; or Erin Nelson, Senior Special Counsel, and Meagan Van Orden,

App.1

Professional Accounting Fellow, in the Office of the Chief Accountant, at (202) 551-5300, Securities and Exchange Commission, 100 F Street NE, Washington, DC 20549.

**SUPPLEMENTARY INFORMATION:** We are adopting amendments to or adding the following rules and forms:

| Commission Reference | | CFR Citation (17 CFR) |
|---|---|---|
| Regulation S-X | Article 8-01 | § 210.8-01 |
| | Article 14-01 | § 210.14-01 |
| | Article 14-02 | § 210.14-02 |
| Regulation S-K | Items 1500 through 1508 | §§ 229.1500 through 229.1508 |
| | Item 601 | § 229.601 |
| Regulation S-T | Item 405 | § 232.405 |
| Securities Act[1] | Rule 436 | § 230.436 |
| | Form S-1 | § 239.11 |
| | Form S-3 | § 239.13 |
| | Form S-11 | § 239.18 |
| | Form S-4 | § 239.25 |
| | Form F-3 | § 239.33 |
| | Form F-4 | § 239.34 |
| Exchange Act[2] | Form 10 | § 249.210 |
| | Form 20-F | § 249.220f |
| | Form 10-Q | § 249.308a |
| | Form 10-K | § 249.310 |

---

[1]     15 U.S.C. 77a *et seq.*

[2]     15 U.S.C. 78a *et seq.*

App.2

Appellate Case: 24-1628     Page: 7     Date Filed: 03/26/2024 Entry ID: 5377362

**Table of Contents**

I. INTRODUCTION ................................................................. 10

   A.   Need for Enhanced and Standardized Climate-Related Disclosures .............................. 19

   B.   Summary of the Final Rules ........................................... 24

     1.   Content of the Climate-Related Disclosures ........................ 26

     2.   Presentation and Submission of the Climate-Related Disclosures................................. 33

     3.   Safe Harbor for Certain Climate-Related Disclosures ................ 35

     4.   Phase in Periods ................................................. 35

II.     DISCUSSION ..................................................... 36

   A.   Overview and Purpose of the Climate-Related Disclosure Rules .................... 36

     1.   Proposed Rules .................................................. 36

       a.   Consistent, Comparable, and Reliable Disclosures for Investors.......................... 36

       b.   Proposed Location of the Disclosure ............................ 37

     2.   Comments........................................................ 38

     3.   Final Rules...................................................... 46

   B.   Commission Authority to Adopt Disclosure Rules ........................ 59

   C.   Disclosure of Climate-Related Risks ............................... 73

     1.   Definitions of Climate-Related Risks and Climate-Related Opportunities (Items 1500 and 1502(a)) ................................................. 73

       a.   Proposed Rule .................................................. 73

       b.   Comments ....................................................... 77

       c.   Final Rules ..................................................... 89

     2.   Time Horizons and the Materiality Determination (Item 1502(a))............................. 100

       a.   Proposed Rule .................................................. 100

       b.   Comments ....................................................... 101

       c.   Final Rule ...................................................... 103

   D.   Disclosure Regarding Impacts of Climate-Related Risks on Strategy, Business Model, and Outlook................................................... 106

     1.   Disclosure of Material Impacts (Item 1502(b), (c), and (d))................................ 106

       a.   Proposed Rules ................................................. 106

       b.   Comments ....................................................... 109

App.3

Appellate Case: 24-1628   Page: 8   Date Filed: 03/26/2024 Entry ID: 5377362

  c. Final Rules ................................................................................. 114

 2. Transition Plan Disclosure (Items 1500 and 1502(e)) ................. 125

  a. Proposed Rule ............................................................................ 125

  b. Comments ................................................................................... 127

  c. Final rule .................................................................................... 131

 3. Disclosure of Scenario Analysis If Used (Items 1500 and 1502(f)) ........... 140

  a. Proposed Rule ............................................................................ 140

  b. Comments ................................................................................... 141

  c. Final Rule ................................................................................... 145

 4. Disclosure of a Maintained Internal Carbon Price (Item 1502(g)) ........... 151

  a. Proposed Rule ............................................................................ 151

  b. Comments ................................................................................... 152

  c. Final Rule ................................................................................... 156

E. Governance Disclosure ................................................................... 160

 1. Disclosure of Board Oversight (Item 1501(a)) ........................... 160

  a. Proposed Rules ........................................................................... 160

  b. Comments ................................................................................... 162

  c. Final Rule ................................................................................... 168

 2. Disclosure of Management Oversight (Item 1501(b)) ................. 172

  a. Proposed Rules ........................................................................... 172

  b. Comments ................................................................................... 173

  c. Final Rule ................................................................................... 179

F. Risk Management Disclosure (Item 1503) ...................................... 184

 1. Proposed Rule ............................................................................. 184

 2. Comments .................................................................................... 186

 3. Final Rule .................................................................................... 192

G. Targets and Goals Disclosure (Item 1504) ...................................... 199

 1. Proposed Rule ............................................................................. 199

 2. Comments .................................................................................... 201

  a. The Overall Proposed Disclosure Requirements ....................... 201

  b. The Proposed Disclosure Requirement Concerning the Use of Carbon Offsets or RECs 206

 3. Final Rule .................................................................................... 210

4

App.4

     a.   The Overall Disclosure Requirement (Item 1504(a), (b), and (c)) .......................... 210

     b.   The Carbon Offsets and RECs Disclosure Requirement (Item 1504(d)) ................ 218

H.   GHG Emissions Disclosure (Item 1505) ........................................................................ 222

  1.   Proposed Rule ............................................................................................................ 222

  2.   Comments.................................................................................................................... 226

     a.   Overall GHG Emissions Disclosure Requirement ............................................... 226

     b.   Presentation of the GHG Emissions Metrics and Underlying Methodologies and Assumptions................................................................................................................ 235

     c.   Timeline for Reporting GHG Emissions Metrics.................................................. 241

  3.   Final Rule ................................................................................................................... 244

     a.   Overview of the GHG Emissions Disclosure Requirement ................................... 244

     b.   Presentation of the GHG Emissions Metrics and Disclosure of the Underlying Methodologies and Assumptions ............................................................................... 249

     c.   Exclusions from the GHG Emissions Disclosure Requirement .............................. 256

     d.   Timeline for Reporting GHG Emissions Metrics.................................................. 258

I.    Attestation Over GHG Emissions Disclosure (Item 1506)............................................ 262

  1.   Overview .................................................................................................................... 262

     a.   Proposed Rules .................................................................................................... 262

     b.   Comments............................................................................................................ 268

     c.   Final Rules (Item 1506) ....................................................................................... 285

  2.   GHG Emissions Attestation Provider Requirements ................................................. 303

     a.   Proposed Rules .................................................................................................... 303

     b.   Comments............................................................................................................ 307

     c.   Final Rules (Item 1506(b)) ................................................................................... 319

  3.   GHG Emissions Attestation Engagement and Report Requirements (Item 1506(a)(2) and (c)).......................................................................................................................... 336

     a.   Proposed Rules .................................................................................................... 336

     b.   Comments............................................................................................................ 338

     c.   Final Rules ........................................................................................................... 346

  4.   Additional Disclosure by the Registrant (Item 1506(d))............................................ 357

     a.   Proposed Rules .................................................................................................... 357

     b.   Comments............................................................................................................ 358

     c.   Final Rules ........................................................................................................... 363

Appellate Case: 24-1628   Page: 10   Date Filed: 03/26/2024 Entry ID: 5377362

    5.    Disclosure of Voluntary Assurance (Item 1506(e)) ...................................... 371

         a.    Proposed Rules ........................................................................ 371

         b.    Comments ................................................................................ 372

         c.    Final Rules .............................................................................. 375

J.    Safe Harbor for Certain Climate-Related Disclosures (Item 1507) .............................. 387

    1.    Proposed Rules .................................................................................... 387

    2.    Comments ........................................................................................... 389

    3.    Final Rules ........................................................................................... 394

K.    Financial Statement Effects (Article 14) .................................................. 402

    1.    Introduction ......................................................................................... 402

    2.    Financial Impact Metrics ................................................................... 415

         a.    Proposed Rules ........................................................................ 415

         b.    Comments ................................................................................ 420

             i.    General Comments ........................................................ 420

             ii.    Disclosure Threshold ................................................. 426

             iii.    Terminology and Attribution ..................................... 435

             iv.    Alternatives ................................................................. 444

         c.    Final Rules .............................................................................. 447

    3.    Expenditure Effects ............................................................................ 449

         a.    Proposed Rules ........................................................................ 449

         b.    Comments ................................................................................ 452

         c.    Final Rules .............................................................................. 457

             i.    Scope (Rules 14-02(c) and (d)) ................................... 457

             ii.    Disclosure Threshold (Rule 14-02(b)) ........................ 467

             iii.    Attribution Principle (Rule 14-02(g)) ......................... 479

             iv.    Recoveries (Rule 14-02(f)) .......................................... 481

             v.    Severe Weather Events and Other Natural Conditions (Rule 14-02(c) and (d)) .. 483

             vi.    Carbon Offsets and Renewable Energy Credits (Rule 14-02(e)) ........................ 487

            vii.    Presentation of Disclosure (Rule 14-02(c) and (d)) .................................... 490

    4.    Financial Estimates and Assumptions (Rule 14-02(h)) ............................ 496

         a.    Proposed Rules ........................................................................ 496

         b.    Comments ................................................................................ 499

         c.    Final Rules .............................................................................. 504

Appellate Case: 24-1628   Page: 11   Date Filed: 03/26/2024   Entry ID: 5377362

5.   Opportunities ........................................................................................ 510

     a.   Proposed Rules ............................................................................ 510

     b.   Comments ................................................................................... 511

     c.   Final Rules ................................................................................. 514

6.   Financial Statement Disclosure Requirements ...................................... 518

     a.   Contextual Information (Rule 14-02(a)) and Basis of Calculation (Rule 14-01(c))  518

          i.    Proposed Rules .................................................................... 518

          ii.   Comments .......................................................................... 519

          iii.  Final Rules ......................................................................... 522

     b.   Historical Periods (Rule 14-01(d)) ............................................... 528

          i.    Proposed Rules .................................................................... 528

          ii.   Comments .......................................................................... 528

          iii.  Final Rules ......................................................................... 531

7.   Inclusion of Disclosures in the Financial Statements (Rule 14-01(a)) ......................... 533

     a.   Proposed Rules ............................................................................ 533

     b.   Comments ................................................................................... 534

     c.   Final Rules ................................................................................. 543

L.   Registrants Subject to the Climate-Related Disclosure Rules and Affected Forms ....... 550

     1.   Proposed Rules ............................................................................ 550

     2.   Comments ................................................................................... 554

     3.   Final Rules ................................................................................. 566

M.   Structured Data Requirement (Item 1508) ................................................ 575

     1.   Proposed Rules ............................................................................ 575

     2.   Comments ................................................................................... 575

     3.   Final Rules ................................................................................. 578

N.   Treatment for Purposes of the Securities Act and the Exchange Act ............... 581

     1.   Proposed Rules ............................................................................ 581

     2.   Comments ................................................................................... 582

     3.   Final Rules ................................................................................. 584

O.   Compliance Date ................................................................................ 585

     1.   Proposed Rules ............................................................................ 585

     2.   Comments ................................................................................... 586

     3.   Final Rules ................................................................................. 588

Appellate Case: 24-1628    Page: 12    Date Filed: 03/26/2024 Entry ID: 5377362

III.    OTHER MATTERS.................................................................................. 592

IV.    ECONOMIC ANALYSIS .................................................................... 593

   A.  Baseline and Affected Parties .......................................................... 596

     1.  Affected Parties ......................................................................... 598

     2.  Current Commission Disclosure Requirements ........................ 599

     3.  Existing State and Other Federal Laws .................................... 601

     4.  International Disclosure Requirements ...................................... 607

     5.  Current Market Practices........................................................... 611

       a.  Climate-Related Disclosures in SEC Filings ..................... 612

       b.  Additional Trends in Climate-Related Disclosures ............ 625

         i.   Prevalence and Scope of Climate-Related Disclosures ..................... 625

         ii.  GHG Emissions Reporting ......................................... 628

       c.  Use of Third-Party Frameworks ......................................... 631

       d.  Climate-Related Targets, Goals, and Transition Plan Disclosures.......................... 635

       e.  Third-Party Assurance of Climate-Related Disclosures..................... 639

   B.  Broad Economic Considerations...................................................... 641

     1.  Investor Demand for Additional Climate Information................ 641

     2.  Current Impediments to Climate Disclosures ........................... 644

   C.  Benefits and Costs ........................................................................... 646

     1.  General Discussion of Benefits and Costs ................................ 646

       a.  Benefits................................................................................ 646

       b.  Costs ................................................................................... 653

     2.  Analysis of Specific Provisions................................................ 660

       a.  Disclosure of Climate-Related Risks.................................. 660

       b.  Disclosure Regarding Impacts of Climate-Related Risks on Strategy, Business Model, and Outlook ...................... 663

       c.  Governance Disclosure ....................................................... 670

       d.  Targets and Goals Disclosure ............................................. 675

       e.  GHG Emissions Metrics ..................................................... 680

       f.  Attestation Over GHG Emissions Disclosure .................... 691

       g.  Risk Management Disclosure .............................................. 701

       h.  Financial Statement Disclosures ......................................... 705

         i.   Expenditure Disclosures ........................................... 705

Appellate Case: 24-1628    Page: 13    Date Filed: 03/26/2024 Entry ID: 5377362

     ii.    Contextual Information, Historical Periods, and Other Requirements ................ 716

     iii.   Financial Estimates and Assumptions ........................................................... 718

     iv.  Inclusion of Climate-Related Disclosures in the Financial Statements ............... 718

   i.    Structured Data Requirement ............................................................................. 720

  3.    Quantifiable Direct Costs on Registrants ................................................................. 725

   a.   Comments and data on direct cost estimates of the proposed rules ........................ 726

   b.   Direct cost estimates for the final rules ..................................................................... 739

     i.    Cost estimates of Governance Disclosure; Disclosure Regarding Impacts of Climate-Related Risks on Strategy, Business Model, and Outlook; and Risk Management Disclosure ................................................................................... 745

     ii.    Cost estimates of Scope 1 and 2 emissions disclosures ........................................ 758

     iii.   Cost estimates of assurance for Scope 1 and 2 emissions disclosures................. 762

     iv.  Estimates of reporting costs for scenario analysis and targets/goals ................... 767

     v.    Cost estimates of amendments to Regulation S-X and incremental audit fees..... 770

   c.   Factors that Influence Direct Costs ............................................................................ 777

D.   Other Economic Effects ......................................................................................................... 783

E.   Effects on Efficiency, Competition, and Capital Formation............................................ 786

  1.    Efficiency ...................................................................................................................... 786

  2.    Competition.................................................................................................................. 791

  3.    Capital Formation........................................................................................................ 794

F.   Reasonable Alternatives........................................................................................................ 797

  1.    Adopt a more (or less) principles-based approach to Regulation S-K disclosures ...... 797

  2.    Different approaches to assurance over GHG emissions disclosures ......................... 799

  3.    Different thresholds for financial statement disclosures .......................................... 800

  4.    Permit disclosures to be furnished rather than filed.................................................. 802

  5.    Exempt SRCs/EGCs................................................................................................... 804

  6.    Permit registrants to rely on home-country disclosure frameworks / substituted compliance ................................................................................................................... 804

  7.    Alternative tagging requirements ............................................................................... 806

V.      PAPERWORK REDUCTION ACT ................................................................................. 807

A.   Summary of the Collections of Information ..................................................................... 807

B.   Current Inventory Update to Reflect $600 Per Hour Rather than $400 Per Hour Outside Professional Costs Rate ............................................................................................ 809

C.   Summary of Comment Letters .............................................................................................. 810

D.   Sources of Cost Estimates ................................................................ 812

E.   Incremental and Aggregate Burden and Cost Estimates of the Final Rules ................. 812

   1.   Calculation of the Paperwork Burden Estimates of the Final Rules ........................... 813

   2.   Estimated Number of Affected Respondents ............................................... 822

   3.   Summary of the Estimated Burden Hour and Cost Increases Resulting from the Final Rules ...................................................................................... 825

VI.   FINAL REGULATORY FLEXIBILITY ACT ANALYSIS ........................................ 829

A.   Need for, and Objectives of, the Final Amendments ..................................... 829

B.   Significant Issues Raised by Public Comments ........................................... 830

   1.   Estimate of Affected Small Entities and Impact to Those Entities ........................... 831

   2.   Consideration of Alternatives .......................................................... 834

C.   Small Entities Subject to the Final Amendments ......................................... 838

D.   Projected Reporting, Recordkeeping, and other Compliance Requirements ................. 839

E.   Agency Action to Minimize Effect on Small Entities .................................... 840

STATUTORY AUTHORITY ........................................................................ 842

## I.  INTRODUCTION

Climate-related risks, their impacts, and a public company's response to those risks can significantly affect the company's financial performance and position.[3]  Accordingly, many investors and those acting on their behalf—including investment advisers and investment management companies—currently seek information to assess how climate-related risks affect a registrant's business and financial condition and thus the price of the registrant's securities. Investors also seek climate-related information to assess a registrant's management and board oversight of climate-related risks so as to inform their investment and voting decisions.  In light of these investor needs, the Commission is adopting rules to require registrants to provide certain

---

[3]   *See infra* section I.A.  For purposes of this release, we use the terms "public companies," "companies," "registrants," and "issuers" interchangeably and, unless explained in the text, the use of different terms in different places is not meant to connote a significant difference.

Appellate Case: 24-1628   Page: 15   Date Filed: 03/26/2024 Entry ID: 5377362

information about climate-related risks that have materially impacted, or are reasonably likely to have a material impact on, the registrant's business strategy, results of operations, or financial condition; the governance and management of such risks; and the financial statement effects of severe weather events and other natural conditions in their registration statements and annual reports. This information, alongside disclosures on other risks that companies face, will assist investors in making decisions to buy, hold, sell, or vote securities in their portfolio.

Many companies currently provide some information regarding climate-related risks. For example, as discussed in more detail in section IV.A.5 below, some studies show that a third of public companies disclose information about climate-related risks, mostly outside of Commission filings,[4] and nearly 40 percent of all annual reports contain some climate-related discussion.[5] In addition, Commission staff analysis found that approximately 20 percent of public companies provide some information regarding their Scope 1 and 2 greenhouse gas ("GHG") emissions, often outside of Commission filings, with the highest rate of emissions disclosures found among large accelerated filers.[6] Among companies in the Russell 1000 Index, based on one analysis, these numbers are even higher, with 90 percent publicly disclosing some climate-related information[7] and almost 60 percent providing disclosures regarding their GHG emissions.[8]

---

[4]    *See, e.g.*, Center for Capital Markets, *2021 Survey Report:  Climate Change & ESG Reporting from the Public Company Perspective*, available at https://www.centerforcapitalmarkets.com/wp-content/uploads/2021/08/CCMC_ESG_Report_v4.pdf, discussed *infra* in Section IV.A.5.

[5]    *See infra* notes 2638-2639 and accompanying text.

[6]    *See infra* notes 2675-2676 and accompanying text.

[7]    *See infra* note 2666 and accompanying text.

[8]    *See infra* note 2683 and accompanying text.

The climate-related information that these companies currently provide, however, is inconsistent and often difficult for investors to find and/or compare across companies. As a result, investors have expressed the need for more detailed, reliable, and comparable disclosure of information regarding climate-related risks. The requirements adopted in this release meet that need by providing more complete and decision-useful information about the impacts of climate-related risks on registrants, improving the consistency, comparability, and reliability of climate-related information for investors. As a result, investors will be able to make more informed investment and voting decisions.

As discussed in more detail throughout this release, disclosure of certain climate-related matters is required in a number of Federal, State, and foreign jurisdictions.[9] Companies currently often provide much of this information outside of Commission filings, in varying levels of detail, and in different documents and formats. Additionally, because of the importance of this information to investors, a variety of third parties have developed climate-related reporting frameworks.[10] Use of reporting frameworks is also often voluntary. Companies may disclose certain information under one or more frameworks, may provide only partial disclosures, or may choose not to provide consistent information year over year. As a result, reporting is fragmented and difficult for investors to compare across companies or across reporting periods. As commenters have indicated, this lack of consistency and comparability increases costs to investors in obtaining and analyzing decision-useful information and impairs investors' ability to

---

[9] *See, e.g., infra* sections I.A (discussing certain international initiatives) and II.A.3 (discussing the Inflation Reduction Act and recent California laws).

[10] *See, e.g.,* Task Force on Climate-related Financial Disclosures, *About,* available at https://www.fsb-tcfd.org/about/; CDP Worldwide ("CDP"), *About us,* available at https://www.cdp.net/en/info/about-us; Sustainability Accounting Standards Board ("SASB") Standards, *About us,* available at https://sasb.org/about/; and Global Reporting Initiative ("GRI"), *About GRI,* available at https://www.globalreporting.org/about-gri/. *See also infra* notes 148-151.

Appellate Case: 24-1628    Page: 17    Date Filed: 03/26/2024 Entry ID: 5377362

make investment or voting decisions in line with their risk preferences.[11]  Investors have asked for this information in Commission filings, alongside other disclosures on the business, results of operations, and financial condition of a registrant and information on the other risks companies face to their business, finances, and operations.  Requiring these additional disclosures in Commission filings will allow investors to evaluate together the range of risks that a company faces, the existing and potential impacts of those risks, and the way that company management assesses and addresses those risks.  Providing these disclosures in Commission filings also will subject them to enhanced liability that provides important investor protections by promoting the reliability of the disclosures.

The Commission has required disclosure of certain environmental matters for the past 50 years,[12] most recently issuing guidance in 2010 ("2010 Guidance") on how existing rules may require disclosure of climate-related risks and their impacts on a registrant's business or financial condition.[13]  Since the Commission issued the 2010 Guidance, there has been growing recognition that climate-related risks affect public companies' business, results of operations,

---

[11]    *See, e.g.*, letters from AllianceBernstein (June 17, 2022) ("AllianceBernstein"); Attorneys General from California and 19 other states (June 17, 2022) ("AGs of Cal. *et al.*"); California Public Employees' Retirement System (June 15, 2022) ("CalPERS"); California State Teachers' Retirement System (June 17, 2022) ("CalSTRS"); Ceres (June 17, 2022) ("Ceres"); Domini Impact Investments (June 17, 2022) ("Domini Impact"); Trillium Asset Management (Oct. 20, 2022) ("Trillium"); and Wellington Management Company (June 17, 2022) ("Wellington Mgmt."); *see also* Proposing Release, section I.B, note 42 and accompanying text; and *infra* section IV.C.  We discuss investors' need for more consistent, comparable, and decision-useful disclosure about registrants' climate-related risks in Sections I.A and II.A.3 below.

[12]    *See infra* notes 202-203 and accompanying text.

[13]    *See Commission Guidance Regarding Disclosure Related to Climate Change*, Release No. 33-9106 (Feb. 2, 2010) [75 FR 6290 (Feb. 8, 2010)] ("2010 Guidance"); and discussion *infra* notes 204-205 and accompanying text.  *See also infra* section II.B.

and financial condition.[14]  Our experience with the 2010 Guidance and current practices regarding disclosure of this information led us to conclude that, although many companies disclose some climate-related information, there was a need to both standardize and enhance the information available to investors about such matters and thus to propose an updated approach.[15] Since the proposal, ongoing regulatory developments and market practices with respect to disclosure of climate-related risks have only underscored the need for enhanced disclosure requirements in this area.[16]  Although current disclosure practices elicit some useful information about climate-related risks, there remain significant deficiencies in the consistency and completeness of this information.  We have therefore concluded that additional requirements are appropriate to ensure that investors have access to more complete and reliable information that will enable them to make informed investment and voting decisions.[17]

    The rules that we are adopting respond to investors' concerns regarding the adequacy of current disclosure practices while taking into account comments received on the proposed rules.

---

[14]    *See, e.g.*, letters from AllianceBernstein; Alphabet, Autodesk, Dropbox, eBay, Hewlett Packard Enterprise, HP Inc., Intel, Meta, PayPal, and Workday (June 17, 2022) ("Alphabet *et al*."); Amazon (June 17, 2022); CalPERS; CalSTRS; Eni SpA (June 16, 2022) ("Eni SpA"); Pacific Investment Management Company (June 17, 2022) ("PIMCO"); PricewaterhouseCoopers (June 17, 2022) ("PwC"); and Wellington Mgmt. *See also infra* note 28 (discussing the Financial Stability Oversight Council's ("FSOC's") Report on Climate-Related Financial Risk 2021).

[15]    *See The Enhancement and Standardization of Climate-Related Disclosures for Investors*, Release No. 33-11042 (Mar. 21, 2022) [87 FR 21334 (Apr. 11, 2022)] ("Proposing Release").

[16]    *See infra* Section II.A.3 for a discussion of recent foreign and state regulatory developments regarding the disclosure of climate-related risks, including the announcement by several countries of their intention to adopt laws or regulations implementing the International Sustainability Standards Board's ("ISSB") climate reporting standard in whole or part; and certain recent California laws requiring the disclosure of climate-related risks and greenhouse gas emissions by certain large companies.

[17]    Even after adoption of the final rules, the 2010 Guidance will still be relevant because it discusses existing Commission rules, such as those pertaining to a registrant's description of its business and certain legal proceedings, which require disclosure regarding, among other things, compliance with environmental laws and regulations that are only tangentially mentioned in this rulemaking.  Registrants should continue to consider the 2010 Guidance as they evaluate their disclosure obligations in their Description of Business, Risk Factors, Legal Proceedings, and Management's Discussion and Analysis.  These disclosures should be based on the registrant's specific facts and circumstances.

14

App.14

In general terms, the final rules will elicit enhanced and more consistent and comparable disclosure about the material risks that companies face and how companies manage those risks by requiring:

- A description of any climate-related risks that have materially impacted or are reasonably likely to have a material impact on the registrant, including on its strategy, results of operations, and financial condition, as well as the actual or potential material impacts of those same risks on its strategy, business model, and outlook;

- Specified disclosures, regarding a registrant's activities, if any, to mitigate or adapt to a material climate-related risk or use of transition plans, scenario analysis or internal carbon prices to manage a material climate-related risk;

- Disclosure about any oversight by the registrant's board of directors of climate-related risks and any role by management in assessing and managing material climate-related risks;

- A description of any processes the registrant uses to assess or manage material climate-related risks; and

- Disclosure about any targets or goals that have materially affected or are reasonably likely to materially affect the registrant's business, results of operations, or financial condition.

In addition, to facilitate investors' assessment of particular types of risk, the final rules require:

- Disclosure of Scope 1 and/or Scope 2 emissions on a phased in basis by certain larger registrants when those emissions are material, and the filing of an attestation report

15

covering the required disclosure of such registrants' Scope 1 and/or Scope 2 emissions, also on a phased in basis; and

- Disclosure of the financial statement effects of severe weather events and other natural conditions including costs and losses.

A further summary of the final rules is presented below.[18]

In crafting the final rules, we benefited from extensive public comments. We received over 4,500 unique comment letters on the proposed climate-related disclosure rules and over 18,000 form letters.[19] Commenters included academics, accounting and audit firms, individuals, industry groups, investor groups, law firms, non-governmental organizations, pension funds, professional climate advisors, professional investment advisers and investment management companies, registrants, standard-setters, state government officials, and U.S. Senators and Members of the House of Representatives. Many commenters generally supported the proposal to require climate-related disclosure. Others opposed the proposed rules in whole or in part. In addition, the Commission's Investor Advisory Committee offered broad support for the proposal, with recommendations for certain modifications to the proposed rules, as discussed in more detail below.[20] The Commission's Small Business Capital Formation Advisory Committee made

---

[18] *See infra* section I.B.

[19] These comments are available at https://www.sec.gov/comments/s7-10-22/s71022.htm. Unless otherwise noted, comments referenced in this release pertain to these comments.

[20] *See* U.S. Securities and Exchange Commission Investor Advisory Committee Recommendation Related to Climate-Related Disclosure Rule Proposals (Sept. 21, 2022), available at https://www.sec.gov/spotlight/investor-advisory-committee-2012/20220921-climate-related-disclosure-recommendation.pdf "IAC Recommendation"). Specifically, the Investor Advisory Committee recommended the following changes to the proposed rules, as discussed in more detail in section II below: (1) adding a requirement for "Management Discussion of Climate-Related Risks & Opportunities"; (2) requiring disclosure of material facility locations; and (3) eliminating the proposed requirement around

several recommendations, including that the Commission exempt emerging growth companies

("EGCs")[21] and smaller reporting companies ("SRCs")[22] from the final rules or otherwise adopt

scaled climate-related disclosure requirements for EGCs and SRCs.[23] We considered comments

board expertise. In addition to the IAC Recommendation, in June 2022, the Investor Advisory Committee held a meeting that included a panel discussion regarding climate disclosures. See the minutes for that meeting, including the panelists that participated in the discussion, at https://www.sec.gov/spotlight/investor-advisory-committee-2012/iac060922-minutes.pdf. The Investor Advisory Committee was established in Apr. 2012 pursuant to section 911 of the Dodd-Frank Wall Street Reform and Consumer Protection Act [Pub. L. 111-203, sec. 911, 124 Stat. 1376, 1822 (2010)] ("Dodd-Frank Act") to advise and make recommendations to the Commission on regulatory priorities, the regulation of securities products, trading strategies, fee structures, the effectiveness of disclosure, and initiatives to protect investor interests and to promote investor confidence and the integrity of the securities marketplace.

[21] An EGC is a registrant that had total annual gross revenues of less than $1.235 billion during its most recently completed fiscal year and has not met the specified conditions for no longer being considered an EGC. *See* 17 CFR 230.405; 17 CFR 240.12b-2; 15 U.S.C. 77b(a)(19); 15 U.S.C. 78c(a)(80); and *Inflation Adjustments under Titles I and III of the JOBS Act*, Release No. 33-11098 (Sep. 9, 2022) [87 FR 57394 (Sep. 20, 2022)].

[22] An SRC is an issuer that is not an investment company, an asset-backed issuer (as defined in 17 CFR 229.1101), or a majority-owned subsidiary of a parent that is not an SRC and that: (1) had a public float of less than $250 million; or (2) had annual revenues of less than $100 million and either: (i) no public float; or (ii) a public float of less than $700 million. 17 CFR 229.10 (defining SRC and also providing how and when an issuer determines whether it qualifies as an SRC); 17 CFR 230.405 (same); 17 CFR 240.12b-2 (same).

[23] *See* U.S. Securities and Exchange Commission Small Business Capital Formation Advisory Committee Recommendation Regarding the Enhancement and Standardization of Climate-Related Disclosures for Investors (July 13, 2022), available at https://www.sec.gov/spotlight/sbcfac/sbcfac-climate-related-disclosures-recommendation-050622.pdf ("SBCFAC Recommendation"). In addition, the Small Business Capital Formation Advisory Committee highlights generally in its parting perspectives letter that "exemptions, scaling, and phase-ins for new requirements where appropriate, allows smaller companies to build their businesses and balance the needs of companies and investors while promoting strong and effective U.S. public markets." *See* Parting Perspectives Letter, U.S. Securities and Exchange Commission Small Business Capital Formation Advisory Committee (Feb. 28, 2023), available at https://www.sec.gov/files/committee-perspectives-letter-022823.pdf. Finally, we note that participants in the Commission-hosted Small Business Forum in 2023 recommended that the Commission revise the proposed rules to exempt SRCs, non-accelerated filers, EGCs, and other midsized companies and to consider scaling and delayed compliance ("Small Business Forum Recommendation (2023)"); participants in 2022 and 2021 Small Business Forums similarly recommended the Commission provide exemptions or scaled requirements for small and medium-sized companies in connection with any new ESG disclosure requirements adopted by the Commission. *See* Report on the 42nd Annual Small Business Forum (April 2023), available at https://www.sec.gov/files/2023_oasb_annual_forum_report_508.pdf; Report on the 41st Annual Small Business Forum (April 2022), available at https://www.sec.gov/files/2022-oasb-annual-forum-report.pdf; and Report on the 40th Annual Small Business Forum (May 2021), available at https://www.sec.gov/files/2021_OASB_Annual_Forum_Report_FINAL_508.pdf. *See also* U.S. Securities

that were supportive as well as those that were critical of aspects of the proposed rules, including comments from investors as to the information they need to make informed investment or voting decisions, as well as concerns expressed by registrants, trade associations, and others with regard to compliance burdens, liability risk, and our statutory authority. After considering all comments, we are adopting final rules with modifications from the proposal to better effectuate our goals in requiring these additional disclosures while limiting the final rules' burdens on registrants.[24]

As the Commission explained when proposing the climate disclosure rules,[25] while climate-related issues are subject to various other regulatory schemes, our objective is limited to advancing the Commission's mission to protect investors, maintain fair, orderly, and efficient markets, and promote capital formation by providing disclosure to investors of information important to their investment and voting decisions. We are adopting the final rules to advance these investor protection, market efficiency and capital formation objectives, consistent with our statutory authority, and not to address climate-related issues more generally. The final rules should be read in that context. Thus, for example, in those instances where the rules reference

---

and Exchange Commission Office of the Advocate for Small Business Capital Formation, Annual Report Fiscal Year 2023 ("2023 OASB Annual Report"), available at https://www.sec.gov/files/2023-oasb-annual-report.pdf, at 84-85 (recommending generally that in engaging in rulemaking that affects small businesses, the Commission tailor the disclosure and reporting framework to the complexity and size of operations of companies, either by scaling obligations or delaying compliance for the smallest of the public companies). The Small Business Capital Formation Advisory Committee was established in Dec. 2016 pursuant to the Small Business Advocate Act of 2016 [Public Law 114-284 (2016)] to advise the Commission on rules, regulations, and policies with regard to the Commission's mission of protecting investors, maintaining fair, orderly, and efficient markets, and facilitating capital formation, as such rules, regulations, and policies relate to: capital raising by emerging, privately held small businesses ("emerging companies") and publicly traded companies with less than $250,000,000 in public market capitalization ("smaller public companies") through securities offerings, including private and limited offerings and initial and other public offerings; trading in the securities of emerging companies and smaller public companies; and public reporting and corporate governance requirements of emerging companies and smaller public companies.

[24] *See infra* section I.B for a summary of changes from the proposed rules, including the addition of materiality qualifiers in certain rule provisions and revisions to make the final rules less prescriptive.

[25] *See* Proposing Release, section I.

materiality—consistent with our existing disclosure rules and market practices—materiality refers to the importance of information to investment and voting decisions about a particular company, not to the importance of the information to climate-related issues outside of those decisions. The Commission has been and remains agnostic about whether or how registrants consider or manage climate-related risks. Investors have expressed a need for this information on risks in valuing the securities they currently hold or are considering purchasing. While we recognize that the rules will impose burdens on registrants, we note that the degree of that burden will vary depending upon the circumstances facing individual registrants, as not every registrant will be required to provide all disclosures specified under the final rules. Moreover, as discussed further throughout the release, we believe that those burdens are justified by the informational benefits of the disclosures to investors.

## A. Need for Enhanced and Standardized Climate-Related Disclosures

The importance of climate-related disclosures for investors has grown as investors,[26] companies, and the markets have recognized that climate-related risks[27] can affect a company's

---

[26] Throughout this release, we refer to investors to include retail investors, institutional investors, and other market participants (such as financial analysts, investment advisers, and portfolio managers) that use disclosures in Commission filings as part of their analysis and to help investors.

[27] The Commission has a long history of requiring disclosures to investors of information about risks facing registrants. See *infra* notes 184-191 and accompany text for a discussion of that history. In that time, the Commission has described those risks using differently terminology, but has largely focused on the same concepts. *See, e.g.*, 17 CFR 229.105(a) (Where appropriate, provide under the caption "Risk Factors" a discussion of the material factors that make an investment in the registrant or offering speculative or risky.); *Disclosure of Accounting Policies for Derivative Financial Instruments and Derivative Commodity Instruments and Disclosure of Quantitative and Qualitative Information About Market Risk Inherent in Derivative Financial Instruments, Other Financial Instruments, and Derivative Commodity Instruments*, Release No. 33-7386 (Jan. 31, 1997) [62 FR 6044 at n.12 (Feb. 10, 1997)] (Requiring disclosure of qualitative and quantitative information about market risk for derivatives and other financial instruments; Market risk is the risk of loss arising from adverse changes in market rates and prices, such as interest rates, foreign currency exchange rates, commodity prices, and other relevant market rate or price changes (e.g.,

Appellate Case: 24-1628     Page: 24     Date Filed: 03/26/2024 Entry ID: 5377362

business and its current and longer-term financial performance and position in numerous ways.[28]

Climate-related natural disasters can damage issuers' assets, disrupt their operations, and

increase their costs.[29] Any widespread market-based transition to lower carbon products,

practices, and services—triggered, for example, by recent or future changes in consumer

preferences[30] or the availability of financing, technology, and other market forces[31]—can lead to

equity prices).); *Guides for Preparation and Filing of Registration Statements*, Release No. 33-4666 (Feb. 7, 1964) [29 FR 2490, 2492 (Feb. 15, 1964)] (In many instances the securities to be offered are of a highly speculative nature. The speculative nature may be due to such factors as an absence of operating history of the registrant, an absence of profitable operations in recent periods, the financial position of the registrant or the nature of the business in which the registrant is engaged or proposes to engage. . . In such instances, and particularly where a lengthy prospectus cannot be avoided, there should be set forth immediately following the cover page of the prospectus a carefully organized series of short, concise paragraphs summarizing the principal factors which make the offering speculative with references to other parts of the prospectus where complete information with respect to such factors is set forth.).

[28]     For example, FSOC's Report on Climate-Related Financial Risk 2021 found that investors and businesses may experience direct financial effects from climate-related risks and observed that the costs would likely be broadly felt as they are passed through supply chains and to customers and as they reduce firms' ability to service debt or produce returns for investors. *See* 2021 FSOC Report, Chapter 1: *From Climate-Related Physical Risks to Financial Risks; From Climate-related Transition Risks to Financial Risks.* In 2023 FSOC repeated its concern that climate-related risks are an emerging and increasing threat to U.S. financial stability and stated that climate-related financial risk can manifest as and amplify traditional risks, such as credit, market, liquidity, operational, compliance, reputational, and legal risks. *See* FSOC, Annual Report 2023; *see also* letters from AGs of Cal. *et al.*; Ceres; PIMCO; and Wellington Mgmt; *infra* note 99 and accompanying text.

[29]     *See, e.g.*, Greg Ritchie, Bloomberg, *90% of World's Biggest Firms Will Have at Least One Asset Exposed to Climate Risk, Fresh Data Show* (Sept. 15, 2022) (stating that over 90% of the world's largest companies will have at least one asset financially exposed to climate risks such as wildfires or floods by the 2050s, and more than a third of those companies will see at least one asset lose 20% or more of its value as a result of climate-related events).

[30]     *See, e.g.*, McKinsey & Company, *How electric vehicles will shape the future* (Apr. 23, 2022), available at https://www.mckinsey.com/featured-insights/themes/how-electric-vehicles-will-shape-the-future (predicting that by 2035, the major automotive markets will be fully electric).

[31]     *See, e.g.*, Amrith Ramkumar, Wall Street Journal, *JPMorgan Makes One of the Biggest Bets Ever on Carbon Removal* (May 23, 2023), available at https://www.wsj.com/articles/jpmorgan-makes-one-of-the-biggest-bets-ever-on-carbon-removal-c7d5fe63 (noting that "JPMorgan Chase has agreed to invest more than $200 million to purchase credits from several companies in the nascent [carbon removal] industry").

App.20

material changes in a company's business model or strategy and may have a material impact on a registrant's financial condition or operations.[32]

In addition to these market forces, changes in law, regulation, or policy may prompt companies to transition to lower carbon products, practices, and services. For example, governments including the United States and others throughout the world have made public commitments to transition to a lower carbon economy.[33] Efforts towards meeting GHG reduction goals[34] could have financial effects that materially impact registrants.[35] Recently both

---

[32] *See, e.g.*, BlackRock, *Managing the net-zero transition* (Feb. 2022), available at https://www.blackrock.com/corporate/literature/whitepaper/bii-managing-the-net-zero-transition-february-2022.pdf ("On top of physical climate risks, companies and asset owners must now grapple with the transition [to a net-zero economy]. Economies will be reshaped as carbon emissions are cut. The transition will involve a massive reallocation of resources. Supply and demand will shift, with mismatches along the way. Value will be created and destroyed across companies.").

[33] *See* United Nations, *Net Zero*, available at https://www.un.org/en/climatechange/net-zero-coalition ("More than 140 countries, including the biggest polluters – China, the United States, India and the European Union – have set a net-zero target . . . .").

[34] *See, e.g.*, Press Statement, Antony J. Blinken, Secretary of State, The United States Officially Rejoins the Paris Agreement (Feb. 19, 2021), available at https://www.state.gov/the-united-states-officially-rejoins-the-paris-agreement/. Over 190 countries have signed the Paris Climate Agreement, which aims to limit global temperature rise. Moreover, at the UN Climate Change Conference (COP 26), the United States committed to become net zero by 2050, China by 2060, and India by 2070. Further, over 100 countries including the U.S. formed a coalition to reduce methane emissions by 30 % by 2030. *See David Worford*, COP26 Net Zero Commitments will Speed Energy Transition, Increase Pressure on Industries, According to Moody's Report, Environment+Energy Leader (Nov. 17, 2021), available athttps://www.environmentenergyleader.com/2021/11/cop26-net-zero-commitments-will-speed-energy-transition-increase-pressure-on-industries-according-to-moodys-report/. At COP27, participating countries (which included the U.S.) reaffirmed their commitment to limit global temperature rise and agreed to provide "loss and damage" funding for vulnerable countries hit hard by climate disasters. *See* United Nations Climate Change, *COP27 Reaches Breakthrough Agreement on New "Loss and Damage" Fund for Vulnerable Countries* (Nov. 20, 2022), available at https://unfccc.int/news/cop27-reaches-breakthrough-agreement-on-new-loss-and-damage-fund-for-vulnerable-countries. More recently, at COP 28, participating countries (which included the U.S.) signed an agreement that includes commitments for "deep emissions cuts and scaled-up finance." *See* United Nations Climate Change, *COP28 Agreement Signals "Beginning of the End" of the Fossil Fuel Era* (Dec. 13, 2023), available at https://unfccc.int/news/cop28-agreement-signals-beginning-of-the-end-of-the-fossil-fuel-era.

[35] *See, e.g.*, letter from Eni SpA ("[C]ompanies should discuss the reference scenario in which they are acting, providing information about any emerging trends, demands, uncertainties, commitments or events that are reasonably likely to have material impacts on the company's future profitability and growth prospects in

the Federal Government and several State governments have adopted or proposed laws and regulations that incentivize companies to reduce their GHG emissions and transition to a lower carbon economy in a variety of ways.[36] How a registrant assesses and plans in response to such legislative and regulatory efforts and going forward complies with such laws and regulations, may have a significant impact on its financial performance and investors' return on their investment in the company.

Further, as reflected in comments received in response to the proposed rules and as discussed throughout this release, investors seek to assess the climate-related risks that registrants face and evaluate how registrants are measuring and responding to those risks.[37] Effective disclosures regarding climate-related risks can help investors better assess how registrants are measuring and responding to those risks. Those assessments can, in turn, inform investment and voting decisions.

We agree with the many commenters that stated that the current state of climate-related disclosure has resulted in inconsistent, difficult to compare, and frequently boilerplate disclosures, and has therefore proven inadequate to meet the growing needs of investors for more detailed, consistent, reliable, and comparable information about climate-related effects on a registrant's business and financial condition to use in making their investment and voting

---

dependence of likely or possible evolution of the regulatory or competitive environment in response to the global need to achieve the goals of the Paris Agreement."); *see also infra* note 108 and accompanying text (citing comment letters that stated that, as governments and registrants have increasingly made pledges and enacted laws regarding a transition to a lower carbon economy, more consistent and reliable climate-related disclosure has become particularly important to help investors assess the reasonably likely financial impacts to a registrant's business, results of operations, and financial condition in connection with such governmental pledges or laws and the related financial and operational impacts of a registrant's progress in achieving its publicly announced, climate-related targets and goals).

[36]    *See infra* section II.C for examples of Federal law and State regulation that may be sources of climate-related risk, particularly transition risk, for registrants.

[37]    *See, e.g.*, *infra* notes 99-106 and accompanying text.

decisions.[38]  Since the Commission issued the 2010 Guidance, awareness of climate-related risks

to registrants has grown.[39]  Retail and institutional investors[40] and investor-led initiatives[41] have

increasingly expressed the need for more reliable information about the effects of climate-related

risks, as well as information about how registrants have considered and addressed climate-related

risks and opportunities when conducting operations and developing business strategy and

financial plans.[42]  At the same time, many companies have made climate-related commitments to

---

[38]  *See, e.g.*, letters from AllianceBernstein; BlackRock, Inc. (June 17, 2022) ("BlackRock"); CalPERS; CalSTRS; Calvert Research and Management (June 17, 2022) ("Calvert"); Decatur Capital Management (May 29, 2022); Domini Impact; Harvard Management Company (June 6, 2022) ("Harvard Mgmt."); Impax Asset Management (May 12, 2022) ("Impax Asset Mgmt."); Trillium; and Wellington Mgmt.  *But see, e.g.*, letters from the U.S. Chamber of Commerce (June 16, 2022) ("Chamber") (June 16, 2022); National Association of Manufacturers (June 6, 2022) ("NAM") (June 6, 2022); and Society for Corporate Governance (June 17, 2022) ("Soc. Corp. Gov.").

[39]  *See, e.g.*, *supra* notes 28-32.

[40]  Although some commenters stated that only institutional investors have demanded that the Commission adopt climate-related disclosure requirements, *see, e.g.*, letters from Chamber and Soc. Corp. Gov., most individual retail investors and firms advising such investors who submitted comments supported the proposed rules.  *See, e.g.*, letters from Barry Gillespie (June 8, 2022); Betterment (June 17, 2022); Helene Marsh (June 7, 2022); and Rodney Smith (June 13, 2022); *see also* letter from Investment Company Institute (June 17, 2022) ("ICI") (supporting "key components of the proposal" and noting that its "members, US regulated funds . . . serv[e] more than 100 million investors" and "clearly have a significant interest in how the nature and availability of climate-related risk information provided by public companies evolves" and "analyze this, and other, information in formulating their investment decisions on behalf of those millions of long-term individual investors").

[41]  See Proposing Release, section I.C.1 for a discussion of some of these investor-led initiatives.  Among other initiatives discussed in the Proposing Release, in 2019, more than 630 investors collectively managing more than $37 trillion signed the Global Investor Statement to Governments on Climate Change urging governments to require climate-related financial reporting.  *See* United Nations Climate Change, *631 Institutional Investors Managing More than USD 37 Trillion in Assets Urge Governments to Step up Climate Ambition* (Dec. 9, 2019), available at https://unfccc.int/news/631- institutional-investors-managing-more-than-usd-37-trillion-in-assets-urge-governments-to-step-up.  This investor initiative continued as the Investor Agenda's 2021 Global Investor Statement to Governments on the Climate Crisis, which was signed by 733 global institutional investors, including some of the largest investors, with more than $52 trillion in assets under management in the aggregate.  This statement called for governments to implement a number of measures, including mandating climate risk disclosure.  *See* The Investor Agenda, 2021 Global Investor Statement to Governments on the Climate Crisis (Oct. 27, 2021), available at https://theinvestoragenda.org/wp-content/uploads/2021/09/2021-Global-Investor-Statementto-Governments-on-the-Climate-Crisis.pdf.  *But see* letter from Lawrence Cunningham for Twenty Professors of Law and Finance, George Washington University (Feb. 29, 2024) (noting that some large institutional asset managers or investors have recently withdrawn membership from certain of the investor-led initiatives described in the Proposing Release).

[42]  *See, e.g.*, letters from AllianceBernstein; CalPERS; CalSTRS; Domini Impact; Harvard Mgmt; Impax Asset Mgmt; Trillium; and Wellington Mgmt.

reduce GHG emissions or become "net zero" by a particular date.[43]  In response, investors have expressed the need for more detailed information to aid their investment and voting decisions, including insight into the potential impacts on registrants associated with fulfilling such commitments.[44]

## B.  Summary of the Final Rules

Having considered the comments received on the proposal, we are adopting the final amendments described in this release with modifications in response to those comments.[45]

Like the proposed rules, the final rules' reporting framework has structural elements, definitions, concepts, and, in some cases, substantive requirements that are similar to those in the Task Force on Climate-related Financial Disclosure ("TCFD"), an industry-led task force charged with promoting better-informed investment, credit, and insurance underwriting

---

[43]    *See* Proposing Release, section I.C.1.  *See also* Dieter Holger and Pierre Bertrand, *U.N. Group Recommends Stricter Rules Over Net-Zero Pledges*, The Wall Street Journal (Nov. 8, 2022) (stating that roughly 800 of the world's 2,000 largest public companies by revenue have committed to get to net zero emissions by 2050 or sooner); and United Nations, *Recognizing growing urgency, global leaders call for concrete commitments for clean, affordable energy for all by 2030 and net-zero emissions by 2050* (May 26, 2021).

[44]    *See, e.g.*, letters from Calvert; Ceres; Investment Adviser Association (June 17, 2022) ("IAA"); and PIMCO.  *See also* Climate Action 100+, As The 2023 Proxy Season Continues, Investors Are Calling On Climate Action 100+ Focus Companies For More Robust Climate Action (May 9, 2023) (stating that in addition to more robust corporate governance on climate, investors are calling for disclosure on key issues including greenhouse gas emissions targets, transition plans (including policies to ensure a just transition for workers and communities), and reporting on methane measurements); Climate Action 100+, Climate Action 100+ Net Zero Company Benchmark Shows Continued Progress On Ambition Contrasted By A Lack Of Detailed Plans Of Action (Oct. 18, 2023); and Dieter Holger, Corporate Climate Plans Fall Well Short of Targets, With a Few Bright Spots, The Wall Street Journal (Feb. 13, 2023).

[45]    As stated above, the Commission received a large number of comments on the proposal, and we considered all of those comments.  Nevertheless, considering the overlapping content and themes in the comments, and for the sake of clarity, we have not cited each individual comment letter in support of or against a particular position in the discussion below.

App.24

Appellate Case: 24-1628     Page: 29     Date Filed: 03/26/2024 Entry ID: 5377362

decisions.[46]  The TCFD reporting framework was designed to elicit information to help investors better understand a registrant's climate-related risks to make more informed investment decisions.[47]  We therefore find that it is an appropriate reference point for the final rules.  Indeed, the core categories of the framework, which focus on governance, risk management, strategy, and metrics,[48] align with the type of information called for by existing disclosure requirements within Regulation S-K.[49]  Accordingly, where consistent with our objectives, the authority Congress granted, and the comments received, certain provisions in the final rules are similar to the TCFD recommendations.[50]  Similarly, we have used concepts developed by the GHG Protocol for aspects of the final rules, as it has become a leading reporting standard for GHG emissions.[51]  Because many registrants have elected to follow the TCFD recommendations when

---

[46]   *See* TCFD, Recommendations of the Task Force on Climate-related Financial Disclosures (June 2017), available at https://assets.bbhub.io/company/sites/60/2020/10/FINAL-2017-TCFD-Report-11052018.pdf. In Apr. 2015, the Group of 20 Finance Ministers directed the Financial Stability Board ("FSB") to evaluate ways in which the financial sector could address climate-related concerns.  The FSB concluded that better information was needed to facilitate informed investment decisions and to help investors and other market participants to better understand and take into account climate-related risks.  The FSB established the TCFD.  Since then, the framework for climate-related disclosures developed by the TCFD has been refined and garnered global support as a reliable framework for climate-related financial reporting.  For background on the TCFD and development of its recommendations, *see* Proposing Release, section I.D.1.

[47]   *See* TCFD, *supra* note 46, at ii-iii.

[48]   *See* TCFD, *supra* note 4646 (listing governance, strategy, risk management, and metrics and targets as core elements of the TCFD framework).

[49]   *See, e.g.*, 17 CFR 229.105 (Risk factors), 17 CFR 229.303 (Management's discussion and analysis of financial condition and results of operation), 17 CFR 229.401 (Directors, executive officers, promoters and control persons), and 17 CFR 229.407 (Corporate governance).

[50]   As discussed below, a number of commenters recommended that the Commission incorporate the TCFD recommendations into the final rules.  *See infra* notes 115-118 and accompanying text.

[51]   *See* World Business Council for Sustainable Development and World Resources Institute, *The Greenhouse Gas Protocol, A Corporate Accounting and Reporting Standard* REVISED EDITION, available at https://ghgprotocol.org/corporate-standard.  The GHG Protocol was created through a partnership between the World Resources Institute and the World Business Council for Sustainable Development, which agreed in 1997 to collaborate with businesses and NGOs to create a standardized GHG accounting methodology. *See* Greenhouse Gas Protocol, *About Us*, available at https://ghgprotocol.org/about-us. The GHG Protocol, which is subject to updates periodically, has been broadly incorporated into various sustainability reporting frameworks, including the TCFD.

voluntarily providing climate-related disclosures,[52] and/or have relied on the GHG Protocol

when reporting their GHG emissions,[53] building off these reporting frameworks will mitigate

those registrants' compliance burdens and help limit costs.[54]  Building off the TCFD framework

and the GHG Protocol will also benefit those investors seeking to make comparisons between

Commission registrants and foreign companies not registered under the Federal securities laws

that make disclosures under the TCFD framework and GHG Protocol, mitigating the challenges

they experience when making investment and voting decisions.[55]  Nevertheless, while the final

rules use concepts from both TCFD and the GHG Protocol where appropriate, the rules diverge

from both of those frameworks in certain respects where necessary for our markets and

registrants and to achieve our specific investor protection and capital formation goals.

### 1.  Content of the Climate-Related Disclosures

The final rules will create a new subpart 1500 of Regulation S-K and Article 14 of

Regulation S-X.  In particular, the final rules will require a registrant to disclose information

about the following items:

---

[52]    *See, e.g.*, *infra* note 2690 and accompanying text (describing a report finding that 50 percent of sustainability reports from Russell 1000 companies aligned with the TCFD recommendations).  In addition, many registrants submit climate disclosures to the CDP, formerly known as the "Carbon Disclosure Project," which is aligned with the TCFD framework.  *See* CDP Worldwide ("CDP"), *How CDP is aligned to the TCFD*, available at https://www.cdp.net/en/guidance/how-cdp-is-aligned-to-the-tcfd (last visited Feb. 21, 2024); CDP, *How companies can take action*, available at https://www.cdp.net/en/companies (noting that "23,000+ companies representing two thirds of global market capitalization disclosed through CDP in 2023"); *see also* CDP, *About us*, available at https://www.cdp.net/en/info/about-us ("CDP is a not-for-profit charity that runs the global disclosure system for investors, companies, cities, states and regions to manage their environmental impacts. . . . CDP was established as the 'Carbon Disclosure Project' in 2000, asking companies to disclose their climate impact.").  In addition, several international climate disclosure initiatives are based on the TCFD recommendations.  *See infra* section II.A.3.

[53]    *See infra* section II.A; and Proposing Release, section I.D.2; *see also infra* note 2621 (noting that, in the U.S. and other jurisdictions, GHG emissions quantification and reporting are generally based on the GHG Protocol).

[54]    *See infra* note 2760 and accompanying text.

[55]    *Cf. infra* notes 2568-2570 and accompanying text.

- Any climate-related risks identified by the registrant that have had or are reasonably likely to have a material impact on the registrant, including on its strategy, results of operations, or financial condition in the short-term (i.e., the next 12 months) and in the long-term (i.e., beyond the next 12 months);[56]

- The actual and potential material impacts of any identified climate-related risks on the registrant's strategy, business model, and outlook, including, as applicable, any material impacts on a non-exclusive list of items;[57]

- If, as part of its strategy, a registrant has undertaken activities to mitigate or adapt to a material climate-related risk, a quantitative and qualitative description of material expenditures incurred and material impacts on financial estimates and assumptions that, in management's assessment, directly result from such mitigation or adaptation activities;[58]

- If a registrant has adopted a transition plan to manage a material transition risk, a description of the transition plan, and updated disclosures in the subsequent years describing the actions taken during the year under the plan, including how the actions have impacted the registrant's business, results of operations, or financial condition, and quantitative and qualitative disclosure of material expenditures incurred and material

---

[56] *See infra* section II.D.1.

[57] *See infra* sections II.D.1.  That non-exclusive list is comprised of the registrant's: (1) business operations, including the types and locations of its operations, (2) products and services, (3) suppliers, purchasers, or counterparties to material contracts, to the extent known or reasonably available, (4) activities to mitigate or adapt to climate-related risks, including adoption of new technologies or processes, and (5) expenditure for research and development.

[58] *See infra* sections II.D.1.

impacts on financial estimates and assumptions as a direct result of the disclosed actions;[59]

- If a registrant uses scenario analysis and, in doing so, determines that a climate-related risk is reasonably likely to have a material impact on its business, results of operations, or financial condition, certain disclosures regarding such use of scenario analysis;[60]

- If a registrant's use of an internal carbon price is material to how it evaluates and manages a material climate-related risk, certain disclosures about the internal carbon price;[61]

- Any oversight by the board of directors of climate-related risks and any role by management in assessing and managing the registrant's material climate-related risks;[62]

- Any processes the registrant has for identifying, assessing, and managing material climate-related risks and, if the registrant is managing those risks, whether and how any such processes are integrated into the registrant's overall risk management system or processes;[63]

- If a registrant has set a climate-related target or goal that has materially affected or is reasonably likely to materially affect the registrant's business, results of operations, or financial condition, certain disclosures about such target or goal, including material expenditures and material impacts on financial estimates and assumptions as a direct

---

[59]     *See infra* section II.D.2.

[60]     *See infra* section II.D.3.

[61]     *See infra* section II.D.4.

[62]     *See infra* section II.E.

[63]     *See infra* section II.F.

28

result of the target or goal or actions taken to make progress toward meeting such target or goal;[64]

- If a registrant is a large accelerated filer ("LAF"),[65] or an accelerated filer ("AF")[66] that is not otherwise exempted, and its Scope 1 emissions and/or its Scope 2 emissions metrics are material, certain disclosure about those emissions;[67]

- The capitalized costs, expenditures expensed, charges, and losses incurred as a result of severe weather events and other natural conditions, such as hurricanes, tornadoes, flooding, drought, wildfires, extreme temperatures, and sea level rise, subject to applicable one percent and de minimis disclosure thresholds;[68]

---

[64] *See infra* section II.G.

[65] An LAF is an issuer after it first meets the following conditions as of the end of its fiscal year: (i) the issuer had an aggregate worldwide market value of the voting and non-voting common equity held by its non-affiliates of $700 million or more, as of the last business day of the issuer's most recently completed second fiscal quarter; (ii) the issuer has been subject to the requirements of Section 13(a) or 15(d) of the Exchange Act for a period of at least twelve calendar months; (iii) the issuer has filed at least one annual report pursuant to Section 13(a) or 15(d) of the Exchange Act; and (iv) the issuer is not eligible to use the requirements for SRCs under the revenue test in paragraph (2) or (3)(iii)(B) of the SRC definition in Rule 12b-2. 17 CFR 240.12b-2 (defining LAF and providing how and when an issuer determines whether it qualifies as an LAF).

[66] An AF is an issuer after it first meets the following conditions as of the end of its fiscal year: (i) the issuer had an aggregate worldwide market value of the voting and non-voting common equity held by its non-affiliates of $75 million or more, but less than $700 million, as of the last business day of the issuer's most recently completed second fiscal quarter; (ii) the issuer has been subject to the requirements of Section 13(a) or 15(d) of the Exchange Act for a period of at least twelve calendar months; and (iii) the issuer has filed at least one annual report pursuant to Section 13(a) or 15(d) of the Exchange Act; and (iv) the issuer is not eligible to use the requirements for SRCs under the revenue test in paragraph (2) or (3)(iii)(B) of the SRC definition in Rule 12b-2. 17 CFR 240.12b-2 (defining AF and providing how and when an issuer determines whether it qualifies as an AF).

[67] *See infra* section II.H. The final rules define the terms "Scope 1 emissions" (direct GHG emissions from operations that are owned or controlled by a registrant) and "Scope 2 emissions" (indirect GHG emissions from the generation of purchased or acquired electricity, steam, heat, or cooling that is consumed by operations owned or controlled by a registrant).

[68] *See infra* section II.K.

- The capitalized costs, expenditures expensed, and losses related to carbon offsets and renewable energy credits or certificates ("RECs") if used as a material component of a registrant's plans to achieve its disclosed climate-related targets or goals; and[69]

- If the estimates and assumptions a registrant uses to produce the financial statements were materially impacted by risks and uncertainties associated with severe weather events and other natural conditions, such as hurricanes, tornadoes, flooding, drought, wildfires, extreme temperatures, and sea level rise, or any disclosed climate-related targets or transition plans, a qualitative description of how the development of such estimates and assumptions was impacted.[70]

In addition, under the final rules, a registrant that is required to disclose Scopes 1 and/or 2 emissions and is an LAF or AF must file an attestation report in respect of those emissions subject to phased in compliance dates. An AF must file an attestation report at the limited assurance level beginning the third fiscal year after the compliance date for disclosure of GHG emissions. An LAF must file an attestation report at the limited assurance level beginning the third fiscal year after the compliance date for disclosure of GHG emissions, and then file an attestation report at the reasonable assurance level beginning the seventh fiscal year after the compliance date for disclosure of GHG emissions. The final rules also require a registrant that is not required to disclose its GHG emissions or to include a GHG emissions attestation report pursuant to the final rules to disclose certain information if the registrant voluntarily discloses its GHG emissions in a Commission filing and voluntarily subjects those disclosures to third-party assurance.

---

[69]     *See infra* section II.K.

[70]     *See infra* section II.K.

Appellate Case: 24-1628     Page: 35     Date Filed: 03/26/2024 Entry ID: 5377362

The final rules reflect a number of modifications to the proposed rules based on the comments we received. As discussed in more detail below, we have revised the proposed rules in several respects, including by:

- Adopting a less prescriptive approach to certain of the final rules, including, for example, the climate-related risk disclosure, board oversight disclosure, and risk management disclosure requirements;[71]

- Qualifying the requirements to provide certain climate-related disclosures based on materiality, including, for example, disclosures regarding impacts of climate-related risks, use of scenario analysis, and maintained internal carbon price;

- Eliminating the proposed requirement to describe board members' climate expertise;

- Eliminating the proposed requirement for all registrants to disclose Scope 1 and Scope 2 emissions and instead requiring such disclosure only for LAFs and AFs, on a phased in basis, and only when those emissions are material and with the option to provide the disclosure on a delayed basis;

- Exempting SRCs and EGCs from the Scope 1 and Scope 2 emissions disclosure requirement;

- Modifying the proposed assurance requirement covering Scope 1 and Scope 2 emissions for AFs and LAFs by extending the reasonable assurance phase in period for LAFs and requiring only limited assurance for AFs;

- Eliminating the proposed requirement to provide Scope 3 emissions disclosure (which the proposal would have required in certain circumstances);

---

[71]     See *infra* sections II.C.1.c, II.E.1.c, and II.F.3 for discussions of how we made these disclosure requirements less prescriptive as compared to the proposed rules.

- Removing the requirement to disclose the impact of severe weather events and other natural conditions and transition activities on each line item of a registrant's consolidated financial statements;

- Focusing the required disclosure of financial statement effects on capitalized costs, expenditures expensed, charges, and losses incurred as a result of severe weather events and other natural conditions in the notes to the financial statements;

- Requiring disclosure of material expenditures directly related to climate-related activities as part of a registrant's strategy, transition plan and/or targets and goals disclosure requirements under subpart 1500 of Regulation S-K rather than under Article 14 of Regulation S-X;

- Extending a safe harbor from private liability for certain disclosures, other than historic facts, pertaining to a registrant's transition plan, scenario analysis, internal carbon pricing, and targets and goals;[72]

- Eliminating the proposal to require a private company that is a party to a business combination transaction, as defined by Securities Act Rule 165(f), registered on Form S-4 or F-4 to provide the subpart 1500 and Article 14 disclosures;

- Eliminating the proposed requirement to disclose any material change to the climate-related disclosures provided in a registration statement or annual report in a Form 10-Q (or, in certain circumstances, Form 6-K for a registrant that is a foreign private issuer that does not report on domestic forms); and

---

[72] In addition, the existing safe harbors for forward-looking statements under the Securities Act and Exchange Act will be available for other aspects of the climate-related disclosures. *See* Securities Act section 27A [15 U.S.C. 77z-2], Exchange Act section 21E [15 U.S.C. 78u-5], 17 CFR 230.175 ("Securities Act Rule 175") and 17 CFR 240.3b-6 ("Exchange Act Rule 3b-6").

Appellate Case: 24-1628    Page: 37    Date Filed: 03/26/2024 Entry ID: 5377362

- Extending certain phase in periods.

## 2. Presentation and Submission of the Climate-Related Disclosures

The final rules provide that a registrant (both domestic and foreign private issuer[73]) must:

- File the climate-related disclosure in its registration statements and Exchange Act annual reports;[74]

- Include the climate-related disclosures required under Regulation S-K, except for any Scopes 1 and/or 2 emissions disclosures, in a separate, appropriately captioned section of its filing or in another appropriate section of the filing, such as Risk Factors, Description of Business, or Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A"), or, alternatively, by incorporating such disclosure by reference from another Commission filing as long as the disclosure meets the electronic tagging requirements of the final rules;[75]

- If required to disclose its Scopes 1 and 2 emissions,[76] provide such disclosure:
  - o If a registrant filing on domestic forms, in its annual report on Form 10-K, in its quarterly report on Form 10-Q for the second fiscal quarter in the fiscal year immediately following the year to which the GHG emissions metrics disclosure

---

[73] As defined by Commission rules, a foreign private issuer is any foreign issuer other than a foreign government except an issuer meeting the following conditions as of the last business day of its most recently completed second fiscal quarter: more than 50% of the outstanding voting securities of such issuer are directly or indirectly owned of record by residents of the United States; and either the majority of its executive officers or directors are United States citizens or residents, more than 50% of the assets of the issuer are located in the United States, or the business of the issuer is administered principally in the United States. *See* 17 CFR 230.405 and 17 CFR 240.3b-4. *See infra* section II.L.3 for a discussion of certain types of registrants (both domestic and foreign private issuer) that are not subject to the final rules.

[74] *See infra* section II.N.3.

[75] *See infra* section II.A.3.

[76] *See, e.g.*, *infra* section II.H.3.c (noting that unlike the proposed rules, which would have exempted SRCs from the requirement to disclose Scope 3 emissions, the final rules will exempt SRCs and EGCs from any requirement to disclose its GHG emissions, including its Scopes 1 and 2 emissions).

relates incorporated by reference into its Form 10-K,or in an amendment to its Form 10-K filed no later than the due date for the Form 10-Q for its second fiscal quarter;[77]

- o If a foreign private issuer not filing on domestic forms, in its annual report on Form 20-F, or in an amendment to its annual report on Form 20-F, which shall be due no later than 225 days after the end of the fiscal year to which the GHG emissions metrics disclosure relates;[78] and

- o If filing a Securities Act or Exchange Act registration statement, as of the most recently completed fiscal year that is at least 225 days prior to the date of effectiveness of the registration statement;

- If required to disclose Scopes 1 and 2 emissions, provide such disclosure for the registrant's most recently completed fiscal year and, to the extent previously disclosed, for the historical fiscal year(s) included in the filing;[79]

- If required to provide an attestation report over Scope 1 and Scope 2 emissions, provide such attestation report and any related disclosures in the filing that contains the GHG emissions disclosures to which the attestation report relates;[80]

- Provide the financial statement disclosures required under Regulation S-X for the registrant's most recently completed fiscal year, and to the extent previously disclosed or required to be disclosed, for the historical fiscal year(s) included in the filing, in a note to the registrant's audited financial statements;[81] and

---

[77]   *See infra* section II.H.3.d.

[78]   *See infra* section II.H.3.d.

[79]   *See infra* section II.H.3.d.

[80]   *See infra* section II.I.

[81]   *See infra* section II.K.

Appellate Case: 24-1628     Page: 39     Date Filed: 03/26/2024 Entry ID: 5377362

- Electronically tag both narrative and quantitative climate-related disclosures in Inline XBRL.[82]

### 3. Safe Harbor for Certain Climate-Related Disclosures

The final rules provide a safe harbor for climate-related disclosures pertaining to transition plans, scenario analysis, the use of an internal carbon price, and targets and goals, provided pursuant to Regulation S-K sections 229.1502(e), 229.1502(f), 229.1502(g), and 229.1504. The safe harbor provides that all information required by the specified sections, except for historical facts, is considered a *forward-looking statement* for purposes of the Private Securities Litigation Reform Act ("PSLRA")[83] safe harbors for forward-looking statements provided in section 27A of the Securities Act[84] and section 21E of the Exchange Act[85] ("PSLRA safe harbors").[86]

### 4. Phase in Periods

As discussed in more detail below,[87] the final rules will be phased in for all registrants, with the compliance date dependent upon the status of the registrant as an LAF, an AF, a non-accelerated filer ("NAF"),[88] SRC, or EGC, and the content of the disclosure.

---

[82] *See infra* section II.M.3.

[83] Pub. Law 104-67, 109 Stat. 737.

[84] 15 U.S.C. 77z-2.

[85] 15 U.S.C. 78u-5.

[86] *See infra* sections II.D and II.J.3.

[87] *See infra* section II.O.

[88] Although Rule 12b-2 defines the terms "accelerated filer" and "large accelerated filer," *see supra* notes 65-66, it does not define the term "non-accelerated filer." If an issuer does not meet the definition of AF or LAF, it is considered a NAF. *See Accelerated Filer and Large Accelerated Filer Definitions*, Release No. 34-88365 (Mar. 12, 2020) [85 FR 17178, 17179 n.5 (Mar. 26, 2020)].

Appellate Case: 24-1628    Page: 40    Date Filed: 03/26/2024 Entry ID: 5377362

## II. DISCUSSION

### A. Overview and Purpose of the Climate-Related Disclosure Rules

#### 1. Proposed Rules

##### a. Consistent, Comparable, and Reliable Disclosures for Investors

The Commission proposed the climate-related disclosure rules in order to elicit more consistent, comparable, and reliable information for investors to enable them to make informed assessments of the impact of climate-related risks on current and potential investments.[89] Accordingly, the Commission proposed to amend Regulation S-K to add a new subpart 1500 that would require a registrant to disclose: any material climate-related impacts on its strategy, business model, and outlook; its governance of climate-related risks; its climate-related risk management; GHG emissions metrics; and climate-related targets and goals, if any.[90]

The Commission also proposed to amend Regulation S-X to add a new article (Article 14), which would have required a registrant to disclose in a note to its financial statements certain disaggregated climate-related financial statement metrics.[91] The proposed rules would have required disclosure falling under the following three categories of information: financial impact metrics; expenditure metrics; and financial estimates and assumptions. The Commission proposed the financial statement metrics requirement to increase transparency about how climate-related risks impact a registrant's financial statements.[92] Under the proposed amendments to both Regulation S-K and Regulation S-X, disclosure of climate-related opportunities would be optional.

---

[89]   *See* Proposing Release, section I.B.

[90]   *See id.*

[91]   *See id.*

[92]   *See* Proposing Release, section II.A.1.

As noted above, the proposed rules were modeled on the TCFD disclosure framework.[93] The TCFD framework consists of four core themes that provide a structure for the assessment, management, and disclosure of climate-related financial risks: governance, strategy, risk management, and metrics and targets.[94] The Commission proposed to model its climate-related disclosure rules on the TCFD framework given that many registrants and their investors are already familiar with the framework and are making disclosures voluntarily consistent with the framework. The Commission indicated that this should help to mitigate both the compliance burden for registrants and any burdens faced by investors in analyzing the new disclosures and would facilitate comparability across registrants.[95]

### b. Proposed Location of the Disclosure

In proposing to include the climate-related disclosure rules in Regulation S-K and Regulation S-X, the Commission stated its belief that the proposed disclosure would be fundamental to investors' understanding of the nature of a registrant's business and its operating prospects and financial performance and, therefore, should be presented together with other disclosure about the registrant's business and financial condition.[96] The Commission proposed to require a registrant to include the climate-related disclosure in Securities Act or Exchange Act registration statements and Exchange Act annual reports in a separately captioned "Climate-Related Disclosure" section and in the financial statements. The Commission stated that the proposed presentation would facilitate review of the climate-related disclosure by investors

---

[93]     *See supra* section I.B.

[94]     *See* TCFD, *supra* note 4646, at iv.

[95]     *See* Proposing Release, section II.A.1.

[96]     *See* Proposing Release, section II.A.2.

alongside other relevant company financial and non-financial information and further the comparability of the disclosure across registrants.[97]

The Commission also proposed to permit a registrant to incorporate by reference disclosure from other parts of the registration statement or annual report (*e.g.*, Risk Factors, MD&A, Description of Business, or the financial statements) or from other filed or submitted reports into the Climate-Related Disclosure section if it would be responsive to the topics specified in the proposed Regulation S-K items and if the registrant satisfied the incorporation by reference requirements under the Commission's rules and forms. As the Commission explained, allowing incorporation by reference for the Regulation S-K climate-related disclosure would be consistent with the treatment of other types of business disclosure under our rules and would provide some flexibility for registrants while reducing redundancy in disclosure.[98]

## 2. Comments

Many commenters, including both investors and registrants, stated that climate-related risks can have material impacts on companies' financial position or performance.[99] Commenters indicated that when it is available, information about climate-related risks is currently used to assess the future financial performance of public companies and inform investment decision-making.[100] Some commenters provided specific examples of how that type of information helps

---

[97] *See id.*

[98] *See id.*

[99] *See, e.g.*, letters from AllianceBernstein; Alphabet *et al.*; Amazon (June 17, 2022); Americans for Financial Reform Education Fund, Public Citizen, Sierra Club, Ocean Conservancy, and the Sunrise Project (June 16, 2022) ("Amer. for Fin. Reform, Sunrise Project *et al.*"); Bloomberg L.P. (June 22, 2022) ("Bloomberg"); CalPERS (June 15, 2022); CalSTRS (June 17, 2022); Calvert; Ceres; Harvard Mgmt.; IAA; Miller/Howard; Morningstar, Inc. (June 16, 2022) ("Morningstar"); Soros Fund; and Wellington Mgmt.

[100] *See, e.g.*, letters from AllianceBernstein; Amer. for Fin. Reform, Sunrise Project *et al.*; CalPERS; CalSTRS; Calvert; Ceres; Miller/Howard; Soros Fund; and Wellington Mgmt.

investors make investment decisions today.[101]  However, many commenters stated that the

Commission's current reporting requirements do not yield adequate or sufficient information

regarding climate-related risks.[102]  Many commenters also expressed the view that the current,

largely voluntary reporting of climate-related information under various third-party frameworks,

which differ in certain respects, has allowed registrants to selectively choose which climate-

related disclosures to provide and has failed to produce complete, consistent, reliable, and

comparable information with the level of detail needed by investors to assess the financial impact

of climate-related risks on registrants.[103]  Commenters stated that, despite the Commission's

issuance of the 2010 Guidance, registrants often provided climate-related disclosure that is

boilerplate, with some being or bordering on "greenwashing."[104]  Commenters further indicated

that investors, both institutional and retail,[105] were in need of more consistent and comparable

---

[101]  *See, e.g.*, letters from CalSTRS; Calvert; and Wellington Mgmt.

[102]  *See, e.g.*, letters from AllianceBernstein; Amer. for Fin. Reform, Sunrise Project *et al.*; As You Sow (June 21, 2022); BlackRock; Bloomberg; Boston Common Asset Mgmt.; CalPERS; CalSTRS; Calvert; Ceres; Consumer Federation of America (June 17, 2022) ("CFA"); Franklin Templeton Investments (June 17, 2022) ("Franklin Templeton"); Harvard Mgmt.; IAA; Miller/Howard; Morningstar; New York State Comptroller (June 3, 2022) ("NY St. Comptroller"); Principles for Responsible Investment (Consultation Response) (June 17, 2022) ("PRI"); Soros Fund; Union of Concerned Scientists (June 17, 2022) ("UCS"); US SIF (June 17, 2022); and Wellington Mgmt.

[103]  *See, e.g.*, letters from BlackRock; Bloomberg; Calvert; Ceres; Franklin Templeton; Miller/Howard; PRI; and US SIF.

[104]  *See, e.g.*, letters from Ceres; Interfaith Center on Corporate Responsibility (June 17, 2022) ("ICCR"); and Maple-Brown Abbott (May 31, 2022) ("Maple-Brown").  As the Commission stated when proposing the climate disclosure rules, there does not appear to be a universally accepted definition of "greenwashing." *See* Proposing Release, section IV.C.1.  The Commission did not define greenwashing in the Proposing Release and is not defining it now.  As a general matter, others have defined greenwashing to mean the set of activities conducted by firms or funds to falsely convey to investors that their investment products or practices are aligned with environmental or other ESG principles.  *See* Proposing Release, section IV.C.1. *See also* OICU-IOSCO Supervisory Practices to Address Greenwashing, (Dec 2023), available at https://www.iosco.org/library/pubdocs/pdf/IOSCOPD750.pdf.

[105]  *See, e.g.*, letters from Americans for Financial Reform Education Fund and Public Citizen (June 16, 2022) ("Amer. for Fin. Reform and Public Citizen") (noting that the commenters commissioned a survey of retail

---

climate-related disclosure to enable them to make fully informed decisions and ensure securities

are priced to better reflect climate-related risk.[106] Commenters indicated that adoption of

mandatory, climate-related disclosure rules would improve the timeliness, quality, and reliability

of climate-related information, which would facilitate investors' comparison of climate-related

risks and lead to more accurate securities valuations.[107] Commenters also stated that, as

governments and registrants have increasingly made pledges and enacted laws regarding a

transition to a lower carbon economy, more consistent and reliable climate-related disclosure has

become particularly important to help investors assess the reasonably likely financial impacts to

a registrant's business, results of operations, and financial condition in connection with such

---

investors and describing the results of that survey as "show[ing] that investors care about climate-related risks and opportunities of public companies, support the SEC requiring climate-related disclosures with third-party audit, and would factor the information disclosed into their investment practices"); Ceres (Dec. 2, 2022); and PRI; *see also supra* note 40 (noting that most individual retail investors and firms advising such investors who submitted comments supported the proposed rules and citing comment letters from some retail investors and investment advisers in support of that proposition); *infra* note 139 (citing several comment letters in support of the proposition that retail investors have stated that they found much of the voluntary climate-related reporting to be lacking in quality and completeness and difficult to compare and as a result have incurred costs and inefficiencies when attempting to assess climate-related risks and their effect on the valuation of a registrant's securities). *But see, e.g.*, letter from Soc. Corp. Gov. (asserting that the retail investor survey in the letter from Amer. for Fin. Reform and Public Citizen "do[es] not support the position that retail investors demand more climate-related information in companies' SEC filings, and certainly not the detailed disclosures that would be required under the Proposed Rule" based on its criticisms of the questions in the survey and calculation methodologies that the letter Amer. for Fin. Reform and Public Citizen used to report findings from the survey).

[106]   *See, e.g.*, letters from Bloomberg; Ceres; and Miller/Howard.

[107]   *See, e.g.*, letters from CalSTRS (stating that "[u]sing the TCFD framework as the basis for guiding issuers to more comparable disclosures would help [investors] more easily compare companies' approach to climate risk management in a timelier fashion"); Ceres (stating that "the proposed rule would promote both allocative and informational efficiency" and that "[t]imely, comparable information about each company's climate related risks and opportunities would improve informational efficiency, leading to more accurate valuation"); and PwC (stating that "[m]andatory disclosure in annual filings—including the notes to the financial statements—would enhance comparability while ensuring that the timeliness, quality, and reliability of climate information is commensurate with that of the financial data").

governmental pledges or laws and the related financial and operational impacts of a registrant's progress in achieving its publicly announced, climate-related targets and goals.[108]

Other commenters, however, opposed adoption of the proposed rules and requested either that the Commission rescind the proposal or make significant revisions in the final rules.[109] Some of these commenters, while opposing specific aspects of the proposed rules, agreed with the overall intent of the proposal or otherwise stated that rules requiring climate-related information were appropriate and would be helpful to investors.[110] As discussed in more detail below, other commenters asserted that the Commission lacks statutory authority to adopt the proposed climate-related disclosure rules.[111] Other commenters asserted that current voluntary reporting practices are sufficient to serve the needs of investors and markets, and so the proposed

---

[108] *See, e.g.*, letters from Amer. for Fin. Reform (Dec. 1, 2022) (stating that, with passage of the Inflation Reduction Act, investors will need the Commission's proposed climate-related disclosures to determine which companies and sectors are best positioned and ready to capitalize on the IRA's GHG reduction incentives over the coming decade, and to analyze the progress towards and profitability of companies' transition strategies in this new investment context); CalPERS; and Ceres.

[109] *See, e.g.*, letters from American Bar Association, Business Law Section (June 24, 2022) ("ABA"); Chamber; David R. Burton, Senior Fellow in Economic Policy, The Heritage Foundation (June 17, 2022) ("D. Burton, Heritage Fdn."); NAM; and Soc. Corp. Gov. *See also* Form Letter AG.

[110] *See* letters from Bank of America (June 17,2022) ("BOA") ("Various stakeholders, including asset owners and asset managers, will benefit from consistent, standardized disclosures addressing climate-related risks and opportunities to help them make decisions on where best to deploy capital in alignment with investor goals."); Bank Policy Institute (June 16, 2022) ("BPI"); Dominion Energy , Inc. (June 17, 2022) ("Dominion Energy") ("We believe climate-related disclosures are important to our investors and support the Commission's efforts to design rules and guidance to provide investors with the disclosures that they need in order to make informed decisions."); Long-Term Stock Exchange (June 17, 2022) ("LTSE") (stating that climate "represents an investment risk, and investors deserve to understand what public companies are doing to address this issue… [w]e believe the proposal represents a significant step toward standardizing, clarifying and verifying disclosures so as to enable investors to make more informed investment decisions…"); United Air. (June 17, 2022); and Walmart Inc. (June 17, 2022) ("Walmart") ("The Company supports the adoption of rules that can facilitate the disclosure of consistent, comparable, and reliable material climate-related information.").

[111] *See infra* section II.B. Some of these commenters stated that the Commission exceeded its statutory authority when issuing the proposed rules because those rules would require disclosure of information that is not financially material and is only of general or environmental interest. *See, e.g.*, letters from Boyden Gray (June 17, 2022); D. Burton, Heritage Fdn.; and National Ocean Industries Association (June 17, 2022) ("NOIA").

rules are unnecessary.[112]  Similarly, some opposing commenters stated that, because in their view the Commission's current disclosure regime already requires a registrant to disclose climate-related risks if material, adoption of the proposed rules would impose a significant burden on registrants while resulting in little additional benefit for investors.[113]  Opposing commenters further stated that, because the proposed rules were overly prescriptive and not bound in every instance by materiality, their adoption would result in the disclosure of a large volume of immaterial information that would be confusing for investors.[114]

Many commenters supported basing the Commission's climate disclosure rules on the TCFD framework.[115]  Commenters stated that because the TCFD framework has been widely accepted globally by both issuers and investors, its use as a model for the Commission's rules would help elicit climate-related disclosures that are consistent, comparable, and reliable.[116]  Commenters also stated that basing the Commission's climate disclosure rules on the TCFD framework would benefit investors because of their familiarity with the framework and its

---

[112]   *See, e.g.*, letters from Chamber; NAM; and Soc. Corp. Gov.

[113]   *See, e.g.*, letters from Attorneys General of the States of Texas, Alaska, Arkansas, Idaho, Indiana, Kentucky, Louisiana, Mississippi, Missouri, Montana, South Carolina, and Utah (June 17, 2022) ("AGs of TX *et al.*"); Cato Institute (June 17, 2022) ("Cato Inst."); and Society for Mining, Metallurgy, & Exploration (June 17, 2022) ("SMME").

[114]   *See, e.g.*, letters from American Petroleum Institute (June 17, 2022) ("API"); Business Roundtable (June 17, 2022); Chamber; ConocoPhillips (June 17, 2022); Fenwick & West (June 17, 2022) ("Fenwick West"); Soc. Corp. Gov.; and Williams Companies (June 17, 2022) ("Williams Cos.").

[115]   *See, e.g.,* letters from AllianceBernstein; Alphabet *et al.*; As You Sow; Alan Beller, Daryl Brewster, Robert G. Eccles, Camen X. W. Lu, David A. Katz, and Leo E. Strine, Jr. (June 16, 2022) ("Beller *et al.*"); BHP (June 13, 2022); Bloomberg; BNP Paribas (June 16, 2022); BP Americas (June 17, 2022) ("BP"); CalPERS; CalSTRS; Chevron (June 17, 2022); CEMEX (June 17, 2022); Dell Technologies (May 19, 2022) ("Dell"); Eni SpA; Etsy, Inc. (June 16, 2022) ("Etsy"); Fidelity Investments (June 17, 2022) ("Fidelity"); Harvard Mgmt.; Impax Asset Mgmt.; IAC Recommendation; Maple-Brown; Miller/Howard; Natural Resources Defense Council (June 17, 2022) ("NRDC"); New York City Office of Comptroller (June 17, 2022) ("NY City Comptroller"); PIMCO; PRI; PwC; Unilever PLC (June 17, 2022) ("Unilever"); and The Vanguard Group, Inc. (June 17, 2022) ("Vanguard").

[116]   *See, e.g.,* letters from Beller *et al.*; BNP Paribas; CalPERS; CEMEX; Chevron; Eni SpA; Harvard Mgmt.; NRDC; NY City Comptroller; PIMCO; PRI; Unilever; and Vanguard.

usefulness in understanding the connection between climate-related risk and financial impact.[117] Commenters also stated that basing the Commission's climate-related disclosure rules on the TCFD framework, with which many registrants are familiar and already using, should help mitigate the compliance burden.[118]

One commenter expressed support for basing the rule proposal on the TCFD framework while also stating that the Commission should consider requiring the use of the International Sustainability Standards Board's ("ISSB") climate reporting standard.[119] This commenter noted that, like the rule proposal, the ISSB climate reporting standard is based on the TCFD framework. This commenter, among others, stated that requiring the use of, or basing the Commission's climate disclosure rules on, the ISSB climate reporting standard would contribute substantially to the establishment of a global climate disclosure baseline, which would reduce the reporting burden on companies listed in multiple jurisdictions.[120] Some commenters, however, opposed basing the Commission's climate disclosure rules on the TCFD framework. One commenter stated that the Commission should not base its rules on a disclosure framework, such as the TCFD framework, that has not been developed by a U.S. regulatory agency because there is no process in place for domestic companies, such as oil and gas companies, to provide their input into potential changes to the framework.[121] Another commenter stated that the Commission should not base its climate disclosure rules on the TCFD because, in its view, there

---

[117] *See, e.g.*, letters from CalSTRS; NRDC; and PRI.

[118] *See, e.g.*, letters from Alphabet *et al.*; Eni SpA; Harvard Mgmt.; PRI; and Unilever.

[119] *See* letter from CalSTRS.

[120] *See id.*; *see also* letters from Douglas Hileman Consulting LLC (May 2, 2022) ("D. Hileman Consulting"); T Rowe Price (June 16, 2022); and Vodafone Group Plc (June 17, 2022) ("Vodafone") (stating that the Commission should allow the use of the ISSB climate reporting standard as an alternative reporting regime to the Commission's climate disclosure rules).

[121] *See* letter from Petroleum Alliance of Oklahoma (June 16, 2022) ("Petrol. OK").

Appellate Case: 24-1628    Page: 48    Date Filed: 03/26/2024 Entry ID: 5377362

is currently no third-party framework, including the TCFD, capable of providing reliable and consistent metrics for climate-related risks.[122]  A different commenter disputed that U.S. companies have widely adopted the TCFD framework and recommended instead that the Commission base its climate disclosure rules on the EPA's Greenhouse Gas Reporting Program, with which many U.S. registrants are familiar.[123]

Commenters expressed mixed views regarding the proposed location of the climate-related disclosure rules.  Many commenters supported the proposed placement of climate-related disclosure rules in a new subpart of Regulation S-K and the placement of the proposed financial metrics in a new article of Regulation S-X.[124]  Commenters stated that amending Regulation S-K and Regulation S-X to include climate-related disclosure requirements would facilitate the presentation of climate-related business and financial information as part of a registrant's regular business reporting[125] and appropriately reflect the fact that information about climate-related risks is essential to investors' decision-making and fundamental to understanding the nature of a company's operating prospects and financial performance.[126]  Commenters further stated that requiring climate-related disclosures in annual filings, including the notes to the financial statements, would enhance the accessibility, comparability, and reliability of such disclosures for investors.[127]

---

[122]     *See* letter from Reason Foundation (June 17, 2022) ("Reason Fnd.").

[123]     *See* letter from Western Midstream Partners, LP (June 15, 2022) ("Western Midstream").

[124]     *See, e.g.*, letters from Amer. for Fin. Reform, Sunrise Project *et al*.; Attorneys General from California and 19 other states (June 17, 2022) ("AGs of Cal. *et al*."); Bloomberg; CalSTRS; Eni SpA; Miller/Howard; Morningstar; New York State Insurance Fund (June 17, 2022) ("NY SIF"); PRI; PwC; and SKY Harbor Capital Management (June 16, 2022) ("SKY Harbor").

[125]     *See, e.g.*, letter from Amer. for Fin. Reform, Sunrise Project *et al*.

[126]     *See, e.g.*, letters from AGs of Cal. *et al*.; CalSTRS; and PRI.

[127]     *See, e.g.*, letters from Bloomberg; and PwC.

Many other commenters, however, opposed adoption of the proposed financial metrics under Regulation S-X because of various concerns relating to implementation and interpretation of the proposed financial metrics.[128] A number of these commenters recommended instead requiring disclosure of the financial impact of climate-related events as part of a registrant's MD&A pursuant to 17 CFR 229.303 ("Item 303 of Regulation S-K").[129]

Commenters also had mixed views on the proposed placement of the climate-related disclosures in a separately captioned section of a registration statement or annual report. Several commenters supported the proposed placement because it would facilitate access to and comparability of the climate-related disclosures for investors.[130] Commenters also supported the proposed alternative to permit registrants to incorporate by reference climate-related disclosures from other sections of a filing or from other filings because it would avoid duplication in the filing, would add flexibility regarding the presentation of the disclosures, and would be consistent with the Commission's incorporation by reference rules regarding other types of disclosure.[131] Some of the commenters specifically recommended allowing registrants to include

---

[128]   *See, e.g.*, letters from ABA; AllianceBernstein; Alphabet *et al.*; BOA; BlackRock; Business Roundtable; Cleary Gottlieb Steen & Hamilton LLP (June 16, 2022) ("Cleary Gottlieb"); FedEx Corporation (June 17, 2022) ("FedEx"); General Motors Company (June 17, 2022) ("GM"); Grant Thornton LLP (June 17, 2022) ("Grant Thornton"); National Association of Manufacturers (June 6, 2022) ("NAM"); Securities Industry and Financial Markets Association (June 17, 2022) ("SIFMA"); Soc. Corp. Gov.; Sullivan & Cromwell (June 17, 2022) ("Sullivan Cromwell"); Trillium; Unilever; and Walmart. *See infra* section II.K for further discussion of these comments.

[129]   *See, e.g.*, letters from AllianceBernstein; Alphabet *et al.*; Cleary Gottlieb; IAC Recommendation; GM; Grant Thornton; SIFMA; Soc. Corp. Gov.; Unilever (recommending placement of the financial disclosure in either a registrant's MD&A or its Operating and Financial Review ("OFR")); and Walmart.

[130]   *See, e.g.*, letters from Amer. for Fin. Reform, Sunrise Project *et al.*; (supporting placement of the climate-related disclosure in a separate section as well as in other existing sections of the annual report or registration statement, as applicable); Breckinridge Capital Advisors (June 17, 2022); CEMEX; CFA; Eni SpA; Clifford Howard (June 17, 2022) ("C. Howard"); Institute for Agriculture and Trade Policy (June 17, 2022) ("IATP"); PRI; PwC; and SKY Harbor.

[131]   *See, e.g.*, letters from CalSTRS; CEMEX; Eni SpA; IAA; and PwC.

App.45

Appellate Case: 24-1628     Page: 50     Date Filed: 03/26/2024 Entry ID: 5377362

climate-related governance disclosure in their proxy statements, which could then be incorporated by reference into their annual reports.[132]

Some commenters opposed placing climate-related disclosures in a separate section of a filing, asserting that existing sections, such as MD&A and Risk Factors, are more appropriate places to provide the climate-related disclosures and stating that it should be up to each registrant to determine the most suitable place for such disclosure.[133]  Some commenters recommended that the Commission require some or all of the climate-related disclosures to be included in a new, separate report to be furnished to the Commission following the filing of the annual report because of concerns about the timing and liability for disclosures related to GHG emissions, financial metrics, and certain other aspects of the climate-related disclosures.[134]

### 3.  Final Rules

As discussed in greater detail below, we are adopting climate-related disclosure rules because, as many commenters have indicated, despite an increase in climate-related information being provided by some companies since the Commission issued its 2010 Guidance, there is a need to improve the consistency, comparability, and reliability of climate-related disclosures for

---

[132]  *See, e.g.*, ABA; BlackRock; Business Roundtable; CalSTRS; GM; C. Howard; ICCR; Microsoft; Morningstar; PwC; SIFMA; Shearman & Sterling (June 20, 2022) ("Shearman Sterling"); and Sullivan Cromwell.

[133]  *See, e.g.*, letters from AGs of TX *et al.*; Brendan Herron (Nov. 1, 2022) ("B. Herron"); FedEx; Reason Fnd.; Soc. Corp, Gov.; and Unilever.

[134]  *See, e.g.*, letters from BlackRock; Chevron; ConocoPhillips; FedEx; D. Hileman Consulting; HP Inc. (June 17, 2022) ("HP"); PIMCO; and Sullivan Cromwell.

App.46

Appellate Case: 24-1628    Page: 51    Date Filed: 03/26/2024 Entry ID: 5377362

investors.[135]  As climate-related risks have become more prevalent,[136] investors have increasingly sought information from registrants about the actual and potential impacts of climate-related risks on their financial performance or position.[137]  Both institutional[138] and retail

---

[135]   *See supra* notes 102 and 103 and accompanying text.  The Commission also stated in the Proposing Release that, as part of its filing review process, Commission staff had assessed the extent to which registrants currently disclose climate-related risks in their filings.  Proposing Release at 21339.  The staff noted that, since 2010, disclosures climate-related disclosures have generally increased, but there is considerable variation in the content, detail, and location (i.e., in reports filed with the Commission, in sustainability reports posted on registrant websites, or elsewhere) of climate-related disclosures.  *Id*.  The staff also observed significant inconsistency in the depth and specificity of disclosures by registrants across industries and within the same industry.  *Id*.  The staff found significantly more extensive information in registrants' sustainability reports and other locations such as their websites as compared with their reports filed with the Commission.  *Id*.  In addition, the disclosures in registrants' Forms 10-K frequently contained general, boilerplate discussions that provide limited information as to the registrants' assessment of their climate-related risks or their impact on the companies' business.  *Id*.

[136]   *See, e.g.*, US Global Change Research Program, *The Fifth National Climate Assessment* (2023) (stating that extreme weather events cause direct economic losses through infrastructure damage, disruptions in labor and public services, and losses in property values, and that the United States currently experiences an extreme weather event causing a billion dollars or more in costs and losses every three weeks compared to one such event every four months in the 1980s).

[137]   *See, e.g.*, letters from BlackRock; Bloomberg; Boston Common Asset Mgmt; Breckinridge Capital Advisors; Calvert; Ceres; CFA; East Bay Municipal Utility District Employee Retirement System (June 6, 2022) ("East Bay Mun.") ("[B]ecause climate-related impacts or risks can materially affect a company's financial position and operations, we support the inclusion of some climate-related information in the financial statements; this also promotes consistency in information across a company's reporting."); Harvard Mgmt.; Impax Asset Mgmt; Parnassus Investments (June 14, 2022) ("Parnassus") ("We commend the Commission for understanding the urgency and materiality of the disclosure categories addressed in the Proposed Rule. This demonstrates a recognition that the decisions companies and investors make today regarding emissions and climate-related matters can have financial impacts in the short-, medium-, and long-term."); Rockefeller Asset Management (June 1, 2022); Rebecca Palacios (June 6, 2022) ("R. Palacios") ("[I]t is vital for you to require climate-related disclosures in order to meet the SECs mandate to protect investors ensure fair, orderly, and efficient markets and facilitate capital formation."); ("Rockefeller Asset Mgmt.") ("Our fundamental research and company engagements have revealed that climate related risks and opportunities are increasingly relevant to company valuations."); PIMCO; PRI; SKY Harbor; Trillium; Allyson Tucker, Chief Executive Officer, Washington State Investment Board (June 17, 2022) ("We also support the SEC's inclusion of a greenhouse gas (GHG) emissions reporting requirement in line with the Greenhouse Gas Protocol because this information is critical to our understanding of the quality of a company's earnings in the face of climate change and the energy transition."); and Vanguard.  *See also* Form Letter AM.

[138]   *See, e.g.*, letters from AllianceBernstein; Franklin Templeton; Harvard Mgmt.; Miller/Howard; Trillium; and Wellington Mgmt.

47

investors[139] have stated that they found much of the voluntary climate-related reporting to be lacking in quality and completeness and difficult to compare and as a result have incurred costs and inefficiencies when attempting to assess climate-related risks and their effect on the valuation of a registrant's securities.  Moreover, although the 2010 Guidance reflects that climate-related information may be called for by current Commission disclosure requirements, climate-related information has often been provided outside of Commission filings, such as in sustainability reports or other documents posted on registrants' websites, which are not subject to standardized disclosure rules, and, as noted by some commenters, are not necessarily prepared with the informational needs of investors in mind.[140]  Such information also may not be prepared

---

[139]   *See, e.g.*, letters from Americans for Financial Reform Education Fund, Public Citizen, Ocean Conservancy, Sierra Club, Evergreen Action and 72 additional undersigned organizations (June 17, 2022) ("Amer. for Fin. Reform, Evergreen Action *et al*."); Amer. for Fin. Reform and Public Citizen; Americans for Financial Reform, on behalf of 64,357 advocates (June 16, 2022) ("Enclosed are 64,357 petition signatures supporting the [Commission's] proposed rule on climate-related financial disclosures that would provide investors with the long-awaited and necessary information they and their investment advisors need to make informed investment decisions."); *see also* letter from Betterment (June 17, 2022) (noting that, based on responses of 3,000 retail investors to a survey the commenter conducted, "a reasonable interpretation . . . would be that 95% of respondents would potentially consider GHG emissions reporting . . . as material to whether they would purchase a security" and asserting that "[a] retail investor's exposure to equities via index funds makes the uniform availability of *standardized* climate-related disclosure at the company level that much more critical, and the Proposed Rule would drastically improve the efficiency and robustness of the underlying process that produces such low fee, diversified investing products" (emphasis in original)).  In addition, the Commission received many unique letters from individual investors expressing their support for the proposed rules, with several stating that there was a need for more consistent and comparable disclosure about climate-related risk from registrants.  *See, e.g.,* letters from Kim Leslie Shafer (June 16, 2022) ("[A]s an investor and a citizen, I support the SEC prescribing consistent, comparable, reliable and mandatory disclosure of climate-related information."); Neetin Gulati (June 17, 2022); Sandy Spears (June 16, 2022); R. Palacios.

[140]   *See* letter from PwC (expressing concern about permitting registrants to incorporate by reference from their sustainability reports or corporate responsibility reports because such reports "may be prepared using a basis of presentation designed for a stakeholder group with different information needs than investors and other providers of capital").

with the same level of rigor that results from the disclosure controls and procedures ("DCP") required for disclosure in Commission filings,[141] and as a result may not be as reliable.[142]

Consistent with and as authorized by our enabling statutes, we are adopting the climate-related disclosure requirements discussed herein, so that investors will have the information they need to make informed investment and voting decisions by evaluating a registrant's exposure to material climate-related risks. We modeled the proposed disclosure requirements in large part on the TCFD framework. As discussed in the Proposing Release and as many commenters noted, that framework has been widely accepted by issuers and investors.[143] The TCFD framework focuses on matters that are material to an investment or voting decision and is grounded in concepts that tie climate-related risk disclosure considerations to matters that may affect the results of operations, financial condition, or business strategy of a registrant. Because the TCFD framework is intended to elicit disclosure of climate-related risks that have materially affected or are reasonably likely to materially affect the business, results of operations, or financial condition of a company, it served as an appropriate model for the Commission's proposed climate-related disclosure rules. We therefore disagree with commenters that stated that the Commission's proposed rules would require disclosure of information that is primarily of general

---

[141]   *See* Rule 13a-15 and Rule 15d-15 [17 CFR 240.13a-15 and 17 CFR 240.15d-15]. Pursuant to Exchange Act Rules 13a-15 and 15d-15, a company's principal executive officer and principal financial officer must make certifications regarding the maintenance and effectiveness of disclosure controls and procedures. These rules define "disclosure controls and procedures" as those controls and procedures designed to ensure that information required to be disclosed by the company in the reports that it files or submits under the Exchange Act is (1) "recorded, processed, summarized and reported, within the time periods specified in the Commission's rules and forms," and (2) "accumulated and communicated to the company's management … as appropriate to allow timely decisions regarding required disclosure."

[142]   *See, e.g.*, letter from Ceres; *see also* letter from Calvert (stating that "we believe the disclosures mandated by the SEC in the proposed rule should be filed in annual reports, as well as quarterly reports where appropriate" because "it is supported by disclosure controls, CEO/CFO certification, audit requirements and a level of scrutiny by management appropriate for climate risks").

[143]   *See supra* notes 115 and 116 and accompanying text.

or environmental interest and not of financial interest.[144]  The final rules continue to reflect many of the TCFD's recommendations, modified based on the input of commenters, which will enhance the usefulness and comparability of the required climate-related disclosures for investors and better serve their informational needs when making investment and voting decisions.[145]

At the same time, in consideration of some commenters' concerns,[146] we have revised the proposed climate-related disclosure requirements in certain respects to reduce the likelihood that the final rules result in disclosures that could be less useful for investors and costly for registrants to produce and to provide added flexibility for registrants regarding the content and presentation of the disclosure.  Modeling the climate-related disclosure requirements on the TCFD framework while also adopting these revisions will help mitigate the compliance burden of the final rules, particularly for registrants that are already providing climate-related disclosures based on the TCFD framework or soon will be doing so pursuant to other laws or regulations.[147]

In this regard, we note certain ongoing developments related to climate-risk reporting:

---

[144]   *See supra* note 111 and accompanying text.

[145]   *See supra* note 107 and accompanying text.

[146]   *See, e.g., supra* note 109 and accompanying text.

[147]   *See supra* sections I.B.  In this regard, we note that some commenters recommended that the Commission require or allow the use of the ISSB's climate-related disclosure standards as an alternative to the Commission's climate disclosure rules.  *See supra* note 120 and accompanying text.  While we acknowledge that there are similarities between the ISSB's climate-related disclosure standards and the final rules, and that registrants may operate or be listed in jurisdictions that will adopt or apply the ISSB standards in whole or in part, those jurisdictions have not yet integrated the ISSB standards into their climate-related disclosure rules.  Accordingly, at this time we decline to recognize the use of the ISSB standards as an alternative reporting regime.

Appellate Case: 24-1628     Page: 55     Date Filed: 03/26/2024 Entry ID: 5377362

- The formation of the ISSB by the IFRS Foundation[148] in November 2021, which consolidated several sustainability disclosure organizations into a single organization.[149] In June 2023, the ISSB issued General Requirements for Disclosure of Sustainability-related Financial Information ("IFRS S1") and Climate-related Disclosures ("IFRS S2").[150] Notably, IFRS S1 and S2 integrate the recommendations of the TCFD.[151]

- Several jurisdictions have announced plans to adopt, apply, or otherwise be informed by the ISSB standards, including Australia, Brazil, Canada, Hong Kong, Japan, Malaysia, Nigeria, Singapore, and the United Kingdom ("UK"), although it is not yet

---

[148] The IFRS Foundation refers to the International Financial Reporting Standards Foundation, whose mission is to develop high-quality IFRS Standards that bring transparency, accountability, and efficiency to financial markets around the world. *See* IFRS – Who we are, available at https://www.ifrs.org/about-us/who-we-are/.

[149] *See* IFRS Foundation, IFRS Foundation announces International Sustainability Standards Board, consolidation with CDSB and VRF, and publication of prototype disclosure requirements (Nov. 3, 2021), available at https://www.ifrs.org/news-and-events/news/2021/11/ifrs-foundation-announces-issb-consolidation-with-cdsb-vrf-publication-of-prototypes/. *See also* Proposing Release, section I.C.2.

[150] IFRS S1 sets out the general requirements for a company to disclose information about its sustainability related risks and opportunities. IFRS S2 sets out the requirements for companies to disclose information about their climate-related risks and opportunities, building on the requirements in IFRS S1. *See* IFRS – Project Summary IFRS Sustainability Disclosure Standards, IFRS S1 General Requirements for Disclosure of Sustainability-related Financial Information and IFRS S2 Climate-related Disclosures (June 2023), available at https://www.ifrs.org/content/dam/ifrs/project/general-sustainability-related-disclosures/project-summary.pdf.

[151] Concurrent with the release of its 2023 status report, the TCFD fulfilled its remit and transferred to the ISSB its responsibility for tracking company activities on climate-related disclosure. Fin. Stability Bd., *FSB Roadmap for Addressing Financial Risks from Climate Change Progress Report* (July 13, 2023), available at https://www.fsb.org/wp-content/uploads/P130723.pdf. As discussed *infra*, the TCFD recommendations are incorporated into the ISSB standards. Although the TCFD has disbanded, in this release we continue to refer to "TCFD recommendations" as distinct from ISSB standards, both for clarity and because not all jurisdictions that implemented TCFD-aligned disclosure requirements have implemented the broader and more recent ISSB standards.

clear how specifically the ISSB standards may be incorporated into certain foreign legal frameworks.[152]

- Other jurisdictions were already well advanced in the process of adopting climate disclosure rules when the ISSB standards were announced. For example, in 2022, the European Union ("EU") adopted the Corporate Sustainability Reporting Directive ("CSRD"),[153] which requires certain large and listed companies and other entities, including non-EU entities, to report on sustainability-related issues in line with the European Sustainability Reporting Standards ("ESRS").[154]

- California recently adopted the Climate-Related Financial Risk Act (Senate Bill 261), which will require certain public and private U.S. companies that do business in

---

[152] For example, the UK has announced that its Sustainability Disclosure Standards ("SDS") will be based on the ISSB Standards. *See* Dep't of Bus. & Trade, UK Sustainability Disclosure Standards, Gov.UK (Aug. 2, 2023), available at https://www.gov.uk/guidance/uk-sustainability-disclosure-standards. Australia recently published draft legislation mandating comprehensive climate-related reporting and assurance for large and medium-sized companies that is aligned with the ISSB Standards. *See* Australian Government-the Treasury, *Climate-related financial disclosure: exposure draft legislation* (Jan. 12, 2024), available at https://treasury.gov.au/consultation/c2024-466491.

[153] *See* Directive (EU) 2022/2464 of the European Parliament and of the Council of 14 December 2022 amending Regulation (EU) No 537/2014, Directive 2004/109/EC, Directive 2006/43/EC and Directive 2013/34/EU, as regards corporate sustainability reporting (Text with EEA relevance), available at https://eur-lex.europa.eu/legal-content/EN/TXT/?uri=uriserv%3AOJ.L_.2022.322.01.0015.01.ENG. In adopting the CSRD, the EU explained that there exists a widening gap between the sustainability information, including climate-related data, companies report and the needs of the intended users of that information, which may mean that investors are unable to take sufficient account of climate-related risks in their investment decisions.

[154] *See id*. The CSRD requires large companies and listed companies to publish regular reports on the social and environmental risks they face, and how their activities impact people and the environment. In July 2023, the European Commission ("EC") adopted the delegated act containing the first set of ESRS under the CSRD and the ESRS became effective on Jan. 1, 2024, for companies within scope of the first phase of reporting under the CSRD. *See* EC, *Corporate sustainability reporting*, available at https://finance.ec.europa.eu/capital-markets-union-and-financial-markets/company-reporting-and-auditing/company-reporting/corporate-sustainability-reporting_en (last visited Feb. 6, 2024). *See also* EC Press Release, The Commission Adopts the European Sustainability Reporting Standards (July 31, 2023), available at https://finance.ec.europa.eu/news/commission-adopts-european-sustainability-reporting-standards-2023-07-31_en. Separate reporting standards will be developed for SMEs and certain non-EU companies operating in the EU. *See* EC, *Questions and Answers on the Adoption of European Sustainability Reporting Standards* (July 31, 2023), https://ec.europa.eu/commission/presscorner/detail/en/qanda_23_4043.

California and have over $500 million in annual revenues to disclose their climate-related financial risks and measures based on the TCFD recommendations or a comparable disclosure regime in a report published biennially on the company's website commencing no later than January 2026.[155]

- In addition, California recently adopted the Climate Corporate Data Accountability Act (Senate Bill 253), which will require certain public and private U.S. companies that do business in California and have over $1 billion in annual revenues to disclose their GHG emissions (Scopes 1 and 2 emissions by 2026 and Scope 3 emissions by 2027).[156]

These laws may reduce the compliance burden of the final rules to the extent they impose similar requirements for registrants that are subject to them. However, the disclosure required by these laws will appear in documents outside of Commission filings and therefore will not be subject to the same liability, DCPs, and other investor protections as the climate-related disclosures required under the final rules. In addition, these laws may serve different purposes than the final rules or apply different materiality or other standards. For example, the California laws were adopted to protect the health and safety of California residents,[157] among other

---

[155]   *See* SB-261, *Greenhouse gases: climate-related financial risk* (Oct. 7, 2023), available at https://leginfo.legislature.ca.gov/faces/billNavClient.xhtml?bill_id=202320240SB261.

[156]   *See* SB-253, *Climate Corporate Data Accountability Act* (Oct. 7, 2023), available at https://leginfo.legislature.ca.gov/faces/billNavClient.xhtml?bill_id=202320240SB253. The Act directs the California Air Resources Board (CARB) to adopt regulations to implement the requirements of the Act, with disclosures being required as early as 2026, subject to the CARB's finalization of the rules. The Act further requires the disclosure of Scope 1 and Scope 2 emissions to be subject to assurance, which must be performed at a limited assurance level beginning in 2026 and at a reasonable assurance level beginning in 2030. *See* SB-253, section II.c.1.F.ii. The statute is currently subject to litigation. *See* Compl., Chamber of Commerce v. California Air Resources Board, No. 2:24-cv-00801 (D. C.D. Cal. Jan. 30, 2024).

[157]   *See* SB-253, supra note 156, at section 1 (stating that "Californians are already facing devastating wildfires, sea level rise, drought, and other impacts associated with climate change that threaten the health and safety of Californians. . .").

Appellate Case: 24-1628     Page: 58     Date Filed: 03/26/2024 Entry ID: 5377362

App.53

reasons, whereas we are adopting the final rules to enhance disclosures of emergent risks companies face so that investors can have the information they need to make informed investment and voting decisions. Regardless of the extent of overlap with other jurisdictions' reporting requirements and consistent with the Commission's mission, the final rules are tailored to the particular needs of investors and the specific situations of Commission registrants, as documented in the comment file, and are designed to work within the existing framework of U.S. securities laws that call for disclosure about the material risks that companies face. Integrating the required disclosures into the existing framework of U.S. securities laws will provide investors with more complete information about a company, the risks it faces, and its business, finances, and results of operations while affording investors the protections of the securities laws for this information.

We acknowledge the concerns expressed by some commenters about relying on a third-party framework, such as the TCFD, that may not afford affected parties the ability to provide input on potential future changes.[158] While we considered the TCFD framework in both proposing and now adopting the Commission's own climate-related disclosure rules, the final rules do not incorporate by reference the TCFD recommendations or its procedures. Any future updates to the TCFD framework or any successor framework will have no bearing or impact on the final rules without future action by the Commission. Any consideration of such updates by the Commission will be subject to the Commission's own procedures, and any subsequent rulemaking to reflect those updates will be subject to the Administrative Procedure Act's requirements, including notice and comment, as well as requirements under other relevant laws. The final rules also do not follow every TCFD recommendation. For example, unlike the TCFD,

---

[158]     *See* letter from Petrol. OK.

Appellate Case: 24-1628     Page: 59     Date Filed: 03/26/2024 Entry ID: 5377362

which recommends the disclosure of executive compensation that is linked to climate-related risk management considerations, we have elected not to include such a requirement in the final rules, as discussed below.[159]

Like the proposed rules, the final rules amend Regulation S-K by adding a new section (subpart 1500) composed of the climate-related disclosure rules, other than for the financial statement disclosures, and Regulation S-X by adding a new article (Article 14) to govern the financial statement disclosures. We continue to believe that it is appropriate to amend Regulation S-K and Regulation S-X to require climate-related disclosures in Securities Act or Exchange Act registration statements and Exchange Act reports. Information about climate-related risks and their financial impacts is fundamental in many cases to understanding a company's financial condition and operating results and prospects and therefore should be treated like other business and financial information, including information on risks to the company.[160]

The proposed rules would have required a registrant to include its climate-related disclosures, other than its financial statement disclosures, either in a separately captioned "Climate-Related Disclosure" section in the registration statement or Exchange Act annual report or in other parts of the Commission filing that would then be incorporated by reference into the separately captioned section. While some commenters supported this proposal because it would facilitate the comparability of the disclosures among registrants,[161] other commenters stated that existing parts of the registration statement or annual report could be more appropriate for

---

[159]    *See* TCFD, *Implementing the Recommendations of the Task Force on Climate-related Financial Disclosures* (Oct. 2021), available at https://assets.bbhub.io/company/sites/60/2021/07/2021-TCFD-Implementing_Guidance.pdf; *infra* section II.E.2.

[160]    *See supra* notes 125 and 126 and accompanying text.

[161]    *See supra* note 130 and accompanying text.

55

placement of the climate-related disclosures, and indicated that it should be up to each registrant to determine the most suitable place for the disclosures according to the context of the disclosures and structure of the filing.[162]

While enhancing the comparability of climate-related disclosures remains an important objective of the rulemaking, we also recognize the benefits of granting each registrant sufficient flexibility to determine the most appropriate location within a filing for the disclosures based on its particular facts and circumstances.  Therefore, the final rules leave the placement of the climate-related disclosures, other than the financial statement disclosures, largely up to each registrant.  Further, we are adopting as proposed structured data requirements that will enable automated extraction and analysis of the information required by the final rules, further facilitating investors' ability to identify and compare climate-related disclosures, regardless of where they are presented.[163]  A registrant may elect to place most of the subpart 1500 disclosures in a separately captioned "Climate-Related Disclosure" section.  Alternatively, a registrant may elect to include these climate-related disclosures in applicable, currently existing parts of the registration statement or annual report (*e.g.*, Risk Factors, Description of Business, or MD&A).  If it chooses the latter alternative, then the registrant should consider whether cross-referencing the other disclosures in the separately captioned section would enhance the presentation of the climate-related disclosures for investors.

A registrant may also incorporate by reference some of the climate-related disclosures from other filed registration statements or Exchange Act reports if the incorporated disclosure is responsive to the topics specified in the Regulation S-K climate-related disclosure items and if

---

162    *See, e.g.*, letter from Unilever.

163    See discussion of 17 CFR 229.1508 *infra* section II.M.

Appellate Case: 24-1628     Page: 61     Date Filed: 03/26/2024 Entry ID: 5377362

the registrant satisfies the incorporation by reference requirements under the Commission's rules and forms.[164]  In addition, any climate-related disclosure that is being incorporated by reference must include electronic tags that meet the final rules' structured data requirement.[165]  As commenters noted, allowing incorporation by reference of climate-related disclosures will avoid duplication in the filing, add flexibility regarding the presentation of the disclosures, and be consistent with the Commission's incorporation by reference rules regarding other types of disclosure.[166]

Some commenters recommended that we permit a registrant to include disclosure regarding its climate-related corporate governance in its proxy statement, together with its discussion of other corporate governance matters, which would then be incorporated by reference into the registrant's Form 10-K.[167]  Form 10-K currently permits the incorporation by reference pursuant to General Instruction G.3 of certain corporate governance matters from a proxy statement involving the election of directors.[168]  While disclosure pursuant to Item 401 of Regulation S-K, which pertains to the identification and business experience of directors and executive officers, is permitted to be incorporated by reference from the proxy statement, disclosure pursuant to Item 407(h) of Regulation S-K, which pertains to the board's leadership structure and its role in risk oversight, is not one of the enumerated matters permitted to be incorporated by reference from the proxy statement.  As discussed below, the final rules do not include the proposed provisions that would have most likely elicited disclosure drawn from the

---

[164]     *See* 17 CFR 230.411 and 17 CFR 240.12b-23.

[165]     *See* 17 CFR 229.1508.

[166]     *See supra* note 131 and accompanying text.

[167]     *See, e*.g., letters from Microsoft; and SIFMA.

[168]     *See* General Instruction G.3 of Form 10-K, which pertains to information permitted under Part III of Form 10-K, including, among other matters, Item 401 and certain provisions of Item 407.

57

information required by Item 401 (i.e., the proposed requirements to identify the board members responsible for the oversight of climate-related risks and to disclose whether any board member has expertise in climate-related risks).[169]  Additionally, the retained governance provisions of the final rules require disclosure that is relevant to understanding more generally the board's oversight of climate-related risks and management's role in assessing and managing such risks, and do not necessarily pertain to the election of directors.  For these reasons, while the final rules do not preclude incorporation by reference from a registrant's proxy statement to the extent allowed by existing rules,[170] we decline to expressly permit the disclosure to be incorporated by reference from a registrant's proxy statement pursuant to General Instruction G.3 of Form 10-K.

Placement of the new disclosures required by the final rules in Commission filings further serves our investor protection goals because it will subject these disclosures to DCPs. These controls and procedures will enhance not only the reliability of the climate-related disclosures themselves, including both qualitative climate-related information and quantitative climate-related data, but also their accuracy and consistency.[171]

---

169    *See infra* section II.E.1.

170    *See supra* note 164 and accompanying text.

171    *See supra* notes 141-142 and accompanying text.  As we have stated before, a company's disclosure controls and procedures should not be limited to disclosure specifically required, but should also ensure timely collection and evaluation of "information potentially subject to [required] disclosure," "information that is relevant to an assessment of the need to disclose developments and risks that pertain to the [company's] businesses," and "information that must be evaluated in the context of the disclosure requirement of Exchange Act Rule 12b-20."  *Certification of Disclosure in Companies' Quarterly and Annual Reports*, Release No. 33-8124 (Aug. 28, 2002) [67 FR 57275 (Sept. 9, 2002)].

## B. Commission Authority to Adopt Disclosure Rules

Some commenters[172] asserted that the Commission lacks authority to promulgate the proposed rules. We disagree. The rules we are adopting fall within the statutory authority conferred by Congress through the Securities Act and the Exchange Act.

In section 7(a)(1) of the Securities Act,[173] Congress authorized the Commission to require, in a publicly filed registration statement, that issuers offering and selling securities in the U.S. public capital markets include information—such as the general character of the issuer's business, the remuneration paid to its officers and directors, details of its material contracts, and certain financial information—specified in Schedule A to that Act, as well as "such other information . . . as the Commission may by rules or regulations require as being necessary or

---

172    *See, e.g.,* letter from Soc. Corp. Gov. (stating that the "subject of the Proposed Rule is clearly of great economic and political significance," and that "[a]bsent express authorization by Congress, we believe that the SEC fundamentally lacks the authority to promulgate the Proposed Rule"); *see also* letters from Bernard S. Sharfman (Feb. 6, 2024) (stating that the SEC "has exceeded its delegated authority in promulgating its proposed rule on climate-related disclosures by not adhering to the ascertainable standards found in the 33 and 34 Acts: 'for the protection of investors,' promoting 'efficiency, competition, and capital formation,' and 'materiality'"); Lawrence A. Cunningham and 21 other signatories (Apr. 25, 2022) ("Cunningham *et al.*") (stating that the "EPA's empowerment over this topic probably preempts any statutory authority the SEC might claim," that "the SEC's mission does not include adopting positions intended to promote particular conceptions of acceptable corporate behavior," and that "[c]limate change is a politically-charged issue" and the "Proposal would compel corporations and officials to regularly speak on those issues"); Patrick Morrisey, Attorney General of West Virginia, and the Attorneys General of 23 other states ("Morrissey *et al.*") (June 15, 2022) (stating that the proposed rule "sidesteps the materiality requirement," "offends the major questions doctrine," would "upend the balance between federal and state powers in the corporate sphere," and that "if the SEC's understanding of its powers were right, then the statutes providing it that authority would offend the non-delegation doctrine"); and Andrew N. Vollmer (May 9, 2022) (stating that adopting the proposal would "determine significant national environmental policies without direction from Congress, creating a high risk of proving to be a futile gesture because of the likelihood that a court will overturn final rules"); and Andrew N. Vollmer (Apr. 12, 2022) (stating that "[c]limate-change information is outside the scope of the subjects Congress has allowed the SEC to cover in disclosure rules, and adopting the Proposal would have a subject and objective different from the disclosure provisions in the federal securities laws"); Jones Day; Chamber; Bernard S. Sharfman & James R. Copland (June 16, 2022) ("Sharfman *et al.*").

173    15 U.S.C. 77g(a)(1).

App.59

Appellate Case: 24-1628    Page: 64    Date Filed: 03/26/2024 Entry ID: 5377362

appropriate in the public interest or for the protection of investors."[174]  In addition, under

sections 12(b) and (g) of the Exchange Act,[175] issuers of securities traded on a national securities

exchange or that otherwise have total assets and shareholders of record that exceed certain

thresholds must register those securities with the Commission by filing a registration statement.

That registration statement must contain "[s]uch information, in such detail, as to the issuer"

regarding, among other things, "the organization, financial structure and nature of the [issuer's]

business" as the Commission by rule or regulation determines to be in the public interest or for

the protection of investors.[176]  These same issuers must also provide, as the Commission may

prescribe "as necessary or appropriate for the proper protection of investors and to insure fair

dealing in the security," (1) "such information and documents . . . as the Commission shall

require to keep reasonably current the information and documents required to be included in or

filed with [a] . . . registration statement," and (2) such annual and quarterly reports as the

Commission may prescribe.[177]

　　　　As the text of each of these provisions demonstrates, Congress not only specified certain

enumerated disclosures, but also authorized the Commission to update and build on that

framework by requiring additional disclosures of information that the Commission finds

---

[174]　　Securities Act section 7(a)(1) and Schedule A; *see also* Securities Act section 10(a) and (c) [15 U.S.C. 77j(a) and (c)] (generally requiring a prospectus to contain much of the same the information contained in a registration statement and granting the Commission the authority to require additional information in a prospectus as "necessary or appropriate in the public interest or for the protection of investors").

[175]　　15 U.S.C. 78*l*(b) and (g).

[176]　　Exchange Act sections 12(b) and 12(g).

[177]　　Exchange Act section 13(a) [15 U.S.C. 78m(a)].  Other issuers that are required to comply with the reporting requirements of section 13(a) include those that voluntarily register a class of equity securities under section 12(g)(1), and issuers that file a registration statement under the Securities Act that becomes effective, pursuant to section 15(d) [15 U.S.C. 78*o*].

Appellate Case: 24-1628　　Page: 65　　Date Filed: 03/26/2024 Entry ID: 5377362

"necessary or appropriate in the public interest or for the protection of investors."[178]  When read in the context of these enumerated disclosures and the broader context of the Securities Act and Exchange Act, these provisions authorize the Commission to ensure that public company disclosures provide investors with information important to making informed investment and voting decisions.[179]  Such disclosure facilitates the securities laws' core objectives of protecting investors, facilitating capital formation, and promoting market efficiency.[180]

Both courts and the Commission have long recognized as much.[181]  The Commission has amended its disclosure requirements dozens of times over the last 90 years based on the determination that the required information would be important to investment and voting decisions.  And courts have routinely applied and interpreted the Commission's disclosure

[178]   Securities Act section 7 [15 U.S.C. 77g]; *see* Exchange Act section 13(a) [15 U.S.C. 78m(a)] ("necessary or appropriate for the proper protection of investors and to insure fair dealing in the security"); *see also* Exchange Act sections 12, 13, and 15 [15 U.S.C. 78*l*, 78m, and 78o].

[179]   *See NAACP v. Fed. Power Comm'n*, 425 U.S. 662, 669–70 (1976) ("[T]he use of the words 'public interest' in a regulatory statute . . . take meaning from the purposes of the regulatory legislation.").

[180]   *See, e.g.*, Securities Act of 1933, Pub. L. No. 73-22, 48 Stat. 74, 74 (preamble) ("An Act to provide full and fair disclosure of the character of securities sold in interstate and foreign commerce and through the mails, and to prevent frauds in the sale thereof."); 15 U.S.C. 78b ("Necessity for regulation"); 15 U.S.C. 77b(b), 78c(f) (protection of investors, efficiency, competition, and capital formation); *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 178 (2015) ("The Securities Act of 1933…protects investors by ensuring that companies issuing securities (known as 'issuers') make a full and fair disclosure of information relevant to a public offering." (quotation omitted)); *Basic Inc. v. Levinson*, 485 U.S. 224, 230 (1988) ("The [Exchange] Act was designed to protect investors against manipulation of stock prices.  Underlying the adoption of extensive disclosure requirements was a legislative philosophy:  There cannot be honest markets without honest publicity….This Court repeatedly has described the fundamental purpose of the [Exchange] Act as implementing a philosophy of full disclosure." (quotation omitted)); *see also Lorenzo v. SEC*, 139 S. Ct. 1094, 1103 (2019) ("The fundamental purpose" of the securities laws is substituting "a philosophy of full disclosure for the philosophy of caveat emptor.").

[181]   *See supra* note 180; *see also Nat'l Res. Def. Council, Inc. v. SEC*, 606 F.2d 1031, 1050 (D.C. Cir. 1979) ("The SEC . . . was necessarily given very broad discretion to promulgate rules governing corporate disclosure.  The degree of discretion accorded the Commission is evident from the language in the various statutory grants of rulemaking authority."); *id.* at 1045 ("Rather than casting disclosure rules in stone, Congress opted to rely on the discretion and expertise of the SEC for a determination of what types of additional disclosure would be desirable."); H.R. Rep. No. 73-1383, at 6-7 (1934).

App.61

provisions without suggesting that the Commission lacked the authority to promulgate them.[182]
When determining that additional "information" is "necessary or appropriate" to protect investors, the Commission has responded to marketplace developments, investors' need for information important to their decision-making, and advances in economic, financial, and investment analysis and analytical frameworks, as well of the costs of such disclosures. In addition, the Commission has eliminated existing disclosure requirements, or updated and tailored existing disclosures for similar reasons.[183]

For example, the Commission's predecessor agency,[184] immediately upon enactment of the Securities Act, relied upon Section 7 of that Act as authority to adopt Form A-1, the precursor to today's Form S-1 registration statement, to require disclosure of information important to investor decision-making but not specifically enumerated in Schedule A of the Securities Act. This information included a list of states where the issuer owned property and was qualified to do business, the length of time the registrant had been engaged in its business,[185]

---

[182]   *See SEC v. Life Partners Holdings, Inc.*, 854 F.3d 765 (5th Cir. 2017) (applying regulations regarding disclosure of risks and revenue recognition); *SEC v. Das*, 723 F.3d 943 (8th Cir. 2013) (applying Regulation S-K provisions regarding related-party transactions and executive compensation); *Panther Partners Inc v. Ikanos Communs., Inc.*, 681 F.3d 114 (2d Cir. 2012) (applying Item 303 of Regulation S-K, which requires disclosure of management's discussion and analysis of financial condition); *SEC v. Goldfield Deep Mines Co.*, 758 F.2d 459 (9th Cir. 1985) (applying disclosure requirement for certain legal proceedings).

[183]   *See, e.g.*, *FAST Act Modernization and Simplification of Regulation S-K*, Release No. 33-10618 (Mar. 20, 2019) [84 FR 12674, 12676 (Apr. 2, 2019)] (stating that the amendments "are intended to improve the quality and accessibility of disclosure in filings by simplifying and modernizing our requirements" and "also clarify ambiguous disclosure requirements, remove redundancies, and further leverage the use of technology" which, the Commission expected, "will increase investor access to information without reducing the availability of material information"); *Disclosure Update and Simplification*, Release No. 33-10532 (Aug. 17, 2018) [83 FR 50148, 50176-79 (Oct. 4, 2018)] (discussing amendments to, among other things, eliminate certain disclosure requirements that "have become obsolete as the regulatory, business, or technological environments have changed over time").

[184]   Prior to enactment of the Exchange Act, the Federal Trade Commission was empowered with administration of the Securities Act.

[185]   Items 3 through 5 of Form A-1; *see* Release No. 33-5 (July 6, 1933) [not published in the Federal Register]. The Commission's disclosure requirements no longer explicitly call for this information.

Appellate Case: 24-1628     Page: 67     Date Filed: 03/26/2024 Entry ID: 5377362

and a statement of all litigation that may materially affect the value of the security to be offered.[186]

The Commission has further exercised its statutory authority to require disclosures that provide investors with information on risks facing registrants. These specific disclosure items are consistent with the Commission's longstanding view that understanding the material risks faced by a registrant and how the registrant manages those risks can be just as important to assessing its business operations and financial condition as knowledge about its physical assets or material contracts. These disclosures also reflect investors' increased demand for, and growing ability to use, information regarding the risks faced by registrants through the application of increasingly sophisticated and specialized measurement and analysis frameworks to make investment and voting decisions.[187]

For instance, the Commission in 1982 adopted a rule requiring registrants to disclose "Risk Factors," i.e., a "discussion of the material factors that make an investment in the registrant or offering speculative or risky."[188] Also, in 1997, the Commission first required

---

[186] This early requirement called for certain information related to those legal proceedings, including a description of the origin, nature, and names of parties to the litigation. Item 17 of Form A-1. The Commission has retained a disclosure requirement related to legal proceedings in both Securities Act registration statements and in Exchange Act registration statements and periodic reports. *See* 17 CFR 229.103.

[187] *See infra* notes 200, 206-207 and accompanying text.

[188] 17 CFR 229.105(a); *see also Adoption of Integrated Disclosure System*, Release No. 33-6383 [47 FR 11380 (Mar. 16, 1982)] ("1982 Release"). Prior to 1982, the Commission stated in guidance that, if the securities to be offered are of a highly speculative nature, the registrant should provide "a carefully organized series of short, concise paragraphs summarizing the principal factors that make the offering speculative." *See Guides for Preparation and Filing of Registration Statements*, Release No. 33-4666 (Feb. 7, 1964) [29 FR 2490 (Feb. 15, 1964)]. A guideline to disclose a summary of risk factors relating to an offering was first set forth by the Commission in 1968 and included consideration of five factors that may make an offering speculative or risky, including with respect to risks involving "a registrant's business or proposed business." *See* Guide 6, in *Guides for the Preparation and Filing of Registration Statements*, Release No. 33-4936 (Dec. 9, 1968) [33 FR 18617 (Dec. 16, 1968)].

registrants to disclose quantitative information about market risk.[189]  Those rules included

requirements to present "separate quantitative information . . . to the extent material" for

different categories of market risk, such as "interest rate risk, foreign currency exchange rate

risk, commodity price risk, and other relevant market risks, such as equity price risk."[190]  Under

these market risk disclosure requirements, registrants must also disclose various metrics such as

"value at risk" and "sensitivity analysis disclosures."  In addition, registrants must provide

certain qualitative disclosures about market risk, to the extent material.[191]

Commission rules have also required disclosures regarding specific elements of the risks

facing registrants, such as a registrant's material legal proceedings,[192] as part of its description of

business, the material effects that compliance with government regulations, including

environmental regulations, may have upon a registrant's capital expenditures, earnings, and

competitive position,[193] compensation discussion and analysis,[194] and the extent of the board's

---

[189]    See 17 CFR 229.305; and Disclosure of Accounting Policies for Derivative Financial Instruments and Derivative Commodity Instruments and Disclosure of Quantitative and Qualitative Information About Market Risk Inherent in Derivative Financial Instruments, Other Financial Instruments, and Derivative Commodity Instruments, Release No. 33-7386 (Jan. 31, 1997) [62 FR 6044 (Feb. 10, 1997)].

[190]    17 CFR 229.305(a)(1).

[191]    See 17 CFR 229.305(b).

[192]    See 17 CFR 229.103; *Modernization of Regulation S-K Items 101, 103, and 105*, Release No. 33-10825 (Aug. 26, 2020) [85 FR 63726, 63740 (Oct. 8, 2020)] ("The Commission first adopted a requirement to disclose all pending litigation that may materially affect the value of the security to be offered, describing the origin, nature and name of parties to the litigation, as part of Form A-1 in 1933.").

[193]    See 17 CFR 229.101(c)(2)(i); *Adoption of Disclosure Regulation and Amendments of Disclosure Forms and Rules*, Release No. 33-5893 (Dec. 23, 1977) [42 FR 65554, 65562 (Dec. 30, 1977)] ("Appropriate disclosure shall also be made as to the material effects that compliance with Federal, State and local provisions which have been enacted or adopted regulating the discharge of materials into the environment, or otherwise relating to the protection of the environment, may have upon the capital expenditures, earnings and competitive position of the registrant and its subsidiaries.").

[194]    See 17 CFR 229.402; *Executive Compensation and Related Person Disclosure*, Release No. 33-8732 (Aug. 11, 2006 [71 FR 53158 (Sept. 8, 2006)].

64

App.64

role in the risk oversight of the registrant.[195]  In addition, the Commission has adopted comprehensive disclosure regimes related to particular industries,[196] offering structures,[197] and types of transactions, when it has determined that disclosure in those particular areas was justified.[198]

Relatedly, the Commission has exercised its statutory authority to require registrants to include in registration statements and annual reports a narrative explanation of a number of aspects of the issuer's business, most prominently in the MD&A.[199]  These requirements are "intended to give the investor an opportunity to look at the company through the eyes of management by providing both a short and long-term analysis of the business of the company," and they reflected increased investor need for this type of information as an important tool to make investment and voting decisions.[200]

---

[195]   *See* 17 CFR 229.407(h); *Proxy Disclosure Enhancements*, Release No. 33-9089 (Dec. 16, 2009) [74 FR 68334 (Dec. 23, 2009)].

[196]   *See* 17 CFR Subpart 1200 (Oil and Gas); 17 CFR Subpart 1300 (Mining); and 17 CFR Subpart 1400 (Banks and Savings and Loan).

[197]   *See* 17 CFR Subpart 1100 (Asset-Backed Securities).

[198]   *See* 17 CFR Subpart 900 (Roll-Up Transactions); and 17 CFR Subpart 1000 (Mergers and Acquisitions).

[199]   *See Amendments to Annual Report Form, Related Forms, Rules, Regulations and Guides; Integration of Securities Acts Disclosure Systems*, Release No. 33-6231 (Sept. 2, 1980) [45 FR 63630 (Sept. 25, 1980)]. Item 303 of Regulation S-K requires a registrant to discuss its financial condition, changes in its financial condition, and results of operations, 17 CFR 229.303(a), other disclosure items, see, e.g., 17 CFR 229.303(b)(1)(i), (1)(ii)(B), and (2)(ii), and requires registrants to "provide such other information that the registrant believes to be necessary to an understanding of its financial condition, changes in financial condition, and results of operation."  17 CFR 229.303(b).

[200]   *Concept Release on Management's Discussion and Analysis of Financial Condition and Operations*, Release No. 33-6711 (Apr. 17, 1987) [52 FR 13715 (Apr. 24, 1987)].  The Commission also has stated that it is important that investors understand the extent to which accounting changes and changes in business activity have affected the comparability of year-to-year data and they should be in a position to assess the source and probability of recurrence of net income (or loss).  *Id*. (quoting *Guidelines for Registration and Reporting*, Release No. 33-5520 (Aug. 14, 1974) [39 FR 31894 (Sept. 3, 1974)]).

Finally, the Commission for the last fifty years has also required disclosure about various environmental matters.[201] In adopting those requirements, the Commission recognized the number of ways that environmental issues can impact a company's business and its financial performance and determined that these requirements would provide information important to investment and voting decisions. Throughout the 1970s and early 1980s, the need for specific rules mandating disclosure of information relating to litigation and other business costs arising out of compliance with Federal, State, and local laws relating to environmental protection were the subject of several rulemaking efforts, extensive litigation, and public hearings.[202] As a result of this process, in 1982, the Commission adopted rules that address disclosure of certain environmental issues.[203]

More recently, the Commission published the 2010 Guidance, explaining how the Commission's existing disclosure rules may require disclosure of the impacts of climate change

---

[201] In addition to Commission rules requiring disclosures regarding specific elements of the risks facing registrants that are discussed *supra* notes 192-198 and accompanying text, the Commission has adopted disclosure requirements that are similarly subject to substantive regulation under other statutes and by other agencies, as discussed *infra* note 207.

[202] *See Environmental Disclosure*, Interpretive Release No. 33-6130 (Sept. 27, 1979) [44 FR 56924 (Oct. 3, 1979)] (discussing this history); *Proposed Amendments to Item 5 of Regulation S -K Regarding Disclosure of Certain Environmental Proceedings*, Release No. 33-6315 (May 4, 1981) [46 FR 25638]; *NRDC v. SEC*, 606 F.2d 1031, 1036-42 (D.C. Cir. 1979) (same).

[203] *See* 1982 Release (adopting 17 CFR 229.103, which requires a registrant to describe its material pending legal proceedings, other than ordinary routine litigation incidental to the business, and indicating that administrative or judicial proceedings arising under Federal, state, or local law regulating the discharge of materials into the environment or primarily for the purpose of protecting the environment, shall not be deemed "ordinary routine litigation incidental to the business" and must be described if meeting certain conditions). The 1982 Release also moved the requirement to disclose information regarding the material effects of compliance with Federal, State and local provisions regulating the discharge of materials into the environment, or otherwise relating to the protection of the environment, on the registrant's capital expenditures, earnings and competitive position, as well as the disclosure of its material estimated capital expenditures for environmental control facilities, to 17 CFR 229.101(c)(1)(xii).

on a registrant's business or financial condition.[204]  And in 2020, the Commission amended its disclosure rules to require, to the extent material to an understanding of the business taken as a whole, disclosure of the material effects that compliance with government regulations, including environmental regulations, may have upon the capital expenditures, earnings, and competitive position of the registrant and its subsidiaries.[205]

Similarly, the Commission is adopting the final rules based on its determination that the required disclosures will elicit information that investors have indicated is important to their investment and voting decisions.[206]  As explained throughout this release, climate-related risks can affect a company's business and its financial performance and position in a number of ways. A growing number of investors across a broad swath of the market consider information about climate-related risks to be important to their decision-making.  These investors have expressed the need for more reliable information about the effects of climate-related and other severe weather events or other natural conditions on issuers' businesses, as well as information about how registrants have considered and addressed climate-related risks when conducting operations and developing business strategy and financial plans.  These rules respond to this need by providing investors more reliable and decision-useful disclosure of strategies and risks that a registrant has determined will likely materially impact its business, results of operations, or

---

[204]  *See* 2010 Guidance.  As the Commission discussed in the guidance, the agency reviewed its full disclosure program relating to environmental disclosures in SEC filings in connection with a Government Accountability Office review.  Among other things, the 2010 Guidance emphasized that climate change disclosure might, depending on the circumstances, be required in a company's Description of Business, Risk Factors, Legal Proceedings, and MD&A; identified certain climate-related issues that companies may need to consider in making their disclosures; and stated that registrants should consider any financial statement implications of climate change issues in accordance with applicable accounting standards.

[205]  *See Modernization of Regulation S-K Items 101, 103, and 105*, Release No. 33-10825 (Aug. 26, 2020) [85 FR 63726 (Oct. 8, 2020)].

[206]  *See supra* section I.A.

financial condition. The disclosure of such information—whether climate-related or otherwise—falls within the authority conferred by Congress in the Securities Act and the Exchange Act.[207]

The Regulation S-X provisions of the final rules are also within the Commission's authority. In addition to the statutory provisions discussed above, the Federal securities laws provide the Commission with extensive and specific authority to prescribe financial statement disclosures, set accounting standards, and establish accounting principles for entities that file financial statements with the Commission.

As noted above, Section 7(a)(1) of the Securities Act specifies that a registration statement shall contain, among other things, the information specified in Schedule A. Schedule A in turn requires disclosure of balance sheet and profit and loss statement (i.e., comprehensive income statement) information "in such detail and in such form as the Commission shall prescribe."[208] In addition, Section 12(b) of the Exchange Act provides the Commission with specific authority to require not only balance sheet and income statement disclosure, but also "any further financial statements which the Commission may deem necessary or appropriate for the protection of investors."[209]

Section 19(a) of the Securities Act also grants the Commission extensive authority to "make, amend, and rescind such rules and regulations as may be necessary to carry out the

---

[207] The final rules are also consistent with other disclosure items that are similarly subject to substantive regulation under other statutes and by other agencies. For example, banks, bank holding companies, savings and loan associations, and savings and loan holding companies are subject to subpart 1400 of Regulation S-K despite the substantive jurisdiction and regulation of other state and Federal prudential regulators. Similarly, here, the importance of climate-related risks to investor decision-making makes them appropriate for disclosure regardless of other regimes that substantively regulate those issues.

[208] *See* Schedule A, paras. 25 and 26. The "form" required by the Commission includes both financial statements and notes to those statements. *See* 17 CFR 210.1-01(b) (specifying the term "financial statements" includes all notes to the statements and related schedules).

[209] 15 U.S.C. 78l(b)(1)(J) through (L).

68

provisions of," the Securities Act, which includes "defining accounting, technical, and trade terms used in" the Securities Act. "Among other things," this section grants the Commission the authority to "prescribe . . . the items or details to be shown in the balance sheet and earning statement, and the methods to be followed in the preparation of accounts, in the appraisal or valuation of assets and liabilities, in the determination of depreciation and depletion, in the differentiation of recurring and nonrecurring income, in the differentiation of investment and operating income, and in the preparation, where the Commission deems it necessary or desirable, of consolidated balance sheets or income accounts of any person directly or indirectly controlling or controlled by the issuer, or any person under direct or indirect common control with the issuer."[210] Sections 13 and 23 of the Exchange Act grant the Commission similar authority with respect to reports filed under that Act.[211]

Relying on these provisions, the Commission has prescribed the form and content of the financial statements to ensure that investors have access to information necessary for investment and voting decisions. The Commission adopted Regulation S-X in 1940, which governs the form and content of the financial statements, pursuant to its authority under, among other provisions, Sections 7 and 19(a) of the Securities Act and Sections 12 and 23(a) of the Exchange

---

[210]    15 U.S.C. 77s(a).

[211]    15 U.S.C. 78m(b)(1); *see* 15 U.S.C. 78w(a)(1) ("The Commission . . . shall  . . . have the power to make such rules and regulations as may be necessary or appropriate to implement the provisions of [the Exchange Act] for which [it is] responsible or for the execution of the functions vested in [it] by [the Exchange Act], and may for such purposes classify persons, securities, transactions, statements, applications, reports, and other matters within their respective jurisdictions, and prescribe greater, lesser, or different requirements for different classes thereof."); *see also* 15 U.S.C. 7218(c) ("Nothing in the [Sarbanes-Oxley Act of 2002] . . . shall be construed to impair or limit the authority of the Commission to establish accounting principles or standards for purposes of enforcement of the securities laws."); *Policy Statement: Reaffirming the Status of the FASB as a Designated Private-Sector Standard Setter*, Release No. 33-8221 (Apr. 25, 2003) [68 FR 23333, 23334 (May 1, 2003)] ("While the Commission consistently has looked to the private sector in the past to set accounting standards, the securities laws, including the Sarbanes-Oxley Act, clearly provide the Commission with authority to set accounting standards for public companies and other entities that file financial statements with the Commission.").

Appellate Case: 24-1628    Page: 74    Date Filed: 03/26/2024 Entry ID: 5377362

Act.[212]  Over time, the Commission has amended Regulation S-X to add, modify, and eliminate requirements, as appropriate, with respect to the form and content of the financial statements, taking into consideration the development of accounting practices in the marketplace, investors' need for information important to their decision-making, as well of the costs of such disclosures.

For example, the Commission has on numerous occasions amended Regulation S-X to require the disclosure of particular items of information in the balance sheet or in the income statement.[213]  The Commission has similarly amended Regulation S-X to require additional information in the financial statements with respect to particular issuers or types of transactions, when it has determined that action in those specific areas was responsive to the information needs of investors.[214]

Similarly, the Commission is adopting the final rules based on its determination that the required financial statement disclosures will provide investors with information that is important to their investment and voting decisions.  Specifically, the Commission is exercising its authority to prescribe the content and form of the financial statements to require registrants to disclose

---

[212]   *See Adoption of Regulation S-X*, 5 FR 949, 954 (Mar. 6, 1940).

[213]   *See Improved Disclosures of Leases*, Release No. 33-5401 (June 6, 1973) [38 FR 16085, 16085 (June 20, 1973)] (proposing amendments to Rule 3-16 of Regulation S-X to require disclosure of, among other things, total rental expenses and minimum rental commitments, explaining that for many years corporate disclosure of leased assets "has not been sufficient to enable investors to determine the nature and magnitude of such assets, the size of financial commitments undertaken and the impact upon net income of this kind of financing"); *Improved Disclosures of Leases*, Release No. 33-5428 (Oct. 23, 1973) [38 FR 29215 (Oct. 23, 1973)] (adopting amendments to Rule 3-16); *General Revision of Regulation S-X*, Release No. 6233 (Sept. 25, 1980) [45 FR 63660, 63664 (Sept. 25, 1980)] (requiring separate disclosure of domestic and foreign pre-tax income, in part because the Commission had "seen substantial voluntary inclusion by registrants of this tax information in their annual reports to shareholders").

[214]   *See Amendments to Financial Disclosures About Acquired and Disposed Businesses*, Release No. 33-10786 (May 20, 2020) [85 FR 54002 (Aug. 31, 2020)] (amending Regulation S-X as part of "an ongoing, comprehensive evaluation of our disclosure requirements" to improve for investors the financial information about acquired and disposed businesses); *Financial Statements and Periodic Reports for Related Issuers and Guarantors*, Release No. 33-7878 (Aug. 4, 2000) [65 FR 51692 (Aug. 24, 2000)] (amending Regulation S-X to require additional disclosures relating to guaranteed securities, and explaining that the amendments codified Commission staff practices over the years and would eliminate uncertainty regarding financial statement requirements and ongoing reporting).

Appellate Case: 24-1628    Page: 75    Date Filed: 03/26/2024 Entry ID: 5377362

certain information about costs and expenditures related to: (1) severe weather events and other natural conditions; and (2) in connection with the purchase and use of carbon offsets and RECs, as well as certain information about financial estimates and assumptions, in the notes to the financial statements. As explained in greater detail below, investors have expressed a need for this information,[215] and we believe the final rules will allow investors to make better informed investment or voting decisions by eliciting more complete disclosure of financial statement effects and by improving the consistency, comparability, and reliability of the disclosures.

For similar reasons, we disagree with objections by commenters based on the non-delegation and major-questions doctrines.[216] The non-delegation objection is misplaced because the long-standing statutory authority that we rely on provides intelligible principles to which the Commission must conform in its rulemaking.[217] Indeed, the Supreme Court early in the Commission's history rejected a non-delegation challenge to one of the securities laws that the Commission administered, and the well-tested delegation of rulemaking authority that we exercise here likewise falls comfortably within the Court's holding that a delegation poses no constitutional difficulty when it provides standards that derive "meaningful content from the purpose of the Act, its factual background and the statutory context in which they appear."[218] Also, the major-questions objection is misplaced because the Commission is not claiming to "discover in a long-extant statute an unheralded power representing a transformative expansion in [its] regulatory authority."[219] Nor is it seeking to determine national environmental policy or

---

[215]  *See infra* notes 1741 and 2133.  *See also infra* note 1961 (commenters generally supportive of the proposed expenditure disclosures).

[216]  *See, e.g.*, letter from Morrisey *et al.* (June 15, 2022); *see also* note 172.

[217]  *See Gundy v. United States*, 139 S. Ct. 2116, 2123 (plurality op.); *see also* note 182and accompanying text.

[218]  *Am. Power & Light Co. v. SEC*, 329 U.S. 90, 104 (1946).

[219]  *West Virginia v. EPA*, 597 U.S. 697, 724 (2022) (quotations omitted).

dictate corporate policy, as commenters suggest.[220]  Rather, it is adopting the final rules based on its long standing authority to require disclosures that provide investors with information that is important to their investment and voting decisions, as discussed above.  Consistent with this authority and its traditional role, the Commission is agnostic as to whether and how issuers manage climate-related risks so long as they appropriately inform investors of material risks.

Finally, we disagree with commenters who raised objections to the proposed rules on First Amendment grounds.[221]  The required disclosures are factual information about certain risks companies face to their businesses, finances, and operations–the type of information that companies routinely disclose when seeking investments from the public.  And as discussed throughout this release, these required disclosures also advance crucial interests: the final rules respond to the growing investor need for more reliable information regarding climate-related risks by providing investors with information that is important to their investment and voting decisions.  Further, the final rules have been appropriately tailored to serve those interests, including with a number of significant changes having been made from the proposal to take account of the burdens imposed by requiring such disclosures.

---

[220]    *See, e.g.*, letters from Andrew N. Vollmer (May 9, 2022); Andrew N. Vollmer (Apr. 12, 2022); Morrisey *et al.* (June 15, 2022); Cunningham *et al.* (Apr. 25, 2022); Sharfman *et al.*  For similar reasons, we disagree with commenters who suggested the disclosures required by the final rules impermissibly interfere with state corporate law.  *See, e.g.*, letters from Morrisey *et al.* (June 15, 2022); Cunningham *et al.* (Apr. 25, 2022) Sharfman *et al.*

[221]    *See, e.g.*, letters from Cunningham *et al.* (Apr. 25, 2022); Morrisey *et al.* (June 15, 2022); Sean J. Griffith (June 1, 2022); Jones Day; Chamber; Sharfman *et al.*

C. **Disclosure of Climate-Related Risks**

1. **Definitions of Climate-Related Risks and Climate-Related Opportunities (Items 1500 and 1502(a))**

   a. **Proposed Rule**

The Commission proposed to require a registrant to disclose any climate-related risks reasonably likely to have a material impact on the registrant's business or consolidated financial statements.[222] As proposed, a registrant could also optionally disclose the actual and potential impacts of any climate-related opportunities it is pursuing.[223] The Commission proposed definitions of "climate-related risks" and "climate-related opportunities" that were substantially similar to the TCFD's corresponding definitions of those terms[224] to provide a common terminology that would allow registrants to disclose climate-related risks and opportunities in a consistent and comparable way. In the Proposing Release, the Commission expressed its belief that grounding the definitions in a framework that is already widely accepted could help limit the burden on registrants to identify and describe climate-related risks while improving the comparability and usefulness of the disclosures for investors.[225]

The Commission proposed to define "climate-related risks" to mean the actual or potential negative impacts of climate-related conditions and events on a registrant's consolidated financial statements, business operations, or value chains, as a whole.[226] The Commission proposed to define "value chain" to mean the upstream and downstream activities related to a

---

[222]   *See* Proposing Release, section II.B.1.

[223]   *See id.*

[224]   *See* TCFD, *Recommendations of the Task Force on Climate-related Financial Disclosures*, Appendix 5 available at https://assets.bbhub.io/company/sites/60/2020/10/FINAL-2017-TCFD-Report-11052018.pdf.

[225]   *See* Proposing Release, section II.B.1.

[226]   *See id.*

registrant's operations.[227]  Under the proposed definition, upstream activities would include activities by a party other than the registrant that relate to the initial stages of a registrant's production of a good or service (e.g., materials sourcing, materials processing, and supplier activities).  Downstream activities would include activities by a party other than the registrant that relate to processing materials into a finished product and delivering it or providing a service to the end user (e.g., transportation and distribution, processing of sold products, use of sold products, end of life treatment of sold products, and investments).[228]  The Commission proposed including a registrant's value chain within the definition of climate-related risks to capture the full extent of a registrant's potential exposure to climate-related risks.[229]

Climate-related conditions and events can present risks related to the physical impacts of the climate ("physical risks") and risks related to a potential transition to a lower carbon economy ("transition risks").  The Commission proposed to define "physical risks" to include both acute and chronic risks to a registrant's business operations or the operations of those with whom it does business.[230]  The Commission proposed to define "acute risks" to mean event-driven risks related to shorter-term extreme weather events, such as hurricanes, floods, and tornadoes.[231]  Under the proposed rule, "chronic risks" would be defined to mean those risks that a business may face as a result of longer term weather patterns and related effects, such as sustained higher temperatures, sea level rise, drought, and increased wildfires, as well as related effects such as decreased arability of farmland, decreased habitability of land, and decreased

---

[227]    *See id.*

[228]    *See id.*

[229]    *See id.*

[230]    *See id.*

[231]    *See id.*

availability of fresh water.[232]

The Commission proposed to define transition risks to mean the actual or potential negative impacts on a registrant's consolidated financial statements, business operations, or value chains attributable to regulatory, technological, and market changes to address the mitigation of, or adaptation to, climate-related risks.[233]  Transition risks would include, but not be limited to, increased costs attributable to climate-related changes in law or policy, reduced market demand for carbon-intensive products leading to decreased sales, prices, or profits for such products, the devaluation or abandonment of assets, risk of legal liability and litigation defense costs, competitive pressures associated with the adoption of new technologies, reputational impacts (including those stemming from a registrant's customers or business counterparties) that might trigger changes to market behavior, changes in consumer preferences or behavior, or changes in a registrant's behavior.[234]

The Commission proposed to require a registrant to specify whether an identified climate-related risk is a physical or transition risk so that investors can better understand the nature of the risk.[235]  If a physical risk, the rule proposal would require a registrant to describe the nature of the risk, including whether it may be categorized as an acute or chronic risk.[236]  A registrant would also be required to describe the location and nature of the properties, processes, or operations subject to the physical risk.[237]  The rule proposal defined "location" to mean a ZIP

---

[232]    *See id.*

[233]    *See id.*

[234]    *See id.*

[235]    *See id.*

[236]    *See id.*

[237]    *See id.*

Appellate Case: 24-1628    Page: 80    Date Filed: 03/26/2024 Entry ID: 5377362

code or, in a jurisdiction that does not use ZIP codes, a similar subnational postal zone or geographic location.

The Commission proposed to require additional disclosure from a registrant that has identified a climate-related risk related to flooding or high water stress. As proposed, if a risk concerns the flooding of buildings, plants, or properties located in flood hazard areas, the registrant would be required to disclose the percentage of those assets that are located in flood hazard areas in addition to their location.[238] If a risk concerns the location of assets in regions of high or extremely high water stress, as proposed, the registrant would be required to disclose the amount of assets (e.g., book value and as a percentage of total assets) located in those regions in addition to their location. The registrant would also be required to disclose the percentage of the registrant's total water usage from water withdrawn in those regions.[239]

The Commission proposed to require a registrant to describe the nature of an identified transition risk, including whether it relates to regulatory, technological, market (including changing consumer, business counterparty, and investor preferences), liability, reputational, or other transition-related factors, and how those factors impact the registrant.[240] In this regard, the proposed rule stated that a registrant that has significant operations in a jurisdiction that has made a GHG emissions reduction commitment may be exposed to transition risks related to the implementation of the commitment.[241]

As the Commission noted in the Proposing Release, climate-related conditions and any transition to a lower carbon economy may also present opportunities for registrants and

---

[238]     See id.

[239]     See id.

[240]     See id.

[241]     See id.

investors.[242]  The rule proposal defined "climate-related opportunities" to mean the actual or potential positive impacts of climate-related conditions and events on a registrant's consolidated financial statements, business operations, or value chains, as a whole.[243]

### b. Comments

Many commenters supported the proposal to require a registrant to disclose any climate-related risks that are reasonably likely to have a material impact on its business or consolidated financial statements.[244]  These commenters provided various reasons for supporting the proposal. For example, one commenter noted that it views material climate-related risks and opportunities as fundamental financial factors that impact company cash flows and the valuation investors attribute to those cash flows and stated that the proposed rules will lead to "more consistent, comparable, and reliable disclosures that will enable investors to make better decisions on how and where to allocate capital."[245]  Another commenter stated that the proposed requirements would provide a thorough foundation for disclosure of climate risks, including future risks.[246]  A different commenter stated that the proposed disclosure requirement would ensure that investors receive specific, comparable details about registrants' climate-related risks, which are currently lacking from many registrants.[247]  One other commenter stated that, based on its own research,

---

[242]   *See id.*

[243]   *See id.*

[244]   *See, e.g.*, letters from Acadian Asset Management (June 14, 2022) ("Acadian Asset Mgmt."); AGs of Cal. *et al.*; AllianceBernstein; Amer. for Fin. Reform, Evergreen Action *et al.*; As You Sow; CalPERS; CalSTRS; Center for American Progress (June 17, 2022) ("Center Amer. Progress"); CFA; Domini Impact; D. Hileman Consulting; Eni SpA; IAA; ICI; Impax Asset Mgmt.; KPMG (June 16, 2022); Moody's Corporation (June 17, 2022) ("Moody's"); Morningstar; NY SIF; NY St. Comptroller; PRI; SKY Harbor; TotalEnergies SE (June 17, 2022) ("TotalEnergies"); Unilever; and Wellington Mgmt.

[245]   *See* letter from AllianceBernstein.

[246]   *See* letter from Center Amer. Progress.

[247]   *See* letter from AGs of Cal. *et al.*

most registrants are exposed to climate-related risks, and without sufficient information

regarding transition risks and physical risks facing a registrant, investors may be unable to

correctly value a registrant's securities, thus potentially paying too high or too low a price.[248]

One commenter stated that, because long-term climate-related risks can quickly become

financially impactful, the proposed requirement would elicit disclosure that, at a minimum,

would indicate the quality of a company's governance and risk management.[249]

      Many commenters supported the proposed definition of climate-related risk, including

that the definition encompass both physical and transition risks, and further supported the

proposed requirement to specify whether an identified climate-related risk is a physical or

transition risk.[250] One commenter stated that the proposed definition of climate-related risk is

comprehensive and would help ensure that registrants consider a broad spectrum of climate-

related risks.[251] Another commenter expressed approval of the proposed definition of climate-

related risk because it is substantially similar to the TCFD's definition of climate-related risk,

which is familiar terminology for investors and companies alike and therefore should promote

consistent and comparable disclosure across companies.[252] A different commenter stated that the

definition of climate-related risk should include only the actual negative impacts of climate-

related conditions and events, and not potential negative impacts, as proposed, but agreed that

the definition should include both physical and transition risks because that would be consistent

---

[248] *See* letter from Wellington Mgmt; *see also* letter from Farm Girl Capital (June 17, 2022) ("FGC") (stating that "disclosure of material and systemic risks of climate change will help companies and investors to understand, price, and manage climate risks and opportunities").

[249] *See* letter from SKY Harbor.

[250] *See, e.g.*, letters from Beller *et al.*; BHP; CalSTRS; D. Hileman Consulting; Eni SpA; IAA; ICI; Impax Asset Mgmt.; KPMG; Moody's; Morningstar; TotalEnergies; Unilever; and Wellington Mgmt.

[251] *See* letter from D. Hileman Consulting.

[252] *See* letter from ICI; *see also* letters from KPMG; and Morningstar.

with the TCFD framework.[253]  One other commenter stated that the proposed definition of climate-related risk is generally "correct" because it is similar to the TCFD definition and would facilitate comparability of climate-related disclosure, but recommended that the Commission address in the definition the intersection of climate-related risks and adverse consequences to local communities.[254]

A number of commenters supported including in the proposed definition of physical risk both acute and chronic risks, and further supported specifying whether an identified physical risk is acute or chronic.[255]  One commenter stated that it supported the proposed disclosure of a physical risk, including whether the physical risk is acute or chronic, in addition to any transition risk, and noted that all these risk categories can have "financial materiality."[256]  This commenter did not, however, support requiring the disclosure of whether or how an acute risk and chronic risk may affect each other because of the complex interaction between the two types of risks.[257] Another commenter similarly stated that, while it supported the disclosure of acute and chronic risks, because such risks are complex and may overlap, the Commission should clarify that companies can decide how to categorize acute and chronic risks and, where there may be overlap (e.g., wildfires can be both an acute and chronic risk to a company), the risk only needs to be identified once.[258]  A different commenter stated that it supported the proposed definition of climate-related risk, which includes acute and chronic risks within physical risk, because it

[253]    See letter from CEMEX.

[254]    See letter from Amer. for Fin. Reform, Sunrise Project et al.

[255]    See, e.g., letters from Beller et al.; CalSTRS; Eni SpA; IAA; Impax Asset Mgmt.; Moody's; and Unilever.

[256]    See letter from Moody's.

[257]    See id.; see also letter from Eni SpA.

[258]    See letter from IAA.

Appellate Case: 24-1628    Page: 84    Date Filed: 03/26/2024 Entry ID: 5377362

aligned with the TCFD framework, and such alignment would be of significant benefit because it will help elicit comparable disclosures and help reduce the reporting burden.[259]  One other commenter, while acknowledging that the proposed definition of physical risk aligned with the TCFD framework, recommended that the Commission include, in the definition of chronic risk, systemic threats to public health and safety.[260]

Several commenters supported the proposed requirement to describe the location and nature of the properties, processes, or operations subject to the physical risk.[261]  Commenters stated that the proposed location disclosure would enable investors to more fully assess a registrant's exposure to physical risks, such as extreme storm events, flooding, water shortages, and drought, which may be geographically specific, and whether the registrant is adequately taking steps (e.g., through adopting a transition plan) to mitigate or adapt to the physical risks.[262] One commenter stated that "[i]nvestors and investment analysts are often tasked with understanding the risk that climate change poses to physical assets that are critical to the company's overall business model," including both facilities owned by the company and those owned by key suppliers, and recommended that the Commission "require the disclosure of the locations of all material facilities i.e., geographical concentrations that pose material risks of loss."[263]  Some of these commenters also supported defining location by the ZIP code or other

---

[259]    *See* letter from Unilever.

[260]    *See* letter from Amer. for Fin. Reform, Sunrise Project *et al*.

[261]    *See, e.g.*, letters from Amer. for Fin. Reform, Evergreen Action *et al*.; Bloomberg; BMO Global Asset Management (June 17, 2022) ("BMO Global Asset Mgmt."); CalSTRS; Domini Impact; IAC Recommendation; IATP; Longfellow Investment Management (June 17, 2022) ("Longfellow Invest. Mgmt."); Moody's; Morningstar; NY St. Comptroller; PRI; TotalEnergies; UCS; and Wellington Mgmt.

[262]    *See, e.g.*, letters from BMO Global Asset Mgmt.; CalSTRS; IATP; and Morningstar.

[263]    *See* IAC Recommendation.

App.80

Appellate Case: 24-1628    Page: 85    Date Filed: 03/26/2024 Entry ID: 5377362

subnational postal zone if the ZIP code is not available.[264] One commenter recommended using geographic coordinates to describe the location of assets subject to a material physical risk because they would better fit climate models.[265] Another commenter recommended requiring the disclosure of specific addresses, and not just ZIP codes, to identify the location of assets subject to a material physical risk to enable investors to fully assess the registrant's exposure to the physical risk.[266] This commenter also urged the Commission to require the proposed disclosure with respect to all of a registrant's locations that are material to its businesses rather than only the locations subject to a physical climate risk, stating that physical climate risk potentially impacts a registrant at all of its locations.[267]

Several commenters supported the proposed requirement to disclose the percentage of assets that are located in flood hazard areas if a registrant has determined that flooding is a material physical risk.[268] Several commenters also supported the proposed requirement to disclose the amount of assets (e.g., book value and as a percentage of total assets) located in regions of high or extremely high water stress, and the percentage of the registrant's total water usage from water withdrawn in those regions, if a registrant has determined that high or extremely high water stress is a material physical risk.[269] Commenters stated that the proposed disclosure requirements would help investors understand the extent of the water-related risk to

---

[264] *See, e.g.*, letters from Amer. for Fin. Reform, Evergreen Action *et al.*; IATP; and TotalEnergies.

[265] *See* letter from CalSTRS.

[266] *See* letter from Wellington Mgmt.

[267] *See id.*

[268] *See, e.g.,* letters from Anthesis Group (June 16, 2022) ("Anthesis"); CalPERS; Domini Impact; Eni SpA; ERM CVS (June 17, 2022); IAA; Moody's; Morningstar; NRDC; PRI; TotalEnergies; and Wellington Mgmt.

[269] *See, e.g.,* letters from Anthesis; CalSTRS; Domini Impact; ERM CVS; IAA; Moody's; Morningstar; Paradice Investment Management (June 17, 2022) ("Paradice Invest. Mgmt."); TotalEnergies; and Wellington Mgmt.

Appellate Case: 24-1628    Page: 86    Date Filed: 03/26/2024 Entry ID: 5377362

which a registrant is exposed.[270]  Some commenters generally stressed the importance to investors of obtaining quantitative data from registrants about the physical risks to which they are subject and recommended that the Commission require registrants to similarly provide the percentage of assets or other quantitative data relevant to assessing a registrant's exposure to other material physical risks, such as heatwaves, droughts, and wildfires.[271]

With regard to flooding risk disclosure, some commenters recommended that the Commission require the use of Federal Emergency Management Agency's ("FEMA's") flood hazard terminology and maps to help further the comparability of the disclosure.[272]  One commenter recommended the use of a different flood model that it believed was more up-to-date and more comprehensive than FEMA's flood mapping.[273]  Another commenter supported an approach that would allow for different definitions of "flood hazard area" or "water-stressed area" to be used as long as the registrant disclosed the source of the definitions together with the methodologies and assumptions used in disclosing the water-based physical risk.[274]

Several commenters supported the proposed provision requiring a registrant to describe the nature of an identified transition risk, including whether it relates to regulatory, technological, market (including changing consumer, business counterparty, and investor preferences), liability, reputational, or other transition-related factors, and how those factors impact the registrant.[275]  Some commenters also supported the proposed definition of transition

---

[270]   *See, e.g.*, letters from ERM CVS; IAA; Moody's; and Morningstar.

[271]   *See, e.g.*, letters from Anthesis; CalPERS; IAA; and Morningstar.

[272]   *See, e.g.*, letters from Anthesis; NRDC; and PRI.

[273]   *See* letter from CalPERS (recommending use of the First Street Foundation Flood Model).

[274]   *See* letter from Moody's; *see also* letter from Wellington Mgmt. (stating that, if address-specific locations are not required, the Commission should require the disclosure of methodologies and data sources used for flooding disclosure).

[275]   *See, e.g.*, letters from Eni SpA; Moody's; Morningstar; SKY Harbor; TotalEnergies; and Wellington Mgmt.

risk.[276]  Several commenters stated that the Commission should include additional examples within the definition of transition risk, including the risk of impacts on local and indigenous communities and workers caused by a transition to a lower carbon economy.[277]

Several commenters supported including the negative impacts on a registrant's value chain in the definition of climate-related risk, as proposed.[278]  One commenter stated that because information concerning climate-related risks involving a registrant's value chain may be more important to investors than such risks involving a registrant's own operations, disclosure of climate-related risks in the value chain should be an integrated part of the broader disclosures about the material climate-related risks management is assessing, managing, and reporting to the board, despite the difficulty of providing such value chain information.[279]  Another commenter stated that it supported including value chain impacts in the definition of climate-related risk as long as such impacts relate to direct impacts on a registrant's operations.[280]  Some commenters also supported the proposed definition of value chain to mean the upstream and downstream

---

[276]    *See, e.g.*, letters from Eni SpA; Morningstar; SKY Harbor; and TotalEnergies.

[277]    *See, e.g.*, letters from Boston Common Asset Mgmt.; CalPERS; Domini Impact; IAA; and ICCR.

[278]    *See, e.g.*, letters from Amer. for Fin. Reform, Sunrise Project *et al.*; Anthesis; Domini Impact; D. Hileman Consulting; Eni SpA; Morningstar; NY SIF; PRI; PwC; TotalEnergies; US Technical Advisory Group to TC207 (June 17, 2022) ("US TAG TC207"); and Wellington Mgmt.

[279]    *See* letter from PwC.  This commenter provided the following examples of when climate-related risks involving a registrant's value chain may be more important to investors than such risks involving the registrant's own operations: the manufacturer of "a product reliant on a rare mineral for which mining may be limited due to emissions created in extraction, precursor manufacturing, and transport, or, alternatively, a lender whose primary business is financing emissions-intensive operations."

[280]    *See* letter from Eni SpA.

activities related to a registrant's operations.[281]  One commenter stated that the definition of

value chain should be consistent with the definition provided by the GHG Protocol.[282]

Many other commenters opposed the proposed climate-related risk disclosure

requirement.[283]  Some of these commenters contended that the Commission's rules already

require a registrant to disclose material climate risks, and that therefore there is no need for the

proposed climate-related risk disclosure requirement.[284]  Several other commenters stated that

the proposed climate-related risk disclosure requirement would inundate investors with an

extensive amount of granular information that is largely immaterial.[285]  Commenters provided as

an example of such immaterial disclosure the proposed requirement to disclose the ZIP codes of

assets located in flood hazard areas or other regions in which a registrant's assets are subject to a

material climate-related risk.[286]  Some commenters stated that the highly detailed disclosure

required by the proposed climate risk disclosure rule would confuse investors by causing them to

believe that a climate-related risk is more important than other disclosed risks that are presented

---

[281]  *See, e.g.*, letters from Amer. for Fin. Reform, Sunrise Project *et al.*; Anthesis; and Morningstar.

[282]  *See* letter from Morningstar; *see also* letter from D. Hileman Consulting (stating that if the Commission defines value chain, it should adopt a definition that is already well-established, such as the GHG Protocol's definition of value chain).

[283]  *See, e.g.*, letters from ABA; American Chemistry Council (June 17, 2022) ("Amer. Chem."); American Fuel and Petrochemical Manufacturers (June 17, 2022) ("AFPM"); Biotechnology Innovation Organization (June 17, 2022) ("BIO"); Business Roundtable; Chamber; Davis Polk (June 9, 2022); Fenwick West; GPA Midstream Association (June 17, 2022) ("GPA Midstream"); Insurance Coalition (June 17, 2022) ("IC"); Nareit (June 17, 2022) ("Nareit"); National Mining Association (June 17, 2022) ("NMA"); Retail Industry Leaders Association (June 17, 2022) ("RILA"); and Soc. Corp. Gov.

[284]  *See, e.g.*, letters from AFPM; BIO; and GPA Midstream.

[285]  *See, e.g.*, letters from ABA; Amer. Chem.; AFPM; Business Roundtable; Chamber; Davis Polk; Fenwick West; Nareit; NMA; RILA; SIFMA; and Soc. Corp. Gov.

[286]  *See, e.g.*, letters from ABA; Allstate Corporation (June 17, 2022) ("Allstate") ("Requiring information at a granular level such as ZIP code would create an operational burden and would produce an excessive amount of information that we expect would not be decision-useful for most investors."); Amer. Chem.; AFPM; BOA; Business Roundtable; Chamber; Davis Polk; NAM; Nareit; PGIM (June 17, 2022); RILA; SIFMA; and Soc. Corp. Gov.

in less detail.[287]  Some commenters also stated that the overly granular disclosure elicited by the proposed rule would potentially require registrants to disclose competitively sensitive information.[288]  Other commenters stated that, due to uncertainties in climate science, and uncertainties regarding some of the underlying concepts upon which the proposed climate risk disclosure requirement is based, the disclosure of material climate-related risks would be unduly burdensome for many registrants.[289]  Another commenter stated that a registrant should only be required to disclose a climate-related risk that management is assessing, managing, and reporting to the board, rather than disclosing information regarding any climate risk.[290]

Several commenters also opposed the proposed disclosure requirements concerning the percentage of assets located in flood zones and similar quantitative data for assets located in high water-stressed areas.[291]  One commenter stated that flood risks and high water-stress risks are not comparable within a firm, across sectors, and across regions of the country, so investors are unlikely to make investment decisions based on this information.[292]  This commenter further stated that the Commission has not justified singling out risks relating to flooding and high water stress for detailed prescriptive disclosures, which dilutes the importance of other material

---

[287]  *See, e.g.*, letters from ABA; Fenwick West; GPA Midstream; and Nareit.

[288]  *See, e.g.*, letters from IC; NAM; National Grid; RILA; and Soc. Corp. Gov.

[289]  *See, e.g.*, letters from NMA; and RILA; *see also* letter from IC (stating that the proposed climate risk disclosure requirement raises concerns for insurers because there is no consensus scientific method for insurers to distinguish between weather-related risks and climate-related risks).

[290]  *See* letter from PwC.

[291]  *See, e.g.*, letters from ABA; AFPM; BOA; and D. Hileman Consulting.

[292]  *See* letter from AFPM; *see also* letter from BOA (stating that investors would not be able meaningfully to compare water-stress risks across different companies without standard definitions for "high water-stress" and "extreme high water-stress.").

information.[293]  One other commenter stated that the proposed flood risk requirement is not

necessary because the majority of companies are not subject to such physical risk.[294]  Other

commenters stated that such granular disclosure for water-related physical risks would impose a

heavy reporting burden for registrants and could raise competitive and security risk concerns.[295]

Several commenters also opposed the proposed transition risk disclosure requirement,

including the proposed definition of transition risk.[296]  Some commenters stated that the

proposed requirement would result in overly granular disclosure that would not be decision-

useful for investors and would be burdensome for registrants to produce.[297]  One commenter

stated that the proposed definition was overly broad and would require a registrant to make the

difficult determination of whether a particular activity was undertaken to address a transition risk

or was part of a registrant's normal business strategy.[298]  Another commenter stated that it would

be challenging for companies doing business in multiple markets to provide comparable,

consistent, and reliable disclosure about transition risks given complex, dynamic, and varied

global factors.[299]  Other commenters stated that because the proposed definition of transition risk

---

[293]      *See* letter from AFPM; *see also* letter from ABA (stating that by proposing highly prescriptive disclosure
           requirements, such as those based on flood hazard areas or assets of "high or extremely high water stress,"
           the Commission may potentially narrow disclosures related to the full range of environmental or climate
           issues that are materially relevant to a registrant's business and strategy); and D. Hileman Consulting
           (stating that it is not necessary for the Commission to enumerate specific climate-related risks, such as
           flooding or water stress, as there is the risk that registrants could downplay other types of risk).

[294]      *See* letter from BIO.

[295]      *See, e.g.*, letters from CEMEX; and NAM.

[296]      *See, e.g.*, letters from Airlines for America (June 17, 2022); Allstate; Alphabet *et al.*; American Council for
           Capital Formation (June 17, 2022) ("ACCF"); Chamber; Enbridge Inc. (June 16, 2022) ("Enbridge");
           Interstate Natural Gas Association of America (June 17, 2022) ("INGAA"); PwC; and United States
           Council for International Business (June 17, 2022) ("USCIB").

[297]      *See, e.g.*, letters from ACCF; and Allstate.

[298]      *See* letter from Alphabet *et al*.

[299]      *See* letter from USCIB.

Appellate Case: 24-1628     Page: 91     Date Filed: 03/26/2024 Entry ID: 5377362

would require a registrant to consider impacts on its value chain, the resulting disclosures are likely to be overly detailed and could obscure more important information.[300]  One other commenter stated that the proposed transition risk disclosure requirement would be difficult to comply with because of the speculative nature of certain transition risks.[301]  A different commenter stated that because of the broad definition of transition risk, the Commission should provide additional guidance regarding the scope of the transition risk disclosure requirement.[302]

Many commenters opposed including the negative impacts on a registrant's value chain in the definition of, and related disclosure requirement concerning, its climate-related risks.[303]  Commenters stated that the proposed definition would impose impractical burdens on registrants by forcing them to obtain and assess climate risk information about their third-party suppliers and customers over which they have little to no control.[304]  Commenters in the agricultural sector were particularly opposed to the proposed definition because it would impose costs and burdens on farmer and rancher suppliers, many of whom are private entities, to produce the information needed by registrants to comply with the proposed climate-related risk requirement.[305]  Other commenters stated that, due to the inability to obtain such third-party information, the proposed disclosure requirement is likely to elicit boilerplate disclosure about the climate-related risks of a

---

[300]  *See* letters from Airlines for America; and Chamber.

[301]  *See* letter from INGAA.

[302]  *See* letter from PwC.

[303]  *See, e.g.*, letters from Airlines for America; Arizona Farm Bureau Federation (June 17, 2022) ("AZ Farm"); California Farm Bureau (June 17, 2022) ("CA Farm"); Chamber; CEMEX; D. Burton, Heritage Fdn.; Energy Transfer LP (June 17, 2022) ("Energy Transfer"); Georgia Farm Bureau ("June 17, 2022) ("GA Farm"); GPA Midstream; HP; Indiana Farm Bureau (June 17, 2022) ("IN Farm"); National Agricultural Association (June 17, 2022) ("NAA"); Pennsylvania Farm Bureau (June 17, 2022) ("PA Farm"); Soc. Corp. Gov.; United Airlines Holdings, Inc. (June 17, 2022) ("United Air"); Western Midstream; and Williams Cos.

[304]  *See, e.g.*, letters from CEMEX; GPA Midstream; HP; Soc. Corp. Gov.; United Air; Western Midstream; and Williams Cos.

[305]  *See, e.g.,* letters from AZ Farm; CA Farm; GA Farm; IN Farm; NAA; and PA Farm.

registrant's value chain.[306]  Because of these concerns, several commenters requested that the Commission remove the concept of value chain from the scope of the climate risk disclosure requirement.[307]  More generally, several commenters stated that any Commission climate risk disclosure requirement should be more principles-based and grounded on traditional notions of materiality.[308]

Many commenters supported the proposed definition of climate-related opportunities because it is consistent with the TCFD definition.[309]  Many commenters also supported keeping the disclosure of climate-related opportunities optional, as proposed.[310]  Some of these commenters expressed the view that, while disclosure of climate-related opportunities can provide insight into a registrant's management of climate-related risks and its related strategy, mandatory disclosure of climate-related opportunities could lead to greenwashing.[311]  Some commenters, however, stated that disclosure of climate-related opportunities should be mandatory because such opportunities are frequently related to the reduction of climate-related

---

[306]  *See, e.g.*, letters from Energy Transfer; HP; and Western Midstream.

[307]  *See, e.g.*, letters from CEMEX; GPA Midstream; HP; NAA; United Air; Western Midstream; and Williams Cos.; *see also* letter from Soc. Corp. Gov. (stating that "the required disclosure should be limited to climate-related risks, including value chain-related risks, reasonably likely to materially impact the registrant's financial statements and operations").

[308]  *See, e.g.*, letters from ABA; API; Chamber; NAM; SIFMA; and Soc. Corp. Gov.

[309]  *See, e.g.*, letters from Amer. for Fin. Reform, Sunrise Project *et al.*; Anthesis; CEMEX; NY City Comptroller; and TotalEnergies.

[310]  *See, e.g.*, letters from Amer. for Fin. Reform, Sunrise Project *et al.*; Anthesis; Bloomberg; CEMEX; Eni SpA; Hannon Armstrong (June 17, 2022); IATP; NY City Comptroller; and TotalEnergies.

[311]  *See, e.g.*, letters from Anthesis; Bloomberg; CEMEX; and Eni SpA; *see also* letter from Cleveland-Cliffs, Inc. (June 16, 2022) ("Cleveland-Cliffs") (opposing required disclosure of climate-related opportunities because such disclosures "are likely to be optimistic, overestimated projections at best").

risks and would provide investors with a more balanced perspective of the overall impacts of climate on a company's business and operating performance.[312]

### c. Final Rules

We are adopting final rules (Item 1502(a)) to require the disclosure of any climate-related risks that have materially impacted or are reasonably likely to have a material impact on the registrant, including on its business strategy, results of operations, or financial condition, with several modifications in response to commenter concerns.[313] We disagree with those commenters who stated that a climate-related risk disclosure provision was not necessary because the Commission's general risk factors disclosure rule already requires such disclosure.[314] In our view, a separate disclosure provision specifically focused on climate-related risks will help investors better understand a registrant's assessment of whether its business is, or is reasonably likely to be, exposed to a material climate-related risk, and thereby enhance investor protection. Many commenters indicated that the Commission's current disclosure rules, including the general risk factor provision, has not provided investors with disclosure of climate-related risks and their financial impacts at the level of detail sought by investors that would make the disclosure useful for their investment or voting decisions.[315] The final rules, by contrast, are responsive to investors' need for decision-useful information regarding registrants' material climate-related risks and will help ensure investors receive more consistent, comparable, and reliable disclosures about such risks.[316]

---

[312]  *See, e.g.*, letters from Morningstar; PwC; and World Business Council for Sustainable Development (Jun. 16, 2022) ("WBCSD").

[313]  *See* 17 CFR 229.1502(a).

[314]  *See supra* note 284 and accompanying text.

[315]  *See, e.g.*, *supra* note 102 and accompanying text; *infra* notes 395-397 and accompanying text.

[316]  *See supra* notes 244-249 and accompanying text.

Furthermore, adopting a climate-related risk disclosure rule that uses similar definitions (set forth in Item 1500) and is based on the climate-related disclosure framework of the TCFD, with which many registrants and investors are already familiar, will assist in standardizing climate-related risk disclosure and help elicit more consistent, comparable, and useful information for investors and limit the reporting burden for those registrants that are already providing some climate-related disclosure based on the TCFD framework.

At the same time, we recognize that many commenters expressed significant concerns about the scope of the proposed rules, indicating that they may elicit too much detail, may be costly or burdensome, could result in competitive harm, or may obscure other material information.[317] We have sought to address these concerns by modifying the definition of climate-related risks, by making the climate-related risk disclosure requirements less prescriptive, and by specifying the time frames during which a registrant should describe whether any such material risks are reasonably likely to manifest, as discussed below.[318]

The proposed rule would have required a registrant to describe any climate-related risks reasonably likely to have a material impact on the registrant, including on its business or consolidated financial statements. We have substituted "results of operations" and "financial condition" for "consolidated financial statements" here and in several of the final rule provisions to be more consistent with other Commission rules relevant to risk assessment, such as Item 303 of Regulation S-K regarding MD&A. We have used the term "business strategy" in the final rules to more closely align the final rules with the TCFD recommendation regarding the disclosure of the impacts of climate-related risks on strategy. These revisions do not create any

---

[317]    *See supra* notes 283 and 285.

[318]    *See infra* section II.C.2.

90

substantive differences compared to the proposed rules but should facilitate compliance because many registrants should be familiar with the terminology used.

Similar to the rule proposal, the final rules define *climate-related risks* to mean the actual or potential negative impacts of climate-related conditions and events on a registrant's business, results of operations, or financial condition.[319]  To make a registrant's determination of whether it is exposed to a material climate-related risk less burdensome, in response to commenters' concerns,[320] we have eliminated the reference to negative climate-related impacts on a registrant's value chain from the definition of climate-related risks.  This change means that a climate-related risk involving a registrant's value chain would generally not need to be disclosed except where such risk has materially impacted or is reasonably likely to materially impact the registrant's business, results of operations, or financial condition.  In addition, because a registrant may be able to assess the material risks posed by its value chain without having to request input from third parties in its value chain, this change will also limit the burdens of climate risk assessment on parties in a registrant's value chain that might have occurred under the rule proposal.[321]

Similar to the rule proposal, the definition of climate-related risks includes both physical risks and transition risks.  Also similar to the proposed definition, the final rules define "physical risks" to include both acute and chronic risks to a registrant's business operations.[322]  However, we are not including in the definition acute or chronic risks to the operations of those with whom a registrant does business, as proposed.  This change addresses the concerns of commenters

---

[319]     *See* 17 CFR 229.1500.

[320]     *See supra* notes 303 and 304 and accompanying text.

[321]     *See supra* notes 292303 and 293304 and accompanying text.

[322]     *See* 17 CFR 229.1500

regarding burdens associated with obtaining climate risk information about their counterparties over which they lack control.[323]

Similar to the rule proposal, "acute risks" is defined as event-driven risks and may relate to shorter-term severe weather events, such as hurricanes, floods, tornadoes, and wildfires.[324] "Chronic risks" is defined as those risks that the business may face as a result of longer term weather patterns, such as sustained higher temperatures, sea level rise, and drought, as well as related effects such as decreased arability of farmland, decreased habitability of land, and decreased availability of fresh water.[325] These enumerated risks are provided as examples of the types of physical risks to be disclosed and many represent physical risks that have already impacted and may continue to impact registrants across a wide range of economic sectors.[326]

The final rules define "transition risks" largely as proposed to mean the actual or potential negative impacts on a registrant's business, results of operations, or financial condition attributable to regulatory, technological, and market changes to address the mitigation of, or adaptation to, climate-related risks.[327] For reasons discussed above in relation to the definition of "climate-related risks," we are no longer including value chain impacts in the definition of "transition risks."[328] The final rules' definition of "transition risks" includes the same non-

---

[323] *See, e.g.*, letter from Chamber.

[324] *See* 17 CFR 229.1500. *See infra* section II.K.3.c.v for a discussion of the phrase "severe weather events" as used in subpart 1500 of Regulation S-K and Article 14 of Regulation S-X.

[325] *See id.*

[326] As discussed in more detail in section II.K.3.c.v, although Article 14 of Regulation S-X requires a registrant to disclose certain financial effects of severe weather events and other natural conditions, which may include weather events that are not climate-related, subpart 1500 of Regulation S-K does not require the disclosure of material impacts from non-climate-related weather events.

[327] *See* 17 CFR 229.1500.

[328] As noted above, a registrant would only need to disclose the transition risk of a party in its value chain when such transition risk has materially impacted or is reasonably likely to materially impact the registrant itself.

exclusive list of examples of transition risks as the rule proposal. Transition risks include, but are not limited to, increased costs attributable to climate-related changes in law or policy, reduced market demand for carbon-intensive products leading to decreased sales, prices, or profits for such products, the devaluation or abandonment of assets, risk of legal liability and litigation defense costs, competitive pressures associated with the adoption of new technologies, reputational impacts (including those stemming from a registrant's customers or business counterparties) that might trigger changes to market behavior, changes in consumer preferences or behavior, or changes in a registrant's behavior.[329]

Although some commenters asked the Commission to provide additional examples of transition risks in the definition,[330] we decline to do so. The final rules' examples are non-exclusive[331] and, consistent with the TCFD framework, a registrant's description of its material transition risks should include any type of transition risk that is applicable based on its particular facts and circumstances.[332] The particular type of material transition risk disclosed may be one that is not included or only partially included in the definition. Not every manifestation of transition risk, however, may apply or be material to every registrant and transition risks are dynamic and may change over time.

---

[329] *See* 17 CFR 229.1500. For example, one source of transition risk may be the IRA, Pub. Law 117–169, which was signed into Federal law on Aug. 16, 2022, and includes various initiatives meant to encourage companies, states, and consumers to invest in and adopt renewable energy and other "clean energy" technologies. *See* The White House, *Building A Clean Energy Economy: A Guidebook To The Inflation Reduction Act's Investments In Clean Energy And Climate Action* (Dec. 2022) ("Inflation Reduction Act Guidebook"). If, as a result of the IRA, consumers, small businesses, and other entities switch to more energy efficient products and services, a registrant that produces or uses less energy efficient products could face material impacts to its business, results of operations, or financial condition.

[330] *See supra* note 277 and accompanying text.

[331] *See* 17 CFR 229.1500 (definition of transition risk).

[332] *See, e.g.*, TCFD, *Guidance on Metrics, Targets, and Transition Plans* section E (Oct. 2021), available at https://assets.bbhub.io/company/sites/60/2021/07/2021-Metrics_Targets_Guidance-1.pdf.

The proposed rules would have required a registrant to disclose certain items of information about any material climate-related risk that a registrant has identified.[333]  In order to help address commenters' concerns that the rule proposal was too burdensome and could result in the disclosure of immaterial information, we have revised Item 1502, as adopted, to be less prescriptive.  In doing so, we have sought to strike an appropriate balance between providing investors with more consistent and decision-useful information about material climate-related risks while being conscious of the costs to registrants and investors of requiring specified disclosures that may not be relevant in every circumstance.  The final rules provide that a registrant that has identified a climate-related risk pursuant to Item 1502 must disclose whether the risk is a physical or transition risk, providing information necessary to an understanding of the nature of the risk presented and the extent of the registrant's exposure to the risk.[334]  The final rules then provide a non-exclusive list of disclosures that a registrant must disclose as applicable:

- If a physical risk, whether it may be categorized as an acute or chronic risk, and the geographic location and nature of the properties, processes, or operations subject to the physical risk;[335] and

- If a transition risk, whether it relates to regulatory, technological, market (including changing consumer, business counterparty, and investor preferences), or other transition-related factors, and how those factors impact the registrant.[336]

---

[333]     *See* Proposing Release, section II.B.1.

[334]     *See* 17 CFR 229.1502(a).

[335]     *See* 17 CFR 229.1502(a)(1)(i).

[336]     *See* 17 CFR 229.1502(a)(1)(ii).

Appellate Case: 24-1628     Page: 99     Date Filed: 03/26/2024 Entry ID: 5377362

When proposing the climate-related disclosure rules, the Commission stated that in some instances, chronic risks might give rise to acute risks. For example, a drought (a chronic risk) might contribute to wildfires (an acute risk), or increased temperatures (a chronic risk) might contribute to severe storms (an acute risk). In such instances, the Commission indicated that a registrant should provide a clear and consistent description of the nature of the risk and how it may affect a related risk, as well as how those risks have evolved or are expected to evolve over time.[337]

The final rules require a registrant to provide information necessary to an understanding of the nature of the risk presented and the extent of the registrant's exposure to the risk. We agree, however, with commenters that indicated that requiring a discussion about the interaction of two related physical risks may, due to its complexity, increase the burden on the registrant without yielding a corresponding benefit for investors.[338] While a registrant may opt to provide such discussion, it is not a mandatory disclosure item under the final rules. We also agree with commenters that stated that, for complex and overlapping physical risks, registrants can determine how best to categorize the physical risk as either acute or chronic.[339] What is important is that a registrant describe the climate-related physical risks it faces clearly and consistently, including regarding the particular categories of physical risk. As a disclosed risk develops over time, for example where the category of physical risk has changed and/or the nature of the impact to the registrant has evolved, depending on the facts and circumstances, the registrant may need to describe the changed risk in order for an investor to understand the impact

---

[337] *See* Proposing Release, section II.B.1.

[338] *See, e.g.*, letters from CEMEX; Eni SpA; and ERM CVS.

[339] *See* letter from IAA.

or reasonably likely impact of the risk on the registrant, including on its business strategy, results of operations, or financial condition.

Some commenters opposed proposed Item 1502 because in their view it would be difficult for a registrant to distinguish between a climate-related physical risk and an ordinary weather risk,[340] or between a business activity in response to a transition risk and one that is part of a routine business strategy.[341]  While we recognize that application of some of the Commission's climate disclosure rules may initially be difficult for certain registrants, we expect that compliance will become easier as registrants grow more familiar with disclosing how climate-related factors may impact their business strategies.[342]  In this regard, we note that many registrants are already providing some of the TCFD-recommended disclosures, although in a piecemeal fashion and largely outside of the registrant's Commission filings.  In addition, we have modified the proposed rules in several places to require disclosure only if a registrant is already undertaking a particular analysis or practice or has already made a judgment that a particular risk is climate-related.[343]  Further, the lengthy phase in periods for the final rules will provide registrants additional time to develop, modify, and implement any processes and controls necessary to the assessment and reporting of any material climate-related risk.[344]

---

[340]    In this regard, according to the National Oceanic and Atmospheric Administration ("NOAA"), weather refers to short-term changes in the atmosphere whereas climate describes what the weather is like over a long period of time in a specific area.  *See* NOAA, *What's the Difference Between Weather and Climate?*, available at https://www.ncei.noaa.gov/news/weather-vs-climate.

[341]    *See supra* notes 289 and 298.

[342]    We also expect that compliance with the final rules will become easier as registrants commence disclosing climate-related information pursuant to other jurisdictions' climate disclosure requirements, to the extent those requirements are similar to the final rules.

[343]    *See, e.g.*, *infra* section II.D.

[344]    *See infra* section II.O.

The final rules include several changes from the proposal that mitigate some of the burdens of Item 1502(a), as it was proposed.  For example, the rule proposal would have required a registrant to disclose the location and nature of the properties, processes, or operations subject to the physical risk, and to provide the ZIP code or other subnational postal zone.[345]  The final rules we are adopting no longer require such disclosure and instead include, as one of the physical risk items that a registrant must disclose, as applicable, the geographic location and nature of the properties, processes, or operations subject to the identified physical risk.[346]  This revision is intended to address the concern of many commenters that the proposed ZIP code disclosure requirement would be burdensome to produce and would likely not provide useful information for many investors.[347]  This revision will give registrants the flexibility to determine the granularity of any location disclosures based on their particular facts and circumstances as long as they provide information necessary to understand the extent of the registrant's exposure to the material risk.

The proposal would have called for specific information about physical risks, such as disclosures relating to flooding and the location of assets in regions of high or extremely high water stress.  In particular, the rule proposal would have required a registrant that faces a material physical risk due to flooding or water stress to disclose the percentage of buildings, plants, or properties that are located in flood hazard areas or the amount and percentage of assets located in water-stressed areas.  In a change from the rule proposal, we have eliminated this proposed requirement in order to make the final rules less burdensome and permit the registrant

---

[345]  *See* Proposing Release, section II.B.1.

[346]  *See* 17 CFR 229.1502(a)(1).

[347]  *See supra* note 286 and accompanying text.

to determine the particular metrics that it should disclose, if any, based on its particular facts and circumstances.  Instead, the physical risk disclosure provision we are adopting is less prescriptive and subject to the general condition applicable to both physical and transition risk disclosure that, when describing a material climate-related risk, a registrant must provide information necessary to an understanding of the nature of the risk presented and the extent of the registrant's exposure to the risk.[348]

These revisions help address the concern of some commenters that the proposed disclosure requirements were too prescriptive and could result in overly granular and immaterial disclosure.[349]  The less prescriptive approach of the final rules also addresses the concern of some commenters that the resulting disclosure could cause investor confusion by obscuring other disclosed risks that are presented in less detail.[350]  We expect that the final rules will elicit disclosures more reflective of a registrant's particular business practices.

With respect to those commenters who stated that the required metrics disclosure should cover more than just water-related physical risks, the less prescriptive approach in the final rules eliminates any potential overemphasis on water-related physical risks and gives registrants flexibility to describe any physical risks they may be facing.[351]  Finally, the revised approach in

---

[348]    *See* 17 CFR 229.1502(a).

[349]    *See, e.g.*, letters from ABA; CEMEX; NAM; and SIFMA.

[350]    *See supra* note 287 and accompanying text.  As described below, the addition of materiality qualifiers to certain of the final rule's climate risk disclosure requirements will also help address this concern by eliciting detailed disclosure only when it is material.  *See infra* section II.D.

[351]    *See, e.g.*, letters from CalPERS (recommending that the Commission should also require information on areas subject to droughts, heatwaves, and wildfires); IAA (recommending that the Commission require registrants to provide quantitative details of the volume or revenue (percentage) contribution for facilities located in areas subject to water scarcity, flood risk, wildfires, and other climate-related natural disasters); and Morningstar (recommending that the Commission go further in mandating quantitative disclosures related to a registrant's assets exposed to physical climate risk, as such data is important across economic sectors).

Appellate Case: 24-1628    Page: 103    Date Filed: 03/26/2024 Entry ID: 5377362

the final rules will allow a registrant's disclosures to adapt to changing circumstances over time, while still providing sufficient information for investors to understand and assess any such changes.

Similar to the physical risk rule provision, the final rule requires registrants to disclose the nature of any transition risk presented and the extent of the registrant's exposure to the risk. It also includes a non-exclusive list of disclosures the registrant must provide, as applicable, including whether the transition risk relates to regulatory, technological, market, or other transition-related factors, and how those factors impact the registrant.[352] Describing the nature of an identified transition risk in this manner will help investors understand the realized or potential material impacts of the identified transition risk and whether and how a registrant intends to mitigate or adapt to such risk.

Consistent with the rule proposal, the final rule provision states that a registrant that has significant operations in a jurisdiction that has made a GHG emissions reduction commitment should consider whether it may be exposed to a material transition risk related to the implementation of the commitment.[353] Including this guidance within the rule text will serve to

---

[352] *See* 17 CFR 229.1502(a) and 1502(a)(2).  In a change from the proposal, the final rules omit a specific reference to liability and reputational factors from the transition risk disclosure required pursuant to Item 1502(a)(2).  This change was made in order to conform more closely to the definition of "transition risks" in Item 1500, which refers to "regulatory, technological, and market changes."  Although this definition refers to impacts to a registrant's liability or reputation as non-exclusive examples of negative impacts resulting from such changes, the definition of transition risks also refers to other examples of negative impacts that are not specifically mentioned in Item 1502(a)(2).  To streamline the Item 1502(a)(2) disclosure requirement, and to avoid giving undue emphasis to impacts to a registrant's liability or reputation over other transition risk-related impacts, we have removed the specific reference to liability and reputational factors and have retained the more general reference to "other transition-related factors."  A registrant that, due to regulatory, technological, or market changes, has incurred or is reasonably likely to incur a material negative impact to its reputation or liability will be required to include a description of such impact, together with any other material transition-related impact, in its disclosure pursuant to Item 1502(a)(2).

[353] *See* 17 CFR 229.1502(a)(2).

remind registrants operating in such a jurisdiction that they may need to provide disclosure to investors about this specific type of transition risk.

The proposed rule provisions pertaining to governance, strategy, and risk management would have permitted a registrant, at its option, to describe any climate-related opportunities it was pursuing when responding to those provisions.[354]  In this regard, the Commission proposed a definition of "climate-related opportunities" that was similar to the corresponding definition provided by the TCFD.[355]  While we are retaining the optional approach to disclosure related to climate-related opportunities, unlike the proposed rules, the final rules do not refer to climate-related opportunities and therefore do not include a corresponding definition.  We are treating the disclosure of climate-related opportunities the same as other voluntary disclosure.  Accordingly, despite the absence of a corresponding provision, a registrant may elect to also include disclosure regarding any material climate-related opportunities it is pursuing or is reasonably likely to pursue in addition to disclosure regarding material climate-related risks.[356]

## 2. Time Horizons and the Materiality Determination (Item 1502(a))

### a. Proposed Rule

The rule proposal would have required a registrant to describe any climate-related risks reasonably likely to have a material impact, which may manifest over the short, medium, and long term.  The rule proposal also would have required the registrant to describe how it defines

---

[354]  *See* Proposing Release, sections II.B through II.E.

[355]  *Compare* Proposing Release, section II.B (proposing to define "climate-related opportunities to mean the actual or potential positive impacts of climate-related conditions and events on a registrant's consolidated financial statements, business operations, or value chains, as a whole) *with* TCFD, *Recommendations of the Task Force on Climate-related Financial Disclosures*, Appendix 5 (defining "climate-related opportunity" to mean "the potential positive impacts related to climate change on an organization").

[356]  Registrants have a fundamental obligation not to make materially misleading statements or omissions in their disclosures and may need to provide such additional information as is necessary to keep their disclosures from being misleading.  *See* 17 CFR 230.408 and 17 CFR 240.12b-20.

100

App.100

short-, medium-, and long-term time horizons, including how it takes into account or reassesses the expected useful life of the registrant's assets and the time horizons for its climate-related planning processes and goals.[357]

### b. Comments

Many commenters supported the proposed requirement to describe any material climate-related risk that may manifest over the short, medium, and long term.[358]  Commenters stated that the proposed time horizons are consistent with the time horizons recommended by the TCFD.[359]  Commenters also stated that it is important to assess climate-related risks over multiple time periods because of the changing frequency and severity of climate-related events.[360]

Some commenters supported leaving the time periods undefined while requiring a registrant to specify how it defines short-, medium-, and long-term horizons, as proposed.[361]  Commenters stated that the proposed approach aligns with the TCFD framework and would provide flexibility for registrants by allowing them to choose time periods that best fit their particular facts and circumstances.[362]  Other commenters stated that the Commission should define short-, medium-, and long-term horizons to enhance the comparability of climate risk disclosure.[363]  Commenters recommended various definitions for such time periods.  For

---

[357]    *See* Proposing Release, section II.B.

[358]    *See, e.g.*, letters from Anthesis; Bloomberg; BNP Paribas; CalPERS; CalSTRS; CEMEX; CFA; Center for Climate and Energy Solutions (June 17, 2022) ("C2ES"); Dell; D. Hileman Consulting; Eni SpA; ERM CVS; Harvard Mgmt.; IAA; ICGN; ICI; Moody's; Morningstar; PRI; PwC; SKY Harbor; TotalEnergies; US TAG TC207; and Wellington Mgmt.

[359]    *See, e.g.*, letters from Anthesis; and PRI.

[360]    *See, e.g.*, letters from PRI; and Wellington Mgmt.

[361]    *See, e.g.*, letters from Bloomberg; C2ES; IAA; PRI; SKY Harbor; and TotalEnergies.

[362]    *See, e.g.*, letters from Bloomberg; IAA; J. McClellan (June 17, 2022); and PRI.

[363]    *See, e.g.*, letters from CalSTRS; Calvert; CEMEX; Dell; D. Hileman Consulting; ERM CVS; ICI; Morningstar; and Wellington Mgmt.

Appellate Case: 24-1628      Page: 106      Date Filed: 03/26/2024 Entry ID: 5377362

example, one commenter stated that the Commission should define short-term as 5 years, medium-term as 6 to 15 years, and long-term as 16 to 30 years.[364]  Other commenters recommended defining short-term as one year, medium-term as 5 years, and long-term as 10 years.[365]  Another commenter recommended defining short-term as 1 to 5 years, medium-term as 5 to 20 years, and long-term as 20 to 30 years.[366]  One other commenter recommended defining medium-term as 5 to 10 years and long-term as 10 to 30 years.[367]

Many other commenters opposed the proposed requirement to disclose material climate-related risks as manifested over the short, medium, and long term.[368]  Commenters stated that the proposed requirement ran counter to the traditional materiality standard by which a registrant determines if a risk is material to itself as a general matter rather than applying that standard over multiple different timeframes, and indicated that such an approach could require the registrant to engage in multiple different materiality analyses.[369]  Commenters also stated that the proposed requirement, which could compel a registrant to consider circumstances many years into the future, would elicit risk disclosure that is highly speculative.[370]  Some commenters stated that, instead of the proposed disclosure requirement, the Commission should impose the same temporal standard that registrants use in practice when preparing a registrant's MD&A (i.e., when assessing the risks that are reasonably likely to have a material impact on future operations

---

[364]    *See* letter from CalSTRS.

[365]    *See* letters from Calvert; and ICI.

[366]    *See* letter from CEMEX.

[367]    *See* letter from US TAG TC207.

[368]    *See, e.g.*, letters from ABA; Alphabet *et al*.; AFPM; American Investment Council (June 17, 2022) ("AIC"); Associated General Contractors of America (June 17, 2022) ("AGCA"); BOA; "BPI; Cato Inst.; Chamber; Davis Polk; Enbridge; NAM; RILA; SIFMA; Soc. Corp. Gov.; and J. Weinstein.

[369]    *See, e.g.*, letters from Alphabet *et al*.; AIC; BOA; and BPI.

[370]    *See, e.g.*, letters from AFPM; Cato Inst.; Chamber; Davis Polk; RILA; Soc. Corp. Gov.; and J. Weinstein.

"over whatever time period is relevant to a registrant's particular facts and circumstances").[371] Some commenters recommended bifurcating the climate risk disclosures into short-term and long-term timeframes, without a medium-term timeframe, similar to certain MD&A disclosures.[372] One of those commenters stated that imposing a different temporal standard for climate risk disclosure would pose meaningful challenges to management as they seek to adapt their strategies and could result in misalignment of climate-related disclosures with "other, potentially more critical, strategically relevant disclosure issues, including the financial statements and MD&A."[373]

### c. Final Rule

In a change from the rule proposal, the final rule (Item 1502(a)) provides that in describing any climate-related risks that have materially impacted or are reasonably likely to have a material impact, a registrant should describe whether such risks are reasonably likely to manifest in the short-term (i.e., the next 12 months) and separately in the long-term (i.e., beyond the next 12 months).[374] This temporal standard is generally consistent with an existing standard in MD&A, which was recommended by some commenters.[375] That MD&A standard specifically requires a registrant to analyze its ability to generate and obtain adequate amounts of cash to meet its requirements and plans for cash in the short-term (i.e., the next 12 months from the most recent fiscal period end required to be presented) and separately in the long-term (i.e.,

---

[371]   *See, e.g.*, letters from ABA; and SIFMA; *see also* letter from NAM (stating that the relevant time periods should be short-term (18 to 24 months) and long-term (anything over 24 months), according to the registrant's particular facts and circumstances).

[372]   *See* letter from ABA.

[373]   *See id.*

[374]   *See* 17 CFR 229.1502(a).

[375]   *See, e.g.*, letter from ABA.

beyond the next 12 months).[376]  The existing MD&A standard also generally requires that a registrant "provide insight into material opportunities, challenges and risks, such as those presented by known material trends and uncertainties, on which the company's executives are most focused for both the short and long term, as well as the actions they are taking to address these opportunities, challenges and risks."[377]  We are adopting this temporal standard to address the concern of commenters that imposition of a different temporal standard (and, in particular, one that includes a "medium term" period) for climate risk disclosure would pose challenges and potentially conflict with a registrant's assessment of other risks and events that are reasonably likely to have a material impact on its future operations.[378]  We note, however, that a registrant is not precluded from breaking down its description of risks reasonably likely to manifest beyond the next 12 months into components that may include more medium- and longer-term risks, if that is consistent with the registrant's assessment and management of the climate-related risk.

We are modeling the temporal standard in Item 1502(a) on this MD&A standard as recommended by commenters because the materiality determination that a registrant will be required to make regarding climate-related risks under the final rules is the same as what is generally required when preparing the MD&A section in a registration statement or annual report.  MD&A requires a registrant to disclose material events and uncertainties known to management that are reasonably likely to cause reported financial information not to be

---

[376]    *See* 17 CFR 229.303(b)(1).

[377]    See Commission Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operation, Release No. 33-8350 (Dec. 19, 2003) [68 FR 75056 (Dec. 29, 2003)].  See also Management's Discussion and Analysis of Financial Condition and Results of Operations; Certain Investment Company Disclosures, Release No. 33-6835 (May 18, 1989) [54 FR 22427 (May 24, 1989)] (stating that MD&A is "an opportunity to look at the company through the eyes of management by providing both a short and long-term analysis of the business of the company").

[378]    *See supra* notes 368-371 and accompanying text.

necessarily indicative of future operating results or of future financial condition.[379] MD&A further requires the inclusion of descriptions and amounts of matters that have had a material impact on reported operations as well as matters that are reasonably likely to have a material impact on future operations.[380]

When evaluating whether any climate-related risks have materially impacted or are reasonably likely to have a material impact on the registrant, including on its business strategy, results of operations, or financial condition, registrants should rely on traditional notions of materiality. As defined by the Commission and consistent with Supreme Court precedent, a matter is material if there is a substantial likelihood that a reasonable investor would consider it important when determining whether to buy or sell securities or how to vote or such a reasonable investor would view omission of the disclosure as having significantly altered the total mix of information made available.[381] The materiality determination is fact specific and one that requires both quantitative and qualitative considerations.[382]

---

[379] *See* 17 CFR 229.303(a).

[380] See *Management's Discussion and Analysis, Selected Financial Data, and Supplementary Financial Information*, Release No. 33-10890 (Nov. 19, 2020), [86 FR 2080, 2089 (Jan. 11, 2021)] ("2020 MD&A Adopting Release").

[381] *See* 17 CFR 230.405 (definition of "material"); 17 CFR 240.12b-2 (definition of "material"). *See also Basic Inc. v. Levinson*, 485 U.S. 224, 231, 232, and 240 (1988) (holding that information is material if there is a substantial likelihood that a reasonable investor would consider the information important in deciding how to vote or make an investment decision; and quoting *TSC Industries, Inc. v. Northway, Inc.*, 426 U. S. 438, 449 (1977) to further explain that an omitted fact is material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.").

[382] *See Litwin v. Blackstone Group, L.P.*, 634 F.3d 706, 720 (2d Cir. 2011) ("[A] court must consider 'both quantitative and qualitative factors in assessing an item's materiality,' and that consideration should be undertaken in an integrative manner."). *See also Business and Financial Disclosure Required by Regulation S-K*, Release No. 33-10064 (Apr. 13, 2016) [81 FR 23915 (Apr. 22, 2016)] ("Concept Release") (discussing materiality in the context of, among other matters, restating financial statements). *See also* Staff Accounting Bulletin No. 99 (Aug. 12, 1999), available at

Appellate Case: 24-1628    Page: 110    Date Filed: 03/26/2024 Entry ID: 5377362

The "reasonably likely" component of the rules we are adopting, as with the same standard in MD&A regarding known trends, events, and uncertainties, is grounded in whether disclosure of the climate-related risk would be material to investors and requires that management evaluate the consequences of the risk as it would any known trend, demand, commitment, event, or uncertainty. Accordingly, management should make an objective evaluation, based on materiality, including where the fruition of future events is unknown.[383]

### D. Disclosure Regarding Impacts of Climate-Related Risks on Strategy, Business Model, and Outlook

#### 1. Disclosure of Material Impacts (Item 1502(b), (c), and (d))

##### a. Proposed Rules

The Commission proposed to require a registrant to describe the actual and potential impacts on its strategy, business model, and outlook of those climate-related risks that it must disclose pursuant to proposed Item 1502(a).[384] The Commission further proposed to require a registrant to include in such description any impacts on its:

---

https://www.sec.gov/interps/account/sab99.htm (emphasizing that a registrant or an auditor may not substitute a percentage threshold for a materiality determination that is required by applicable accounting principles). Staff accounting bulletins are not rules or interpretations of the Commission, nor are they published as bearing the Commission's official approval. They represent interpretations and practices followed by the Division of Corporation Finance and the Office of the Chief Accountant in administering the disclosure requirements of the Federal securities laws. Staff accounting bulletins and any other staff statements discussed in this release have no legal force or effect: they do not alter or amend applicable law, and they create no new or additional obligations for any person.

[383] *See, e.g.*, 2020 MD&A Adopting Release. As noted above, the materiality determination that a registrant will be required to make regarding climate-related risks under the final rules is the same as what is generally required when preparing the MD&A section of a registration statement or annual report. Accordingly, registrants can look to the guidance in the 2020 MD&A Adopting Release regarding application of the "reasonably likely" standard when considering their disclosure obligations under the various components of Item 1502. According to this guidance, the reasonably likely standard "is not intended to, nor does it require, registrants to affirm the non-existence or non-occurrence of a material future event." Rather, "it requires management to make a thoughtful and objective evaluation, based on materiality, including where the fruition of future events is unknown." 2020 MD&A Adopting Release, 86 FR at 2093.

[384] *See* Proposing Release, section II.C.1.

- Business operations, including the types and locations of its operations;

- Products or services;

- Suppliers and other parties in its value chain;

- Activities to mitigate or adapt to climate-related risks, including adoption of new technologies or processes;

- Expenditure for research and development; and

- Any other significant changes or impacts.

The proposed rules would have required a registrant to disclose the time horizon for each described impact (i.e., as manifested in the short, medium, or long term, as defined by the registrant when determining its material climate-related risks).[385]

When proposing these disclosure requirements, the Commission stated that information about how climate-related risks have impacted or are likely to impact a registrant's strategy, business model, and outlook can be important for purposes of making an investment or voting decision about the registrant.[386]  The Commission further noted that, in response to a request for public input,[387] several commenters had stated that many registrants included largely boilerplate discussions about climate-related risks and failed to provide a meaningful analysis of the impacts of those risks on their businesses.[388]  The Commission proposed the disclosure requirements about climate-related impacts to elicit more robust and company-specific disclosure on this topic.[389]

---

[385]    *See id.*

[386]    *See id.*

[387]    *See* Proposing Release, section I.B.

[388]    *See* Proposing Release, section II.C.1.

[389]    *See id.*

Appellate Case: 24-1628     Page: 112     Date Filed: 03/26/2024 Entry ID: 5377362

The proposed rules also would have required a registrant to discuss whether and how it has considered the identified impacts as part of its business strategy, financial planning, and capital allocation.[390]  In this regard, the proposed rules would have required a registrant to provide both current and forward-looking disclosures that facilitate an understanding of whether the implications of the identified climate-related risks have been integrated into the registrant's business model or strategy, including how resources are being used to mitigate climate-related risks.  The proposed rules would have required the discussion to include how any of the climate-related financial metrics referenced in proposed Article 14 of Regulation S-X, the metrics referenced in the GHG emissions section of proposed subpart 1500 of Regulation S-K, or any of the targets referenced in the targets and goals section of proposed subpart 1500, relate to the registrant's business model or business strategy.[391]

In addition, the proposed rules would have required a registrant to provide a narrative discussion of whether and how any of its identified climate-related risks have affected or are reasonably likely to affect the registrant's consolidated financial statements.[392]  The proposed rules would have required this discussion to include any of the climate-related financial metrics referenced in proposed Article 14 of Regulation S-X that demonstrate that the identified climate-related risks have had a material impact on the registrant's reported financial condition or operations.[393]  This proposed provision was intended to provide climate-related disclosure that is similar to MD&A, and, as noted in the discussion above, the proposed rules would allow a registrant to provide such disclosure as part of its MD&A.

---

[390]     *See id.*

[391]     *See id.*

[392]     *See id.*

[393]     *See id.*

### b. Comments

Many commenters supported the Commission's proposal to require a registrant to describe the actual and potential impacts on its strategy, business model, and outlook of those climate-related risks that it has determined are reasonably likely to have a material impact on its business or consolidated financial statements.[394]  Commenters indicated that detailed information about the actual and potential impacts of a registrant's identified climate-related risks is central to helping investors do the following: understand the extent to which a registrant's business strategy or business model may need to change to address those impacts; evaluate management's response to the impacts and the resiliency of the registrant's strategy to climate-related factors; and assess whether a registrant's securities have been correctly valued.[395]  One commenter indicated that investors need more detailed information about the effects of climate-related risks because such risks can affect a company's operations and financials in a wide range of ways, including impacts on revenues, the useful life of assets, loan qualification, and insurance costs.[396]  Other commenters stated that, despite the importance for investors of information about climate-related financial impacts, such information is currently underreported.[397]

Several commenters also supported the proposed requirement to include in the impacts description any impacts on, or any significant changes made to, a registrant's business operations, products or services, suppliers and other parties in its value chain, activities to

---

[394]  *See, e.g.*, letters from AGs of Cal. *et al.*; Amazon; Amer. for Fin. Reform, Sunrise Project *et al.*; Anthesis; Bloomberg; BNP Paribas; Breckinridge Capital Advisors; CalSTRS; Center Amer. Progress; Ceres; Eni SpA; D. Hileman Consulting; IAC Recommendation; NY St. Comptroller; PIMCO; PRI; PwC; SKY Harbor; Unilever; and Wellington Mgmt.

[395]  *See, e.g.*, letters from Amer. for Fin. Reform, Sunrise Project *et al.*; CalSTRS; Ceres; Eni SpA; and Wellington Mgmt.

[396]  *See* letter from Center Amer. Progress.

[397]  *See, e.g.*, letters from Ceres; PIMCO; PwC; and Wellington Mgmt.

Appellate Case: 24-1628     Page: 114     Date Filed: 03/26/2024 Entry ID: 5377362

mitigate or adapt to climate-related risks, including adoption of new technologies or processes and expenditure for research and development, and any other significant changes or impacts.[398] Commenters stated that the proposed enumerated disclosure items, including impacts related to a registrant's supply or value chain, are necessary to provide a comprehensive description of a registrant's identified climate-related risks, and are consistent with the types of impacts that a registrant may face and that are recommended for disclosure by the TCFD.[399] Commenters further stated that the proposed disclosure items would help investors understand the extent to which a registrant has taken actions to mitigate or adapt to a material climate-related risk.[400] One commenter, however, recommended that the final rules should clarify that the list of impacts are examples of impacts, to be disclosed if applicable, and not required items of disclosure.[401]

A number of commenters also supported the proposed requirement to disclose whether and how a registrant has considered any identified impacts as part of its business strategy, financial planning, and capital allocation because it would help investors assess a registrant's likely resiliency to climate-related impacts and because, due to its consistency with the TCFD's recommendations, the proposed disclosure requirement would lead to more consistent, comparable, and reliable climate-related disclosure.[402] Several commenters further supported the proposed provision requiring a registrant to provide a narrative discussion of whether and how any of its identified climate-related risks have affected or are reasonably likely to affect its

---

[398] *See, e.g.*, letters from Amer. for Fin. Reform, Sunrise Project *et al.*; CalSTRS; Eni SpA; PRI; TotalEnergies; and Wellington Mgmt.

[399] *See, e.g.*, letters from Amer. for Fin. Reform, Sunrise Project *et al.*; and PRI.

[400] *See, e.g.*, letters from CalSTRS; and Eni SpA.

[401] *See* letter from PwC.

[402] *See, e.g.*, letters from Anthesis; CalPERS; D. Hileman Consulting; PRI; and TotalEnergies.

Appellate Case: 24-1628    Page: 115    Date Filed: 03/26/2024 Entry ID: 5377362

consolidated financial statements.[403] Some of those commenters recommended that this narrative discussion should be part of a registrant's MD&A.[404] One commenter stated that the proposed provision would help investors understand how management views the realized or likely impacts of identified climate-related risks on a company's consolidated financial statements, which would then assist investors in their assessment of a registrant's climate risk management.[405]

One commenter recommended adopting a climate disclosure framework, similar to MD&A, that focuses on providing investors with material climate-related information that management uses to make strategic decisions while allowing registrants to tailor the disclosure to fit their particular circumstances.[406] This commenter stated that requiring a discussion of climate-related impacts from management's perspective and encompassing impacts to the registrant, its suppliers, and other parties in its value chain would provide investors with what has primarily been missing from current Commission filings.[407] The Commission's Investor Advisory Committee similarly recommended requiring a separate "Management Discussion of Climate-Related Risks and Opportunities" in Form 10-K, similar to the disclosure required by Item 303 of Regulation S-K (MD&A), which would enhance investor understanding of management's views of climate-related risks and opportunities.[408]

Several commenters stated that, instead of requiring the disclosure of financial metrics concerning climate-related impacts in the financial statements, as proposed, the Commission

---

[403] *See, e.g.*, letters from AllianceBernstein; Beller *et al.*; BNP Paribas; CalPERS; CEMEX; Eni SpA; ICI; Morningstar; PwC; TotalEnergies; and Unilever.

[404] *See, e.g.*, letters from AllianceBernstein; Beller *et al.*; and BNP Paribas.

[405] *See* letter from Amer. for Fin. Reform, Sunrise Project *et al.*

[406] *See* letter from PwC.

[407] *See id.*

[408] *See* IAC Recommendation.

should require registrants to consider material climate-related impacts when discussing the results of operations, capital resources, and liquidity under MD&A.[409] One commenter, responding to the Commission's proposed amendments to Regulation S-X, recommended requiring the disclosure of a registrant's actual discrete and separable climate-related expenditures, both expensed and capitalized, made during each fiscal year, which would be linked to and aligned with the risks, goals, and strategies companies would disclose under proposed Item 1502 of Regulation S-K.[410] The commenter's recommended expenditures disclosure would be included in the financial statements but would take the place of the proposed "financial impacts" disclosure under Regulation S-X and would be presented in tabular format and cover three distinct categories: climate-related events; transition activities for publicly disclosed climate-related targets and goals, such as those included in a company's sustainability report; and all other transition activities.[411] Another commenter stated that if a registrant's financial estimates and assumptions are impacted by exposures to uncertainties associated with transition risks, the registrant should be required to provide qualitative disclosure about such impacts to its financial estimates and assumptions in its climate-related disclosure or in its MD&A instead of in the financial statements.[412]

---

[409] *See, e.g.*, letter from Randi Morrison, Soc. Corp. Gov (Sept. 9, 2022); *see also* letters from ABA; Airlines for America; Alphabet *et al.*; Amer. Bankers; BDO USA LLP; BPI; California Resources Corporation (June 17, 2022) ("Cal. Resources"); Can. Bankers; CAQ; FEI's Committee on Corporate Reporting (June 17, 2022) ("CCR"); Climate Risk Consortia; Connor Grp.; Diageo; Dominion Energy; Eni Spa; Grant Thornton; LLP; IIB; IIF; Financial Reporting Committee of the Institute of Management Accountants (June 21, 2022) ("IMA"); IPA; JLL (June 17, 2022) ("JLL"); Linklaters LLP (June 17, 2022) ("Linklaters"); Mtg. Bankers; NG; Royal Gold (June 17, 2022); Shearman Sterling; SIFMA AMG; T. Rowe Price; Unilever; Walmart; and Wells Fargo.

[410] *See* letter from Amazon.

[411] *See id.*

[412] *See* letter from IMA.

Many other commenters, however, broadly opposed the proposed disclosure requirement regarding impacts from climate-related risks.[413]  Some commenters stated that the proposed disclosure requirement was unnecessary because the Commission's existing rules already require a registrant to disclose material impacts from climate-related risks.[414]  Some commenters expressed concern that the proposed disclosure requirement would result in disclosure of a large volume of information that is immaterial to investors and burdensome for registrants to produce.[415]  Some commenters stated that the proposed requirement to disclose impacts on participants in a registrant's value chain was particularly onerous for registrants because of difficulties in collecting relevant and reliable information from third parties.[416]  In this regard, some commenters stated that suppliers and other parties in a registrant's value chain may resist pressure to provide the data necessary to assess their climate risk exposure because they are private companies concerned about incurring increased costs or competitive harm.[417]  Other commenters stated that the proposed disclosure requirement was too prescriptive and would not allow a registrant to tailor its disclosures according to its particular business or industry.[418]  One commenter recommended that we delete the term "business model" because it is not otherwise

---

[413]  *See, e.g.*, letters from American Automotive Leasing Association, America Car Rental Association, Truck Renting and Leasing Association (June 17, 2022) ("AALA"); American Bankers Association (June 17, 2022) ("Amer. Bankers"); Amer. Chem.; AGC; CEMEX; Fenwick West; D. Burton, Heritage Fdn.; J. Brendon Herron (June 17, 2022) ("J. Herron"); NMA; National Retail Federation (June 17, 2022) ("NRF"); RILA; and Walmart.

[414]  *See, e.g.*, letters from CEMEX; Fenwick West; D. Burton, Heritage Fdn; and NMA.

[415]  *See, e.g.*, letters from AGC; Fenwick West; NMA; NRF; RILA; and Walmart.

[416]  *See, e.g.*, letters from AGC; Soc. Corp. Gov.; United Air; and Williams Cos.

[417]  *See, e.g.*, letters from AGC; Soc. Corp. Gov.; and United Air.

[418]  *See, e.g.*, letters from AALA; J. Herron; NMA; and Walmart.

used in Regulation S-K and might be interpreted by some registrants that do not have a business model as implying that they must adopt one.[419]

Some commenters generally supported the proposed impact disclosure provision but recommended that the Commission add a materiality qualifier to elicit disclosure of only the most likely and significant impacts, which they asserted would provide more useful information for investors and reduce a registrant's compliance burden.[420] Similarly, some commenters generally supported some form of climate disclosure while recommending that the Commission make the final rules more principles-based so that registrants could better tailor their disclosures to reflect their own particular facts and circumstances.[421]

### c. Final Rules

The final rule provision (Item 1502(b)) will require a registrant to describe the actual and potential material impacts of any climate-related risk identified in response to Item 1502(a) on the registrant's strategy, business model, and outlook.[422] Information about the actual and potential material impacts of climate-related risks on a registrant's strategy, business model, and outlook is central to understanding the extent to which a registrant's business strategy or business model has changed, is changing, or is expected to change to address those impacts. This information is also central to evaluating management's response to the impacts and the resiliency of the registrant's strategy to climate-related factors as it pertains to the registrant's results of

---

[419] *See* letter from ABA.

[420] *See, e.g.*, letters from Amazon; Beller *et al*.; and ICI.

[421] *See, e.g.*, letters from ABA; Beller *et al*.; and Walmart.

[422] *See* 17 CFR 229.1502(b). As used in the final rules, the term "outlook" means "the prospect for the future," consistent with its general definition. *See* Merriam-Webster Dictionary, available at https://www.merriam-webster.com/dictionary/outlook. For the avoidance of doubt, use of the term "outlook" is not intended to suggest that a registrant must disclose its earnings guidance or forecasts in response to Item 1502(b).

operations and financial condition.  Numerous commenters on the proposal shared some or all of these views.[423]

The proposed rule did not specifically include a materiality qualifier when requiring a registrant to describe the actual and potential impacts of any identified climate-related risk in response to proposed Item 1502(a).  In practice, however, proposed Item 1502(b) would have elicited disclosure focused on material impacts because proposed Item 1502(a) would have required a registrant to describe only those climate-related risks that the registrant had identified as having materially impacted or being reasonably likely to have a material impact on the registrant.[424]  Nevertheless, we recognize that, as proposed, Item 1502(b) may have caused some confusion regarding the scope of the proposed disclosure requirement.[425]  Some commenters misinterpreted the rule proposal as requiring the disclosure of actual or potential impacts of climate-related risks, regardless of their materiality.[426]  We have, therefore, added an explicit materiality qualifier to Item 1502(b) to clarify that a registrant is only required to disclose material impacts of climate-related risks that it has identified in response to Item 1502(a).  This clarifying amendment will help address commenters' concerns that the proposed rule could result in the disclosure of large amounts of immaterial information and thus be unduly burdensome for registrants.

Some commenters asserted that the proposed rule provision was not necessary because the Commission's existing rules generally require a registrant to disclose the effects of material

---

[423]    *See supra* note 395 and accompanying text.

[424]    *See supra* section II.C.1.a.

[425]    *See, e.g.*, letter from Fenwick West.

[426]    *See, e.g.*, letters from Fenwick West; and RILA.

risks, including climate-related risks.[427]  However, as other commenters have stated, many companies do not discuss any climate-related risks in response to existing disclosure requirements.[428]  Accordingly, a rule provision that specifically requires the disclosure of material impacts of climate-related risks, and lists the types of potential material impacts that must be described, if applicable, will provide investors access to this information on a more consistent and comparable basis.[429]

The final rule provision largely lists the same types of potential material impacts of climate-related risks as under the rule proposal.  The list, which is intended to be non-exclusive, includes, as applicable, material impacts on the registrant's:

- Business operations, including the types and locations of its operations;

- Products or services;

- Suppliers, purchasers, or counterparties to material contracts, to the extent known or reasonably available;

- Activities to mitigate or adapt to climate-related risks, including adoption of new technologies or processes; and

- Expenditure for research and development.

If none of the listed types of impacts or any other impacts are material, a registrant need not disclose them.  Similarly, if a registrant has identified a climate-related risk that has materially impacted or is reasonably likely to impact its business strategy, results of operations, or financial condition, but the actual and potential material impact on its strategy, business

---

[427]    *See supra* note 414 and accompanying text.

[428]    *See supra* note 397 and accompanying text.

[429]    *See, e.g.*, letters from Amer. for Fin. Reform, Sunrise Project *et al.*; Eni SpA; and PRI.

model, and outlook is not specifically listed in the final rule, the impact will need to be disclosed. By providing a non-exclusive list of material impacts of climate risks in the rule text, but not mandating that all or only these impacts be disclosed, the final rule will help elicit more meaningful and relevant disclosure without overburdening registrants or investors with the presentation of irrelevant information.

We have revised one of the types of potential material impacts listed in the proposal that referenced "suppliers and other parties in [a registrant's] value chain," by replacing this phrase with "[s]uppliers, purchasers, or counterparties to material contracts, to the extent known or reasonably available."  This revision is intended to address the concern of some commenters that requiring a registrant to include material impacts to a registrant's value chain would be overly burdensome to both the registrant and to entities in the registrant's value chain.[430]  Thus the final rule limits the scope of this specific topic to include only material impacts to the registrant's suppliers, purchasers, or counterparties to material contracts and further limits the information that should be disclosed about those impacts to information that is known or is reasonably available.[431]  The adopted provision is consistent with the Commission's general rules regarding the disclosure of information that is difficult to obtain, which will apply to the final rules if their conditions are met.[432]  Accordingly, as modified, this provision will help limit the compliance burden of the final rules by eliminating any potential need for registrants to undertake unreasonable searches or requests for information from their value chains.

---

[430]  *See supra* note 416 and accompanying text.

[431]  *See* 17 CFR 229.1502(b)(3).  Registrants are required to include material contracts in Commission filings under existing rules.  *See, e.g.*, 17 CFR 229.601(b)(10).

[432]  *See* 17 CFR 230.409 and 17 CFR 240.12b-21.

Final Item 1502(c) will require a registrant to discuss whether and how the registrant considers any material impacts described in response to Item 1502(b) as part of its strategy, financial planning, and capital allocation.[433]  Similar to the rule proposal, but modified to make Item 1502(c) less prescriptive, the final rule provision will require a registrant to include in its disclosure responsive to this provision, as applicable:

- Whether the impacts of the climate-related risks described in response to Item 1502(b) have been integrated into the registrant's business model or strategy, including whether and how resources are being used to mitigate climate-related risks; and

- How any of the targets referenced in Item 1504[434] or in a described transition plan[435] relate to the registrant's business model or strategy.

As noted by several commenters, this provision will help investors assess a registrant's resiliency to impacts of climate-related risks, by providing information about how management considers the realized or likely impacts of identified material climate-related risks on a company's business model or strategy.[436]

In further response to commenters' concern that the proposed rules were overly prescriptive and could result in a volume of information that could be confusing for investors,[437] we have streamlined the Item 1502(c) disclosure requirement.  For example, we have omitted from the final Item 1502(c) provision the proposed requirement to "[p]rovide both current and

---

[433]   *See* 17 CFR 229.1502(c).

[434]   *See infra* section II.G.

[435]   *See infra* section II.D.2.

[436]   *See supra* note 402 and accompanying text.

[437]   *See supra* note 415 and accompanying text; *see also* letters from API; Chamber; NAM; SIFMA; and Soc. Corp. Gov.

forward-looking disclosures,"[438] which should provide registrants with more flexibility to determine the appropriate disclosures needed in response to the requirement. We also have eliminated the requirement to describe how any of the financial statement metrics or GHG emissions metrics relate to the registrant's business model or business strategy.[439] Although a registrant may choose to include forward-looking information or discuss any climate-related metrics or financial information in response to Item 1502(c), the final rule leaves it up to each registrant to determine, based on its particular facts and circumstances, what disclosure is necessary to help investors understand whether and how management has incorporated the material impacts of its climate-related risks into its business strategy, financial planning, and capital allocation.

In addition, to further streamline the disclosure and reduce some of the redundancy in the rule proposal,[440] we have eliminated from Item 1502(c) the proposed disclosure requirement concerning the role that the use of carbon offsets or RECs has played in a registrant's climate-related strategy. Under the final rules, as part of its targets and goals disclosure,[441] a registrant will be required to provide disclosure concerning its use of carbon offsets or RECs if they constitute a material component of a registrant's plan to achieve its climate-related targets or goals.[442] Given this targets and goals disclosure requirement, explicitly requiring disclosure concerning the use of carbon offsets and RECs in the context of Item 1502(c) is not necessary.

---

[438]   *See* Proposing Release, section II.C.1.

[439]   *See id.*

[440]   One commenter stated that the Commission should follow the TCFD's recommendation that "[d]isclosures should be eliminated if they are immaterial or redundant to avoid obscuring relevant information." Letter from Chamber.

[441]   *See infra* section II.G.

[442]   *See* 17 CFR 229.1504(d).

We acknowledge the commenter who recommended that we delete the term "business model" in the proposed disclosure item;[443] however, we have retained the use of this term in the final rule because requiring a registrant to disclose a material impact on its business model caused by a climate-related risk will provide important information to investors about the effectiveness of the registrant's climate risk management that would otherwise be lost were we to omit this reference. In addition, registrants generally should be familiar with the term even if not previously used in Regulation S-K.[444] Moreover, the TCFD uses that term in connection with disclosure about the resilience of a company's strategy to climate-related risks, and as such, using the concept in the final rules will provide consistency for those registrants that have been providing climate-related information based on that framework.[445] If a registrant has not yet articulated a business model, or does not believe that its business model is or will be materially impacted by climate-related risks, it need not provide the disclosure specified in this rule provision.

Proposed Item 1502(d) would have required a registrant to provide a narrative discussion of whether and how any climate-related risks described in response to proposed Item 1502(a) have affected or are reasonably likely to affect the registrant's consolidated financial statements.[446] When proposing Item 1502(d), the Commission explained that this provision was intended to elicit a discussion of the financial effects of climate-related risks similar to

---

[443]   *See* letter from ABA.

[444]   *See, e.g., business model, Oxford English Dictionary* (2023), available at https://doi.org/10.1093/OED/2631068139; and *business model, Cambridge Business English Dictionary* (2023), available at https://dictionary.cambridge.org/dictionary/english/business-model.

[445]   *See* TCFD, supra note 159, at Table A2.1; IFRS, *IFRS S2 Climate-related Disclosures* (June 2023); *See also* IFRS, *IFRS S2 Accompanying Guidance on Climate-related Disclosures* (June 2023).

[446]   *See* Proposing Release, section II.C.1.

MD&A.[447]  In a clarifying change from the proposal, and to address commenters' concern that the proposed rule could result in immaterial disclosure,[448] we have added materiality qualifiers to "have affected" and "are reasonably likely to affect" to clarify that Item 1502(d) requires a discussion only of material climate-related risks (i.e., climate-related risks that a registrant has identified as having had or being reasonably likely to have a material effect on the registrant).[449] In a further change from the proposal, the final rules refer to the registrant's "business, results of operations, and financial condition" rather than "consolidated financial statements."  This is to reflect that the type of disclosure that is intended by this provision is more similar to that found in MD&A than that found in the notes to the financial statements.[450]

Proposed Item 1502(d) also would have required a discussion that included the financial statement metrics to be disclosed pursuant to proposed Article 14 of Regulation S-X.  In a change from the proposal, Item 1502(d)(2) will require a registrant to describe quantitatively and qualitatively the material expenditures incurred and material impacts on financial estimates and assumptions that, in management's assessment, directly result from activities to mitigate or adapt to climate-related risks disclosed pursuant to Item 1502(b)(4).[451]  Focusing the disclosure requirement on material expenditures that, based on management's assessment, were incurred as a direct result of the registrant's mitigation or adaptation activities will provide investors with a financial metric that is important to assessing the registrant's management of the disclosed risk,

---

[447]     *See id.*

[448]     *See supra* note 415 and accompanying text.

[449]     *See* 17 CFR 229.1502(d)(1).

[450]     As previously noted, several commenters recommended making or linking any climate-related financial disclosure requirements under or with MD&A disclosure requirements.  *See supra* note 409 and accompanying text.

[451]     *See* 17 CFR 229.1502(d)(2).

Appellate Case: 24-1628     Page: 126     Date Filed: 03/26/2024 Entry ID: 5377362

as well as assessing the financial impact of such activities. At the same time, linking the disclosure of the expenditures with management's assessment that they directly result from mitigation or adaptation activities will more closely align the disclosure requirement with how the registrant actually evaluates a material climate-related risk. This will not only provide investors with important information about a registrant's strategic decision-making concerning a material climate-related risk but should also help the registrant determine whether there are material expenditures that must be disclosed, thereby lowering the compliance burden, as some commenters noted.[452]

This disclosure requirement is intended to capture actual material expenditures, both capitalized and expensed, made during the fiscal year for the purpose of climate-related risk mitigation or adaptation. As one commenter noted, requiring the disclosure of material expenditures that are directly linked to a registrant's climate-related goals as part of a registrant's strategy or targets and goals disclosure under Regulation S-K,[453] instead of requiring the disclosure of climate-related financial impacts on line items under Regulation S-X, as proposed, will help reduce the compliance burden of the final rules while providing material information for investors.[454] Although this commenter recommended that such expenditures disclosure be presented in tabular format, the final rule provision does not specify a particular format. The

---

[452] *See, e.g.,* letters from Amazon; and PwC.

[453] *See infra* sections II.D.2.c and II.G.3.a for a similar material expenditures disclosure requirement, respectively, as part of a registrant's transition plan disclosure under Item 1502(e) and targets and goals disclosure under Item 1504 of Regulation S-K. To the extent that there is any overlapping disclosure of material expenditures in response to these Items, to avoid redundancy, a registrant should provide disclosure of material expenditures regarding the Item where, in its assessment, such disclosure is most appropriate, and then cross-reference to this disclosure when responding to the other Items.

[454] *See* letter from Amazon. As examples of transition activities expenditures, this commenter presented costs and expenses related to electrifying its delivery fleet, renewable energy purchases, and carbon offset purchases. *See id.,* Appendix A.

final rule also does not require disclosure of "discrete and separable" expenditures, as the commenter suggested. A registrant may present the material expenditures disclosure in tabular or narrative form according to how it believes such information best fits within its overall climate risk disclosure.[455] Likewise, the final rules provide registrants with more flexibility than that suggested by the commenter to determine which and to what extent expenditures must be disaggregated or otherwise broken out. This disclosure requirement covers material expenditures for the mitigation or adaptation of both physical risks and transition risks. The final Regulation S-X provisions that we are adopting, on the other hand, do not cover financial impacts caused by transition risks.[456] This Regulation S-K provision, therefore, will elicit disclosures about material expenditures related to activities engaged in for the mitigation of and adaptation to climate-related risks in Commission filings while avoiding the difficulties of reporting such information in a note to the financial statements, as proposed.[457]

As discussed in more detail below,[458] we recognize that some commenters on the proposed Regulation S-X amendments expressed concern regarding the attribution of expenses to climate risk mitigation activities. Specifically, these commenters stated that registrants make business decisions, such as incurring an expenditure to purchase a piece of machinery that is

---

[455] The structured data requirements set forth in Item 1508 will facilitate investors' ability to find and analyze material expenditures disclosure regardless of whether provided in tabular or narrative form. *See infra* section II.M.3.

[456] *See infra* section II.K. In addition, in a change from the proposal, the amendments to Regulation S-X do not require the disclosure of expenditures to mitigate the risks of severe weather events and other natural conditions. Therefore, under Item 1502, investors will also receive information about expenditures related to the mitigation of physical risks that they will not otherwise receive in the disclosures required by the amendments to Regulation S-X.

[457] *See supra* notes 409 and 452 and accompanying text. The amendments to Regulation S-X will require the disclosure of expenditures related to carbon offsets and RECs, a type of transition activity, if carbon offsets and RECs have been used as a material component of a registrant's plans to achieve its disclosed climate-related targets or goals in a note to the financial statements. *See infra* section II.K.

[458] *See infra* sections II.K.2.b.iii, 3.b and c.

App.123

Appellate Case: 24-1628    Page: 128    Date Filed: 03/26/2024 Entry ID: 5377362

more energy efficient, for multiple reasons, and as a result, a registrant's transition activities may be inextricably intertwined with its ordinary business activities.[459]  Although similar concerns could arise with respect to Item 1502(d)'s expenditures disclosure requirement, subjecting the disclosure requirement to materiality rather than a bright-line threshold, as was proposed for the Regulation S-X amendments, and limiting the disclosure to material expenditures that, in "management's assessment," are the direct result of mitigation or adaptation activities, will help to mitigate the compliance burden and related concerns.  In addition, in responding to the final rules, registrants will have the flexibility to explain qualitatively the nature of the expenditure and how management has determined that it is a direct result of the disclosed transition activities, which may help alleviate concerns about potential liability exposure for attribution decisions.[460]

Requiring the disclosure of material impacts on financial estimates and assumptions that, from management's assessment, directly result from mitigation or adaptation activities will also provide investors with important information that will help them understand a registrant's climate risk management and assess any effects on its asset valuation and securities pricing.[461] Registrants will similarly have the flexibility to explain qualitatively the nature of the impact on financial estimates and assumptions and how, in management's assessment, it is a direct result of the disclosed mitigation or adaptation activities.

We recognize that registrants may need to develop new systems and adjust their DCPs to ensure the accurate tracking and reporting of material expenditures and material impacts on

---

[459]    *See infra* note 1892 and accompanying text.

[460]    We note also that the "significant contributing factor" attribution principle applicable to certain disclosures required by the final rules in the financial statements, as well as any other guidance we provide below regarding the presentation of the disclosures in the financial statements, does not pertain to the expenditure disclosure in Regulation S-K.  *See infra* section II.K.3.c.

[461]    *See, e.g.*, letter from IMA.

financial estimates and assumptions that directly result from climate-related mitigation or adaptation activities.[462]  To accommodate such development and adjustment, we are providing an additional phase in for the requirement to disclose this information in the context of Item 1502.  Accordingly, a registrant will not be required to comply with the Item 1502(d)(2) requirement until the fiscal year immediately following the fiscal year of its initial compliance date for subpart 1500 disclosures based on its filer status.[463]

### 2.  Transition Plan Disclosure (Items 1500 and 1502(e))

#### a.  Proposed Rule

The Commission proposed to require a registrant that has adopted a transition plan as part of its climate-related risk management strategy to describe the plan, including the relevant metrics and targets used to identify and manage any physical and transition risks.[464]  The proposed requirements were intended to help investors understand how a registrant intends to address identified climate-related risks and any transition to a lower carbon economy while managing and assessing its business operations and financial condition.  The Commission proposed to define "transition plan" to mean a registrant's strategy and implementation plan to reduce climate-related risks, which may include a plan to reduce its GHG emissions in line with its own commitments or commitments of jurisdictions within which it has significant operations. To allow for an understanding of a registrant's progress to meet its plan's targets or goals over

---

[462]  *See, e.g.*, letters from ABA; Cohn Rez; HP; and IMA.

[463]  We are providing the same one-year phase in for the material expenditures disclosure requirements being adopted in connection with a transition plan or a target and goal.  *See infra* section II.O.3 below.

[464]  *See* Proposing Release, section II.E.2. The Commission proposed to require transition plan disclosure in connection with a registrant's risk management discussion.  The final rules include transition plan disclosure as part of a registrant's disclosure about climate-related risks and their impact on the registrant's strategy to be consistent with TCFD's recommended transition plan disclosure.  *See, e.g.*, TCFD, *Guidance on Metrics, Targets, and Transition Plans* (Oct. 2021), available at https://assets.bbhub.io/company/sites/60/2021/07/2021-Metrics_Targets_Guidance-1.pdf.

Appellate Case: 24-1628    Page: 130    Date Filed: 03/26/2024 Entry ID: 5377362

time, the proposed rules would have required the registrant to update its disclosure about its transition plan each fiscal year by describing the actions taken during the year to achieve the plan's targets or goals.[465]

The proposed rules would have further required a registrant that has adopted a transition plan to discuss, as applicable:

- How the registrant plans to mitigate or adapt to any identified physical risks, including but not limited to those concerning energy, land, or water use and management; and

- How the registrant plans to mitigate or adapt to any identified transition risks, including the following:

  o Laws, regulations, or policies that:

    ▪ Restrict GHG emissions or products with high GHG footprints, including emissions caps; or

    ▪ Require the protection of high conservation value land or natural assets;

  o Imposition of a carbon price; and

  o Changing demands or preferences of consumers, investors, employees, and business counterparties.

The proposed rules provided that a registrant that has adopted a transition plan may also describe how it plans to achieve any identified climate-related opportunities, such as:

- The production of products that may facilitate the transition to a lower carbon economy, such as low emission modes of transportation and supporting infrastructure;

- The generation or use of renewable power;

---

[465]    *See* Proposing Release, section II.E.2.

126

- The production or use of low waste, recycled, or other consumer products that require less carbon intensive production methods;

- The setting of conservation goals and targets that would help reduce GHG emissions; and

- The provision of services related to any transition to a lower carbon economy.

### b. Comments

Many commenters supported the proposed provision requiring a registrant that has adopted a transition plan to describe the plan, including the relevant metrics and targets used to identify and manage any physical and transition risks.[466] Commenters stated that information about a registrant's transition plan would help investors evaluate the seriousness of stated corporate intentions to identify and manage climate-related risks, including the credibility of climate-related targets and progress made toward those targets.[467] Several commenters stated that information regarding a registrant's transition plan is important to help investors evaluate a registrant's management of its identified climate-related risks and help them assess the resiliency of a registrant's strategy in a potential transition to a lower carbon economy.[468] Some commenters specifically supported requiring disclosure, as applicable, of a registrant's plan to mitigate or adapt to identified physical risks, as proposed, and further stated that there are no transition risks, as identified in the rule proposal, that should be excluded from the transition plan disclosure requirement.[469] Other commenters stated that the proposed requirement would help

---

[466] *See, e.g.*, letters from Amer. for Fin. Reform, Sunrise Project *et al.*; Anthesis; BNP Paribas; CalPERS; CalSTRS; Ceres; Eni SpA; Etsy; International Corporate Governance Network (June 17, 2022) ("ICGN"); Miller/Howard; Morningstar; Norges Bank Investment Management (June 17, 2022) ("Norges Bank"); NY SIF; NY St. Comptroller; Paradice Invest. Mgmt.; PRI; PwC; SKY Harbor; Soros Fund; TotalEnergies; and US SIF.

[467] *See, e.g.*, letters from Amer. for Fin. Reform, Sunrise Project *et al.*; and Calvert.

[468] *See, e.g.*, letters from CalPERS; Calvert; ICGN; Morningstar; PRI; PwC; and Soros Fund.

[469] *See, e.g.*, letters from Anthesis; Calvert; and TotalEnergies.

App.127

provide more consistent and comparable disclosure about companies' transition plans, which, despite the importance of such information, is currently lacking.[470]  As previously noted, one other commenter recommended requiring the disclosure of a registrant's climate-related expenditures, both expensed and capitalized, made during each fiscal year, which would be linked to and aligned with the risks, goals, and strategies that the registrant would disclose under proposed Item 1502 of Regulation S-K.[471]

One commenter stated that the Commission should require a registrant that has a transition plan to disclose how it is aligned with the goals of the Paris Agreement.[472]  Another commenter similarly indicated that the proposed transition plan disclosure requirement would help investors evaluate the extent to which a registrant's plan is aligned with global climate-related goals.[473]  A few commenters stated that mandatory disclosure of a transition plan would not raise competitive harm concerns.[474]  One commenter recommended that we revise the transition plan disclosure requirement so that it aligns more with the TCFD's recommended disclosure of transition plans, which focuses solely on transition risk and does not include the mitigation or adaptation of physical risk.[475]  According to this commenter, a transition plan "is

---

[470]    *See, e.g.*, letters from CalSTRS; and Ceres.

[471]    *See* letter from Amazon.

[472]    *See* letter from BNP Paribas.

[473]    *See* letter from Paradice Invest. Mgmt.

[474]    *See, e.g.*, letters from Amer. for Fin. Reform, Sunrise Project *et al.*(stating that mandatory transition plan disclosure should not raise competitive harm concerns because the Commission is not requiring the disclosure of any proprietary or commercially sensitive information); and Eni SpA (stating that a discussion of the short-, medium- and long-term objectives of a registrant's transition plan, the levers that will be used to achieve them, and the metrics used to track the registrant's progress towards alignment with the Paris Agreement goals, would not raise any competitive harm concerns); *see also* letter from Morningstar (stating that registrants "may integrate transition plans into formats akin to medium-term plans or capital markets-day presentations, where they have historically been able to present forward-looking information without raising a competitive harm concern.").

[475]    *See* letter from PRI.

not a tool for addressing physical risks, and disclosures on how an organization would address, manage and reduce the impact of physical risks should be disclosed under the risk management or targets sections."[476]

A number of commenters opposed the proposed requirement to describe a transition plan if one has been adopted.[477] Some commenters stated that the proposed disclosure requirement was too prescriptive and would likely create a disincentive for the adoption of transition plans.[478] Some commenters also stated that the proposed requirement would compel the disclosure of confidential business information and raise competitive harm concerns.[479] One commenter asserted that the proposed requirement is not necessary because the Commission's existing rules, which require disclosure of any material change to a previously disclosed business strategy, would arguably elicit disclosure of a registrant's transition plan.[480] Other commenters recommended that the Commission reduce the prescriptive nature of the proposed transition plan disclosure provision by requiring disclosure only of elements of a transition plan or transition activities that are material.[481] One other commenter similarly recommended requiring the disclosure only of a material transition plan that has been approved by the board of directors.[482] Still other commenters stated that transition plan disclosure should be voluntary.[483]

---

[476] *Id*.

[477] *See, e.g.*, letters from AALA; Amer. Chem.; Beller *et al*.; Business Roundtable; CEMEX; Chamber; Dimensional Fund Advisors (May 13, 2022) ("Dimensional Fund"); D. Hileman Consulting; B. Herron; NAM; RILA; and Western Midstream.

[478] *See, e.g.*, letters from Beller *et al*.; CEMEX; Dimensional Fund; GM; B. Herron; D. Hileman Consulting; NAM; and Western Midstream.

[479] *See, e.g.*, letters from AALA; Business Roundtable; CEMEX; NAM; and RILA.

[480] *See* letter from Chamber; *see also* letter from Sullivan Cromwell.

[481] *See, e.g.*, letters from ABA; Alphabet *et al*.; BlackRock; and Mortgage Bankers Association (June 17, 2022) ("Mtg. Bankers").

[482] *See* letter from SIFMA.

[483] *See, e.g.*, letters from CEMEX; and J. McClellan.

Some commenters supported the proposed provision specifying that a registrant may disclose how it plans to achieve any climate-related opportunities.[484]  Commenters stated that information about whether and how a registrant intends to achieve climate-related opportunities, such as by creating products and services to facilitate a transition to a lower carbon economy, would be helpful for investors when comparing registrants' climate-related preparedness for the purpose of making investment decisions.[485]  One commenter recommended that the Commission require, rather than permit, the disclosure of how a registrant plans to achieve any climate-related opportunities mentioned in its transition plan in order to discourage deceptive statements.[486]

Some commenters supported the proposed provision requiring a registrant to update its disclosure about its transition plan each fiscal year by describing the actions taken during the year to achieve the plan's targets or goals.[487]  Several of these commenters stated that the updating provision was necessary to help investors track a registrant's progress toward meeting a transition plan's goals and to enable investors to make or alter their investment decisions based on current climate-related information.[488]  One of these commenters stated that "[c]ompanies that try to distinguish themselves by releasing a public transition plan often are not required to provide updates as to how they are progressing against those targets, significantly limiting an investor's ability to assess management's success in reaching their goals."[489]  A few of these commenters further stated that the proposed updating requirement would not act as a disincentive

---

[484]  *See, e.g.*, letters from Anthesis; CalSTRS; Morningstar; and TotalEnergies.

[485]  *See, e.g.*, letters from CalSTRS; and Morningstar.

[486]  *See* letter from Amer. for Fin. Reform, Sunrise Project *et al*.

[487]  *See, e.g.*, letters from Anthesis; IAC Recommendation; IATP; Morningstar; and TotalEnergies.

[488]  *See, e.g.*, letters from Amer. for Fin. Reform, Sunrise Project *et al*.; IAC Recommendation; and Morningstar.

[489]  IAC Recommendation.

Appellate Case: 24-1628    Page: 135    Date Filed: 03/26/2024 Entry ID: 5377362

to the adoption of a transition plan because companies that intend to follow through on their transition plan commitments will want to assess their progress in achieving them and report on such progress and any climate-related opportunities they may be pursuing.[490]

Other commenters, however, opposed the proposed updating requirement.[491]  One commenter stated that the proposed requirement would be burdensome for registrants and would act as a disincentive to the adoption of a transition plan.[492]  Another commenter stated that, due to the long timeline of transition plans, annual progress updates would in many cases not provide meaningful information for investors.[493]  This commenter recommended that there should instead be a requirement to annually report any actions taken to achieve transition plans that are material to the registrant, as well as any material positive or negative deviations from the plan or changes to it that are material to the registrant.[494]  Another commenter stated that a registrant should have to update its transition plan disclosure only when the registrant believes it is appropriate to do so, and such updating should occur at most on an annual basis.[495]

### c.  Final rule

After considering comments received, we are adopting, with modifications from the proposal, a final rule provision (Item 1502(e)) that will require a registrant to describe a transition plan if it has adopted the plan to manage a material transition risk.[496]  Like the rule proposal, the final rules define (in Item 1500) a "transition plan" to mean a registrant's strategy

---

[490]     *See, e.g.*, letters from Anthesis; and IATP.

[491]     *See, e.g.,* letters from CEMEX; and SIFMA.

[492]     *See* letter from CEMEX.

[493]     *See* letter from SIFMA.

[494]     *See id.*

[495]     *See* letter from Unilever.

[496]     *See* 17 CFR 229.1502(e).

Appellate Case: 24-1628     Page: 136     Date Filed: 03/26/2024 Entry ID: 5377362

and implementation plan to reduce climate-related risks, which may include a plan to reduce its GHG emissions in line with its own commitments or commitments of jurisdictions within which it has significant operations.[497] The final rules do not mandate that registrants adopt a transition plan; if a registrant does not have a plan, no disclosure is required.

As noted in the Proposing Release, registrants may adopt transition plans to mitigate or adapt to climate-related risks as an important part of their climate-related risk management strategy, particularly if the registrant has made commitments, or operates in a jurisdiction that has made commitments, to reduce its GHG emissions.[498] We recognize that not every registrant has a transition plan and, as noted above, this rulemaking does not seek to prescribe any particular tools, strategies, or practices with respect to climate-related risks. If, however, a registrant has adopted such a plan, information regarding the plan is important to help investors evaluate a registrant's management of its identified climate-related risks and assess the potential impacts of a registrant's strategy to achieve its short- or long-term climate-related targets or goals on its business, results of operations, and/or its financial condition. Moreover, a registrant's transition plan may have a significant impact on its overall business strategy, for example, where companies operate in jurisdictions with laws or regulations in place designed to move them away from high emissions products and services.[499] Because the steps a registrant plans to take pursuant to its transition plan may have a material impact on its business, results of operations, or financial condition, investors have sought more detailed disclosure about transition plans.[500]

---

[497]     *See* 17 CFR 229.1500 (definition of "transition plan").

[498]     *See* Proposing Release, section II.E.2.

[499]     *See supra* section II.A.

[500]     *See, e.g.*, letters from AGs of Cal. *et al.*; BNP Paribas; and Morningstar.

We disagree with commenters that stated that transition plan disclosure should be voluntary[501] and that a transition plan disclosure requirement was not necessary because the Commission's existing business description rules would arguably elicit sufficient disclosure of a registrant's transition plan.[502] As other commenters noted, many registrants are not providing decision-useful information about their transition plans under the Commission's existing disclosure rules.[503] While existing Item 101 of Regulation S-K may result in some disclosure regarding transition plans in response to the general requirements of that rule, mandatory disclosure about transition plans will help ensure that investors receive the information they need to evaluate a registrant's management of material climate-related risks and the impact of those plans on its results of operations and financial condition in a more consistent and predictable manner.

We are cognizant, however, of commenters' concerns that the proposed transition plan disclosure provision was overly prescriptive and could result in immaterial disclosure or discourage registrants from adopting a transition plan to avoid having to describe the plan in detail.[504] To address these concerns, we have significantly streamlined the transition plan disclosure provision and revised the provision so that the description of a transition plan is only required if a registrant has adopted the plan to manage a material transition risk. Unlike the proposed rule, the final rule does not list the types of transition risks and factors related to those risks that must be disclosed, if applicable.[505] Instead, a registrant that is required to provide

---

[501]   *See supra* note 483 and accompanying text.

[502]   *See supra* note 480 and accompanying text.

[503]   *See supra* note 470 and accompanying text.

[504]   *See supra* notes 478 and 481 and accompanying text.

[505]   *See* Proposing Release, section II.E.2.

transition plan disclosure will have the flexibility to provide disclosure that addresses the particular facts and circumstances of its material transition risk.[506] We also note that, as with scenario analysis and use of internal carbon price disclosure, a registrant's transition plan disclosure will be subject to a safe harbor.[507]

Similar to the proposed rule, the final rule requires a registrant to update its annual report disclosure about the transition plan each fiscal year by describing any actions taken during the year under the plan, including how such actions have impacted the registrant's business, results of operations, or financial condition.[508] This updating requirement will help investors understand the registrant's progress under the plan over time, track the impacts of a transition plan on a registrant's business and, as noted by commenters, help inform investment decisions.[509] We disagree with the view of commenters who stated that this updating requirement would result in disclosure of information that is not meaningful for investors.[510] Investors have indicated that they need periodic information regarding the steps a registrant has taken to achieve an announced climate-related target or goal in order to evaluate a registrant's ongoing management of a material transition risk for the purpose of informing their investment

---

[506] As discussed above, transition risk is defined as the actual or potential negative impacts on a registrant's business, results of operations, or financial condition attributable to regulatory, technological, and market changes to address the mitigation of, or adaptation to, climate-related risks, such as increased costs attributable to changes in law or policy, reduced market demand for carbon-intensive products leading to decreased prices or profits for such products, the devaluation or abandonment of assets, risk of legal liability and litigation defense costs, competitive pressures associated with the adoption of new technologies, and reputational impacts (including those stemming from a registrant's customers or business counterparties) that might trigger changes to market behavior, consumer preferences or behavior, and registrant behavior. *See* 17 CFR 229.1500.

[507] *See infra* section II.J.3.

[508] *See* 17 CFR 229.1502(e)(1).

[509] *See supra* note 488 and accompanying text.

[510] *See supra* note 490 and accompanying text.

or voting decisions.[511]  Once a registrant has provided disclosure about a transition plan it has adopted to manage a material climate risk, we do not expect that it would be particularly burdensome for the company to disclose updated information about actions taken under the plan on a going forward basis.[512]  Disclosure of the steps a registrant intends to make under a transition plan, and whether it has taken those steps, will help investors assess the financial impacts of the plan on the registrant's business, results of operations, or financial condition.[513]  Moreover, requiring this information on an annual basis will allow investors to take into account current climate-related information in their investment and voting decisions more consistently than they would be able to if registrants were required to update their climate-related information less frequently or only when they deemed it appropriate.[514]

    We recognize that some commenters asserted that an updating requirement would act as a disincentive to the adoption of a transition plan.  This effect may be attenuated, as some commenters indicated,[515] if registrants that have disclosed a plan wish to inform investors about progress achieved pursuant to the plan.  In any event, if a registrant is using a transition plan to manage a material transition risk, we think it is appropriate for registrants to provide ongoing disclosure about the plan so that investors can assess its impact on the registrant's business.[516]  As previously noted, however, we are agnostic about whether or how a registrant is managing its

---

[511]    *See, e.g.*, letters from AGs of Cal. *et al.*; Amer. for Fin. Reform, Sunrise Project *et al.*; Anthesis; BNP Paribas; CalPERS; CalSTRS; Ceres; and Morningstar.

[512]    We note that such an update would not be required where disclosure of the underlying transition plan would not be currently required (e.g., because the plan is no longer used to manage a material transition risk).

[513]    *See, e.g.*, letters from AGs of Cal. *et al.*; BNP Paribas; and Morningstar.

[514]    *See supra* note 495 and accompanying text.

[515]    *See supra* note 490 and accompanying text.

[516]    To the extent that a registrant no longer uses a transition plan to manage a material climate risk, disclosure under this item, including the requirement for updates, would not be required.

135

climate-related risks, and the final rules are intended neither to incentivize nor disincentivize the use of a transition plan or any other climate risk management tool.

In a modification of the proposed rule, which would have generally required the disclosure of the relevant metrics and targets used to identify and manage transition risk under a transition plan, the final rule will require a registrant, as part of its updating disclosure, to include quantitative and qualitative disclosure of material expenditures incurred and material impacts on financial estimates and assumptions as a direct result of the disclosed actions taken under the plan.[517] While this provision is similar to Item 1502(d), Item 1502(e) differs in that it is intended to elicit disclosure about material expenditures and material impacts on financial estimates and assumptions that directly result from actions taken under a transition plan (e.g., material expenditures made for climate-related research and development). Item 1502(e) is not limited to disclosure concerning expenditures and impacts that directly result from mitigation or adaptation activities;[518] however, to the extent that a registrant's disclosure made in response to Item 1502(d) or Item 1502(e) overlap with each other or with disclosure required under any other subpart 1500 provision,[519] the registrant need not repeat the disclosure.

Similar to Item 1502(d), the disclosure requirement under Item 1502(e) is intended to capture material expenditures, both capitalized and expensed, made during the fiscal year under a

---

[517] *See* 17 CFR 229.1502(e)(2).

[518] *See supra* section II.D.1.c for a discussion of Item 1502(d)(2)'s requirement to disclose material expenditures and material impacts on financial estimates and assumptions directly resulting from mitigation or adaptation activities.

[519] For example, Item 1504(c)(2) requires similar disclosure regarding material impacts that directly result from actions taken by a registrant to achieve a disclosed target or goal. *See infra* section II.G.3. To the extent that there is any overlapping disclosure of material expenditures in response to Items 1502(d)(2), 1502(e), and 1504(c)(2), to avoid redundancy, a registrant should provide disclosure of material expenditures regarding the Item where, in its assessment, such disclosure is most appropriate, and then cross-reference to this disclosure when responding to the other Items.

transition plan, and to more closely align with how the registrant actually makes strategic decisions about taking actions under a transition plan. This provision will provide an important metric to help investors assess a registrant's climate risk management and the financial impact of a transition plan while also helping to limit the compliance burden, as some commenters noted.[520] We have not qualified Item 1502(e) by referring to management's assessment as we have done in Item 1502(d) (i.e., material expenditures and material impacts that, in management's assessment, directly result from the disclosed actions). We believe that if a registrant has adopted a transition plan to manage a material transition risk, it is likely that management will oversee actions taken under the plan and, therefore, any material expenditures or material impacts on financial estimates and assumptions that are disclosed will have been assessed by management as being the direct result of such actions.

As under Item 1502(d), when responding to Item 1502(e), a registrant will have flexibility to explain qualitatively the nature of a material expenditure or material impact on its financial estimates or assumptions and how it directly resulted from the disclosed actions taken under the plan. Additionally, when considering which expenditures related to actions taken under a disclosed plan are material over the relevant period and therefore require disclosure, if individual expenditures do not appear to be material, registrants should consider whether overall expenditures related to actions taken under the plan are material in the aggregate and, if so, provide appropriate disclosure. For example, a series of individually immaterial expenditures could be the result of the same action or related actions under the plan, and those expenditures could be material in the aggregate. With respect to the disclosure of material impacts on financial estimates and assumptions as a direct result of the disclosed actions, to the extent that

---

[520]     *See, e.g.,* letters from Amazon; and PWC.

such information is disclosed in response to Rule 14-02(h) of Regulation S-X, a registrant would be able to cross-reference to such disclosure.[521]

Similar to Item 1502(d)(2), to allow for the development of systems, controls, and procedures to track and report material expenditures and material impacts on financial estimates and assumptions directly resulting from actions taken under a transition plan, we are phasing in compliance with Item 1502(e)(2). A registrant will not be required to comply with either provision until the fiscal year immediately following the fiscal year of its initial compliance date for the subpart 1500 rules based on its filer status.[522]

As recommended by one commenter,[523] we have removed the reference to physical risks that was in the proposed rule.[524] This change will make the transition plan disclosure requirement more consistent with voluntary disclosures that are based on the TCFD's recommendations,[525] which may mitigate the costs and complexity of complying with the final rule for registrants already familiar with the TCFD's framework.[526] A registrant that faces a material physical risk, however, will still be required to disclose how it is managing that risk as part of its risk management disclosure.[527] These revisions will elicit material information for

---

[521] We remind registrants that while they are permitted to cross-reference to information in their financial statements to satisfy their Regulation S-K disclosure obligations, they are not permitted to cross-reference to Regulation S-K disclosures in their financial statements, unless otherwise specifically permitted or required by the Commission's rules or by U.S. Generally Accepted Accounting Principles ("U.S. GAAP") or International Financial Reporting Standards ("IFRS") as issued by the International Accounting Standards Board ("IASB"), whichever is applicable. *See* 17 CFR 230.411 and 17 CFR 240.12b-23.

[522] *See infra* section II.O.3.

[523] *See* letter from PRI.

[524] *See* Proposing Release, section II.E.2.

[525] *See* TCFD, *Guidance on Metrics, Targets, and Transition Plans* section E (Oct. 2021), available at https://assets.bbhub.io/company/sites/60/2021/07/2021-Metrics_Targets_Guidance-1.pdf.

[526] *See, e.g., infra* note 2690 and accompanying text (describing a report finding that 50 percent of sustainability reports from Russell 1000 companies aligned with the TCFD recommendations).

[527] *See* 17 CFR 229.1503, discussed *infra* section II.F.

investors about how a registrant intends to reduce its exposure to a material transition risk while limiting the burdens on registrants and providing them more flexibility to determine what aspects of the transition plan should be disclosed in light of their facts and circumstances.

We are cognizant that some commenters expressed concern that the proposed transition plan disclosure requirement would result in the disclosure of confidential or proprietary information that could cause competitive harm to the registrant.[528] Modifying the transition plan disclosure provision to focus on material expenditures and material impacts on financial estimates and assumptions, rather than all relevant metrics and targets, will help to mitigate this concern by providing registrants with more flexibility to determine what is necessary to disclose in order to describe the plan. Similarly, modifying the transition plan disclosure provision to require disclosure only when a plan has been adopted to manage a material transition risk will further help to mitigate this concern. This added flexibility regarding transition plan disclosure will also help address concerns that the final rule could act as a disincentive to adoption of transition plans.[529] While the final rules seek neither to incentivize nor disincentivize the adoption of transition plans, we recognize that the compliance burdens of disclosure may influence some registrants' decisions with respect to risk management practices and have therefore sought to mitigate such effects.

We decline to follow the recommendation of one commenter to limit the transition plan disclosure requirement to only material transition plans that have been formally approved by a registrant's board of directors.[530] We do not believe that board approval should be the

---

[528] *See supra* note 479 and accompanying text.

[529] *See, e.g.*, letters from CEMEX; and SIFMA.

[530] *See supra* note 482 and accompanying text.

Appellate Case: 24-1628    Page: 144    Date Filed: 03/26/2024 Entry ID: 5377362

determining factor in whether disclosure is provided.  Such a provision would fail to elicit disclosure of a material transition plan adopted by senior management that, due to a registrant's particular corporate governance structure, is not required to be subject to a board vote but nevertheless has significant potential implications for the registrant's financial condition or results of operations.  Like the proposal, the final rule does not require a registrant to disclose climate-related opportunities included in its transition plan.  Nevertheless, as previously mentioned, a registrant may still elect to describe any opportunities that it intends to achieve as part of its transition plan discussion or when responding to any of the Item 1502 provisions.[531]  We decline, however, to follow the recommendation of one commenter to require the disclosure of how a registrant intends to achieve any climate-related opportunities that are a part of its transition plan.[532]  Consistent with the rule proposal, we have determined to treat disclosure regarding climate-related opportunities as optional, among other reasons, to allay any anti-competitive concerns that might arise from a requirement to disclose a particular business opportunity.[533]  We believe those concerns could be exacerbated by requiring disclosure not only of the existence of opportunities in the transition plan but also how the registrant intends to achieve those opportunities.

### 3.  Disclosure of Scenario Analysis If Used (Items 1500 and 1502(f))

#### a.  Proposed Rule

The Commission proposed to require a registrant to describe the resilience of its business strategy in light of potential future changes in climate-related risks.[534]  In connection with this

---

[531]    *See supra* section II.C.1.c.

[532]    *See supra* note 486 and accompanying text.

[533]    *See* Proposing Release, section II.A.1.

[534]    *See* Proposing Release, section II.C.4.

Appellate Case: 24-1628     Page: 145     Date Filed: 03/26/2024 Entry ID: 5377362

disclosure, the Commission proposed to require a registrant to describe any analytical tools, such as scenario analysis, that the registrant uses to assess the impact of climate-related risks on its business and consolidated financial statements, and to support the resilience of its strategy and business model in light of foreseeable climate-related risks.[535]  The Commission proposed to define scenario analysis to mean a process for identifying and assessing a potential range of outcomes of various possible future climate scenarios, and how climate-related risks may impact a registrant's operations, business strategy, and consolidated financial statements over time.[536] The proposed definition included an example of how registrants might use scenario analysis.[537]

The Commission proposed to require a registrant that uses scenario analysis to assess the resilience of its business strategy to climate-related risks to disclose the scenarios considered (e.g., an increase of no greater than 3 ºC, 2 ºC, or 1.5 ºC above pre-industrial levels), including the parameters, assumptions, and analytical choices, and the projected principal financial impacts on the registrant's business strategy under each scenario.  The Commission further proposed that such disclosure should include both qualitative and quantitative information.[538]

### b.  Comments

Several commenters supported the proposed rule requiring a registrant to describe any analytical tools, such as scenario analysis, that the registrant uses to assess the impact of climate-related risks on its business and consolidated financial statements, and to support the resilience

---

[535]    *See id.*

[536]    *See id.*  More generally, scenario analysis is a process for identifying and assessing a potential range of outcomes of future events under conditions of uncertainty.  See, for example, the definition of "scenario analysis" in TCFD, Recommendations of the Task Force on Climate-related Financial Disclosures, Appendix 5.

[537]    *See* Proposing Release, section II.C.4.

[538]    *See id.*

of its strategy and business model in light of foreseeable climate-related risks.[539]  One

commenter stated that scenario analysis has emerged as a key analytical tool for assessing

potential climate-related impacts on a company by allowing market participants to understand

multiple possible outcomes while still reflecting a realistic level of uncertainty.[540]  This

commenter further indicated that disclosure of scenario analysis if used would allow investors to

review the general models and projections used by the company in its planning and capital

allocation strategy, and would greatly assist investors in understanding a firm's resilience and

assumptions about the effects of climate change.[541]  Another commenter supported the disclosure

of scenario analysis if used because of the importance to investors of forward-looking

assessments of climate-related risks in understanding the resilience of a company's climate-

related strategy.[542]

Some commenters recommended that the Commission require all registrants to provide

scenario analysis disclosure in their climate risk reporting, regardless of whether they otherwise

---

[539]    *See, e.g.*, letters from American Institute of CPAs (June 15, 2022) ("AICPA"); AllianceBernstein; Amer. for Fin. Reform, Sunrise Project *et al.*; Bloomberg; CalSTRS; Ceres; CFA; Council of Institutional Advisors (May 19, 2022) ("CII"); Eni SpA; IAC Recommendation; ICGN; ICI; J. McClellan; Morningstar; Norges Bank; NRDC; Paradice Invest. Mgmt.; Member of the U.S. House of Representatives Kathy Castor and 130 other House Members (Jun. 17, 2022) ("U.S. Reps. Castor *et al.*"); San Francisco Employees' Retirement System (June 17, 2022) ("SFERS"); Unilever; Vodafone; and Wellington Mgmt.

[540]    *See* letter from Amer. for Fin. Reform, Sunrise Project *et al*.

[541]    *See id.*; *see also* letters from ICI (stating that "[i]nformation about scenario analysis can help investors evaluate the resilience of the company's business strategy in the face of various climate scenarios that could impose potentially different climate-related risks"); and Wellington Mgmt. (stating that "disclosure of a scenario analysis enables investors to assess an issuer's risk management process and whether an issuer is considering different climate risk outcomes in its planning").

[542]    *See* letter from Bloomberg; *see also* letter from Morningstar (stating that scenario analysis is an important analytical tool in which companies may project their performance and results subject to various changes, including, but not limited to, policy interventions, technological advancement, or environmental and physical challenges, and that such analysis would help investors understand circumstances under which the value of a company could be at risk, and how a company's strategy may—or may not—move it forward toward long-term value creation and sustainability).

App.142

Appellate Case: 24-1628     Page: 147     Date Filed: 03/26/2024 Entry ID: 5377362

use scenario analysis.[543]  One such commenter stated that requiring scenario analysis disclosure is essential if a registrant's disclosure of material climate-related risks is to be decision-useful for investors.[544]  According to that commenter, because scenario analysis requires a registrant to make assumptions regarding different global temperature increase pathways and various potential pathways of decarbonization involving regulatory, technological, and behavioral responses, investors need to know the assumptions and parameters considered by the registrant in order to understand the registrant's disclosure of likely climate-related impacts.[545]  One other commenter stated that, "all else being equal," registrants that conduct strong scenario analyses should have more intrinsic value in the securities they offer than issuers that do not plan sufficiently for climate risk.[546]

One commenter stated that the proposed scenario analysis disclosure requirement struck an appropriate balance by requiring registrants to share any scenario analysis that they are otherwise conducting for their business operations while avoiding imposing a potentially difficult or burdensome requirement on those registrants that have not yet conducted such analysis.[547]  Some commenters similarly stated that, due to cost concerns, they could only support a requirement to disclose scenario analysis if it was limited to situations in which a registrant has actually used such analysis in its assessment of climate-related risks.[548]  Other commenters supported the proposed scenario analysis disclosure requirement but only if the use

---

[543]    *See, e.g.*, letters from Anthesis; NY St. Comptroller; PRI; and SFERS.

[544]    *See* letter from SFERS.

[545]    *See id.*

[546]    *See* letter from Wellington Mgmt.

[547]    *See* letter from CII.

[548]    *See, e.g.*, letters from AICPA; J. McClellan; and Unilever.

of scenario analysis reflected an expected material impact on the registrant's business strategy, financial planning, and capital raising.[549]  Still other commenters recommended that the Commission require a registrant that does not currently use scenario analysis to explain why it does not do so to prevent the disclosure requirement from acting as a disincentive to the adoption of scenario analysis.[550]

Several commenters opposed or expressed concerns about the proposed requirement to disclose scenario analysis, if used.[551]  Some commenters stated that the proposed requirement could result in the disclosure of confidential business information.[552]  Other commenters stated that a scenario analysis disclosure requirement that is not qualified by materiality would act as a disincentive to the use of scenario analysis as a climate-related tool.[553]  Still other commenters opposed the proposed disclosure requirement because it was too prescriptive and would be costly and burdensome to fulfill.[554]  Because of the above concerns, some commenters stated that the disclosure of scenario analysis should be voluntary.[555]  Other commenters stated that the required scenario analysis disclosure should be limited to high level trends or material drivers and impacts, and should not cover more detailed parameters, assumptions, and analytical choices

---

[549]    *See, e.g.*, letters from ABA; and AllianceBernstein.

[550]    *See, e.g.*, letters from BlackRock; ICI; NEI Investments (June 17, 2022) ("NEI"); and NY City Comptroller.

[551]    *See, e.g.*, letters from Alphabet *et al.*; Amazon; Amer. Bankers; AFPM; CEMEX; Chamber; Chevron; Citigroup; Hydro One Limited (June 16, 2022) ("Hydro One"); Institute of International Finance (June 17, 2022) ("IIF"); NAM; Northern Trust; RILA; Shearman Sterling; Soc. Corp. Gov.; Sullivan Cromwell; the Travelers Companies (June 17, 2022) ("Travelers"); and Western Midstream.

[552]    *See, e.g.*, letters from AFPM; Amazon; Amer. Bankers; Chevron; Citigroup; GPA Midstream; IIF; NAM; RILA; Shearman Sterling; Soc. Corp. Gov.; Sullivan Cromwell and Travelers.

[553]    *See, e.g.*, letters from Chamber; PGIM; Sullivan Cromwell; United Parcel Service, Inc. (Jun. 14, 2022) ("UPS"); and Western Midstream; *see also* letter from Beller *et al.* (opposing a mandatory scenario analysis disclosure requirement because it would stifle innovation).

[554]    *See, e.g.*, letters from Amer. Bankers; Dimensional Fund; NAM; and Soc. Corp. Gov.

[555]    *See, e.g.*, letters from Alphabet *et al.*; Beller *et al.*; Chamber; Hydro One; and Northern Trust.

144

underlying the scenario analysis, as proposed.[556]  One commenter stated that scenario analysis disclosure should only be required when it is broadly used by senior management and the board as part of their strategic planning process and when integrated and material to a publicly announced climate-related strategy or initiative.[557]

Some commenters recommended that the Commission require the use of certain publicly available scenario models, such as those published by the Intergovernmental Panel on Climate Change ("IPCC"), the International Energy Agency ("IEA"), or the Network of Central Banks and Supervisors for Greening the Financial System ("NGFS"), to enhance the comparability of the scenario analysis disclosure.[558]  Other commenters stated that it should be up to each registrant to choose those scenarios that best fit its particular business or industry and tailor its disclosure accordingly.[559]

### c.  Final Rule

We are adopting a final rule (Item 1502(f)) requiring the disclosure of scenario analysis under certain circumstances.  The disclosure of a registrant's use of scenario analysis can provide important forward-looking information to help investors evaluate the resilience of the registrant's strategy under various climate-related circumstances.[560]  Scenario analysis has increasingly been recognized as an important analytical tool in assessing a company's climate-related risk

---

[556]    *See, e.g.*, letters from ABA; and Chevron.

[557]    *See* letter from Amazon.

[558]    *See, e.g.*, letters from Anthesis; Bloomberg; CalSTRS; Chevron; and Shell plc (June 17, 2022) ("Shell").

[559]    *See, e.g.*, letters from American Council of Life Insurers (June 17, 2022) ("ACLI"); J. Herron; and TotalEnergies.

[560]    *See supra* notes 540-542 and accompanying text.

Appellate Case: 24-1628     Page: 150     Date Filed: 03/26/2024  Entry ID: 5377362

exposure,[561] and investors have increasingly sought information from registrants about their use of scenario analysis and expressed a need for improved disclosure about such use.[562]

Although some commenters recommended that we require all registrants to include scenario analysis disclosure in their climate risk reporting,[563] we recognize that not every registrant conducts scenario analysis and, as noted above, this rulemaking does not seek to prescribe any particular tools, strategies, or practices with respect to climate-related risks but rather, when material, to provide investors with the information they need to evaluate the climate-related risks faced by registrant and their potential impacts on the registrant's business, results of operations, or financial condition. Therefore, similar to the proposed rule, the final rule's scenario analysis disclosure requirement will depend on whether and how a registrant uses such analysis. Importantly, the rule will not require any registrant to conduct scenario analysis.

We are, however, adopting modifications in the final rules. For example, we have added a materiality qualifier regarding the disclosure of scenario analysis to address commenters' concern that the proposed requirement could result in disclosure of immaterial information that

---

[561] *See, e.g.*, letter from AllianceBernstein (stating that "[s]cenario analysis is particularly important for those registrants in emissions-intensive industries where such analysis can demonstrate the quality of impairment testing and increase confidence in asset values"). The Federal Reserve Board's climate scenario analysis pilot program, in which six of the nation's largest banks are voluntarily participating, further demonstrates the increased recognition of scenario analysis as an important tool to assess climate-related financial risks. *See* Board of Governors of the Federal Reserve System, *Federal Reserve Board announces that six of the nation's largest banks will participate in a pilot climate scenario analysis exercise designed to enhance the ability of supervisors and firms to measure and manage climate-related financial risks* (Sept. 29, 2022), available at https://www.federalreserve.gov/newsevents/pressreleases/other20220929a.htm.

[562] *See, e.g.*, letters from AllianceBernstein (stating that "[w]hile many registrants claim to perform scenario analysis, however, there is little disclosure around assumptions used in these models and how registrants use results impact strategy, business and capital allocation decisions, making their results challenging to compare"); and Ceres (citing evidence from the Climate Action 100+ Benchmark that companies' "scenario analyses leave much room for improvement").

[563] *See supra* note 543 and accompanying text.

would be burdensome and costly to produce.[564]  We also note that, as with transition plan and use of internal carbon price disclosure, a registrant's scenario analysis disclosure will be subject to a safe harbor.[565]  The final rule provides that, if a registrant uses scenario analysis[566] to assess the impact of climate-related risks on its business, results of operations, or financial condition, and if, based on the results of scenario analysis, a registrant determines that a climate-related risk is reasonably likely to have a *material* impact on its business, results of operations, or financial condition, then the registrant must describe each such scenario,[567] including a brief description of the parameters, assumptions, and analytical choices used, as well as the expected material impacts, including financial impacts, on the registrant under each such scenario.[568]  We are adopting this disclosure requirement because, if a registrant has used scenario analysis to assess and manage a material climate-related risk, investors need to understand how it conducted that analysis in order to evaluate the registrant's conclusions regarding material impacts on its business, results of operations, or financial condition.

We also have streamlined the proposed scenario analysis disclosure requirements to reduce redundancy in the final rules.  For example, we have eliminated the introductory

---

[564]  *See supra* note 554 and accompanying text.

[565]  *See infra* section II.J.3.

[566]  We are largely adopting the definition of scenario analysis, as proposed.  *See* 17 CFR 229.1500 ("Scenario analysis means a process for identifying and assessing a potential range of outcomes of various possible future climate scenarios, and how climate-related risks may impact a registrant's business strategy, results of operations, and financial condition over time.")  We have deleted from the definition the example that "registrants might use scenario analysis to test the resilience of their strategies under certain future climate scenarios, such as those that assume global temperature increases of 3 °C, 2 °C, and 1.5 °C above pre-industrial levels" because we do not wish to convey the impression that these scenarios are required should a registrant elect to conduct scenario analysis.

[567]  *See* 17 CFR 229.1502(f).  Conversely, if a registrant conducts scenario analysis and determines from its results that it is not likely to be materially impacted by a climate-related risk, no disclosure about its use of scenario analysis is required under Item 1502(f).

[568]  *See id.*

147

provision in the rule proposal requiring a registrant to describe the resilience of its business strategy in light of potential future changes in climate-related risks. Because companies use scenario analysis to test the resilience of their business strategies under varying future climate scenarios, and because such use is explained in the definition of scenario analysis (in Item 1500) that we are adopting largely as proposed,[569] if registrants are required to disclose their use of scenario analysis under the final rules, such disclosure likely would include a description of the resilience of their strategies under various climate scenarios.

The rule proposal would have required a registrant to disclose "any analytical tools, such as scenario analysis" that it uses to assess the impact of climate-related risks on its business. In a modification of the proposed rule, we have eliminated the reference to "any analytical tools" to clarify that the disclosure required by this provision should concern the registrant's use of scenario analysis rather than any other analytical tools. We note that the TCFD's guidance discusses scenario analysis as the primary tool to help companies assess the impacts of climate-related risks on their business strategies, and therefore this change should eliminate any confusion about what other analytical tools might fall under the scope of the requirements.[570]

In another change from the rule proposal, we have added the term "brief" to modify the "description of the parameters, assumptions, and analytical choices used" prong of the scenario analysis disclosure provision. The adopted provision will continue to elicit disclosure that will enhance investors' assessment of the resiliency of a registrant's strategy while also mitigating the compliance burden for registrants. Requiring a *brief* description of the parameters, assumptions, and analytical choices used, together with a description of the projected *material* financial

---

[569]    *See* 17 CFR 229.1500.

[570]    *See* TCFD, *supra* note 332332.

impacts on the registrant's business strategy under each scenario, should help elicit disclosure that neither burdens investors with immaterial detail nor unduly adds to a registrant's compliance burden.  As with disclosure related to transition plans, we reiterate that our focus in adopting these requirements is neither on incentivizing nor disincentivizing any particular risk management practice but rather on providing investors with the information they need with respect to the particular practices of a registrant in order to make informed investment and voting decisions.

These revisions to the proposed rule also address commenters' concern that the required scenario analysis disclosure could result in the disclosure of confidential business information.[571] If a registrant has used scenario analysis to determine that an identified climate-related risk is likely to have a material impact on its business, results of operations, or financial condition, it is important for investors to receive disclosure about that material impact.  The registrant will not, however, be required to provide a lengthy description of the underlying parameters and assumptions that may be more likely to reveal confidential business information.

Although some commenters recommended that we require the use of one or more climate scenario models,[572] the final rules do not impose any specific risk management model.  By requiring disclosure based on whether a registrant has determined to conduct scenario analysis as part of its consideration of material climate-related risks, a registrant will be able to select the climate scenario model or models that it believes best fits its particular industry or business, or its climate risk assessment approach.  This approach will provide useful information to investors

---

[571]    *See supra* note 552 and accompanying text.

[572]    *See supra* note 558 and accompanying text.

about the resilience of a registrant's climate-related business strategy while also helping to limit the registrant's compliance burden relating to scenario analysis disclosure under the final rules.

The proposed scenario analysis disclosure provision would have included as an example of potential scenarios to be considered "an increase of no greater than 3 ºC, 2 ºC, or 1.5 ºC above pre-industrial levels."[573]  Because this was for illustrative purposes only, and because we have removed the same example from the definition of scenario analysis to avoid conveying the impression that these scenarios are required,[574] we have also removed the example from Item 1502(f).

To further streamline the scenario analysis disclosure requirement, we have removed the proposed provision stating that the disclosure should include both qualitative and quantitative information.[575]  We recognize that, as noted by some commenters, scenario analysis practices are still evolving,[576] and that, in the early stages of use, a registrant's disclosure regarding its use of scenario analysis may be qualitative.  As a registrant's use of scenario analysis becomes more sophisticated, we would expect its disclosure of the results of scenario analysis to become more quantitative, particularly when discussing the expected material financial impacts on the registrant's business strategy, under each considered scenario, which, like the proposed rule, must be addressed should a registrant be required to disclose its use of scenario analysis. Streamlining the proposed scenario analysis disclosure requirement in this way will enable a registrant to determine the mix of qualitative and quantitative disclosure that best fits its particular circumstances when satisfying its obligations under the final rule.

---

[573]     *See* Proposing Release, section II.C.4.

[574]     *See supra* note 566 and accompanying text.

[575]     *See id.*

[576]     *See, e.g.*, letters from Bloomberg; and Chamber.

We decline to follow the recommendation of one commenter who stated that disclosure of scenario analysis should only be required when integrated and material to a publicly announced climate-related strategy or initiative.[577]  Conditioning the disclosure requirement in this way could deprive investors of needed information solely because the registrant has not yet announced the corresponding strategy or initiative.

### 4.  Disclosure of a Maintained Internal Carbon Price (Item 1502(g))

#### a.  Proposed Rule

The Commission proposed to define an internal carbon price to mean an estimated cost of carbon emissions used internally within an organization.[578]  The Commission also proposed that, if a registrant maintains an internal carbon price, it would have to disclose:

- The price in units of the registrant's reporting currency per metric ton of carbon dioxide equivalent ("$CO_2e$");

- The total price, including how the total price is estimated to change over time, if applicable;

- The boundaries for measurement of overall $CO_2e$ on which the total price is based, if different from the GHG emission organizational boundary required pursuant to the proposed GHG emissions disclosure provision; and

- The rationale for selecting the internal carbon price applied.[579]

The proposed rules would have further required a registrant to describe how it uses an internal carbon price to evaluate and manage climate-related risks.  In addition, the proposed

---

[577]    *See* letter from Amazon.

[578]    *See* Proposing Release, section II.C.3.

[579]    *See id.*

rules would have required a registrant that uses more than one internal carbon price to provide the proposed disclosures for each internal carbon price and to disclose its reasons for using different prices.[580]

### b. Comments

Several commenters supported the rule proposal requiring a registrant to disclose information about a maintained internal carbon price because of the important role played by internal carbon pricing in the management of climate-related risks.[581]  One commenter stated that internal carbon pricing has become an important mechanism to help companies manage risks and capitalize on emerging opportunities in the transition to a low-carbon economy.[582]  According to this commenter, in the event that governments adopt a carbon tax, registrants that have not begun using internal carbon pricing could find themselves increasingly vulnerable due to their failure to internalize the cost into their business.[583]  A different commenter stated that an internal carbon price is a multifaceted tool that enables a registrant to embed a shadow cost for carbon in all carbon mitigation investment decisions, or impose an internal carbon fee by charging business units for their emissions and using the revenue generated to support investment into clean technologies.[584]  Other commenters similarly stated that an internal carbon price can assist companies in steering capital expenditures, research and design, and other financing decisions

---

[580]    *See id.*

[581]    *See, e.g.*, letters from AGs of Cal. *et al.*; AllianceBernstein; Amer. for Fin. Reform, Sunrise Project *et al.*; Anthesis; Ceres; CFA; Eni SpA; ERM CVS; IAC Recommendation; Microsoft; Morningstar; Norges Bank; NY City Comptroller; Paradice Invest. Mgmt.; PRI; SFERS; and TotalEnergies.

[582]    *See* letter from Amer. for Fin. Reform, Sunrise Project *et al.*

[583]    *See id.*

[584]    *See* letter from Eni SpA.

Appellate Case: 24-1628      Page: 157      Date Filed: 03/26/2024 Entry ID: 5377362

toward projects with reduced emissions.[585]  One commenter asserted that nearly half of the world's largest companies factor a cost of carbon into their business plans.[586]  Other commenters recommended that the Commission require a registrant that does not use internal carbon pricing to explain its reason for not doing so, as to prevent the proposed disclosure requirement from acting as a disincentive toward the use of this tool.[587]

Most of the above commenters supported requiring a registrant that uses internal carbon pricing to disclose the proposed items, including:

- The price in units of the registrant's reporting currency per metric ton of $CO_2e$;

- The total price;

- The rationale for selecting the internal carbon price applied; and

- How it uses internal carbon price to evaluate and manage climate-related risks.[588]

Some commenters also supported requiring the disclosure of the methodology used to develop and apply an internal carbon price.[589]  In this regard, one commenter stated that while many companies claim to utilize internal carbon pricing, it is challenging for investors to assess "the validity and strength" of such pricing without transparency on methodology, price, and

---

[585]   *See* letters from AllianceBernstein (stating that "[i]nternal carbon pricing can guide capital expenditures, research and design and other fundamental decisions towards projects, products and services that are more resilient to climate change and away from assets that may become economically unviable in the global transition to a lower carbon economy"); and Ceres.

[586]   *See* letter from NY City Comptroller.

[587]   *See, e.g.*, letters from BlackRock; and Teachers Insurance and Annuity Association of America (June 17, 2022) ("TIAA").

[588]   *See, e.g.*, letters from AllianceBernstein; Amer. for Fin. Reform, Sunrise Project *et al.*; Anthesis; Ceres; ERM CVS; Microsoft; NY City Comptroller; Paradice Invest. Mgmt.; PRI; SFERS; and TotalEnergies. Commenters also supported requiring a registrant that uses more than one internal carbon price to provide the proposed disclosures for each internal carbon price and to explain why it uses different internal carbon prices.  *See, e.g.*, letters from Amer. for Fin. Reform, Sunrise Project *et al.*; Anthesis; ERM CVS; and NY City Comptroller.

[589]   *See, e.g.*, letters from AllianceBernstein; Anthesis; ERM CVS; Microsoft; and PRI.

Appellate Case: 24-1628    Page: 158    Date Filed: 03/26/2024 Entry ID: 5377362

application.[590]  Other commenters stated that the proposed disclosure details are important for investors to assess the reasonableness, applicability, comparability, and accuracy of internal carbon pricing by registrants.[591]  These commenters supported requiring the disclosure of the boundaries for measurement of overall $CO_2e$ on which the total price is based,[592] including when those boundaries are different than the organizational boundaries used to measure a registrant's GHG emissions, in order to increase the transparency underlying the use of internal carbon pricing.[593]

Several other commenters, however, opposed the proposed internal carbon disclosure requirement.[594]  Some commenters stated that the proposed requirement could result in competitive harm for registrants,[595] such as through potential disclosure of confidential or proprietary business information.[596]  For example, commenters asserted that such disclosures "would divulge sensitive information to . . . competitors"[597] and noted that registrants "us[ing] internal prices of carbon in their operations may often be doing so for pricing or other competitive purposes"[598] and "private companies and state-owned enterprises that compete in a

---

[590]  *See. e.g.,* letter from AllianceBernstein; *see also* letter from Paradice Invest. Mgmt. (stating that "[w]here a company does use an internal carbon price, unless transparency is provided on what the price is and how it is set, investors cannot determine whether this is appropriate and what the financial implications may be").

[591]  *See, e.g.,* letter from AllianceBernstein; ERM CVS; and PRI.

[592]  *See* letter from PRI.

[593]  *See* letter from ERM CVS.

[594]  *See, e.g.,* letters from Amer. Bankers; Amer. Chem.; AFPM; BOA; CEMEX; Chevron; Cleary Gottlieb; Dimensional Fund; J. Herron; NAM; Northern Trust; PGIM; PwC; RILA; Sullivan Cromwell; Unilever; Jeremy Weinstein (June 17, 2022) ("J. Weinstein"); and Western Midstream.

[595]  *See, e.g.,* letters from ConocoPhillips, CEMEX, Chevron, Amazon, RILA, SIFMA, NAM, TRC, ESPA, and Center for Climate and Energy Solutions ("CCES").

[596]  *See, e.g.,* letters from Amer. Bankers; Amer. Chem.; AFPM; BOA; CEMEX; Chevron; NAM; Sullivan Cromwell; and J. Weinstein.

[597]  *See* letter from ConocoPhillips.

[598]  *See* letter from Amer. Bankers.

Appellate Case: 24-1628    Page: 159    Date Filed: 03/26/2024 Entry ID: 5377362

registrant's sector would not need to provide the same type and level of information as public companies."[599]  Other commenters indicated that the proposed disclosure requirement was too prescriptive and, lacking a materiality qualifier, would result in the disclosure of information that is not decision-useful for investors and costly to produce.[600]  Because of these concerns, commenters stated that the proposed disclosure requirement would act as a disincentive to the use of internal carbon pricing.[601]  Accordingly, some commenters recommended that the Commission provide exceptions to any internal carbon price disclosure requirements (such as exclusions for information that is competitively sensitive),[602] a separate safe harbor or exemption from liability for internal carbon price disclosure,[603] or a phase in period for these requirements.[604]  One commenter stated that disclosure of internal carbon pricing should be required only when it is broadly used by senior management and the board as part of their strategic planning process and when integrated and material to a publicly announced climate-change strategy or initiative.[605]  Finally, one commenter, who was concerned that the proposed internal carbon pricing requirement would require the disclosure of proprietary information, recommended that the Commission adopt an alternative approach to obtain carbon price-related

---

[599]     *See* letter from Enbridge.

[600]     *See, e.g.*, letters from Cleary Gottlieb; Dimensional Fund; J. Herron; PGIM; PwC; and RILA.

[601]     *See, e.g.*, letters from Cleary Gottlieb; Dimensional Fund; J. Herron; NAM; PGIM; RILA; Sullivan Cromwell; and Western Midstream.

[602]     *See, e.g.*, letters from ConocoPhillips; Amazon; and CCES.

[603]     *See, e.g.*, letters from Reinsurance Association of America (June 16, 2022) ("Reinsurance AA"); Third Coast; BOA; CEMEX; BHP; RILA; CEBA; WMBC; Zions Bancorporation (June 7, 2022) ("Zions"); Can. Coalition GG; Airlines for America; IATA; Southside Bancshares, Inc. (June 16, 2022) ("Southside Bancshares"); WY Bankers; and CCES.

[604]     *See, e.g.*, letters from Managed Funds Association (June 17, 2022) ("MFA"); Moody's; TRC; and Inclusive Capital Partners, L.P. (June 24, 2022) ("Inclusive Cap.").

[605]     *See* letter from Amazon.

disclosures, such as an approach similar to the Financial Accounting Standards Board's ("FASB") standardized measure of oil and gas, or SMOG.[606]

### c. Final Rule

The final rule (Item 1502(g)) will require a registrant that uses internal carbon pricing to disclose certain information about the internal carbon price, if such use is material to how it evaluates and manages a climate-related risk that, in response to Item 1502(a), it has identified as having materially impacted or is reasonably likely to have a material impact on the registrant, including on its business strategy, results of operations, or financial condition.[607] As commenters have noted, many registrants use internal carbon pricing as a planning tool, among other purposes: to help identify climate-related risks and opportunities; as an incentive to drive energy efficiencies to reduce costs; to quantify the potential costs the company would incur should a carbon tax be put into effect; and to guide capital investment decisions.[608] Information about a registrant's use of internal carbon pricing will help investors evaluate how a registrant is managing climate-related risks, particularly transition risks, and the effectiveness of its business strategy to mitigate or adapt to such risks.

At the same time, we recognize commenters' concern that, without a materiality qualifier, the proposed rule could have resulted in the disclosure of internal carbon pricing data that would

---

[606] *See* letter from Chevron (recommending "a disclosure requirement similar to FASB Accounting Standards Codification (ASC) 932, which requires a standardized measure of discounted future cash flows relating to proved oil and gas reserves quantities, often referred to as the standardized measure of oil and gas, or SMOG").

[607] *See* 17 CFR 229.1502(g).

[608] *See supra* notes 581-585 and accompanying text. We also note, based on current voluntary reporting, an increasing trend among public companies to use internal carbon pricing. *See* CDP, *Putting a Price on Carbon* (2021), available at https://cdn.cdp.net/cdp-production/cms/reports/documents/000/005/651/original/CDP_Global_Carbon_Price_report_2021.pdf.

156

not be decision-useful for investors and would be burdensome for registrants to produce.[609]  To address this concern, in a change from the proposed rule, which would have required internal carbon pricing disclosure whenever a registrant maintains an internal carbon price, the final rule will require this disclosure only when the registrant's use of internal carbon pricing is material to how it evaluates and manages a climate-related risk identified in response to Item 1502(a).

If a registrant's use of internal carbon pricing is material, similar to the proposed rule, the final rule will require it to disclose in units of the registrant's reporting currency:

- The price per metric ton of $CO_2e$; and

- The total price, including how the total price is estimated to change over the time periods referenced in Item 1502(a), as applicable.[610]

Similar to the proposed rule, if a registrant uses more than one internal carbon price to evaluate and manage a material climate-related risk, it must provide the required disclosures for each internal carbon price, and disclose its reasons for using different prices.[611]  We also have included a provision, similar to the rule proposal and as recommended by some commenters,[612] stating that if the scope of entities and operations involved in the use of a described internal carbon price is materially different than the organizational boundaries used for the purpose of calculating a registrant's GHG emissions pursuant to the final rule, the registrant must briefly describe this difference.[613]

---

[609]    *See supra* note 600 and accompanying text.

[610]    *See* 17 CFR 229.1502(g)(1).

[611]    *See* 17 CFR 229.1502(g)(2).

[612]    *See supra* notes 592-593 and accompanying text.

[613]    *See* 17 CFR 229.1502(g)(3).

Appellate Case: 24-1628    Page: 162    Date Filed: 03/26/2024 Entry ID: 5377362

We are requiring disclosure of this information because, as commenters noted, it will help investors understand a registrant's internal carbon pricing practice and how such practice has contributed to the registrant's overall evaluation and planning regarding climate-related risk.[614]  Increased transparency about internal carbon pricing by registrants that use an internal carbon price to evaluate and manage a material climate-related risk, in particular a material transition risk, will help investors understand the assumptions and analyses made by registrants when determining and managing the likely financial impacts of such risks on the company. Moreover, including a requirement to disclose any material difference in the boundaries used for internal carbon pricing and GHG emissions measurement will help minimize investor confusion about the scope of entities and operations included in a registrant's application of internal carbon pricing and improve transparency about the methodology underlying the use of internal carbon pricing so that investors may better compare such use across registrants.[615]

To streamline the internal carbon price disclosure requirement and to reduce redundancy, we have eliminated the proposed requirement to describe how a registrant uses an internal carbon price to evaluate and manage climate-related risks.[616]  If a registrant is required to provide internal carbon pricing disclosure under the final rules, the registrant is likely to describe how it uses an internal carbon price to evaluate and manage a material climate-related risk when responding to other final rule provisions, such as when describing a related transition plan,[617] even if the description of internal carbon pricing is less detailed because it is part of a broader narrative discussion.  To further streamline the internal carbon price disclosure requirement, we

---

[614]    *See supra* notes 590-591 and accompanying text.

[615]    *See, e.g.,* letters from ERM CVS; and PRI.

[616]    *See* Proposing Release, section II.C.3.

[617]    *See* 17 CFR 229.1502(e).

have eliminated from the final rule the proposed requirements to disclose the rationale for selecting the internal carbon price applied.[618]

By streamlining the internal carbon price disclosure requirement in this way and adding materiality qualifiers, the final rules will help ensure that investors receive material information about the registrant's use of internal carbon pricing to inform their investment and voting decisions while limiting the compliance burden for registrants. Moreover, eliminating the proposed requirement to provide a separate narrative description of how a registrant uses an internal carbon price and the rationale for selecting the internal carbon price applied will help address commenters' concerns that the proposed disclosure requirement would result in the disclosure of confidential or proprietary information and act as a disincentive to using an internal carbon pricing mechanism.[619] We also note that, as with transition plan and scenario analysis disclosure, disclosure of a registrant's use of an internal carbon price will be subject to a safe harbor.[620] Because of these changes to the proposed rule, we believe that it is unnecessary to adopt an exemption or exception to the internal carbon price disclosure requirement, as some commenters recommended,[621] or a separate phase in for the disclosure requirement, as recommended by other commenters.[622]

---

[618]    *See* Proposing Release, section II.C.3.

[619]    *See supra* note 596 and accompanying text.

[620]    *See infra* section II.J.3.

[621]    *See supra* notes 602-603 and accompanying text.

[622]    *See supra* note 604 and accompanying text.

### E. Governance Disclosure

#### 1. Disclosure of Board Oversight (Item 1501(a))

##### a. Proposed Rules

The proposed rules would have required a registrant to disclose a number of items related to a board of directors' oversight of climate-related risks, largely based on the TCFD framework. First, the Commission proposed to require the identification of any board members or board committees responsible for the oversight of climate-related risks,[623] whether an existing committee, such as the audit committee or risk committee, or a separate committee established to focus on climate-related risks. Next, the proposed rules required detailed disclosure of whether any member of a registrant's board of directors possessed expertise in climate-related risk.[624] Additionally, the proposal required a description of the processes and frequency by which the board or board committee discusses climate-related risks,[625] including disclosure of how the board is informed about climate-related risks, and how frequently the board considers such risks. These proposed disclosure items were intended to afford investors with transparency into how a registrant's board considers climate-related risks and any relevant qualifications of board members.[626]

The proposed rules would also have required disclosure about whether and how the board or board committee considered climate-related risks as part of its business strategy, risk management, and financial oversight.[627] This disclosure was intended to give investors

---

[623]    *See* Proposing Release, section II.D.1.

[624]    *See id.*

[625]    *See id.*

[626]    *See id.*

[627]    *See id.*

information regarding how the board or board committee considers climate-related risks when reviewing and guiding business strategy and major plans of action; when setting and monitoring implementation of risk management policies and performance objectives; when reviewing and approving annual budgets; and when overseeing major expenditures, acquisitions, and divestitures. The proposed disclosure requirement sought to provide investors with information to assess the degree to which a board's consideration of climate-related risks has been integrated into a registrant's strategic business and financial planning, and its overall level of preparation to maintain its shareholder value.

The proposed rules also would have required disclosure about whether and how the board sets climate-related targets or goals and how it evaluates progress, including the establishment of any interim targets or goals.[628] This proposed requirement was intended to help investors evaluate whether and how a board is preparing to mitigate or adapt to material transition risks. Finally, the proposed rule provided that, if applicable, a registrant may describe the board of directors' oversight of climate-related opportunities.

While the goal of these governance-related proposals was to elicit decision-useful information about the board's oversight of climate-related risks for investors, the proposal neither required nor encouraged any particular board composition or board practices. Similarly, the proposal was not intended to affect how a registrant operates, at any level, either through management or the board of directors.

---

[628] *See id.*

App.161

Appellate Case: 24-1628    Page: 166    Date Filed: 03/26/2024 Entry ID: 5377362

### b. Comments

A number of commenters supported the Commission's proposed board oversight disclosures.[629] Some of these commenters stated that investors currently lack easily accessible and comparable information regarding how registrants' governance structures contribute to the evaluation and assessment of material climate-related risks,[630] while others stated the proposed rules would allow investors to understand the governance context in which financial results are achieved.[631] One commenter expressed particular support for those aspects of the proposal that aligned with the TCFD framework.[632] Another commenter suggested that registrants should be required to describe board member training, expertise, or skill-building related to the understanding of climate-related financial risks and opportunities.[633]

Other commenters opposed the proposed board oversight disclosures, stating that the proposals were overly prescriptive,[634] duplicative,[635] and should be integrated into existing disclosure requirements.[636] Commenters that opposed the board oversight provisions expressed concern that the proposed rules narrowly focused on board members' climate expertise and could have a negative overall impact on governance by limiting the flexibility of companies to fill

---

[629] *See, e.g.*, letters from CalPERS; British Columbia Investment Management Corporation (June 17, 2022) ("BC IM Corp."); and Mirova US LLC.

[630] *See, e.g.*, letter from NY City Comptroller.

[631] *See, e.g.*, letter from Bloomberg.

[632] *See, e.g.*, letter from Hydro One.

[633] *See, e.g.*, letter from WSP.

[634] *See, e.g.*, letters from Davis Polk; Amer. Bankers; Business Roundtable; and Sullivan Cromwell.

[635] *See, e.g.*, letter from GPA Midstream.

[636] *See, e.g.*, letters from PwC; and Davis Polk ("We believe proposed new Regulation S-K Item 1501(a), covering the board's role in the management of climate-related risk, is overly prescriptive and unnecessary, because any material information that could be captured by the proposed rule is already addressed by Item 407(h) of Regulation S-K, which obligates companies to disclose the extent of the board's role in the company's risk oversight and how the board administers this oversight function.").

limited numbers of board seats with the individuals best suited to a given company's needs, including individuals' suitability to whole-of-the-board undertakings.[637]  These commenters stated that registrants may be better served appointing directors with wide ranging expertise rather than technical skills in one particular area.[638]  Other commenters stated that the Commission was placing an undue emphasis on board oversight of climate risk, disproportionate to disclosure requirements in other areas.[639]  Some commenters asserted that Regulation S-K already requires the disclosure of information that allows for investors to adequately assess a registrant's board of directors[640] while another commenter stated that the Commission should enhance existing disclosure requirements rather than adopt a new rule.[641]  Other commenters

---

[637]  *See* letters from BlackRock ("We believe that robust board oversight with respect to climate requires a whole-of-the-board approach, and the identification of 'specialist' directors is not conducive to a holistic undertaking by the board."); INGAA ("More fundamentally, the proposed requirement is problematic because the emphasis on climate expertise will have the practical result of elevating climate issues above other business considerations, thus removing the flexibility that companies need to select the right board members for their unique circumstances."); Sullivan Cromwell ("We believe some of these requirements could harm the overall effectiveness of governance by reducing the flexibility of registrants' boards and management to exercise their judgment on the most appropriate governance framework for responding to climate-related risks and opportunities, and to evolve their approach based on new risks developments."); and Deloitte & Touche LLP (May 31, 2022) ("Deloitte & Touche") ("While specific expertise may be valuable in some cases, in general, especially given the limited size of boards, we do not think it is practical for all boards to recruit dedicated experts in each of its critical oversight areas."). *See also, e.g.,* letters from ACA Connects (June 17, 2022); Airlines for America; Amer. Bankers; API; AGs of TX *et al.*; BPI; CalSTRS; Capital Research; Davis Polk; Energy Transfer LP; IAC Recommendation; NMA; NRF; National Waste & Recycling Association (June 17, 2022) ("NWRA"); Natural Resource Partners LP (June 16, 2022) ("NRP"); and SIFMA.

[638]  *See, e.g.,* letters from BIO; and NRP.

[639]  *See, e.g.,* letters from Texas Pipeline Association (June 17, 2022) ("TX Pipeline"); American Forest & Paper Association (June 17, 2022) ("AFPA"); API; INGAA; Amer. Chem.; Alliance Resource Partners, L.P (June 17, 2022) ("Alliance Resource").

[640]  *See, e.g.,* CEMEX; and Soc. Corp. Gov.

[641]  *See* letter from U.S. Chamber of Commerce (stating that some of the information referenced in proposed Regulation S-K Item 1501 could be provided pursuant to Regulation S-K Item 407(h), which requires disclosure regarding the board's role in the risk oversight of the registrant, including how the board administers its oversight function).

Appellate Case: 24-1628     Page: 168     Date Filed: 03/26/2024 Entry ID: 5377362

noted that the proposed rules went beyond the requirements of the TCFD, in particular as it pertains to board-level expertise.[642]

With respect to the proposed requirement to identify any board members or board committees responsible for the oversight of climate-related risks, some commenters were supportive of the proposal.[643] However, many commenters were opposed or expressed concerns about the proposed requirement.[644] Several commenters stated that the identification of key personnel could lead to poaching and would undermine registrant's efforts to retain individuals with climate expertise.[645]

Other commenters highlighted the difficulty that small or specialized companies could face if the proposed disclosure requirement creates pressure to appoint individuals with climate expertise, as it elevates climate expertise at the expense of other skills that are arguably more important to their business.[646]

Some commenters were supportive of the proposal for detailed disclosure of whether any member of a registrant's board of directors possessed expertise in climate-related risk, with some also recommending that the Commission require additional detailed disclosures.[647] For example,

---

[642] *See, e.g.*, letters from Federated Hermes, Inc (June 17, 2022) ("Fed. Hermes"); MBA; and MFA.

[643] *See, e.g.*, letters from CalPERS; RMI (June 17, 2022); PRI; 60 Plus Association (June 17, 2022) ("60 Plus"); Reward Value Foundation (June 17, 2022) ("RVF"); TotalEnergies; NEI; and Norges Bank.

[644] *See, e.g.*, letters from Risk Management Association's Climate Risk Consortia (June 16, 2022) ("Climate Risk Consortia"); Canadian Bankers Association (June 17, 2022) ("Can. Bankers"); Eni Spa; Sullivan Cromwell; Fenwick West; Dominion Energy; BOA; Citigroup; Unilever; CalSTRS; BlackRock; MFA; IIF; ACLI; Business Roundtable; NRF; RILA; NMA,TX Pipeline, American Property Casualty Insurance Association (June 17, 2022) ("APCIA"); National Grid; Diageo plc (June 17, 2022) ("Diageo"); Davis Polk; Airlines for America; IATA; Corteva, Inc. (June 17, 2022) ("Corteva"); PGIM; GPA Midstream; Energy Transfer; and Shearman Sterling.

[645] *See, e.g.*, letter from RILA.

[646] *See, e.g.*, letter from NRP.

[647] *See, e.g.*, letters from Anthesis; Bloomberg; ICCR; and the Greenlining Institute (June 17, 2022) ("Greenlining Institute").

Appellate Case: 24-1628     Page: 169     Date Filed: 03/26/2024 Entry ID: 5377362

one of these commenters suggested that the rules should require disclosure of whether and how the board brings in additional expertise and conducts training for board members.[648]  Other commenters, however, asserted that this proposed disclosure requirement would drive registrants to appoint board members with climate expertise, at the potential expense of more relevant areas, and stated that the Commission's rules should not influence registrants' decisions regarding the composition of their boards.[649]  Some suggested that this proposed disclosure requirement would result in the expansion of boards, driving up costs for registrants, even those that do not currently have a need for particularized climate-related expertise.[650]  Others asserted that, by designating specific board members as having climate-related expertise, the provision would discourage the full engagement of the board on climate-related matters.[651]

Commenters expressed mixed views on the proposal to describe the processes and frequency by which the board or board committee discusses climate-related risks, including disclosure of how the board is informed about climate-related risks, and how frequently the board considers such risks.  One commenter stated that this aspect of the Commission's proposal would help ensure that the board was receiving and processing consistent information on climate-related risk.[652]  Others went further, asserting that directors have a fiduciary responsibility to conduct increased oversight of climate-related risks, and that the proposal would require registrants to report whether and how its board was fulfilling these responsibilities.[653]

---

648  *See, e.g.,* letter from ICCR.

649  *See, e.g.,* letters from United Air Holdings, Fidelity, ICI; U.S. Chamber of Commerce; Targa Resources Corp; Vodafone; Business Roundtable; and SIFMA.

650  *See, e.g.,* letter from SIFMA.

651  *See, e.g.,* letter from Vodafone.

652  *See, e.g.,* letter from NEI.

653  *See, e.g.,* letter from Center for International Environmental Law (June 17, 2022) ("CIEL").

165

Some commenters stated that this proposed disclosure requirement was too detailed, would invite micromanagement of both the board and management, and be potentially misleading to investors.[654] Commenters also stated that disclosure of when and how often boards meet on climate-related matters could lead to changes in how board time and resources are allocated, without necessarily improving the quality of climate-related risk disclosure.[655] Some commenters pointed out that the Commission does not require registrants to report on how frequently other topics are considered by the board of directors and asserted that requiring the disclosure of this information with respect to climate-related risks would be out of step with other governance disclosure rules.[656] According to these commenters, the proposed disclosure requirements were so prescriptive that they singled out climate-related disclosures for presentation in a level of detail that was not consistent with the Commission's overall disclosure regime. Other commenters stated that the information was simply unnecessary and could lead to boilerplate disclosures.[657] Some commenters cautioned that, by requiring this level of detail, the Commission was inadvertently discouraging companies from engaging in internal decision making that would then have to be disclosed under the proposal.[658]

Regarding the proposal for disclosure on whether and how the board considers climate-related risks as part of its business strategy, risk management, and financial oversight, a number of commenters agreed that registrants should disclose this information as it is currently "unnecessarily difficult" for investors to assess whether there is "effective oversight of risks to

---

[654]    *See, e.g.*, letter from Business Roundtable.

[655]    *See, e.g.*, letters from Fidelity; and PGIM.

[656]    *See, e.g.*, letter from SIFMA.

[657]    *See, e.g.*, letter from Morningstar.

[658]    *See, e.g.*, letter from Energy Transfer.

firm value, including material environmental risks."[659]  However, a number of commenters expressed concerns with the granularity of the proposal and urged the Commission to take a less-prescriptive approach more consistent with the Commission's overall disclosure regime.[660] Some commenters urged the Commission to adopt a materiality qualifier to avoid eliciting immaterial or overly granular information and bring the requirements more in line with other required disclosures.[661]

Commenters were divided on the proposal related to disclosure of board oversight of targets and goals, particularly how the board sets such targets and monitors progress. Commenters supportive of the proposal stated that investors need more granular governance disclosures to assess whether the board has sufficient experience in managing dynamic climate-related risk.[662]  In contrast, other commenters asserted that the proposal would require the expenditure of significant resources by registrants while offering little in the way of benefit to investors.[663]  Other commenters expressed the view that the proposal should focus on management's role in setting targets and goals, given that the board's role is more appropriately focused on monitoring the targets and goals that management sets.[664]

---

[659]   *See* letter from NY City Comptroller.  *See also, e.g.*, letters from AFL-CIO; IATP; PRI; 60 Plus; NEI; Vodafone; CalSTRS; CalPERS; BlackRock; Soros Fund; Morningstar; State Street Corporation (June 17, 2022) ("State St."); and Canadian Investor Relations Institute (June 17, 2022).

[660]   *See, e.g.*, letters from Corteva; Energy Transfer; and Soc. Corp. Gov.

[661]   *See, e.g.*, letter from Bipartisan Policy Center (June 13, 2022) ("Bipartisan Policy").

[662]   *See, e.g.*, letters from The Ocean Foundation (June 10, 2022) ("Ocean Fnd."); ICCR; For the Long Term (June 17, 2022); and PRI.

[663]   *See, e.g.*, letters from American Securities Association (June 13, 2022) ("ASA"); Morningstar; and PGIM (stating that only registrants with material climate-related exposure should be required to provide detailed disclosure of board management of climate-related risk).

[664]   *See, e.g.*, letter from National Association of Corporate Directors (June 13, 2022).

### c. Final Rule

We are adopting the proposed requirements to disclose board oversight of climate-related risks (Item 1501(a)), with some modifications to address the concerns of commenters. These disclosures will enhance investors' ability to evaluate a registrant's overall management of climate-related risks by improving their understanding of the board's role in overseeing those risks.[665] The final rule will require a description of a board of directors' oversight of climate-related risks, as proposed.[666] The final rule will also require the identification, if applicable, of any board committee or subcommittee responsible for the oversight of climate-related risks and a description of the processes by which the board or such committee or subcommittee is informed about such risks. Further, if there is a target or goal disclosed pursuant to § 229.1504 or transition plan disclosed pursuant to § 229.1502(e)(1), the final rule will require disclosure of whether and how the board oversees progress against the target or goal or transition plan.[667] These disclosures are not required for registrants that do not exercise board oversight of climate-related risks.

Despite the concerns expressed by several commenters, the proposed rules were not intended to shift governance behaviors, including board composition or board practices. Similarly, the final rules neither seek to influence registrants' decisions about how to manage climate-related risks nor does their design incorporate, reflect, or favor any governance structure

---

[665] *See, e.g.*, letters from Ceres; PRI; and RMI.

[666] We are also adding Instruction 1 to Item 1501 to clarify that in the case of a foreign private issuer with a two-tier board of directors, the term "board of directors" means the supervisory or non-management board. In the case of a foreign private issuer meeting the requirements of 17 CFR 240.10A–3(c)(3), the term board of directors' means the issuer's board of auditors (or similar body) or statutory auditors, as applicable.

[667] The proposed governance provision stated that a registrant may also describe the board of directors' oversight of climate-related opportunities. As previously mentioned, although the final rules do not contain a similar provision, a registrant may elect to provide such disclosure as part of its governance disclosure.

or process. Rather, consistent with our statutory authority, the final rules focus on disclosure of registrants' existing or developing climate-related risk governance practices. We recognize that registrants have varied reasons for pursuing different oversight arrangements, and some registrants may reasonably determine that climate-related risks are not among the most pressing issue facing the company. The final rules will provide investors with the information they need to understand and evaluate those oversight arrangements and make informed investment decisions in light of their overall investment objectives and risk tolerance. Furthermore, as stated above, these disclosure requirements apply to those registrants the boards of which exercise oversight of climate-related risks; no disclosure is required for registrants that do not have information responsive to the disclosure requirements.

We are not adopting some of the more prescriptive elements of the proposal in response to commenter concerns. Specifically, we are eliminating the proposed requirements to disclose:

- The identity of specific board members responsible for climate-risk oversight;

- Whether any board member has expertise in climate-related risks and the nature of the expertise;

- How frequently the board is informed of such risks; and

- Information regarding whether and how the board sets climate-related targets or goals, including interim targets or goals.

While the proposal would have required this disclosure only to the extent applicable, we appreciate the concerns of some commenters who stated that these elements of the proposal could have unintended effects on the registrant's governance structure and processes by focusing on one area of risk at the expense of others. In addition, some commenters raised concerns that the level of detail required by the proposal would cause registrants to divulge sensitive internal

App.169

board processes.  It may be that a registrant, in describing "the board of directors' oversight of climate-related risks," will find it necessary to disclose, or otherwise choose to disclose, some or all of the information called for by the proposal.  But, by adopting a more streamlined rule, we intend to eliminate any misperception that this information is required for all registrants, particularly those without existing processes or information to disclose.

We are, however, adopting the proposed requirement to identify any board committee or subcommittee responsible for the oversight of climate-related risks, if a registrant has such a committee or subcommittee.  This information is important to an understanding of how the board is managing such risk and will not be burdensome to disclose.  Moreover, the provision simply requires the registrant to identify any committee or subcommittee that has been tasked with managing climate-related risks and is not designed to influence decisions about whether and how the board allocates responsibility for oversight of such risk.  We are also adopting a requirement, albeit modified from the proposal, to describe whether and how the board of directors oversees progress against disclosed climate-related targets, goals, or transition plans.  By tying this disclosure requirement to circumstances in which the registrant has a disclosed climate-related target, goal, or transition plan, the final rule will avoid generating detailed disclosure about matters that are not important to investors.  In addition, in light of commenter concerns regarding the proposed disclosure of whether and how the board of directors establishes any final or interim targets or goals,[668] we are omitting this requirement from the final rule.  Overall, the less prescriptive approach to disclosure in the final rule will facilitate investors' understanding of how a registrant intends to manage a target or goal that is material to its business while

---

[668]        *See supra* note 663 and accompanying text.

discouraging boilerplate disclosures and avoiding any unintended adverse effects on the board's governance structures.

We are also adopting the proposed requirement to describe the processes by which the board or any board committee or subcommittee is informed about climate-related risks, while eliminating the requirement to describe the frequency of these discussions. While some commenters stated that it would be helpful to investors for registrants to disclose both the processes and frequency of these discussions,[669] other commenters expressed concern that this disclosure will shift governance behavior.[670] The final rules balance investors' need to understand the board's governance of climate-related risks in sufficient detail to inform an investment or voting decision with concerns that the proposal could inadvertently pressure registrants to adopt specific or inflexible climate-risk governance practices or organizational structures or otherwise influence the conduct of the board. By retaining the requirement to disclose the process by which the board is informed, investors will have meaningful information that they can use to assess the conduct of boards in dealing with climate-related risks while avoiding overly detailed or granular disclosures that could unduly influence such processes.

Although some commenters asserted that registrants may feel pressure to appoint certain individuals with climate expertise,[671] we reemphasize that the Commission remains agnostic about whether and/or how registrants govern climate-related risks. Registrants remain free to elect whether and how to establish or retain the procedures and practices that they determine best fit their business. The focus of the final rules remains on investor protection and improving

---

[669] *See, e.g.*, letters from FTLT; Morningstar; and PRI.

[670] *See supra* note 655.

[671] *See supra* note 646.

Appellate Case: 24-1628    Page: 176    Date Filed: 03/26/2024 Entry ID: 5377362

investors' access to comparable and consistent climate-related disclosures. The final rules are focused on disclosure and do not require, and are not formulated to prompt, registrants to change their governance or other business practices.

We are not, as suggested by some commenters, adopting a materiality qualifier for this portion of the final rule. As discussed above, we have revised the final rule from the proposal to make the disclosure requirement less prescriptive. As such, registrants will have additional flexibility to determine how much detail to provide about the board's oversight of climate-related risk. These revisions help mitigate some commenters' concerns that the rule will require disclosure of immaterial information. The specific information called for by the final rule will provide important context for an investor to evaluate the extent to which the board is evaluating climate-related risks. If a board of directors determines to oversee a particular risk, the fact of such oversight being exercised by the board is likely material to investors given other demands on the board's time and attention.[672] Moreover, unlike management, which likely oversees many more routine matters, some of which may not be material to investors, we expect that any risks elevated to the board level will be material to the company and limited in number. Accordingly, we do not believe that a materiality qualifier is necessary for this provision.

## 2. Disclosure of Management Oversight (Item 1501(b))

### a. Proposed Rules

Similar to the proposed disclosures on board oversight, the proposed rules would have required a registrant to disclose a number of items, as applicable, about management's role in the assessment and management of climate-related risks. First, the Commission proposed to require

---

[672]    See discussion *infra* section II.E.2.c (regarding our reasons for adding a materiality qualifier to Item 1501(b)).

registrants to disclose whether certain management positions or committees are responsible for assessing and managing climate-related risks and, if so, to identify such positions or committees and disclose the relevant expertise of the position holders or members in such detail as necessary to fully describe the nature of the expertise.[673] This proposed requirement was intended to better inform investment or voting decisions by providing information on the extent to which management addresses climate-related risks. Additionally, the proposed rules would have required disclosure about the processes by which the responsible managers or management committees are informed about and monitor climate-related risks.[674] Finally, the proposed rule would have also required disclosure about whether the responsible positions or committees report to the board or board committee on climate-related risks and how frequently this occurs.[675] These proposed disclosure items were intended to help investors understand management's processes to identify, assess, and manage climate-related risks. Under the proposal, if applicable, a registrant also could elect to describe management's role in assessing and managing climate-related opportunities.

### b. Comments

Many commenters generally supported the proposed requirement to disclose management oversight of climate-related risks,[676] and expressed support for the proposed requirement to

---

[673] *See* Proposing Release, section II.D.2.

[674] *See id.*

[675] *See id.*

[676] *See, e.g.,* letters from RMI; PRI; IAA; CFA; Beller *et al.*; HP; Uber; BHP; Etsy; UAW Retiree Medical Benefits Trust (June 17, 2022) ("UAW Retiree"); ICGN; AIMco, BCI, CDPQ, HOOP, IMCO, OMERS, OTPP, PSP, UPP (June 17, 2022) ("BCI, *et al.*"); US SIF; Seventh Generation Interfaith, Inc. (June 16, 2022) ("Seventh Gen."); AllianceBernstein.; SKY Harbor; Paradice Invest. Mgmt.; Wellington Mgmt.;

describe management's role in assessing and managing climate-related risks.[677]  These
commenters stated that investors are interested in procuring comprehensive and standardized
information that allows for an examination of how management monitors and assesses climate-
related risk.  Some supportive commenters stated that there is currently a lack of detailed and
available information on how registrants manage climate-related risks.[678]  Commenters were
generally supportive of the proposals that aligned with the TCFD, including the proposal to
require a description of management's role in assessing and managing climate-related risks.[679]  A
few commenters also recommended that the final rule require more detailed disclosure, including
organizational diagrams so that reporting lines to the executive management and board of
directors are disclosed[680] and information about executive management remuneration linked to
climate-based incentives.[681]

        By contrast, some commenters expressed concerns that the proposals were overly
prescriptive, and would require disclosure of potentially proprietary and sensitive information
about management structure and individual employees.[682]  These commenters further expressed

---

Bailard, Inc. (June 14, 2022) ("Bailard"); Harvard Mgmt.; IIF; BNP Paribas; Rick Love (March 30, 2022);
NY City Comptroller; GHGSAT; J. Herron; California Farm Bureau (June 17, 2022) ("CFB"); Richard
Bentley (May 21, 2022) ("R. Bentley"); D. Higgins; Richard Burke (May 20, 2022) ("R. Burke"); ICI;
Anthesis; Canadian Post Corporation Pension Plan (June 17, 2022) ("Can. PCPP"); WSP USA (June 17,
2022) ("WSP"); Arjunal; Ecofin; Fiduciary Trust International (June 17, 2022); and Can. IRI.

[677]    *See, e.g.*, letters from Ocean Fnd.; PRI; Harvard Mgmt.; and WSP.

[678]    *See, e.g.*, letters from Climate First Bank; and Bailard.

[679]    *See, e.g.*, letters from ICI; and Harvard Mgmt.

[680]    *See* letter from Morningstar.

[681]    *See, e.g.*, letters from RVF; Can. PCPP; IEEFA (May 10, 2022) (stating that "[t]he linkage of executive
compensation to climate-related goals is a significant indicator to investors that the company is serious
about climate change," and noting that IFRS sustainability disclosure protocols require disclosure of such
linkage); AllianceBernstein; BCI, *et al.*; CalSTRS; CalPERS; I. Millenaar; and T. Sanzillo.

[682]    *See, e.g.*, letters from Airlines for America; BPI; and MFA.

174

Appellate Case: 24-1628     Page: 179     Date Filed: 03/26/2024 Entry ID: 5377362

concerns that disclosure of such information would cause competitive harm.[683]  Another

commenter stated that the Commission could elicit more helpful information by adopting a

principles-based approach that would allow registrants to tailor disclosures to their specific

business, thereby avoiding unnecessary reporting burdens and the production of boilerplate

language that provides little value to investors.[684]

With respect to the proposed requirement to describe management's role in assessing and

managing climate-related risks, some commenters emphasized how critical this information is to

investors, explaining that the current lack of transparent and standardized information prevents

investors from assessing the operating environments of the companies in which they invest.[685]

Another commenter stated that the requirement would be unduly burdensome for many

companies, particularly smaller companies that either do not maintain a large management team

or have not established formalized internal controls to produce the proposed disclosures on

climate-related risks.[686]

Commenters expressed mixed views about the proposal to require disclosure of the

management positions or committees responsible for assessing and managing climate-related

risks and the identity of such positions or committees.  Some commenters were concerned that

the disclosure of management positions or committees could reveal proprietary information

about the internal structure of registrants.[687]  On the other hand, some commenters emphasized

---

[683]    *See, e.g.*, letter from Amer. Chem.

[684]    *See* letter from Sullivan Cromwell ("Requiring registrants to disclose governance and risk management information with more granularity inappropriately places greater emphasis on climate risk oversight compared to the oversight of other business risks that are equally (and in some cases, more) deserving of the attention of a registrant's board and management.").

[685]    *See, e.g.*, letter from CFA.

[686]    *See, e.g.*, letter from NRP.

[687]    *See, e.g.,* letters from AFPA; BlackRock.

Appellate Case: 24-1628     Page: 180     Date Filed: 03/26/2024 Entry ID: 5377362

the relevance of these proposed disclosures,[688] with many of these commenters explicitly tying this information to the need for transparency about compensation practices.[689]  Supportive commenters also emphasized that the proposed disclosure requirements would allow investors to evaluate the capabilities and preparedness of a company's executive management, who are often tasked with incorporating climate-related risk management into business practices and decisions.[690]  One commenter indicated that this proposal would provide different information to investors than the proposed information about boards, as it would allow investors to understand the operational expertise and accountability that exists in relation to how a registrant is overseeing such risk.[691]  Commenters stated that investors are seeking particularized information about management's role in dealing with climate-related risks given that effective oversight requires business-level understanding of these risks."[692]

Some commenters supported the proposed requirement to disclose the relevant expertise or identity of management position holders or members responsible for managing climate related risk, stating that such disclosures would provide investors with a general understanding of how management's climate expertise is deployed, as well as whether and how climate-related risk is integrated in the organization.[693]  In contrast, many commenters stated that this disclosure would require registrants to publish detailed descriptions of in-house staff and management's reliance on such staff.[694]  Other commenters asserted that the universe of climate-related experts is

---

[688]    *See, e.g.*, letter from PRI.

[689]    *See, e.g.*, letters from CFA; and Nia Impact Capital (June 15, 2022) ("Nia Impact").

[690]    *See, e.g.*, letter from D. Higgins.

[691]    *See, e.g.*, letter from RMI.

[692]    *See, e.g.*, letters from RMI; and Ocean Fnd.

[693]    *See, e.g.*, letters from PRI; and NEI.

[694]    *See, e.g.*, Can. Bankers.

limited, and that the proposed requirements would increase the competition for executives with climate-related expertise.[695] Some commenters further asserted that the proposed rules would encourage the recruitment of climate experts, who are already scarce, and constrain registrants' ability to produce climate disclosures and institute climate-related strategies.[696] Other commenters were skeptical of the value added by disclosing the relevant expertise or identity of management, stating that these positions turn over frequently and more generalized disclosures of the management process would afford investors with better quality information.[697]

Many commenters were supportive of the proposal to require registrants to describe the processes by which the management positions or committees responsible for climate-related risks are informed about and monitor climate-related risks.[698] These commenters stated that this information was highly relevant to and sought after by investors, and would provide the kind of detailed and standardized information that is currently unavailable in current disclosures.[699] Other commenters expressed concerns regarding the utility of this information.[700] Some commenters stated that, by requiring this kind of disclosure, the Commission was placing an undue priority on climate-related risks above other more pressing business risks.[701] Other commenters stated that a high-level summary of the management of material climate-related risks was sufficient and would avoid the expense of producing excessive and unnecessary

---

[695] *See, e.g.*, letters from ABA; Fed. Hermes; ICI; RILA; Sullivan Cromwell; and Wellington Management Company.

[696] *See, e.g.*, letter from Can. Bankers (arguing "Highlighting reliance on these experts will … lead to potential poaching issues that could further inhibit registrants' ability to comply with climate disclosures and to implement climate strategies.").

[697] *See, e.g.*, letters from RILA; and ICI.

[698] *See, e.g.*, letters from GHGSAT; NY City Comptroller; Anthesis; and J. Brendan Herron.

[699] *See, e.g.*, letters from TotalEnergies; and Greenlining Institute.

[700] *See, e.g.*, letters from Corteva; IC; and AFPA.

[701] *See, e.g.*, letters from Charles Franklin (Nov. 1, 2022); Southside Bancshares; and BIO.

Appellate Case: 24-1628     Page: 182     Date Filed: 03/26/2024 Entry ID: 5377362

information.[702]  In addition, commenters representing smaller registrants or registrants in particular industries stated that their management of climate-related risks are appropriately tailored to their size and scale and asserted that the proposed rule unduly pressures such registrants into a one-sized-fits-all approach.[703]

Commenters were divided on the proposal to require disclosure of whether and how frequently such positions or committees report to the board or a committee of the board on climate-related risks.  Commenters supportive of the proposal stated that the disclosure would allow investors to analyze how boards integrate climate-related information into the overall risk management structure and how this information affects decision-making.[704]  Other commenters suggested that this disclosure would drive unwelcome changes in current business practice and structure, potentially diverting attention and resources away from other material risks or other matters.[705]

Commenters also provided views on the proposal to allow, but not require, registrants to disclose the board's oversight of, and management's role in, assessing and managing climate-related opportunities.  While some commenters supported allowing such disclosure to be

---

[702]    *See, e.g.*, letters from GPA Midstream ("While we agree with the Commission that general information on governance, such as identification of the committee or committees responsible for addressing climate-related risks, may be relevant information for investors, we disagree with the level of detail called for by the Proposed Rules."); and PwC ("Focusing on information that the registrant's management uses to make strategic decisions—instead of a broad requirement to disclose 'any' climate-related risks—would improve the usefulness of the disclosures and provide additional insight to investors, while simultaneously reducing the burden on registrants.").

[703]    *See, e.g.*, letters from Southside Bancshares; BIO; and NRP.

[704]    *See, e.g.*, letters from PRI; NY City Comptroller; CIEL; Greenlining Institute; TotalEnergies; NEI; J. Brendan Herron; ICI; Canadian Coalition for Good Governance (June 16, 2022) ("Can. Coalition GG"); Anthesis; WSP; Fed. Hermes; and Ocean Fnd.

[705]    *See, e.g.*, letters from Alliance Resource; NRP; The Sustainability Board Report; Corteva, Inc.; Energy Transfer LP; Center for Climate and Energy Solutions; IIF; AFPA; PGIM; Southside Bancshares; IC; GPA Midstream; AALA; D. Burton, Heritage Fdn.; and Akin Gump Strauss Hauer & Feld LLP.

178

optional and not mandatory,[706] others indicated that how companies are responding to highly dynamic opportunities is material information and therefore should be required to be disclosed.[707]  One commenter stated that climate-related opportunity reporting is likely to be adopted in both the EU and UK, and therefore, to streamline mandatory disclosures for dually-listed companies, the commenter recommended that the Commission require this disclosure, except for opportunities unrelated to a registrant's principal line of business.[708]

### c. Final Rule

We are adopting the proposed requirement to disclose management oversight of climate related risks (Item 1501(b)) with some modifications to address the concerns of commenters. The final rules will, like the proposed rules, require that registrants describe management's role in assessing and managing climate-related risks.  As commenters stated, investors need information about how management-level staff assess and manage material climate-related risks to make informed investment and voting decisions.  However, we are limiting the disclosure required by this final rule provision to material climate-related risks, as suggested by commenters,[709] given the multitude of climate-related matters that may be overseen by management.  The final rules also specify that a registrant should address, as applicable, the following non-exclusive list of disclosure items when describing management's role in assessing and managing the registrant's material climate-related risks:

- Whether and which management positions or committees are responsible for assessing and managing climate-related risks, and the relevant expertise of such position holders or

---

[706]    *See, e.g.*, letter from CEMEX.

[707]    *See, e.g.*, letter from CHRE and Institute for Governance & Sustainable Development.

[708]    *See, e.g.*, letter from We Mean Business Coalition (June 13, 2022) ("We Mean Business").

[709]    *See, e.g.*, letters from MFA; and RILA.

committee members in such detail as necessary to fully describe the nature of the expertise;

- The processes by which such positions or committees assess and manage climate-related risks; and

- Whether such positions or committees report information about such risks to the board of directors or a committee or subcommittee of the board of directors.

The non-exclusive list of disclosures in Item 1501(b) should help elicit specific information about management's oversight of climate-related risks and thereby mitigate any tendency towards boilerplate disclosures. At the same time, by focusing the disclosure on management's role in assessing and managing material climate-related risks, the final rules will provide registrants with the flexibility to tailor the disclosures based on their particular governance structure. Given these changes, we believe the final rule appropriately balances investors' needs for information to understand management's involvement in assessing and managing material climate risks with concerns that a more prescriptive rule could have adverse consequences on registrants' governance practices or organizational structures.

We reiterate, as we did above with respect to our rules requiring disclosure of board oversight of climate-related risks, that the final rule does not seek to influence decisions about how to manage climate-related risks or otherwise change registrant behavior. Rather, the final rule seeks to elicit disclosure about existing oversight practices that will allow investors to make better informed judgments about registrants' oversight processes and mechanisms in light of their overall investment objectives and risk tolerance. Furthermore, the final rule does not require registrants that do not engage in the oversight of material climate-related risk to disclose any information.

Appellate Case: 24-1628    Page: 185    Date Filed: 03/26/2024 Entry ID: 5377362

We are mindful of the suggestions of some commenters that we adopt additional requirements to disclose information related to management oversight of climate-related risks, including descriptions of internal positions and reporting structures and detailed information about climate-based remuneration. However, consistent with our overall goal to streamline the proposed requirements and to focus on management's oversight of material climate-related risk, we are not including such additional disclosure elements in the final rule.[710]

We are adopting the proposal requiring a description of the relevant expertise of position holders or members responsible for assessing and managing climate-related risk.[711] While we considered the view of commenters that this could cause registrants to feel compelled to find and hire management with such expertise, regardless of whether that is the most sensible use of managerial resources given the registrant's particular facts and circumstances, the added qualification that disclosure is only required where the risk is material mitigates this concern. We agree with commenters that asserted that this information will be helpful to understanding a registrant's ability to manage climate-related risks given the direct role that management will play in overseeing any such risks yet emphasize that registrants are required to make this disclosure only if they have identified a material climate risk.

As noted above, the final rule has been modified to eliminate many of the prescriptive disclosure elements from the proposal, and it instead provides a non-exclusive list of the types of

---

[710]   Although we are not adopting specific requirements related to executive management remuneration linked to climate-based incentives, to the extent a climate-related target or goal or other measure is a material element of a registrant's compensation of named executive officers, such information is required to be disclosed under Item 402(b) of Regulation S-K.

[711]   Further, we are adding Instruction 2 to Item 1501 to clarify that relevant expertise of management in Item 1501(b)(1) may include, for example: prior work experience in climate-related matters; any relevant degrees or certifications; any knowledge, skills, or other background in climate-related matters.

disclosures that a registrant should include, as applicable, when describing management's role in assessing and managing the registrant's material climate-related risk. For example, if applicable, registrants should describe the processes by which certain positions or committees are informed about and monitor climate-related risks. A process-based description of management's governance of material climate-risks can offer investors a meaningful look at how registrants manage material climate-related risks. Registrants should also disclose, if applicable, whether management reports to the board or a subcommittee of the board on climate-related risks. Elimination of the proposed requirement to disclose how frequently the board meets to discuss climate-related matters, as discussed above, addresses commenters' concerns that this disclosure, if provided, could divert limited resources from the consideration of other material risks and encourage changes to business practices. Nonetheless, information on whether management reports to the board can provide needed clarity on the connection between board and management level governance of climate-related risks, and accordingly, we have retained it as an example of the type of disclosure that might be responsive to the rule. We have also added a reference to a subcommittee of the board because some registrants may establish a subcommittee to focus on climate-related issues.

Finally, as noted above,[712] we are not adopting the proposed rule that would have allowed, but did not require, registrants to describe management's role in assessing and managing climate-related opportunities. As with other voluntary disclosure, registrants may elect to include such disclosure. While we recognize that some commenters recommended that such disclosure be mandatory, we have determined to treat the disclosure regarding climate-

---

[712] *See* section II.C.1.c.

Appellate Case: 24-1628    Page: 187    Date Filed: 03/26/2024 Entry ID: 5377362

related opportunities as optional, among other reasons, to allay any anti-competitive concerns that might arise from a requirement to disclose a particular business opportunity.[713]

These changes will also help address the concerns expressed by some commenters, including from smaller reporting companies and registrants in certain industries,[714] that the proposed rules would unduly pressure such registrants into a one-sized-fits-all governance approach given the line of business, size, and structure of their companies.[715] While we disagree with one commenter's suggestion that the proposal would "mandate that every company in the United States be required to expand management structures in order to accommodate concerns that are not material to a company,"[716] shifting to a non-exclusive list of topics that a registrant should address, as applicable, will mitigate the concerns raised by some commenters that the prescriptiveness of the proposed disclosures could lead to such a result. In addition, the flexibility afforded to registrants under the final rule to determine which details about management's oversight of climate-related risks to include in their disclosure will help alleviate concerns that the proposal would elevate climate-related disclosures above other, equally important, disclosures. Furthermore, as stated above, the final rule does not impose any disclosure requirements on registrants that do not exercise management oversight of climate-related risks.

---

[713] *See* Proposing Release, section II.A.1.

[714] *See, e.g.*, letter from BIO.

[715] *See, e.g.*, letter from Chamber ("We believe the Proposed Rule, if adopted, would create a board oversight and risk management structure that not only makes little sense for certain companies but could harm investors in companies that have no need for such extensive oversight of climate risk. The Proposed Rule, if adopted, would present a costly distraction for companies with limited resources (particularly small-cap and many mid-cap companies) to attempt to align their behavior and disclosures with those of other companies that similarly felt pressured by the rule to adapt their behavior to what appears to be the SEC's preferred response to climate-related risks.").

[716] *See* letter from BIO.

### F. Risk Management Disclosure (Item 1503)

#### 1. Proposed Rule

The Commission proposed to require a registrant to describe any processes the registrant has for identifying, assessing, and managing climate-related risks.[717]  The Commission stated that more granular information regarding climate-related risk management could allow investors to better understand how a registrant identifies, evaluates, and addresses climate-related risks that may materially impact its business.[718]  Such information could also permit investors to ascertain whether a registrant has integrated the assessment of climate-related risks into its regular risk management processes.[719]

The rule proposal would have required a registrant, when describing the processes for identifying and assessing climate-related risks, to disclose, as applicable, how the registrant:

- Determines the relative significance of climate-related risks compared to other risks;

- Considers existing or likely regulatory requirements of policies, such as GHG emissions limits, when identifying climate-related risks;

- Considers shifts in customer or counterparty preferences, technological changes, or changes in market prices in assessing potential transition risks; and

---

[717] *See* Proposing Release, section II.E.1.  As previously noted, *see supra* note 464, the Commission proposed to require transition plan disclosure in connection with a registrant's risk management discussion.  *See* Proposing Release, section II.E.2.  The final rule includes transition plan disclosure as part of a registrant's disclosure about climate-related risks and their impact on the registrant's strategy.  We discuss transition plan disclosure requirements above in section II.D.2.

[718] *See* Proposing Release, section II.E.1.

[719] *See id.*

- Determines the materiality of climate-related risks, including how it assesses the potential size and scope of any identified climate-related risk, such as the risks identified in response to proposed Item 1502.[720]

The rule proposal also required a registrant, when describing any processes for managing climate-related risks, to disclose, as applicable, how the registrant:

a) Decides whether to mitigate, accept, or adapt to a particular risk;

b) Prioritizes addressing climate-related risks; and

c) Determines how to mitigate a high priority risk.[721]

The rule proposal further required a registrant to disclose whether and how climate-related risks are integrated into the registrant's overall risk management system or processes.[722] If a separate board or management committee is responsible for assessing and managing climate-related risks, the rule proposal required a registrant to disclose how that committee interacts with the registrant's board or management committee governing risks.[723] The Commission explained that these proposed disclosures would help investors assess whether the registrant has centralized the processes for managing climate-related risks, which may indicate to investors how the board and management may respond to such risks as they unfold.[724]

---

[720]    *See id.*

[721]    *See id.*

[722]    *See id.*

[723]    *See id.*

[724]    *See id.*

Appellate Case: 24-1628    Page: 190    Date Filed: 03/26/2024 Entry ID: 5377362

## 2. Comments

Many commenters supported the proposed rule requiring registrants to describe any processes in place for identifying, assessing, and managing climate-related risks.[725] Commenters stated that investors would use the risk management disclosures to evaluate an issuer's readiness for confronting climate-related risks.[726] Commenters also stated that the proposed risk management disclosure requirement would improve the quality of the disclosures that registrants currently provide on a voluntary basis.[727] Commenters further stated that the proposed risk management disclosure requirement is aligned with the TCFD's recommended disclosures regarding risk management, with which many registrants are already familiar.[728]

Other commenters generally opposed the proposed risk management disclosure requirement.[729] Commenters objected to the prescriptiveness of the proposal, which they stated would result in overly granular disclosure that may not be relevant to a registrant's particular business or industry and, therefore, may not be material for investors.[730] Commenters also stated that the prescriptive nature of the rule proposal may result in the disclosure of commercially

---

[725] *See, e.g.*, letters from AGs of Cal. *et al.*; Amer. for Fin. Reform, Sunrise Project *et al.*; Anthesis; Bloomberg; BNP Paribas; BOA; CalPERS; Center Amer. Progress; Ceres; CFA; C2ES; Eni SpA; Friends Fiduciary Corporation (June 17, 2022) ("FFC"); Grant Thornton; Morningstar; IAC Recommendation; NY St. Comptroller; PRI; PwC; SKY Harbor; TotalEnergies; and US SIF.

[726] *See, e.g.*, letters from AGs of Cal. *et al.*; CFA; and Morningstar.

[727] *See, e.g.*, letters from Bloomberg; and PRI.

[728] *See, e.g.*, letters from Center Amer. Progress; C2ES; and US SIF. We note that other commenters that approved of the proposed risk management disclosure requirements also supported aligning the Commission's climate disclosure requirements generally with the TCFD recommendations because it would help elicit consistent, comparable, and reliable disclosure for investors. *See, e.g.*, letters from Bloomberg; CalPERS; and PRI.

[729] *See, e.g.*, letters from Airlines for America; BIO; Business Roundtable; CEMEX; Chamber; Davis Polk; Dominion Energy; Fenwick & West; GPA Midstream; J. Herron; RILA; and Soc. Corp. Gov.

[730] *See, e.g.*, letters from BIO; Chamber; Dominion Energy; GPA Midstream; J. Herron; RILA; and Soc. Corp. Gov.

sensitive and strategic information.[731]  These commenters urged the Commission to adopt a more

principles-based approach that would allow registrants to avoid the disclosure of commercially

sensitive or proprietary information.[732]

Some commenters opposed the proposed risk management disclosure requirement

because they believed that the Commission's existing rules already require the disclosure of

material risks and how the registrant is managing them.[733]  Other commenters stated that the

Commission's proposed climate-related risk management disclosure provision deviated from the

Commission's disclosure requirements for other risk categories and placed undue emphasis on

climate-related matters.[734]  Additionally, some commenters expressed general opposition to the

proposed disclosure requirements, including risk management disclosures, because of concerns

about the resulting compliance burden and costs.[735]

Several of the commenters that supported the risk management disclosure proposal also

expressed support for the proposal's discrete disclosure items.[736]  For example, one commenter

supported requiring the disclosure of how a registrant determines the relative significance of

climate-related risks compared to other risks, how it determines the materiality of climate-related

risks, and how it considers various factors, such as existing or prospective regulatory

requirements or policies, shifts in customer or counterparty preferences, technological changes,

and changes in market prices, in assessing potential transition risks, and specifically mentioned

---

[731]   *See, e.g.*, letters from Airlines for America; Business Roundtable; CEMEX; and Dominion Energy.

[732]   *See, e.g.*, letters from Airlines for America; BOA; Business Roundtable; and Soc. Corp. Gov.

[733]   *See, e.g.*, letters from BIO; CEMEX; and Dominion Energy.

[734]   *See, e.g.*, letters from Airlines for America; Davis Polk; Dominion Energy; RILA; and Soc. Corp. Gov.

[735]   *See, e.g.*, letters from CEMEX; Davis Polk; GPA Midstream; Fred Reitman (June 16, 2022) ("F. Reitman"); and J. Weinstein.

[736]   *See, e.g.*, letters from Amer. for Fin. Reform, Sunrise Project *et al*.; C2ES; ICI; Morningstar; PRI; TotalEnergies; and WSP.

Appellate Case: 24-1628     Page: 192     Date Filed: 03/26/2024 Entry ID: 5377362

that such disclosures are recommended by the TCFD.[737]  Another commenter stated that

requiring disclosure of how a company determines the importance of climate-related risks would

be useful to investors, as this determination provides the foundation for all other climate-related

considerations.[738]  Relatedly, one commenter stated that it needs transparent disclosure regarding

how companies are determining the materiality of climate-related risks in order to evaluate issuer

risks properly.[739]  Another commenter stated that how a registrant determines the materiality of

climate-related risks is important for investors to understand because it helps set the necessary

context for all of the other climate-related disclosures.[740]

      Commenters also supported the proposed requirement to describe how the registrant

considers existing or likely regulatory requirements or policies, such as GHG emissions limits,

when identifying climate-related risks.[741]  One commenter stated that this would provide

information about an important transition-related risk.[742]  Another commenter stated that this

type of information, among others, would help investors evaluate whether a company has

implemented adequate processes for identifying, assessing, and managing climate-related

risks.[743]

      For similar reasons, some commenters supported the proposal requiring a registrant to

disclose how it considers shifts in customer or counterparty preferences, technological changes,

---

[737]  *See* letter from Anthesis.  *See also supra* note 728.

[738]  *See* letter from PRI (stating that the determination of how a company determines the importance of climate-related risks "will then go on to dictate how management and the board consider climate-related risks as part of governance, [and] whether management sets climate related targets or uses other tools such as scenario analysis").

[739]  *See* letter from Calvert.

[740]  *See* letter from WSP.

[741]  *See, e.g.*, letters from ICI; PRI; and TotalEnergies.

[742]  *See, e.g.*, letter from WSP.

[743]  *See, e.g.*, letter from ICI.

or changes in market prices in assessing potential transition risks.[744]  Certain commenters, while supportive of the proposal, stated that the Commission should go further and also afford registrants the ability to provide additional disclosures, such as regarding how climate-related technological and customer shifts are being managed, minimized, tracked over time, and reported on regularly.[745]

Many commenters supported the proposal to require a registrant to disclose how it decides whether to mitigate, accept, or adapt to a particular climate-related risk.[746]  One of these commenters stated that this information would help investors evaluate whether a company has implemented adequate processes for identifying, assessing, and managing climate-related risks.[747]  Many commenters similarly supported the Commission's proposal to require disclosure of how registrants prioritize climate-related risks and how they determine to mitigate a high priority risk.[748]  Commenters indicated that information concerning how the registrant prioritizes climate-related risks vis-à-vis other risks that the registrant is managing would be particularly useful.[749]  One commenter stated that disclosure of a registrant's rationale for pursuing capital expenditures for managing certain climate-related risks would be beneficial for investors to better assess the company's capital allocation.[750]  Other commenters emphasized that since investors must depend on issuers' assessment of their own significant or material climate-related

---

[744]  *See, e.g.*, letters from C2ES; ICI; PRI; TotalEnergies; and WSP.

[745]  *See, e.g.*, letter from C2ES.

[746]  *See, e.g.*, letters from CalPERS; C2ES; ICI; PRI; Morningstar; TotalEnergies; and WSP.

[747]  *See* letter from ICI.

[748]  *See, e.g.*, letters from ICI; Morningstar; TotalEnergies; and WSP.

[749]  *See, e.g.*, letters from C2ES; and WSP.

[750]  *See* letter from CalPERS.

risks, the proposed disclosure requirements would allow investors to understand how issuers reach these conclusions.[751]

Many commenters also supported the proposed disclosure requirement concerning whether and how climate-related risk management processes are integrated into a registrant's overall risk management system.[752] One commenter stated that information about how a registrant integrates its climate risk management processes into its overall risk management system is essential to understanding the effectiveness of those climate risk management processes.[753] Another commenter stated that disclosure regarding how a registrant's identified material climate-related risks are "integrated into its company-wide enterprise risk management framework [would] allow for comparability of climate risks with other financial and non-financial risks."[754] Yet another commenter stated that information about whether a registrant has centralized its climate-related risk management into its regular risk management processes is decision-useful for investors because the disintegration of climate-related risks from other risks signals insufficient competence in managing the financial implications of climate-related matters.[755] One commenter expressed support for the proposed risk management disclosure provision but cautioned that registrants should not be required to speculate about future

---

[751] *See, e.g.*, letters from Earthjustice (June 17, 2022); and RMI.

[752] *See, e.g.*, letters from Anthesis; Eni SpA; ICI; Morningstar; NY St. Comptroller; PRI; Verena Rossolatos (June 8, 2022) ("V. Rossolatos"); SKY Harbor; TotalEnergies; and WSP.

[753] *See* letter from Morningstar; *see also* letter from PRI (stating that understanding the extent to which risk management disclosure on climate-related issues is integrated into a company's overall risk management process is essential for investors).

[754] *See* letter from Anthesis.

[755] *See* letter from V. Rossolatos.

190

restructurings, write-downs, or impairments related to climate risks or disclose any trade secrets or confidential business information in their climate-related risk management disclosures.[756]

Several commenters opposed the proposed risk management disclosure requirement because of the detailed items that a registrant would be required to address when describing the processes used to identify, assess, and manage climate-related risks and how those processes are integrated into the registrant's overall risk management system.[757] One commenter stated that the proposed disclosure requirement could cause investors to overestimate climate-related risks and improperly contextualize the materiality of those risks.[758] Another commenter stated that the proposed disclosure requirement was redundant because such information already must be included in annual reports.[759] Other commenters expressed concern that the proposed disclosure requirement called for unnecessarily detailed, confidential, and proprietary information.[760] Some commenters also asserted that the proposed itemized risk management disclosure requirements go well beyond the TCFD framework, which one commenter stated would "not provide a material benefit to investors and in fact may harm the public markets by creating undue costs on issuers to produce such information."[761] Other commenters criticized the proposed risk management disclosure provision for not including materiality qualifiers and not being more

---

[756] *See* letter from BOA.

[757] *See, e.g.*, letters from Chamber; International Energy Credit Association (June 17, 2022) ("IECA"); MFA; Soc. Corp. Gov; and J. Weinstein.

[758] *See, e.g.*, letter from Alliance Resource.

[759] *See, e.g.*, letter from CEMEX.

[760] *See, e.g.*, letter from Business Roundtable.

[761] *See, e.g.*, letters from MFA; and Soc. Corp. Gov.

principles-based, and cautioned that the prescriptiveness of the rule proposal would lead to boilerplate language that would not provide decision-useful information to investors.[762]

### 3. Final Rule

After considering the comments received, we are adopting a requirement (Item 1503), modified from the proposal as discussed below, to describe any processes the registrant has for identifying, assessing, and managing material climate-related risks.[763]  We agree with those commenters that stated investors need more comprehensive disclosure of registrants' climate-related risk management practices to inform their investment and voting decisions.[764]  Because climate-related risks can have material impacts on a registrant's business, it is important for investors to have information available to them so that they can understand how a registrant identifies, assesses, and manages any such risks.  At the same time, we are mindful of commenters' suggestions, both for this risk management disclosure in particular and climate-related disclosures more generally, that the Commission promulgate rules that allow registrants to tailor the disclosure of material climate-related risks and related management practices to their own particular facts and circumstances.[765]  Accordingly, we are adopting a less prescriptive approach that focuses on a description of processes for identifying, assessing, and managing *material* climate-related risks.  In doing so, we have sought to avoid imposing a "one-size-fits-all" disclosure model[766] that fails to account for differences in industries and businesses and that

---

[762] *See, e.g.*, letters from Chamber; IECA; and J. Weinstein.

[763] *See* 17 CFR 229.1503(a).  As noted in section II.D.2.c above, we have moved the disclosure requirement concerning a registrant's transition plan to the 17 CFR 229.1502.

[764] *See, e.g.*, letters from Ceres; C2ES; PWHC; SKY Harbor; and WSP.

[765] *See supra* note 730 and accompanying text.

[766] *See, e.g.*, letters from API; Chamber; and SIFMA.

192

could result in disclosure of immaterial information while still eliciting decision-useful information for investors about registrants' risk management practices.

As a number of commenters indicated, consistent information about a registrant's management of climate-related risks is vital to informed investment and voting decisions.[767] Despite the importance of climate-related risk management information to investors, only a minority of registrants currently include such information in their voluntary climate reports or in their Exchange Act filings.[768]  We considered comments that the proposed disclosure requirements are redundant because existing rules already require disclosure about material risks in annual reports, but we continue to believe that a specific disclosure item focused on managing material climate-related risks is warranted.  While registrants may be required to disclose certain climate-related information in filings made with the Commission pursuant to existing disclosure requirements, as noted above[769] there is a need to improve the consistency, comparability, and reliability of disclosures about climate-related risk management for investors given that, as noted above, most registrants are not currently including the type of information called for by the final rules in voluntary climate reports or Exchange Act filings.[770]  We also considered comments that the proposal placed undue emphasis on climate-related risks and, as discussed below, have made a number of changes in response to streamline the requirements and focus on material climate-related risks.

---

[767] *See supra* note 727 and accompanying text.  *See also* Anthesis (stating that the SEC should require the registrant to disclose its process for identifying climate risks with the highest materiality and explain its adaptation/mitigation plan to build resiliency).

[768] *See* TCFD, *2022 Status Report* (Oct. 2022)*, available at* https://assets.bbhub.io/company/sites/60/2022/10/2022-TCFD-Status-Report.pdf (indicating that only approximately one-third of over 1,400 public companies surveyed provided disclosure concerning climate risk management processes in their 2021 reports).

[769] *See supra* note 727 and accompanying text.

[770] *See* section IV.A.5.

Appellate Case: 24-1628     Page: 198     Date Filed: 03/26/2024 Entry ID: 5377362

First, in a change from the proposal, we have added a materiality qualifier to the disclosure item.[771]  The final rule will require registrants to disclose any existing processes for the identification, assessment, and management of material climate-related risks.  Including a materiality qualifier addresses the specific concerns expressed by commenters that the proposal would require registrants to disclose this information in a level of detail that would impose undue costs.  If a registrant has not identified a material climate-related risk, no disclosure is required.  Given the concerns expressed by commenters that there is a wide range of risks that registrants manage as part of their operations, we are persuaded that it is appropriate to include a materiality qualifier for this aspect of the proposal to help ensure that the final rule elicits decision-useful information for investors without imposing an undue burden on registrants and placing undue emphasis on climate-related risks that are not material.

Similarly, to address the concerns of commenters that the proposed risk management disclosure provision would require registrants to address items that might not be relevant to their particular business or industry,[772] we have removed several prescriptive elements from the final rule.  Those proposed provisions that we are not adopting would have required a registrant, when describing any processes for identifying and assessing climate-related risks, to disclose, as applicable, how the registrant:

- Determines the relative significance of climate-related risks compared to other risks;

- Considers existing or likely regulatory requirements or policies, such as GHG emissions limits, when identifying climate-related risks;

---

[771]    *See supra* note 730 and accompanying text.

[772]    *See supra* note 730 and accompanying text.

- Considers shifts in customer or counterparty preferences, technological changes, or changes in market prices in assessing potential transition risks; and

- Determines the materiality of climate-related risks.

Instead, the final rule will allow a registrant, when describing its processes for identifying, assessing, and managing material climate-related risks, to determine which factors are most significant, and therefore should be addressed, based on its particular facts and circumstances, which may include information on the items listed above.

Commenters that supported the proposal stated that a meaningful description of the processes underlying climate risk management is necessary to enable investors to evaluate registrants' climate risk management practices as part of their investment decisions. The final rule will elicit disclosures that offer a more complete picture of the management of material climate-related risks while also mitigating concerns that the proposed rule could unnecessarily elevate climate-related risk above other important matters and give rise to competitive harm and increased litigation risk for registrants. The final rule will also promote more consistent and comparable disclosure of registrants' climate-related risk management practices than is currently available from voluntary reporting and, as these provisions of the final rules more closely align with the TCFD, they may limit costs for those registrants who are familiar with reporting under this framework.

The final rule provides that a registrant should address, as applicable, how it identifies whether it has incurred or is reasonably likely to incur a material physical or transition risk.[773] This provision is similar to the proposed rule that would have required a registrant to describe its

---

[773]    *See* 17 CFR 229.1503(a)(1).

195

processes for identifying a climate-related risk.[774]  The final rule substitutes the more specific terms "physical risk or transition risk" for "climate-related risk" to clarify and simplify the requirement since Item 1500 defines climate-related risk to encompass physical and transition risks.  In addition, because the processes and factors that a registrant may use to identify the two types of risks may differ in certain respects, or in some cases a registrant may face one and not the other kind of risk, this change should elicit more relevant information for investors.[775]

Similar to the rule proposal, the final rule also provides that a registrant should address, as applicable, how it:

- Decides whether to mitigate, accept, or adapt to the particular risk;[776] and

- Prioritizes whether to address the climate-related risk.[777]

The final rules will help investors to understand the processes that a registrant has for identifying, assessing, and managing climate-related risks, consistent with the feedback of many commenters.[778]  In this regard, commenters further indicated that information concerning how a registrant prioritizes climate-related risks vis-à-vis other risks that the registrant is managing would be particularly useful.[779]  We are not, however, retaining the proposed requirement to disclose how a registrant determines how to mitigate any high priority risks.  In response to the concerns expressed by several commenters,[780] we have removed this proposed disclosure item to

---

[774] *See* Proposing Release, section II.E.1.

[775] *See* TCFD, *supra* note 332, at 13-14 (providing different tables (Tables D2 and D3) outlining the identification and assessment approaches for transition risks and physical risks).

[776] *See* 17 CFR 229.1503(a)(2).

[777] *See* 17 CFR 229.1503(a)(3).

[778] *See supra* note 747 and accompanying text.

[779] *See supra* note 749 and accompanying text.

[780] *See supra* note 733 and 734 and accompanying text.

reduce the prescriptiveness of the risk management disclosure requirement and streamline this requirement, as we have done with other areas of the final rules. Furthermore, in response to one commenter who supported the proposal but cautioned against an overly broad application,[781] we confirm that the final rules do not require registrants to speculate in their disclosures about future restructurings, write-downs, or impairments related to climate risk management. The flexibility afforded by the final rules also helps address the point made by the same commenter that the proposed disclosure item should not compel registrants to disclose trade secrets or confidential business information.

Also similar to the rule proposal, the final rule provides that, if a registrant is managing a material climate-related risk, it must disclose whether and how any of the processes it has described for identifying, assessing, and managing the material climate-related risk have been integrated into the registrant's overall risk management system or processes.[782] As some commenters noted, information about how a registrant integrates its climate risk management processes into its overall risk management system is important to help investors understand and assess the effectiveness of those climate risk management processes.[783] Mandating this disclosure, therefore, will allow investors to make better informed decisions about the overall risk profile of their investment in the registrant and provide a measure from which they can evaluate similarly situated companies.[784]

We are not adopting the proposed requirement for a registrant to disclose, if it has a separate board or management committee responsible for assessing and managing climate-

---

[781]   *See e.g.*, letter from BOA.

[782]   *See* 17 CFR 229.1503(b).

[783]   *See supra* note 753 and accompanying text.

[784]   *See, e.g.*, letter from SKY Harbor.

related risks, how that committee interacts with the registrant's board or management committee governing risks.  Several commenters stated that they do not have dedicated board or management committees for managing climate-related risks,[785] or asserted that including such prescriptive elements in the final rule could lead to boilerplate disclosure.[786]  Having considered these comments, and in light of our overall aim to reduce the prescriptiveness of the proposed requirements, we are not including this disclosure item in the final rule.  We believe the other disclosure items we are adopting will still provide investors with decision-useful information about how registrants manage their material climate-related risks.

Finally, as noted above,[787] we are not adopting the proposed rule that allowed but did not require registrants to describe any processes for identifying, assessing, and managing climate-related opportunities when responding to any of the provisions in the risk management section.[788]  As with other voluntary disclosure, registrants may elect to include such disclosure.  While we recognize the recommendation of some commenters that such disclosure be mandatory, consistent with the rule proposal, we have determined to treat disclosure regarding climate-related opportunities as optional, among other reasons, to allay any anti-competitive concerns that might arise from a requirement to disclose a particular business opportunity.[789]

---

[785]     *See, e.g.*, letter from BIO.

[786]     *See, e.g.*, letter from Chamber.

[787]     *See supra* section II.C.1.c.

[788]     *See* 17 CFR 229.1503(c).

[789]     *See* Proposing Release, section II.A.1.

### G. Targets and Goals Disclosure (Item 1504)

#### 1. Proposed Rule

The Commission proposed to require a registrant that has set any climate-related targets or goals to disclose certain information about those targets or goals.[790] The proposed rule provided examples of climate-related targets or goals, such as those related to the reduction of GHG emissions or regarding energy usage, water usage, conservation or ecosystem restoration, or revenues from low-carbon products in line with anticipated regulatory requirements, market constraints, or other goals established by a climate-related treaty, law, regulation, policy, or organization.[791]

The proposed rule would have required a registrant that has set climate-related targets or goals to disclose the targets or goals and include, as applicable, a description of:

- The scope of activities and emissions included in the target;

- The unit of measurement, including whether the target is absolute or intensity based;

- The defined time horizon by which the target is intended to be achieved, and whether the time horizon is consistent with one or more goals established by a climate-related treaty, law, regulation, policy, or organization;

- The defined baseline time period and baseline emissions against which progress will be tracked with a consistent base year set for multiple targets;

- Any interim targets set by the registrant; and

---

[790]    *See* Proposing Release, section II.I.

[791]    *See id.*

- How the registrant intends to meet its climate-related targets or goals.[792]

The proposed rule also would have required a registrant to disclose relevant data to indicate whether it is making progress toward achieving the target or goal and how such progress has been achieved. The proposed rule would have required the registrant to update this disclosure each fiscal year by describing the actions taken during the year to achieve its targets or goals.[793]

Finally, the Commission proposed to require a registrant that, as part of any net emissions reduction strategy, uses carbon offsets[794] or RECs[795] to disclose the role that carbon offsets or RECs play in the registrant's climate-related business strategy.[796] If the registrant used carbon offsets or RECs in its plan to achieve climate-related targets or goals,[797] the proposed rule would

---

[792] *See id*. The proposed rule further provided, as an example, that for a target or goal regarding net GHG emissions reduction, the discussion could include a strategy to increase energy efficiency, transition to lower carbon products, purchase carbon offsets or RECs, or engage in carbon removal and carbon storage.

[793] *See id.*

[794] The proposed rules defined carbon offsets as representing an emissions reduction or removal of greenhouse gases in a manner calculated and traced for the purpose of offsetting an entity's GHG emissions. *See* Proposing Release, section II.C.2.

[795] The proposed rules defined an REC, consistent with the EPA's commonly used definition, to mean a credit or certificate representing each purchased megawatt-hour (1 MWh or 1000 kilowatt-hours) of renewable electricity generated and delivered to a registrant's power grid. *See id*.

[796] *See id*. The Commission proposed the requirement to disclose information about the carbon offsets or RECs used by a registrant both in the proposed disclosure requirements for targets and goals and as part of the proposed disclosure requirements regarding the impacts of climate-related risks on a registrant's strategy. *See* Proposing Release, sections II.C.2 and II.I. To streamline and reduce redundancies in the subpart 1500 disclosure requirements, the final rules require disclosure of used carbon offsets or RECs only as part of the targets and goals disclosure requirements. Nevertheless, as discussed below, a registrant may elect to provide its disclosure about targets and goals as part of its strategy discussion, including its transition plan disclosure, as applicable. The final rules also require certain disclosures of offsets and RECs under the Regulation S-X amendments. *See* 17 CFR 210.14-02(e)(1) and *infra* section II.K.3.c.vi.

[797] While both carbon offsets and RECs represent commonly used GHG emissions mitigation options for companies, they are used for somewhat different purposes. A company may purchase carbon offsets to address its GHG emissions (Scopes 1, 2, and 3 emissions) by verifying global emissions reductions at additional, external projects. The reduction in GHG emissions from one place ("offset project") can be

have required it to disclose the amount of carbon reduction represented by the offsets or the amount of generated renewable energy represented by the RECs, the source of the offsets or RECs, a description and location of the underlying projects, any registries or other authentication of the offsets or RECs, and the cost of the offsets or RECs.[798]

The proposed rule further stated that a registrant could provide the disclosures regarding its targets and goals when discussing climate-related impacts on its strategy, business model, and outlook or when discussing its transition plan.[799]

### 2. Comments

#### a. The Overall Proposed Disclosure Requirements

Many commenters supported the rule proposal requiring a registrant that has set climate-related targets or goals, including the reduction of GHG emissions, to disclose certain information about those targets or goals.[800] Commenters stated that information about a registrant's set targets and goals, how a registrant plans to achieve them, and progress made towards them is critical to understanding a registrant's transition risk management and its exposure to the likely financial impacts of identified transition risks.[801] Commenters also stated

---

used to "offset" the emissions taking place somewhere else (at the company's operations). *See, e.g.*, EPA, *Offsets and RECs: What's the Difference?* (Feb. 2018), available at https://www.epa.gov/sites/default/files/2018-03/documents/gpp_guide_recs_offsets.pdf. In contrast, a company may purchase an REC in renewable electricity markets solely to address its indirect GHG emissions associated with purchased electricity (i.e., Scope 2 emissions) by verifying the use of zero- or low-emissions renewable sources of electricity.

[798]  *See* Proposing Release, section II.I.

[799]  *See id.*

[800]  *See, e.g.*, letters from AllianceBernstein; Amazon; Amer. for Fin. Reform, Sunrise Project *et al.*; As You Sow; BHP; Bloomberg; BNP Paribas; Boston Common Asset Mgmt; CalPERS; CalSTRS; Calvert; CEMEX; Center Amer. Progress; Ceres; CFA; Dell; D. Hileman Consulting; Engine No. 1 (June 17, 2022); HP; Impax Asset Mgmt.; IAA; IAC Recommendation; IIF; Maple-Brown; Morningstar; Norges Bank; NRDC; NY City Comptroller; NY St. Comptroller; Paradice Invest. Mgmt.; PGIM; PwC; Salesforce (June 15, 2022); U.S. Sen. Brian Schatz and seven other U.S. Senators (June 17, 2022) ("Sens. B. Schatz *et al.*"); SKY Harbor; TotalEnergies; Unilever; Vodafone; and World Resources Institute (June 17, 2022) ("WRI").

[801]  *See, e.g.*, letters from CalPERS; CalSTRS; Ceres; Engine No. 1; Norges Bank; and NY St. Comptroller.

Appellate Case: 24-1628     Page: 206     Date Filed: 03/26/2024 Entry ID: 5377362

that the proposed targets and goals disclosure requirement would help investors assess a registrant's transition plan and whether it is aligned with global climate-related goals so that they may better understand the registrant's transition risk exposure.[802]  Commenters also indicated that the proposed targets and goals disclosure requirement would provide needed data to help investors determine if a registrant's climate-related public commitments are real and would help discourage greenwashing.[803]  Commenters further indicated that, despite the importance of information about a registrant's targets or goals to investors, such information currently is lacking.[804]

Several of the commenters that supported requiring disclosure of a GHG emissions reduction target or goal also supported the disclosure of other climate-related targets or goals, such as those pertaining to energy usage, water usage, conservation or ecosystem restoration, and revenues from low-carbon products.[805]  Some commenters also recommended requiring the disclosure of any targets or goals that a registrant has set to mitigate climate-related impacts on local or indigenous communities or that involve human capital management goals related to employee retraining and retention in clean energy jobs.[806]  One commenter, however, stated that the targets and goals disclosure requirement should only pertain to GHG emissions reduction.[807]  According to this commenter, because standards for other climate-related targets and goals have

---

[802]  *See, e.g.*, letters from Morningstar; and Paradice Invest. Mgmt.

[803]  *See, e.g.,* letters from Center Amer. Progress; D. Hileman Consulting; and Sens. Schatz *et al.*

[804]  *See, e.g.*, letters from Calvert; Engine No. 1; IIF; Maple-Brown; NY St. Comptroller; and Paradice Invest. Mgmt.

[805]  *See, e.g.*, letters from Amer. for Fin. Reform, Evergreen Action *et al.*; Ceres; Moody's; TotalEnergies; U.S. Green Building Council (June 17, 2022) ("USGBC"); and WRI.

[806]  *See, e.g.*, letters from CIEL; ICCR; and Seventh Gen.

[807]  *See* letter from Dell.

not been broadly defined or accepted, voluntary reporting regarding such targets or goals is more appropriate.[808]

Several commenters that supported the proposed targets and goals disclosure requirement also supported requiring a registrant that has set a climate-related target or goal to describe, as proposed:

- The scope of activities and emissions included in the target;

- The unit of measurement, including whether the target is absolute or intensity based;

- The defined time horizon by which the target is intended to be achieved, and whether the time horizon is consistent with one or more goals established by a climate-related treaty, law, regulation, policy, or organization;

- The defined baseline time period and baseline emissions against which progress will be tracked with a consistent base year set for multiple targets;

- Any interim targets set by the registrant; and

- How the registrant intends to meet its climate-related targets or goals.[809]

Commenters stated that the proposed detailed disclosure requirements would help investors understand the level of a registrant's commitment to achieving its climate-related targets and goals.[810] Some commenters recommended requiring additional disclosure requirements, such as whether the registrant has set science-based greenhouse gas emission reduction targets under the

---

[808] *See id.*

[809] *See, e.g.*, letters from Amer. for Fin. Reform, Sunrise Project *et al.*; Bloomberg; Maple-Brown; Moody's; and WRI; *see also* letters from IATP (supporting disclosure of the scope of activities and emissions, how targets have been set, and progress realized); and Unilever (supporting disclosure of the scope, details of the method of calculation and any baseline being used, together with any plans to meet the targets, but stating that it is not necessary to require disclosure of any other climate targets because, if material, they will be included in the registrant's plans to meet the GHG reduction target).

[810] *See, e.g.*, letters from Maple-Brown; and USGBC.

Science Based Targets Initiative,[811] or the extent to which it can achieve its targets or goals using existing technology.[812]

Several commenters supported the proposed rule provision requiring a registrant to disclose relevant data indicating whether it is making progress toward achieving a set target or goal and how such progress has been achieved.[813] One commenter stated that the proposed requirement would enhance management's accountability for its climate-related commitments.[814] This commenter further supported requiring a registrant to provide periodic updates to help investors evaluate its progress in achieving its targets or goals.[815] Another commenter stated that disclosure regarding a registrant's progress toward achieving its targets or goals should include information about the related capital expenditures it has made or intends to make.[816] One other commenter, in response to the proposed Regulation S-X amendments, recommended requiring the disclosure of a registrant's discrete and separable expenditures, both expensed and capitalized, related to transition activities for the registrant's publicly disclosed, climate-related targets and goals.[817]

---

[811] *See, e.g.,* letter from WRI.

[812] *See, e.g.,* letter from Amer. for Fin. Reform, Sunrise Project *et al.* ("The Commission should require a registrant, when disclosing its targets or goals, to disclose any data that indicate whether the registrant is making progress toward meeting the target and how such progress has been achieved, as proposed. This should include how a registrant's progress toward targets or goals links to the financial statements, because capital expenditures made by registrants in implementing transition plans are a key metric for investors.").

[813] *See, e.g.,* letters from Amer. for Fin. Reform, Sunrise Project *et al.*; CalPERS; CEMEX; D. Hileman Consulting; Morningstar; Paradice Invest. Mgmt.; PwC; Sens. B. Schatz *et al.*; TotalEnergies; USGBC; and WRI.

[814] *See* letter from PwC.

[815] *See id.*

[816] *See* letter from Amer. for Fin. Reform, Sunrise Project *et al.*

[817] *See* letter from Amazon.

Some commenters supported a targets and goals disclosure requirement but recommended conditions to such requirement. For example, some commenters stated that, in order to prevent the proposed disclosure requirement from acting as a disincentive to the adoption of climate-related targets or goals, the final rule should provide an opportunity for a registrant that has not set a target or goal to explain why it has not done so.[818] Some commenters indicated that a registrant should only be required to provide data about a publicly announced target or goal.[819] One commenter stated that the disclosure requirement should only be triggered by the board's or CEO's formal adoption of the target or goal to encourage the informal development of the target or goal.[820] One other commenter similarly stated that the Commission should require disclosure of targets or goals only when the board and senior management use the target or goal in their decision-making.[821]

Several commenters opposed the proposed targets and goals disclosure requirement.[822] Commenters expressed concern that the proposed disclosure requirement was overly prescriptive and would require detailed disclosure about a target or goal even if the target or goal was not material.[823] Commenters asserted that the disclosure requirements for targets and goals were

---

[818] *See, e.g.*, letters from Impax Asset Mgmt.; Maple-Brown; and TIAA.

[819] *See* letter from PwC (recommending that the Commission clarify that the disclosure of voluntary targets or goals applies only to targets and goals that have been publicly announced by the registrant, its subsidiaries that are separate registrants, or its significant subsidiaries); *see also* letter from Amazon (indicating that some internal targets or goals may never be as fully developed with the level of detail that the proposed rule would require).

[820] *See* letter from SKY Harbor.

[821] *See* letter from Amazon.

[822] *See, e.g.*, letters from Abrasca Ibri (Oct. 13, 2022) ("Abrasca"); ACLI; AFPM; Amer. Chem.; AIC; Business Roundtable; CA Farm; Chamber; Footwear Distributors and Retailers of America (June 15, 2022) ("FDRA"); IN Farm; LTSE; NAA; Nebraska Farm Bureau Federation (June 17, 2022) ("NB Farm"); Oklahoma Farm Bureau (June 17, 2022) ("OK Farm"); Petrol. OK; RILA; Soc. Corp. Gov.; and USCIB.

[823] *See, e.g.*, letters from Abrasca; ACLI; AIC; Business Roundtable; Chamber; FDRA; RILA; and Soc. Corp. Gov.

overly prescriptive and would impose a costly compliance burden on registrants that, together with liability concerns, would discourage registrants from setting climate-related targets or goals.[824]  One commenter stated that the proposed targets and goals disclosure requirement would have a chilling effect on registrants setting even aspirational targets or goals.[825]  Another commenter stated that the proposed disclosure requirement would chill even preliminary discussions of climate-related initiatives at the board or management level.[826]  A different commenter stated that the proposed targets and goals disclosure requirement would effectively punish early adopters of targets or goals by exclusively requiring them to disclose their targets and goals in extensive detail.[827]

Commenters also expressed concern that the proposed disclosure requirement would compel disclosure of internal, non-public targets that would reveal confidential proprietary information.[828]  Because of these concerns, some of these commenters recommended that the Commission only require the disclosure of material targets and goals that have been publicly announced.[829]

### b.  The Proposed Disclosure Requirement Concerning the Use of Carbon Offsets or RECs

Many commenters supported the proposed rule provision requiring a registrant that uses carbon offsets or RECs in its plan to achieve climate-related targets or goals to disclose

---

[824]    *See, e.g.*, letters from Abrasca; AIC; AFPM; Business Roundtable; CA Farm; Chamber; FDRA; IN Farm; LTSE; NAA; NB Farm; OK Farm; Petrol. OK; RILA; Soc. Corp. Gov.; and USCIB.

[825]    *See* letter from Abrasca.

[826]    *See* letter from Chamber.

[827]    *See* letter from Business Roundtable.

[828]    *See, e.g.*, letters from Abrasca; AIC; Amer. Chem.; Chamber; and Soc. Corp. Gov.

[829]    *See, e.g.*, letters from Abrasca; AIC; Chamber; and Soc. Corp. Gov.

information about: the amount of carbon reduction represented by the offsets or the amount of generated renewable energy represented by the RECs; the source of the offsets or RECs; a description and location of the underlying projects; any registries or other authentication of the offsets or RECs; and the cost of the offsets or RECs.[830]  Commenters stated that, because many registrants rely on the use of carbon offsets or RECs to achieve their GHG emissions reduction targets or goals, and because there are different types of carbon offsets and RECs with different attendant risks and benefits, investors need detailed information about the carbon offsets or RECs used in order to evaluate the effectiveness of a registrant's transition risk strategy and management of climate-related impacts on its business.[831]  Commenters further stated that, despite this need, such information is currently lacking, and that without detailed information about the type, underlying project, authentication, and cost of the offsets, investors cannot adequately assess a registrant's climate-related strategy and its exposure to climate-related risks, particularly transition risks.[832]

For example, some commenters expressed concern that registrants' carbon offset purchases vary considerably in terms of quality and effectiveness in meeting their own net-zero

---

[830]  *See, e.g.*, letters from AllianceBernstein; Amazon; Amer. for Fin. Reform, Sunrise Project *et al.*; As You Sow; CalPERS; Calvert; Carbon Direct (June 16, 2022); CarbonPlan (June 16, 2022); Ceres; Constellation Energy Corporation (June 7, 2022) ("Constellation Energy"); D. Hileman Consulting; Domini Impact; Enerplus (June 16, 2022); Engine No. 1; Eni SpA; Ethic Inc. (June 17, 2022) ("Ethic"); Harvard Mgmt.; J. Herron;IATP; ICCR; J. McClellan; Morningstar; NRDC; Paradice Invest. Mgmt.; PGIM; SKY Harbor; TotalEnergies; and WRI.  *See also* IAC Recommendation ("We support requiring companies to disclose the role that carbon offsets or renewable energy credits play in their climate-related business strategy or if the company used them to meet targets or goals").

[831]  *See, e.g.*, letters from AllianceBernstein; Carbon Direct; CarbonPlan; and Ceres.

[832]  *See, e.g.*, letter from AllianceBernstein (stating that "[t]he markets for carbon credits and offsets are nascent, fragmented and opaque, with significant variability in governance, quality, pricing and sourcing" and that "[i]ncreasing transparency on offsets is critical to an investor's assessment of how well a registrant is managing the risk of climate change to its business, particularly transition risk."); *see also* letters from Calvert; CarbonDirect; CarbonPlan; Ceres; Engine No. 1; and Ethic.

Appellate Case: 24-1628     Page: 212     Date Filed: 03/26/2024 Entry ID: 5377362

carbon targets or those required by jurisdictions in which they operate.[833]  In this regard one commenter stated that investors need to know the type of carbon offset purchased in order to assess a registrant's climate risk management because, if the registrant has a net-zero target or goal, it must use a carbon removal offset rather than a carbon avoidance offset to achieve the net-zero target or goal.[834]  Commenters relatedly recommended defining carbon offsets to include those that seek to avoid emissions (in addition to those that seek to reduce or remove them) and to require registrants that have used offsets to disclose the type of offset used (e.g., avoidance, reduction, or removal).[835]  Other commenters expressed support for increased disclosure about carbon offsets because of concerns about perceived problems in carbon offset markets regarding the quality and permanence of offsets.[836]  Commenters further stated that a registrant's strategy that is heavily dependent on the use of carbon offsets or RECs runs the risk of market volatility, including spikes in the price of such instruments due to low supply and increased demand, and litigation and reputational risks from conducting an ineffective transition risk strategy or from claims of greenwashing.[837]

Some commenters recommended that the Commission require the disclosure of certain information about RECs in addition to the proposed disclosure items.[838]  For example,

---

[833]   *See, e.g.*, letters from CarbonPlan; Ceres; and Morningstar.

[834]   *See* letter from CarbonPlan.

[835]   *See, e.g.*, letters from Amer. Fin. Reform, Sunrise Project *et al*.; Business Council for Sustainable Energy (June 17, 2022) ("BCSE"); Ceres; and WBCSD.

[836]   *See, e.g.*, letter from ICCR.

[837]   *See, e.g.*, letters from Amer. Fin. Reform, Sunrise Project *et al*.; CarbonDirect; and CarbonPlan.

[838]   *See, e.g.*, letters from American Clean Power Association (June 17, 2022) ("Amer. Clean Power"); BCSE; CalPERS; and International Emissions Trading Association (June 17, 2022) ("IETA").

commenters[839] recommended requiring the disclosure of whether a registrant's RECs are bundled or unbundled.[840] Commenters[841] also sought disclosure regarding whether a registrant purchased or obtained its RECs from a compliance market or voluntary market.[842]

Other commenters, however, opposed the proposed requirement to disclose detailed information regarding a registrant's use of carbon offsets or RECs.[843] One commenter stated that the proposed disclosure requirement was overly prescriptive and that, without a materiality qualifier, it was likely to result in disclosure that was not decision-useful for investors.[844] Another commenter similarly stated that the proposed requirement would result in the disclosure of immaterial information and also indicated that the proposed requirement, which the commenter characterized as seeking to regulate offsets and RECs, was outside the area of the Commission's expertise and beyond the Commission's statutory authority.[845] One other

---

[839] *See* letters from Amer. Clean Power; and IETA; *see also* letter from CalPERS (stating its belief that unbundled RECs should not be allowed to be counted, but if the final rule allows for unbundled RECs to be counted, then a registrant should be required to disclose both a total amount with, and a total amount without, the use of unbundled RECs for each scope of emissions).

[840] A bundled REC is one that is sold together with the generated electricity directly to the consumer or reseller whereas an unbundled REC is one that has been separated from and sold without delivery of the generated electricity. *See, e.g.*, U.S. EPA, *Retail RECs*, available at https://www.epa.gov/green-power-markets/retail-recs (last updated Nov. 1, 2023); *see also* Sustainable Development Strategy Group ("SDSG"), *Renewable Energy Credits* (Jan. 2020), available at https://static1.squarespace.com/static/5bb24d3c9b8fe8421e87bbb6/t/5e212aa512182f60deb4849c/1579231912520/RECs+Policy+Primer.pdf.

[841] *See, e.g.*, letters from Amer. Clean Power; and BCSE.

[842] Utilities may purchase RECs in a compliance market to comply with a state's renewable portfolio standard whereas a non-utility company may purchase RECs in a voluntary market to support the general deployment of renewable energy. RECs purchased in a compliance market must meet certain standards and must be certified by an approved certifying group. RECs purchased in a voluntary market may or may not be subject to certain standards and technically are not required to be certified. *See* SDSG, *supra* note 840840.

[843] *See, e.g.*, letters from Beller *et al.*; CEMEX; and J. Weinstein.

[844] *See* letter from Beller *et al.*

[845] *See* letter from J. Weinstein.

Appellate Case: 24-1628    Page: 214    Date Filed: 03/26/2024 Entry ID: 5377362

commenter stated that it did not believe it was necessary for companies to disclose the amount of energy represented by RECs, their nature, or the location of the underlying projects.[846]

### 3. Final Rule

#### a. The Overall Disclosure Requirement (Item 1504(a), (b), and (c))

The final rule (Item 1504(a)) will require a registrant to disclose any climate-related target or goal if such target or goal has materially affected or is reasonably likely to materially affect the registrant's business, results of operations, or financial condition.[847]  Investors need detailed information about a registrant's climate-related targets or goals in order to understand and assess the registrant's transition risk strategy and how the registrant is managing the material impacts of its identified climate-related risks.  We recognize, however, as some commenters indicated, that an overly broad requirement to disclose any climate-related target or goal, even one that is meant for preliminary, internal planning purposes and that is not yet material, could impose a compliance burden on registrants that may outweigh its benefit to investors.[848] Conditioning the targets and goals disclosure requirement on the targets or goals being material will help to address this concern by focusing the requirement on the information that is most likely to be decision-useful for investors.

If a registrant sets an internal target or goal that materially affects or is reasonably likely to materially affect the registrant's business, results of operations, or financial condition (e.g., due to material expenditures or operational changes that are required to achieve the target or goal), then investors should have access to information about that target or goal to help them

---

[846]     *See* letter from CEMEX.

[847]     *See* 17 CFR 229.1504(a).

[848]     *See supra* notes 823 and 828 and accompanying text.

understand the financial impacts and assess the registrant's transition risk management. While some commenters recommended that the Commission require the disclosure only of targets or goals that are both material and publicly announced,[849] we decline to follow this suggestion. Such a condition would enable a registrant to keep non-public an internal target or goal that is material, which would fail to protect investors by potentially precluding their access to information that is important to make informed investment and voting decisions. We reemphasize, however, that a registrant is not required to disclose an internal target or goal that is not material.

In addition, we decline to follow the recommendation of some commenters that the targets and goals disclosure requirement should only be triggered by the board's or CEO's formal adoption of the target or goal.[850] Such a provision would deprive investors of material information for procedural reasons unrelated to the importance of the information to investors. Furthermore, as previously mentioned, the final rules are intended to elicit material climate-related disclosures for investors and not to influence governance practices regarding climate-related matters. Because registrants may have different processes for setting targets or goals, we believe that materiality is a better threshold for disclosure of targets or goals than basing the disclosure requirement on an internal process that may differ from company to company.

Similarly, although one commenter recommended that the Commission require the disclosure only of targets or goals related to a registrant's GHG emissions,[851] we decline to follow this recommendation. Investors need information about all of a registrant's material

---

[849]    *See supra* note 829 and accompanying text.

[850]    *See supra* note 820 and accompanying text.

[851]    *See supra* note 807 and accompanying text.

climate-related targets and goals in order to assess the impact of such targets and goals on a registrant's overall business, results of operations, financial condition, and prospects. Although the particular non-GHG emissions target or goal to be disclosed will depend on a registrant's particular facts and circumstances, to the extent such targets or goals are material, a registrant must disclose them. To simplify the targets and goals disclosure requirement and avoid implying any topical focus regarding the particular targets or goals that should be discussed, we have eliminated from the final rule the parenthetical "e.g., the reduction of GHG emissions or regarding energy usage, water usage, or revenues from low-carbon products."

We also decline to follow the recommendations of some commenters to include provisions that specifically require the disclosure of targets or goals related to mitigation of impacts on local communities or that concern human capital management goals.[852] The final rule is intended to elicit disclosure of any climate-related target or goal that has materially affected or is reasonably likely to materially affect a registrant's business, results of operations, or financial condition. Accordingly, any target or goal meeting the conditions of the final rule (including that it is material) will need to be disclosed regardless of the particular issues it addresses, if that target or goal is considered climate-related in the registrant's particular circumstances and if achieving such target or goal would materially impact its business, results of operations, or financial condition. We note that a registrant may voluntarily disclose additional information that is not required to be disclosed under the final rule (and not part of a target or goal) but that is related to the mitigation of climate-related risks.

Similar to the proposed rule, with some modifications as discussed below, the final rule (Item 1504(b)) will require a registrant that is disclosing its targets and goals pursuant to Item

---

[852] *See supra* note 806 and accompanying text.

Appellate Case: 24-1628    Page: 217    Date Filed: 03/26/2024 Entry ID: 5377362

1504 to provide any additional information or explanation necessary to an understanding of the material impact or reasonably likely material impact of the target or goal, including, as applicable, a description of:

- The scope of activities included in the target;

- The unit of measurement;

- The defined time horizon by which the target is intended to be achieved, and whether the time horizon is based on one or more goals established by a climate-related treaty, law, regulation, policy, or organization;

- If the registrant has established a baseline for the target or goal, the defined baseline time period and the means by which progress will be tracked; and

- A qualitative description of how the registrant intends to meet its climate-related targets or goals.[853]

These disclosures will allow investors to better understand a registrant's targets or goals and how it intends to achieve them, which will help investors better assess a registrant's transition risks and make more informed investment and voting decisions. In order to address the concern of some commenters that the proposed targets and goals disclosure provision was too prescriptive and would impose a costly compliance burden without necessarily resulting in material information,[854] the final rule has been revised so that the listed items are non-exclusive examples of additional information or explanation that a registrant must disclose only if

---

[853]     *See* 17 CFR 229.1504(b).

[854]     *See supra* note 823 and accompanying text.

necessary to an understanding of the material impact or reasonably likely material impact of the target or goal.[855]

To further streamline the targets and goals disclosure requirement, the final rules do not include "emissions" in the list of information that must be disclosed if necessary to an understanding of the material impact or reasonably likely material impact of a target or goal. If a registrant has set a material target or goal to reduce emissions, it will be required to disclose this when explaining the scope of activities included in the target. We also have eliminated the proposed disclosure item regarding whether a target is absolute or intensity-based because this information will likely be elicited by other required disclosure, such as the unit of measurement pertaining to the target or goal.[856]

Similar to the proposed rule, the final rule requires disclosure, as applicable, of how the registrant intends to meet its climate-related targets or goals.[857] However, in order to help address the concern of some commenters that the proposed rule could result in the disclosure of an excessive amount of detail, the final rule specifies that this discussion of prospective activities need only be qualitative. In addition, we are eliminating the proposed example that, for a target or goal regarding net GHG emissions reduction, the discussion could include a strategy to increase energy efficiency, transition to lower carbon products, purchase carbon offsets or RECs, or engage in carbon removal and carbon storage.[858] This will avoid any misperception that these are required items of disclosure. The final rule leaves it up to the registrant to determine what

---

[855] *See* 17 CFR 229.1504(b).

[856] In addition, as discussed below in section II.H, elimination of this proposed disclosure requirement is consistent with our removal of the proposed requirement to disclose a registrant's GHG emissions metrics in intensity terms in addition to absolute terms.

[857] *See* 17 CFR 229.1504(b)(5).

[858] *See* Proposing Release, section II.I.

Appellate Case: 24-1628    Page: 219    Date Filed: 03/26/2024 Entry ID: 5377362

specific factors to highlight as part of the qualitative description of how it plans to meet its targets or goals.

We are also not adopting the proposed requirement to disclose any interim targets set by the registrant. We agree with commenters that stated that this disclosure item is not necessary because, if a registrant has set an interim target that is material, it will likely be included in the registrant's discussion of its plan to achieve its targets or goals.[859]

Similar to the proposed rule, the final rule (Item 1504(c)) will require a registrant to disclose any progress toward meeting the target or goal and how such progress has been achieved.[860] Also similar to the proposed rule, the final rule will require the registrant to update this disclosure each fiscal year by describing the actions taken during the year to achieve its targets or goals.[861] We are adopting this updating requirement for substantially the same reasons we are adopting the updating requirement with respect to the transition plan disclosure required under Item 1502(e),[862] including because it will better enable investors to monitor impacts on the registrant as it attempts to meet its targets or goals.

Relatedly, the final rule will require a registrant to include in its targets and goals disclosure a discussion of any material impacts to the registrant's business, results of operations, or financial condition as a direct result of the target or goal or the actions taken to make progress toward meeting the target or goal.[863] This discussion must include quantitative and qualitative

---

[859]    *See* letter from Unilever.

[860]    *See* 17 CFR 229.1504(c).

[861]    *See id.*

[862]    *See supra* notes 508-514 and accompanying text. In addition, as with the required transition plan disclosure, no update about targets and goals would be required to be disclosed if the underlying targets or goals are not required to be disclosed (e.g., because the target or goal is no longer material).

[863]    *See* 17 CFR 229.1504(c)(1).

Appellate Case: 24-1628    Page: 220    Date Filed: 03/26/2024 Entry ID: 5377362

disclosure of any material expenditures and material impacts on financial estimates and assumptions as a direct result of the target or goal or the actions taken to make progress toward meeting the target or goal,[864] consistent with the suggestion of some commenters.[865] We have added these latter provisions because, as commenters noted, a company's climate commitments, and progress in relation to its commitments, may materially impact its business, outlook, operating expenditures, capital expenditures, liquidity, and other capital resources, which is why investors seek and need information about such material expenditures and other material financial impacts related to its targets and goals.[866] As discussed in more detail below,[867] a number of commenters who supported the proposed expenditures disclosures in Regulation S-X indicated that such disclosure would help investors understand a registrant's ability to meet its climate-related targets and goals.[868]

We recognize commenters' concerns about registrants' abilities to identify, attribute, and quantify the impact of transition activities in the financial statements.[869] We believe that providing for this disclosure in the context of Item 1504 information on progress towards targets or goals appropriately balances investors' need for this information with commenters' concerns about implementation challenges. As discussed above,[870] with respect to concerns raised in the

---

[864]   *See* 17 CFR 229.1504(c)(2).

[865]   *See supra* notes 816 and 817 and accompanying text.

[866]   *See, e.g.*, letters from Amazon; Amer. for Fin. Reform, Sunrise Project *et al.*; and PwC.

[867]   *See infra* sections II.K.3.b and c.

[868]   *See infra* notes 1967 and accompanying text.

[869]   *See infra* notes 1902 and 1907 and accompanying text.

[870]   *See supra* sections II.D.1.c. and II.D.2.c for discussion of similar material expenditures disclosure requirement, respectively, as part of a registrant's transition plan disclosure under Item 1502(e) and from

---

context of the proposed Regulation S-X amendments about registrants' abilities to disaggregate the portion of an expenditure that is directly related to transition activities, under the final rules, registrants will have flexibility to explain qualitatively the nature of any disclosed expenditure and how it is a direct result of progress under a disclosed target or goal. In addition, subjecting the disclosure requirement to materiality rather than a bright-line threshold, as was proposed for the Regulation S-X amendments, will help reduce the compliance burden of the final rules while providing material information for investors. Additionally, when considering which expenditures related to progress under a disclosed target or goal are material over the relevant period and therefore require disclosure, registrants should consider whether overall expenditures related to progress under a disclosed target or goal are material in the aggregate and, if so, provide appropriate disclosure. Finally, to the extent that disclosure of material impacts on financial estimates and assumptions as a direct result of the target or goal is disclosed in response to Rule 14-02(h) of Regulation S-X, a registrant would be able to cross-reference to such disclosure.[871]

Similar to the rule proposal, the final rule will permit a registrant to provide the required targets and goals disclosure as part of its discussion pursuant to Item 1502 regarding its transition plan or when otherwise discussing material impacts of climate-related risks on its business strategy or business model.[872] A registrant will also be permitted to provide the required targets

---

activities to mitigate or adapt to climate-related risks disclosed pursuant to Item 1502(b)(4) under Item 1502(d) of Regulation S-K. To the extent that there is any overlapping disclosure of material expenditures in response to these Items, to avoid redundancy, a registrant should provide disclosure of material expenditures regarding the Item where, in its assessment, such disclosure is most appropriate, and then cross-reference to this disclosure when responding to the other Items.

[871] *See supra* note 521.

[872] *See* 17 CFR 229.1504(a).

and goals disclosure in its risk management discussion pursuant to Item 1503.[873]  This provision will help to eliminate redundancies in the subpart 1500 disclosure.

Similar to Items 1502(d)(2) and 1502(e)(2), and for similar reasons, we are providing a phase in for compliance with the Item 1504(c)(2) disclosure requirement.  A registrant will not be required to comply with the requirements of Item 1504(c)(2) until the fiscal year immediately following the fiscal year of its initial compliance date for the subpart 1500 rules based on its filer status.[874]

We decline to follow the recommendation of some commenters to require the disclosure of whether the registrant has set science-based GHG emission reduction targets under the Science Based Targets Initiative, or the extent to which it can achieve its targets or goals using existing technology.[875]  As we similarly noted when declining to follow a recommendation to broaden transition risk disclosure, the targets and goals disclosure requirement we are adopting is consistent with the TCFD framework, which provides flexibility in terms of which tools or methods a registrant chooses to use, and therefore will limit the targets and goals compliance burden for those registrants that are already familiar with the TCFD framework.[876]  A registrant may elect to provide disclosure regarding these additional items, but they are not required items of disclosure.

### b.  The Carbon Offsets and RECs Disclosure Requirement (Item 1504(d))

Similar to the proposed rule, the final rule includes a disclosure requirement about a registrant's use of carbon offsets or RECs (Item 1504(d)).  Unlike the proposed rule, however, a

---

[873]    *See id.*

[874]    *See* section II.O.3.

[875]    *See supra* notes 811-812 and accompanying text.

[876]    *See supra* section II.C.1.c.

Appellate Case: 24-1628     Page: 223     Date Filed: 03/26/2024 Entry ID: 5377362

registrant will be required to disclose certain information about the carbon offsets or RECs only if they have been used as a material component of a registrant's plan to achieve climate-related targets or goals.[877]  We have added a materiality qualifier to the final rule to address the concern of commenters that the proposed disclosure requirement could result in detailed offsets or RECs information that is of little use to investors.[878]  Under the final rule, registrants will need to make a determination, based upon their specific facts and circumstances, about the importance of such carbon offsets and credits to their overall transition plan and provide disclosure accordingly.

If carbon offsets or RECs have been used as a material component of a registrant's plan to achieve climate-related targets or goals, then, similar to the proposed rule, the registrant will be required to disclose: the amount of carbon avoidance, reduction or removal represented by the offsets or the amount of generated renewable energy represented by the RECs; the nature and source of the offsets or RECs;[879] a description and location of the underlying projects; any registries or other authentication of the offsets or RECs; and the cost of the offsets or RECs.[880]

Information about the source, value, underlying projects, and authentication of the carbon offsets or RECs will help investors evaluate the role of these instruments in a registrant's climate-related strategy and the impacts on its business.  For example, understanding the role that carbon offsets or RECs play in a registrant's climate-related business strategy can help investors

---

[877]     *See* 17 CFR 229.1504(d).

[878]     *See, e.g.*, letters from Beller *et al.*; and J. Weinstein.

[879]     The nature of an offset refers to whether it represents carbon avoidance, reduction, or removal.  The nature of an REC refers primarily to whether it is bundled or unbundled.  The source of an offset or REC refers to the party that has issued the offset or REC.  Commenters stated that investors need such detailed information about offsets or RECs in order to evaluate the effectiveness of a registrant's transition risk strategy and management of climate-related impacts on its business.  *See supra* notes 831-834 and accompanying text.

[880]     *See* 17 CFR 229.1504(d).  At the recommendation of commenters, *see supra* note 835, to clarify that an offset can represent carbon avoidance, in addition to carbon reduction or removal, we have added "avoidance" to the definition of carbon offset.  *See* 17 CFR 229.1500.

219

Appellate Case: 24-1628     Page: 224     Date Filed: 03/26/2024 Entry ID: 5377362

assess the potential risks and financial impacts of pursuing that strategy. Relatedly, a registrant that relies on carbon offsets or RECs as a material component of its plan to achieve its targets or goals might need to consider whether fluctuating supply or demand, and corresponding variability of price, related to carbon offsets or RECs, presents an additional material risk that is required to be disclosed when discussing its plan to achieve such target or goal pursuant the requirements of subpart 1500.

At the recommendation of commenters, in addition to carbon reduction, we have added the amount of carbon avoidance and carbon removal[881] represented by carbon offsets as disclosure items to clarify that disclosure is required about offsets representing carbon removal and those representing carbon avoidance or reduction if the registrant has used these types of offsets as a material part of its climate-related strategy.[882] This addition will help investors assess the risks associated with the different types of offsets used and how they may affect a registrant's transition risk management and the related impacts on the registrant's business and financial condition.

Also, at the recommendation of commenters, we have added the nature of the carbon offsets or RECs as a disclosure item in addition to the source of the offsets or RECs.[883] This addition will help investors understand whether a purchased offset represents carbon avoidance, reduction, or removal, and whether an REC is bundled or unbundled. Requiring the disclosure of

---

[881] A carbon avoidance occurs, *e.g.*, when a company protects a forest from deforestation. A carbon reduction occurs when emissions are reduced, *e.g.*, when a company switches from the use of fossil-fuel based energy to the use of wind or solar power. A carbon removal occurs when $CO_2$ is drawn out of the atmosphere and sequestered, *e.g.*, by carbon capture and storage technology. *See, e.g.*, letter from Ceres; and Ceres, *Evaluating the Use of Carbon Credits* (Mar. 1, 2022), available at https://www.ceres.org/resources/reports/evaluating-use-carbon-credits.

[882] *See, e.g.*, letters from Amer. Fin. Reform, Sunrise Project *et al.*; BCSE; and Ceres.

[883] *See, e.g.*, letters from Amer. Clean Power; and IETA.

the source of the offset or REC will help investors determine whether the offset has met certain criteria of an established standard-setting body,[884] and whether the REC originated from and met the standards of a compliance market or is instead derived from a more loosely regulated voluntary market.[885]  These factors can affect the value and cost of the offsets and RECs and their attendant risks.  For example, as one commenter noted, a market that develops increased demand for carbon removal offsets, either because of new regulation or stricter voluntary standards for net-zero targets, could result in a significant increase in offset prices, potential supply bottlenecks, and increased transition risk for registrants that assumed the continued availability and abundance of cheaper offsets.[886]

One commenter who objected to the proposed offsets and RECs disclosure requirement asserted that the Commission lacks statutory authority to regulate offsets and RECs.[887]  We disagree with that commenter's characterization of the rule.  In requiring the disclosure of certain information about a registrant's use of offsets or RECs when such use is a material component of the registrant's plan to achieve a target or goal that is required to be disclosed, we are not advocating for or against the use of offsets or RECs generally, or for or against the use of certain types of offsets or RECs.  Nor are we substantively regulating their use.  As previously mentioned, the final rules, including those pertaining to the use of offsets or RECs, are neutral regarding any strategy that a registrant may choose to manage a material climate-related risk. Instead, like the other climate-related disclosure rules we are adopting, the final rule regarding

---

[884]  *See, e.g.*, letter of IETA (referencing the Carbon Offset Reduction Scheme for International Aviation ("CORSIA") market established by the UN International Civil Aviation Organization ("ICAO") and adopted by the U.S. Federal Aviation Authority).

[885]  *See, e.g.*, letter from Amer. Clean Power.

[886]  *See* letter from CarbonPlan.

[887]  *See* letter from J. Weinstein.

the disclosure of offsets or RECs is intended to provide investors with the decision-useful information they need to understand a registrant's strategy to mitigate or adapt to the realized or reasonably likely financial impacts of a material climate-related risk.

## H.  GHG Emissions Disclosure (Item 1505)

### 1.  Proposed Rule

The proposed rules would have required a registrant to disclose its GHG emissions[888] for its most recently completed fiscal year and for the historical fiscal years included in its consolidated financial statements, to the extent such historical GHG emissions data is reasonably available.[889]  The Commission based the proposed GHG emissions disclosure requirement on the concept of scopes, which are themselves based on the concepts of direct and indirect emissions, developed by the GHG Protocol.[890]  The Commission proposed to require a registrant to disclose its Scope 1 emissions, which, similar to the GHG Protocol, were defined to mean the direct GHG emissions from operations that are owned or controlled by a registrant.[891]  The Commission also proposed to require a registrant to disclose its Scope 2 emissions, which, similar to the GHG Protocol, were defined to mean the indirect GHG emissions from the generation of purchased or

---

[888]    We proposed to define "greenhouse gases" as carbon dioxide ("$CO_2$"); methane ("$CH_4$"); nitrous oxide ("$N_2O$"); nitrogen trifluoride ("$NF_3$"); hydrofluorocarbons ("HFCs"); perfluorocarbons ("PFCs"); and sulfur hexafluoride ("$SF_6$").  The greenhouse gases included in the proposed definition reflect the gases that are currently commonly referenced by international, scientific, and regulatory authorities as having significant climate impacts.  This list of constituent greenhouse gases is consistent with the gases identified by widely used frameworks, such as the Kyoto Protocol, the UN Framework Convention on Climate Change, the U.S. Energy Information Administration, the EPA, and the GHG Protocol.  *See* Proposing Release, section II.G.1.a.

[889]    *See id*.

[890]    Direct emissions are GHG emissions from sources that are owned or controlled by a registrant, whereas indirect emissions are GHG emissions that result from the activities of the registrant but occur at sources not owned or controlled by the registrant.  *See* World Business Council for Sustainable Development and World Resources Institute, GHG Protocol, *Corporate Accounting and Reporting Standard* (2004), available at https://ghgprotocol.org/sites/default/files/standards/ghg-protocol-revised.pdf.

[891]    *See* Proposing Release, section II.G.1.a.

acquired electricity, steam, heat, or cooling that is consumed by operations owned or controlled by a registrant.[892]  By sharing certain basic concepts and a common vocabulary with the GHG Protocol, the Commission intended to both elicit consistent, comparable, and reliable climate-related information for investors, and mitigate the compliance burden of the proposed rules for those registrants that are already disclosing or estimating their GHG emissions pursuant to the GHG Protocol.[893]

The Commission further proposed to require a registrant, other than an SRC, to disclose its Scope 3 emissions, which, similar to the GHG Protocol, were defined to mean all indirect GHG emissions not otherwise included in a registrant's Scope 2 emissions that occur in the upstream and downstream activities of a registrant's value chain.[894]  Unlike the proposed disclosure requirement for Scopes 1 and 2 emissions, however, the Commission proposed to require the disclosure of a registrant's Scope 3 emissions only if those emissions are material, or if the registrant has set a GHG emissions reduction target or goal that includes its Scope 3 emissions.[895]  The Commission proposed these limitations regarding Scope 3 disclosure in recognition of the fact that, unlike Scopes 1 and 2 emissions, Scope 3 emissions typically result from the activities of third parties in a registrant's value chain and, thus, collecting the appropriate data and calculating these emissions would potentially be more difficult than for Scopes 1 and 2 emissions.  Although the Commission recognized that the disclosure of Scope 3

---

[892]    *See id.*

[893]    *See* Proposing Release, section I.D.2.

[894]    *See* Proposing Release, section II.G.1.a.  Upstream emissions include emissions attributable to goods and services that the registrant acquires, the transportation of goods (for example, to the registrant), and employee business travel and commuting.  Downstream emissions include the use of the registrant's products, transportation of products (for example, to the registrant's customers), end of life treatment of sold products, and investments made by the registrant.

[895]    *See* Proposing Release, section II.G.1.b.

App.223

Appellate Case: 24-1628    Page: 228    Date Filed: 03/26/2024 Entry ID: 5377362

emissions may be important to provide investors with a complete picture of the climate-related risks that a registrant faces—particularly transition risks—it also believed it was necessary to balance the importance of Scope 3 emissions with the potential relative difficulty in data collection and measurement.[896]

For each of its Scopes 1, 2, and 3 emissions, the proposed rules would have required a registrant to disclose the emissions both disaggregated by each constituent greenhouse gas and in the aggregate, expressed in terms of $CO_2e$. The Commission proposed this requirement so that investors could gain decision-useful information regarding the relative risks to the registrant posed by each constituent GHG in addition to the risks posed by its total GHG emissions by scope.[897] The proposed rules would also have required a registrant to disclose the GHG emissions data in gross terms, excluding any use of purchased or generated offsets,[898] and in terms of GHG intensity.[899]

The proposed rules would have required a registrant to describe the methodology, significant inputs, and significant assumptions used to calculate its GHG emissions metrics.[900] While the proposed GHG emissions disclosure rules shared many features with the GHG Protocol, they differed regarding the approach required to set a registrant's organizational boundaries. Those boundaries determine the business operations owned or controlled by a registrant to be included in the calculation of its GHG emissions. The proposed approach would

---

[896]   *See id.*

[897]   *See* Proposing Release, section II.G.1.a.

[898]   *See id.*

[899]   *See* Proposing Release, section II.G.1.c. The proposed rules would have required the disclosure of GHG intensity to be in terms of metric tons of $CO_2e$ per unit of total revenue and per unit of production for the fiscal year.

[900]   *See* Proposing Release, section II.G.2.

App.224

Appellate Case: 24-1628     Page: 229     Date Filed: 03/26/2024 Entry ID: 5377362

have required a registrant to set the organizational boundaries for its GHG emissions disclosure using the same scope of entities, operations, assets, and other holdings within its business organization as those included in, and based upon the same set of accounting principles applicable to, its consolidated financial statements.[901]  The Commission proposed this approach in order to provide investors a consistent view of the registrant's business across its financial and GHG emissions disclosures.  The same organizational boundaries requirement would have applied to each disclosure of a registrant's Scope 1, Scope 2, and Scope 3 emissions.[902]

The rule proposal provided that a registrant may use reasonable estimates when disclosing its GHG emissions as long as it also describes the assumptions underlying, and its reasons for using, the estimates.  In proposing this provision, the Commission stated that while it encouraged registrants to provide as accurate a measurement of its GHG emissions as is reasonably possible, it recognized that, in many instances, direct measurement of GHG emissions at the source, which would provide the most accurate measurement, may not be possible.[903]

The Commission proposed to require the disclosure of a registrant's GHG emissions as of the end of its most recently completed fiscal year in its Exchange Act annual report for that year and in a Securities Act or Exchange Act registration statement filed subsequent to the compliance date for the climate-related disclosure rules.[904]  The Commission also proposed to permit a registrant to use a reasonable estimate of its GHG emissions for its fourth fiscal quarter if no actual reported data is reasonably available, together with actual, determined GHG

---

[901]     *See* Proposing Release, section II.G.2.a.

[902]     *See id.*

[903]     *See* Proposing Release, section II.G.2.d.

[904]     *See* Proposing Release, section II.G.1.a.

emissions data for its first three fiscal quarters when disclosing its GHG emissions for its most recently completed fiscal year, as long as the registrant promptly discloses in a subsequent filing any material difference between the estimate used and the actual, determined GHG emissions data for the fourth fiscal quarter.[905] The Commission proposed this accommodation to address the concern of some commenters that a registrant may find it difficult to complete its GHG emissions calculations for its most recently completed fiscal year in time to meet its disclosure obligations for that year's Exchange Act annual report.[906]

### 2. Comments

#### a. Overall GHG Emissions Disclosure Requirement

Several commenters supported the proposed requirement to disclose Scopes 1 and 2 emissions, as well as Scope 3 emissions if material or if included in a registrant's GHG emissions reduction target or goal.[907] The most common reason asserted for supporting the mandatory disclosure of GHG emissions is that such disclosure would provide investors with specific metrics to assess a registrant's exposure to transition risks.[908] Commenters also relatedly stated that mandatory disclosure of GHG emissions would enable investors to evaluate a registrant's progress towards achieving any publicly announced transition targets and goals,[909]

---

[905] *See* Proposing Release, section II.G.1.

[906] *See id.*

[907] *See, e.g.*, letters from AGs from Cal. *et al.*; AllianceBernstein; Alphabet *et al.*; Amazon; Amer. for Fin. Reform, Sunrise Project *et al.*; BHP; BP; CalPERS; CalSTRS; Chevron; Etsy; IAC Recommendation; Member of the U.S. House of Representatives Kathy Castor and 130 other House Members; Member of the U.S. House of Representatives Adam B. Schiff 25 Other House Members from California (Oct. 12, 2023) ("Rep. Adam Schiff *et al.*"); Microsoft; Miller/Howard; NRDC; Sens. B Schatz *et al.*; Trillium; UPS; Wellington Mgmt.; and WRI.

[908] *See, e.g.*, letters from AllianceBernstein; AGs from Cal. *et al.;* CalPERS; Ceres; Rep. Maxine Waters; Sen. Elizabeth Warren, *et al.*; and Wellington Mgmt.

[909] *See, e.g.*, letter from Amer. for Fin. Reform, Sunrise Project *et al.*

and allow investors to compare registrants across sectors and industries to determine whether their transition strategies are aligned with investors' investment objectives.[910]

Some of these commenters also indicated that Scope 3 emissions disclosure was necessary to provide a complete picture of a registrant's transition risk exposure and therefore recommended that the Commission require the disclosure of Scope 3 emissions for all registrants.[911] Some commenters indicated that they are already using Scope 3 emissions data to make investment decisions.[912] Other commenters stated that, as registrants, they have disclosed Scope 3 emissions from certain activities and indicated their support for a Scope 3 emissions disclosure requirement with certain accommodations.[913] One commenter stated that capital markets are now assigning financial value to Scope 3 emissions metrics and, in supporting a Scope 3 emissions disclosure requirement, recommended that the Commission establish a quantitative threshold for determining the materiality and corresponding disclosure of Scope 3 emissions.[914] In addition, some commenters indicated that the disclosure of Scope 3 emissions may deter registrants from outsourcing to third-parties facilities that would otherwise count as sources of Scopes 1 and 2 emissions, thereby seeming to lower their transition risk exposure and

---

[910] *See id*; *see also* letters from AllianceBernstein; and Wellington Mgmt.

[911] *See, e.g.*, letters from Amer. for Fin. Reform, Sunrise Project *et al.*; CalPERS; CalSTRS; and Wellington Mgmt.; *see also* letter from Rep. Adam Schiff *et al.*(stating that enactment of California's Climate Corporate Data Accountability Act (SB 253), which will require companies with more than $1 billion in annual revenues to file annual reports publicly disclosing their Scope 1, 2, and 3 GHG emission, "virtually eliminates the cost of compliance with a federal Scope 3 disclosure requirement for all businesses operating in California with over $1 billion in revenue").

[912] *See, e.g.*, letters from CalSTRS; Soros Fund; and Wellington Mgmt.

[913] *See, e.g.*, letters from Amazon; and Microsoft.

[914] *See* letter from Sens. B. Schatz *et al.*

facilitating greenwashing.[915]  Some commenters indicated that while many registrants already measure and voluntarily disclose their Scopes 1 and 2 emissions, that is not the case for Scope 3 emissions.[916]  Another commenter stated that publishing Scope 3 emissions information has not been cost prohibitive.[917]

While many commenters, including both issuers and investors, stated that they supported requiring Scope 1 and 2 disclosures, a significant number of commenters raised serious concerns about requiring Scope 3 emissions disclosures.  Some asserted that the Commission lacks the authority to require disclosures of information that may come largely from non-public companies in registrants' value chain;[918] others questioned the value of Scope 3 emissions disclosures for investors, citing their concerns about the reliability of the metric;[919] others focused on their view of the costs and burdens of gathering, validating, and reporting the information.[920]  A number of commenters representing entities not subject to the Commission's disclosure authority raised serious concerns about the costs and burdens they could face as a result of the requirement on

---

[915] *See, e.g.*, letter from AGs from Cal. *et al.* (stating that "Scope 3 GHG emissions disclosures will help avoid gamesmanship and greenwashing by registrants that artificially limit their Scope 1 and 2 GHG emissions by transferring higher-emission activities and their climate-related risks to third parties"); and Wellington Mgmt.

[916] *See, e.g.*, letters from Amer. for Fin. Reform, Sunrise Project *et al.*; C2ES; Ceres (Feb. 1, 2023); and Fidelity.

[917] *See* letter from Amalgamated Financial Corp. (June 17, 2022) ("AFC") ("We have published three years of our scope 3 financed emissions, starting in 2019. For 2021, this included our listed equities and fixed income assets under management.  As a firm we track absolute emissions and emissions intensity across our lending and investment portfolios and understand where risks and opportunities present.  We have done this work with modest cost to us, requiring some redirection of resources and modest consultant and data support.  This work has not been cost prohibitive and builds on existing systems within the bank for reporting and disclosure.")

[918] *See, e.g.*, letters from D. Burton, Heritage Fdn.; and Chamber.

[919] *See infra* note 925 and accompanying text.

[920] *See infra* notes 924 and accompanying text.

228

registrants.[921]  Among those costs, they highlighted not only the cost of collecting and reporting information but also the potential competitive disadvantage for smaller suppliers, if registrants select larger suppliers that may be in a better position to supply information to use in their Scope 3 emissions disclosures.[922]  We discuss certain of these comments in more detail.

Some commenters supported the mandatory disclosure of Scopes 1 and 2 emissions but opposed the proposed disclosure of Scope 3 emissions.[923]  Commenters stated that, because much of the data underlying Scope 3 emissions is in the control of third parties, registrants could face difficulty collecting such data, resulting in likely data gaps.[924]  Commenters also asserted that the methodologies underlying the measurement and reporting of Scope 3 emissions are still too uncertain and expressed concerns about the reliability of Scope 3 emissions disclosure.[925]  In light of these concerns, commenters stated that the compliance burden associated with Scope 3 emissions disclosure would be costly to registrants and that such costs were likely to exceed the benefit to investors.[926]  Relatedly, one commenter raised concerns that Scope 3 emissions

---

[921] *See, e.g.,* letters from AZ Farm; CA Farm; GA Farm; IN Farm; NAA; and PA Farm; *see also* letter from National Association of Convenience Stores (June 8, 2022).

[922] *See, e.g.,* letters from AZ Farm; CA Farm; GA Farm; IN Farm; NAA; and PA Farm.

[923] *See, e.g.,* letters from Beller *et al.*; Exxon Mobil Corporation (June 17, 2022) ("Exxon"); Fed. Hermes; Fidelity; Harvard Mgmt.; IAA; ICI; Nareit; Reed Smith LLP (June 17, 2022) ("Reed Smith"); Stanford Management Company (June 17, 2022) ("Stanford Mgmt."); and State St.

[924] *See, e.g.,* letter from Beller *et al.*; Blackrock; Fed. Hermes; ICI; Reed Smith; Stanford Mgmt.; and State St.

[925] *See, e.g.,* letters from Exxon; Fed. Hermes; Fidelity; Harvard Mgmt.; IAA; Reed Smith; Stanford Mgmt.; and State St.

[926] *See, e.g.,* letter from Harvard Mgmt.

disclosure would not meet the materiality threshold for any registrant because of the challenges in calculating Scope 3 emissions in a reliable and consistent manner.[927]

One commenter supported the disclosure of Scope 3 emissions but only for activities, such as business travel, over which a registrant has influence or indirect control.[928]  This commenter also recommended adopting a safe harbor for Scope 3 emissions modeled on the PSLRA safe harbors and treating Scope 3 emissions disclosure as furnished rather than filed because of the "inherent uncertainty" in the estimates and assumptions underlying Scope 3 emissions disclosure.[929]

Many commenters, however, generally opposed the proposed mandatory GHG emissions disclosure requirement, including the disclosure of Scopes 1 and 2 emissions.[930]  Commenters stated that because the proposed disclosure of Scopes 1 and 2 emissions would require such disclosure even when a registrant has not determined climate-related risks to be material, the proposed GHG emissions disclosure requirement may not result in decision-useful information for investors.[931]  Commenters also stated that because the registrants producing 85 to 90 percent of the emissions in the United States already report their emissions pursuant to the EPA's Greenhouse Gas Reporting Program, the Commission's proposed emissions disclosure

---

[927]  *See* letter from Fidelity.  While not directly opposing the proposed Scope 3 emissions disclosure requirement, another commenter recommended that, due to perceived complexities in the calculation of Scope 3 emissions, the Commission reconsider this proposed requirement and, if it retains the requirement, then it should provide guidance around determining the materiality of Scope 3 emissions as well as more explicit standards to calculate Scope 3 emissions for key industries.  *See* letter from SFERS.

[928]  *See* letter from Amazon.

[929]  *See id.*

[930]  *See, e.g.*, letters from API; Atlas Sand Company, LLC (June 17, 2022) ("Atlas Sand"); Bipartisan Policy; Brigham Exploration (June 17, 2022); Chamber; ConocoPhillips; Dimensional Fund; Independent Petroleum Association of New Mexico (June 17, 2022); Iowa Commissioner of Insurance (June 13, 2022); and Soc. Corp. Gov.

[931]  *See, e.g.*, letters from API; Dimensional Fund Advisors; and Soc. Corp. Gov.

requirements are unnecessary and the resulting emissions data potentially confusing for investors.[932]

Further, commenters opposed the GHG emissions disclosure requirement because of the expected high compliance costs, which they believed the Commission had underestimated.[933] One commenter further indicated that, although the Commission had stated that many companies were already disclosing their GHG emissions, according to a number of studies, most registrants have not yet measured and reported their Scopes 1 and 2 emissions, let alone their Scope 3 emissions.[934]

Commenters also expressed concerns, in connection with registrants' disclosure of Scope 3 emissions, regarding compliance costs involving private companies, which comprise a large percentage of many registrants' value chains or joint ventures, and which, through the influence of those registrants, would be compelled to measure and report their GHG emissions for the first time.[935] Some of these commenters asserted that registrants would likely incur costs to renegotiate contracts with these third parties to obtain the GHG emissions data required to comply with the proposed rules.[936] Another commenter stated that third parties that are

---

[932] *See, e.g.*, letters from API; Chamber; and ConocoPhillips. According to commenters, confusion could result from the fact that the EPA's Greenhouse Gas Reporting Program ("GHGRP") requires the disclosure of emissions by individual source whereas the Commission's proposed rules would require the disclosure by company; *see also* discussion *infra* notes 2593-2595 and accompanying text. As noted in section IV.A.3, we estimate that approximately 365 registrants had an ownership stake in facilities that reported to the GHGRP in 2022; *see infra* note 2596and accompanying text.

[933] *See infra* sections IV.C.3.b.ii and iii for more information on specific cost estimates provided by commenters.

[934] *See infra* section IV.A.5c (citing statistics in the 2021 TCFD Status Report and a Moody's Analytics analysis of TCFD reporting of 2020/21 public disclosures showing that only 21% of North American companies and 19% of U.S. companies reported their Scopes 1 and 2 emissions and, if appropriate, their Scope 3 emissions).

[935] *See, e.g.*, letters from API; Atlas Sand; Bipartisan Policy; Brigham Exploration; Chamber; ConocoPhillips; Independent Petroleum Association of New Mexico; and Iowa Commissioner of Insurance.

[936] *See, e.g.*, letter from ConocoPhillips.

unwilling or unable to provide their GHG emissions to registrants could eventually be excluded from consideration for contracts to provide goods or services to registrants, which could diminish opportunities for these third-parties, which may often be smaller businesses.[937]

In addition, commenters stated that, even if registrants are already voluntarily disclosing their Scopes 1 and 2 emissions pursuant to the GHG Protocol, those registrants will incur an increased compliance burden if the Commission was to adopt the proposed GHG emissions disclosure requirement, because of differences between the Commission's proposed requirement and the GHG Protocol and the TCFD.[938]  These commenters also shared many of the concerns about the proposed Scope 3 emissions disclosure provision discussed above, including the difficulties of collecting emissions data from third parties in its value chain, the unreliability of reported data stemming from third parties' lack of sophisticated data collection technologies and the use of proxy data to fill data gaps, and the absence of a fully developed and uniformly accepted methodology to report Scope 3 emissions.  According to commenters, these concerns would increase compliance costs and raise a registrant's liability exposure so that the total cost of the Scope 3 emissions disclosure would likely exceed its benefit.[939]  Because of the difficulties

---

[937]    *See* letter from Soc. Corp. Gov.

[938]    *See id*.  Specifically, the commenter noted that the proposed rules would require a registrant's organizational boundaries to be consistent with the scope of entities included in its consolidated financial statements, whereas the GHG Protocol permits a company to choose between an equity share, operational control, or financial control method.  The commenter also noted that the Commission's proposed rules would require a company to disclose its GHG emissions both on a disaggregated and aggregated basis whereas the TCFD requires a company to disclose its Scopes 1 and 2 emissions, without specifying whether the disclosure must be on a disaggregated basis.  According to the commenter, these differences could result in an increased compliance burden for a registrant.  We discuss additional commenter input on these differences below.

[939]    *See id*; *see also* Bipartisan Policy; Brigham Exploration; Chamber; D. Burton, Heritage Fdn.; and the National Association of Convenience Stores (June 8, 2022).

and uncertainties involved in Scope 3 emissions disclosure, some commenters recommended that the reporting of Scope 3 emissions should remain voluntary.[940]

One commenter presented an alternative to the proposed GHG emissions requirement.[941] This commenter stated that, rather than adopting the proposed GHG emissions disclosure requirement, the Commission should "mandate reporting, on a standardized form, of emissions data that registrants are required to disclose publicly pursuant to other federal, state, or foreign regulations." This commenter also stated that the alternative set of rules "would, in effect, integrate the existing EPA reporting regime with the SEC's disclosure system in a manner that would be easier for investors and registrants to access and analyze."[942] This commenter further stated that approximately 40 foreign countries already require various forms of emissions disclosures, and that California and other states are considering the adoption of their own mandatory emissions reporting regimes.[943] According to this commenter, the alternative set of rules "would efficiently integrate, aggregate, and collate those disclosures on a single form available to all investors through documents provided to the Commission."[944]

Some commenters supported the proposed exemption from Scope 3 emissions reporting for SRCs.[945] Some commenters also supported exempting SRCs from the requirement to disclose Scopes 1 and 2 emissions because, in their experience, SRCs have not historically

---

[940] *See, e.g.*, letter from Airlines for America.

[941] *See* letter from Joseph A. Grundfest, William A. Franke Professor of Law and Business, Stanford Law School (June 15, 2022) ("Grundfest"); *see also* letters from Joseph A. Grundfest, Professor of Law and Business (emeritus), Stanford Law School (Oct. 9, 2023); and Devon S. Wilson (Sept. 7, 2023).

[942] Letter from Grundfest.

[943] *See id.* As previously noted, California has since enacted a mandatory emissions reporting regime. *See supra* section II.A.

[944] *See* letter from Grundfest.

[945] *See, e.g.*, letters from D. Burton, Heritage Fdn.; J. Herron; ICI; Morningstar; and TotalEnergies.

tracked their GHG emissions and exempting SRCs from a GHG emissions reporting requirement would be consistent with a scaled disclosure regime for such issuers.[946]

Other commenters, however, opposed exempting all SRCs from the proposed Scope 3 emissions disclosure requirement.[947]  Commenters stated that investors need climate-related disclosures from SRCs because SRCs are as exposed to climate-related risks as larger issuers, including risks stemming from their value chains.[948]  Commenters also stated that because many large companies obtain climate-related data (e.g., Scopes 1 and 2 emissions data) from small companies in their value chains, exempting SRCs from climate-related disclosures could hamper larger registrants from accurately assessing their Scope 3 emissions.[949]  Instead of, or in addition to, an exemption from Scope 3 reporting, some commenters recommended providing a longer transition period for SRCs.[950]

Some commenters recommended that the Commission exempt EGCs from the proposed rules, including GHG emissions reporting requirements, or at least provide them with the same accommodations as SRCs.[951]  Commenters stated that the large compliance costs of the proposed

---

[946]  *See, e.g.*, letters from BDO USA, LLP (June 17, 2022) ("BDO USA"); D. Burton, Heritage Fdn.; and Volta Inc. (June 15, 2022) ("Volta").

[947]  *See, e.g.*, letters from AGs of Cal. *et al.* (recommending requiring SRCs that have adopted transition plans with Scope 3 emissions reductions to report on those emissions); Amer. for Fin. Reform, Sunrise Project *et al.*; CalSTRS; CEMEX; Center Amer. Progress (stating that at a minimum, the final rule should establish a date in the future, such as fiscal year 2026 (filed in 2027), when small companies would be required to begin reporting Scope 3 emissions); Center for Sustainable Business at the University of Pittsburgh (June 17, 2022) ("CSB") (recommending requiring universal disclosure of Scope 3 emissions in 3-5 years of effectiveness of the final rule); and PwC (recommending requiring SRCs that have included Scope 3 emissions in their targets and goals to disclose those emissions).

[948]  *See, e.g.*, letters from Amer. for Fin. Reform, Sunrise Project *et al.*; and Center Amer. Progress.

[949]  *See* letters from CalSTRS; Center Amer. Progress; and J. McClellan.

[950]  *See, e.g.*, letters from Amer. for Fin. Reform, Sunrise Project *et al.*; ICI; and Soros Fund.

[951]  *See, e.g.*, letters from BIO; Davis Polk; Grant Thornton; D. Burton, Heritage Fdn.; J. Herron; Nasdaq, Inc. (June 14, 2022) ("Nasdaq"); Shearman Sterling; and SBCFAC Recommendation.

rules would likely deter many potential EGCs from going public.[952]  Other commenters opposed

exempting EGCs from the proposed rules because such companies, like SRCs, may be exposed

to climate-related risks.[953]

**b.  Presentation of the GHG Emissions Metrics and Underlying Methodologies
and Assumptions**

Commenters expressed mixed views on the proposed requirement to disclose GHG

emissions on both an aggregated and disaggregated basis.  Some commenters supported the

proposed requirement because each constituent gas may be subject to differing regulations and

presents its own set of risks, which aggregated disclosure, by itself, would conceal.[954]  Other

commenters supported the proposed requirement because it would standardize the GHG

emissions disclosure and help investors compare the GHG emissions data when making their risk

assessments regarding a registrant.[955]  Still other commenters supported the proposed

requirement because it is consistent with the GHG Protocol and would generally enhance the

transparency of GHG emissions disclosure, which they viewed as fundamental for investors

because it helps investors understand the financial impacts that transition risk may have on a

registrant's business and financial condition, including on its liquidity and capital resources.[956]

Other commenters, however, opposed the proposed requirement to disclose GHG

emissions on a disaggregated basis because they believe it would impose additional costs without

---

[952]    *See, e.g.*, letters from Davis Polk; and Grant Thornton.

[953]    *See, e.g.*, letters from ICI; PwC; and Soros.

[954]    *See, e.g.*, letters from PwC; and WRI.

[955]    *See, e.g.*, letters from Amer. for Fin. Reform, Sunrise Project *et al.*; As You Sow; and Wellington Mgmt.

[956]    *See, e.g.*, letters from Calvert; Fidelity; C. Howard; Impax Asset Mgmt.; and Morningstar.

necessarily resulting in material disclosure.[957]  Several of these commenters stated that a registrant should only be required to disclose disaggregated data for constituent gases that are material.[958]  Other commenters opposed the proposed requirement because it would be difficult to obtain the necessary data for each constituent gas, particularly for Scopes 2 and 3 emissions.[959]  One commenter stated that the proposed disaggregated disclosure requirement would not be compatible with certain industry standard life cycle assessment models.[960]  Another commenter opposed a disaggregated disclosure requirement for GHG emissions unless a registrant's particular industry required such disclosure.[961]

Many commenters supported the proposed requirement to describe the methodology, significant inputs, and significant assumptions used to calculate a registrant's GHG emissions metrics.[962]  Commenters stated that such disclosure is necessary to place the GHG emissions data in context and to help investors properly understand and interpret the reported emissions information and associated risks.[963]  One commenter, however, opposed the proposed requirement, asserting that it would require extensive disclosure of information that is unlikely to be material to investors and will require significant additional effort by registrants.[964]  Other commenters opposed a requirement to disclose the emission factors used when calculating GHG

---

[957]    *See, e.g.*, letters from ABA; ERM CVS; Sullivan Cromwell; and T Rowe Price.

[958]    *See, e.g.*, letters from ABA; Sullivan Cromwell; and T Rowe Price.

[959]    *See, e.g.*, letters from Cleary Gottlieb; Deloitte & Touche; and Walmart.

[960]    *See* letter from Amazon.

[961]    *See* letter from CEMEX.

[962]    *See, e.g.*, letters from CalPERS; Calvert; Impax Asset Mgmt.; and WRI.

[963]    *See, e.g.*, letters from CalPERS; and WRI.

[964]    *See* letter from ABA.

emissions because, in their view, such disclosure would be burdensome to produce and of limited use by investors.[965]

Many commenters stated that a registrant should be required to calculate its GHG emissions pursuant to the GHG Protocol because the GHG Protocol's methodologies have been widely accepted and requiring their adherence would promote comparability.[966] Several of these commenters further recommended that the Commission allow registrants to follow the GHG Protocol's methodology regarding setting organizational boundaries[967] instead of the proposed requirement to base a registrant's organizational boundaries on the entities included in its consolidated financial statements. One of these commenters stated that because many registrants use the "operational control" approach permitted under the GHG Protocol, allowing such registrants to continue to follow the GHG Protocol in this regard would mitigate the compliance burden of GHG emissions disclosure because those registrants would not be required to implement a different approach, in particular, regarding equity method investees.[968] Some commenters, however, stated that a registrant should be permitted to follow other climate-related

---

[965] *See, e.g.*, letters from ABA; D. Hileman Consulting; ERM CVS; and Futurepast (June 16, 2022).

[966] *See, e.g.*, letters from Alphabet *et al.*; As You Sow; Beller *et al.*; CalSTRS; CFA; Dell; Deloitte & Touche; Engine No. 1; ERM CVS; KPMG; Morningstar; Soc. Corp. Gov.; and WRI.

[967] *See, e.g.*, letters from Alphabet *et al.*; Beller *et al.*; Deloitte & Touche; and KPMG; *see also* Soc. Corp. Gov (stating that because many registrants use the operational control method, the proposed GHG emissions requirement would not only require unnecessary additional time, effort, and resources and present significant challenges, but it would also generate discrepancies between earlier-reported data and data disclosed pursuant to the proposed rule). *See also* discussion *supra* note 938.

[968] *See* letter from Alphabet *et al.*

standards, such as certain International Organization for Standardization (ISO) standards, used by some companies when calculating their GHG emissions.[969]

Several commenters supported the proposed requirement to disclose gross emissions by excluding any purchased or generated carbon offsets.[970] Commenters stated that requiring the disclosure of gross emissions would enable investors to gain a full picture of a registrant's emissions profile and better assess its transition risk exposure.[971] Some commenters also pointed to perceived problems in carbon offset markets regarding the quality and permanence of offsets when supporting a gross emissions disclosure requirement.[972] Other commenters stated that a registrant should be required to disclose both a total amount with, and a total amount without, the use of offsets for each scope of emissions because such disclosure would increase transparency on offset use, which is critical to understanding how a registrant is managing transition risk to its business.[973]

Some commenters, however, opposed the proposed requirement to exclude carbon offsets when disclosing GHG emissions.[974] These commenters stated that the purchase of carbon offsets is a legitimate means for a registrant to reduce its carbon emissions and expressed the view that

---

[969] *See* letters from Futurepast (referencing ISO 14064-1, Specification with guidance at the organization level for quantification and reporting of greenhouse gas statements and ISO 14067, Carbon footprint of products—Requirements and guidelines for quantification); and International Organization for Standardization (ISO) Committee on GHG and Climate Change Management (June 13, 2022) ("ISO Comm. GHG").

[970] *See, e.g.*, letters from AllianceBernstein; Amer. for Fin. Reform, Sunrise Project *et al.*; As You Sow; CalPERS; Etsy; C. Howard; ICCR; KPMG; and Wellington Mgmt.

[971] *See, e.g.*, letters from Anthesis Group; As You Sow; CEMEX; Domini Impact; ICI; IATP; KPMG; PRI; and Wellington Mgmt.

[972] *See, e.g.*, letters from Amer. For Fin. Reform, Sunrise Project *et al.*; Ceres; and ICCR.

[973] *See, e.g.*, letters from AllianceBernstein; CalPERS; and ERM CVS.

[974] *See, e.g.*, letters from Airlines for America; International Air Transport Association (June 17, 2022) ("IATA"); and SIFMA (each opposed to a requirement to solely disclose GHG emissions in gross terms and supporting GHG emissions disclosure both in gross and net terms); *see also* letter from J. Weinstein (opposed to any requirement to exclude carbon offsets when disclosing GHG emissions).

Appellate Case: 24-1628     Page: 243     Date Filed: 03/26/2024 Entry ID: 5377362

high-quality carbon offsets should play a significant role in a transition to a lower carbon economy.[975]

A number of commenters supported the proposed requirement to disclose GHG emissions in terms of GHG intensity.[976] These commenters stated that investors would find the disclosure of GHG intensity useful because it would help them assess a registrant's progress in achieving its emissions management and reduction goals, put in context its emissions in relation to its scale, and facilitate comparing the registrant's emissions efficiency with other registrants in the same industry.[977] Some commenters also noted that the TCFD recommends the disclosure of GHG emissions both in absolute terms and terms of intensity because each metric serves a different purpose.[978] For example, one commenter stated that the disclosure of emissions in absolute terms provides necessary baseline emissions data whereas normalizing the data using an intensity metric allows for a focus on emissions efficiency per unit of production relevant to the registrant's industry.[979] While some commenters supported the proposed requirement to disclose GHG intensity in terms of both metric tons of $CO_2e$ per unit of total revenue and per unit of production relevant to the registrant's industry,[980] other commenters recommended making the

---

[975] *See* letters from Airlines for America; and SIFMA.

[976] *See, e.g.*, letters from Amazon; BOA; CalPERS; D. Hileman Consulting; C. Howard; Morningstar; PIMCO; and PRI.

[977] *See, e.g.*, letters from Amazon; BOA; and PIMCO.

[978] *See, e.g.*, letters from BOA; and PRI.

[979] *See* letter from BOA.

[980] *See, e.g.*, letters from Amazon (stating that an intensity metric based on "gross merchandise sales" should be an appropriate unit of production); ERM CVS (stating that an intensity metric based on unit of production should be required where possible); and C. Howard.

final rules more flexible by expressly permitting registrants to use other GHG intensity metrics.[981]

Some commenters, however, opposed the proposed GHG intensity disclosure requirement.[982]  These commenters stated that the proposed requirement to disclose a registrant's GHG emissions per unit of total revenue was unnecessary because investors can easily calculate this metric from a registrant's gross GHG emissions divided by its total revenues.[983]  Some commenters further stated that the proposed requirement to disclose a registrant's GHG emissions per unit of production would be unworkable for many registrants with different product lines, even within the same industry, and would not result in comparable disclosure for investors.[984]  Consequently, according to these commenters, GHG intensity disclosure should only be voluntary.[985]

Several commenters supported the proposed provision that would allow a registrant to use reasonable estimates when disclosing its GHG emissions as long as it also describes the assumptions underlying, and its reasons for using, the estimates.[986]  One commenter stated that the proposed provision would encourage the disclosure of GHG emissions.[987]  Other commenters supported the proposed provision because the reporting of GHG emissions often relies on the use

---

[981]    *See, e.g.*, letters from BOA (stating that registrants should be permitted to use GHG intensity metrics specified under the TCFD framework or incorporated into the Partnership for Carbon Accounting Financials' Global GHG Accounting & Reporting Standard used by banks and other financial institutions); and NAM (supporting increased flexibility that would allow companies to choose and disclose a single GHG intensity metric, or to forgo intensity reporting, depending on the metrics' relevance to their operations and emissions).

[982]    *See, e.g.*, letters from ABA; PwC; SIFMA; and Sullivan Cromwell.

[983]    *See* letters from ABA; and Sullivan Cromwell.

[984]    *See* letters from ABA; PwC; SIFMA; and Sullivan Cromwell.

[985]    *See, e.g.*, letters from CEMEX; PwC; and SIFMA.

[986]    *See, e.g.*, letters from C2ES; CEMEX; D. Hileman Consulting; ERM CVS; KPMG; PWC; and WSP.

[987]    *See* letter from Cemex.

Appellate Case: 24-1628     Page: 245     Date Filed: 03/26/2024 Entry ID: 5377362

of estimates, such as emission factors and location-based data.[988]  Another commenter stated that, while the use of estimates would primarily be needed for the disclosure of Scope 3 emissions, in certain instances registrants may need to estimate their Scope 1 and 2 emissions if they are not able to access the necessary information.[989]  One other commenter stated that the use of estimates should not be permitted when actual data is available.[990]

### c.  Timeline for Reporting GHG Emissions Metrics

Some commenters supported the proposed requirement to provide GHG emissions disclosure for the registrant's most recently completed fiscal year and for the appropriate, corresponding historical fiscal years included in the registrant's consolidated financial statements in the filing, to the extent such historical GHG emissions data is reasonably available.[991]  Other commenters, however, stated that the GHG emissions disclosure requirement should be applied initially only to the most recently completed fiscal year following the date of compliance, with GHG emissions disclosure for historical periods required prospectively only.[992]

Several commenters supported the proposed requirement to disclose a registrant's GHG emissions as of fiscal year-end in its corresponding Exchange Act annual report.[993]  Commenters stated that the proposed timeline for reporting a registrant's GHG emissions should be consistent

---

[988]  *See* letters from PWC; and KPMG (supporting the use of estimates generally because the measurement of emissions usually includes many estimates, assumptions, and extrapolations of data); *see also* letter from BIO (supporting maximum flexibility in the reporting of GHG emissions because "the current ecosystem of GHG emission reporting is 'evolving and unique' and in some cases may warrant the use of varying methodologies, differing assumptions, and a substantial amount of estimation").

[989]  *See* letter from C2ES.

[990]  *See* letter from ERM CVS.

[991]  *See, e.g.*, letters from Morningstar; Salesforce; Unilever; and WRI.

[992]  *See, e.g.*, letters from Alphabet *et al.*; ABA; BHP; BlackRock; BOA; BP; Chamber; Citigroup; Cleary Gottlieb; Dell; D. Hileman Consulting; NAM; PwC; SIFMA; and T Rowe Price.

[993]  *See, e.g.*, letters from Alternative Investment Management Association (June 17, 2022) ("AIMA"); CalPERS; CEMEX; Eni SpA; Morningstar; TotalEnergies; and XBRL US (June 17, 2022).

with the timeline for its financial reporting to maximize the use of the GHG emissions data and to enhance the data's comparability.[994]  One commenter further stated that the timing of a registrant's emissions data disclosure should be coincident with its financial statement data reporting because the objective of reporting climate-related data for investors is to understand the correlation with financial performance.[995]

Many other commenters[996] opposed the proposed requirement to disclose GHG emissions metrics in a registrant's Exchange Act annual report.[997]  Commenters stated that, because of the difficulty required to calculate, verify, and disclose a registrant's GHG emissions, and because much of the necessary data for such disclosure does not become available along the same timeline as its other Exchange Act annual reporting requirements, the Commission should permit a registrant to provide its GHG emissions disclosure sometime after the Exchange Act annual report deadline.[998]  Commenters recommended that the Commission permit registrants to include the GHG emissions disclosure either in a separate report that would be due later than the

---

[994]  *See, e.g.*, letters from AIMA; CEMEX; and XBRL US.

[995]  *See* letter from XBRL US.

[996]  *See, e.g.*, letters from ABA; ACLI; Amer. Bankers; Blackrock; Can. Bankers; Chamber; ConocoPhillips; GM; HP; Hydro One; Microsoft; NAM; Nareit; Nasdaq; NMA; NRF; Prologis (June 17, 2022); Real Estate Board of New York (June 15, 2022) ("Real Estate NY"); SIFMA; Soc. Corp. Gov.; Walmart; and Williams Cos.

[997]  Commenters also expressed timing concerns regarding the proposed requirement to include the GHG emissions disclosure in a Securities Act or Exchange Act registration statement.  In particular, commenters raised concerns with applying the proposed climate disclosure rules to registrants in initial public offerings or to companies that are the target of a Form S-4 or F-4 transaction.  We discuss these comments in section II.L below.

[998]  *See, e.g.*, letters from ABA; BlackRock; Chamber; GM; SIFMA; and Soc. Corp. Gov.

Appellate Case: 24-1628     Page: 247     Date Filed: 03/26/2024 Entry ID: 5377362

deadline for filing their annual report on Form 10-K or Form 20-F,[999] in a Form 10-Q or Form 6-K filed subsequent to the due date for the Exchange Act annual report,[1000] or in an amendment to the Exchange Act annual report.[1001]  Commenters recommended varying deadlines for reporting GHG emissions, such as 120 days[1002] or 180 days following the end of its most recently completed fiscal year,[1003] or the due date for the Form 10-Q for the registrant's first[1004] or second fiscal quarter.[1005]  Commenters further stated that providing a later deadline for GHG emissions disclosure would better align with the GHG emissions reporting required by other administrative agencies.[1006]  In addition, commenters stated that providing a later deadline for GHG emissions disclosure would be preferable to the proposed use of a fourth quarter estimate, which would likely require an additional submission that would be burdensome for registrants and potentially confusing for investors.[1007]

---

[999]     *See, e.g.*, letters from Alphabet *et al.* (recommending inclusion in a separate form filed no earlier than 180 days after fiscal year-end); BlackRock (recommending inclusion in a new form due 120 days after fiscal year-end); Chamber (recommending inclusion in a form due no earlier than 180 days after fiscal year-end); D. Hileman Consulting (recommending inclusion in a form due by May 31st in the subsequent fiscal year); NAM (recommending inclusion in a form due no earlier than the end of the second quarter in the subsequent fiscal year); and T Rowe Price (recommending inclusion in a form due 120 days after fiscal year-end).

[1000]    *See, e.g.*, letters from ABA (recommending inclusion in the Form 10-Q for the first quarter in the subsequent fiscal year or in a Form 6-K furnished at a comparable time); BOA (recommending inclusion no later than the due date for the Form 10-Q for the second quarter in the subsequent fiscal year); and SIFMA (recommending inclusion in the Form 10-Q for the second quarter in the subsequent fiscal year or in a Form 6-K furnished at a comparable time).

[1001]    *See* letter from Cleary Gottlieb.

[1002]    *See, e.g.*, letters from Blackrock; and GM (suggesting alignment with GHG emissions reporting deadline of other agencies (90-120 days after fiscal year-end)).

[1003]    *See, e.g.*, letters from ACLI; Can. Bankers; Chamber; HP; Nareit; NMA; Soc. Corp. Gov.; Sullivan Cromwell (recommending 180 days after fiscal year-end deadline for all climate disclosures).

[1004]    *See, e.g.*, letter from ABA.

[1005]    *See, e.g.*, letters from NAM (recommending that GHG emissions be disclosed in separate report that is aligned with due date for 2nd fiscal quarter Form 10-Q); and SIFMA.

[1006]    *See, e.g.*, letters from ABA; Chamber; GM; HP; NAM; NMA; and Soc. Corp. Gov.

[1007]    *See, e.g.*, letters from ABA; Can. Bankers; Chamber; GM; HP; Microsoft; NAM; Nareit; and Soc. Corp. Gov.

Appellate Case: 24-1628     Page: 248     Date Filed: 03/26/2024 Entry ID: 5377362

### 3. Final Rule

#### a. Overview of the GHG Emissions Disclosure Requirement

As many commenters have indicated, investors view information about a registrant's GHG emissions, including its Scopes 1 and 2 emissions, as a central measure and indicator of the registrant's exposure to transition risk as well as a useful tool for assessing its management of transition risk and understanding its progress towards a registrant's own climate-related targets or goals.[1008]  Because such information can be necessary to inform an investor's understanding of the overall impact of transition risk and related targets and goals on a registrant's business, results of operations, financial condition, and prospects, the final rules include a Scopes 1 and 2 emissions disclosure requirement (Item 1505), although modified from the rule proposal.  We recognize commenters' concerns about the potentially high cost of compliance associated with the proposed GHG emissions disclosure requirement, including Scopes 1 and 2 emissions,[1009] as well as concerns about the current availability and reliability of the underlying data for Scope 3 emissions.[1010]  To help address these concerns, instead of requiring, as proposed, the disclosure of Scopes 1 and 2 emissions by all registrants regardless of their materiality, the final rules will

---

[1008]  *See, e.g.*, letters from AGs of Cal. *et al.*; AllianceBernstein; CalPERS; CalSTRS; IAA; Miller/Howard; Morningstar; Trillium; and Wellington Mgmt.

[1009]  *See supra* notes 933 to 935 and accompanying text.

[1010]  *See supra* notes 924-925 and accompanying text.

require the disclosure of Scope 1 emissions and/or Scope 2 emissions metrics[1011] by LAFs and AFs that are not SRCs or EGCs, on a phased in basis,[1012] if such emissions are material.[1013]

As commenters have noted, some registrants already measure their GHG emissions, typically Scopes 1 and 2 emissions,[1014] and some use the data to manage their transition risk exposure or monitor their progress towards achieving climate-related targets and goals.[1015] Many other registrants, however, have determined that climate is not a material risk to their business, or are not currently measuring their GHG emissions.[1016]

In balancing these considerations, we are not mandating Scopes 1 and/or 2 emissions disclosures from all registrants. Rather, under the final rule, if either or both of those categories of GHG emissions are material, and the registrant is an LAF or an AF other than an SRC or

---

[1011] The concept of scopes was developed as part of the GHG Protocol. *See* World Business Council for Sustainable Development and World Resources Institute, GHG Protocol, *Corporate Accounting and Reporting Standard* (2004), available at https://ghgprotocol.org/sites/default/files/standards/ghg-protocol-revised.pdf. We understand that some registrants may measure their GHG emissions pursuant to other well-established standards, such as ISO 14064 and related ISO standards, which do not refer to scopes. For the purposes of the final rules, we have defined "Scope 1 emissions" and "Scope 2 emissions," respectively, as a registrant's direct emissions and indirect emissions largely from the generation of purchased or acquired electricity consumed by the registrant's operations. We intend these definitions to include substantially similar emissions as those measured pursuant to the ISO standards. Accordingly, registrants have flexibility to leverage standards of their choice in calculating and disclosing GHG emissions metrics required by the final rules, including the GHG Protocol or relevant ISO standards, or other standards that may be established over time.

[1012] As discussed in section II.O below, LAFs will have a one-year transition period before they are required to comply with the final rule's GHG emissions disclosure requirements. AFs that are not SRCs or EGCs will be required to comply with the final rule's GHG emissions disclosure requirements two years following the GHG emissions compliance date for LAFs.

[1013] *See* 17 CFR 229.1505(a)(1). To the extent Scope 1 and/or 2 emissions disclosure are required under the final rules, 17 CFR 230.409 or 17 CFR 240.12b-21, which provide accommodations for information that is unknown and not reasonably available, would be available if its conditions are met.

[1014] *See supra* note 916 and accompanying text.

[1015] *See id*.

[1016] Although the TCFD has reported a significant increase in the number of companies that have publicly disclosed their GHG emissions across the globe in recent years, a minority of North American and U.S. companies have done so. The TCFD recently reported that only 30% of North American companies surveyed reported their Scopes 1, 2, and 3 emissions in 2021. *See* TCFD, *supra* note 768768.

Appellate Case: 24-1628     Page: 250     Date Filed: 03/26/2024 Entry ID: 5377362

EGC, it must disclose its Scopes 1 and/or 2 emissions metrics.[1017]  As we stated when discussing a registrant's determination of material impacts of climate-related risks, we intend that a registrant apply traditional notions of materiality under the Federal securities laws when evaluating whether its Scopes 1 and/or 2 emissions are material.[1018]  Thus, materiality is not determined merely by the amount of these emissions.  Rather, as with other materiality determinations under the Federal securities laws and Regulation S-K, the guiding principle for this determination is whether a reasonable investor would consider the disclosure of an item of information, in this case the registrant's Scope 1 emissions and/or its Scope 2 emissions, important when making an investment or voting decision or such a reasonable investor would view omission of the disclosure as having significantly altered the total mix of information made available.

A registrant's Scopes 1 and/or 2 emissions may be material because their calculation and disclosure are necessary to allow investors to understand whether those emissions are significant enough to subject the registrant to a transition risk that will or is reasonably likely to materially impact its business, results of operations, or financial condition in the short- or long-term.  For example, where a registrant faces a material transition risk that has manifested as a result of a requirement to report its GHG emissions metrics under foreign or state law[1019] because such emissions are currently or are reasonably likely to be subject to additional regulatory burdens

---

[1017] If a registrant is an LAF or an AF other than an SRC or EGC and its Scope 1 emissions are material but its Scope 2 emissions are not material, then, under the final rules, the registrant must disclose its Scope 1 emissions and is not required to disclose its Scope 2 emissions (and vice versa if its Scope 2 emissions are material but its Scope 1 emissions are not).  If a registrant's Scope 1 and Scope 2 emissions both are material, then it must disclose both categories of emissions.

[1018] *See, e.g.*, *supra* note 381 and accompanying text.

[1019] *See supra* section II.A.3 (discussing adoption of the ISSB climate disclosure standard and the foreign jurisdictions that intend to implement the standard and California's recently adopted laws requiring certain large corporations to disclose their GHG emissions metrics and their climate-related financial risks).

through increased taxes or financial penalties, the registrant should consider whether such emissions metrics are material under the final rules. A registrant's GHG emissions may also be material if their calculation and disclosure are necessary to enable investors to understand whether the registrant has made progress toward achieving a target or goal or a transition plan that the registrant is required to disclose under the final rules.

Conversely, the fact that a registrant is exposed to a material transition risk does not necessarily result in its Scope 1 and Scope 2 emissions being de facto material to the registrant. For example, a registrant could reasonably determine that it is exposed to a material transition risk for reasons other than its GHG emissions, such as a new law or regulation that restricts the sale of its products based on the technology it uses, not directly based on its emissions.[1020] Such a risk may trigger disclosure under other provisions of subpart 1500 but may not necessarily trigger disclosure of Scope 1 and Scope 2 emissions information under Item 1505.[1021]

This revised approach to GHG emissions disclosure will provide investors with information they need to make informed investment and voting decisions while addressing concerns regarding the disclosure of GHG emissions data that may be immaterial. This approach will also limit the compliance costs of the final rules, as it will *not* require disclosure of GHG emissions data where such data is immaterial. Basing the GHG emissions disclosure requirement on traditional notions of materiality, which are fundamental to U.S. securities laws and the Commission's securities regulation, is more appropriate than a requirement that relies on GHG emissions disclosure laws or regulations required by other Federal agencies and foreign or

---

[1020] *See, e.g.*, Simone Foxman, *The Electric Revolution Is Coming for Your Lawn Mower*, Bloomberg (Nov. 20, 2023), available at https://www.bloomberg.com/news/articles/2023-11-20/gas-lawn-care-ban-in-california-tests-electric-leaf-blower-appeal.

[1021] *See id.*

state jurisdictions, as one commenter recommended.[1022] Those other laws or regulations may be adopted to serve other purposes and may be presented without the additional disclosures that supplement the "total mix" of information investors need for context and to understand why the GHG emissions information is material.

We acknowledge, however, that registrants could incur costs to assess and monitor the materiality of their emissions, even in situations in which they ultimately determine that they do not need to provide disclosure, and that for some registrants these costs could be significant, especially if firms are not already tracking this information for internal purposes.[1023] Mindful of these costs, we are further limiting the GHG emissions disclosure requirement to LAFs and AFs that are not SRCs or EGCs and on a phased in basis. These further limitations will help ensure that any registrants potentially subject to the final rule have sufficient resources and time to prepare for what we acknowledge could be a significant additional compliance obligation.[1024]

We recognize that many commenters supported the proposed requirement for disclosure of Scopes 1 and 2 emissions for all registrants. Nevertheless, mindful of the attendant costs, we believe that the final rules present an appropriate means to achieve the primary benefits of GHG emissions disclosure, namely: providing investors with material metrics that will aid in the assessment of transition risk for those registrants that have identified a material climate risk; and facilitating investors' evaluation of a registrant's progress towards achieving a material target or goal and the attendant effects on the registrant's business, results of operations, or financial condition. While the final GHG emissions disclosure provision will not apply to as many

---

[1022] *See* letter from Grundfest.

[1023] *See infra* section IV.C.2.e.

[1024] As discussed below, neither EGCs nor SRCs will be required to disclose their Scopes 1 and 2 emissions under the final rules. *See* 17 CFR 229.1505(a)(3)(i).

registrants or achieve the same level of comparability as may have been achieved under the proposed rules, on balance, we believe that, coupled with the other disclosures required under subpart 1500 and the structured data requirements of the final rules, investors will have sufficient information to assess the operational and financial impact of transition risks and strategies on registrants and compare such impacts across registrants.

### b. Presentation of the GHG Emissions Metrics and Disclosure of the Underlying Methodologies and Assumptions

In a change from the rule proposal, which would have required the disclosure of a registrant's GHG emissions both disaggregated by each constituent GHG and in the aggregate, the final rule will require the disclosure of any described scope of emissions to be expressed in the aggregate in terms of $CO_2$e.[1025]  This change is intended to address the concern of some commenters that the proposed approach would impose additional burdens and costs on registrants without necessarily resulting in material information for investors.[1026]  In addition, if a registrant is required to disclose its Scope 1 and/or Scope 2 emissions, and any constituent gas of the disclosed emissions is individually material, it must also disclose such constituent gas disaggregated from the other gases.[1027]  For example, if a registrant has included a particular constituent gas, such as methane, in a GHG emissions reduction target that is disclosed pursuant to Item 1504(a) because it is reasonably likely to materially affect the registrant's business, such constituent gas may be material and, therefore, required to be disclosed in disaggregated fashion. The required disaggregated disclosure of an individually material gas will help inform investors

---

[1025]     *See* 17 CFR 229.1505(a)(2)(i).

[1026]     *See supra* note 957 and accompanying text.

[1027]     *See* 17 CFR 229.1505(a)(2)(i).

about the degree to which a registrant is exposed to transition risk as governments and markets may treat the individual GHG components differently.[1028]  As explained in the Proposing Release, requiring a standard unit of measurement for GHG emissions with which many registrants are familiar should simplify the disclosure for investors and enhance its comparability across registrants with different types of GHG emissions.[1029]

Consistent with the rule proposal, under the final rule, a registrant that is required to disclose its Scope 1 and/or Scope 2 emissions must disclose those emissions in gross terms by excluding the impact of any purchased or generated offsets.[1030]  As noted by some commenters, this requirement will enable investors to gain a more complete understanding of the full magnitude of a registrant's exposure to transition risk and to assess the extent to which a registrant relies upon purchased or generated offsets, if the registrant provides disclosure about the offsets pursuant to Item 1504, and better compare such exposure across registrants.[1031] Information about the degree to which a registrant's strategy relies on offsets is increasingly important for investors not only because their use exposes the registrant to offset market

---

[1028]    For example, the EPA recently adopted a new regulation to curb methane emissions, which could be a source of transition risk for some registrants.  *See* EPA, *EPA's Final Rule for Oil and Natural Gas Operations Will Sharply Reduce Methane and Other Harmful Pollution* (Dec. 2, 2023), available at https://www.epa.gov/controlling-air-pollution-oil-and-natural-gas-operations/epas-final-rule-oil-and-natural-gas.

[1029]    *See* Proposing Release, section II.G.1.

[1030]    *See* 17 CFR 229.1505(a)(2)(ii). While the rule specifies that gross emissions should be calculated without taking into account any purchased or generated offsets, the extent to which a registrant will exclude RECs from its gross emissions will depend on the methodology the registrant chooses to use.  As described in the Proposing Release, section II.G.2., there are two common methods for calculating Scope 2 emissions: the market-based method and the location-based method.  The market-based method may involve the use of RECs.  *See* World Resources Institute, *GHG Protocol Scope 2 Guidance (2015),* Chapter 4,  available at https://ghgprotocol.org/sites/default/files/standards/Scope%202%20Guidance_Final_Sept26.pdf.  A registrant is required to describe its methodology, and in the case of Scope 2 emissions, it should include a description of whether and how RECs factor into its gross emissions calculation.

[1031]    *See, e.g.*, letters from ICI; and Wellington Mgmt.

fluctuations but also because such use may indicate heightened transition risk exposure to the extent governments seek to regulate their use.[1032]

Also, similar to the rule proposal,[1033] the final rule will require a registrant to describe the methodology, significant inputs, and significant assumptions used to calculate the registrant's disclosed GHG emissions.[1034] We continue to believe that this information is important to investors because it will help them understand GHG emissions disclosures by providing important contextual information, such as the scope of the entities included in the GHG emissions results that may be subject to transition risk, and inform comparability across registrants while also providing registrants with flexibility to determine the appropriate methodologies and assumptions to use based on their own facts and circumstances. However, we have modified the proposed requirement to provide registrants with greater flexibility to present this information in a manner that best fits with their particular facts and circumstances, as several commenters recommended.[1035] For example, like the rule proposal, the final rule will require a registrant to disclose the organizational boundaries used when calculating its Scope 1 emissions and/or its Scope 2 emissions.[1036] Unlike the rule proposal, however, which would have required a registrant to use the same scope of entities and other assets included in its consolidated financial statements when determining the organizational boundaries for its GHG

---

[1032]    *See* California Legislative Information, Assembly Bill No. 1305, *Voluntary carbon market disclosures* (Oct. 7, 2023), available at https://leginfo.legislature.ca.gov/faces/billTextClient.xhtml?bill_id=202320240AB1305.

[1033]    *See* Proposing Release, section II.G.2.

[1034]    *See* 17 CFR 229.1505(b)(1).

[1035]    *See, e.g.*, letters from ABA; Chamber; SIFMA; and Soc. Corp. Gov.

[1036]    Like the rule proposal, the final rule defines "organizational boundaries" to mean the boundaries that determine the operations owned or controlled by a registrant for the purpose of calculating its GHG emissions.  *See* 17 CFR 229.1500.

emissions calculation,[1037] the final rule provides that the registrant must disclose the method used to determine the organizational boundaries, and if the organizational boundaries materially differ from the scope of entities and operations included in the registrant's consolidated financial statements, the registrant must provide a brief explanation of this difference in sufficient detail for a reasonable investor to understand.  In addition, when describing its organizational boundaries, a registrant must describe the method used to determine those boundaries.[1038]  Under this approach, a registrant will have flexibility to use, for example, one of the methods for determining control under the GHG Protocol, including the operational control approach, as recommended by some commenters,[1039] as long as it discloses the method used, and provides investors with information material to understanding the scope of entities and operations included in the GHG emissions calculation as compared to those included in its financial statements.  We have made this change to address widely shared concerns about the compliance burden and associated costs of the more prescriptive aspects of the rule proposal.[1040]  At the same time, requiring the registrant to provide a brief explanation of any material difference from the scope of entities and operations included in the consolidated financial statements will help avoid any potential confusion on the part of investors about the scope of entities included in the GHG emissions calculation and help them assess the extent of the registrant's transition risk-related financial impacts.

Similarly, we have also streamlined the methodology disclosure provision by, for example, specifying that a *brief* discussion, in sufficient detail for a reasonable investor to

---

[1037]   *See* Proposing Release, section II.G.2.a.

[1038]   *See* 17 CFR 229.1505(b)(1)(i).

[1039]   *See supra* note 967 and accompanying text.

[1040]   *See supra* notes 956 and 968 and accompanying text.

understand, is required of the operational boundaries used,[1041] including the approach to categorization of emissions and emissions sources.[1042] This provision is intended to provide investors with a general understanding of how the registrant determined which sources of emissions to include when calculating its direct emissions (Scope 1) and indirect emissions (Scope 2) to facilitate investors' understanding of the GHG emissions results and enhance their comparability across registrants while avoiding extensive disclosure that may be more burdensome for registrants to produce or investors to process.

Whereas the rule proposal would have required the disclosure of the calculation approach, including any emission factors used and the source of the emission factors,[1043] and any calculation tools used to calculate the GHG emissions, the final rule requires a *brief* description of, in sufficient detail for a reasonable investor to understand, the protocol or standard used to report the GHG emissions, including the calculation approach, the type and source of any emission factors used, and any calculation tools used to calculate the GHG emissions.[1044] Rather than potentially requiring a lengthy explanation of the calculation approach used, this provision will require a registrant to disclose whether it calculated its GHG emissions metrics using an approach pursuant to the GHG Protocol's Corporate Accounting and Reporting Standard, an

---

[1041] Like the rule proposal, the final rule defines "operational boundaries" to mean the boundaries that determine the direct and indirect emissions associated with the business operations owned or controlled by a registrant. *See* 17 CFR 229.1500.

[1042] *See* 17 CFR 229.1505(b)(1)(ii).

[1043] Emission factors are ratios that typically relate GHG emissions to a proxy measure of activity at an emissions source. Examples of activity data reflected in emission factors include kilowatt-hours of electricity used, quantity of fuel used, output of a process, hours of operation of equipment, distance travelled, and floor area of a building. The EPA has published a series of commonly used emission factors. *See* EPA, *Emission Factors for Greenhouse Gas Inventories* (Apr. 2021), available at https://www.epa.gov/sites/default/files/2021-04/documents/emission-factors_apr2021.pdf. *See also* 17 CFR 229.1500 (definition of "emission factors").

[1044] *See* 17 CFR 229.1505(b)(1)(iii).

EPA regulation, an applicable ISO standard,[1045] or another standard. Pursuant to this provision, we would expect a registrant to also disclose whether it calculated its Scope 2 emissions using a particular method (which may differ from the method used to calculate Scope 1 emissions, to the extent both Scope 1 and 2 emissions are required to be disclosed under the final rules), such as the location-based method, market-based method, or both.[1046] Similarly, a registrant should disclose the identity of any calculation tools used, such as those provided by the GHG Protocol or pursuant to GHG emissions calculation under the ISO standards. In addition, by modifying the proposed requirement to disclose any emission factors used, we are clarifying that the final rule will not require the disclosure of any quantitative emission factors used. Instead, the final rule will require a registrant to disclose the type and source of any emission factors used, such as the EPA's emission factors for stationary combustion and/or mobile combustion of various fuel types.[1047]

Requiring a brief description of the protocol or standard used to calculate a registrant's GHG emissions, together with the type and source of any emission factors used, will provide investors with information that is important to understanding the reported emissions data and associated risks[1048] without burdening registrants by requiring disclosure of detailed information

---

[1045] *See supra* note 969.

[1046] The market-based method and the location-based method are two common methods for calculating Scope 2 emissions for purchased electricity. For a description of these methods, *see* World Resources Institute, *GHG Protocol Scope 2 Guidance*, Chapter 7, available at https://files.wri.org/d8/s3fs-public/ghg-protocol-scope-2-guidance.pdf; and EPA Center for Corporate Climate Leadership, *Scope 1 and Scope 2 Inventory Guidance*, available at https://www.epa.gov/climateleadership/scope-1-and-scope-2-inventory-guidance.

[1047] The EPA has published a set of emission factors based on the particular type of source (e.g., stationary combustion, mobile combustion, refrigerants, and electrical grid, among others) and type of fuel consumed (e.g., natural gas, coal or coke, crude oil, and kerosene, among many others. *See* EPA, Emission Factors for Greenhouse Gas Inventories (Apr. 2021), available at https://www.epa.gov/sites/default/files/2021-04/documents/emission-factors_apr2021.pdf.

[1048] *See supra* note 963 and accompanying text.

Appellate Case: 24-1628    Page: 259    Date Filed: 03/26/2024 Entry ID: 5377362

that may not be material.[1049]  Such disclosure should assist investors in understanding the emission disclosures and promote consistency and comparability over time.  For example, with the required disclosures, an investor will be able to evaluate the registrant's selected emission factor(s) in the context of its operations and assess whether changes in reported emissions over time reflect changes in actual emissions in accordance with its strategy or simply a change in calculation methodology.

Unlike the rule proposal, which would have required a registrant to disclose its GHG emissions in both absolute terms and terms of intensity,[1050] under the final rule, registrants will not be required to disclose its GHG emissions in terms of intensity.  As some commenters noted, the proposed intensity disclosure requirement is not necessary because investors should be able to calculate a registrant's GHG emissions per unit of total revenue by dividing a registrant's gross GHG emissions by its total revenues.[1051]  Eliminating the GHG intensity disclosure requirement will also help lower the final rules' compliance burden.  Although a registrant may choose to disclose its GHG emissions in terms of intensity, it is not required under the final rule.

Like the rule proposal, the final rule provides that a registrant may use reasonable estimates when disclosing its GHG emissions as long as it also describes the assumptions underlying, and its reasons for using, the estimates.[1052]  This explanation will help investors understand and assess the GHG emissions disclosures and facilitate comparability across registrants.  We recognize that, in many instances, direct measurement of GHG emissions at the source, which would provide the most accurate measurement, may not be possible.  We also

---

[1049]    *See supra* note 964 and accompanying text.

[1050]    *See* Proposing Release, section II.G.1.

[1051]    *See supra* note 983 and accompanying text.

[1052]    *See* 17 CFR 229.1505(b)(2).

Appellate Case: 24-1628     Page: 260     Date Filed: 03/26/2024 Entry ID: 5377362

recognize that it is common practice under various GHG emissions reporting methodologies to use estimates, such as emission factors, when calculating a company's Scopes 1 and 2 emissions.[1053]  A registrant may use reasonable estimates under the final rule as long as it describes the underlying assumptions and explains its reasons for using the estimates.  Allowing for the use of reasonable estimates with an explanation will help lower the compliance burden for a registrant that must disclose its GHG emissions without, in our view, unduly undermining comparability and reliability of the GHG emissions metrics disclosure.

### c.  Exclusions from the GHG Emissions Disclosure Requirement

We are not adopting a provision that would require a registrant to disclose its Scope 3 emissions at this time.  We are mindful of the potential burdens such a requirement could impose on registrants and other parties as well as questions about the current reliability and robustness of the data associated with Scope 3 emissions, as noted by commenters.[1054]  However, we also recognize that, as some commenters indicated, disclosure of a registrant's Scope 3 emissions, including emissions from its suppliers (i.e., upstream emissions) and its customers or consumers (i.e., downstream emissions), or at least from those parties in its value chain that have significant emissions, may allow investors to develop a fuller picture of the registrant's transition risk exposure and evaluate and compare investment risks across registrants more thoroughly.[1055]  Moreover, because many registrants will be required to disclose their Scope 3 emissions under foreign or state law or regulation,[1056] Scope 3 calculation methodologies may continue to evolve, mitigating many of the concerns noted by commenters about the disclosure of Scope 3

---

[1053]    *See, e.g.*, letter from PWC.

[1054]    *See supra* notes 924-925 and accompanying text.

[1055]    *See, e.g.*, letters from AllianceBernstein; CalPERS; Miller/Howard; Trillium; and Wellington Mgmt.

[1056]    *See supra* section II.A.3.

emissions.  While such developments may encourage more registrants to disclose their Scope 3 emissions in Commission filings, at the present time, because of the potential costs and difficulties related to Scope 3 emissions reporting, the disclosure of Scope 3 emissions in Commission filings will remain voluntary.

Unlike the proposed rule, which would have exempted SRCs from the requirement to disclose Scope 3 emissions,[1057] the final rule will exempt SRCs and EGCs from any requirement to disclose its GHG emissions, including its Scopes 1 and 2 emissions.[1058]  Such treatment is consistent with the scaled disclosure approach that is sometimes adopted for SRCs and EGCs.[1059]  We understand from commenters that SRCs and EGCs will face the greatest burden and costs in attempting to comply with the GHG emissions disclosure requirement as compared to the other climate-related disclosure requirements.[1060]  Accordingly, exempting SRCs and EGCs from this requirement but requiring them to comply with the final rules' other climate-related disclosure requirements should allow investors in SRCs and EGCs to gain a better understanding of the material climate risks such companies may be facing while limiting the overall costs to these registrants by alleviating the significant burdens associated with GHG emissions disclosure.

---

[1057]  *See* Proposing Release, section II.G.3.

[1058]  *See* 17 CFR 229.1505(a)(3)(i).  A registrant will be exempt from any requirement to disclose its GHG emissions for any fiscal year in which it qualified as an SRC.  A registrant that previously qualified as an SRC also will be exempt from the GHG emissions disclosure requirements in the first fiscal year in which it no longer so qualifies because a registrant must reflect the determination of whether it came within the definition of smaller reporting company in its quarterly report on Form 10-Q for the first fiscal quarter of the next year, *see* 17 CFR 240.12b-2, which will be after the date of the annual report on Form 10-K in which the GHG emissions disclosure is required.  This remains the case notwithstanding the permissibility under the final rules (as discussed *infra* Section II.H.3.d) of a registrant incorporating by reference its GHG emissions disclosures required in its Form 10-K from its Form 10-Q for the second quarter of that next fiscal year.

[1059]  *See supra* notes 946 and accompanying text.

[1060]  *See, e.g.*, letter from BIO (When recommending adoption of additional exemptions for small companies from the proposed rules, this commenter stated that "67% of BIO members surveyed said that they currently do not report on carbon emissions, and a similar majority have significant concerns with the ability to collect and accurately report without significant liability.").

The final rules provide that a registrant is not required to include GHG emissions from a manure management system when disclosing its overall Scopes 1 and 2 emissions pursuant to 17 CFR 229.1505(a)(1).[1061]  This exclusion from the GHG emissions disclosure requirement has been included in light of the 2023 Consolidated Appropriations Act, which provides that none of the funds made available under that Act or any other Act (including to the Commission) may be used to implement "any provision in a rule, if that provision requires mandatory reporting of greenhouse gas emissions from manure management systems."[1062]  Accordingly, an agricultural producer or other registrant that operates a manure management system will not be required to include GHG emissions from that system when disclosing its overall Scopes 1 and 2 emissions for so long as implementation of such a provision is subject to restrictions on appropriated funds or otherwise prohibited by Federal law.

### d.  Timeline for Reporting GHG Emissions Metrics

Under the final rules, if a registrant is required to disclose its Scope 1 and/or Scope 2 emissions, it must disclose those emissions for its most recently completed fiscal year and, to the extent previously disclosed in a Commission filing, for the historical fiscal year(s) included in the consolidated financial statements included in the filing.[1063]  By contrast, a registrant that has not previously disclosed its Scopes 1 and 2 emissions in a Commission filing for a particular historical fiscal year will not be required to estimate and report those emissions for such

---

[1061]     *See* 17 CFR 229.1505(a)(3)(ii).

[1062]     Pub. L. No. 117-328, div. G, tit. IV, § 437, 136 Stat. 4459, 4831 (2022).

[1063]     *See* 17 CFR 229.1505(a)(1).

period.[1064]  Limiting the historical period disclosure requirement for GHG emissions in this fashion is largely consistent with the recommendation of commenters that any GHG emissions disclosure not be required for historical periods prior to the initial compliance date[1065] and should help mitigate the compliance costs for registrants that have not yet disclosed their Scopes 1 and 2 emissions in a Commission filing.  This approach is also consistent with the approach taken for the disclosure of financial effects for historical periods under new Article 14 of Regulation S-X,[1066] as well as with approaches taken for other recently adopted changes to Regulation S-K.[1067]

We recognize that, as many commenters have stated, a registrant may have difficulty measuring and reporting its GHG emissions as of fiscal year-end by the same deadline for its Exchange Act annual report.[1068]  To address this concern, the final rules provide that any GHG emissions metrics required to be disclosed pursuant to Item 1505 in an annual report filed with the Commission on Form 10-K may be incorporated by reference from the registrant's Form 10-Q for the second fiscal quarter in the fiscal year immediately following the year to which the GHG emissions metrics disclosure relates.[1069]  Many commenters requesting additional time to

---

[1064]   For example, if a registrant becomes an LAF during the fiscal year, it is required to present these disclosures for the most recently completed fiscal year in which it became an LAF; however, it is not required to provide those disclosures for the prior fiscal years included in its filing when it was not an LAF, to the extent that information was not previously required to be disclosed.

[1065]   *See supra* note 992 and accompanying text.

[1066]   *See infra* section II.K.

[1067]   See, e.g., Management's Discussion and Analysis, Selected Financial Data, and Supplementary Financial Information, Release No. 33-10890 (Nov. 19, 2020) [86 FR 2080 (Jan. 11, 2021)]; and Pay Versus Performance, Release No. 34-95607 (Aug. 25, 2022) [87 FR 55134 (Sept. 8, 2022)], which provided similar transition periods.

[1068]   *See supra* note 998 and accompanying text.

[1069]   *See* 17 CFR 229.1505(c)(1).  A registrant may also include this in an amended Form 10-K filed no later than the due date for the registrant's second quarter Form 10-Q.  This deadline would also apply to transition year registrants, i.e., to registrants that have changed their fiscal year and the difference in reporting periods is so small that they are not required to file a Form 10-KT and can report the difference in a Form 10-Q.

disclose GHG emissions metrics indicated that most registrants currently report such metrics outside of Commission filings after completion of the second fiscal quarter. Accordingly, this change will help alleviate the challenges with disclosing such data in the annual report and be consistent with current market practices while still providing investors with timely GHG emissions information.

To provide comparable treatment for foreign private issuers, the final rules provide that the GHG emissions metrics required to be disclosed pursuant to Item 1505 may be disclosed in an amendment to their annual report on Form 20-F, which shall be due no later than 225 days after the end of the fiscal year to which the GHG emissions metrics disclosure relates. This corresponds approximately to the second quarter Form 10-Q filing deadline and should provide foreign private issuers with an appropriate and similar amount of time as domestic registrants to provide the required GHG emissions metrics disclosure.[1070] In order to treat the GHG emissions disclosure as filed and maintain the same level of liability as for corresponding disclosure by domestic registrants, a foreign private issuer must provide its GHG emissions disclosure in an amendment to its annual report on Form 20-F instead of on a Form 6-K.

Whether a registrant is a domestic registrant or foreign private issuer, the final rules provide that the registrant must include an express statement in its annual report indicating its intention to incorporate by reference or amend its filing for this information.[1071] This requirement will provide notice to investors regarding where to find the required GHG emissions

---

[1070]    *See* Form 10-Q, General Instruction A.1, which states that the Form 10-Q must be filed within 40 days after the end of the fiscal quarter if the registrant is an LAF or AF (and, if that 40 day period falls on a Saturday, the filing is not due until the following Monday, which is the 42nd day after the end of the quarter). The end of the second fiscal quarter corresponds to 181 days following the most recently completed fiscal year (and 182 days in a leap year). The 225-day deadline is intended to account for the upper limit combined periods (42 days + 182 days = 224 days).

[1071]    *See* 17 CFR 229.1505(c)(1).

App.260

Appellate Case: 24-1628      Page: 265      Date Filed: 03/26/2024 Entry ID: 5377362

metrics disclosure and is consistent with the general notice requirements for information that is being incorporated by reference under existing Securities Act and Exchange Act rules.[1072]

To provide similar treatment to GHG emissions metrics required to be disclosed under Item 1505 in a Securities Act or Exchange Act registration statement, the final rules state that the GHG emissions metrics must be provided as of the most recently completed fiscal year that is at least 225 days prior to the date of effectiveness of the registration statement.[1073]  For example, if a calendar year-end LAF files a Form S-1 registration statement in 2028, which goes effective on or after Monday, August 7, 2028, its GHG emissions metrics disclosure must be as of 2027 since the Form S-1's date of effectiveness is at least 225 days after the 2027 fiscal year-end.  If, however, the Form S-1 registration statement goes effective on Friday, August 4, 2028, which is less than 225 days after its 2027 fiscal year-end, the registrant may provide its GHG emissions metrics disclosure as of its 2026 fiscal year-end.[1074]

---

[1072]   *See* 17 CFR 230.411(e) and 17 CFR 240.12b-23(e).

[1073]   *See* 17 CFR 229.1505(c)(2).

[1074]   Similarly, for a registration statement on Form S-3, because information is incorporated by reference from a registrant's Exchange Act filings, to address the scenario where a Form S-3 registration statement goes effective after a registrant files its Form 10-K annual report for its most recently completed fiscal year but before it has filed its second quarter Form 10-Q containing its GHG emissions metrics disclosure for its most recently completed fiscal year, we have added a provision to Form S-3 stating that the GHG emissions metrics disclosure must be as of its most recently completed fiscal year that is at least 225 days prior to the date of effectiveness of the Form S-3 registration statement.  Accordingly, where a registrant has filed its annual report on Form 10-K for the most recently completed fiscal year but has not yet filed its Form 10-Q for the second fiscal quarter containing the disclosure required by 17 CFR 229.1505(a), it must incorporate its GHG emissions metrics disclosure for the fiscal year that is immediately prior to its most recently completed fiscal year.  *See* Item 12(e) to Part I of Form S-3.  For example, if a calendar year-end LAF has a Form S-3 registration statement go effective after it files its Form 10-K for 2028 but before it files its second quarter Form 10-Q (due no later than Aug. 9, 2029), it must incorporate its GHG emissions disclosure for the 2027 fiscal year previously filed on a Form 10-Q or a Form 10-K/A.  We have added a similar provision to Form F-3.  *See* Item 6(g) to Part I of Form F-3.  For any registration statement, if the date of effectiveness is less than 225 days after its most recently completed fiscal year-end, a registrant will only be required to disclose its GHG emissions for the fiscal year that is immediately prior to its most recently completed fiscal year if the registrant was required to disclose its Scope 1 and/or Scope 2 emissions pursuant to Item 1505 for that year.

261

Appellate Case: 24-1628    Page: 266    Date Filed: 03/26/2024 Entry ID: 5377362

### I.  Attestation Over GHG Emissions Disclosure (Item 1506)

#### 1.  Overview

##### a.  Proposed Rules

The Commission proposed to require a registrant, including a foreign private issuer, that is an AF or an LAF to include in the relevant filing an attestation report covering the disclosure of its Scope 1 and Scope 2 emissions and to provide certain related disclosures about the service provider providing the attestation report.[1075]  The proposed rules also included requirements related to the service provider and requirements for the engagement and the attestation report.[1076] The proposed rules would have required the attestation engagement to be performed by the service provider at a "limited assurance" level[1077] for fiscal years 2 and 3 after the Scopes 1 and 2 emissions disclosure compliance date and at a reasonable assurance level[1078] for fiscal year 4 and beyond.[1079]  The Commission explained that during the transition period when limited assurance would be required, an AF or an LAF would be permitted to obtain "reasonable assurance" of its Scope 1 and 2 emissions disclosure at its option.[1080]

Also at its option, an AF or an LAF would have been permitted under the proposed rules to obtain any level of assurance over climate-related disclosures that are not subject to the proposed assurance requirements.[1081]  To avoid potential confusion, however, the proposed rules

---

[1075]    *See* Proposing Release, section II.H.1.

[1076]    *See* Proposing Release, section II.H.2 and 3.

[1077]    Limited assurance is equivalent to the level of assurance (commonly referred to as a "review") provided over a registrant's interim financial statements included in a Form 10-Q.

[1078]    Reasonable assurance is equivalent to the level of assurance provided in an audit of a registrant's consolidated financial statements included in a Form 10-K.

[1079]    *See* Proposing Release, section II.H.1.

[1080]    *See id.*

[1081]    *See id.*  For example, the Commission stated that an AF or LAF could voluntarily include an attestation report at the limited assurance level for its GHG intensity metrics or its Scope 3 emissions disclosure.

Appellate Case: 24-1628    Page: 267    Date Filed: 03/26/2024 Entry ID: 5377362

would have required the voluntary assurance obtained by such registrant to follow the requirements of proposed Items 1505(b) through (d), including using the same attestation standard as the required assurance over Scope 1 and Scope 2 emissions. For filings made by AFs and LAFs after the compliance date for the GHG emissions disclosure requirements but before proposed Item 1505(a) would require limited assurance, the proposed rules only would have required the filer to provide the disclosure called for by proposed Item 1505(e) if it chose to voluntarily obtain attestation.[1082] The Commission stated that a registrant that is not an AF or LAF that obtains voluntary assurance would be required to comply only with proposed Item 1505(e).[1083]

In the Proposing Release, the Commission stated that requiring GHG emissions disclosure in Commission filings should enhance the consistency, comparability, and reliability of such disclosures due to the application of a registrant's DCP and the proposed inclusion of certain prescriptive elements that may help improve standardization of GHG emission calculations.[1084] The Commission also observed that the evolving and unique nature of GHG emissions involves and, in some cases, warrants varying methodologies, differing assumptions, and a substantial amount of estimation.[1085] Certain aspects of GHG emissions disclosure also involve reliance on third-party data. As such, the Commission concluded that requiring a third-party's attestation over these disclosures would provide investors with an additional degree of

---

[1082]    *See id.*

[1083]    *See id.*

[1084]    *See id.*

[1085]    *See id.*

reliability regarding not only the figures that are disclosed, but also the key assumptions, methodologies, and data sources the registrant used to arrive at those figures.[1086]

In the Proposing Release, the Commission explained that, although many registrants have voluntarily obtained some level of assurance for their climate-related disclosures,[1087] current voluntary climate-related assurance practices have been varied with respect to the levels of assurance provided (e.g., limited versus reasonable), the assurance standards used, the types of service providers, and the scope of disclosures covered by the assurance.[1088]  The Commission stated that this fragmentation has diminished the comparability of the assurance provided and may require investors to become familiar with many different assurance standards and the varying benefits of different levels of assurance.[1089]  Accordingly, to improve accuracy, comparability, and consistency with respect to the proposed GHG emissions disclosure, the Commission proposed to require a minimum level of assurance services for AFs and LAFs

---

[1086]   *See id.*

[1087]   For example, the Commission stated that according to one study, 53% of the S&P 500 companies had some form of assurance or verification over climate-related metrics, along with other metrics.  *See* CAQ, *S&P 500 and ESG Reporting* (Aug. 9, 2021), available at https://www.thecaq.org/sp-500-and-esg-reporting-2019-2020.  Another survey of sustainability reporting trends from 5,200 companies across 52 countries (including the United States) stated that, of the top 100 companies (by revenue), 80% have reporting on ESG (including climate), with up to 61% of those companies obtaining assurance.  *See* KPMG, *The KPMG Survey of Sustainability Reporting 2020*, available at https://home.kpmg/xx/en/home/insights/2020/11/the-time-has-come-survey-of-sustainability-reporting.html.  Proposing Release, section II.H.1.

[1088]   *See* Proposing Release, section II.H.1.

[1089]   *See id.*  The Commission noted in the Proposing Release that the consequences of such fragmentation have also been highlighted by certain international organizations, including IOSCO, which stated that it "identified a perceived lack of clarity and consistency around the purpose and scope of [voluntary] assurance . . . [which] can potentially lead to market confusion, including misleading investors and exacerbating the expectations gap."  IOSCO, *Report on Sustainability-related Issuer Disclosures* (June 2021), available at https://www.iosco.org/library/pubdocs/pdf/IOSCOPD678.pdf.  *See also, e.g.*, International Federation of Accountants, *The State of Play in Sustainability Assurance* (June 23, 2021), available at https://www.ifac.org/knowledge-gateway/contributing-global-economy/publications/state-play-sustainability-assurance.  *See* Proposing Release, section II.H.1.

Appellate Case: 24-1628     Page: 269     Date Filed: 03/26/2024 Entry ID: 5377362

including:  (1) limited assurance[1090] for Scopes 1 and 2 emissions disclosure that scales up to reasonable assurance[1091] after a specified transition period; (2) minimum qualifications and independence requirements for the attestation service provider; and (3) minimum requirements for the accompanying attestation report.[1092]

The Commission stated that by specifying minimum standards for the attestation provided with respect to GHG emissions disclosure by AFs and LAFs, the proposed rules should improve accuracy and consistency in the reporting of this information, while also providing investors with an enhanced level of reliability against which to evaluate the disclosure.[1093]  In addition to the proposed minimum standards for attestation services, the Commission explained that the proposed additional disclosure requirements for registrants should further assist investors in understanding the qualifications and suitability of the GHG emissions attestation provider selected by the registrant, particularly in light of the broad spectrum of attestation providers that currently provide and that would be permitted under the proposed rules to provide attestation services.[1094]

---

[1090]  The Commission explained in the Proposing Release that the objective of a limited assurance engagement is for the service provider to express a conclusion about whether it is aware of any material modifications that should be made to the subject matter (e.g., the Scopes 1 and 2 emissions disclosure) in order for it to be fairly stated or in accordance with the relevant criteria (e.g., the methodology and other disclosure requirements specified in proposed Item 1504).  *See* Proposing Release, section II.H.1 (citing, for example, AICPA's Statement on Standards for Attestation Engagements (SSAE) No. 22, AT-C section 210).  In such engagements the conclusion is expressed in the form of negative assurance regarding whether any material misstatements have been identified.  *See id.*

[1091]  The Commission explained in the Proposing Release that the objective of a reasonable assurance engagement, which is the same level of assurance provided in an audit of a registrant's consolidated financial statements, is to express an opinion on whether the subject matter is in accordance with the relevant criteria, in all material respects.  A reasonable assurance opinion provides positive assurance that the subject matter is free from material misstatement.  *See* Proposing Release, section II.H.1 (citing, for example, AICPA SSAE No. 21, AT-C sections 205 and 206).

[1092]  *See* Proposing Release, section II.H.1.

[1093]  *See id.*

[1094]  *See id.*

265

The Commission explained that the proposed rules did not aim to create or adopt a specific attestation standard for assuring GHG emissions because both the reporting and attestation landscapes are currently evolving and it would be premature to adopt one approach and potentially curtail future innovations in these two areas.[1095]  The Commission acknowledged in the Proposing Release that the proposed minimum standards for attestation services and the proposed additional disclosure requirements would not eliminate fragmentation with respect to assurance or obviate the need for investors to assess and compare multiple attestation standards.[1096]  Nevertheless, the Commission stated it believed some flexibility in its approach was warranted at this time given the unique and evolving nature of third-party assurance for climate-related disclosures.[1097]

In proposing mandatory assurance of GHG emissions disclosure, the Commission weighed the challenges such requirements could present with the benefits that assurance would provide to investors and proposed only requiring AFs and LAFs to obtain an attestation report, subject to a phased in compliance period, to help mitigate concerns about cost and burden.[1098]  In addition, the Commission stated that the proposed phase in periods would provide AFs and LAFs with significant time to develop processes to support their GHG emissions disclosure requirements and the relevant DCP, as well as to adjust to the incremental costs and efforts associated with escalating levels of assurance.[1099]  During the proposed transition period, GHG

---

[1095]     *See id.*

[1096]     *See id.*

[1097]     *See id.*

[1098]     *See id.*  The Commission further stated that, for the many LAFs that are already voluntarily obtaining some form of assurance over GHG emissions, any cost increases associated with complying with the proposed rules would be mitigated and larger issuers generally bear proportionately lower compliance costs than smaller issuers due to the fixed cost components of such compliance.  *See id.*

[1099]     *See id.*

emissions attestation providers would also have had time to prepare themselves for providing such services in connection with Commission filings.[1100]

In the Proposing Release, the Commission stated that the voluntary attestation obtained by some registrants has been at the reasonable assurance level; however, it acknowledged that a limited assurance engagement is less extensive and currently the level of assurance most commonly provided in the voluntary assurance market for climate-related disclosure.[1101] The Commission explained that, for this reason, prior to the transition to reasonable assurance, the additional compliance efforts required to comply with the proposed assurance requirement should be limited for the many registrants that are already obtaining limited assurance for their climate related disclosures.[1102] Although reasonable assurance provides a significantly higher level of assurance than limited assurance, the Commission expressed its belief that limited assurance would benefit investors during the initial transition period by enhancing the reliability of a registrant's Scopes 1 and 2 emissions disclosure, in light of the benefits that assurance provides.

Finally, the Commission stated in the Proposing Release that it did not propose to require assurance of Scope 3 emissions disclosure because the preparation of such disclosure presents unique challenges.[1103] The Commission explained that depending on the size and complexity of

---

[1100] *See id.*

[1101] *See id.* (citing CAQ, *S&P 500 and ESG Reporting* (Aug. 9, 2021) (providing statistics on limited assurance versus reasonable assurance obtained voluntarily in the current market (*e.g.*, at least 26 of 31 companies that obtained assurance from public company auditors obtained limited assurance; at least 174 of 235 companies that obtained assurance or verification from other service providers (non-public company auditors) obtained limited assurance)) and CAQ, *S&P 100 and ESG Reporting* (Apr. 29, 2021), available at https://www.thecaq.org/sp-100-and-esg-reporting/). The Commission stated that based on an analysis by Commission staff on Mar. 3, 2022, a substantial number of the S&P 500 companies (460+) are LAFs. *See* Proposing Release, section II.H.1.

[1102] *See* Proposing Release, section II.H.1.

[1103] *See id.*

a company and its value chain, the task of calculating Scope 3 emissions could be relatively more burdensome and expensive than calculating Scope 1 and Scope 2 emissions, and in particular, it may be difficult to obtain activity data from suppliers, customers, and other third parties in a registrant's value chain, or to verify the accuracy of that information compared to disclosures of Scope 1 and Scope 2 emissions data, which are more readily available to a registrant.[1104]

### b. Comments

Commenters expressed a variety of views on the proposal to require AFs and LAFs to provide an attestation report from a service provider over Scope 1 and Scope 2 emissions. A number of commenters supported the proposal to require some form of attestation.[1105] These commenters generally stated that subjecting Scope 1 and Scope 2 emissions to attestation would

---

[1104] *See id.*

[1105] *See, e.g.*, letters from 3Degrees Group Inc. (June 17, 2022) ("3Degree"); AGs of Cal. *et al.*; ANSI National Accreditations Board (June 17, 2022) ("ANSI NAB"); Anthesis Grp.; A. Payton; BC IM Corp.; Better Markets (June 17, 2022) (stating that the Commission should apply the attestation requirement to all registrants); Bloomberg; BNP Paribas (supporting the proposal to require attestation over Scope 1 and 2 emissions but recommending only requiring limited assurance initially and on a time-limited basis); BOA (supporting the proposal to require attestation over Scope 1 and Scope 2 emissions with a two-year extension to the proposed phase in periods); Boston Common Asset Mgmt; Breckinridge Capital; Bureau Veritas; CalPERS; CalSTRS; Can. Coalition GG; Center for Amer. Progress; Center for Audit Quality (June 17, 2022) ("CAQ"); CEMEX; Ceres; CFA; CFA Institute; Chevron (supporting the proposal to require attestation over Scope 1 and Scope 2 emissions beginning with an extended phase in period); CFB; Climate Advisers; Corteva; DSC Meridian; East Bay Mun.; Educ. Fdn. Amer.; Engine No. 1; E. Kenny; ERM CVS; Ernst & Young LLP (June 17, 2022); Etsy; Futurepast; Florian Berg (Feb. 23, 2024) ("F. Berg"); Galvanize Climate; Grant Thornton; H. Marsh; Humane Society; IAA; IAC Recommendation; ICAEW (June 17, 2022) ("ICAEW"); ICCR; IFAC; Impax Asset Mgmt.; ISS ESG; IWAP; JLL; KPMG; K. Talbot; Mackenzie Invest.; Maple-Brown; Mazars USA LLP (June 17, 2022) ("Mazars"); MFA; Mickey Hadick ("M. Hadick") (supporting attestation on an accelerated timeline); Mariam Khaldoon ("M. Khaldoon"); Morningstar; Northern Trust; NY City Comptroller; NY SIF; NY St. Comptroller; PAM; Paradice Invest. Mgmt.; PGIM; Prentiss Smith and Company, Inc. (June 6, 2022) ("Prentiss"); PRI; PwC (noting that it would support requiring reasonable assurance beginning in the first year of disclosure required for impacted registrants assuming a delayed effective date); Redington; Rockefeller Asset Mgmt.; SFERS; S. Spears; Sumitomo Mitsui; TotalEnergies; UAW Retiree; USIIA; XBRL US; and Xpansiv.

help increase the reliability and accuracy of the disclosures.[1106]  Several commenters stated that the proposed mandatory assurance requirement would provide confidence to investors.[1107]  For example, one commenter explained that "[g]reenhouse gas emissions are the basic unit of input for all our individual company, industry, and market climate risk assessments" and that "[a]ssurance provides investors with greater confidence that this essential data is prepared faithfully and in line with globally accepted standards."[1108]  Another commenter stated that "[i]ndependent assurance on the accuracy, completeness and consistency of GHG emissions data would be beneficial to both internal decision-making and for investors and other external stakeholders."[1109]  One commenter stated it supported the proposed mandatory assurance requirement because "[r]eliable, standardized and assured data will strengthen our underwriting as it is critical to our understanding of the quality of a company's earnings in the face of climate change and the energy transition."[1110]  Other commenters stated that the proposed attestation requirements would increase investor protection[1111] or help prevent greenwashing.[1112]  One commenter that is a public company registrant explained that "[w]hile obtaining assurances certainly requires additional resources, we do not feel it is overly burdensome and believe it has

---

[1106] *See, e.g.*, letters from Better Markets; Boston Common Asset Mgmt; Ceres; CFA; ICI (stating that limited assurance would enhance the reliability of Scopes 1 and 2 disclosures); Inherent Grp.; KPMG; Mackenzie Invest.; Mazars; MFA; M. Khaldoon; PAM; and Prentiss.  *See also* IAC Recommendation (stating that the proposed assurance requirement would improve the quality of data being provided to investors).

[1107] *See, e.g.*, letters from BC IM Corp. (stating that assurance "will provide investors with enhanced confidence in companies' reported emissions"); CalSTRS; NEI Investments; and Oxfam America.

[1108] *See* letter from CalSTRS.

[1109] *See* letter from Can. Coalition GG.

[1110] *See* letter from DSC Meridian.

[1111] *See, e.g.*, letters from Better Markets; CAQ; IFAC; and SFERS.

[1112] *See, e.g.*, letters from Climate Advisers; BNP Paribas; and UAW Retiree.

significantly improved our risk management and quality of our reporting."[1113]  In addition, a number of commenters agreed with the Commission's statement in the Proposing Release that many registrants already obtain some form of assurance over GHG emissions data.[1114]

Conversely, a number of commenters did not support the proposed requirement for AFs and LAFs to provide an attestation report over Scope 1 and Scope 2 emissions.[1115]  Many of these commenters stated that the proposed attestation requirements would be costly for registrants,[1116] with some commenters stating that the costs would outweigh any potential benefit

---

[1113]    *See* letter from Etsy (stating it has received limited assurance for its reported Scope 1, 2, and 3 emissions since 2016).

[1114]    *See, e.g.*, letters from CalPERS ("Many issuers already obtain assurance for such information when the disclosure appears in non-regulatory reports.  It is appropriate to maintain verification of the data when such disclosures move to regulatory reports."); Climate Advisers; KPMG; SIFMA AMG (stating that many large registrants obtain limited assurance in connection with existing voluntary GHG emissions disclosures); and USIIA.  Relatedly, some registrants stated that they are currently obtaining assurance over their GHG emissions disclosures.  *See, e.g.*, Dow (stating it obtained limited assurance on its GHG emissions metrics beginning in 2021); and Microsoft (stating that it has obtained limited assurance over Scopes 1, 2, and 3 emissions for the past two years).

[1115]    *See, e.g.*, letters from AAFA; AALA *et al.*; ABA; ACA Connects; AEPC; AFPM; American Hotel and Lodging Association (June 17, 2022) ("AHLA"); Amer. Chem.; APCIA; BCSE; BIO; Bipartisan Policy; BPI; Business Roundtable; Can. Bankers; Capital Group; Capital Research; C. Franklin; Chamber; Champion X; D. Burton, Heritage Fdn.; Enerplus; Eversource Energy (June 16, 2022) ("Eversource"); ID Ass. Comm.; J. Herron; K. Connor; McCormick; Mid-Size Bank Coalition of America (June 14, 2022) ("Mid-Size Bank"); NAA; Nasdaq; National Ocean Industries Association (June 17, 2022) ("NOIA"); NMA; Petrol. OK; PLASTICS; PPL Corporation (June 17, 2022) ("PPL"); Ranger Oil; RILA; Schneider; SBCFAC Recommendation; Small Business Forum Recommendation (2023); SIA; SIFMA ("[T]he Commission should reevaluate in the future whether the standards and market practice necessary for external assurance has sufficiently developed such that a mandatory assurance requirement is viable and consider adopting an attestation standard at that time."); SIFMA AMG;  SKY Harbor; Soc. Corp. Gov.; Southside Bancshares; SouthState Corporation (June 17, 2022) ("SouthState"); Sullivan Cromwell; Travelers; UPS; and Zions.

[1116]    *See, e.g.*, letters from AAFA; AFPM; AHLA; Amer. Chem.; BIO; Bipartisan Policy; Eversource; Business Roundtable; Capital Group; Chamber; Champion X; ConocoPhillips (stating that "the availability of assurance providers is currently insufficient to meet demand and will likely trigger a surge in costs"); Corteva; McCormick; NOIA; Petrol. OK; PLASTICS; PPL; Ranger Oil (stating that the attestation requirement will substantially increase auditing fees); SBCFAC Recommendation; SIFMA; SIFMA AMG; Soc. Corp. Gov.; Sullivan Cromwell; Travelers; UPS; and Zions.

Appellate Case: 24-1628      Page: 275      Date Filed: 03/26/2024 Entry ID: 5377362

to investors.[1117]  For example, one commenter stated that obtaining attestation over GHG emissions disclosures would be "far more costly than with financial data because the [attestation] market for emissions is not at all well developed."[1118]  Other commenters stated that attestation is unnecessary because of the incentives for accuracy that already exist for information registrants provide to the Commission.[1119]  Some commenters stated that there is currently a shortage in the supply of assurance providers to support the proposed rule's attestation requirements,[1120] while other commenters recommended eliminating the proposed requirement for attestation because assurance standards and methodologies are still evolving.[1121]  Several commenters raised concerns about registrants' ability to obtain assurance over GHG emissions disclosures in light

---

[1117]    *See, e.g.*, letters from ACA Connects (stating that third-party attestation "would result in substantial costs without a corresponding benefit"); AFPM; Business Roundtable; Capital Research; Chamber; Eversource ("It is our view that the attestation requirement would significantly increase cost without providing corresponding value to investors and stakeholders."); PPL; SIA; SIFMA; and Travelers.

[1118]    *See* letter from Bipartisan Policy.

[1119]    *See, e.g.*, letters from Bipartisan Policy; Eversource; PPL; Ranger Oil; Soc. Corp. Gov.; and SKY Harbor. *See also* APCIA ("Additional checks and balances include the SEC's comment letter process, enforcement actions, and an active plaintiffs' bar that avails itself of the private right of action under Exchange Act Rule 10b-5.").

[1120]    *See, e.g.*, letters from AAFA; ABA; Amer. Chem.; BPI; Champion X; Eversource; PLASTICS; PPL; Soc. Corp. Gov.; Soros Fund ("Financial audits are different than climate disclosure audits and auditors do not have specific expertise to ensure the best outcomes."); SouthState; Sullivan Cromwell ("The number of qualified providers would likely be insufficient to meet the demand for their services prompted by the Proposed Rules, at least in the near term."); and Zions.

[1121]    *See, e.g.*, letters from ABA ("As the reporting and attestation standards develop further, a single standards-setting body emerges as the clear leader, and third parties begin to become qualified under these standards, the Commission can then assess whether an attestation standard is appropriate."); Mid-Size Bank; Nasdaq ("To encourage disclosures while the attestation industry continues to mature, the Commission should eliminate the attestation requirement for Scope 1 and 2 emissions, and permit all issuers to disclose a voluntary attestation in accordance with proposed Item 1505(e)(1-3) of Regulation S-K."); RILA; SIFMA; SIFMA AMG; Tata Consultancy Services (June 17, 2022); and Zions.

of the level of judgment, estimation, or uncertainty that would be involved in calculating GHG emissions data.[1122]

In addition, some commenters pointed out that neither the TCFD nor the GHG Protocol require attestation.[1123]  Similarly, a number of commenters stated that the Environmental Protection Agency (EPA)'s GHG Reporting Program has its own verification process for greenhouse gas reports submitted to the EPA.[1124]  One commenter stated the Commission's proposal to require mandatory attestation "is inconsistent with the requirements of existing EPA regulation."[1125]  Other commenters stated that the Commission should adopt the same verification process as the EPA, which does not require third-party assurance.[1126]  Another commenter stated that adopting the same verification process as the EPA "would reduce the costs and concerns with needing to verify emissions data under two separate and very different federal reporting regimes."[1127]  Some commenters stated that, in their view, there is no reason why climate-related disclosures should be subject to attestation and treated any differently than other

---

[1122] *See, e.g.*, letters from AFPM (stating that GHG emissions "are subject to greater measurement challenges than most financial metrics and are subject to greater uncertainty"); Financial Services Forum (stating that "Scope 1 and Scope 2 emissions may incorporate third-party data and rely in part on estimates and averages, which may be difficult or impossible for a registrant to verify with current capabilities"); Schneider; UPS; and USCIB.

[1123] *See, e.g.*, letters from AEPC; Corteva (noting that the TCFD does not require attestation over Scope 1 and Scope 2 emissions); Chamber; and Enerplus (noting that the TCFD does not require attestation over Scope 1 and Scope 2 emissions).

[1124] *See, e.g.*, letters from AFPM; API; NAA; SIA; Western Energy Alliance and the U.S. Oil & Gas Association ("WEA/USOGA"); and Williams Cos.

[1125] *See* letter from SIA (recommending that the Commission modify the proposed rules to permit registrants to "self-certify emissions, consistent with existing EPA regulations").

[1126] *See, e.g.*, letters from NAA; SIA; WEA/USOGA; and Williams Cos.  *See also* EPA, Fact Sheet – Greenhouse Gases reporting Program Implementation (Nov. 2013) ("EPA Fact Sheet"), available at https://www.epa.gov/sites/default/files/2014-09/documents/ghgfactsheet.pdf (stating that the EPA verifies the data submitted and does not require third party verification, although prior to EPA verification, reporters are required to self-certify the data they submit to the EPA).

[1127] *See* letter from NAA.

required disclosures outside of the financial statements in a Form 10-K.[1128]  Relatedly, one commenter agreed with the Commission's statement in the Proposing Release that GHG emissions disclosure is different from existing quantitative disclosure required to be provided outside of the financial statements because such existing disclosure typically is derived, at least in part, from the same books and records that are used to generate a registrant's audited financial statements and that are subject to ICFR.[1129]  However, other commenters disagreed with that statement.[1130]

Alternatively, some commenters stated that the Commission should wait before determining whether to adopt a mandatory assurance requirement for GHG emissions.[1131]  A few commenters stated that instead of requiring mandatory assurance over GHG emissions disclosures, assurance should be voluntary.[1132]  One of these commenters stated that permitting registrants to disclose whether they obtained voluntary attestation in accordance with proposed

---

[1128]    *See, e.g.*, letters from APCIA; Capital Group; Capital Research ("In addition, no other numerical data in a company's regulatory filing, other than its financial statements, is required to be audited today.  We are not persuaded that Scope 1 and Scope 2 GHG emissions data should be treated any differently…."); and Soc. Corp. Gov.  *See also* BCSE ("There is nothing particularly unique about the proposed disclosures as compared to numerous existing disclosures on other topics that would justify imposing an attestation requirement.").

[1129]    *See* letter from PwC.

[1130]    *See* letters from CFA Institute; and Soc. Corp. Gov.

[1131]    *See, e.g.*, letters from Allstate ("[W]e believe the Commission should set dates for limited assurance engagements only after attestation standards and interpretive guidance have been published."); Anonymous; Davis Polk; Sullivan Cromwell (stating that before mandating assurance the Commission should "work with industry participants and standard setters to develop generally accepted climate disclosure attestation principles); and TIAA ("Waiting to impose audit and attestation requirements will give registrants and other industry participants more time to become informed about the specifics of the new climate disclosure landscape and weigh in knowledgeably on the implications of auditing climate data.").  *See also* letter from Bipartisan Policy (recommending that the Commission monitor company disclosures and public statements for consistent disclosure and ultimately defer to Congress to address whether attestation of GHG emissions disclosures is needed).

[1132]    *See, e.g.*, letters from AEPC (stating that the Commission "should allow a commensurate market-based approach to third-party assurance for climate-related reporting for registrants that desire to enhance the reliability of information"); AFPA (same); Chamber ("Alternatively, to the extent companies are obtaining assurances, the SEC's alternative that registrants disclose what type of assurance, if any, they are obtaining may be appropriate."); Nasdaq; and RILA.

Items 1505(e)(1) through (3) would help investors understand whether the attestation or verification has enhanced the reliability of the GHG emissions disclosures.[1133]

A number of commenters offered their views on the types of registrants that should be subject to any attestation requirement. A few commenters stated that the attestation requirements should apply to AFs and LAFs as proposed.[1134] Several commenters stated that the proposed attestation requirements should apply to all registrants, not just AFs and LAFs.[1135] One of these commenters explained that it supported requiring all registrants to comply with the proposed attestation requirements because "GHG emissions are a key metric for determining climate-related transition risks, and those risks are likely to impact small companies as well as large companies."[1136] Similarly, another commenter stated that extending the attestation requirement to additional registrants "would be insightful for investors and allow comparability amongst disclosures of these attestation reports between several types of filers."[1137] Commenter feedback was mixed regarding whether SRCs should be subject to the proposed mandatory assurance requirements. Several commenters stated that SRCs should be excluded from the attestation

---

[1133]    *See* letter from Nasdaq.

[1134]    *See* letter from BC IM Corp.; and Morningstar (recommending that filers other than AFs and LAFs obtain attestation on a voluntary basis).

[1135]    *See, e.g.*, letters from AGs of Cal. *et al.*; Better Markets; CalSTRS (noting that a phase in schedule could provide more time for non-accelerated filers and smaller companies); CEMEX (supporting a specified transition period for filers other than accelerated filers and large accelerated filers); ERM CVS (recommending that the proposed attestation requirements apply to all registrants with material GHG emissions and suggesting an additional one-year delay for smaller reporting companies); NY St. Comptroller; and OMERS.

[1136]    *See* letter from AGs of Cal. *et al.* ("To address burdens on SRCs, we recommend a longer phase in period for SRCs than for large accelerated filers, with the expectation that as independent attestation services become more mainstream, competition will increase and costs will come down.").

[1137]    *See* letter from CEMEX.

274

requirement.[1138]  On the other hand, one commenter stated that the Commission did not adequately justify an exclusion for SRCs and that excluding SRCs "will undoubtedly undermine one of the key goals of the rule, here the reliability of climate disclosures."[1139]  Alternatively, one commenter stated that the attestation requirement should be limited to "seasoned issuers" and "those companies with more than [$1 billion] in revenue and more than [$2 billion] in public float."[1140]

Some commenters stated that they supported phasing in the assurance requirement from limited assurance to reasonable assurance over time as proposed.[1141]  One of these commenters stated that the phased in approach would "enable registrants to install the necessary DCP" and "enable providers to upskill and establish the necessary capacity to provide limited and then reasonable assurance."[1142]  Another commenter stated that phase in periods would balance investors' "needs for the data with the ability of issuers to provide that data."[1143]  Some commenters stated that it was important for GHG emissions disclosures to ultimately be subject

---

[1138]  *See, e.g.*, letters from ABA; MFA ("[T]he exclusion of non-accelerated filers and smaller reporting companies from the attestation requirement will aid in relieving the burden on those issuers that may face the greatest challenges."); and Sullivan Cromwell ("[T]he burden and cost required to comply with the Proposed Rules will be significant and will disproportionately impact smaller registrants.").  *See also* letter from ICBA ("The final rule is improperly scaled because it imposes the same requirements on smaller banks (that aren't SRCs) as on larger banks.  This includes the costs of assurance.").

[1139]  *See* letter from Better Markets.

[1140]  *See* letter from BIO.

[1141]  *See, e.g.*, letters from Addenda; Boston Common Asset Mgmt; BC IM Corp.; B. Lab Global *et al.*; CalPERS; Can. Coalition GG; CAQ; CEMEX; Ceres; DSC Meridian; ERM CVS; Ernst & Young LLP; Etsy; H. Marsh; Holcim; Impax Asset Mgmt.; Inherent Grp.; ICGN; ICSWG; J. McClellan; Mackenzie Invest.; Morningstar; NEI Investments; Net Zero Owners Alliance; NY City Comptroller (recommending that the Commission consider proposing incentives to encourage companies to obtain reasonable assurance early); OMERS; PGIM (supporting the requirement to scale up to reasonable assurance over time, but recommending registrants be given an additional year to comply); Prentiss; PRI; Redington; SFERS; TotalEnergies; US SIF; and Veris Wealth.

[1142]  *See* letter from J. McClellan.

[1143]  *See* letter from PRI.

to reasonable assurance because reasonable assurance is necessary to ensure reliability.[1144]  In fact, a number of commenters stated that the Commission should require reasonable assurance from the start without a phase in from limited assurance.[1145]  One of these commenters stated that "investors may place disproportionate reliance on disclosures subject only to the review procedures of a limited assurance engagement, creating an expectations gap."[1146]

A few commenters stated that the level of assurance for Scope 1 and Scope 2 emissions should only be raised from limited to reasonable assurance after the Commission assesses the implementation of the assurance requirement.[1147]  One of these commenters stated that, as a first step, "limited assurance is all that is required to accomplish the SEC's objective to provide an external independent verification of climate disclosures – and reasonable assurance would be unduly burdensome and unnecessary at this stage, given data gaps."[1148]  According to this commenter, "[a]s data gaps are progressively addressed, reasonable assurance could be applied as in an audit of financial statements if it is determined that it is practical and the robustness of data warrants the enactment of a reasonable assurance standard."[1149]  Another commenter

---

[1144] *See, e.g.*, letters from CAQ; and NY City Comptroller.  *See also* letter from CIEL (stating that "limited assurance has a higher probability of overlooking material misstatements and will do little to ensure the accuracy of disclosures").

[1145] *See, e.g.*, letters from CFA; FFC; GRI; Maryknoll Sisters; PwC; and PWYP.

[1146] *See* letter from PwC.

[1147] *See, e.g.*, letters from AFEP ("The level of assurance for scope 1 and 2 emissions should only be raised, from a limited to a reasonable level of assurance, 3 years after the first application of the proposed rule and provided that an assessment of the implementation of this requirement has been made."); BNP Paribas ("[T]he SEC should only require a reasonable assurance if it determines after no less than five years that the limited assurance is inadequate and that the reasonable assurance is practical and feasible."); C2ES; and JPN Bankers.

[1148] *See* letter from BNP Paribas.

[1149] *See id.*

recommended that the Commission take into consideration the EU's CSRD and "contemplate raising the level of assurance within the same timeline subject to an assessment."[1150]

On the other hand, a number of commenters recommended that the Commission only require AFs and LAFs to obtain limited assurance over their Scope 1 and Scope 2 disclosures without a requirement to phase in reasonable assurance.[1151] This includes commenters that stated they did not support requiring mandatory attestation but, if the Commission adopts an assurance requirement, then the Commission should only require limited assurance.[1152] Some of these commenters stated that limited assurance should be sufficient to provide investors with comfort that GHG emissions disclosures are accurate.[1153] Other commenters stated that existing voluntary assurance over GHG emissions is most frequently performed at a limited assurance level.[1154] A few commenters stated that registrants had not received requests or feedback from investors asking for reasonable assurance.[1155] One commenter that has obtained limited assurance over its GHG emissions data stated that, based on its experience with limited

---

[1150] *See* letter from AFEP. *See also* letter from AFG ("We invite the SEC to consider the implications of a potential difference in scope, timing, and level of assurance between the SEC's proposed rule and the EU Regulation, also in light of preparers and auditors' level of readiness to comply with such requirements.").

[1151] *See, e.g.*, letters from ACLI; Alphabet et al.; Cleary Gottlieb; Climate Risk Consortia; EMC; Energy Transfer; Hydro One; ICI; IIB; IIF; ITIC (stating that it is premature to require reasonable assurance and the "SEC should assess registrants' implementation of the extensive new disclosure requirements, monitor evolving industry and auditor practices, and consider whether it would be appropriate to shift to reasonable assurance at a later date."); Mouvement Entreprises FR; Nareit; NAM ("NAM believes that a limited assurance requirement for Scope 1 and Scope 2 emissions could be workable."); PIMCO; Reinsurance AA; R. Love; Salesforce; T. Rowe Price; and WSP.

[1152] *See, e.g.*, letters from AHLA; Allstate; BPI; Chamber; Financial Services Forum; INGAA; NMA; and SouthState.

[1153] *See, e.g.*, letters from PIMCO; SIFMA; and T. Rowe Price.

[1154] *See, e.g.*, letters from Financial Services Forum; and SIFMA.

[1155] *See, e.g.*, letters from Alphabet et al.; IIB; Nareit ("Our members note that they are unaware of investors who have expressed concerns about their current attestation approach, which often provides limited assurance for the GHG reporting."); and SIFMA ("As a general matter, we do not believe investors currently are pressing for assurance of GHG emissions data at any level of assurance, and certainly not at a reasonable assurance level.").

Appellate Case: 24-1628     Page: 282     Date Filed: 03/26/2024 Entry ID: 5377362

assurance and discussions with its auditors, it anticipated a "significant incremental investment in our processes, systems and personnel would be required to achieve reasonable assurance."[1156]

More generally, a number of commenters raised concerns about a requirement to obtain reasonable assurance.[1157]  Several commenters expressed the view that reasonable assurance would be costly.[1158]  For example, one commenter stated that "moving from limited assurance to reasonable assurance could add far greater costs than anticipated, potentially without a commensurate increase in reliability of the information."[1159]  One commenter stated that requiring reasonable assurance "significantly increases regulatory risk" and could result in penalties for companies.[1160]  Another commenter stated that reasonable assurance would be impracticable for companies because "unlike financial data, Scope 1 and 2 emissions calculations are never completely precise or completely 'knowable.'"[1161]  One commenter stated

---

[1156]    *See* letter from Salesforce (stating that its costs would include, but would not be limited to, incremental headcount or consulting fees to enhance documentation over processes and controls, incremental investments in systems to track and monitor GHG emission data points, including headcount to implement and maintain such systems, and incremental costs to the third-party reviewer to complete a reasonable assurance review).

[1157]    *See, e.g.*, letters from AFPM; Can. Bankers (stating that the proposed requirements would require registrants to gather substantial data from third parties and it is not clear that third parties will have in places processes and procedures to generate data that would meet a reasonable assurance standard); Climate Risk Consortia; EMC; Financial Services Forum; ICI; INGAA; Nareit; NAM; PIMCO; Reinsurance AA; and SIFMA.

[1158]    *See, e.g.*, letters from Climate Risk Consortia ("Requiring reasonable assurance would impose immediate costs on registrants by requiring additional build-out of controls but provide little to no benefit for investors."); Financial Services Forum; ICI; INGAA; NAM; Nareit; PIMCO; Reinsurance AA (stating that there would be significant initial and ongoing costs because reasonable assurance "is a very high level of assurance" that "involves significantly more examination, including the evaluation and testing of ICFR"); and SIFMA.

[1159]    *See* letter from Business Roundtable.  *See also* letter from AFPM (stating that the "Commission provided no evidence demonstrating that reasonable assurance would increase the reliability of disclosures above limited assurance, let alone that such benefits would outweigh additional costs, burdens, and risks.").

[1160]    *See* letter from AEM.

[1161]    *See* letter from INGAA (stating that one member, for example, reports than more than 80% of its Scope 1 and 2 data are based on emissions factors or other forms of extrapolation, not actual measurements).

278

that reasonable assurance is "difficult at this stage in the absence of sustainability assurance standards."[1162]

As an alternative, one commenter recommended that the Commission require registrants to initially obtain reasonable assurance, followed by two years of limited assurance, provided that the first year's attestation report included no modifications or qualifications.[1163] This commenter explained that this order would enable the attestation provider to understand and examine the design and implementation of controls to detect misstatements far more thoroughly than is possible during a limited assurance engagement.[1164]

Several commenters agreed with the proposed timing for phasing in the attestation requirement from limited to reasonable assurance.[1165] On the other hand, a number of commenters, including those that did not support requiring mandatory assurance, stated that the Commission should allow for a longer phase in period for the attestation requirements.[1166] One

---

[1162] *See* letter from WFE. *See also* letter from Cleary Gottlieb (stating that because reporting and attestation practices are in the preliminary stages of development, it is premature to mandate that registrants obtain reasonable assurance).

[1163] *See* letter from Futurepast.

[1164] *See* letter from Futurepast.

[1165] *See, e.g.*, letters from B. Gillespie; BC IM Corp. (stating that the transition periods proposed are reasonable but "as investors, we will continue to engage with large emitters on obtaining reasonable assurance for their scope 1 and 2 emissions over an accelerated timeline to what is contemplated in the proposed rule"); Crowe; and Praxis.

[1166] *See, e.g.*, letters from AEM (recommending that registrants not be required to begin obtaining assurance for five years); AFPM; APCIA; API; Beller *et al.* (recommending phasing in attestation for public companies with a market capitalization of over $25 billion first with other smaller companies to follow); BHP ("[T]he Commission could consider extending the period in which the attestation requirement applied for limited assurance beyond two years, before requiring the more demanding requirement to provide reasonable assurance."); BIO ("Attestation should be phased-in in-line with the spirit of the JOBS Act emerging growth company exemptions."); BOA (recommending a two-year extension to the proposed phase in periods from limited assurance to reasonable assurance); CFA Institute (suggesting that the Commission consider a longer phase in period for reasonable assurance); Chevron; ConocoPhillips (stating that the

---

commenter stated that delaying the phase in periods would provide time for assurance standard setters to "develop specialized assurance standards necessary for GHG emissions" and would provide them time to obtain necessary staff and resources, which could help to reduce costs for registrants.[1167]  A few commenters stated that the phase in period should be accelerated.[1168]  For example, one of these commenters stated that an accelerated phrase in period was warranted given that various attestation providers are already offering limited, and in some cases, reasonable assurance of GHG emissions reporting.[1169]

Also related to timing, a number of commenters stated that the proposed timeline for attestation, which would require disclosure in annual reports, was impractical because it would not provide adequate time for registrants to prepare disclosures and for third-party providers to

---

Commission should extend the assurance implementation timeline to require assurance no earlier than three years following the initial implementation of the disclosure rules to permit capacity building and align internal record-keeping); Inclusive Cap.; INGAA; ITIC (recommending that the Commission extend the phase in period for assurance by at least a year to allow adequate time to establish the appropriate systems and controls and to ensure attestation providers are properly staffed and prepared); J. Josephs (recommending that the Commission provide a phase in period of five years before limited assurance is required); LTSE; Microsoft (recommending the deferral of the attestation requirements for at least one additional year); Mid-Size Bank; NMA; NRA/RLC (stating that the phase in of limited assurance should be extended by three years and the transition to reasonable assurance should be extended by six years); NRF; Nikola (recommending an additional two years of limited assurance for Scopes 1 and 2 emissions); Petrol. OK; and PGIM (supporting the proposal, but recommending registrants be given an additional year to comply).

[1167] *See* letter from BOA.

[1168] *See, e.g.*, letters from Better Markets ("Again, while transition periods for new rules may be appropriate, particularly in the cases of new or novel requirements, such transition periods should not be solely justified by reducing costs or burdens for registrants."); Center Amer. Progress (stating that five years to phase in reasonable assurance is "far too long" since many filers already disclose or at least track Scopes 1 and 2 emissions); and M. Hadick (stating that the timeline should be accelerated to require limited assurance in the first reporting year and reasonable assurance in the second reporting year).

[1169] *See* letter from Amer. for Fin. Reform, Evergreen Action *et al*.

complete attestation procedures before the annual report is due.[1170]  For example, one commenter stated that "[c]ompiling, reviewing, and publishing" GHG emissions data "as well as obtaining assurance" is a "significant undertaking that can extend a number of months beyond a registrant's fiscal year end."[1171]  Another commenter stated that "[w]hile third party attestation is common" it was "concerned about the feasibility of obtaining assurance on the proposed timelines required to file on the Form 10-K."[1172]

One commenter supported requiring any voluntary assurance obtained by AFs and LAFs after limited assurance is required to follow the same attestation requirements of Items 1505(b) through (d) as proposed.[1173]  Several commenters stated that the Commission should adopt an attestation requirement for Scope 3 GHG emissions disclosures[1174] with some commenters suggesting limited assurance would be sufficient[1175] while others recommended phasing in

---

[1170]  *See, e.g.*, letters from AEPC; AHLA; Alphabet et al.; APCIA; Barrick Gold; BPI; Business Roundtable; Chamber; Climate Risk Consortia; Dow Inc.; ITIC; NMA; NOIA; SEC Professionals (recommending that the Commission modify or re-purpose the current Commission Form SD which is currently filed no later than May 31st after the end of the issuer's most recent calendar year, which would allow additional time to collect, quantify, validate and obtain assurance over GHG emissions); SIA; Trane; Travelers (stating that "Scope 1 and Scope 2 GHG emissions data is currently not available until about six months after the calendar year end" and noting that "is one of the reasons we provided our sustainability reports mid-year"); T. Rowe Price (recommending that Scope 1 and Scope 2 GHG emissions be disclosed in a furnished form due within 120- days of the fiscal year end, aligning with the timing of proxy statements); and Williams Cos.

[1171]  *See* letter from ITIC.

[1172]  *See* letter from Business Roundtable.

[1173]  *See* letter from Amer. for Fin. Reform, Sunrise Project *et al.*

[1174]  *See, e.g.*, letters from B. Gillespie; CalSTRS; Center Amer. Progress; CFA; CIEL; E. Kenny; ERM CVS; Evergreen (June 17, 2022); IATP; ICCR; NY City Comptroller; NY SIF; NY St. Comptroller; Oxfam America; PWYP; and Rick Love (Mar. 30, 2022) ("R. Love").

[1175]  *See, e.g.*, letters from ANSI NAB (recommending the Commission allow a limited level of assurance engagement to be provided as per ISO 14064-3); Anthesis Grp. (recommending that limited assurance for material sources of Scope 3 emissions be phased in over the next five to ten years); B. Lab Global *et al.* (recommending the Commission phase in limited assurance for Scope 3 emissions); Morningstar (supporting requiring limited assurance for registrants with material Scope 3 emissions or with Scope 3 targets); and Salesforce.

Appellate Case: 24-1628      Page: 286      Date Filed: 03/26/2024 Entry ID: 5377362

reasonable assurance.[1176]  On the other hand, a number of commenters stated that they did not support requiring attestation over Scope 3 emissions disclosures, with several pointing to the potential cost.[1177]

In the Proposing Release, the Commission explained that it did not propose definitions for the terms "limited assurance" and "reasonable assurance" because under prevailing attestation standards these are defined terms that the Commission believed were generally understood in the marketplace, both by those seeking and those engaged to provide such assurance.[1178]  The Commission included a request for comment asking if, instead, the Commission should define "limited assurance" and "reasonable assurance," and if so, how it should define them.[1179]  Several commenters recommended that the Commission include a definition of "limited assurance" and "reasonable assurance" in the final rules.[1180]  One of these commenters explained that providing definitions would "reduce any confusion in the market" and "ensure those familiar with greenhouse gas accounting principles and third-party

---

[1176]  *See, e.g.*, A. Payton; Impossible Foods; M. Hadick (supporting reasonable assurance over Scope 3 emissions for large registrants); Praxis; Sens. E. Markey, *et al.* (recommending that the Commission require accelerated and large accelerated filers obtain limited and reasonable assurance over Scope 3 emissions on a phased in timeline); and US SIF.

[1177]  *See, e.g.*, letters from BC IM Corp.; Can. Bankers; CEMEX; CFA Institute; Climate Advisers; Ernst & Young ("We support the proposed approach of excluding Scope 3 GHG emissions from assurance requirements for all filers because the cost of compliance for registrants would likely outweigh the benefits to investors."); Futurepast; JLL; JPN Bankers; J. McClellan; NAM; Nutrien; RSM US LLP; SIFMA; and WEA/USOGA.

[1178]  *See* Proposing Release, section II.H.1.

[1179]  *See id.*

[1180]  *See, e.g.*, letters from Amer. for Fin. Reform, Sunrise Project *et al* (stating that the Commission should provide a definition for limited assurance to "establish a process more rigorous than currently used for assurance of quarterly SEC filings"); C2ES; ENGIE; ERM CVS; IECA (stating that the Commission should define these terms because it is "not clear what those terms mean in this context, nor how they relate to the standard GHG terms of 'measured,' 'monitored,' and 'verified.'"); J. Weinstein; NASBA (stating that limited assurance and reasonable assurance should be defined in the proposal and noting that if "non-CPAs are permitted to perform these attestation services, then regulations must be developed to build the intellectual infrastructure outside of the professional standards governing the public accounting profession"); and SCS Global.

validation/verification for greenhouse gas inventories can more easily translate to either limited or reasonable assurance."[1181]  Other commenters recommended that the Commission provide guidance explaining the differences between limited assurance and reasonable assurance.[1182]

Some commenters stated that no definition is needed for these terms.[1183]  For example, one commenter stated that it agreed that limited assurance and reasonable assurance are defined terms that are generally understood in the marketplace and therefore no definitions are needed.[1184]  A few commenters stated that if the attestation standards are limited to those issued by the AICPA, IAASB, and the Public Company Accounting Oversight Board ("PCAOB"), no definitions are needed; however, if the standards are not so limited, then the SEC should define the terms in the final rule.[1185]  One commenter stated that it believed assurance terms should be defined by assurance standard setters and not by the Commission.[1186]

In the Proposing Release, the Commission asked if it should require AFs and LAFs to provide a separate management assessment and disclosure of the effectiveness of controls over GHG emissions disclosure (separate from the existing requirements with respect to the

---

[1181]  *See* letter from C2ES.

[1182]  *See, e.g.*, letters from Ceres; ICCR (stating it would be helpful for the Commission to describe some minimum procedures that the auditor would be expected to utilize in performing a limited assurance engagement); and Morningstar.

[1183]  *See, e.g.*, letters from ABA (stating that definitions are not needed but recommending additional guidance for limited and reasonable assurance engagements); CFA Institute; Eni Spa; and Futurepast (stating that these terms are generally understood).

[1184]  *See* letter from CFA Institute (stating that it did not support providing additional or alternative definitions for these terms because it was concerned this would cause confusion regarding other attestation engagements not covered by the proposed rules).

[1185]  *See, e.g.*, letters from CAQ (stating that the Commission should define "limited assurance" and "reasonable assurance" by reference to the standards of the AICPA and IAASB rather than developing alternative definitions); and KPMG.

[1186]  *See* letter from Mazars (stating that definitions of "limited assurance" and "reasonable assurance" currently exist within AICPA and IAASB standards).

assessment and effectiveness of DCP).[1187]  Some commenters stated that the Commission should require a registrant to provide a separate assessment and disclosure of the effectiveness of controls over GHG emissions disclosure by management.[1188]  One commenter stated that such a requirement would "further strengthen the validity of the data available."[1189]  Conversely, some commenters stated that the Commission should not require registrants to provide a separate assessment and disclosure of the effectiveness of controls over GHG emissions disclosures.[1190]  One commenter explained that current DCP requirements have proven to be effective and should suffice.[1191]  Another commenter stated that the "cost of such an undertaking may not support the incremental benefit to investors."[1192]  Similarly, in the Proposing Release, the Commission asked whether, instead of, or in addition to, such management assessment, it should require the registrant to obtain an attestation report from a GHG emissions attestation provider that covers the effectiveness of such GHG emissions controls.[1193]  Some commenters stated that the Commission should not require an attestation report from a GHG emissions provider that covers the effectiveness of such GHG emissions controls.[1194]  One commenter questioned the value of a separate attestation report on controls at the moment because it does not believe there is a

---

[1187]   *See* Proposing Release, section II.H.1.

[1188]   *See, e.g.*, letters from B. Smith.; ERM CVS; and RSM US LLP.

[1189]   *See* letter from B. Smith.

[1190]   *See, e.g.*, letters from CEMEX; CFA Institute (stating that the issue could be revisited by the Commission in the future); Grant Thornton; J. Herron; and PwC.

[1191]   *See* letter from CEMEX.  *See also* letter from PwC ("We believe that the overall certifications regarding DC&P are sufficient and do not recommend modifying such language to specifically refer to GHG or other climate disclosures more broadly.").

[1192]   *See* letter from Grant Thornton.

[1193]   *See* Proposing Release, section II.H.1.

[1194]   *See, e.g.*, letters from CEMEX; CFA Institute (stating that the issue could be revisited by the Commission in the future); and Grant Thornton.

"specific standard for . . . controls around non-financial data" that "takes into account the specific subject matter expertise needed in the internal control process."[1195]

### c. Final Rules (Item 1506)

After considering comments, we are adopting final rules (Item 1506(a)(1)) that require a registrant, including a foreign private issuer, that is required to provide Scope 1 and/or Scope 2 emissions disclosure pursuant to Item 1505 to include an attestation report covering the disclosure of its Scope 1 and/or Scope 2 emissions in the relevant filing.[1196] However, as discussed in greater detail below, we made a number of modifications to the proposal to address certain concerns raised by commenters.

Under the final rules, the attestation engagement must, at a minimum, be at the following assurance level for the indicated fiscal year for the required GHG emissions disclosure:[1197]

| Filer Type | Scopes 1 and 2 Emissions Disclosure Compliance Date | Limited Assurance Compliance Date | Reasonable Assurance Compliance Date |
|---|---|---|---|
| LAFs | Fiscal year 2026 | Fiscal year 2029 | Fiscal year 2033 |
| AFs (other than SRCs and EGCs) | Fiscal year 2028 | Fiscal year 2031 | N/A |

---

[1195]  *See* letter from ERM CVS.

[1196]  *See* 17 CFR 229.1506. Consistent with the Commission's statement in the Proposing Release, in order to attest to Scopes 1 and/or 2 emissions disclosure, a GHG emissions attestation provider will need to include in its evaluation relevant contextual information. *See* Proposing Release, section II.H.1. In particular, under the final rules, the attestation provider will be required to evaluate the registrant's compliance with (i) Item 1505(a), which includes presentation requirements (e.g., disaggregation of any constituent gas if individually material), and (ii) the disclosure requirements in Item 1505(b) regarding methodology, organization boundary, and operational boundary. *See infra* section II.I.3.c for further discussion of the criteria against which the Scopes 1 and 2 emissions disclosure are measured or evaluated.

[1197]  *See infra* section II.O.3 for a detailed discussion of compliance dates for the final rules.

Appellate Case: 24-1628    Page: 290    Date Filed: 03/26/2024 Entry ID: 5377362

AFs (excluding SRCs and EGCs) and LAFs are required to obtain an attestation report under the final rules,[1198] consistent with the scope of registrants that are required to comply with the GHG emissions disclosure requirements in Item 1505.[1199]  As illustrated in the table above, the final rules (Item 1506(a)(1)(i), (ii)) require both AFs and LAFs to obtain limited assurance beginning the third fiscal year after the compliance date for Item 1505; however, under the final rules (Item 1506(a)(1)(iii)), only LAFs are required to obtain an attestation report at a reasonable assurance level beginning the seventh fiscal year after the compliance date for Item 1505.[1200] The final rules do not require an AF to obtain an attestation report at a reasonable assurance level.  Consistent with the proposed rules, and with the lack of a requirement to disclose Scope 3 emissions under the final rules, no registrants will be required to obtain assurance over Scope 3 emissions under the final rules.  Furthermore, as explained in greater detail below in section II.L.3, the final rules, including Item 1506, will not apply to a private company that is a party to a business combination transaction, as defined by Securities Act Rule 165(f), involving a securities offering registered on Form S-4 or F-4.

As discussed above, a significant number of commenters supported the Commission's proposal to require certain registrants to obtain mandatory assurance over GHG emissions disclosure.[1201]  Many of these commenters agreed with the Commission that mandatory assurance would improve the accuracy, comparability, and consistency of registrants' GHG emissions disclosure.[1202]  As the Commission explained in the Proposing Release, obtaining

---

[1198]    *See* 17 CFR 229.1506(a).

[1199]    *See* 17 CFR 229.1505.  *See also supra* section II.H.3.

[1200]    *See* 17 CFR 229.1506(a)(1).

[1201]    *See supra* note 1105 and accompanying text.

[1202]    *See supra* note 1106 and accompanying text.

assurance over GHG emissions disclosure provides investors with an additional degree of reliability regarding not only the figures that are disclosed, but also the key assumptions, methodologies, and data sources the registrant used to arrive at those figures.[1203]  The Commission has long recognized the important role played by an independent auditor in contributing to the reliability of financial reporting.[1204]  Studies suggest that investors have greater confidence in information that has been assured, particularly when it is assured at the reasonable assurance level,[1205] and that high quality audits reduce the cost of capital,[1206] which may benefit both registrants and investors.  Similarly, studies of ESG-related assurance, which is typically provided at a limited assurance level, have found benefits such as credibility enhancement, lower cost of equity capital, and lower analyst forecast errors and dispersion.[1207]  The benefits that assurance will provide in terms of investor protection and increased confidence in GHG emissions disclosure warrants requiring attestation.[1208]  That said, we recognize commenters' concerns about the potential cost of obtaining assurance, the potential shortage in

---

[1203]  *See* Proposing Release, section II.H.1.

[1204]  *See Qualifications of Accountants*, Release No. 33-10876 (Oct. 16, 2020) [85 FR 80508, 80508 (Dec. 22, 2020)].  *See also* Statement, Paul Munter, Acting Chief Accountant, The Importance of High Quality Independent Audits and Effective Audit Committee Oversight to High Quality Financial Reporting to Investors (Oct. 26, 2021), available at https://www.sec.gov/news/statement/munter-audit-2021-10-26.

[1205]  *See, e.g.*, Carol Callaway Dee, et al., *Client Stock Market Reaction to PCAOB Sanctions Against a Big Four Auditor*, 28 Contemp. Acct. Res. 263 (Spring 2011) ("Audits are valued by investors because they assure the reliability of and reduce the uncertainty associated with financial statements.").

[1206]  *See* Warren Robert Knechel, *Audit Quality: Insights from Academic Literature*, Auditing: A Journal of Practice & Theory (Jan. 2013).

[1207]  *See, e.g.*, Ryan J. Casey, et al., *Understanding and Contributing to the Enigma of Corporate Social Responsibility (CSR) Assurance in the United States*, 34 Auditing: A Journal of Practice & Theory 97, 122 (Feb. 2015) (finding that corporate social responsibility ("CSR") assurance results in lower cost-of-capital along with lower analyst forecast errors and dispersion, and that financial analysts find related CSR reports to be more credible when independently assured).  *See also* letter from F. Berg.

[1208]  *See also* IOSCO, Report on International Work to Develop a Global Assurance Framework for Sustainability-related Corporate Reporting (Mar. 2023), available at https://www.iosco.org/library/pubdocs/pdf/IOSCOPD729.pdf (observing "growing demand among investors for high-quality assurance over some sustainability-related information to enhance the reliability of corporate reporting").

the current supply of assurance providers, and the continually evolving state of assurance standards and methodologies.[1209]  As discussed below, we have made modifications in the final rules to mitigate these concerns.

We considered the view expressed by some commenters that there is no reason to treat GHG emissions disclosures differently than other disclosures located outside of the financial statements, which do not require assurance.[1210]  Although we recognize that registrants may provide quantitative disclosure outside of the financial statements that is not subject to any assurance requirement, as explained in the Proposing Release,[1211] and consistent with the feedback provided by commenters,[1212] GHG emissions disclosures are unique in that many companies currently voluntarily seek third-party assurance over their climate-related disclosures, and commenters, including investors, have expressed a particular need for assurance over GHG emissions disclosures.  Current voluntary assurance practices have been varied and this fragmentation has diminished the comparability of assurance provided.  Prescribing a minimum level of assurance required for AFs and LAFs over their Scope 1 and/or Scope 2 emissions in the final rules, along with minimum requirements for the GHG emissions attestation provider and the engagement, will enhance comparability and consistency with respect to assurance over GHG emissions disclosures.

A few commenters stated that it is unnecessary to mandate assurance because there are existing incentives for accuracy in connection with corporate disclosures, such as the Commission staff's filing review process or the possibility of Commission enforcement actions

---

[1209]    *See supra* notes 1116 and 1121 and accompanying text.

[1210]    *See supra* note 1128 and accompanying text.

[1211]    *See* Proposing Release, section II.H.1.

[1212]    *See supra* notes 1114 and 1106 and accompanying text.

or private litigation.[1213]  While it is true that there are existing incentives for companies to provide accurate information to investors, these incentives do not provide the same benefits that assurance will provide under the final rules.  Although the desire to avoid an enforcement action or private litigation has a deterrent effect on registrants, such proceedings generally serve to adjudicate claims after investors have allegedly received inaccurate or misleading disclosures.  In contrast, the assurance requirement in the final rules will require an independent third-party to provide a check on the accuracy and completeness of a registrant's GHG emissions disclosure before the information is provided to investors, which as explained above, will likely result in additional benefits such as lower cost of equity capital and lower analyst forecast errors.[1214]  Furthermore, although the Commission staff's filing review process serves a valuable compliance function that contributes to investor protection, it is not designed to provide assurance, and certainly not for every filing.  We note that, despite the existence and benefits of the filing review process, the Commission requires annual financial statements to be audited and has adopted other rules requiring an expert to review and provide conclusions on other specialized quantitative data that is provided outside of the financial statements to enhance its reliability.[1215]

Several commenters raised concerns about registrants' ability to obtain assurance over GHG emissions disclosure in light of the level of judgment, estimation, or uncertainty that would be involved in calculating GHG emissions data.[1216]  While we acknowledge these concerns, we

---

[1213]    *See supra* note 1119.

[1214]    *See supra* note 1207.

[1215]    *See Modernization of Property Disclosures for Mining Registrants*, Release No. 33-10570 (Oct. 31, 2018) [83 FR 66344 (Dec. 26, 2018)].  *See supra* section I.2.c for further discussion of the expert requirements in the context of the mining disclosure rules.

[1216]    *See supra* note 1122 and accompanying text.

App.289

note that a number of registrants have voluntarily obtained either limited or reasonable assurance over their GHG emissions data, which shows that the practice is feasible.[1217]  And although there are differences between a financial statement audit and an assurance engagement over GHG emissions, registered public accounting firms regularly must provide assurance over financial statement amounts that are subject to significant judgment, estimates, or assumptions or that rely upon information received from a third party.  We acknowledge that auditing standards for financial statement audits are more established after decades of development and required use than attestation standards and practices for GHG emissions.  Nevertheless, as noted above, the practice of providing assurance over GHG emissions is far from nascent and is now expected by many market participants.[1218]

---

[1217]  *See, e.g.*, Salesforce, Inc., FY23 Stakeholder Impact Summary, at 31, available at https://stakeholderimpactreport.salesforce.com/pdf/FY23-SIR-Summary-ESG-Metrics.pdf (obtaining limited assurance over its Consolidated Statements of Environmental Metrics, including Scopes 1, 2, and 3 emissions); The PNC Financial Services Group, Inc., Corporate Responsibility Report 2022, at 48, available at https://www.pnc.com/content/dam/pnc-com/pdf/aboutpnc/CorporateResponsibilityReports/PNC_Corporate_Responsibility_Report_2022.pdf (obtaining limited assurance over Scopes 1 and 2 and certain categories of Scope 3 emissions); Guess?, Inc. FY 2022-2023, at 82, available at https://static1.squarespace.com/static/609c10ed49db5202181d673f/t/64b8f15ff1649742c0a1c552/1689842028424/FY2022-2023+ESG+Report.pdf (obtaining reasonable assurance over climate-related disclosures, including Scopes 1, 2, and 3 GHG emissions); and United Parcel Service, Inc., 2022 GRI, at 61, available at https://about.ups.com/content/dam/upsstories/images/social-impact/reporting/2022-reporting/2022%20UPS%20GRI%20Report.pdf (obtaining reasonable assurance over its 2022 Statement of GHG emissions, including Scopes 1, 2, and 3 emissions).

[1218]  As discussed above, a number of jurisdictions have undertaken efforts to obtain more consistent, comparable, and reliable climate-related information for investors, *see supra* section II.A.3, with certain jurisdictions requiring the disclosure of GHG emissions data along with assurance.  *See* Directive (EU) 2022/2464 of the European Parliament and of the Council of 14 December 2022 amending Regulation (EU) No 537/2014, Directive 2004/109/EC, Directive 2006/43/EC and Directive 2013/34/EU, as regards corporate sustainability reporting (Text with EEA relevance), available at https://eur-lex.europa.eu/legal-content/EN/TXT/?uri=uriserv%3AOJ.L_.2022.322.01.0015.01.ENG (requiring companies within its jurisdiction to obtain limited assurance over sustainability reporting and stating that the European Commission will perform an assessment to determine if moving from limited to reasonable assurance is feasible for both auditors and companies); SB-253, *Climate Corporate Data Accountability Act* (Oct. 7, 2023), available at https://leginfo.legislature.ca.gov/faces/billNavClient.xhtml?bill_id=202320240SB253

Several commenters urged the Commission to adopt the verification process for GHG reporting used by the EPA in lieu of the proposed assurance requirements.[1219] Although we considered the EPA's multi-step verification process, given the differences in the Commission's and EPA's reporting requirements, the different purposes of the Commission's and EPA's respective regulatory regimes, and the benefits of third-party assurance, we determined that independent, third-party assurance is a more appropriate model for the final rules.[1220]

Some commenters urged the Commission to wait before determining whether to adopt a mandatory attestation requirement for GHG emissions or to adopt final rules that permit registrants to disclose whether they voluntarily obtained attestation and related details instead of mandating assurance.[1221] We agree with commenters that requiring registrants to disclose whether they obtained voluntary assurance and related details would help those investors that invest in companies that decide to voluntarily obtain assurance understand whether the attestation obtained has enhanced the reliability of the GHG emissions disclosure, which is why

---

(requiring the California state board to develop and adopt regulations requiring the disclosure of GHG emissions and accompanying assurance engagements beginning with limited assurance and transitioning to reasonable assurance). In addition, the IAASB issued an exposure draft on Proposed International Standard on Sustainability Assurance 5000. *See* Proposed International Standard on Sustainability Assurance (ISSA) 5000, General Requirements for Sustainability Assurance Engagements (Exposure Draft) (Aug. 2, 2023), available at https://www.iaasb.org/publications/proposed-international-standard-sustainability-assurance-5000-general-requirements-sustainability (proposing assurance standards for both reasonable and limited assurance engagements).

[1219] *See supra* note 1126 and accompanying text.

[1220] For a summary of the EPA's multi-step verification process, which includes verification performed by the EPA itself, *see* EPA Fact Sheet *supra* note 1126. *See also* EPA, Greenhouse Gas Reporting Program Report Verification, available at https://www.epa.gov/sites/default/files/2017-12/documents/ghgrp_verification_factsheet.pdf. The comment letter submitted by the EPA notes distinctions in reporting requirements between the Commission's proposed rules and the EPA's GHGRP, including that the Commission's proposal covers publicly traded companies (domestic and international) regardless of their emissions level, while the EPA's GHGRP covers facilities and GHG and fuel suppliers (located in the U.S. and its territories) that fall into one or more of forty-one industrial categories and that, in general, emit or supply 25,000 metric tons $CO_2$ equivalent or more. *See* letter from EPA.

[1221] *See supra* notes 1131 and 1132 and accompanying text.

Appellate Case: 24-1628      Page: 296      Date Filed: 03/26/2024 Entry ID: 5377362

we have included a requirement in the final rules for registrants that are not subject to Item 1505 to provide certain disclosure if they voluntarily obtain assurance over any voluntary GHG emissions disclosure included in Commission filings.[1222]  However, requiring AFs and LAFs to obtain assurance over their Scope 1 and/or Scope 2 emissions disclosure in accordance with the final rules will result in more investors receiving the important benefits of assurance, including increased confidence in the reliability of, and an improved ability to make informed investment decisions based on, assured GHG emissions disclosures, which, as discussed above, provide investors with information for assessing a registrant's business, results of operations, and financial condition.[1223]  As discussed in greater detail below, the assurance requirements in the final rules are narrowly tailored and limited to a subset of registrants, many of which already obtain assurance services with respect to their GHG emissions disclosures.  In addition, we disagree with those commenters that suggested we wait before determining whether to adopt a mandatory attestation requirement for GHG emissions.[1224]  The phase in periods included in the final rules should mitigate the concerns of commenters that stated the Commission should wait in order to give registrants and GHG emissions attestation providers more time to prepare for assurance, or to allow more time for attestation standards or guidance to develop.

Consistent with the proposal, the final rules will apply the attestation requirements to AFs and LAFs.[1225]  However, in a shift from the proposal, the final rules will exempt SRCs and EGCs from the requirement to obtain an attestation report.[1226]  Although some commenters urged the

---

[1222]   *See infra* section II.I.5.

[1223]   *See supra* section II.H.3.a.

[1224]   *See supra* note 1131 and accompanying text.

[1225]   *See* 17 CFR 229.1506(a).

[1226]   SRCs and EGCs that qualified as AFs would have been included within the scope of AFs subject to the requirement to obtain an attestation report under the proposed rules.

Commission to apply the final rules to all registrants,[1227] not just AFs and LAFs, our decision to exempt SRCs and EGCs from the assurance requirement is driven by our decision to exempt these companies from the requirement to disclose GHG emissions, which is discussed in greater detail above.[1228] Since SRCs and EGCs will not be required to disclose GHG emissions, they also will not be required to obtain assurance.

Under the final rules, AFs and LAFs will be required to obtain limited assurance over their GHG emissions disclosure beginning the third fiscal year after the compliance date for Item 1505 (the GHG emissions disclosure provision).[1229] LAFs will be required to obtain reasonable assurance over their GHG emissions disclosure beginning the seventh fiscal year after the compliance date for Item 1505.[1230] In a change from the proposal, AFs will *not* be required to scale up to reasonable assurance under the final rules. Although we agree with those commenters that stated that reasonable assurance would provide investors with increased confidence that a registrant's GHG emissions disclosure is reliable as compared to limited assurance,[1231] we have determined that it is appropriate to apply the reasonable assurance requirement to a more limited pool of registrants – LAFs – at this time because some LAFs are already collecting and disclosing climate-related information, including GHG emissions data,[1232]

---

[1227]    *See supra* note 1135 and accompanying text.

[1228]    *See supra* section II.H.3.

[1229]    *See* 17 CFR 229.1506(a)(1)(i), (ii).

[1230]    *See* 17 CFR 229.1506(a)(1)(iii).

[1231]    *See, e.g.*, letter from GRI.

[1232]    According to one study, 99% of S&P 500 companies reported ESG information in 2021 and 65% of such companies reported obtaining assurance over some ESG information. *See* CAQ, *S&P 500 and ESG Reporting* (updated June 2023), available at https://www.thecaq.org/sp-500-and-esg-reporting. In addition, according to the study, over 63% of S&P 500 companies reported obtaining assurance specifically over some portion of their GHG emissions disclosures. *See id.* Based on an analysis by Commission staff on Feb. 29, 2024, a substantial number of the S&P 500 companies (494) are LAFs.

and larger issuers generally bear proportionately lower compliance costs than smaller issuers due to the fixed cost components of such compliance. This scaled approach will avoid increasing compliance burdens for AFs that may be smaller or less sophisticated issuers.

We considered whether to require LAFs to obtain an attestation report at a reasonable assurance level from the start as suggested by some commenters.[1233] However, most registrants that are voluntarily obtaining assurance today obtain limited assurance rather than reasonable assurance,[1234] and therefore a transition period is appropriate to give LAFs and GHG emissions attestation providers time to prepare for the higher level of assurance. In contrast to some commenters' suggestion that obtaining reasonable assurance would be impractical,[1235] we note that some registrants have voluntarily obtained reasonable assurance over their GHG emissions disclosure.[1236] In addition, one commenter stated that it agreed with the Commission's statement in the Proposing Release that limited assurance is not possible unless the assurance provider also believes reasonable assurance is possible on the subject matter.[1237]

We recognize that obtaining reasonable assurance over GHG emissions disclosure will be more costly than obtaining limited assurance because the scope of work in a limited assurance

---

[1233]   *See supra* note 1145 and accompanying text.

[1234]   *See* CAQ, *S&P 500 and ESG Reporting* (Updated June 2023), available at https://www.thecaq.org/sp-500-and-esg-reporting (stating that in 2021 most companies that obtained assurance from public company auditors and other providers opted for limited assurance).

[1235]   *See, e.g.*, letter from INGAA.

[1236]   *See supra* note 1217.

[1237]   *See* letter from ERM CVS. As the Commission explained in the Proposing Release, under commonly used attestation standards, both a reasonable assurance engagement and a limited assurance engagement have the same requirement that the subject matter (e.g., Scope 1 and Scope 2 emissions) of the engagement be appropriate as a precondition for providing assurance. Thus, if the subject matter is appropriate for a limited assurance engagement, it is also appropriate for a reasonable assurance engagement. *See* Proposing Release, section II.H.1 *See also, e.g.*, AICPA SSAE No. 18, Attestation Standards, available at https://us.aicpa.org/content/dam/aicpa/research/standards/auditattest/downloadabledocuments/ssae-no-18.pdf; and IAASB ISAE 3000 (Revised), Assurance Engagements Other than Audits or Reviews of Historical Financial Information, available at https://www.ifac.org/_flysystem/azure-private/publications/files/ISAE%203000%20Revised%20-%20for%20IAASB.pdf.

Appellate Case: 24-1628    Page: 299    Date Filed: 03/26/2024 Entry ID: 5377362

engagement is substantially less than the scope of work in a reasonable assurance engagement. The primary difference between the two levels of assurance relates to the nature, timing, and extent of procedures required to obtain sufficient, appropriate evidence to support the limited assurance conclusion or reasonable assurance opinion. For example, in a limited assurance engagement, the procedures performed by attestation providers are generally limited to analytical procedures and inquiries,[1238] but in a reasonable assurance engagement, they are also required to perform risk assessment and detail testing procedures to respond to the assessed risk.[1239] However, the outcome of a reasonable assurance engagement results in positive assurance (e.g., the provider forms an opinion about whether the registrant's GHG emissions disclosures are in accordance with Item 1505 in all material respects) while the outcome of a limited assurance engagement results in negative assurance (e.g., the provider forms a conclusion about whether it is aware of any material modifications that should be made to the disclosures for it to be in accordance with Item 1505). Therefore, we agree with those commenters that stated reasonable assurance will provide greater value to investors because at the reasonable assurance level, investors receive more reliable information about GHG emissions.[1240] Registrants may also benefit from providing disclosures subject to a reasonable assurance level because such assurance enhances investor confidence in the disclosures, and as a result, may lower the cost of capital for registrants.[1241]

As explained above, LAFs are best positioned to bear the increased costs of obtaining reasonable assurance. Such costs are justified for these registrants by the benefits that investors

---

[1238]    *See, e.g.*, AICPA SSAE No. 18, AT-C § 105.A14.

[1239]    *See, e.g.*, AICPA SSAE No. 18, AT-C § 205.18.

[1240]    *See supra* note 1145 and accompanying text.

[1241]    *See* letter from Anthesis Grp. *See also supra* note 1207.

Appellate Case: 24-1628    Page: 300    Date Filed: 03/26/2024 Entry ID: 5377362

and registrants will receive in the form of positive assurance, which makes it more likely that material errors or omissions are detected and is consistent with the Commission's investor protection mission. In light of the significant phased in compliance period that LAFs will have before reasonable assurance is required, we expect that registrants will incur these costs over several years, which should make the burden easier to bear in any particular year. We also expect that during the significant phased in compliance period new assurance providers will enter the market and any resulting increase in competition will lead to relative reductions in the costs of providing those services over time.[1242]

We considered whether it would be appropriate to wait to make a determination about whether LAFs should be required to scale up to reasonable assurance, but decided against such an approach because the benefits of obtaining reasonable assurance are apparent now[1243] and we do not expect those to change in the future, while our decision to limit the reasonable assurance requirement to a narrower scope of registrants and to provide a significant transition period will help address the concerns raised by commenters. We also considered the suggestion by one commenter that the Commission initially require registrants to obtain reasonable assurance, followed by limited assurance engagements to the extent the first year's attestation report

---

[1242] *See* letter from Futurepast (expressing the view that the existence of a larger pool of potential GHG emissions attestation providers will enhance competition and likely result in lower costs to registrants). In addition, as discussed in greater detail below in Sections II.I.2.c and 3.c., we expect that registrants' ability to hire a non-accounting firm as a GHG emissions attestation provider and our decision to make certain modifications to the proposed requirements applicable to the GHG emissions attestation engagement should help address concerns about the supply of GHG emissions attestation providers.

[1243] *See supra* note 1193; Brandon Gipper, et al., *Carbon Accounting Quality: Measurement and the Role of Assurance* (Nov. 2023), available at https://ssrn.com/abstract=4627783 (concluding that reasonable assurance improves carbon accounting quality more than limited assurance). *See also* letters from GRI ("Reasonable assurance should be adopted as this would be commensurate with the level of assurance provided through statutory audits of financial statements and will give information users increased confidence that the reported information is prepared in accordance with stated criteria."); and PWYP ("given the importance of GHG emissions data to enable investors to fully understand the climate-related risks of issuers, reasonable assurance is necessary to ensure that information is subjected to sufficient examination and verification such that it can be relied on by investors.").

Appellate Case: 24-1628      Page: 301      Date Filed: 03/26/2024 Entry ID: 5377362

included no qualifications; however, for the reasons stated above, the scaled approach, starting with limited assurance and subsequently moving to reasonable assurance, will allow LAFs time for their processes and controls to mature before being subject to the higher level of assurance.  It will also provide attestation service providers that do not currently provide assurance over GHG emissions disclosure with additional time to familiarize themselves with providing assurance over such disclosure, which, as noted above, should facilitate additional competition between assurance providers and further help decrease costs of compliance.

A number of commenters recommended that the Commission extend the phase in periods in the final rules because the proposed compliance schedule would have been too challenging for registrants to meet.[1244]  We agree with commenters that extending the phase in periods would provide registrants and GHG emissions attestation providers with additional time to prepare for implementation of the rules and would allow assurance standards and practices applicable to GHG emissions to further evolve while balancing investors' need for the information. Therefore, as compared to the proposal, the final rules provide AFs and LAFs with additional time before they are required to comply with the GHG emissions assurance requirements in addition to the phased in GHG emissions compliance dates.[1245]  Providing two phased in compliance dates—one before registrants are required to comply with the GHG emissions disclosure requirements and another before registrants are required to comply with the assurance requirements—will allow registrants and assurance providers to gain experience with the new rules before assurance is required.

---

[1244]     *See supra* note 1166 and accompanying text.

[1245]     *See* 17 CFR 229.1506(a).  *See also infra* section II.O.3 for further discussion of the compliance dates for the final rules.

Appellate Case: 24-1628     Page: 302     Date Filed: 03/26/2024  Entry ID: 5377362

Commenters expressed a variety of views about whether the Commission should define the terms "limited assurance" and "reasonable assurance" in the final rules. Some commenters stated that definitions or guidance could be helpful or reduce any potential confusion,[1246] while other commenters stated that no definition is needed.[1247] We have determined not to include definitions of "limited assurance" and "reasonable assurance" in the final rules because we agree with the commenters that stated that this terminology is generally well understood[1248] and should be defined by assurance standard setters and not by the Commission.[1249] As we explained in the Proposing Release, "limited assurance" and "reasonable assurance" are currently defined by the prevailing attestation standards.[1250] Furthermore, we expect the description of the work performed as a basis for the assurance provider's conclusion on the GHG emissions attestation engagement to be included in any assurance report issued pursuant to the final rules, which should facilitate investors' understanding of the nature of the limited or reasonable assurance engagement.[1251]

One commenter asked the Commission to clarify how the terms "limited assurance" and "reasonable assurance" relate to the "standard GHG terms of 'measured,' 'monitored,' and 'verified.'"[1252] It is our general understanding that "measured," "monitored," and "verified" are terms commonly used in the marketplace to describe the process for calculating and reporting

---

[1246] *See supra* note 1180 and accompanying text.

[1247] *See supra* note 1183 and accompanying text.

[1248] *See* letter from CFA Institute.

[1249] *See* letter from Mazars.

[1250] *See* Proposing Release, section II.H.1. *See also, e.g.*, AICPA SSAE No. 18, AT-C § 105.10 and IAASB ISAE 3000 (Revised) § 12(a)(i).

[1251] *See, e.g.*, IAASB ISAE 3000 (Revised) § 69(k).

[1252] *See* letter from IECA.

GHG emissions data.[1253]  Although such a process could share some similarities with the steps GHG emission attestation providers undertake during the course of an assurance engagement, such a process is distinct from the assurance required by the final rules, which must be performed in accordance with a standard that meets the requirements detailed below.  Another commenter urged the Commission to provide a definition of limited assurance that establishes "a process more rigorous than currently used for assurance of quarterly SEC filings."[1254]  However, doing so would potentially result in the Commission's definition of limited assurance being different from, or conflicting with, the definitions included in the prevailing attestation standards that we expect many GHG emissions attestation providers will use, which could cause confusion.

As discussed above, the final rules provide that any GHG emissions metrics required to be disclosed pursuant to Item 1505 in an annual report filed with the Commission on Form 10-K may be incorporated by reference from the registrant's Form 10-Q for the second fiscal quarter in the fiscal year immediately following the year to which the GHG emissions disclosure relates, or may be included in an amended annual report on Form 10-K no later than the due date for such Form 10-Q.[1255]  The extension of the deadline for the filing of GHG emissions metrics also applies to the deadline for the filing of an attestation report, which should accompany the GHG

---

[1253]  For example, the draft interagency report entitled, "Federal Strategy to Advance Greenhouse Gas Measurement and Monitoring for the Agriculture and Forest Sectors (Strategy)," states that "Measurement, Monitoring, Reporting, and Verification (MMRV) refers to activities undertaken to quantify GHG emissions and sinks (through direct measurement and/or modeling), monitor emission over time, verify estimates, and synthesize and report on findings."  *See Federal Strategy to Advance Measurement and Monitoring Greenhouse Gas Measurement and Monitoring for the Agriculture and Forest Sectors*, 88 FR 44251 (July 12, 2023).

[1254]  *See supra* note 1180.

[1255]  *See* 17 CFR 220.1505(c)(1).  If the registrant is a foreign private issuer, the final rules provide that its GHG emissions disclosure may be included in an amendment to its annual report on Form 20-F, which shall be due no later than 225 days after the end of the fiscal year to which the GHG emissions disclosure relates. *See id.  See also supra* section II.H.3.

Appellate Case: 24-1628     Page: 304     Date Filed: 03/26/2024 Entry ID: 5377362

emissions disclosure to which the report applies.[1256]  This additional time—an additional two fiscal quarters—should provide registrants subject to Item 1505 and their GHG emissions attestation providers with sufficient time to measure GHG emissions, provide assurance, and prepare the required attestation report.  Consistent with the notice requirements included in Item 1505(c), the final rules (Item 1506(f)) provide that a registrant that elects to incorporate by reference its attestation report from its Form 10-Q for the second fiscal quarter or to provide its attestation report in an amended annual report must include an express statement in its annual report indicating its intention to either incorporate by reference the attestation report from a quarterly report on Form 10-Q or amend its annual report to provide the attestation report by the due date specified in Item 1505.[1257]

The proposed rules would have required the attestation report to be included in the separately captioned "Climate-Related Disclosure" section in the relevant filing.[1258]  However, as discussed above, the final rules leave the placement of climate-related disclosures, other than the financial statement disclosures, largely up to each registrant.[1259]  As such, a registrant will not be required to include the attestation report in a separately captioned "Climate-Related Disclosure" section, although it may elect to do so.[1260]

Consistent with the proposed rules, during the phased in compliance period when limited assurance is required for LAFs, the final rules (Item 1506(a)(1)(ii)) permit an LAF, at its option,

---

[1256]   *See* 17 CFR 229.1506(f).

[1257]   *See id.*

[1258]   *See* Proposing Release, section II.H.3.

[1259]   *See supra* section II.A.3.

[1260]   *See id.* for further discussion of presentation requirements for GHG emissions disclosure under the final rules.

300

Appellate Case: 24-1628     Page: 305     Date Filed: 03/26/2024 Entry ID: 5377362

to obtain reasonable assurance of its Scope 1 and/or 2 emissions disclosure.[1261]  Similarly, the final rules (Item 1506(a)(1)(i)) permit an AF, at its option, to obtain reasonable assurance of its Scope 1 and/or 2 emissions disclosure.  In addition, at its option, a registrant that is subject to the assurance requirements would be able to obtain any level of assurance over its GHG emissions disclosures that are not required to be assured pursuant to Item 1506(a).[1262]  For filings made after the compliance date for the GHG emissions disclosure requirements but before Item 1506(a) requires limited assurance, a registrant would only be required to provide the disclosure called for by Item 1506(e).[1263]  For filings made after the compliance date for assurance required by Item 1506(a), to avoid potential confusion, the additional, voluntary assurance obtained by such filer would be required to follow the requirements of Items 1506(b) through (d), including using the same attestation standard as the required assurance over Scope 1 and/or Scope 2 emissions, which was supported by one commenter.[1264]  Although in the Proposing Release, the requirements outlined in this paragraph would have applied to any climate-related disclosures not subject to assurance under Item 1506(a),[1265] we have narrowed the scope of the final rule to apply only to GHG emissions disclosures that are not required to be assured under Item 1506(a) because, given the modifications in the final rule, we think it is unlikely that registrants will

---

[1261]  *See* Proposing Release, section II.H.1.

[1262]  Scope 1 and/or Scope 2 emissions disclosures are required to be assured pursuant to Item 1506(a).  As noted above, no registrants are required to provide Scope 3 GHG emissions disclosures; however, a registrant may choose to provide such disclosure voluntarily.

[1263]  *See* 17 CFR 229.1506(a)(3).

[1264]  *See* letter from Amer. for Fin. Reform, Sunrise Project *et al.*; 17 CFR 229.1506(a)(3).  For example, if an LAF was required to obtain reasonable assurance over its Scope 1 and/or Scope 2 emissions disclosure and the attestation provider chose to follow, for example, the AICPA attestation standards, the LAF could voluntarily obtain limited assurance over any voluntary Scope 3 GHG emissions disclosure, and the attestation provider would be required to follow the AICPA's attestation standard for providing limited assurance.

[1265]  *See* Proposing Release, section II.H.1.

voluntarily obtain assurance over non-GHG emissions disclosure for which the disclosure required by 1506(e) would be useful to investors.[1266]  Therefore, to reduce the complexity of the final rules, we are streamlining it in this way.  In addition, as discussed below in section II.I.5, a registrant that is not subject to Item 1505 but that voluntarily discloses GHG emissions information and voluntarily obtains assurance will be required to comply only with Item 1506(e), if applicable.

For ease of reference, we have included a table reflecting the application of these requirements:

| | After the Compliance Date for GHG Emissions Disclosure but before the Compliance Date for Assurance | After the Compliance Date for Assurance |
|---|---|---|
| **LAFs and AFs subject to Items 1505 and 1506(a) through (d) (e.g., registrants that are required to disclose GHG emissions and obtain assurance)** | Any voluntary assurance over any GHG emissions disclosure must comply with the disclosure requirements in Item 1506(e). | Any voluntary assurance obtained over GHG emissions disclosures that are not required to be assured pursuant to Item 1506(a) (e.g., voluntary Scope 3 disclosures) must follow the requirements of Item 1506(b) through (d), including using the same attestation standard as the registrant's required assurance over Scope 1 and/or Scope 2 disclosure. |

---

[1266]    *See* 17 CFR 229.1506(a)(3).

Appellate Case: 24-1628     Page: 307     Date Filed: 03/26/2024 Entry ID: 5377362

| Registrants not subject to Items 1505 or 1506(a) through (d) (e.g., registrants that are not required to disclose GHG emissions) | Any voluntary assurance over any GHG emissions disclosure must comply with the disclosure requirements in Item 1506(e) | Any voluntary assurance over any GHG emissions disclosure must comply with the disclosure requirements in Item 1506(e). |
|---|---|---|

### 2. GHG Emissions Attestation Provider Requirements

#### a. Proposed Rules

The proposed rules would have required the GHG emissions attestation report required by proposed Item 1505(a) for AFs and LAFs to be prepared and signed by a GHG emissions attestation provider.[1267] The proposed rules would have defined a GHG emissions attestation provider to mean a person or firm that has all the following characteristics:

- Is an expert in GHG emissions by virtue of having significant experience in measuring, analyzing, reporting, or attesting to GHG emissions. Significant experience means having sufficient competence and capabilities necessary to:

  - Perform engagements in accordance with professional standards and applicable legal and regulatory requirements; and

  - Enable the service provider to issue reports that are appropriate under the circumstances.

---

[1267] *See* Proposing Release, section II.H.2.

App.303

Appellate Case: 24-1628   Page: 308   Date Filed: 03/26/2024 Entry ID: 5377362

- Is independent with respect to the registrant, and any of its affiliates,[1268] for whom it is providing the attestation report, during the attestation and professional engagement period.[1269]

The Commission explained that the proposed expertise requirement was intended to help ensure that the service provider preparing the attestation report has sufficient competence and capabilities necessary to execute the attestation requirement.[1270]  If the service provider is a firm, the Commission stated it would expect that the firm has policies and procedures designed to provide it with reasonable assurance that the personnel selected to conduct the GHG emissions attestation engagement have sufficient experience with respect to both attestation engagements and GHG disclosure.  This would mean that the service provider has the qualifications necessary for fulfillment of the responsibilities that it would be called on to assume, including the appropriate engagement of specialists, if needed.[1271]  The Commission explained that the proposed expertise requirement would have applied to the person or the firm signing the GHG emissions attestation report.[1272]

---

[1268] *See id.*  Proposed Item 1505(b)(2)(iii) stated that the term "affiliates" has the meaning provided in 17 CFR 210.2-01, except that references to "audit" are deemed to be references to the attestation services provided pursuant to this section.

[1269] *See* Proposing Release, section II.H.2.  Proposed Item 1505(b)(2)(iv) stated that the term "attestation and professional engagement period" means the period covered by the attestation report and the period of the engagement to attest to the registrant's GHG emissions or to prepare a report filed with the Commission. The professional engagement period begins when the GHG attestation service provider either signs an initial engagement letter (or other agreement to attest a registrant's GHG emissions) or begins attest procedures, whichever is earlier.

[1270] *See* Proposing Release, Section II.H.2.          `

[1271] *See id.*

[1272] *See id.*  The Commission noted that it has adopted similar expertise requirements in the past to determine eligibility to prepare a mining technical report, although the mining technical report requirements differ in that such an engagement is not an assurance engagement.  *See id.* (citing *Modernization of Property Disclosures for Mining Registrants*, Release No. 33-10570 (Oct. 31, 2018) [83 FR 66344 (Dec. 26, 2018)]).

304

The proposed requirement related to independence was modeled on the Commission's qualifications for accountants under 17 CFR 210.2-01 ("Rule 2-01 of Regulation S-X"), which are designed to ensure that auditors are independent of their audit clients.[1273]  The Commission explained that similar to how assurance provided by independent public accountants improves the reliability of the financial statements and disclosures and is a critical component of our capital markets, assurance of GHG emissions disclosure by independent service providers should also improve the reliability of such disclosure.[1274]  The Commission stated that academic studies demonstrate that assurance provided by an independent auditor reduces the risk that an entity provides materially inaccurate information to external parties, including investors, by facilitating the dissemination of transparent and reliable financial information.[1275]  The Commission explained that it expected that GHG emissions disclosure would similarly benefit if assured by an independent service provider.[1276]

Similar to Rule 2-01 of Regulation S-X,[1277] the proposed rules provided that a GHG emissions attestation provider is not independent if, during the attestation and professional engagement period, such attestation provider is not, or a reasonable investor with knowledge of all relevant facts and circumstances would conclude that such attestation provider is not, capable of exercising objective and impartial judgment on all issues encompassed within the attestation

---

[1273]    *See* Proposing Release, section II.H.2.

[1274]    *See id.*

[1275]    *See id.*

[1276]    *See id.*

[1277]    *See* 17 CFR 210.2-01(b).

Appellate Case: 24-1628    Page: 310    Date Filed: 03/26/2024 Entry ID: 5377362

provider's engagement.[1278]  The proposed rules further stated that, in determining whether a

GHG emissions attestation provider is independent the Commission would consider:

- Whether a relationship or the provision of a service creates a mutual or conflicting interest between the attestation provider and the registrant (or any of its affiliates), places the attestation provider in the position of attesting to such attestation provider's own work, results in the attestation provider acting as management or an employee of the registrant (or any of its affiliates), or places the attestation provider in a position of being an advocate for the registrant (or any of its affiliates); and

- All relevant circumstances, including all financial or other relationships between the attestation provider and the registrant (or any of its affiliates), and not just those relating to reports filed with the Commission.[1279]

These proposed provisions were modeled on the factors used by the Commission in

determining whether an accountant is independent.[1280]  The Commission explained that similar

to Rule 2-01 of Regulation S-X, the proposed provisions should help protect investors by

requiring the GHG emissions attestation provider to be independent both in fact and appearance

from the registrant, including its affiliates.[1281]

The Commission also explained that because the GHG emissions attestation provider

would be a person whose profession gives authority to the statements made in the attestation

---

[1278]    *See* Proposing Release, section II.H.2.

[1279]    *See id.*

[1280]    *See* 17 CFR 210.2-01.  For the avoidance of doubt, the Commission noted that if the independent accountant who audits the registrant's consolidated financial statements is also engaged to perform the GHG emissions attestation for the same filing, the fees associated with the GHG emissions attestation engagement would be considered "Audit-Related Fees" for purposes of Item 9(e) of 17 CFR 240.14a-101, Item 14 of Form 10-K, Item 16C of Form 20-F, or any similar requirements.  *See* Proposing Release, section II.H.2.

[1281]    *See id.*

Appellate Case: 24-1628     Page: 311     Date Filed: 03/26/2024 Entry ID: 5377362

report and who is named as having provided an attestation report that is part of the registration statement, the registrant would be required to obtain and include the written consent of the GHG emissions attestation provider pursuant to Securities Act section 7,[1282] the corresponding rule requiring the written consents of such experts,[1283] and the Regulation S-K provision requiring the attachment of the written consent of an expert to a Securities Act registration statement or Exchange Act report that incorporates by reference a written expert report attached to a previously filed Securities Act registration statement.[1284] The GHG emissions attestation provider would also be subject to liability under the Federal securities laws for the attestation conclusion or, when applicable, opinion provided.[1285] The Commission explained that such liability should encourage the attestation service provider to exercise due diligence with respect to its obligations under a limited or reasonable assurance engagement.[1286]

### b. Comments

A number of commenters supported the proposed rules' requirement for a registrant to obtain a GHG emissions attestation report that is provided by a GHG emissions attestation provider that meets specified requirements.[1287] A number of commenters stated that they agreed with the approach taken in the proposed rules not to limit eligible GHG emissions attestation

---

[1282] 15 U.S.C. 77g.

[1283] *See* 17 CFR 230.436.

[1284] *See* Proposing Release, section II.H.2. *See also* 17 CFR 229.601(b)(23).

[1285] As explained above, a limited assurance engagement results in a conclusion that no material modification is needed and a reasonable assurance engagement results in an opinion. *See supra* notes 1090 and 1091.

[1286] *See* Proposing Release, section II.H.2.

[1287] *See, e.g.*, letters from BOA; Bureau Veritas; CII; Crowe; ERM CVS; Ernst & Young LLP; Futurepast; ICAEW ("Third party assurance providers should comply with a professional framework encompassing competence, independence and a system of quality control."); ICI; LRQA; MFA; Morningstar; and TotalEnergies.

providers to only accounting firms.[1288]  Several commenters stated that non-accounting firms

may have expertise that would be relevant to providing assurance over GHG emissions

disclosure.[1289]  For example, one commenter stated that "certain situations may require specialist

expertise and that limiting attestation providers only to accounting firms would prevent

registrants in such situations from availing themselves of the requisite special knowledge."[1290]

Another commenter stated that "[e]xpanding assurance beyond accounting firms has the added

benefit of providing a much larger pool of assurance providers, which could potentially lower

compliance costs."[1291]  A few commenters stated that if non-accounting firms are eligible to

provide assurance services, then the Commission would need to ensure that there are appropriate

protections in place for investors.[1292]  A few commenters stated that the proposed rules'

---

[1288]  *See* letter from ABA; Beller *et al.*; Bureau Veritas; Ceres; CFA Institute; Chevron; Climate Risk Consortia; ERM; Futurepast; J. Herron; J. McClellan ("Practically, many accounting firms will seek to hire subject matter experts to build their own internal expertise so it makes sense to expand the universe of providers to include these experts."); LRQA; MFA; NAM; SKY Harbor; and TCS.

[1289]  *See, e.g.*, letters from ABA (limiting qualified attestation providers to only accounting firms "would constrict the supply and ignore the fact that other types of enterprises, such as engineering and consulting firms, have expertise in the measurement of GHG emissions and could conduct attestation engagements"); Bureau Veritas ("This creates an open, competitive market, and enables engineers, environmental scientists who have subject matter expertise in climate change and understand the specifics of GHG management to an expert level."); ERM CVS; and J. McClellan.

[1290]  *See* letter from J. Herron.

[1291]  *See* letter from ANSI NAB.  *See also* letter from Ceres (stating that non-accounting firms "are likely to charge less for their services than major accounting firms, and we support having competition").

[1292]  *See* letter from Amer. for Fin. Reform, Sunrise Project *et al.* ("Eligible attestation providers should not be limited to only PCAOB-registered audit firms, but the SEC will need to conduct enhanced monitoring and enforcement of the assurance, as the attesting entities will be neither inspected by the PCAOB nor subject to PCAOB standards and enforcement."); Center Amer. Progress (stating that non-accounting firms "should be subject to the internal controls or other guardrails that exist for financial auditors); and NASBA (recommending that the Commission develop regulations "to build the intellectual infrastructure, including independence requirements, quality management systems, and peer review inspections outside of the professional standards governing the public accounting profession").  *See also* letter from TCS ("The SEC should also permit attestation providers who are not registered public accounting firms to provide assurance of GHG emission disclosure, particularly for non-accelerated and smaller filers, so long as they can meet quality standards through certification or other means.").

references to accounting or audit-style requirements could favor accounting firms or make it difficult for non-accounting firms to meet the qualifications.[1293]

On the other hand, a few commenters stated that the Commission should require that the GHG emissions attestation provider be a public accounting firm registered with the PCAOB.[1294] One of these commenters stated that requiring a GHG emissions attestation provider to be a PCAOB-registered public accounting firm "will enhance the reliability of the [GHG emissions] disclosures themselves, thus promoting confidence in the disclosures among investors."[1295] Another commenter explained that PCAOB-registered public accounting firms "already have a framework to adhere to professional obligations related to objectivity and due process, and to the independence rules," which would negate "the burden for registrants to research and provide various information related to attestation service providers" required by the proposed rules.[1296]

Some commenters agreed with the proposal that significant experience means having sufficient competence and capabilities necessary to (a) perform engagements in accordance with professional standards and applicable legal and regulatory requirements and (b) enable the

---

[1293] *See, e.g.*, letters from AFPM (stating that although the proposed rules "ostensibly allow expert providers that are not auditors to provide assurance, imposing audit style assurance requirements will render the approach taken by many non-auditor consultants inadequate, leaving few firms that are qualified to provide this assurance"); and Airlines for America ("While the SEC appears to have intended to allow the use of, for example, qualified environmental engineering firms that have traditionally provided GHG emissions verification, the repeated references to accounting standards throughout the proposed rules seem to strongly favor accounting firms.").

[1294] *See, e.g.*, letters from Better Markets (noting that the goals of the proposal would be served by requiring that providers be PCAOB-regulated entities because those firms are subject to oversight and inspection whereas other types of third-party verifiers are not); Mazars; and PRI. *See also* letter from NASBA ("We believe that permitting non-CPAs who are not subject to the standards that result from such due process procedures to provide attestation services is not the public interest."); and RSM US LLP ("We believe assurance over climate-related reporting when performed by a public company auditor would offer increased investor protection compared with other forms of third-party assurance or verification.").

[1295] *See* letter from Better Markets.

[1296] *See* letter from Mazars.

Appellate Case: 24-1628     Page: 314     Date Filed: 03/26/2024 Entry ID: 5377362

service provider to issue reports that are appropriate under the circumstances.[1297] One commenter recommended that the Commission require a minimum of three years of experience in GHG emissions attestation or assurance for the person or organization signing the assurance statement.[1298] Conversely, some commenters stated that the Commission should not prescribe a number of years of experience that would be required to qualify as a GHG emissions attestation provider.[1299]

Some commenters stated that the proposed rules were not clear about the qualifications required for a GHG emissions attestation provider[1300] or that the Commission should provide additional guidance.[1301] One commenter stated that registrants "would face significant challenges and risks in connection with making determinations as to the qualification of attestation providers."[1302] Several commenters raised concerns about the supply and availability

---

[1297] *See, e.g.*, letters from CFA Institute; Crowe; and GGMI (recommending that the Commission further clarify that by "experience" it means that "experts have the proper technical knowledge and competencies in STEM fields related to the sources and sinks of GHG emission and removals being quantified.").

[1298] *See* letter from ERM CVS.

[1299] *See, e.g.*, letters from C2ES ("Prescribing a number of years of experience may limit new businesses who have employees with long term experience, therefore we do not recommend instead requiring a specified number of years of experience."); CFA Institute; and Futurepast.

[1300] *See, e.g.*, letters from AEPC; APCIA; CEMEX ("We believe that in order to accurately comply with the proposed expertise requirements, additional guidance is needed. As done before with the recently implemented S-K 1300 where it specified the prescriptive requirements to be a 'qualified person' and provide insight to the registrant, something similar would suffice to ensure the experts that provide services to the registrant meet the necessary criteria and thus ensure a comparable and accurate GHG attestation amongst registrants."); and INGAA.

[1301] *See, e.g.*, letters from Praxis, *et al.* ("In addition, the SEC should provide guidance on standards for third-party verifiers who are not accredited with the Public Company Accounting Oversight Board); S. Sills (same); and Veris Wealth (same).

[1302] *See* letter from Sullivan Cromwell.

of experienced and qualified GHG emissions attestation providers to meet the deadlines included in the proposed rules.[1303]

In the Proposing Release, the Commission asked if it should specify that a GHG emissions attestation provider meets the expertise requirements if it is a member in good standing of a specified accreditation body that provides oversight to service providers that apply attestation standards, and if so, which accreditation body or bodies it should consider.[1304] A few commenters stated that the Commission should require the use of GHG emissions attestation providers that are accredited to ISO 14065[1305] or require that the GHG emissions attestation provider be able to demonstrate expertise in ISO 14064-3.[1306] One commenter stated the Commission should include all firms that are accredited for independent certification and assurance work by one of the members of the International Accreditation Forum (IAF), as well as accounting firms that are members of the AICPA or other professional accounting organizations, and that either have significant experience in GHG emissions and their attestation or are able to supervise an appropriately qualified Auditor-Engaged Specialist.[1307] Another commenter stated that registrants should be required to "engage a verifier accredited by a

---

[1303]    *See, e.g.*, letters from Financial Services Forum; Jones Day ("It is also not clear that there will be a sufficient number of qualified firms to provide these services for companies to comply with the attestation requirements."); SouthState ("Further, the number of experienced personnel to oversee, execute, or otherwise be considered an 'expert' in climate-related financial risk management is currently (and likely for the foreseeable future) very low."); and Sullivan Cromwell ("Although an industry of qualified third-party providers likely would develop, the current lack of qualified attestation providers would prove challenging and costly for companies, especially smaller registrants, to adhere to the proposed attestation requirements, particularly given the short proposed implementation period.").

[1304]    *See* Proposing Release, section II.H.2.

[1305]    *See, e.g.*, letters from ANSI NAB; and LRQA.

[1306]    *See, e.g.*, letters from Anthesis Grp. (stating that the evaluation of attestation providers could "conform to ANSI ISO 14064-3" or an "accepted equivalent," which "will ensure appropriate rigor and consistency"); and ERM CVS.

[1307]    *See* letter from ERM CVS. *See also* letter from ANSI NAB (recommending that the Commission require a GHG emissions attestation provider to be "accredited to ISO 14065" or a signatory to the International Accreditation Forum's Multilateral Recognition Arrangement (IAF MLA)).

reputable organization, such as ANAB."[1308]  One commenter recommended that the Commission establish a process for "staff oversight of non-PCAOB-registered accounting firms,"[1309] while another commenter suggested that the PCAOB be directed to develop "a separate registration process for service providers specific to climate disclosures."[1310]  Finally, one commenter stated that "since there is no internationally recognized accreditation body to certify the qualifications of third-party attestation providers, issuers may not have sufficient clarity as to which third-party attestation providers have adequate qualifications under the proposed rule."[1311]

Some commenters recommended that the Commission specify additional qualifications for GHG emissions attestation providers.[1312]  For example, a few commenters recommended that the Commission include a requirement for a GHG emission attestation provider to have prior experience in providing assurance.[1313]  Another commenter stated that the Commission should require a GHG emissions attestation provider to "have familiarity with the specific industry of

---

[1308]    *See* letter from First Environment.  ANAB is the ANSI National Accreditation Board, which provides accreditation and training services to the certification body, validation and verification body, inspection and laboratory related communities.  *See* ANSI National Accreditation Board, About ANAB, available at https://anab.ansi.org/about-anab/.

[1309]    *See* letter from Ceres.  *See also* letter from Center. Amer. Progress ("We strongly recommend that the SEC work toward establishing oversight of these attestation providers in the near future.").

[1310]    *See* letter from J. McClellan.

[1311]    *See* letter from RILA.

[1312]    *See, e.g.*, letters from CAQ; CFA Institute (stating that the Commission should require a GHG emissions attestation provider to have the financial wherewithal to withstand any litigation that might ensue from their attestation services); Crowe (stating that the Commission should consider whether the audit committee should be tasked with selecting the independent GHG emissions attestation provider); ERM CVS (recommending that a GHG emissions attestation provider be able to demonstrate expertise in IAASB standards and that the final rules include requirements related to the appointment of an "Auditor-Engaged Specialist"); Ernst & Young LLP; IAA; PwC; and RSM.

[1313]    *See, e.g.*, letters from CAQ; and Ernst & Young LLP.  *See also* letters from PwC (recommending that the Commission more closely align the expertise requirement with that used by ISAE 3000, which, among other provisions, requires the engagement partner to have "competence in assurance skills and techniques developed through extensive training and practical application" and "sufficient competence in the underlying subject matter and its measurement or evaluation to accept responsibility for the assurance conclusion"); and RSM US LLP ("Understanding the requisite skills to perform attestation services would be important for instilling public trust in sustainability reporting.").

the registrant for which the attestation report is being provided," which the commenter stated "should enhance the attestation quality and provide greater transparency to investors and investment advisers without unduly burdening assurance providers."[1314]  One commenter stated that GHG emissions attestation providers should be required to demonstrate that they have policies and procedures in place to carry out the objectives of the proposed rules in an impartial, fair, and expert manner.[1315]  Finally, one commenter recommended that the Commission consider whether state licensure laws would preclude parties other than CPAs from performing attest services.[1316]

A number of commenters agreed with the proposed requirement for a GHG emissions attestation provider to be independent with respect to the registrant and any of its affiliates.[1317] One commenter stated that the proposed independence requirement "should help ensure that the attestation provider can exercise informed, objective, and impartial judgment."[1318]  Several commenters stated that the proposed independence requirement would enhance the reliability of the attestation report.[1319]  Another commenter stated that "[t]here is already a proliferation of

---

[1314]   *See* letter from IAA.

[1315]   *See* letter from Futurepast.  *See also* letter from CFA Institute (recommending that an GHG emissions attestation provider "have established policies and procedures designed to provide it with confidence that the personnel selected to provide the GHG attestation service have the qualifications necessary for fulfillment of the responsibilities that the GHG emissions attestation provider will be called on to assume, including the appropriate engagement of specialists").

[1316]   *See* letter from PwC.  *See also* letter from NASBA ("Virtually all of the State Boards do not allow non-CPAs to perform attestation services or issue reports under the professional standards governing the public accounting profession.").

[1317]   *See, e.g.*, letters from AGs of Cal. *et al.*; ANSI NAB; Anthesis Grp.; CFA; CFA Institute; CII; Crowe; ERM CVS; Futurepast; ICAEW; ICCR; ICI ("We view the proposed independence requirements as particularly important so as to ensure that the provider cannot concurrently consult or advise on emissions reduction strategy and provide assurance on the company's emissions."); LRQA; Morningstar; RSM US LLP; and TotalEnergies.

[1318]   *See* letter from CFA.

[1319]   *See, e.g.*, letters from CAQ; and RSM US LLP.

Appellate Case: 24-1628     Page: 318     Date Filed: 03/26/2024 Entry ID: 5377362

potentially and actually conflicted operators in this space" and that an independence requirement would "protect against further conflicts of interest" and provide investors with "better assurances of accuracy."[1320]

A few commenters stated that Rule 2-01 of Regulation S-X is an appropriate model for determining the independence of GHG emissions attestation providers,[1321] while another commenter stated that it supported all the proposed criteria for determining the independence of the GHG emissions attestation provider.[1322]  Alternatively, one commenter stated that the proposed rules do not explicitly require the GHG emissions attestation provider to "meet the stringent independence standards applicable to the financial statement auditor" and encouraged the Commission to require GHG emissions attestation providers to "meet the full complement of SEC independence requirements."[1323]  Other commenters stated that they supported the proposed definitions of "affiliates" and "attestation and professional engagement period."[1324]  One commenter stated that the definition of "attestation and professional engagement period" should be based on the definition of "audit and professional engagement period" in Rule 2-01.[1325]  One commenter recommended that the Commission consider the relationship between the GHG

<hr>

[1320]   *See* letter from AGs of Cal. *et al.*

[1321]   *See* letter from Amer. for Fin. Reform, Sunrise Project et al.; and RSM US LLP ("We believe SEC Regulation S-X Rule 2-01 is an appropriate model for determining the independence of the GHG emissions attestation provider as it addresses financial relationships, employment relationships, business relationships, services in which the provider acts as registrant management, and contingent fees, among other matters.").

[1322]   *See* letter from ERM CVS.

[1323]   *See* letter from PwC.

[1324]   *See, e.g.*, letters from ERM CVS; and Morningstar.

[1325]   *See* letter from RSM.

emission attestation engagement and the financial audit if the same firm undertakes both engagements.[1326]

Conversely, a few commenters stated that they did not support the proposed independence requirement.[1327] A number of commenters raised concerns that the proposed independence requirement would limit the available pool of providers.[1328] For example, some commenters stated that GHG emissions consultants that are already familiar with the processes of a particular registrant may not meet the independence requirement.[1329] Another commenter stated that companies that have been obtaining third-party verification of GHG emissions data have not necessarily been obtaining verification from a provider that would meet the proposed independence requirement.[1330] One commenter stated that the "shortage of qualified, independent third parties" would "further drive up cost and impair the efficiency and quality of assurance services."[1331] Some commenters noted that other Commission rules pertaining to

---

[1326] *See* letter from ERM CVS ("The fees for the [GHG emissions attestation engagement] may be small compared to the financial audit fees and therefore we believe, based on 25 years' experience, that there is sometimes the risk of influence from the financial audit team, especially if material errors have been found in the climate disclosure or GHG emission data, despite the professional codes of conduct and independence requirements.").

[1327] *See, e.g.*, letters from Barrick Gold; and CEMEX.

[1328] *See, e.g.*, letters from AEPC; Barrick Gold; Chamber; Climate Risk Consortia ("The scarcity of qualified attestation providers, coupled with the fact that any expert providing the attestation needs to be fully independent of the preparation of the disclosures (i.e., a consulting expert cannot be an attestation provider), may create significant challenges in finding even a qualified attestation provider, at least in the near term.)" INGAA; Jones Day; PLASTICS; and Soc. Corp. Gov.

[1329] *See, e.g.*, letters from AEPC ("At this point in time, there are a limited number of providers who would be available, and many of these same firms have been employed by registrants in their efforts to generate recommendations and techniques."); Chamber ("Consultants who are already familiar with the processes of a given company may not meet the independence requirements."); and SKY Harbor. *But see* letters from C2ES (stating that "under no circumstance" should the GHG emissions attestation provider "be involved in developing the emission inventory"); and WSP (same).

[1330] *See* letter from APCIA.

[1331] *See* letter from Soc. Corp. Gov.

315

qualified persons did not contain an independence requirement.[1332]  One commenter stated that the proposed independence requirement will place additional burdens on registrants given that they will need to perform procedures to assess the independence of attestation providers.[1333]

Some commenters recommended that the Commission consider alternatives to the proposed independence requirement.  Instead of the proposed independence requirement, one commenter suggested that the Commission allow a non-independent attestation provider to disclose that the provider is not independent to address any concerns investors or others may have about the relationship.[1334]  Another commenter stated that instead of requiring a GHG emissions attestation provider to be independent, the Commission should provide that "if the firm retained by the company is providing other services to the company (in addition to attestation services) in excess of $1 million (for example) during the last completed fiscal year, then the company must provide disclosure of the aggregate fees for the attestation services and for such additional other services provided to the company for such year."[1335]  One commenter stated that the proposed independence requirement was "overbroad" and recommended that the Commission permit qualified firms to provide services – at least to affiliates of the registrant – in

---

[1332]  *See, e.g.*, letters from Barrick Gold ("We note that Qualified Persons under the new mining rules under Regulation S-K 1300 are not required to be independent, and we do not believe that an independence requirement is necessary for this purpose."); and Soc. Corp. Gov. (noting that "disclosures regarding mineral resources and oil and gas reserves do not contain similar independence requirements").

[1333]  *See* letter from Soc. Corp. Gov. ("Registrants and public audit firms determine auditor independence based on well-established rules, regulations, and procedures, including those promulgated by the Public Company Accounting Oversight Board.  In light of the fact that there is no entity providing oversight of attestation providers for GHG emissions, this burden will fall squarely on issuers.").

[1334]  *See* letter from CEMEX.

[1335]  *See* letter from Jones Day (recommending the Commission adopt a requirement similar to Item 407(e)(3)(iii)(A) of Regulation S-K).

App.316

Appellate Case: 24-1628     Page: 321     Date Filed: 03/26/2024 Entry ID: 5377362

addition to their attestation services.[1336]  Another commenter stated that it would support a "slimmed down" version of Rule 2-01 for non-accountants and recommended particular criteria.[1337]

In the Proposing Release, the Commission explained that accountants are already required to comply with relevant quality control and management standards when providing audit and attest services under the PCAOB, AICPA, or IAASB standards, and those quality control and management standards would similarly apply to accountants providing GHG emissions attestation services pursuant to these standards.[1338]  The Commission included a request for comment asking if it should require a GHG emissions attestation provider that does not (or cannot) use the PCAOB, AICPA, or IAASB attestation standards to comply with additional minimum quality control requirements.[1339]  Some commenters recommended that the Commission require the GHG emissions attestation provider to be subject to additional minimum quality control requirements.[1340]  One commenter stated that such requirements "would foster more consistent quality in attestation reports under the proposed rules when a registrant selects a service provider that does not use PCAOB, AICPA, or IAASB attestation standards."[1341]  One

---

[1336]  *See* letter from IAA (noting its concern that the independence requirement would prohibit registrants from using firms "that may be the most qualified to provide such attestations" because those firms also provide other services to the registrant or their affiliates, such as audit or consulting services).

[1337]  *See* letter from ERM CVS (stating that because the requirements in Rule 2-01 of Regulation S-X are specifically designed for financial auditing, they may be excessive for non-accountants).

[1338]  *See* Proposing Release, section II.H.2.

[1339]  *See id.*

[1340]  *See, e.g.*, letters from CFA Institute; Crowe; ERM CVS (stating that all firms that are accredited by one of the members of the International Accreditation Forum (IAF) must have a fully functional quality control and management system and that many GHG emissions attestation engagements are already carried out in accordance with IAASB Standards (ISAE 3000/3410), which require an equivalent system of quality control and management); and PwC (recommending that the GHG emissions attestation provider be required to comply with additional minimum quality control requirements if the provider is not registered with the PCAOB or otherwise subject to independent oversight); and RSM.

[1341]  *See* letter from Crowe.

Appellate Case: 24-1628     Page: 322     Date Filed: 03/26/2024 Entry ID: 5377362

commenter stated that it believed the ISO standards create a sufficient basis for ensuring quality attestation engagements and therefore any attestation provider should be required to perform attestation engagements in accordance with these standards.[1342]

In the Proposing Release the Commission included a request for comment asking if it should amend 17 CFR 230.436 ("Rule 436") to provide that a report on GHG emissions at the limited assurance level by a GHG emissions attestation provider that has reviewed such information is not considered a part of a registration statement prepared or certified by such person within the meaning of sections 7 and 11 of the Securities Act.[1343] Several commenters generally expressed support for such an amendment so that GHG emissions attestation providers would not be subject to liability under section 11.[1344] A few of these commenters stated that the potential for liability under section 11 would or could deter or reduce the number of assurance providers available.[1345] On the other hand, a few commenters stated that the Commission should confirm that attestation reports are considered to be expertized material because firms acting as underwriters will be exposed to significant legal liability if Scope 1 and Scope 2 GHG emissions attestations are not considered to be expertized material for purposes of liability under section 11 of the Securities Act.[1346] One of these commenters further stated that "[f]or any period for which assurance is not required for GHG emissions attestation reports, the SEC should clarify that the reports will still be considered to be expertized material, to avoid inadvertently subjecting

---

[1342] *See* letter from LRQA.

[1343] *See* Proposing Release, section II.H.2.

[1344] *See, e.g.*, letters from Bureau Veritas (June 17, 2022); D. Hileman Consulting; ERM CVS; Ernst & Young; Futurepast; and WSP.

[1345] *See, e.g.*, letters from Apex; D. Hileman Consulting; ERM CVS; and WSP. *But see, e.g.*, letter from Futurepast ("Futurepast does not believe that the possibility of section 11 liability will deter qualified firms and persons from providing attestation services to registrants.").

[1346] *See, e.g.*, letters from BPI; and Financial Services Forum.

underwriters to heightened due diligence requirements during an interim period of disclosure implementation."[1347]

### c. Final Rules (Item 1506(b))

We are adopting the GHG emissions attestation provider requirements substantially as proposed.[1348] We continue to believe that the expertise requirements (Item 1506(b)(1)) are necessary to help ensure that the service provider preparing the attestation report has sufficient competence and capabilities necessary to execute the attestation engagement.[1349] Several commenters agreed with the proposal's expertise requirements and definition of significant experience.[1350] While some commenters urged the Commission to require a GHG emissions attestation provider to have a certain number of years of experience,[1351] other commenters stated that the Commission should not prescribe a minimum number of years.[1352] We do not think it is necessary to require a provider to have a certain number of years of experience because imposing such a requirement could result in a "check the box" mentality, and we believe that investors would be better served by registrants undertaking a more holistic consideration of a provider's qualifications in selecting a provider. Some commenters requested that the Commission provide additional guidance regarding the qualifications for a GHG emissions attestation provider;[1353]

---

[1347] *See* letter from BPI.

[1348] *See* 17 CFR 229.1506(b). To enhance clarity, we are making one minor change to the rule text. In the definition of "significant experience" in the final rules, we are substituting the proposed rule's reference to "professional standards" with a reference to "attestation standards" to make it clear that the standards being referenced in Item 1506(b)(1)(i) are the attestation standards that meet the requirements of Item 1506(a). *See* 17 CFR 229.1506(b)(1)(i).

[1349] *See* Proposing Release, section II.H.2.

[1350] *See supra* notes 1287 and 1297 and accompanying text.

[1351] *See supra* note 1298 and accompanying text.

[1352] *See supra* note 1299 and accompanying text.

[1353] *See supra* notes 1300 and 1301 and accompanying text.

Appellate Case: 24-1628     Page: 324     Date Filed: 03/26/2024 Entry ID: 5377362

however, these commenters generally did not identify any particular aspects of the expertise requirement that required clarification. Adopting a principles-based approach inherently involves some uncertainty, but we believe registrants would be better served by such flexibility than an approach that, for example, identifies a static list of qualified providers. Such an approach will provide a registrant with more leeway to select a GHG emissions attestation provider that has the experience that best fits the registrant's facts and circumstances, which could improve the quality of assurance provided thereby enhancing the reliability of GHG emissions disclosures.

In response to a question included in the Proposing Release, some commenters stated that the Commission should specify that a GHG emissions attestation provider meets the expertise requirements if it is a member in good standing of a specified accreditation body and identified particular bodies or approaches the Commission should consider.[1354] We have decided not to impose such a requirement at this time given the evolving nature of GHG emissions assurance and the possibility that new or different accreditation bodies may exist at the time when registrants subject to Item 1505 and Item 1506 are required to begin obtaining attestation reports. Several commenters recommended that the Commission specify additional qualifications for GHG emissions attestation providers,[1355] and while we considered each of these suggestions, we believe that the requirements we have included in the final rules will help ensure that GHG emissions attestation providers have sufficient competence and capabilities necessary to execute the attestation engagement.

---

[1354]    *See supra* notes 1305, 1307, and 1308 and accompanying text.

[1355]    *See supra* note 1312 and accompanying text.

While a number of commenters urged the Commission to require that a GHG emissions attestation provider be a public accounting firm registered with the PCAOB,[1356] we determined to retain the principles-based approach in the final rules because it will provide registrants with the flexibility to hire a non-accounting firm that may have relevant or specialized experience with respect to assuring GHG emissions disclosure while at the same time ensuring that a GHG emissions attestation provider has the requisite expertise to perform the engagement in accordance with professional standards. Although we agree there would be investor protection benefits to be gained by requiring a registrant to use a PCAOB-regulated entity that is subject to oversight and inspections (even though the PCAOB's inspection jurisdiction would not include engagements for the assurance of GHG emissions disclosure within its scope),[1357] we have balanced this against other considerations, such as the availability of GHG emissions providers and compliance costs, which could potentially be lower if a larger pool of assurance providers is available. Nevertheless, we agree with those commenters who stated that if the final rules permit non-PCAOB-registered accounting firms to provide attestation services, the Commission would need to ensure that there are appropriate protections in place for investors.[1358] The expertise, independence, and other requirements applicable to the GHG emissions attestation engagement under the final rules, such as the requirement for a provider to use attestation standards that are

---

[1356] *See supra* note 1294 and accompanying text.

[1357] The PCAOB's inspection jurisdiction is limited to audits of issuers, brokers, and dealers and would not include engagements for the assurance of GHG emissions disclosure within its scope. *See* 15 U.S.C. 7214 (setting forth the PCAOB's inspection jurisdiction). However, as discussed in greater detail below, inspection oversight programs can provide benefits, such as providing a check on a GHG emissions attestation provider's overall activities and driving improvements in the quality of services overall, even when an inspection oversight program does not include a GHG emissions attestation engagement within its scope.

[1358] *See supra* note 1292 and accompanying text.

established by a body or group that has followed due process procedures, are intended to serve precisely that function.

As with the proposed rules, the final rules apply the expertise requirement to the person or firm signing the GHG emissions attestation report.[1359]  If the service provider is a firm, we would expect it to have policies and procedures designed to provide it with reasonable assurance that the personnel selected to conduct the GHG emissions attestation engagement have significant experience with respect to both attestation engagements and GHG emissions.  As we explained in the Proposing Release, this would mean that the service provider has the qualifications necessary for fulfillment of the responsibilities that it would be called on to assume, including the appropriate engagement of specialists, if needed.[1360]  A few commenters supported a requirement for GHG emissions attestation providers to establish policies and procedures along these lines.[1361]  Although, as stated above, we expect firms to adopt policies and procedures related to the expertise of its personnel, we have determined not to include such a requirement in the final rules because we do not want to foreclose other possible means by which a firm may ensure that it and its relevant personnel meet the expertise requirements set forth in Item 1506(b).

As noted above, one commenter recommended that the Commission consider whether state licensure laws would preclude parties other than CPAs from performing attestation services.[1362]  It is our understanding that states typically require someone who holds itself out as

---

[1359]    *See* 17 CFR 229.1506(b).

[1360]    *See* Proposing Release, section II.H.2.

[1361]    *See supra* note 1315 and accompanying text.

[1362]    *See* letter from PwC.  *See also* letter from NASBA ("Virtually all of the State Boards do not allow non-CPAs to perform attestation services or issue reports under the professional standards governing the public accounting profession.").

Appellate Case: 24-1628     Page: 327     Date Filed: 03/26/2024 Entry ID: 5377362

a public accountant or as performing public accounting services to be licensed as a CPA.  In addition, non-CPAs are not able to use the AICPA or PCAOB attestation standards.[1363] However, these principles would not prevent a non-CPA from performing attestation services as long as it was neither holding itself out as a CPA nor using an attestation standard that, by its terms, is only available to CPAs.  In this regard, we note that the IAASB and ISO standards, two of the four standards we are explicitly permitting assurance providers to use under the final rules (as discussed in more detail below), are not restricted to CPAs, and we are not aware that any state laws are currently impacting the ability of non-CPA service providers to provide assurance over GHG emissions.

With respect to independence, we are adopting each of the independence requirements (Item 1506(b)(2)) as proposed.[1364]  These independence requirements are important because they help ensure that the attestation provider will perform the engagement in an objective and impartial manner.  A number of commenters agreed with the proposed requirement for a GHG emissions attestation provider to be independent with respect to the registrant and any of its affiliates and agreed that the independence requirement would enhance the reliability of the attestation report.[1365]  We continue to believe that, similar to how assurance provided by independent public accountants improves the reliability of financial statements and disclosures

---

[1363]    By their terms, AICPA and PCAOB attestation standards are only applicable in the context of engagements performed by certified public accountants.  *See, e.g.*, PCAOB AT section 101, Attest Engagements, available at https://pcaobus.org/oversight/standards/attestation-standards/details/AT101 (stating that "[t]his section applies to engagements . . . in which *a certified public accountant in the practice of public accounting* . . . is engaged to issue or does issue an examination, a review, or an agreed-upon procedures report on subject matter . . .") (emphasis added); AICPA SSAE No. 18, AT-C § 105.01 ("This section applies to engagements in which a *CPA in the practice of public accounting* is engaged to issue, or does issue, a practitioner's examination, review, or agreed-upon procedures report on subject matter or an assertion about subject matter (hereinafter referred to as an assertion) that is the responsibility of another party.") (emphasis added).

[1364]    *See* 17 CFR 229.1506(b)(2).

[1365]    *See supra* note 1317 and accompanying text.

and is a critical component of our capital markets, assurance of GHG emissions disclosure by independent service providers should also improve the reliability of such disclosure.[1366] Several commenters agreed with the Commission's proposed approach of modeling the independence requirement and relevant definitions on the Commission's qualifications for accountants under Rule 2-01 of Regulation S-X,[1367] and we continue to believe the approach is appropriate given our experience in administering Rule 2-01 in the context of financial statement audits. One commenter appeared to suggest that, under the proposed rules, GHG emissions attestation providers would not be subject to the same level of independence as financial statement auditors.[1368] Although the final rules do not set forth a non-exclusive specification of circumstances inconsistent with independence like Rule 2-01(c) does for financial statement auditors, the foundational principles underlying the independence requirements in Rule 2-01 and the final rules are the same,[1369] and we view the independence requirements in the two contexts as providing similar, if not equivalent, protections to investors. However, for the avoidance of any doubt, we are clarifying that registrants and GHG emissions attestation providers are only required to comply with the independence requirements included in Item 1506 and are not required to separately comply with the independence requirements included in Rule 2-01 with

---

[1366]  *See* Proposing Release, section II.H.2.

[1367]  *See supra* notes 1321 and 1324 and accompanying text.

[1368]  *See* letter from PwC.

[1369]  Namely, the final rules provide that a GHG emissions attestation provider is not independent if such attestation provider is not, or a reasonable investor with knowledge of all relevant facts and circumstances would conclude that such attestation provider is not, capable of exercising objective and impartial judgment on all issues encompassed within the attestation provider's engagement, which is modeled on Rule 2-01(b). *Compare* 17 CFR 229.1506(b)(2)(i) and 17 CFR 210.2-01(b). Also, the final rules model the factors the Commission will consider in determining whether a GHG emissions attestation provider is independent on the introductory text to Rule 2-01. *Compare* 17 CFR 229.1506(b)(2)(ii) and Introductory Text to Rule 2-01.

Appellate Case: 24-1628     Page: 329     Date Filed: 03/26/2024 Entry ID: 5377362

respect to the GHG emissions attestation engagement.[1370]  Along those lines, existing Commission guidance and staff interpretations regarding Rule 2-01 do not apply to the independence requirements in Item 1506; however, to the extent any such guidance or interpretation may apply to an issue that is similarly presented under Item 1506 (which is a possibility since Item 1506 is modeled on Rule 2-01), the guidance or interpretation would be a useful starting point for consideration, although not determinative.[1371]

We considered the concern raised by commenters that requiring a GHG emissions attestation provider to be independent would limit the available pool of providers and potentially increase costs.[1372]  However, we think these concerns are mitigated by the modifications in the final rules that provide registrants subject to the requirements with a multi-year transition period before they are required to obtain an attestation report.  The phased in compliance period will give registrants adequate time to find a provider that meets the independence requirements.  It will also give non-accountant attestation providers time to familiarize themselves with the independence requirements and adapt their business practices accordingly, which may help mitigate any adverse effects that the independence requirements could have on the available pool of providers.  For this reason, we do not think it is necessary, as suggested by some commenters, to adopt an alternative to the independence requirement to simply disclose the fees received.[1373]  Although requiring the disclosure of any fees, including non-attestation fees, received by the

---

[1370]  The final rules do not alter or amend Rule 2-01 or its current applicability in any way, which means, for example, there is no change to the requirement that registrants and their financial statement auditor comply with Rule 2-01 with respect to the financial statement audit.

[1371]  The staff of the Commission's Office of the Chief Accountant is available to consult with registrants or GHG emissions attestation providers regarding the independence requirements in the final rules.

[1372]  *See supra* notes 1327, 1328, and 1331 and accompanying text.

[1373]  *See supra* note 1335 and accompanying text.

Appellate Case: 24-1628     Page: 330     Date Filed: 03/26/2024 Entry ID: 5377362

GHG emissions attestation provider from the registrant would provide investors with important information for evaluating the objectivity of the attestation provider, such an alternative would not prohibit the GHG emissions attestation provider from performing the GHG emissions assurance services in circumstances where the provider was not independent from the registrant (as the final rules will do).  A few commenters stated that the proposed rules' references to accounting or audit-style requirements could favor accounting firms,[1374] and we acknowledge that some of the requirements in the final rules, such as the independence requirements, may be more familiar to accounting firms versus non-accounting firms.  However, we believe the principles-based approach in the final rules generally should be accessible for both accounting and non-accounting firms.  Moreover, the phased in compliance period should give non-accountant attestation providers time to familiarize themselves with the independence requirements and provide existing service providers with time to unwind any existing conflicts to their independence.

Some commenters suggested that the proposed independence requirement was problematic because it would seem to prohibit an expert or other third-party that has assisted a registrant in calculating or preparing its GHG emissions data from serving as the registrant's GHG emissions attestation provider.[1375]  We agree that it would be difficult for an expert that has assisted a registrant in calculating or preparing its GHG emissions data to meet the independence requirements because such an engagement would presumably place the attestation provider in the position of attesting to its own work and may create a mutual interest between the attestation provider and the registrant, two of the factors the final rules state the Commission will consider

---

[1374]    *See supra* note 1293 and accompanying text.

[1375]    *See supra* note 1329 and accompanying text.

in determining whether the GHG emissions provider is independent.[1376]  We think the conflict of interest presented by this circumstance is exactly the type of situation that the independence requirement is intended to prevent, and therefore we are not modifying the independence requirement in response to these commenters' concerns.  As a result, this could mean that a registrant that determines it is necessary to hire a third-party service provider to help it calculate or prepare its GHG emissions disclosure may have to pay a fee to both the third-party service provider and to its GHG emissions attestation provider.  However, the likelihood of this scenario is reduced by the multiyear phase in compliance period we are adopting, which provides registrants with sufficient time to develop the necessary processes and procedures to calculate their GHG emissions data before they are required to comply with the assurance requirements.  In addition, the exemption from the GHG emissions reporting and assurance requirements for SRCs and EGCs provides most newly public companies with time to develop any in-house expertise that may be necessary in case they no longer qualify for SRC or EGC status in the future and become subject to the final rules.

In response to the commenters that pointed out that the Commission did not adopt a requirement to retain an independent third party to prepare, or conduct a reserves audit of, a registrant's reserves estimates in the context of its mining and oil and gas disclosure rules,[1377] we note that the Commission's determination in each of its rulemakings about whether to require a registrant to retain an independent third-party is context specific.  For example, with respect to its mining disclosure rules, the Commission stated that it was not adopting a requirement for a

---

[1376]     *See* 17 CFR 229.1506(b)(2)(ii)(A).  Conversely, we generally expect that a registrant would be able to use its financial statement auditor as its GHG emissions attestation provider consistent with the independence requirement in the final rules.

[1377]     *See supra* note 1332 and accompanying text.

Appellate Case: 24-1628     Page: 332     Date Filed: 03/26/2024 Entry ID: 5377362

qualified person to be independent from the registrant because, among other things, the final rules require a registrant to disclose the qualified person's affiliated status with the registrant or another entity having an ownership or similar interest in the subject property, which is consistent with the Committee for Mineral Reserves International Reporting Standards' mining guidelines, to which the Commission was amending its mining rules to more closely align.[1378]  With respect to its oil and gas disclosure rules, the Commission pointed out that most commenters did not support a requirement to obtain an independent third-party assessment of reserves estimates because a company's internal staff is generally in a better position to prepare those estimates and there is a potential lack of qualified third party engineers and professionals available.[1379] However, the Commission did adopt a requirement for a registrant to provide a general discussion of the internal controls it uses to assure objectivity in the reserves estimation process and the disclosure of the qualifications of the technical person primarily responsible for preparing the reserves estimates.[1380]  In keeping with this context specific approach, with respect to assurance over GHG emissions disclosure, we believe that the benefits to investors from requiring a GHG emissions attestation provider to be independent in accordance with Item 1506 justify the potential costs for the reasons stated above.  Moreover,  there is currently a growing practice among some registrants of obtaining third-party assurance over their GHG emissions data.[1381]  Although generally the independence requirements in the assurance standards currently

---

[1378]    *See Modernization of Property Disclosures for Mining Registrants*, Release No. 33-10098 (June 16, 2016) [81 FR 41651, 41661 (June 27, 2016)]; *Modernization of Property Disclosures for Mining Registrants*, Release No. 33-10570 (Oct. 31, 2018) [83 FR 66344, 66363 (Dec. 26, 2018)].

[1379]    *See Modernization of Oil and Gas Reporting*, Release No. 8995 (Dec. 31, 2008) [74 FR 2157, 2175 (Jan. 14, 2009)].

[1380]    *See id.*

[1381]    *See supra* note 1232.

being used with respect to GHG emissions data are not as robust as the requirements in the final rules, many of these standards include requirements related to the objectivity and impartiality of the third-party assurance provider.[1382]  Therefore, the final rules' independence requirement is not inconsistent with the general practice in this space of retaining an objective and impartial third-party to provide assurance.[1383]

In addition, we are adopting the definition of "affiliate" as proposed and consistent with the feedback provided by commenters that addressed this issue.[1384]  Similarly, we are adopting the broad definition of "attestation and professional engagement period" as proposed, which is modeled on the definition of "audit and professional engagement period" in Rule 2-01.[1385]

As discussed in greater detail above, in response to a request for comment, some commenters recommended that the Commission require the GHG emissions attestation provider to be subject to additional minimum quality control requirements.[1386]  We have determined not to impose such requirements at this time; however, we reiterate the statement the Commission

---

[1382]   *See, e.g.*, AICPA SSAE No. 18, AT-C § 105.26; IAASB ISAE 3000 (Revised) § 20; and ISO 14064-3: 2019 § 4.2.  The independence requirements in the final rules are more rigorous and may differ in scope from the requirements included in these standards.  It is possible that the application of the independence requirements in the final rules may result in a GHG emissions attestation provider no longer being able to provide certain non-assurance services to its assurance client that may be permissible to provide outside the context of the final rules.

[1383]   The International Ethics Standards Board for Accountants (IESBA), which is an independent global ethics standard-setting board, has recently proposed ethics standards for sustainability assurance providers (i.e., professional accountants and other professionals performing sustainability assurance engagements), including robust independence standards.  IESBA stated that it "holds to the premise that sustainability assurance engagements . . . must be underpinned by the same high standards of ethical behavior and independence that apply to audits of financial information."  *See* IESBA, Explanatory Memorandum for Proposed International Ethics Standards for Sustainability Assurance (including International Independence Standards) (IESSA) and Other Revisions to the Code Relating to Sustainability Assurance and Reporting, available at https://ifacweb.blob.core.windows.net/publicfiles/2024-01/Proposed%20IESSA%20and%20Other%20Revisions%20to%20the%20Code%20Relating%20to%20Sustainability%20Assurance%20and%20Reporting%20-%20Explanatory%20Memorandum.pdf.

[1384]   *See supra* note 1324.

[1385]   *See* letter from RSM.

[1386]   *See supra* note 1340 and accompanying text.

made in the Proposing Release that accountants are already required to comply with relevant quality control and management standards when providing audit and attest services under PCAOB, AICPA, or IAASB standards, and those quality control and management standards would similarly apply to accountants providing GHG emissions attestation services pursuant to these standards.[1387]  The IAASB standards impose similar quality control requirements on non-accountants.[1388] In addition, one commenter stated that, for example, all firms that are accredited by one of the members of the IAF must have a quality control and management system.[1389]  As such, we believe that many of the more experienced non-accountant GHG emissions attestation providers are required to comply with quality control requirements.  More generally, we expect that any attestation standards that meet the requirements of the final rules would likely provide guidance on quality control for assurance providers.[1390]

Although the final rules do not include a requirement that a registrant's audit committee pre-approve the GHG emissions attestation services, nor was such a requirement proposed, it would be permissible under the final rules for a registrant to use the auditor of its financial

---

[1387]    *See* Proposing Release, section II.H.2.

[1388]    *See* IAASB ISAE 3000.3(b) (Revised) ("The practitioner who is performing the engagement is a member of a firm that is subject to [International Standard on Quality Control (ISQC) 1], or other professional requirements, or requirements in law or regulation, regarding the firm's responsibility for its system of quality control, that are at least as demanding as ISQC 1.").

[1389]    *See* letter from ERM CVS.  The International Accreditation Forum is a worldwide association of accreditation bodies and other bodies interested in conformity assessment in the fields of management systems, products, processes, services, personnel, validation and verification and other similar programs of conformity assessment.  *See* International Accreditation Forum, About IAF, available at https://iaf.nu/en/about/.  Its members include ANAB, the ANSI National Accreditation Board, which provides accreditation to greenhouse gas verification and validation providers that demonstrate competence to validate or verify statements in accordance with its accreditation requirements, including ISO 14065.

[1390]    The ISO standards, which are used by many non-accountant GHG emissions attestation providers as described in greater detail below, include two standards that can be used as a basis for requirements for attestation providers related to impartiality, competency, and communication, which are areas typically covered by quality control requirements.  *See* ISO 14065, General principles and requirements for bodies validating and verifying environmental information (2020); and ISO 14066, Environmental information – Competence requirements for teams validating and verifying environmental information (2023).

statements to perform the GHG emissions attestation engagement, assuming the final rules' requirements for assurance providers are met. To the extent that the registrant's auditor is engaged to provide an attestation report in connection with the registrant's GHG emissions, or with respect to any other climate-related disclosures, the auditor would be required to comply with applicable, existing pre-approval requirements.[1391] Even in circumstances where the GHG emissions attestation services are not subject to a pre-approval requirement, however, audit committees should consider what level of involvement would be appropriate for them to take with respect to the selection and retention of attestation providers for climate-related disclosures.

In addition, in response to commenters' feedback,[1392] we are amending Rule 436 to provide that a report by an attestation provider covering Scope 1 and/or Scope 2 emissions at a limited assurance level shall not be considered a part of the registration statement that is prepared or certified by an expert or person whose profession gives authority to the statements made within the meaning of sections 7 and 11 of the Securities Act.[1393] We determined to include this amendment, in part, because we agree with commenters that the potential for section 11 liability could deter or reduce the number of attestation providers willing to accept these engagements.[1394] However, we are limiting the exception to those GHG emissions attestation engagements performed at a limited assurance level to encourage GHG emissions attestation providers to perform such engagements. We think there could be reluctance on the part of a

---

[1391]   *See* 15 U.S.C. 78j-1(i). *See also supra* note 1280 (explaining that if the independent accountant who audits the registrant's consolidated financial statements is also engaged to perform the GHG emissions attestation for the same filing, the fees associated with the GHG emissions attestation engagement would be considered "Audit-Related Fees" for purposes of Item 9(e) of 17 CFR 240.14a-101, Item 14 of Form 10-K, Item 16C of Form 20-F, or any similar requirements).

[1392]   *See supra* note 1344 and accompanying text.

[1393]   *See* 17 CFR 230.436(i)(1).

[1394]   *See supra* note 1345 and accompanying text.

App.331

Appellate Case: 24-1628     Page: 336     Date Filed: 03/26/2024 Entry ID: 5377362

GHG emissions attestation provider to perform attestation engagements at the limited assurance level because of their potential liability under section 11, and that, alternatively, if GHG emissions attestation providers perform significantly expanded procedures, much closer to reasonable assurance, in order to meet potential liability concerns under section 11, substantial increased costs to issuers could result.[1395] The same considerations do not apply to reasonable assurance engagements, and we are therefore not providing a similar exception for those engagements.

The amendment to Rule 436 also states that a report covering Scope 3 emissions at a limited assurance level shall not be considered a part of the registration statement that is prepared or certified by an expert or person whose profession gives authority to the statements made within the meaning of sections 7 and 11 of the Securities Act.[1396] Although no registrants are required to disclose Scope 3 emissions or obtain an attestation report for Scope 3 emissions under the final rules, we have included Scope 3 emissions within the exception contained in Rule 436 in the event that a registrant voluntarily discloses its Scope 3 emissions. We believe it is appropriate to provide these accommodations to encourage registrants to obtain limited assurance over Scope 3 disclosure.

Although not subjecting providers of these reports to liability could affect their incentives, on balance we think that encouraging more providers to enter this market would

---

[1395] The Commission relied upon a similar rationale when it amended Rule 436 to provide that a report prepared or certified by an accountant within the meaning of sections 7 and 11 of the Securities Act shall not include a report by an independent accountant on a review of unaudited interim financial statements. *See Accountant Liability for Reports on Unaudited Interim Financial Information Under Securities Act of 1933*, Release No. 33-6173 (Jan. 8, 1980) [45 FR 1601, 1604 (Jan. 8, 1980)].

[1396] *See* 17 CFR 230.436(i)(1).

result in more competition, which would benefit investors.[1397]  We acknowledge the potential downsides of not subjecting the providers of these reports to liability; however, as noted above,[1398] these accommodations are consistent with the treatment of an accountant's report on unaudited interim financial statements included in a registration statement, which is also provided at the limited assurance level.  Therefore, in these particular circumstances, we believe it is appropriate to provide these accommodations.

One result of the amendments to Rule 436 is that a GHG emissions attestation provider that has performed an attestation engagement over GHG emissions at a limited assurance level is not required to submit a consent in connection with the registration statement under section 7 of the Securities Act.[1399]  However, we think it is nonetheless important that a GHG emissions attestation provider have some awareness about whether its attestation report is included in a

---

[1397]    In situations where GHG emissions attestation providers are experts, the amendments to Rule 436 will eliminate the potential for section 11 liability for those providers with respect to attestation reports at the limited assurance level.  This could reduce the incentives for GHG emissions attestation providers to perform a thorough analysis and ensure that their attestation report, which is required to be included in a registration statement with GHG emissions disclosures to which the assurance services relate, is true and that there was no omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading.  We remind registrants and providers, however, that there are other remedies available to shareholders and/or the Commission, such as section 10(b) of the Exchange Act and Rule 10b-5 thereunder and section 17(a) of the Securities Act, which are not affected by the amendments to Rule 436.

[1398]    *See supra* note 1395.

[1399]    *See* 15 U.S.C. 77g.  The amendments to Rule 436 provide that a report by a GHG emissions attestation provider covering Scope 1, Scope 2, and/or Scope 3 emissions at a limited assurance level shall not be considered part of the registration statement prepared or certified by an expert or person whose profession gives authority to the statements made, and therefore the requirement in section 7 of the Securities Act that written consent is required from "any person whose profession gives authority to a statement made by him" that is "named as having prepared or certified a report . . . for use in connection with the registration statement" does not apply.

registration statement under the Securities Act.[1400]  Therefore, we are also amending Item 601 of Regulation S-K, which details the exhibits required to be included in Securities Act and Exchange Act filings, to require registrants to file as an exhibit to certain registration statements under the Securities Act or reports on Form 10-K or 10-Q that are incorporated into these registration statements a letter from the attestation provider that acknowledges its awareness of the use in certain registration statements of any of its reports which are not subject to the consent requirement of section 7.[1401]  We are amending the Instructions as to Exhibits section of Form 20-F to include the same requirement for Form 20-F filers to the extent the Form 20-F is incorporated into a registration statement under the Securities Act.[1402]

We note that certain commenters urged the Commission to confirm that any attestation reports are expertized material, stating that otherwise underwriters may face heightened due diligence requirements in light of potential section 11 liability over GHG emission disclosures

---

[1400]  The Commission relied on this same rationale when it adopted an amendment requiring issuers to file as an exhibit to a registration statement a letter from the independent accountants that acknowledges its awareness of the use in a registration statement of any of its reports which are not subject to the consent requirement of section 7.  *See Accountant Liability for Reports on Unaudited Interim Financial Information Under Securities Act of 1933*, Release No. 33-6173 (Jan. 8, 1980) [45 FR 1601, 1604 (Jan. 8, 1980)]; *Amendments Regarding Exhibit Requirements*, Release No. 6230 (Sept. 5, 1980) [45 FR 58822, 58824 (Sept. 5, 1980)].

[1401]  *See* 17 CFR 229.601(b)(27).  This requirement is modeled on the requirement for an issuer to file as an exhibit to a registration statement a letter from the independent public accountant, which acknowledges their awareness that their report on unaudited interim financial information is being included in a registration statement.  *See* 17 CFR 229.601(b)(15); *Accountant Liability for Reports on Unaudited Interim Financial Information Under Securities Act of 1933*, Release No. 33-6173 (Jan. 8, 1980) [45 FR 1601, 1604 (Jan. 8, 1980)]; *Amendments Regarding Exhibit Requirements*, Release No. 6230 (Sept. 5, 1980) [45 FR 58822, 58824 (Sept. 5, 1980)].  Although the Commission did not solicit comment specifically on the requirement to provide an acknowledgement letter, the requirement follows from similar contexts noted above.  In addition, the associated burdens on issuers are less than the proposed consent requirement while retaining the benefit of providing notice to the assurance provider.  Further, to help facilitate registrants' compliance with the requirement to file the letter from the GHG emissions attestation provider as an exhibit, we have included an instruction to Item 1506 that directs registrants obtaining assurance at a limited assurance level to Item 601(b)(27) (as well as to paragraph 18 of Form 20-F's Instructions as to Exhibits, as discussed *infra* note 1402 and accompanying text).

[1402]  *See* Instructions as to Exhibits 18 of Form 20-F.  Where Form 20-F is used a registration statement under the Exchange Act, this exhibit would not be required.

App.334

Appellate Case: 24-1628     Page: 339     Date Filed: 03/26/2024 Entry ID: 5377362

included in a registration statement.[1403]  We also note, as discussed above, that certain commenters stated that deeming the information expertized may have the effect of deterring or reducing available assurance providers.[1404]  We believe the approach we have taken appropriately addresses these concerns by exempting the GHG emissions attestation providers that perform limited assurance engagements from section 11 liability and the consent requirements associated with expertized reports, and requiring consent with corresponding section 11 liability only when the heightened level of review associated with reasonable assurance makes it appropriate for the report to be expertized.  This bifurcated approach to reasonable versus limited assurance engagements is consistent with the current treatment of audited financial statements and unaudited (reviewed) interim financial statements.[1405]  While we recognize underwriters and other non-issuer defendants subject to potential liability under section 11 may face additional due diligence costs during the transition period or where limited assurance is required,[1406] we do not believe this is unduly burdensome compared to other climate-related information that will be required in a registration statement pursuant to the final rules that is not otherwise expertized.  Moreover, absent a mandatory limited assurance requirement in the final rules, a registrant would nonetheless be required to disclose its GHG emissions and underwriters and other defendants subject to potential liability under section 11 would be faced with the same potential liability and due diligence costs with respect to those

---

[1403]   *See supra* note 1346 and accompanying text.

[1404]   *See supra* note 1345 and accompanying text.

[1405]   *See infra* section II.I.5.c discussing an additional amendment to Rule 436 in the context of a registrant's statements pertaining to voluntary assurance received over GHG emissions disclosure.

[1406]   *Compare* 15 U.S.C. 77k(b)(3)(C) (providing underwriters and others with a defense for expertized material) *with* 15 U.S.C. 77k(b)(3)(A) (providing underwriters and others with a defense for non-expertized materials).

disclosures.[1407]  Finally, the other defenses to liability included in Securities Act section 11(b) remain available in accordance with the terms of that provision.[1408]

### 3.  GHG Emissions Attestation Engagement and Report Requirements (Item 1506(a)(2) and (c))

#### a.  Proposed Rules

The proposed rules would have required the attestation report required by proposed Item 1505(a) for AFs and LAFs to be included in the separately-captioned "Climate-Related Disclosure" section in the relevant filing and provided pursuant to standards that are publicly available at no cost and are established by a body or group that has followed due process procedures, including the broad distribution of the framework for public comment.[1409]  The Commission explained that the proposed requirement that the standards be established by a body or group that has followed due process procedures would be similar to the requirements for determining a suitable, recognized control framework for use in management's evaluation of an issuer's ICFR because in both cases a specific framework is not prescribed but minimum requirements for what constitutes a suitable framework are provided.[1410]  The Commission stated

---

[1407]  *See* 17 CFR 229.1505.

[1408]  *See* 15 U.S.C. 77k(b)(3)(A) (providing that "no person, other than the issuer, shall be liable as provided therein who shall sustain the burden of proof . . . as regards any part of the registrant statement not purporting to be made on the authority of an expert . . . he had, after reasonable investigation, reasonable ground to believe and did believe, at the time such part of the registration statement became effective, that the statements therein were true and that there was no omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading . . .").

[1409]  *See* Proposing Release, section II.H.3.

[1410]  *See id.* (citing 17 CFR240.13a-15(c) and 240.15d-15(c) (stating that the "framework on which management's evaluation of the issuer's internal control over financial reporting is based must be a suitable, recognized control framework that is established by a body or group that has followed due-process procedures, including the broad distribution of the framework for public comment")).

336

App.336

Appellate Case: 24-1628    Page: 341    Date Filed: 03/26/2024 Entry ID: 5377362

that this approach would help to ensure that the standards upon which the attestation engagement and report are based are the result of a transparent, public and reasoned process.[1411]

In the Proposing Release, the Commission stated that, for example, in its view, the attestation standards of the PCAOB,[1412] AICPA,[1413] and IAASB[1414] would meet the proposed due-process requirement, and all of these standards are publicly available at no cost to investors who desire to review them.[1415]  The Commission explained that by highlighting these standards, it did not mean to imply that other standards currently used in voluntary reporting would not be suitable for use under the proposed rules.[1416]  The Commission further stated it intended the proposal to set minimum standards while acknowledging the current voluntary practices of registrants.[1417]

The proposed rules would have required a GHG emissions attestation provider to follow the specific requirements regarding form and content of the reports set forth by the attestation standard (or standards) used by such attestation provider.[1418]  In addition, the proposed rules would have imposed minimum requirements for the GHG emissions attestation report to provide

---

[1411]    *See* Proposing Release, section II.H.3.

[1412]    *See* PCAOB AT section 101.

[1413]    *See* AICPA SSAE No. 18; SSAE No. 22, Review Engagements (limited assurance standard, effective for reports dated on or after June 15, 2022), available at https://us.aicpa.org/content/dam/aicpa/research/standards/auditattest/downloadabledocuments/ssae-22.pdf; and SSAE No. 21, Direct Examination Engagements (reasonable assurance standard, effective for reports dated on or after June 15, 2022 and will amend SSAE No. 18), available at https://us.aicpa.org/content/dam/aicpa/research/standards/auditattest/downloadabledocuments/ssae-21.pdf.

[1414]    *See* IAASB ISAE 3000 (Revised).  *See also* IAASB ISAE 3410, Assurance Engagements on Greenhouse Gas Statements, available at https://ifacweb.blob.core.windows.net/publicfiles/2023-10/IAASB-2022-Handbook-Volume-2.pdf.

[1415]    *See* Proposing Release, section II.H.3.

[1416]    *See id.*

[1417]    *See id.*

[1418]    *See id.*

some standardization and comparability of GHG emissions attestation reports.[1419] The Commission explained that the proposed minimum report requirements would provide investors with consistent and comparable information about the GHG emissions attestation engagement and report obtained by the registrant when the engagement is conducted by a GHG emissions attestation provider using an attestation standard that may be less widely used or that has less robust report requirements than more prevalent standards.[1420]

The proposed minimum attestation engagement and report requirements were primarily derived from the AICPA's attestation standards (e.g., SSAE No. 18), which are commonly used by accountants who currently provided GHG attestation engagement services as well as other non-GHG-related attestation engagement services and are largely similar to the report requirements under PCAOB AT-101 and IAASB ISAE 3410.[1421] The Commission explained that many of the proposed minimum attestation report requirements are also elements of an accountant's report when attesting to internal control over financial reporting, an accountant's report on audited financial statements (which is conducted at a reasonable assurance level), and a review report on interim financial statements (which is conducted at a limited assurance level).[1422]

### b. Comments

Several commenters agreed with the proposal to require that the attestation engagement and related attestation report be provided pursuant to standards that are publicly available at no cost to investors and are established by a body or group that has followed due process

---

[1419]    *See id.*

[1420]    *See id.*

[1421]    *See id.*

[1422]    *See id.*

procedures.[1423] One commenter stated that these proposed requirements would "help to protect investors who may rely on the attestation report by limiting the standards to those that have been sufficiently developed."[1424] Another commenter stated that these proposed requirements would "provide necessary transparency and opportunity for input from all stakeholders."[1425] One commenter stated that public availability of the standards "would be especially important for smaller investors and registrants."[1426]

Conversely, a few commenters disagreed with the proposal to require that the attestation engagement and related attestation report be provided pursuant to standards that are publicly available at no cost to investors and are established by a body or group that has followed due process procedures.[1427] One of these commenters stated it "strongly disagrees" with the proposal to require the use of standards that are publicly available at no cost because, in its view, such requirements would preclude the use of ISO 14064-3, a standard widely used for GHG verification, and therefore, would not serve the interests of investors.[1428]

---

[1423]   *See, e.g.*, letters from CAQ; CFA Institute; CII; Crowe; D. Hileman Consulting; ERM CVS; IECA; KPMG; Mazars (supporting the proposed requirements related to due process procedures); PwC ; RSM US LLP; and TCS.

[1424]   *See* letter from CAQ.

[1425]   *See* letter from KPMG.

[1426]   *See* letter from RSM US LLP.

[1427]   *See* letter from Futurepast; and USTAG TC207. *See also* letter from CalPERS (stating that it is not clear why the proposed rules focus on providing the information at no cost and noting that "[L]ike in other areas, chances are that a free public option would be made available and then a useable version would be made available at higher cost").

[1428]   *See* letter from Futurepast (stating that the National Technology Transfer Act of 1995 does not require the use of standards that are publicly available at no cost and explaining that the fees ISO charges for standards are designed to support the standards writing activity of the International Organization for Standardization).

Appellate Case: 24-1628    Page: 344    Date Filed: 03/26/2024 Entry ID: 5377362

Several commenters stated that they appreciated that the proposed rules were flexible or not overly prescriptive about the required attestation standards.[1429] However, some commenters stated it would be helpful to provide further guidance about which standards would meet the proposed requirements,[1430] or suggested that, absent a list of acceptable attestation standards, the proposed rules could hinder consistency and comparability.[1431]

A few commenters agreed with the Commission's statement in the Proposing Release that the attestation standards of the PCAOB, AICPA, and IAASB would meet the proposed due process requirements.[1432] In fact, some commenters recommended that the Commission consider requiring a GHG emissions attestation provider to use the standards established by the AICPA, IAASB, or PCAOB.[1433] One of these commenters stated that limiting the permissible standards in this way would "promote the quality and comparability" of the attestation

---

[1429] *See, e.g.*, letters from BPI; Chevron ("We support flexibility on acceptable attestation standards…"); IIB; and NAM ("We also appreciate that the proposed rule does not prescribe a particular attestation standard, choosing instead to 'recognize[] that more than one suitable attestation standard exists and that others may develop in the future.'").

[1430] *See, e.g.*, letter from BPI (recommending that the Commission provide a non-exclusive list of acceptable verification standards).

[1431] *See, e.g.*, letters from APCIA; and PLASTICS (stating that allowing the provider to "pick the attestation standard" could "add variability to costs and reporting methodology, thereby undermining the Proposed Rule's claimed goal of promoting consistency").

[1432] *See, e.g.*, letters from ERM CVS (agreeing with the Commission's statement but stating that the attestation standards of the PCAOB, AICPA, and IAASB are "generic auditing/assurance/attestation standards and may not always address the complexities of non-financial or GHG emissions assurance/attestation"); and PwC. *But see* letter from RILA (stating that it appreciated the proposed rules' flexibility, but applying PCAOB, AICPA, and IAASB attestation standards "prematurely will cause confusion and inconsistency, especially since it is still not clear what 'reasonable assurance' means under these standards with respect to GHG emissions disclosures").

[1433] *See* letter from CAQ (stating that the PCAOB's attestation standards would need to be updated if required for use by the Commission); and Mazars. *See also, e.g.*, letters from Deloitte & Touche (stating that the AICPA, IAASB, and PCAOB standards are well-established and would provide needed transparency to investors, but that it sees a risk of investor confusion beyond those standards); and KPMG (stating that if the Commission were to limit the requirements to the PCAOB; AICPA; and IAASB standards the other elements of the proposed rules, such as the minimum criteria for a report, could be removed).

Appellate Case: 24-1628     Page: 345     Date Filed: 03/26/2024 Entry ID: 5377362

provided.[1434]  Alternatively, one commenter recommended that the Commission require the use of attestation standards promulgated by the PCAOB because in general "investors would be best served if all verification was performed pursuant to the same standards."[1435]  Another commenter stated that the PCAOB "should begin preparing a separate standard based on the proposed rule."[1436]  One commenter stated that the Commission should consider requiring non-accountant service providers to use the IAASB attestation standards, which in its view would "potentially result in consistency across service providers, since accountants and non-accountants can both use those standards."[1437]  Another commenter stated that if the Commission permits the use of attestation standards other than those of the PCAOB, AICPA, or IAASB, the Commission could establish "a process to consider whether these standards are sufficient" and "provide transparency on the differences compared to the widely understood standards," which would protect the public interest.[1438]

---

[1434]  *See* letter from CAQ.

[1435]  *See* letter from CFA Institute.  Other commenters suggested that the PCAOB may need to update its attestation standards.  *See, e.g.*, letters from Crowe (stating that the standard setters for the AICPA and IAASB attestation standards have issued standards or guidance on sustainability information, including GHG emissions information, while the PCAOB standards do not explicitly address these topics); and RSM US LLP (stating that if "the Commission determines that attestation engagements related to GHG emissions should be conducted in accordance with PCAOB standards, we believe the PCAOB may deem it appropriate to update its attestation standards.").

[1436]  *See* letter from Amer. for Fin. Reform, Sunrise Project *et al.*

[1437]  *See* letter from Crowe.

[1438]  *See* letter from KPMG.

Several commenters stated that the Commission should require[1439] or permit[1440] attestation over GHG emissions disclosure be performed in accordance with standards promulgated by the ISO.[1441] Several commenters stated that ISO 14064-3 is widely or commonly used by attestation providers.[1442] For example, one commenter stated that the "International Civil Aviation Organization, a United Nations body, requires verification bodies to meet the requirements of ISO 14065 and perform verifications in accordance with ISO 14064-3" and also recognizes "ISO 14066 as the appropriate standard for assessing the competence of greenhouse gas validation teams and verification teams."[1443] Another commenter stated that ISO 14064-3 is either a "required" or "acceptable" method for "verification by all of the major voluntary and regulatory reporting schemes (CDP, The Climate Registry and regional regulatory programs in California, Washington State, Oregon, and Canadian Provinces)."[1444]

In addition, another commenter stated that ISO standards "have been subjected to a rigorous development and approval process and have been accepted internationally as the basis

---

[1439] *See* letters from ANSI NAB ("ANAB believes that ISO standards, including ISO 14064-3, ISO 14065, and ISO 14066 form the basis for quality auditing of GHG emissions and environmental information, and that attestation bodies should be required to perform attestation engagements in accordance with these requirements."); Futurepast (stating that attestation bodies that are not public accounting firms should be required to perform attestation engagements in accordance with ISO standards); and LRQA.

[1440] *See, e.g.*, letters from AIA; Anthesis Grp.; CCR (stating that "precluding the use of ISO 14064-3 under the proposed rules would require a significant population of registrants to reevaluate and potentially change service providers, reducing efficiencies gained through prior attestation and narrowing the field of service providers qualified to issue an acceptable attestation report under the proposed rules"); Chevron; Eni Spa; ERM CVS; First Environment; ISO; ISO Comm. GHG; NAM; SCS Global Services; S. Robinson (5-3-22) (stating that "nearly two thirds of GHG reporting firms and approximately one third of all S&P 500 firms already report and receive external attestation using ISO");.and USTAG TC207. *See also* letter from Bureau Veritas (recommending that "validation and verification bodies" be accredited to "ISO 17029").

[1441] The ISO is an independent, non-governmental international organization with a membership of 169 national standards bodies. *See* ISO, About us, available at https://www.iso.org/about-us.html.

[1442] *See, e.g.*, letters from Chevron (stating its view that ISO 14064-3 is the "most predominantly used in the United States"); NAM; and US TAG TC207.

[1443] *See* letter from Futurepast (noting that Futurepast's president "helped write" the ISO standards "as a U.S. Expert to ISO Technical Committee 207").

[1444] *See* letter from SCS Global Services.

for . . . [the] conduct of attestation engagements for nearly two decades."[1445]  Relatedly, one commenter stated that it believed ISO 14064-3 would meet the proposed due process and public availability requirements.[1446]  Further, another commenter stated that it believes ISO standards 14064-3, 14065, and 14066 "address required expertise, independence, and quality control at least as well if not better than" the IAASB's ISAE 3000, ISAE 3410, and ISRS 4400.[1447] Another commenter that supported the proposed requirement related to the public availability of standards noted that ISO standards "are not free" and suggested that "some agreement needs to be reached regarding access by investors to ISO 14064-3, if this standard is used by the attestation provider."[1448]  On the other hand, one of the commenters that did not support the proposed requirement for the attestation standards to be publicly available at no cost to investors explained that the fees ISO charges for standards are designed to support its standards writing activity and that it "does not have any other agenda than the publication of high quality, consensus-based standards."[1449]  Another commenter stated that "[a]lthough ISO standards must

---

[1445]    *See* letter from US TAG TC207 (stating that the ISO Technical Committee 207, which is responsible for the development, review, and revision of ISO environmental and climate change standards, includes 120 member countries, each represented by its national standards body, and includes liaisons with 32 organizations that monitor the committee's standards development activities and can provide input during standards development, including, among others, the European Commission, International Chamber of Commerce, and World Trade Organization).

[1446]    *See* letter from NAM.  *See also* letter from D. Hileman (stating that the Commission should require that attestation or verification reports be provided pursuant to standards publicly available and established by groups that have followed "due process for broad stakeholder process" and that "[d]evelopment of ISO standards follows a similar trajectory").

[1447]    *See* letter from Futurepast.  *See also* letter from ANSI NAB (stating that it supports the proposed requirement for attestation providers to be independent, which is supported by accreditation requirements such as those set forth in ISO 14065).

[1448]    *See* letter from ERM CVS.

[1449]    *See* letter from Futurepast.

343

be purchased for a fee, we believe that the nominal fee required to obtain ISO 14064-3 would not be a serious obstacle to investors who desire to review the standard."[1450]

A few commenters mentioned other potential attestation standards for the Commission's consideration. One commenter recommended that the Commission consider the CDP's criteria for third party verification standards[1451] and another commenter stated that the final rules should permit the use of "the standards accepted by the CDP so as to avoid inadvertently excluding qualified providers.[1452] In response to a request for comment included in the Proposing Release, one commenter stated that it did not believe that AccountAbility's AA1000 Series of Standards would meet the proposed requirements because, among other reasons, it does not believe AccountAbility's process for developing and publishing standards would meet the proposed due process requirements.[1453] However, another commenter stated that the final rules should be inclusive of AccountAbility's AA1000 Series of Standards.[1454]

Several commenters agreed that the Commission should require the GHG emission attestation report to meet certain minimum requirements in addition to any form and content requirements set forth by the attestation standard or standards used, as proposed.[1455] One commenter stated that the proposed minimum attestation report requirements are "similar to the

---

[1450]  *See* letter from CCR.

[1451]  *See* letter from 3Degree.

[1452]  *See* letter from Climate Risk Consortia.

[1453]  *See* letter from ERM CVS (additionally stating that, under AA1000, the disclosure of data for individual metrics such as GHG emissions cannot be assured separately from assurance on the implementation and application of AA1000APS, which pertains to sustainability management, and that it does not believe that many Commission registrants would be willing to disclose compliance with AA1000APS and obtain assurance over all of these disclosures).

[1454]  *See* letter from Climate Risk Consortia.

[1455]  *See, e.g.*, letters from CAQ (stating that the proposed minimum requirements for the attestation report "will provide investors with increased trust and confidence in the GHG emissions data"); CFA Institute; Crowe; and RSM US LLP.

requirements of an independent auditor's report, which is well-understood by the investment community."[1456]  Another commenter stated that the proposed minimum requirements for the attestation report are particularly important if standards beyond those of the AICPA, IAASB, and PCAOB are permitted.[1457]  One commenter stated that the Commission should also require a description of the role of internal audit in the underlying GHG emissions data and whether or how the GHG emissions attestation provider relied on internal audit's work in the minimum report requirements.[1458]

On the other hand, a few commenters recommended against requiring additional minimum requirements for attestation reports.[1459]  One of these commenters stated that the report requirements from the attestation standard used should be sufficient.[1460]  Another commenter recommended that the Commission clarify whether a report that states the GHG emissions attestation provider is disclaiming an opinion on the GHG emissions would satisfy the requirements of Regulation S-K.[1461]

Regarding the proposed provision requiring the identification of the criteria against which the subject matter was measured or evaluated, a few commenters agreed that reference to

---

[1456]     *See* letter from CFA Institute.

[1457]     *See* letter from CAQ.

[1458]     *See* letter from D. Hileman Consulting.

[1459]     *See, e.g.*, letters from C2ES; and ERM CVS (stating that it believes it would be difficult to prescribe minimum contents that would be applicable under all standards used but welcoming the Commission to provide additional guidance on the contents of the attestation report, such as the importance of a description of the work undertaken).

[1460]     *See* letter from C2ES (stating that in "common practice, the attestation reports deliver a statement explaining the items reviewed, findings, a list of the metrics as verified and statement of independence," which "is sufficient").

[1461]     *See* letter from Grant Thornton (drawing a comparison to Article 2 of Regulation S-X, which requires "the clear expression of an opinion on the financial statements" and stating that a "report that states that the auditor is disclaiming an opinion on the financial statements for any reason does not satisfy the requirements of Regulation S-X.").

proposed Item 1504 would meet the "suitable criteria" requirement under the prevailing attestation standard.[1462]  One commenter stated that, in addition to referencing proposed Item 1504, the attestation report should refer to "the (publicly available) standard used by the registrant to determine the emissions."[1463]

In the Proposing Release, the Commission included a request for comment asking if it requires or permits a registrant to use the GHG Protocol as the methodology for determining GHG emissions, would the provisions of the GHG Protocol qualify as "suitable criteria" against which the Scope 1 and Scope 2 emissions disclosure should be evaluated.[1464]  A number of commenters agreed that if the Commission required or permitted a registrant to use the GHG Protocol as the methodology for determining GHG emissions, the provisions of the GHG protocol would qualify as "suitable criteria."[1465]  On the other hand, one commenter stated that "the reporting standards are not fully developed enough to establish criteria for reliability measuring GHG emissions."[1466]

### c.  Final Rules

We are adopting the GHG emissions attestation engagement and report requirements with some modifications from the proposal.[1467]  Consistent with the proposed rules, the final rules (Item 1506(a)(2)) provide that the attestation report must be provided pursuant to standards that

---

[1462]   *See, e.g.*, letters from ERM CVS; Futurepast; and Mazars.

[1463]   *See* letter from ERM CVS.

[1464]   *See* Proposing Release, section II.H.3.

[1465]   *See* letter from Anthesis Grp.; CRS (stating that, in general, "the market-based methodology for Scope 2 accounting as found in 2015 GHG Protocol Scope 2 Guidance would qualify as suitable criteria against which Scope 2 emissions disclosure should be evaluated"); D. Hileman Consulting; ERM CVS; Futurepast; KPMG; Mazars; PwC; WBCSD; and WRI.

[1466]   *See* letter from Travelers.

[1467]   *See* 17 CFR 229.1506(a)(2), (c).

are established by a body or group that has followed due process procedures, including the broad distribution of the framework for public comment.[1468]  Most commenters who discussed this aspect of the proposal supported the proposed requirement related to due process procedures,[1469] and we continue to believe that requiring the attestation report to be provided pursuant to standards that are established by a body or group that has followed due process procedures would help to ensure that the standards upon which the attestation engagement and report are based are the result of a transparent, public, and reasoned process.[1470]  As the Commission stated in the Proposing Release, this requirement should also help to protect investors who may rely on the attestation report by limiting the standards to those that have been sufficiently developed.[1471]

The proposed rules also would have required the attestation standards to be publicly available at no cost.  We received feedback from some commenters indicating that including such a requirement in the final rules would preclude the use of certain standards that are currently widely used by GHG emissions attestation providers with respect to voluntary assurance over GHG emissions disclosures but that are not publicly available for free.[1472]  After consideration of this feedback, the final rules will require that the attestation report be provided pursuant to standards that, in addition to being developed using due process, are either (i) publicly available at no cost, or (ii) widely used for GHG emissions assurance.[1473]  In the Proposing Release, the Commission explained that open access is an important consideration

---

[1468]    *See* 17 CFR 229.1506(a)(2).

[1469]    *See supra* note 1423 and accompanying text.

[1470]    *See* Proposing Release, section II.H.3.

[1471]    *See id.*

[1472]    *See supra* note 1428 and accompanying text.

[1473]    *See* 17 CFR 229.1506(a)(2).

when determining the suitability of attestation standards because it enables investors to evaluate the report against the requirements of the attestation standard.[1474]  We continue to believe that open access is an important consideration for the reasons the Commission previously stated; however, we also recognize that the benefits provided by open access may also exist when a standard is widely used in the marketplace such that registrants, GHG emissions attestation providers, and investors have significant experience using, or evaluating disclosure assured pursuant to, that standard.  In addition, it is important to recognize the value that investors have found in the voluntary assurance services currently being provided with respect to climate and GHG emissions disclosures.  By making this modification to the final rules, we expect that many registrants and GHG emissions attestation providers will be able to continue to use assurance standards they are already using for their voluntary disclosures, assuming that those standards meet the due process requirement.[1475]  This approach will not only reduce the costs of complying with the final rules[1476] but will likely benefit investors by leveraging the experience that GHG emissions attestation providers already have with particular standards, which could lead to assurance engagements being performed with a greater level of skill initially than if GHG emissions attestation providers were required to gain expertise with an unfamiliar standard.

Several commenters agreed with the Commission's statement in the Proposing Release that the attestation standards of the PCAOB, AICPA, and IAASB would meet the proposed

---

[1474]    *See* Proposing Release, section II.H.3.

[1475]    Registrants and GHG emissions attestation providers would also need to meet the other requirements included in the final rules relating to the level and scope of the engagement and the expertise and independence of the provider, among other requirements.

[1476]    *See* letter from Futurepast (stating that one benefit of having non-accounting firm attestation providers provide assurance pursuant to ISO or IAASB ISAE standards is that it would "make available to registrants a much larger pool of potential service providers," which "will enhance competition and likely result in lower costs to registrants").

attestation standard requirements.[1477]  We continue to be of the view that the PCAOB, AICPA, and IAASB standards meet the due process requirements and are publicly available at no cost to investors.  In addition, in light of our modifications to the final rules, we also believe that the ISO standards related to the attestation of GHG emissions disclosures would meet these requirements.  We agree with those commenters that stated the process the ISO undertakes for the development of its standards is consistent with due process requirement included in the final rules.[1478]

The ISO TC 207/SC7 is the technical committee responsible for the development of ISO 14064-3 – Greenhouse gases – Part 3: Specification with guidance for the verification and validation of greenhouse gas statements.[1479]  The committee includes members from 120 countries, each represented by the country's national standards body, and the committee also liaises with 32 organizations who monitor standards development activities and can provide input during standards development.[1480]  Members organize consultations among stakeholders in

---

[1477]  *See supra* note 1432 and accompanying text.  The PCAOB has announced an ongoing project to evaluate its attestation standards for purposes of developing any potential recommendation to amend, consolidate or eliminate certain standards as appropriate.  *See* PCAOB, Attestation Standards Update (Updated Sept. 26, 2022), available at https://pcaobus.org/oversight/standards/standard-setting-research-projects/attestation-standards-update.  The AICPA included its attestation standards as an active project under consideration on its 2022-23 strategy work plan.  *See* AICPA, 2022-23 ASB strategy work plan, available at https://us.aicpa.org/content/dam/aicpa/research/standards/auditattest/asb/downloadabledocuments/2022-2023-asb-strategy-work-plan.pdf.

[1478]  *See supra* notes 1445 and 1446 and accompanying text.

[1479]  *See* ISO/TC 207/SC7, About us, available at https://committee.iso.org/home/tc207sc7.  More generally, the ISO is a non-governmental organization established in 1947 and based in Geneva, Switzerland.  Its mission is to promote the development of standardization and related activities in the world with a view to facilitating the international exchange of goods and services, and to developing cooperation in the spheres of intellectual, scientific, technological and economic activity.  *See* ANSI, U.S. Representation in ISO, available at https://www.ansi.org/iso/us-representation-in-iso/introduction.  ISO is composed of representatives from 170 national standards bodies.  *See* ISO, About us, available at https://www.iso.org/about-us.html.

[1480]  *See* letter from USTAG TC207.  The 32 organizations include the European Commission, International Accreditation Forum, International Chamber of Commerce, United Nations Conference on Trade and Development, World Health Organization, and World Trade Organization, among others.  *See id.*

349

their country to develop a national position on ISO standards.[1481]  The ISO member from the

United States is ANSI and it publishes on its website a listing of draft ISO standards that are

open to public comment.[1482]  Moreover, ISO follows a consensus process for approval of its

standards.[1483]  This multi-stakeholder process, which includes an opportunity for public

comment on proposed standards, is consistent with the reasoned and transparent process the

Commission described in the Proposing Release as being the foundation for standards that are

sufficiently developed.  This leads us to the conclusion that ISO standards align with the due

process requirement in the final rules.

      As commenters have noted, ISO standards are not available for free.  The ISO standards

are, however, widely used for GHG emissions assurance.  For example, a recent report

determined that for S&P 500 companies that voluntarily obtained assurance over their climate-

related disclosures, including in many cases GHG emissions disclosures, the most common

standard referenced by non-accounting firm GHG emission attestation providers was ISO 14064-

3.[1484]  Specifically, the report found that ISO standards were used in connection with 196 out of

a total 346 engagements.[1485]  This frequency of use aligns with the "widely used" criteria in the

final rules.

      It is important to note that by highlighting these standards, we do not mean to imply that

other standards, either those currently in existence, or those that may develop in the future,

would not be suitable for use under the final rules.  Commenters recommended a number of

---

1481    *See id.*

1482    *See* ANSI Standards Action, available at https://www.ansi.org/resource-center/standards-action.

1483    *See* ISO, Developing standards, available at https://www.iso.org/developing-standards.html.

1484    *See* CAQ, *S&P 500 and ESG Reporting* (Updated June 2023) (providing statistics for 2021).

1485    *See id.*

Appellate Case: 24-1628    Page: 355    Date Filed: 03/26/2024    Entry ID: 5377362

alternative approaches, such as providing a list of acceptable standards,[1486] or requiring the use

of a particular standard.[1487]  Although we considered these alternatives, we ultimately agreed

with those commenters who stated that the Commission should take a flexible approach to the

acceptable standards in recognition that more than one suitable standard exists, and others could

develop in the future.[1488]

The final rules (Item 1506(c)) require the form and content of the GHG emissions

attestation report to follow the requirements set forth by the attestation standard or standards

used, as proposed; however, in a shift from the proposal, the final rules do not prescribe

minimum report requirements.[1489]  The Commission explained in the Proposing Release that the

proposed minimum components were all common elements of current assurance reports,[1490] a

point that was affirmed in the feedback we received from commenters.[1491]  We continue to

expect that the attestation standards that meet the requirements of the final rules will generally

---

[1486]   *See supra* note 1430 and accompanying text.  *See also* letter from Climate Risk Consortia (recommending that the Commission permit the use of "the standards accepted by the CDP").

[1487]   *See supra* notes 1433, 1435, 1437, and 1439 and accompanying text.

[1488]   *See supra* note 1428 and accompanying text.  For example, in the Proposing Release, the Commission included a request for comment asking if AccountAbility's AA1000 Series of Standards would meet the proposed requirements for attestation standards.  We received one comment that stated the final rule should be written in a way that is inclusive of all standards, including AA1000, among others, but the commenter did not provide any substantive reasons why AA1000 would meet the proposed criteria.  *See* letter from Climate Risk Consortia.  Another commenter stated that the process for developing the AA1000 standard would not meet the proposed due process requirements.  *See* letter from ERM CVS.  Although the feedback we received from commenters was mixed, to the extent that the AA1000 standard meets the criteria in the final rule, registrants and GHG emissions attestation providers would not be precluded from using it in connection with complying with the final rules.  The staff of the Commission's Office of the Chief Accountant is available to consult with registrants about whether a particular standard meets the requirements in the final rules.

[1489]   *See* 17 CFR 229.1506(c).

[1490]   The Commission explained in the Proposing Release that it primarily derived the proposed requirements from the AICPA's attestation standard (e.g., SSAE No. 18), which are largely similar to the report requirements under PCAOB AT-101 and IAASB ISAE 3410.  *See* Proposing Release, section II.H.3.

[1491]   *See supra* note 279 and accompanying text.

Appellate Case: 24-1628     Page: 356     Date Filed: 03/26/2024  Entry ID: 5377362

include all of the elements that were proposed.[1492]  Therefore, the benefit of including the proposed minimum requirements would be marginal, at best, and could be viewed as redundant and adding unnecessary complexity and associated burdens to the final rules.  Instead, simply requiring the attestation report to follow the form and content requirements of the attestation standard or standards should provide investors with important information about the attestation engagement in a consistent and comparable manner.  Nevertheless, in light of this shift to a more principles-based approach, to the extent that a particular attestation standard does not include elements sufficiently similar to those commonly included in an assurance report, the GHG emissions attestation provider should consider including such information in its attestation report to facilitate investors' understanding of the nature and scope of the engagement.  Although some commenters suggested additional minimum requirements that could be included in the final rules,[1493] we decided against including any additional requirements for the same reason.

A few commenters asked the Commission to clarify the level of assurance that is required for historical periods in a registrant's filing.[1494]  We are therefore clarifying that the final rules apply on a prospective basis only with disclosure for historical periods phasing in over time.  Specifically, in the first year that an AF or LAF is required to provide an attestation report, such report is only required to cover the Scope 1 and/or Scope 2 emissions for its most recently completed fiscal year.  To the extent the AF or LAF disclosed Scope 1 and/or Scope 2 emissions for a historical period, it would not be required to obtain an assurance report covering such historical period in the first year of the attestation rule's applicability.  However, for each

---

[1492]  *See supra* note 1490.  *See also* ISO 14064-3, §§ 6.3.2 and 9.3.

[1493]  *See supra* note 1458 and accompanying text.

[1494]  *See, e.g.*, letters from Deloitte & Touche (requesting that the Commission clarify the level of assurance that is required for historical periods); and Grant Thornton (same).

subsequent fiscal year's annual report, the registrant will be required to provide an attestation report for an additional fiscal year until an attestation report is provided for the entire period covered by the registrant's GHG emissions disclosures. In circumstances where more than one GHG emissions provider may have provided an attestation report for the different fiscal years included in the filing, a GHG emissions attestation provider should be clear about its involvement with any historical information, including disclaiming any such involvement where applicable.[1495]

In response to a request for comment, a few commenters agreed that a reference to proposed Item 1504 would meet the "suitable criteria" requirement under the prevailing attestation standard and that the provisions of the GHG Protocol would qualify as "suitable criteria" against which Scope 1 and Scope 2 emissions disclosure should be evaluated.[1496] Consistent with the Proposing Release, we reiterate that prevailing attestation standards require the criteria against which the subject matter is measured or evaluated to be "suitable."[1497] Suitable criteria, when followed, will result in reasonably consistent measurement or evaluation of the registrant's disclosure that is within the scope of the engagement.[1498] Consistent with commenter feedback, Item 1505 of Regulation S-K will satisfy the suitable criteria requirements of the prevailing attestation standards because the proposed requirements set forth relevant,

---

[1495] This guidance parallels similar practices in the context of the financial statement audit. *See, e.g.*, PCAOB AS 3101, *The Auditor's Report on an Audit of Financial Statements When the Auditor Expresses an Unqualified Opinion*, paragraph 18h, available at https://pcaobus.org/oversight/standards/auditing-standards/details/AS3101.

[1496] *See supra* note 1462 and accompanying text.

[1497] *See* Proposing Release, section II.H.3.

[1498] Characteristics of suitable criteria include relevance, objectivity, measurability, and completeness. *See, e.g.*, AICPA SSAE No. 18, AT-C §105.A16 and A42; AICPA SSAE No. 21, AT-C §105.A16 and .A44. In addition to relevance and completeness, the characteristics of suitable criteria under IAASB ISAE 3000.A23 include reliability, neutrality and understandability. Therefore, despite the differences in the characteristics listed, the underlying concepts and objectives are consistent.

objective standards that call for measurable and complete disclosure of GHG emissions that would allow for a consistent evaluation of the registrant's disclosure.[1499]  In addition, in response to a question from a commenter,[1500] we are clarifying that a report that states the GHG emissions attestation provider is disclaiming an opinion on the GHG emissions would not constitute compliance by the AF or LAF with the requirement to obtain an attestation report over its Scope 1 and/or Scope 2 emissions under the final rules.

Consistent with the proposed rules, the final rules do not require a registrant to obtain an attestation report specifically covering the effectiveness of internal control over GHG emissions disclosure.[1501]  Such a report would not be required even when the GHG emissions attestation engagement is performed at a reasonable assurance level.  As explained in the Proposing Release, given the current evolving state of GHG emissions reporting and assurance, existing DCP obligations and the requirement that AFs and LAFs (initially) obtain at least limited assurance of such disclosure are appropriate first steps toward enhancing the reliability of GHG emissions disclosure.[1502]

As explained above in section II.H.3, in a modification from the proposal, the final rules will not require that GHG emissions disclosure be provided in a separately captioned "Climate-

---

[1499]    In addition, to the extent an AF or LAF chooses to disclose its Scope 1 and/or Scope 2 emissions pursuant to Item 1505 and leverages the GHG Protocol's methodologies, we agree with the commenters that stated the provisions of the GHG Protocol would qualify as "suitable criteria" against which the Scope 1 and/or Scope 2 emissions disclosure should be evaluated.  *See supra* note 1366 and accompanying text.

[1500]    *See* letter from Grant Thornton.

[1501]    *See* Proposing Release, section II.H.3.

[1502]    *See id.*  Under prevailing attestation standards for limited assurance engagements, the testing of and attestation over internal controls are not required.  *See, e.g.*, AICPA SSAE No. 22, AT-C § 210.A16.  With respect to reasonable assurance, while there are requirements under prevailing attestation standards to consider and obtain an understanding of internal controls, there is no required attestation of the effectiveness of internal controls such as that included in section 404(b) of the Sarbanes-Oxley Act of 2002 (Sarbanes-Oxley Act).  *See* 15 U.S.C. 7262(b) (requiring a registered public accounting firm that prepares or issues an audit report for certain issuers to attest to, and report on, the assessment made by the management of the issuer with respect to internal controls).

Related Disclosure" section in the relevant filing. Therefore, the final rules do not require a registrant to include an attestation report in such a section, although a registrant may choose to do so.

One commenter asked the Commission to clarify whether, to the extent the Commission permits the use of standards other than those developed by the PCAOB, AICPA, and IAASB, the Commission should clarify "whether all practitioners should be required to consider 'other information' in the same way as CPAs."[1503] The GHG emissions attestation provider must perform the engagement in accordance with the requirements included in the attestation standard being used. We are clarifying that, to the extent an attestation standard requires an attestation provider to consider 'other information,' then the provider would be required to comply with such a requirement to perform the engagement in accordance with the standard.

One commenter stated that, due to the proposed phase in for the assurance requirements, an LAF or AF may be required to obtain assurance over its GHG emissions disclosures, while its consolidated public subsidiaries are not (or not yet) subject to the same level of assurance.[1504] This commenter asked the Commission to consider clarifying whether the consolidated subsidiary is expected to obtain assurance based on the requirements of its parent entity or entities, and if not, how the assurance provider for the parent entity or entities would report the level of assurance provided over the individual components of the reporting entity.[1505] In response to the specific factual scenario raised by this commenter, we are clarifying that the consolidated information included in the parent company's Commission filing would need to

---

[1503] *See* letter from KPMG.

[1504] *See* letter from Grant Thornton.

[1505] *See id.*

comply with the final rules' requirements applicable to the parent company.  This means that a subsidiary's information that is part of the consolidated reporting of its parent company will need to be assured as part of the assurance over the parent company's consolidated reporting even if the consolidated subsidiary itself is not subject to assurance.  This is consistent with how the auditing standards over consolidated financial statements generally apply.

Along similar lines, another commenter stated that there might be instances where a subsidiary of a registrant has a separate attestation engagement performed over its GHG emissions data to meet local statutory or jurisdictional requirements and the subsidiary might choose an attestation provider at the local level that differs from the attestation provider retained to perform the assurance required under the Commission's rules.[1506]  This commenter stated, for example, if a subsidiary's attestation engagement was performed by an accounting firm provider that used AICPA standards, then AICPA attestation standards would allow the provider performing the assurance required under the Commission's rules to use the work of another practitioner; however, AICPA standards do not address the ability of an accounting firm provider to use the work of a non-accountant practitioner, particularly when the non-accountant uses different attestation standards.[1507]  Consistent with our response above, we are clarifying that the consolidated information included in the parent company's Commission filing would need to comply with the final rules' requirements applicable to the parent company.  As is the case with other new disclosure requirements, the Commission staff is available to answer practice questions as registrants begin applying the final rules.

---

[1506]    *See* letter from Crowe.

[1507]    *See id.*

### 4. Additional Disclosure by the Registrant (Item 1506(d))

#### a. Proposed Rules

In addition to the proposed minimum attestation report requirements described above, the proposed rules would have required disclosure of certain additional matters related to the attestation of a registrant's GHG emissions.[1508] With respect to the Scope 1 and Scope 2 emissions attestation required pursuant to proposed Item 1505(a) for AFs and LAFs, the proposed rules would have required the registrant to disclose in the filing, based on relevant information obtained from any GHG emissions attestation provider:

- Whether the attestation provider has a license from any licensing or accreditation body to provide assurance, and if so, the identity of the licensing or accreditation body, and whether the attestation provider is a member in good standing of that licensing or accreditation body;

- Whether the GHG emission attestation engagement is subject to any oversight inspection program, and if so, which program (or programs);[1509] and

- Whether the attestation provider is subject to record-keeping requirements with respect to the work performed for the GHG emissions attestation engagement and, if so, identify the record-keeping requirements and the duration of those requirements.[1510]

The Commission stated that these disclosures are not typically included in an attestation report and would not be included in the GHG emissions attestation report under the proposed

---

[1508] *See* Proposing Release, section II.H.4.

[1509] In the Proposing Release, the Commission stated that one example of an oversight program would be the AICPA peer review program, among others. *See id.*

[1510] *See id.*

App.357

Appellate Case: 24-1628    Page: 362    Date Filed: 03/26/2024 Entry ID: 5377362

rules.[1511] Instead, the registrant would be required to provide these disclosures in the separately captioned "Climate-Related Disclosure" section, where the GHG emissions disclosure would be provided pursuant to the proposed rules.[1512]

### b. Comments

A few commenters generally agreed that the Commission should require the proposed items of disclosure to be provided by the registrant in the filing that includes the attestation report (where the GHG emissions and other climate-related disclosures are presented), based on relevant information obtained from the GHG emissions attestation provider as proposed.[1513] Alternatively, several commenters stated that they supported such disclosure requirements when the GHG emissions attestation provider is not registered with the PCAOB.[1514] One of these commenters explained that when a registrant uses a PCAOB-registered accounting firm as its GHG emissions attestation provider it should not be required to make the proposed additional disclosures "[g]iven that a PCAOB-registered accounting firm is already complying with stringent requirements for things such as licensure, oversight, and record-keeping," which is "well understood by investors."[1515] On the other hand, one commenter stated that registrants should not be required to provide these additional items of disclosure because, in its view, these

---

[1511] *See id.*

[1512] *See id.*

[1513] *See* letters from Amer. for Fin. Reform, Sunrise Project *et al.*; and ICAEW.

[1514] *See, e.g.,* letters from CAQ; CFA Institute; Crowe ("If a registrant uses its financial statement auditor, who currently must meet the requirements in Article 2 of Reg. S-X, to also perform any required GHG emissions attestation, we recommend the SEC consider exempting those registrants from additional disclosures."); and PwC (stating that given the importance of licensing, oversight, and record-keeping requirements they should be added to the qualifications necessary to be a GHG emissions attestation provider).

[1515] *See* letter from CAQ.

Appellate Case: 24-1628      Page: 363      Date Filed: 03/26/2024 Entry ID: 5377362

are not "appropriate determinations to be made by registrants and instead believe that this disclosure, if retained, should be included in the attestation provider's report itself."[1516]

Some commenters stated they agreed with the proposed requirement for a registrant to disclose whether the GHG emissions attestation provider has a license from an accreditation body.[1517] One of these commenters explained that this information "would be helpful to investors as they could then rely on the licensing and accreditation bodies to vet the provider's expertise rather than needing to evaluate other related information."[1518] A few commenters stated that they disagreed with the proposed requirement for registrants to disclose whether the attestation provider has a license from any licensing or accreditation provider. One commenter explained that "[i]n the absence of a universal certification or credential, registrants will seemingly bear the risk and burden of making a determination regarding the qualifications of an appropriate provider and disclosing these qualifications, and many registrants may lack the expertise to make such a determination or disclosure."[1519] Similarly, another commenter stated that the "entity granting and monitoring professional practice for these credentials should bear the responsibility for making public disclosures" on these topics with the GHG emissions attestation provider providing "a citation to the granting entity's website."[1520] One commenter urged the Commission to "defer action" on this matter until after the rules have been implemented for a period of time.[1521]

---

[1516] *See* letter from ABA. *See also* letter from D. Hileman (stating that "none of the proposed requirements in this section should be born by the registrant").

[1517] *See, e.g.*, letters from ICAEW; ICI; Morningstar; and RSM.

[1518] *See* letter from RSM.

[1519] *See* letter from ABA.

[1520] *See* letter from D. Hileman.

[1521] *See* letter from Futurepast.

The Proposing Release included a request for comment asking if, in lieu of only requiring disclosure about whether the GHG emissions attestation provider has a license from an accreditation body, the Commission instead should require a GHG emissions attestation provider to be licensed to provide assurance by specified licensing or accreditation bodies, and if so, which bodies the Commission should specify.[1522] One commenter stated that "review by a licensed or accredited firm with minimum standards is essential for reliable GHG emissions reporting."[1523] Conversely, one commenter stated that the Commission should not require accreditation or require a GHG emissions attestation provider "to be a member in good standing of a particular body" because it could unintentionally disqualify an appropriate provider.[1524] Although the proposed rules would not have required a GHG emissions attestation provider to be licensed, one commenter asked the Commission to clarify "which existing licensing or accrediting bodies meet SEC standards" under the proposed rules.[1525]

Some commenters agreed that the Commission should require a registrant to disclose whether the GHG emissions attestation engagement is subject to any oversight inspection program, and if so, which program(s), as proposed.[1526] One commenter stated that this proposed requirement "would provide decision-useful information to investors."[1527] On the other hand,

---

[1522] *See* Proposing Release, section II.H.4.

[1523] *See* letter from Salesforce. *See also* letter from CFA Institute (stating that it supported requiring GHG emissions attestation providers to be members in good standing of a specified accreditation body that provides oversight to service providers that apply attestation standards).

[1524] *See* letter from Climate Risk Consortia.

[1525] *See* letter from IECA.

[1526] *See* letters from ICAEW; ICI; Morningstar; and PwC.

[1527] *See* letter from Morningstar. *See also* letter from PwC (stating that this information "would be beneficial to an investor in assessing the quality of the provider" but requesting that the Commission make the existence of an inspection oversight program a required qualification for a provider as opposed to an item subject only to disclosure).

one commenter disagreed with the proposed requirement and suggested instead the Commission require the attestation provider to publicly disclose on its website certain information such as the "qualifications and experience of its principals" and "errors and omissions insurance information," among other things.[1528]  Another commenter stated that such requirement is "only relevant if the Commission also specifies the particular standards under which the attestation engagement should be performed."[1529]  One commenter stated that such information "should be communicated by the attestation provider as part of their reporting, rather than being reported by the issuer, who may or may not be able to confirm the information (notwithstanding its responsibility to do so in all SEC filings)."[1530]  In addition, one commenter stated that the Commission should work toward establishing oversight over GHG emissions attestation providers in the near future,[1531] and other commenters asked the Commission to "clarify what regulatory environment applies to GHG attestation providers"[1532] or stated that it was not clear what any oversight inspection program would include.[1533]

A few commenters stated that they supported the proposed requirement for registrants to disclose whether the GHG emissions attestation provider is subject to record-keeping requirements for the engagement.[1534]  The Proposing Release included a request for comment asking if, in lieu of requiring disclosure about such matters, the Commission instead should

---

[1528]  *See* letter from Futurepast.

[1529]  *See* letter from RSM.

[1530]  *See* letter from NASBA.

[1531]  *See* letter from Center Amer. Progress.

[1532]  *See* letter from Grant Thornton.

[1533]  *See* letter from IECA.

[1534]  *See, e.g.*, letters from Amer. for Fin. Reform, Sunrise Project *et al.*; ICAEW; ICI; Grant Thornton; and RSM.

specify that the record-keeping requirements of a GHG emissions attestation provider must be of a certain minimum duration.[1535] One commenter stated it believed "the record-keeping requirement for the GHG attestation provider should extend to the duration of the securities law protections for investors."[1536]

One commenter recommended that the Commission include an additional element of disclosure and require registrants to disclose the terms that they negotiate with third-party verification firms to enable investors to evaluate the adequacy of third-party oversight.[1537]

In the Proposing Release, the Commission included a request for comment asking if it should include disclosure requirements when there is a change in, or disagreement with, the registrant's GHG emissions attestation provider that are similar to the disclosure requirements in Item 4.01 of Form 8-K and 17 CFR 229.304 ("Item 304 of Regulation S-K").[1538] A few commenters stated that they would support such a requirement.[1539] One commenter stated that the "level of detail" in Item 304 of Regulation S-K "is excessive for non-accountants," but indicated it would support a "slimmed down" version of this requirement.[1540]

---

[1535] *See* Proposing Release, section II.H.4.

[1536] *See* letter from Grant Thornton. *See also* letter from Third Coast (stating that the "proposed rule should explicitly support retention strategies that focus on validating the digital originality of these highly sensitive data sets when directly controlled by the registrant organization").

[1537] *See* letter from Amer. for Fin. Reform, Sunrise Project *et al.* (recommending this additional requirement "since the Commission did not propose to establish minimum standards for limited assurance engagements").

[1538] *See* Proposing Release, section II.H.2.

[1539] *See, e.g.*, letters from CII; PwC (recommending that the disclosures be modeled after the requirements of Item 304 of Regulation S-K); and RSM US LLP. *See also* letter from CFA Institute (stating that it would not object to a requirement to disclose a change in attestation provider).

[1540] *See* letter from ERM CVS (stating that it would particularly support a requirement to disclose the "most likely circumstances" for dismissal or disagreement between the registrant and the GHG emissions attestation provider and identifying examples).

App.362

Appellate Case: 24-1628    Page: 367    Date Filed: 03/26/2024 Entry ID: 5377362

### c. Final Rules

The Commission is adopting the requirement for registrants to disclose certain additional information related to the attestation of a registrant's GHG emissions with significant modifications from the proposal.[1541] To reduce the burdens on issuers that would have arisen under the proposed rules, and in response to certain commenter feedback described above, we are not adopting a requirement for registrants to disclose (1) whether the attestation provider has a license from any licensing or accreditation body to provide assurance; and (2) whether the attestation provider is subject to record-keeping requirements with respect to the work performed for the GHG emissions attestation engagement. However, consistent with the proposal, the final rules (Item 1506(d)) require registrants to disclose whether the GHG emission attestation engagement is subject to any oversight inspection program, subject to certain modifications.[1542] In addition, in a modification from the proposal, the final rules require registrants to disclose certain information when there is a change in, and disagreement with, the registrant's GHG emissions attestation provider as discussed in greater detail below.[1543]

The decision not to adopt a requirement for a registrant to disclose whether its GHG emissions attestation provider has a license from any licensing or accreditation body will eliminate the potential for confusion about when disclosure is required, thus reducing the burden associated with the final rules. Although the existence of a license for a GHG emissions attestation provider that is a certified public accountant is straightforward to determine because certified public accountants and their firms must be registered with state boards of

---

[1541]    *See* 17 CFR 229.1506(d).

[1542]    *See* 17 CFR 229.1506(d)(1).

[1543]    *See* 17 CFR 229.1506(d)(2).

App.363

Appellate Case: 24-1628      Page: 368      Date Filed: 03/26/2024 Entry ID: 5377362

accountancy,[1544] it may be more difficult for a registrant to determine if a non-accountant GHG emissions attestation provider holds a license. Furthermore, although accreditation and certification organizations exist for GHG emissions attestation providers that are not accountants,[1545] it may be difficult for registrants and even GHG emissions attestation providers themselves to determine whether the credential conferred by such organization constitutes a "license," or if it is some other type of accreditation or certification. Therefore, we agree with the commenter that pointed out the "absence of a universal certification or credential" likely would make it difficult for registrants to determine whether disclosure is required.[1546]

We decided not to require a registrant to disclose whether the attestation provider is subject to record-keeping requirements with respect to the work performed for the GHG emissions attestation engagement to reduce burdens on registrants. Upon further consideration, this proposed requirement would seem to have marginal benefit to investors making investment or voting decisions while adding complexity to issuer disclosures. Instead, the final rules focus the disclosure requirements on the more significant disclosure of the existence of an oversight inspection program.[1547]

The proposed rules would have required a registrant to disclose whether the GHG emissions attestation engagement is subject to any oversight inspection program, and if so, which

---

[1544] *See, e.g.*, National Association of State Boards of Accountancy, Getting a License, available at https://nasba.org/licensure/gettingacpalicense/ (explaining the licensure process for certified public accountants and accounting firms by state boards of accountancy).

[1545] *See, e.g.*, letter from ANSI NAB (describing itself as the "only peer recognized accreditation body operating an accreditation program for oversight of greenhouse gas (GHG) validation and verification bodies (attestation providers) in the United States").

[1546] *See* letter from ABA.

[1547] *See* 17 CFR 229.1506(d).

program (or programs).[1548]  We are adopting this requirement as proposed.[1549]  In response to commenters,[1550] we are clarifying, for purposes of the final rules, that we would consider a GHG emissions attestation engagement to be subject to an oversight inspection program if it is possible that the assurance services could be inspected pursuant to the oversight program, even if it is not certain that the services will be inspected in a particular inspection cycle.  An example of such an oversight inspection program is the AICPA's peer review program, which includes within its scope attestation engagements performed by a certified public accountant in accordance with AICPA standards.[1551]  Commenters did not offer any examples of oversight inspection programs that would include within their scope GHG emissions attestation engagements performed by *non-accountants*.  Even if no such programs currently exist, it is possible that they could develop in the future given the evolving nature of GHG emissions assurance practices.  Accordingly, we continue to believe that the existence of an oversight inspection program will help investors better understand the qualifications of the GHG emissions attestation provider, which in turn will help them determine whether the assurance services have enhanced the reliability of the GHG emissions disclosure.

In addition to requiring a registrant to disclose whether the GHG emissions attestation engagement is subject to any oversight inspection program as proposed, the final rules also require a registrant to disclose whether the GHG emissions attestation provider is subject to any

---

[1548]     *See* Proposing Release, section II.H.4.

[1549]     *See* 17 CFR 229.1506(d).

[1550]     *See supra* notes 1532 and 1533 and accompanying text.

[1551]     Under the AICPA Peer Review Program, firms that are members of the AICPA are required to have a peer review of their accounting and auditing practice once every three years in accordance with the AICPA Standards for Performing and Reporting on Peer Reviews. The peer review is conducted by an independent evaluator, known as a peer reviewer, who reviews a sample of the firm's work against the requirements of applicable professional standards in all material respects.  *See* Summary of AICPA Peer Review Program, available at https://us.aicpa.org/research/standards/peerreview/peer-review-summary.html.

oversight inspection program, and if so, which program (or programs).[1552]  To be clear, this

requirement is not limited to oversight inspection programs that include within their scope, or

require the inspection of, the GHG emissions attestation engagement.  Rather, the final rules

require the disclosure of "any" oversight inspection program that applies to the GHG emissions

attestation provider.[1553]  Therefore, a registrant must disclose any oversight inspection program

the GHG emissions attestation provider is subject to for any type of engagement (e.g., a financial

statement audit or other review).[1554]  This additional requirement will provide investors with a

better understanding of the qualifications of the GHG emissions attestation provider because

such oversight can provide a check on a provider's overall activities and drive improvements in

the quality of their services.[1555]

We considered whether to only require disclosure about the existence of oversight

inspections programs from registrants who engage GHG emission attestation providers that are

---

[1552]  *See* 17 CFR 229.1506(d).

[1553]  *See id.*

[1554]  Examples of such oversight inspection programs include the AICPA's peer review program or the PCAOB's inspection program.  The AICPA's peer review program and PCAOB's inspection program are two examples of types of oversight inspection programs that a GHG emissions attestation provider may be subject to generally; however, only the AICPA's peer review program would include within its scope the GHG emissions attestation engagement.  The PCAOB's inspection jurisdiction is limited to audits of issuers and registered brokers and dealers and does not include attestation engagements for GHG emissions disclosure within its scope.  *See* 15 U.S.C. 7214 (setting forth the PCAOB's inspection jurisdiction).  Consistent with our explanation above, commenters did not offer any examples of oversight inspection programs that apply to non-accountant GHG emissions attestation providers.

[1555]  For example, in the context of inspections of PCAOB-registered public accounting firms, academic literature suggests that engagement-specific PCAOB inspections may have spillover effects on non-inspected engagements.  *See*, *e.g*., Daniel Aobdia, The Impact of the PCAOB Individual Engagement Inspection Process—Preliminary Evidence, 93 (4) The Accounting Review 53-80 (2018) (concluding that "engagement-specific PCAOB inspections influence non-inspected engagements, with spillover effects detected at both partner and office levels" and that "the information communicated by the PCAOB to audit firms is applicable to non-inspected engagements"); Daniel Aobdia, The Economic Consequences of Audit Firms' Quality Control System Deficiencies, 66 (7) Management Science (July 2020) (concluding that "common issues identified in PCAOB inspections of individual engagements can be generalized to the entire firm, despite the PCAOB claiming its engagement selection process targets higher risk clients" and that "[PCAOB quality control] remediation also appears to positively influence audit quality").

Appellate Case: 24-1628     Page: 371     Date Filed: 03/26/2024 Entry ID: 5377362

not registered with the PCAOB, as suggested by some commenters.[1556]  However, we are concerned that requiring this disclosure only with respect to certain GHG emission attestation providers could result in confusion and believe that requiring registrants to provide such disclosure with respect to all GHG emissions attestation providers will enhance the consistency and comparability of disclosures.  Moreover, to the extent that a particular GHG emissions attestation provider is registered with the PCAOB, we would not expect it to be time consuming or difficult for a registrant to make this disclosure, which would presumably remain the same from year-to-year absent any changes to PCAOB rules.

We also considered whether to require such disclosure to be included in the attestation report as recommended by one commenter,[1557] instead of requiring the registrant to disclose this information in the filing that includes the attestation report as proposed.  We understand that whether the attestation provider is subject to any oversight inspection program is in the first instance known by the attestation provider rather than the registrant, and therefore it may seem reasonable to require the attestation provider to make the disclosure rather than the registrant.  However, we do not expect it would be difficult or burdensome for a registrant to obtain this information from the GHG emissions attestation provider, and in fact, we expect that most registrants would want to know about the existence of an oversight inspection program before retaining an attestation provider in most instances and therefore likely will already have such information in their possession.  Moreover, we continue to believe that requiring such disclosure to be included in the attestation report may create confusion because this disclosure may not be required by existing attestation standards.

---

[1556]    *See supra* note 400 and accompanying text.

[1557]    *See supra* note 402 and accompanying text.

Appellate Case: 24-1628    Page: 372    Date Filed: 03/26/2024 Entry ID: 5377362

As stated above, the Commission included a request for comment in the Proposing Release asking if it should require disclosure when there is a change in, or disagreement with, the registrant's GHG emissions attestation provider that is similar to the disclosure requirements in Item 4.01 of Form 8-K and Item 304 of Regulation S-K.[1558]  The commenters that responded to the request for comment generally agreed with including such a requirement in the final rules.[1559] Because we believe that requiring the disclosure of information regarding changes in, and disagreements with, a GHG emissions attestation provider would provide investors with important information about the provider and the conduct of the attestation engagement, which investors need to help them assess the reliability of the registrant's GHG emissions disclosures, we have included a provision in the final rules that will require AFs and LAFs subject to Item 1506(a) to disclose certain information when the registrant's GHG emissions attestation provider resigns (or indicates that it declines to stand for re-appointment after completion of the attestation engagement) or is dismissed.[1560]

We have generally modeled this aspect of the final rules on the disclosure requirements in Item 4.01 of Form 8-K and Item 304 of Regulation S-K, tailored to fit the context of a GHG emissions attestation engagement and to limit additional burdens.[1561]  In particular, our decision to require the disclosure in the filing that contains the GHG emissions disclosures and attestation report (e.g., a registration statement or an annual report that requires disclosure pursuant to Item

---

[1558]    *See* Proposing Release, Section II.H.2.

[1559]    *See supra* note 1539 and accompanying text.

[1560]    *See* 17 CFR 229.1502(d)(2).

[1561]    Although we have generally modeled these aspects of the final rules on existing requirements, in addition to the substantive differences discussed herein, we have also made several non-substantive changes and updates for readability.  For the avoidance of doubt, neither the final rules nor this discussion should be construed as a modification or interpretation of the existing requirements on which they were modeled.

1506), instead of an alternative such as requiring a registrant to provide the disclosure in a Form 8-K, should serve to limit additional burdens associated with this provision. We believe that requiring similar disclosure for GHG emissions attestation providers to be included in the annual report or registration statement that contains the attestation report is appropriate because it will provide investors with the essential information they need to evaluate the assurance services provided while minimizing the need for additional filings by a registrant.

Specifically, the final rules (Item 1506(d)(2)) will require an AF or LAF subject to Item 1506(a) to disclose whether its former GHG emissions attestation provider resigned or was dismissed and the date thereof.[1562] If so, the registrant must state whether during the performance of the attestation engagement for the fiscal year covered by the attestation report there were any disagreements with the former GHG emissions attestation provider over any measurement or disclosure of GHG emission or attestation scope of procedures.[1563] The final rules will require the registrant to describe each such disagreement and state whether the registrant has authorized the former GHG emissions attestation provider to respond fully to the inquiries of the successor GHG emissions attestation provider concerning the subject matter of each such disagreement.[1564] Like the other elements of the disclosure requirement, this is modeled on the requirement to disclose disagreements between a registrant and its independent auditor in connection with the auditor's dismissal or resignation in Item 304 of Regulation S-K, and just as in that context, it is important that significant disagreements are brought to the

---

[1562] *See* 17 CFR 229.1506(d)(2)(i). Therefore, the registrant will be required to provide disclosure in circumstances where: (1) a GHG emissions attestation provider resigns or is dismissed during the fiscal year covered by the attestation report but it does not issue the attestation report; and (2) a GHG emissions attestation provider issues an opinion or conclusion on GHG emissions disclosure for the relevant fiscal year but is dismissed or resigns before the attestation report is filed.

[1563] *See* 17 CFR 229.1506(d)(2)(i)(B).

[1564] *See* 17 CFR 229.1506(d)(2)(i)(B)(1)-(2).

attention of investors.[1565]  The disclosure of the existence of a disagreement in the event of the resignation or dismissal of the GHG emissions attestation provider will enable investors to assess the possible effects of such disagreement and whether it could have impacted the reliability of the GHG emissions disclosure, which, as discussed above, provides investors with information about a registrant's business, results of operations, and financial condition.  The final rules also include two instructions defining the term "disagreements" for purposes of the disclosure and explaining the circumstances in which it is sufficient to conclude that a disagreement has been communicated to the registrant.[1566]  This definition and explanation is consistent with Item 304 of Regulation S-K and its Instructions, with minor modifications to take into account the circumstances of a GHG emissions attestation engagement.[1567]

We have determined to take an incremental approach to requiring disclosure about the resignation or dismissal of a GHG emissions attestation provider and therefore have not included a requirement for the registrant to request the former GHG emissions attestation provider to furnish the registrant with a letter addressed to the Commission stating whether it agrees with the statements made by the registrant with respect to the resignation or dismissal and disagreement (if applicable).  The final rules, however, do not preclude a registrant from disclosing its explanation of the dismissal or resignation to its former GHG emissions attestation provider, and although not required, we encourage any GHG emissions attestation provider to convey concerns it has with the registrant's description of those events to the Commission's Office of the Chief Accountant.

---

[1565]  *See Registrants and Independent Accountants Amended Rules for Increased Disclosure of Relationships*, Release No. 33-5550 (Dec. 20, 1974) [40 FR 1010, 1011 (Jan. 6, 1975)].

[1566]  *See* 17 CFR 229.1506(d)(2)(ii)-(iii).

[1567]  *See* 17 CFR 229.304(a)(1)(iv); and Instructions 4 and 5 to Item 304.

The requirement to disclose certain information when a GHG emissions attestation provider resigns or is dismissed only applies to AFs and LAFs that are required to obtain an attestation report pursuant to Item 1506(a). It does not apply if an AF or LAF is not required to disclose its GHG emissions (and therefore is not required to obtain an attestation report) because the AF or LAF determines that its GHG emissions are not material for a particular fiscal year. In addition, for the avoidance of doubt, Item 1506(d)(2) does not apply to registrants that voluntarily obtain assurance over their GHG emissions disclosure and provide certain information about the engagement pursuant to Item 1506(e). We expect that the documentation regarding resignations and dismissals and any disagreements between the registrant and the GHG emissions attestation provider will be readily available to the registrant such that it would not be difficult or costly to comply with this requirement.

### 5. Disclosure of Voluntary Assurance (Item 1506(e))

#### a. Proposed Rules

The Commission proposed to require a registrant that was not required to include a GHG emissions attestation report under the proposed rules to disclose certain information if the registrant's GHG emissions disclosures were voluntarily subjected to third-party attestation or verification.[1568] Specifically, the Commission proposed new Item 1505(e) of Regulation S-K to require a registrant to disclose within the separately captioned "Climate-Related Disclosure" section in the filing the following information if the registrant's GHG emissions disclosures were subject to third-party attestation or verification:

(i)      Identify the provider of such assurance or verification;

(ii)     Describe the assurance or verification standard used;

---

[1568]   *See* Proposing Release, section II.H.5.

Appellate Case: 24-1628    Page: 376    Date Filed: 03/26/2024 Entry ID: 5377362

(iii)    Describe the level and scope of assurance or verification provided;

(iv)    Briefly describe the results of the assurance or verification;

(v)    Disclose whether the third-party service provider has any other business relationships with or has provided any other professional services to the registrant that may lead to an impairment of the service provider's independence with respect to the registrant; and

(vi)    Disclose any oversight inspection program to which the service provider is subject (e.g., the AICPA's peer review program).[1569]

The Commission explained that, taken together, these proposed disclosure items should help investors understand the nature and reliability of the attestation or verification provided and help them assess whether the voluntary assurance or verification has enhanced the reliability of the GHG emissions disclosure.[1570]

### b. Comments

Many of the commenters that specifically addressed the proposed requirement to provide disclosures regarding voluntary attestation or verification supported the proposal.[1571]  One commenter stated, "[i]f a registrant receives assurance for their GHG emissions, regardless of whether they are required to do so under the final [Commission] rule, they should be required to disclose this information . . . as proposed."[1572]  Alternatively, one commenter stated that registrants that obtained voluntary assurance should follow the same proposed attestation requirements that would apply to mandatory assurance over Scope 1 and Scope 2 disclosures

---

[1569]    *See id.*

[1570]    *See id.*

[1571]    *See, e.g.,* letters from Amer. for Fin. Reform, Sunrise Project *et al*.; CEMEX; C. Howard; and CII.

[1572]    *See* letter from Amer. for Fin. Reform, Sunrise Project *et al*.

(e.g., proposed Items 1505(a) through (d)) to protect investors from attestation reports provided under standards that did not meet a minimum set of criteria established by the Commission.[1573]

Several commenters supported the proposed requirements to: identify the provider of such assurance or verification; disclose the assurance or verification standard used; describe the level and scope of assurance or verification provided; and briefly describe the results of the assurance or verification.[1574] A few commenters supported the proposed requirement to disclose whether the third-party service provider had any other business relationships with or has provided any other professional services to the registrant that may lead to an impairment of the service provider's independence with respect to the registrant.[1575] However, one commenter stated that it did not support such a disclosure requirement because it did "not believe the third-party provider should be independent."[1576] A few commenters supported the requirement to disclose any oversight program to which the service provider is subject,[1577] while one commenter suggested aligning with the Science Based Targets Initiative.[1578] One commenter stated that it did not support requiring attestation providers to disclose any oversight inspection programs to which they are subject because investors could, in its view, wrongly assume that attestation providers that are subject to oversight are necessarily more qualified than those that are not.[1579]

---

[1573] *See* letter from KPMG.

[1574] *See, e.g.*, letters from Amer. for Fin. Reform, Sunrise Project *et al.*; CEMEX; and C. Howard.

[1575] *See, e.g.*, letters from Amer. for Fin. Reform, Sunrise Project *et al.*; C. Howard; and CII.

[1576] *See* letter from CEMEX.

[1577] *See, e.g.*, letters from Amer. for Fin. Reform, Sunrise Project *et al.*; C. Howard; and Morningstar.

[1578] *See, e.g.*, letter from CEMEX.  Science Based Targets Initiative ("SBTi") is a partnership between CDP, the United Nations Global Compact, World Resources Institute, and the World Wide Fund for Nature, which seeks to define and promote best practices in emissions reductions and net zero targets in line with climate science, among other objectives.  *See* SBTi, *Who We Are/What We Do*, available at https://sciencebasedtargets.org/about-us.

[1579] *See* letter from Futurepast.

373

Appellate Case: 24-1628    Page: 378    Date Filed: 03/26/2024 Entry ID: 5377362

One commenter stated that "it is not clear what 'any oversight inspection program' would include."[1580]

The Proposing Release included a request for comment asking whether registrants should be required to furnish a copy of, or provide a link to, the assurance or verification report.[1581] One commenter stated that registrants should be asked to provide a copy of the attestation or verification report when available.[1582] Another commenter stated that if summarizing the report in accordance with proposed Item 1505(e) effectively means that the report is filed, then furnishing the report would, in the commenter's view, be a more appropriate alternative.[1583] The Proposing Release also asked whether, instead of requiring a registrant to disclose whether the third-party service provider has any other business relationships with or has provided any other professional services to the registrant that may lead to an impairment of the service provider's independence with respect to the registrant as proposed, the Commission should require the third-party service provider to be independent, according to the standard proposed under Item 1505(b) with respect to mandatory attestation over Scope 1 and Scope 2 emissions.[1584] In response, one commenter stated that it supported such a requirement,[1585] and one commenter stated that it did not support such a requirement, explaining that it would severely narrow the options registrants have to hire such providers.[1586] Finally, some commenters requested

---

[1580] *See* letters from IECA. *But see* letter from CEMEX (stating that "the oversight inspection program is clear").

[1581] *See* Proposing Release, section II.H.5.

[1582] *See* letter from CEMEX.

[1583] *See* letter from KPMG.

[1584] *See* Proposing Release, section II.H.5.

[1585] *See* letter from Futurepast.

[1586] *See* letter from CEMEX.

clarification on the use of the terminology "assurance" and "verification," and the difference between the two.[1587]

### c. Final Rules

We are adopting final rules (Item 1506(e)) that require any registrant that is not required to include a GHG emissions attestation report pursuant to Item 1506(a) to disclose certain information about the assurance engagement if the registrant's GHG emissions disclosure was voluntarily subject to assurance.[1588]  Under the final rules, a registrant will be required to disclose the following information if the registrant's GHG emissions disclosure was subject to third-party assurance:

(i)      Identification of the service provider of such assurance;

(ii)     Description of the assurance standard used;

(iii)    Description of the level and scope of assurance services provided;

(iv)    Brief description of the results of the assurance services;

(v)     Whether the service provider has any material business relationships with or has provided any material professional services to the registrant; and

---

[1587]   *See, e.g.,* letters from CEMEX; C. Howard; and IECA.

[1588]   *See* 17 CFR 229.1506(e).  Under the proposed rules, all registrants would have been subject to the requirement to disclose Scopes 1 and 2 emissions, but only AFs and LAFs would have been subject to the proposed requirement to obtain attestation.  Therefore, under the proposed rules, there would have been a category of registrants that were required to disclose GHG emissions in their filings but were not required to obtain an attestation report.  The situation is different under the final rules because only AFs and LAFs are required to disclose Scopes 1 and/or 2 emissions in certain circumstances, and these categories of registrants are also required to obtain an attestation report.  Thus, under the final rules, there is no category of registrants that is required to disclose GHG emissions but not obtain an attestation report.  As a result, Item 1506(e), which requires disclosure of voluntary assurance, only applies to (i) non-AF and non-LAF registrants that voluntarily disclose their GHG emissions in a Commission filing and voluntarily obtain assurance over such disclosure; and (ii) as explained above in section II.I.1, filings made by AFs and LAFs after the compliance date for the GHG emissions disclosure requirements but before Item 1506(a) requires limited assurance.

(vi)    Whether the service provider is subject to any oversight inspection program, and if so, which program (or programs) and whether the assurance services over GHG emissions are included within the scope of authority of such oversight inspection program.[1589]

The final rules require disclosure of this information whenever assurance services are voluntarily obtained by the registrant. Although we considered requiring a registrant to provide disclosure only when the registrant chooses to disclose the results of the assurance services, we decided not to adopt this alternative because it could incentivize a registrant not to disclose unfavorable results from voluntary assurance services when that information would be meaningful to an investor evaluating the reliability of a registrant's GHG emissions disclosure. If a registrant chooses to voluntarily obtain assurance over its GHG emissions disclosure, it is important that investors be made aware of the fact that assurance was obtained, the nature of the services provided, and the results of those assurance services so that they can evaluate how much reliance to place upon the disclosed GHG emissions data when making investment decisions.

Although the proposed rules would have required a registrant to disclose certain information if its GHG emissions disclosure was voluntarily subject to third-party "attestation" or "verification," the final rules are narrower in scope in that they only require a registrant to disclose certain information about "assurance" services a registrant voluntarily obtains over its GHG emissions disclosure.[1590] For purposes of the final rules, assurance services are services performed in accordance with professional standards that are designed to provide assurance, which would include, for example, an examination providing reasonable assurance or a review

---

[1589]    *See* 17 CFR 229.1506(e).

[1590]    *See id.*

376

providing limited assurance.[1591]  Certain "attestation" engagements may be designed to provide limited or reasonable assurance over identified information and therefore such services would fall within the scope of the final rules, but in many cases "verification" services are not designed to provide assurance.  In contrast to assurance services, non-assurance services are services that are not designed to provide assurance, which would include, for example, agreed upon procedures engagements and, as indicated above, in many cases, verification engagements.[1592]

We have decided to focus the final rules on requiring disclosure of assurance services because investors are likely to place greater reliance on GHG emissions disclosure that has been subject to assurance than disclosure that has not been subject to assurance.[1593]  Current voluntary

---

[1591]  For examples of attestation engagements designed to provide assurance, *see, e.g.*, PCAOB AT section 101; AICPA SSAE No. 21 AT-C sections 205and 206 and AICPA SSAE No. 22 AT-C section 210; and IAASB ISAE 3000 (Revised) and ISAE 3410.  *See also* Proposed ISSA 5000.  The Proposing Release discussed the differences between limited and reasonable assurance.  *See* Proposing Release, section II.H.1.

[1592]  For examples of engagements that are not designed to provide assurance, *see, e.g.*, PCAOB AT section 201, Agreed-Upon Procedures Engagements, available at https://pcaobus.org/oversight/standards/attestation-standards/details/AT201; AICPA SSAE No. 19 AT-C section 215, Agreed-Upon Procedures Engagements, available at https://us.aicpa.org/content/dam/aicpa/research/standards/auditattest/downloadabledocuments/at-c-00215.pdf; and IAASB International Standard on Related Services 4400 (Revised) Agreed-Upon Procedures Engagements, available at https://www.iaasb.org/_flysystem/azure-private/publications/files/ISRS-4400-Revised-Agreed-Upon-Procedures-final.pdf.  It is possible that a service identified or described as a "verification" could be designed to provide assurance (either limited or reasonable).  *See, e.g.*, ISO 14064-3 (defining "reasonable assurance" as the "level of assurance where the nature and extent of the *verification activities* have been designed to provide a high but not absolute level of assurance on historical data and information" and "limited assurance" as the "level of assurance where the nature and extent of the *verification activities* have been designed to provide a reduced level of assurance on historical data and information) (emphasis added).  The key factor for purposes of determining whether disclosure is necessary under Item 1506(e) is whether the third-party services are *designed to provide assurance*.

[1593]  A number of commenters on the proposed mandatory attestation requirements stated that they supported the proposal because it would help increase the reliability of the disclosure.  *See supra* note 1106 and accompanying text.  Relatedly, academic research suggests that investors prefer audited to non-audited information.  *See* J. Cohen, *et al.*, Retail investors' perceptions of the decision-usefulness of economic performance, governance, and corporate social responsibility disclosures, 23(1) Behavioral Research in Accounting 127 (2011) ("Auditing appears to be of use in lending credibility to the disclosure of nonfinancial information, in the view of most respondents."); F.D. Hodge, Investors' perceptions of

Appellate Case: 24-1628     Page: 382     Date Filed: 03/26/2024 Entry ID: 5377362

ESG assurance practices have been varied with respect to the levels of assurance provided (e.g., limited versus reasonable), the assurance standards used, the types of service providers, and the scope of disclosure covered by the assurance.[1594]  Therefore, we believe it is appropriate to require registrants to provide investors with some basic information about the assurance services voluntarily obtained to help them understand the nature of the services provided and to help investors determine whether the assurance services have enhanced the reliability of the GHG emission disclosure.  Similarly, requiring a brief description of the results of the voluntary assurance services will provide transparency about the reliability of any disclosed GHG emissions data, which in turn will help investors weigh how much importance to give that data when making investment decisions.  Since non-assurance services are not designed to provide assurance, they do not connote the same degree of reliability as assurance services.  Based on our experience, investors likely do not rely upon non-assurance services to the same degree as assurance services.  Therefore, the final rules will not require a registrant to provide Item 1506(e) information about any voluntary non-assurance services (e.g., agreed upon procedures) obtained

---

earnings quality, auditor independence, and the usefulness of audited financial statements, 17 Accounting Horizons-Supplement 42 (2003) ("Retail investors recognize the agency problems related to their investment and prefer audited financial information because of that.").  A financial statement audit is a type of "reasonable assurance" engagement.  *See, e.g.*, PCAOB AS 1015, *Due Professional Care in the Performance of Work*, paragraph 10, available at https://pcaobus.org/oversight/standards/auditing-standards/details/AS1015.

[1594]  *See* Proposing Release, section II.H.1.  The Commission explained in the Proposing Release that this fragmentation has diminished the comparability of assurance provided and may require investors to become familiar with many different assurance standards and the varying benefits of different levels of assurance.  *See id.*  For example, investors may see that a service provider has produced an assurance report for a registrant's GHG emissions disclosure and have an expectation that such assurance will enhance the reliability of the disclosure, without always understanding, for example, what level of assurance (e.g., limited versus reasonable) is being provided or what scope of assurance (e.g., the disclosure covered by the assurance) is being provided with respect to the registrant's GHG emissions disclosure.  *See id.*  As noted above, the consequences of such fragmentation have also been highlighted by certain international organizations, including IOSCO.  *See supra* note 1089 and accompanying text.

Appellate Case: 24-1628    Page: 383    Date Filed: 03/26/2024 Entry ID: 5377362

over its GHG emissions disclosure to avoid the potential for confusion.[1595]  Finally, we think these changes to the final rules respond to several commenters who requested that the Commission clarify the terminology "assurance" and "verification" and the differences between the two.[1596]

To the extent that registrants voluntarily provide more disclosure to investors than what is required under Item 1506(e), registrants should remain cognizant of their obligation to provide investors with truthful and accurate information and to avoid making any materially misleading statements or omissions.[1597]  Importantly, this includes ensuring that any description or characterization of any assurance or any other type of services obtained with respect to GHG emissions disclosure is accurate.

Consistent with the general support expressed by commenters, registrants are required to disclose each of the proposed categories of information in the final rules with respect to voluntary assurance services with some minor modifications.[1598]  The final rules require

---

[1595]    One commenter, which supported requiring mandatory attestation over Scope 1 and Scope 2 emissions for AFs and LAFs as proposed, expressed concerns that, among other things, "inconsistencies in the nature and extent of procedures performed in voluntary attestation may detract from the benefits of the required attestations" and also stated that "[d]isclosing that the data was 'verified' would compound the confusion." *See* letter from PwC.  This commenter's proposed solution was to subject any attestation – voluntary or required – to the proposed requirements that applied to the proposed mandatory attestation requirements. Although we are not adopting this commenter's recommendation, we think the approach we are taking in the final rules to require disclosure of certain information about assurance services voluntarily obtained by a registrant will reduce the potential for confusion while providing investors with information to help them evaluate whether the assurance services have enhanced the reliability of the GHG emissions disclosure.

[1596]    *See supra* note 1587 and accompanying text.

[1597]    *See, e.g.,* Securities Act section 17(a) [15 U.S.C. 77q(a)], Exchange Act section 10(b) [15 U.S.C. 78j(b)], and Exchange Act Rule 10b-5 [17 CFR 240.10b-5].

[1598]    *See* 17 CFR 229.1506(e).  In the Proposing Release, the Commission included a request for comment asking if registrants should be required to disclose the voluntary assurance or verification fees associated with the GHG emissions disclosure.  One commenter responded to the request for comment and stated that it believed requiring the disclosure of such fees is unnecessary because the disclosure would not be useful for investors and would burden registrants.  *See* letter from CEMEX.  We have decided not to require the disclosure of voluntary assurance fees and instead focus on requiring the disclosure of the general categories of information specified in the final rules, which will be most useful to investors.

Appellate Case: 24-1628    Page: 384    Date Filed: 03/26/2024 Entry ID: 5377362

registrants to identify the provider of such assurance services.[1599]  The identity of the assurance provider is a basic, but important, piece of information for investors, particularly considering the broad spectrum of providers that may provide assurance services (e.g., public accounting firms registered with the PCAOB, unregistered public accounting firms, and potentially other types of service providers).

If voluntary assurance services are obtained, the final rules also require registrants to disclose the assurance standard used.[1600]  As noted above, the assurance landscape is currently evolving and there is diversity in practice.[1601]  Identification of the assurance standard would enable investors to better understand the service that has been provided and to assess whether the standard is sufficiently developed, which may be particularly important given that some service providers may use standards that are developed by accreditation bodies with notice and public comment and other robust due processes for standard setting in the public interest, while other service providers may use standards that do not have these characteristics.

In addition, if voluntary assurance services are obtained, the final rules require registrants to describe the level and scope of assurance provided and to briefly describe the results of the assurance services.[1602]  Registrants must clearly identify the level of assurance provided. Identifying the scope of the assurance provided will help investors understand whether the scope of the engagement aligns with the scope of the registrant's GHG emissions disclosure (e.g.,

---

[1599]   *See* 17 CFR 229.1506(e)(1).

[1600]   *See* 17 CFR 229.1506(e)(2).  *See also supra* note 1591 and accompanying text (citing examples of attestation engagements providing assurance and applicable standards).

[1601]   *See, e.g.,* CAQ, *S&P 500 and ESG Reporting* (Updated June 2023) (pointing to the use of assurance methodologies such as AICPA AT-C 205, Assertion-Based Examination Engagements, AICPA AT-C 210, Review Engagements; and IAASB ISAE 3000 (Revised), and ISAE 3410, Assurance Engagements on Greenhouse Gas Statements).

[1602]   *See* 17 CFR 229.1506(e)(3), (4).

Appellate Case: 24-1628     Page: 385     Date Filed: 03/26/2024 Entry ID: 5377362

Scope 1 or 2).  Providing investors with clear and transparent disclosure about the level and scope of assurance obtained is necessary to help investors weigh the level of reliance they should place on assurance services and determine whether the assurance services have enhanced the reliability of the GHG emissions disclosure.  In addition, as noted above, requiring disclosure of the results of the assurance will provide transparency about the reliability of any disclosed GHG emissions data so that investors can weigh how much importance to give that data when making investment decisions.

As explained above, with respect to voluntary assurance, the proposed rules would have required a registrant to disclose whether the third-party service provider has any other business relationships with or has provided any other professional services to the registrant that may lead to an impairment of the service provider's independence with respect to the registrant.[1603]  In a modification to the proposed rules, Item 1506(e)(5) requires a registrant to disclose whether the service provider has any material business relationships with or has provided any material professional services to the registrant.[1604]  We have decided not to adopt the requirement for a registrant to determine whether any business relationships or other professional services "may lead to an impairment of the service provider's *independence*" (emphasis added) because of the variety of independence standards that could apply to the services.  The assurance standard dictates the requirements for independence for engagements conducted in accordance with the standard.  The final rules do not prescribe a particular assurance standard that third-party service

---

[1603]  *See* Proposing Release, section II.H.5.

[1604]  *See* 17 CFR 229.1506(e)(5).  A GHG emissions assurance engagement, by itself, does not trigger the requirement to provide disclosure under Item 1506(e)(5).

Appellate Case: 24-1628     Page: 386     Date Filed: 03/26/2024 Entry ID: 5377362

providers must use with respect to the disclosure required under Item 1506(e).[1605]  This could result in registrants and third-party providers applying different standards, which may not be apparent to investors and could reduce comparability.  The modifications we have made in the final rules, however, will help avoid potential confusion and will enhance transparency related to the independence and objectivity of the third-party service provider by requiring registrants to disclose material business relationships and material professional services while also disclosing the assurance standard used by the service provider.[1606]  Accordingly, the final rules serve much the same purpose as the proposed rules; namely, providing investors with information to evaluate the impartiality and objectivity of the service provider, which will in turn enable investors to determine whether the voluntary assurance services have enhanced the reliability of the GHG emissions disclosure.  We continue to believe that assurance of GHG emissions disclosure by independent assurance providers improves the reliability of, and investor confidence in, such disclosure.[1607]

One commenter recommended that the Commission require a provider to be independent instead of simply requiring disclosure of the relevant facts;[1608] however, in keeping with the approach we are taking in the final rules with respect to voluntary assurance, which is focused on requiring the disclosure of information regarding the voluntary assurance services provided rather than imposing requirements addressing what the services must entail, the final rules

---

[1605]  For examples of independence standards, *see, e.g.*, PCAOB Ethics and Independence Rules and Standards; AICPA Code of Professional Conduct; and International Ethics Standards Board for Accountants (IESBA) International Code of Ethics for Professional Accountants (including International Independence Standards).

[1606]  *See* 17 CFR 229.1506(e)(2), (5).

[1607]  *See* Proposing Release, sections II.H.2 and II.H.5.

[1608]  *See* letter from Futurepast.

require registrants to provide disclosure of material business relationships or other material professional services and the assurance standard used to enable investors to determine how much reliance to place on the assurance services.[1609]

Consistent with the proposed rules, the final rules require registrants to disclose any oversight inspection program to which the service provider is subject.[1610] This is the same requirement that applies to AFs and LAFs in Item 1506(d). As we explained in the discussion of Item 1506(d) in section II.I.4 above, the requirement to disclose any oversight inspection program to which the service provider is subject is not limited to oversight inspection programs that include within their scope, or require the inspection of, the assurance services provided for the GHG emissions disclosure. Rather, the final rules require the disclosure of "any" oversight inspection program, which includes any oversight program the service provider is subject to for any type of engagement (e.g., a financial statement audit or other review).[1611] Examples of such oversight inspection programs includes the AICPA's peer review program and the PCAOB's inspection program.[1612] As explained in section II.I.4 above, this information will help investors better understand the qualifications of an assurance provider, which in turn will help them determine whether the assurance services have enhanced the reliability of the GHG emissions disclosure.[1613]

---

[1609] *See* 17 CFR 229.1506(e)(2), (5).

[1610] *See* 17 CFR 229.1506(e)(6).

[1611] *See id.*

[1612] *See id.* The PCAOB's oversight inspection program is another non-exhaustive example of an oversight inspection program that would fall within the scope of the required disclosure, which, along with the additional explanation we are providing, will help clarify this requirement for commenters. *See supra* note 1580 and accompanying text.

[1613] As stated above in section II.I.4, this is true even in circumstances where the oversight inspection program does not include within its scope the assurance services for the GHG emissions disclosure because such oversight can provide a check on a provider's overall activities and drive improvements in the quality of their services overall. *See supra* note 1555 and accompanying text.

However, to provide investors with a more complete understanding of such oversight inspection program, in a modification to the proposed rules, the final rules also require a registrant to disclose whether such oversight inspection program includes within its scope the assurance services over GHG emissions disclosure obtained by the registrant.[1614] Again, this is the same requirement that applies to AFs and LAFs in Item 1506(d). As explained above, we would consider assurance services over GHG emissions disclosure to be within the scope of an oversight inspection program if it is possible for the assurance services to be inspected pursuant to the oversight program, even if it is not certain that the services will be inspected in a particular inspection cycle. Requiring registrants to disclose the existence of an oversight inspection program provides investors with valuable information about the qualifications of a GHG emissions attestation provider regardless of whether the oversight inspection program includes the inspection of assurance over GHG emissions disclosure within its scope. Similarly, requiring disclosure of whether the GHG emission assurance services would fall within the scope of such program would further facilitate investors' evaluation of the reliability of the assurance results and GHG emissions disclosure.[1615] One commenter stated that the Commission should not require the disclosure of oversight inspection programs because it could wrongly suggest that attestation providers that are subject to oversight are necessarily more qualified than those that are not.[1616] We agree with the commenter that it is not necessarily true that an assurance

---

[1614] *See* 17 CFR 229.1506(e)(6).

[1615] The PCAOB's inspection jurisdiction is limited to audits of issuers and broker-dealers registered with the Commission and would not include engagements for the assurance of GHG emissions disclosures within its scope. *See supra* note 1357. However, as stated in the Proposing Release, an example of an oversight inspection program that includes within its scope assurance engagements is the AICPA peer review program. *See* Proposing Release, section II.H.4.

[1616] *See* letter from Futurepast.

App.384

Appellate Case: 24-1628     Page: 389     Date Filed: 03/26/2024 Entry ID: 5377362

provider that is subject to oversight is more qualified than a provider that is not.[1617]  But whether a provider is subject to oversight is one relevant factor for investors to consider when assessing the reliability of assurance results and GHG emissions disclosure and such oversight can provide a check on a provider's activities and drive improvements in quality as explained above.

The proposed rules would have required a registrant to include the proposed disclosure regarding voluntary attestation within the separately captioned "Climate-Related Disclosure" section in the Commission filing where the GHG emissions data is disclosed.[1618]  Since the final rules leave the placement of climate-related disclosures, other than the financial statement disclosures, largely up to the registrant, a registrant will not be required to include the disclosure regarding voluntary assurance within a separately captioned "Climate-Related Disclosure" section in the Commission filing.[1619]  Rather, registrants should provide the disclosure required by this section in the same Commission filing and alongside the GHG emissions disclosure to which the voluntary assurance services relate.

Under the final rules, a registrant is responsible for disclosing the required information about the voluntary assurance services in its Commission filings.  In these circumstances, we do not view the assurance provider as having prepared or certified the filing or any information contained therein.  In addition, Item 1506(e) will not require registrants to file or furnish any voluntary assurance reports to the Commission.

Although the final rules do not require a registrant that has obtained voluntary assurance over its GHG emissions disclosure to file or furnish an assurance report to the Commission, for

---

[1617]    *See supra* note 1579.

[1618]    *See* Proposing Release, section II.H.5.

[1619]    *See supra* section II.A.3.

**App.385**

Appellate Case: 24-1628    Page: 390    Date Filed: 03/26/2024 Entry ID: 5377362

the avoidance of doubt, and in response to commenters,[1620] we are amending Rule 436 to provide

that any description of assurance services regarding a registrant's GHG emissions disclosure

provided in accordance with Item 1506(e) of Regulation S-K will not be considered a part of the

registration statement prepared or certified by an expert or person whose profession gives

authority to the statements made within the meaning of sections 7 and 11 of the Securities

Act.[1621]  Therefore, a registrant is not required to obtain and include the written consent of the

GHG emissions attestation provider pursuant to Securities Act section 7 or Rule 436.[1622]  Even

though we believe that accountability for experts under section 11 is a central tenet of the

Securities Act,[1623] this limited exception should encourage registrants to voluntarily obtain

assurance over their GHG emission disclosure, which will benefit investors because assurance

helps to enhance the reliability of a registrant's GHG emissions disclosure.

      As discussed above in section II.I.2.c, we are also amending Rule 436 to provide that a

report by a GHG emissions attestation provider covering Scope 1, Scope 2, and/or Scope 3

emissions at a limited assurance level shall not be considered a part of the registrant statement

that is prepared or certified by an expert or person whose profession gives authority to the

---

[1620]   *See supra* note 1345 and accompanying text.

[1621]   *See* 17 CFR 230.436(i)(2).

[1622]   *See* 15 U.S.C. 77g; 17 CFR 230.436.  For the avoidance of doubt, a registrant would not have to obtain and include the written consent of the GHG emissions attestation provider pursuant to 17 CFR 229.601(b)(23), which is the Regulation S-K provision requiring a registrant to file the written consent of an expert as an exhibit to a Securities Act registration statement or Exchange Act report that incorporates by reference a written expert report attached to a previously filed Securities Act registration statement.

[1623]   *See* 15 U.S.C. 77k(a)(4).  *See also* 77 Cong. Rec. 2910, 2934 (1933) (Statement of Rep. Chapman) ("Under its provisions the issuer, the underwriter, and the technical expert (including the engineer, the lawyer, the appraiser, the accountant, in connection with the issuance of securities) are held responsible for making a full disclosure of every material fact in connection with an issue of corporate securities.  The burden of proof is placed on them to show that after the exercise of the degree of diligence expected of reasonably prudent men they 'had reasonable ground to believe and did believe . . . that such statement was true or that there was no such omission.'").

Appellate Case: 24-1628     Page: 391     Date Filed: 03/26/2024 Entry ID: 5377362

statements made within the meaning of sections 7 and 11 of the Securities Act.[1624]  To the extent

that a registrant that voluntarily obtains assurance over its GHG emissions disclosures decides to

voluntarily file or furnish an assurance report to the Commission at the limited assurance level,

the GHG emissions attestation provider would be entitled to rely on this amendment to Rule 436

if its terms are met.  In these circumstances, a registrant would be required to submit a letter from

the GHG emissions attestation provider that acknowledges their awareness of the use in certain

registration statements of any of their reports which are not subject to the consent requirement of

section 7 pursuant to the amendments to Item 601 of Regulation S-K.[1625]  However, if a

registrant voluntarily chooses to file or furnish an assurance report to the Commission that does

not meet the requirements of Rule 436(i)(1) (e.g., the assurance report is provided at a reasonable

assurance level), or if the registrant chooses to voluntarily disclose more information than is

required under Item 1506(e) of Regulation S-K, then, by its terms, the exception in Rule 436

would not apply, and the assurance provider may be required to provide a consent in accordance

with applicable statutory provisions and rules and would be subject to Section 11 liability.[1626]

### J.  Safe Harbor for Certain Climate-Related Disclosures (Item 1507)

#### 1.  Proposed Rules

The Commission proposed a safe harbor for Scope 3 emissions data to mitigate potential

liability concerns that registrants may have about providing emissions information derived

---

[1624]  *See* 17 CFR 230.436(i)(1).

[1625]  *See* 17 CFR 229.601(b)(27).  *See also supra* section II.I.2.c. for further discussion of the amendments to Item 601 of Regulation S-K.

[1626]  Although the amendments to Rule 436 will clarify that assurance providers will not be liable to shareholders in actions under section 11 of the Securities Act (to the extent the provider qualifies for the exception), we remind registrants and providers that there are other remedies available to shareholders and the Commission, such as section 10(b) of the Exchange Act and Rule 10b-5 thereunder, which are not affected by the amendments to Rule 436.

Appellate Case: 24-1628      Page: 392      Date Filed: 03/26/2024 Entry ID: 5377362

largely from third parties in a registrant's value chain. The proposed safe harbor provided that disclosure of Scope 3 emissions by or on behalf of the registrant would be deemed not to be a fraudulent statement unless it is shown that such statement was made or reaffirmed without a reasonable basis or was disclosed other than in good faith.[1627] As proposed, the safe harbor would extend to any statement regarding Scope 3 emissions that is disclosed pursuant to proposed Items 1500 through 1506 of Regulation S-K and made in a document filed with the Commission. For purposes of the proposed safe harbor, the term "fraudulent statement" was defined to mean a statement that is an untrue statement of material fact, a statement false or misleading with respect to any material fact, an omission to state a material fact necessary to make a statement not misleading, or that constitutes the employment of a manipulative, deceptive, or fraudulent device, contrivance, scheme, transaction, act, practice, course of business, or an artifice to defraud as those terms are used in the Securities Act or the Exchange Act or the rules or regulations promulgated thereunder.[1628]

Although the proposed safe harbor only applied to Scope 3 emissions disclosures, the Commission solicited comment on whether the safe harbor should apply to other climate-related disclosures, such as Scopes 1 and 2 emissions disclosures, any targets and goals disclosures, or the proposed financial statement metrics disclosures.[1629] The Commission also solicited comment on whether to provide a safe harbor for disclosures related to a registrant's use of internal carbon pricing, scenario analysis,[1630] and a transition plan.[1631] The Commission further

---

[1627]    *See* Proposing Release, section II.G.3.

[1628]    *See id.*

[1629]    *See id.*

[1630]    *See* Proposing Release, section II.C.

[1631]    *See* Proposing Release, section II.E.2.

requested comment on whether it should adopt a provision similar to 17 CFR 229.305(d) that would apply the PSLRA safe harbors to forward-looking statements made in response to specified climate-related disclosure items, such as proposed Item 1502 pertaining to impacts of climate-related risks on strategy.[1632]  Finally, the Commission solicited comment on whether the safe harbor should apply indefinitely or, instead, should sunset after the passage of a certain number of years or after certain conditions are satisfied.[1633]

### 2. Comments

Several commenters supported the adoption of a Scope 3 emissions safe harbor in the form proposed.[1634]  These commenters stated that the proposed safe harbor for Scope 3 emissions disclosure was appropriate because of the uncertainties involved in the calculation of those emissions due to the need to rely on estimates[1635] and data from third parties.[1636]  Some of these commenters also stated that the proposed safe harbor would encourage more robust disclosure of a registrant's Scope 3 emissions.[1637]  A few commenters specifically supported basing the Scope 3 emissions safe harbor on the proposed standard that a registrant's Scope 3 emissions disclosure would not be deemed to be a fraudulent statement unless it is shown that such statement was made or reaffirmed without a reasonable basis or was disclosed other than in good faith.[1638]

---

[1632]    *See* Proposing Release, section II.C.

[1633]    *See* Proposing Release, section II.G.3.

[1634]    *See, e.g.*, letters from CalPERS; Calvert; CEMEX; IAC Recommendation; Impax Asset Mgmt.; and TotalEnergies.

[1635]    *See, e.g.*, letters from CalPERS; Calvert; CEMEX; and TotalEnergies.

[1636]    *See, e.g.*, letters from CEMEX; Impax Asset Mgmt.; and TotalEnergies.

[1637]    *See, e.g.*, letters from PRI; and SKY Harbor.

[1638]    *See, e.g.*, letters from CEMEX; and TotalEnergies.

Appellate Case: 24-1628      Page: 394      Date Filed: 03/26/2024 Entry ID: 5377362

Many other commenters recommended strengthening and/or broadening the scope of the proposed safe harbor to include other types of climate-related disclosures.[1639]  In this regard several commenters stated that a more robust safe harbor for climate-related disclosures than what was proposed would encourage registrants to provide more robust and "higher quality" disclosures for investors while the proposed safe harbor would potentially chill climate reporting.[1640]

For example, some commenters stated that the proposed Scope 3 emissions safe harbor appeared to be based on a negligence liability standard, which would provide protection that was too weak to be of much use for many registrants.[1641]  Some commenters recommended that the Commission remove the proposed "reasonable basis" requirement, condition the safe harbor only on a registrant acting in good faith when calculating and reporting its Scope 3 emissions, and, for loss of the safe harbor, require knowing or intentional fraud in the sense that the registrant must have actual knowledge that the third-party information it is utilizing is unreliable.[1642]

Some commenters, as well as the Commission's Small Business Capital Formation Advisory Committee,[1643] recommended adoption of a safe harbor that would cover any climate

---

[1639]    *See, e.g.*, letters from AALA; Airlines for America; Amer. Bankers; American Exploration and Production Council (June 17, 2022) ("AXPC"); API; AZ Farm; BCSE; Beller *et al.*; BHP; BlackRock; BNP Paribas; BOA; BPI; Business Roundtable; California Bankers Association (June 17, 2022) ("CA Bankers"); CA Farm; Can. Bankers; CEMEX; Chamber; Chevron; Citigroup; Davis Polk; Delahaye Advisors LLC (June 17, 2022) ("Delahaye"); Energy Transfer; Enerplus; Exxon; HP; J. Herron; Impax Asset Mgmt.; Institute of International Bankers (June 17, 2022) ("IIB"); IIF; Japanese Bankers Association (June 17, 2022) ("JPN Bankers); Loan Syndications and Trading Association (June 17, 2022) ("LSTA"); NAA; NAM; Nareit; Nasdaq; NMA; RILA; Salesforce; SBCFAC Recommendation; Soc. Corp. Gov.; Sullivan Cromwell; Unilever; and United Air.

[1640]    *See, e.g.*, letters from BOA; Business Roundtable; Chamber; Nasdaq; and Soc. Corp. Gov.

[1641]    *See, e.g.*, letters from Beller *et al.*; BOA; and Chamber.

[1642]    *See, e.g.*, letters from Beller *et al.*; BHP; BOA; and NAM.

[1643]    *See* SBCFAC Recommendation.

390

risk-related statement, historical or forward-looking, required by the final rules.[1644]  Some commenters stated that the safe harbor should cover all forward-looking climate-related disclosures, including disclosure of forward-looking impacts.[1645]  Other commenters stated that a safe harbor for Scope 3 emissions and other climate-related disclosures should provide protection at least as strong as that provided by the PSLRA safe harbors.[1646]  In this regard some commenters stated that the safe harbor should be modeled on the market risk disclosure safe harbor under 17 CFR 229.305(d).[1647]  Some commenters stated that the Commission should adopt a forward-looking statement safe harbor for climate-related disclosures made in connection with initial public offerings ("IPOs")[1648] or by partnerships, limited liability companies, and direct participation investment programs, which are excluded from the PSLRA safe harbors.[1649] Commenters stated that excluding climate-related disclosures made in connection with IPOs or by entities such as partnerships from safe harbor protections could potentially impede capital formation and discourage private companies from going public.[1650]

---

[1644]  *See, e.g.*, letters from Amer. Bankers; BIO; BOA; Chamber; Delahaye; Nasdaq; RILA; Soc. Corp. Gov.; Sullivan Cromwell; and T Rowe Price.

[1645]  *See, e.g.*, letters from Airlines for America; Chevron; Cleary Gottlieb; IIF; Nareit; and NMA.

[1646]  *See, e.g.*, letters from Alphabet *et al.*; BHP; BPI; Business Roundtable; Chevron; LSTA; and Nasdaq.

[1647]  *See, e.g.*, letters from BHP (stating that clear safe harbors for mandated climate-related disclosures, such as those related to internal carbon prices, scenario analysis, transition plans and targets and goals, would be more appropriate than implicit or uncertain reliance on the PSLRA safe harbors, and recommending that, "similar to 17 CFR 229.305(d), the information required or permitted by Item 1502 (Strategy, business model, and outlook), Item 1503 (Risk Management) and Item 1506 (Targets and goals) of Regulation S-K, except for historical facts, should be explicitly considered a 'forward-looking statement' for purposes of the PSLRA safe harbors"); and Chevron (stating that, in comparable circumstances, when the Commission adopted novel and complex disclosure requirements regarding market risk, "the Commission recognized the challenges companies would face in preparing this novel information and specifically provided PSLRA safe-harbor protection for it," and recommending that the Commission adopt a similar safe harbor for GHG emissions disclosure).

[1648]  *See, e.g.*, letters from Chamber; and Nasdaq.

[1649]  *See, e.g.*, letter from Nareit; *see also* letter from AFPM (stating that any forward-looking statement safe harbor should apply to all business organizations providing the climate-related disclosures).

[1650]  *See, e.g.*, letters from Chamber; Nareit; and Nasdaq.

Appellate Case: 24-1628    Page: 396    Date Filed: 03/26/2024 Entry ID: 5377362

Several commenters recommended including specific disclosure items, in addition to Scope 3 emissions disclosures, within the scope of the safe harbor, such as Scopes 1 and 2 emissions disclosures,[1651] financial impact disclosures,[1652] and disclosures related to a registrant's use of internal carbon pricing,[1653] scenario analysis,[1654] and a transition plan,[1655] or the setting of targets and goals.[1656] Other commenters stated that the safe harbor should cover any climate-related disclosures based on third-party data or estimates.[1657] Commenters stated that because many of the required climate-related disclosures will involve complex assessments that are substantially based on estimates, assumptions, still-evolving science and analytical methods, and the use of third-party data, the safe harbor should cover all such climate-related disclosures.[1658] Still other commenters stated that the safe harbor should protect against not only private rights of action but Commission enforcement proceedings as well.[1659]

Some commenters opposed adoption of a safe harbor for Scope 3 emissions disclosure.[1660] A few commenters indicated that it would be inappropriate to adopt a safe harbor for Scope 3 emissions disclosure or any other climate-related disclosure that provided historical

---

[1651]   *See, e.g.*, letters from AZ Farm; BHP; BlackRock; BOA; Can. Bankers; Citigroup; Energy Transfer; J. Herron; IIB; International Association of Drilling Contractors (June 16, 2022) ("IADC"); NAA; NAM; NMA; Salesforce; Unilever; and United Air.

[1652]   *See, e.g.*, letters from Can. Bankers; CEMEX; Citigroup; Energy Transfer; IIB; and NAM.

[1653]   *See, e.g.*, letters from Beller *et al.*; BHP; BlackRock; BOA; CEMEX; and Chevron.

[1654]   *See, e.g.*, letters from BCSE; Beller *et al.*; BHP; BlackRock; BOA; Can. Bankers; CEMEX; Chevron; HP; IADC; and IIF.

[1655]   *See, e.g.*, letters from BHP; BlackRock; BOA; Can. Bankers; CEMEX; Chevron; HP; IIB; and IIF.

[1656]   *See, e.g.*, letters from Beller *et al.*; BHP; BlackRock; BOA; Can. Bankers; CEMEX; Citigroup; Enerplus; HP; Impax Asset Mgmt.; IIB; and NAM.

[1657]   *See, e.g.,* letters from API; BNP Paribas; BPI; Cleary Gottlieb; Exxon; IIF; NMA; and T Rowe Price.

[1658]   *See, e.g.,* letters from Amer. Bankers; BOA; Chamber; and Sullivan Cromwell.

[1659]   *See, e.g.*, letters from BOA; and JPN Bankers.

[1660]   *See, e.g.*, letters from Amer. for Fin. Reform, Sunrise Project *et al.*; CIEL; ClientEarth US (June 17, 2022) ("ClientEarth"); and Consumer Reports (June 17, 2022).

or current information.[1661]  These commenters further stated that a separate forward-looking statement safe harbor for climate-related disclosures was not necessary because the PSLRA safe harbor is available to protect forward-looking climate-related disclosures.[1662]  One other commenter stated that providing a safe harbor for Scope 3 emissions disclosure would disincentivize registrants from providing accurate disclosures.[1663]

Several commenters supported adoption of a Scope 3 emissions safe harbor but only if it was subject to a sunset provision.[1664]  These commenters stated that the Scope 3 emissions safe harbor should eventually be phased out because of an expectation that Scope 3 reporting methodologies will be refined, Scope 3 tools and resources will improve, and the cost of Scope 3 emissions reporting will decline, which should reduce the uncertainties and difficulties in connection with Scope 3 emissions reporting.[1665]  Commenters recommended various time horizons before sunsetting, such as one year,[1666] three years,[1667] five years,[1668] and five to seven years.[1669]  By contrast, several other commenters stated that the Scope 3 emissions safe harbor should not be subject to a sunset.[1670]  One commenter stated that the Scope 3 emissions safe harbor should be indefinite because the underlying data will always be under the control of third

[1661]  *See* letters from Amer. for Fin. Reform, Sunrise Project *et al.*; and ClientEarth.

[1662]  *See id.*

[1663]  *See* letter from CIEL.

[1664]  *See, e.g.*, letters from As You Sow; Bailard; CalPERS; Calvert; Ceres; CFA; ERM CVS; Friends of the Earth US (June 17, 2022) ("Friends of Earth"); IATP; ICCR; Nasdaq; PRI; SKY Harbor; and Soros Fund.

[1665]  *See, e.g.*, letters from As You Sow; Friends of Earth; IATP; PRI; and Soros Fund.

[1666]  *See* letter from ERM CVS.

[1667]  *See, e.g.*, letters from IATP; and ICCR.

[1668]  *See* letter from SKY Harbor.

[1669]  *See* letter from Calvert; *see also* letter from C2ES (recommending that the safe harbor be re-evaluated every 5-7 years).

[1670]  *See, e.g.*, letters from AALA; Alphabet *et al.*; AXPC; CEMEX; Delahaye; J. McClellan; Mtg. Bankers; and Nikola Corporation (June 17, 2022) ("Nikola").

Appellate Case: 24-1628     Page: 398     Date Filed: 03/26/2024 Entry ID: 5377362

parties.[1671]  Another commenter stated that there should be a meaningful safe harbor for the entirety of any final rule considering the "unique" challenges that registrants must overcome to meet the proposed climate-related disclosure obligations.[1672]

### 3.  Final Rules

Because the final rules will not require the disclosure of Scope 3 emissions from any registrant,[1673] we are not adopting a safe harbor for such disclosures in the final rules.  Instead, for the reasons discussed below and consistent with the feedback from commenters that asked the Commission to promulgate a safe harbor for certain climate-related disclosures (in addition to the Scope 3 emissions disclosure safe harbor that was proposed),[1674] we are adopting a provision (Item 1507) stating that disclosures (other than historic facts) provided pursuant to the following subpart 1500 provisions constitute "forward-looking statements" for purposes of the PSLRA safe harbors:

- 17 CFR 229.1502(e) (transition plans);

- 17 CFR 229.1502(f) (scenario analysis);

- 17 CFR 229.1502(g) (internal carbon pricing); and

- 17 CFR 229.1504 (targets and goals).[1675]

In addition, as discussed in more detail below, the final rules provide that the PSLRA safe harbors will apply to these forward-looking statements in connection with certain transactions and disclosures by certain issuers notwithstanding that these transactions and issuers are

---

[1671]    *See* letter from CEMEX.

[1672]    *See* letter from AXPC.

[1673]    *See supra* section II.H.3.

[1674]    *See supra* note 1639 and accompanying text.

[1675]    *See* 17 CFR 229.1507(a)(1).

excluded from the PSLRA safe harbors in subparagraphs (a) and (b) of section 27A of the Securities Act and section 21E of the Exchange Act.

When proposing the climate disclosure rules, the Commission indicated that, because transition planning, scenario analysis, and internal carbon pricing involve assumptions, judgments, and predictions about future events, the PSLRA safe harbors would be applicable to forward-looking statements concerning transition plans, scenario analysis, and internal carbon pricing.[1676]  Moreover, because the proposed targets and goals disclosure provision would require a registrant to disclose how it intends to achieve its climate-related targets or goals, the Commission similarly stated that the PSLRA safe harbors would apply to forward-looking statements made in the context of such targets and goals disclosure.[1677]  Because estimates and assumptions based on future events are intrinsically involved in disclosures concerning a registrant's transition plan, use of scenario analysis or internal carbon pricing, and targets and goals, we continue to believe that such disclosures constitute "forward-looking statements" for purposes of the PSLRA safe harbors.

The PSLRA statutory provisions define "forward-looking statement" to include a number of different types of statements.[1678]  Several of these definitional provisions are potentially applicable to statements made in the context of disclosures regarding transition plans, scenario analysis, and internal carbon pricing made pursuant to Item 1502 and regarding targets and goals made pursuant to Item 1504.  To the extent that disclosures made in response to these Items or to

---

[1676]     *See* Proposing Release, sections II.C and E.

[1677]     *See* Proposing Release, section II.I.

[1678]     *See* 15 U.S.C. 77z-2(i)(1) and 15 U.S.C. 78u-5(i)(1).

395

any other subpart 1500 provision contain one or more of the following statements, they will fall within the PSLRA statutory definition of "forward-looking statement":

- A statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, capital structure, or other financial items;[1679]

- A statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;[1680]

- A statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management, made pursuant to Commission rules;[1681]

- Any statement of the assumptions underlying or relating to the above statements;[1682] and

- A statement containing a projection or estimate of items specified by Commission rule or regulation.[1683]

If a forward-looking statement falls squarely within any of the above-described forward-looking statements, certain parties may rely on the existing PSLRA safe harbors for disclosures made pursuant to any of the subpart 1500 provisions, assuming the other requirements of the

---

[1679] *See* 15 U.S.C. 77z-2(i)(1)(A) and 15 U.S.C. 78u-5(i)(1)(A). For example, a statement of potential capital expenditures made in response to Item 1502(e) (transition plans) and Item 1502(d) (narrative discussion of material impacts of climate-related risks) would likely constitute a forward-looking statement.

[1680] *See* 15 U.S.C. 77z-2(i)(1)(B) and 15 U.S.C. 78u-5(i)(1)(B). For example, a statement of plans to transition to more efficient operations or a different mix of products or services made in response to Item 1502(d), Item 1502(e), or Item 1504 (targets and goals) would likely constitute a forward-looking statement.

[1681] *See* 15 U.S.C. 77z-2(i)(1)(C) and 15 U.S.C. 78u-5(i)(1)(C). For example, a statement of future economic performance made pursuant to Items 1502(d), Item 1504, or Item 303 of Regulation S-K would likely constitute a forward-looking statement.

[1682] *See* 15 U.S.C. 77z-2(i)(1)(D) and 15 U.S.C. 78u-5(i)(1)(D).

[1683] *See* 15 U.S.C. 77z-2(i)(1)(F) and 15 U.S.C. 78u-5(i)(1)(F). For example, a projection or estimate of a registrant's future GHG emissions made pursuant to Item 1504 would likely constitute a forward-looking statement.

PSLRA provisions are met.[1684]  We recognize, however, the concern of some commenters that the PSLRA safe harbors may not be applicable to disclosures related to transition plans, scenario analysis, internal carbon price, and targets and goals to the extent the disclosures consist of a complex mix of factual and forward-looking statements and because the PSLRA safe harbors do not apply to certain parties and certain transactions.[1685]

In addition to the forward-looking statement exemptions expressly provided under the PSLRA, the Commission has authority under the PSLRA to provide exemptions from liability for other statements based on projections or other forward-looking information if the Commission determines that such exemption is consistent with the public interest and the protection of investors.[1686]  The Commission previously exercised this authority when it adopted a rule providing a forward-looking statement safe harbor for certain statements made concerning market risk.[1687]

After considering feedback from commenters, we have concluded that using the authority provided by the PSLRA to extend its protections to disclosures (other than historical facts) concerning transition plans, scenario analysis, internal carbon pricing, and targets and goals is consistent with the public interest and the protection of investors.  We expect that the disclosures

---

[1684]  Other safe harbors, such as Securities Act Rule 175 and Exchange Act Rule 3b-6 and the bespeaks caution doctrine may also continue to apply to disclosures made pursuant to any of the subpart 1500 provisions, depending on specific facts and circumstances.

[1685]  *See, e.g.*, letters from BOA; and Chamber.  For example, the PSLRA safe harbors do not apply to statements made in connection with an IPO, *see* 15 U.S.C. 77z-2(b)(2)(D) and 15 U.S.C. 78u-5(b)(2)(D), or made in connection with an offering by, or related to the operations of, a partnership, limited liability company, or a direct participation investment program, *see* 15 U.S.C. 77z-2(b)(2)(E) and 15 U.S.C. 78u-5(b)(2)(E).

[1686]  15 U.S.C. 77z-2(g) and 15 U.S.C. 78u-5(g).  The PSLRA also provides that it does not limit, "either expressly or by implication, the authority of the Commission to exercise similar authority or to adopt similar rules and regulations with respect to forward-looking statements under any other statute under which the Commission exercises rulemaking authority."  15 U.S.C. 77z-2(h) and 15 U.S.C. 78u-5(h).

[1687]  17 CFR 229.305; *see* Disclosure of Market Risk Sensitive Instruments Release.

Appellate Case: 24-1628    Page: 402    Date Filed: 03/26/2024 Entry ID: 5377362

required by these items will include a complex mixture of both forward-looking and factual information related to climate-related risks and assumptions concerning those risks. Thus, we are providing a safe harbor for these disclosures to avoid having to disentangle the information to claim protection for forward-looking statements under the PSLRA safe harbors, which would increase the compliance burden under the final rules and potentially reduce the usefulness of those disclosures for investors. We also believe that a safe harbor for these disclosures will help incentivize more comprehensive disclosures on these matters to the benefit of investors.[1688]

Statements made by issuers and/or in connection with transactions[1689] currently excluded from the PSLRA statutory safe harbor for forward-looking statements that will be eligible for the final rules' safe harbor include forward-looking statements: made in connection with an offering of securities by a blank check company;[1690] made with respect to the business or operations of an issuer of penny stock; made in connection with a rollup transaction; or made in connection with an IPO,[1691] or in connection with an offering by, or relating to the operations of, a partnership, limited liability company, or a direct participation investment program.[1692]

---

[1688] *See supra* note 1640 and accompanying text.

[1689] In addition to issuers, consistent with the PSLRA safe harbors, the safe harbor will apply to: a person acting on behalf of the issuer; an outside reviewer retained by the issuer making a statement on behalf of the issuer; or an underwriter, with respect to information provided by the issuer or information derived from information provided by the issuer. *See* 15 U.S.C. 77z-2(a)(2)-(4) and 15 U.S.C. 78u-5(a)(2)-(4); *see also infra* note 1691.

[1690] The Commission recently amended Securities Act Rule 405 and Exchange Act Rule 12b-2 to define "blank check company" for purposes of Securities Act Section 27A and Exchange Act Section 21E to mean a company that has no specific business plan or purpose or has indicated that its business plan is to engage in a merger or acquisition with an unidentified company or companies, or other entity or person. *See Special Purpose Acquisition Companies, Shell Companies, and Projections*, Release No. 33-11265 (Jan. 24, 2024), [89 FR 14158 (Feb. 26, 2024)].

[1691] The limitation in 15 U.S.C. 77z-2(a)(1) and 15 U.S.C. 78u-5(a)(1) is not applicable. *See* Item 1507(a)(3). Thus, notwithstanding 15.U.S.C. 77z(2)(a)(1) and 15 U.S.C. 78(u)(a)(1), the safe harbor will apply where an issuer that, at the time the statement is made, is not subject to the reporting requirements of section 13(a) or section 15(d) of the Exchange Act.

[1692] *See* 17 CFR 229.1507(a)(2).

We have determined that it is consistent with the public interest and the protection of investors to extend the safe harbor to these entities, such as partnerships and limited liability companies, and to transactions, such as IPOs, all of which are currently excluded from the PSLRA statutory safe harbor for forward-looking statements, because such entities may be subject to material climate-related risks that will require them to provide the disclosures pursuant to Items 1502(e), (f), or (g), or Item 1504. Extending the PSLRA safe harbor to these specified disclosures will encourage more comprehensive disclosures under these Items and help limit any negative effects to capital formation that may result from the perceived compliance costs associated with these provisions of the final rules.[1693]

Because the disclosure items pertaining to transition plans, scenario analysis, internal carbon pricing, and targets and goals are likely to involve a complex mixture of estimates and assumptions, some of which may be based on a combination of facts and projections, the safe harbor we are adopting provides that all information required by the subpart 1500 provisions concerning transition plans, scenario analysis, internal carbon pricing, and targets and goals is considered forward-looking statements for purposes of the statutory PSLRA safe harbors, except for historical facts.[1694] This provision should encourage more comprehensive disclosures

---

[1693]   *See* 15 U.S.C. 77z-2(b)(1)(B)-(D) and 77z-2(b)(2)(C)-(E); and 15 U.S.C. 78u-5(b)(1)(B)-(D) and 78u-5(b)(2)(C)-(E). We are not using our exemptive authority to extend the PSLRA safe harbors to: (i) issuers specified in Securities Act section 27A(b)(1)(A) and Exchange Act section 21E(b)(1)(A) (specified "bad actors"); (ii) forward looking-statements contained in a registration statement of, or otherwise issued by, an investment company as specified in Securities Act section 27A(b)(2)(B) and Exchange Act section 21E(b)(2)(B); and (iii) forward-looking statements made by an issuer in a going-private transaction, *see* section 27A(b)(1)(E) and Exchange Act section 21E(b)(1)(E), in connection with a tender offer, *see* Securities Act section 27A(b)(2)(C) and Exchange Act section 21E(b)(2)(C), or in a beneficial ownership report required to be filed pursuant to section 13(d) of the Exchange Act, *see* Securities Act section 27A(b)(2)(F) and Exchange Act section 21E(b)(2)(F). *See also* the discussion below of forward-looking statements made in consolidated financial statements, which are excluded from both the PSLRA and Item 1507 safe harbors.

[1694]   *See* 17 CFR 229.1507(b). The Commission adopted a similar provision in the market risk disclosure context. *See* 17 CFR 229.305(d)(2)(i).

regarding these subpart 1500 items, to the benefit of investors, despite their novelty and complexity.

Consistent with the operation of the PSLRA safe harbor, the final rules' forward-looking safe harbor will not be available for statements consisting solely of historical fact because such information does not involve the assumptions, judgments, and predictions about future events that necessitates additional protections.[1695] The safe harbor provision provides as non-exclusive examples of historical facts that are excluded from the safe harbor information related to carbon offsets or RECs described pursuant to a target or goal and a registrant's statements in response to Item 1502(e) (transition plan disclosure) or Item 1504 (targets and goals disclosure) about material expenditures actually incurred.[1696] Like the terms of a material contract, parties covered by the safe harbor should know with reasonable certainty information about a purchased carbon offset or REC, such as the amount of carbon avoidance, reduction, or removal represented by the offset or the amount of generated renewable energy represented by the REC, as well as the nature and source of the offset or REC, and should not need the protection of a forward-looking safe harbor if those items are required to be disclosed pursuant to Item 1504.[1697] Similarly, statements in response to Item 1502(e) (transition plan disclosure) and Item 1504 (targets and goals disclosure) about material expenditures actually incurred will not be eligible for the Item 1507 safe harbor because those statements consist of historical facts.

The PSLRA safe harbor does not apply to forward-looking statements included in financial statements prepared in accordance with generally accepted accounting principles

---

[1695]    *See* 15 U.S.C. 77z-2(a) and 15 U.S.C. 78u-5(a).

[1696]    *See* 17 CFR 229.1507(b).

[1697]    *See* 17 CFR 229.1504(d).

("GAAP").[1698]  Consistent with this, the final rules' safe harbor will not be available for forward-looking statements included in a registrant's consolidated financial statements.  In addition, any such forward-looking statements that are incorporated by reference from the financial statements into a registrant's subpart 1500 disclosures will not be eligible for the Item 1507 safe harbor.

Notwithstanding deeming certain disclosures to be "forward-looking statements" and expanding the PSLRA protections to include certain issuers and transactions under Item 1507, the rest of the PSLRA requirements apply to the Item 1507 safe harbor.  For example, in order for the safe harbor protections to apply, a forward-looking statement must be accompanied by a meaningful cautionary statement that identifies important factors that could cause actual results to differ materially from those in the forward-looking statement.[1699]

Although some commenters asked the Commission to include Scopes 1 and 2 emissions disclosures within the scope of any safe harbor, we decline to follow this recommendation.[1700]  Because the methodologies underlying the calculation of those scopes are fairly well-established,[1701] we do not believe that it is necessary to provide a safe harbor from private litigation for such disclosures.  We also decline to extend the safe harbor to Commission enforcement actions because existing Securities Act Rule 175 and Exchange Act Rule 3b-6 already provide a suitable safe harbor from liability for forward-looking statements in certain Commission enforcement actions.[1702]

---

[1698]    *See* 15 U.S.C. 77z-2(b)(2)(B) and 15 U.S.C. 78u-5(b)(2)(B).

[1699]    *See* 15 U.S.C. 77z-2(c)(1)(A) and 15 U.S.C. 78u-5(c)(1)(A).

[1700]    *See supra* note 1651 and accompanying text.

[1701]    *See, e.g.*, *supra* note 916 and accompanying text.

[1702]    Securities Act Rule 175 and Exchange Act Rule 3b-6 also apply to private litigation.

Appellate Case: 24-1628     Page: 406     Date Filed: 03/26/2024 Entry ID: 5377362

Although some commenters recommended that we sunset any safe harbor,[1703] we decline to follow this recommendation at this time. The Commission may determine at a future date, after assessing how disclosure practices have evolved, whether it makes sense to amend or remove the safe harbor.

## K. Financial Statement Effects (Article 14)

### 1. Introduction

The Commission proposed amendments to Regulation S-X that would require certain disclosures in registrants' financial statements. Specifically, the Commission proposed that if a registrant is required to file the disclosure required by proposed subpart 1500 in a filing that also requires audited financial statements, then the registrant would be required to disclose in a note to its financial statements certain disaggregated financial statement metrics.[1704] The proposed rules would have required disclosure falling under three categories of information:

- Financial Impact Metrics;[1705]

- Expenditure Metrics; and

- Financial Estimates and Assumptions.[1706]

The proposed Financial Impact Metrics would have required disclosure of the impacts of severe weather events and other natural conditions and any efforts to reduce GHG emissions or otherwise mitigate exposure to transition risks on the line items in a registrant's financial

---

[1703] *See supra* note 1664 and accompanying text.

[1704] *See* Proposing Release, section II.F.1.

[1705] The Proposing Release and the proposed rules used the term "metrics" to describe the proposed Regulation S-X amendments, including the proposed Financial Impact Metrics and the proposed Expenditure Metrics. *See* Proposing Release, section II.F. The final rules do not use the term "metrics" to describe the Regulation S-X amendments because we think it is more accurate to characterize them as disclosures of financial statement effects. *See* 17 CFR 210.14-01, 14-02.

[1706] *See* Proposing Release, section II.F.1.

statements.[1707]  Disclosure of the Financial Impact Metrics would have been required if the sum of the absolute value of all impacts on the line item was one percent or more of the total line item for the relevant fiscal year.[1708]  The proposed Expenditure Metrics would have required registrants to disclose expenditures expensed and costs incurred to mitigate risks related to the same severe weather events and other natural conditions and transition activities.[1709]  Under the Expenditure Metrics, disclosure would have been required if the aggregate amount of expenditures expensed or the aggregate amount of capitalized costs was one percent or more of the total expenditure expensed or total capitalized costs incurred, respectively, for the relevant fiscal year.[1710]  In addition, the proposed rules would have required disclosure of Financial Estimates and Assumptions impacted by severe weather events and other natural conditions and transition activities and would have permitted a registrant to include the impact of any opportunities arising from these events and activities on any of the financial metrics disclosed.[1711]

Although commenters' views were mixed, a number of commenters supported adoption of the proposed financial statement disclosure requirements.[1712]  Commenters stated that the

---

[1707]  *See* Proposing Release, section II.F.2.

[1708]  *See id.*

[1709]  *See* Proposing Release, section II.F.3.

[1710]  *See id.*

[1711]  *See* Proposing Release, sections II.2, 3, and 4.

[1712]  *See, e.g.,* letters from Aron Cramer, BSR (May 31, 2022) ("A. Cramer"); AGs of Cal. *et al.*; Amer. For Fin. Reform, Evergreen Action, *et al.*; Amer. For Fin. Reform, Sunrise Project *et al.*; Bailard; Bloomberg; BMO Global Asset Mgmt.; Boston Trust Walden (June 16, 2022) ("Boston Trust"); CalPERS; CalSTRS; Carbon Tracker Initiative (June 17, 2022) ("Carbon Tracker"); Center Amer. Progress; CFB; Climate Advisers (June 17, 2022); D. Higgins; ERM CVS; Dana Investment Advisors (June 16, 2022) ("Dana Invest."); Earthjustice; Investor Advocates for Social Justice (June 17, 2022) ("IASJ"); ICGN; Impax Asset Mgmt.;

Appellate Case: 24-1628     Page: 408     Date Filed: 03/26/2024 Entry ID: 5377362

proposed requirements would promote consistency across reporting and would satisfy investor demand for reliable information about the financial impacts of climate-related risks.[1713] One commenter stated that "integrating climate risk information into financial statements goes to the very purpose of disclosures – helping investors understand how climate-related risks impact the profitability and resilience of a company and its financial position."[1714] Some commenters asserted that it was important to include the disclosures in the notes to the financial statements so that the information is subject to independent audit and registrants' internal control over financial reporting ("ICFR").[1715] Another commenter stated that although existing regulations are clear that registrants must incorporate material climate considerations into the financial statements, this is not being done consistently, and therefore the proposed rules are important to help prevent companies from misrepresenting their financial positions.[1716] Some commenters supported including some climate-related disclosures in the audited financial statements subject to certain

---

Maple-Brown; Minnesota State Board of Investment (June 16, 2022) ("MN SBI"); Morningstar; NY City Comptroller; NY St. Comptroller; PRI; R. Bentley; R. Burke; R. Palacios; RMI; U.S. Reps. Castor *et al.*; Seattle City Employees' Retirement System (June 17, 2022) ("Seattle City ERS"); Sens. J. Reed *et al.*; SFERS; SKY Harbor; UAW Retiree; UCS; USIIA; US SIF; and WSP. Several commenters stated that they supported the inclusion of some climate-related information in the financial statements because climate-related impacts or risks can materially affect a company's financial position and operations. *See* letters from Can. PCPP; Boston Common Asset Mgmt; East Bay Mun.; Mackenzie Investments (June 14, 2022) ("Mackenzie Invest."); and Paradice Invest. Mgmt.

[1713]   *See, e.g.,* letters from Boston Trust; CalPERS; Can. PCPP; Carbon Tracker; CFA; East Bay Mun.; Dana Invest.; ERM CVS; ICGN; Inherent Group, LP (June 17, 2022) ("Inherent Grp."); Prentiss; PwC; R. Bentley; and Seventh Gen.

[1714]   *See* letter from Center Amer. Progress.

[1715]   *See, e.g.,* letters from As You Sow; CFA Institute; Climate Accounting Audit Project (June 17, 2022) ("Climate Accounting Audit Project"); CSB; ERM CVS; NY City Comptroller; PGIM; Sarasin and Partners LLP (June 10, 2022) ("Sarasin"); Seattle City ERS; Sens. J. Reed *et al.*; and UAW Retiree.

[1716]   *See* letter from Sarasin. *See also* letter from Carbon Tracker; Carbon Tracker, *Flying Blind: The Glaring Absence of Climate Risks in Financial Reporting* (Sept. 2021), available at https://carbontracker.org/reports/flying-blind-the-glaring-absence-of-climate-risks-in-financial-reporting/; Carbon Tracker, *Still Flying Blind: The Absence of Climate Risk in Financial Reporting* (Oct. 2022), available at https://carbontracker.org/reports/still-flying-blind-the-absence-of-climate-risk-in-financial-reporting/.

App.404

revisions as described below.[1717]  One of these commenters stated that the linkage of the climate-related risks disclosed elsewhere in the filing to the financial statements is essential.[1718]  This commenter explained that "[a]nchoring the disclosures outside the financial statements to those within the financial statements will have a focusing effect and increase the reliability and consistency of both."[1719]

Conversely, many commenters expressed the view that the proposed rules would be difficult to implement and would require registrants to make costly and burdensome adjustments to their controls, procedures, and accounting records to provide the disclosures.[1720]  Many commenters asserted that the proposed requirements would result in the disclosure of a potentially overwhelming volume of information that would be immaterial to investors.[1721]

---

[1717]  *See, e.g.*, letters from Amazon; Amer. Academy Actuaries; Calvert; CEMEX; Ceres and the Center for Audit Quality ("Ceres, *et al.*") (Mar. 28, 2023); CFA Institute; Colorado Public Employees' Retirement Association (June 17, 2022) ("CO PERA"); IAA; Inclusive Cap.; ISS ESG (June 22, 2022); MFA; Northern Trust; PIMCO; PwC; TIAA; TotalEnergies, and Unilever.

[1718]  *See* letter from CFA Institute.

[1719]  *See id.*

[1720]  *See, e.g.*, letters from ABA; ACLI; AFPM; BlackRock; Business Roundtable; Can. Bankers; Chevron; CohnReznick LLP (June 22, 2022) ("Cohn Rez."); ConocoPhillips ("Compliance with the proposed rules . . . will require registrants to implement an entirely separate and additional set of books or ledgers of activity-based costing, which will be costly and time-consuming."); Corteva; HP; INGAA; Kevin Connor, Es. (June 17, 2022) ("K. Connor"); Marathon Oil; NACCO (identifying costs related to the "development of new systems . . ., hiring of new staff . . ., and utilization of outside consultants."); National Alliance of Forest Owners (June 17, 2022) ("NAFO"); NAM ("The extreme burden of building new processes and systems to track quantitative climate impacts, with no materiality threshold or even a de minimis exception for minor events or immaterial impacts, would impose colossal costs and strain resources at all public companies."); NG; NYSE Sustainability Advisory Council (June 20, 2022) ("NYSE SAC"); OPC; PPL; Semiconductor Industry Association (June 17, 2022) ("SIA"); Soc. Corp. Gov. (identifying costs related to the "[d]evelopment of new systems, processes, and controls" and "the hiring of additional internal staff and outside consultants"); Sullivan Cromwell; Vodafone; and Williams Cos. ("Williams would also expect a significant increase in core financial statement audit fees due to the additional granular disclosure requirements, the significant expansion of related internal controls related to the new disclosures, and the high degree of judgment and estimation required in developing the disclosed information.").

[1721]  *See, e.g.,* letters from BlackRock; Cleco Corporate Holdings (June 17, 2022) ("Cleco"); Daniel Churay (June 16, 2022); Energy Transfer; Edison Electric Institute and the American Gas Association (June 17, 2022) ("EEI & AGA"); Exxon; Magellan Midstream Partners, L.P. (June 17, 2022) ("Magellan"); State Treasurer of Missouri (June 17, 2022) ("MO Treas."); MRC Global Inc (June 17, 2022) ("MRC Global"); Richard C. Breeden, Harvey L. Pitt, Phillip R. Lochner Jr., Richard Y. Roberts, Paul S. Atkins (June 17, 2022) ("R. Breeden *et al.*"); and Transocean (June 16, 2022).

Some commenters stated that the Commission's existing rules elicit sufficient disclosure for investors[1722] or would elicit sufficient disclosure when combined with the Commission's proposed amendments to Regulation S-K.[1723]

A number of commenters recommended alternatives to the proposed financial statement disclosures. For example, some commenters stated that in lieu of the proposed rules, the Commission should instead require registrants to discuss the impact of climate-related matters on the registrant's financial position in Item 303 of Regulation S-K (i.e., MD&A).[1724] Other commenters stated that registrants are already required to disclose material climate-related impacts in MD&A.[1725] A number of commenters recommended that the Commission work with the FASB to determine whether accounting standards should be developed to address climate-related financial statement disclosures or that the Commission should simply refer the development of standards to the FASB.[1726] Other commenters stated that the Commission

---

[1722] *See, e.g.,* letters from Business Roundtable; Dow, Inc.; LTSE; NG; and NIRI Capital Area Chapter (July 6, 2022) ("NIRI").

[1723] *See* letter from Deutsche Bank Securities Inc. (June 17, 2022) ("Deutsche Bank").

[1724] *See, e.g.,* letters from ABA; Airlines for America; Alphabet *et al.*; Amer. Bankers; BDO USA LLP; BPI; California Resources Corporation (June 17, 2022) ("Cal. Resources"); Can. Bankers; CAQ; FEI's Committee on Corporate Reporting (June 17, 2022) ("CCR"); Climate Risk Consortia; Connor Grp.; Diageo; Dominion Energy; Eni Spa; Grant Thornton; LLP; IIB; IIF; Financial Reporting Committee of the Institute of Management Accountants (June 21, 2022) ("IMA"); IPA; JLL (June 17, 2022) ("JLL"); Linklaters LLP (June 17, 2022) ("Linklaters"); Mtg. Bankers; NG; Royal Gold (June 17, 2022); Shearman Sterling; SIFMA AMG; Soc. Corp. Gov. (Sept 9, 2022); T. Rowe Price; Unilever; Walmart; and Wells Fargo.

[1725] *See, e.g.,* letters from BlackRock; ConocoPhillips; Hannon Armstrong; and Sullivan Cromwell.

[1726] *See, e.g.,* letters from ABA; AEPC; API; Autodesk; BDO USA LLP; Bipartisan Policy; BlackRock; BPI; Cal. Resources; Connor Grp.; Joint Trade Associations: CRE Finance Council, Housing Policy Council, Institute for Portfolio Alternatives, Mortgage Bankers Association, NAIOP, the Commercial Real Estate Development Association, Nareit, National Apartment Association, National Association of Home Builders of the United States, National Association of REALTORS, NMHC, The Real Estate Roundtable, CRE Financial Council (June 13, 2022) ("CRE Fin. *et al.*"); Davis Polk; Deutsche Bank; Etsy; IPA; MRC Global; Nareit; OPC; RILA; Shearman Sterling; SIFMA AMG; S.P. Kothari and Craig Lewis (June 17, 2022) ("S.P. Kothari *et al.*"); and Sullivan Cromwell. *See also* letter from AICPA (stating that prescribing accounting principles requires a robust and transparent standard-setting process and advising the Commission to "consider whether it is ideally positioned to establish new accounting rules on this topic.").

should instead update or issue new guidance addressing climate-related risk disclosure[1727] or consider requiring disclosure of the financial impacts in a separate report published outside of the financial statements.[1728]  Finally, some commenters stated that the proposed financial statement metrics should only apply to registrants in certain sectors or industries, such as the energy sector.[1729]

After consideration of the feedback received from commenters, we are adopting rules that require certain financial statement effects to be disclosed in a note to the financial statements, but with modifications.  We appreciate the significant concerns raised by commenters with respect to the potential burdens resulting from the proposed financial statement disclosures, including the adjustments that registrants stated they would need to make to their controls, processes, and accounting records in order to comply with the proposed requirements.[1730]  Therefore, we are adopting rules that require registrants to provide decision-useful information to investors but that are significantly narrower in scope than the proposed rules, which should help to mitigate concerns about the potential burdens of the disclosure.

The Commission is not adopting the proposed Financial Impact Metrics and is modifying the scope of the proposed Expenditure Metrics and proposed Financial Estimates and Assumptions in the final rules, including by narrowing several aspects of the final rules as compared to the proposal.  Declining to adopt the Financial Impact Metrics will reduce costs and

---

[1727]     *See, e.g.,* letters from BIO; and EMC.

[1728]     *See, e.g.*, letters from AFEP (June 17, 2022); AHLA; McCormick; and BIO.

[1729]     *See, e.g.,* letters from ACLI; and Soros Fund ("While we believe it is valuable for all companies to evaluate how climate impacts and expenditures are tied to line items in their financial statements, we believe only companies in high emitting industries and large accelerated filers should be required to disclose the proposed financial statement metrics, and we do not believe it should be pursuant to Regulation S-X.").

[1730]     *See supra* note 1720 and accompanying text.

ease many of the burdens that commenters stated would arise as a result of a requirement to disclose financial impacts on a line item basis.[1731]  As discussed in greater detail below, the final rules are focused on requiring the disclosure of capitalized costs, expenditures expensed, charges, and losses[1732] incurred as a result of severe weather events and other natural conditions, and capitalized costs, expenditures expensed, and losses related to carbon offsets and RECs, subject to disclosure thresholds.[1733]  These capitalized costs, expenditures expensed, charges, and losses represent quantitative information that is derived from transactions and amounts recorded in a registrant's books and records underlying the financial statements.  The final rules require registrants to disclose where on the balance sheet and income statement these capitalized costs, expenditures expensed, charges, and losses are presented.[1734]  However, the balance sheet and income statement line items where these capitalized costs, expenditures expensed, charges, and losses are presented will be far fewer in number as compared to the number of line items that would have been impacted by the proposed Financial Impact Metrics, which, for example, would have required registrants to disclose changes in revenues due to disruptions of business operations.[1735]  To narrow the scope further, the final rules do not require the disclosure of any

---

[1731]  *See supra* note 1730 and accompanying text.

[1732]  While the final rules use the terms "charges" and "losses" in the disclosure requirements related to expenditures, these terms represent impacts that would have been disclosed under the proposed Financial Impact Metrics and, accordingly, we do not consider these to be an expansion of the proposed disclosure requirements.  *See infra* note 1735 for an explanation of the overlap between the proposed Financial Impact Metrics and the proposed Expenditure Metrics.

[1733]  *See* 17 CFR 210.14-02(c), (d), and (e).

[1734]  *See id.*  See *infra* section K.3.c.i for further discussion of the requirement to disclose where on the balance sheet and income statement the required capitalized costs, expenditures expensed, charges, and losses are presented.

[1735]  *See* Proposing Release, section II.F.2.  In response to a request for comment included in the Proposing Release, commenters stated that the Financial Impact Metrics and Expenditure Metrics, as proposed, potentially would result in some overlapping disclosures with respect to costs and expenditures (i.e., certain costs included in the aggregate disclosures required by the proposed Expenditure Metrics would also have been captured by the proposed Financial Impact Metrics line item disclosures).

impacts on the statement of cash flows, as would have been required under the proposed rules.[1736]

In addition, although we are retaining a one percent disclosure threshold in the final rules, registrants will not be required to apply it on a line item basis to determine whether disclosure is required since we are not adopting the proposed Financial Impact Metrics. Instead, as discussed in greater detail below, the final rules require the application of the one percent disclosure threshold to only two categories of aggregate amounts: (1) expenditures expensed as incurred and losses; and (2) capitalized costs and charges, in both cases incurred as a result of severe weather events and other natural conditions. The final rules use different denominators for the disclosure thresholds as compared to the proposal and include de minimis thresholds to help respond to commenters' concerns about burdens.[1737] The requirement to disclose capitalized costs, expenditures expensed, and losses related to carbon offsets and RECs is not subject to a one percent disclosure threshold. Rather, disclosure is only required if carbon offsets and RECs have been used as material component of a registrant's plans to achieve its disclosed climate-related targets or goals.[1738] As discussed in greater detail above, instead of requiring the disclosure of expenditures related to transition activities in the financial statements as proposed, the final rules will require registrants to disclose material expenditures related to (1) activities to mitigate or adapt to climate-related risk (in management's assessment), (2) disclosed transition

---

[1736] *See* Proposing Release, section II.F.2 ("A registrant would be required to determine the impacts of severe weather events, other natural conditions, transition activities, and identified climate-related risks described above on each consolidated financial statement line item.").

[1737] *See infra* section II.K.3.c.ii for further discussion of the disclosure threshold requirement. In addition, in response to commenters' concerns, we are adopting a principle for attributing an expenditure to a severe weather event or other natural condition and for determining the amount to be disclosed. *See infra* section II.K.3.c.iii.

[1738] *See infra* section II.K.3.c.vi for further discussion of this requirement.

Appellate Case: 24-1628     Page: 414     Date Filed: 03/26/2024 Entry ID: 5377362

plans, and (3) disclosed targets and goals, outside of the financial statements as part of the amendments to Regulation S-K.[1739]  The final rules we are adopting seek to realize many of the benefits of the proposed rules in terms of enhanced financial statement disclosure while minimizing the likelihood that issuers will need to undertake costly updates to their internal systems and processes.  Physical risks, such as severe weather events and other natural conditions, can significantly affect public companies' financial performance or position.[1740]  Investors need disaggregated disclosure of capitalized costs, expenditures expensed, charges, and losses incurred as a result of severe weather events and other natural conditions to better understand the effect such events have on the financial statements.[1741]  By expanding on the information provided in the financial statements, the final rules will help investors "assess a registrant's exposure to physical risks,"[1742] and "better understand the overall vulnerability of

---

[1739]  *See supra* sections II.D.1.c, II.D.2.c, and II.G.3.a.

[1740]  *See, e.g.*, Richard Vanderford, *A Punishing Year of Thunderstorms has Led to Record-Breaking Losses*, The Wall Street Journal (Nov. 24, 2023) (stating that thunderstorms (formally known as severe convective storms) "have so far led to at least $55.67 billion in insured damages in the U.S. this year through Nov. 13. . . Insured damages from the storms had never before topped $50 billion.").  *See also* NOAA National Centers for Environmental Information, U.S. Billion-Dollar Weather and Climate Disasters (2024), available at https://www.ncei.noaa.gov/access/billions/ (stating that, in 2023, 28 confirmed weather/climate disaster events with losses exceeding $1 billion each affected the United States, including 1 drought event, 4 flooding events, 19 severe storm events, 2 tropical cyclone events, 1 wildfire event, and 1 winter storm event, with damages totaling at least $92.9 billion); Form Letter F (stating that increasingly severe weather events "affect numerous corporate assets and operations, putting pressure on essential supply chains, posing harm to facilities, and undermining the ability of businesses to meet targets" and therefore investors need to be aware of how companies are impacted by these financial risks).

[1741]  *See, e.g.*, letters from As You Sow (stating its support for requiring the disclosure of "costs of physical risks," among other things, in the financial statements); Boston Trust (supporting the disclosure of expenditures related to severe weather events); CalPERS (stating that it is important to require the disclosure of the impact of "extreme temperatures, flooding, drought, [and] wildfires" in the financial statements); ICGN (supporting the disclosure of how physical impacts are accounted for in the financial statements); Maple Brown (stating that requiring disclosures in the financial statements would make it "better equipped to price in potential risks" such as "the physical risks associated with more frequent and extreme weather events"); MNSBI (stating a need for disaggregated physical and transition risk-related impacts on the financial statements); and UCS ("Requiring issuers to disclose disaggregated financial metrics that will be subject to audit must remain in the rule.").

[1742]  *See* letter from Boston Trust.

Appellate Case: 24-1628     Page: 415     Date Filed: 03/26/2024 Entry ID: 5377362

assets . . . [and] loss experience."[1743]  In addition, the requirement to provide disaggregated disclosure of capitalized costs, expenditures expensed, and losses incurred in connection with the purchase and use of carbon offsets and RECs will provide investors with needed transparency about the financial statement effects of a registrant's purchase and use of carbon offsets and RECs as part of its climate-related business strategy.  As such, the disclosure required by the final rules will help investors make better informed investment or voting decisions by eliciting more complete disclosure of financial statement effects and improving the consistency, comparability, and reliability of such disclosures.  In this way, the final rules appropriately balance the need for enhanced financial statement disclosures with the potential costs entailed to produce such disclosures given the current state of financial reporting practices.

Consistent with the proposed rules, the final rules require a registrant to include the financial statement disclosures in any filing that is required to include disclosure pursuant to subpart 1500 and that also requires the registrant to include its audited financial statements.[1744]
For the avoidance of doubt, this means that a registrant is required to comply with the requirements in Article 14 even if it does not have information to disclose pursuant to subpart 1500, as long as the applicable Commission filing requires the registrant to comply with subpart 1500.  Including disclosure of the financial statement effects in a note to the financial statements, as proposed, as opposed to including them outside of the financial statements, such as exclusively in the MD&A section of registrants' filings as recommended by some

---

[1743]    *See* letter from IAA.

[1744]    *See* 17 CFR 210.14-01(a).  For example, the note to the financial statements will not be required in a Form 10-Q filing.  Similarly, the note to the financial statements will not be required for unaudited interim financial statements included in a registration statement.  *See, e.g.*, 17 CFR 210.3-01, 3-02, 8-03, 10-01.  *See also infra* note 2380 and section II.L.3, which discuss the applicability of the rules to foreign private issuers.

commenters,[1745] will subject these disclosures to the same financial statement audit and ICFR as similar financial disclosures, which will improve their consistency, quality, and reliability and thereby provide an important benefit to investors.

In addition, the disclosure requirements we are adopting will apply to public companies generally as opposed to only requiring companies in certain industries or sectors to comply with the final rules. The final rules are focused on requiring the disclosure of capitalized costs, expenditures expensed, charges, and losses incurred as a result of severe weather events and other natural conditions, which are occurrences that can happen to public companies in any sector or industry, and therefore it would not be appropriate to only require public companies in certain sectors or industries to comply with the rules. The decision not to limit the scope of Article 14 to only public companies in certain sectors or industries is consistent with the approach we are taking with respect to the amendments to Regulation S-K, which similarly are not limited to public companies in certain sectors or industries.

Furthermore, the financial statement disclosure requirements included in the final rules will apply to SRCs and EGCs. A few commenters raised concerns about the application of the proposed financial statement disclosure requirements to smaller companies, including SRCs.[1746] We considered whether it would be appropriate to exempt SRCs and EGCs from the financial statement disclosure requirements. We recognize that SRCs generally may avail themselves of the scaled disclosure requirements in Article 8 of Regulation S-X. However, as the Commission expressed in the Proposing Release, we determined that it is appropriate to apply the financial

---

[1745]  *See supra* note 1724 and accompanying text. Registrants are reminded that they may nonetheless have an obligation to discuss climate-related information in MD&A if the information meets the requirements for disclosure under Item 303 of Regulation S-K. *See* 17 CFR 229.303; 2010 Guidance.

[1746]  *See, e.g.*, letters from Abrasca; Cohn Rez.; Henry H Huang (Apr. 16, 2022) ("H. Huang"); NAM; US SBA; and Volta.

statement disclosure requirements to SRCs and EGCs because severe weather events and other natural conditions can pose significant risks to the operations and financial conditions of all registrants. We expect that the narrower scope of the final rules we are adopting will significantly mitigate the costs and burdens for registrants of all sizes as compared to the proposed rules, including certain aspects of the final rules that may particularly benefit SRCs and EGCs, such as a de minimis disclosure threshold, which is discussed in further detail below. The final rules also provide SRCs and EGCs with a longer phased in compliance period than other registrants, which will give them more time to prepare to comply with the final rules.[1747] In addition, as explained in greater detail below in section II.L.3, the final rules, including the amendments to Regulation S-X, will not apply to a private company that is a party to a business combination transaction, as defined by Securities Act Rule 165(f), involving a securities offering registered on Form S-4 or F-4.

We do not agree with those commenters who stated that the Commission should not adopt the amendments and instead refer the matter to the FASB.[1748] Although the Commission has recognized the FASB's financial accounting and reporting standards as "generally accepted" for purposes of the Federal securities laws, as explained above in section II.B, the Securities Act and the Exchange Act (as confirmed by the Sarbanes-Oxley Act of 2002) make it clear that the Commission has the ultimate responsibility and broad authority to set accounting standards,

---

[1747] *See infra* section II.O.3 for a discussion of the compliance dates for the final rules.

[1748] *See supra* note 1726 and accompanying text. Some commenters, however, stated that the Commission should not defer to the FASB. *See, e.g.*, letters from Ceres; and CFA Institute.

413

Appellate Case: 24-1628    Page: 418    Date Filed: 03/26/2024 Entry ID: 5377362

principles, and financial statement disclosure requirements for registrants.[1749]  The Commission

is exercising its authority to prescribe the financial statement disclosure requirements included in

the final rules in response to the need expressed by investors for information related to the

financial statement impacts of severe weather events as discussed elsewhere in this release.[1750]

Significantly, the rules we are adopting amend both Regulation S-K, which prescribes the

narrative disclosure requirements for registrants' periodic filings with the Commission, and

Regulation S-X, which prescribes the requirements for the financial statements included in those

filings.  Therefore, adopting financial statement requirements as part of this rulemaking will

provide for consistent disclosure of information across registrants' public filings and avoid

potential inconsistencies that could arise through an approach that requires both Commission and

---

[1749]    *See, e.g.,* 15 U.S.C. 77s(a) (Among other things, the Commission shall have authority, for the purposes of this subchapter, to prescribe the form or forms in which required information shall be set forth, the items or details to be shown in the balance sheet and earning statement, and the methods to be followed in the preparation of accounts, in the appraisal or valuation of assets and liabilities, in the determination of depreciation and depletion, in the differentiation of recurring and nonrecurring income, in the differentiation of investment and operating income, and in the preparation, where the Commission deems it necessary or desirable, of consolidated balance sheets or income accounts of any person directly or indirectly controlling or controlled by the issuer, or any person under direct or indirect common control with the issuer. The rules and regulations of the Commission shall be effective upon publication in the manner which the Commission shall prescribe); 15 U.S.C. 7218(c) (Nothing in this Act, including this section and the amendment made by this section, shall be construed to impair or limit the authority of the Commission to establish accounting principles or standards for purposes of enforcement of the securities laws.); and *Policy Statement: Reaffirming the Status of the FASB as a Designated Private-Sector Standard Setter*, Release No. 33-8221 (Apr. 25, 2003) [68 FR 23333, 23334 (May 1, 2003)] (While the Commission consistently has looked to the private sector in the past to set accounting standards, the securities laws, including the Sarbanes-Oxley Act, clearly provide the Commission with authority to set accounting standards for public companies and other entities that file financial statements with the Commission.).  *See also* FASB Accounting Standards Codification ("FASB ASC") Topic 105-10-10-1 ("Rules and interpretive releases of the Securities and Exchange Commission . . . are also sources of authoritative GAAP for SEC registrants.").

[1750]    *See supra* note 1741 and accompanying text.

independent FASB action.[1751]  In addition, the final rules will apply regardless of whether the registrant applies U.S. GAAP, IFRS, or local GAAP, and therefore rulemaking by the Commission ensures that registrants are subject to the same requirements since the adoption of standards by the FASB would be limited to registrants that apply U.S. GAAP to their financial statements.  Under each of these circumstances, it is appropriate for the Commission to adopt rules to ensure that investors are receiving the consistent, comparable, and reliable information they need to make timely investing and voting decisions.[1752]

### 2.  Financial Impact Metrics

#### a.  Proposed Rules

The Commission proposed to amend Regulation S-X to require a registrant to disclose Financial Impact Metrics.  More specifically, the Financial Impact Metrics would have required a registrant to disclose the financial impacts from severe weather events and other natural conditions and transition activities on any relevant line item in the registrant's consolidated financial statements during the fiscal years presented.[1753]  The Commission explained in the Proposing Release that this proposed requirement was intended to complement the proposed requirement in Item 1502(d) of Regulation S-K that called for a registrant to provide a narrative discussion of whether and how any of its identified climate-related risks have affected or are

---

[1751]    The final rules establish presentation and disclosure requirements; they do not alter or establish recognition and measurement requirements.  As discussed in greater detail above in section II.B, the Commission has previously adopted presentation and disclosure requirements regarding the form and content of the financial statements.  For example, Rule 5-02 of Regulation S-X prescribes the various line items and certain additional disclosures that should appear on the face of the balance sheet or related notes.  *See* 17 CFR 210.5-02.

[1752]    *See General Revision of Regulation S-X*, Release No. 6233 (Sept. 25, 1980) [45 FR 63660, 63661 (Sept. 25, 1980)] (explaining, in connection with amendments to Regulation S-X, that the Commission does not believe "any decision to require particular disclosures . . . through rulemaking in [Regulation] S-X, conflicts with the basic policy of relying on the FASB for leadership in establishing financial accounting and reporting standards").

[1753]    *See* Proposing Release, section II.F.2.

reasonably likely to affect the registrant's consolidated financial statements.[1754]  The Commission also explained in the Proposing Release that requiring disclosure of the impacts from severe weather events and other natural conditions and transition activities would capture a broad spectrum of physical and transition risks.[1755]  To aid in the comparability of disclosures and to assist issuers, the proposed rules identified flooding, drought, wildfires, extreme temperatures, and sea level rise as non-exclusive examples of severe weather events and other natural conditions that may require disclosure.[1756]  The Commission further noted that there has been an increased recognition of the current and potential effects, both positive and negative, of these events and associated physical risks on a registrant's business as well as its financial performance and position.[1757]  With respect to transition risks, the Commission proposed to require a registrant to disclose the financial impact of any identified transition risks and any efforts to reduce GHG emissions or otherwise mitigate exposure to transition risks (collectively, "transition activities") on any relevant line items in the registrant's consolidated financial statements during the fiscal years presented.[1758]

The proposed rules prescribed a specific quantitative disclosure threshold for the Financial Impact Metrics.  Specifically, a registrant would have been required to disclose the impacts of severe weather events, other natural conditions, and transition activities on the consolidated financial statements included in the relevant filing unless the aggregated impact of

---

[1754]    *See id.*

[1755]    *See id.*

[1756]    *See id.*  With the exception of wildfires, all of these examples were identified by the Commission more than a decade ago in its 2010 Guidance as events that could potentially affect a registrant's operations and results.

[1757]    *See id.* (citing, among other sources, the FSOC's Report on Climate Related Financial Risk 2021, which discussed significant costs from the types of events identified in the proposed rule).

[1758]    *See id.*

the severe weather events, other natural conditions, and transition activities was less than one percent of the total line item for the relevant fiscal year.[1759]  The Commission stated that this quantitative threshold would provide a bright-line standard for registrants and should reduce the risk of underreporting such information.[1760]  The Commission further stated that the proposed quantitative threshold could promote comparability and consistency among a registrant's filings over time and among different registrants compared to a more principles-based approach.[1761]  The Commission also pointed out that it has used similar one-percent thresholds in other contexts (within the financial statements and without),[1762] and that, more generally, other rules such as 17 CFR 229.103 and 17 CFR 229.404 use quantitative disclosure thresholds to facilitate comparability, consistency, and clarity in determining when information must be disclosed.[1763]

Under the proposed rules, impacts would have, at a minimum, been required to be disclosed on an aggregated, line-by-line basis for all negative impacts and, separately, on an

---

[1759]   *See id.*

[1760]   *See id.*

[1761]   *See id.*

[1762]   *See, e.g.*, 17 CFR 210.5-03.1(a) (stating that if the total of sales and revenues reported under this caption includes excise taxes in an amount equal to 1% or more of such total, the amount of such excise taxes shall be shown on the face of the statement parenthetically or otherwise) and 17 CFR 210.12-13 (requiring disclosure of open option contracts by management investment companies using a 1% of net asset value threshold, based on the notional amounts of the contracts).

[1763]   *See* Proposing Release, section II.F.2 (citing 17 CFR 229.103(b)(2) (requiring disclosure of a legal proceeding primarily involving a claim for damages if the amount involved, exclusive of interest and costs, exceeds 10 percent of the current assets of the registrant and its subsidiaries on a consolidated basis), (c)(3)(iii) (requiring disclosure of a judicial proceeding that has been enacted or adopted regulating the discharge of materials into the environment or primarily for the purpose of protecting the environment, if a governmental authority is a party to such proceeding and such proceeding involves potential monetary sanctions, unless the registrant reasonably believes that such proceeding will result in no monetary sanctions or monetary sanctions, exclusive of interest and costs, of less than $300,000) and 17 CFR 229.404(a) (requiring disclosure of any transaction, since the beginning of the registrant's last fiscal year, or any currently proposed transaction, in which the registrant was or is to be a participant and the amount involved exceeds $120,000, and in which any related person had or will have a direct or indirect material interest).

Appellate Case: 24-1628      Page: 422      Date Filed: 03/26/2024   Entry ID: 5377362

aggregated, line-by-line basis for all positive impacts.[1764]  For purposes of determining whether the disclosure threshold has been met, a registrant would be required to aggregate the absolute value of the positive and negative impacts on a line-by-line basis, which the Commission explained would better reflect the significance of the impact of severe weather events, other natural conditions, and transition activities on a registrant's financial performance and position.[1765]

To provide additional clarity, the proposed rules included the following examples of disclosures that may be required to reflect the impact of the severe weather events and other natural conditions on each line item of the registrant's consolidated financial statements (e.g., line items of the consolidated income statement, balance sheet, or cash flow statement):

- Changes to revenues or costs from disruptions to business operations or supply chains;

- Impairment charges and changes to the carrying amount of assets (such as inventory, intangibles, and property, plant, and equipment) due to the assets being exposed to severe weather, flooding, drought, wildfires, extreme temperatures, and sea level rise;

- Changes to loss contingencies or reserves (such as environmental reserves or loan loss allowances) due to impact from severe weather events; and

- Changes to total expected insured losses due to flooding or wildfire patterns.[1766]

---

[1764]    *See id.*

[1765]    *See id.*

[1766]    *See id.*

With respect to the financial impacts of transition activities, the proposed rules included the following examples of potential impacts:

- Changes to revenue or cost due to new emissions pricing or regulations resulting in the loss of a sales contract;

- Changes to operating, investing, or financing cash flow from changes in upstream costs, such as transportation of raw materials;

- Changes to the carrying amount of assets (such as intangibles and property, plant, and equipment), for example, due to a reduction of the asset's useful life or a change in the asset's salvage value by being exposed to transition activities; and

- Changes to interest expense driven by financial instruments such as climate-linked bonds issued where the interest rate increases if certain climate-related targets are not met.[1767]

The Commission noted in the Proposing Release that an analogous approach to disaggregated, or separately stated, disclosure has been taken in other contexts within the financial statements and elsewhere, including in segment reporting,[1768] and that the importance of disaggregated disclosure in a registrant's financial statements is also supported by concepts set forth in FASB ASC Topic 606 *Revenue from Contracts with Customers* and IFRS 15 *Revenue*

---

[1767] *See id.*

[1768] For example, in segment reporting, a registrant must present within its consolidated financial statements a separate presentation of certain financial statement line items for each segment. *See* FASB ASC Topic 280 *Segment Reporting* and IFRS 8 *Operating Segments* (requiring segment reporting disclosures to be included in the audited financial statements). The Commission has noted the importance of disaggregated disclosure in the segment reporting context, stating that it "has long been aware of the importance of meaningful segment information to reasoned investment decision-making." *See Industry and Homogenous Geographic Segment Reporting*, Release No. 33-6514 (Feb. 15, 1984) [49 FR 6737, 6738 (Feb. 23, 1984)]. For simplicity, we do not refer to the corresponding IFRS in each instance where we reference the FASB ASC. Accordingly, references in this release to the FASB ASC should be read to refer also to the corresponding IFRS for foreign private issuers applying those standards.

*from Contracts with Customers*.[1769]  The Commission further noted that disaggregation of certain

financial statement line items is also required by Article 5 of Regulation S-X, which calls for

separate disclosure of specific balance sheet and income statement line items when practicable or

when certain percentage thresholds are met, depending on the nature of the information.[1770]

Finally, the Commission proposed to require registrants to disclose the impacts of any

climate-related risks identified pursuant to proposed Item 1502(a) of Regulation S-K—both

physical risks and transition risks—on any of the financial statement metrics.[1771]

**b.  Comments**

**i.  General Comments**

Some commenters supported the proposal to require disclosure of Financial Impact

Metrics.[1772]  These commenters generally indicated that the proposed disclosures would be used

---

[1769]    *See* Proposing Release, section II.F.2.  FASB ASC Topic 606 and IFRS 15 require, among other things, disclosure of disaggregated revenue recognized from contracts with customers into categories that depict how the nature, amount, timing, and uncertainty of revenue and cash flows are affected by economic factors.

[1770]    *See* Proposing Release, section II.F.2.  The analogies presented in this paragraph are not intended to imply that FASB ASC Topic 280, IFRS 8 or other concepts would have to be applied when accounting for and disclosing the financial statement effects required by the final rules.  The analogies are also not intended to imply that the determination of when disclosure may be required and how that determination is made is the same across all these concepts.

[1771]    *See* Proposing Release, section II.F.2.

[1772]    *See, e.g.*, letters from A. Cramer; A. Payton (June 17, 2022); AGs of Cal. *et al.*; American Academy of Actuaries (June 17, 2022) ("Amer. Academy Actuaries"); Anthesis; Arjuna Capital (June 17, 2022) ("Arjuna"); As You Sow; Better Markets; Bloomberg; BMO Global Asset Mgmt.; Boston Trust; CalPERS; CalSTRS; Carbon Tracker; Center Amer. Progress; CFB; Church Investment Group (June 15, 2022) ("Church Grp."); Climate Accounting Audit Project; Climate Advisers; CSB; Dana Invest.; D. Higgins; Domini Impact; Ecofin; ERM CVS; H. Huang; IASJ; ICGN; Impax Asset Mgmt.; Inherent Grp.; Mercy Investment Services (June 16, 2022) ("Mercy Invest."); M. Hadick; Miller/Howard; Morningstar; The Committee on Mission Responsibility Through Investment of the Presbyterian Church (June 14, 2022) ("MRTI"); Northern Trust; NY City Comptroller; NY St. Comptroller; Parnassus; PGIM; PRI; R. Bentley; R. Burke; U.S. Reps. Castor *et al.*; RMI; Rockefeller Asset Mgmt.; R. Palacios; Sarasin; Seattle City ERS; Sens. J. Reed *et al.*; Seventh Gen.; SFERS; SKY Harbor; Terra Alpha; UAW Retiree; UCS; UNCA Divest (June 15, 2022) ("UNCA"); United Church Funds (June 15, 2022); USIIA; US SIF; WSP; and Xpansiv Ltd. (June 17, 2022) ("Xpansiv").  Certain of these commenters stated they also would support requiring registrants to disclose changes to the cost of capital resulting from climate-related events.  *See, e.g.*, letters from Carbon Tracker; Eni Spa; and ICGN.  *But see* letter from TotalEnergies (stating that the Commission should not require disclosure of changes to cost of capital).

420

by investors to make investment and voting decisions.[1773]  Specifically, one commenter stated that the Financial Impact Metrics would be used by investors in voting, engaging, buying, and selling decisions and would help investors determine whether the company is "properly oriented to manage for the long-term."[1774]  Some commenters asserted that the proposed Financial Impact Metrics would provide investors with the information they need in a standardized or comparable way[1775] and that the level of detail required would be helpful for investors.[1776]

Commenters also asserted that the proposed Financial Impact Metrics are necessary to fill a void in the information currently provided to investors.  For example, one commenter stated that requiring disclosure on a line item basis would "overcome the longstanding problem of registrant climate risk disclosure that is too generic and boilerplate, or non-existent, despite repeated efforts by the [Commission] to encourage more detailed information in this broad area of risk."[1777]  Some of these commenters suggested that the Commission provide additional guidance to facilitate the disclosure of the Financial Impact Metrics.[1778]

Some commenters generally supported requiring the disclosure of climate-related impacts in the financial statements, but they identified certain challenges and recommended certain revisions to the proposed Financial Impact Metrics.[1779]  For example, as discussed in greater detail below, a number of these commenters recommended that the Commission replace the one

---

[1773]   *See, e.g.,* letters from Anthesis; Better Markets; BMO Global Asset Mgmt.; Church Grp.; ICGN; Morningstar; Parnassus; PGIM; PRI; SKY Harbor; and Terra Alpha.

[1774]   *See* letter from CalPERS.

[1775]   *See, e.g.,* letters from Carbon Tracker; RMI; and UCS.

[1776]   *See* letter from PGIM; and SKY Harbor (stating that it would avail itself of "the additional detail and metrics" to further assess impacts on a registrant's financial condition).

[1777]   *See* letter from Center Amer. Progress.  *See also* letter from Amer. Academy Actuaries.

[1778]   *See, e.g.,* letters from Miller/Howard; and RMI.  *See also, e.g.,* letters from Eni Spa; and TotalEnergies

[1779]   *See, e.g.,* letters from AFG (June 17, 2022); BC IM Corp.; BHP; Calvert; CEMEX; Ceres; CFA Institute; CO PERA; Dell; Eni Spa; Eversource; IAA; Inclusive Cap.; PwC; TIAA; and TotalEnergies.

percent disclosure threshold with a requirement to disclose the financial impacts if material.[1780] Several commenters recommended revising the line-by-line disclosures to take a less granular or less disaggregated approach.[1781]

Some commenters stated that the Commission should require disclosure of climate-related events and transition activities on a separate basis as proposed.[1782] One commenter stated that it supported the proposed requirement to separately report climate-related events and transition activities because it would be consistent with the TCFD framework and facilitate investors' understanding of the disclosures.[1783] One commenter stated that the Commission should instead require climate impacts to be considered in the aggregate, rather than distinguishing between those attributable to severe weather events versus transition activities since the distinction between the two may not always be clear.[1784] Other commenters recommended limiting the proposed disclosure to the impacts of severe weather events and other natural conditions and eliminating the proposed requirements related to identified climate-related risks and transition activities.[1785] One of these commenters explained that this would be

---

[1780] *See, e.g.*, letters from AFG; BC IM Corp.; BHP; CEMEX; CO PERA; Dell; Eni Spa; Eversource; IAA; and TotalEnergies.

[1781] *See, e.g.*, letters from BHP; Eni Spa; ICAEW; PIMCO; and TotalEnergies.

[1782] *See, e.g.*, letters from Anthesis; Eni Spa; H. Huang; Morningstar; and TotalEnergies. One commenter recommended that the Commission highlight elements of the proposed financial statement metrics where one specific type of transition activity – carbon offsets – may be relevant. *See* letter from D. Hileman Consulting (similarly suggesting the Commission highlight insurance).

[1783] *See* letter from ISS ESG.

[1784] *See* letter from Deloitte & Touche. *See also* letter from KPMG (noting that the separation between physical and transition risks may not always be feasible and recommending "the final rule allow for a hybrid categorization, with the distinction being explained in the contextual information").

[1785] *See, e.g.,* letters from BPI (stating that the proposed amendments to Regulation S-X "should be removed, or, at a minimum, significantly narrowed"); Climate Risk Consortia (generally opposing the proposed amendments to Regulation S-X but recommending revisions if retained in the final rules); Dell (recommending revisions to the proposed rules to enhance the operation of the requirements while ensuring that investors receive material disclosure); Eversource; and SIFMA (generally opposing the proposed amendments to Regulation S-X but recommending revisions if retained in the final rules).

consistent with an approach that only requires disclosure of impacts that would be recognized under GAAP.[1786]  Another commenter stated that it would not support a rule that only required disclosures for severe weather events because this would result in other climate risks remaining "hidden to investors."[1787]

Conversely, many of the commenters who provided feedback on the proposed Financial Impact Metrics did not support the proposed requirements.[1788]  Commenters generally asserted that it would not be feasible to provide the disclosures as proposed.[1789]  Several commenters explained that companies currently do not track climate-related impacts by financial statement line item and companies do not have processes in place to do so under current accounting systems.[1790]  A number of commenters stated that registrants would be required to create new

---

[1786]  *See* letter from SIFMA.

[1787]  *See* letter from Sarasin.

[1788]  *See, e.g.*, letters from Association of American Railroads (June 17, 2022) ("AAR"); ABA; ACA Connects; ACCO; ACLI; AEPC; AFEP; AFPA; AFPM; AHLA; Airlines for America; Alliance Resource; Allstate; Alphabet *et al.*; Amazon; Amer. Bankers; APCIA; API; Barrick Gold; BDO USA LLP; BlackRock; BNP Paribas; BOA; BPI; Business Roundtable; CA Bankers; Cal. Resources; Can. Bankers; CCR; Chamber; ChampionX Corporation (June 17, 2022) ("ChampionX"); Chevron; Citigroup; Cleary; Cleco; Cleveland Cliffs; Climate Risk Consortia; Cohn Rez; Connor Grp.; ConocoPhillips; Corteva; CREFC; CRE Fin. *et al.*; D. Burton, Heritage Fdn; Dominion Energy; Dow; EEI & AGA; Energy Transfer; EMC; Energy Infrastructure; Electric Power Supply Association (June 17, 2022) ("EPSA"); Ernst & Young LLP; Exxon; FDRA; FedEx; Fed. Hermes; Fidelity; G. Farris; GM; GPA Midstream; HP; IADC; IC; ICI; ID Ass. Comm.; IIB; IIF; IMA; INGAA; IPA; Information Technology Industry Council (June 17, 2022) ("ITIC"); K. Connor; LSTA; LTSE; Magellan; Marathon; Microsoft; Mid-Size Bank; Moody's; MO Treas.; MRC Global; Mtg. Bankers; NACCO; NAM; Nareit; National Electrical Manufacturers Associations (June 17, 2022) ("NEMA"); NIRI; NMA; National Multifamily Housing Council and National Apartment Association (June 17, 2022) ("NMHC *et al.*"); NRP; NYSE SAC; OPC; Petrol. OK; PPL; R. Breeden, *et al.*; Real Estate NY; Reinsurance AA; RILA; Royal Gold; Shearman Sterling; Shell; SIA; SIFMA; SMME; Soc. Corp. Gov.; Soros Fund; SouthState; Southwest Airlines Co. (June 17, 2022) ("Southwest Air"); S.P. Kothari *et al.*; State St.; Sullivan Cromwell; Tapestry Networks' Audit Committee Leadership Network (June 16, 2022) ("Tapestry Network"); Transocean; Travelers; TRC; T. Rowe Price; Tucson Electric Power (June 16, 2022) ("Tucson Electric"); Vodafone; Walmart; Western Energy Alliance and the U.S. Oil & Gas Association (June 15, 2022) ("WEA/USOGA"); Wells Fargo; Western Midstream; and Williams Cos.

[1789]  *See, e.g.,* letters from ABA; ACLI; AEPC; Airlines for America; BNP Paribas; BOA; BPI; CCR; Corteva; GM; ITIC; LSTA; Marathon; Mtg. Bankers; NACCO; and Soc. Corp. Gov.

[1790]  *See, e.g.*, letters from ABA; ACLI; AEPC; APCIA; Chamber; Cohn Rez.; GM; IMA; INGAA; LSTA; Marathon; Mid-Size Bank; NACCO; NAM; Nareit; RILA; SMME; and Williams Cos.

App.423

accounting systems, processes, controls, and infrastructure to track, quantify, and disclose the proposed Financial Impact Metrics.[1791]  Many commenters stated that the proposed Financial Impact Metrics would be burdensome and costly.[1792]

Some commenters questioned whether the proposed Financial Impact Metrics would benefit investors.  For example, a number of commenters stated that the proposed Financial Impact Metrics would likely result in non-comparable or inconsistent data across registrants and therefore would not be useful or relevant to investors.[1793]  In addition, one registrant stated that investors have not asked them to provide the level of detail that the Financial Impact Metrics would require.[1794]  Some commenters pointed out that requiring registrants to disclose the Financial Impact Metrics on every line item could disincentivize companies from voluntarily disaggregating information in their financial statements, which would result in a loss of information for investors.[1795]  One commenter asserted that the proposed Financial Impact Metrics are not included in the TCFD framework and it is unclear that these requirements would

---

[1791]  *See, e.g.,* letters from ABA; Abrasca; ACA Connects; Airlines for America; Alliance Resource; Amer. Bankers; API; BlackRock; Chamber; Citigroup; Cleco; Climate Risk Consortia; Cohn Rez.; ConocoPhillips; Corteva; Deloitte & Touche; Deutsche Bank; Ernst & Young LLP; FedEx; Grant Thornton; HP; IC; ICI; IIB; INGAA; Linklaters; Microsoft; NG; NRF; NYSE SAC; OPC; Performance Food Group Company (June 17, 2022) ("PFG"); PPL; Salesforce; Shell; SIA; Soc. Corp. Gov.; Southwest Air; Transocean; TRC; Uber; United Air; Vodafone; and Williams Cos.

[1792]  *See, e.g.,* letters from ACA Connects; AFPA; AFPM; Airlines for America; Alliance Resource; APCIA; BlackRock; Cleco; Corteva; EEI & AGA; Exxon; GM; Grant Thornton; IADC; NAFO; NEMA; NOV Inc. (June 16, 2022) ("NOV"); NYSE SAC; OPC; PFG; PPL; Professional Services Council (June 17, 2022) ("PSC"); Salesforce; Shell; Soc. Corp. Gov.; Southwest Air; State St.; Sullivan Cromwell; TRC; United Air; WEA/USOGA; and Western Midstream.

[1793]  *See, e.g.,* letters from AFEP; AFPM; Alphabet *et al*.; Amazon; Barrick Gold; BP; Business Roundtable; Cal. Resources; Chevron; Cleveland Cliffs; CRE Fin. *et al.;* Dominion Energy; Energy Infrastructure; EPSA; Exxon; ICI; ITIC; IPA; JPN Bankers; Moody's; NAFO; Nareit; NG; NMA; NYSE SAC; Transocean; Travelers; T. Rowe Price; Vodafone; Walmart; and Western Midstream.

[1794]  *See* letter from Corteva.

[1795]  *See, e.g.,* letters from ABA; BDO USA LLP; and Energy Infrastructure.

424

be adopted globally, which, in this commenter's view, would limit their usefulness for global investors and potentially undermine investment in U.S. registrants.[1796]

Other commenters expressed accounting-related concerns with respect to the Financial Impact Metrics. For example, some commenters asserted that certain of the disclosures that would be required by the proposal, such as disclosures regarding changes to revenue, would not be consistent with GAAP.[1797] Similarly, some commenters asserted that no accounting principles or guidance exist for certain of the proposed Financial Impact Metrics, which would make it difficult for auditors to opine on this information.[1798] In addition, a few commenters stated that the proposed Financial Impact Metrics would require public companies to seek information from the private companies they do business with and that private companies may not have the capabilities to respond to those inquiries.[1799]

Further, a number of commenters stated that it would be very difficult or impossible to accurately estimate the potential future or unrealized impacts of severe weather events and transition activities by financial statement line item.[1800] Some commenters also raised concerns about a registrant's ability to include indirect effects of climate-related events when disclosing financial impacts.[1801]

---

[1796] *See* letter from Dow. Several commenters more generally asserted that registrants should not be required to disclose information that exceeds the scope of the TCFD framework, such as the proposed Financial Impact Metrics. *See, e.g.*, letters from Blackrock; and MFA.

[1797] *See, e.g.*, letters from AAR; ABA; AFEP; Alphabet *et al.*; Amazon; APCIA; Autodesk; BOA; Business Roundtable; CCR; Chamber; Grant Thornton; IADC; INGAA; JLL; KPMG; Nutrien; Sullivan Cromwell; Tapestry Network; Transocean; Travelers; Tucson Electric; and Unilever. *See also* letter from Deloitte & Touche (stating that the Commission should consider providing further guidance on how to calculate the estimated loss of revenue from disruptions to business operations).

[1798] *See, e.g.*, letters from Climate Risk Consortia; G. Farris; Nareit; Nutrien; and Walmart.

[1799] *See, e.g.*, letters from Atlas Sand; Brigham; and ConocoPhillips.

[1800] *See, e.g.*, letters from AIC; Business Roundtable; and D. Burton, Heritage Fdn.

[1801] *See, e.g.*, letters from BHP; Chamber; GPA Midstream; Grant Thornton; KPMG; Nareit; PGIM; Williams Cos.; and Volta.

App.425

Appellate Case: 24-1628     Page: 430     Date Filed: 03/26/2024 Entry ID: 5377362

### ii. Disclosure Threshold

Several commenters specifically expressed their support for the one percent disclosure threshold.[1802] Some of these commenters stated that a one percent disclosure threshold would reduce the risk of underreporting.[1803] For example, one commenter explained that setting the disclosure threshold too high could result in companies failing to undertake the necessary inquiry because they may conclude there is no way the threshold would be triggered.[1804] A few commenters explained that a percentage threshold is beneficial because it provides registrants and auditors with bright-line guidance.[1805] Other commenters asserted the Commission acted within its authority in prescribing a particular percentage disclosure threshold.[1806]

Conversely, many commenters stated that they did not support the proposed disclosure threshold of one percent.[1807] A number of these commenters asserted that the threshold was too

---

[1802] *See, e.g.*, letters from AGs of Cal. *et al.*; CalPERS; Carbon Tracker; Center Amer. Progress; CFA; Climate Advisers; Dana Invest.; ICGN; Impax Asset Mgmt.; MN SBI (encouraging the Commission to implement reporting thresholds for physical events separately from reporting thresholds for transition activities and not permit netting); Sarasin; Sens. J. Reed *et al.*; and US SIF.

[1803] *See, e.g.*, letters from CalPERS; and US SIF.

[1804] *See* letter from CalPERS.

[1805] *See, e.g.*, letters from Carbon Tracker; and Sens. J. Reed *et al.*

[1806] *See, e.g.*, letters from Amer. for Fin. Reform, Sunrise Project *et al.*; and Carbon Tracker.

[1807] *See, e.g.*, letters from American Apparel & Footwear Association (June 17, 2022) ("AAFA"); ABA; AFPA; AFPM; Airlines for America; Amer. Bankers; Amer. Chem.; API; Beller *et al.*; B. Herron; BIO; Bipartisan Policy; BlackRock; BOA; BP; Business Roundtable; Chamber; Chevron; Citigroup; ConocoPhillips; Cummins Inc. (June 17, 2022) ("Cummins"); Dell; Deloitte & Touche; Deutsche Bank; Devon Energy; Dow; Enel Group (June 17, 2022) ("Enel"); Ernst & Young LLP; Electronic Transactions Association (June 16, 2022) ("ETA"); Exxon; FHL Bank Des Moines; Fidelity; Fortive Corporation (June 8, 2022) ("Fortive"); G. Farris; GPA Midstream; Grupo Bancolombia (June 17, 2022); Healthcare Distribution Alliance (June 16, 2022) ("HDA"); HP; IAA; IADC; IC; ICAEW; ICI; INGAA; ITIC; K. Connor; KPMG; Linklaters; LSTA; Marathon; McCormick; MFA; Mid-Size Bank; NMHC *et al.*; NOIA; The National Restaurant Association and the Restaurant Law Center (June 16, 2022) ("NRA/RLC"); NRF; NYSE SAC; Occidental Petroleum; Petrol. OK; RE ER; Reinsurance AA; RILA; Salesforce; SEC Professionals Group (June 16, 2022) ("SEC Professionals"); Redington (June 17, 2022) ("Redington"); Shearman Sterling; Shell; SIA; SIFMA; Soc. Corp. Gov.; Southwest Air; State St.; Trane Technologies plc (June 16, 2022) ("Trane"); Transocean; Travelers; TRC; T. Rowe Price; Western Midstream; and Zions.

low[1808] and it would result in an excessive amount of detail, which would be immaterial and not useful to investors.[1809] Several commenters stated that it could confuse investors because investors could equate the level of detail that would be disclosed with a level of precision that is not consistent with the nature of the disclosures.[1810] Some commenters asserted that requiring disclosure at a one percent threshold would give disproportionate prominence to the proposed financial statement metrics relative to other risks addressed in the financial statements.[1811]

Other commenters were concerned that a one percent disclosure threshold would not result in consistent and comparable disclosure because the reported line items in the financial statements can vary significantly across registrants.[1812] A few commenters stated that applying the one percent disclosure threshold on a line item basis could result in only partial disclosure of expenditures related to a climate-related event since the total impact could be recorded in multiple financial statement line items, which would diminish the usefulness of the information to investors.[1813] In addition, some commenters asserted that registrants would not be able to

---

[1808] *See, e.g.*, letters from ABA; Abrasca; AFEP; AFPA; Alliance Resource; Allstate; APCIA; BIO; BlackRock; Business Roundtable; CA Bankers; Cal. Resources; CAQ; Cleary Gottlieb; Climate Risk Consortia; ConocoPhillips; CO PERA; Deloitte & Touche; Energy Transfer; IADC; IIB; LTSE; Marathon; MFA; NASBA; NG; NRA/RLC; NRP; NYSE SAC; PPL; PwC; Reinsurance AA; Salesforce; SIA; SouthState; State St.; Transocean; Tyson; and Warner Music.

[1809] *See, e.g.*, letters from AEPC; AFEP; AFG; AFPM; AllianceBernstein; Allstate; Alphabet *et al.*; APCIA; ARC-A&A; Barrick Gold; BHP; Business Roundtable; BPI; CCR; ChampionX; Cleary Gottlieb; Cleco; Climate Risk Consortia; ConocoPhillips; Dell; Deloitte & Touche; Deutsche Bank; Dominion Energy; Energy Transfer; EPSA; FHL Bank Des Moines; G. Farris; HP; IADC; IC; IIB; IIF; ITIC; JLL; LTSE; Magellan; Marathon; McCormick; MFA; Mid-Size Bank; NACCO; NG; NRP; PGIM; PwC; Shearman Sterling; SouthState; Southwest Air; Transocean; TRC; T. Rowe Price; Tucson Electric; and Warner Music.

[1810] *See, e.g.*, letters from CA Bankers; Can. Bankers; Deloitte & Touche; ICAEW; Redington; and RILA.

[1811] *See, e.g.*, letters from AAR; AEPC; Airlines for America; Alliance Resource; Baker Tilly; BCSE; Cal. Resources; CAQ; Chevron; Diageo; Energy Infrastructure; Energy Transfer; GPA Midstream; IADC; INGAA; ITIC; Linklaters; NMHC *et al.*; Transocean; and United Air.

[1812] *See, e.g.*, letters from Alphabet *et al.*; Autodesk; BIO; BOA; BDO USA LLP; CCR; Crowe; Fortive; ID Ass. Comm.; Moody's; and NAM.

[1813] *See, e.g.*, letters from AFPM; CAQ; Moody's; Occidental Petroleum; and PwC.

427

calculate the monetary value for the one percent disclosure threshold until the end of the relevant period, which would require registrants to evaluate each transaction to determine if it counts towards the threshold.[1814]

Other commenters stated that one percent is significantly below the five percent "rule of thumb" for materiality used by many registrants and auditors,[1815] and that, in their view, a one percent disclosure threshold is not consistent with existing guidance from the Commission staff.[1816] Several commenters stated that the examples provided in the Proposing Release of other one percent disclosure thresholds were not comparable.[1817] For example, with respect to the one percent disclosure threshold applicable to excise taxes, one commenter asserted that, unlike excise taxes, registrants would not be able to precisely measure the impacts of severe weather events and transition activities, and therefore the two situations are distinguishable.[1818] A few commenters questioned the Commission's authority to establish a one percent disclosure threshold.[1819] Several commenters also stated that the proposed line item disclosure threshold is

---

[1814] *See, e.g.,* letters from Chamber; CRE Fin. *et al.*; IPA; Soc. Corp. Gov.; and Williams Cos.

[1815] *See, e.g.*, letters from Connor Grp.; Energy Transfer; Eversource; GPA Midstream; INGAA; MFA; TRC; United Air; and Western Midstream.

[1816] *See, e.g.*, letters from ACLI; AEPC; AIMA; B. Herron; BlackRock; Cal. Resources; Cleveland Cliffs; Connor Grp.; Corteva; Diageo; EEI & AGA; Energy Transfer; GPA Midstream; Hannon Armstrong; HP; IMA; Inclusive Cap.; INGAA; JLL; Linklaters; NMA; RILA; Royal Gold; SEC Professionals; Soc. Corp. Gov.; Travelers; TRC; Tucson Electric; United Air; Vodafone; and Western Midstream. These commenters generally stated that, in their view, the 1% disclosure threshold was not consistent with Staff Accounting Bulletin No. 99.

[1817] *See, e.g.*, letters from AEPC; Airlines for America; Alphabet *et al.*; Amer. Chem.; BHP; Bipartisan Policy; BPI; Chamber; Crowe; Deloitte & Touche; Dow; Energy Transfer; Ernst & Young LLP; IADC; INGAA; ITIC; Transocean; and TRC.

[1818] *See* letter from Deloitte & Touche.

[1819] *See, e.g.*, letters from Amer. Bankers ("Putting aside for the moment the very real question of whether the Commission has the authority to require such extensive information reporting, such a regime is neither cost effective nor necessary to inform investor decisions."); and NAM ("The NAM does not believe it is lawful or appropriate for the SEC to set a bright-line test that would mandate reporting on risks and events that may or may not be material for a given business.").

not aligned with the TCFD framework,[1820] and another commenter stated that the TCFD framework provides registrants with more flexibility to describe financial impacts.[1821]

Other commenters asserted that a one percent threshold would place an unreasonable burden on smaller companies.[1822] For example, one commenter asserted that it is more likely that smaller companies' impacts would exceed the one percent disclosure threshold.[1823] In addition, some commenters stated that the Commission did not adequately justify or explain its rationale for using a one percent disclosure threshold.[1824]

Other commenters raised concerns about the ability to audit the disclosures triggered by the one percent threshold or that the threshold could increase inefficiencies and costs associated with the audit.[1825] Specifically some of these commenters stated that the proposed one percent threshold may lead registrants to conclude that the one percent threshold is a de facto materiality threshold and should be applied to other financial statement disclosures that are triggered by materiality.[1826]

Due to these and other concerns, many commenters stated that if the proposed Financial Statement Metrics are retained in the final rules, then the Commission should require disclosure

---

[1820]    *See, e.g.*, letters from Chamber; Diageo; EEI & AGA; Mid-Size Bank; and State St.

[1821]    *See* letter from Chamber.

[1822]    *See, e.g.*, letters from Abrasca; and US SBA.

[1823]    *See* letter from US SBA.

[1824]    *See, e.g.*, letters from ABA; Bipartisan Policy; Business Roundtable; and Petrol. OK.

[1825]    *See, e.g.*, letters from CAQ; Chamber; INGAA; Linklaters; NAM; RSM US LLP; and Vodafone.

[1826]    *See, e.g.*, letters from Barrick Gold; and Crowe.

Appellate Case: 24-1628    Page: 434    Date Filed: 03/26/2024 Entry ID: 5377362

only if the impacts are material.[1827]  One commenter stated that a materiality standard would better align with how registrants track and view impacts internally,[1828] while another commenter stated that applying a materiality standard could mitigate operational challenges presented by the proposed rules.[1829]  Another commenter stated that a materiality standard would strike a better balance between anticipated benefits to investors and the cost of and burden of the reporting on registrants.[1830]  A few commenters noted that aligning with existing materiality concepts may elicit disclosure above or below the one percent disclosure threshold.[1831]

On the other hand, some of the commenters who supported the requirement to apply a one percent disclosure threshold also specifically disagreed with moving to a materiality standard.[1832]  A few of these commenters stated that applying a materiality standard would result

---

[1827]   *See, e.g.*, letters from AAFA; ABA; Abrasca; ACCO; ACLI; AEPC; AFEP; AFG; AHLA; AIC; AIMA; Airlines for America; AllianceBerstein; Alphabet *et al.*; Amer. Bankers; API; ARC-A&A; Autodesk; Baker Tilly; Barrick Gold; BC IM Corp.; BCSE; BHP; Bipartisan Policy; BlackRock; BNP Paribas; BOA; BP; BPI; Can. Bankers; CCR; Ceres, *et al.*; Chamber; Citigroup; Cleco; Cohn Rez.; Connor Grp.; ConocoPhillips; CO PERA; Corteva; D. Burton, Heritage Fdn.; Deloitte & Touche; Devon Energy; D. Wen; EMC; Enbridge; Enel; Energy Infrastructure; EPSA; ETA; Ernst & Young LLP; Exxon; FDRA; FedEx; Fenwick West; FHL Bank Des Moines; Fidelity; Fortive; G. Farris; GPA Midstream; HDA; HP; Hydro One; IAA; IC; ICAEW; ID Ass. Comm.; ICI; IIF; IMA; IN Chamber; INGAA; IPA; IPI; ISS ESG; ITIC; JLL; J. Shoen; J. Weinstein; KPMG; LSTA; Magellan; Marathon; McCormick; MFA; Microsoft; Mouvement Enterprises; MRC Global; Mtg. Bankers; NAM; Nareit; NASBA; NG; NIRI; NMHC *et al.*; NOIA; Northern Trust; NRF; NRP; NYSE SAC; Occidental Petroleum; PFG; Pacific Gas and Electric Company (June 17, 2022) ("PGEC"); PPL; Prologis; PSC; PwC; R. Breeden *et al.*; Reinsurance AA; Royal Gold; Salesforce; SEC Professionals; Shell; SIFMA; Soc. Corp. Gov.; Tapestry Network; TotalEnergies; Trane; Travelers; T. Rowe Price; Tucson Electric; Unilever; Walmart; Western Midstream; and Zions.

[1828]   *See* letter from ABA.

[1829]   *See* letter from Ernst & Young LLP.

[1830]   *See* letter from IAA.

[1831]   *See, e.g.*, letters from Ceres, *et al.*; and PwC.

[1832]   *See, e.g.*, letters from Amer. for Fin. Reform, Sunrise Project *et al.*; CalPERS; Center Amer. Progress; and Sens. J. Reed *et al.*

in underreporting[1833] or would not provide investors with as much decision-useful information.[1834]  One commenter pointed out that Regulation S-X is composed of requirements to disclose specific financial information in a specific format and stated that the Commission did not need to establish the materiality of every one of those items for all registrants.[1835]  Similarly, another commenter explained that registrants have experience disclosing information in their financial statements without applying materiality, such as information regarding executive compensation, related-party transactions, and share repurchases.[1836]

Several commenters suggested that the Commission should apply a different percentage threshold, such as five percent[1837] or ten percent.[1838]  A few commenters asserted that the appropriateness of a particular percentage disclosure threshold may depend on the line item that is used as the denominator.[1839]  For example, one of the commenters that recommended using a five percent threshold acknowledged that a percentage lower than five percent may be appropriate if the threshold is anchored to one of the larger line items in the financial statements, such as total operating expenses.[1840]  Another commenter suggested using a percentage

---

[1833]   *See* letter from CalPERS; and US SIF.  *See also* letter from ICGN (stating that "there is inadequate consistency in how registrants are integrating material climate factors into their financial statements, and therefore a rule by the SEC on this matter is important to ensure implementation"); and Impax Asset Mgmt. (stating that the Commission was wise to propose the 1% disclosure threshold because "too often, we have seen that companies take an atomistic approach to materiality").

[1834]   *See* letter from Center Amer. Progress.

[1835]   *See* letter from Amer. for Fin. Reform, Sunrise Project *et al*.

[1836]   *See* letter from Sens. J. Reed *et al*.

[1837]   *See, e.g.*, letters from Abrasca; Amer. Chem.; Calvert; CEMEX (recommending a range of between 5% and 10%); Dow; Eni Spa; Eversource; Inclusive Cap; and PGIM.

[1838]   *See, e.g.*, letters from APCIA (recommending applying a 10% threshold and incorporating qualitative considerations); JBG Smith; NAM; Nareit; NRA/RLC; and TotalEnergies.

[1839]   *See, e.g.*, letters from CalPERS; Energy Transfer; and Eversource.

[1840]   *See* letter from Eversource.

disclosure threshold based on total assets or income instead of individual line items.[1841]  A couple of commenters stated that increasing the threshold to a higher percentage would not be an improvement because registrants still would not know the results of each line item until the end of the reporting period and therefore registrants would still have to track essentially all transactions.[1842]  Another commenter emphasized the need for consistency over the desire for any particular percentage.[1843]

Some commenters offered their views on the appropriateness of using a dollar-based disclosure threshold.  A few commenters stated that, to the extent the Commission does not adopt a principles-based approach, the Commission should consider adopting a combination of a higher percentage threshold along with a dollar threshold.[1844]  Another commenter stated that if the Commission incorporates a dollar amount into the threshold it should be significantly higher than $1 million.[1845]  One commenter suggested a materiality standard combined with a dollar-based disclosure threshold.[1846]  A couple of commenters stated that they did not support applying a dollar threshold.[1847]

One commenter stated that the Commission should not apply a disclosure threshold and instead should require disclosure of any impacts.[1848]  A couple of commenters asserted that the Commission should also require registrants to determine whether an impact that falls below the

---

[1841]    *See* letter from Energy Transfer.

[1842]    *See, e.g.*, letters from AFPA; and Chamber.

[1843]    *See* letter from Morningstar.

[1844]    *See, e.g.,* letters from B. Herron; and FHL Bank Des Moines.

[1845]    *See* letter from AIC (stating that a disclosure threshold of $1 million applies to the disclosure of certain environmental proceedings in Item 103 of Regulation S-K).

[1846]    *See* letter from D. Hileman Consulting.

[1847]    *See, e.g.*, letters from BHP; and Eni Spa.

[1848]    *See* letter from PRI.

prescribed one percent threshold would nevertheless be material given its nature and, if so, to require disclosure of that impact.[1849]  One commenter suggested setting a basic principle based on materiality and backstopping the materiality standard with a numerical disclosure threshold set at five percent in the short- and medium- term or ten percent in the long term.[1850] Alternatively, one commenter stated that relying on a one percent disclosure threshold alone could create a "loophole" for larger companies and therefore the Commission should clarify that disclosure would still be required for impacts that fall below one percent if they are material.[1851]

Commenters also provided feedback on the proposed requirement for registrants to aggregate the absolute value of the positive and negative impacts on a line-by-line basis before determining whether the disclosure threshold has been met.  A number of commenters disagreed with the proposal to aggregate the absolute value of impacts.[1852]  Some of these commenters stated that it would be a significant departure from typical accounting practices,[1853] and others asserted it would be unworkable and would result in the disclosure of individually immaterial information.[1854]  One commenter suggested that any aggregation requirements should allow a

---

[1849]  *See, e.g.*, letters from ICGN ("While we agree with the proposed threshold of 1% of the total line item (including for expenditure items), where the aggregate impact is less than this, but investors have expressed a clear interest in understanding this impact (thus making it material), registrants should be required to offer commentary on how the impact was assessed."); and Sarasin ("While we agree with the proposed threshold of 1% of the total line item (including for expenditure items), additional disclosure would be appropriate where the aggregate impact is less than this, but investors have expressed a clear interest in understanding this impact (thus making it material).").

[1850]  *See* letter from Beller, *et al.*

[1851]  *See* letter from ClientEarth.

[1852]  *See, e.g.*, letters from AAR; ABA; AFPA; Alliance Resource; API; CCR; CEMEX; Chamber; Cleco; Cleveland Cliffs; Dell; D. Hileman Consulting; EEI & AGA; Etsy; Exxon; G. Farris; GPA Midstream; IADC; NAM; PPL; Reinsurance AA; RILA; Soc. Corp. Gov.; Transocean; T. Rowe Price; United Air; and Williams Cos.

[1853]  *See, e.g.*, letters from AAR; IADC; NAM; PPL; and Transocean.

[1854]  *See, e.g.*, letters from Alliance Resource; BHP; Cleco; NAM; and Shearman Sterling.

registrant to set a minimum materiality threshold for individual items.[1855] On the other hand, some commenters supported aggregating the absolute value of impacts, with one commenter stating it better reflects the significance of the impact on a registrant's financial performance and position.[1856]

A few commenters stated that the Commission should instead use a net value.[1857] For example, some commenters stated that the proposed rules fail to take into account mitigation efforts such as insurance, which would net against the gross value of any loss.[1858] Specifically, one commenter asserted that disclosure of losses, net of insurance proceeds, is appropriate if it is probable that the insurance recovery would be realized and if the provision for the loss and the insurance receivable are recognized in the same period in accordance with FASB ASC 450-20.[1859] In addition, one commenter asserted that using absolute values would not accurately reflect the economics of the (re)insurance industry, which manages its weather risks through reinsurance.[1860] On the other hand, some commenters opposed the netting of positive and negative impacts.[1861] One commenter asserted that netting would involve many assumptions and

---

[1855] *See* letter from J. Herron.

[1856] *See* letter from Dana Invest.

[1857] *See, e.g.*, letters from AAR; CEMEX; Dell; GPA Midstream; Inclusive Cap.; PSC; Soc. Corp. Gov.; and United Air.

[1858] *See, e.g.*, letters from GPA Midstream; United Air; and Williams Cos.

[1859] *See* letter from Prologis.

[1860] *See* letter from Reinsurance AA.

[1861] *See, e.g.*, letters from BC IM Corp. (stating "there is more value for investors in absolute numbers in this context"); Center Amer. Progress; ClientEarth; ICGN ("We are not in favor of netting positive and negative impacts due to the dangers that this hides large and material absolute impacts"); MN SBI; Morningstar ("Fundamentally, disclosure of absolute values should allow investors to distinguish between negative impacts (such as severe weather, regulatory changes) and positive impacts (such as mitigation, resilience, and opportunities)."); PwC ("In determining whether the disclosure threshold is met, we believe that positive and negative impacts should be considered separately, not netted (e.g., if a winery receives insurance proceeds for grapes damaged by a wildfire, they should consider the gross loss in assessing whether disclosure is triggered."); Sarasin; and Third Coast.

there is more value for investors in absolute numbers.[1862]  Other commenters stated that netting could incentivize greenwashing.[1863]  Finally, some commenters asserted that registrants should be required to determine if the disclosure threshold has been met or exceeded separately for physical events and transition activities.[1864]

### iii.  Terminology and Attribution

A number of commenters pointed out that "severe weather events and other natural conditions" is not defined in the proposal and they asserted that additional clarification or guidance is needed.[1865]  Some commenters stated that the proposed amendments to Regulation S-X refer to "severe weather events," while the proposed amendments to Regulation S-K refer to "extreme weather events," and that the amendments provided overlapping, but different, examples.[1866]  A few commenters suggested that the Commission should limit any required disclosures to a specified list of severe weather events and other natural conditions.[1867]  For example, one commenter suggested that the Commission could establish a list of weather events and update it on a monthly or quarterly basis,[1868] but another commenter stated that maintaining

---

[1862]  *See* letter from BC IM Corp.

[1863]  *See, e.g.,* letters from ClientEarth; and Third Coast.

[1864]  *See, e.g.,* letter from MN SBI.

[1865]  *See, e.g.,* letters from Abrasca; AEPC; Alliance Resource; Amazon; Anthesis; APCIA; BDO USA LLP; BHP; BPI; Ceres, *et al.*; Chamber; Cleary Gottlieb; Corteva; Davis Polk; Deutsche Bank; EEI & AGA; EMC; Eni Spa; EPSA; FedEx; GPA Midstream; IADC; IIF; INGAA; Marathon; Morningstar; Mtg. Bankers; Nareit; NRA/RLC; NRP; Occidental Petroleum; PwC; RSM US LLP; Shearman Sterling; Shell; Soc. Corp. Gov.; Transocean; Travelers; Tucson Electric; Unilever; and Volta.

[1866]  *See, e.g.,* letters from Amazon; KPMG (recommending that the Commission align the terminology between the proposed rules under Regulation S-K and Regulation S-X); and PwC (same).

[1867]  *See, e.g.,* letters from Abrasca; Cohn Rez.; and Nutrien.  *See also* Reinsurance AA ("The RAA recommends that the Commission exclude specific weather events from the definition of physical C-R risks for (re)insurers.").

[1868]  *See* letter from Cohn Rez.

a list of events would be impractical.[1869]  A few commenters suggested that the Commission

could borrow or refer to a list of severe weather events and other natural conditions prepared by

a third party.[1870]  Other commenters suggested specific additions to the list of non-exclusive

examples included in the proposed rules.[1871]  Many of these commenters stated that registrants

will likely have different views on what constitutes a severe weather event, which will reduce

comparability.[1872]

In addition, a number of commenters stated that it was unclear whether registrants would

need to determine that a severe weather event or other natural condition was, in fact, caused by

climate change before disclosure would be required, while other commenters assumed that such

a determination was required.[1873]  Some commenters stated that registrants would not have the

ability to determine whether a weather event or natural condition was caused by climate

change,[1874] and other commenters stated that the Commission failed to provide guidance on this

issue.[1875]

---

[1869]  *See* letter from Nutrien.

[1870]  *See, e.g.,* letters from Amer. Academy Actuaries (Actuaries Climate Index or Actuaries Climate Risk Index to aid the identification of physical risks); Anthesis (TCFD's list of acute and chronic physical risks); and Morningstar (technical screen criteria of the EU Taxonomy Regulation (Reg (EU) 2020/852) pertaining to climate-related hazards).

[1871]  *See, e.g.,* letters from Anthesis (cyclones, water stress, severe precipitation, and severe wind); Climate Advisers (deforestation); and WSP (water stress).

[1872]  *See, e.g.,* letters from Abrasca; AHLA; Alliance Resource; Autodesk; BHP; BOA; Business Roundtable; Chevron; ConocoPhillips; Energy Infrastructure; EPSA; IADC; IIF; Marathon; NRF; NRP; NYSE SAC; Occidental Petroleum; Shell; Soc. Corp. Gov.; Transocean; and Unilever.

[1873]  *See, e.g.,* letters from AHLA; Airlines for America; Alliance Resource; APCIA; Atlas Sand; B. Herron; BPI; Brigham; Business Roundtable; Chamber; Davis Polk; Deutsche Bank; EEI & AGA; Energy Infrastructure; Eversource; GM; GPA Midstream; ID Ass. Comm.; IC; Magellan; NAM; Nareit; NMA; NRF; PGIM; Prologis; Reinsurance AA; Shell; SIA; Soc. Corp. Gov.; Travelers; and United Air.

[1874]  *See, e.g.,* letters from AAR; APCIA; Atlas Sand; Brigham; Chamber; ConocoPhillips; GPA Midstream; HP; IADC; ID Ass. Comm.; NRF; PGEC; Reinsurance AA; Texas Public Policy Foundation (June 16, 2022); Transocean; and Travelers.

[1875]  *See, e.g.,* letters from APCIA; CAQ; Corteva; IADC; Prologis; and Williams Cos.

Several commenters stated that it was unclear whether the proposed financial statement metrics are intended to capture all severe weather events or only those above a historical baseline.[1876] Specifically, one commenter asked the Commission to provide guidance on how registrants should distinguish "events and conditions that are severe and relate to climate risks from those that are consistent with historical patterns."[1877] Other commenters stated that it is not clear how the severity of a weather event should be assessed.[1878] For example, one commenter questioned whether the severity of a hurricane should be assessed by looking to factors such as the wind speed categorization or the financial impact on the registrant itself.[1879] Another commenter suggested that the Commission should clarify that what is considered to be a severe weather event in one region may not be considered severe in a different region.[1880] One commenter asked for guidance on how to identify the beginning and ending dates of severe weather events because the impact from a weather event can continue even after the meteorological event has itself passed.[1881] Similarly, another commenter asked the Commission to provide additional examples of how to disclose a weather event like a hurricane or wildfire, both in the year that the event happened and for future years where the impacts may continue to manifest on the financial statements.[1882]

---

[1876] *See, e.g.*, letters from Airlines for America; EEI & AGA; EPSA; Grant Thornton; KPMG; PwC; SIA; Volta; and Western Midstream.

[1877] *See* letter from Grant Thornton.

[1878] *See, e.g.*, letters from Alliance Resource; Chamber; EEI & AGA; Grant Thornton; and KPMG.

[1879] *See* letter from Grant Thornton.

[1880] *See* letter from RSM US LLP.

[1881] *See* letter from Marathon.

[1882] *See* letter from Amer. for Fin. Reform, Sunrise Project *et al.*

In addition, commenters asked the Commission to clarify what constitutes "other natural conditions,"[1883] and in particular, some commenters asserted that it would be difficult to identify chronic risks.[1884] For example, one commenter stated that the impact of sea level rise may be difficult to discern in a particular reporting period and might only be apparent over substantially longer periods.[1885] In addition, a few commenters raised concerns about the inclusion of "wildfires" in the list of severe weather events and natural conditions, pointing out, among other things, that wildfires have many different causes, including humans, or the cause of a wildfire may not be known for some time.[1886] One commenter asked the Commission to provide additional examples of "other natural conditions."[1887]

On the other hand, some commenters stated that registrants should have flexibility to determine what constitutes a severe weather event or other natural condition.[1888] Several commenters asserted that the Commission should not limit climate risk disclosures to a specified set of severe weather events because companies will face different climate risks.[1889] Other commenters suggested that the Commission should require disclosure of "unusual climate events" instead of "severe weather events" and allow registrants to define what they consider to be unusual for the area in which they operate.[1890]

---

[1883] *See, e.g.*, letters from EEI & AGA; EMC; Grant Thornton; NRP; and RSM US LLP. *See also* letter from Chamber (questioning whether earthquakes should be included under "other natural conditions").

[1884] *See, e.g.,* letters from C2ES (Feb.13, 2023); Grant Thornton; Prologis; and WSP.

[1885] *See* letter from Grant Thornton.

[1886] *See, e.g.*, letters from BDO USA LLP; Chamber; and Deloitte & Touche.

[1887] *See* letter from RSM US LLP.

[1888] *See, e.g.*, letters from Carbon Tracker; Cleco; Eni Spa; Eversource; Sarasin; and TotalEnergies.

[1889] *See, e.g.*, letters from Autodesk; CEMEX; and Center. Amer. Progress.

[1890] *See, e.g.*, letters from Cleco; and EEI & AGA.

Appellate Case: 24-1628     Page: 443     Date Filed: 03/26/2024 Entry ID: 5377362

A number of commenters also raised concerns about the definition and scope of transition activities.[1891]  Commenters expressed concerns that the scope of transition activities could broadly encompass ordinary business activities that are motivated by the intent to be more efficient.[1892]  Other commenters were concerned that registrants would be required to disclose competitively sensitive information.[1893]  In addition, a number of commenters stated that registrants are unlikely to interpret transition activities in a consistent manner and therefore the proposed disclosures would not result in decision-useful information for investors.[1894]

Some commenters requested that the Commission provide additional guidance related to transition activities.[1895]  For example, one commenter urged the Commission to clarify when a transition activity ends, asserting that it was not clear if a registrant's disclosure obligation would cease once the registrant achieves its stated transition goal.[1896]  Another commenter asked the Commission to clarify the scope of transition activities included in proposed Rule 14-02(d) because, in the commenter's view, the proposed provision could be read to mean that a registrant is only required to disclose the financial impact of activities or efforts of the registrant, and not the "broad range of climate-related changes in technology, market forces and other occurrences

---

[1891]  *See, e.g.*, letters from AEPC; AHLA; Airlines for America; Alliance Resource; Chamber; Cleco; Climate Risk Consortia; Dell; EEI & AGA; Enbridge; EPSA; FedEx; GM; GPA Midstream; IADC; IIF; INGAA; Microsoft; Mtg. Bankers; NAM; Occidental Petroleum; PGIM; PwC; Shell; Tucson Electric; Unilever; United Air; and Western Midstream.

[1892]  *See, e.g.*, letters from Alliance Resource; Alphabet *et al.*; Amazon; BP; BPI; Business Roundtable; CCR; Chamber; Cleco; Climate Risk Consortia; Connor Grp.; Dell; Diageo; EEI & AGA; EPSA; Ernst & Young LLP; Eversource; FedEx; GM; IMA; JLL; KPMG; Microsoft; NAM; Occidental Petroleum; PGIM; RILA; Shell; Soc. Corp. Gov.; Sullivan Cromwell; Unilever; United Air; and Walmart.

[1893]  *See, e.g.*, letters from GM; IADC; and Petrol. OK.

[1894]  *See, e.g.*, letters from Airlines for America; CCR; Cleveland Cliffs; Climate Risk Consortia; Ernst & Young LLP; Microsoft; PGIM; and Sullivan Cromwell.

[1895]  *See, e.g.*, letters from AHLA; Alphabet *et al.*; Amazon; Deloitte & Touche; Occidental Petroleum; and PwC.

[1896]  *See* letter from Amazon.  *See also* letter from C2ES (Feb. 13, 2023).

439

instituted by entities not related to the registrant that may nonetheless impact the registrant's financials."[1897] This commenter pointed out that proposed Rule 14-02(f), which would require the disclosure of expenditures related to transition activities, already covers disclosure of the financial impact of activities or efforts of the registrant.[1898]

Other commenters suggested potential alternatives to the proposed requirements related to transition activities. A couple of commenters stated that the Commission should only require registrants to disclose the impact of certain specified transition activities, such as efforts taken exclusively to reduce GHG emissions.[1899] Another commenter suggested "that the Commission instead require companies to track and report on transition activities that management has identified and reported on under the proposed [amendments to] Regulation S-K."[1900] One commenter suggested that the Commission could issue sector-specific guidance for industries where most registrants' balance sheets reflect expenditures related to clean energy, decarbonization, or resilience, to help companies determine what constitutes transition-related expenses.[1901]

Many commenters raised concerns about registrants' abilities to isolate or attribute the effects of severe weather events and other natural conditions and transition activities on the

---

[1897]   *See* letter from Center Amer. Progress.

[1898]   *See id.*

[1899]   *See, e.g.*, letters from EEI & AGA; and Soc. Corp. Gov.

[1900]   *See* letter from Amazon.

[1901]   *See* letter from C2ES (Feb. 13, 2023).

App.440

Appellate Case: 24-1628    Page: 445    Date Filed: 03/26/2024 Entry ID: 5377362

financial statements.[1902]  Commenters pointed out that some events may have multiple contributing causes or that the cause may not be clear.[1903]  For example, several commenters stated that companies incur many expenses for core business purposes that may also be characterized as helping to mitigate climate-related risks.[1904]  Another commenter pointed out that if a registrant's insurance costs increase, it will be difficult for a registrant to attribute this increase, or a portion of this increase, to climate-related risks.[1905]  In addition, one commenter noted that there may be circumstances where financial impacts are attributable to both physical risks and transition risks, such as when a facility is destroyed in a storm and the registrant decides to rebuild it with storm-protection features and LEED-certification, and the commenter questioned how the impacts should be attributed in those circumstances.[1906]  Many commenters also stated that it would be difficult to quantify climate-related events, conditions, and activities.[1907]  For example, where an expenditure is made in part for a climate-related purpose,

---

[1902] *See, e.g.*, letters from AAR; ABA; Abrasca; AEPC; AFPA; AFPM; AHLA; Airlines for America; Alliance Resource; Alphabet *et al.*; APCIA; Autodesk; Barrick Gold; BDO USA LLP; BHP; BOA; BP; BPI; Business Roundtable; Cal. Resources; Can. Bankers; CAQ; CCR; Chamber; Citigroup; Cleary Gottlieb; Cleco; Climate Risk Consortia; Connor Grp.; ConocoPhillips; Crowe; Cummins; Davis Polk; Dell; Deloitte & Touche; Diageo; Dominion Energy; EEI & AGA; Energy Transfer; Ernst & Young LLP; Eversource; Exxon; FedEx; Fortive; G. Farris; GM; HDA; IADC; INGAA; JLL; JPN Bankers; KPMG; Linklaters; Marathon; McCormick; Mid-Size Bank; Mtg. Bankers; NACCO; NAM; Nareit; NOIA; NRA/RLC; PFG; PGEC; RILA; RMI; Shearman Sterling; Southwest Air; Travelers; TRC; Tucson Electric; Unilever; United Air; Vodafone; Walmart; Western Midstream; and Williams Cos.

[1903] *See, e.g.*, letters from Abrasca; AFPA; AHLA; Barrick Gold; BHP; Cal. Resources; CCR; Climate Risk Consortia; Connor Grp.; Deloitte & Touche; Dominion Energy; EEI & AGA; Energy Infrastructure; HDA; IADC; INGAA; JPN Bankers; KPMG; Linklaters; Mid-Size Bank; Nareit; PFG; PGEC; Southwest Air; TRC; and Vodafone.

[1904] *See, e.g.*, letters from AAR; ACLI; Diageo; Energy Infrastructure; PFG; Salesforce; and Walmart.

[1905] *See* letter from TRC.

[1906] *See* letter from KPMG.

[1907] *See, e.g.*, letters from ABA; Airlines for America; Alliance Resource; Alphabet *et al.*; BDO USA LLP; BOA; CAQ; CCR; Chamber; Climate Risk Consortia; Connor Grp.; ConocoPhillips; Deutsche Bank; EEI & AGA; Ernst & Young LLP; Eversource; Exxon; GM; Grant Thornton; KPMG; Marathon; McCormick; Mtg. Bankers; NACCO; NAFO; NAM; PGEC; Prologis; Southwest Air; Travelers; TRC; Western Midstream; and Williams Cos.

commenters questioned whether registrants should attribute the entire cost or only an incremental portion of the cost to climate-related events.[1908]  A number of other commenters questioned how registrants would be expected to quantify indirect financial impacts such as those affecting a registrant's supply or value chain.[1909]  Some commenters stated that there are currently no accounting principles or guidance to help registrants make these determinations[1910] and another commenter pointed out that it may require the expertise of a climate specialist.[1911]  Commenters generally requested additional guidance to address these issues.[1912]

Commenters suggested various possibilities for addressing concerns about attribution and quantification.  A few commenters stated that registrants should be permitted to make a reasonable estimate and disclose the assumptions that resulted in the estimate.[1913]  Commenters suggested that disclosing the relevant assumptions would help investors interpret any estimations that may be required.[1914]  One commenter recommended that any final rules should allow registrants to disclose either a single amount or a range, along with appropriate contextual information.  This commenter noted that if the Commission proceeds with a single amount, registrants would require guidance on how the amount should be determined.[1915]  Another commenter suggested that a registrant should be allowed to explain that it was unable to disclose

---

[1908]   *See, e.g.,* letters from AAR; EEI & AGA; and GM.

[1909]   *See, e.g.,* letters from BHP; Chamber; GPA Midstream; Grant Thornton; Nareit; PGIM; United Air; Volta; Western Midstream; and Williams Cos.

[1910]   *See, e.g.,* letters from AEPC; Barrick Gold; G. Farris; IIF; Nareit; NRF; TRC; and Walmart.

[1911]   *See* letter from SEC Professionals.

[1912]   *See, e.g.,* letters from AAFA; BDO USA LLP; Chamber; Climate Accounting Audit Project; Crowe; Deloitte & Touche; Deutsche Bank; Eversource; INGAA; JPN Bankers; PGIM; and RMI.

[1913]   *See, e.g.,* letters from AFPA; Anthesis; C2ES; ERM CVS; MN SBI; and Morningstar.

[1914]   *See, e.g.,* letters from Eni Spa; and ERM CVS.

[1915]   *See* letter from KPMG.

the required information on a disaggregated basis due to impacts that were caused by a mixture of factors.[1916]  Other commenters suggested that when disaggregation is not possible due to multiple contributing factors, registrants should provide qualitative information to explain the factors.[1917]

One commenter asserted that applying an entity-specific allocation methodology would not result in decision-useful information, and instead recommended attributing a financial statement impact or expenditure to climate risk only when the climate risk is a "significant contributing factor," and otherwise requiring registrants to provide contextual information to explain the impact, which would help avoid accusations of greenwashing that might occur if registrants were required to attribute substantially all events, conditions, and activities to climate risk.[1918]  Another commenter urged the Commission to clarify that disclosure is only required where the relevant impacts can be reasonably determined to be primarily or entirely driven by physical or transition risk activities, are material to the business, and are reasonably estimable.[1919]

On the other hand, a few commenters stated that the Commission does not need to prescribe a particular approach to attribution or allocation.[1920]  One of these commenters pointed out that registrants already are required to allocate costs across multiple risks when preparing their financial statements.[1921]

---

[1916]    *See* letter from Abrasca.

[1917]    *See, e.g.*, letters from BHP; CEMEX; Sarasin; and SKY Harbor.

[1918]    *See* letter from KPMG.

[1919]    *See* letter from Airlines for America.

[1920]    *See, e.g.*, letters from Amer. for Fin. Reform, Sunrise Project *et al.*; and TotalEnergies.

[1921]    *See* letter from Amer. for Fin. Reform, Sunrise Project *et al.*

Appellate Case: 24-1628    Page: 448    Date Filed: 03/26/2024 Entry ID: 5377362

### iv. Alternatives

Commenters suggested a number of potential alternatives to the proposed financial statement metrics.[1922] Several commenters recommended that the Commission limit any requirement to disclose climate-related impacts to "first order effects" or direct impacts only.[1923] Specifically with respect to severe weather events, some commenters stated that it would be operationally possible to track specific, direct costs incurred due to severe weather events and natural conditions.[1924] For example, one commenter noted that certain property damage and related repair costs sustained as a result of severe weather could "easily be segregated, analyzed, and quantified within our current processes."[1925] Another commenter stated that calculating direct costs incurred due to severe weather events might be straightforward because the costs are recorded in the registrant's financial records.[1926] One commenter recommended that the "Commission consider limiting Article 14 of Regulation S-X requirements to physical impacts

---

[1922] In many cases, the commenters discussed in this section expressed a stronger preference for other approaches discussed above, such as not adopting or reducing the proposed disclosure requirements but offered these alternatives to the proposed rules as well.

[1923] *See, e.g.*, letters from BOA; C2ES; Citigroup; and SIA.

[1924] *See, e.g.*, letters from Autodesk (noting that if a fire or storm destroys a registrant's facilities, the associated costs, impairments, and contingencies would be accounted for and, if material, disclosed under U.S. GAAP); Crowe; Dow; and Nutrien (noting that it would be operationally possible to track specific costs incurred to mitigate transition risks or costs incurred due to severe weather events and natural conditions).

[1925] *See* letter from Dow (explaining, however, that "[q]uantifying the indirect impact of [severe weather events] on sales and cost of sales would be exceedingly difficult and require significant judgment, estimates and assumptions, thereby limiting the comparability of such information with other registrants and the usefulness of such information to investors").

[1926] *See* letter from Crowe. *See also* letter from PwC (stating that the financial impact of some climate-related risks – for example, losses arising from asset impairments or operations and maintenance expenses associated with site restoration – may already be disclosed under existing GAAP, although the disclosures may not clearly link to the impact of climate).

and related expenditures only."[1927]  More generally, another commenter recommended streamlining the proposed rules to focus on "what issuers can easily produce."[1928]

A few commenters recommended alternative approaches that focused on requiring the disclosure of discrete expenditures.  For example, one commenter recommended that the Commission require a table in a note to the financial statements that presents discrete and separable expenditures, both expensed and capitalized, in three distinct categories: (i) climate-related events, (ii) transition activities for publicly-disclosed climate-related targets and goals, and (iii) all other transition activities.[1929]  Similarly, another commenter recommended that the Commission should require disclosure of "identifiable direct costs and capital expenditures incurred for the express purpose of addressing climate events and transition issues," which "could be produced and audited with a level of certainty and comparability that is consistent with GAAP financial statements."[1930]

Other commenters recommended taking a more aggregated approach to disclosure.  For example, one commenter suggested aggregating costs and benefits relating to climate-related events into categories (revenues, expenditures, and profits), and aggregating impacts on the balance sheet into the categories (assets, liabilities, and equity), which the commenter stated would ensure investors are able to identify the magnitude of the impacts affecting the company

---

[1927]  *See* letter from Dell.

[1928]  *See* letter from MFA.  *See also* letter from Ceres, *et al.* ("Disclosure of financial impacts from climate-related activities should be derived from transactions and amounts recorded in the books and records underlying the financial statements.").

[1929]  *See* letter from Amazon.  *See also* letter from C2ES (Feb. 13, 2023) (describing the expenditure table included in Amazon's comment letter as a more workable alternative but reiterating concerns with other aspects of the proposed rules, such as the disclosure threshold).

[1930]  *See* letter from ABA.  *See also* letter from Ceres (recommending disclosure of current period and planned capital expenditures to show the portion of investments attributable to addressing transition risks and opportunities and the adaptation to or mitigation of physical risks associated with climate change).

without unnecessary complication and cost for registrants.[1931] Another commenter recommended requiring disclosure at the event or activity level rather than disclosing impacts on financial statement line items, and focusing on discrete, material climate-related events and transition activities.[1932] Similarly, another commenter recommended analyzing potential impacts by broad accounting topics, such as impairments or useful life of assets, which would simultaneously cover several lines of the income statement, balance sheet, and cash flow statement.[1933] One commenter suggested that the Commission could enhance comparability by identifying a minimum set of line items for which disclosure is required while permitting registrants to present disclosure on additional line items in order to better reflect their business model and industry.[1934] On the other hand, one commenter recommended a more disaggregated approach to disclosure.[1935]

Additionally, one commenter recommended that the Commission adopt a "top down approach" by linking disclosure of short-term risks identified under the proposed amendments to Regulation S-K to financial statement impacts that would be required to be disclosed at a specified threshold, and supplemented by the disclosure of other material impacts.[1936] Another commenter suggested requiring the disclosure of climate-related cash-flow metrics, focused on providing gross cash flows of climate-related expenditures, with an indication of which cash

---

[1931] *See* letter from PIMCO.

[1932] *See* letter from Alphabet, *et al.*

[1933] *See* letter from TotalEnergies. *See also* letter from iClima Earth ("Require companies to split both their revenue and their CAPEX figures into 'green' and 'brown.'").

[1934] *See* letter from Eni Spa.

[1935] *See* letter from Dana Invest. ("We would propose a separate disclosure footnote to disaggregate any category impact if any single identified climate-related risk within an aggregated category was 1% or more of the total line item on its own.").

[1936] *See* letter from KPMG (noting that this approach would be based on amounts recorded in the financial statements).

flows have been capitalized, which the commenter stated would provide an understanding of real cash-flow impacts that could be more directly linked to the Regulation S-K disclosures and would be more useful for investors.[1937]  One commenter stated that the Commission should consider amending its industry guides for the oil and gas industry, among others, to require better disclosure of the financial statement impacts of climate change.[1938]

### c.  Final Rules

After consideration of the comments, including those expressing significant concerns about the burdens associated with this aspect of the proposal, we are not adopting the proposed Financial Impact Metrics.[1939]  While the proposed Financial Impact Metrics would have provided additional transparency for investors, we were persuaded by those commenters that stated the proposed Financial Impact Metrics would be burdensome and costly for registrants because of the updates that would be necessary to internal systems and processes.[1940] Therefore, at this time, we have chosen not to adopt these disclosures.  These concerns led us to adopt a significantly narrower set of requirements that are focused on requiring the disclosure of a discrete set of actual expenses that registrants incur and can attribute to severe weather events and other natural conditions.  In line with the views of certain commenters,[1941] we expect these

---

[1937]    *See* letter from CFA Institute.

[1938]    *See* letter from Ceres (recommending that the Commission also consider also expanding its industry guides for mining, bank holding companies, real estate limited partnerships, and property-casualty insurance underwriters).  The industry guides for oil and gas, mining, and bank and savings and loan companies have been codified by the Commission.  *See* 17 CFR 229.1201 through 1208 (oil and gas); 17 CFR 229.1300 through 1305 (mining); and 17 CFR 229.1401 through 1406 (bank and savings and loan).

[1939]    As discussed in greater detail below, since we are not adopting the proposed Financial Impact Metrics, a registrant will not have the option to disclose the impact of any climate-related opportunities on the Financial Impact Metrics.  *See infra* section II.K.5.c.  For the same reason, we are not adopting the requirement set forth in proposed Rule 14-02(i) requiring a registrant to include the impacts of any climate-related risks identified pursuant to proposed Item 1502(a) on the Financial Impact Metrics.

[1940]    *See supra* note 1791 and accompanying text.

[1941]    *See supra* notes 1924 and 1926 and accompanying text.

requirements to be more feasible for registrants to disclose under current financial reporting processes. Moreover, given the overlapping nature of some of the disclosures that would have been required by the proposed Financial Impact Metrics and the capitalized costs, expenditures expensed, charges, and losses that are required to be disclosed under the final rules,[1942] the requirements we are adopting will provide many of the same benefits of transparency and insights that the proposed Financial Impact Metrics would have provided, albeit without as much detail, which should reduce the burden on registrants.

In addition, as discussed in greater detail below in section II.K.3.c.ii, we emphasize that registrants currently have an obligation under GAAP to consider material impacts on the financial statements, and the fact that the impact may be driven by climate-related matters does not alter registrants' financial reporting obligations.[1943] Therefore, a registrant should consider whether it currently has an obligation to disclose information that would have been covered by the proposed Financial Impact Metrics. Our decision not to adopt the proposed Financial Impact Metrics does not affect registrants' ongoing responsibility to consider material impacts, including those that may be climate-related, when preparing their financial statements and related disclosures.

Although we are not adopting the proposed Financial Impact Metrics at this time, certain aspects of the proposed rules discussed at length above also applied to, or were substantially similar to, the proposed Expenditure Metrics. For example, the proposed one percent disclosure threshold and terminology such as "severe weather events and other natural conditions" were

---

[1942]   *See supra* notes 1732 and 1735.

[1943]   *See infra* notes 2068 and 2069 and accompanying text.

Appellate Case: 24-1628     Page: 453     Date Filed: 03/26/2024 Entry ID: 5377362

included in the proposals for both proposed metrics.[1944]  A number of commenters provided

feedback on these issues generally, without indicating that their comments were limited to only

the proposed Financial Impact Metrics or to only the proposed Expenditure Metrics.[1945]  In

addition, some of the alternatives discussed above are relevant to the proposed Expenditure

Metrics.[1946]  As such, we also considered these comments with respect to the proposed

Expenditure Metrics.  Below, our discussion focuses on additional issues that commenters raised

with respect to the proposed Expenditure Metrics.  As a result, our rationale for the final rules

takes into consideration all of the commenter feedback we received on the proposed rules.

### 3.  Expenditure Effects

#### a.  Proposed Rules

The Commission proposed to amend Regulation S-X to require a registrant to disclose

Expenditure Metrics.  As proposed, the Expenditure Metrics referred to the positive and negative

impacts associated with the same severe weather events, other natural conditions, transition

activities, and identified climate-related risks as the proposed Financial Impact Metrics.[1947]

Registrants would have been required to separately aggregate the amounts of (i) expenditures

expensed and (ii) capitalized costs incurred during the fiscal years presented.[1948]  For each of

---

[1944]    *See* Proposing Release, sections II.F.2 and 3.

[1945]    *See, e.g.*, letters from B. Herron (opposing the 1% disclosure threshold generally without distinguishing between the proposed Financial Impact Metrics and the proposed Expenditure Metrics); Moody's ("[W]e therefore suggest the Commission dispense with the one-percent rule in favor of a more principles-based approach for reporting any financial statement metrics."); and Sens. J. Reed *et al.* (stating its support for the 1% disclosure threshold without distinguishing between the proposed Financial Impact Metrics and the proposed Expenditure Metrics).

[1946]    *See supra* section II.K.2.b.iv.

[1947]    *See* Proposing Release, section II.F.3.

[1948]    The Proposing Release explained that these metrics are focused on expenditures (spending) incurred in each reported fiscal year(s), and it stated that the number of periods of the expenditure metrics should correspond to the number of years of income statement or cash flow statement presented in the consolidated financial statements.  *See id.*

Appellate Case: 24-1628      Page: 454      Date Filed: 03/26/2024 Entry ID: 5377362

those categories, a registrant would have been required to disclose separately the amount incurred during the fiscal years presented (i) toward positive and negative impacts associated with the climate-related events and (ii) toward transition activities.[1949]  The proposed rules provided that the registrant could also choose to disclose the impact of efforts to pursue climate-related opportunities.[1950]  As discussed above, under the proposal, if a registrant elected to disclose the impact of an opportunity, it would have been required to do so consistently and would have been required to follow the same presentation and disclosure threshold requirements applicable to the required disclosures of the Expenditure Metrics.[1951]  The Proposing Release explained that the amount of expenditure disclosed pursuant to the proposed Expenditure Metrics would be a portion, if not all, of the registrant's total recorded expenditure (expensed or capitalized), as calculated pursuant to the accounting principles applicable to the registrant's financial statements.[1952]

   The proposed Expenditure Metrics were subject to the same disclosure threshold as the Financial Impact Metrics, which the Commission explained would promote comparability, consistency, and clarity in determining when information must be disclosed.[1953]  The Commission explained in the Proposing Release that for purposes of calculating the disclosure thresholds for the Expenditure Metrics, a registrant could separately determine the amount of expenditure expensed and the amount of expenditure capitalized; however, a registrant would have been required to aggregate expenditure related to climate-related events and transition

---

[1949]    *See id.*

[1950]    *See id.*

[1951]    *See id.*

[1952]    *See id.* (citing 17 CFR 210.4-01(a)(1) and (2)).

[1953]    *See id.*

activities within the categories of expenditure (i.e., amount capitalized and amount expensed).[1954] This approach was designed to better reflect the significance of climate-related expenditure compared to a calculation approach that allowed for a disclosure threshold to be measured at the individual event or activity level, which may result in more limited disclosures.

The Proposing Release provided examples of how a registrant would evaluate and disclose the proposed Expenditure Metrics, including examples of contextual information that could require disclosure, such as information about the specific climate-related events and transition activities that were aggregated for purposes of determining the impacts on the capitalized and expensed amounts.[1955] To provide additional clarity, the proposed rules clarified that a registrant may be required to disclose the amount of expenditure expensed or capitalized costs, as applicable, incurred for the climate-related events to increase the resilience of assets or operations, retire or shorten the estimated useful lives of impacted assets, relocate assets or operations at risk, or otherwise reduce the future impact of severe weather events and other natural conditions on business operations.[1956] The proposed rules also clarified that a registrant may be required to disclose the amount of expenditure expensed or capitalized costs, as applicable, incurred for climate-related transition activities related to research and development of new technologies, purchase of assets, infrastructure, or products that are intended to reduce GHG emissions, increase energy efficiency, offset emissions (purchase of energy credits), or improve other resource efficiency.[1957]

---

[1954]   *See id.*

[1955]   *See id.*

[1956]   *See id.*

[1957]   *See id.*

Appellate Case: 24-1628    Page: 456    Date Filed: 03/26/2024 Entry ID: 5377362

The Commission stated in the Proposing Release that separate disclosure of total expense and total capitalized costs incurred toward the climate-related events and transition activities should provide important information to help investors make better informed investment or voting decisions.[1958]  The Commission pointed out that the financial impacts of expenditure typically appear in different places within the financial statements (e.g., in an asset line item(s) on the balance sheet or in an expense line item(s) in the income statement), and therefore the proposed approach, which would require registrants to first identify the relevant climate-related expenditures and then compile those impacts in one location, was intended to address this dispersed presentation.[1959]

### b.  Comments

As discussed above, some commenters generally stated that they supported the proposed amendments to Regulation S-X, including the financial statement disclosures.[1960]  Other commenters specifically stated that they supported the proposed Expenditure Metrics.[1961]  As previously noted, some of the commenters who supported the proposed amendments to

---

[1958]     *See id.*

[1959]     *See id.*

[1960]     *See, e.g.*, letters from A. Cramer, AGs of Cal. *et al.*; Anthesis; Arjuna; Bailard; BC IM Corp.; Bloomberg; Better Markets; Church Grp.; Climate Accounting Audit Project; Can. PCPP; CFB; CSB; Dana Invest.; D. Higgins; Domini Impact; Ecofin; Educ. Fnd. Amer.; H. Huang; IASJ; IMA; Impax Asset Mgmt.; Inherent Grp.; K. Ramanna *et al.*; LSEG; Mercy Invest.; Miller/Howard; MRTI; NY City Comptroller; NY SIF; NY St. Comptroller; Parnassus; Prentiss; R. Bentley; R. Burke; RMI; Rockefeller Asset Mgmt.; R. Palacios; Seventh Gen.; SKY Harbor; Terra Alpha; UAW Retiree; UNCA; United Church; US SIF; and Xpansiv.

[1961]     *See, e.g.*, letters from As You Sow; BMO Global Asset Mgmt.; Boston Trust; CalPERS; Carbon Tracker; CEMEX; ERM CVS; ICGN; M. Hadick; Morningstar; PRI; Sarasin; SEIA; Sens. J. Reed *et al.*; S. Spears; UCS; and WSP.

Appellate Case: 24-1628     Page: 457     Date Filed: 03/26/2024 Entry ID: 5377362

Regulation S-X, including the Expenditure Metrics, recommended revising certain aspects of the proposal,[1962] such as the one percent disclosure threshold.[1963]

Many of the commenters that supported the proposed Expenditure Metrics stated that the disclosure requirement would provide useful information to investors.[1964] For example, one commenter stated that the proposed Expenditure Metrics would allow investors to gauge whether the qualitative discussions included in a registrant's periodic report match the substance of the registrant's expenditures.[1965] Another commenter stated that requiring the reporting of expenses associated with climate-related events would allow investors to "better understand the overall vulnerability of assets, loss experience, and long term investment in asset resiliency or adaption."[1966] Several commenters noted that the proposed Expenditure Metrics would help investors understand a registrant's ability to meet stated GHG emissions reduction targets or other climate-related targets and goals.[1967] One commenter stated that understanding the quantification of costs such as operating and capital expenditures enables it to improve its valuation models.[1968] Another commenter noted favorably that the proposed Expenditure Metrics were similar to one of the TCFD's seven cross-sector metrics, and that the ISSB's

---

[1962] *See, e.g.*, letters from AFG; Amer. Academy Actuaries; BC IM Corp.; BHP; Calvert; CEMEX; CO PERA; IAA; ISS ESG; Northern Trust; PGIM; PwC; TIAA; TotalEnergies; and Trane.

[1963] *See, e.g.,* letters from AFG; Amer. Academy Actuaries; BC IM Corp.; BHP; Calvert; CEMEX; CO PERA; IAA; ISS ESG; Northern Trust; PGIM; PwC; TotalEnergies; and Trane.

[1964] *See, e.g.*, letters from BMO Global; Boston Trust; CalPERS; Carbon Tracker; IAA; ICGN; PRI; Sarasin; SEIA; Sens. J. Reed *et al.*; and WSP.

[1965] *See* letter from CalPERS.

[1966] *See* letter from IAA. *See also* letter from Boston Trust (stating that the proposed Expenditure Metrics would help investors assess a registrant's exposure to physical risks and evaluate its overall resilience planning).

[1967] *See* letters from BMO Global Asset Mgmt.; NY City Comptroller; PRI; Sens. J. Reed *et al.*; and S. Spears. *See also* letter from M. Hadick (stating that investors need to know if a registrant's level and type of capital expenditures is commensurate with the registrant's plans).

[1968] *See* letter from Rockefeller Asset Mgmt.

exposure draft similarly included language requiring "the amount of capital expenditure, financing, or investment deployed towards climate-related risks and opportunities."[1969]  A few commenters specifically stated that they supported applying the one percent disclosure threshold to the proposed Expenditure Metrics.[1970]

On the other hand, consistent with the feedback the Commission received on the proposed Financial Impact Metrics, and as discussed at length above, many of the commenters who provided feedback on the proposed Expenditure Metrics did not support the proposed requirements.  Many commenters generally stated that they did not support the proposed amendments to Regulation S-X for the feasibility and other reasons described above.[1971]  Other commenters specifically stated that they disagreed with the proposed Expenditure Metrics.[1972] For example, some commenters stated that the proposed Expenditure Metrics would be time intensive and costly for companies.[1973]  One of these commenters stated that registrants "do not

---

[1969]  *See* letter from PRI.  The exposure draft preceded the final standards adopted by the ISSB in June 2023, i.e., General Requirements for Disclosure of Sustainability-related Financial Information (IFRS S1) and Climate-related Disclosures (IFRS S2).  *See supra* note 150 and accompanying text.

[1970]  *See, e.g.*, letters from Amer. for Fin. Reform, Sunrise Project *et al.*; and Sarasin.  *See also* letter from Morningstar ("Morningstar recommends applying the same threshold to financial impact and expenditure metrics.").

[1971]  *See, e.g.*, letters from AAFA; AAR; ACA Connects; AEPC; AFEP; AFPA; AHLA; Airlines for America; Alliance Resource; Allstate; Alphabet *et al.*; Amer. Bankers; Amer. Chem.; APCIA; API; Autodesk; Barrick Gold; B. Herron; BlackRock; BNP Paribas; BOA; BPI; Brigham; Business Roundtable; CA Bankers; Cal. Resources; Can. Bankers; Chamber; Chevron; Cleary Gottlieb; Cleco; Cleveland Cliffs; Climate Risk Consortia; ConocoPhillips; Corteva; CREFC; CRE Fin. *et al.*; Deutsche Bank; Devon Energy; Dominion Energy; EEI & AGA; Energy Infrastructure; Energy Transfer; EPSA; Ernst & Young LLP; Exxon; FedEx; Fed. Hermes; Fidelity; G. Farris; GM; Grant Thornton; IC; ICI; IIB; IIF; INGAA; IPA; ITIC; JPN Bankers; K. Connor; K. Tubb, Heritage Fnd, Linklaters; LTSE; LSTA; Magellan; Mid-Size Bank; Moody's; MRC Global; Mtg. Bankers; NAFO; NAM; Nareit; NG; NMA; NMHC *et al.*; NRF; NRP; NYSE SAC; Occidental Petroleum; Petrol. OK; PPL; Reinsurance AA; RILA; Royal Gold; Salesforce; Shell; SIA; SMME; Soc. Corp. Gov.; SouthState; Southwest Air; State St.; Sullivan Cromwell; Tapestry Network; Travelers; TRC; Tucson Electric; Tyson; Vodafone; Wells Fargo; Western Midstream; and Williams Cos.

[1972]  *See, e.g.*, letters from ACLI; AFPM; HDA; HP; IADC; McCormick; NIRI; NOV; and Transocean.

[1973]  *See, e.g.*, letters from BP; Cohn Rez.; HP; IADC; NOV; and Transocean.

measure capital expenditures by climate purpose" and therefore the proposed disclosures would require "the implementation of costly controls and procedures organization wide."[1974]  Similarly, another commenter stated that many smaller issuers use accounting software packages that offer limited expenditure tracking functionality and therefore the proposed Expenditure Metrics would likely require significant upgrades to cash outflow tracking infrastructure.[1975]  Some commenters stated that they opposed the use of a one percent disclosure threshold in the context of the Expenditure Metrics.[1976]  Other commenters raised concerns about registrants' abilities to separately identify the cost of climate risk mitigation activities.[1977]  A few commenters stated that the proposed Expenditure Metrics would not provide decision-useful information to investors because, among other things, the information is unlikely to be comparable among registrants.[1978]

Some commenters asserted that the proposed Financial Impact and Expenditure Metrics would require overlapping disclosure.[1979]  These commenters generally stated that registrants should only be required to disclose the relevant information once.[1980]  One of these commenters recommended that the proposed Expenditure Metrics focus on actions related to transition plans and the mitigation of physical risks.[1981]  On the other hand, one commenter stated that the

---

[1974]    *See* letter from HP.

[1975]    *See* letter from Cohn Rez.

[1976]    *See, e.g.*, letters from C2ES; and TotalEnergies.

[1977]    *See, e.g.*, letters from PGEC; and Unilever.

[1978]    *See, e.g.,* letters from ACLI; and IADC.

[1979]    *See, e.g.*, letters from BIO; BHP; Carbon Tracker; Eni Spa; KPMG; Morningstar; PGIM; SIA; and TotalEnergies.  *See also supra* note 1735 (discussing the overlapping nature of the proposed Financial Impact and Expenditure Metrics).

[1980]    *See, e.g.,* letters from BIO; BHP; Carbon Tracker; Eni Spa; KPMG; and TotalEnergies.

[1981]    *See* letter from PGIM.

Commission should require both the proposed Financial Impact and Expenditure Metrics in the final rules because they provide different perspectives and are both decision-useful for investors.[1982]

Some commenters agreed that it would be appropriate to require separate disclosure of capitalized costs and expenditures expensed.[1983] One of these commenters explained that capitalized costs and expenditures expensed have different effects on the value of assets and are recorded separately elsewhere in the financial statements.[1984] Another commenter stated that requiring the disclosures of expenditures expensed would be particularly helpful because otherwise they may not be subject to the same scrutiny or disclosure requirements as capitalized costs.[1985] Several commenters stated that additional examples or guidance would be useful.[1986]

Some commenters requested clarification regarding the proposed Expenditure Metrics. One commenter suggested that the Commission should provide an accounting definition of "expenditures."[1987] Another commenter asked the Commission to clarify what it meant by a "capitalized cost," for example, whether it only includes costs associated with purchases of Property, Plant and Equipment (PP&E) or if the definition is broader and also includes costs initially recognized as a debit on the balance sheet such as prepaid expenses.[1988] The commenter also noted that costs could be both capitalized and expensed in the same period, and therefore the

---

[1982] *See* letter from Amer. for Fin. Reform, Sunrise Project *et al.*

[1983] *See, e.g.*, letters from Amer. for Fin. Reform, Sunrise Project *et al.*; Eni Spa; and Morningstar.

[1984] *See* letter from Amer. for Fin. Reform, Sunrise Project *et al.*

[1985] *See* letter from Carbon Tracker.

[1986] *See, e.g.*, letters from Eni Spa; Morningstar; and TotalEnergies.

[1987] *See* letter from TotalEnergies.

[1988] *See* letter from Grant Thornton.

rules should address how the costs should be presented in that circumstance.[1989]  Similarly, one commenter asserted that whether something is identified as an expenditure or a capitalized cost would require registrants to make subjective judgments that are unlikely to be uniform across industries.[1990]  Another commenter warned that a registrant could "game" the rules by classifying costs as expenditures, rather than capitalizing the costs, to avoid triggering the disclosure threshold.[1991]  Some commenters generally asked the Commission to provide additional examples and guidance for calculating the proposed Expenditure Metrics.[1992]

### c. Final Rules

#### i. Scope (Rules 14-02(c) and (d))

The proposed Expenditure Metrics would have required registrants to disclose expenditures expensed and capitalized costs to mitigate the risks of severe weather events and other natural conditions and related to transition activities.[1993]  After consideration of the comments, we are adopting a requirement (Rules 14-02(c) and (d)) to disclose expenditures expensed and capitalized costs with a number of changes from the proposed rules based on commenter feedback.[1994]  In response to the concerns identified by commenters above, we have modified the proposed requirements and are adopting final rules that require disclosures that

---

[1989]  *See id.*

[1990]  *See* letter from Can. Bankers.

[1991]  *See* letter from Sarasin.

[1992]  *See, e.g.,* letters from J. McClellan (seeking clarification on expensed or capitalized costs partially incurred towards the climate-related events and transition activities); RSM US LLP; and Salesforce (seeking clarification around what constitutes "expenditures incurred for climate-related transition activities related to research and development of new technologies, purchase of assets, infrastructure or products that are intended to reduce GHG emissions, increase energy efficiency, offset emissions (purchase of energy credits), or improve other resource efficiency").

[1993]  *See* Proposing Release, section II.F.3.

[1994]  *See supra* note 1720 and accompanying text.

Appellate Case: 24-1628      Page: 462      Date Filed: 03/26/2024 Entry ID: 5377362

significantly reduce the burdens for registrants while providing investors with decision-useful information.

The final rules focus on requiring the disclosure of capitalized costs, expenditures expensed, charges, and losses incurred as a result of severe weather events and other natural conditions, which is similar to certain of the alternatives suggested by commenters.[1995]  Having considered the various alternatives presented by commenters, we concluded that focusing on the disclosure of discrete expenditures related to severe weather events and other natural conditions strikes an appropriate balance between providing investors with useful information and limiting the burdens on registrants.

Under the final rules, a registrant must disclose:

(1) The aggregate amount of expenditures expensed as incurred and losses, excluding recoveries, incurred during the fiscal year as a result of severe weather events and other natural conditions, and

(2) The aggregate amount of capitalized costs and charges, excluding recoveries, recognized during the fiscal year as a result of severe weather events and other natural conditions.[1996]

---

[1995]  *See supra* section II.K.2.b.iv.  *See also* letter from Dell (requesting that the "Commission consider limiting Article 14 of Regulation S-X requirement to physical impacts and related expenditures only").

[1996]  *See* 17 CFR 210.14-02(c), (d).  Under the final rules, disclosure must be provided for the registrant's most recently completed fiscal year, and to the extent previously disclosed or required to be disclosed, for the historical fiscal year(s) included in the consolidated financial statements in the filing.  *See* 17 CFR 210.14-01(d).  In addition, foreign private issuers that file consolidated financial statements under home country GAAP and reconcile to U.S. GAAP, would be required to use U.S. GAAP (including the provisions of the final rules) as the basis for calculating and disclosing this information.  Foreign private issuers that file consolidated financial statements under IFRS as issued by the IASB, would apply IFRS and the final rules as the basis for calculating and disclosing the financial statement effects.  *See also infra* note 2380 which discusses proposed amendments to Form 20-F.

458

The proposed rules would have required registrants to disclose costs and expenditures incurred to "mitigate the risks from severe weather events and other natural conditions."[1997] Some commenters indicated that it would be feasible, and significantly less burdensome, to instead segregate and quantify discrete costs incurred due to severe weather events.[1998] Requiring disclosure of expenditures related to mitigation activities would present challenges for registrants in terms of forecasting and determining their expectations about future severe weather events at the time they are making expenditure decisions. In addition, costs and expenditures related to mitigation activities may present similar issues to transition activities, which are discussed in further detail below, because the mitigation of the risks of severe weather events may be only one of several reasons why a company makes a business decision to incur a particular expenditure. Therefore, we have decided to require registrants to disclose capitalized costs, expenditures expensed, charges, and losses incurred "as a result of" severe weather events and other natural conditions.[1999] The capitalized costs, expenditures expensed, charges, and losses that will be disclosed under the final rules are already captured in a registrant's income statement or balance sheet and measured and reported in accordance with U.S. GAAP or

---

[1997] *See* Proposing Release, section II.F.3.

[1998] *See, e.g.*, letters from Dow (stating that direct costs related to property damage and related repair costs as a result of extreme weather events on the U.S. Gulf Coast "can easily be segregated, analyzed, and quantified within our current processes"); and Nutrien (stating that if there is a fire at one of its locations that it can attribute to a severe weather event it could "readily identify costs associated with demolition, clean-up and rebuilding of those physical assets for disclosure").

[1999] *See* 17 CFR 210.14-02(c) and (d). Although the proposed Expenditure Metrics only required the disclosure of costs and expenditures related to the mitigation of risks from severe weather events and other natural conditions, the proposed Financial Impact Metrics would have required registrants to disclose costs and expenditures incurred as a result of severe weather events and other natural conditions because those costs would have constituted line-item impacts to a registrant's financial statements. Therefore, the requirement to disclose costs and expenditures incurred as a result of severe weather events and other natural conditions is a subset of the information that was included in the proposal.

IFRS.[2000]  Thus, this approach will be less costly and burdensome for registrants as compared to the proposed rules.

In response to commenter requests for additional clarity,[2001] we are prescribing an attribution principle that registrants must use to determine whether a capitalized cost, expenditure expensed, charge, or loss is "as a result of" a severe weather event or other natural condition.[2002]  The attribution principle will also simplify the determination of the amount required to be disclosed by eliminating the need to allocate portions of costs and expenditures, which will reduce compliance costs for registrants.[2003]

Under the final rules, the requirement to disclose capitalized costs, expenditures expensed, charges, and losses incurred as a result of severe weather events and other natural conditions remains subject to a one percent disclosure threshold; however, we are modifying the denominators used for the threshold and adopting de minimis thresholds that exempt disclosure of amounts that aggregate to less than $100,000 in the income statement or less than $500,000 in the balance sheet, as explained in greater detail below.[2004]  In addition, under the final rules, registrants must separately disclose, as part of the required contextual information, any recoveries resulting from severe weather events and other natural conditions to reflect the net

---

[2000]    *See, e.g.*, letter from KPMG ("We recommend that the final rule clarify that the required disclosures are indeed a disaggregation of amounts already recognized in the financial statements.").

[2001]    *See supra* note 1912 and accompanying text.

[2002]    The attribution principle is discussed in greater detail below in section II.K.3.c.iii. *See also* 17 CFR 210.14-02(g).

[2003]    *See id.*  The attribution principle will also apply to recoveries, which are discussed in greater detail below in section II.K.3.c.iv.  *See also* 17 CFR 210.14-02(f) and (g).

[2004]    *See* 17 CFR 210.14-02(b).

effect that severe weather events and other natural conditions have on a registrant's financial statements.[2005]

As proposed, the Expenditure Metrics would have required registrants to disclose separately the aggregate amount of expenditure expensed and the aggregate amount of capitalized costs.[2006] In a shift from the proposal, the final rules require registrants to separately disclose where on the income statement and balance sheet, as applicable, the capitalized costs, expenditures expensed, charges, and losses are presented.[2007] As explained above, significantly fewer line items are impacted by the final rules we are adopting than would have been impacted by a requirement to disclose the proposed Financial Impact Metrics. Only those line items that reflect capitalized costs, expenditures expensed, charges, and losses fall within the scope of the disclosures, as is further illustrated below in section II.K.3.c.vii. For example, we do not expect that gross revenues would be impacted under the final rules. In addition, we do not believe that requiring registrants to disclose in which line item each of the required capitalized costs, expenditures expensed, charges, and losses are presented will increase the burden as compared to the proposed Expenditure Metrics because the disclosures required under the final rules are simply a disaggregation of financial statement line items. Requiring registrants to separately disclose in which line item the capitalized costs, expenditures expensed, charges, and losses are presented will enhance the usefulness of the disclosures for investors by allowing them to understand the effects of severe weather events and other natural conditions on a registrant's

---

[2005] *See* 17 CFR 210.14-02(f). *See infra* section II.K.6.a.iii for further discussion of the requirement to disclose contextual information.

[2006] *See* Proposing Release, section II.F.3.

[2007] *See* 17 CFR 210.14-02(c), (d), and (e)(1).

App.461

Appellate Case: 24-1628    Page: 466    Date Filed: 03/26/2024 Entry ID: 5377362

financial position and performance. This information will facilitate their analyses and cash flow projections year-on-year and across registrants.

The proposed rules would have required registrants to disclose expenditures expensed and capitalized costs incurred to reduce GHG emissions or otherwise mitigate exposure to transition risks.[2008] With respect to transition activities, many commenters pointed out that registrants make business decisions, such as incurring an expenditure to purchase a piece of machinery that is more energy efficient, for multiple reasons, and as a result, a registrant's transition activities may be inextricably intertwined with its ordinary business activities.[2009] Consequently, commenters raised concerns about registrants' abilities to identify, attribute, and quantify the impact of transition activities on the financial statements.[2010] In addition, requiring disclosure for transition activities would present challenges for registrants in terms of forecasting and determining their expectations about transition activities at the time they are making expenditure decisions. Taking these comments into consideration, we have determined not to require registrants to disclose costs and expenditures related to general transition activities in the financial statements at this time.

Although we are not adopting the broader requirement for disclosure of transition activities in the financial statements, registrants will be required to disclose capitalized costs, expenditures expensed, and losses related to the purchase and use of carbon offsets and RECs in the financial statements.[2011] The proposed rules identified the amount of expensed or capitalized

---

[2008] *See* Proposing Release, section II.F.3.

[2009] *See supra* note 1892 and accompanying text.

[2010] *See supra* notes 1902 and 1907 and accompanying text.

[2011] *See* 17 CFR 210.14-02(e). *See also* 17 CFR 229.1500(a) and (m) (defining "carbon offsets" and "renewable energy credits or certificates").

Appellate Case: 24-1628    Page: 467    Date Filed: 03/26/2024 Entry ID: 5377362

cost, as applicable, related to "offset emissions (purchase of energy credits)" as one example of the disclosures that may be required[2012] and the purchase and use of carbon offsets and RECs is a type of transition activity that does not present the definitional or scoping concerns presented by transition activities more generally.  In addition, carbon offsets and RECs that are expensed or capitalized are discrete transactions that are currently captured in a registrant's income statement or balance sheet.[2013]  Moreover, requiring the disclosure of capitalized costs, expenditures expensed, and losses related to the acquisition and use of carbon offsets and RECs will complement the disclosures regarding carbon offsets and RECs required by the amendments to Regulation S-K that we are adopting in this release.[2014]

Furthermore, although the final rules under Article 14 do not require registrants to disclose costs and expenditures incurred to reduce GHG emissions or otherwise mitigate exposure to transition risks in the financial statements, the final rules under subpart 1500 of Regulation S-K will require registrants to provide quantitative and qualitative disclosure of material expenditures in certain circumstances as described in greater detail above,[2015] which should result in the disclosure of some of the information for expenditures related to transition activities that we would have expected to be disclosed under the proposed rules, albeit outside of the financial statements.  Requiring the disclosure of these expenditures outside of the financial statements and subject to materiality rather than a bright-line threshold, among other things, should mitigate the compliance burden and related concerns raised by commenters with respect

---

[2012]   *See* Proposing Release, section II.F.3.

[2013]   There is currently a diversity in practice in accounting for carbon offsets and RECs.  *See infra* note 2110.

[2014]   *See supra* note 2023.

[2015]   *See supra* sections II.D.2.c (transition plan disclosure) and II.G.3.a (targets and goals disclosure).

to the proposed requirement to disclose transition expenditures in the financial statements.[2016] While we are adopting the requirements to disclose expenditures related to transition activities outside the financial statements, we remind registrants that current accounting standards may require the disclosure of material expenditures within the financial statements,[2017] which may include material expenditures incurred in furtherance of a registrant's transition activities, depending upon the application of these current accounting standards. Current accounting standards specify minimum presentation and disclosure requirements. Importantly, however, the FASB's Conceptual Framework provides additional guidance for evaluating whether financial information is representationally faithful. In particular, the Conceptual Framework states "[t]o be a perfectly faithful representation," a depiction "would be complete, neutral and free from error." The Conceptual Framework further states, "[a] complete depiction includes *all* information necessary for a user to understand the phenomenon being depicted, including *all* necessary descriptions and explanations"[2018] (emphasis added). Accordingly, additional disaggregation and disclosure of material expenditures, whether on the face of the primary financial statements or in the notes to the financial statements, may be needed to meet the

---

[2016] *See supra* section II.D.2.c. for additional discussion of how these revisions mitigate the compliance burdens.

[2017] *See, e.g.*, ASC 230 *Statement of Cash flows* (requiring classification of cash receipts and cash payments as resulting from operating, investing, and financing activities); ASC 280 *Segments* (noting that a registrant "shall disclose both of the following about each reportable segment if the specified amounts are included in the determination of segment assets reviewed by the chief operating decision maker or are otherwise regularly provided to the chief operating decision maker, even if not included in the determination of segment assets…(b) total expenditures for additions to long-lived assets…") (ASC 280-10-50-25); and ASC 730 *Research and Development* (requiring disclosure of the total research and development costs charged to expense in each period for which an income statement is presented) (ASC 730-10-50-1).

[2018] See FASB, Statement of Financial Accounting Concepts No. 8 – Conceptual Framework for Financial Reporting – Chapter 3, Qualitative Characteristics of Useful Financial Information (As Amended) (Aug. 2018), para. QC12 – QC13.

App.464

Appellate Case: 24-1628    Page: 469    Date Filed: 03/26/2024 Entry ID: 5377362

objective of the financial reporting as explained by the Conceptual Framework.[2019]  For example, a registrant may consider whether disaggregating material cash outflows to acquire property, plant, and equipment[2020] purchased to meet the registrant's transition plans, targets, or goals on the statement of cash flows or in a related note is appropriate to provide complete information about the entity's cash flows for the period.

Under the final rules, registrants are required to disclose the aggregate amounts of (1) carbon offsets and RECs expensed, (2) carbon offsets and RECs capitalized, and (3) losses incurred on the capitalized carbon offsets and RECs during the fiscal year.[2021]  This disclosure requirement is not subject to the one percent disclosure threshold that applies to the disclosure of severe weather events and other natural conditions.  Instead, disclosure is required if carbon offsets or RECs have been used as a material component of a registrant's plan to achieve disclosed climate-related targets or goals,[2022] which is consistent with the requirement to disclose information about carbon offsets and RECs included in the amendments to Regulation S-K that we are adopting in this release and therefore will help limit the burden for registrants and avoid confusion for investors.[2023]  In addition, registrants are required to disclose the beginning and ending balances of capitalized carbon offsets and RECs on the balance sheet for the fiscal year.[2024]  The beginning and ending balances are currently existing information in a registrant's

---

[2019]  See FASB, Statement of Financial Accounting Concepts No. 8 – Conceptual Framework for Financial Reporting – Chapter 1, The Objective of General Purpose Financial Reporting (As Amended) (Dec. 2021).

[2020]  ASC 230-10-45-13.

[2021]  *See* 17 CFR 210.14-02(e).

[2022]  *See* 17 CFR 210.14-02(e)(1).

[2023]  *See* 17 CFR 229.1504(d) (requiring the disclosure of certain information regarding carbon offsets or RECs "if carbon offsets or RECs have been used as a material component of a registrant's plan to achieve climate-related targets or goals").  *See also supra* section II.G.3.b.

[2024]  *See* 17 CFR 210.14-02(e)(1).

Appellate Case: 24-1628     Page: 470     Date Filed: 03/26/2024 Entry ID: 5377362

balance sheet that will provide investors with information to help them understand the registrant's activity related to the purchase and use of carbon offsets and RECs, further illustrating how a registrant is using carbon offsets and RECs as a material component of its plan to achieve a target or goal. Registrants are also required to disclose where on the income statement or balance sheet the capitalized costs, expenditures expensed, and losses related to carbon offsets and RECs are presented under the final rules.[2025]

One commenter stated that the proposed rules would likely require many smaller issuers to make significant upgrades to their cash outflow tracking infrastructure.[2026] The commenter identified upgrades that would be needed to cash outflow tracking infrastructure to capture the costs and investments for each separate risk, transition activity, and weather event.[2027] However, as discussed above, the final rules will not require disclosure of the proposed Financial Impact Metrics or costs and expenditures related to transition activities in the financial statements. Rather, the amendments to Regulation S-X have been narrowed to focus on severe weather events and other natural conditions and carbon offsets and RECs, which will be less burdensome for registrants. Furthermore, the final rules do not require any disclosure of the impacts to the statement of cash flows.

We did not include in the final rules the proposed requirement for a registrant to disclose the impact of any climate-related risks identified by the registrant pursuant to proposed Item 1502(a) on any of the financial metrics included in the proposed rules, including the proposed Expenditure Metrics.[2028] A few commenters sought clarification about the scope of this

---

[2025] *See id.*

[2026] *See supra* note 1975 and accompanying text.

[2027] *See id.*

[2028] *See* Proposing Release, section II.F.2.

proposed requirement or questioned what disclosure objective it was intended to achieve.[2029] Because the final rules we are adopting are more narrowly focused on requiring the disclosure of capitalized costs, expenditures expensed, charges, and losses incurred as a result of severe weather events and other natural conditions, we do not think it would be in keeping with this approach to also require a registrant to disclose the impacts from any climate-related risks identified by the registrant pursuant to Item 1502(a).

We recognize that a number of commenters expressed support for the Expenditure Metrics as proposed, including some who stated that the proposed requirements would provide investors with important information about "long term investments in asset resiliency" or would help investors understand a registrant's ability to meet its climate-related targets and goals.[2030] Although the final rule is more narrow in scope than the proposal, the information elicited by the final rules will provide investors with comparable, reliable, and decision-useful information about registrants' capitalized costs, expenditures expensed, charges, and losses related to severe weather events and other natural conditions, which will serve to protect investors, while minimizing costs and burdens on registrants.

### ii. Disclosure Threshold (Rule 14-02(b))

In the final rules, we are retaining a quantitative disclosure threshold for capitalized costs, expenditures expensed, charges, and losses incurred as a result of severe weather events and other natural conditions.[2031] Providing a bright-line standard for registrants will simplify

---

[2029] *See, e.g.*, letters from ABA; Amer. for Fin. Reform, Sunrise Project *et al.*; and Deloitte & Touche. *See also* letter from Travelers (Mar. 10, 2023) (objecting to the proposed requirement for a registrant to disclose the impact of any climate-related risks identified by the registrant pursuant to proposed Item 1502(a) on any of the financial metrics included in the proposed rule).

[2030] *See supra* notes 1966 and 1967 and accompanying text.

[2031] *See* 17 CFR 210.14-02(b).

467

compliance compared to a more principles-based standard, reduce the risk of underreporting such information, and promote comparability and consistency among a registrant's filings over time and among different registrants.[2032]  Accordingly, the final rules require disclosure of:

> (1) Expenditures expensed as incurred and losses if the aggregate amount of such expenditures expensed as incurred and losses equals or exceeds one percent of the absolute value of income or loss before income tax expense or benefit for the relevant fiscal year; and

> (2) Capitalized costs and charges recognized if the aggregate amount of the absolute value of capitalized costs and charges recognized equals or exceeds one percent of the absolute value of stockholders' equity or deficit, at the end of the relevant fiscal year.[2033]

Such disclosure is not required, however, if the aggregate amount of expenditures expensed and losses as incurred in the income statement is less than $100,000 for the relevant fiscal year.[2034] With respect to the balance sheet, registrants are not required to provide disclosure if the aggregate amount of capitalized costs and charges is less than $500,000 for the relevant fiscal year.[2035]

In a shift from the proposal, we are using different denominators for the disclosure thresholds.  Specifically, the denominators we are adopting are: (1) income or loss before income tax expense or benefit, and (2) stockholders' equity or deficit.[2036]  Income or loss before income

---

[2032]    *See* Proposing Release, section II.F.2.

[2033]    *See* 17 CFR 210.14-02(b).

[2034]    *See* 17 CFR 210.14-02(b)(1).

[2035]    *See* 17 CFR 210.14-02(b)(2).

[2036]    *See* 17 CFR 210.14-02(b).

Appellate Case: 24-1628      Page: 473      Date Filed: 03/26/2024 Entry ID: 5377362

tax expense or benefit is a frequently disclosed line item on the income statement that provides an accounting-based measure of financial performance. Stockholders' equity or deficit is a disclosed line item in the balance sheet that reflects stockholders' ownership interest in the book value of the registrant and represents the net difference between the assets and liabilities of the registrant.

Although we did not receive commenter feedback specifically objecting to the denominators for the proposed Expenditure Metrics (i.e., "total expenditure expensed" or "total capitalized costs"), we have decided to use these alternative denominators because income or loss before income tax expense or benefit and stockholders' equity or deficit are well known and understood by registrants and investors and are easily calculable based on line items in the financial statements that are defined under U.S. GAAP and IFRS.[2037] These alternative denominators are broadly responsive to commenters who raised concerns that the proposed rules would be inconsistent with existing GAAP[2038] or would not result in comparable disclosure,[2039] although neither of these concerns was specifically directed at the proposed denominators for the disclosure threshold. Since the line items we have chosen for the denominators in the final rules are well known and represent aggregated financial activity, we expect at least some companies will have insight into the expected amount or magnitude of these denominators in advance of the end of the fiscal year, which could help facilitate the establishment of internal accounting

---

[2037]    For example, while some registrants are not explicitly required to present income or loss before income tax expense or benefit in accordance with 17 CFR 210.5-03.10 in their financial statements, U.S. GAAP includes presentation and disclosure requirements that result in information sufficient to calculate income or loss before income tax expense or benefit, and registrants often do present this amount. In addition, while IFRS does not explicitly require income or loss before income tax expense or benefit, the standards do require disclosure of profit or loss and income tax expense.

[2038]    *See supra* note 1797 and accompanying text.

[2039]    *See supra* note 1793 and accompanying text.

Appellate Case: 24-1628      Page: 474      Date Filed: 03/26/2024 Entry ID: 5377362

controls related to the required disclosure and support the establishment of ICFR and accurate and timely disclosure.[2040]  In addition, as mentioned above, income or loss before income tax expense or benefit is a measure of profitability, and requiring a registrant to disclose expenditures expensed and losses incurred as a result of severe weather events and other natural conditions will help investors understand the impact these events and conditions had on the registrant's profitability.  Likewise, stockholders' equity or deficit represents shareholders' interest in the book value of an entity, and requiring a registrant to disclose the capitalized costs and charges incurred as a result of severe weather events and other natural conditions will help investors understand the impact these events and conditions have on assets attributable to shareholders.

The final rules provide that the disclosure thresholds should be calculated using the absolute values of the relevant denominator.[2041]  We think it is appropriate to use the absolute values because the balances for these line items may represent debit or credit balances (which are not inherently either positive or negative) in the books and records, and thus using an absolute value will avoid any confusion that could arise from using a negative number resulting from an accounting convention for the disclosure threshold.[2042]

---

[2040]   Some commenters raised concerns that registrants would not be able to calculate the monetary value for the 1% disclosure threshold until the end of the relevant period, which would require registrants to evaluate every transaction to determine if it counts towards the threshold.  *See supra* note 1814 and accompanying text.  Our decision to use income or loss before income tax expense or benefit and shareholders' equity or deficit as the denominators in the final rules should mitigate this concern to some extent for registrants because we expect that many registrants will have insight into the magnitude of these denominators prior to the end of the fiscal year.

[2041]   *See* 17 CFR 210.14-02(b).

[2042]   Other rules in Regulation S-X use absolute values in determining whether a threshold has been exceeded.  *See* 17 CFR 210.1-02(w) (setting forth the income test for determining whether a subsidiary is a significant subsidiary).

In addition, the final rules require registrants to use the absolute value of capitalized costs and charges recognized for the numerator to determine whether the applicable disclosure threshold is triggered for the balance sheet disclosures since capitalized costs and charges can offset one another.[2043] Expenditures expensed as incurred and losses in the income statement do not offset one another and therefore the use of absolute values is unnecessary to determine whether the applicable disclosure threshold is triggered. Although the proposed Expenditure Metrics did not use absolute values in the numerator to determine whether the applicable disclosure threshold was triggered,[2044] the proposed Financial Impact Metrics did, and commenter feedback on the use of absolute values in that context was varied. A few commenters supported using the absolute value, and one investor stated that the absolute value would better reflect the significance of the impact on a registrant's financial performance and position.[2045] On the other hand, a few commenters objected to using the absolute value and stated it could result in the disclosure of individually immaterial information.[2046] We agree with the commenter that stated using the absolute value to determine whether the disclosure threshold is triggered will better reflect the significance of the impact on a registrant's financial position because the absolute value takes into account each of the relevant capitalized costs or charges (i.e., the full magnitude of the costs or charges), whereas a net amount would not necessarily reflect the total effect on the registrant.

---

[2043]   *See* 17 CFR 210.14-02(b)(2).

[2044]   As explained above, the proposed Expenditure Metrics did not require the disclosure of charges, and therefore there was no potential for offsetting, although charges would have been required disclosures under the proposed Financial Impact Metrics. *See supra* note 1732.

[2045]   *See supra* note 1856 and accompanying text.

[2046]   *See supra* note 1854 and accompanying text.

In a further shift from the proposal, we have included de minimis thresholds in the final rules.[2047] As discussed above, some commenters expressed the view that the proposed one percent disclosure threshold would place an unreasonable burden on smaller companies because it is more likely that the impacts on smaller companies would exceed the one percent disclosure threshold.[2048] In addition, a few commenters mentioned a de minimis exception in their letters.[2049] We recognize the possibility that a one percent disclosure threshold could be disproportionately burdensome for smaller companies or companies in the early stages of developing a product or business line for which one percent of income or loss before income tax expense or benefit or stockholders' equity or deficit could be a very small amount. In addition to smaller companies, we think de minimis thresholds will also be helpful for companies that have income or loss before income tax expense or benefit near breakeven in a particular year, perhaps due to anomalous circumstances. Therefore, we have included in the final rules de minimis thresholds of: (1) $100,000 for expenditures expensed as incurred and losses in the income statement, and (2) $500,000 for capitalized costs and charges recognized on the balance sheet.[2050] As a practical matter, this means that, under the final rules, registrants for which one percent of the absolute value of income or loss before income tax expense or benefit is less than $100,000 will not have to provide disclosure until the aggregate amount of expenditures expensed and losses incurred as a result of severe weather events and other natural conditions

---

[2047] *See* 17 CFR 210.14-02(b).

[2048] *See supra* note 1823 and accompanying text.

[2049] *See* letter from NAM ("The extreme burden of building new processes and systems to track quantitative climate impacts, with no materiality threshold or even a de minimis exception for minor events or immaterial impacts, would impose colossal costs and strain resources at all public companies."). *See also* letter from Cleveland Cliffs (stating a similar view).

[2050] *See* 17 CFR 210.14-02(b). There is precedent in Regulation S-X for using $100,000 as a de minimis threshold. *See* 17 CFR 210.3-11 (permitting a registrant to submit unaudited financial statements if gross receipts and expenditures are not in excess of $100,000).

Appellate Case: 24-1628      Page: 477      Date Filed: 03/26/2024 Entry ID: 5377362

equals or exceeds $100,000.[2051] Similarly, under the final rules, registrants for which one percent of the absolute value of stockholders' equity or deficit is less than $500,000 will not have to provide disclosure until the absolute value of the aggregate amount of capitalized costs and charges incurred as a result of severe weather events and other natural conditions equals or exceeds $500,000.[2052] We have decided to use a higher de minimis threshold for capitalized costs and charges recognized on the balance sheet because generally the disclosure threshold applicable to the balance sheet—one percent of the absolute value of stockholders' equity or deficit—will result in larger numbers than the disclosure threshold applicable to the income statement, and therefore a larger de minimis threshold is appropriate and proportionate. Moreover, as noted below in section IV, in 2022 the $100,000 de minimis value for the income statement would have exceeded one percent of income or loss before income tax expense or benefit for approximately 17% of registrants, and the $500,000 de minimis value for the balance sheet would have exceeded one percent of stockholders' equity or deficit for approximately 24% of registrants. Thus, approximately the same number of companies will benefit from the de minimis thresholds by using these values.

While a number of commenters asserted that requiring disclosure at a one percent threshold would result in an excessive amount of immaterial detail for investors, the changes we

---

[2051] *See* 17 CFR 210.14-02(b)(1). For example, if a registrant had $5 million in income or loss before income tax expense or benefit for the relevant fiscal year, the registrant's disclosure threshold for the income statement would be $50,000 ($5,000,000 x .01= $50,000). Since $50,000 falls below the $100,000 de minimis threshold, the registrant would not be required to provide the disclosure required by Rule 14-02(b)(1) and (c) until the aggregate amount of expenditures expensed as incurred and losses equals or exceeds $100,000 (i.e., the de minimis threshold).

[2052] *See* 17 CFR 210.14-02(b)(2). For example, if a registrant had $25 million in stockholders' equity or deficit for the relevant fiscal year, the registrant's disclosure threshold for the balance sheet would be $250,000 ($25,000,000 x .01=$250,000). Since $250,000 falls below the $500,000 de minimis threshold, the registrant would not be required to provide the disclosure required by Rule 14-02(b)(2) and (d) until the aggregate amount of capitalized costs and charges equals or exceeds $500,000 (i.e., the de minimis threshold).

have made from the proposal address this concern.[2053]  Specifically, the final rules require

disclosure of specific categories of discrete capitalized costs, expenditures expensed, charges,

and losses, which in our view is unlikely to result in immaterial disclosure.  As discussed in

greater detail below, the final rules also include an attribution principle that limits the required

disclosure to circumstances where the severe weather event or other natural condition was a

significant contributing factor in incurring the capitalized cost, expenditure expensed, charge, or

loss.[2054]  The final rules include de minimis thresholds, and the denominators used in the final

rules—stockholders' equity or deficit and income or loss before income tax expense or benefit—

are aggregated amounts and therefore we expect that in many instances they will result in a

larger denominator than what was included in the proposal.  Given the narrower scope of the

final rules, the one percent threshold should not result in an excessive amount of detail or

immaterial disclosure.  Some commenters also raised concerns that the one percent disclosure

threshold could confuse investors by giving too much prominence to the climate-related

disclosures relative to the impacts of other risks disclosed in the financial statements or could

suggest a level of precision that does not exist.[2055]  However, the final rules require disclosure of

capitalized costs, expenditures expensed, charges, and losses that are currently recorded in a

registrant's financial statements in accordance with GAAP, and therefore the disclosures should

have the same degree of precision as the other information provided in the financial statements.

Moreover, the required disclosures will be in a note to the financial statements along with other

---

[2053]    *See supra* note 1809 and accompanying text.

[2054]    *See* 17 CFR 210.14-02(g) and *infra* Section II.K.3.c.iii.

[2055]    *See supra* notes 1810 and 1811 and accompanying text.

Appellate Case: 24-1628    Page: 479    Date Filed: 03/26/2024 Entry ID: 5377362

disaggregated disclosures addressing a variety of topics, and therefore its placement will be on equal footing with other information included in such notes.

Other commenters stated that applying the one percent disclosure threshold on a line-item basis could result in only partial disclosure of expenditures related to a climate-related event since the impact could be recorded in multiple financial statement line items—for which the disclosure threshold may not be triggered—which would diminish the usefulness of the information to investors.[2056] Our decision not to adopt the proposed Financial Impact Metrics should alleviate this concern to a great extent. However, it remains true that, under the final rules, the application of the disclosure threshold separately to (i) capitalized costs and charges in the balance sheet, and (ii) expenditures expensed and losses in the income statement could result in a situation where the threshold for only one of the financial statements is triggered and certain costs related to a particular severe weather event or other natural condition may not be required to be disclosed. We acknowledge that in some circumstances this may result in investors only receiving a partial picture of the financial statement effects of a particular event or condition; however, applying the disclosure threshold separately to the income statement and the balance sheet will be more straightforward for registrants to implement and therefore will help to limit the overall burden of the final rules. Moreover, registrants are not prohibited from disclosing how the severe weather event or other natural condition affected both the income statement and balance sheet, even if the disclosure threshold for one of the financial statements is not triggered. One commenter suggested that a registrant could "game" the rules by classifying costs as expenditures, rather than capitalizing costs, to avoid triggering the disclosure threshold.[2057] We

---

[2056]  *See supra* note 1813.
[2057]  *See supra* note 1991.

Appellate Case: 24-1628     Page: 480     Date Filed: 03/26/2024 Entry ID: 5377362

think the likelihood of this occurring is low because registrants are required to follow GAAP in determining whether to expense a cost or capitalize it and these amounts will be subject to audit.

Certain commenters argued that the Commission should apply a different percentage threshold, such as five or ten percent.[2058]  Although we considered those options, in light of the other changes we are making to the disclosure threshold, such as using an aggregated denominator and including a de minimis threshold, we think one percent will generally not result in immaterial disclosure nor result in undue burdens on registrants.  In this regard, we agree with those commenters who stated that the appropriate percentage threshold depends upon what is used as the denominator.[2059]  For the same reason, we considered, but are not adopting, the other alternative disclosure thresholds that commenters suggested, such as only using a dollar threshold or requiring the disclosure of all relevant expenditures.[2060]

Certain commenters stated that the examples provided in the Proposing Release of other one percent disclosure thresholds were not analogous.[2061]  Generally, these commenters suggested that the examples were not analogous, at least in part, because they involved amounts that are knowable under current accounting practice and have discrete impacts on a smaller number of larger line items (as opposed to every line item).[2062]  Although the alignment with

---

[2058]    *See supra* notes 1837 and 1838 and accompanying text.

[2059]    *See supra* note 1839 and accompanying text.

[2060]    *See supra* notes 1846 and 1848 and accompanying text.

[2061]    *See supra* note 1817.

[2062]    *See, e.g.*, letters from BHP ("Further, while we acknowledge that the Commission currently uses a specific 1% threshold for certain disclosures, we note that the disclosure examples provided by the Commission are generally narrow in scope, factual in nature and limited to certain line items in the financial statements (for example, the amount of excise taxes included in revenue)"); Ernst & Young LLP ("But we note that, unlike the climate-related impacts, excise taxes are discrete event charges that are easily calculated and tracked in a registrant's accounting books and records."); and IADC ("The Commission argues that a 1% quantitative threshold is used in other contexts, but the examples the Commission cites are circumstances where the quantitative amounts involved are knowable under current accounting practice, have discrete impacts on specific financial line items, and address scenarios in which more detailed disclosure is appropriate.").

other disclosure thresholds is not dispositive of whether a threshold elicits appropriate disclosure for investors, the final rules' focus on requiring the disclosure of amounts that are currently recorded in a registrant's financial statements in accordance with GAAP and that pertain to a significantly smaller number of line items (as well as the revisions made to the denominators for the disclosure thresholds) should align the final rules more closely with other instances where the Commission has used a one percent or other numerical disclosure threshold.[2063]

We have considered the feedback we received from commenters urging the Commission to forgo the one percent disclosure threshold and instead require disclosure only if material.[2064] We agree that the concept of materiality plays an important role in the Federal securities laws. As such, as discussed above, we have significantly modified the scope of the proposed disclosures and the proposed disclosure threshold and have included de minimis exceptions to focus the final requirements on eliciting material information for investors. We are not, however, eliminating the threshold entirely and moving to a more principles-based disclosure standard because, as discussed in the Proposing Release,[2065] the proposed quantitative disclosure threshold provides registrants with greater clarity in implementing the rules, reduces the risk of underreporting, and increases consistency and comparability. This approach is consistent with the feedback we received from some commenters that expressed concerns about the risks of underreporting in the context of the financial statements, as evidenced by the limited climate-

---

[2063] As noted in the Proposing Release, Regulation S-X (and other aspects of the Federal securities laws) includes a variety of different percentage thresholds prescribing disaggregated disclosure–rather than relying only on principles-based materiality thresholds. *See, e.g.,* 17 CFR 210.5-03.1(a) (stating that if the total sales and revenues reported under this caption includes excise taxes in an amount equal to 1% or more of such total, the amount of such excise taxes shall be shown on the face of the statement parenthetically or otherwise); 17 CFR 210.5-02.8 (requiring registrants to state separately, in the balance sheet or a note thereto, any amounts in excess of 5% of total current assets).

[2064] *See supra* note 1827 and accompanying text.

[2065] *See* Proposing Release, section II.F.2.

related disclosure under current accounting standards despite increasing demand by investors for such disclosure.[2066]

We agree with, and further emphasize, the point made by those commenters who asserted that registrants are already required to disclose the financial statement effect of material climate risks under existing rules.[2067] Registrants currently have an obligation to consider material impacts on the financial statements, and the fact that a material impact may be driven by climate-related matters does not alter a registrant's obligation.[2068] The Commission and accounting standard-setting bodies and their staff have all reminded registrants, through the issuance of guidance, of existing accounting and disclosure requirements that may apply to climate-related matters when there is a material impact on the financial statements.[2069] Although the final rules require registrants to disclose certain expenditures if they exceed the one percent disclosure

---

[2066] *See supra* note 1833. *But see, e.g.*, letter from M. Winden (suggesting increased enforcement to the extent underreporting exists).

[2067] *See supra* note 1716 and accompanying text. *See also* letter from CFA Institute ("We would also observe that existing U.S. GAAP and IFRS standards—as highlighted in publications by the FASB and IASB, as noted by the SEC in the Proposal—require consideration of climate-related risks in the measurement of various financial statement estimates.").

[2068] For example, although U.S. GAAP and IFRS Accounting Standards do not refer explicitly to climate-related matters, registrants have an obligation to consider material impacts when applying, for example, FASB ASC Topic 330 *Inventory* (IAS 2 *Inventories*) and FASB ASC Topic 360 *Property, Plant, and Equipment* (IAS 36 *Impairment of Assets*). *See also supra* note 2069.

[2069] *See, e.g.*, 2010 Guidance (stating that "registrants must also consider any financial statement implications of climate change issues in accordance with applicable accounting standards, including [FASB ASC] Topic 450, Contingencies, and [FASB ASC] Topic 275, Risks and Uncertainties."); FASB Staff Educational Paper, Intersection of Environmental, Social, and Governance Matters with Financial Accounting Standards (Mar. 2021), available at https://www.fasb.org/Page/ShowPdf?path=FASB_Staff_ESG_Educational_Paper_FINAL.pdf ("When applying the financial accounting standards, an entity must consider the effects of certain material ESG matters, similar to how an entity considers other changes in business and operating environment that have a material direct or indirect effect on the financial statements and notes thereto."); IFRS, Effects of climate-related matters on financial statements (Nov. 2020 and July 2023), available at https://www.ifrs.org/content/dam/ifrs/supporting-implementation/documents/effects-of-climate-related-matters-on-financial-statements.pdf (stating that the IFRS has re-published "this educational material to remind stakeholders of the long-standing requirements in IFRS Accounting Standards to report on the effects of climate-related matters in the financial statements when those effects are material.").

threshold, that requirement does not affect registrants' ongoing responsibility to consider material impacts, whether climate-related or not, when preparing their financial statements and related disclosures.[2070]  This may include determining whether costs and expenditures that do not trigger the disclosure threshold may be material to the registrant, taking into consideration all relevant quantitative and qualitative factors.[2071]

### iii.  Attribution Principle (Rule 14-02(g))

A number of commenters raised concerns about the ability of registrants to isolate, attribute, and quantify expenditures related to severe weather events and other natural conditions.[2072]  In response to these concerns, we are adopting a principle for attributing a cost, expenditure, charge, loss, or recovery to a severe weather event or other natural condition and for determining the amount to be disclosed.  The final rules (Rule 14-02(g)) require a registrant to attribute a cost, expenditure, charge, loss, or recovery to a severe weather event or other natural condition and disclose the entire amount of the expenditure or recovery when the event or condition is a significant contributing factor in incurring the cost, expenditure, charge, loss, or recovery.[2073]

Some commenters suggested that registrants should be permitted to make a reasonable estimate and disclose the assumptions that resulted in the estimate, or suggested that the

---

[2070]  *See id.*  Notwithstanding the final rules' 1% disclosure threshold, registrants have a fundamental obligation not to make materially misleading statements or omissions in their disclosures and may need to provide such additional information as is necessary to keep their disclosures from being misleading.  *See* 17 CFR 230.408 and 17 CFR 240.12b-20.

[2071]  *See* Concept Release (discussing materiality in the context of, among other matters, restating financial statements).  *See also* Staff Accounting Bulletin No. 99 (Aug. 12, 1999), available at https://www.sec.gov/interps/account/sab99.htm (emphasizing that a registrant or an auditor may not substitute a percentage threshold for a materiality determination that is required by applicable accounting principles).

[2072]  *See supra* notes 1902 and 1907 and accompanying text.

[2073]  *See* 17 CFR 210.14-02(g).

Appellate Case: 24-1628     Page: 484     Date Filed: 03/26/2024 Entry ID: 5377362

Commission did not need to prescribe a particular approach to attribution or quantification because registrants already have experience allocating costs across risks when preparing financial statements.[2074]  Although we considered those possibilities, we are adopting "significant contributing factor" as the attribution principle for the final rules, which was recommended by a commenter.[2075]  We think it is appropriate to do so for a number of reasons.  First, it is important to establish an attribution principle because allowing a registrant to apply an entity-specific methodology may not result in consistent or comparable information from one registrant to another which would limit the usefulness of the disclosures to investors.  Second, the "significant contributing factor" principle will strike an appropriate balance by requiring disclosure when a severe weather event or other natural condition was a significant factor resulting in the registrant incurring the expenditure or receiving the recovery, while not requiring disclosure where a severe weather event or other natural condition was only a minor factor, thereby reducing the cost burden on registrants.  Moreover, many areas of U.S. GAAP currently require a registrant to apply the concept of significance (even though U.S. GAAP does not define the term "significant"),[2076] which should help facilitate registrants' use of this attribution principle.  Although the application of this attribution principle may require the exercise of judgment, financial statement preparers are accustomed to applying judgment in many circumstances under U.S. GAAP, and, as stated above, preparers have experience applying the

---

[2074]    *See supra* notes 1913 and 1921 and accompanying text.

[2075]    *See supra* note 1918 and accompanying text.

[2076]    See, e.g., FASB ASC Topic 280 Segment Reporting, FASB ASC 323 Equity Method and Joint Ventures, FASB ASC 810 Consolidations, and FASB ASC 820 Fair Value Measurement.

concept of significance.[2077]  Finally, in addition to enhancing consistency and comparability of how the disclosures are developed, specifying an attribution and quantification principle in the final rules will reduce the burden associated with attributing (since there is no allocation involved) and quantifying costs and expenditures.

### iv.  Recoveries (Rule 14-02(f))

In addition, the final rules (Rule 14-02(f)) provide that, if a registrant is required to disclose capitalized costs, expenditures expensed, charges, or losses incurred as a result of severe weather events and other natural conditions, then it must separately disclose the aggregate amount of any recoveries recognized during the fiscal year as a result of the severe weather events and other natural conditions for which capitalized costs, expenditures expensed, charges, or losses have been disclosed.[2078]  Registrants would have been required to disclose the financial impacts of severe weather events and other natural conditions, including the receipt of insurance proceeds, as part of the Financial Impact Metrics included in the proposed rules.  Although we are not adopting the proposed Financial Impact Metrics, along the lines of the proposal, the final rules provide that any recoveries should be disclosed as part of the contextual information required by the rules.[2079]  Several commenters raised concerns about the treatment of mitigation

---

[2077]  To illustrate the application of the attribution principle, if a tornado damages the roof of a registrant's factory and the registrant incurs costs to repair the damage, the tornado would be a significant contributing factor in incurring the costs to repair the roof and the registrant would be required to disclose the entire cost incurred (if the applicable disclosure threshold is triggered), notwithstanding the fact that if the roof had been in place for some period of time there could be other factors that contributed to the roof's condition after the tornado.

[2078]  *See* 17 CFR 210.14-02(f).  We expect most recoveries to consist of insurance proceeds, however, we appreciate that other transactions or agreements may result in recovery of amounts as a result of severe weather events and other natural conditions, such as guarantees or indemnifications, and therefore have not limited the disclosure to only insurance proceeds.

[2079]  *See id*.  *See infra* section II.K.6.a.iii for further discussion of the requirement to disclose contextual information.

efforts, such as insurance, under the proposed rules.[2080]  Relatedly, other commenters asserted that registrants should not be permitted to use "net" amounts to determine whether disclosure is required under the rules.[2081]  Having considered those comments, we are persuaded that permitting a registrant to use a net amount to determine whether capitalized costs, expenditures expensed, charges, and losses have exceeded the disclosure threshold would be inconsistent with the intent of the rules because the net amount could obscure the magnitude of the financial effects of severe weather events and other natural conditions experienced by the registrant.  For example, obtaining insurance is a risk mitigation activity that may ultimately result in payment to the registrant for costs and expenditures incurred, but it does not mean that the financial effects did not occur in the first place.  The existence of recoveries, such as insurance proceeds, is important information for investors because without it, investors could be under the misperception that severe weather events and other natural conditions have a greater effect on a registrant's operations than is the case.  Therefore, requiring registrants to disclose whether they have recognized any recoveries, such as insurance proceeds, as a result of the severe weather events and natural conditions for which capitalized costs, expenditures expensed, charges, or losses have been disclosed, will provide investors with information that is important to understand the financial statement effects of the capitalized costs, expenditures expensed, charges, and losses.[2082]  In addition, such disclosure will complement other contextual

---

[2080]    *See supra* note 1858 and accompanying text.

[2081]    *See supra* note 1861 and accompanying text.

[2082]    One commenter appeared to suggest that it would be contrary to accounting principles to require registrants to disclose costs and expenditures that are not net of insurance proceeds.  *See* letter from Prologis.  However, the final rules do not prescribe how a registrant must account for insurance proceeds in its

information that may be disclosed by a registrant such as a discussion of the composition of the

capitalized costs, expenditures expensed, charges, or losses.[2083]  Similar to the final rules' other

disclosure requirements, a registrant will be required to identify where the recoveries are

presented in the income statement and the balance sheet.[2084]

### v. Severe Weather Events and Other Natural Conditions (Rule 14-02(c) and (d))

A number of commenters requested that the Commission provide additional guidance to

help registrants apply the meaning and scope of "severe weather events and other natural

conditions."[2085]  Some commenters pointed out that the proposed amendments to Regulation S-K

used the phrase "extreme weather events," and that the examples of extreme weather events

provided in the Proposing Release were different, but overlapping, with the examples of severe

weather events included in the proposed amendments to Regulation S-X.[2086]  In response to these

---

financial statements, and registrants should prepare their financial statements in accordance with GAAP. Rather, the final rules require a registrant to disaggregate certain costs and expenditures in the notes to the financial statements and require a registrant to disclose separately whether it has recognized any recoveries, such as insurance proceeds, as part of the contextual information that must be provided to help investors understand the financial statement effect.

[2083] *See* 17 CFR 210.14-02(a).

[2084] *See* 17 CFR 210.14-02(f).  Under the final rules it is possible that the disclosure threshold could be triggered for a registrant's balance sheet, but not its income statement, and vice versa, resulting in only partial disclosure of capitalized costs, expenditures expensed, charges, and losses related to severe weather events and other natural conditions incurred during the fiscal year.  *See supra* section II.K.3.c.ii.  The final rules require a registrant to disclose the aggregate amount of any recoveries recognized during the fiscal year as a result of the severe weather events and other natural conditions for which capitalized costs, expenditures expensed, charges, or losses have been disclosed.  *See* 17 CFR 210.14-02(f).  We acknowledge that in some circumstances this may result in a registrant only disclosing a portion of its expenditures corresponding to the event or condition that resulted in the recovery, which could create the impression that a registrant's recoveries for a particular fiscal year exceed its expenditures related to severe weather events and other natural conditions.  However, as explained above, to the extent this is a concern for an issuer, there is nothing in the final rules that would prevent a registrant from disclosing how the severe weather event or other natural condition affected both the income statement and balance sheet, even if the disclosure threshold for one of the financial statements is not triggered.  *See supra* section II.K.3.c.ii.

[2085] *See supra* note 1865 and accompanying text.

[2086] *See supra* note 1866 and accompanying text.

Appellate Case: 24-1628    Page: 488    Date Filed: 03/26/2024 Entry ID: 5377362

comments and to provide greater clarity, the final amendments to Regulation S-K and Regulation S-X both use the phrase "severe weather events."[2087]  In addition, both include the same examples; specifically, in a change from the proposal, the examples of severe weather events included in the final amendments to Regulation S-X include hurricanes and tornadoes.[2088]  These revisions are consistent with our expectation that there will be significant overlap between the severe weather events and other natural conditions a registrant identifies for purposes of disclosure under Rule 14-02 and the types of physical risks (i.e., acute risks (including severe weather events) and chronic risks) a registrant identifies for purposes of disclosure under the amendments to Regulation S-K.

However, in response to questions raised by commenters,[2089] we are clarifying that a registrant is not required to make a determination that a severe weather event or other natural condition was, in fact, caused by climate change in order to trigger the disclosure required by Rule 14-02 related to such event or condition.  Requiring such a determination for severe weather events or other natural conditions was not the intent of the proposed amendments to

---

[2087]    *See* 17 CFR 229.1500 (defining "physical risks" to include "acute risks" (including severe weather events) and "chronic risks"); and 17 CFR 210.14-02 (c), (d), and (h).  Although we do not believe there was any confusion about this issue, for the avoidance of doubt, we are confirming that "severe" modifies both the weather events and other natural conditions.  *See* 17 CFR 210.14-02(c), (d), and (h).

[2088]    *See* 17 CFR 229.1500; and 17 CFR 210.14-02 (c), (d), and (h).  The proposed amendments to Regulation S-K included hurricanes, floods, tornadoes, and wildfires as examples of "acute risks" and included sustained higher temperatures, sea level rise, and drought as examples of "chronic risks."  These remain unchanged in the final amendments to Regulation S-K.  *See* 17 CFR 229.1500.  As noted above, the final amendments to Regulation S-X include hurricanes and tornadoes as examples of severe weather events and other natural conditions, in addition to the following examples that were included in the proposed amendments to Regulation S-X and remain unchanged in the final rules: flooding, drought, wildfires, extreme temperatures, and sea level rise.  We have retained the "extreme temperatures" terminology in the final amendments to Regulation S-X instead of using the "sustained higher temperatures" terminology included in the final amendments to Regulation S-K because we want to emphasize that disclosure under Rule 14-02 is only required if the weather event or other natural condition is "severe."

[2089]    *See supra* note 1873 and accompanying text.

Regulation S-X, and it is not required by Rule 14-02.[2090]  In this way, although there is significant overlap between the disclosure of climate-related physical risks pursuant to Regulation S-K and the severe weather events and other natural conditions that a registrant identifies pursuant to Rule 14-02, the events covered by Rule 14-02 would also cover severe weather events and other natural conditions that are not necessarily related to climate.[2091]

Since Rule 14-02 requires event-based disclosure, the decision not to require a registrant to determine whether a severe weather event or other natural condition was caused by climate change should simplify the analysis that a registrant has to undertake to determine whether disclosure is required.  We expect that the final rules will elicit disclosure appropriately aligned with the corresponding risk-based Regulation S-K disclosure without presenting the financial-statement specific challenges associated with making a determination about whether particular events relate to climate or climate change.

The list of examples of severe weather events and other natural conditions included in Rule 14-02 is not intended to be exclusive or exhaustive, nor are the examples intended to create a presumption about whether disclosure is required for those events in every circumstance.[2092] Rather, under the final rules, registrants will have the flexibility to determine what constitutes a

---

[2090]    Similarly, a few commenters raised concerns about determining the cause of a wildfire, *see supra* note 1886 and accompanying text, but as we have stated, registrants will not be required to determine the cause of the severe weather event or natural condition for purposes of providing disclosure under Rule 14-02. The cause of a severe weather event or natural condition is irrelevant in determining whether disclosure is required under Rules 14-01 and 14-02.

[2091]    For example, the "natural conditions" referenced in Rule 14-02 need not be climate-related, and therefore may include types of non-climate-related occurrences, such as earthquakes, if severe and depending on the registrant's particular facts and circumstances.  *See* letter from Chamber.  In addition to simplifying the analysis for registrants, as discussed below, disclosure of these non-climate-related severe weather events and other natural conditions is consistent with the other event-based disclosure reflected in the final amendments to Regulation S-X and will elicit material information for investors.

[2092]    We believe providing examples of severe weather events and other natural conditions will aid in the comparability of the resulting disclosure while assisting issuers in making the disclosures.  *See* Proposing Release, Section II.F.2.

severe weather event or other natural condition based on the particular risks faced by the registrant, taking into consideration the registrant's geographic location, historical experience,[2093] and the financial impact of the event on the registrant, among other factors. We do not agree with those commenters who suggested that we should provide a comprehensive list of severe weather events, or refer to a list from another source, because doing so would be inconsistent with the dynamic nature of these events.[2094] Furthermore, a particular weather event may be "severe" in one region but not in another region.

We considered whether the non-exclusive list of examples should be expanded to include other types of severe weather events or other natural conditions identified by commenters in their comment letters;[2095] however, we designed the list as non-exhaustive and non-exclusive because we think it is more appropriate to take a flexible approach to enable registrants to exercise judgment in identifying severe weather events or other natural conditions based on the impacts those events have on their financial condition.

Some commenters asserted that allowing registrants to exercise judgment about which severe weather events or natural conditions to analyze would reduce comparability.[2096] Although more prescriptive requirements can increase comparability, our view is that greater flexibility for registrants to determine which severe weather events and other natural conditions affect them in light of their particular facts and circumstances will yield better disclosures for investors compared to a static list of potential events that may or may not be relevant to every

---

[2093] For example, in determining whether high temperatures constitute a severe natural condition, a relevant factor may include average seasonal temperatures.

[2094] *See supra* notes 1867 and 1870 and accompanying text.

[2095] *See, e.g.*, letters from Anthesis (cyclones, water stress, severe participation, and severe wind); Chamber (earthquakes); Climate Advisers (deforestation); and WSP (water stress).

[2096] *See supra* note 1872 and accompanying text.

registrant now and in future years. Additionally, requiring registrants to use a prescribed list of events could lead to significant gaps in disclosure over time. We expect that the final rules will give registrants the flexibility to adopt reasonable approaches to identifying severe weather events and other natural conditions and adapt to changing circumstances. As a result, the final rules provide a level of flexibility that even a regularly updated, prescribed list of events would be unable to match—resulting in what we believe is appropriate, decision-useful information to investors.

Some commenters raised questions about how to identify the beginning and ending dates of severe weather events and how to disclose weather events where the impact from the weather event may continue into the future.[2097] We have streamlined the final rules to focus on requiring the disclosure of expenditures for specific transactions that are recorded in a registrant's books and records during the fiscal year, and that are attributable to severe weather events or other natural conditions. This more straightforward approach will make it clearer when disclosure is required and avoid many of the questions raised by commenters in this regard.

### vi. Carbon Offsets and Renewable Energy Credits (Rule 14-02(e))

If carbon offsets or RECs have been used as a material component of a registrant's plan to achieve its disclosed climate-related targets or goals, the final rules (Rule 14-02(e)) require registrants to disclose (1) the aggregate amount of carbon offsets and RECs expensed, (2) the aggregate amount of capitalized carbon offsets and RECs recognized, and (3) the aggregate amount of losses[2098] incurred on the capitalized carbon offsets and RECs, during the fiscal

---

[2097]   *See supra* notes 1881 and 1882 and accompanying text.

[2098]   For example, an impairment could result in the recognition of a loss on a capitalized carbon offset.

App.487

year.[2099]  As explained above, although the final rules do not include a requirement for registrants to disclose costs and expenditures related to transition activities in the financial statements as proposed,[2100] we think it is appropriate to require registrants to disclose costs, expenditures, and losses related to one type of transition activity—the acquisition[2101] and use of carbon offsets and RECs—because the acquisition and use of carbon offsets and RECs do not present the definitional or scoping concerns raised by commenters with respect to transition activities generally.[2102]  Significantly, requiring disclosure of capitalized costs, expenditures expensed, and losses recognized in the notes to the financial statements when carbon offsets or RECs have been used as a material component of a registrant's plan to achieve its disclosed climate-related targets or goals will complement the disclosures required by the amendments to Regulation S-K[2103] and will anchor the disclosures required outside the financial statements to those required within the financial statements, making a connection which one commenter generally described as having "a focusing effect" and increasing "the reliability and consistency of both."[2104]  Although we considered applying the one percent disclosure thresholds applicable

---

[2099]     *See* 17 CFR 210.14-02(e)(1).  The final rules do not prevent registrants from disclosing additional information about other transactions involving their carbon offsets and RECs.

[2100]     *See* Proposing Release, section II.F.3.  Proposed Rule 14-02(f), which would have required the disclosure of expenditures related to transition activities, provided that a registrant may be required to disclose the amount of expense or capitalized cost, as applicable related to "offset emissions (purchase of energy credits)," among other things.  *See supra* note 2012.

[2101]     Carbon offsets and RECs may be acquired in various ways. For example, they may be purchased or granted.

[2102]     *See supra* note 1891 and accompanying text.

[2103]     *See* 17 CFR 229.1504(d).

[2104]     *See supra* note 1718 and accompanying text.  This commenter was referring generally to the Commission's proposal to amend both Regulation S-K and Regulation S-X when it stated its support for anchoring disclosures required outside the financial statements to disclosures required inside the financial statements and was not directly addressing the requirement to disclose expenditure related to carbon offsets or RECs.  *See id.*  However, this commenter's general assertion is equally applicable to the requirements in the final rules to disclose certain information about carbon offsets and RECs inside and outside the financial statements.

to severe weather events and other natural conditions to carbon offsets and RECs, using the same trigger for disclosure in the amendments to Regulation S-K and the amendments to Regulation S-X will provide investors with a comprehensive understanding of the registrant's use of carbon offsets and RECs, which will help investors evaluate the role of these instruments in a registrant's climate-related strategy and help them assess the likely financial effects of a disclosed material transition risk.[2105]

In addition, the final rules require registrants to disclose the beginning and ending balances of capitalized carbon offsets and RECs on the balance sheet for the fiscal year.[2106] The beginning and ending balances of carbon offsets and RECs are an important data point for investors to understand as they assess a registrant's transition risks. Specifically, while the disclosure of expenditures related to the acquisition and use of carbon offsets and RECs will provide information about the registrant's activity throughout the fiscal period, it does not provide information about the carbon offsets still available to the registrant for use in future periods, which some commenters indicated is important information.[2107] The requirement to provide the beginning and ending balances will help provide a more complete picture of the financial impact of a registrant's use of carbon offsets and RECs as a material component of its plan to achieve a disclosed target or goal. While this particular data point was not part of the

---

[2105] *See* letter from J. McClellan (stating that a registrant's intent to meet its climate-related targets or goals through any purchase of offsets or RECs "is directly connected to climate related financial metrics" and "[t]here is consensus that significant capital expenditures will be required to meet the most ambitious targets, and investors will want to understand how a registrant is deploying capital against its target").

[2106] *See* 17 CFR 210.14-02(e)(1).

[2107] *See, e.g.,* letters from Rockefeller Asset Mgmt. ("It would be helpful to understand a company's intended utilization of carbon offsets and the corresponding quantification of carbon credits that may need to be purchased."); and Carbon Direct ("Accurate and separate disclosure of the procurement and retirement of carbon offset credits to attempt to compensate for these emissions, are critical for informed investment decisions.").

proposal, which would have required disclosure of costs and expenditures related to transition activities more generally, the beginning and ending balances are currently existing information in a registrant's balance sheet and therefore we expect the cost and burdens of disclosing this information to be minimal. The final rules also require a registrant to disclose where on the balance sheet and income statement these capitalized costs, expenditures expensed, and losses are presented.[2108] If a registrant is required to disclose capitalized costs, expenditures expensed, and losses related to carbon offsets and RECs, the final rules provide that a registrant must also state, as part of the contextual information required, the registrant's accounting policy for carbon offsets and RECs.[2109] We understand there is currently a diversity in practice in how registrants account for carbon offsets and RECs, and therefore an explanation of the registrant's accounting policy will help enhance the usefulness and comparability of this disclosure for investors.[2110]

### vii. Presentation of Disclosure (Rule 14-02(c) and (d))

As discussed above, the final rules (Rule 14-02(c) and (d)) require disclosure of the amount of (1) capitalized costs and charges on the balance sheet, and (2) expenditures expensed as incurred and losses in the income statement, during the fiscal year, as a result of severe

---

[2108]    *See* 17 CFR 210.14-02(e)(1).

[2109]    *See* 17 CFR 210.14-02(e)(2). *See infra* section II.K.6.a.iii for further discussion of the requirement to disclose contextual information.

[2110]    On Dec. 15, 2021, the FASB Chair added a research project to explore accounting for regulatory credits (such as carbon offsets and RECs among others). Respondents provided feedback on this project indicating that the lack of guidance in GAAP for accounting for regulatory credits results in a significant diversity in practice. In May 2022, the FASB added a project to its technical agenda on regulatory credits (such as carbon offsets and RECs among others). *See* 2021 FASB Agenda Consultation Report, available at https://fasb.org/Page/ShowPdf?path=2021%20FASB%20Agenda%20Consultation%20Report.pdf. In addition, in July 2022, the IASB added a pollutant pricing mechanisms project to their reserve list as a result of its Third Agenda Consultation. The project aims to develop specific requirements for pollutant pricing mechanisms. *See* Third Agenda Consultation Feedback Statement, available at https://www.ifrs.org/content/dam/ifrs/project/third-agenda-consultation/thirdagenda-feedbackstatement-july2022.pdf.

Appellate Case: 24-1628    Page: 495    Date Filed: 03/26/2024 Entry ID: 5377362

weather events and other natural conditions.[2111]  Under the final rules, registrants must separately aggregate the (1) capitalized costs and charges on the balance sheet, and (2) expenditures expensed as incurred and losses in the income statement to determine whether the applicable disclosure threshold is triggered and for purposes of disclosure.[2112]  The capitalized costs, expenditures expensed, charges, and losses must be segregated between the balance sheet and the income statement depending on which financial statement they are recorded within upon recognition in accordance with applicable GAAP.  For each of the balance sheet and income statement disclosures, if the applicable disclosure threshold is met, a registrant is required to disclose the aggregate amount of expenditures expensed and losses and the aggregate amount of capitalized costs and charges incurred during the fiscal year and separately identify where on the income statement and balance sheet these amounts are presented as illustrated in greater detail below.[2113]

    With respect to capitalized costs, expenditures expensed, and losses related to carbon offsets and RECs, registrants must disclose these amounts if carbon offsets or RECs have been used as a material component of a registrant's plan to achieve its disclosed climate-related targets or goals.[2114]  Unlike the disclosures related to severe weather events and other natural conditions, a registrant is not required to separately determine whether the disclosure threshold is triggered for costs, expenditures, and losses that are recorded on the balance sheet versus the income

---

[2111]    *See* 17 CFR 210.14-02(c) and (d).

[2112]    *See* 17 CFR 210.14-02(b), (c), and (d).  Similarly, the proposed Expenditure Metrics would have required a registrant to separately aggregate the amount of expenditures expensed and the amount of capitalized costs to determine whether the applicable disclosure threshold was triggered.  *See* Proposing Release, section II.F.3.

[2113]    *See* 17 CFR 210.14-02(c) and (d).

[2114]    *See* 17 CFR 210.14-02(e)(1).

Appellate Case: 24-1628    Page: 496    Date Filed: 03/26/2024 Entry ID: 5377362

statement for disclosures related to carbon offsets and RECs.[2115]  If disclosure is required

because carbon offsets or RECs have been used as a material component of a registrant's plan to

achieve its disclosed climate-related targets or goals, then a registrant must separately disclose

the following: (1) the aggregate amount of each of the capitalized costs, expenditures expensed,

and losses related to carbon offsets and RECs during the fiscal year; (2) the beginning and

ending balances of capitalized carbon offsets and RECs on the balance sheet for the fiscal year;

and (3) where on the balance sheet and the income statement the capitalized costs, expenditures

expensed, and losses related to carbon offsets and RECs are presented, as illustrated in greater

detail below.[2116]

    We are providing the following example to help illustrate the operation of the final rules.

Assume a registrant (1) capitalized $1,200,000 of expenditures related to Severe Weather Event

A; (2) incurred an impairment charge of $750,000 in the income statement to write-off $750,000

of inventory from the balance sheet related to Natural Condition B; (3) capitalized $1,000,000 of

expenditures to replace the inventory written off related to Natural Condition B; (4) expensed

$2,000,000 of expenditures related to Severe Weather Event C; and (5) received $400,000 in

insurance recoveries related to Severe Weather Event A.  The registrant determined that Severe

Weather Events A and C and Natural Condition B were significant contributing factors in

incurring the capitalized costs, expenditures expensed, charges, losses, and recovery described

above.  In addition, the registrant used carbon offsets and RECs as a material component of its

plan to achieve a disclosed climate-related target or goal, and it capitalized $1,000,000 and

expensed $3,000,000 of carbon offsets or RECs during the period.  The registrant had a

---

[2115]     *See id.*

[2116]     *See id.*

App.492

Appellate Case: 24-1628     Page: 497     Date Filed: 03/26/2024 Entry ID: 5377362

beginning balance of capitalized carbon offsets or RECs of $2,500,000 and ended the year with

$500,000 in capitalized carbon offsets or RECs remaining on its balance sheet. The registrant

would determine whether the financial statement effects as a result of severe weather events and

other natural conditions would trigger the disclosure requirements based on the thresholds, as

illustrated below:

| Expenditure Category | Current Fiscal Year Balances (Stockholders' Equity from Balance Sheet, Income or Loss Before Income Tax Expense or Benefit from Income Statement) | Severe Weather Event A | Natural Condition B | Severe Weather Event C | Percentage Impact |
|---|---|---|---|---|---|
| Balance Sheet (capitalized costs and charges) | $150,000,000 | $1,200,000 | $1,750,000 | | 1.97% |
| Income Statement (expenditures expensed as incurred and losses) | $75,000,000 | | $750,000 | $2,000,000 | 3.67% |

In the above example, the expenditures incurred toward Severe Weather Event A was

$1,200,000 (capitalized on balance sheet), the capitalized cost, charge, and loss incurred as a

result of Natural Condition B was $1,750,000 (charge on balance sheet and loss in income

statement of $750,00 and capitalized cost of $1,000,000 on the balance sheet), and the

expenditures incurred toward Severe Weather Event C was $2,000,000 (expense in the income

statement). The aggregate amount of the absolute value of capitalized costs and charges on the

balance sheet ($2,950,000) exceeded the one percent threshold of stockholders' equity, and

therefore disclosure would be required for these costs and charges. The aggregate amount of

expenditures expensed as incurred and losses in the income statement ($2,750,000) exceeded the

one percent threshold of income or loss before income tax expense or benefit, and therefore

disclosure would be required for the expenses and loss. In addition, the registrant used carbon

493

offsets and RECs as a material component of its plan to achieve a disclosed climate-related target or goal, and therefore disclosure would be required for the carbon offsets and RECs. The registrant's resulting disclosure of such costs and expenditures may be provided, for example, as illustrated in the following table (excluding disclosure of contextual information):

**Note X**. Financial statement effects related to severe weather events and other natural conditions and carbon offsets and renewable energy credits:

| Category | Balance Sheet | | Income Statement | | |
|---|---|---|---|---|---|
| | Year Ended Dec. 31, | | Year Ended Dec. 31, | | |
| | 20X2 | 20X3 | 20X1 | 20X2 | 20X3 |
| **Severe Weather Events and Other Natural Conditions** | | | | | |
| **Capitalized Costs and Charges:** | | | | | |
| Inventory | $ - | $ 250,000ᵃ | | | |
| PP&E | $ - | $1,200,000 | | | |
| **Expenditures Expensed as Incurred and Losses:** | | | | | |
| General & Administrative | | | $ - | $ - | $ (2,000,000) |
| Other Income/(Loss) | | | $ - | $ - | $ (750,000) |
| a. $1,000,000 + ($750,000) = $250,000 | | | | | |

In this example, the required contextual information may include disclosure such as the specific severe weather events, natural conditions, and transactions that were aggregated for purposes of determining the effects on the balance sheet and income statement amounts and, if applicable, policy decisions made by a registrant, such as any significant judgments made to determine the amount of capitalized costs, expenditures expensed, charges, and losses.[2117] Also, as part of the contextual information, a registrant would be required to disclose the $400,000 in

---

[2117]    *See* 17 CFR 210.14-02(a). *See infra* section II.K.6.a.iii for further discussion of the requirement to disclose contextual information.

494

insurance recoveries recognized in the consolidated financial statements as a result of Severe Weather Event A, including identification of where it is presented in the income statement or balance sheet.

| Carbon Offsets and RECs | |
|---|---|
| Carbon Offsets and RECs at Jan. 1, 20X3 | $2,500,000 |
| Capitalized Carbon Offsets and RECs | $1,000,000 |
| Expensed Carbon Offsets and RECs | $(3,000,000) |
| Carbon Offsets and RECs at Dec. 31, 20X3 | $500,000 |

Carbon offsets and RECs are presented in the Intangible Assets line item on the balance sheet and expensed in the General and Administrative line item on the income statement.[a]

a. As noted above, there is diversity in practice in accounting for carbon offsets and RECs. *See supra* note 2110 and accompanying text. In this example, the entity capitalizes all of its costs of carbon offsets and RECs and presents these amounts within the intangible assets line item. We are providing this example for illustrative purposes only and this is not meant to indicate a preferred method of accounting or presentation. Registrants should consider their specific facts and circumstances when determining the appropriate accounting treatment and disclose their accounting policy in accordance with 17 CFR 210.14-02(e)(2).

In this example, the required contextual information would include the registrant's accounting policy for the carbon offsets and RECs.[2118]

Currently, expenditures, costs, charges, losses, and recoveries may appear in different places within the financial statements (e.g., in one or more asset line items or expense line items on the balance sheet or income statement, respectively). The final rules address this dispersed presentation by requiring registrants to first identify the relevant expenditures, costs, charges, losses, and recoveries and then separately disclose where on the balance sheet and income statement these costs and expenditures are presented.[2119] Such an approach should provide insight into, and context for understanding, the nature of a registrant's business, and provide consistency and comparability for users of the financial statements.

---

[2118]     *See* 17 CFR 210.14-02(a) and (e)(2).

[2119]     *See* 17 CFR 210.14-02(c), (d), (e)(1), and (f).

Appellate Case: 24-1628     Page: 500     Date Filed: 03/26/2024 Entry ID: 5377362

Similar to the examples of disclosure that were included in the proposed rules, the final rules state that a registrant may be required to disclose the aggregate amount of expenditures expensed and losses as incurred as a result of severe weather events and other natural conditions, for example, to restore operations, relocate assets or operations affected by the event or condition, retire affected assets, repair affected assets, recognize impairment loss of affected assets, or otherwise respond to the effect that severe weather events and other natural conditions had on business operations.[2120] The final rules also state that a registrant may be required to disclose the aggregate amount of capitalized costs and charges incurred as a result of severe weather events and other natural conditions, for example, to restore operations, retire affected assets, replace or repair affected assets, recognize an impairment charge for affected assets, or otherwise respond to the effect that severe weather events and other natural conditions had on business operations.[2121]

### 4. Financial Estimates and Assumptions (Rule 14-02(h))

#### a. Proposed Rules

The Commission proposed to require registrants to disclose whether the estimates and assumptions used to produce their consolidated financial statements were impacted by exposures to risks and uncertainties associated with, or known impacts from, severe weather events and

---

[2120] *See* 17 CFR 210.14-02(c). In response to a question raised by a commenter, with respect to the capitalized costs, expenditures expensed, charges, and losses incurred as a result of severe weather events and other natural conditions, we are clarifying that the final rules do not require a registrant to disclose both the capitalization of expenditures and subsequent expense of expenditures in the same period. *See supra* note 1989. Rather, the final rules require the disclosure of expenditures expensed and losses "as incurred." *See* 17 CFR 210.14-02(c). For example, a registrant that purchased new machinery to replace machinery that was damaged due to a severe weather event would be required to disclose the cost to purchase the new machinery (assuming the relevant disclosure threshold is met), but the registrant would not be required to disclose (or include in the numerator for purposes of calculating the disclosure threshold) the subsequent depreciation associated with the machinery.

[2121] *See* 17 CFR 210.14-02(d).

496

other natural conditions or any climate-related risks identified by the registrant pursuant to Item 1502(a) of Regulation S-K.[2122]  For such impacts, registrants would have been required to provide a qualitative description of how these events impacted the development of the estimates and assumptions used in the preparation of their financial statements.[2123]

Like the other proposed financial statement metrics, the proposed rules also included a provision that would have required separate disclosure focused on transition activities, including identified transition risks.[2124]  If the estimates and assumptions the registrant used to produce the consolidated financial statements were impacted by risks and uncertainties associated with, or known impacts from, a potential transition to a lower carbon economy or any climate-related targets it disclosed, the registrant would have been required to provide a qualitative description of how the development of the estimates and assumptions were impacted by such a potential transition or the registrant's disclosed climate-related targets.[2125]  If a registrant elected to disclose the impact of an opportunity on its financial estimate and assumptions, then it would have been required to do so consistently and would have been required to follow the same applicable presentation and disclosure requirements.[2126]

The Commission explained in the Proposing Release that estimates and assumptions are currently required for accounting and financial reporting purposes (e.g., projected financial information used in impairment calculations, estimated loss contingencies, estimated credit risks, commodity price assumptions) and expressed its belief that the proposed disclosures could

---

[2122]    *See* Proposing Release, section II.F.4.

[2123]    *See id.*

[2124]    *See id.*

[2125]    *See id.*

[2126]    *See id.*

provide decision-useful information and transparency to investors about the impact of climate-related events and transition activities, including disclosed targets and goals, on such estimates and assumptions.[2127]  In addition, the Commission stated that such disclosure could allow investors to evaluate the reasonableness of the registrant's estimates and assumptions, which are used to prepare the registrant's financial statements.[2128]  The Proposing Release noted that current accounting standards require registrants to consider how climate-related matters may intersect with and affect the financial statements, including their impact on estimates and assumptions.  However, the Proposing Release explained that the nature of climate-related events and transition activities discussed in the proposed rules may manifest over a longer time horizon, and therefore targeted disclosure requirements may be necessary to elicit decision-useful information for investors in a consistent manner.[2129]

In addition, the Commission noted in the Proposing Release that some registrants have already provided disclosure along the lines of the proposed requirements, which the Commission said provided support for the feasibility of making such disclosures.[2130]  The Proposing Release provided examples of financial statement estimates and assumptions that may require disclosure pursuant to the proposed rules, such as those related to the estimated salvage value of certain assets, estimated useful life of certain assets, projected financial information used in impairment calculations, estimated loss contingencies, estimated reserves (such as environmental reserves or

---

[2127]    *See id.*

[2128]    *See id.*

[2129]    *See id.*

[2130]    *See id.*

loan loss allowances), estimated credit risks, fair value measurement of certain assets, and commodity price assumptions.[2131]

### b. Comments

A number of commenters stated that they supported the proposal to require the disclosure of whether and how the estimates and assumptions the registrant used to produce the consolidated financial statements were impacted by exposures to risks and uncertainties associated with, or known impacts from, severe weather events and other natural conditions and a potential transition to a lower carbon economy, or any climate-related targets disclosed by the registrant.[2132] Several commenters stated that the proposed rules would provide useful information for investors.[2133] For example, one commenter asserted that disclosures of registrants' estimates and assumptions are "[e]qually if not more important" than the line item disclosures themselves.[2134] Another commenter stated that requiring the disclosure of impacts on estimates and assumptions is necessary because for financial risk to be assessed and quantified using financial metrics, investors need to understand the degree of uncertainty of projections and be able to use that information to alter investment choices.[2135] One commenter stated that it would use disclosures about impacts on estimates and assumptions to uncover emerging trends affecting the registrant or other companies similarly situated with respect to the climate related event.[2136]

---

[2131] *See id.*

[2132] *See, e.g.*, letters from As You Sow; Bailard; BC IM Corp.; Boston Trust; CalPERS; Calvert; Center Amer. Progress; D. Higgins; H. Huang; IAA; ICGN; U.S. Reps. Castor *et al.*; Miller/Howard; NY St. Comptroller; PRI; R. Bentley; R. Burke; Rho Impact; Sens. J. Reed *et al.*; SKY Harbor; and UCS.

[2133] *See, e.g.*, letters from Calvert; Carbon Tracker; PwC; and SKY Harbor.

[2134] *See* letter from Calvert.

[2135] *See* letter from IAA.

[2136] *See* letter from SKY Harbor.

The Commission included a request for comment in the Proposing Release asking if it should require disclosure of only significant or material estimates and assumptions that were impacted by climate-related events and transition activities, or whether it should require disclosure of only estimates and assumptions that were materially impacted by climate-related events and transition activities.[2137] A number of commenters recommended that the Commission only require the disclosure of estimates and assumptions that were materially impacted by climate-related events.[2138] On the other hand, a few commenters recommended that the Commission only require the disclosure of material estimates and assumptions impacted by climate-related events.[2139] A few commenters recommended that the Commission require disclosure of material estimates and assumptions that were materially impacted by climate-related events.[2140] At least two commenters more generally stated that the proposed estimates and assumptions disclosure should be qualified by materiality.[2141] Some of these commenters asserted that if not qualified by materiality, the proposed rules would result in a large volume of immaterial information.[2142] On the other hand, one commenter stated that the requirement

---

[2137] *See* Proposing Release, section II.F.4.

[2138] *See, e.g.*, letters from AAFA; Abrasca; Airlines for America; ITIC; KPMG; and Unilever.

[2139] *See, e.g.*, letters from C2ES; Eni Spa; and Morningstar.

[2140] *See, e.g.*, letters from BIO; and CEMEX. *See also* letter from Carbon Tracker ("In principle, the focus should be on the significant accounting estimates and assumptions that would be materially impacted by an energy transition (e.g., climate-related events and transition activities).").

[2141] *See, e.g.*, letters from SIFMA AMG; and T. Rowe Price. Similarly, one commenter suggested that the disclosure of financial estimates and assumptions impacted by climate-related opportunities should only be required where the opportunities are highly likely to occur or a core element of the registrant's strategy, but if the opportunity is otherwise uncertain, it should not be factored into the estimates or assumptions. *See* letter from Sarasin.

[2142] *See, e.g.*, letters from SIFMA AMG; and T. Rowe Price.

App.500

Appellate Case: 24-1628    Page: 505    Date Filed: 03/26/2024 Entry ID: 5377362

should not be limited to only significant or material estimates and assumptions because it would

create a risk that registrants would fail to produce decision-useful information for investors.[2143]

A few commenters stated that they did not support the proposed disclosures of estimates

and assumptions.[2144]  For example, some commenters pointed out that existing accounting

standards already require the disclosure of material financial estimates and related assumptions,

which would include those impacted by climate-related risks.[2145]  Another commenter stated that

amending Regulation S-X to require these disclosures when, in its view, existing standards

already require this disclosure could lead registrants to include a statement in their reports that

climate-related events were not considered (if they were not a key assumption in calculating

estimates), which could imply a negative connotation that, in fact, they should have been

considered.[2146]

Some commenters stated that it would be challenging to provide the disclosures,[2147] or

stated that additional guidance was needed.[2148]  For example, one commenter stated that without

additional guidance it would be challenging for registrants to develop estimates to isolate the

relevant exposures.[2149]  Another commenter stated that it would be helpful to provide additional

guidance about when the disclosures would be triggered when there may be more than one

---

[2143]    *See* letter from Amer. for Fin. Reform, Sunrise Project *et al.*

[2144]    *See, e.g.,* letters from Carpenter Tech; D. Burton, Heritage Fdn.; McCormick; Petrol. OK; Reinsurance AA; and TotalEnergies.

[2145]    *See, e.g.*, letters from AFEP (pointing to IFRS accounting standards); TotalEnergies ("[W]e believe existing accounting standards already require disclosure of material financial estimates and assumptions."); and Western Midstream ("The disclosure of contingencies and management's assessment of long-lived asset impairments are already critical accounting estimates for many companies requiring significant judgment and disclosure in the financial statements.").

[2146]    *See* letter from Alliance Resource.

[2147]    *See, e.g.*, letters from AAR; and Ernst & Young LLP.

[2148]    *See, e.g.*, letters from Ernst & Young LLP; and PwC.

[2149]    *See* letter from Ernst & Young LLP.

contributing factor.[2150]  This commenter suggested focusing on changes to estimates and assumptions primarily or solely due to climate rather than instances when changes "are inextricably linked to other contributing factors."[2151]  Another commenter suggested that the Commission should clarify that registrants have an existing obligation to disclose climate-related financial estimates and assumptions and the proposed rule is providing guidance on the form and location of the already required disclosure.[2152]

Some commenters stated that the scope of the proposed disclosures should be limited to critical accounting estimates.[2153]  In particular, one commenter suggested it would be more meaningful if the proposed requirements were included in a registrant's MD&A section of its periodic reports along with the other critical accounting estimates.[2154]  One commenter stated that the Commission should not limit disclosure to whether and how climate-related events and transition activities affected critical accounting estimates.[2155]  This same commenter also stated that the Commission should not limit the disclosures of impacts to financial estimates and assumptions to only a subset of risks.[2156]

---

[2150]   *See* letter from PwC.

[2151]   *See* letter from PwC.

[2152]   *See* letter from Amer. for Fin. Reform, Sunrise Project *et al.*

[2153]   *See, e.g.*, letters from PwC and RSM US LLP.  *See also* Eni Spa ("We agree that financial estimates and assumptions impacted by climate-related events and transition risks are critical accounting estimates and so should fall within the scope of 17 CFR 229.303(b)(3)).").  Critical accounting estimates are those estimates made in accordance with generally accepted accounting principles that involve a significant level of estimation uncertainty and have had or are reasonably likely to have a material impact on the financial condition or results of operations of the registrant.  *See* 17 CFR 229.303(b)(3).

[2154]   *See* letter from RSM US LLP.

[2155]   *See* letter from Amer. for Fin. Reform, Sunrise Project *et al.  See also* letter from Sarasin ("We believe the critical accounting estimate disclosure requirement terminology is appropriate to capture the need for climate-related disclosures, but should not limit the disclosure needed to understand fully how climate considerations have been incorporated into the critical assumptions and estimates.").

[2156]   *See* letter from Amer. for Fin. Reform, Sunrise Project *et al.*

The Commission included a request for comment in the Proposing Release asking if, for the proposed financial statement metrics, it should require a registrant to disclose material changes in estimates, assumptions, or methodology among fiscal years and the reasons for those changes, and if so, whether the Commission should require the material changes disclosure to occur on a quarterly, or some other, basis.[2157] Some commenters stated that registrants should be required to disclose material changes in estimates and assumptions for the proposed financial statement metrics.[2158] A few of these commenters noted that current regulations already require disclosure of material changes in estimates and assumptions.[2159] However, some commenters asserted that current regulations may not be effectively eliciting this disclosure.[2160] One commenter suggested that the Commission should require material changes in estimates and assumptions to be provided on a quantitative basis by financial statement caption because the information would be useful in showing the variability of key estimates and assumptions going forward and their future impact on cash flows.[2161] With respect to timing, one commenter suggested that disclosures regarding material changes in estimates and assumptions could be made on an annual basis with prior year changes and adjustments noted.[2162] Conversely, one commenter stated that registrants should not be required to disclose material changes in estimates and assumptions.[2163] In addition, one commenter asked the Commission to clarify that nothing

---

[2157] *See* Proposing Release, section II.F.4.

[2158] *See, e.g.*, letters from ERM CVS; Carbon Tracker; Center Amer. Progress; CFA Institute; ICGN; Morningstar; and Sarasin.

[2159] *See, e.g.*, letters from Carbon Tracker; ICGN; and Sarasin.

[2160] *See, e.g.*, letters from Carbon Tracker; and Center Amer. Progress.

[2161] *See* letter from CFA Institute.

[2162] *See* letter from Carbon Tracker.

[2163] *See* letter from TotalEnergies.

Appellate Case: 24-1628    Page: 508    Date Filed: 03/26/2024 Entry ID: 5377362

in the proposed rules would create an affirmative obligation for a foreign private issuer to provide interim updates for any material changes beyond what they would already be required to disclose on Form 6-K.[2164]

### c. Final Rules

We are adopting the proposed requirements (Rule 14-02(h)) for registrants to disclose impacts on financial estimates and assumptions with some modifications.[2165] First, the Commission proposed to require a registrant to disclose whether the estimates and assumptions the registrant used to produce the consolidated financial statements were impacted by risks and uncertainties associated with, or known impacts from, a potential transition to a lower carbon economy or any climate related targets disclosed by the registrant.[2166] The final rules, instead of requiring disclosures related to "a potential transition to a lower carbon economy," require registrants to disclose financial estimates and assumptions related to a narrower category of transition activities, specifically, "any . . . transition plans disclosed by the registrant."[2167] As noted above, commenters, including registrants, raised concerns about the scope of transition activities and potential difficulties with identifying and quantifying their impacts when they overlapped with a registrant's ordinary business decisions.[2168] To reduce the potential burden on registrants, we have decided to narrow the scope of transition activities covered by this aspect of the final rule to only those transition plans disclosed by the registrant.[2169] Consistent with the

---

[2164]   *See* letter from BHP.

[2165]   *See* 17 CFR 210.14-02(h).

[2166]   *See* Proposing Release, section II.F.4.

[2167]   *See* 17 CFR 210.14-02(h).

[2168]   *See supra* note 1892 and accompanying text.

[2169]   *See* 17 CFR 210.14-02(h).

proposed rules, the final rules also require a registrant to disclose whether the estimates and assumptions the registrant used to produce the consolidated financial statements were impacted by risks and uncertainties associated with, or known impacts from, any climate-related targets disclosed by the registrant.[2170]

Second, consistent with commenters' suggestion,[2171] we are modifying the proposed requirements by adding a materiality qualifier in the final rules. The final rules require registrants to disclose whether the estimates and assumptions used to prepare the consolidated financial statements were materially impacted by exposures to risks and uncertainties associated with, or known impacts from, severe weather events and other natural conditions, such as hurricanes, tornadoes,[2172] flooding, drought, wildfires, extreme temperatures, and sea level rise, or any climate-related targets or transition plans disclosed by the registrant.[2173] If so, then consistent with the proposed rules, the final rules require registrants to provide a qualitative description of how the development of such estimates and assumptions were impacted by the events, conditions, and disclosed targets or transition plans identified above.[2174]

---

[2170] *See id.*

[2171] *See supra* notes 2138-2141 and accompanying text.

[2172] We have added hurricanes and tornadoes to the list of severe weather events and other natural conditions included in Rule 14-02(h) to be consistent with the addition of these two types of severe weather events or natural conditions in Rule 14-02(c) and (d). *See supra* section II.K.3.c.v.

[2173] *See* 17 CFR 210.14-02(h). As previously discussed, the final rules include similar requirements under subpart 1500 of Regulation S-K to disclose material impacts on financial estimates and assumptions as a direct result of disclosed actions under a transition plan or as a direct result of a disclosed target or goal or actions taken to make progress toward meeting the target or goal. *See* 17 CFR 229.1502(e), discussed *supra* section II.D.2, and 17 CFR 229.1504(c)(2), discussed *supra* section II.G.3. When responding to these Regulation S-K provisions, a registrant may cross-reference from the disclosure provided under 17 CFR 210.14-02(h) to the extent such disclosure is responsive to these subpart 1500 provisions.

[2174] *See* 17 CFR 210.14-02(h). For the avoidance of doubt, if the registrant's estimates and assumptions were not materially impacted by exposures to risks and uncertainties associated with, or known impacts from, severe weather events and other natural conditions, or any climate-related targets or transition plans disclosed by the registrant, then no disclosure is required under Rule 14-02(h).

Appellate Case: 24-1628     Page: 510     Date Filed: 03/26/2024 Entry ID: 5377362

As described above, a number of commenters indicated that if we adopted a requirement to disclose impacts on estimates and assumptions, then it would be appropriate to include a materiality qualifier in the final rules, and those commenters recommended various permutations related to the materiality qualifier.[2175] After considering this feedback, we have modified the final rules to focus on estimates and assumptions that have been materially impacted because a registrant may use numerous inputs and assumptions, including qualitative considerations, when developing accounting estimates. Focusing on estimates and assumptions that were materially impacted by the events, conditions, and disclosed targets and plans will help to reduce operational challenges and burdens that could arise if registrants were required to assess all impacts when determining the disclosures that would be required. We considered whether it would be appropriate to instead include two materiality qualifiers and require the disclosure of material estimates and assumptions that were materially impacted. However, we think that adding a second materiality qualifier is unnecessary because the disclosures that would result from the two different alternatives would likely be the same. Namely, we think it is unlikely that there could be "material" impact to an estimate or assumption if the estimate or assumption itself was not material to the financial statements.[2176] We also considered whether to require disclosure of any impacts to material estimates and assumptions or to not include any materiality qualifiers in the final rules, but we think the approach we are taking appropriately balances investors' need for decision-useful information with a desire to reduce operational challenges for registrants.

---

[2175]   *See supra* notes 2138-2141 and accompanying text.

[2176]   *See supra* note 381 and accompanying text.

We continue to believe that disclosure of whether and how climate-related events impacted the development of financial estimates and assumptions will provide important information to investors. As the Commission stated in the Proposing Release, such disclosure will provide insight into the impacts described above on the registrant's financial statements and will allow investors to assess the reasonableness of the registrant's estimates and assumptions.[2177] Among other things, these disclosures will allow investors to evaluate material impacts on future cash flows, which will help investors make more informed investing decisions. We also agree with those commenters that stated disclosure of impacts on financial estimates and assumptions would enable investors to evaluate a registrant's "physical risk resilience,"[2178] or would inform investors "of the scope, likelihood, and magnitude of potential risks as perceived by the company" and enable "comparative analysis against peers."[2179]

Some commenters stated that they did not support the proposed requirement to disclose financial estimates and assumptions because existing accounting standards already require the disclosure of this information and therefore this additional requirement would be unnecessary or could be confusing for investors.[2180] Although we agree with commenters that U.S. GAAP and IFRS require the disclosure of material estimates and assumptions in many circumstances,[2181] including significant inputs associated with material estimates and assumptions, the final rules will enhance transparency and consistency by requiring registrants to disclose how estimates and assumptions are materially impacted by severe weather events, natural conditions, and disclosed

---

[2177]    *See* Proposing Release, section II.F.4.

[2178]    *See* letter from Morningstar.

[2179]    *See* letter from BMO Global.

[2180]    *See supra* notes 2145 and 2146 and accompanying text.

[2181]    *See supra* note 2145.

targets and transition plans, which may require more specific disclosures in certain situations than is currently required under applicable accounting standards.

In addition, although we agree with commenters that the proposed requirements share similarities with critical accounting estimates,[2182] we do not think those disclosures obviate the need for this requirement because the final rules go further by requiring specific disclosure about how estimates and assumptions are materially impacted by risks and uncertainties associated with, or known impacts from, severe weather events and other natural conditions and any climate-related targets or transition plans disclosed by the registrant. While critical accounting estimates are often presented outside of the financial statements, the disclosure regarding material impacts to estimates and assumptions will be located in a single note to the financial statements along with the other financial statement disclosures we are adopting, which will enhance the usefulness of the disclosure to investors. Furthermore, we do not think the required disclosure will be confusing to investors. To the contrary, it will provide investors with more decision-useful information about the estimates and assumptions used to prepare the financial statements than is required under applicable accounting standards. Registrants are presumably making business decisions and taking actions to achieve their disclosed transition plans and targets and these decisions may have material impacts on their estimates and assumptions. Providing investors with an understanding of these impacts will help them better evaluate a registrant's financial position, performance, and future cash flows. Other commenters raised concerns about registrants' abilities to isolate the relevant impacts when there may be more than one contributing factor.[2183] We expect these concerns to be mitigated to some extent by the final

---

[2182]    *See supra* notes 2153 and 2154 and accompanying text.

[2183]    *See supra* note 2150 and accompanying text.

rules, which include a materiality qualifier and thereby focus management on a narrower

category of impacts for which management should have greater insight.  In addition, the final

rules require registrants to provide a qualitative description of the impacts, which generally is

less burdensome to produce than if management had to identify a specific amount.

In addition, we are reiterating a few examples that were included in the Proposing

Release where severe weather events, natural conditions, or a registrant's disclosed targets or

transition plans could affect a registrant's financial estimates and assumptions.[2184]  For example,

a registrant's climate-related targets and related commitments, such as a disclosed commitment

to achieve net-zero emissions by 2040, may impact certain accounting estimates and

assumptions.  Also, for example, if a registrant disclosed a commitment that would require

decommissioning an asset by a target year, then the registrant's useful life and salvage value

estimates used to compute depreciation expense as well as its measurement of asset retirement

obligation should reflect alignment with that commitment.  Financial statement estimates and

assumptions that may require disclosure pursuant to the final rules may include those related to

the estimated salvage value of certain assets, estimated useful life of certain assets, projected

financial information used in impairment calculations, estimated loss contingencies, estimated

reserves (such as environmental reserves, asset retirement obligations, or loan loss allowances),

estimated credit risks, fair value measurement of certain assets, and commodity price

assumptions.

Finally, although we considered whether it would be appropriate to require disclosure of

material changes in estimates, assumptions, or methodology among fiscal years and the reasons

---

[2184]      *See* Proposing Release, section II.F.4.

for those changes,[2185] at this time we are not including such a requirement in the final rules. The narrower scope of the final rules, which is focused on discrete transactions that are currently recognized in a registrant's financial statements in accordance with GAAP, reduces the need for explicit requirements regarding material changes in estimates and assumptions underlying the financial disclosures. Current requirements under GAAP would continue to apply to material changes in estimates and assumptions.[2186] In addition, in response to the commenter that asked for clarification about whether foreign private issuers would have to provide interim updates,[2187] we are clarifying that the final rules will not affect existing filing obligations under Form 6-K.

### 5. Opportunities

#### a. Proposed Rules

The proposed rules would have permitted a registrant, at its option, to disclose the impact of any opportunities arising from severe weather events and other natural conditions, any impact of efforts to pursue climate-related opportunities associated with transition activities, and the impact of any other climate-related opportunities, including those identified by the registrant pursuant to proposed Item 1502(a) of Regulation S-K, on any of the financial statement metrics.[2188] The Proposing Release explained that if a registrant makes a policy decision to disclose the impact of a climate-related opportunity on the proposed financial statement metrics, it must do so consistently (e.g., for each fiscal year presented in the consolidated financial statements, for each financial statement line item, for all relevant opportunities identified by the

---

2185   *See supra* note 2157 and accompanying text.

2186   See FASB ASC Topic 250, Accounting Changes and Error Corrections and IFRS IAS 8 Accounting Policies, Changes in Accounting Estimates and Errors.

2187   *See supra* note 2164 and accompanying text.

2188   *See* Proposing Release, sections II.F.2, 3, and 4.

registrant) and must follow the same presentation and disclosure threshold requirements applicable to the required disclosures related to the financial impact metrics and expenditure metrics.[2189]

### b. Comments

A number of commenters stated that they supported the proposal to make the disclosure of climate-related opportunities optional.[2190] Commenters stated that investors would benefit from this information about positive impacts,[2191] including because it is key for investors to understand how a company is reducing its climate-related financial risks.[2192] However, a few of these commenters explained that concerns about requiring the sharing of sensitive or competitive business information weighed in favor of making the proposed disclosure optional.[2193] In addition, some commenters stated that they supported the proposal to require the disclosure of opportunities to be made consistently.[2194]

One commenter asserted that the disclosure of opportunities in the financial statements should be limited to amounts that can be objectively verified and reliably quantified.[2195] Similarly, another commenter stated it should be limited to "virtually certain opportunities" to avoid misleading investors.[2196] A few commenters expressed concerns about potential

---

[2189]   *See* Proposing Release, section II.F.2.

[2190]   *See, e.g.*, letters from Anthesis; BC IM Corp.; Bloomberg; C2ES; Eni Spa; ERM CVS; ICGN; Miller/Howard; Moody's; NY City Comptroller; Reinsurance AA; Sarasin; TotalEnergies; and T. Peterson.

[2191]   *See, e.g.*, letters from Anthesis; C2ES; and Mazars.

[2192]   *See* letter from C2ES.

[2193]   *See, e.g.*, letters from Anthesis; C2ES; and Reinsurance AA.

[2194]   *See, e.g.*, letters from ICGN; RSM US LLP; and Sarasin.

[2195]   *See* letter from PwC.

[2196]   *See* letter from CEMEX.

Appellate Case: 24-1628     Page: 516     Date Filed: 03/26/2024 Entry ID: 5377362

greenwashing related to the disclosure of opportunities.[2197]  However, one commenter explained that, although there is a risk that the disclosure of opportunities could lead to greenwashing, by including the information in a filing with the Commission, registrants would be subject to liability and would be required to disclose their assumptions and methodologies.[2198]

Other commenters stated that the disclosure of opportunities should not be permitted in the audited financial statements.[2199]  For example, one commenter explained that opportunities should not be disclosed in the financial statements because opportunities appear to be forward-looking and speculative and may be subject to management bias.[2200]  Some commenters stated that it may be difficult to develop internal controls for the disclosure of opportunities[2201] or that opportunities may be complex to audit.[2202]  A few commenters suggested that registrants could address opportunities in the MD&A section of their periodic reports.[2203]

Some commenters stated that they would support the Commission mandating the disclosure of opportunities.[2204]  One of these commenters stated that mandated disclosure of opportunities would facilitate an understanding of the strategic or competitive advantages a company may have in terms of furthering physical risk resilience.[2205]  Another commenter expressed support for mandatory disclosure of climate-related opportunities except when such

---

[2197]  *See, e.g.*, letters from Bloomberg; D. Higgins; R. Bentley; and R. Burke.

[2198]  *See* letter from Anthesis.

[2199]  *See, e.g.*, letters from McCormick; and Nutrien.

[2200]  *See* letter from Nutrien.

[2201]  *See, e.g.*, letters from CEMEX; and Nutrien.

[2202]  *See, e.g.*, letters from CEMEX; and RSM US LLP.

[2203]  *See, e.g.*, letters from Eni Spa; Mazars (recommending that opportunities would be discussed in the financial statements and in MD&A); and RSM US LLP.

[2204]  *See, e.g.*, letters from BHP; Morningstar; and We Mean Business.

[2205]  *See* letter from Morningstar.

opportunities are unrelated to the registrant's core or existing lines of business.[2206]  Relatedly, one commenter requested that the Commission clarify that the disclosure of opportunities is optional because the interaction between proposed rules 14-02(b) and (j) could give the impression that disclosure of opportunities is required if the impact is greater than one percent.[2207]

A few commenters recommended revisions or clarifications to the definition of opportunities.  For example, one commenter pointed out that financial statements typically include backward-looking financial results and therefore the use of the term opportunities in the financial statements should be clarified.[2208]  Another commenter asserted that the definition of "climate-related opportunities" provided in proposed Item 1500(b) is confusing when applied to the disclosure of opportunities in the financial statements, which would be made on a line item basis, because the definition refers to the actual or potential positive impacts of climate-related conditions and events on a registrant's consolidated financial statements "as a whole."[2209]  Other commenters suggested that the definition of climate-related opportunities should be revised to include activities in the forestry and forest products sector[2210] and the positive impacts of a company's competitive positioning, brand strength, and reputation.[2211]  One commenter asserted that the disclosure of opportunities should not impact the reporting relevant for the disclosure thresholds because it could potentially discourage companies from disclosing impacts from

---

[2206]    *See* letter from We Mean Business.

[2207]    *See* letter from Deloitte & Touche.

[2208]    *See* letter from CFA Institute.

[2209]    *See* letter from Chamber.

[2210]    *See* letter from NAFO.

[2211]    *See* letter from Moody's.

opportunities and triggering the threshold.[2212]  One commenter requested that the Commission provide additional guidance around the definition of climate-related opportunities.[2213]

### c. Final Rules

In light of the changes to other aspects of the final rules, we have decided not to adopt the proposed rules related to the disclosure of opportunities.  First, as discussed above, we have decided not to adopt: (1) the proposed Financial Impact Metrics,[2214] (2) the proposed requirement to disclose costs and expenditures related to general transition activities in the financial statements (e.g., a portion of the proposed Expenditure Metrics), and (3) the proposed requirement to disclose the impacts of any climate-related risks identified pursuant to proposed Item 1502(a) of Regulation S-K.  The proposed rules would have permitted a registrant to disclose the impact of any opportunities with respect to each of these disclosure items.[2215] Because these disclosure items will not be included in the final rules, there is no reason to adopt final requirements regarding the disclosure of opportunities with respect to these items.

Second, as discussed above in section K.3.c, in a modification from the proposed rules, the final rules require the disclosure of capitalized costs, expenditures expensed, charges, and losses incurred as a result of severe weather events.[2216]  Unlike the proposed rules, the final rules do not make a distinction between "risks" and "opportunities" in the financial statement disclosure requirements.  Therefore, we do not think it is necessary to retain a provision related

---

[2212]    *See* letter from Morningstar.

[2213]    *See* letter from PwC.

[2214]    *See supra* note 1735 for an explanation regarding the overlap between the proposed Financial Impact Metrics and the proposed Expenditure Metrics.

[2215]    *See* Proposing Release, sections II.F.2, 3, and 4.

[2216]    *See* 17 CFR 210.14-02(c) and (d).  The proposed rules would have required the disclosure of costs and expenditures to "mitigate the risks from severe weather events and other natural conditions."  *See* Proposing Release, section II.F.3.

Appellate Case: 24-1628    Page: 519    Date Filed: 03/26/2024 Entry ID: 5377362

to the disclosure of opportunities. To the extent that a registrant incurs costs and expenditures as a result of a severe weather event (applying the final rules' attribution principle), the registrant would be required to disclose these costs and expenditures under the final rules regardless of the reason for the expenditure (assuming the disclosure threshold is met). However, we do not expect that registrants will commonly incur costs, expenditures, charges, and losses as a result of severe weather events or other natural conditions in furtherance of an opportunity. In this regard, our expectation is consistent with the Proposing Release, which did not provide any examples of opportunities associated with severe weather events and other natural conditions in the discussion of the proposed Expenditure Metrics.[2217] To the extent that a registrant identifies a cost or expenditure incurred as a result of severe weather events or other natural conditions that it believes was incurred in furtherance of an opportunity, disclosure of the cost or expenditure would be required (assuming the other requirements of the final rules are satisfied) as explained above. However, the registrant would not be required to identify any costs or expenditures disclosed under Article 14 as related to an "opportunity" as explained in greater detail below.[2218]

The same analysis applies to opportunities related to carbon offsets and RECs. The requirement in the final rules to disclose capitalized costs, expenditures expensed, and losses related to carbon offsets and RECs was not included in the proposed rules because the proposed

---

[2217] *See* Proposing Release, section II.F.3 (stating, in the discussion of the proposed Expenditure Metrics, that a registrant may choose to disclose the impact of efforts to pursue climate-related opportunities associated with transition activities but remaining silent with respect to opportunities for costs and expenditures related to severe weather events and other natural conditions).

[2218] The same analysis applies to opportunities related to carbon offsets and RECs. The requirement in the final rules to disclose capitalized costs, expenditures expensed, and losses related to carbon offsets and RECs was not included in the proposed rules because the proposed rules required the disclosure of costs and expenditures related to transition risks more generally, and therefore the proposed rules did not separately address opportunities related to carbon offsets and RECs. Under the final rules, a registrant is required to disclose capitalized costs, expenditures expensed, and losses related to carbon offsets and RECs regardless of the reason for the expenditure (assuming the disclosure threshold is met) for the same reasons as discussed in this paragraph with respect to severe weather events. *See* 17 CFR 210.14-02(e).

Appellate Case: 24-1628     Page: 520     Date Filed: 03/26/2024 Entry ID: 5377362

rules required the disclosure of costs and expenditures related to transition risks more generally, and therefore the proposed rules did not separately address opportunities related to carbon offsets and RECs.  Under the final rules, a registrant is required to disclose capitalized costs, expenditures expensed, and losses related to carbon offsets and RECs regardless of the reason for the expenditure (assuming the disclosure threshold is met) for the same reasons as discussed in the previous paragraph with respect to severe weather events.  We expect that registrants will most commonly incur costs, expenditures, and losses in connection with the acquisition and use of carbon offsets and RECs as part of a strategy to mitigate transition *risk* as opposed to in furtherance of an *opportunity*.  However, to the extent that a registrant incurs such costs, expenditures, and losses in furtherance of an opportunity, the registrant would not be required to identify any amounts disclosed under the final rules as related to an "opportunity" as explained in greater detail below.

Third, as discussed above in section K.4, we are adopting Rule 14-02(h), which we have modified from the proposal, to require registrants to disclose whether the estimates and assumptions the registrant used to produce the consolidated financial statements were materially impacted by exposures to risks and uncertainties associated with, or known impacts from, severe weather events and other natural conditions or any climate-related targets or transition plans disclosed by the registrant.[2219]  After further consideration, we believe that including a provision regarding the disclosure of the impact of opportunities on the financial estimates and assumptions is also unnecessary.  That is because Rule 14-02(h) requires a registrant to disclose the "known impacts" on its financial estimates and assumptions and "impacts" is not limited to

---

[2219]    *See* 17 CFR 210.14-02(h).

Appellate Case: 24-1628    Page: 521    Date Filed: 03/26/2024 Entry ID: 5377362

negative impacts.[2220] Nor does "known impacts" draw a distinction between the impacts resulting from "risks" or "opportunities." In other words, to the extent that a registrant's financial estimates and assumptions are materially impacted by severe weather events or other natural conditions or disclosed targets or transition plans, the registrant would be required to disclose this material impact under the final rules regardless of the reason for the impact.[2221] Therefore, we are not adopting the proposed rules related to the voluntary disclosure in the financial statements of the impact of any opportunities related to financial estimates and assumptions.

The approach we are taking in the final rules will mitigate many of the concerns that commenters raised about the disclosure of opportunities, while still providing investors with decision-useful information about a registrant's capitalized costs, expenditures expensed, charges, losses, and material impacts to estimates and assumptions. As discussed above, the final rules do not distinguish between "risks" and "opportunities" in requiring the disclosure of capitalized costs, expenditures expensed, charges, losses, and material impacts to estimates and assumptions, and registrants will not be required to identify any amounts disclosed under the final rules as related to a "risk" or "opportunity." Furthermore, any capitalized costs, expenditures expensed, charges, losses, and material impacts to financial estimates and assumptions required to be disclosed under the final rules are limited to those that a registrant has actually incurred and recorded in its books and records. These aspects of the final rules should alleviate commenters' concerns about the potential for greenwashing,[2222] issues regarding

---

[2220]    *See id.*

[2221]    *See id.*

[2222]    *See supra* note 2197 and accompanying text.

App.517

Appellate Case: 24-1628    Page: 522    Date Filed: 03/26/2024 Entry ID: 5377362

auditability,[2223] and concerns that registrants could be required to disclose sensitive or competitive business information related to opportunities.[2224] Similarly, commenters' concerns about the definition of "opportunities" as applied to the financial statement disclosures[2225] are rendered moot because, as explained above, the final rules will not require registrants to identify particular capitalized costs, expenditures expensed, charges, losses, or material impacts to estimates and assumptions as derived from an opportunity, and furthermore the final rules no longer include a definition of opportunities.[2226]

### 6. Financial Statement Disclosure Requirements

#### a. Contextual Information (Rule 14-02(a)) and Basis of Calculation (Rule 14-01(c))

##### i. Proposed Rules

In the Proposing Release, the Commission explained that because the proposed financial statement metrics would involve estimation uncertainties driven by the application of judgments and assumptions, similar to other financial statement disclosures, registrants would be required to disclose contextual information to enable a reader to understand how it derived the financial statement metrics, including a description of significant inputs and assumptions used, and if applicable, policy decisions made by the registrant to calculate the metrics.[2227]

---

[2223] *See supra* note 2202 and accompanying text.

[2224] *See supra* note 2193 and accompanying text.

[2225] *See supra* note 2208 and accompanying text.

[2226] *See supra* section II.C.1.c.

[2227] *See* Proposing Release, section II.F.1. In the Proposing Release, the Commission explained that inputs and assumptions may include the estimation methodology used to disaggregate the amount of impact on the financial statements between the climate-related events and activities and other factors. The Proposing Release also stated that policy decisions may include a registrant's election to disclose the impacts from climate-related opportunities. *See* Proposing Release, section II.F.1.

To avoid potential confusion, maintain consistency with the rest of the financial statements, and to aid comparability, the Commission proposed that registrants would be required to calculate the financial statement metrics using financial information that is consistent with the scope of the rest of the registrant's consolidated financial statements included in the filing.[2228] Therefore, registrants would have to include in any such calculation financial information from subsidiaries.[2229]

The Commission also proposed basis of calculation requirements providing that a registrant would be required to apply the same set of accounting principles that it is required to apply in preparation of the rest of its consolidated financial statements included in the filing, whenever applicable.[2230]

### ii. Comments

Many of the commenters that specifically addressed the proposed requirement to provide contextual information supported it.[2231] Commenters who supported the proposal generally stated that contextual information would provide important information to investors and would help them understand the financial statement disclosures.[2232] One commenter stated that the

---

[2228] *See id.*

[2229] *See id.* (citing 17 CFR 210.3-01(a) ("There shall be filed, for the registrant and its subsidiaries consolidated, audited balance sheets as of the end of each of the two most recent fiscal years.")).

[2230] *See id.* 17 CFR 210.4-01(a)(1) states that financial statements filed with the Commission that are not prepared in accordance with GAAP will be presumed misleading or inaccurate unless the Commission has otherwise provided. The Commission stated in the Proposing Release that, for the avoidance of doubt, it was clarifying the application of this concept to the proposed rules by requiring a registrant to apply the same set of accounting principles that it is required to apply in the preparation of the rest of its consolidated financial statements included in the filing, whenever applicable. *See* Proposing Release, section II.F.1 (citing 17 CFR 210.4-01(a)(2) (discussing the application of U.S. GAAP, IFRS, and the use of other comprehensive sets of accounting principles (with reconciliation to U.S. GAAP))).

[2231] *See, e.g.,* letters from CalPERS; CEMEX; CFA Institute; E. Ocampo; ICGN; KPMG; Mazars; Morningstar; PwC; Sarasin; SKY Harbor; and TotalEnergies.

[2232] *See, e.g.,* letters from Mazars; PwC; and SKY Harbor.

requirement to provide contextual information would make comparisons easier across registrants.[2233]  Another commenter confirmed that it would use contextual information in evaluating a registrant's securities.[2234]

A few commenters specifically disagreed with the proposal to require contextual information.[2235]  One commenter expressed concern that a registrant would be required to make many assumptions and policy decisions in order to disclose contextual information and asserted that the proposed requirement could result in inconsistent and incomparable information that is not useful for investors.[2236]  Another commenter stated that the Proposing Release does not provide any guidance on the necessary level of detail required for contextual information and that contextual information will not help registrants distinguish between climate and non-climate related activities or help registrants determine how to allocate impacts to particular line items.[2237]  One commenter stated that while it supported the need for transparency in definitions and methodologies used, it believed it would be possible to simplify the requirement to provide contextual information, in particular, by making the information required in the audited financial statements less prescriptive.[2238]  Finally, in the Proposing Release, the Commission requested comment on whether providing additional examples or guidance would assist registrants in disclosing contextual information.  Commenters had different views on whether additional

---

[2233]    *See* letter from Amer. For Fin. Reform, Evergreen Action, *et al.*

[2234]    *See* letter from SKY Harbor.

[2235]    *See, e.g.,* letters Corteva; and Energy Transfer.

[2236]    *See* letter from Energy Transfer.

[2237]    *See* letter from Chamber.

[2238]    *See* letter from BNP Paribas.

examples or guidance would be helpful, but generally did not provide the Commission with any specific recommendations.[2239]

Commenters who addressed the issue generally agreed with the proposal to require registrants to calculate the financial statement metrics using financial information that is consistent with the scope of the rest of the registrant's consolidated financial statements and to use the same accounting principles that the registrant is required to apply in preparing the rest of its consolidated financial statements including in the filing.[2240]  One commenter stated that applying the same set of accounting principles consistently throughout a registrant's consolidated financial statements is important and would aid comparability.[2241]  Another commenter asked the Commission to clarify the phrase "whenever applicable" as used in proposed Rule 14-01(c)(2), which directs a registrant to, "whenever applicable, apply the same accounting principles that it is required to apply in the preparation of the rest of its consolidated financial statements . . . ."[2242] This commenter stated that the phrase "whenever applicable" is confusing because it is presumed that GAAP applies to the proposed financial statement metrics and therefore the Commission should clarify any circumstances it is aware of where the accounting principles would conflict with, or be inconsistent with, GAAP.[2243]  With respect to the proposed requirement to use financial information that is consistent with the scope of the rest of the registrant's consolidated

---

[2239]  *See, e.g.,* letters from CFA Institute; E. Ocampo; Grant Thornton; and Third Coast.

[2240]  *See, e.g.,* letters from BHP; CEMEX; CFA; Eur. Banking Fed.; Eni Spa; IAA; KPMG; Mazars; Morningstar; Nutrien; and Sarasin.

[2241]  *See* letter from IAA.

[2242]  *See* letter from Deloitte & Touche.

[2243]  *See id.*

Appellate Case: 24-1628     Page: 526     Date Filed: 03/26/2024 Entry ID: 5377362

financial statements, one commenter stated that the proposed rule "makes no allowance for wholly-owned subsidiaries, which may lead to duplication and double counting."[2244]

In addition, most commenters supported requiring the application of existing GAAP to the proposed financial statement metrics.[2245] However, a number of commenters raised concerns that certain of the proposed financial statement metrics would not necessarily comport with GAAP, including amounts for lost revenues, cost savings, or cost reductions.[2246] In addition, in response to a question in the Proposing Release, certain commenters stated that the proposed financial statement metrics should be calculated at a reportable segment level when a registrant has more than one reportable segment, as defined by FASB ASC Topic 280 *Segment Reporting*, or presented by geographic areas that are consistent with the registrant's reporting pursuant to FASB ASC Topic 280-10-50-41.[2247] On the other hand, some commenters stated that they did not support calculating and presenting the disclosures at a segment or geographic level because it would be too complex or would result in the disclosure of irrelevant information.[2248]

### iii. Final Rules

After consideration of the comments, we are adopting the requirement (Rule 14-02(a)) to provide contextual information with certain clarifying modifications. We have decided to include in the text of the final rules two additional types of contextual information a registrant is required to disclose.[2249] In addition to the types of contextual information included in the

---

[2244]    *See* letter from PPL.

[2245]    *See, e.g.,* letters from Chamber; Eni Spa; KPMG; and Mazars.

[2246]    *See* letter from Chamber. *See also, e.g.,* letters from KPMG; PwC; SIFMA; and Soc. Corp. Gov.

[2247]    *See, e.g.,* letters from Eni Spa; ICGN; Mazars; Moody's; Morningstar; and Sarasin.

[2248]    *See, e.g.,* letters from Abrasca; BHP; and SEC Professionals.

[2249]    *See* 17 CFR 210.14-02(a).

proposed rules, registrants will also be required to disclose significant judgments made and other information that is important to an investor's understanding of the financial statement effect.[2250] Therefore, under the final rules, a registrant must "[p]rovide contextual information, describing how each specified financial statement effect . . . was derived, including a description of significant inputs and assumptions used, significant judgments made, [and] other information that is important to understand the financial statement effect and, if applicable, policy decisions made by the registrant to calculate the specified disclosures."[2251] Similar to the Proposing Release, in the discussion of the financial statement disclosures above, we provided certain non-exclusive examples of the types of contextual information that registrants may be required to disclose depending on the particular facts and circumstances. We agree with the commenters who stated that contextual information will help investors understand the required financial statement effects.[2252] The financial statement disclosures we are adopting may involve estimation uncertainties that are driven by the application of judgments and assumptions, like certain other financial statement disclosures,[2253] and therefore disclosure of contextual information will facilitate investors' understanding of the financial statement effects and will be an integral part of the financial statements.

---

[2250] *See id.*

[2251] *See id.*

[2252] *See supra* note 2232 and accompanying text.

[2253] For example, the application of FASB ASC Topic 606 *Revenue from Contracts with Customers* and ASC Topic 326 *Financial Instruments — Credit Losses* require the application of judgment when applying GAAP to the financial statements. FASB ASC 275-10-50-6 through 50-15A require the disclosure of information about certain significant estimates. In addition, FASB ASC 235-10-05-3, 05-4, and 50-1 require the disclosure of information about accounting policies.

In response to certain commenters' requests for clarification or additional guidance,[2254] as noted above, we decided to include in the final rules two additional types of contextual information that will enhance investors' understanding of the financial statement disclosures. We have decided to include "significant judgments" as an additional type of contextual information in the final rules because registrants will need to exercise judgment when preparing their disclosures, and disclosing contextual information about those judgments will help investors understand and evaluate the reasonableness of the disclosures.[2255] Given the narrower scope of the disclosure requirements that we are adopting, we expect that the final rules require fewer inputs and assumptions than would have been required under the proposal; however, we are retaining the references to inputs and assumptions in the final rules because it is possible, though less likely, that preparation of the financial statement disclosures could involve estimation uncertainty and require the registrant to exercise judgment in the selection of inputs and assumptions.[2256] In addition, to enhance understanding of the financial statement disclosures, the final rules explicitly require disclosure of other information that is important to understand the financial statement effects.[2257] In section II.K.3.c.iv above, we have specified one instance where the final rules require registrants to disclose this type of contextual information because we think the information is important to understand the financial statement effects of the

---

[2254] *See supra* note 2239 and accompanying text.

[2255] *See* 17 CFR 210.14-02(a). Registrants are regularly required to exercise judgment when applying GAAP to prepare their financial statements and therefore the fact that the final rules will require registrants to exercise judgment is not unusual. For example, FASB ASC Topic 606 *Revenue from Contracts with Customers* requires an entity to disclose significant judgments in the application of the guidance (ASC 606-10-50-17), FASB ASC Topic 820 *Fair Value Measurement* requires an entity to disclose judgments and assumptions about assets and liabilities measured at fair value in the financial statements, and FASB ASC Topic 842 *Leases* requires a lessees to disclose information about significant assumptions and judgments made in applying the requirements of Topic 842.

[2256] *See* 17 CFR 210.14-02(a).

[2257] *See id.*

disclosed capitalized costs, expenditures expensed, charges, or losses.[2258]  By requiring the disclosure of information that is important to understand the financial statement effects, the requirement to provide contextual information will also help registrants avoid having incomplete and potentially misleading disclosures.

We disagree with the commenters who stated that requiring disclosure of contextual information would result in inconsistent and incomparable information that is not useful for investors.[2259]  On the contrary, the requirement to provide contextual information will improve the comparability of disclosures by enabling investors to understand how registrants have exercised judgment and made assumptions in determining the financial statement effect.  This will enable investors to compare judgments and assumptions made by registrants, including across industries, which will provide investors with useful information for purposes of their investment and voting decisions.  Furthermore, although we are clarifying aspects of the contextual information requirement, we disagree with the commenters who stated that the requirement to provide contextual information should be simplified and that more guidance is needed with respect to the level of detail required.[2260]  The final rules intentionally provide flexibility to registrants to allow them to include contextual information that is tailored to their particular circumstances thereby improving the usefulness for investors of the disclosures.  One commenter stated that a registrant would be required to make many assumptions and policy decisions to disclose contextual information.[2261]  As noted above, the final rules focus on requiring the disclosure of capitalized costs, expenditures expensed, charges, and losses incurred

---

[2258]    *See id.*

[2259]    *See supra* note 2236 and accompanying text.

[2260]    *See supra* notes 2237 and 2238 and accompanying text.

[2261]    *See supra* note 2236 and accompanying text.

as a result of severe weather events and other natural conditions, which require fewer assumptions and policy decisions by the registrant than would have been required under the proposed rules. As a result, we expect the extent of contextual information provided under the final rules will be reduced as compared to the proposal.

We are also adopting the requirements (Rule 14-01(c)) for registrants to calculate the financial statement effects using financial information that is consistent with the scope of the rest of the registrant's consolidated financial statements and to apply the same set of accounting principles that a registrant is required to apply in preparation of the rest of its consolidated financial statements, consistent with the proposal.[2262] As the Commission explained in the Proposing Release, requiring registrants to calculate the financial statement disclosures using financial information that is consistent with the scope of the rest of the registrant's consolidated financial statements will avoid potential confusion, maintain consistency, and aid comparability.[2263] In addition, we agree with the commenter who stated that applying the same set of accounting principles to the financial statement disclosures will aid comparability.[2264] We are not aware of any circumstances where the final rules will require a registrant to deviate from GAAP, and therefore we are striking the words "[w]henever applicable" from the final rules, in response to the commenter who stated that this phrase was confusing because it could imply that

---

[2262] *See* 17 CFR 210.14-01(c).

[2263] *See* Proposing Release, section II.F.1. As noted above, one commenter stated that the proposed rule "makes no allowance for wholly-owned subsidiaries, which may lead to duplication and double counting." *See supra* note 2244 and accompanying text. Although the comment letter does not provide additional context for this statement, we think the commenter may have the misimpression that the proposed disclosure threshold would have been evaluated at the parent and subsidiary level separately. On the contrary, and as proposed, the final rules will require registrants to calculate the financial statement disclosure using financial information that is consistent with the scope of the rest of its *consolidated* financial statements included in the filing, which we do not believe would result in any double-counting or duplication.

[2264] *See supra* note 2241 and accompanying text.

the Commission is aware of circumstances where the applicable accounting principles would be inconsistent with GAAP.[2265]  In addition, it is important for investors to be provided with information that is consistent across financial statements.

As discussed above, the Commission also received feedback about whether registrants should be required to calculate the proposed financial statement metrics at a reportable segment level or to present the metrics by geographic areas.[2266]  The Commission did not propose such requirements and—although we do not necessarily agree with those commenters that stated requiring disclosure at a segment or geographic level would be too complex or result in the disclosure of irrelevant information[2267]—we think the approach to disclosure we are adopting strikes an appropriate balance between providing consistent, comparable, and decision-useful information to investors and the associated burdens to registrants.

Finally, several areas of commenter question or concern related to the requirements discussed above are addressed by our decision to not adopt the proposed Financial Impact Metrics and to focus on the disaggregation and disclosure of discrete transactions that are recorded in the financial statements.  For example, concerns about the interaction between GAAP and the proposed Financial Impact Metrics will not apply to the final rules.[2268]  For the sake of clarity, however, we reiterate that the rules the Commission is adopting require registrants to apply existing GAAP recognition and measurement requirements to the financial statement disclosures.

---

[2265]    *See supra* note 2242 and accompanying text.

[2266]    *See supra* notes 2247 and 2248 and accompanying text.

[2267]    *See supra* note 2248 and accompanying text.

[2268]    *See supra* note 2246 and accompanying text.

### b. Historical Periods (Rule 14-01(d))

#### i. Proposed Rules

The Commission proposed to require a registrant to provide disclosure for the registrant's most recently completed fiscal year and for the historical fiscal year(s) included in the registrant's consolidated financial statements in the applicable filing.[2269]  The Proposing Release stated that a registrant would not need to provide a corresponding historical metric for a fiscal year preceding its current reporting fiscal year if it is eligible to take advantage of the accommodation in 17 CFR 230.409 ("Rule 409") or 17 CFR 240.12b-21 ("Rule 12b-21").[2270] The Commission explained that requiring disclosure of current and, when known or reasonably available to the registrant without unreasonable effort or expense, historical periods, should allow investors to analyze trends in relevant impacts on the consolidated financial statements and to better evaluate the narrative trend disclosure provided pursuant to proposed subpart 1500 of Regulation S-K.[2271]

#### ii. Comments

A few commenters supported the requirement as proposed.[2272]  One commenter indicated that the accommodation in Rule 409 or Rule 12b-21 would be sufficient for issuers to rely upon when historical information subject to disclosure is unknown or not reasonably available.[2273]  On the other hand, some commenters stated that it was not clear when a registrant could take

---

[2269]    *See* Proposing Release, section II.F.1.

[2270]    *See id.*

[2271]    *See id.*

[2272]    *See, e.g.*, letters from Center Amer. Progress; Morningstar; and Sarasin.

[2273]    *See* letter from Center Amer. Progress.

Appellate Case: 24-1628     Page: 533     Date Filed: 03/26/2024 Entry ID: 5377362

advantage of the accommodations provided by these rules or that the requirements applicable to these rules made it difficult for registrants to rely upon them.[2274]

Most commenters that provided feedback on the proposed financial statement metrics did not support requiring registrants to provide disclosure for historical period(s) that occurred prior to the compliance date of the rule and instead recommended requiring disclosure on a prospective basis and phasing in disclosure for historical periods over time.[2275]  These commenters generally observed that it would be challenging and burdensome for registrants to provide disclosure for historical periods that occurred prior to the compliance date because many registrants do not currently collect or report the information that would have been required under the proposal.[2276]  One commenter stated that issuers would have to "retroactively estimate their historical data," which would be "burdensome and unlikely to produce reliable and consistent disclosures for investors."[2277]  Other commenters pointed out that even if historical information is available, issuers may not be able to conclude that they had adequate controls in place prior to the compliance date for the rule.[2278]  As an alternative, some commenters recommended that the

---

[2274]  *See, e.g.*, letters from BOA; CAQ; Cleary Gottlieb; INGAA; RSM US LLP; Soc. Corp. Gov.; TRC; and Western Midstream.

[2275]  *See, e.g.,* letters from ABA; AEPC; AFPA; AFPM; Allstate; Alphabet *et al.*; API; Autodesk; Baker Tilly; BDO USA LLP; BHP; BOA; BP; CAQ; CCR; CEMEX; CFA Institute; Chamber; Corteva; Crowe; Dell; Deloitte & Touche; D. Hileman Consulting; E. Ocampo; Energy Infrastructure; Energy Transfer; Etsy; FHL Bank Des Moines; HP; Hydro One; IAA; IMA; INGAA; Marathon; McCormick; Microsoft; NAFO; NAM; Nareit; NMHC *et al.*; Northern Trust; PFG; PPL; PSC; PwC; RILA; Royal Gold; RSM US LLP; SEC Professionals; SIFMA; SouthState; Sullivan Cromwell; TotalEnergies; TRC; Walmart; Western Midstream; and WSP.

[2276]  *See, e.g.,* letters from Abrasca; Alphabet *et al.*; API; BlackRock; Cal. Resources; Deloitte & Touche; Devon Energy; Nutrien; and TRC.

[2277]  *See* letter from BlackRock.

[2278]  *See, e.g.,* letters from Autodesk; CAQ; Dell; and Etsy.

Appellate Case: 24-1628    Page: 534    Date Filed: 03/26/2024 Entry ID: 5377362

Commission delay the effective date of the proposed rule to help facilitate the disclosure of information for historical periods.[2279]

Several commenters stated that disclosure of historical information on a prospective basis would be useful information for investors.[2280] These commenters generally observed that the disclosure of historical information would be valuable for illuminating material changes to estimates and assumptions and historical trends.[2281]

The Commission included a request for comment in the Proposing Release asking if information for all periods in the consolidated financial statements should be required for registrants that are filing an initial registration statement.[2282] A few commenters supported requiring a registrant to provide disclosure for all periods in the consolidated financial statements for registrants filing an initial registration statement.[2283] On the other hand, one commenter recommended that, for newly public companies on an ongoing basis, the Commission require disclosure only for the most recent fiscal year for which audited financial statements are included in the initial registration statement to "reduce the barriers to market."[2284] In addition, one commenter asked whether the proposed financial statement metrics would need to be restated or adjusted for historical periods if climate-related impacts (both physical and transition events) are not identifiable and do not occur until after the metrics are first reported.[2285]

---

[2279] *See, e.g.*, letters from Ernst & Young LLP; and NASBA.

[2280] *See, e.g.,* letters from Amer. for Fin. Reform, Sunrise Project *et al.*; Center Amer. Progress; and E. Ocampo.

[2281] *See id.*

[2282] *See* Proposing Release, section II.F.1.

[2283] *See, e.g.*, letters from Center Amer. Progress; and Sarasin.

[2284] *See* letter from KPMG.

[2285] *See* letter from Climate Risk Consortia.

530

### iii. Final Rules

After consideration of comments, we have decided to require a registrant to provide disclosure for historical fiscal year(s) included in a registrant's consolidated financial statements on a prospective basis only.[2286]  Under the final rules (Rule 14-01(d)), disclosure must be provided for the registrant's most recently completed fiscal year, and to the extent previously disclosed or required to be disclosed, for the historical fiscal year(s), for which audited consolidated financial statements are included in the filing.[2287]  Subject to the compliance date discussed below,[2288] registrants will be required to provide disclosure for the registrant's most recently completed fiscal year for which audited financial statements are included in the filing in any filings to which the final rules apply; however, registrants are not required to provide disclosure for historical fiscal year(s) included in that filing.  For example, subject to the compliance date, a registrant that files its annual report will only be required to provide the applicable disclosure for the registrant's most recently completed fiscal year for which audited financial statements are included in the filing.  For each subsequent fiscal year's annual report, the registrant will be required to provide the applicable disclosure for an additional fiscal year until the required disclosure is provided for the entire period covered by the registrant's financial statements.[2289]  Initial registration statements are subject to the final rules to the same extent as

---

[2286]   *See* 17 CFR 210.14-01(d).

[2287]   *See id.*

[2288]   *See infra* section II.O for a discussion of the compliance date for the rules.

[2289]   As discussed in more detail above in section II.K.3.c.ii, the final rules call for disclosure triggered off both the balance sheet and the income statement.  A registrant that is required to include balance sheets as of the end of its two most recent fiscal years and income statements as of the end of its three most recent fiscal years would be required to disclose two years of the financial statement effects that correspond to the

Appellate Case: 24-1628     Page: 536     Date Filed: 03/26/2024 Entry ID: 5377362

the other Commission filings to which the rules apply.[2290]  Specifically, a registrant engaged in an IPO that has a fiscal year that is subject to the final rules is required to provide disclosure for the registrant's most recently completed fiscal year for which audited financial statements are included in the filing.  However, such registrant will not be required to provide disclosure for any preceding fiscal years included in the initial registration statement because as new entrants to the public markets such registrants would not have previously disclosed or been required to disclose the information required by the final rules.[2291]

  We agree with those commenters who stated that the disclosure of historical information would be useful for investors because it would illuminate changes to the financial statement disclosures and trends.[2292]  However, we recognize that it may be difficult for registrants to compile and produce the required disclosures for periods that occurred prior to the compliance date of the rules.  Therefore, we are modifying the proposed rules to require registrants to provide disclosure for historical fiscal year(s) only on a prospective basis, which will further limit the burdens on reporting companies or companies considering an IPO without unduly

---

balance sheet and three years of the financial statement effects that correspond to the income statement. *See* 17 CFR 210.3-01(a), 210.3-02(a).  An EGC may, in a Securities Act registration statement for the IPO of its equity securities, "provide audited statements of comprehensive income and cash flows for each of the two fiscal years preceding the date of the most recent audited balance sheet (or such shorter period as the registrant has been in existence)."  *See* 17 CFR 210.3-02(a).  A smaller reporting company is required to "file an audited balance sheet as of the end of each of the most recent two fiscal years, or as of a date within 135 days if the issuer has existed for a period of less than one fiscal year, and audited statements of comprehensive income, cash flows and changes in stockholders' equity for each of the two fiscal years preceding the date of the most recent audited balance sheet (or such shorter period as the registrant has been in business)."  *See* 17 CFR 210.8-02.

[2290]  *See* 17 CFR 210.14-01(d).  *See infra* section II.L.3 for further discussion of the decision not to provide an exemption or transitional relief for registrants engaged in an IPO.

[2291]  *See* 17 CFR 210.14-01(d).  *See, e.g.*, letter from KPMG ("[F]or initial public offerings of securities, we recommend that the Commission permit newly public companies on an ongoing basis to provide the proposed information only for the most recent fiscal year for which audited financial statements are included in the initial registration statement.").

[2292]  *See supra* note 2280.

compromising the intended benefit to investors. This modification, when combined with the phased in compliance dates for the final rules, will provide registrants with sufficient time to prepare their disclosures.

Finally, in response to a question raised by a commenter about whether the proposed financial statement disclosures would need to be restated or adjusted for historical periods if climate-related impacts are not identifiable until after the metrics are first reported,[2293] we are clarifying that registrants should apply the principles in FASB ASC Topic 250 *Accounting Changes and Error Corrections* or IFRS International Accounting Standard ("IAS") 8 *Accounting Policies, Changes in Accounting Estimates and Errors,* as appropriate, in these circumstances.

### 7. Inclusion of Disclosures in the Financial Statements (Rule 14-01(a))

#### a. Proposed Rules

The Commission proposed to require registrants to include the proposed financial statement metrics in the financial statements, which would result in the metrics being (i) included in the scope of any required audit of the financial statements in the relevant disclosure filing, (ii) subject to audit by an independent registered public accounting firm, and (iii) within the scope of the registrant's ICFR.[2294] The proposed disclosures shared many characteristics with other financial statement disclosures, and the proposed financial statement metrics would reflect financial data that is derived from the registrant's consolidated balance sheets, income statements, and statements of cash flows, and would be presented in a similar way to existing

---

[2293] *See supra* note 2285.

[2294] *See* Proposing Release, section II.F.5.

financial statement disclosures.[2295]  The Commission explained in the Proposing Release that requiring the proposed financial statement metrics to be included in a note to the financial statements, and therefore subject to audit and within the scope of ICFR, should enhance the reliability of the proposed financial statement metrics.[2296]

### b. Comments

As discussed above, a number of commenters stated that the proposed financial statement metrics should be included in the financial statements and subject to audit.[2297]  One commenter explained that subjecting the disclosures to audit would be important because "[a]s investors, we look to auditors to provide robustly independent challenge to ensure the assumptions and estimates underpinning the financial statements are sound, and the statements themselves provide a fair representation of the entity's economic health."[2298]  Another commenter stated that requiring the disclosures to be audited "will result in more decision useful information because investors can presume it to be accurate, truthful, and complete."[2299]  In response to a request for comment included in the Proposing Release, a few commenters stated that the proposed financial metrics should not be included in a separate or supplemental document instead of the financial

---

[2295]  *See id.*

[2296]  *See id.*

[2297]  *See supra* note 1715 and accompanying text.  *See also, e.g.*, letters from Anthesis; BC IM Corp.; Climate Accounting Audit Project; I. Millenaar; PwC (recommending that the Commission provide additional flexibility with respect to the placement of the disclosures within the notes to the financial statements because in some cases information may be more effectively presented together with other related disclosures instead of a climate-related footnote); and Third Coast.

[2298]  *See* letter from Sarasin.

[2299]  *See* letter from Sens. J. Reed, *et al.*

statements.[2300]  One of these commenters said that doing so "could send a perverse message that climate impacts are not financial or material for corporate earnings and financial condition, which would, in our view, be misleading."[2301]  One commenter suggested that the Commission apply the ICFR requirements set forth in Item 308 of Regulation S-K to the proposed financial statement metrics, if finalized.[2302]

Conversely, a number of commenters were opposed to including the financial impact of climate-related risks in the financial statements.[2303]  As discussed above, many commenters asserted the disclosures should instead be included in the MD&A section of a registrant's periodic reports.[2304]  Other commenters stated that the proposed disclosures should be included alongside the proposed amendments to Regulation S-K in the new climate-related discussion section.[2305]  A few commenters stated that if the Commission adopts the proposed financial statement metrics, then they should be provided in supplemental information or a schedule outside of the financial statements,[2306] although some of these commenters had different views

---

[2300]  *See, e.g.,* letters from Center Amer. Progress; CFA Institute; Sarasin ("While we can support a separate climate report that brings together all the material climate-related financial impacts, this should not replace the disclosures within the financial statements (including in the Notes) that appropriately reflect the financial consequences of these climate factors."); and TotalEnergies.  *See also* letter from CalSTRS ("We prefer the information to be included in existing reports instead of additional reports; companies already publish sustainability-related reports or webpages with climate information that is disconnected from financial data.").

[2301]  *See* letter from Sarasin (noting that there could be an argument for companies to both include climate impacts in their existing financial statements as proposed and publish a stand-alone audited climate report, which aggregates climate impacts).

[2302]  *See* letter from RSM US LLP.

[2303]  *See, e.g.,* letters from ACLI; AFEP; APCIA; Cleveland Cliffs; Cohn Rez.; D. Burton, Heritage Fdn.; NAFO; Nutrien; and Western Midstream.

[2304]  *See supra* note 1724 and accompanying text.

[2305]  *See* letter from AFPA; Autodesk; D. Burton, Heritage Fdn.; NAFO; NAM; GPA Midstream; and Southwest Air.

[2306]  *See, e.g.*, letters from AutoDesk; BIO; Eni Spa (noting that the financial assumptions impacted by climate-related events should nevertheless be included in the notes to the financial statements); McCormick; Nutrien; and Soros Fund.

about whether disclosure in a supplemental schedule should be subject to audit and ICFR requirements.[2307]  Some commenters stated that the Commission should consider including the proposed disclosures outside of Form 10-K in an alternative report.[2308]

Other commenters generally stated that if the Commission adopts the proposed financial statements metrics they should be exempted from the audit requirement.[2309]  One of these commenters noted that "[d]ata processes and controls over climate-related information are not as mature as financial reporting processes and controls" and "[t]o mature these processes and controls to a level of audit readiness will take significant time."[2310]  A few commenters stated that the proposed disclosure requirements did not have to be included in an audited note to the financial statements to be "valid and reliable."[2311]  Similarly, one commenter stated that disclosures included in a Commission filing but outside of the audited financial statements would be subject to "the existing level of oversight, regulation, and liability associated with [Commission] filings."[2312]  One commenter stated that the Commission should exclude the proposed rules from ICFR requirements until the Commission has established appropriate guidelines for audit and assurance.[2313]

---

[2307]  *See* letters from CEMEX (disclosures should be subject to audit and ICFR requirements); Eni Spa (disclosures should not be subject to audit but should be subject to ICFR requirements); and BIO (disclosures should not be subject to audit or ICFR requirements).

[2308]  *See* letters from AAFA; AHLA; Allstate; Eversource; FedEx; and NRF.  *See also* letter from ICI (recommending that the Commission require a registrant to provide material climate-related disclosures in Commission filings and require a registrant to furnish any additional mandated information that the registrant determines is not material in a new climate report).

[2309]  *See, e.g.*, letters from AFPA; AGCA; APCIA; Chamber; Cleco; Climate Risk Consortia; NAM; NMHC, *et al.*; and SIA.

[2310]  *See* letter from SIA.

[2311]  *See* letter from Cleco; and EEI & AGA.

[2312]  *See* letter from Connor Grp.

[2313]  *See* letter from BIO.

Other commenters suggested that the Commission defer making a determination about audit and ICFR requirements for the proposed financial statement disclosures. For example, one commenter suggested that the Commission defer making a determination until after issuers have had an opportunity to familiarize themselves with any new requirements.[2314] In addition, one commenter stated that the Commission should not impose any financial statement disclosure requirements or require certifications pursuant to the Sarbanes-Oxley Act until generally accepted accounting rules have been established by the FASB.[2315] A few commenters suggested including the proposed financial statement metrics outside of the financial statements initially with a transition to the financial statements.[2316]

A few commenters stated that PCAOB auditing standards would be applicable or should be applied to the proposed financial statement metrics.[2317] A number of commenters asserted that it would be necessary to develop additional guidance regarding the application of PCAOB auditing standards to the proposed financial statement metrics.[2318] One commenter stated that guidance would be helpful to registrants because it would "better enable them to effectively obtain or prepare necessary data, information and analysis, and for auditors to obtain sufficient appropriate audit evidence related to these metrics."[2319] Some commenters suggested particular standards for which additional specific guidance would be needed for the proposed financial

---

[2314] *See* letter from TIAA.

[2315] *See* letter from RILA. *See also* letter from Climate Risk Consortia (stating it would be premature to require an audit because the FASB "has not yet developed climate accounting standards for GAAP").

[2316] *See* letters from CFA Institute; and USGBC.

[2317] *See, e.g.,* letters from CAQ; CEMEX; and ERM CVS.

[2318] *See, e.g.,* letters from ABA; Baker Tilly; BOA; CalPERS ("The Commission would have to instruct the PCAOB to prioritize the development and adoption of standards for auditing such metrics."); Climate Accounting Audit Project (noting that additional guidance may be required with respect to already existing auditor obligations as well); Eni Spa; ERM CVS; Mazars; RSM US LLP; Sarasin; and Williams Cos.

[2319] *See* letter from Mazars.

statement metrics.[2320]  For example, one commenter asserted additional guidance was needed regarding PCAOB Auditing Standard (AS) 2105, *Consideration of Materiality in Planning and Performing an Audit*, because "if the proposed one percent disclosure threshold for disclosure of climate-related impacts on the financial statement line items is not considered material, current PCAOB auditing standards may not require the auditor to perform audit procedures for those disclosures."[2321]

Some commenters agreed that additional guidance and auditing standards may be needed, but did not identify particular standards for which guidance is needed.[2322]  More generally, one commenter stated that the PCAOB should provide guidance to auditors regarding what is expected and then should undertake reviews to ensure proper implementation.[2323]  Another commenter suggested that the PCAOB should issue guidance confirming existing audit requirements regarding the consideration of material climate risk and should increase its focus on this issue during the auditor inspection process.[2324]  Conversely, one commenter asserted that the proposed financial impact disclosures would leave auditors open to "second guessing" during the PCAOB inspection process.[2325]

---

[2320]  *See, e.g.*, letters from Baker Tilly (identifying PCAOB Auditing Standards (AS) 2105); ERM CVS (identifying AS 1200, AS 1201, AS 1205, AS 1210, AS 2100, AS 2101, AS 2105, AS 2200, AS 2400, and AS 2800); and RSM US LLP (identifying AS 2105).

[2321]  *See* letter from RSM US LLP.  *See also* letters from CAQ (noting that there could be a situation where the climate-related metrics are in scope for the audit, but the underlying financial statement line items ordinarily would not be because of the risk assessment judgments made by the auditor and therefore auditors may decide to scope in these lower risk accounts, which could create significant inefficiencies and increased audit costs with minimal benefits for investors); and Baker Tilly (stating that some of the items within the proposed financial statement metrics might not be part of significant, in-scope accounts subject to PCAOB auditing standards).

[2322]  *See, e.g.*, letters from BOA; Climate Accounting Audit Project; Eni Spa; Mazars; Sarasin; and Williams Cos.

[2323]  *See* letter from Sarasin.

[2324]  *See* letter from Climate Accounting Auditing Project.

[2325]  *See* letter from Chamber.

538

Another commenter suggested that the audits of any expenditures and costs related to severe weather events and other natural conditions should be a separate assurance engagement outside of the scope of the current financial statement and internal controls audits and that these separate engagements should be governed by clearly defined weather-related cost accounting standards and an appropriately tailored PCAOB assurance standard that provides implementation examples.[2326] One commenter suggested that the Commission consider allowing sustainability consultants or experts outside of the traditional accounting sector to audit the proposed financial statement metrics.[2327] Another commenter stated that it may be necessary for an auditor to tailor its audit opinion to explain that the note to the financial statements was not prepared in accordance with IFRS disclosure requirements, but in accordance with Commission disclosure requirements and based upon financial statement information prepared in accordance with IFRS.[2328]

Alternatively, some commenters asserted that there are no clearly established auditing standards for registrants with respect to the proposed financial statement metrics.[2329] One commenter argued that "[g]iven the subjectivity inherent in assigning the required quantitative financial impacts, it is unclear how auditors will evaluate and subsequently provide assurance with respect to these decisions and the associated disclosures."[2330] Another commenter

---

[2326] *See* letter from Cohn Rez.

[2327] *See* letter from I. Millenaar.

[2328] *See* letter from CFA Institute.

[2329] *See, e.g.*, letters from FedEx; G. Farris; Marathon; NAM; and Sullivan Cromwell.

[2330] *See* letter from NAM.

suggested that it would be preferable to include the proposed financial statement metrics outside of the financial statements to avoid "distracting" the PCAOB from its "core mission."[2331]

With respect to timing, one commenter stated that any changes to PCAOB standards would need to be implemented and effective before the proposed disclosures are required to be included in the audited financial statements.[2332]  Another commenter stated that the Commission will have to instruct the PCAOB to prioritize the development and adoption of standards for auditing the proposed financial statement metrics.[2333]  Another commenter asserted that the proposed timeline for adoption of final rules would not provide issuers with enough time to integrate a robust ICFR framework for the proposed financial impact metrics that would be auditable.[2334]

In the Proposing Release,  the Commission solicited comment on whether it would be clear that the proposed climate-related financial statement metrics would be included in the scope of the audit when the registrant files financial statements prepared in accordance with IFRS as issued by the IASB, and whether it would be clear that the proposed rules would not alter the basis of presentation of financial statements as referred to in an auditor's report.[2335]  The Commission also solicited comment on whether it should amend Form 20-F, or other forms, to clarify the scope of the audit or the basis of presentation.[2336]  In response, one commenter asserted that disclosure of the basis of presentation is important for understanding and

---

[2331]    *See* letter from D. Burton, Heritage Fdn.

[2332]    *See* letter from RSM US LLP.

[2333]    *See* letter from CalPERS.

[2334]    *See* letter from G. Farris.

[2335]    *See* Proposing Release, section II.F.5.

[2336]    *See id.*

comparability, and noted that since the basis of presentation of climate-related financial metrics may be different from the basis of presentation of the financial statements due to boundary differences, there should be disclosure when these differ.[2337]  One commenter stated that the Commission should amend Form 20-F and other forms to make it clear that the scope of the audit must include the proposed financial statement footnote.[2338]  On the other hand, one commenter stated that the scope of the audit is clear, and therefore it did not believe it was necessary to amend Form 20-F.[2339]  One commenter asserted that the proposed climate-related financial statement metrics and related audit requirements for foreign filers should align with those for domestic filers.[2340]  Another commenter stated that foreign private issuers should be allowed to disclose the proposed financial statement metrics as unaudited supplemental financial information.[2341]

Some commenters stated that the audit and ICFR assessment required for the proposed financial statement metrics would result in significant costs for registrants[2342] or would result in an increase in audit fees for registrants.[2343]  A few commenters stated that they expected the audit costs would be higher than the estimated amount included in the proposal.[2344]  For example, a registrant stated that its auditors estimated the cost of the audit to be within the range

---

[2337]  *See* letter from ERM CVS.

[2338]  *See* letter from Center Amer. Progress.

[2339]  *See* letter from Eni Spa.

[2340]  *See* letter from RSM US LLP.

[2341]  *See* letter from Abrasca.

[2342]  *See, e.g.*, letters from AAR; Airline for America; Autodesk; NAM; Occidental Petroleum; Reinsurance AA; and Williams Cos.

[2343]  *See, e.g.*, letters from Alliance Resource; Crowe; Mazars; and Shell.

[2344]  *See, e.g.*, letters from AAR; BDO USA LLP; Business Roundtable; Cohn Rez.; EEI & AGA; and Nutrien.

Appellate Case: 24-1628     Page: 546     Date Filed: 03/26/2024 Entry ID: 5377362

of $70,000 to $225,000 per year.[2345] One commenter stated that registrants' audit fees would increase "due to the significant level of assurance required based on the low thresholds applied."[2346] Another commenter stated that the costs of the audit will depend on the granularity and complexity of the information required.[2347] One commenter stated if specialists are needed this would increase the cost of the audit for companies.[2348] Another commenter stated that the costs would be out of proportion to the value of the information to investors.[2349] Other commenters stated that it is likely that the costs of auditing the proposed financial statement footnotes would decrease[2350] or stabilize[2351] over time like other areas of audit work.

Finally, some commenters observed that the safe harbor established by the Private Securities Litigation Reform Act (PSLRA) does not apply to forecasting information in the financial statements and urged the Commission to include a safe harbor for any forward-looking financial disclosures included in the financial statements and footnotes.[2352] Other commenters generally recommended including a safe harbor for the proposed financial statement metrics and did not appear to limit their recommendation to only forward-looking statements.[2353] Commenters generally claimed that a safe harbor was necessary to protect registrants from

---

[2345] *See* letter from Nutrien.

[2346] *See* letter from Shell.

[2347] *See* letter from Eni Spa.

[2348] *See* letter from CEMEX.

[2349] *See* letter from Shearman Sterling.

[2350] *See, e.g.,* letters from Eni Spa; and Mazars.

[2351] *See* letter from CEMEX.

[2352] *See, e.g.,* letters from Cleary Gottlieb; IIB; NMA; and Soc. Corp. Gov.

[2353] *See, e.g.,* letters from APCIA; AAFA; BIO; BOA; Can. Bankers; Devon Energy; FedEx; IC; IIF; KPMG; LTSE; NAM; NMA; NMHC, *et al.*; Southside Bancshares; and TotalEnergies.

liability in light of the estimates, judgments, and assumptions that would be required to disclose the proposed financial statement metrics.[2354]

### c. Final Rules

As explained above, we believe it is appropriate to require that the financial statement effects disclosure we are adopting be presented in a note to the financial statements (Rule 14-01(a)).[2355]  Identifying a specific location for the disclosures – a note to the financial statements – will make the information more accessible for investors.[2356]  In addition, we agree with the commenter that stated that including the disclosure of the financial statement effects in the financial statements will facilitate investor decision-making.[2357]  As is true of any disclosures included in the financial statements, subjecting the required disclosures to a financial statement audit and registrants' ICFR will enhance the reliability of that information.  The scope of the final rules is significantly narrower than the proposal and requires the disclosure of costs and expenditures for transactions that are currently recorded in registrants' books and records and materially impacted financial estimates and assumptions.  These modifications will ease many of the burdens that registrants identified with respect to requiring the disclosures to be subject to audit and ICFR.

We considered the various alternatives suggested by commenters, including whether to require the disclosure of financial statement effects to be provided in supplemental information

---

[2354]    *See, e.g.,* letters from BOA; LTSE; NAM; Soc. Corp. Gov.; and TotalEnergies.

[2355]    *See* 17 CFR 210.14-01(a).

[2356]    *See, e.g.,* letters from PGIM; and UAW Retiree.  *See also* IAC Recommendation (indicating its support for requiring the presentation of disclosures in the financial statements and stating "[m]aking this information available in a predictable way that is consistent with the location of other important data helps achieve the goal of consistent dissemination of this important information").

[2357]    *See* letter from Sarasin.

or a schedule outside of the financial statements.[2358]  The financial statement disclosures we are adopting, however, present financial information that is derived from registrants' books and records and is already included in registrants' financial statements.  Therefore, presenting this information in a note to the financial statements, consistent with other financial statement disclosures, will enhance its accessibility and usefulness for investors.  We do not think it would be appropriate to exempt these financial statement disclosures from audit or ICFR requirements.  Providing an exemption from audit or ICFR for the financial statement disclosure requirements in the final rules could confuse investors about which parts of the financial statements are covered by audit and ICFR.  Nevertheless, the phase in periods provided for in the final rules should give registrants and their auditors time to familiarize themselves with the new requirements before the compliance date and should help to mitigate the concerns raised by commenters.

With respect to auditing standards, PCAOB standards can and will apply to the financial statement disclosures included in a note to the financial statements.  We understand that a number of commenters raised concerns about applying PCAOB standards and stated that additional guidance would be needed.[2359]  The modifications made to the final rules to narrow their scope to capitalized costs, expenditures expensed, charges, and losses derived from transactions and amounts recorded in registrant's books and records underlying the financial statements and materially impacted estimates and assumptions, along with the Commission's adoption of an attribution principle, will help to mitigate commenters' concerns about the auditability of the disclosures.  In light of these modifications, we expect that including the

---

[2358]    *See supra* notes 2306 and 2308 and accompanying text.

[2359]    *See, e.g.*, *supra* note 2318 and accompanying text.

financial statement note as part of the audited financial statements will allow the disclosures to be readily incorporated into the scope of the financial statement and ICFR audits that registrants currently obtain and that existing PCAOB auditing standards will readily apply.

Several commenters raised concerns about how auditors would address the one percent disclosure threshold when considering materiality in planning and performing an audit.[2360] Auditors should apply the concepts of materiality in PCAOB AS 2105, *Consideration of Materiality in Planning and Performing an Audit,* to the rules we are adopting. In applying the concept of materiality, auditors should remain alert for misstatements that could be material due to quantitative or qualitative factors and lesser amounts of misstatement could influence the judgment of a reasonable investor because of qualitative factors.[2361] Under PCAOB Auditing Standards, auditors should also evaluate whether, in light of particular circumstances, there are certain accounts or disclosures for which there is a substantial likelihood that misstatements of lesser amounts than the materiality level established for the financial statements as a whole would influence the judgment of a reasonable investor. If so, the Auditing Standards provide that the auditor should establish separate materiality levels for those accounts or disclosures to plan the nature, timing, and extent of audit procedures for those accounts or disclosures.[2362] Additionally, there are numerous rules in Regulation S-X as well as other disclosure requirements within GAAP that include a percentage disclosure threshold.[2363] Based on staff

---

[2360] *See supra* note 2321 and accompanying text.

[2361] *See* PCAOB AS 2105, paragraph .03.

[2362] *See id.*, paragraph .07.

[2363] *See, e.g., supra* note 2063 and accompanying text; FASB ASC 280-10-50-12 (requiring the reporting of separate information about an operating segment that meets certain quantitative thresholds), 280-10-50-14

experience, we understand that auditors have developed procedures for auditing such disclosures and have not claimed an inability to audit that information. We expect auditors similarly will be able to apply the concepts of materiality and to audit the financial statement disclosures included in the final rules, particularly given the final rules' narrower scope. Therefore, there is no need to delay the requirement to obtain an audit or exclude the financial statement disclosures from the scope of the audit or the registrants' ICFR. The rules we are adopting will provide the suitable criteria necessary for the disclosures to be subject to audit. Nevertheless, the Commission will work with the PCAOB to address any issues that come to light regarding the auditing of this information and will consider issuing additional guidance to the extent needed and helpful.

Finally, we do not agree with the commenter who suggested that consultants or experts outside of the traditional accounting sector should be allowed to audit the proposed financial statement disclosures.[2364] The auditor's unqualified opinion contains an expression of opinion on the financial statements, taken as a whole, which refers to a complete set of financial statements, including the related financial statements notes and any related schedules.[2365] As

---

(stating that if total of external revenue reported by operating segments constitutes less than 75% of total consolidated revenue, additional operating segments shall be identified as reportable segments (even if they do not meet the criteria in paragraph 280-10-50-12) until at least 75% of total consolidated revenue is included in reportable segments), 280-10-50-42 (stating, among other things, that if revenues from transactions with a single external customer amount to 10% or more of a public entity's revenues, the public entity shall disclose that fact, the total amount of revenues from each such customer, and the identity of the segment or segments reporting the revenues), and 323-10-50-3 (requiring, among other things, disclosure of the names of any significant investee entities in which the investor holds 20% or more of the voting stock, but the common stock is not accounted for on the equity method, together with the reasons why the equity method is not considered appropriate, and the names of any significant investee corporations in which the investor holds less than 20% of the voting stock and the common stock is accounted for on the equity method, together with the reasons why the equity method is considered appropriate).

[2364] *See supra* note 2327 and accompanying text.

[2365] See PCAOB AS 3101, paragraph .08, The Auditor's Report on an Audit of the Financial Statements When the Auditor Expresses an Unqualified Opinion.

App.546

Appellate Case: 24-1628    Page: 551    Date Filed: 03/26/2024 Entry ID: 5377362

stated above, we expect that the audit procedures applied to the financial statement note will be incorporated into the scope of registrants' current financial statement and internal controls audit and therefore PCAOB-registered public accounting firms will be able to apply sufficient, appropriate audit procedures to these disclosures as required by law.[2366]  Moreover, PCAOB-registered accounting firms are subject to periodic inspection by the PCAOB and are required to comply with PCAOB rules, including a requirement to establish a system of quality control that is implemented throughout the accounting firm, which will enhance investors' confidence in the accuracy of registrants' disclosures.

However, this does not mean that the auditor cannot use the work of an auditor specialist while performing its work if the auditor determines doing so would be appropriate in accordance with applicable auditing standards.  PCAOB AS 2101, paragraph .16, *Audit Planning*, states that auditors should determine whether specialized skill or knowledge, such as an auditor specialist, is needed to perform the appropriate risk assessments, plan or perform audit procedures, or evaluate audit results.  Auditors may use the work of auditors' specialists to assist in their evaluation of significant accounts and disclosures, including accounting estimates.  In doing so, auditors consider the requirements within PCAOB AS 1201, *Supervision of the Audit Engagement*, when using the work of auditor-employed specialists, and AS 1210, *Using the Work of an Auditor-Engaged Specialists*, when using the work of an auditor engaged specialist, as appropriate.

---

[2366]    *See* 15 U.S.C. 7212 ("It shall be unlawful for any person that is not a registered public accounting firm to prepare or issue, or to participate in the preparation or issuance of, any audit report with respect to any issuer, broker, or dealer.").  *See also* letter from CalPERS ("We expect that the regular auditor will do the audit.").

The Commission received mixed feedback about whether it would be clear that: (i) the financial statement disclosure requirements would be included in the scope of the audit when a registrant files financial statements prepared in accordance with IFRS as issued by the IASB, and (ii) the proposed rules would not alter the basis of presentation of financial statements as referred to in an auditor's report.[2367]  Therefore, we are clarifying that the financial statement disclosure requirements we are adopting in this release must be included in the scope of the audit when a registrant files financial statements in accordance with IFRS as issued by the IASB.  We believe that these disclosures are important and should be required regardless of the GAAP followed. Furthermore, registrants that file financial statements prepared using IFRS as issued by the IASB are subject to the existing requirement to comply with Regulation S-X,[2368] and we are not aware of any policies that would prevent registrants from including the financial statement disclosures in a note in the financial statements prepared in accordance with IFRS as issued by the IASB. Further, the final rules will not alter the basis of presentation of financial statements referred to in an auditor's report.  The instructions to Form 20-F make it clear that the issuer's financial statements must be audited in accordance with PCAOB standards.[2369]  PCAOB AS 3101.08 states that the first section of the auditor's report must include a "statement identifying each financial statement and any related schedule(s) that has been audited" and a "statement indicating that the financial statements, including the related notes and any related schedule(s),

---

[2367]   *See supra* notes 2337-2339 and accompanying text.

[2368]   See Acceptance from Foreign Private Issuers of Financial Statements Prepared in Accordance with International Financial Reporting Standards Without Reconciliation to U.S. GAAP, Rel. No. 33-8879 (Dec. 21, 2007) [73 FR 986, 999 n.136 (Jan. 4, 2008)] (stating that "Regulation S–X will continue to apply to the filings of all foreign private issuers, including those who file financial statements prepared using IFRS as issued by the IASB," but providing that such issuers "will comply with IASB requirements for form and content within the financial statements, rather than with the specific presentation and disclosure provisions in Articles 4, 5, 6, 7, 9, and 10 of Regulation S-X").

[2369]   *See, e.g.*, General Instruction E(c)(2) and Instruction 2 to Item 8.A.2 of Form 20-F.

548

identified and collectively referred to in the report as the financial statements, were audited."[2370] As the disclosure requirements we are adopting will be included in a note to the foreign private issuer's financial statements and based on information that is recognized and measured in the foreign private issuer's financial statements in accordance with IFRS as issued by the IASB, they will be within the scope of the statement by the registrant's auditor that the financial statements "including any related notes" were audited.

A number of commenters provided feedback on the cost of the audit for the proposed financial statement metrics and some of these commenters suggested that the estimate included in the proposal was too low[2371] or that the proposed financial statement metrics would result in significant fees or an increase the cost of the audit.[2372] Given the narrower scope of the final rules and their focus on costs and expenditures for transactions that are currently recorded in registrants' books and records and material impacts to financial estimates and assumptions rather than the proposed Financial Impact Metrics, we expect any increases to the cost of the audit due to the financial statement disclosures will be relatively modest for most companies.[2373] In addition, we agree with those commenters that stated the costs of auditing the proposed note to the financial statements would likely decrease or stabilize over time like other areas of audit work.[2374] The financial statement disclosures we are adopting share many similarities with other disclosures in the financial statements, in particular because they are based in transactions

---

[2370]    *See* PCAOB AS 3101, paragraph .08.

[2371]    *See supra* note 2344 and accompanying text.

[2372]    *See supra* notes 2343 and accompanying text.

[2373]    *See infra* section IV.C.3.b.v.

[2374]    *See supra* notes 2350-2351 and accompanying text.

currently recorded in registrants' books and records, and therefore the cost trajectory for auditing should be similar over time.

Finally, a number of commenters argued that the Commission should adopt a safe harbor for the financial statement metrics.[2375]  Some of these commenters limited their request to forward-looking financial disclosures included in the financial statements, while other commenters did not appear to limit their request for a safe harbor to forward-looking financial disclosures.  By narrowing the scope of financial statement disclosures and focusing on costs and expenditures for transactions that are currently recorded in registrants' books and records and material financial estimates and assumptions, the final rules avoid many of the complexities associated with the proposed rules and therefore we do not think it would be necessary or appropriate to adopt a safe harbor for the financial statement disclosures.

## L.  Registrants Subject to the Climate-Related Disclosure Rules and Affected Forms

### 1.  Proposed Rules

The Commission proposed to apply the proposed climate-related disclosure rules to a registrant with Exchange Act reporting obligations pursuant to Exchange Act section 13(a)[2376] or section 15(d)[2377] and companies filing a Securities Act or Exchange Act registration statement.[2378]  The Commission proposed to require such registrants to include climate-related

---

[2375]    *See supra* notes 2353 and accompanying text.

[2376]    15 U.S.C. 78m(a).

[2377]    15 U.S.C. 78o(d).

[2378]    *See* Proposing Release, section II.J.

App.550

Appellate Case: 24-1628    Page: 555    Date Filed: 03/26/2024 Entry ID: 5377362

disclosures, including the proposed financial statement metrics,[2379] in Securities Act or Exchange Act registration statements (Securities Act Forms S-1, F-1, S-3, F-3, S-4, F-4, and S-11, and Exchange Act Forms 10 and 20-F)[2380] and Exchange Act annual reports (Forms 10-K and 20-F). Similar to the treatment of other important business and financial information, the proposed rules also required registrants to disclose any material change to the climate-related disclosures provided in a registration statement or annual report in their Form 10-Q (or, in certain circumstances, Form 6-K for a registrant that is a foreign private issuer that does not report on domestic forms).[2381]

---

[2379]   *See* Form 20-F, General Instruction B(d) (stating that Regulation S-X applies to the presentation of financial information in the form). Although Item 17 and 18 of Form 20-F, and the forms that refer to Form 20-F (including Forms F-1 and F-3) permit a foreign private issuer to file financial statements prepared in accordance with IFRS as issued by the IASB, proposed Article 14 disclosure was nevertheless required (similar to disclosure required by Article 12 of Regulation S-X). *See Acceptance from Foreign Private Issuers of Financial Statements Prepared in Accordance with International Financial Reporting Standards Without Reconciliation to U.S. GAAP*, Rel. No. 33-8879 (Dec. 21, 2007) [73 FR 986 (Jan. 4, 2008)], 999, note 136 (stating that "Regulation S–X will continue to apply to the filings of all foreign private issuers, including those who file financial statements prepared using IFRS as issued by the IASB," but providing that such issuers "will comply with IASB requirements for form and content within the financial statements, rather than with the specific presentation and disclosure provisions in Articles 4, 5, 6, 7, 9, and 10 of Regulation S-X").

[2380]   Form 20-F is the Exchange Act form used by a foreign private issuer for its annual report or to register a class of securities under section 12 of the Exchange Act. We proposed to amend Part I of Form 20-F to require a foreign private issuer to provide the climate-related disclosures pursuant to the proposed rules either when registering a class of securities under the Exchange Act or when filing its Exchange Act annual report. The proposed rules further required a foreign private issuer to comply with the proposed rules when filing a Securities Act registration statement on Form F-1. Because Form F-1 requires a registrant to include the disclosures required by Part I of Form 20-F, the proposed amendment to Form 20-F rendered unnecessary a formal proposed amendment to Form F-1. We similarly did not propose to formally amend Forms S-3 and F-3 because the climate-related disclosure would be included in a registrant's Form 10-K or 20-F annual report that is incorporated by reference into those Securities Act registration statements.

[2381]   Form 6-K is the form furnished by a foreign private issuer with an Exchange Act reporting obligation if the issuer: (i) makes or is required to make the information public pursuant to the law of the jurisdiction of its domicile or in which it is incorporated or organized, or (ii) files or is required to file the information with a stock exchange on which its securities are traded and which was made public by that exchange, or (iii) distributes or is required to distribute the information to its security holders. *See* General Instruction B to Form 6-K. That instruction currently lists certain types of information that are required to be furnished pursuant to subparagraphs (i), (ii), and (iii), above. While we proposed to amend Form 6-K to add climate-related disclosure to the list of the types of information to be provided on Form 6-K, we explained that a foreign private issuer would not be required to provide the climate-related disclosure if such disclosure is not required to be furnished pursuant to subparagraphs (i), (ii), or (iii) of General Instruction B.

The Commission proposed to amend Form 20-F and the Securities Act forms that a foreign private issuer may use to register the offer and sale of securities under the Securities Act to require the same climate-related disclosures as proposed for a domestic registrant.[2382]  The Commission explained that, because climate-related risks potentially impact both domestic and foreign private issuers regardless of the registrant's jurisdiction of origin or organization, requiring that foreign private issuers provide this disclosure is important to achieving the Commission's goal of more consistent, reliable, and comparable information across registrants.[2383]  The Proposing Release further noted that Form 20-F imposes substantially similar disclosure requirements as those required for Form 10-K filers on matters that are similar and relevant to the proposed climate-related disclosures, such as risk factors and MD&A.[2384]

The Commission proposed to exempt SRCs from the proposed Scope 3 emissions disclosure requirement.  SRCs would otherwise be subject to all of the proposed rules.  The Commission did not propose to exempt EGCs from the proposed rules noting that, due to their broad impact across industries and jurisdictions, climate-related risks may pose a significant risk to the operations and financial condition of registrants, both large and small.[2385]  The Commission did, however, solicit comment on whether the proposed rules should apply to EGCs or to other issuers, such as business development companies ("BDCs").[2386]

---

[2382]   *See* Proposing Release, section II.J.

[2383]   *See id.*

[2384]   *See id.*

[2385]   *See* Proposing Release, section II.J.

[2386]   A BDC is a closed-end investment company that has a class of its equity securities registered under, or has filed a registration statement pursuant to, section 12 of the Exchange Act, and elects to be regulated as a business development company.  *See* section 54 of the Investment Company Act, 15 U.S.C. 80a-53.  Like other section 12 registrants, BDCs are required to file Exchange Act annual reports.

App.552

Appellate Case: 24-1628     Page: 557     Date Filed: 03/26/2024 Entry ID: 5377362

The proposed climate-related disclosure rules would not have applied to asset-backed issuers. The proposed rules also would not have required the proposed disclosures on the following forms, although the Commission solicited comment regarding such application:

- Form 40-F, the Exchange Act form used by a Canadian issuer eligible to report under the Multijurisdictional Disclosure System ("MJDS") to register securities or to file its annual report under the Exchange Act;

- Form S-8, the Securities Act form used to register securities pursuant to an employee benefit plan; and

- Form 11-K, the Exchange Act form used for annual reports with respect to employee stock purchase, savings, and similar plans.[2387]

The Commission also requested comment on whether the Commission should exclude Securities Act registration statements filed in connection with a registrant's IPO from the scope of the proposed climate-related disclosure rules instead of including them, as proposed.[2388] The Commission further solicited comment on whether to require climate-related disclosure on Forms S-4 and F-4, as proposed. Specifically, the Commission requested comment on whether it should provide transitional relief for recently acquired companies such that registrants would not be required to provide the climate-related disclosures for a company that is the target of a proposed acquisition under Form S-4 or F-4 until the fiscal year following the year of the acquisition if the target company is not an Exchange Act reporting company and is not the subject of foreign or alternative climate-related disclosure requirements that are substantially similar to the Commission's proposed requirements.

---

[2387] *See* Proposing Release, section II.J.

[2388] *See id.*

## 2. Comments

Many commenters supported the proposal to include the climate-related disclosures in Securities Act and Exchange Act registration statements and Exchange Act annual reports.[2389] One commenter stated that it supported the placement of the climate-related disclosures in a company's annual report or registration statement instead of in a separate report because of its belief in integrated reporting, which facilitates a better understanding of a business.[2390] Another commenter stated that inclusion of the proposed climate-related disclosures in registrants' annual reports and registration statements will dramatically improve the transparency of climate-related issues that affect registrants to the securities markets and drive consistency with which such data is prepared, presented, and audited.[2391]

Many other commenters opposed requiring the climate-related disclosures to be included in existing forms and recommended that some or all of the climate-related disclosures be included in a new and separately furnished form.[2392] Some commenters stated that GHG emissions disclosures should be furnished on a separate form, which would be due after the deadline for a registrant's Exchange Act annual report, among other reasons, to better align this disclosure with GHG emissions reporting pursuant to the EPA's Greenhouse Gas Reporting Program ("GHGRP").[2393] Other commenters asserted that climate information that was "beyond that traditionally required for other risk factors" should be furnished supplementally on a new

---

[2389] *See, e.g.*, letters from Amer. for Fin. Reform, Sunrise Project *et al.*; Bloomberg; Boston Common Asset Mgmt.; CalPERS; CalSTRS; CEMEX; CFA; NY SIF; TotalEnergies; Unilever; and Xpansiv.

[2390] *See* letter from Unilever.

[2391] *See* letter from Xpansiv.

[2392] *See, e.g.*, letters from Amer. Chem. Council; API; BlackRock; Chevron; D. Hileman Consulting; FedEx; NRF; and RILA.

[2393] *See, e.g.*, letters from Amer. Bankers; ConocoPhillips; GM; and PIMCO.

form.[2394]  Still other commenters, pointing to what they characterized as the rules' novelty and complexity, stated that most of the required climate disclosures should be furnished on one or more separate forms.[2395]

One commenter opposed requiring climate-related disclosures in Securities Act registration statements unless the disclosures are incorporated by reference from another filing (e.g., from Form 10-K or 20-F).[2396]  This commenter stated that excluding climate disclosures from these registration statements would prevent the climate disclosure rules from acting as a barrier to entry to the capital markets or unnecessarily delaying a pending merger and/or acquisition ("M&A") transaction.[2397]

Commenters offered varied input on the application of the proposed rules to SRCs.  Some commenters supported exempting SRCs from all of the proposed climate-related disclosure requirements[2398] on the grounds that the compliance burden would be disproportionately greater for SRCs, as a proportion of overall revenue.[2399]  One commenter suggested that SRCs should be allowed to opt-out of climate disclosures for a period of ten years following an evaluation of certain factors, including the proportion of public investors and other metrics related to the

---

[2394]    *See, e.g.*, letter from Amer. Chem. Council. *See also* BlackRock (recommending that certain GHG metrics and information on internal carbon pricing, scenario analyses, transition plans and climate-related targets or goals be furnished supplementally on a new form).

[2395]    *See, e.g.*, letters from API; Chevron; D. Hileman Consulting (stating that GHG emissions disclosures should be reported on one separate form and disclosures pertaining to climate-related risks, impacts, governance, risk management, and targets and goals should be reported on another separate form.); FedEx; NRF; and RILA.

[2396]    *See* letter from PwC.

[2397]    *See id.*

[2398]    *See, e.g.*, letters from Baker Tilly; BIO; BDO USA LLP; MD State Bar; Securities Law Comm.; and Volta.

[2399]    *See, e.g.*, letters from OTC Markets; UPS; and Nasdaq.

Appellate Case: 24-1628     Page: 560     Date Filed: 03/26/2024 Entry ID: 5377362

registrant's climate impact.[2400]  Many commenters[2401] supported the proposed exemption for

Scope 3 emissions included in the proposed rules, asserting that SRCs will face significant data

collection and reporting costs[2402] and that SRCs need time to implement new technologies that

will aid data collection and reporting.[2403]  Other commenters further stated that the Commission

was underestimating these compliance costs and the resultant burdens it would impose on

SRCs.[2404]  A number of commenters supported the proposed exemption for SRCs given the risk

that the reporting burden would be passed to smaller downstream companies and urged the

Commission to consider the impact of its climate disclosure requirements on those entities when

considering exemptions for SRCs.[2405]

Some commenters stated that the proposed rules would discourage private companies

from joining the public markets due to the high cost of complying with climate disclosures.[2406]

Other commenters urged the Commission to ameliorate the compliance costs for newly public

companies by implementing exemptions for EGCs[2407] and recommended that the Commission

offer a phase in for newly public companies until the end of the first full fiscal year after going

---

[2400] *See, e.g.*, letter from Cohn Rez.

[2401] *See, e.g.*, letters from AIMA; Dechert; ICBA; Fidelity; and SIA.

[2402] *See, e.g.*, letter from Fortive. ("Notwithstanding the proposed exemption for smaller reporting companies, the administrative and financial costs associated with collecting and measuring such data would be particularly burdensome for many registrants that currently do not report such information on a voluntary basis, especially small, medium-sized and newly reporting companies.")  *See also* letters from NAHB; and ICSWG.

[2403] *See, e.g.*, letter from AEM.

[2404] *See, e.g.*, letters from Baker Tilly US LLP (June 17, 2022) ("Baker Tilly"); BIO; and J. Herron.

[2405] *See, e.g.*, letters from ARA et al.; FPA; and HAAA.

[2406] *See, e.g.*, letters from OTC Markets; MD State Bar; Securities Law Comm.; and NAHB.

[2407] *See, e.g.*, letter from Connor Group.

public.[2408]  Others recommended scaling and delaying the compliance requirements for both EGCs and SRCs.[2409]

A number of commenters opposed providing exemptions for SRCs, in particular for some or all of the proposed GHG requirements.[2410]  Some of these commenters instead favored longer compliance deadlines to ease the compliance burden for registrants, including SRCs,[2411] while other commenters asserted that it was important not to exempt SRCs indefinitely from the requirement to disclose GHG emissions, particularly because this class of registrants is a significant portion of public companies.[2412]  Another commenter stated that SRCs have disproportionately higher exposure to climate-related risk, and indicated that while it may be appropriate to mitigate their compliance burden, disclosure would provide necessary transparency into the operations and financial condition of these registrants.[2413]  A different commenter stated that the ability of large filers to disclose Scope 3 emissions depended in part

---

[2408]  *See, e.g.*, letter from Shearman Sterling.

[2409]  *See* SBCFAC Recommendation; Small Business Forum Recommendation (2023).

[2410]  *See, e.g.*, letters from Anthesis; CalSTRS; The Center for Biological Diversity (June 17, 2022) ("CBD"); CNX; ICI; ClientEarth; FFAC; OMERS; Prentiss; NCF; NY City Comptroller; WAP; and Essex Invest. Mgmt. (opposing exempting SRCs from providing Scope 3 disclosures); Terra Alpha; ClientEarth; and Defenders Wildlife (opposing any exemptions for SRCs).

[2411]  *See, e.g.*, letter from Anthesis.

[2412]  *See, e.g.*, letter from Essex Invest. Mgmt. ("As stated in the text to the proposed rule, SRCs make up approximately half of domestic filers in terms of numbers. By exempting SRCs from scope 3 reporting indefinitely, it will impair investors' ability to fully analyze the extent of the climate-related risks that SRCs face."  *See also, e.g.*, letter from Ceres (stating that "[w]e . . . do not object, in principle, to the proposed safe harbor and exemption for SRCs" but indicating that "we believe all of these measures should be temporary").

[2413]  *See, e.g.*, letter from ICI.  *See also, e.g.*, letter from CalSTRS stating ("We need reliable numbers for small companies as well as for large companies; we have the same responsibility to vote proxies and monitor small companies as we do large companies.")

557

on smaller registrants disclosing Scope 1 and 2 emissions.[2414]  In addition, as discussed

below,[2415] commenters weighed in on the phase in periods that should apply to SRCs.[2416]

Some commenters recommended that the Commission exempt EGCs from the proposed

rules or at least provide them with the same accommodations as SRCs.[2417]  Commenters stated

that the large compliance costs of the proposed rules may deter many potential EGCs from going

public.[2418]  Other commenters opposed exempting EGCs from the proposed rules because such

companies, like SRCs, may be exposed to climate-related risks.[2419]  Some commenters

recommended providing EGCs with a longer phase in period rather than exempting them from

the proposed rules.[2420]

Several commenters recommended that the Commission exempt BDCs from the

proposed rules.[2421]  Commenters stated that subjecting BDCs to the proposed rules would be

inappropriate because they are pooled investment vehicles that are more like registered

investment companies than operating companies, which would also make the disclosure of GHG

emissions difficult.[2422]  Commenters further stated that BDCs would be subject to the

---

[2414]  *See, e.g.*, letter from J. McClellan.

[2415]  *See infra* section II.O.2.

[2416]  *See, e.g.*, letter from Morningstar.

[2417]  *See, e.g.,* letters from BIO; Davis Polk; Grant Thornton; D. Burton, Heritage Fdn.; J. Herron; Nasdaq (recommending phase ins for EGCs similar to those proposed for SRCs); Shearman Sterling (recommending that EGCs be exempt from proposed attestation requirement for Scopes 1 and 2 emissions); and SBCFAC Recommendation (recommending scaled and delayed disclosure for SRCs and EGCs).

[2418]  *See, e.g.*, letters from Davis Polk; Grant Thornton.

[2419]  *See, e.g.*, letters from ICI; PwC; and Soros.

[2420]  *See, e.g.*, letters from ICI; and Soros.

[2421]  *See, e.g.,* letters from AIC; BlackRock; Dechert LLP (June 17, 2022) ("Dechert"); Fidelity; D. Burton, Heritage Fdn.; ICI; Northern Trust; Stradley Ronon Stevens and Young (June. 15, 2022) ("Stradley Ronon"); and TIAA.

[2422]  *See, e.g.*, letters from AIC; Dechert; Fidelity; ICI; and Northern Trust.

Commission's proposed rules regarding ESG disclosures for certain investment advisers and investment companies,[2423] if adopted, which the commenters asserted is a more suitable regulation for BDCs than proposed subpart 1500.[2424]  Some commenters similarly recommended the exemption of other registered collective investment vehicles, such as real estate investment trusts ("REITs"),[2425] and exchange-traded products (i.e., pooled investment vehicles listed on securities exchanges that are not investment companies registered under the Investment Company Act),[2426] and issuers of non-variable insurance contracts[2427] because of their differences with registered operating companies.

Several commenters supported requiring foreign private issuers to provide the same climate disclosures as domestic registrants, as proposed.[2428]  Commenters stated that because foreign private issuers are exposed to climate-related risks in much the same way as domestic registrants, they should be subject to the same disclosure requirements.[2429]  Commenters also stated that applying the same climate-related disclosure requirements to domestic and foreign registrants would enhance the comparability of such disclosure.[2430]

Other commenters stated that the Commission should permit foreign private issuers to follow the climate disclosure requirements of their home jurisdiction or of an alternative

---

[2423] See Enhanced Disclosures by Certain Investment Advisers and Investment Companies about Environmental, Social, and Governance Investment Practices, Release No. 33-11068 (May 25, 2022) [87 FR 36654 (June 17, 2022)].

[2424] *See, e.g.*, letters from AIC; Dechert; ICI; and Stradley Ronon.

[2425] *See, e.g.*, letters from Fidelity; and TIAA.

[2426] *See, e.g.*, letters from AIC; BlackRock; ICI; and Northern Trust.

[2427] *See, e.g.*, letter from Committee of Annuity Insurers (June 17, 2022) ("CAI").

[2428] *See, e.g.*, letters from Amer. for Fin. Reform, Sunrise Project *et al.*; CEMEX; Futurepast; SKY Harbor; and WBCSD.

[2429] *See, e.g.*, letters from Amer. for Fin. Reform, Sunrise Project *et al.*; and WBCSD.

[2430] *See, e.g.*, letters from CEMEX; and Futurepast.

Appellate Case: 24-1628      Page: 564      Date Filed: 03/26/2024 Entry ID: 5377362

reporting regime to which they are subject.[2431]  Commenters stated that such treatment would alleviate the burden of having to comply with more than one set of climate disclosure requirements and would help prevent the Commission's climate disclosure rules from deterring foreign private issuers from becoming or remaining U.S. registrants.[2432]  One commenter recommended that the Commission exempt foreign private issuers from the proposed climate disclosure rules in order to discourage foreign private issuers from delisting from U.S. securities exchanges.[2433]

Some commenters supported the rule proposal to require a registrant to disclose any material changes to the climate disclosures provided in its Exchange Act annual report in a subsequently filed Form 10-Q or furnished Form 6-K.[2434]  In this regard, one commenter stated that because climate-related risks are financial risks, they should be subject to the same disclosure requirements as other financial risks.[2435]  Another commenter stated that the proposed requirement should apply to any material change in a registrant's disclosure related to governance, strategy, risk management, and targets and goals, and not just to changes in previously reported quantitative information.[2436]

---

[2431]  *See, e.g.*, letters from AllianceBernstein; Davis Polk; Linklaters L; PGIM; PwC; and SAP SE (June 16, 2022) ("SAP").

[2432]  *See, e.g.*, letter from Davis Polk.

[2433]  *See* letter from Soc. Corp. Gov.

[2434]  *See, e.g.*, letters from Amer. for Fin. Reform, Sunrise Project *et al*.; CEMEX; D. Hileman Consulting; J. Herron; and TotalEnergies; *see also* letter from Morningstar (stating that any changes that would materially impact a company's GHG emissions disclosure should be reported at least in its Form 10-K, if not in its quarterly reports, as this information could significantly impact an investor's decision-making).

[2435]  *See* letter from Amer. for Fin. Reform, Sunrise Project *et al.*

[2436]  *See* letter from D. Hileman Consulting.

Other commenters, however, opposed the disclosure of climate-related information on a quarterly basis.[2437] One commenter stated that an interim updating requirement to report a material change in climate-related disclosures is not necessary because Form 10-Q already requires an update to risk factor disclosure provided by registrants other than SRCs and related material financial impacts disclosure would be required in an interim MD&A.[2438] This commenter further stated that intra-year updates on climate-related disclosures would create meaningful incremental costs for registrants but offer little additional value to investors.[2439] Another commenter that opposed quarterly updating stated that "many, if not most, climate metrics, risks, opportunities, and strategies are long-term in nature and cannot meaningfully be assessed on a quarter-to-quarter basis."[2440] Other commenters asserted that requiring the disclosure of climate-related information in Form 10-Q, in addition to Form 10-K, would overwhelm investors with information of limited usefulness and, due to its novelty, should not be required to be disclosed in Commission periodic reports.[2441]

Many commenters supported not subjecting MJDS filers to the proposed climate disclosure rules, as proposed.[2442] Commenters stated that excluding MJDS filers from the Commission's climate disclosure rules would be consistent with the purpose of the MJDS, which is to enhance the efficiency of cross-border capital raising between the United States and Canada

---

[2437] *See, e.g.*, letters from Etsy; and Sullivan Cromwell.

[2438] *See* letter from Sullivan Cromwell.

[2439] *See id.*

[2440] Letter from Etsy.

[2441] *See, e.g.*, letters from API; and Chamber.

[2442] *See, e.g.*, letters from ACLI; Barrick Gold Corporation (June 17, 2022) ("Barrick Gold"); Business Council of Canada (June 16, 2022) ("BCC"); Can. Bankers; Davies Ward Phillips & Vineberg LLP (June 17, 2022) ("Davies Ward"); Dorsey Whitney (Oct. 31, 2022) ("Dorsey"); Enbridge; Enerplus; Hydro One; Nutrien (June 17, 2022); and Suncor Energy Inc. (June 17, 2022) ("Suncor").

Appellate Case: 24-1628     Page: 566     Date Filed: 03/26/2024 Entry ID: 5377362

by in part permitting Canadian registrants to follow their home jurisdiction laws and rules when registering securities in the United States and satisfying their reporting obligations under the Exchange Act.[2443]  Commenters also noted that in October 2021, the Canadian Securities Administrators proposed a specific climate-related disclosure framework ("CSA Proposed Instrument")[2444] that is primarily modeled on the TCFD framework.[2445]  According to commenters, once the CSA Proposed Instrument is adopted, MJDS filers will provide climate-related disclosures pursuant to the CSA Instrument that is similar to the disclosures required pursuant to the Commission's proposed rules.[2446]  One commenter, however, opposed excluding MJDS filers from the Commission's disclosure rules at least until the CSA Proposed Instrument is finalized and the Commission has determined that the CSA final Instrument is substantially similar to the Commission's climate-related rules.[2447]

Many commenters supported excluding asset-backed issuers from the proposed rules, as proposed.[2448]  One commenter stated that application of the proposed rules to asset-backed issuers would be inappropriate because of the unique market structure of asset-backed securities, regarding which the relevant disclosures for most investors relate to matters tied to credit quality and payment performance of the securitized pools, and not to commitments of the sponsoring company relating to climate.[2449]  Another commenter stated that any climate-related disclosure

---

[2443]   *See, e.g.*, letters from Can. Bankers; Davies Ward; and Dorsey.

[2444]   *See* CSA Consultation, Climate-related Disclosure Update and CSA Notice and Request for Comment, Proposed National Instrument 51-107, *Disclosure of Climate-related Matters* (Oct. 2021).

[2445]   *See, e.g.*, letters from BCC; Can. Bankers; and Davies Ward.

[2446]   *See id.*

[2447]   *See* letter from PwC.

[2448]   *See, e.g.*, letters from American Financial Services Association (June 16, 2022) ("AFSA"); J. Herron; IECA; Structured Finance Association (June 17, 2022) ("SFA"); and J. Weinstein.

[2449]   *See* letter from AFSA.

requirements would need to be based on a framework that is particularly suited for asset-backed issuers, such as the ABS Climate Disclosure Framework that is being developed by the Structured Finance Association.[2450]  Other commenters stated that, because asset-backed securitizations are essential for making home mortgages and car loans available to Americans, including those in low-income communities, and because application of the proposed rules to asset-backed issuers would motivate them to exclude such loans from their financed emissions, such application would result in disproportionate and negative impacts on low-income communities.[2451]

One commenter expressly opposed excluding asset-backed issuers from the proposed rules.[2452]  This commenter stated that asset-backed issuers are subject to many of the same climate risks as other issuers and require similar disclosure.  As an example of the need for such disclosure, this commenter stated that there are growing concerns that asset-backed issuers are not fully disclosing that properties within the asset pools that they securitize are located in areas particularly vulnerable to increased risk of sea-level rise and extreme flooding.[2453]  Another commenter supported excluding asset-backed issuers from the Commission's climate disclosure rules at this time, but encouraged the Commission to consider, in due time, separate rules requiring climate-related disclosures from such issuers.[2454]  This commenter stated that, while it believed that all financial and nonfinancial corporations should be expected to provide consistent climate-related disclosures with respect to their equity or debt (or debtlike) issuances, a more

---

[2450]    *See* letter from SFA.

[2451]    *See* letters from IECA; and J. Weinstein.

[2452]    *See* letter from Amer. for Fin. Reform, Sunrise Project *et al*.

[2453]    *See id.*

[2454]    *See* letter from Morningstar.

Appellate Case: 24-1628    Page: 568    Date Filed: 03/26/2024 Entry ID: 5377362

tailored, risk-based approach may be more appropriate for climate-related disclosures with respect to securitizations.[2455]

One commenter opposed applying the Commission's climate disclosure rules to Form S-8 filings without stating the reasons why.[2456] No commenter addressed whether the proposed rules should apply to Form 11-K filings.

Several commenters raised concerns about the application of the proposed disclosure requirements to newly public companies.[2457] For example, commenters stated that application of the proposed rules to IPOs could deter many companies from going public due to the increased compliance costs and litigation risks associated with providing the climate-related disclosures, which would run counter to the Commission's mission of facilitating capital formation.[2458] One commenter further stated that because private companies already face complex, lengthy, and costly processes to prepare for an IPO, the additional compliance burden imposed by the proposed climate disclosure rules would have a chilling effect on the use of the public securities markets to raise capital and on the broader U.S. economy.[2459]

Commenters raised similar concerns about the proposed rules in the context of M&A transactions. For example, one commenter stated that, given the scale of the disclosure and work necessary to comply with the proposed climate disclosure rules, having to prepare this disclosure for a private target on a stand-alone basis before the acquiring registrant can file its Form S-4 or F-4 to register the securities being issued in connection with the business combination would

---

[2455] *See id.*

[2456] *See* letter from J. Herron.

[2457] *See, e.g.*, letters from AIC; Baker Tilly; BDO USA; Nasdaq; PwC; RILA; Shearman Sterling; SIFMA; Soros Fund; and Sullivan Cromwell.

[2458] *See, e.g.*, letters from AIC; and Nasdaq.

[2459] *See* letter from Nasdaq.

materially delay those filings and significantly extend the overall transaction timeline.[2460] According to this commenter, public companies could be placed at a competitive disadvantage when bidding to acquire a private target company under the proposal because it would be necessary to screen prospective acquisitions for the ability to produce climate-related disclosures.[2461] Another commenter stated that a private target may not have collected climate-related data prior to its acquisition, and it could be "incredibly burdensome" for the private company to go back in time and measure the impact of climate-related events during a period when it was not collecting such data.[2462] Commenters noted that integrating a recently acquired company takes considerable time and resources, and the Commission should allow for delayed reporting so that an acquiring company need not alter its acquisition schedule to account for the difficulties in assuming responsibility for climate-related disclosures.[2463] Because of the above concerns, commenters urged the Commission not to adopt compliance deadlines for the proposed climate disclosure requirements that would substantially influence the probability or timing of M&A transactions and IPOs.[2464]

Some commenters opposed excluding IPO registrants from the scope of the proposed climate disclosure rules.[2465] After stating that companies that are going public should be held to the same reporting and disclosure requirements of all other public companies, one commenter noted that the rule proposal already contains a number of accommodations for filers, which

---

[2460] *See* letter from Shearman Sterling.

[2461] *See id.*

[2462] *See* letter from Nasdaq.

[2463] *See* letters from Etsy; and Sullivan Cromwell.

[2464] *See, e.g.,* letter from Shearman Sterling.

[2465] *See* letters from AGs of Cal. *et al.*; Amer. for Fin. Reform, Sunrise Project *et al.*; and CFA.

should not be expanded.[2466]  Another commenter opposed exempting IPO registrants from the proposed rules because that would lower investor protections in the public markets, which is contrary to the Commission's mission and purpose.[2467]  One other commenter stated that because investors need information about a registrant's climate-related risks at every stage of capital formation, it supported requiring a registrant to provide climate-related disclosures about a target company in its Form S-4 or F-4.[2468]

### 3. Final Rules

The final rules will apply to Exchange Act periodic reports[2469] and Securities Act and Exchange Act registration statements largely as proposed, with some modifications as described below.  As we stated above when discussing our reasons for amending Regulations S-K and S-X,[2470] we are requiring climate-related disclosures in most Securities Act or Exchange Act registration statements and Exchange Act periodic reports.  We believe disclosures about climate-related risks and their financial impacts should be treated like other business and financial information because they are necessary to understand a company's operating results and prospects and financial condition.[2471]

---

[2466]   *See* letter from CFA (stating that the proposed rule "includes a safe harbor with limited reach, phase in periods for compliance, and reasonable boundaries for disclosure, and the Commission should not expand or loosen these accommodations.").

[2467]   *See* letter from AGs of Cal. *et al*.

[2468]   *See* letter from Amer. for Fin. Reform, Sunrise Project *et al*.

[2469]   Although we generally refer to the final rules applying to Exchange Act periodic reports, the only time a registrant will disclose climate-related information responsive to the final rules in a Form 10-Q is when it elects to disclose its Scopes 1 and/or 2 emissions pursuant to Item 1505 of Regulation S-K.  A foreign private issuer that is subject to the GHG emissions reporting requirement, however, is required to provide the GHG emissions disclosure in its annual report on Form 20-F, although it may provide such emissions disclosure on a delayed basis in an amendment to that filing.  *See supra* section II.H.  The other portions of the final rules are not applicable to Exchange Act periodic reports other than annual reports.

[2470]   *See supra* section II.A.3.

[2471]   *See id.*

We are taking this approach instead of adopting a new form for climate-related disclosures as suggested by commenters because it is more consistent with the Commission's integrated disclosure system for business and financial reporting and will improve the transparency and comparability of climate-related disclosures for investors as they will be included and incorporated into forms with which registrants and investors alike are familiar, and alongside information regarding a registrant's business, results of operations, and financial condition, which will facilitate an understanding of the impacts of climate-related risks.[2472] While we understand the concern of commenters that recommended the creation of a new form for climate-related disclosures,[2473] revisions to the proposed rules[2474] and strengthened accommodations regarding certain types of disclosures[2475] and for certain issuers[2476] will address many of these concerns.

The final rules require registrants that file their Exchange Act annual reports on Forms 10-K, as well as their Exchange Act and Securities Act registration statements on Form 10 and Form S-1, S-4 (except as provided below), or S-11, as applicable, to include the climate-related disclosures required by the final rules in these forms.[2477] The final rules will also require foreign

---

[2472] *See, e.g.*, *supra* notes 2390 and 2391 and accompanying text.

[2473] *See supra* notes 2392-2395 and accompanying text.

[2474] *See, e.g.*, the adoption of less prescriptive requirements and a materiality qualifier for several of the final rule provisions.

[2475] *See, e.g., supra* section II.J (discussing the adoption of an expanded safe harbor provision).

[2476] *See, e.g., supra* section II.H (discussing the exemption from Scopes 1 and 2 emissions reporting for both SRCs and EGCs); and *infra* section II.O (discussing the adoption of different compliance dates for different types of filers).

[2477] Registrants may incorporate by reference the climate-related disclosures required by the final rules to the extent they are permitted to do so under Forms S-1, S-4, and S-11. *See, e.g.*, Form S-1, General Instruction VII (setting forth the requirements a registrant must meet in order to incorporate by reference certain

private issuers that file their Exchange Act annual reports or registration statements on Form 20-F and their Securities Act registration statements on Form F-1 or Form F-4 (except as provided below) to provide the same climate-related disclosures as domestic registrants.[2478] As commenters noted, because foreign private issuers are exposed to climate-related risks in the same way as domestic registrants, they should be subject to the same disclosure requirements.[2479] Applying the same climate-related disclosure requirements to domestic and foreign registrants will also help achieve the Commission's goal of providing more consistent, reliable, and comparable information across registrants for investors. While we acknowledge commenters who suggested that foreign private issuers be permitted to substitute compliance with the final rules through disclosures made in response to requirements of other jurisdictions, we are not adopting substituted compliance at this time. We believe it makes sense to observe how reporting under international climate-related reporting requirements and practices develop before making a determination whether such an approach would result in consistent, reliable, and comparable information for investors. The Commission may consider such accommodations in

---

information required by Form S-1). If a registrant is eligible and elects to incorporate by reference certain information required by Forms S-1, S-4, and S-11, those forms also require the registrant to incorporate by reference its latest Form 10-K and all other Exchange Act reports filed since the end of the fiscal year covered by that Form 10-K. *See* Form S-1, Item 12; Form S-4, Items 11 and 13; Form S-11, Item 29. In addition to those filings that a registrant is required to incorporate by reference, a registrant may also incorporate by reference its required emissions disclosure, if applicable, from the prior filing that contained such disclosure to satisfy its Item 1505 disclosure obligations under Form S-1, S-4, or S-11 if (1) such Form S-1, S-4, or S-11 becomes effective after filing its Form 10-K for its latest fiscal year but before filing a Form 10-K/A or its Form 10-Q for the second quarter of its current fiscal year containing the prior year's emissions disclosure and (2) the registrant, pursuant to Item 1505(c)(1), discloses the information required by Item 1505 in either a Form 10-K/A or its second quarter Form 10-Q rather than in its Form 10-K (in both the prior and current fiscal year). *See also* 17 CFR 230.411 and 17 CFR 240.12b-23.

[2478] Forms S-3 and F-3 are not being amended to reference subpart 1500 because the required climate-related disclosures would be included in a registrant's Form 10-K or 20-F annual report that is incorporated by reference into those Securities Act registration statements. *See* Proposing Release, section J, note 690. However, as discussed in section II.H.3 above, we are amending these forms to clarify the date as of which disclosure required by Item 1505(a) must be incorporated.

[2479] *See supra* note 2429 and accompanying text.

App.568

Appellate Case: 24-1628    Page: 573    Date Filed: 03/26/2024 Entry ID: 5377362

the future depending on developments in the international climate reporting practices and our experience with disclosures under the final rules.[2480]

In a change from the proposed rules, the final rules will not apply to private companies that are parties to business combination transactions, as defined by Securities Act Rule 165(f),[2481] involving a securities offering registered on Forms S-4 and F-4.[2482] We acknowledge the concerns of commenters about the difficulties and costs associated with private target companies complying with the proposed disclosure requirements in the business combination context in addition to complying with certain other disclosure requirements under Regulation S-K and Regulation S-X,[2483] as well as concerns that the application of those requirements to private target companies could impact the timing of or discourage business combination activity in U.S. public markets.[2484] Disclosure pursuant to subpart 1500 of Regulation S-K and Article

---

[2480] *See also* discussion *infra* section IV.A.4 and IV.C.3.

[2481] *See* 17 CFR 230.165.

[2482] While Form S-1 may be used for business combination transactions, climate-related disclosure will also be required for reporting companies that are parties to the transaction.

[2483] *See, e.g.*, Form S-4, Part I.C, Item 17(b) (requiring, with respect to a company being acquired that is not subject to the reporting requirements of Section 13(a) or 15(d) of the Exchange Act, a brief description of its business, disclosure pursuant to Item 2-01 of Regulation S-K (market price of and dividends on the company's equity), disclosure pursuant to Item 303 of Regulation S-K (MD&A), disclosure pursuant to Item 304 of Regulation S-K (changes in and disagreements with accountants) and, in certain circumstances, financial information).

[2484] *See, e.g.*, letters from Shearman Sterling (stating that private targets are "unlikely to have the extensive climate change disclosure prepared in advance of entering into a business combination with a public company"); and Sullivan Cromwell (stating that, "in addition to having the resources necessary to collect emissions data from the target company, acquirors would need to expend significant resources to ensure that (1) it has appropriate controls and procedures in place to assess the quality of the information and (2) such information is being collected and measured on a basis consistent with the emissions calculations throughout its organization").

Appellate Case: 24-1628     Page: 574     Date Filed: 03/26/2024 Entry ID: 5377362

14 of Regulation S-X will only be required for a registrant or company being acquired that is subject to the reporting requirements of Section 13(a) or 15(d) of the Exchange Act.[2485]

In another change from the proposed rules, the final rules will not require registrants to disclose any material change to the climate-related disclosures provided in a registration statement or annual report in its Form 10-Q or, in certain circumstances, Form 6-K for a registrant that is a foreign private issuer that does not report on domestic forms. This is consistent with the annual reporting requirement adopted by the Commission in other contexts.[2486] We are mindful of the concern expressed by many commenters about the potential compliance costs of the proposed rules, including the proposed interim updating requirement.[2487] This change will help to mitigate the compliance burden.[2488]

---

[2485] The discussion throughout this release regarding the application of the subpart 1500 disclosure requirements to business combination transactions involving a securities offering registered on Forms S-4 and F-4 also applies to certain business combination transactions for which a proxy statement on Schedule 14A or an information statement on Schedule 14C is required to be filed. *See* 17 CFR 240.14a-101, Item 14(c)(1) (requiring, for certain business combination transactions, disclosure of "the information required by Part B (Registrant Information) of Form S–4 . . . or Form F–4 . . . , as applicable, for the acquiring company") and Item 14 (c)(2) (requiring, for certain business combination transactions, disclosure of "the information required by Part C (Information with Respect to the Company Being Acquired) of Form S-4 . . . or Form F-4 . . . , as applicable"); and 17 CFR 240.14c-101, Item 1 ("Furnish the information called for by all of the items of Schedule 14A . . . which would be applicable to any matter to be acted upon at the meeting if proxies were to be solicited in connection with the meeting."). The information required by Parts B and C of Forms S-4 and F-4 includes the information required by General Instructions B.3 and C.3 to those forms. *See* Form S-4, General Instruction B.3 ("If the registrant is subject to the reporting requirements of Section 13(a) or 15(d) of the Exchange Act, then . . . the information required by subpart 1500 of Regulation S-K . . . must be provided with respect to the registrant . . . ."); Form F-4, General Instruction B.3 (same); Form S-4, General Instruction C.3 ("If the company being acquired is subject to the reporting requirements of Section 13(a) or 15(d) of the Exchange Act, then . . . the information required by subpart 1500 of Regulation S-K . . . must be provided with respect to the company being acquired . . . ."); Form F-4, General Instruction C.3 (same).

[2486] See, e.g., Modernization of Property Disclosures for Mining Registrants, Release No. 33-10570 (Oct. 31, 2018) [83 FR 66344 (Dec. 26, 2018)]; and Cybersecurity Risk Management, Strategy, Governance, and Incident Disclosure, Release No. 33-11216 (Jul. 26, 2023) [88 FR 51896 (Aug. 4, 2023)].

[2487] *See, e.g.,* letter from Sullivan Cromwell.

[2488] *See supra* note 2469.

Also as proposed, the final rules will not apply to Canadian registrants that use the MJDS and file their Exchange Act registration statements and annual reports on Form 40-F. As many commenters stated, excluding MJDS filers from the Commission's climate disclosure rules is consistent with the purpose of the MJDS and will continue to allow MJDS registrants to follow their home jurisdiction laws and rules when registering securities in the United States and satisfying their reporting obligations under the Exchange Act.[2489]

The proposed rules would have required SRCs to comply with all of the proposed climate-related disclosure requirements, except for disclosure pertaining to Scope 3 emissions, from which they were proposed to be exempted.[2490] Similarly, most of the final rules will apply to SRCs, except for the disclosures requiring Scopes 1 and 2 emissions, from which SRCs will be exempted.[2491] Although some commenters asked the Commission to exclude SRCs from all of the Commission's climate disclosure rules,[2492] we do not believe that such a blanket exemption would be appropriate in light of the fact that, as some commenters noted, SRCs are exposed to climate-related risks to the same extent as other registrants.[2493] For similar reasons, the final rules will apply to EGCs, as proposed, except for the exemption regarding Scopes 1 and 2 emissions disclosure. However, we acknowledge that some aspects of the final rules could impose significant burdens on smaller and early growth stage registrants, particularly if the costs of compliance do not scale with the size of the firm and divert resources that are needed to expand the registrant's business. Because we expect the compliance burden and costs for the

---

[2489] *See supra* note 2443 and accompanying text.

[2490] *See* Proposing Release, section II.J.

[2491] As discussed in section II.H.3 above, the final rules will not require any registrant to disclose its Scope 3 emissions.

[2492] *See supra* notes 2398 and 2417 and accompanying text.

[2493] *See supra* notes 948 and 2419 and accompanying text.

Appellate Case: 24-1628     Page: 576     Date Filed: 03/26/2024 Entry ID: 5377362

GHG emissions disclosure requirement to be proportionally greater for such registrants, not requiring SRCs and EGCs to disclose their Scopes 1 and/or 2 emissions will help address these concerns. For these reasons, we find that it is necessary and appropriate in the public interest and consistent with the protection of investors to not include SRCs and EGCs within the scope of the GHG emissions disclosure requirement,[2494] but to include them within the scope of the other aspects of the final rules.[2495] Moreover, the streamlined requirements and disclosure accommodations we are adopting, which will help limit the compliance burden of the final rules for all registrants, should further alleviate commenters' concerns about the impact of the proposed rules on SRCs and EGCs. In particular, adding materiality qualifiers and making several of the disclosure provisions less prescriptive should enable registrants, including SRCs and EGCs, to provide disclosure that better fit their particular facts and circumstances, which should lessen the need for scaled disclosure for SRCs and EGCs. Additionally, as discussed below, we are providing extended phase ins based on filer status, which will provide SRCs and EGCs with additional time to prepare for the final rules.

Similarly, we are not providing an exemption or transitional relief for registrants engaged in an IPO, as recommended by some commenters, because of these streamlined requirements and other accommodations.[2496] In addition, we note that exempting EGCs from the GHG emissions disclosure requirement will significantly reduce the compliance burden of the final rules for most

---

[2494] All registrants subject to the final rules, including SRCs and EGCs, are not required to disclose GHG emissions metrics other than as required by Item 1505, including where GHG emissions are included as part of a transition plan, target or goal.

[2495] *See* 15 U.S.C. 77z-3 and 15 U.S.C. 78mm.

[2496] *See supra* note 2457 and accompanying text.

new registrants, as historically EGCs have accounted for almost 90% of IPO companies.[2497] Moreover, providing a longer transition period before SRCs and EGCs must first comply with the final rules should help those entities that go public to develop the appropriate controls and procedures for providing the required climate-related disclosures. We further note that initial filings from registrants that are not SRCs or EGCs and that determine that they have material Scope 1 and/or Scope 2 emissions will only be required to provide emissions data for one year because they will not have previously provided such disclosure in a Commission filing.[2498]

The final rules also will not apply to asset-backed securities issuers, as proposed. Although we recognize that, as one commenter noted, climate-related risks may be relevant for some of the pooled assets that comprise certain asset-backed securities,[2499] we believe that adoption of climate-related disclosure requirements for certain types of securities, such as asset-backed securities, should consider the unique structure and characteristics of those securities, consistent with other Commission disclosure requirements applicable to asset-backed securities issuers.[2500] Accordingly, while the Commission may consider climate-related disclosure requirements for asset-backed securities issuers in a future rulemaking, we decline to adopt such requirements as part of this rulemaking.

We are not exempting other registrants, such as BDCs, REITs, or issuers of registered non-variable insurance contracts from the final rules. As with operating companies, these

---

[2497] Wilmer Hale, *2023 IPO Report, 2* (Mar. 31, 2023), available at https://www.wilmerhale.com/insights/publications/2023-ipo-report ("IPOs by emerging growth companies (EGCs) accounted for 87% of the year's IPOs, a share modestly lower than the 93% in 2021 and the 89% average that has prevailed since enactment of the JOBS Act in 2012.").

[2498] *See supra* section II.H.3.

[2499] *See supra* notes 2452 and2453 and accompanying text.

[2500] *See supra* note2450 and accompanying text. *See also* 17 CFR 229.1100 through 229.1125 (Regulation AB).

entities may face material climate-related risks that would impact an investment or voting decision and will have only limited disclosure obligations to the extent climate-related risks are not material in a given case.  We acknowledge commenters that noted that certain registered collective investment vehicles have differences from operating companies, but, in our view, those differences are not significant enough in this context to warrant the differential treatment we are applying to asset-backed securities issuers.  Further, because the final rules have been modified and streamlined from proposed, as described above, to the extent a climate-related risk is not material to such registrants the information required to be disclosed would be limited.  Likewise, we are not exempting BDCs as suggested by other commenters.  While we acknowledge that, if the Commission's proposed rules regarding ESG disclosures for certain investment advisers and investment companies were adopted, there may be some overlap in the required disclosures, we nonetheless believe that the climate-related information required to be disclosed by the final rules in a registrant's Securities Act registration statements and Exchange Act reports will be important to investors and should apply to BDCs and REITs.  Finally, with respect to issuers of registered non-variable insurance contracts, if the final rules would otherwise apply solely as a result of a registrant's offerings of registered index-linked annuities, the final rules may not apply prior to required compliance.[2501]  To the extent such a registrant is subject to the final rules in connection with offerings of other types of registered non-variable

---

[2501]  *See* Division AA, Title I of the Consolidated Appropriations Act, 2023, Pub. L. 117-328; 136 Stat. 4459 (Dec. 29, 2022) and Registration for Index-Linked Annuities; Amendments to Form N–4 for Index-Linked and Variable Annuities ("RILA Act"), Release No. 33-11250 (Sept. 29, 2023) [17 FR 71088 (Oct. 13, 2023)]. If the Commission adopts this proposal substantially as proposed, or insurers are able to register offerings of registered index-linked annuities on Form N-4 pursuant to a provision in the RILA Act, the registration statement for a registered-index linked annuity would not be required to include the information required by the final rules adopted in this release. We also anticipate that in these circumstances insurance companies generally will rely on Exchange Act Rule 12h-7 if they would otherwise be subject to Exchange Act reporting obligations solely by reason of their offerings of registered index-linked annuities.

insurance contracts, as noted above, to the extent a climate-related risk is not material to such registrants the information required to be disclosed would be limited.

Finally, as proposed, the final rules will not apply to Forms S-8 and 11-K.

## M. Structured Data Requirement (Item 1508)

### 1. Proposed Rules

The proposed rules would have required a registrant to tag the proposed climate-related disclosures in a structured, machine-readable data language. Specifically, the proposed rules would have required a registrant to tag climate-related disclosures in Inline eXtensible Business Reporting Language ("Inline XBRL") in accordance with 17 CFR 232.405 (Rule 405 of Regulation S-T) and the EDGAR Filer Manual. The proposed requirements would include block text tagging and detail tagging of narrative and quantitative disclosures provided pursuant to subpart 1500 of Regulation S-K and Article 14 of Regulation S-X.

### 2. Comments

Commenters that addressed this aspect of the proposal largely supported requiring registrants to tag climate-related disclosures, including block text tagging and detail tagging of narrative and quantitative disclosures in Inline XBRL, as proposed.[2502] Commenters indicated

---

[2502] *See, e.g.*, letters from Impact Capital Managers, Inc.; ISS ESG; Crowe LLP; Eni SpA; CFA (noting that "Even retail investors who do not have the same capacity to conduct that analysis directly would still benefit from tagging if, as we expect, independent third parties use the data to analyze companies' performance on climate-related criteria and communicate their findings broadly to the investing public"); Ceres; The Deep South Center for Environmental Justice (June 17, 2022) ("Deep South"); London Stock Exchange Group (June 17, 2022) ("LSEG") Earthjustice; Data Foundation (June 17, 2022) ("Data Fnd"); TotalEnergies; John Turner, CEO, XBRL US (June 23, 2023) ("XBRL US"); Eric Pedersen, Head of Responsible Investments in Nordea Asset Management (June 17, 2022) ("Nordea Asset Mgmt"); Church Grp.; Bloomberg .; BHP; CalPERS; Ethic; Harvard Mgmt.; Can. Coalition GG; Morningstar, Inc.; Patrick Callery, XBRL International, Inc.; Prime Buchholz, LLC; Treehouse Investments, LLC; Trakref, Xpansiv Ltd.; Seattle City ERS; Asia Investor Group on Climate Change, Asia Investor Group on Climate Change;

Appellate Case: 24-1628     Page: 580     Date Filed: 03/26/2024  Entry ID: 5377362

that Inline XBRL is a functional tool familiar to most investors and that it would be a useful tool for climate-related disclosures.[2503]  Some commenters questioned the utility of climate-related disclosures without digital tagging and asserted that the benefit to end users of this information far outweighed the costs to issuers, particularly given that issuers should already have established the necessary software, skills, and processes to comply with the proposed requirements.[2504]

One commenter questioned how many investors use this functionality and suggested that tagging should instead be voluntary.[2505]  Another commenter stated that tagging of climate-related disclosures under subpart 1500 of Regulation S-K should not be required because currently registrants only tag their financial statements including any footnotes and schedules set forth in Article 12 of Regulation S-X.[2506]  This commenter also asserted that, if the Commission were to adopt an Inline XBRL tagging requirement as proposed, it should approve and update a taxonomy prior to compliance, otherwise registrants would create custom tags which would reduce the comparability and utility of the required disclosures.  One supportive commenter stated that the Commission should consider developing guidance to help standardize climate-related custom tags "to foster comparability and faster access across corporate disclosures."[2507]  Yet another supportive commenter recommended that "the Commission avoid custom tags

---

Clara Miller; M. Hadick; R. Palacios.  *But see* Alliance Resource ("Requiring XBRL tagging of information would increase costs and impose time constraints on registrants.  Requiring the use of XBRL would be a departure from other areas of Securities and Exchange Act filings outside the financial statements and given the differences in the estimates and assumptions used to calculate Scope 1, 2, and 3 emissions, we believe the use of XBRL for these disclosures would not be meaningful to investors.").

[2503]  *See, e.g.*, letters from ISS ESG; Ceres.

[2504]  *See, e.g.*, letters from XBRL International; Ceres.

[2505]  *See, e.g.*, letters from Sky Harbor.

[2506]  *See, e.g.*, letter from American Fuel & Petrochemical Manufacturers.

[2507]  *See, e.g.*, letter from ISS ESG.

Appellate Case: 24-1628     Page: 581     Date Filed: 03/26/2024 Entry ID: 5377362

within the Inline XBRL schema because they erode the comparability of the climate-related disclosures."[2508]

Commenters largely supported the proposal to require tagging of both quantitative climate-related metrics and qualitative climate-related disclosures, stating that tagging will maximize efficiency and make the information easier to consume.[2509] One of these commenters stated that detail and block text tagging "of all disclosure, as opposed to only quantitative metrics, expedites aggregation, filtering, and synthesis of corporate reporting in addition to making the reporting more accessible and usable in the first place."[2510] Another commenter stated that tagging of both narrative and quantitative information is necessary to increase efficiencies in the capital markets as a new volume of information becomes available.[2511]

The Commission also solicited comment on whether there are any third-party taxonomies the Commission should consider in connection with the proposed tagging requirements.[2512] While one commenter[2513] suggested the registrant should have the ability to select the structured data language it wanted to use, most commenters stated that the Commission should require tagging in Inline XBRL, as proposed.[2514] One commenter noted the importance of interoperability with international regulators and organizations when considering alternatives.[2515] Another commenter emphasized that machine-readable data that are interoperable with

---

[2508] *See, e.g.*, letter from Morningstar.

[2509] *See, e.g.*, letters from CalPERS; ISS ESG; and Morningstar, Inc. *See also, e.g.,* XBRL US; and XBRL International, Inc.

[2510] *See, e.g.*, letter from ISS ESG.

[2511] *See, e.g.*, letter from Morningstar.

[2512] *See* Proposing Release, section II.L.

[2513] *See, e.g.*, letter from TotalEnergies.

[2514] *See, e.g.*, letters from ISS ESG; XBRL US, Morningstar US, XBRL International.

[2515] *See, e.g.*, letter from Eni Spa.

577

international standards was necessary to ensure effective usage in the current international regulatory environment.[2516]  A different commenter similarly stated that the ISSB has been refining the XBRL climate risk disclosure taxonomy since its inception and recommended that the Commission build its taxonomy based on this work, which would further facilitate global alignment of disclosure standards.[2517]  Other commenters stated that the existing XBRL taxonomy is both familiar and available to issuers and consumers of financial data.[2518]

### 3. Final Rules

After considering comments, we are adopting the structured data requirements as proposed.[2519]  For registrants that are LAFs, compliance with the structured data requirements for disclosures under subpart 1500 of Regulation S-K will be required for all disclosures beginning one year after initial compliance with the disclosure requirements.[2520]  Other categories of filers will be required to comply with the tagging requirements upon their initial compliance with subpart 1500.  Likewise, with respect to any specific provisions that have an extended compliance date that begins on or after the initial tagging compliance date for LAFs, filers will be required to tag such information at initial compliance.[2521]  Because non-LAF registrants will have a later date than LAF registrants to comply overall with the final rules, we

---

[2516] *See, e.g.*, letter from Data Fnd, urging the Commission to consider adopting international standards to ensure the highest possibility for data comparability across reporting regimes and international regulatory bodies.

[2517] *See, e.g.*, letter from Ceres (also noting that the ISSB released a Sustainability Disclosure Taxonomy for public comment on May 25, 2022).

[2518] *See, e.g.*, letter from ISS ESG.

[2519] Item 1508 of Regulation S-K and Rule 405(b)(4)(vii) of Regulation S-T (requiring disclosures filed pursuant to subpart 1500 of Regulation S-K to be submitted as an Interactive Data File).  Because financial statements are already structured in Inline XBRL, no new regulatory text is necessary to structure the disclosures filed pursuant to Article 14 of Regulation S-X.  See Rule 405(b)(1)(i) of Regulation S-T.

[2520] *See infra* at section II.O.3 for a more detailed discussion of compliance dates.

[2521] This includes Item 1502(d)(2), Item 1502(e)(2), Item 1504(c)(2), Item 1505, and Item 1506.

Appellate Case: 24-1628    Page: 583    Date Filed: 03/26/2024    Entry ID: 5377362

are not adopting a separate later compliance date regarding the structured data requirements for non-LAF registrants.

Since all issuers that will be subject to the final rules must currently tag disclosures in Inline XBRL,[2522] the requirement will not unduly add to companies' burden, and we believe any incremental costs are appropriate given the significant benefits to investors, as detailed by commenters, including improving the usefulness and comparability of disclosures, as well as making such disclosures easier to locate and review. With respect to the commenter that stated that registrants should not be required to tag climate-related disclosures because they currently only tag financial statement disclosures, we note that all issuers, including smaller reporting companies, must tag in Inline XBRL cover page disclosures and financial statement disclosures, which includes both detail and block text tagging. In addition, we note that the limited incremental additional cost associated with tagging additional disclosures results in a significant benefit to investors in terms of the ability to readily find and analyze disclosures. As the Commission stated in the Proposing Release and as confirmed by commenters, Inline XBRL tagging will enable automated extraction and analysis of the information required by the final rules, allowing investors and other market participants to more efficiently identify responsive disclosure, as well as perform large-scale aggregation, comparison, filtering, and other analysis of this information across registrants, as compared to requiring a non-machine readable data language such at HTML.[2523] The Inline XBRL requirement will also enable automatic

---

[2522]  *See* Rules 405, 406, and 408 of Regulation S-T.

[2523]  These considerations are generally consistent with objectives of the recently enacted Financial Data Transparency Act of 2022, which directs the establishment by the Commission and other financial

comparison of tagged disclosures against prior periods.  If we were not to adopt the Inline XBRL requirement as suggested by some commenters, some of these benefits would be diminished, in particular the enhanced comparability of the disclosures required under the final rules.  We are not allowing for voluntary tagging, as suggested by one commenter, because to do so would likely negatively impact the completeness of the data, thereby diminishing the usefulness of the information.

With respect to the commenter that suggested registrants should have the ability to select a structured data language, we have concluded that leaving the particular structured data language unspecified could lead to different issuers using different data languages for the same disclosure, thus hindering the interoperability and usability of the data.  We agree with commenters that stated that the existing Inline XBRL data language is familiar to registrants and investors, and therefore continued use of this structured data language will ease registrants' cost of compliance and burdens on investors.

We acknowledge commenters that noted the importance of interoperability with international standards.  The staff will keep this consideration in mind as it develops a draft taxonomy for the final rules and will seek to incorporate elements from third-party taxonomies whenever appropriate to do so.  With respect to the commenter who called for the Commission to approve a taxonomy prior to compliance, consistent with the Commission's common practice, a draft taxonomy will be made available for public comment, and the Commission will incorporate a final taxonomy into an updated version of EDGAR before the tagging requirements

---

regulators of data standards for collections of information, including with respect to periodic and current reports required to be filed or furnished under Exchange Act sections 13 and 15(d).  Such data standards must meet specified criteria relating to openness and machine-readability and promote interoperability of financial regulatory data across members of the Financial Stability Oversight Council.  *See* James M. Inhofe National Defense Authorization Act for Fiscal Year 2023, P.L. 117-263, tit. LVIII, 136 Stat. 2395, 3421-39 (2022).

take effect.  We acknowledge commenters who expressed concerns about the potential for

extensive custom tagging, and the possible resulting effect on data quality and usefulness.  In

order to address these concerns and provide sufficient time for the adoption of a final taxonomy

that will take into consideration initial disclosures that will be provided in response to the final

rules, we are delaying compliance with the structured data requirements for one year beyond

initial compliance with the disclosure requirements for LAF registrants, which have the earliest

compliance date regarding the final rules.[2524]  This approach should both help lessen any

compliance burden and improve data by reducing the need for extensive custom tagging.

### N. Treatment for Purposes of the Securities Act and the Exchange Act

#### 1. Proposed Rules

The Commission proposed to treat the proposed required climate-related disclosures as

"filed" and therefore subject to potential liability under Exchange Act section 18,[2525] except for

disclosures furnished on Form 6-K.[2526]  The proposed filed climate-related disclosures would

also be subject to potential section 11 liability[2527] if included in, or incorporated by reference

into, a Securities Act registration statement.  This treatment would apply both to the disclosures

in response to proposed subpart 1500 of Regulation S-K and to proposed Article 14 of

Regulation S-X.

The Commission proposed that Form 6-K disclosures would not be treated as "filed"

because the form, by its own terms, states that "information and documents furnished in this

report shall not be deemed to be 'filed' for the purposes of section 18 of the Act or otherwise

---

[2524]  *See infra* at section II.O.3.

[2525]  15 U.S.C. 78r.

[2526]  *See* Proposing Release, section II.L.

[2527]  15 U.S.C. 77k.

subject to the liabilities of that section."[2528]  As the Commission explained when proposing the climate-related disclosure rules,[2529] the treatment of disclosures on Form 6-K as furnished is a long-standing part of the foreign private issuer disclosure system.[2530]

## 2.  Comments

Commenters expressed differing views on whether we should treat Commission-mandated climate-related disclosures as filed or furnished.  Several commenters supported the proposed treatment of disclosures required by both proposed subpart 1500 of Regulation S-K and proposed Article 14 of Regulation S-X as filed.[2531]  One commenter stated that because climate-related disclosures will provide information that is important for investors in securities analysis and the management of investment risk, these disclosures should be treated the same as other critical information filed under Regulations S-X and S-K that is material and necessary for investors' assessment of registrants' financial performance and future prospects.[2532]  Other commenters stated that the treatment of climate-related disclosures as filed, which would allow liability under section 18 to attach to false or misleading statements, will communicate to registrants the importance of these disclosures and deter them from greenwashing or otherwise making misleading statements.[2533]  Still other commenters stated that the proposed treatment of climate-related disclosures as filed would help ensure that the disclosures are accurate and

---

[2528]  Form 6-K, General Instruction B.

[2529]  *See* Proposing Release at section II.L.

[2530]  *See Periodic Report of Foreign Issuer*, Release No. 34-8069 (Apr. 28, 1967) [32 FR 7853 (May 30, 1967)]. Form 6-K's treatment as furnished for purposes of section 18 has existed since the Commission adopted the form.

[2531]  *See, e.g.*, letters from Amer. for Fin. Reform, Sunrise Project *et al.*; AGs of Cal. *et al.*; CalPERS; Ceres; CFA; Engine No. 1; Franklin Templeton; PwC; SKY Harbor; and TotalEnergies.

[2532]  *See* letter from Amer. for Fin. Reform, Sunrise Project *et al.*

[2533]  *See* letters from AGs of Cal. *et al.*; and CFA.

consistent.[2534]  One such commenter stated that the treatment of climate-related disclosures as filed could substitute for the proposed requirement to provide assurance for certain GHG emissions disclosures, which the commenter opposed.[2535]

Several other commenters opposed the proposed treatment of climate-related disclosures as filed.[2536]  Some of these commenters stated that the Commission should treat climate-related disclosures as furnished rather than filed because of the complexities and uncertainties involved in such disclosures, particularly regarding those pertaining to GHG emissions disclosures.[2537]  In this regard one commenter stated that the "evolving and uncertain nature of Scope 3 measurement and tracking capabilities (and, for some smaller companies, the novelty of Scope 1 and Scope 2 reporting) could make it difficult for [registrants] to reach the degree of certainty necessary to assume the liability burden associated with reports filed with the [Commission]."[2538]  Other commenters stated that the proposed treatment would deter registrants from providing expansive climate-related disclosures because of the potential liability under Exchange Act section 18 and Securities Act section 11.[2539]

Several commenters supported the proposed treatment of climate-related disclosures on a Form 6-K as furnished.[2540]  One commenter stated that it saw no reason to disrupt the well-

---

[2534]   *See, e.g.*, letters from Ceres; Franklin Templeton; PwC; and SKY Harbor.

[2535]   *See* letter from SKY Harbor.

[2536]   *See, e.g.*, letters from Amer. Chem.; AGC; BlackRock; Chevron; D. Burton, Heritage Fdn.; GPA Midstream; HP; MFA; Nareit; Nasdaq; NAM; RILA; Soc. Corp. Gov.; UPS; and Williams Cos.

[2537]   *See, e.g.*, letters from Alphabet *et al.*; Chevron; D. Burton, Heritage Fdn.; GPA Midstream; HP; NAM; RILA; UPS; and Williams Cos.

[2538]   *See* letter from NAM; *see also* letter from Alphabet *et al.*

[2539]   *See, e.g.*, letters from BlackRock; J. Herron; and Nareit.

[2540]   *See, e.g.*, letters from BHP; CEMEX; and J. Herron.

Appellate Case: 24-1628     Page: 588     Date Filed: 03/26/2024 Entry ID: 5377362

established treatment of information provided on a Form 6-K.[2541]  Other commenters supported the proposed Form 6-K treatment because they believed that all climate-related disclosures should be treated as furnished.[2542]

### 3. Final Rules

As proposed, the climate-related disclosures provided pursuant to the final rules will be treated as filed.  Climate-related disclosures will therefore be subject to potential liability pursuant to Exchange Act section 18 and, if included or otherwise incorporated by reference into a Securities Act registration statement, Securities Act section 11 as well.  Treating climate-related disclosures as filed will help promote the accuracy and consistency of such disclosures.  In this regard, we believe climate-related disclosures should be subject to the same liability as other important business or financial information that the registrant includes in its registration statements and periodic reports.  While we acknowledge commenters' concerns regarding the complexities and evolving nature of climate data methodologies, particularly with regard to GHG emissions metrics,[2543] the modifications we have made to the proposed rules should help to mitigate this concern.  These modifications include: limiting the scope of the GHG emissions disclosure requirement;[2544] revising several provisions regarding the impacts of climate-related risks on strategy, targets and goals, and climate-related metrics so that registrants will only be required to provide the disclosures in certain circumstances, such as when material to the

---

[2541]  *See* letter from BHP.

[2542]  *See, e.g.*, letters from CEMEX; and J. Herron; *see also* letter from Nasdaq (stating that the Commission should treat all climate-related disclosures as furnished while also stating that the Commission has "not explained why it has discriminated between foreign and domestic companies in this regard").

[2543]  *See supra* notes 2537 and 2538 and accompanying text.

[2544]  *See supra* section II.H.3.

registrant;[2545] and providing an additional PSLRA safe harbor for several types of climate-related disclosures.[2546] We also are providing registrants with a transition period based on filer status and the content of the required information to afford registrants additional time to prepare to provide the climate-related disclosures.[2547] For these reasons, we are requiring the climate-related disclosures to be filed rather than furnished.

## O. Compliance Date

### 1. Proposed Rules

The Commission proposed phase in dates for complying with the proposed rules that differed based on a registrant's filing status or status as an SRC.[2548] In proposing the different compliance dates, the Commission recognized that many registrants may require time to establish the necessary systems, controls, and procedures to comply with the proposed climate-related disclosure requirements. The Commission also indicated that it was appropriate to apply the rules first to LAFs because many LAFs are already collecting and disclosing climate-related information, have already devoted resources to these efforts, and have some levels of controls and processes in place for such disclosure.[2549] In addition, by providing AFs and NAFs with additional time, and SRCs with the greatest amount of time, to prepare for complying with the proposed rules, the Commission sought to provide registrants, especially smaller registrants, with additional time to prepare for the proposed climate-related disclosures.[2550]

---

[2545]    *See supra* sections II.D., II.G.3, and II.H.3.

[2546]    *See supra* section II.J.3.

[2547]    *See infra* section II.O.3.

[2548]    *See* Proposing Release, section II.M.

[2549]    *See id.*

[2550]    *See id.*

Appellate Case: 24-1628    Page: 590    Date Filed: 03/26/2024 Entry ID: 5377362

The Commission summarized the proposed phase ins for compliance in the following table, which was included in the Proposing Release.  The table assumed, for illustrative purposes, that the proposed rules would be adopted with an effective date in December 2022, and that the registrant has a December 31 fiscal year-end.  The proposed compliance dates in the table applied to both annual reports and registration statements.

| Compliance Dates Under Proposed Rules | | | |
|---|---|---|---|
| Registrant Type | Disclosure Compliance Date | | Financial Statement Metrics Audit Compliance Date |
| | All proposed disclosures, including GHG emissions metrics: Scope 1, Scope 2, and associated intensity metric, but excluding Scope 3. | GHG emissions metrics: Scope 3 and associated intensity metric | |
| LAFs | Fiscal year 2023 (filed in 2024) | Fiscal year 2024 (filed in 2025) | Same as disclosure compliance date |
| AFs and NAFs | Fiscal year 2024 (filed in 2025) | Fiscal year 2025 (filed in 2026) | |
| SRCs | Fiscal year 2025 (filed in 2026) | Exempted | |

## 2. Comments

Many responsive commenters supported different compliance dates based on a registrant's status as an LAF, AF, NAF, or SRC.[2551]  Some commenters supported the phase in schedule, as proposed.[2552]  One commenter stated that the proposed phase in periods would give

---

[2551]  *See, e.g.*, letters from Alphabet *et al.*; CEMEX; CAQ (recommending phase in schedule by type of disclosure and filer status); Ceres; Franklin Templeton; J. Herron; IADC; ICI; Institutional Shareholder Services (June 22, 2022) ("ISS"); KPMG (recommending phase in schedule by type of disclosure in addition to filer status); Northern Trust; NRF; PwC; SKY Harbor; Soros Fund; TotalEnergies; US SIF; and XBRL.

[2552]  *See, e.g.*, letters from ISS; SKY Harbor; and TotalEnergies.

App.586

sufficient lead time for registrants to prepare while also not unduly delaying the disclosures for investors.[2553]

Several commenters stated that the proposed phase in schedule would be challenging even for LAFs to meet and that additional time would be needed for registrants to develop the reporting controls and procedures necessary to prepare disclosures that are high quality and reliable for investors.[2554] Commenters recommended that the proposed compliance dates be extended by various periods, such as by: one year;[2555] two years;[2556] three years;[2557] or five years.[2558] Some commenters opposed the proposed compliance dates without specifying what dates would be appropriate.[2559] Other commenters recommended that the Commission shorten the proposed phase in periods.[2560]

---

[2553] *See* letter from SKY Harbor.

[2554] *See, e.g.*, letters from Alphabet; ConocoPhillips; HP; PwC; RILA; Shearman Sterling; SIFMA; and Williams Cos.

[2555] *See, e.g.*, letters by HP; ICI (recommending extending the compliance date for financial metrics disclosure by at least one year); Microsoft (requesting one-year extension of the compliance date for GHG emissions, financial metrics, and impact disclosures); Nikola; Northern Trust (recommending extending by one year the compliance date for GHG emissions); PwC (recommending a one year delayed effective date); and Shearman Sterling.

[2556] *See, e.g.*, letters from Alphabet *et al.*; AXPC; KPMG (recommending extending the phase in periods by two-three years); NRF; RILA; SIFMA (recommending two-year extension of the compliance date for Scope 3 emissions disclosure); and US TAG TC207.

[2557] *See, e.g.*, letters from CEMEX (recommending extending the compliance date for Scope 3 emissions disclosure by LAFs by three-five years); SIFMA (recommending three-four year extension for compliance with financial metrics disclosure); and Williams Cos. (recommending three-five year extension for all registrants, including LAFs).

[2558] *See, e.g.*, letters from API; and ConocoPhillips (recommending extending the compliance date for Scopes 1 and 2 emissions disclosures to at least five years from date of adoption).

[2559] *See, e.g.*, letters from AGCA; Crowe LLP (June 16, 2022) ("Crowe") (recommending extending the phase in periods for GHG emissions and financial metrics disclosures); Eni SpA (recommending a phase in for financial metrics disclosure); IADC; and Nasdaq.

[2560] *See, e.g.*, letters from AGs of Cal. *et al.* (recommending shortening the phase in period for all registrants other than LAFs by one year); CalSTRS (recommending setting the phase in periods to the earliest possible dates); and Ceres (recommending moving up disclosure proposed to be required for fiscal year 2025 by one year).

### 3. Final Rules

Similar to the proposed rules, we are adopting delayed and staggered compliance dates for the final rules that vary according to the filing status of the registrant.[2561] We continue to believe that initially applying the disclosure requirements to LAFs is appropriate because many LAFs are already collecting and disclosing climate-related information,[2562] and therefore will have devoted resources to these efforts and have some levels of controls and processes in place for such disclosure. In comparison, registrants that are not LAFs may need more time to develop the systems, controls, and processes necessary to comply with the climate disclosure rules and may face proportionately higher costs. Accordingly, we are providing such registrants additional time to comply, with SRCs, EGCs, and NAFs receiving the longest phase in period. Although we recognize that some SRCs and EGCs may technically be classified as AFs, such registrants may face the same difficulties as other SRCs and EGCs in complying with the final rules, and accordingly, the extended compliance date applies to them based on their status as SRCs or EGCs.

To address the concerns of many commenters that the proposed compliance schedule was too challenging even for LAFs to meet, we are providing an extended and phased in compliance period for each type of registrant and for certain types of disclosures. For example, we are providing a further phased in compliance date for registrants that may be required to disclose their Scopes 1 and 2 emissions that differs from the proposed compliance schedule, which would have required registrants to provide those emissions disclosures by the same deadline as for the

---

[2561] For the avoidance of doubt, notwithstanding the fact that we generally use the term "registrant" in this section, the compliance dates discussed herein also apply to the information required to be provided pursuant to new General Instruction C.3 of Forms S-4 and F-4 with respect to a company being acquired.

[2562] *See infra* section IV.A.5. *See also, e.g.*, letters from Amazon; Dell; and Microsoft.

other climate disclosures.  This will help address the concern of commenters that additional time is required for registrants, including many LAFs, to enhance or implement new policies, processes, controls, and system solutions in order to provide the GHG emissions disclosures if required.  We are also providing a further phased-in compliance date for the requirements to provide quantitative and qualitative disclosures about material expenditures and material impacts to financial estimates and assumptions required by Item 1502(d)(2), Item 1502(e)(2), and Item 1504(c)(2) until the fiscal year immediately following the fiscal year of the registrant's initial compliance date for subpart 1500 disclosures based on its filer status, for the reasons discussed above.[2563]

The following table summarizes the phased in compliance dates of the final rules, both for subpart 1500 of Regulation S-K and Article 14 of Regulation S-X.  The compliance dates in the table apply to both annual reports and registration statements; in the case of registration statements, compliance would be required beginning in any registration statement that is required to include financial information for the full fiscal year indicated in the table.

| Compliance Dates under the Final Rules[1] | | | | | |
|---|---|---|---|---|---|
| **Registrant Type** | **Disclosure and Financial Statement Effects Audit** | | **GHG Emissions/Assurance** | | **Electronic Tagging** |
| | *All Reg. S-K and S-X disclosures, other than as noted in this table* | *Item 1502(d)(2), Item 1502(e)(2), and Item 1504(c)(2)* | *Item 1505 (Scopes 1 and 2 GHG emissions)* | *Item 1506 - Limited Assurance* | *Item 1506 - Reasonable Assurance* | *Item 1508 - Inline XBRL tagging for subpart 1500[2]* |
| LAFs | FYB 2025 | FYB 2026 | FYB 2026 | FYB 2029 | FYB 2033 | FYB 2026 |
| AFs (other than SRCs and EGCs) | FYB 2026 | FYB 2027 | FYB 2028 | FYB 2031 | N/A | FYB 2026 |
| SRCs, EGCs, and NAFs | FYB 2027 | FYB 2028 | N/A | N/A | N/A | FYB 2027 |
| | [1] As used in this chart, "FYB" refers to any fiscal year beginning in the calendar year listed. [2] Financial statement disclosures under Article 14 will be required to be tagged in accordance with existing rules pertaining to the tagging of financial statements.  *See* Rule 405(b)(1)(i) of Regulation S-T. | | | | | |

---

[2563]    *See supra* sections II.D.1.c, II.D.2.c, and II.G.3.a.

App.589

Appellate Case: 24-1628      Page: 594      Date Filed: 03/26/2024 Entry ID: 5377362

For example, an LAF with a January 1 fiscal-year start and a December 31 fiscal year-end date will not be required to comply with the climate disclosure rules (other than those pertaining to GHG emissions and those related to Item 1502(d)(2), Item 1502(e)(2), and Item 1504(c)(2), if applicable) until its Form 10-K for fiscal year ended December 31, 2025, due in March 2026. If required to disclose its Scopes 1 and/or 2 emissions, such a filer will not be required to disclose those emissions until its Form 10-K for fiscal year ended December 31, 2026, due in March 2027, or in a registration statement that is required to include financial information for fiscal year 2026. Such emissions disclosures would not be subject to the requirement to obtain limited assurance until its Form 10-K for fiscal year ended December 31, 2029, due in March 2030, or in a registration statement that is required to include financial information for fiscal year 2029. The registrant would be required to obtain reasonable assurance over such emissions disclosure beginning with its Form 10-K for fiscal year ended December 31, 2033, due in March 2034, or in a registration statement that is required to include financial information for fiscal year 2033. If required to make disclosures pursuant to Item 1502(d)(2), Item 1502(e)(2), or Item 1504(c)(2), such a filer will not be required to make such disclosures until its Form 10-K for fiscal year ended December 31, 2026, due in March 2027, or in a registration statement that is required to include financial information for fiscal year 2026.

As another example, an AF that is not an SRC or EGC with a January 1 fiscal-year start and December 31 fiscal year-end date will not be required to comply with the climate disclosure rules (other than those pertaining to GHG emissions and those related to Item 1502(d)(2), Item 1502(e)(2), and Item 1504(c)(2), if applicable) until its Form 10-K for the fiscal-year ending December 31, 2026, due in March 2027. If required to disclose its Scopes 1 and 2 emissions, such a filer will not be required to disclose those emissions until its Form 10-K for fiscal year

ending December 31, 2028, due in March 2029, or in a registration statement that is required to include financial information for fiscal year 2028, and it would not be required to obtain limited assurance over such disclosure until its Form 10-K for fiscal year ending December 31, 2031, due in March 2032, or in a registration statement that is required to include financial information for fiscal year 2031. If required to make disclosures pursuant to Item 1502(d)(2), Item 1502(e)(2), or Item 1504(c)(2), such a filer will not be required to make such disclosures until its Form 10-K for fiscal year ended December 31, 2027, due in March 2028, or in a registration statement that is required to include financial information for fiscal year 2027.

We are adopting a separate compliance date for the structured data (electronic tagging) requirements of the final rules that is one year following the earliest compliance date (which applies to LAFs) under the final rules.[2564] We are adopting a later compliance date for the structured data requirements to improve the quality of the structured data, as discussed above.[2565] Accordingly, LAFs will not be required to comply with the structured data requirements when first complying with the climate disclosure rules in subpart 1500 required in 2025 but will be required to do so when complying with the climate disclosure rules in subpart 1500 for fiscal year 2026; tagging of disclosures provided in response to Item 1502(d)(2), Item 1502(e)(2), Item 1504(c)(2), Item 1505, and Item 1506 will be required at the time of initial compliance with these provisions. AFs (other than SRCS and EGCs) will be required to comply with the structured data requirements when first complying with the relevant provisions of subpart 1500 for the fiscal year that begins in 2026. Similarly, SRCs, EGCs, and NAFs will be required to

---

[2564] We note that the final rules do not alter the requirements for registrants to tag their financial statement disclosures in Inline XBRL. Accordingly, financial statement disclosures provided pursuant to new Article 14 of Regulation S-X will be required to be tagged in accordance with those requirements at the time they are first required. *See* Rule 405(b)(1)(i) of Regulation S-T.

[2565] *See* discussion *supra* at section II.M.3.

Appellate Case: 24-1628    Page: 596    Date Filed: 03/26/2024 Entry ID: 5377362

comply with the structured data requirements when first complying with the climate disclosure rules for the fiscal year that begins in 2027. For these non-LAF registrants, we are not adopting a later compliance date for the structured data requirements because we are adopting later compliance dates regarding the final rules overall for these registrants, which will provide them with additional time to meet the final rules' structured data requirements.

## III. OTHER MATTERS

The Commission considers the provisions of the final rules to be severable to the fullest extent permitted by law. "If parts of a regulation are invalid and other parts are not," courts "set aside only the invalid parts unless the remaining ones cannot operate by themselves or unless the agency manifests an intent for the entire package to rise or fall together." *Bd. of Cnty. Commissioners of Weld Cnty. v. EPA*, 72 F.4th 284, 296 (D.C. Cir. 2023); *see K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 294 (1988). "In such an inquiry, the presumption is always in favor of severability." *Cmty. for Creative Non-Violence v. Turner*, 893 F.2d 1387, 1394 (D.C. Cir. 1990). Consistent with these principles, while the Commission believes that all provisions of the final rules are fully consistent with governing law, if any of the provisions of these rules, or the application thereof to any person or circumstance, is held to be invalid, the Commission intends that such invalidity shall not affect other provisions or application of such provisions to other persons or circumstances that can be given effect without the invalid provision or application. For instance, but without limitation, each of the following portions of the final rules serves distinct but related purposes and is capable of operating independently: (1) climate-related risk disclosures, (2) targets and goals disclosures, (3) GHG emissions disclosures and assurance, and (4) Article 14 financial statement disclosures. Moreover, many of the required disclosure items in the final rules operate independently in that not all registrants are required to provide

each of the required disclosures, and some disclosures will only be provided to the extent applicable. For example, disclosures related to a registrant's use of transition plans, scenario analysis, or internal carbon prices would depend upon a registrant's activities, if any, to mitigate or adapt to material climate-related risks. Similarly, governance disclosures would only be required to the extent that a registrant has information responsive to the disclosure requirements. In addition, the GHG emissions disclosure requirements will apply only with respect to LAFs and AFs (other than SRCs and EGCs). Thus, while the final rules are each intended to improve the overall consistency, comparability, and reliability of climate-related disclosures as discussed throughout this release, the invalidity of any particular disclosure requirement would not undermine the operability or usefulness of other aspects of the final rules.

Pursuant to the Congressional Review Act,[2566] the Office of Information and Regulatory Affairs has designated these rules a "major rule," as defined by 5 U.S.C. 804(2).

## IV. ECONOMIC ANALYSIS

We are mindful of the economic effects that may result from the final rules, including the benefits, costs, and the effects on efficiency, competition, and capital formation.[2567] This section analyzes the expected economic effects of the final rules relative to the current baseline, which consists of the regulatory framework of disclosure requirements in existence today, the current

---

[2566] 5 U.S.C. 801 *et seq*.

[2567] Section 2(b) of the Securities Act, 15 U.S.C. 77b(b), and section 3(f) of the Exchange Act, 17 U.S.C. 78c(f), require the Commission, when engaging in rulemaking where it is required to consider or determine whether an action is necessary or appropriate in the public interest, to consider, in addition to the protection of investors, whether the action will promote efficiency, competition, and capital formation. Further, section 23(a)(2) of the Exchange Act, 17 U.S.C. 78w(a)(2), requires the Commission, when making rules under the Exchange Act, to consider the impact that the rules would have on competition, and prohibits the Commission from adopting any rules that would impose a burden on competition not necessary or appropriate in furtherance of the Exchange Act.

Appellate Case: 24-1628    Page: 598    Date Filed: 03/26/2024 Entry ID: 5377362

disclosure practices of registrants, and the use of such disclosures by investors and other market participants. Where possible, we have attempted to quantify these economic effects. In many cases, however, we are unable to reliably quantify the potential benefits and costs of the final rules because we lack information necessary to provide a reasonable estimate. For example, existing empirical evidence does not allow us to reliably quantify how enhancements in climate-related disclosure may improve information processing by investors, or company monitoring of climate-related risks. Where quantification of the economic effects of the final rules is not practical or possible, we provide a qualitative assessment of the effects.

The final rules will provide investors with more consistent, comparable, and reliable disclosures with respect to registrants' climate-related risks that have materially impacted, or are reasonably likely to have a material impact on, the registrant's business strategy, results of operations, or financial condition, the governance and management of such risks, and the financial statement effects of severe weather events and other natural conditions, which will enable investors to make more informed investment and voting decisions.[2568] Many investors have expressed concern that the current landscape of primarily voluntary climate-related disclosures is inadequate.[2569] By requiring registrants to provide climate-related information in a more standardized format in Commission filings, the final rules will mitigate the challenges that investors currently confront in obtaining consistent, comparable, and reliable information, assessing the nature and extent of the climate-related risks faced by registrants and their impact on registrants' business operations and financial condition, and making comparisons across registrants. Further, a mandatory disclosure regime will generally provide investors with access

---

[2568]    *See infra* section IV.C.1.

[2569]    *See infra* section IV.B.

to climate-related disclosures on a more timely and regular basis than a voluntary disclosure regime.[2570]  As a result, the final rules will reduce information asymmetry between investors and registrants, which can reduce investors' uncertainty about estimated future cash flows.  This effect contributes to a lowering of the risk premium that investors demand and therefore registrants' cost of capital.  The final rules will also reduce information asymmetry among investors by narrowing the informational gap between informed and uninformed traders, which can reduce adverse selection problems and improve stock liquidity.[2571]  Further, by enabling climate-related information to be more fully incorporated into securities prices, the final rules will allow climate-related investment risks to be borne by those investors who are most willing and able to bear them.  Taken together, the final rules are expected to promote investor protection, the efficient allocation of capital, and, for some registrants, capital formation.[2572]

We recognize that the final rules will impose additional costs on registrants, investors, and other parties.  Registrants will face increased compliance burdens, with the extent of these burdens varying based on a registrant's filer status, existing climate-related disclosure practices (if any), and other characteristics.  For example, additional compliance burdens could be

---

[2570]  As industry observers have noted, many companies do not disclose their climate and other sustainability data until more than 12 months after the end of their fiscal year.  *See, e.g.,* Corporate Knights, *Measuring Sustainability Disclosure* (2019), available at https://www.corporateknights.com/wp-content/uploads/2021/08/CK_StockExchangeRanking_2020.pdf. *See* letter from Morningstar (stating that "Currently, a lack of clear disclosure standards for the timing of 'sustainability reports,' which is the primary source for emissions data, greatly hinders investor knowledge.  For example, some registrants released 2021 reports—detailing 2020 data—as late as November 2021."); *see also* letters from Miller/Howard (stating that requiring disclosure in filings with the Commission will provide users with confidence that they are receiving the "most recent" climate-related information); and Calvert (stating that "57% of 2,207 companies disclosed their Scope 1 and 2 emissions with a one or two year delay.").  Furthermore, a voluntary regime may allow registrants to provide disclosures at irregular or multi-year intervals.  In contrast, the final rules will generally require disclosures on an annual basis, which will allow investors to make better comparisons across time.

[2571]  *See* Corporate Knights, *supra* note 2570.

[2572]  *See infra* section IV.D.

significant for registrants that are not already collecting climate-related information and providing climate-related disclosures.  In other cases, the compliance burden could be more modest, such as for registrants that are already collecting climate-related information and providing information similar to what is required by the rules we are adopting.  Additionally, the requirements will pose a comparatively smaller compliance burden for those registrants that do not have material climate-related risks.  Other potential costs for registrants include increased litigation risk and the potential disclosure of proprietary information about a registrant's operations, business, and/or production processes.[2573]  Beyond registrants, certain third parties, such as market participants, customers, and suppliers, could face reduced demand for their services or higher prices for their inputs as a result of the final rules' required disclosures.

## A.  Baseline and Affected Parties

The baseline against which the costs, benefits, and the effects on efficiency, competition, and capital formation of the final rules are measured consists of current requirements for climate-related disclosures and current market practice as it relates to such disclosures.  The economic analysis considers existing regulatory requirements, including recently adopted rules, as part of its economic baseline against which the benefits and costs of the final rules are measured.[2574]

---

[2573] *See infra* section IV.C.2.

[2574] *See, e.g.*, *Nasdaq v. SEC*, 34 F.4th 1105, 1111-15 (D.C. Cir. 2022).  This approach also follows Commission staff guidance on economic analysis for rulemaking.  *See* SEC Staff, *Current Guidance on Economic Analysis in SEC Rulemaking* (Mar. 16, 2012), available at https://www.sec.gov/divisions/riskfin/rsfi_guidance_econ_analy_secrulemaking.pdf ("SEC Guidance on Economic Analysis (2012)") ("The economic consequences of proposed rules (potential costs and benefits including effects on efficiency, competition, and capital formation) should be measured against a baseline, which is the best assessment of how the world would look in the absence of the proposed action."); *see id*. ("The baseline includes both the economic attributes of the relevant market and the existing regulatory structure.").  The best assessment of how the world would look in the absence of the proposed or final action typically does not include recently proposed actions, because that would improperly assume the adoption of those proposed actions.

One commenter stated that our analysis should account for the "[s]taggering aggregate costs and unprecedented operational challenges" of recently proposed rules in three categories, including "[c]orporate governance."[2575]  Another commenter identified two specific rules with which these final amendments could "interact in obvious or non-obvious ways that raise costs for businesses."[2576]  Implementation of one of these, adopted in the Cybersecurity Disclosures Adopting Release,[2577] could involve the same staff and resources as implementation of the final climate disclosure rules.  However, we expect minimal overlap in the implementation periods of the two rules because the only remaining compliance dates for the rules adopted in the Cybersecurity Disclosures Adopting Release are for cybersecurity incident disclosure by smaller reporting companies by June 15, 2024, structured data requirements for Form 8-K and Form 6-K disclosures by December 18, 2024, and structured data requirements for Item 106 of Regulation S-K and Item 16K of Form 20-F disclosures beginning with annual reports for fiscal years ending on or after December 15, 2024.  By contrast, the earliest compliance date for these final rules covers activities occurring in fiscal year 2025.

---

[2575]  *See* letter from Member of the U.S. House of Representatives Patrick McHenry and 28 other House Members (Sept. 26, 2023).  Although the commenter did not identify specific rules that should be considered as part of this analysis, we considered the "corporate governance" category noted by the commenter (because the final rules include disclosure provisions related to governance of climate-related risks) and identified *Cybersecurity Risk Management, Strategy, Governance, and Incident Disclosure*, *supra* note 2486 ("Cybersecurity Disclosures Adopting Release") as a rule with potentially overlapping implementation costs (discussed *infra* note 2577 and accompanying text).

[2576]  *See* Overdahl exhibit to letter from Chamber (citing Mandel and Carew (2013)).  In addition to the Cybersecurity Disclosures Adopting Release, discussed *infra*, this commenter identified *Share Repurchase Disclosure Modernization*, Release Nos. 34-97424, IC-34906 (May 3, 2023) [88 FR 36002 (June 1, 2023)].  That rule was vacated by the U.S. Court of Appeals for the Fifth Circuit in December 2023.  *See* Chamber of Com. of the U.S. v. SEC, 88 F.4th 1115 (Dec. 19, 2023).

[2577]  *See* Cybersecurity Disclosures Adopting Release.  The Cybersecurity Disclosures Adopting Release requires current disclosure about material cybersecurity incidents, and periodic disclosures about a registrant's processes to assess, identify, and manage material cybersecurity risks, management's role in assessing and managing material cybersecurity risks, and the board of directors' oversight of cybersecurity risks.  For a full discussion of compliance dates for these amendments, *see id.* at section II.I.

This section describes the current regulatory and economic landscape with respect to climate-related disclosures. It discusses the parties likely to be affected by the final rules, current trends in registrants' voluntary reporting on climate risks, related assurance practices, and existing mandatory disclosure rules under state and other Federal laws as well as from other jurisdictions in which registrants may operate.

## 1. Affected Parties

The disclosure requirements being adopted in this release will apply to Securities Act and Exchange Act registration statements as well as Exchange Act annual and quarterly reports. Thus, the parties that are likely to be affected by the final rules include: registrants subject to the disclosure requirements imposed by these forms, as detailed below; consumers of the climate-related risk information, such as investors, analysts, and other market participants; and third-party service providers who may collect and process this information, including assurance providers and ratings providers.

The final rules will affect both domestic registrants and foreign private issuers, but will not apply to Canadian registrants that use the MJDS and file their Exchange Act registration statements and annual reports on Form 40-F.[2578] We estimate that during calendar year 2022,

---

[2578] The number of domestic registrants and foreign private issuers affected by the final rules is estimated as the number of companies, identified by Central Index Key ("CIK"), that filed a unique Form 10-K or Form 20-F during calendar year 2022, excluding asset-backed securities issuers. For the purposes of this economic analysis, these estimates do not include registrants that did not file a unique annual report. This approach avoids including entities whose reporting obligation would be satisfied by a parent or other company, such as co-issuers of debt securities or guarantors, or who otherwise have a suspended reporting obligation. The estimates for the percentages of SRCs, EGCs, AFs, LAFs, and NAFs are based on data obtained by Commission staff using a computer program that analyzes SEC filings, with supplemental data from Ives Group Audit Analytics and manual review of filings by Commission staff. Because this manual review takes a substantial amount of time, the Commission staff performs this process at the end of each calendar year rather than at the end of each quarter. Data for the 2023 filings is not yet available and fully reviewed, so the release includes 2022 numbers. Additionally, there are no 2023 updates for several sections of the baseline (such as those that rely on data or reports from third parties that have not completed their reviews of 2023), so the release includes 2022 data to provide for comparability across the release.

Appellate Case: 24-1628     Page: 603     Date Filed: 03/26/2024 Entry ID: 5377362

excluding registered investment companies, there were approximately 6,870 registrants that filed on domestic forms,[2579] and approximately 920 foreign private issuers that filed on Form 20-F. Among domestic registrants, approximately 34 percent were LAFs, 10 percent were AFs, and 56 percent were NAFs. In addition, we estimate that approximately 57 percent of domestic registrants and 37 percent of foreign private issuers were either SRCs, EGCs, or both.

The final rules will require disclosures in registered offerings, except with respect to business combination transactions involving a company not subject to the reporting requirements of Section 13(a) or 15(d) of the Exchange Act. In many cases, registrants will be able to meet these requirements by incorporating by reference from their periodic reports. Registrants that have not previously filed periodic reports, such as companies conducting IPOs, will not have previously filed such reports to incorporate by reference. In 2022, there were approximately 390 such companies that conducted registered offerings on Form S-1 or F-1.[2580]

## 2. Current Commission Disclosure Requirements

As discussed above and in the Proposing Release, existing disclosure requirements may, depending on circumstance, require the disclosure of climate-related risk.[2581] The 2010

---

[2579]    This number includes approximately 50 foreign private issuers that filed on domestic forms in 2022, approximately 120 BDCs, and 300 REITs.

[2580]    This estimate was calculated by searching EDGAR for all registrants who filed a Form S-1 or F-1 in the year 2022. If multiple registration statements were filed in 2022 by the same registrant, the earliest was used. This list of registrants was then compared to a list of periodic reports (Forms 10-K, 10-Q, 20-F, 8-K) in EDGAR dating back to 2015. Approximately 390 registrants filed registration statements in 2022 that had not previously filed a Form 10-K, 10-Q, 20-F, or 8-K. Of those, approximately 180 did not subsequently file a Form 10-K, 10-Q, 20-F, or 8-K in 2022 or 2023, for example by operation of 17 CFR 240.12h-5 or 12h-7, indicating that they may incur lower or no cost of ongoing compliance because they are exempt from ongoing Exchange Act reporting obligations.

[2581]    *See* discussion *supra* section I.A; Proposing Release sections I.A, IV.A.2; *see also supra* section II.B. for discussion of the historical evolution of Commission rules requiring registrant disclosure. The Commission

Guidance describes how the Commission's existing disclosure requirements can encompass climate-related risk.[2582] The 2010 Guidance emphasized that certain existing disclosure requirements in Regulation S-K and Regulation S-X may require disclosure related to climate change. With respect to the most pertinent non-financial statement disclosure rules, the Commission noted that: Item 101 (Description of Business) expressly requires disclosure regarding certain costs of compliance with environmental laws;[2583] Item 103 (Legal Proceedings) requires disclosure regarding any material pending legal proceeding to which a registrant or any of its subsidiaries is a party; Item 105 (Risk Factors) requires disclosure regarding the most significant factors that would make an investment in the registrant speculative;[2584] and Item 303 (MD&A) of Regulation S-K requires material historical and prospective narrative disclosure enabling investors to assess the financial condition and results of operations of a registrant.[2585]

---

considers the current disclosure of climate risk-related information as part of the baseline against which the benefits and costs of the final rules are measured. We disagree with the commenter who said that the baseline discussion in the Proposing Release was "in effect suggesting that anything climate-related should be presumed to be material." (Overdahl exhibit to letter from Chamber). The baseline includes both the required disclosure of material information under Commission regulation, as well as requirements under other laws that may apply to registrants, and current market practices which may include voluntary disclosures. *See also* section IV.F.1. discussing the benefits and costs of a principles-based approach.

[2582] For an overview of how climate change issues may be required to be disclosed under existing rules, primarily Regulation S-K and Regulation S-X, *see* 2010 Guidance, section III.

[2583] Item 101 of Regulation S-K was amended in 2019. *See* Release No. 33-10618. When the 2010 Guidance was issued, Item 101(c)(1)(xii) required disclosure "as to the material effects that compliance with Federal, state and local provisions which have been enacted or adopted regulating the discharge of materials into the environment, or otherwise relating to the protection of the environment, may have upon the capital expenditures, earnings and competitive position of the registrant and its subsidiaries. The registrant shall disclose any material estimated capital expenditures for environmental control facilities for the remainder of its current fiscal year and its succeeding fiscal year and for such further periods as the registrant may deem material."

[2584] Risk Factors disclosure was required by Item 503(c) of Regulation S-K at the time of the 2010 Guidance. It was moved to Item 105 of Regulation S-K in 2019. *See* Release No. 33-10618.

[2585] The 2010 Guidance also discusses corollary provisions applicable to foreign private issuers not filing on domestic forms and states that, in addition to the Regulation S-K items discussed therein, registrants must

Appellate Case: 24-1628    Page: 605    Date Filed: 03/26/2024 Entry ID: 5377362

While these provisions elicit some decision-useful climate-related disclosure,[2586] they have not resulted in consistent and comparable information about the actual and potential material impacts of climate-related risks on a registrant's business or financial condition, which many investors have increasingly stated that they need in order to make informed investment and voting decisions.[2587]

### 3. Existing State and Other Federal Laws

Existing state and other Federal laws require certain climate-related disclosures or reporting. For instance, within the insurance industry there are requirements for mandatory climate risk disclosure for any domestic insurers that write more than $100 million in annual net written premium.[2588] As of 2022, 14 states[2589] and the District of Columbia require these domestic insurers to disclose their climate-related risk assessment and strategy via the NAIC Climate Risk Disclosure Survey, which the NAIC revised in 2022 to align with the TCFD

---

also consider any financial statement implications of climate-related matters in accordance with applicable accounting standards, including FASB ASC Topic 450, Contingencies, and FASB ASC Topic 275, Risks and Uncertainties. Finally, the 2010 Guidance noted the applicability of Securities Act Rule 408 and Exchange Act Rule 12b-20, which require a registrant to disclose, in addition to the information expressly required by Commission regulation, "such further material information, if any, as may be necessary to make the required statements, in light of the circumstances under which they are made, not misleading."

[2586] *See, e.g.*, Jeong-Bon Kim, Chong Wang & Feng Wu, *The Real Effects of Risk Disclosures: Evidence from Climate Change Reporting in 10-Ks,* 28 Rev. Acct. Stud. 2271 (2023) (finding that the 2010 Guidance resulted in a large increase in the number of firms providing climate-related disclosures).

[2587] *See supra* section I.A.

[2588] "Net written premium" is defined as the premiums written by an insurance company, minus premiums paid to reinsurance companies, plus any reinsurance assumed.

[2589] The 14 states are California, Connecticut, Delaware, Maine, Maryland, Massachusetts, Minnesota, New Mexico, New York, Oregon, Pennsylvania, Rhode Island, Vermont, and Washington. Colorado enacted legislation requiring insurers to participate beginning in 2024. Co. Rev. Stat. 10-3-244 (enacted May 11, 2023).

framework.[2590]  Survey question topics include climate risk governance, climate risk management, and modeling.  For reporting year 2021, 62 registrants provided climate risk disclosures in response to the NAIC survey.[2591]  For reporting year 2022, insurers were allowed to submit a completed TCFD report or a survey response: 96 registrants provided either a TCFD report or a survey response.[2592]

Federal and state reporting requirements related to GHG emissions also exist.  At the Federal level, the GHGRP requires that each facility that directly emits more than 25,000 metric tons of $CO_2e$ per year report these direct emissions to the EPA.[2593]  Additionally, facilities that supply certain products that would result in over 25,000 metric tons of $CO_2e$ per year if those products were released, combusted, or oxidized must similarly report these "supplied" emissions to the EPA.[2594]  The resulting emissions data are then made public through the EPA's website.

---

[2590]  NAIC News Release, *U.S. Insurance Commissioners Endorse Internationally Recognized Climate Risk Disclosure Standard for Insurance Companies* (Apr. 8, 2022), available at https://content.naic.org/article/us-insurance-commissioners-endorse-internationally-recognized-climate-risk-disclosure-standard; NAIC, *Redesigned State Climate Risk Disclosure Survey* (adopted Apr. 6, 2022), available at https://www.insurance.ca.gov/0250-insurers/0300-insurers/0100-applications/ClimateSurvey/upload/2022RevisedStateClimateRiskSurvey.pdf.

[2591]  This estimate is based on 20-F and 10-K filings in calendar year 2021 and 2021 NAIC survey results available at https://interactive.web.insurance.ca.gov/apex_extprd/f?p=201:1 (last visited Jan. 16, 2024). *See supra* note 2578 for more information on how the Commission staff estimated the number of registrants.

[2592]  This estimate is based on 20-F and 10-K filings in calendar year 2022, and 2022 NAIC survey results, available at https://interactive.web.insurance.ca.gov/apex_extprd/f?p=201:1 (last visited Jan. 16, 2024).

[2593]  *See* 40 CFR Part 98 (2022); *see also* EPA Fact Sheet.  The EPA's emissions data does not include emissions from agriculture, land use, or direct emissions from sources that have annual emissions of less than 25,000 metric tons of CO2e per year.  *See also* letter from EPA (describing differences between the GHGRP and the SEC's proposed rule and noting the "Clean Air Act authority for reporting and the purpose of the GHGRP are distinct from those of the SEC's proposed rule.").

[2594]  *See* EPA Fact Sheet; *see also* EPA, *Learn About the Greenhouse Gas Reporting Program (GHGRP)*, available at https://www.epa.gov/ghgreporting/learn-about-greenhouse-gas-reporting-program-ghgrp (Updated June 20, 2023).  According to the EPA, "direct emitters" are facilities that combust fuels or otherwise put GHGs into the atmosphere directly from their facility. *See* EPA, *Greenhouse Gas Search*

Appellate Case: 24-1628     Page: 607     Date Filed: 03/26/2024 Entry ID: 5377362

The EPA estimates that the reporting required under the GHGRP covers 85 to 90 percent of all GHG emissions from over 8,000 facilities in the United States,[2595] and we estimate that approximately 365 registrants had an ownership stake in facilities that reported to the GHGRP in 2022.[2596] Gases that must be reported under the GHGRP include all those referenced by the GHG Protocol, which are also included within these final rules' definition of "greenhouse gases."[2597]

In light of the existence of the GHGRP, some commenters questioned the need for the proposed rules.[2598] One commenter stated "[t]he natural question is why the SEC feels compelled to require its own GHG emissions disclosures when the EPA already has a public reporting program that covers 85 to 90 percent of all GHG emissions from over 8,000 facilities

---

*User Guide*, available at https://www.epa.gov/enviro/greenhouse-gas-search-user-guide (Updated Jan. 17, 2024). An example of a direct emitter is a power plant that burns coal or natural gas and emits $CO_2$ directly into the atmosphere. *Id*. "Suppliers" are those entities that supply products into the economy which if combusted, released, or oxidized emit GHGs into the atmosphere. *Id.* An example of a supplier is a gasoline importer or distributor, which sells gasoline in the U.S. that is burned in cars throughout the country. *Id*. While the GHGRP does not represent the total GHG emissions in the U.S., it is the only dataset containing facility-level data for large sources of direct emissions, thus including the majority of U.S. GHG emissions. *See* EPA, *2022 GHGRP Overview Report*, available at https://www.epa.gov/system/files/documents/2023-10/ghgrp-2022-overview-profile.pdf. The EPA estimates that the GHGRP data reported by direct emitters covers about half of all U.S. emissions. *Id.* When including the greenhouse gas information reported by suppliers to the GHGRP, emissions coverage reaches approximately 85-90% of U.S. GHG emissions. *Id.*

[2595] *See* EPA Fact Sheet.

[2596] This estimate is based on parent company data provided by the EPA (*GHGRP Reported Data* (2022), *supra* note 2594), as well as registrant data gathered by Commission staff from Commission filings. Parent companies from the GHGRP reporting data were matched to registrants based on company name using Levenshtein Distance, as well as the reported city and state of the parent company. Matches were then manually reviewed by Commission staff.

[2597] The EPA also requires reporting on some gases (*e.g.*, fluorinated ethers, perfluoropolyether) that are considered optional under the GHG Protocol and that are not included within this final rules' definition of "greenhouse gases."

[2598] *See* letter from Andrew N. Vollmer (May 9, 2022)*; see also* letters from D. Burton; Heritage Fdn. ("The very limited increase in actual information that will be achieved by the proposed rule will make virtually no difference. And, if it is thought that it will, by far the most efficient and effective means of increasing the information available would be to amend the EPA rules"); and ConocoPhillips ("We believe GHG disclosure regimes established by the EPA and regulators in other jurisdictions with broad existing GHG emissions coverage should form the basis of GHG emissions disclosure and do not believe additional and duplicative Scope 1 and 2 emissions disclosures will be useful or material to investors in many instances.").

603

in the United States."[2599]  While we acknowledge that the GHGRP and the final rules both address reporting of GHGs, there are distinct and significant differences between both the goals and requirements of the GHGRP and the final rules.  As the EPA noted in its comment letter: "[T]he GHGRP…informs the development of greenhouse gas policies and programs under the Clean Air Act, and serves as an important tool for the Agency and the public to understand greenhouse gas emissions from facilities covered by the GHGRP nationwide. This is distinct from the purposes of the SEC's Proposed Rules, which are intended to enhance and standardize climate-related disclosures to address investor needs and help issuers more efficiently and effectively disclose climate-related risks, benefitting both investors and issuers."[2600]  In addition to the difference in goals, there are several significant differences in the requirements between the GHGRP and the final rules.  First, the entities required to report under the EPA regime may differ from the entities required to report under the final rules.[2601]  Second, the EPA requires emissions reporting only for U.S. facilities, while the final rules are not limited to U.S. facilities.  Third, the EPA emissions data do not allow a precise disaggregation across the different scopes of emissions for a given registrant.  In particular, the EPA requires reporting of facility-level direct emissions, which may be a subset of the relevant registrant's Scope 1 emissions.  Finally, the EPA does not require reporting of Scope 2 emissions.[2602]

---

[2599]   *See* letter from Andrew N. Vollmer (May 9, 2022).

[2600]   *See* letter from EPA.

[2601]   The EPA requirements apply to facility owners and operators, and suppliers, while these final rules apply to registrants.

[2602]   "The GHGRP does not include emissions from…reporting of data on electricity purchases or indirect emissions from energy consumption, which falls under Scope 2 emissions." (footnote omitted). EPA, *Greenhouse Gas Reporting Program (GHGRP)* (Updated June 20, 2023)*, available at* https://www.epa.gov/ghgreporting/learn-about-greenhouse-gas-reporting-program-ghgrp.

Many state laws also impose specific GHG emissions reporting requirements.[2603] States' rules vary with respect to reporting thresholds and emissions calculation methodologies, but most tend to focus on direct emissions, with certain exceptions. For example, in New York, any owner or operator of a facility that is a "major source" must report its annual actual emissions of certain air contaminants to the New York State Department of Environmental Conservation.[2604] Colorado requires GHG-emitting entities to report their emissions to the state in support of Colorado's GHG inventory and reduction efforts.[2605] California and Washington require annual reporting of GHG emissions by industrial sources that emit more than 10,000 metric tons of $CO_2e$, transportation and natural gas fuel suppliers, and electricity importers.[2606]

California also recently enacted two laws requiring additional climate-related disclosures and reporting for certain companies doing business in the state.[2607] The Climate Corporate Data

---

[2603] *See*, *e.g.*, CA Health & Safety Code § 38530; CO Rev. Stat. § 25-7-140; HI Rev. Stat. § 342B-72; MA Gen. Laws ch. 21N, sec. 2; NJ Rev. Stat. § 26:2C-41; OR Rev. Stat. § 468A.050; *see also* NCSL, *Greenhouse Gas Emissions Reduction Targets and Market-Based Policies* (updated Sept. 5, 2023), available at https://www.ncsl.org/research/energy/greenhouse-gas-emissions-reduction-targets-and-market-based-policies.aspx.

[2604] *See* 6 NY Codes, Rules & Regs. 202-2.3(c).

[2605] 5 Code Colo. Regs. § 1001-26. *See also* Colo. Dep't of Pub. Health & Env't, *Greenhouse Gas Reporting*, available at https://cdphe.colorado.gov/environment/air-pollution/climate-change#reporting (last visited Sept. 13, 2023).

[2606] *See* 17 Cal. Code Regs. § 95100 - 95163; WAC 173-441-010 - 173-441-070; *see also* Cal. Air Res. Bd., Mandatory Greenhouse Gas Reporting 2020 Emissions Year Frequently Asked Questions (2021), available at https://www.arb.ca.gov/cc/reporting/ghg-rep/reported-data/2020mrrfaqs.pdf; *see also Was. Dept. of Ecology, Mandatory Greenhouse Gas Reports*, available at https://ecology.wa.gov/Air-Climate/Reducing-Greenhouse-Gas-Emissions/Tracking-greenhouse-gases/Mandatory-greenhouse-gas-reports.

[2607] The California Air Resources Board ("CARB") will need to develop and adopt regulations by January 1, 2025 for the disclosure requirements under the Climate Corporate Data Accountability Act to become effective. *See supra* note 156. These regulations are expected to provide further details regarding the law's compliance requirements, including the content of the disclosure, the methodology for calculating emissions that are required to be disclosed and what qualifies as "doing business" in California. The requirements of the Climate-Related Financial Risk Act are self-effectuating, such that additional regulations are not required to implement the law's reporting requirements; however, the law requires the CARB to adopt regulations that authorize it to seek administrative penalties from covered entities for failing to make the required reports publicly available or publishing inadequate or insufficient information in the report. *See* SB-253, *supra* note 156.

Appellate Case: 24-1628    Page: 610    Date Filed: 03/26/2024 Entry ID: 5377362

Accountability Act (Senate Bill 253), which will require companies making over $1 billion in gross annual revenue to disclose their GHG emissions to the state on an annual basis and to obtain independent third-party assurance over such disclosures,[2608] is expected to apply to an estimated 5,300 companies doing business in the state.[2609]  The Climate-Related Financial Risk Act (Senate Bill 261),[2610] which will require companies with total annual revenue above $500 million to publish a biennial report on the company's website disclosing such company's climate-related financial risk in accordance with the TCFD framework or a comparable disclosure regime,[2611] and describing what measures have been adopted to reduce and adapt to such risk, is expected to apply to an estimated 10,000 companies doing business in the state.[2612] Companies subject to the Climate Corporate Data Accountability Act will be required to disclose their Scope 1 and Scope 2 emissions beginning in 2026 and their Scope 3 emissions beginning in 2027.[2613]  Companies subject to the Climate-Related Financial Risk Act will be required to begin reporting their climate-related financial risks and measures in 2026.[2614]  We estimate that

---

[2608]    *See* SB-253, *supra* note 156.

[2609]    *See* Brent W. Thompson, California's Climate Disclosure Requirements: An Overview of Senate Bills 253 and 261, Ca. Lawyers Assoc. (Nov. 2023), available at https://calawyers.org/business-law/californias-climate-disclosure-requirements-an-overview-of-senate-bills-253-and-261/.

[2610]    *See* SB-261, *supra* note 155.

[2611]    A company will satisfy the requirements of the Climate-Related Financial Risk Act if it prepares a publicly accessible biennial report that includes climate-related financial risk disclosure information by any of the following methods: (1) pursuant to a law, regulation or listing requirement by any regulated exchange or government entity, incorporating the disclosure requirements that are consistent with the requirements of the Climate-Related Financial Risk Act or (2) voluntarily using a framework that meets the requirements of the Climate-Related Financial Risk Act or is in compliance with ISSB standards. *See* SB-261, *supra* note 155.

[2612]    *See* Thompson, *supra* note 2609; *see also* letter from Chamber (Dec. 6, 2023) (describing the California laws and highlighting differences in purpose, scope, and timing between the California laws and the proposed rules) ("letter from Chamber II"); *see also infra* note 3112 and accompanying text discussing this comment and the inclusion of California state law in the baseline.

[2613]    *See* Thompson, *supra* note 2609.

[2614]    *See id.*

606

approximately 1,980 Commission registrants meet the $1 billion revenue threshold for Climate Corporate Data Accountability Act and approximately 2,520 Commission registrants meet the $500 million revenue threshold for the Climate-Related Financial Risk Act.[2615]

As a result of these Federal- and state-level climate-related disclosure and reporting requirements, some registrants subject to the final rules may already have in place, or may be developing, certain processes and systems to track and disclose aspects of their climate-related risks.

### 4. International Disclosure Requirements

Issuers that are listed or operate in jurisdictions outside the United States may also be subject to those jurisdictions' disclosure and reporting requirements. As discussed in section I.B. above, many jurisdictions' current or proposed requirements for climate-risk disclosure are aligned with the TCFD's framework for climate-related financial reporting.[2616] Several jurisdictions also have announced plans or support for adopting climate disclosure requirements that are consistent with the TCFD recommendations, and some jurisdictions already require

---

[2615] Estimates are based on Compustat data for 2022 registrants. We do not have readily accessible data that could be used to reliably estimate the subset of these registrants doing business in California. One commenter estimated that 73% of Fortune 1000 companies would need to comply with both California laws. *See* letter from Amer. for Fin. Reform, Public Citizen and Sierra Club (Oct. 26, 2023) (using a list of companies registered with the California Secretary of State for their estimate, but describing in their methodology discussion why that does not directly correspond to "doing business" in the state).

[2616] *See* note 46 and accompanying text; *see also* TCFD, Task Force on Climate-Related Financial Disclosure: 2023 Status Report, Table D1 (Oct. 2023), available at https://assets.bbhub.io/company/sites/60/2023/09/2023-Status-Report.pdf ("TCFD 2023 Status Report"). For more detail on the TCFD recommendations, *see* Proposing Release, section I.D; *see also* TCFD, *Overview* (Mar. 2021), available at https://assets.bbhub.io/company/sites/60/2020/10/TCFD_Booklet_FNL_Digital_March-2020.pdf. Concurrent with the release of its 2023 status report, the TCFD fulfilled its remit and transferred to the ISSB its responsibility for tracking company activities on climate-related disclosure. Fin. Stability Bd., *supra* note 151. As discussed *infra*, the TCFD recommendations are incorporated into the ISSB standards. Although the TCFD has disbanded, in this release we continue to refer to "TCFD recommendations" as distinct from ISSB standards, both for clarity and because not all jurisdictions that implemented TCFD-aligned disclosure requirements have implemented the broader and more recent ISSB standards.

climate-related disclosures aligned with the TCFD recommendations.[2617]  The UK, for example, has TCFD-aligned disclosure requirements for certain issuers.[2618]  Insofar as Commission registrants are listed or have operations in these other jurisdictions, they may already be subject to these other jurisdictions' disclosure requirements, policies, and guidance on reporting certain information about climate-related financial risk.

Additionally, the ISSB released its climate-related disclosure standards in June 2023.[2619] These standards incorporate the TCFD recommendations, such that companies that apply the ISSB standards will satisfy the TCFD recommendations, although the ISSB standards include some additional disclosure requirements.[2620]  The ISSB provisions relating to GHG emissions also align with the GHG Protocol.[2621]  Several jurisdictions have announced plans or support for implementing the ISSB standards, or local standards based on ISSB standards.[2622]

---

[2617]    *See* Proposing Release, section IV.A.4 (discussing disclosure requirements implemented, for example in the United Kingdom, Japan, and New Zealand).  Commission staff determined that in 2022, approximately 1,961 Commission registrants traded in the U.K., 52 in Japan, and 2 in New Zealand; however, individual requirements in each country determine whether these registrants are subject to the climate-related disclosure laws of that country.  *See also* TCFD 2023 Status Report, *supra* note 2616, at Part D.

[2618]    *See* Financial Conduct Authority, *Climate-related Reporting Requirements*, available at https://www.fca.org.uk/firms/climate-change-sustainable-finance/reporting-requirements (updated June 10, 2022); *see also* further discussion *infra* section IV.C.3.a.

[2619]    *See supra* section II.A. describing the standards.

[2620]    IFRS, *IFRS Foundation Publishes Comparison of IFRS S2 with the TCFD Recommendations* (July 24, 2023), available at https://www.ifrs.org/news-and-events/news/2023/07/ifrs-foundation-publishes-comparison-of-ifrs-s2-with-the-tcfd-recommendations/.

[2621]    *See supra* section II.A. In the U.S. and other jurisdictions, GHG emissions quantification and reporting are generally based on the widely-used GHG Protocol, *see supra* notes 51 and 1011 and accompanying text. *See also* Patrick Bolton & Marcin Kacperczyk, *Global Pricing of Carbon-Transition Risk*, 78 J. of Fin. 3677 (Dec. 2023) (using the GHG Protocol to measure firm-level GHG emissions across 77 countries). However, we recognize that there exist other standards, e.g., ISO standards, as noted *supra* note 1011 and in letters from ISO and Futurepast.

[2622]    *See supra* section II.A.

App.608

In the EU, the CSRD will apply to approximately 50,000 companies when implemented.[2623]  Companies required to report under the CSRD beginning on January 1, 2024, will report according to ESRS, adopted in July 2023,[2624] that are closely aligned with the TCFD framework[2625] and ISSB standards, although the CSRD includes some additional disclosure requirements.[2626]  This first stage of CSRD implementation will primarily affect companies that have more than 500 employees and are listed on an EU-regulated market.  Subsequent stages will encompass other large EU-based companies,[2627] and later, certain small to medium-sized companies and certain non-EU companies operating in the EU.[2628]  Finally, in the last stage of CSRD implementation, certain non-EU companies operating in the EU would report

---

[2623]   European Parliament, *Sustainable Economy: Parliament Adopts New Reporting Rules for Multinationals* (Nov. 10, 2022), available at https://www.europarl.europa.eu/news/en/press-room/20221107IPR49611/sustainable-economy-parliament-adopts-new-reporting-rules-for-multinationals; *see also EU Commission's New Proposals Aim to Simplify Sustainability Reporting Rules*, FinTech Global (June 13, 2023), available at https://fintech.global/2023/06/13/eu-commissions-new-proposals-aim-to-simplify-sustainability-reporting-rules/.  *See supra* section II.A.3, at note 154 and accompanying text for discussion of the CSRD.

[2624]   EU Commission Delegated Regulation of July 31, 2023, supplementing Directive 2013/34/EU, and Annexes, available at https://finance.ec.europa.eu/regulation-and-supervision/financial-services-legislation/implementing-and-delegated-acts/corporate-sustainability-reporting-directive_en.  ESRS for later stages of the CSRD are not yet developed.

[2625]   *See* EFRAG, *Draft European Sustainability Reporting Standards: Appendix IV – TCFD Recommendations and ESRS Reconciliation Table* (Nov. 2022), available at https://www.efrag.org/Assets/Download?assetUrl=%2Fsites%2Fwebpublishing%2FsiteAssets%2F21%250Appendix%2520IV%2520-%2520TCFD-EFRAG%2520Comparative%2520analysis%2520final.pdf.

[2626]   European Commission, *Questions and Answers on the Adoption of European Sustainability Reporting Standards* (July 31, 2023), available at https://ec.europa.eu/commission/presscorner/detail/en/qanda_23_4043 ("CSRD Q&A").  *See also* EFRAG, *Interoperability Between ESRS and ISSB Standards,* Discussion Paper 04-02 (Aug. 23, 2023) ("Companies that are required to report in accordance with ESRS will to a very large extent report the same information as companies that use ISSB standards.").

[2627]   For purposes of the CSRD, a "large" company is one that meets at least two of the following criteria: balance sheet total greater than €25 million; net turnover greater than €50 million; or more than 250 employees. *See* Directive (EU) 2023/2775 amending Directive 2013/34/EU as regards the adjustments of the size criteria for micro, small, medium-sized and large undertakings or groups (Dec. 21, 2023), available at https://eur-lex.europa.eu/legal-content/EN/ALL/?uri=CELEX:32023L2775.

[2628]   *See* CSRD Q&A, *supra* note 2626.

sustainability impacts to the EU,[2629] but because the ESRS for that stage are not yet developed, we cannot assess the extent to which disclosures made under this last stage would overlap with either the TCFD framework or these final rules.

We estimate that there are approximately 3,700 Commission registrants that are traded on a European exchange; however, we understand that most of these companies do not trade on an EU-regulated market, in which case they may not be impacted by the initial stage of CSRD implementation.[2630] We estimate that approximately 70 Commission registrants (fewer than 10 of which are U.S.-based) are listed on EU-regulated markets and could therefore be subject to reporting under the initial set of ESRS in fiscal year 2024.[2631] Additional registrants may have EU subsidiaries or operations that fall within the scope of the CSRD, including in later compliance years. Although the number of Commission registrants subject to CSRD reporting in 2024 may be relatively low, we expect that once the CSRD is fully implemented, it could apply to many of the 3,700 Commission registrants that trade on a European exchange, as well as other

---

[2629]  *See id.*

[2630]  "European exchange" refers to an exchange located in the EU. The first stage of CSRD implementation is specific to companies trading on an "EU-regulated market," where "regulated market" is a defined term under EU securities law, distinct from an organized trading facility or multilateral trading facility. *See* Directive 2014/65/EU of the European Parliament and of the Council (May 15, 2014), available at https://eur-lex.europa.eu/legal-content/EN/TXT/?uri=celex%3A32014L0065 (updated Mar. 23, 2023).

[2631]  This analysis is based on listing status data from Refinitiv. We note that this figure may not reflect all registrants that would be subject to the CSRD rules, as listing status is just one of the conditions for required disclosure under the EU rules. Fiscal year 2024 reporting is required of companies already subject to another EU reporting directive known as the Non-Financial Reporting Directive, including large U.S. companies with more than 500 employees and listed on an EU-regulated market. Among the approximately 70 registrants listed on EU-regulated markets, we are unable to determine how many are "large" as defined in the CSRD, as many registrants do not provide geographic breakdowns of turnover or assets needed to identify turnover or assets attributable to the EU, so it is possible that the lower bound is fewer than 70 registrants. Even if not subject to CSRD reporting in fiscal year 2024, however, we anticipate that all or nearly all registrants listed on an EU-regulated exchange, and many not listed on such an exchange, will be required to report in subsequent compliance years as the CSRD phases in. We are not aware of any official analysis from European authorities regarding the number of Commission-registered issuers which will be subject to CSRD reporting.

Appellate Case: 24-1628     Page: 615     Date Filed: 03/26/2024 Entry ID: 5377362

non-EU companies, provided that they meet the required turnover and presence thresholds.[2632]
This assessment aligns with another estimate, which found that U.S. companies could make up
31 percent of an estimated 10,000 U.S., Canadian, and British companies required to begin
complying with the CSRD between 2025 and 2029.[2633]  However, the number of registrants
affected cannot be determined with specificity because the CSRD implementing standards are
not fully developed yet, and because the number will depend on factors such as, for example,
how many Commission registrants trade on an exchange defined as an EU-regulated market.

Despite uncertainty as to the parameters of other jurisdictions' requirements, the
information described above indicates that a meaningful number of Commission registrants may
be subject to the climate-related disclosure and reporting requirements of one or more additional
jurisdictions.  As a result, some registrants subject to the final rules may already have in place, or
may be developing, processes and systems to track and disclose aspects of their climate-related
risks.

### 5.   Current Market Practices

This section describes current market practices with regard to climate-related disclosure,
including disclosures made in Commission filings and in other contexts.  This section then
describes the use of third-party frameworks in current disclosures; the disclosure of climate-
related targets, goals, and transition plans; and the use of third-party assurance.

---

[2632]   *See generally* CSRD Q&A, *supra* note 2626; Thibault Meynier, *et al.*, *EU Finalizes ESG Reporting Rules with International Impacts*, Harvard L. Sch. Forum on Corp. Gov. (Jan. 30, 2023), available at https://corpgov.law.harvard.edu/2023/01/30/eu-finalizes-esg-reporting-rules-with-international-impacts/.

[2633]   Dieter Holger, *At Least 10,000 Foreign Companies to be Hit by EU Sustainability Rules*, Wall St. J. (Apr. 5, 2023), available at https://www.wsj.com/articles/at-least-10-000-foreign-companies-to-be-hit-by-eu-sustainability-rules-307a1406 (retrieved from Factiva database).

We recognize that some aspects of the final rules may overlap with existing disclosure requirements and practices. The incremental costs of the final rules to a specific registrant will depend on the extent to which its disclosures resulting from the final rules overlap with disclosures that would have occurred in the absence of the final rules, as discussed in further detail below.[2634]

### a. Climate-Related Disclosures in SEC Filings

The Commission staff reviewed 52,778 annual reports (Forms 10-K and 20-F) submitted from January 1, 2016, until December 31, 2022, to determine how many contain any of the following keywords: "climate change," "climate risk," or "global warming," collectively referred to as "climate-related keywords" throughout this section.[2635] The presence of any of the climate-related keywords in any part of the annual report is indicative of some form of climate-related disclosure.[2636] Table 1 shows the portion of climate-related keywords used in Form 10-Ks and 20-Fs from 2021 through 2022.

---

[2634] *See* section IV.C.3.c, "Factors that Influence Direct Costs." The same point applies similarly to the more general costs imposed by the final rules: those registrants that currently provide (or plan to provide) climate-related disclosures irrespective of the final rules will incur lower incremental costs to the extent that these disclosures overlap with the final rules' requirements.

[2635] We follow the approach used in the proposing release except we have excluded 40-F filers because they are not subject to the final rules.

[2636] One limitation of using this climate-related keyword search is that it is unable to discern the extent or decision-usefulness of climate-related disclosures, nor can it determine specific sub-topics within climate-related disclosures. For these reasons, the analysis was supplemented by natural language processing ("NLP") analysis, as described later in this section.

**Table 1.** Filings with Climate-Related Keywords by Form Type

| Form | Has Keyword | All Filings | Percent |
|------|-------------|-------------|---------|
| 10-K | 4,521 | 12,846 | 35% |
| 20-F | 662 | 1,721 | 38% |
| Total | 5,183 | 14,567 | 36% |

This table presents the analysis of annual filings submitted to the Commission between Jan. 1, 2021, and Dec. 31, 2022. For each form type, the table indicates how many contain any of the climate-related keywords.

Figure 1 shows that the percentage of Form 10-K and Form 20-F filings with climate-related keywords[2637] has increased between 2016 and 2022. As reflected in Table 1, in more recent filings (i.e., those submitted in calendar years 2021 and 2022) 36 percent of all annual reports contain some climate-related keywords, with a slightly greater proportion (38 percent) among foreign private issuers filing on Form 20-F.[2638] These figures are consistent with data from Bloomberg, which focuses on registrants listed on NYSE and NASDAQ, on ESG reporting. Specifically, using this data, we find that 39 percent of registrants include a discussion of climate related risks in their MD&A section.[2639]

Figure 1 shows that the percentage of Form 10-K and 20-F filings with climate-related keywords[2640] has been increasing between 2016 and 2022. We note that Table 1 reflects the averages of the last two years of the time-series shown in Figure 1.

---

[2637]   *See supra* note 2636.

[2638]   Some foreign private issuers may elect to file their annual report on Form 10-K and would thus be classified as "domestic filers" in the following analysis.

[2639]   Bloomberg reports "[w]hether the Management Discussion and Analysis (MD&A) or its equivalent risk section of registrant's annual report discusses business risks related to climate change." As with other summary statistics presented in this release, these figures may not be representative of all Commission registrants. For example, registrants that are not listed on NYSE or NASDAQ may be less likely to include discussions of climate related risks in their MD&A section.

[2640]   *See supra* note 2636.

Appellate Case: 24-1628     Page: 618     Date Filed: 03/26/2024 Entry ID: 5377362

**Figure 1.** Percentage of Filings with Climate-related Keywords by Form Type



This figure presents the analysis of annual filings on Form 10-K and Form 20-F submitted to the Commission between Jan. 1, 2016, and Dec. 31, 2022. For each form type, the figure plots the percentage of filings containing climate-related keywords.

Appellate Case: 24-1628    Page: 619    Date Filed: 03/26/2024 Entry ID: 5377362

Table 2 provides a breakdown of more recent filings by accelerated filer status. Among LAFs, 68 percent provided climate-related keywords in 2022, while only 50 percent did so in 2021. Discussions by AFs and NAFs also saw increases over the same period (from 40 to 49 percent and from 16 to 23 percent, respectively).

**Table 2.** Filings with Climate-related Keywords by Accelerated Filer Status

| Year | Filer Status | Has Keyword | All Filings | Percent |
|------|-------------|-------------|-------------|---------|
| 2021 | LAF | 1,063 | 2,126 | 50% |
|      | AF | 373 | 936 | 40% |
|      | NAF | 635 | 3,883 | 16% |
|      | All | 2,071 | 6,945 | 30% |
| 2022 | LAF | 1,726 | 2,520 | 68% |
|      | AF | 425 | 863 | 49% |
|      | NAF | 961 | 4,241 | 23% |
|      | All | 3,112 | 7,622 | 41% |

This table presents the analysis of annual filings submitted to the Commission between Jan. 1, 2021, and Dec. 31, 2022. For each filer status, the table indicates how many contain any of the climate-related keywords.

Similarly, Table 3 indicates that the inclusion of climate-related keywords by SRCs and EGCs also increased from 2021 to 2022, but that climate change discussions remain less common among these registrants than among registrants that are not SRCs or EGCs.

Appellate Case: 24-1628    Page: 620    Date Filed: 03/26/2024 Entry ID: 5377362

**Table 3.** Filings with Climate-related Keywords by SRC/EGC Status

| Year | Filer Status | Has Keyword | All Filings | Percent |
|------|-------------|------------|------------|---------|
| 2021 | SRC & EGC | 184 | 2,400 | 8% |
|      | SRC | 744 | 4,142 | 18% |
|      | EGC | 198 | 984 | 20% |
|      | Neither | 3,016 | 6,364 | 47% |
| 2022 | SRC & EGC | 440 | 3,180 | 14% |
|      | SRC | 912 | 3,724 | 24% |
|      | EGC | 424 | 1,226 | 35% |
|      | Neither | 4,448 | 7,114 | 63% |

This table presents the analysis of annual filings submitted to the Commission between Jan. 1, 2021, and Dec. 31, 2022. Filer status SRC, EGC, small emerging growth companies ("SRC & EGC"), and large non-EGC and non-SRC companies ("Neither"). For each filer status, the table indicates how many contain any of the climate-related keywords.

Table 4 (presented as a graph in Figure 2) provides a breakdown of the recent filings by industry and shows that the industries with the highest percentage of annual reports containing climate-related disclosure include electric services, maritime transportation, steel manufacturing, paper and forest products, and oil and gas, among others.

Appellate Case: 24-1628     Page: 621     Date Filed: 03/26/2024 Entry ID: 5377362

**Table 4.** Filings with Climate-related Keywords by Industry

| Industry | Has Keyword | All Filings | Percent |
|---|---|---|---|
| Electric Services | 144 | 157 | 92% |
| Maritime Transportation | 114 | 127 | 90% |
| Steel Manufacturing | 29 | 33 | 88% |
| Paper and Forest Products | 44 | 52 | 85% |
| Oil and Gas | 350 | 445 | 79% |
| Rail Transportation | 14 | 18 | 78% |
| Passenger Air and Air Freight | 50 | 66 | 76% |
| Trucking Services | 32 | 44 | 73% |
| Insurance | 189 | 272 | 69% |
| Real-Estate Investment Trusts | 292 | 483 | 60% |
| Beverages, Packaged Foods and Meats | 138 | 243 | 57% |
| Construction Materials | 128 | 234 | 55% |
| Automotive | 34 | 67 | 51% |
| Capital Goods | 123 | 243 | 51% |
| Mining | 154 | 332 | 46% |
| Agriculture | 32 | 72 | 44% |
| Other | 622 | 1,454 | 43% |
| Textiles and Apparel | 31 | 74 | 42% |
| Banking | 558 | 1,460 | 38% |
| Technology Hardware and Equipment | 618 | 1,725 | 36% |
| Consumer Retailing | 392 | 1,229 | 32% |
| Total | 5,188 | 14,593 | 36% |

This table presents the analysis of annual filings submitted to the Commission between Jan. 1, 2021, and Dec. 31, 2022. For each industry, the table indicates how many contain any of the climate-related keywords.

Appellate Case: 24-1628    Page: 622    Date Filed: 03/26/2024 Entry ID: 5377362

Figure 2 provides a breakdown by industry of use of climate-related keywords.

**Figure 2**. Percentage of Filings with Climate-related Keywords by Industry



Using the same sample of recent annual reports, Commission staff conducted additional

analysis using NLP, which can provide insight on the semantic meaning of individual sentences

Appellate Case: 24-1628    Page: 623    Date Filed: 03/26/2024 Entry ID: 5377362

within registrants' climate-related disclosures and classify them into topics (i.e., clusters).[2641] The NLP analysis suggests that climate-related disclosures can be broadly organized into four topics: business impact, emissions, international climate accords, and physical risks. The analysis finds significant variation, both within the quantity and content, of climate-related disclosures across industries, as shown in Figures 3 and 4.

Figure 3 presents the intensity of disclosure for domestic annual report filings (Form 10-K). The intensity refers to sentences per registrant, which is calculated by taking the aggregate number of sentences in an industry and dividing it by the total number of registrants within the industry (including those that do not include any climate-related keywords). Thus, the intensity represents a more comparable estimate across industries. Figure 3 shows that registrants in the following industries have the highest intensity of disclosures: oil and gas, electric services, and mining. The majority of these disclosures addressed business impact, followed by emissions, international climate accords, and physical risks. Figure 4 presents the corresponding information for foreign annual report filings (Form 20-F). The foreign filings contain considerably higher intensity of climate-related keywords. For example, Form 10-K filers in the oil and gas industry have approximately 12 sentences per filing containing climate-related keywords while foreign filers in the same industry devote approximately 75 sentences per filing containing climate-related keywords. Overall, the analysis indicates that the majority of the disclosure for both domestic and foreign filings is focused on transition risks, with comparatively fewer mentions of physical risk.

---

[2641]    The specific NLP method used in this analysis is word embedding, which utilizes Google's publicly available, pre-trained word vectors that are then applied to the text of climate-related disclosures within regulatory filings. While this NLP analysis can be used to identify the general topic and the extent of disclosures, it is limited in its ability to discern the decision-usefulness of disclosures from investors' perspective.

Appellate Case: 24-1628    Page: 624    Date Filed: 03/26/2024 Entry ID: 5377362

**Figure 3**. Clustered Intensity by Industry for Domestic Filings (Form 10-K)



This figure presents the analysis of Form 10-K annual filings submitted to the Commission between Jan. 1, 2021, and Dec. 31, 2022. NLP was used to analyze sentences contained within the annual filings and classify them into four broad topics (i.e., clusters): business impact, emissions, international climate accords, and physical risks. Intensity refers to the average number of sentences per registrant, which is calculated by taking the aggregate number of relevant sentences in an industry and dividing it by the total number of registrants within the industry.

Appellate Case: 24-1628    Page: 625    Date Filed: 03/26/2024 Entry ID: 5377362

**Figure 4.** Clustered Intensity by Industry for Foreign Filings (Form 20-F)



This figure presents the analysis of Form 20-F annual reports submitted to the Commission between Jan. 1, 2021, and Dec. 31, 2022. We exclude any Form 20-Fs that were not annual reports. NLP was used to analyze sentences contained within the annual filings and classify them into four broad topics (i.e., clusters): business impact, emissions, international climate accords, and physical risks. Intensity refers to the average number of relevant sentences per registrant, which is calculated by taking the aggregate number of sentences in an industry and dividing it by the total number of registrants within the industry.

Appellate Case: 24-1628     Page: 626     Date Filed: 03/26/2024 Entry ID: 5377362

The Commission staff's findings are consistent with one academic study that looked at the extent of climate-related disclosures by Commission registrants.[2642]  In this study, a review of Form 10-K filings from Russell 3000 companies over the last 12 years found that the majority of climate-related disclosure is focused on transition risks,[2643] consistent with the above Commission staff analysis that finds that annual filings contain more discussion on emissions and international climate accords relative to physical risks.  This study further found that while 35 percent of Russell 3000 Index companies provided climate-related information in 2009, this figure grew to 60 percent in 2020.[2644]  The study also found that the extent of disclosure for a given report has increased.[2645]  In 2009, companies mentioned climate risks 8.4 times on average in their Form 10-K.[2646]  This figure grew to 19.1 times in 2020.[2647]

The Proposing Release included a similar analysis of climate-related disclosures in Commission filings using data from earlier years.[2648]  That analysis also found that filings by registrants in the electric services and oil and gas industries have the most robust climate-related discussions.[2649]  In response to this finding, one commenter suggested that the current "principles-based approach is working successfully, as these are industries where climate-related

---

[2642]    *See* Parker Bolstad, Sadie Frank, Erick Gesick & David Victor, *Flying Blind: What Do Investors Really Know About Climate Change Risks in the U.S. Equity and Municipal Debt Markets* (Hutchins Center Working Paper 67, 2020) ("Hutchins Center Working Paper").

[2643]    *See id.*

[2644]    *See id.*  The methodology uses a series of keywords to determine whether a company provides climate-related disclosures.  Some keywords may occur in non-climate contexts, which the authors note may introduce some bias into the statistics.

[2645]    *See id.*

[2646]    *See id.*

[2647]    *See id.*

[2648]    *See* Proposing Release, section IV.A.5.a.

[2649]    *See id.*

Appellate Case: 24-1628    Page: 627    Date Filed: 03/26/2024 Entry ID: 5377362

factors are more likely to have a material impact on the present value of future cash flows."[2650]
We disagree.  The Commission staff's analysis focuses on the incidence of climate-related discussion in annual reports (Forms 10-K and 20-F).[2651]  The fact that the incidence of disclosures may be correlated with the likelihood that climate-related risks are material to a particular company does not demonstrate that registrants are fully disclosing their material climate-related risks to investors.  For instance, registrants may strategically omit information that could be perceived as negative or adverse,[2652] and some studies point to the potential for substantial underreporting of material climate-related information within the current principles-based reporting regime.[2653]

    In addition, one commenter suggested the Commission examine analyst reports and interactions involving analysts to assess "the significance of ESG factors relative to other factors for determining the value of securities."[2654]  There is academic research that considers analyst reports; this literature has found that, while very few analyst reports traditionally discuss topics related to climate, climate-related disclosures can offer useful predictive signals about future financial performance for firms whose industries are most exposed to climate-related risk and

---

[2650]    *See* Overdahl exhibit to letter from Chamber.

[2651]    *See also* section IV.A.5 for an update of the analysis in the Proposing Release.

[2652]    A recent analysis, for example, showed that absent mandatory requirements from regulators, voluntary disclosures following third-party frameworks were generally of poor quality and that companies making these disclosures cherry-picked to report primarily non-material climate risk information. *See* Julia Bingler, Mathias Kraus, Markus Leippold & Nicolas Webersinke, *Cheap Talk and Cherry-Picking: What ClimateBert Has to Say on Corporate Climate Risk Disclosures,* 47 Fin. Rsch. Letters, Article 102776 (June 2022) ("Bingler *et al.*") (reviewing annual reports for fiscal years 2014-2019 – i.e., before and after the introduction of TCFD recommendations – for a sample of 818 TCFD-supporting firms).

[2653]    Lee Reiners & Charlie Wowk, *Climate Risk Disclosures & Practices* (2021), available at https://econ.duke.edu/sites/econ.duke.edu/files/documents/Climate-Risk-Disclosures-and-Practices.pdf; Bingler *et al.*; Morningstar, *Corporate Sustainability Disclosures* (2021), available at https://www.morningstar.com/en-uk/lp/corporate-sustainability-disclosures ("Companies will disclose the good and hide the bad while disclosure remains voluntary.").

[2654]    *See* Overdahl exhibit to letter from Chamber.

App.623

Appellate Case: 24-1628     Page: 628     Date Filed: 03/26/2024 Entry ID: 5377362

can influence analysts to revise their target prices for these firms.[2655]  Other research has found that Form 10-K disclosures on material climate risks are associated with increased precision and lower dispersion in analysts' earnings forecasts.[2656]  Similarly, in the context of earnings conference calls involving analysts, discussions concerning exposure to climate-related risks have been shown to contain important information that is priced in stocks and options.[2657] Relatedly, the same commenter suggested that the Commission conduct an event study to study price or volume responses to climate-related disclosures.[2658]  We decline to follow the suggestion in light of the support in peer reviewed literature for the importance of climate-related disclosures to investors.[2659]  Existing research finds an increase in stock price volatility around the day when GHG or carbon emissions are disclosed in a Form 8-K filing.[2660]  This suggests that investors find such disclosures to be informative.

---

[2655]  *See* Jesse Yuen-Fu Chan, *Climate Change Information and Analyst Expectations* (July 29, 2022) (Ph.D. dissertation, University of Texas, Austin), available at https://repositories.lib.utexas.edu/items/092f6e82-c4b1-4d61-a83b-207643cbb62d.

[2656]  *See* Walid Ben-Amar *et al.*, *Do Climate Risk Disclosures Matter to Financial Analysts?*, J. of Bus. Fin. & Acct. (2023), available at  https://onlinelibrary.wiley.com/doi/10.1111/jbfa.12778 (using the Materiality Map provided by the Sustainability Accounting Standards Board (SASB) to show that the association between improvements to forecast precision and climate risk disclosure is present only when climate risk is deemed financially material at the industry level according to SASB).

[2657]  *See* Zacharias Sautner, *et al.*, *Firm-Level Climate Change Exposure*, 78 J. of Fin. 1449 (Feb. 2023) ("Sautner, *et al.* (2023)"); Qing Li, Hongyu Shan, Yuehua Tang & Vincent Yao, *Corporate Climate Risk: Measurement and Responses* (forthcoming Rev. Fin. Stud., 2020), available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3508497 (retrieved from SSRN Elsevier database); additionally, researchers have noted that, although the frequency of such climate-related discussions have historically been low, there has been an increase in recent years. *See* Michał Dzieliński, Florian Eugster, Emma Sjöström & Alexander F. Wagner, *Climate Talk in Corporate Earnings Calls* (Swiss Fin. Inst. Rsch. Paper Series 22-14, 2022), available at https://ideas.repec.org/p/chf/rpseri/rp2214.html.

[2658]  *See* Overdahl exhibit to letter from Chamber.

[2659]  *See also* discussions in sections IV.B.1 and IV.C.1.a.

[2660]  *See* Paul A. Griffin, David H. Lont & Estelle Y. Sun, *The Relevance to Investors of Greenhouse Gas Emission Disclosures*, 34 Contemp. Acct. Rsch. 1265 (2017).

### b.  Additional Trends in Climate-Related Disclosures

As discussed below, a number of industry and advocacy groups have examined the scope of voluntary climate-related disclosures, and their findings are relevant to assess the economic impact of the final rules.

### i.  Prevalence and Scope of Climate-Related Disclosures

As discussed in the Proposing Release,[2661] one organization, in collaboration with several other organizations, conducted a survey of a sample of 436 U.S. public companies across 17 industries that range from small to large in terms of market capitalization.[2662]  According to the survey, over half of the companies (52 percent) published a CSR, sustainability, or a similar report, the contents of which commonly include information regarding climate-related risks.  The most frequently discussed topics in such reports were energy (74 percent), emissions (70 percent), environmental policy (69 percent), water (59 percent), climate mitigation strategy (57 percent), and supplier environmental policies (35 percent).  Among the registrants that reported climate-related information to the public, the majority disclosed such information via external reports or company websites rather than through regulatory filings.  Similar to the Commission staff's review, the survey found that about a third (34 percent) of the respondents disclosed information regarding "risks related to climate change, greenhouse gas emissions, or energy sourcing" in their Commission filings.[2663]  Among these companies, 82 percent disclosed such

---

[2661]   *See* Proposing Release, at section IV.A.5.b.

[2662]   *See* Center for Capital Markets, *2021 Survey Report:  Climate Change & ESG Reporting from the Public Company Perspective*, available at https://www.centerforcapitalmarkets.com/wp-content/uploads/2021/08/CCMC_ESG_Report_v4.pdf.  Sixty-seven percent of survey respondents have market capitalization below $5 billion, while 32% are below $700 million.

[2663]   *See id.*

information in Risk Factors, 26 percent in MD&A, 19 percent in the Description of Business, and 4 percent in Legal Proceedings.[2664]

One institute issues annual analyses of sustainability reports by the companies belonging to the Russell 1000 Index.[2665]  The institute found that in calendar year 2022, a record high of 90 percent of these companies published sustainability reports, which commonly include climate-related information—up from 60 percent in 2018.[2666]  In particular, sustainability reporting reached an all-time high of 98 percent for companies in the top half of the Russell 1000 Index (which roughly comprises the S&P 500 Index).  However, the most significant change was among companies in the bottom half of the Russell 1000 Index, where sustainability reporting percentage increased to 82 percent, up from 34 percent in 2018.  The percentage of companies from each Global Industry Classification Standard ("GICS") sector[2667] that published a sustainability report in 2021 were: Communications (56 percent), Consumer Discretionary (81 percent), Consumer Staples (91 percent), Energy (94 percent), Financials (85 percent), Health Care (69 percent), Industrials (89 percent), Information Technology (71 percent), Materials (95 percent), Real Estate (90 percent), and Utilities (100 percent).

---

[2664]  *See id.*

[2665]  *See* G&A, *Sustainability Reporting Trends*, available at https://www.ga-institute.com/research/ga-research-directory/sustainability-reporting-trends; *see also* Proposing Release, section IV.A.5.b.

[2666]  *See* G&A, *2023 Sustainability Reporting in Focus*, available at https://www.ga-institute.com/research/ga-research-directory/sustainability-reporting-trends/2023-sustainability-reporting-in-focus.html; *see also* past reports, available at https://www.ga-institute.com/research/ga-research-directory/sustainability-reporting-trends.html.

[2667]  For more information on GICS sector categories, *see* MSCI, The Global Industry Classification Standard (GICS),  available at https://www.msci.com/our-solutions/indexes/gics (last visited Feb. 28, 2024).

Appellate Case: 24-1628     Page: 631     Date Filed: 03/26/2024 Entry ID: 5377362

Notwithstanding these investor-led initiatives, disclosures currently vary considerably in terms of coverage, location, and presentation across companies,[2668] making it difficult for investors to navigate through different information sources and filings to identify, compare, and analyze climate-related information.[2669] For example, one commenter submitted a survey reporting that institutional investors spend an average of $257,000 and $357,000 on "collecting climate data related to assets" and "internal climate-related investment analysis," respectively.[2670] An academic study similarly finds that "there exists considerable heterogeneity in what and how firms report about their CSR activities…The heterogeneity in reported CSR topics makes it difficult for users to compare disclosures and to benchmark firms' underlying CSR performance."[2671] Some studies and commenters have asserted that current disclosures are

---

[2668] *See*, *e.g.,* TCFD Report, *supra* note 46, at 16; *see also* IOSCO Report, *supra* note 1089; GAO, *Climate-Related Risks* (2018), available at https://www.gao.gov/assets/gao-18-188.pdf (reporting that "investors may find it difficult to navigate through the filings to identify, compare, and analyze the climate-related disclosures across filings"); letter from Bloomberg.

[2669] *See* letters from Calvert ("Calvert purchases third party vendor data to support our ability to assess companies on their ESG factors and that provide specific data related to climate change, where available. Often vendor information is estimated when a company has not disclosed information on its climate-related risks. Sometimes the estimates are made across industries, based on what other more proactive peers have disclosed. We are concerned about the lack of accuracy fostered by estimation methodologies, and also the trend for these methodologies to under-estimate actual emissions."); Boston Trust Walden ("our analysts examine quantitative and qualitative climate-related corporate disclosure to enhance our understanding of the existing and potential financial outcomes associated, ranging from risks (e.g., losing the license to operate) to opportunities (e.g., generating new sources of revenue). In the absence of mandated disclosure requirements, we rely on the data of third-party research providers, which includes a mix of issuer provided data and estimates. Our analysts then seek to fill data gaps through additional research and analysis, outreach via written requests, meetings, and shareholder resolutions seeking the expanded disclosure we require. These processes for gathering necessary climate-related disclosures are inefficient and resource intensive."); NY Office of the State Comptroller; and State of Vermont Pension Investment Commission.

[2670] *See* ERM survey attached to letter from ERM (June 16, 2022) ("ERM survey").

[2671] *See* Hans B. Christensen, Luzi Hail & Christian Leuz, *Mandatory CSR and Sustainability Reporting: Economic Analysis and Literature Review,* 26 Rev. of Acct. Stud. 1176 (2021) ("Christensen *et al.* (2021)") at 1194.

often vague and boilerplate, creating challenges for investors.[2672]  Industry observers and some commenters also report that many registrants that currently provide voluntary climate-related disclosures through sustainability reports often take longer than 12 months after their fiscal year end to disclose decision-relevant data, raising concerns about the timeliness of these reports for investors.[2673]  As noted in section II.A.2, many commenters stated that the Commission's current reporting requirements do not yield adequate or sufficient information regarding climate-related risks.[2674]

### ii.  GHG Emissions Reporting

Commission staff also analyzed the number of registrants that recently reported Scope 1 and 2 emissions data.  In this analysis, Commission staff utilized a database that compiles emissions data (among other ESG-related information) from companies' annual filings, sustainability reports, or other public disclosures.[2675]  The number of registrants that are covered in

---

[2672]  *See* SASB, The State of Disclosure: An Analysis of the Effectiveness of Sustainability Disclosure in SEC Filing*s* (2017), available at https://www.sasb.org/wp-content/uploads/2019/08/StateofDisclosure-Report-web112717.pdf (reporting that about 50% of Commission registrants provide generic or boilerplate sustainability information in their regulatory filings); *see also* letter from The Institute for Policy Integrity (Policy Integrity) at New York University School of Law, 1 Environmental Defense Fund (EDF), and Professor Madison Condon https://www.sec.gov/comments/s7-10-22/s71022-20131770-302204.pdf ("Existing disclosure regulations and guidance have proved insufficient to address this asymmetry.  In a 2020 study of climate risk disclosures in 10-K filings, the Brookings Institution concluded that though '[d]isclosure has risen sharply,' '[m]ore firms are disclosing more general information that is essentially of no utility to the marketplace.'").

[2673]  *See supra* note 2570; *see also* letter from Calvert ("Last year, when evaluating disclosure rates of companies in our equities portfolios, we found 57% of 2,207 companies disclosed their Scope 1 and 2 emissions with a one to two year delay . . . [B]y the time this data is gathered, there may be a long lag time to the point of disclosure—it is not uncommon that GHG emissions disclosure is already 12-18 months out of date once it is actually published.").

[2674]  *See supra* section II.A.2.

[2675]  Commission staff used the  Refinitiv ESG database, which covers over 88% of global market capitalization, across more than 700 different ESG metrics.  The U.S. coverage broadly includes listed companies belonging to the Russell 3000 Index.  The emissions data used in this analysis was extracted from Refinitiv on Feb 11, 2024.  *See* Refinitiv, *Environmental, Social And Governance Scores From Refinitiv* (May 2022), available at https://www.lseg.com/content/dam/marketing/en_us/documents/methodology/refinitiv-esg-scores-methodology.pdf

Appellate Case: 24-1628     Page: 633     Date Filed: 03/26/2024 Entry ID: 5377362

this database is 5,535, which comprises the matched sample. From this matched sample, about 20 percent of registrants (1,125 out of 5,535) reported their Scope 1 and Scope 2 emissions in fiscal year 2021, with the highest disclosure rate found among LAFs (50 percent).[2676] In fiscal year 2022, about 18% of registrants (870 out of 5,535) reported their Scope 1 and 2 emissions, with the disclosure rate among LAFs at 42 percent. These and other statistics are presented in Table 5.

**Table 5.** Number of registrants that disclose Scope 1 and 2 emissions using third-party data[1]

| | | | | Scope 1 and 2 emissions disclosures | | | |
| | | | | FY 2021 | | FY 2022[6] | |
| Filer status (1) | SEC registrants[2] (2) | Registrants covered in third-party database[3] (3) | Coverage rate[4] (4) | Disclosed (5) | Disclosure rate[5] (6) | Disclosed (7) | Disclosure rate[7] (8) |
|---|---|---|---|---|---|---|---|
| LAF | 2,528 | 2,059 | 81% | 1,026 | 50% | 870 | 42% |
| AF | 444 | 334 | 75% | 57 | 17% | 50 | 15% |
| NAF | 507 | 154 | 30% | 8 | 5% | 15 | 10% |
| SRC/EGC | 4,265 | 2,988 | 70% | 34 | 1% | 50 | 2% |
| Total | 7,744 | 5,535 | 71% | 1,125 | 20% | 985 | 18% |

1. Commission staff used the Refinitiv ESG database. *See supra* note 2675.

2. These statistics are based on SEC registrants filing annual reports in calendar year 2022. *See supra* note 2578. For LAF, AF, and NAF registrant counts, only those that are not SRCs or EGCs are included. We note that several non-SRC/EGC registrants did not disclose their filer status, thus the total registrant count in Table 5 is not the same as what is indicated in section IV.A.1.

3. The matched sample consists of the number of registrants that are covered in the Refinitiv ESG database.

4. Column (4) = (Column (3))/(Column (2)).

5. Column (6) = (Column (5))/(Column (3)).

6. Data collection of GHG emissions disclosure can lag by 18 months or longer. As a result, the number of disclosers for FY 2022 may not be complete and thus understated.

7. Column (8) = (Column (7))/(Column (3)).

---

[2676] These percentages may be understated to the extent that Refinitiv may not be able to fully track all emissions disclosures made by Commission registrants. Conversely, compared to the full sample of Commission registrants, these figures may be overstated given that smaller firms outside of Refinitiv's coverage universe (i.e., those outside of the Russell 3000) are less likely to report emissions.

We note that the number of registrants providing disclosure in fiscal year 2022 may be understated given that data collection of GHG emissions can lag by up to 18 months.[2677] To estimate how this number could potentially increase upon the completion of data collection, we consider the following assumption: for those registrants that disclosed only in fiscal year 2021 (but not in fiscal year 2022), we assume that their fiscal year 2022 disclosures are forthcoming.[2678] Within the matched sample, there are 263 LAFs that disclosed in fiscal year 2021 but not in fiscal year 2022. The corresponding number for AFs is 17. If we assume that these registrants subsequently provide their fiscal year 2022 disclosures, the fiscal year 2022 disclosure rate for LAFs would increase from 42% to 55%[2679] and that of AFs would increase from 15% to 20%.[2680] We recognize, however, that the above assumption may not hold true for all of these registrants.

Commission staff also analyzed U.S. companies that voluntarily responded to CDP's questionnaire and publicly disclosed their responses.[2681] In 2022, 1,311 domestic companies

---

[2677] The Commission understands that data collection of GHG emissions for FY 2022 is ongoing. In addition, some industry observers have noted that "many companies still take more than 12 months after their fiscal year to disclose their sustainability data," *see, e.g.*, Corporate Knights, *supra* note 2570; letter from Morningstar ("Currently, a lack of clear disclosure standards for the timing of 'sustainability reports,' which is the primary source for emissions data, greatly hinders investor knowledge. For example, some registrants released 2021 reports—detailing 2020 data—as late as November 2021.")

[2678] These registrants have demonstrated that they have Scope 1 and 2 emissions measurement and disclosure processes in place. It is therefore plausible that they have forthcoming disclosures for FY 2022 that is not yet in the dataset.

[2679] (870 + 263)/2059 = 55%.

[2680] (50+17)/334 = 20%.

[2681] This analysis is based on data provided to the Commission from CDP, available at https://www.sec.gov/comments/s7-10-22/s71022-206599-416182.xlsx. CDP operates a global disclosure system that enables companies, cities, states and regions to measure and manage their environmental risks, opportunities and impacts. Despite not being a framework like GRI, SASB and TCFD, CDP's questionnaires gather both qualitative and quantitative information from across governance, strategy, risk,

Appellate Case: 24-1628     Page: 635     Date Filed: 03/26/2024 Entry ID: 5377362

provided responses to CDP's questionnaire. Approximately 610 of these were Commission registrants,[2682] suggesting that 10 percent of the approximately 5,860 domestic registrants that will be subject to the final rules provided responses to CDP's questionnaire in 2022. The response rate was higher among companies with higher market capitalizations. For example, CDP lists 351 respondents as included in its S&P 500 sample, suggesting that approximately 70 percent of S&P 500 companies provided responses. Of these 351 respondents, 95 percent provided Scope 1 and Scope 2 emissions data. In addition, a 2022 report examines Russell 1000 companies and finds that 57% disclose Scope 1 and 2 emissions.[2683]

### c. Use of Third-Party Frameworks

Multiple third-party reporting frameworks and data providers have emerged over the years to facilitate and encourage the reporting of climate-related information by companies.[2684]

---

impact and performance. To aid comparability and ensure comprehensiveness, CDP includes sector-specific questions and data points. In 2018, CDP aligned its climate change questionnaire with the TCFD. Companies' participation in the CDP questionnaire is voluntary. If a company decides to respond to the questionnaire and disclose its information to the CDP, it then has the option to mark its response as either "Public" or "Private." Importantly, responses marked as "Private" are available only to the signatory investors of the CDP (non-signatory investors and the general public cannot access this information). Responses marked as "Public" can be accessed by the general public at no cost. *See* CDP, available at https://www.cdp.net/en/info/about-us. In a meeting with CDP officials, the Commission staff was informed that the number of public companies that respond to the CDP questionnaire but do not publicly disclose their responses is negligible. *See* SEC Meeting Memorandum dated June 15, 2023, available at https://www.sec.gov/comments/s7-10-22/s71022-206619-416182.pdf.

[2682] This estimate is based on matching CDP survey respondents to registrants on ticker, company name, and industry. Five-hundred seventy matches were made on ticker. Approximately 40 more matches were made on company name using Levenshtein Distance. The matches were then manually reviewed by Commission staff to ensure the industry description provided by CDP aligned with the SIC code assigned to the matched registrant.

[2683] *See* Just Capital, The Current State of Environment Disclosure in Corporate America: Assessing What Data Russell 1000 Companies Publicly Share, available at https://justcapital.com/wp-content/uploads/2022/04/JUST-Capital_Environment-State-of-Disclosure-Report_2022.pdf.

[2684] The TCFD, the SASB, the GRI, the Principles for Responsible Investment, the PCAF, and the CDP (among others), have all developed standards and systems that aim to help firms and investors identify, measure, and communicate climate-related information and incorporate that information into their business practices. Multiple frameworks have emerged, in part, because each seeks to provide different information or fulfill different functions when it comes to disclosing information related to climate-related risks or other ESG factors that may be important to investors.

631

Due to the voluntary nature of third-party frameworks, however, companies often disclose some but not all components of those frameworks, and the components that are disclosed may not be the same across companies,[2685] resulting in reporting fragmentation.

Some companies follow existing third-party reporting frameworks when developing climate-related disclosures for Commission filings or to be included in CSR, sustainability, ESG, or similar reports. As described in the Proposing Release, for instance, one survey found that 59 percent of respondents follow one or more such frameworks.[2686] Among these respondents, 44 percent used SASB, 31 percent used the Global Reporting Initiative GRI, 29 percent used the TCFD, and 24 percent used the CDP.[2687] Broadly similar statistics on the usage of different reporting frameworks are also provided by other studies. For example, another report[2688] found that 78 percent of sustainability reports from Russell 1000 companies aligned with SASB reporting standards,[2689] 54 percent utilized GRI reporting standards,[2690] 50 percent aligned with the TCFD recommendations,[2691] and 53 percent responded to the CDP Climate Change

---

[2685] *See* Reiners *et al.*, *supra* note 2653.

[2686] *See supra* note 2662; *see also* Proposing Release, section IV.A.5.

[2687] *See* Proposing Release at nn.768-770 and accompanying text.

[2688] *See supra* note 2666.

[2689] *See id.* Sixty-seven percent of companies in the smaller half of the Russell 1000 index (by market capitalization) report according to SASB standards. The corresponding statistic for companies in the larger half is 88%.

[2690] *See id.* Forty percent of companies in the smaller half of the Russell 1000 index (by market capitalization) report according to GRI standards. The corresponding statistic for companies in the larger half is 66%.

[2691] *See id.* Thirty-two percent of companies in the smaller half of the Russell 1000 index (by market capitalization) report according to the TCFD recommendations. The corresponding statistic for companies in the larger half is 65%.

Appellate Case: 24-1628     Page: 637     Date Filed: 03/26/2024 Entry ID: 5377362

questionnaire.[2692]  A review of website sustainability disclosures by 80 small- and mid-cap companies across five different industries found comparable numbers.[2693]

    While these various frameworks are distinct, they overlap in their alignment with the TCFD recommendations.  According to one report,[2694] the GRI standards exhibit "Reasonable" alignment with the TCFD, while the SASB standards generally exhibit "Moderate" or "Reasonable" alignment with the majority of the TCFD disclosure items.  Additionally, the CDP Climate Change questionnaire fully incorporates the TCFD framework and thus exhibits full alignment.[2695]  Thus, companies that report following the GRI, SASB, or CDP frameworks are, to varying degrees, producing disclosures that are in line with the TCFD.  However, because each framework takes different approaches (*e.g.*, different intended audience and/or reporting channel) and because certain differences exist in the scope and definitions of certain elements, investors may find it difficult to compare disclosures under each framework.  One organization

---

[2692]  *See id.*  Thirty-two percent of companies in the smaller half of the Russell 1000 index (by market capitalization) responded to the CDP Climate Change questionnaire.  The corresponding statistic for companies in the larger half is 74%.

[2693]  *See* White & Case and the Soc. Corp. Gov., *A Survey and In-Depth Review of Sustainability Disclosures by Small- and Mid-Cap Companies* (Feb. 18, 2021), available at https://www.whitecase.com/publications/article/survey-and-depth-review-sustainability-disclosures-small-and-mid-cap-companies (Among the companies reviewed, 41 companies (51%) provided some form of voluntary sustainability disclosure on their websites.  Further, nine of those 41 companies indicated the reporting standards with which they aligned their reporting, with the majority of the nine companies not following any one set of standards completely.  Additionally, six companies followed the GRI standards, while three companies stated that they follow both the TCFD recommendations and SASB standards).

[2694]  The Corporate Reporting Dialogue is a platform, convened by the Value Reporting Foundation, to promote greater coherence, consistency and comparability between corporate reporting frameworks, standards and related requirements.  *See Driving Alignment in Climate-related Reporting, Corporate Reporting Dialogue* (2019), available at https://www.integratedreporting.org/wp-content/uploads/2019/09/CRD_BAP_Report_2019.pdf (providing a detailed assessment of the various frameworks' degrees of alignment with each TCFD disclosure item, ranging from maximum to minimum alignment as follows: Full, Reasonable, Moderate, Very Limited, and None).

[2695]  *See* CDP, *supra* note 52.

analyzed the rate of disclosure for each TCFD disclosure element for a sample of 659 U.S. companies in 2020 and 2021, presented in Table 6.[2696]

**Table 6.** Third-party analysis of TCFD disclosure rates from a sample of U.S. companies[1]

| TCFD Disclosure Element | | Rate of Disclosure |
|---|---|---|
| **Governance** | a) Describe the board's oversight of climate-related risks and opportunities. | 17% |
| | b) Describe management's role in assessing and managing climate-related risks and opportunities. | 10% |
| **Strategy** | a) Describe the climate-related risks and opportunities the organization has identified over the short, medium, and long term. | 45% |
| | b) Describe the impact of climate-related risks and opportunities on the organization's businesses, strategy, and financial planning. | 34% |
| | c) Describe the resilience of the organization's strategy, taking into consideration different climate-related scenarios, including a 2°C or lower scenario. | 5% |
| **Risk Management** | a) Describe the organization's processes for identifying and assessing climate-related risks. | 15% |
| | b) Describe the organization's processes for managing climate-related risks. | 17% |
| | c) Describe how processes for identifying, assessing, and managing climate-related risks are integrated into the organization's overall risk management. | 16% |
| **Metrics and Targets** | a) Describe the metrics used by the organization to assess climate-related risks and opportunities in line with its strategy and risk management process. | 21% |

---

[2696] *See* Moody's Analytics, TCFD-Aligned Reporting by Major U.S. and European Corporations (Feb. 2022), available at https://www.moodysanalytics.com/articles/pa/2022/tcfd_aligned_reporting_by_major_us_and_european_corporations. The sample for analysis was provided to Moody's Analytics by the TCFD and includes 659 companies domiciled in the United States. To arrive at these statistics, Moody's conducted an artificial intelligence ("AI") based review of all public filings, including financial filings, annual reports, integrated reports, sustainability reports, and other publicly available reports that were associated with companies' annual reporting on sustainability. Non-public disclosures, such as responses to the CDP questionnaire, were not included in the analysis.

Appellate Case: 24-1628     Page: 639     Date Filed: 03/26/2024 Entry ID: 5377362

| | | |
|---|---|---|
| | b) Disclose Scope 1, Scope 2, and, if appropriate, Scope 3 GHG emissions, and the related risks. | 19% |
| | c) Describe the targets used by the organization to manage climate-related risks and opportunities and performance against targets. | 25% |

1.     The source of this table is Moody's Analytics. *See* supra note 2696.

The variety of disclosure frameworks in use, and their varying rates of overlap with the TCFD disclosure elements, demonstrates the low rate of consistency and comparability among existing climate disclosures.

### d. Climate-Related Targets, Goals, and Transition Plan Disclosures

Carbon reduction targets or goals have become an increasing focus for both companies and countries.[2697] For example, 195 parties, including the United States, the EU, and the UK, have signed the Paris Climate Agreement as of December 2023.[2698] The agreement aims to strengthen the global response to climate change by keeping a rise in global temperatures to well below 2º Celsius above pre-industrial levels this century, as well as pursue efforts to limit the temperature increase even further to 1.5º Celsius.[2699] A 2022 report, which examined approximately 5,300 companies across the globe, found that over one-third of these companies

---

[2697]     *See, e.g.,* UNFCC COP28 Agreement, *supra* note 34; Press Release, United Nations Framework Convention on Climate Change, Commitments to Net Zero Double in Less Than a Year, (Sept. 21, 2020), available at https://unfccc.int/news/commitments-to-net-zero-double-in-less-than-a-year.

[2698]     *See* United Nations*, Multilateral Treaties Deposited with the Secretary General ch. XXVII, 7.d Paris Agreement (treaty status updated Feb. 2024), available at https://treaties.un.org/Pages/ViewDetails.aspx?src=TREATY&mtdsg_no=XXVII-7-d&chapter=27&clang=_en treaty collection ; *see also* EU Press Release, *Corporate Sustainability Due Diligence: Council and Parliament Strike a Deal to Protect Environment and Human Rights* (Dec. 14, 2023), available at https://www.consilium.europa.eu/en/press-releases/2023/12/14/corporate-sustainability-due-diligence-council-and-parliament-strike-a-deal-to-protect-environment-and-human-rights/ (announcing a provisional agreement to adopt the Corporate Sustainability Due Diligence Directive, which includes a requirement that companies ensure their business strategies are compatible with limiting global warming to 1.5º Celsius).

[2699]     *See* section I.

announced plans to curb their Scope 1 or Scope 2 emissions.[2700]  Of these 5,300 companies that

also responded to the CDP climate survey, the same report found that about one-fourth of these

companies had established a target to achieve net-zero carbon emissions.[2701]  In addition, a

growing number of companies and organizations have signed on to The Climate Pledge,

indicating a commitment to achieve net-zero emissions by 2040.[2702]  According to data from

another source, as of August 2023, 5,728 companies had established climate targets.[2703]  Of these

companies, 710 were located in the United States, about half of which were Commission

registrants.[2704]  The trend in companies disclosing other climate-related targets has also been

increasing over time.[2705]

An increasing number of companies are adopting transition plans, according to a 2023

report.[2706]  This report finds that 4,100 organizations[2707] across the globe reported having

transition plans aligned with reaching a temperature change of no more than 1.5º Celsius above

---

[2700] *The Sustainability Yearbook 2022*, S&P Global (Feb. 2022), available at
https://www.spglobal.com/esg/csa/yearbook/2022/downloads/spglobal_sustainability_yearbook_2022.pdf.

[2701] *Id.*

[2702] As of February 20, 2024, The Climate Pledge had acquired 468 signatories, 146 of which are from the
United States. *See The Climate Pledge*, available at https://www.theclimatepledge.com/us/en/Signatories
(last visited Feb. 20, 2024).

[2703] *See Target Dashboard*, available at https://sciencebasedtargets.org/ (as visited Aug. 16, 2023).

[2704] *See id.*

[2705] For example, the percentage of both global and U.S. companies with water reduction targets grew by 4% in
2019 on a year-over-year basis.  This represented 28% of major global companies (i.e., those listed on the
S&P Global 1200 index) and 27% of major (i.e., those listed in the S&P 500 index) U.S. companies
publicly disclosing these targets.  *See State of Green Business 2021*, S&P Global (Feb. 4, 2021), available
at https://www.spglobal.com/marketintelligence/en/news-insights/research/state-of-green-business-2021.

[2706] CDP, Are Companies Developing Credible Climate Transition Plans? (Feb. 2023), available at
https://cdn.cdp.net/cdp-
production/cms/reports/documents/000/006/785/original/Climate_transition_plan_report_2022_%2810%29
.pdf.

[2707] *See id.* According to the CDP's Transition Plan report, "Nearly 20,000 organizations around the world
disclosed data through CDP in 2022, including more than 18,700 companies worth 50% of global market
capitalization, and over 1,100 cities, states and regions."

Appellate Case: 24-1628     Page: 641     Date Filed: 03/26/2024 Entry ID: 5377362

pre-industrial levels.[2708]  Approximately 43 percent of these transition plans are publicly available.[2709]

Commission staff compared these figures to data related to targets and goals on the Bloomberg ESG database, which is focused on registrants listed on NYSE and NASDAQ.  The results are reported in Table 7 below.  These results are generally consistent with data from the sources discussed above.

---

[2708]     *See id.*

[2709]     *See id.*

App.637

Appellate Case: 24-1628     Page: 642     Date Filed: 03/26/2024 Entry ID: 5377362

**Table 7.** Registrants with targets or goals according to Bloomberg ESG data

| | Climate Change Policy[1] | Emission Reduction Initiatives[2] | Science-Based Targets[3] | Net Zero Plans[4] |
|---|---|---|---|---|
| All issuers | 37% | 45% | 11% | 17% |
| NAFs | 10% | 11% | 1% | 2% |
| AFs | 23% | 29% | 2% | 7% |
| LAFs | 55% | 67% | 19% | 27% |
| EGCs | 8% | 9% | 0% | 1% |
| Non EGCs | 47% | 58% | 15% | 22% |
| SRCs | 13% | 12% | 0% | 3% |
| Non SRCs | 40% | 49% | 12% | 18% |

Sources: Bloomberg, SEC filings

1  Bloomberg defines this field as indicating: "Whether the registrant has disclosed its intention to help reduce global GHG emissions through its ongoing operations and/or the use of its products and services in its annual report or CSR report. Examples might include efforts to reduce GHG emissions, efforts to improve energy efficiency, efforts to derive energy from cleaner fuel sources, investment in product development to reduce emissions generated or energy consumed in the use of the company's products etc."

2  Bloomberg defines this field as indicating: "Whether the registrant has disclosed the implementation of any initiative to reduce its emissions, such as GHGs, SOx, NOx, or other air pollutants in its annual report or CSR report."

3  Bloomberg defines this field as indicating: "Whether the registrant has disclosed its ambition and engagement related to setting science-based GHG emissions reduction targets. Emissions targets are considered science-based if they align with the goals of the Paris Climate Agreement to limit warming to well below 2 degrees Celsius above pre-industrial levels. That is, whether the company has explicitly disclosed that they have either committed to setting or have set science-based targets. This information is sourced from a company's CSR report."

4  Bloomberg defines this field as indicating: "Whether the registrant has disclosed its ambition and engagement related to achieving Net Zero GHG emissions. Net Zero refers to a state in which GHG emissions released into the atmosphere are balanced by removal of emissions from the atmosphere. This information is sourced from a company's CSR report."

The results suggest that smaller registrants (NAFs, EGCs, and SRCs) are much less likely to have developed climate-related targets and goals. For example, the portion of companies that have "Net Zero Plans" is approximately 1 percent for EGCs and approximately 22 percent for non-EGCs.

Appellate Case: 24-1628   Page: 643   Date Filed: 03/26/2024 Entry ID: 5377362

### e. Third-Party Assurance of Climate-Related Disclosures

Among the companies that provide climate-related disclosures, a considerable portion include some form of third-party assurance of the accuracy of these disclosures. One report finds that 40 percent of Russell 1000 Index companies, nearly all of which are LAFs, obtained third-party assurance for their sustainability reports in 2022, up from 24 percent in 2019.[2710] Among the companies that obtained assurance, however, only three percent obtained assurance for the entire report, with 58 percent obtaining assurance only with respect to GHG emissions. Regarding the level of assurance, the overwhelming majority (92 percent) obtained limited assurance while only 5 percent obtained reasonable assurance. Regarding service providers, 17 percent of companies received assurance from an accounting firm, 15 percent from small consultancy/boutique firms, and 68 percent from engineering firms.[2711] Because these statistics are limited to Russell 1000 Index companies, corresponding figures for the full sample of U.S. registrants may differ depending on the extent to which the practice of obtaining third-party assurance is concentrated in large companies.[2712] Indeed, based on Commission staff's analysis

---

[2710] *See supra* note 2666.

[2711] One study finds that assurance service providers that are not financial auditors are reported to be not applying the AICPA assurance standards. *See* Brandon Gipper, Samantha Ross & Shawn Shi, *ESG Assurance in the United States* (Aug. 14, 2023), Stanford Univ. Grad. Sch. of Bus. Rsch Paper No. 4263085, UC San Francisco Rsch. Paper No. Forthcoming, available at https://ssrn.com/abstract=4263085 (retrieved from SSRN Elsevier database) ("Gipper *et al.* (2023)"); *see also supra* note 1363 (explaining that non-CPAs are unable to use AICPA or PCAOB attestation standards).

[2712] Other studies also report evidence of third-party assurance among smaller samples of companies analyzed. For example, according to a recent study by the International Federation of Accountants ("IFAC"), in 2019, 99 out of the 100 largest U.S. companies by market capitalization provided some form of sustainability disclosure, which may contain climate-related information among other sustainability-related topics. Seventy of those companies obtained some level of third-party assurance, with the vast majority being "limited assurance" according to the study. Of the 70 companies that obtained assurance, the study reports that 54 obtained "limited assurance," eight obtained "reasonable assurance," five obtained "moderate assurance," and three did not disclose any assurance. Of the 81 unique assurance reports examined in the study, nine were found to be issued by an auditing firm, while 72 were issued by another service provider. *See* IFAC, *supra* note 1089. Among the sample of 436 companies included in the CCMC Survey, 28% disclosed that they engaged a third party to provide some form of auditing or assurance regarding their climate-related or ESG disclosure.

Appellate Case: 24-1628     Page: 644     Date Filed: 03/26/2024 Entry ID: 5377362

of Bloomberg ESG data, which focuses on registrants listed on NYSE and NASDAQ, approximately 15 percent obtained some type of third-party assurance or verification[2713] on their environmental policies and data, nearly all of which are non-SRCs and non-EGCs.[2714]  Based on analysis of S&P 500 companies from 2010 through 2020, a 2023 study finds that the most common form of assurance standard used for GHG emissions is the ISO 14064,[2715] which is the assurance standard typically applied by assurance providers who are not accountants.[2716]  Specifically, across Scopes 1, 2, and 3 GHG emissions, approximately 40 percent of the assurance performed utilizes ISO 14064-3.  Application of other assurance standards are reported to be also consistent across Scopes 1, 2, and 3 GHG emissions: around 10 percent for AICPA, around 10 percent for AccountAbility's AA1000, around 16 percent for IAASB ISAE, and around 30 percent for miscellaneous in-house assurance standards and protocols.[2717]  An analysis of S&P 500 firms in 2021 reveals a similar finding with ISO 14064-3 being the most common assurance standard referenced in ESG reporting followed by the IAASB ISAE, which experienced an increase of 41 more references compared to the previous year (i.e., 54 percent increase).[2718]

---

[2713] As discussed in section II.I.5.c, assurance services are services performed in accordance with professional standards that are designed to provide assurance, while in many cases verification services are not designed to provide assurance.

[2714] Consistent with rates of voluntary GHG emissions disclosures, the percentages become much smaller when the sample analyzed is expanded to include smaller registrants.  The breakdown for LAF, AFs, and NAFs is as follows: 25%, 4%, and 1%, respectively.

[2715] *See* Gipper *et al.* (2023).

[2716] *See* Center for Audit Quality, *S&P 500 ESG Reporting and Assurance Analysis* (2023), available at https://www.thecaq.org/sp-500-and-esg-reporting (stating, in the context of the study, that the most common standard used by non-accountant providers was ISO 14064-3).

[2717] Percentages do not add up to 100% because assurance statements can sometimes reference multiple assurance standards.

[2718] Center for Audit Quality, *supra* note 2716.

Appellate Case: 24-1628    Page: 645    Date Filed: 03/26/2024 Entry ID: 5377362

### B. Broad Economic Considerations

#### 1. Investor Demand for Additional Climate Information

Comments received in response to the Proposing Release, previously discussed in section II.A.2, indicate that there is broad support from investors for more reliable, consistent, and comparable information on how climate-related risks can impact companies' operations and financial conditions.[2719] The results of multiple recent surveys[2720] and evidence in academic studies[2721] also indicate strong demand from investors for multiple types for disclosures of

---

[2719] This includes support for climate-related disclosure in the form of numerous letters from individuals as well as letters from investment managers and investment advisers. *See supra* section II.A.

[2720] *See, e.g.*, Morrow Sodali, *Institutional Investor Survey* (2021), available at https://morrowsodali.com/uploads/INSTITUTIONAL-INVESTOR-SURVEY-2021.pdf ("Morrow Sodali (2021)"). This survey solicited the views of 42 global institutional investors managing over $29 trillion in assets (more than a quarter of global assets under management). Results show that 85% of surveyed investors cited climate change as the leading issue driving their engagements with companies, and 61% indicated that they would benefit from disclosures that more clearly link climate-related risks to financial risks and opportunities. *See also*, *e.g.*, E. Ilhan, *et al.*, *Climate Risk Disclosure and Institutional Investors*, 36 Rev. Fin. Stud. 2617 (2023) ("Ilhan *et al.* (2023)") ("Through a survey and analyses of observational data, we provide systematic evidence that institutional investors value and demand climate risk disclosures"). The sample consists of 439 institutional investor respondents. Results show that 68% of respondents either agreed or strongly agreed that management discussions on climate risk are not sufficiently precise. Also, 74% either agreed or strongly agreed that investors should demand that portfolio companies disclose their exposure to climate risk, while 59% engaged (or planned to engage) portfolio companies to provide disclosures in line with the TCFD. Lastly, 73% of institutional investors surveyed either agreed or strongly agreed that standardized and mandatory reporting on climate risk is necessary. The authors state that "respondents are likely biased toward investors with a high ESG awareness."

[2721] *See also* Christensen *et al.* (2021), at 1-73; *see also* Shira Cohen, Igor Kadach & Gaizka Ormazabal, *Institutional Investors, Climate Disclosure, and Carbon Emissions*, 76 J. of Acct. & Econ., Article 101640 (2023); Juan Castillo, *et al.*, *Does Talking the Climate Change Talk Affect Firm Value? Evidence from the Paris Agreement* (Apr. 6, 2023), available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4411193 (retrieved from SSRN Elsevier database); Kölbel, *et al.*, *Ask BERT: How Regulatory Disclosure of Transition and Physical Climate Risks Affects the CDS Term Structure*, 22 J. Fin. Econometrics 30 (2022); Philipp Baier, *et al.*, *Environmental, Social and Governance Reporting in Annual Reports: A Textual Analysis*, 29 Fin. Markets, Insts. & Instruments 93 (2020); Dirk Black, *et al.*, *Investor Commitment to Responsible Investing and Firm ESG Disclosure* (Oct. 12, 2022), available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4205956 (retrieved from SSRN Elsevier database); Scott Robinson, *et al.*, *Environmental Disclosures and ESG Fund Ownership* (Jan. 31, 2023), available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4344219 (retrieved from SSRN Elsevier database); *see also infra* notes 2738 to 2745 and surrounding discussion.

climate-related risks faced by companies.[2722]  Commenters identified various channels by which climate risks can impact financial performance[2723] and why this information is important for their investment decisions.  These commenters agreed with the Commission's assessment in the Proposing Release that the current set of voluntary disclosures are inadequate to meet investor needs.  Accordingly, these commenters expressed support for new rules to enhance the consistency, comparability, and reliability of climate-related disclosures.

Other commenters questioned both the Commission's rationale for the proposed rules and the views of supportive commenters.  Some of these commenters characterized the demand for climate-related information as being concentrated among a small set of institutional investors, who did not represent investors more broadly.[2724]  Other commenters expressed the view that institutional investors are influenced by motives other than the desire to obtain the best financial return for their clients.[2725]  Relatedly, one commenter expressed the view that climate-related

---

[2722]   *See* discussion *supra* sections I and II.A.; *see also* Christensen *et al.* (2021) (stating "it is clear that capital-market participants have a demand for CSR information, not least because of the potential performance, risk or valuation implications"); Investor Agenda, 2021 Global Investor Statement to Governments on the Climate Crisis, available at https://theinvestoragenda.org/wp-content/uploads/2021/09/2021-Global-Investor-Statement-to-Governments-on-the-Climate-Crisis.pdf (statement signed in 2021 by 733 investors collectively managing over $52 trillion in assets).

[2723]   *See infra* notes 2738-2745 and accompanying text.

[2724]   *See, e.g.,* letter from Business Roundtable; Nasdaq, *The SEC's proposal on Climate Change Disclosure: a Survey of U.S. Companies* (2022) (letter and accompanying survey report), available at https://nd.nasdaq.com/rs/303-QKM-463/images/1497-Q22_SEC-Climate-Change-Survey-Findings-Report-Listings-CP-v3.pdf; and Overdahl exhibit to letter from Chamber (citing BCG Investor Perspectives Series Pulse Check #19 Mar. 18-22, 2022, available at https://web-assets.bcg.com/7e/19/4b86c63541b78f1c9ffa82e42804/bcg-investor-pulse-check-series-19.pdf).  From that BCG study, the commenter cites a footnote (slide 17): "However, most of the investors BCG recently surveyed indicated that ESG is not currently a primary consideration in day-to-day investment decisions and recommendations."  Simply because a matter is not a *day-to-day* consideration does not imply that disclosure relating to it is unimportant to an investor.

[2725]   *See, e.g.,* letters from Cunningham *et al.*; David R. Burton; Domestic Energy Producers' Alliance; National Fuel Corporation; Western Energy Alliance and U.S. Oil & Gas Association; and Competitive Enterprise Institute. *See also* letter from Boyden Gray (June 2022), citing Paul G. Mahoney & Julia D. Mahoney, *The New Separation of Ownership and Control: Institutional Investors and ESG*, 2 Colum. Bus. L. Rev. 840, 851 (2021), which discusses cases in which some institutional investors may act for purposes that are contrary to those of their investors but noting that such concerns may not apply to all institutional investors.

642

information would not better inform investor decision-making beyond what is found in current financial disclosures, while also stating that the risks that it highlighted were too far in the future to matter for current valuation.[2726]

We disagree with the commenters who stated that the demand for climate-related information is concentrated among a small group of institutional investors. We received numerous comment letters from investors, both institutional and individual, expressing a need for more reliable, consistent, and comparable climate-related information.[2727] Furthermore, institutional managers' demand for climate-related disclosures likely reflects what they believe to be in the best interests of their investors and clients, including individuals.[2728] Institutional investors have strong incentives to earn financial returns on behalf of their clients.

Moreover, climate risk information can be informative about financial performance in a way that goes beyond current accounting numbers. As stock prices reflect profits potentially years in the future, even long-term climate-related risks can affect profitability, though not all climate risks are necessarily long-term. In any case, risks to cash flows, even those that are far in the future, can still be important for investors today.[2729]

---

[2726] *See* Overdahl exhibit to letter from Chamber.

[2727] *See supra* section II.A.2.

[2728] *See, e.g.,* letters from PIMCO and ICI. For evidence on retail investors using ESG-related information in their decisions; *see also* Q. Li, E. Watts & C. Zhu, *Retail Investors and ESG News*, Jacobs Levy Equity Mgmt. Center for Quantitative Fin. Rsch. Paper (2023), available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4384675 (retrieved from SSRN Elsevier database); A. Amel-Zadeh, R. Lustermans & M. Pieterse-Bloem, *Do Sustainability Ratings Matter? Evidence from Private Wealth Investment Flows* (Mar. 9, 2022).

[2729] *See* J. van Binsbergen, *Duration-Based Stock Valuation: Reassessing Stock Market Performance and Volatility* (2021), available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3611428 (retrieved from SSRN Elsevier database); D. Greenwald, M. Leombroni, H. Lustig & S. van Nieuwerburgh, *Financial and Total Wealth Inequality with Declining Interest Rates* (2021), available at

Appellate Case: 24-1628     Page: 648     Date Filed: 03/26/2024 Entry ID: 5377362

## 2. Current Impediments to Climate Disclosures

In the Proposing Release, the Commission stated that, in practice, investors' demand for climate-related information is often met by inconsistent and incomplete disclosures due to the considerable variation in the coverage, specificity, location, and reliability of information related to climate risk.[2730] Furthermore, the Commission noted that multiple third-party reporting frameworks and data providers have emerged over the years but these resources lack mechanisms to ensure compliance and have contributed to reporting fragmentation.[2731] Many commenters supported these observations.[2732]

The Commission also described a set of conditions that could contribute to the market failing to achieve an optimal level of climate disclosure from the point of view of investors.[2733] Briefly put, these market failures stemmed from the existence of information externalities (implying that registrants may fully internalize the costs of disclosure but not the benefits, which may lead them to under-disclose relative to what is optimal from investors' perspective), from agency problems in that managers may not be motivated to disclose information due to agency concerns, and the fact that disclosures may not elicit uniform responses from investors. In

---

https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3789220 (retrieved from SSRN Elsevier database). Both of these papers find that the Macauley duration of equity, the weighted average length of time which investors will receive the cash flows from the asset, is in excess of 35 years as of 2019. This indicates that changes in cash flows in the future can impact equity prices today. *See* E. Ilhan, Z. Sautner & G. Vilkov, *Carbon Tail Risk*, 34 Rev. of Fin. Studs. 1540 (2021), for evidence of the market reflecting expectations about future climate events, even the rarest ones. *See* Kölbel, *et al*., *supra* note 2721, for evidence of climate risks being priced in CDS contracts with distant maturities. *See also* David C. Ling, Spenser J. Robinson, Andrew Sanderford & Chongyu Wang, *Climate Change and Commercial Property Markets: The Role of Shocks, Retail Investors, and Media Attention* (Apr. 7, 2023), available at SSRN: https://ssrn.com/abstract=4412550 (retrieved from SSRN Elsevier database).

[2730] Proposing Release, section IV.B.2.a.

[2731] *Id*.

[2732] *See supra* section II.A.

[2733] *See* Proposing Release, section IV.B.2.a.

Appellate Case: 24-1628     Page: 649     Date Filed: 03/26/2024 Entry ID: 5377362

articulating these market failures, the Commission drew on a long-standing literature in economics regarding insufficient private incentives for disclosure.[2734] Academic literature that focuses on climate disclosures acknowledges these to be applicable market failures, though there is a debate over whether these failures justify official sector action.[2735]

One commenter argued that the Commission must empirically establish the existence of a market failure and that the Proposing Release "failed to demonstrate that a market failure exists with respect to the current principles-based approach."[2736] As discussed in section IV.B.1, however, investors have expressed a need for the information provided by these disclosures and have stated there is a lack of consistency in current disclosures. In addition, there are several conditions that inhibit an optimal level of climate-related disclosure in the current market, as

---

[2734] *See id*; *see also* S.J. Grossman, The Informational Role of Warranties and Private Disclosure About Product Quality, 24 J. L. & Econ. 461 (1981); P. Milgrom, Good News and Bad News: Representation Theorems and Applications, 17 Bell J. Econ. 18 (1981); S.A. Ross, Disclosure Regulation in Financial Markets: Implications of Modern Finance Theory and Signaling Theory, Issues in Financial Regulation (McGraw Hill, F.K. Edwards Ed., 1979); Anne Beyer, *et al*., The Financial Reporting Environment: Review of the Recent Literature, 50 J. Acct. & Econ. 296 (2010).

[2735] *See* Christensen *et al*. (2021); Richard M. Frankel, S.P. Kothari & Aneesh Raghunandan, *The Economics of ESG Disclosure Regulation* (Nov. 29, 2023), available at https://ssrn.com/abstract=4647550 (retrieved from SSRN Elsevier database). *See also* Overdahl exhibit to letter from Chamber (critiquing a rules-based approach).

[2736] *See* Overdahl exhibit to letter from Chamber. This commenter also pointed to a statement from a set of economists that considered how the Commission should approach disclosures of environmental and social issues. The commenter cites to the groups' recommendation that, "that the SEC should not mandate disclosure of the firm's impacts on environmental and social (E&S) outcomes." *See* Jonathan M. Karpoff, Robert Litan, Catherine Schrand & Roman L. Weil, *What ESG-Related Disclosures Should the SEC Mandate?*, 78 Fin. Analysts J. 8 (2022); Fin. Economists Roundtable, Statement on SEC Regulation of ESG Issues: SEC Should Mandate ESG Disclosure Limited to Matters that Directly Affect the Firm's Cash Flows, (2021) ("FER Statement"), available at https://static1.squarespace.com/static/61a4492358cbd07dda5dd80f/t/61e8d6dd8c22c04330637bc9/1642649310539/2021.pdf. Although the final rules require some disclosure of GHG emissions, contrary to the FER Statement's concerns, those disclosures are not intended to promote an "understanding [of] how the firm's activities affect society." *Id*. Instead, consistent with the FER Statement's suggestion, the GHG emissions disclosure requirements are intended to help investors understand the risks to which registrants are subject so that they can make better-informed investment and voting decisions. Moreover, the commenter neglected to reference the group's recommendation that "[t]he SEC should mandate disclosure of E&S-related cash flow effects, including investments that alter E&S outcomes." Overall, therefore, we believe our approach is broadly consistent with the FER Statement's recommendation to focus on "understanding the impact of E&S activities on the firm's value through their effects on a firm's cash flows."

645

described above.  It is widely accepted that such conditions demonstrate barriers to voluntary disclosure, namely, a market failure in this context.  These together establish the basis for Commission action.

### C.  Benefits and Costs

We begin with a general discussion of the final rules' benefits and costs (section IV.C.1). We then turn to the benefits and costs that are specific to particular provisions of the final rules (section IV.C.2).  Finally, we discuss estimates of quantifiable direct costs of compliance with the final rules (section IV.C.3).

#### 1.  General Discussion of Benefits and Costs

##### a.  Benefits

The final rules will require comprehensive and standardized climate-related disclosures, including disclosure on governance, business strategy, targets and goals, GHG emissions, risk management, and financial statement metrics.  This information will enable investors to better assess material risks in climate-related reporting and facilitate comparisons across firms and over time.

Academic literature shows a well-established link between climate-related risks and firm fundamentals.[2737]  In an international study of over 17,000 firms from 1995 to 2019, researchers

---

[2737]    One commenter said that the Commission did not explain "why climate-related information would often be material to investors when other information, such as cash flows, profitability and industry, are likely to be much more relevant to an investment decision."  *See* Overdahl exhibit to letter from Chamber (citing BCG Investor Perspectives Series Pulse Check #19, *supra* note 2724).  We disagree with the premise underlying this comment.  Indeed, as other commenters have expressed, understanding the impact of climate-related risks is important, for investors to assess current financial information such as cash flows and profitability and thus to make informed investment decisions.  *See supra* section IV.B.1.  Moreover, disclosure regarding the potentially likely material impacts of a registrant's climate-related risks may be more informative about future cash flows than disclosure regarding its current cash flows.  This commenter cites

found that increased exposure to higher temperatures, a form of physical climate risk, reduces firm revenues and operating income.[2738] Another study found that drought risk, another form of physical climate risk, predicts poor profit growth.[2739] A third study found that exposure to physical climate risk leads firms to choose capital structures with less debt due to higher expected distress costs and greater operating costs.[2740] Researchers have found that banks with financial exposure in their lending portfolios to extreme climate-related hazards (e.g., hurricanes) experience higher loan losses and lower long-run profitability.[2741] Other studies document effects of climate-related transition risks on innovation, employment and investment policies.[2742]

---

as evidence an academic study, A. Moss, J.P. Naughton & C. Wang, *The Irrelevance of Environmental, Social, and Governance Disclosure to Retail Investors*, Mgmt. Sci. (2023) (also submitted to the comment file by the authors, *see* letter from James P. Naughton). This study suggests that the portfolios of retail investors on one trading platform are not different on days of ESG press releases. We received numerous comments speaking to difficulties in analyzing current climate disclosures, and this paper's findings are consistent with this feedback. We acknowledge, however, that this study is subject to certain limitations, such as the fact that its findings center around disclosures on social issues more generally (rather than specifically focusing on climate-related risks). Also, voluntary disclosures are analytically subject to a dual selection problem. *See* Christensen *et al.* (2021), at 1208. The dual selection problem refers to two concurrent issues that pose challenges in determining causality. The first stems from the fact that observable ESG disclosures are from companies that voluntarily choose to disclose, reflecting a selection bias. The second is the challenge of disentangling the effects of disclosure by itself from the effects of the underlying CSR activities.

[2738] *See* Nora Pankratz, Rob Bauer & Jeroen Derwall, *Climate Change, Firm Performance, and Investor Surprises*, 69 Mgmt Sci. 7352 (2023).

[2739] *See* Harrison Hong, Frank Weikai Li & Jiangmin Xu, *Climate Risks and Market Efficiency*, 208 J. of Econometrics 265 (Jan. 2019); Claudia Custodio, *et al.*, *How Does Climate Change Affect Firm Sales? Identifying Supply Effects* (June 30, 2022), available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3724940 (retrieved from SSRN Elsevier database) (describing decline in labor and sales due to extreme temperatures in manufacturing and other heat-sensitive industries).

[2740] *See* Edith Ginglinger & Quentin Moreau, *Climate Risk and Capital Structure*, 69 Mgmt Sci. 7492 (2023). Similar evidence also appears in the context of transition risk where researchers find that firms with higher carbon emissions exhibit lower leverage when their banks through commitments to decarbonize are found to supply less credit to these firms. *See* Marcin T. Kacperczyk & José-Luis Peydró, *Carbon Emissions and the Bank-lending Channel* (Aug. 2022), available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3915486 (retrieved from SSRN Elsevier database).

[2741] *See* Yao Lu & Valeri V. Nikolaev, *The Impact of Climate Hazards on Banks' Long-Run Performance* (Sept. 2023), available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4569935 (retrieved from SSRN Elsevier database).

[2742] *See* Sautner, *et al.* (2023); Li, *supra* note 2657.

Relatedly, research shows that publicly available climate-related information is reflected in asset prices, which is an indication that such information affects the prices at which investors are willing to buy or sell assets (i.e., their investment decisions).[2743]  For example, some studies document a carbon emissions premium: investors demand compensation (higher expected returns) for bearing exposure to firms with higher carbon emissions.[2744]  Similar evidence is found in debt and financial derivatives markets where climate-related risks are found to be priced in corporate bonds, options, credit default swaps, and futures contracts.[2745]  Recent academic research also concludes that climate disclosures can be used in constructing efficient "climate-

---

[2743]  Although the literature shows that financial motivations play a central role in driving investor interest in information regarding climate- and sustainability-related issues, we acknowledge that there coexist investors who exhibit nonpecuniary preferences involving this type of information.  *See* S.M. Hartzmark & A.B. Sussman, *Do Investors Value Sustainability? A Natural Experiment Examining Ranking and Fund Flows,* 74 J. of Fin. 2789 (Aug. 2019); A. Riedl & P. Smeets, *Why Do Investors Hold Socially Responsible Mutual Funds?* 72 J. of Fin. 2505 (Aug. 2017); Ľ. Pástor, R. F. Stambaugh, & L. A. Taylor, *Sustainable Investing in Equilibrium*, 142 J. of Fin. Econ 550 (Nov. 2021).

[2744]  *See* Patrick Bolton & Marcin T. Kacperczyk, *Do Investors Care about Carbon Risk?* 142 J. of Fin. Econ. 517 (2021).  Similar evidence on the pricing of information regarding climate-related risks more generally, *see* Sautner, *et al.* (2023); Griffin, *et al.*, *supra* note 2660; E.M. Matsumura, R. Prakash & S.C. Vera-Munoz, *Firm-value Effects of Carbon Emissions and Carbon Disclosures*, 89 Acct. Rev. 695 (March 2014); E.M. Matsumura, R. Prakash & S.C. Vera-Munoz, *Climate Risk Materiality and Firm Risk*, Rev. Acct. Stud. (Feb. 5, 2022) available at https://ssrn.com/abstract=2983977 (retrieved from SSRN Elsevier database).

[2745]  For evidence within the market for corporate bonds, *see, e.g.*, Thanh D. Huynh & Ying Xia, *Climate Change News Risk and Corporate Bond Returns*, 56 J. of Fin. & Quant. Analysis 1985 (Sept. 2021) ("Huynh & Xia (2021)").  For evidence within the market for options, *see, e.g.*, E. Ilhan, Z. Sautner, & G. Vilkov, *Carbon Tail Risk*, *supra* note 2729; Sautner *et al.* (2023).  For evidence within the market for credit default swaps, *see* Kölbel *et al.*, *supra* note 2721.  For evidence within the market for futures contracts, *see* Wolfram Schlenker & Charles A. Taylor, *Market Expectations of a Warming Climate*, 142 J. of Fin. Econ. 627 (Nov. 2021).  *But see* Hong, *supra* note 2739 (finding asset prices may not fully price in climate related risks); and evidence finding a lack of relation between climate-related risks and asset prices, J. Aswani, A. Raghunandan & S. Rajgopal, *Are Carbon Emissions Associated with Stock Returns?* 28 Rev. of Fin. 75 (Jan. 2024); R. Faccini, R. Matin & G. Skiadopoulos, *Dissecting Climate Risks: Are They Reflected in Stock Prices?* 155 J. of Banking & Fin., Article 106948 (Oct. 2023); J. Murfin & M. Spiegel, *Is the Risk of Sea Level Rise Capitalized in Residential Real Estate?*, 33 Rev. of Fin. Stud. 1217 (March 2020).  For a discussion of seemingly contradictory empirical results found in studies involving stock returns and carbon emissions, *see* Patrick Bolton, Zachery Halem & Marcin T. Kacperczyk, *The Financial Cost of Carbon*, 34 J. of Applied Corp. Fin. 17 (June 2022).  For further evidence in real estate and municipal bonds, *see* D.D. Nguyen, S. Ongena, S. Qi & V. Sila, *Climate Change Risk and the Cost of Mortgage Credit*, 26 Rev. of Fin. 1509 (2022); P. Goldsmith-Pinkham, M.T. Gustafson, R.C. Lewis & M. Schwert, *Sea-level Rise Exposure and Municipal Bond Yields*, 36 The Rev. of Fin. Studs. 4588 (2023); M. Painter, *An Inconvenient Cost: The Effects of Climate Change on Municipal Bonds*, 135 J. of Fin. Econ. 468 (2020).

hedging" portfolios, by allowing investors to better identify firms with positive or negative climate exposure and adjust their portfolios in response to that information.[2746] Collectively, this research indicates that disclosures about climate-related risks, when they are made, become priced into the value of a firm, thereby demonstrating that the disclosure provides relevant information to investors as they make investment decisions.

Given the usefulness of climate disclosures to investors in accurately valuing a company and assessing its risks, the use of a standardized disclosure framework will mitigate agency problems arising from registrants being able to selectively disclose (i.e., "cherry pick") information, which reduces transparency and impairs investors' ability to effectively assess the potential financial impacts of a registrant's climate-related risks. Providing better information to investors will, in turn, reduce information asymmetries between managers and investors as well as amongst investors[2747] (i.e., reduce any informational advantages), which will improve liquidity and reduce transaction costs for investors (i.e., reduce adverse selection), and may lower firms' cost of capital.[2748]

---

[2746] *See, e.g.*, Robert F Engle, *et al.*, *Hedging Climate Change News*, 33 Rev. Fin. Stud. 1184 (2020).

[2747] This information asymmetry can result from the fact that it currently requires considerable resources to infer a registrant's exposure to or management of climate-related risks using the existing publicly available information provided through voluntary disclosures. *See, e.g.*, letters from Vermont Pension Investment Commission; CalSTERS; and Wellington (describing how these commenters currently glean such information, incurring costs related to development of proprietary models, devoting considerable resources to reviews of public information, and subscribing to services from other data providers).

[2748] *See* section IV.E. for more information on capital market benefits; *see also* Christensen *et al.* (2021), at 1202, 1208; Yakov Amihud & Haim Mendelson, *Liquidity and Stock Returns*, 42 Fin. Analysts J. 43 (May-June 1986); Lawrence R. Glosten & Paul R. Milgrom, *Bid, Ask and Transaction Prices in a Specialist Market with Heterogeneously Informed Traders*, 14 J. of Fin. Econ. 71 (March 1985); R.E. Verrecchia, *Essays on Disclosure*, 32 J. of Acct. & Econ. 97 (Dec. 2001). More recently, researchers used international evidence to find that mandatory ESG disclosures improves stock liquidity, *see* P. Krueger, Z. Sautner, D.Y. Tang & R. Zhong, *The Effects of Mandatory ESG Disclosure Around the World*, Euro. Corp. Gov. Inst. – Finance Working Paper No. 754/2021 (Jan. 12, 2024). Asymmetric information occurs when one party to

The final rules will also integrate climate-related risk disclosures into the existing Regulation S-K and S-X disclosure frameworks. Investors will therefore find information about all the material risks that companies face—not just climate-related risks— within a centralized source (i.e., Commission filings, as opposed to sustainability reports, brochures, or company websites), thereby reducing search costs, and will receive this information in a more timely manner and on a regular schedule.[2749] These benefits should be especially pronounced for financial institutions with significant exposure to climate-related risks through their portfolio companies since any enhancements in the portfolio companies' disclosures will better position the institutions to assess their portfolio-level risks.[2750]

Furthermore, by treating the climate-related disclosures as "filed," these disclosures will be subject to potential liability under the Exchange Act and the Securities Act, which will

---

an economic transaction possesses greater material knowledge than the other party. Adverse selection occurs when the more knowledgeable party only chooses to transact in settings that, based on their private information, is advantageous for them. Less informed parties, aware of their informational disadvantage, might be less inclined to transact at all for fear of being taken advantage of. *See* George Akerlof, *The Market for Lemons, Quality Uncertainty and the Market Mechanism*, 84 Q. J. of Econ. 488 (Aug. 1970). One commenter claimed that the final rules could result in adverse selection if companies with the most exposure to climate risks choose to de-register or opt out of registration (*see* letter from Chamber). We disagree with this claim. We believe the benefits of being a public registered company are sufficiently strong such that it is unlikely many companies will choose to avoid becoming or continuing as a public registered company as a result of the final rules. *See* section IV.E.3 for more information.

[2749] *See supra* note 2570.

[2750] *See Report on Climate-Related Financial Risk 2021*, FSOC, available at https://home.treasury.gov/system/files/261/FSOC-Climate-Report.pdf ("Demand for information about climate-related risks and opportunities has grown significantly, driven by investors and financial institutions that are interested in managing their exposure to climate risks… Further, it is important to note that to assess and quantify their own climate-related financial risks, particularly transition risks, financial institutions need access to climate-related risk information from the companies they are financing and investing in."); CDP, CDP Non-Disclosure Campaign: 2021 Results (2021), available at https://cdn.cdp.net/cdp-production/cms/reports/documents/000/006/069/original/CDP_2021_Non-Disclosure_Campaign_Report_10_01_22_%281%29.pdf; *see also* letter from BNP Paribas ("Given the increasing awareness of corporates and the financial community about the need to accelerate the transition to a low carbon economy, establishing robust and comparable climate related disclosure standards is critical to providing investors decision-useful information. In particular, this information is essential for banks and asset managers to assess climate-related risks for lending purposes and making investment decisions, to define portfolio alignment strategies in the context of a registrant's net zero commitments…").

Appellate Case: 24-1628     Page: 655     Date Filed: 03/26/2024 Entry ID: 5377362

incentivize registrants to take additional care to ensure the accuracy of the disclosures, thereby resulting in more reliable disclosures.[2751]  Several commenters expressed support for treating climate-related disclosures as filed, noting that it would help improve investor confidence in the accuracy and completeness of such disclosures.[2752]

For disclosures other than financial statement disclosures, the final rules will provide registrants with the flexibility to determine the appropriate placement within their filing of climate-related disclosures.  While this could affect investors' ability to easily locate and compare those disclosures, we believe that this concern is largely mitigated by the final rules' structured data requirement.  The structured disclosure requirements we are adopting, including the requirement to tag such disclosures using XBRL, will enable search and retrieval of the disclosures on an automated and large-scale basis, allowing investors, and the market, to process information much more effectively and efficiently as compared to manual searches through unstructured formats.  This will improve investors' assessment of companies' estimated future cash flows, leading to more accurate company valuations and lowering companies' cost of capital.[2753]

Additionally, having access to more reliable information could result in cost savings for those investors who collect or organize information about climate-related risks.  Several

---

[2751]    However, we note that these benefits will be mitigated for certain forward-looking statements, including those related to transition plan disclosures, scenario analysis, internal carbon pricing, and climate-related targets and goals, as these statements will have the benefit of safe harbor protections if the safe harbor requirements are satisfied.

[2752]    *See, e.g.*, letters from Amer. For Fin. Reform, Sunrise Project *et al.*; Ags of Cal. *et al.*; CalPERS; Ceres; CFA; Engine No. 1; Franklin Templeton; PwC; SKY Harbor; and TotalEnergies.

[2753]    *See* Christensen *et al.* (2021), at 1187; R. Lambert, C. Leuz & R.E. Verrecchia, *Accounting Information, Disclosure, and the Cost of Capital*, 45 J. of Acct. Rsch. 385 (May 2007); D. Easley & M. O'Hara, *Information and the Cost of Capital*, 59 J. of Fin 1553 (Aug. 2004); R. Lambert, C. Leuz & R.E. Verrecchia, *Information Asymmetry, Information Precision, and the Cost of Capital*, 16 Rev. of Fin. 1 (Jan. 2012).

Appellate Case: 24-1628     Page: 656     Date Filed: 03/26/2024 Entry ID: 5377362

commenters emphasized the scale of the resources required to render the currently available information on climate-related disclosures useful to their decisions.[2754]

Similarly, investors also may benefit from the final rules if the required disclosures change the nature and degree to which investors rely on third parties that provide ESG ratings or scores. To the extent there is overlap between the disclosures required by the final rules and the types of information considered by ESG ratings providers, the final rules may reduce reliance on these third parties, thereby reducing costs incurred by investors to obtain decision-useful information. ESG ratings are not necessarily standardized or transparent with respect to their underlying methodologies, and several studies have found that different ESG ratings providers often assign inconsistent ratings for the same registrant.[2755] To the extent the final rules reduce reliance on these ratings, registrants and investors could benefit by saving money that would otherwise be spent on obtaining third-party ESG ratings.[2756] Alternatively, the disclosures elicited by the final rules may increase the value of these third-party services to the extent that the third-party services are able to leverage the enhanced disclosures to provide investors with

---

[2754] *See, e.g.*, letter from CalSTRS (stating, "The current reporting requirements are insufficient for investors to assess corporate climate risk and the related financial impacts to execute investment decisions. CalSTRS spends approximately $2,200,000 per year to access climate research, analyze available data, and develop methods to estimate climate risks and opportunities for assets in our portfolio. In addition to two full-time investment staff members, CalSTRS consults external advisors to learn how other global asset owners determine climate risk exposures to their portfolios given the lack of reliable, consistent, and comprehensive data. A conservative estimate of the variable cost of these combined human resources is $550,000 annually.").

[2755] Florian Berg, Julian Kölbel & Roberto Rigobon, *Aggregate Confusion: The Divergence of ESG Ratings*, 26 Rev. Fin. 1315 (Nov. 2022). The authors found that the correlations between six different ESG ratings are on average 0.54, and range from 0.38 to 0.71, while the correlations between credit ratings were 0.99. *See also* Scott Robinson *et al.*, *supra* note 2721; Dane Christensen, George Serafeim & Anywhere Sikochi, *Why is Corporate Virtue in the Eye of the Beholder? The Case of ESG Ratings*, Acct. Rev. (Feb. 26, 2021), available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3793804 (retrieved from SSRN Elsevier database).

[2756] Because ESG ratings encompass information beyond climate-related matters, registrants and investors may still obtain ESG ratings for reasons unrelated to climate-related information.

greater market insights. The disclosures may also allow registrants to better monitor ESG ratings, which could reduce the risk of greenwashing.

### b. Costs

The final rules will impose direct costs of compliance on registrants. We use the term "direct costs" or "compliance costs" to include (1) any costs related to developing or maintaining systems for collecting information to comply with the final rules, (2) costs of preparing and presenting the resulting disclosures for Commission filings, which we refer to as "reporting costs,"[2757] (3) costs associated with assuring the accuracy of the disclosures, such as audit and attestation costs, and (4) any legal or disclosure review costs incurred to support management's assertion that the disclosures comply with the final rules. These costs could be incurred internally (e.g., through employee hours or hiring additional staff) or externally (e.g., via third-party service providers, such as auditors or consultants). Numerous commenters expressed concerns over the direct costs of compliance on registrants of the proposed rules.[2758] As discussed in section II.A, the final rules include certain modifications relative to the proposed rules that reduce overall costs and help address commenters' concerns about the time and resources required to comply with the final rules' requirements.[2759] This concern could further be mitigated for certain registrants to the extent that the final rules generally align with the disclosure frameworks that they are already using for their voluntary disclosures or disclosures

---

[2757] Specifically, "reporting costs" refer to the costs of preparing information to be presented in Commission filings, separate from any prior costs or resources expended in obtaining or developing such information. For example, the final rules will require some registrants to disclose their Scope 1 and 2 emissions. For registrants that already disclose them, the incremental cost will only be the reporting cost, distinct from any costs they have previously voluntarily incurred related to developing emissions measurement/estimation systems and processes in order to quantify their emissions.

[2758] *See, e.g.*, letters from Chamber; Nutrien; Williams Companies; Energy Transfer LP; Hess; PPL; NRF; RILA; ConocoPhillips; NASDAQ; API; and SCG.

[2759] *See, e.g.*, letter from Chamber.

**App.653**

Appellate Case: 24-1628    Page: 658    Date Filed: 03/26/2024 Entry ID: 5377362

that are, or will be, required by state, Federal, or other laws.[2760]  Many commenters submitted

cost estimates for the proposed rules that varied considerably depending on a given company's

size, industry, complexity of operations, and other characteristics. We review these comments

and discuss cost estimates in detail in sections IV.C.2 and IV.C.3.  The remainder of this section

focuses on other costs that may result from the final rules.

The final rules may result in additional litigation risk for registrants.[2761]  However, the

final rules include several changes from the proposal to mitigate these concerns.  For example,

certain forward-looking statements, including those related to transition plan disclosures,

scenario analysis, internal carbon pricing, and climate-related targets and goals, will have the

benefit of certain liability protections if the adopted safe harbor requirements are satisfied.

Another example is the inclusion of phase in periods after the effective date to provide

registrants with additional time to become familiar with and meet the final rules' disclosure

requirements.  In addition, Scope 3 emissions disclosure is no longer required and the

amendments to Regulation S-X have been modified to lessen the compliance requirements,

among other examples.

---

[2760]  *See* section IV.A.3 for discussion of existing state and Federal laws.

[2761]  *See* letter from NAM (expressing concern about treating climate-related disclosures as "filed," noting the "evolving and uncertain nature" of GHG emissions disclosures could make it difficult for registrants to reach the degree of certainty necessary to assume the liability burden associated with reports filed with the Commission); *see also* letter from Chamber (noting that the complexity of the proposed rules could increase the likelihood of nuisance lawsuits that are intended to extract a settlement thereby increasing the cost of compliance with the rules).  This commenter also pointed out that audit costs could increase if auditors were also subject to increased litigation risk.  *See also* letter from Cunningham *et al.* (noting that "The SEC recognizes that a major cost of the Proposal concerns litigation risk."); Overdahl exhibit to letter from Chamber (noting the increase in litigation risk can also result in higher insurance costs for registrants and auditors).

Some commenters expressed concerns that the proposed disclosures would over-emphasize climate risks relative to other types of risks that investors might find important.[2762]  A related concern that commenters raised is that potentially voluminous disclosures could obscure the information that investors deem most relevant to their investment or voting decisions.[2763]  To mitigate such concerns (in addition to concerns related to the compliance costs) the final rules are less prescriptive in certain places relative to the proposed rules.  The final rules also have additional materiality qualifiers such that registrants that determine climate risks to be immaterial will have fewer disclosure obligations relative to the proposal.  These costs also are expected to be mitigated by the structured data requirements of the final rules, which will make it easier for investors to find and analyze relevant information in filings.  These changes also address other commenters' concerns that mandatory climate disclosure requirements that are too prescriptive or granular may lead to inefficient changes in business strategies and limit or halt innovation in the market for voluntary climate disclosures.[2764]

---

[2762]    *See, e.g.*, Overdahl exhibit to letter from Chamber, stating, "because climate-related information is just one factor among many other (potentially more relevant) factors, climate-related information is often not material;" *see also* letters from API; Western Energy Alliance and the U.S. Oil & Gas Association; Matthew Winden; American Council of Engineering Companies; Chamber; and Wisconsin Manufacturers & Commerce.

[2763]    *See, e.g.*, letters from Chamber; Soc. Corp. Gov.; and ConocoPhillips.  For example, investors may be unable to review all potentially relevant information, resulting in suboptimal decisions.  *See, e.g.*, H.A. Simon, *A Behavioral Model of Rational Choice*, 69 Q. J. of Econ. 99 (Feb. 1955); H.A. Simon, *Rationality As Process and As Product of Thought*, 68 Am. Econ. Rev. 1 (May 1978); K.L. Chapman, N. Reiter & H.D. White, *et al*., *Information Overload and Disclosure Smoothing*, 24 Rev Acct. Stud. 1486 (Dec. 2019).

[2764]    *See, e.g.*, letters from API; Matthew Winden; Footwear Distributors & Retailers of America; Petrol. OK.; and Chamber.

We also acknowledge the concerns expressed by several commenters that the proposed rules would have required the disclosure of confidential or proprietary information,[2765] which can put affected registrants at a competitive disadvantage. This consequence could alter registrants' incentives to develop strategies to manage climate-related risks where it would otherwise be beneficial to do so.[2766] The final rules have been narrowed relative to the proposed rules to provide additional flexibility to limit costs associated with the disclosure of competitively sensitive information, while retaining disclosures that will help investors understand registrants' climate-related risks. In particular, we have eliminated certain prescriptive requirements from the proposal that commenters identified as potentially revealing competitively sensitive information and for which the benefits to investors were less apparent.[2767] For example, by providing registrants with flexibility to determine how best to describe their strategy towards managing climate-related risks, the final rules may enable them to avoid disclosure of competitively sensitive information.[2768] Furthermore, while we have eliminated the requirement to disclose ZIP code level information, the final rules continue to require location disclosures sufficient to understand a registrants' exposure to physical risks. We also have eliminated the requirement to disclose interim targets or goals. At the same time, we acknowledge that, in some instances, a more flexible approach may also result in less

---

[2765] *See, e.g., supra* notes 479, 596, and surrounding text. Proprietary costs are generally relevant for reporting that involves information about a companies' business operations or production processes and disclosures that are specific, detailed and process-oriented. *See, e.g.,* C. Leuz, A. Triantis & T.Y. Wang, *Why Do Firms Go Dark? Causes and Economic Consequences of Voluntary SEC Deregistrations*, 45 J. of Acct. & Econ. 181 (Aug. 2008); D.A. Bens, P.G. Berger & S.J. Monahan, *Discretionary Disclosure in Financial Reporting: An Examination Comparing Internal Firm Data to Externally Reported Segment Data*, 86 Acct. Rev. 417 (March 2011).

[2766] *See* section IV.D.

[2767] *See, e.g.,* letter from Business Roundtable (June 17, 2022).

[2768] *See, e.g.,* discussion in section II.C.1.c

comparable disclosures.  While this has the possibility of reducing the value of the disclosures to investors, we believe this approach appropriately balances investor protection with concerns raised by commenters.

Relatedly, the final rules may have indirect cost implications for third-party service providers, such as ESG ratings providers.  For example, the increased disclosures may reduce institutional investors' reliance on ESG ratings providers, which could negatively impact these providers.[2769]  Conversely, more comprehensive disclosures could reduce the cost of producing ESG ratings or may improve the informational content of the ratings, thereby increasing demand. This could benefit not only the ratings providers, but also investors that rely on ESG ratings.

Many commenters raised concerns about costs to third parties from the proposed rules,[2770] with one commenter stating that "measuring and reporting of GHG emissions would be a prerequisite for doing business with registrants and most retailers under this proposal."[2771] Compared to the proposed rules, the final rules do not impose such costs because they do not include Scope 3 disclosure requirements.  Other disclosure items under the final rules may continue to result in registrants seeking input from third parties, such as those disclosure items requiring disclosure of material impacts from climate-related risks on purchasers, suppliers, or other counterparties to material contracts with registrants.  However, the final rules limit the compliance burden of this requirement by limiting information that should be disclosed to that which is "known or reasonably available," thereby eliminating any potential need for registrants

---

[2769] We note that this "cost" is from the perspective of the ratings providers and could be offset by the efficiency gain that renders their intermediation less necessary; as such, it reflects more of a transfer than a net economic "cost."

[2770] *See* letter from the Heritage Foundation, which estimates compliance costs of the proposed rules on non-registrants would total $14 billion.

[2771] *See* letter from International Dairy Foods Association.

to undertake unreasonable searches or requests for information from such third parties. Given the more flexible and tailored approach in the final rules, such consultations will pertain only to parties whose relationship with the registrant is most likely to materially impact the registrant's strategy, business model and outlook, as well as parties from whom the registrant may be best positioned to request information, thus lowering these costs.

Some commenters asserted that a registrant's compliance costs could be passed on to other parties such as consumers (via higher prices), workers (through reduced wages or benefits), or shareholders (in the form of lower earnings).[2772] Other commenters stated that compliance costs could vary across industries.[2773] We acknowledge that third parties could bear some of the increased costs of compliance arising from the final rules and that this effect may be more pronounced in certain industries than in others. The final rules include significant changes from the proposal that lower the burdens on registrants. To the extent that these changes result in lower compliance costs, they also will help mitigate any adverse effects on other parties.

There is some existing academic literature on costs related to mandatory climate-related disclosures in other jurisdictions.[2774] Some studies report lower profitability and costly operational adjustments for firms affected by mandatory CSR disclosure and GHG emissions

---

[2772]  *See, e.g.*, letters from National Fuel Corporation; Petrol. OK; Footwear Distributors & Retails of America; Truth in Energy and Climate; ASA; and David R. Burton.

[2773]  *See* letters from API; and Matthew Winden.

[2774]  Commenters stated that there is limited evidence on the overall economic impact of mandatory climate-related disclosure regimes in other jurisdictions. *See* letter from Committee on Capital Markets Regulation (June 16, 2022) ("CCMR"); and Overdahl exhibit to letter from Chamber; *see also* Christensen *et al.* (2021).

reporting in China and the United Kingdom, respectively.[2775] However, other studies do not find

an impact on financial operating performance from mandating climate-related disclosures.[2776]

Another study showed aggregate stock price movement associated with mandatory climate-

related disclosure; while the study found, on average, a negative market reaction, the negative

stock returns were concentrated in firms with weak ESG performance and disclosure, while firms

with above-median ESG performance and disclosure exhibited a positive abnormal return.[2777]

We note that differences between the final rules and these other mandates (e.g., materiality

qualifiers) suggest that similar costs associated with the final rules may be lower.

   As discussed in sections IV.C.2.f and IV.C.3.c, the final rules may have implications for

assurance providers or, more generally, for third parties with climate-related expertise. In the

short run, the rules may increase demand (and accordingly, the cost) for climate-related expertise

and/or assurance of emissions disclosures.  Over time, we expect the supply of third parties with

climate-related expertise will adjust to correspond with the increased demand, leading to reduced

costs.

   Finally, the modifications made in the final rules to reduce overall costs will help address,

to an extent, some commenters' concerns that costs associated with the proposed rules could

---

[2775]   *See* Y .Chen, M. Hung & Y. Wang, *The Effect of Mandatory CSR Disclosure on Firm Profitability and Social Externalities: Evidence from China*, 65 J. of Acct. & Econ. 169 (2018); *see also* letter from CCMR (citing, as evidence of negative effects to firm financial performance from mandatory climate-related disclosures, Jouvenot & P. Krueger, *Mandatory Corporate Carbon Disclosure: Evidence from a Natural Experiment* (Aug. 8, 2019), available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3434490 (retrieved from SSRN Elsevier database)).

[2776]   *See* B. Downar, J. Ernstberger, S. Reichelstein, S. Schwenen & A. Zaklan, *The Impact of Carbon Disclosure Mandates on Emissions and Financial Operating Performance*, 26 Rev. of Acct. Stud. 1137 (2021).

[2777]   *See* letter from CCMR.  *See also* Proposing Release, section IV.C.1., at n. 848, citing Jody Grewal, Edward J. Riedl & George Serafeim, *Market Reaction to Mandatory Nonfinancial Disclosure*, 65 Mgmt Sci. 3061 (2019). We note that the study's findings are based on the assumption that the only news disproportionately affecting the treated companies was the policy at issue, as opposed to some other event(s) impacting the treated companies.

factor into a company's decision to become or remain a public reporting company.[2778]  In response to other commenters' concerns,[2779] the final rules also provide EGCs and SRCs with a longer phase in period for climate-related disclosures (including financial statement disclosures under Regulation S-X) and exempt EGCs and SRCs from GHG emissions disclosure requirements.  And, while climate-related disclosures will be required in registration statements for firms conducting IPOs, we are not applying the subpart 1500 and Article 14 disclosure requirements to a private company that is a party to a business combination transaction, as defined by Securities Act Rule 165(f), involving a securities offering registered on Form S-4 or F-4.[2780]

### 2.  Analysis of Specific Provisions

The costs incurred by any particular registrant may vary significantly depending upon which, if any, of the disclosures required under the final rules are applicable to that registrant's operations and circumstances.  We discuss the costs of specific components of the rules below.

### a.  Disclosure of Climate-Related Risks

The final rules require registrants to identify any climate-related risks that have materially impacted or are reasonably likely to have a material impact on the registrant, including on its

---

[2778] *See, e.g.*, letter from Chamber and section II.L.2.  For example, private companies might decide to defer a public offering, and existing public companies might decide to deregister from U.S. securities markets or not pursue mergers that would subject the merged company to reporting requirements.  Other provisions that will reduce costs for conducting an IPO include (i) registrants will only have to provide Article 14 disclosure for historical fiscal years on a prospective basis, and (ii) the PSLRA statutory safe harbor for forward-looking statements (with respect to transition plans, scenario analysis, targets and goals) will apply to registration statements in IPOs.

[2779] *See* sections II.H.2 and II.O.2 for a discussion of commenters' concerns on GHG emissions disclosures and phase in periods, respectively.

[2780] *See supra* section II.L.3. While this approach avoids imposing additional costs on companies engaged in business combination transactions involving a private company, we note that investors will not have the benefit of the disclosures required by the final rules with respect to such private company.

strategy, results of operations, or financial condition.[2781]  For any risks identified, registrants are required to provide information necessary to an understanding of the nature of the risk presented and whether the risk is a physical or transition risk.  Registrants are also required to classify whether these risks are reasonably likely to manifest in the short-term and in the long-term.  For both physical and transition risks, registrants are required, as applicable, to provide detailed information on these risks (e.g., the particular type of transition risk as well as the geographic location and nature of the properties, processes, or operations subject to the physical risk).

This aspect of the final rules will improve investors' understanding of what a registrant considers to be the relevant short-term and long-term climate-related risks that have materially impacted or are reasonably likely to have a material impact on its business.  As a number of commenters have noted, climate-related risks often translate into material financial risks with implications for firm growth and profitability, and therefore investors would benefit from a disclosure regime that requires registrants to provide information on climate-related risks that is accurate and more comparable to each other.[2782]

---

[2781]   *See* 17 CFR 229.1502(a).

[2782]   *See, e.g.*, letters from PIMCO ("[W]e believe climate risks often pose a material financial risk, and therefore, investors need disclosure of climate risks that is complete, reliable, and consistent in order to analyze how climate-related risks may affect a company's business or overall financial performance."); Wellington ("Accurate and comparable information about climate risk is critical to Wellington Management's ability to make informed investment decisions on behalf of our clients. Because climate change will continue to profoundly impact society, economies and markets, investors need more information to better price these risks and fully assess the value of an issuer's securities."); and AllianceBernstein ("[M]aterial risks and opportunities associated with climate change as fundamental financial factors that impact company cash flows and the valuation investors attribute to those cash flows. Regulatory changes, physical risks, and changing consumer decision criteria and preferences are all factors that asset managers need to understand and integrate into their investment processes to make optimal investment decisions on behalf of their clients.")

Academic research has found that retail investors as well as institutional investors value and utilize information on climate-related risks in decision-making.[2783]  As numerous commenters stated,[2784] climate-related risks and their impacts on businesses are often not reported in a way that is useful to investors.  Commenters noted that with the limitations to the currently available climate-related disclosures, extensive costs in the form of data gathering, research and analysis are needed to process them and to fill data gaps where possible in forming investment decisions.[2785]  We expect the final rules to reduce these information processing costs for investors.[2786]

---

[2783]  *See supra* section IV.B.1. One commenter suggested that institutional investors and retail investors may have different preferences for climate-related information, especially when the former consider investment portfolios and the latter consider individual companies. *See* letter from Society for Corp. Gov.  The commenter further argued that retail investors are unlikely to care about climate-related information given their investment horizon.  Because of the documented impact of climate-related risks, including distant ones, on asset prices, we disagree with these assertions.

[2784]  *See* section IV.B; *see also, e.g.*, letters from BlackRock ("Compared to the existing voluntary framework, the Commission's detailed analytical and disclosure roadmap . . . is more likely to increase the comparability and consistency of issuers' climate-related disclosures."); Calvert ("Currently, climate change disclosures are largely voluntary, unverified, and idiosyncratic."); CFA ( "The current voluntary climate-related disclosure regime has resulted in inadequate and inconsistent information which falls short of investor demands and prevents market participants from reasonably assessing the risks of climate change."); and Wellington ("Currently, our evaluation of the positive and negative impacts of climate change on issuers is limited by inadequate information and the absence of a standardized framework for disclosure." and that "For a significant number of issuers, information is not sufficient to support equivalent analysis.").

[2785]  *See* letter from Wellington ("We were able to make these and other determinations based on available information (including internal and external estimates), and only after extensive research and analysis. For a significant number of issuers, information is not sufficient to support equivalent analysis."); Boston Trust Walden ("Evaluation of climate risk across investment portfolios represents a cost to investors and results in the gathering of data that is often incomplete and not comparable. At Boston Trust Walden, our analysts examine quantitative and qualitative climate-related corporate disclosure to enhance our understanding of the existing and potential financial outcomes associated, ranging from risks (e.g., losing the license to operate) to opportunities (e.g., generating new sources of revenue). In the absence of mandated disclosure requirements, we rely on the data of third-party research providers, which includes a mix of issuer provided data and estimates. Our analysts then seek to fill data gaps through additional research and analysis, outreach via written requests, meetings, and shareholder resolutions seeking the expanded disclosure we require. These processes for gathering necessary climate-related disclosures are inefficient and resource intensive.").

[2786]  The final rules may also lead to a lower cost of capital for some registrants, as we discuss below.

Appellate Case: 24-1628     Page: 667     Date Filed: 03/26/2024 Entry ID: 5377362

We expect the final rules will help investors gain a more accurate and complete understanding of the climate-related risks that a registrant determines have materially impacted or are reasonably likely to materially impact its strategy, results of operations, or financial condition. By distinguishing between climate-related risks that manifest in the short-term and long-term, the final rules will help inform investors about which risks are salient to their investment decision-making and which are not, depending on the time horizon investors are focused on. For instance, longer term risks may be less certain and are less likely to have impacts on cash flows in the short-term. As such, some investors may choose to focus more on short-term risks. Conversely, an investor with a long investment horizon may choose to focus on the risks that match its investment horizon.[2787] This temporal standard is consistent with an existing MD&A disclosure requirement and therefore should provide a degree of familiarity to registrants and investors as they prepare and analyze these disclosures.[2788] This aspect of the final rules will impose additional costs on registrants (e.g., direct compliance costs and indirect costs resulting from, for example, increased litigation risk). These costs are discussed in greater detail in sections IV.C.1 and IV.C.3.

### b. Disclosure Regarding Impacts of Climate-Related Risks on Strategy, Business Model, and Outlook

The final rules require registrants to describe the actual and potential material impacts of any climate-related risks identified in response to Item 1502(a) on the registrant's strategy,

---

[2787] *See* letter from Vanguard ("climate risks to be material and fundamental risks for investors and the management of those risks is important for price discovery and long-term shareholder returns.").

[2788] *See, e.g.,* letter from ABA ("We believe that climate-related matters should be addressed within the same time short- and long-term time frames used in MD&A."); 17 CFR 229.303(b)(1) ("Analyze the registrant's ability to generate and obtain adequate amounts of cash to meet its requirements and its plans for cash in the short-term (i.e., the next 12 months from the most recent fiscal period end required to be presented) and separately in the long-term (i.e., beyond the next 12 months)."); *see also* section II.C.2.

business model, and outlook.[2789]  With respect to their strategy, business model, and outlook, the final rules specify that registrants are required to assess, as applicable, any material impacts on a non-exclusive list of items: business operations; products or services; suppliers, purchasers, or counterparties to material contracts (to the extent known or reasonably available); activities to mitigate or adapt to climate-related risks; and expenditure for research and development. Registrants are also required to discuss whether and how the registrant considers these impacts as part of its strategy, financial planning, and capital allocation.

We expect the resulting disclosures to provide investors with a better understanding of how climate-related risks have materially impacted or are reasonably likely to have a material impact on the registrant.  Such disclosures will directly benefit investors who use this information to evaluate the financial prospects of the firms in which they are looking to invest.[2790]  Discussions of material impacts on strategy, business model, or outlook will help investors determine whether and how registrants are addressing identified material climate-related risks.  This type of disclosure could be particularly useful when comparing the approaches taken by similarly situated registrants.  For example, one registrant may disclose that it is actively shifting assets away from exposure to flood zones, while another might disclose that it is investing in such assets as they are considered currently undervalued.  These disclosures will allow an investor to choose to invest in the company with climate-related risk strategies that best align with the investor's investment objectives.

Under the final rules, if a registrant has adopted a transition plan to manage a material transition risk, it must describe the plan.  The registrant must also provide an annual update about

---

[2789]  *See* 17 CFR 1502(b)-(g).

[2790]  *See* P. Krueger, Z. Sautner & L.T. Starks, *The Importance of Climate Risks for Institutional Investors*, 33 Rev. of Fin. Stud. 1067 (March 2020); Ilhan *et al*. (2023).

any actions taken during the year under the plan, including how these expenditures have impacted the registrant's financial condition, or results of operations, along with quantitative and qualitative disclosure of material expenditures incurred and material impacts on financial estimates and assumptions as a direct result of the transition plan. We expect these disclosures to provide investors with more complete and reliable information about how registrants plan to address material transition risks. A number of commenters indicated that these disclosures would help investors assess the registrant's approach to managing climate-related risks and achieving its climate-related targets and goals.[2791] This benefit could be reduced if these disclosures provide opportunities for greenwashing. However, we expect this risk to be reduced given that these disclosures will include quantitative and qualitative information on expenditures that are filed with the Commission and are subject to the applicable liability provisions under the Securities Act and Exchange Act. The requirement to provide annual updates should further mitigate these concerns. The updating requirement will be particularly beneficial to investors as it will allow them to analyze the impacts of transition plans on a registrant's operations and financial condition over time.

The requirement to describe quantitatively and qualitatively the material expenditures incurred and material impacts on financial estimates and assumptions as a direct result of the transition plan will help investors better understand a registrant's approach to managing climate-

---

[2791] *See, e.g.*, letters from CalPERS; Morningstar; Change Finance; *see also* letter from ICI ("We support [transition plan] disclosure as it would inform investors of the nature of the risks and the company's actions or plans to mitigate or adapt to them."); and the CFA Institute ("We support the Proposed Rule's requirement that a registrant disclose, if it has adopted a transition plan (i.e., a strategy and implementation plan to reduce climate-related risks) as part of its climate-related risk management strategy. We agree with the view that it will facilitate investor understanding of whether the company has a plan and whether it may be effective in the short, medium, and long term in achieving such a transition. Presently, many companies have made net-zero commitments by 2050 but have made little if any disclosures regarding how they plan to get there. This requirement would necessitate that they do so.")

related risks so they have information necessary to assess how those actions have impacted the registrant. Including a quantitative description of material expenditures incurred will discourage boilerplate disclosures and, to some extent, facilitate comparisons across registrants. However, we acknowledge commenters who raised concerns about the difficulties of attributing expenditures to these types of activities.[2792] We recognize that similarly situated registrants may take different approaches in their determination of which expenditures to include and whether to quantitatively or qualitatively identify portions of expenditures specifically tied to these activities. To the extent that registrants take different approaches to identifying such expenditures, the comparability benefits of the disclosure will be diminished. Nevertheless, the qualitative discussion accompanying the disclosures should provide the context necessary for investors to understand the registrant's approach to these activities and provide an assessment of the impact of these activities on the registrant's financial condition.

If a registrant uses scenario analysis to assess the impact of climate-related risks on its business, results of operations, or financial condition, and if, based on the results of such scenario analysis, the registrant determines that a climate-related risk is reasonably likely to have a material impact on its business, results of operations, or financial condition, the registrant must describe each such scenario. This description must include a brief description of the parameters, assumptions, and analytical choices used, as well as the expected material impacts on the registrant under each such scenario. Disclosures about the use of scenario analysis to stress test businesses across a range of possible future climate and climate policy scenarios can vary

---

[2792] *See supra* notes 1891 and 1892, and accompanying text.

Appellate Case: 24-1628    Page: 671    Date Filed: 03/26/2024 Entry ID: 5377362

significantly.[2793]  As such, the final rules will inform investors about whether a registrant is using scenario analysis to manage a material climate risk, and for those investors who view scenario analysis as an important tool for climate risk management, allow them to factor this information into their investment decisions.[2794]  The required disclosures around parameters, assumptions, and analytical choices used by a registrant when conducting scenario analysis will allow investors to better understand the methodology underlying the scenario analysis and thereby improve  investors' assessment of the appropriateness of a registrant's strategy and business model in light of foreseeable climate-related risks.[2795]

If a registrant's use of an internal carbon price is material to how it evaluates and manages climate-related risks disclosed in response to Item 1502(a), then the registrant must disclose in units of the registrant's reporting currency information about the price per metric ton of $CO_2e$, and the total price, including how the total price is estimated to change over the short-term and long-term, as applicable.  For registrants that use more than one internal carbon price to evaluate and manage a material climate-related risk, these disclosures apply to each internal carbon price and the registrant must disclose reasons for using different prices.  If the scope of entities and operations involved in the use of an internal carbon price described is materially different from the organizational boundaries used for the purpose of calculating GHG emissions

---

[2793]  *See Using Scenarios to Assess and Report Climate-Related C2ES 20 Financial Risk,* C2ES (Aug. 2018), https://www.c2es.org/document/using-scenarios-to-assess-and-report-climate-related-financial-risk/; FRB of New York, *Climate Stress Testing*, Staff Report No. 1059 (2023).

[2794]  *See*, *e.g*., Council of Institutional Investors; Boston Common Asset Management; Boston Walden Trust; Domini; University Network for Investor Engagement; AllianceBernstein.

[2795]  *See*, *e.g*., letter from Bloomberg (stating "scenario analysis is a useful tool to describe the resilience of a company's strategy to the risks and opportunities of climate change and to develop a more informed view of implications for enterprise value and value chains"); *see also supra* notes 540-542 and accompanying text; *see also* letter from Wellington ("[i]nformation concerning scenario analysis would also help investors evaluate the resilience of the registrant's business strategy in the face of various climate scenarios that could impose potentially different climate-related risks.").

Appellate Case: 24-1628     Page: 672     Date Filed: 03/26/2024 Entry ID: 5377362

pursuant to Item 1505, the final rules require registrants to describe the difference. We expect this disclosure will provide investors with more standardized and decision-useful information regarding whether a registrant's use of an internal carbon price is material and, if so, how it impacts its strategy, results of operations, and financial condition. This is important to address issues with increased voluntary corporate disclosures of internal carbon pricing.[2796] By mandating that registrants disclose any material differences in their boundaries used for internal carbon pricing and GHG emissions measurement, the final rules will help clarify for investors the scope of entities and operations included in a registrant's application of internal carbon pricing and improve the transparency about the methodology underlying the use of internal carbon pricing so that investors may better compare such use across registrants.

In addition to the general cost considerations discussed in section IV.C.1.b, these provisions may have certain unintended effects on registrants and investors. In particular, as some commenters noted, it is possible that requiring registrants to disclose specific facts about their use of transition plans, scenario analysis, and internal carbon prices to address climate-related risks could deter registrants from utilizing these methods or cause them to abandon them, for example because of perceived litigation risk or because of the direct costs of preparing such disclosure.[2797] This could have negative consequences for investors if the use of these methods would have helped registrants better manage climate-related risks and therefore make value-maximizing decisions in light of those risks. However, if registrants' use of these methods

---

[2796] See CDP, *supra* note 608.

[2797] *See, e.g.*, letters from OMERS; Cemex; and NAM.

668

becomes a common practice,[2798] due to investor demand or otherwise, this deterrence effect is likely to be limited.

There are potential costs that could result from scenario analysis disclosures under the final rules. First, commenters expressed concern that the disclosure of the scenario analysis results could confuse investors to the extent they inadvertently suggest that the chance of a loss occurring due to a rare event is more likely.[2799] The commenters' concern could materialize if, for instance, a scenario analysis suggests a heightened risk of a once-in-a-hundred-year flood over the next 30 years, and disclosure of this causes certain investors, particularly those not familiar with such analysis, not to invest in the registrant despite the fact that the registrant actually has the same risk profile as other companies that have not made this disclosure. However, we expect any potential investor confusion in such a case will be mitigated because, under the final rules, the registrant would not be required to disclose this information if it determines that this scenario, like other very remote scenarios, are not likely to have a material impact on its business or financial condition. In addition, when disclosure is required, information accompanying the scenario analysis results—such as the assumptions and parameters underlying the analysis—should help provide investors the necessary context for understanding the import of the disclosed analysis.[2800] Second, in disclosing scenario analysis assumptions and inputs as well as information about internal carbon prices, a registrant may face competitive harm to the extent that the disclosures reveal competitively sensitive information,

---

[2798] S*ee, e.g.,* Climate Action 100+, *Progress Update 2022* (2022), available at https://www.climateaction100.org/wp-content/uploads/2023/01/CA-100-Progress-Update-2022-FINAL-2.pdf (stating that "91% of focus companies have now aligned with TCFD recommendations, either by supporting the TCFD principles or by employing climate scenario planning").

[2799] *See, e.g*., letter from the BPI.

[2800] We note that other disclosure requirements, such as those relating to market risk disclosures, convey to investors complex information about uncertain future risks that registrants face.

such as asset allocation decisions.  However, we expect that the degree of flexibility offered by the disclosure requirements in the final rules will help avoid the exposure of confidential or proprietary information, though they may make the disclosures less comparable.

Overall, by focusing on climate-related risks that are material to the registrant's business, the final rules seek to avoid imposing costs associated with disclosing large amounts of detailed information that may be less relevant to investors.  Finally, some of the required disclosures (*e.g.*, forward-looking statements concerning transition plans, scenario analysis, and internal carbon pricing) will be subject to PSLRA safe harbors, which may reduce litigation costs where the safe harbors are applicable.[2801]

### c.  Governance Disclosure

The final rules require a registrant to disclose information concerning the board's oversight of climate-related risks as well as management's role in assessing and managing the registrant's material climate-related risks.[2802]  The final rules require a registrant to identify, if applicable, any board committee or subcommittee responsible for the oversight of climate-related risks and to describe the processes by which the board or such committee or subcommittee is informed about such risks.  Additionally, if there is a disclosed climate-related target or goal or transition plan, the registrant must describe whether and how the board oversees progress against the target or goal or transition plan.  In describing management's role in assessing and managing the registrant's material climate-related risks, the registrant should address, as applicable, the following non-exclusive list of disclosure items: (1) whether and which management positions or committees are responsible for assessing and managing climate-related risks and the relevant

---

[2801]  *See supra* section II.J.3 for a discussion of the disclosures required under the final rules that will be subject to PSLRA safe harbors. *See also* 17 CFR 229.1507.

[2802]  *See* 17 CFR 229.1501.

expertise of the position holders or committee members; (2) the processes by which such positions or committees assess and manage climate-related risks; and (3) whether such positions or committees report information about such climate-related risks to the board of directors or a committee or subcommittee of the board of directors. Like other parts of the final rules, these provisions provide some flexibility for registrants to tailor their disclosures to suit their particular facts and circumstances while helping to ensure that investors receive information regarding the board's and management's role in addressing and managing climate-related risks.[2803]

The disclosures required by the final rules will enable investors to better understand how the company's leadership (*i.e.,* its board of directors and management) is informed about climate-related risks and how the company's leadership considers such factors as part of its business strategy, risk management, and financial oversight. Managers and directors typically play a key role in identifying and addressing these risks.[2804] Commenters stated that governance-focused information on how such risks are being overseen by the board is "fundamental" for investors, and supported "full disclosure with respect to how and to whom within the company's organization accountability for climate-related risks is assigned" so that

---

2803 *See, e.g.*, letters from Wellington ("The proposed enhancements to disclosure on governance would help investors assess whether the issuer is appropriately considering risks and provide investors with valuable information about how the issuer plans to address these risks. This disclosure, in turn, gives investors insight into potential future capital allocation, expansion plans, and potential vulnerabilities associated with the issuer's business model (e.g., significant exposure to the impact of a carbon price)."); and Institute of Internal Auditors ("The board is accountable for the success of the organization and needs assurance from an independent source to fulfill its duties…. Effective governance inspires stakeholders' confidence and trust that a company's decisions, actions, and outcomes can address priorities and achieve the organization's desired purpose.").

2804 *See* Henry He Huang, Joseph Kerstein, Chong Wang & Feng Wu, *Firm Climate Risk, Risk Management, and Bank Loan Financing*, 43 Strategic Management Journal 2849 ((June 2022); *see also* Walid Ben-Amar & Philip McIlkenny, *Board Effectiveness and the Voluntary Disclosure of Climate Change Information*, 24 Business Strategy and the Environment 704 (2015).



Appellate Case: 24-1628 Page: 676 Date Filed: 03/26/2024 Entry ID: 5377362

investors may assess a registrant's risk management systems in this context.[2805]  The disclosures required by the final rules will inform investors about whether the organization has assigned climate-related responsibilities to management-level positions and/or to the board and, if so, whether those responsibilities include assessing and/or managing climate-related risks.  As a result, investors will be better able to understand and evaluate the processes, if any, by which the registrant assesses and manages material climate-related risks.

Information regarding whether and how the board oversees progress on material climate-related targets or goals or transition plans will provide useful context for the final rules' other targets or goals or transition plan disclosure requirements.  Researchers have found that oversight systems at the board level can provide an important signal about how directors of the registrants recognize and address relevant climate-related risks.[2806]

The final rules require disclosure of board-level governance, if any, of climate-related risks irrespective of the materiality of those risks.  This disclosure will allow investors to understand whether climate-risks are among those that are significant enough to be considered at the board level and how management and the board collectively oversee such risks. Regardless of the potential impact of such risks to the company, the decision to oversee climate-related risks at the board level as opposed to delegating entirely to management can provide useful information for understanding the company's overall approach to risk management and how climate-related risks factor into such processes.

---

[2805]  *See, e.g.*, letter from Canadian Coalition for Good Governance (noting that "If a company cannot articulate how material climate-related risks are identified and clearly integrated into its governance philosophy and approach, this is a significant red flag for investors."); *see also* GHGSAT who state that "A challenge to the implementation of the TCFD framework has been a lack of education on the topic at the board level and a shortage of time for boards to consider the issues."

[2806]  V. Ramani & B. Ward, How Board Oversight Can Drive Climate and Sustainability Performance, 31 J. of Applied Corp. Fin. 80 (2019).

Commenters asserted that the proposed rules may disproportionally burden small registrants that may not have the internal management organizations and processes in place to assess and manage climate-related risks.[2807]  This provision of the final rules does not require registrants to disclose any information when such internal management organizations and processes are absent.  In these cases, registrants will not incur any direct costs associated with producing these disclosures.  As with any other disclosure requirement, smaller registrants that are required to disclose governance information under the final rules may be disproportionally affected in terms of costs relative to larger registrants because of the direct fixed costs associated with producing disclosure.

Finally, we recognize that the disclosure requirements may either prompt or deter companies from overseeing climate-related risks at the board or management level.  To the extent that the final rules lead companies to alter their governance structures in ways that are less efficient (*e.g.,* by diverting board or management attention from other pressing corporate matters or devoting internal resources and expertise to climate-related risks at the expense of other concerns), investors could incur costs in the form of diminished shareholder value.  One commenter noted that the adverse effects could be particularly pronounced for smaller registrants that may be less likely to have internal management organizations and processes in place to assess and manage climate-related risks.[2808]  We acknowledge these potential costs but also note that several changes from the proposal help to mitigate such effects.  For example, by adopting less prescriptive disclosure requirements compared to the those in the proposal and only requiring disclosure of management's role in overseeing material climate related risks, the final

---

[2808]    *See* letter from Chamber.

App.673

rules are less likely to have such unintended effects on the registrant's governance structure and processes. Finally, we reiterate that the final rules are focused on disclosure and do not require registrants to change their governance or other business practices.

Other commenters expressed concern that the proposed requirement to disclose board members' climate expertise would impose costs by placing pressure on registrants to fill limited numbers of board seats with individuals with a narrow skillset, rather than those with wide ranging expertise or skillsets that may be better suited to the company's needs.[2809] Some commenters also noted the limited number of climate-risk experts compared to the demand for such individuals for board seats, which could increase costs for registrants that feel pressured to appoint climate-risk experts to the board as a result of the final rules.[2810] Similar concerns were raised with respect to the proposed requirement to disclose management's relevant expertise.[2811] In light of the comments, the Commission is not requiring the disclosure of board expertise. We are, however, adopting the requirement to disclose the relevant expertise of management to provide investors with useful information about the expertise of those responsible for identifying material climate risks and communicating those risks to the board.[2812] We acknowledge the incremental cost of making this disclosure and the potential for indirect costs if registrants decide to hire climate experts in response to the disclosure requirement. While acknowledging these costs, we reiterate that the Commission remains agnostic about whether and/or how registrants govern climate-related risks. Registrants remain free to establish or retain the procedures and practices that they determine best fit their business. Overall, we agree with commenters that

---

[2809] *See supra* note 637 and accompanying text.

[2810] *See*, *e.g.*, *supra* note 650.

[2811] *See*, *e.g.*, *supra* note 695 and accompanying text.

[2812] *See supra* section II.E.2.c.

stated that investors will benefit from this disclosure given the direct role that management plays in overseeing any material climate-related risks.[2813]

### d.  Targets and Goals Disclosure

The final rules will require a registrant to disclose any climate-related target or goal if such target or goal has materially affected or is reasonably likely to materially affect the registrant's business, results of operations, or financial condition.[2814]  Under the final rules, a registrant must provide any additional information or explanation necessary to an understanding of the material impact or reasonably likely material impact of the target or goal, including, as applicable, a description of: (1) the scope of activities included in the target; (2) the unit of measurement; (3) the defined time horizon by which the target is intended to be achieved and whether the time horizon is based on goals established by a climate-related treaty, law, regulation, policy, or organization; (4) if the registrant has established a baseline for the target or goal, the defined baseline time period and the means by which progress will be tracked; and (5) a qualitative description of how the registrant intends to meet these climate-related targets or goals. Registrants are also required to provide certain information if carbon offsets or RECs have been used as a material component of a registrant's plan to achieve climate-related targets or goals. Furthermore, registrants must disclose any progress made toward meeting the target or goal, how any such progress has been achieved, any material impacts to the registrant's business, results of operations, or financial condition as a direct result of the target or goal (or actions taken to make progress toward meeting the target or goal), and include quantitative and qualitative disclosure of any material expenditures and material impacts on financial estimates and assumptions as a

---

[2813]    *See* section II.E.2.ii.

[2814]    *See* 17 CFR 229.1504.

Appellate Case: 24-1628     Page: 680     Date Filed: 03/26/2024 Entry ID: 5377362

direct result of the target or goal (or actions taken to make progress toward meeting the target or goal). This disclosure must be updated each fiscal year by describing the actions taken during the year to achieve its targets or goals.[2815]

The final rules will help investors to understand how a registrant's target or goal impacts its business and financial condition. Such disclosure will enable investors to better understand the costs associated with pursuing these objectives as well as the benefits associated with achieving them. While some registrants may currently provide disclosure about their climate-related targets or goals, those voluntary disclosures generally do not provide investors with an understanding of whether and how the climate-related targets or goals materially impact or are reasonably likely to materially impact the registrant's business, results of operations, or financial condition. In addition, without a requirement to disclose material targets or goals, investors have no way of knowing if there are nonpublic targets or goals that could be relevant to their investment decisions, or if the registrant has simply not set any such targets or goals. Furthermore, voluntary disclosures about climate-related targets or goals are often missing key pieces of information that investors need to understand them, such as the plan for achieving them.[2816] The final rules will address these knowledge gaps by supplementing the existing publicly available information.

The final rules will allow for greater comparability across registrants. However, we recognize that the requirement to disclose targets and goals may prompt registrants to forgo

---

[2815] As with forward-looking statements concerning transition plans, scenario analysis, and internal carbon pricing, forward-looking statements related to targets and goals will be covered by the PSLRA safe harbor, which may reduce litigation costs.

[2816] *See, e.g.*, Kenji Watanabe, Antonios Panagiotopoulos & Siyao He, *Assessing Science-Based Corporate Climate Target-Setting*, (June 9, 2023), at Appendix 4, available at https://www.msci.com/www/research-report/assessing-science-based/03881548607.

676

establishing targets or goals that may be or may become material in order to avoid the disclosure requirements. This effect may be mitigated to the extent that registrants also consider other factors (e.g., investor demand) for having or not having climate-related targets and goals when making such decisions.

The greater transparency from the required disclosure of specific details related to these targets and goals in Commission filings may help alleviate concerns regarding the issue of greenwashing in existing voluntary disclosures, as noted by commenters.[2817] Academic studies have found that existing information about climate-related targets and goals can suffer from considerable imprecision and inaccuracy despite efforts by certain organizations to create more accountability and transparency.[2818] As a result, under the current voluntary framework, investors may not be able to distinguish between targets and goals that are material and those that are more akin to puffery and are unlikely to be material to a registrant. For example, disclosures that explicitly link a target to a material impact on a registrant's financial condition will both inform investors about the potential costs and benefits of the target, while also lending credibility towards the registrant's efforts to achieve the target. Thus, by requiring disclosures about material targets and goals in Commission filings, the final rules should enhance the reliability and utility of such information for investors.[2819] In addition, since any greenwashing under the current voluntary disclosure regime could lead investors to over- or under-estimate the potential impact of targets or goals on a registrant's business strategy, results of operations, or financial

---

[2817] *See, e.g.*, letters from D. Hileman Consulting; and Sen. Schatz *et al*.

[2818] *See, e.g.*, Bingler *et al*.; *see also* Memorandum Concerning Staff Meeting with Representatives of South Pole (Jan. 14, 2022) ("South Pole Memo").

[2819] *See, e.g.*, letter from Center Amer. Progress ("Disclosures around management's plans to address climate risks, including how management is meeting or not meeting the targets or goals in those plans, are essential for investors and other market participants.").

conditions, the disclosures required by the final rules will further enable investors to draw more informed conclusions about how targets and goals may impact the business.

We are not adopting the proposed requirement to disclose metrics quantifying a registrant's progress towards its target or goal. By not requiring registrants to provide quantification of its targets and goals metrics, we avoid some of the cost concerns raised by comments associated with such disclosure, including Scope 3 emissions disclosures and other potentially difficult-to-calculate metrics.[2820] Nevertheless, we expect the final rules to result in some costs associated with developing systems for measuring progress made on targets or goals because registrants may still have to track their progress for purposes of providing the required disclosures, if they do not already have those processes in place. Further, the final rules' more flexible approach may limit the usefulness of targets and goals disclosures relative to the proposed rules. In particular, if a registrant provides boilerplate qualitative disclosures, then it would be harder for investors to assess the disclosures' credibility. However, the final rules requirement to provide quantitative and qualitative disclosures of material expenditures and material impacts on financial estimates and assumptions related to targets and goals will mitigate this concern to some extent. This disclosure will also inform investors about the financial implications of pursuing these targets and goals. For instance, investment in achieving targets could be value-enhancing in the long run but reduce cash flow in the short run. By facilitating a better understanding of these impacts, investors will be better positioned to value companies and make investment and voting decisions.

---

[2820] *See* section II.H.2. As noted above, the final rules will not require disclosure of Scope 3 emissions information, including in the context of a registrant's targets or goals.

Appellate Case: 24-1628    Page: 683    Date Filed: 03/26/2024 Entry ID: 5377362

Quantitative disclosures of expenditures and impacts may facilitate comparisons across registrants; although, as noted in section IV.C.2.b above, the comparability benefits of this quantitative disclosure depend on the degree of variation in management determinations of which portion of their expenditures can be directly attributable to targets and goals. In addition, as discussed above, these disclosures may lead some registrants to report figures that overstate the impact of targets and goals (if, for example, the registrant determines not to deduct the portion of expenditures that are unrelated to pursuit of the target or goal). However, we expect that accompanying qualitative discussion should provide investors the context necessary to draw informed conclusions.

In a change from the proposal, the final rules do not require disclosure of interim targets set by the registrant. Rather, registrants have flexibility to determine whether to disclose their interim targets, if any, in describing their plans to achieve their targets and goals or in the context of describing their progress towards such targets or goals.

If carbon offsets or RECs have been used as a material component of a registrant's plan to achieve climate-related targets or goals, the final rules require registrants to separately disclose the amount of carbon avoidance, reduction, or removal represented by the offsets or the amount of generated renewable energy represented by the RECs, the nature and source of the offsets or RECs, a description and location of the underlying projects, any registries or other authentication of the offsets or RECs, and the costs of the offsets or RECs. Describing the features of RECs will help investors understand how registrants are managing their climate-related risks.[2821] For example, one commenter said that "not all offsets or RECs are equal" and that information on RECs would "allow investors to better assess the use of capital, the integrity and validity of such

---

[2821]    *See, e.g.*, letters from AllianceBernstein; Carbon Direct; CarbonPlan; and Ceres.

offsets or RECs, and the degree that the registrants emissions profile and offsets or RECs could be at risk due to policy or regulation changes."[2822]  These disclosures also will provide context for any required disclosures of Scope 1 or Scope 2 GHG emissions (i.e., if such emissions are material for an LAF or an AF).  In addition, more complete disclosures about carbon offsets and RECs may help deter potential greenwashing that results from a lack of reliable basic information.  Because these disclosures comprise basic facts associated with the registrant's purchased carbon offsets and RECs, we do not expect that collecting and reporting this information will constitute a significant burden.

### e.  GHG Emissions Metrics

The final rules will require LAFs and AFs (that are not SRCs or EGCs) to disclose Scope 1 and/or Scope 2 emissions, if such emissions are material, for their most recently completed fiscal year and, to the extent previously disclosed in a Commission filing, for the historical fiscal year(s) included in the consolidated financial statements in the filing.[2823]  By specifying that these registrants must provide information on material GHG emissions, the final rules will give investors access to a more comprehensive set of emissions data than under the baseline. Investors can use this data to assess exposures to certain types of climate-related risks and provide quantitative contextual data to supplement a registrant's description of the material climate-related risks it faces, as well as progress on the management of those risks, as a part of assessing the registrant's overall business and financial condition.  Because the value of a company's equity is derived from expected future cash flows, disclosure of GHG emissions can help investors understand whether those emissions are likely to subject the registrant to a

---

[2822]    *See* letter from CalPERS.

[2823]    *See* 17 CFR 229.1505.

transition risk that will materially impact its business, results of operations, or financial condition in the short- or long-term and incorporate risks associated with such future cash flows into asset values today. Indeed, academic literature shows that risks both in the near term and far into the future are priced into current asset valuations.[2824] Thus, for many registrants, GHG emissions can be helpful to assess the registrants' exposure to climate-related risks, particularly to material transition risks.[2825]

As noted in section IV.A, many registrants currently do not provide quantitative disclosures on their Scope 1 and 2 emissions. This lack of information on emissions makes it more difficult for investors to assess the degree of risk in individual companies, to compare those risks across companies, and to value securities. By requiring disclosure of GHG emissions for specified registrants for the same historical periods as those included in the financial statements in the relevant filing, the final rules will help investors develop a more accurate assessment of those registrants' exposure and approach to climate-related risks over time. For example, Scope 1 and Scope 2 emissions disclosure may be relevant to investors' assessment of a registrant's progress made on targets or goals or towards its transition plan.[2826]

---

[2824] For evidence that points to the pricing of short-term climate-related risks, *see* R. Faccini, R. Matin & G. Skiadopoulos, *Dissecting Climate Risks: Are They Reflected in Stock Prices?* 155 J. of Banking & Fin., Article 106948 (Oct. 2023); Huynh & Xia (2021). For evidence that points to the pricing of long-term climate-related risks, *see* M. Painter, *An Inconvenient Cost: The Effects of Climate Change on Municipal Bonds*, 135 J. of Fin. Econ. 468 (2020); D.D. Nguyen, S. Ongena, S. Qi & V. Sila, *Climate Change Risk and the Cost of Mortgage Credit*, 26 Rev. of Fin. 1509 (2022); Huynh & Xia (2021).

[2825] *See* letters from CALSTRS; Vanguard; Fidelity; BlackRock; CALPERS; and State of NY Office of the Comptroller.

[2826] Research has shown that issuers tend to "cherry-pick" the baseline year (i.e., pick the year with highest emissions within the past few years) when forming an emissions target so that any progress appears in the most favorable light. *See* P. Bolton & M. Kacperczyk, *Firm Commitments*, National Bureau of Economic Research, No. w31244 (May 2023). The final rules will thus benefit investors by helping them identify when such cherry-picking occurs so as to arrive at a more informed assessment about the registrant's progress towards meeting its targets or goals.

The final rules will provide informational benefits beyond those associated with the voluntary disclosure of emissions that may be found in sustainability reports or other places, such as company websites. In particular, the overall mix of information disclosed to the market can be distorted when only a certain subset of companies (e.g., those with lower emissions or those that face lower costs of emissions measurement) have stronger incentives to make voluntary disclosures. The final rules may offset this distortion because disclosure is only required if a registrant determines that its Scope 1 and Scope 2 emissions are material. The materiality qualifier will allow registrants that determine that their emissions are immaterial to avoid the full costs of emissions measurement and disclosure. It will also mitigate the risk that investors could be burdened with large amounts of information that is less relevant for their investment and voting decisions. In addition, mandatory disclosure of Scope 1 and Scope 2 emissions data in Commission filings may deter potential greenwashing that could occur with voluntary disclosures.[2827]

Some commenters questioned the value of GHG disclosures in light of existing requirements for some registrants to report emissions pursuant to the GHGRP.[2828] As previously discussed,[2829] the data available from the GHGRP is generally not suited to help investors understand how a registrant's exposure and approach to managing climate-related risks may impact its future cash flows and profitability for several reasons. First, the GHGRP requires that

---

[2827] R. Yang, *What Do We Learn from Ratings About Corporate Social Responsibility? New Evidence of Uninformative Ratings*, 52 J. of Fin. Intermediation, Article 100994 (Oct. 2022); Soh Young In & Kim Schumacher, *Carbonwashing: A New Type of Carbon Data-related ESG Greenwashing* (2021), available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3901278 (retrieved from SSRN Elsevier database); V. Kalesnik, M. Wilkens & J. Zink, *Do Corporate Carbon Emissions Data Enable Investors to Mitigate Climate Change?*, 48 J. of Portfolio Mgmt. 119 (2022) ("Kalesnik *et al.*").

[2828] *See supra* section IV.A.3 and letters from Chamber; Elaine Henry; BOK Financial; David R. Burton; Permian Basin; and Petroleum Association.

[2829] *See supra* section IV.A.3.

Appellate Case: 24-1628    Page: 687    Date Filed: 03/26/2024 Entry ID: 5377362

emissions are reported at the facility-level rather than the registrant-level. Second, suppliers of certain products must report their "supplied emissions," conditional on these emissions exceeding a specified threshold.[2830] Third, GHGRP reporting is limited to U.S. facilities. Some commenters asserted that the GHGRP could not be substituted for the proposed rules given the different disclosure requirements and the different objectives of the two reporting regimes.[2831]

While there are differences between the EPA's GHGRP and the Scope 1 and 2 emissions disclosures in the final rules, we expect that registrants subject to both reporting regimes would face reduced costs of compliance with the final rules to the extent there is overlap between the reporting requirements of the GHGRP and the final rules. As discussed in section IV.A, the GHGRP covers 85 to 90 percent of all GHG emissions in the U.S. and includes those emissions referenced by the GHG Protocol and included in the final rules' definition of "greenhouse gasses."[2832] As such, we expect that entities subject to the GHGRP disclosure and reporting requirements may consequently have lower incremental information gathering costs under the final rules for those emissions already required to be calculated and reported by a registrant pursuant to the GHGRP. For example, because both the GHGRP and the final rules require companies to collect information to report and disclose their Scope 1 emissions, to the extent that the information and reporting activities overlap, registrants subject to both the final rules and the GHGRP may face lower incremental information gathering costs. However, as one commenter

---

[2830] In addition, as previously discussed, the EPA emissions data only reflects a portion of emissions. *See supra* section IV.A.3. The EPA's emissions data therefore presents challenges for investors to use, especially as the data are made public by facility and not by company. While each facility is matched to its parent company, this company may not be the entity registered with the SEC and thus the reported information may be less relevant to investors. *See also* letter from EPA (containing a tabular comparison of the EPA disclosures to the proposed disclosures).

[2831] *See, e.g.,* letters from EPA; and Marathon Oil.

[2832] *See supra* section IV.A.3.

App.683

Appellate Case: 24-1628   Page: 688   Date Filed: 03/26/2024 Entry ID: 5377362

noted, "[t]he Commission-proposed regulation is not completely in alignment with the US EPA regulation. Thus, an assessment, plan of action, and implementation of changes will be needed for many companies to be compliant with the requirements of both agencies."[2833]  In addition as noted above, this lower incremental cost would only apply to direct emissions from U.S.-based facilities, not registrants' international facilities or operations.

Limiting the disclosure requirement to larger companies (*i.e.,* those with greater resources that tend to be already calculating emissions, as noted in section IV.A) will help to balance the concerns of commenters who stated that the evolving nature of current emissions measurement technologies could impose significant compliance costs on registrants, especially those not currently familiar with reporting this information.[2834]

Although the final rules limit disclosures to circumstances in which emissions are material for registrants, we expect most, if not all, LAFs and AFs that are not EGCs or SRCs will need to assess or estimate their Scope 1 and 2 emissions to reach a materiality determination.  As a result, we expect these registrants will, to some extent, need to adopt controls and procedures to assess the materiality of their Scope 1 and 2 emissions and determine whether disclosure is required if they do not already have them in place.  Registrants that determine that their Scope 1 and 2 emissions are material may likewise need to adopt further controls and procedures, including measurement technologies and other tools to track and report the information to the extent they do not already do so.  The final rules may also affect registrants that currently track and/or report this information.[2835]  For example, some registrants may only be measuring some

---

[2833]     Letter from Marathon Oil.

[2834]     *See* letters from Blackrock; Business Roundtable; and Chevron.  *See also* Kalesnik, *et al*., *supra* note 2827.

[2835]     As we discuss below, the costs for existing registrants who track and disclose emissions will be limited because the final rules enable registrants to continue to use the operational and organizational boundaries they already use to track emissions.

Scope 1 or Scope 2 emissions.[2836]  Any investments in systems or technologies to better measure Scope 1 and Scope 2 emissions will improve the quality of available data[2837] on emissions but will also contribute to the direct costs of compliance.[2838]

The benefits of this component of the final rules depend on the extent to which Scope 1 and 2 emissions disclosures are accurate and thus provide reliable reflections of registrants' exposure to material climate-related risks, their management of that risk, and their progress on transition plans and/or targets and goals (to the extent they have them).  Several commenters noted that many registrants have had more experience measuring and disclosing Scope 1 and 2 emissions than Scope 3 emissions, and that those methodologies, from their experiences, are well-established and are considered fairly robust.[2839]  Nevertheless, according to studies as well as commenter feedback, there may be issues with errors and inconsistencies in voluntary Scope 1 and 2 emissions disclosures.[2840]  The final rules will benefit investors by improving the accuracy and reliability of this information—first through requiring registrants to subject GHG emissions disclosures, to the extent they are required to make them, to disclosure controls and procedures;

---

[2836]   *See* Kalesnik, *et al.*, *supra* note 2827 (noting that many registrants do not fully measure their Scope 1 emissions).

[2837]   A number of studies have raised concerns about the quality of existing emissions data.  For example, one study found that third-party estimates of emissions, which represent a significant fraction of the emissions data available in several existing databases, are materially less accurate than self-reported emissions data by issuers. *See* Kalesnik *et al.*, *supra* note 2827.  Another study examined emissions data reported to CDP between 2010 and 2019 and found that 38.9% of the reports exhibited disparities between the reported total emissions and sum of reported emissions by various sub-categories.  *See* S. Garcia-Vega, A.G. Hoepner, J. Rogelj & F. Schiemann, *Abominable Greenhouse Gas Bookkeeping Casts Serious Doubts On Climate Intentions of Oil and Gas Companies* (working paper, Mar. 2023), available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4451926 (retrieved from SSRN Elsevier database).

[2838]   *See* sections IV.C.1.b and IV.C.3 for additional information on the associated compliance costs.

[2839]   *See* letters from National Retail Federation; AHLA; and Aerospace Industries Association.

[2840]   *See* Kalesnik *et al.*, *supra* note 2827; Garcia-Vega *et al.*, *supra* note 2837; *see also* letter from Calvert ("Research demonstrates about 30% of companies that disclose such information in their own reporting make errors on a regular to periodic basis, despite the well-established rules and systems that already exist to ensure proper reporting of such emissions. In many cases, this appears to stem from a lack of effective internal controls or well-functioning monitoring systems.").

and second, by requiring assurance. The final rules also permit the disclosure of reasonable estimates for Scope 1 and 2 emissions provided that such estimates are accompanied by disclosure of underlying assumptions and reasons for using estimates, which will help investors better understand the metrics that registrants are disclosing.

Scope 1 and 2 emissions may not fully reflect a registrant's exposure to transition risks because some of those risks would only be captured through other metrics such as Scope 3 emissions.[2841] For example, registrants facing similar exposure to emissions-related climate risks may report different Scope 2 emissions levels depending on, for example, whether they pay directly for their utilities (counted as Scope 2) or their leases provide for utilities expenses (counted as Scope 3), or, as another example, whether they have employees who work from home and therefore who do not contribute directly to utilities expenses. Recognizing these limitations, the final rules also require disclosures on methodology, significant inputs, significant assumptions, organizational boundaries, operational boundaries, and reporting standard used with respect to Scope 1 and 2 emissions. These disclosures will provide additional context to help investors understand the disclosures and will enable investors to draw more reliable comparisons across registrants. For example, disclosure of operational boundaries will help distinguish registrants that rely on utilities provided by third parties from those that pay directly for their utilities, which will assist investors in accounting for this difference when comparing reported emissions and thus climate-related risk across registrants.

In a change from the proposal, we are exempting SRCs and EGCs from the GHG emissions disclosure requirements in order to limit the costs of this disclosure requirement for such registrants. This exemption should also mitigate the risk of deterring prospective EGCs or

---

[2841]    *See* letters from Wellington; and Calvert.

Appellate Case: 24-1628    Page: 691    Date Filed: 03/26/2024 Entry ID: 5377362

SRCs from conducting IPOs or inducing EGCs or SRCs to deregister under the Exchange Act as a result of the costs associated with compliance with the requirements to disclose material Scopes 1 and 2 emissions. Registrants that already measure their GHG emissions tend to be larger companies (with greater exposure to various climate-related transition risks by virtue of their size and economic footprint) as observed in our own baseline analysis (see Table 5) and in the assessments of commenters, many of whom supported exemptions for SRCs and EGCs as they would be disproportionately impacted by the requirement.[2842] While these exemptions may limit the benefit of achieving greater consistency and comparability across registrants, exempting SRCs and EGCs from this disclosure requirement at this time is appropriate given the relatively larger burden GHG emissions reporting requirements could have on these firms[2843] and the differences in the existing levels of climate-related disclosure between larger companies and smaller companies.

Commenters raised concerns about the costs of providing GHG emissions on a disaggregated basis.[2844] However, many commenters also explained that disaggregated disclosures could be decision useful, as emissions from specific constituent gases could have

---

[2842] *See, e.g.*, letters from U.S. SBA ("Small entities will need to allocate larger shares of their technological, financial, and staff resources to comply with the proposed rules. Representatives from the biotechnology, plastics, and equipment manufacturing industries have reported to Advocacy that small businesses in their industries have not traditionally tracked GHG emissions or other climate-related metrics. These businesses would either need to develop modeling software to track climate metrics in-house or hire third-party consultants to do so … Small private companies have also voiced that the costs of collecting and analyzing GHG emissions data could be prohibitive."); Soros Fund (suggesting that EGCs and SRCs should be allowed additional time to adjust to climate disclosure requirements, be afforded an additional safe harbor and be exempt from financial statement metrics disclosure); and SBCFAC Recommendation (recommending "scaling and delaying the compliance requirement for emerging growth companies, along with smaller reporting companies.").

[2843] Even for SRCs and EGCs that are currently calculating GHG emissions, there could be certain fixed costs associated with preparing this information for disclosure in Commission filings that would not scale with the size of the registrant and would therefore be more burdensome to these entities. We expect benefits to scale with the size of the firm.

[2844] *See, e.g.*, letters from ABA; ERM CVS; Sullivan Cromwell; and T. Rowe Price.

differential effects on a company's cash flows or business operations.[2845]  For example, a registrant may be subject to methane fees by the EPA, in which case information about the registrant's methane emissions could factor into investors' decision making.  To balance these views, some commenters suggested that the final rules should require constituent gases to be disclosed on a disaggregated basis only when individually material.[2846]  We agree with those commenters and believe that this approach will provide investors with decision-useful information about GHG emissions without imposing undue compliance costs on registrants to produce disaggregated data in circumstances in which the disaggregation may not be particularly useful for investors.[2847]

The final rules also permit registrants to calculate and disclose GHG emissions according to the methodology that best matches their particular facts and circumstances.  The benefit of this flexible approach is that registrants will have the opportunity to provide investors with information about their GHG emissions using the latest and most suitable methodology as measurement technologies and standards continue to develop. For example, while many companies calculate their GHG emissions pursuant to the GHG Protocol, others utilize different approaches, such as certain ISO standards.[2848]  This flexibility, which may include registrants'

---

[2845]  *See, e.g.*, letters from PwC; and WRI.

[2846]  *See, e.g.,* letter from Deloitte & Touche ("Many emissions category calculation methods are estimate-based and rely on proxy data; the potential variance in actual can be significant and is largely unknown in many instances.  Especially given these challenges, the Commission may consider whether the disaggregated data by each constituent greenhouse gas should only be required to be disclosed when individually material.").

[2847]  *Id.*

[2848]  *See* letters from Futurepast (referencing ISO 14064-1, Specification with Guidance at the Organization Level for Quantification and Reporting of Greenhouse Gas Statements; and ISO 14067, Carbon Footprint of Products—Requirements and Guidelines for Quantification); and ISO Comm. GHG; *see also, e.g.*, letters from Alphabet *et al*.; As You Sow; Beller *et al*.; CalSTRS; CFA; Dell; Deloitte & Touche; Engine No. 1; ERM CVS; KPMG; Morningstar; Soc. Corp. Gov.; and WRI.

ability to round as appropriate, will serve to limit costs.[2849]  Conversely, it could also make comparisons less straightforward, which may attenuate some of the expected benefits of the final rules.  However, there are several reasons to believe that this reduction in comparability will not significantly undermine the utility of the required disclosures.  First, the required disclosures will expand upon and enhance the quality of the existing set of GHG emissions disclosures that investors already find useful despite the variation in methodologies that produce existing emission disclosures.[2850]  Second, the contextual disclosures (e.g., operational boundaries) will enable investors to better understand the quantitative disclosures and make adjustments to facilitate comparisons with other registrants that are otherwise not possible under the baseline. Third, to the extent that industry-specific approaches to disclosing emissions continue to develop and evolve, the final rules will permit registrants within those industries to adopt those approaches, which will help investors to compare peer companies within an industry.  Finally, as we discuss in the next subsection, obtaining assurance over GHG emissions disclosure provides investors with an additional degree of reliability regarding not only the figures that are disclosed, but also the key assumptions, methodologies, and data sources the registrant used to arrive at those figures.

These disclosures complement the other required disclosures about the organizational boundaries (used to calculate emissions versus those used in their financial statements) as well as carbon offsets and RECs, which offer important context for facilitating comparisons between companies as discussed above.  In fact, by not requiring organizational boundaries to necessarily conform to those used in the company's consolidated financial statements, the final rules permit

---

[2849]  *See* letter from AGs of TX *et al.*

[2850]  *See, e.g*., letters from Vanguard; Fidelity; BlackRock; CALSTRS; and CALPERS for investors who derive utility from existing emissions disclosures.

the development of a standardized framework (*e.g.*, control approach) for measuring emissions across registrants.  Commenters supported this approach as it would allow registrants to continue to measure emissions using their current approach and procedures.[2851]  That is, by not imposing a prescriptive methodology for GHG emissions disclosures, the final rules provide space for the continued development of a shared reporting framework for issuers to disclose information that ultimately may enhance the degree of comparability of registrant-level GHG emissions data, to the benefit of investors, registrants and the market (relative to the baseline).[2852]

Finally, as discussed in section II.I above, we are following the suggestions of many commenters and allowing registrants more time to report emissions given the inherent challenges with reporting sooner that commenters highlighted.[2853]  By delaying the requirement to disclose GHG emissions until later in the year, the final rules will provide additional time to prepare the information for filing (more consistent with current voluntary reporting practices),[2854] which should improve its accuracy and reduce costs for registrants but may result in delayed disclosure in some instances.  The delay in annual reporting may also allow registrants to leverage disclosures they may have already prepared for other reporting regimes.  Nonetheless, even with the extended filing deadline for registrants, investors will still benefit from receiving this information in a more timely and predictable manner than they currently do.[2855]

---

[2851]    *See, e.g.*, letters from API; ACORE; AHLA; and Chevron.

[2852]    *See, e.g.*, letters from Alphabet *et al.*; and Alliance-Bernstein.

[2853]    *See*, *e.g.*, letters from Morningstar; and American Banker.

[2854]    *See*, *e.g.*, *supra* note 2570 (stating "many companies still take more than 12 months after their fiscal year to disclose their sustainability data").

[2855]    *See, e.g.*, letter from Morningstar ("Currently, a lack of clear disclosure standards for the timing of 'sustainability reports,' which is the primary source for emissions data, greatly hinders investor knowledge. For example, some registrants released 2021 reports—detailing 2020 data—as late as November 2021.").

### f. Attestation Over GHG Emissions Disclosure

The proposed rules would have required LAFs and AFs to provide an attestation report covering the disclosure of its Scope 1 and Scope 2 emissions at the limited assurance level for the second and third fiscal years after the Scopes 1 and 2 emissions disclosure compliance date, and at the reasonable assurance level beginning in fiscal year four. In a change from the proposal, the final rules require LAFs and AFs to provide an attestation report at the limited assurance level for Scope 1 and/or Scope 2 emissions disclosures beginning the third fiscal year after the compliance date for GHG emissions reporting and require an LAF to provide an attestation report at the reasonable assurance level for Scope 1 and/or Scope 2 emissions disclosures beginning the seventh fiscal year after the compliance date for GHG emissions reporting.[2856]

Many commenters stated that the proposed assurance requirements would be too costly.[2857] In response to these commenters' concerns, and in a shift from the proposal, the final rules will exempt SRCs and EGCs from the requirement to obtain assurance, since SRCs and EGCs will not be required to disclose GHG emissions. In addition, the final rules do not require AFs to provide attestation reports at the reasonable assurance level. We have determined that it is appropriate to apply the reasonable assurance requirement to a more limited pool of registrants—LAFs—at this time because a number of LAFs are already collecting and disclosing

---

[2856] *See* 17 CFR 229.1506.

[2857] *See, e.g.,* letters from AFPM; AHLA; Amer. Chem.; Bipartisan Policy ("While emissions data is no doubt important for companies to evaluate, especially those that are large emitters, attesting or certifying this data as accurate is far more costly than with financial data because the market for emissions is not at all well-developed."); Eversource; Business Roundtable; Chamber; ConocoPhillips ("the availability of assurance providers is currently insufficient to meet demand and will likely trigger a surge in costs"); McCormick ("While unknown at this time, due to the fact that these types of disclosures have never been required by the SEC in the past and in this form, these added costs must be well understood and measured against the benefit."); NOIA; PPL; SBCFAC Recommendation; SIFMA; Soc. Corp. Gov.; Sullivan Cromwell; and Travelers.

Appellate Case: 24-1628    Page: 696    Date Filed: 03/26/2024 Entry ID: 5377362

climate-related information, including GHG emissions data and larger issuers generally bear proportionately lower compliance costs than smaller issuers due to the fixed cost components of such compliance.

For both LAFs and AFs, the extended phased in compliance dates will further address concerns about the immediate costs of compliance under the final rules.[2858]  Specifically, the final rules provide registrants with two phased in compliance periods—one phased in compliance period before GHG emissions disclosures are required, and another, later phased in compliance period before assurance over GHG emissions disclosures is required.  These phased in compliance periods will give registrants time to develop and implement processes and controls to produce high quality GHG emissions data and disclosures.  In addition, the phased in compliance periods will provide existing GHG emissions assurance providers with time to train additional staff and undertake other preparations for these engagements as necessary, as well as facilitate the entry of new GHG emissions attestation providers into the market to meet demand.[2859]  As the availability of assurance providers increases and the quality of registrants' reporting improves, we expect the costs of assurance will decrease.

Many commenters also pointed out the benefits of attestation reports covering the disclosure of registrants' Scope 1 and Scope 2 emissions, including increased investor

---

[2858]    *See* letter from BOA (stating that a delay in the compliance date "would give additional time to attestation providers to obtain the necessary staff and resources to meet future demand and could help to reduce costs for registrants"); *see also* letter from Corteva (stating that a minimum one-year extension to the implementation deadlines set forth in the proposal "would reduce the risk of reporting delays, give registrants further opportunities to improve data quality and internal control processes, and work with assurance providers to ensure a more productive assurance process").

[2859]    There can be barriers to entry due to consolidation around a few major assurance providers.  *See* Gipper *et al.* (2023); *see also* discussion of similar concerns raised in the context of recent California laws, discussed *infra* note 3118 and accompanying text.

Appellate Case: 24-1628     Page: 697     Date Filed: 03/26/2024 Entry ID: 5377362

protection[2860] and mitigation against the risk of potential greenwashing.[2861]  Academic research shows that voluntary assurance improves the quality of GHG emissions disclosures and CSR disclosures more generally,[2862] and that investors perceive CSR disclosures to be more credible when they are accompanied by the assurance reports, regardless of the assurance level.[2863] Broadly, academic research also suggests that the market values voluntary audits[2864] and due to this demand firms voluntarily submit to audits.[2865]  Furthermore, practitioner evidence suggests that the demand for voluntary ESG assurance is increasing.[2866]  And while some registrants may meet this demand by obtaining voluntary assurance; others may not.  Indeed, research shows that many firms do not obtain voluntary assurance,[2867] and that assurance provided on a voluntary

---

[2860]   *See, e.g.*, letters from Better Markets; CAQ; and SFERS.

[2861]   *See, e.g.*, letters from BNP Paribas; and UAW Retiree. In response to one commenter who asserted a lack of factual evidence on the extensiveness of greenwashing (*see* Overdahl exhibit to letter from Chamber), we note that recent analysis shows greenwashing risk has accelerated.  *See* RepRisk, *On the Rise: Navigating the Wave of Greenwashing and Social Washing* (Oct. 2023), available at https://www.reprisk.com/news-research/reports/on-the-rise-navigating-the-wave-of-greenwashing-and-social-washing.

[2862]   *See*, *e.g.*, letter from F. Berg; Brandon Gipper, *et al.*, *Carbon Accounting Quality: Measurement and the Role of Assurance*, *supra* note 1243; B. Ballou, P.C. Chen, J.H. Grenier & D.L. Heitger (2018); L. Luo, Q. Tang, H. Fan & J. Ayers, *Corporate Carbon Assurance and the Quality of Carbon Disclosure*, 63 Acct. & Fin. 657 (2023); W. Maroun, *Does External Assurance Contribute to Higher Quality Integrated Reports?*, 38 J. of Acct. and Public Policy 106670 (2019); *Corporate Social Responsibility Assurance and Reporting Quality: Evidence from Restatements*, 37 J. of Acct. and Public Policy 167 (2018).

[2863]   H. Hoang & K.T. Trotman, The Effect of CSR Assurance and Explicit Assessment on Investor Valuation Judgments, 40 Auditing: A J. of Practice & Theory 19 (2011).

[2864]   See, e.g., C.S. Lennox & J.A. Pittman, Voluntary Audits Versus Mandatory Audits, 86 Acct. Rev. 1655 (2011); T. Bourveau, J. Brendel & J. Schoenfeld, Decentralized Finance (DeFi) Assurance: Audit Adoption and Capital Markets Effects (2023), available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4457936 (retrieved from SSRN Elsevier database).

[2865]   *See*, *e.g.*, T. Bourveau, M. Breuer, J. Koenraadt & R. Stoumbos, *Public Company Auditing Around the Securities Exchange Act*, Columbia Bus. School Rsch. Paper (revised Feb. 2023), available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3837593.

[2866]   *See* Center for Audit Quality, *supra* note 2716.

[2867]   As of 2020, the voluntary assurance rate of ESG reports in the U.S. was 46%.  Gipper *et al*. (2023).

Appellate Case: 24-1628      Page: 698      Date Filed: 03/26/2024 Entry ID: 5377362

basis may vary widely in form and content.[2868]  Hence, we expect there to be benefits from

requiring LAFs and AFs to provide the attestation reports covering their Scope 1 and/or Scope 2

emission disclosures.[2869]  The assurance requirement in the final rules will require an

independent third-party to provide a check on the accuracy and completeness of a registrant's

GHG emissions disclosures before the information is provided to investors, which as explained

above, will likely contribute to lowering the cost of capital and analyst forecast errors.[2870]  While

the academic accounting literature, as one commenter has noted, has traditionally found that

"auditing assurance for corporate social responsibility in the US has not led to positive market

effects,"[2871] more recent evidence on specifically carbon emissions assurance has revealed a

positive link between external assurance of carbon emissions and market value.[2872]

Other commenters stated that there is a lack of expertise to meet the demand for required

attestation services.[2873]  These commenters raised concerns that this lack of expertise, coupled

---

[2868]   For example, there was significant heterogeneity in the content of voluntary assurance reports over financial statements provided in the U.S. prior to the adoption of the mandatory audit requirements of the Exchange Act. *See* Bourveau, *et al.*, *supra* note 2865; Gipper *et al.* (2023) also document that there is a heterogeneity of the types of metrics being voluntarily assured, depending on the type of the assuror.  For example, financial auditors tend to assure slightly more metrics (93%) than non-financial assurers (89%). *See* Gipper *et al.* (2023), at Table IA-2.

[2869]   *See, e.g.*, Cohen, *et al.*, *supra* note 2721; Ilhan *et al.* (2023).

[2870]   *See, e.g.*, Casey, *et al.*, *supra* note 1207 (finding that corporate social responsibility ("CSR") assurance results in lower cost-of-capital along with lower analyst forecast errors and dispersion, and that financial analysts find related CSR reports to be more credible when independently assured).

[2871]   *See* Overdahl exhibit to letter from Chamber; *see also* Charles H. Cho, Giovanna Michelon, Dennis M. Patten & Robin W. Roberts, *CSR Report Assurance in the USA: An Empirical Investigation of Determinants and Effects*, 5 Sustainability Acct., Mgmt. and Policy J. 130 (2014).

[2872]   Y. Shen, Z.W. Su, G. Huang, F. Khalid, M.B. Farooq & R. Akram, Firm Market Value Relevance of Carbon Reduction Targets, External Carbon Assurance and Carbon Communication, 11 Carbon Mgmt. 549 (2020).

[2873]   *See, e.g.*, letters from ABA; Amer. Chem.; Eversource; PPL; Soc. Corp. Gov.; Soros Fund ("Financial audits are different than climate disclosure audits and auditors do not have specific expertise to ensure the best outcomes."); SouthState; and Sullivan Cromwell ("The number of qualified providers would likely be insufficient to meet the demand for their services prompted by the Proposed Rules, at least in the near term.").

with the proposed rules' requirements for assurance providers, would increase costs of obtaining assurance. Other commenters stated that they were opposed to the proposed assurance requirements because the requirements would preclude assurance providers from applying the ISO 14064-3 standards, which is the most common standard used by non-accountant assurance providers.[2874] As discussed in the baseline, most companies that currently obtain some type of third-party verification or assurance do not obtain these services from accounting firms.[2875] The proposed requirements would not have limited the scope of providers to accounting firms. However, the proposed requirements regarding the attestation standards would have prevented providers from using certain attestation standards widely used by non-accounting firm providers, such as ISO 14064-3, which could have resulted in providers needing to become familiar with different standards or registrants needing to change assurance providers, which would have increased the costs of obtaining assurance. The final rules address these concerns by modifying the requirements for the attestation standards such that an attestation report pursuant to the ISO 14064-3 standards will satisfy the requirements in the final rule.

Commenters also asserted that assurance standards and methodologies are still evolving.[2876] Consistent with these commenters' assertions, prior research shows that the field

---

[2874] *See*, *e.g.*, letter from Futurepast; *see also* section IV.A.5.e.

[2875] While this is true in the U.S., we note that in Europe and other parts of the world, accountants are the primary service provider. *See* IFAC, *supra* note 1089 (approximately 57% of engagements assurance reports were conducted by audit firms in 2021).

[2876] *See*, *e.g.*, letters from ABA ("As the reporting and attestation standards develop further, a single standards-setting body emerges as the clear leader, and third parties begin to become qualified under these standards, the Commission can then assess whether an attestation standard is appropriate."); Mid-Size Bank; Nasdaq ("To encourage disclosures while the attestation industry continues to mature, the Commission should eliminate the attestation requirement for Scope 1 and 2 emissions, and permit all issuers to disclose a voluntary attestation in accordance with proposed Item 1505(e)(1-3) of Regulation S-K."); SIFMA; and Tata Consultancy Services (June 17, 2022) ("We do not subscribe to the view that an attestation of reported emissions would be appropriate at such a nascent stage of adoption of climate-related disclosure standards and practices.")

of sustainability assurance—which presumably encompasses the assurance over emissions disclosures—is fairly new and thus may not provide the same benefits as decades of financial audit practice.[2877]  While we acknowledge that the field of GHG emission assurance is still maturing, as discussed elsewhere, a number of registrants currently obtain voluntary assurance over their GHG emissions disclosures, which presumably they would not do if existing assurance standards were unworkable or did not meaningfully enhance the reliability of those disclosures. The final rules permit registrants to follow any attestation standards that are publicly available at no cost or that are widely used for GHG emissions assurance and that are established by a body or group that has followed due process procedures including the broad distribution of the framework for public comment.  These conditions will help ensure that any standards used for GHG assurance services under the final rules are sufficiently developed to provide meaningful investor protection benefits, while still providing a degree of flexibility to registrants given the emerging nature of GHG assurance services.  In addition, the final rules include a longer phase in period before LAFs and AFs are required to comply with the assurance requirements, which also provides additional time for standards and methodologies to further develop.

The final amendments also require the GHG emissions attestation report be prepared and signed by a GHG emissions attestation provider who is an expert in GHG emissions by virtue of

---

[2877]    See K. Hummel, C. Schlick & M. Fifka, The Role of Sustainability Performance and Accounting Assurors in Sustainability Assurance Engagements, 154 J. of Bus. Ethics 733 (2019); M.B. Farooq & C. De Villiers, Sustainability Assurance: Who Are The Assurance Providers and What Do They Do?, Challenges in Managing Sustainable Business: Reporting, Taxation, Ethics, & Governance (S. Arvidsson, ed., 2019) ("Farooq and Villiers (2019)"); C. Larrinaga, *et al.*, Institutionalization of the Contents of Sustainability Assurance Services: A Comparison Between Italy and United States, 163 J. of Bus. Ethics 67 (2020). Academic evidence also suggests that sustainability report restatements are positively associated with the presence of sustainability assurance reports.  See G. Michelon, D.M. Patten & A.M. Romi, *Creating Legitimacy for Sustainability Assurance Practices: Evidence from Sustainability Restatements*, 28 European Acct. Rev. 395 (2019).  This finding is more pronounced "for error restatements than for restatements due to methodological updates."  *See also* R. Hoitash & U. Hoitash, *Measuring Accounting Reporting Complexity with XBRL*, 93 Acct. Rev. 259 (2018) (finding misstatements are more likely in areas of reporting complexity).

having significant experience in measuring, analyzing, reporting, or attesting to GHG emissions. This provider must be independent with respect to the registrant, and any of its affiliates, for whom it is providing the attestation report, during the attestation and professional engagement period.

The final rule's expertise requirement for attestation providers should enhance the overall benefits of obtaining GHG emissions assurance, consistent with academic research showing that industry specialist auditors deliver higher quality financial statement audits than non-specialist auditors[2878] and that audit clients are willing to pay more for audit services of more experienced audit partners.[2879]

Similarly, the final rules' independence requirement for attestation providers is consistent with the similar requirement that has long existed for financial statement auditors and will enhance the perceived credibility of the GHG emissions assurance.[2880] Attestation providers that are not accountants may incur additional costs to familiarize themselves with these requirements.

The final rules also require LAFs and AFs to disclose, after requesting relevant information from any GHG emissions attestation provider as necessary, whether the GHG emissions attestation provider is subject to any oversight inspection program, and if so, which program (or programs) and whether the GHG emissions attestation engagement is included within the scope of authority of such oversight inspection program. While the final rules do not

---

[2878] See, e.g., K.J. Reichelt & D. Wang, National and Office-specific Measures of Auditor Industry Expertise and Effects on Audit Quality, 48 J. of Acct. Rsch. 647 (2010); W.R. Knechel, *et al.*, The Demand Attributes of Assurance Services Providers and the Role of Independent Accountants, 10 Int'l J. of Auditing 143 (2006).

[2879] D. Aobdia, S. Siddiqui & A. Vinelli, Heterogeneity in Expertise in a Credence Goods Setting: Evidence from Audit Partners, 26 Rev. of Acct. Stud. 693 (2021).

[2880] *See*, *e.g.*, M. DeFond & J. Zhang, *A Review of Archival Auditing Research*, 38 J. of Acct. & Econ. 275 (2014); W.R. Knechel *et al.*, *supra* note 1206.

require that the GHG emissions attestation provider be subjected to mandatory oversight and inspection processes, disclosure of whether this is the case will provide investors with a better understanding of the qualifications of the GHG emissions attestation provider, which in turn will help them determine whether the assurance services have enhanced the reliability of the GHG emissions disclosure. For example, academic research shows that oversight inspections of financial statement audits by the PCAOB have significantly increased the credibility of the financial statement audits.[2881] Similarly, in the context of inspections of PCAOB-registered public accounting firms, academic literature suggests that engagement-specific PCAOB inspections may have spillover effects on non-inspected engagements.[2882]

Furthermore, the final rules require AFs and LAFs subject to Item 1506(a) to disclose whether any GHG emissions attestation provider that was previously engaged to provide attestation over the registrant's GHG emissions disclosure for the fiscal year covered by the attestation report resigned (or indicated that it declined to stand for re-appointment after the completion of the attestation engagement) or was dismissed. If so, the registrant is required to disclose certain information about whether there were any disagreements with the former GHG emissions attestation provider and to describe the disagreement. The registrant also must disclose whether it has authorized the former GHG emissions attestation provider to respond

---

[2881] *See, e.g.*, B. Gipper, C. Leuz & M. Maffett, *Public Oversight and Reporting Credibility: Evidence from the PCAOB Audit Inspection Regime*, 33 Rev. of Fin. Stud. 4532 (2020); P.T. Lamoreaux, *Does PCAOB Inspection Access Improve Audit Quality? An Examination of Foreign Firms Listed in the United States*, 61 J. of Acct. & Econ. 313 (2016).

[2882] *See, e.g.*, Aobdia, *Impact*, *supra* note 1555 (concluding that "engagement-specific PCAOB inspections influence non-inspected engagements, with spillover effects detected at both partner and office levels" and that "the information communicated by the PCAOB to audit firms is applicable to non-inspected engagements"); Aobdia, *Economic Consequences*, *supra* note 1555 (concluding that "common issues identified in PCAOB inspections of individual engagements can be generalized to the entire firm, despite the PCAOB claiming its engagement selection process targets higher risk clients" and that "[PCAOB quality control] remediation also appears to positively influence audit quality").

Appellate Case: 24-1628    Page: 703    Date Filed: 03/26/2024 Entry ID: 5377362

fully to the inquiries of the successor GHG emissions attestation provider concerning the subject matter of the disagreement. Due to the readily available nature of this information for registrants, we do not expect that it would be costly for registrants to include these disclosures in the filing that contains the GHG emissions disclosures and attestation report, when applicable. The disclosure of the existence of a disagreement in the event of the resignation or dismissal of the GHG emissions attestation provider will enable investors to assess the possible effects of such disagreement and whether it could have impacted the reliability of the GHG emissions disclosure, which, as discussed in Section II.H above, provides investors with information about a registrant's business, results of operations, and financial condition. This disclosure requirement also may limit a registrant's incentive to dismiss attestation providers that it views as unfavorable.[2883]

In addition, the final rules require any registrant that is not required to include a GHG emissions attestation report pursuant to Item 1506(a) to disclose certain information if the registrant's GHG emissions disclosure were voluntarily subjected to third-party assurance, which is consistent with the proposed rules and with the feedback provided by several commenters.[2884] There is some academic evidence suggesting that the assurance approaches of accountants and non-accountants differ (thus potentially reducing comparability across what is being assured),[2885] that firms choose accountants vs. non-accountants as their GHG emissions assurance providers

---

[2883] Registrants may have incentives to search for a favorable assurance conclusion or opinion, similar to those previously documented in the market for credit ratings. *See* P. Bolton, X. Freixas, & J. Shapiro, *The Credit Ratings Game*, 67 J. of Fin. 85 (2012).

[2884] *See, e.g.*, letters from Amer. for Fin. Reform; Sunrise Project *et al.*; CEMEX; and C. Howard; *see also* letter from Chamber (opposing any mandatory assurance requirements but stating "to the extent companies are obtaining assurances, the SEC's alternative that registrants disclose what types of assurance, if any, they are obtaining may be appropriate").

[2885] Farooq and Villiers (2019), *supra* note 2877.

depending on their internal objectives,[2886] and that market participants draw inferences from the attributes of the assurance providers.[2887] We expect that greater disclosures about the nature of voluntarily obtained Scope 1 and Scope 2 emissions attestation reports will help investors determine whether the assurance services have enhanced the reliability of the GHG emissions disclosure.[2888] However, the liability and accompanying litigation risk associated with including these disclosures in Commission filings could disincentivize some registrants from voluntarily obtaining assurance, particularly if they have lower confidence in the quality of the services performed. These concerns are mitigated to some extent with respect to liability under section 11 of the Securities Act by the final rules' amendment to Rule 436, which provides that any description of assurance regarding a registrant's GHG emissions disclosures provided in accordance with Item 1506(e) (i.e., assurance voluntarily obtained over GHG emissions disclosures) shall not be considered part of the registration statement prepared or certified by a person within the meaning of sections 7 and 11 of the Securities Act.[2889]

---

[2886] R. Datt, L. Luo & Q. Tang, *Corporate Choice of Providers of Voluntary Carbon Assurance*, 24 Int'l J. of Auditing 145 (2020).

[2887] G. Pflugrath, P. Roebuck & R. Simnett, Impact of Assurance and Assu'er's Professional Affiliation on Financial Analy'ts' Assessment of Credibility of Corporate Social Responsibility Information, 30 Auditing: A J. of Practice & Theory 239 (2011). However, another study did not find that the investors cared whether a sustainability assurance provider was affiliated with the audit profession or not (see, e.g., R. Simnett, A. Vanstraelen & W.F. Chua, Assurance on Sustainability Reports: An International Comparison, 84 Acct. Rev. 937 (2009).

[2888] Academic research shows that the market trusts more voluntary disclosures by managers with established reputations for better accuracy or "forthcomingness" of such past disclosures. *See, e.g.*, H.I. Yang, *Capital Market Consequences of Managers' Voluntary Disclosure Styles*, 53 J. of Acct. and Econ. 167 (2012); A. Beyer & R.A. Dye, *Reputation Management and the Disclosure of Earnings Forecasts*, 17 Rev. of Acct. Stud. 877 (2012); P.C. Stocken, *Credibility of Voluntary Disclosure*, RAND J. of Econ. 359 (2000).

[2889] *See* 17 CFR 230.436(i)(2); *supra* section II.I.5.c; *see also supra* section II.I.2.c. *But see supra* note 1397 (noting that amending Rule 436 to eliminate potential section 11 liability could "reduce the incentives for GHG emissions attestation providers to perform a thorough analysis and ensure that their attestation report . . . is true and that there was no omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading").

Appellate Case: 24-1628    Page: 705    Date Filed: 03/26/2024 Entry ID: 5377362

### g. Risk Management Disclosure

The final rules require a registrant to describe any processes it has for identifying, assessing, and managing material climate-related risks.[2890]  A registrant with such a process should address, as applicable, the following non-exclusive list of disclosure items: (1) how it identifies whether it has incurred or is reasonably likely to incur a material physical or transition risk; (2) how it decides whether to mitigate, accept, or adapt to the particular risk; and (3) how it prioritizes whether to address the climate-related risk.  Furthermore, the final rules specify that registrants who manage a material climate-related risk must disclose whether and how their processes for identifying, assessing, and managing climate-related risks have been integrated into their overall risk management system or processes.

These disclosures will allow investors to better assess the risk management processes registrants use to evaluate and address material climate-related risks that may have or are reasonably likely to have an impact on companies' operations and financial conditions.  Climate-related risks could impact companies' financial performance in a number of ways.  For example, physical risks could result in asset impairments and business interruptions.  Regulatory changes could render certain business plans less or unprofitable.  Shifts in consumer preferences could increase or decrease demand for certain types of products.  While some of these risks may be relatively straightforward to evaluate, others may require expertise and detailed knowledge about a company's business partners and operations.  The risk management disclosures in the final rules will provide investors with a more detailed understanding of how a registrants' risk

---

[2890]    *See* 17 CFR 229.1503.

Appellate Case: 24-1628    Page: 706    Date Filed: 03/26/2024 Entry ID: 5377362

management systems identify, evaluate, and address climate-related risks, which could contribute to better-informed investment and voting decisions.[2891]

As one example of how investors could use risk management disclosure, one commenter explained:"[we] identified a semi-conductor manufacturer as a more attractive investment when we learned it was diversifying its manufacturing locations to diversify its water sourcing."[2892] However, a commenter also noted that "[f]or a significant number of issuers, information is not sufficient to support equivalent analysis."[2893] In this respect, requiring a registrant to describe its process for identifying, assessing, and managing material climate-related risks, such as water sourcing risks, will allow investors to more fully evaluate the drivers and outcomes of the registrant's risk management decisions. These disclosures will also benefit investors by providing context for the other disclosures required by the final rules. For example, investors can use these disclosures to better understand the steps a registrant took to identify material climate-related risks in the context of the registrant's disclosures about the types of material climate-related risks it faces.

The requirement to disclose the extent to which a registrant's processes for identifying, assessing, and managing climate-related risks have been integrated into its overall risk

---

[2891]    *See* letters from the Investment Company Institute ("We also support companies being required to disclose whether and how climate-related risks are integrated into the company's overall risk management system or processes. This disclosure should help investors assess how the company handles climate-related risk as compared to other risks."); Vanguard ("We consider climate risks to be material and fundamental risks for investors and the management of those risks is important for price discovery and long-term shareholder returns."); and Calvert ("We support the SEC's mandated approach for registrants to describe processes for identifying, assessing and managing climate-related risks, including both physical and transition risks. In order for us to evaluate issuer risks properly, we need transparent disclosure that allows us to assess how companies are determining the materiality of climate-related risks, including how they measure the potential scope and impact of an identified climate-related risk and how the risks identified in the disclosures relate back to that issuer's strategy, business model and outlook.").

[2892]    *See* letter from Wellington.

[2893]    *Id.*

management system or processes provision will help investors understand and assess the effectiveness of those climate risk management processes.

There are many climate risk management approaches available to firm managers, ranging from divestment from certain suppliers to engagement with their business partners to hedging to incorporating climate risk into their financial planning.[2894] To the extent that there is variation in risk management practices across registrants or such practices change over time, the final rules will allow investors to compare those risk management practices when making investment decisions.

As discussed in section IV.C.3, we expect registrants to incur some additional compliance costs as a result of these disclosures; however, to limit the costs associated with these disclosures, we are not requiring several of the prescriptive elements found in the proposed rules, including a separate disclosure item on how a registrant determines how to mitigate any high priority risks.[2895] While these disclosures may have been low cost to produce for some registrants that already create TCFD-compliant sustainability reports, we opted for a more flexible approach for the reasons discussed above. In providing that registrants only need to describe the process for identifying, assessing, and managing material climate-related risks, the final rules further limit the compliance costs for registrants. Nonetheless, registrants may still

---

[2894] *See, e.g.,* Keely Bosn, Amelia Brinkerhoff, Katherine Cunningham & Shirui Li, *Climate Risk Management: Strategies for Building Resilience to Climate Change in the Private Sector* (2020), available at https://deepblue.lib.umich.edu/bitstream/handle/2027.42/154987/370%20Climate%20Risk%20Managemen t_%20Zurich.pdf (documenting various divestment and planning strategies in managing climate-related risk among companies in the insurance and financial services industries).

[2895] For instance a registrant will not be required to disclose, as applicable, how it: (1) determines the relative significance of climate-related risks compared to other risks; (2) considers existing or likely regulatory requirements or policies, such as GHG emissions limits, when identifying climate-related risks; (3) considers shifts in customer or counterparty preferences, technological changes, or changes in market prices in assessing potential transition risks; or (4) determines the materiality of climate-related risks.

Appellate Case: 24-1628    Page: 708    Date Filed: 03/26/2024 Entry ID: 5377362

choose to include the details set forth in the proposed rules if they are relevant to their risk management practices.

Under the approach taken in the final rules, investors will benefit from a discussion tailored to the registrant's facts and circumstances. For example, registrants will be able to exclude information that they deem to be less relevant or useful to understanding the registrant's approach to managing material climate-related risks. However, this flexibility could potentially result in disclosures that are not fully comparable across registrants, which could reduce the benefits of this provision. The more flexible approach we are adopting could also reduce the risk that a registrant would have to disclose confidential information, a concern raised by some commenters.[2896]

The benefits of the final rules will be lessened to the extent that this existing voluntary reporting overlaps in content with the required disclosures.[2897] However, even in these cases, investors will benefit from having this information set forth in a Commission filing, which will improve its reliability of this information and reduce search costs for investors. We also expect the final rules to address concerns expressed by commenters that existing voluntary disclosures are often deficient in terms of understandability, transparency, and detail.[2898] Therefore, we expect the final rules will result in more consistent, comparable, and reliable information about registrants' risk management processes as compared to the baseline.

---

[2896] *See, e.g.*, letters from Cemex; Chief Execs. (noting that registrants may simply start making generic disclosures); AFPA; American AALA *et al.*; IADC; and Sullivan Cromwell.

[2897] *See supra* section IV.A., particularly IV.A.5., for a discussion of existing trends in voluntary disclosure.

[2898] *See* letters from Bloomberg; and PRI.

Appellate Case: 24-1628     Page: 709     Date Filed: 03/26/2024 Entry ID: 5377362

### h. Financial Statement Disclosures

### i. Expenditure Disclosures

The final rules require an issuer to disclose the following categories of expenditures: (1) expenditures expensed as incurred and losses resulting from severe weather events and other natural conditions; (2) , capitalized costs and charges resulting from severe weather events and other natural conditions; and (3) if carbon offsets or RECs or certificates have been used as a material component of a registrant's plans to achieve its disclosed climate-related targets or goals, the aggregate amount of carbon offsets and RECs expensed, the aggregate amount of capitalized carbon offsets and RECs recognized, and the aggregate amount of losses incurred on the capitalized carbon offsets and RECs.[2899] Under the final rules, a capitalized cost, expenditure expensed, charge, loss, or recovery results from a severe weather event or other natural condition when the event or condition is a "significant contributing factor" in incurring the capitalized costs, expenditure expensed, charge, loss, or recovery.[2900]

The final rules require financial statement disclosures only if the capitalized costs, expenditures expensed, charges, and losses incurred as a result of severe weather events and other natural conditions exceed certain thresholds.[2901] Specifically, a registrant will be required to disclose capitalized costs and charges incurred as a result of severe weather events or other natural conditions if the aggregate amount of the absolute value of capitalized costs and charges incurred is one percent or more of the absolute value of shareholders' equity or deficit, but no disclosure will be required if such amount is less than $500,000 for the relevant fiscal year.[2902]

---

[2899]   *See* 17 CFR 210.14-02(b), (c), (d) and (e).

[2900]   *See* 17 CFR 210.14-02(g).

[2901]   *See* 17 CFR 210.14-02(b).

[2902]   *See* 17 CFR 210.14-02(b)(2).

Similarly, a registrant will be required to disclose expenditures expensed and losses incurred as a result of severe weather events and other natural conditions if the aggregate amount of such expenditures expensed and losses is one percent or more of the absolute value of income or loss before income tax expense ("pretax income"), but no disclosure will be required if such amount is less than $100,000 for the relevant fiscal year.[2903] If the disclosure threshold is triggered, registrants will be required to disclose the aggregate amount of the capitalized costs, expenditures expensed, charges, and losses and identify where the amounts are presented in the income statement and the balance sheet.

We expect that disclosure of capitalized costs, expenditures expensed, charges, and losses incurred resulting from severe weather events and other natural conditions will enable investors to better assess the effects of these events and conditions (i.e., types of physical risks) on a registrant's financial position and financial performance. Better disclosures of physical risks can provide decision-useful information to investors.[2904] For example, one study found that a one standard deviation increase in exposure to heat stress is associated with a 40 basis point increase in yields on corporate bonds.[2905] Another study found that stock price reactions to climate-related risk disclosures in earnings calls are more negative for companies that have experienced a severe weather event in the quarter.[2906]

---

[2903] *See* 17 CFR 210.14-02(b)(1).

[2904] H. Hong, *et al.*, *supra* note 2739.

[2905] Viral V. Acharya, Timothy Johnson, Suresh Sundaresan & Tuomas Tomunen, *Is Physical Climate Risk Priced? Evidence From Regional Variation in Exposure to Heat Stress*, Nat'l Bureau of Econ. Rsch., No. w304452022 (2022).

[2906] Brian Bratten & Sung-Yuan (Mark) Cheng, *The Information Content of Managers' Climate Risk Disclosure* (Sept. 2023), available at https://ssrn.com/abstract=4068992 (retrieved from SSRN Elsevier database).

Appellate Case: 24-1628    Page: 711    Date Filed: 03/26/2024 Entry ID: 5377362

We anticipate that these financial statement disclosures will result in increased

consistency and comparability relative to registrants' current disclosure practices.  In particular,

our decision to use a bright-line threshold will ensure that investors have access to decision-

useful information for all registrants that have been meaningfully impacted by severe weather-

related events and other natural conditions.  Comparisons across registrants may enable investors

to assess how different registrants manage and respond to severe weather events and other

natural conditions, while comparisons over time will enable investors to evaluate how registrants

are adapting to these types of events and conditions.

A better understanding of registrants' exposure to severe weather events and other natural

conditions will help individual investors manage their portfolio-level exposure to climate-related

physical risks.  Whereas some climate-related risks may be company-specific, others may be

correlated across different registrants and across time.[2907]  The financial statement disclosures

required by the final rules will provide investors with information to help assess which types of

climate-related physical risks are company-specific, and therefore diversifiable, and which are

not.  This will better equip investors to limit their portfolio-level exposure to non-diversifiable

climate-related physical risks by selecting companies less sensitive to any non-diversifiable risks

related to severe weather events and other natural conditions.

The value of this financial statement information to assessing risk exposure depends in

part on the extent to which past exposure to severe weather events or other natural conditions

---

[2907] *See* Acharya, *et al.*, *supra* note 2905 (finding "evidence that other dimensions of physical climate risk—estimated damages due to droughts, floods, hurricanes and sea level rise—have systematic asset pricing effects in these three asset classes. This is consistent with these risks being smaller economically and more idiosyncratic (i.e., diversifiable and/or insurable) compared to heat stress.").

Appellate Case: 24-1628     Page: 712     Date Filed: 03/26/2024 Entry ID: 5377362

predicts future exposure to those events or conditions.[2908]  For example, commenters questioned the benefits of disclosures related to physical risks given their view that there is inherent uncertainty of trends in exposure.[2909]  However, other commenters indicated that a better understanding of the impact of past severe weather events would help them assess a registrant's exposure to physical risks going forward, and some commenters highlighted the value of having quantitative estimates of impacts.[2910]  We agree that discussion of past impacts could be informative.  The required expenditure disclosures will help investors identify the relative magnitude of different risk trends in various types of risk over time.  Moreover, historical data may help investors assess a company's response to severe weather events or other natural conditions.  This will help investors assess a registrant's risk management and risk mitigation. This information will allow investors to better tailor their decisions to their own risk-tolerance.

In the context of the proposal, commenters expressed concern that these benefits will be lessened if reporting companies choose to apply the final rules in different ways.[2911]  For example, investors may mistakenly conclude that a registrant has a very high level of exposure to climate-related physical risks simply because the registrant takes a very inclusive approach to identifying "severe weather events or other natural conditions."  Different interpretations of

---

[2908]  *See, e.g.*, Harrison Hong, Neng Wang & Jinqiang Yang, *Mitigating Disaster Risks in the Age of Climate Change*, Nat'l Bur. of Econ. Rsch. Working Paper No. w27066 (2020) (concluding that past exposure predicts future exposure); letter from AEI (expressing the opposite view); *see also*, Michael Barnett *et al.*, *Pricing Uncertainty Induced by Climate Change*, 33 Rev. of Fin. Stud. 1024 (2020).

[2909]  *See, e.g.*, letter from AEI.

[2910]  *See, e.g.,* letters from RMI ("Especially for physical risks, losses incurred may be indicative of chronic risk exposure (e.g., assets in areas that are drought-prone or exposed to sea level rise), or they may stem from acute climate impacts . . . it will be important for investors to have the information necessary to assess forward-looking risk exposures."); Amer. Academy Actuaries ("Identification of material risks without sufficient quantitative disclosure of financial impact would not benefit investors, so investors want to understand the relative magnitude of various climate risks, track the size of various climate risks over time, and compare the climate risk of different registrants.").

[2911]  *See, e.g.*, letter from ACLI.

which "capitalized costs," "expenditures expensed," "charges," or "losses" are required to be disclosed by the final rules could similarly reduce the comparability benefits.[2912]  The final rules address this concern by narrowing the scope of the disclosures (as discussed below).  Any differences in application may be relatively benign or they may be used strategically to highlight or downplay certain aspects of the effects on the registrant's financial statements.  We expect the inclusion of these disclosures in the financial statements to mitigate these types of concerns, as the disclosures will be subject to ICFR and an audit by an independent registered public accounting firm.  Moreover, we believe the final rules' requirement to disclose contextual information, such as a description of significant inputs and assumptions used, significant judgments made, and if applicable, policy decisions made by the registrant to calculate the specified disclosures, alongside the expenditures disclosures should help to mitigate the concerns discussed above by providing additional transparency and facilitating comparability,[2913] although we note that some commenters were skeptical about the added value of contextual information in this respect.[2914]

Several commenters highlighted comparability concerns resulting from ambiguities and uncertainty related to the definition of transition activities and the proposal's approach to attribution.  For example, one commenter asked whether replacing a light bulb with an LED bulb would constitute a transition expense.[2915]  Another commenter asked how a registrant should

---

[2912]    *See, e.g.*, letter from Grant Thornton LLP ("The Final Rule should explain whether (a) capitalized costs consist only of costs associated with purchases of property, plant, and equipment, or (b) the definition is broader, including any costs initially recognized as a debit on the registrant's balance sheet, such as prepaid expenses.").

[2913]    *See* 17 CFR 210.14-02(a).

[2914]    *See, e.g.*, letter from ABA, Securities Law Comm.

[2915]    *See* letter from Amazon.

709

identify the portion of a cost that could be attributable to drought.[2916]  These hypotheticals, and many others raised by commenters, are addressed by limiting the financial statement disclosures to the capitalized costs, expenditures expensed, charges, and losses incurred as a result of severe weather events and other natural conditions and the capitalized costs, expenditures expensed, and losses related to carbon offsets and RECs (instead of requiring the disclosure of expenditures related to transition activities generally in the financial statements)[2917] and by the revised approach to attribution.  However, we recognize that some issuers will apply the final rules differently than others.  For example, several commenters pointed out that some registrants might consider a hurricane to be a severe weather event regardless of whether hurricanes are common to the area while others might base this assessment on whether a weather event is uncharacteristic or more severe than usual.[2918]  Although a more prescriptive requirement could increase comparability, it may do so at the expense of disclosure that is more decision-useful for investors for the reasons stated above.[2919]  We also expect comparability of the disclosures to improve over time as registrants gain more experience applying the disclosure thresholds and attribution standards and consensus emerges among registrants regarding best practices for compliance with the final rules.

In addition to reducing information asymmetry about the impact of severe weather events and other natural conditions, these disclosures will improve consistency and comparability

---

[2916]    *See* letter from ABA, Securities Law Comm.

[2917]    Although we are requiring disclosure of material expenditures incurred and material impacts on financial estimates and assumptions that (i) "in management's assessment, directly result from activities to mitigate or adapt to climate-related risks, including adoption of new technologies or processes" (*See* 17 CFR 229.1502(d)(2)); or (ii) "occur as a direct result of the target or goal or the actions taken to make progress toward meeting the target or goal." (*See* 17 CFR 229.1504(c)(2)).

[2918]    *See, e.g.*, letter from PwC.

[2919]    *See id.*

App.710

Appellate Case: 24-1628     Page: 715     Date Filed: 03/26/2024 Entry ID: 5377362

relative to registrants' current disclosure practices. We are unable to quantify these benefits, and we are cognizant that registrants will exercise discretion in making their disclosures. Nevertheless, we expect comparability of the disclosures to improve over time as consensus emerges among registrants on best practices for compliance with the final rules.

The benefits of the disclosures will also be reduced if the final rules result in disclosures that are not decision-useful to investors, for example if they represent a small portion of capitalized costs, expenditures expensed, charges, and/or losses. We believe that the final rules mitigate this risk by not requiring disclosure if the aggregate amount of the absolute value of the effects of severe weather events or other natural conditions is less than one percent of pretax income for income statement effects or of shareholders' equity for balance sheet effects.[2920] However, we recognize the possibility that these thresholds may nonetheless result in some disclosure of information that is not decision-useful for investors, depending upon the facts and circumstances of the particular company, especially for companies with limited pretax income or shareholders' equity. Some commenters took issue with the use of absolute values for determining whether the disclosure threshold is triggered, explaining that if the net effect of an event is not material, it is not clear why the positive and negative components would be material.[2921] Others had a contrary view and thought it was important to delineate the positive and negative effects to help protect against greenwashing.[2922] Many commenters viewed a one percent threshold in the context of the financial statement disclosure to be too low.[2923] The de

---

[2920] The choice of a 1% threshold is consistent with what the Commission currently uses in other contexts for disclosure of certain items within the financial statements (e.g., §§ 210.5-03.1(a) and 210.12-13).

[2921] *See, e.g.*, letter from Cemex.

[2922] *See, e.g.*, letter from ClientEarth.

[2923] *See, e.g.*, letter from Moody's.

Appellate Case: 24-1628    Page: 716    Date Filed: 03/26/2024 Entry ID: 5377362

minimis thresholds partially address this concern.  For example, we estimate that in 2022, the de minimis value of $100,000 exceeded one percent of the absolute value of pretax income for approximately 17 percent of companies and the de minimis value of $500,000 exceeded one percent of the absolute value of shareholders' equity for approximately 24 percent of companies.[2924]  Conversely, it is also possible that some disclosures that would have been decision-useful to investors may not meet the disclosure thresholds and therefore will not be required to be included in the note to the financial statements under the final rules.

The disclosure thresholds may also result in partial disclosures of the financial effects of severe weather events and other natural conditions.  For example, if a registrant exceeds the income statement threshold, but not the balance sheet threshold, it is only required to disclose expenditures expensed as incurred and losses on the income statement and it need not disclose the effects on the balance sheet, if any.  Some registrants may find it simplest to disclose how the severe weather event or natural condition affected both the income statement and balance sheet while others might limit their disclosure to the rules' requirements.  If so, the disclosures could lead to confusion about, for example, how and whether the severe weather event affected the financial statements for which disclosure is not required.  We acknowledge that in some circumstances this may result in investors only receiving a partial picture of the financial statement effects of a particular event or condition; however, we think that applying the disclosure threshold separately to the income statement and the balance sheet will be more straightforward for registrants to implement and therefore will help to limit the overall burden of the final rules.  To the extent this is a concern for an issuer, there is nothing in the final rules that would prevent a registrant from disclosing how the severe weather event or other natural

---

[2924]    Estimates are based on 2022 registrants (*supra* note 2578) and data from Compustat.

Appellate Case: 24-1628     Page: 717     Date Filed: 03/26/2024 Entry ID: 5377362

condition affected both the income statement and balance sheet, even if the disclosure threshold for one of the financial statements is not triggered.

Some commenters raised the possibility that the financial statement disclosures could confuse or distract investors from other factors that contribute meaningfully to the financial statements.[2925] We believe our decision to limit the scope of disclosure to expenditures resulting from severe weather events and other natural conditions should mitigate these concerns.[2926] Furthermore, the fact that the information is tagged in Inline XBRL will facilitate an investor's ability to extract and sort the information that the investor deems more useful.[2927]

Many commenters raised concerns about registrants' ability to isolate or attribute particular costs or expenses to severe weather events and other natural conditions or to transition activities, explaining it would be complicated and costly.[2928] We believe that this cost is largely mitigated by the attribution principle included in the final rules, which requires registrants to disclose the entire capitalized cost, expenditure expensed, charge, or loss, provided that a severe weather event or other natural condition was a "significant contributing factor" to incurring the expense.

The requirement in the final rules to disclose where in the income statement or the balance sheet the disclosed expenditures expensed, capitalized costs, charges, and losses are

---

[2925] *See, e.g.*, letter from API stating ("The flood of information and the presumed importance that would attach to it by virtue of the SEC's mandate could easily distract investors from equally important or more topically relevant material information that a registrant discloses.").

[2926] The final rules are not the only place where disaggregated disclosure is required. We note that U.S. GAAP and IFRS require the disaggregation of certain information on the face of the financial statements or in the notes to the financial statements. For example, FASB ASC Topic 220 In*come Statement – Reporting Comprehensive Income* requires the nature and financial effects of each event or transaction that is unusual in nature or occurs infrequently to be presented separately in the income statement or in the notes to the financial statements. *See* ASC 220-20-50-1.

[2927] *See infra* section IV.C.2.ix.

[2928] *See, e.g.*, letter from BOA.

presented could result in some incremental compliance costs. However, the expenditures expensed, capitalized costs, charges, and losses subject to disclosure are all captured in the books and records of the registrant and are measured and recognized in accordance with GAAP, such that concerns commenters raised about needing to develop and test new systems to track line-item impacts of climate-related expenses should be substantially mitigated under the final rules, relative to the proposed rules.[2929]

Many commenters expressed concerns with the proposed one percent disclosure thresholds as discussed in detail in section II.K.2.b.ii. Some of these commenters specifically highlighted that registrants would have challenges estimating or determining one percent of the individual line items before period end, which would require the tracking of all financial impacts and expenditures throughout the reporting period.[2930] In response to these commenters' feedback,[2931] the final rules do not require the disclosure of the proposed Financial Impact Metrics, which would have required the disclosure of financial impacts (and the determination of whether the disclosure threshold was met) on a line-by-line basis. Instead, the final rules focus on the disclosure of discrete expenditures and require the disclosure threshold to be calculated once for impacts to the income statement and once for impacts to the balance sheet using as the denominator income or loss before income tax expense or benefit and shareholders' equity or deficit, respectively. In addition to reducing the number of calculations that are necessary to determine whether disclosure is required as compared to the proposal, as discussed above in section II.K.3.c.ii, we believe that simplifying the threshold in this manner will give registrants

---

[2929]    *See, e.g.*, letter from Amer. Bankers.

[2930]    *See, e.g.*, letter from ABA, Securities Law Comm.

[2931]    *See* section II.K.c.2.

the ability to estimate the amount or magnitude of these denominators earlier in the fiscal year, as compared to the proposed rules. As a result, the burdens on registrants associated with the final rules will be much less than they would have been under the proposed disclosure thresholds. That said, we recognize that registrants may need to track their expenditures expensed, capitalized costs, charges, and losses incurred as a result of severe weather events throughout the year to comply with the final rules.

Any differences in application of the rules that are not fully addressed by subjecting the disclosures to third-party audits could also introduce some incremental legal and compliance costs. For example, registrants may face some litigation risk stemming from their classification of expenditures. As above, we expect some of these costs to decrease over time as registrants gain experience applying the final rules and best practices emerge for application of the final rules.

The final rules also require that a registrant disclose, as part of the required contextual information, recoveries resulting from severe weather events and natural conditions, if they are required to disclose capitalized costs, expenditures expensed, charges, or losses incurred resulting from the same severe weather events or natural conditions. This provision will allow investors to better understand the net impact of severe weather events.

Finally, the rules also require disclosure of expenditures expensed, capitalized costs, and losses resulting from the purchase and use of carbon offsets and RECs if carbon offsets or RECs have been used as a material component of a registrant's plans to achieve its disclosed climate-related targets or goals. As discussed in more detail in section IV.C.2.d, providing investors with disclosure regarding expenditures resulting from a registrant's purchase and use of carbon offsets and RECs will allow investors to better understand the registrant's approach to meeting its

App.715

targets or goals and any applicable requirements set by other regulators.[2932]  These disclosures could introduce some incremental compliance and audit costs, but we expect these costs to be relatively small as these expenditures expensed, capitalized costs, and losses are discrete and easily identifiable.

### ii.  Contextual Information, Historical Periods, and Other Requirements

The final rules require registrants to provide contextual information, to accompany the financial statement disclosures of expenditures expensed as incurred losses and resulting from severe weather events and other natural conditions, capitalized costs and charges resulting from severe weather events and other natural conditions, and, if carbon offsets or renewable energy credits or certificates have been used as a material component of a registrant's plants to achieve its disclosed targets or goals, the aggregate among of carbon offsets and renewable energy credits or certificates expensed, the aggregate amount of capitalized carbon offsets and renewable energy credits or certificates recognized, and the aggregate amount of losses incurred on the capitalized carbon offsets and renewable energy certificates or credits.[2933]  This information will explain the basis for the financial statement disclosures, including a description of any significant inputs and assumptions used, significant judgments made to calculate the disclosures, and other information that is important to an investor's understanding of the financial statement effects.  The rules further require that a registrant use financial information that is consistent with the scope of its consolidated financial statements and apply the same accounting principles that it is required to apply in the preparation of its consolidated financial statements.

---

[2932]    *See, e.g.*, letters from Amer. For Fin. Reform; and Sunrise Project *et al.*

[2933]    *See* 17 CFR 210.14-02(a).

Collectively, the inclusion of contextual information and the presentation of financial statement disclosures that are consistent with the rest of the financial statements should improve investors' ability to understand and compare registrants' financial statement effects. Several commenters agreed with this rationale for providing contextual information.[2934]

It is possible that some disclosures of contextual information may be of limited usefulness to investors in understanding the financial statement effects. Likewise, some registrants may provide disclosures with a level of detail that investors deem immaterial. Ultimately, the level of detail important to understand a particular registrant's disclosure of the financial statement effects and thus necessary for compliance with the final rules will depend on the specific facts and circumstances faced by that registrant. We therefore believe that the flexibility provided in the final rules achieves the benefits of eliciting disclosures that are both comparable and most likely to be relevant to investors' understanding of the registrant's financial statement disclosures, without imposing significant additional costs on registrants and the investors who use the disclosures. This conclusion is supported by commenters' reactions to the proposal, which were generally supportive of the requirement to provide contextual information.[2935]

In a change from the proposal, the final rules require the presentation of the financial statement disclosures on a prospective basis only. That is, the final rules require registrants to provide disclosure for the registrant's most recently completed fiscal year, and to the extent previously disclosed or required to be disclosed, for the historical fiscal year(s) included in the consolidated financial statements in the filing. This approach will lower the initial compliance

---

[2934]  *See, e.g.,* letters from Airlines for America; and IATA.

[2935]  *See* section II.K.6.a

costs of the rule, although investors will not immediately benefit from the ability to make year-over-year comparisons of the financial statement effects.

### iii. Financial Estimates and Assumptions

The final rules require registrants to disclose whether the estimates and assumptions the registrant used to produce the consolidated financial statements were materially impacted by exposures to risks and uncertainties associated with, or known impacts from, severe weather events and other natural conditions, such as hurricanes, tornadoes, flooding, drought, wildfires, extreme temperatures, and sea level rise, or any climate-related targets or transition plans disclosed by the registrant.[2936]

These disclosures will provide investors with information as to the sensitivity of the financial information to climate-related risks, as explained by some commenters.[2937]  Consider, for example, a registrant that recently disclosed a net-zero emissions target.  Investors could benefit from understanding how that target impacted the assumptions and estimates that went into the preparation of the registrant's financial statements.  This benefit, as well as any costs of the provision, will be lessened if registrants would have disclosed the impact of these events, conditions, targets, or plans on their financial estimates and assumptions regardless of the adoption of the final rules.[2938]

### iv. Inclusion of Climate-Related Disclosures in the Financial Statements

The required disclosures must be included in a note to the financial statements and thus audited by an independent registered public accounting firm in accordance with existing

---

[2936]  *See* 17 CFR 210.14-02(b)(h).

[2937]  *See, e.g.*, letter from IAA.

[2938]  *See, e.g.*, letter from TotalEnergies.

Commission rules and PCAOB auditing standards.[2939]  Subjecting these financial statement disclosures to reasonable assurance pursuant to an audit will subject these disclosures to the same financial statement audit and ICFR as similar financial disclosures, which will alleviate possible concerns about the consistency, quality, and reliability of the financial statement disclosures and thereby provide an important benefit to investors.[2940]  Assurance can increase the relevance and reliability of disclosures.[2941]  In addition, by including the required disclosures in the financial statements, they will be subject to a registrant's ICFR and the requirement for management to establish and maintain an adequate control structure and provide an annual assessment of the effectiveness of ICFR.[2942]  Furthermore, for AFs and LAFs, the registrant's independent auditor must attest to, and report on, management's assessment of the effectiveness of the registrant's ICFR.[2943]  Effective ICFR can reduce the risk of material misstatements to the financial statements and thereby enhance the reliability and improve investor confidence in the disclosure.

Inclusion of these disclosures in the financial statements will increase the compliance costs of the final rules as audit firms will need to apply sufficient appropriate audit procedures to the application of the rules to each registrant's circumstances.  However, we believe these increased costs will be limited because the final rules will require disclosure of capitalized costs, expenditures expensed, charges, and losses that are already required to be recorded in a

---

[2939]    *See* 17 CFR 210.14-01(a).

[2940]    *See* section II.K.1.

[2941]    *See* DeFond *et al.*, *supra* note 2880; V.K. Krishnan, *The Association Between Big 6 Auditor Industry Expertise and the Asymmetric Timeliness of Earnings*, 20 J. of Acct., Auditing and Fin. 209 (2005); W. Kinney & R. Martin, *Does Auditing Reduce Bias in Financial Reporting? A Review of Audit-Related Adjustment Studies*, 13 Auditing: A J. of Practice & Theory 149 (1994); K.B. Behn, J.H. Choi & T. Kang, *Audit Quality and Properties of Analyst Earnings Forecasts*, 83 Acct. Rev. 327 (2008).  Some commenters expressed similar views.  *See, e.g.,* letters from CAQ; Ceres; Impax Asset Mgmt.; San Francisco Employees' Retirement System; and UNEP-FI.

[2942]    *See* 17 CFR 210.13a-15, 210.15d-15.

[2943]    *See* 15 U.S.C. 7262.

App.719

Appellate Case: 24-1628     Page: 724     Date Filed: 03/26/2024 Entry ID: 5377362

registrant's financial statements.  The incremental compliance costs will be due to the requirement to separately disaggregate and disclose these costs, expenditures, charges, and losses in the notes to the financial statements.[2944]  Over time, we expect audits of these disclosures will become more streamlined and therefore the costs associated with these disclosures should also decrease.  We discuss these costs in detail in section IV.C.3.

### i. Structured Data Requirement

Under the final rules, the new climate-related disclosures will be required to be tagged in the Inline XBRL structured data language on a phased in basis.[2945]  The provision requiring Inline XBRL tagging of climate-related disclosures will benefit investors by making those disclosures more readily available for aggregation, comparison, filtering, and other enhanced analytical methods.[2946]  These benefits are expected to reduce search costs and substantially improve investors' information-processing efficiency.[2947]  Structured data requirements for public company financial statement disclosures have been observed to reduce information-processing costs, thereby decreasing information asymmetry and increasing transparency by

---

[2944]  The incremental costs include the disclosure of financial statement estimates and assumptions materially impacted by severe weather events and other conditions or disclosed targets or transition plans; however, we believe these incremental costs will be minimal.

[2945]  *See* 17 CFR 229.1508; 17 CFR 232.405.  LAFs must begin complying with the disclosure requirements in filings covering fiscal year 2025 and must comply with the tagging requirements in filings covering fiscal year 2026.  Other categories of filers must comply with the tagging requirements upon their initial compliance with the climate disclosure rules.  For example, AFs must comply with tagging requirements when they first provide climate disclosures in filings covering fiscal year 2026.  *See* section II.N.

[2946]  *See* Darren Bernard, Elizabeth Blankespoor, Ties de Kok & Sara Toynbee, *Confused Readers: A Modular Measure of Business Complexity* (June 15, 2023), available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4480309 (retrieved from SSRN Elsevier database) (developing an algorithm mimicking a sophisticated general user of financial statements by training it on a random sample of sentences with inline XBRL tags to understand a large corpus of numerical concepts based on surrounding text).

[2947]  The findings on XBRL cited in the following paragraphs are not necessarily focused on climate-related disclosures and metrics, but we expect the findings to be generally applicable and to result in similar benefits for investors.

Appellate Case: 24-1628     Page: 725     Date Filed: 03/26/2024 Entry ID: 5377362

incorporating more company-specific information into the financial markets.[2948]  In addition, the

Inline XBRL requirement for the climate-related disclosures will further limit agency problems,

as requirements for financial statement tagging have been observed to facilitate external

monitoring of registrants through the aforementioned reduction of information processing

costs.[2949]

Investors with access to XBRL analysis software may directly benefit from the

availability of the climate-related disclosures in Inline XBRL, whereas other investors may

indirectly benefit from the processing of Inline XBRL disclosures by asset managers and by

information intermediaries such as financial analysts.[2950]  In that regard, XBRL requirements for

---

[2948]   *See, e.g.*, Y. Cong, J. Hao & L. Zou, *The Impact of XBRL Reporting on Market Efficiency*, 28 J. Info. Sys. 181 (2014) (finding support for the hypothesis that "XBRL reporting facilitates the generation and infusion of idiosyncratic information into the market and thus improves market efficiency"); Y. Huang, J.T. Parwada, Y.G. Shan & J. Yang, *Insider Profitability and Public Information: Evidence From the XBRL Mandate* (working paper, 2019) (finding XBRL adoption levels the informational playing field between insiders and non-insiders; J. Efendi, J.D. Park & C. Subramaniam, *Does the XBRL Reporting Format Provide Incremental Information Value? A Study Using XBRL Disclosures During the Voluntary Filing Program*, 52 Abacus 259 (2016) (finding XBRL filings have larger relative informational value than HTML filings); J. Birt, K. Muthusamy & P. Bir, *XBRL and the Qualitative Characteristics of Useful Financial Information*, 30 Acct. Res. J. 107 (2017) (finding "financial information presented with XBRL tagging is significantly more relevant, understandable and comparable to non-professional investors"); S.F. Cahan, S. Chang, W.Z. Siqueira & K. Tam, *The Roles of XBRL and Processed XBRL in 10-K Readability*, J. Bus. Fin. Acct. (2021) (finding Form 10-K file size reduces readability before XBRL's adoption since 2012, but increases readability after XBRL adoption, indicating "more XBRL data improves users' understanding of the financial statements").

[2949]   *See, e.g.,* P.A. Griffin, H.A. Hong, J.B. Kim & J.H. Lim, *The SEC's XBRL Mandate and Credit Risk: Evidence on a Link Between Credit Default Swap Pricing and XBRL Disclosure*, 2014 American Accounting Association Annual Meeting (2014) (attributing the negative association between XBRL information and credit default swap spreads to "(i) a reduction in firm default risk from better outside monitoring and (ii) an increase in the quality of information about firm default risk from lower information cost"); J.Z. Chen, H.A. Hong, J.B. Kim & J.W. Ryou, *Information Processing Costs and Corporate Tax Avoidance: Evidence from the SEC's XBRL Mandate*, 40 J. Acct. Pub. Pol. (2021) (finding XBRL reporting decreases likelihood of company tax avoidance, because "XBRL reporting reduces the cost of IRS monitoring in terms of information processing, which dampens managerial incentives to engage in tax avoidance behavior").

[2950]   Additional information intermediaries that have used XBRL disclosures may include financial media, data aggregators and academic researchers.  *See, e.g.*, Nina Trentmann, *Companies Adjust Earnings for Covid-*

---

public company financial statement disclosures have been observed to increase the number of companies followed by analysts, decrease analyst forecast dispersion, and, in some cases, improve analyst forecast accuracy.[2951] Should similar impacts on the analysts' informational environment arise from climate-related disclosure tagging requirements, this will likely benefit retail investors, who have generally been observed to rely on analysts' interpretation of financial disclosures rather than directly analyzing those disclosures themselves.[2952]

With respect to the Inline XBRL tagging requirements, various preparation solutions have been developed and used by operating companies to fulfill their structuring requirements, and some evidence suggests that, for smaller companies, XBRL compliance costs have decreased

---

*19 Costs, But Are They Still a One-Time Expense?*, The Wall Street Journal (2020), available at https://www.wsj.com/articles/companies-adjust-earnings-for-covid-19-costs-but-are-they-still-a-one-time-expense-11600939813 (retrieved from Factiva database) (citing XBRL research software provider Calcbench as data source); *Bloomberg Lists BSE XBRL Data*, XBRL (2018), available at https://www.xbrl.org/news/bloomberg-lists-bse-xbrl-data/; R. Hoitash & U. Hoitash, *supra* note 2877. *See 2019 Pension Review First Take: Flat to Down*, Goldman Sachs Asset Management (2020) (an example of asset manager use of XBRL data), available at https://www.gsam.com/content/dam/gsam/pdfs/common/en/public/articles/2020/2019_Pension_First_Take.pdf (citing XBRL research software provider Idaciti as a data source).

[2951] See, e.g., A.J. Felo, J.W. Kim & J. Lim, Can XBRL Detailed Tagging of Footnotes Improve Financial Analy'ts' Information Environment?, 28 Int'l J. Acct. Info. Sys. 45 (2018); Y. Huang, Y.G. Shan & J.W. Yang, Information Processing Costs and Stock Price Informativeness: Evidence from the XBRL Mandate, 46 Aust. J. Mgmt. 110 (2020) (finding "a significant increase of analyst forecast accuracy post-XBRL"); M. Kirk, J. Vincent & D. Williams, From Print to Practice: XBRL Extension Use and Analyst Forecast Properties (working paper, 2016) (finding "the general trend in forecast accuracy post-XBRL adoption is positive"); C. Liu, T. Wang & L.J. Yao, XBRL's Impact on Analyst Forecast Behavior: An Empirical Study, 33 J. Acct. Pub. Pol. 69 (2014) (finding "mandatory XBRL adoption has led to a significant improvement in both the quantity and quality of information, as measured by analyst following and forecast accuracy"). But see S.L. Lambert, K. Krieger & N. Mauck, Analysts' Forecasts Timeliness and Accuracy Post-XBRL, 27 Int'l. J. Acct. Info. Mgmt. 151 (2019) (finding significant increases in frequency and speed of analyst forecast announcements, but no significant increase in analyst forecast accuracy post-XBRL).

[2952] *See, e.g.*, A. Lawrence, J. Ryans & E. Sun, *Investor Demand for Sell-Side Research*, 92 Acct. Rev. 123 (2017) (finding the "average retail investor appears to rely on analysts to interpret financial reporting information rather than read the actual filing"); D. Bradley, J. Clarke, S. Lee & C. Ornthanalai, *Are Analyts' Recommendations Informative? Intraday Evidence on the Impact of Time Stamp Delays*, 69 J. Fin. 645 (2014) (concluding "analyst recommendation revisions are the most important and influential information disclosure channel examined").

over time.[2953]  One commenter, in opposing the proposed Inline XBRL requirements, stated that the requirements would increase costs for registrants.[2954]  While we acknowledge that costs for registrants will increase as a result of the tagging requirements, this increase should be mitigated by the fact that filers subject to the final rules are already subject to Inline XBRL requirements for other disclosures in Commission filings, including financial statement disclosures and disclosures outside the financial statements.[2955]  As such, the final rules do not impose Inline XBRL compliance requirements on filers that would otherwise not be subject to such requirements, and filers may be able to leverage existing Inline XBRL preparation processes and/or expertise in complying with the climate-related disclosure tagging requirements.

Many commenters agreed that the proposed structuring requirement would enable more efficient data processing and more informed investment decisions.[2956]  One commenter noted

---

[2953]  An AICPA survey of 1,032 reporting companies with $75 million or less in market capitalization in 2018 found an average cost of $5,476 per year, a median cost of $2,500 per year, and a maximum cost of $51,500 per year for fully outsourced XBRL creation and filing, representing a 45% decline in average cost and a 69% decline in median cost since 2014.  *See* AICPA, XBRL Costs for Small Reporting Companies Have Declined 45%Since 2014 (2018), available at https://us.aicpa.org/content/dam/aicpa/interestareas/frc/accountingfinancialreporting/xbrl/downloadabledocuments/xbrl-costs-for-small-companies.pdf; *see also* letter from Nasdaq; Request for Comment on Earnings Releases and Quarterly Reports, Release No. 33–10588 (Dec. 18, 2018) [83 FR 65601 (Dec. 21, 2018)] (stating that a 2018 Nasdaq survey of 151 listed registrants found an average XBRL compliance cost of $20,000 per quarter, a median XBRL compliance cost of $7,500 per quarter, and a maximum, XBRL compliance cost of $350,000 per quarter in XBRL costs).

[2954]  *See* letter from Alliance Resource.

[2955]  *See* 17 CFR 229.601(b)(101); 17 CFR 232.405; *see also* 17 CFR 229.601(b)(104); 17 CFR 232.406 for requirements related to tagging cover page disclosures in Inline XBRL.  Beginning in July 2024, filers of most fee-bearing forms will also be required to structure filing fee information in Inline XBRL.  The Commission will provide an optional web tool that will allow filers to provide those tagged disclosures without the use of Inline XBRL compliance services or software*; see* 17 CFR 229.601(b)(107); 17 CFR 232.408; Filing Fee Disclosure and Payment Methods Modernization, Release No. 33-10997 (Oct. 13, 2021) [86 FR 70166 (Dec. 9, 2021)].

[2956]  *See* letters from Crowe LLP; Institute of Internal Auditors; Data Foundation; Arcadia Power, Climate & Company; MovingWorlds; Rho Impact; Trakref; Bloomberg; London Stock Exchange Group; Morningstar; MSCI; AIMCo *et al.*; CalPERS; Can. Coalition GG; Church Investment Group; CII; PRI; SCERS; Treehouse Invest.; Research Affiliates; Cedar Street Asset Management; Ceres; Corbel Capital Partners; Decatur Capital Management; Nordea Asset Management; Ethic; First Eagle; Impact Capital Managers; ICI; ICSWG; Liontrust; Nipun Capital; and Prime Buchholz.

that tagging the new disclosures in Inline XBRL would, by allowing the disclosed information to be more readily incorporated into investors' analyses, promote the efficiency of the U.S. capital markets.[2957] Another commenter stated that tagging the new disclosures would offer significant benefits to both institutional and retail investors.[2958] A different commenter indicated that the tagging requirement should enable investors to compare the adequacy of risk analysis and mitigation planning among registrants in the same economic sector.[2959]

One commenter questioned the benefits of requiring the new disclosures to be structured by asserting that investors and market participants who need to extract and analyze the disclosures required under subpart 1500 of Regulation S-K can perform the same search manually by using the appropriate Item reference as is done for current searches.[2960] However, the availability of such disclosures in a machine-readable form will allow for search and retrieval of disclosures on an automated, large-scale basis, greatly increasing the efficiency of information acquisition as compared to manual searches through unstructured formats.[2961]

Other commenters expressed concern that the potential for excessive use of extensions (i.e., custom tags) would detract from the aforementioned benefits of structured data.[2962] We agree that the inappropriate use of custom tags hinders the benefits of tagging. However, we do not believe the final rules will result in an excessive use of custom tags, because filers will be

---

[2957] *See* letter from Climate Advisers.

[2958] *See* letter from CFA.

[2959] *See* letter from IATP.

[2960] *See* letter from AFPM.

[2961] *See, e.g.*, Joung W. Kim & Jee Hae Lim, *The Impact of XBRL-tagged Financial Notes on Information Environment*, The 2015 Annual Summer/International Conference-Korean Accounting Association (2015) (finding block and detail tagging of financial statement footnotes in XBRL filings improve the readability of 10-K filings and the explanatory power of certain accounting figures like net income and book value of equity on stock price).

[2962] *See* letters from BHP; Morningstar; and Ethic.

prohibited from using custom tags unless there is no suitable standard tag for their disclosure in the related climate taxonomy, which the Commission will publish before the tagging compliance date.[2963] The climate taxonomy will contain standard tags that cover each new disclosure provision, so we do not expect custom tagging for climate disclosures will be excessive. Also, as discussed above, the one-year transition period for tagging requirements will enable the climate taxonomy development process to leverage samples of climate disclosures in Commission filings to further build out the list of standard tags and adapt to common disclosure practices. This should further reduce the likelihood of excessive custom tags and thus improve data quality.[2964] Such improvement in data quality will come at the cost of data users having one less year of tagged climate disclosures, making the climate disclosures filed during that year more difficult to analyze efficiently.

### 3. Quantifiable Direct Costs on Registrants

In this section, we attempt to quantify the direct costs of compliance for registrants that will be impacted by the final rules.[2965] These costs could be incurred internally (*e.g.,* through employee hours or hiring additional staff) or externally (*e.g.,* via third-party service providers, such as auditors or consultants).

Our estimates are informed, in part, by feedback we received from public comment letters. As discussed below, however, commenters offered a wide range of cost estimates, suggesting that there is significant heterogeneity when it comes to expected compliance costs

---

[2963] *See* 17 CFR 232.405(c)(1)(iii)(B). Studies have found informational benefits resulting from the proper use of custom tags. *See, e.g.*, Joseph Johnston, *Extended XBRL Tags and Financial Analysts' Forecast Error and Dispersion*, 34 J. of Info. Sys. 105 (Sept. 2020) (finding custom tags to be "robustly negatively related to analysts' forecast error and dispersion").

[2964] *See supra* section II.O.

[2965] *See supra* section IV.C.1.b.

among registrants, and such estimates may not provide a representative view of the costs of compliance for all affected registrants.

The cost estimates submitted by commenters varied considerably depending on a given company's size, industry, complexity of operations, and other characteristics. This variability adds to the challenges in estimating compliance costs. Additionally, many commenters provided aggregate cost estimates that did not include certain elements required by the final rules, or included other elements that are not required in the final rules,[2966] without providing a breakdown of the component costs. Without a breakdown of component costs, it is difficult to use these cost estimates to quantify the direct cost of the final rules. Furthermore, changes from the proposal, often in response to commenter concerns about costs, will result in corresponding differences in the anticipated cost of the final rules as compared to the proposal.[2967] Nonetheless, we have endeavored below to factor these comments into our analysis to determine registrants' approximate cost of compliance with the final rules.

### a. Comments and data on direct cost estimates of the proposed rules

In the Proposing Release, the Commission requested comment on all aspects of its economic analysis, including the potential costs and benefits of the proposed rules and alternatives, and whether the proposed rules, if adopted, will promote efficiency, competition, and capital formation or have an impact on investor protection.[2968] The Commission specifically

---

[2966] Commenters' estimates that include the cost of voluntarily undertaking a specific activity (e.g., the costs of setting targets or goals, formulating transition plans, or conducting scenario analysis) may not be indicative of the compliance costs of the final rules since the final rules do not necessarily require the undertaking of such activities, but rather require only the attendant disclosures in certain cases.

[2967] For example, as compared to the proposed rules, the final rules include a number of changes intended to reduce the burden of the Regulation S-X disclosure requirements and do not require Scope 3 emissions reporting.

[2968] *See* Proposing Release, section IV.G.

requested empirical data, estimation methodologies, and other factual support for commenters' views, in particular, on costs and benefits estimates.[2969]

We received many comments asserting that the direct costs imposed by the proposed rules would be much greater than the Commission estimated.[2970]  Many letters from individual companies and industry groups provided quantitative estimates of the cost to comply with the proposed rules that were considerably higher than the estimates included in the Proposing Release.[2971]  One commenter conducted a survey of 263 public companies between April and June 2022.[2972]  Seventy-nine percent of non-SRC respondents in this survey asserted that the Commission under-estimated the costs of compliance with the proposed rules.  Seventy-three percent of survey participants responded that their compliance costs under the proposed rules would exceed the Commission's estimates in the Proposing Release, with 41 percent of respondents stating that the compliance costs would exceed $1 million on an ongoing basis.[2973]  Another commenter, a biotechnology trade association, surveyed its members and found that 56 percent of respondents expected that the proposed rules would be more expensive than the Commission's estimates, with 40 percent indicating it would cost between $0.5 and $1.0 million.[2974]  Additionally, a survey of corporate executives indicated that 61 percent of

[2969] *See id.*

[2970] *See, e.g.,* letters from Soc. Corp. Gov. (June 17, 2022); Chamber; Business Roundtable; S.P. Kothari, *et al.*; Biotechnology Innovation Organization; Committee on Corporate Reporting; American Automotive Leasing Association (AALA); America Car Rental Association; Truck Renting and Leasing Association (TRALA); AEPC. Some commenters also critiqued our PRA analysis, asserting that it used the wrong cost of labor and did not include the costs to non-registrants.  *See* letter from the Heritage Foundation.

[2971] *See, e.g.,* letters from Soc. Corp. Gov. (June 17, 2022); RILA; NRF; ConocoPhillips; API; PPL Corporation; Nutrien; and Chamber.

[2972] *See* letter from Nasdaq.

[2973] *Id.*  Twelve percent of the participants in the survey were SRCs.

[2974] *See* letter from Biotechnology Innovation Organization.

respondents expect that the proposed rules would impose $750,000 or more in first year compliance costs.[2975]  Some commenters specifically identified the GHG emissions reporting and Regulation S-X provisions of the proposed rules as likely to impose large cost burdens on both registrants and potentially on non-registrants.[2976]

To help assess the direct costs of the final rules, we conducted a detailed review of compliance cost estimates from commenters and other public sources.  The nature of the cost information ranged from survey results, estimates directly from identifiable companies, estimates of anonymous companies, and general estimates, either based on industry experience, fees for related services, or derived as part of similar rulemaking processes in other jurisdictions.  We describe below the cost estimates provided in these letters and other sources.

One commenter provided cost information from seven large-cap companies in various industries on their current voluntary climate-reporting practices, which vary in their degrees of alignment with the proposed or final rules.[2977]  The responses varied considerably regarding the reporting activities, disclosure elements, and costs.  The number of staff required to produce the voluntary disclosures ranged from two to 20 full-time equivalents ("FTEs").  Reported employee hours for climate reporting (including TCFD reporting) ranged from 7,500 to 10,000 hours

---

[2975]  PwC, *Change in the Climate: How US business leaders are preparing for the SEC's climate disclosure rule* (2023), available at https://www.pwc.com/us/en/services/esg/library/sec-climate-disclosure-survey.html (discussing survey, conducted between Dec. 2022 and Jan. 2023, that solicits the views of 300 executives at U.S.-based public companies with at least $500 million in annual revenue with respect to the proposed rules).

[2976]  *See, e.g.*, letter from Chamber.  Concerns about burdens for non-registrants were mostly focused on the proposed rules' Scope 3 GHG emissions disclosure requirements.  The final rules do not require disclosures of Scope 3 emissions.

[2977]  *See* letter from Soc. Corp. Gov (June 11, 2022), referencing a comment it submitted in response to Acting Chair Allison Herren Lee's request for public input on climate disclosures.  *See* Acting Chair Allison Herren Lee Public Statement, *Public Input Welcomed on Climate Change Disclosures*, available at https://www.sec.gov/news/public-statement/lee-climate-change-disclosures.  Comment letters in response to this request are available at https://www.sec.gov/comments/climate-disclosure/cll12.htm.

annually. One company reported spending 9 months to prepare its TCFD report and 4 months responding to the CDP questionnaire. Commonly cited external advisory services include environmental engineering consultants; emissions, climate science, and modeling consultants; outside counsel; and sustainability or sustainability reporting consultants, with costs ranging from $50,000 to $1.35 million annually. Third-party assurance costs ranged from $10,000 to $600,000. One company reported that it incurred initial costs of approximately $1.3 million to establish a baseline for SASB and TCFD reporting, while another company estimated that new or enhanced systems, controls, audit, and other costs associated with any additional disclosure requirements would be over $1 million.

The same commenter submitted another letter presenting detailed annual cost estimates from 13 companies (11 large-cap, 1 mid-cap, and 1 small-cap).[2978] Similar to their first comment, the responses displayed considerable variation with respect to current disclosure scope, granularity, and reported costs. Specific estimates of initial costs to comply with the proposed rules included $5 to $10 million,[2979] $6 million (with $4 to $5 million in ongoing costs),[2980] $10 million (with "much of it recurring"),[2981] and $650,000 to $1.5 million (with $650,000 in ongoing costs).[2982] In many cases, the reported costs in this comment letter aggregated several different disclosure items and related activities without providing a cost

---

[2978] *See* letter from Soc. Corp. Gov (June 17, 2022). The commenter acknowledges that these companies are "not the norm. They represent a discrete subset of predominantly larger companies that have undertaken these reporting efforts voluntarily and generally reflect a much greater level of maturity in climate-related reporting than the average company."

[2979] *Id. See* Company 1 (large-cap company).

[2980] *Id. See* Company 2 (large-cap company). Throughout this release, "ongoing costs" refer to recurring costs on an annual basis.

[2981] *Id. See* Company 3 (large-cap company).

[2982] *Id. See* Company 4 (small-cap company).

Appellate Case: 24-1628     Page: 734     Date Filed: 03/26/2024 Entry ID: 5377362

breakdown.  In other cases, costs were much more specific.  For example, some companies reported their costs of measuring emissions.  One small-cap company estimated $300,000 annually in internal staff time for its Scope 1 emissions data collection and reporting.  This letter also included the aggregate ongoing costs of measuring Scope 1, Scope 2, and some Scope 3 emissions[2983] from three different companies. These companies' respective estimates are $200,000,[2984] $75,000,[2985] and 188 internal hours.[2986]  Other specific cost estimates included assurance (ranging from $10,000 to $550,000, depending on the scope and level of assurance), external consultants (ranging from $55,000 to $990,000), and other activities related to sustainability reporting.

A public report presents detailed climate-related reporting cost estimates from three anonymous companies.[2987]  One company, a large-cap financial institution, reported that the cost of issuing their first TCFD report was less than $100,000 and that annual ongoing costs for responding to the CDP questionnaire is likewise less than $100,000.  Another company, a mid-cap waste management company, stated that the cost of producing their first TCFD and SASB report were both less than $10,000.  This company reported that its total annual employee costs associated with climate disclosure are approximately $12,600.  It also reported incurring annual third-party costs between $60,000 to $160,000 to "develop [its] corporate sustainability report

---

[2983]   Disclosing "some Scope 3 emissions" generally means that the commenter discloses some—but not all—categories of Scope 3 emissions.  For example, one company "discloses Scope 1 and Scope 2 and some Scope 3 (fuel and energy-related activities, business travel, and use of sold products) GHG emissions…" *See* letter from Soc. Corp. Gov (June 17, 2022).

[2984]   *Id.  See* Company 9 (large-cap company).

[2985]   *Id.  See* Company 11 (large-cap company).

[2986]   *Id.  See* Company 10 (large-cap company).

[2987]   *See* L. Reiners & K. Torrent, *The Cost of Climate Disclosure: Three Case Studies on the Cost of Voluntary Climate-Related Disclosure*, Climate Risk Disclosure Lab (2021), available at https://econ.duke.edu/sites/econ.duke.edu/files/documents/The%20Cost%20of%20Climate%20Disclosure. pdf. This source was also reviewed as part of the proposed rules.  *See* Proposing Release, section IV.C.2.a.

and microsite, both of which contain GHG climate-related information." This company estimates the cost of producing voluntary climate-related disclosures to be less than 5 percent of its total SEC compliance-related costs. The remaining company, a large-cap industrial manufacturing company, reported that the combined cost of producing its first TCFD, SASB, and GRI disclosures amounted to between $250,000 and $350,000 (without providing a breakdown of component costs), while the cost of responding to its first CDP questionnaire was less than $50,000. This company reported that it also spent $400,000 annually for third-party auditors and consultants that provide support in the company's climate disclosure efforts.

Another commenter provided the results of a survey, conducted from February to March 2022, of corporate issuers and institutional investors ( "ERM survey").[2988] The results reflect the responses of 39 issuers, of which 29 were LAFs.[2989] The ERM survey presents issuers' average annual costs in seven categories: GHG analysis and/or disclosures ($237,000);[2990] climate scenario analysis and/or disclosures ($154,000);[2991] additional climate-related analysis and/or

---

[2988] *See* ERM survey, *supra* note 2670. The 39 issuers included the following industries: healthcare and pharmaceuticals; financials, insurance, and professional services; consumer discretionary products; communication services; transportation, construction, and industrials; consumer staples; oil, gas, and energy; utilities; real estate; metals, plastics, and other raw material; and information technology.

[2989] *See id.* Respondent market capitalizations ranged from less than $300 million to more than $200 billion, with the highest proportion of respondents (34%) having a market capitalization between $10 billion and $50 billion.

[2990] This survey category includes all costs relating to the development of GHG inventories with analysis and disclosure of Scope 1, Scope 2, and/or Scope 3 emissions.

[2991] This survey category includes all costs to issuers related to conducting assessments of the impact of climate risks in the short-, medium-, or long-term using scenario analysis as well as TCFD/CDP disclosure of risks and opportunities. Respondents were asked to exclude from this category any costs that they included in their costs of GHG emissions analysis and disclosures.

Appellate Case: 24-1628    Page: 736    Date Filed: 03/26/2024 Entry ID: 5377362

disclosures ($130,000);[2992] internal climate risk management controls ($148,000);[2993] proxy responses to climate related proposals ($80,000); assurance/audits related to climate ($82,000); and other climate-related disclosure costs not covered by the previous six categories ($76,000).

We also reviewed annual cost estimates associated with existing climate-related disclosure policies in the U.K. In 2021, the U.K. Financial Conduct Authority ("FCA") adopted a comply-or-explain disclosure rule ("FCA rule"), which originally applied only to commercial companies with a U.K. premium listing[2994] but, effective 2022, was subsequently expanded to include issuers of standard listed shares.[2995] The U.K. Department for Business, Energy, and Industrial Strategy ("BEIS") adopted a similar—albeit mandatory—disclosure rule ("BEIS

---

[2992] This survey category includes additional voluntary climate-related analyses and disclosures for processes largely disconnected from current and proposed climate-related disclosures such as outreach, engagement, and management.

[2993] This survey category includes costs for internal climate risk management controls, namely the costs related to integrating climate risk into enterprise risk management, oversight at the board level, strategic planning, internal audit, and other fundamental business processes. In addition, this category includes issuer costs related to climate-related data collection and aggregation, including IT costs and staff time; internal review of climate-related data collection by management, board committees, and the board; in-house counsel drafting; and review by outside counsel.

[2994] *See* FCA, Policy Statement PS20/17, *Proposals to Enhance Climate-related Disclosures by Listed Issuers and Clarification of Existing Disclosure Obligations* (Dec. 2020), available at https://www.fca.org.uk/publication/policy/ps20-17.pdf. This document states that the rule would apply to 480 companies that have a premium listing. A premium listed company is a company listed on the London Stock Exchange that is subject to more stringent compliance and disclosure requirements in addition to the minimum standards outlined in the UK provisions that implemented the EU Consolidated Admissions and Reporting Directive (CARD) and the EU Transparency Directive.

[2995] *See* FCA, Consultation Paper CP21/18, *Enhancing Climate-related Disclosures by Standard Listed Companies and Seeking Views on ESG Topics in Capital Markets* (June 2021), available at https://www.fca.org.uk/publication/consultation/cp21-18.pdf. Cost estimates of the FCA rule are sourced from this document. *See also* FCA, Policy Statement PS21/23, *Enhancing Climate-related Disclosures by Standard Listed Companies* (Dec. 2021). This rule applies to 244 issuers: 148 issuers of standard listed equity shares as well as 96 additional issuers (i.e., standard listed issuers of Global Depository Receipts and standard listed issuers of shares other than equity shares, excluding standard listed investment entities and shell companies). A standard listed company is a company listed on the London Stock Exchange that is subject to the minimum standards outlined in the UK provisions that implemented the EU Consolidated Admissions and Reporting Directive (CARD) and the EU Transparency Directive.

rule"), also effective 2022,[2996] that was previously used to inform the Commission's cost estimates of the proposed rules.[2997]  The BEIS rule generally applies to companies that have over 500 employees and/or a turnover of more than £500 million.[2998]  Both rules exhibit significant overlap as they are both largely based on the TCFD framework's major components, including disclosure on governance, strategy, and risk management, all of which have similar counterparts in the final rules.  Both UK rules also include scenario analysis and metrics and targets; however, because undertaking these activities is not required under the final rules (only their disclosure in specific circumstances), we focus on the cost estimates of the other components that are more relevant to the final rules.[2999]

One-time implementation costs—which consist of "familiarization costs" and "legal review"—are estimated to be $19,543[3000] by the BEIS and $15,147 by the FCA.  The BEIS rule

---

[2996]  U.K. Final Stage Impact Assessment, Mandating Climate-related Financial Disclosures By Publicly Quoted Companies, Large Private Companies and Limited Liability Partnerships (LLPs) (2021), available at https://assets.publishing.service.gov.uk/government/uploads/system/uploads/attachment_data/file/1055931/tcfd-final-stage-ia.pdf ("BEIS Final Stage Impact Assessment").  Cost estimates of the BEIS rule (with the exception of familiarization costs) are sourced from this document.

[2997]  *See* Proposing Release, section IV.C.2.a, which also reviews the BEIS rule (referred to as the "UK Impact Assessment" in the Proposing Release).  The estimated costs of the BEIS rule, as outlined in the following paragraphs, are the same as those presented in the proposed rules, with the exception of applying an updated exchange rate to convert the costs from GBP to USD.

[2998]  Specifically, the BEIS rule applies to relevant Public Interest Entities ("PIEs"), including UK Premium and Standard listed companies with over 500 employees, UK registered companies with securities admitted to the Alternative Investment Market with more than 500 employees, limited liability partnerships with over 500 employees and a turnover of over £500 million, and UK registered companies that are not included in the categories above and that have over 500 employees and a turnover of over £500 million.

[2999]  The following cost estimates from the BEIS and FCA reflect internal labor costs with the assumption that affected entities have no pre-existing climate-related disclosure practices that fulfill the stated requirements.  The costs are converted from GBP to USD using the 2022 average exchange rate of $1.2369 USD/GBP.

[3000]  The familiarization cost component is sourced from the BEIS Consultation Stage Impact Assessment (as opposed to Final Stage), which assumes that scenario analysis requirements are not part of the familiarization process, and thus may be a relatively better representation of the corresponding cost with respect to the final rules.  The familiarization cost is estimated to be £12,600.  *See* BEIS Final Stage Impact Assessment2996.  The other initial cost related to legal review (£3,200), as outlined in the BEIS Final Stage Impact Assessment, is added to obtain £15,800 ($19,543).  *See supra* note 2996.

Appellate Case: 24-1628     Page: 738     Date Filed: 03/26/2024 Entry ID: 5377362

presents first-year cost estimates of complying with climate-related disclosures associated with Governance ($11,256),[3001] Strategy ($16,080),[3002] and Risk Management ($13,359),[3003] for a combined total of $40,694, which is assumed to remain the same in subsequent years. This contrasts with the FCA's corresponding first-year costs of $183,028 and ongoing costs of $86,270 for larger issuers.[3004] The FCA rule also estimates costs for small and medium-sized issuers, with corresponding costs of $137,271 in the first year and $64,702 in subsequent years.

These estimates from the FCA and BEIS rules help to inform our assessment of the compliance costs of similar provisions of the final rules amending Regulation S-K, as our approach for these provisions is based, in part, on the TCFD recommendations. However, it is important to note that these estimates are intended to reflect compliance costs of the typical company within the designated sample of affected entities and are conditional upon several assumptions regarding the number of required staff, the rank or title of the staff, the required labor hours, and local wage data. Actual costs can vary significantly depending on company characteristics, such as company size, industry, business model, the complexity of the company's corporate structure, existing climate-related disclosure practices, and internal expertise, etc.

---

[3001]   Governance costs include the ongoing cost to those in scope to implement, document and disclose governance of their climate related risks and opportunities and to coordinate across internal business functions.

[3002]   Strategy costs include the ongoing reporting costs to those entities in scope of internally coordinating, documenting and disclosing climate-related risks and opportunities the company has identified, as well as reporting the impact of these risks on the company's business, strategy, and financial planning. This estimate does not include scenario analysis, which is discussed separately in a later paragraph.

[3003]   Risk management costs are the ongoing annual costs to those entities in scope to disclose the company's management of climate-related risks, including the coordination across functions internally, identification and assessment of risks and their integration into the company's overarching risk-management strategy. This also includes the time taken to identify and analyze major risk exposures in the context of the company's business strategy.

[3004]   The FCA presents aggregated costs for governance, strategy, and risk management disclosure instead of individual costs for each of the aforementioned disclosure categories. The cost discrepancy relative to the BEIS rule is primarily driven by significantly different assumptions of internal labor requirements, such as the number of employees, salaries, and required hours.

Another commenter provided cost estimates reported by an anonymous company, referred to as a "Well-known seasoned issuer."[3005] This company, which has made TCFD-aligned disclosures public on its website (including Scope 1, Scope 2, and Scope 3 emissions disclosures) estimated that, combined with the amounts the company currently spends on voluntary climate disclosure, the company would need to spend a total of approximately $35 million over five years to implement climate-related reporting in order to comply with the proposed rules, if adopted as proposed. Within this amount, the company estimates one-time expenses of $19 million and recurring expenses averaging $3.1 million per year. The primary categories of expenses are audit fees, professional services, subscriptions, labor, licenses, and training. The company estimates that compliance with the provisions amending Regulation S-X, as proposed, would have initial costs of $1.5 million to $2.0 million and subsequent ongoing costs of $1.0 million to $2.0 million annually. The company also estimated compliance costs for the proposed Scope 3 emissions disclosure to be $15.6 million over five years, with a significant part of this cost attributable to attestation requirements and with "filing" Scope 3 information.[3006]

Several letters from professional trade or industry organization also provided cost estimates. One commenter stated that the "cost of registrants trying to report in alignment with just certain aspects of TCFD for their first time on a voluntarily basis can be around $500,000…. The actual cost for complete alignment to TCFD could be up to $1,000,000 per registrant over several years," which does not include the annual cost associated with preparing for and conducting attestation.[3007] Another commenter said that based on member feedback, the "true

---

[3005] *See* letter from Chamber.

[3006] *See* letter by API. We note that the proposed rules would not have imposed any attestation requirements with respect to Scope 3 emissions disclosure.

[3007] *See* letter from AEPC.

Appellate Case: 24-1628     Page: 740     Date Filed: 03/26/2024 Entry ID: 5377362

initial set up and ongoing compliance costs for a typical retailer will be more than 35 times the amount that the SEC has estimated....Members estimate that the initial costs of implementing the proposed rules would be somewhere in the $5 million to $15 million range."[3008]  Other commenters estimated the initial cost of complying with the proposed amendments to Regulation S-X would exceed $100 million.[3009]  One commenter estimated that the combined costs of "complying with the reporting requirements under S-X and S-K would cost companies $3 to $7 million annually."[3010]

One commenter included cost estimates provided by members of its trade association with respect to their on-going efforts, prior to the proposed rules, in measuring GHG emissions.[3011]  One member reported that an average automated GHG measuring system would cost $250,000 to purchase and set up, with ongoing annual costs of approximately $100,000. Another member reported that "completing questionnaires and conducting emissions measurements through an automated GHG measuring program with applicable audits costs the company about $15,000 per year to maintain."  Another member company's mature Scope 1 and 2 emissions reporting programs resulted in 100 to 200 resource hours per year.

Several individual registrants also provided cost estimates of either their own current climate-reporting practices or expected practices if the proposed rules were adopted as proposed. One multinational registrant that engages in hydrocarbon exploration and production estimated that initial compliance costs with respect to the proposed rules would range from $100 to $500

---

[3008]   *See* letter from RILA.

[3009]   *See* letters from Western Energy Alliance (suggesting initial compliance costs to be "over $100 million for large companies when considering not just the new systems but the staff training required") and API (without specifying whether the $100 million figure reflects implementation costs or ongoing annual costs).

[3010]   *See* letter from National Retail Federation.

[3011]   *See* letter from IDFA.

million.[3012]  This registrant expressed concerns about the burden of complying with the proposed rules, particularly with the proposed amendments to Regulation S-X. This registrant estimated ongoing costs to be $10 to $25 million annually.  One energy company noted that it expected compliance costs to be at least four to five times the estimates provided in the Proposing Release, primarily due to the necessary increases in staff and the added costs in auditing and attestation fees.[3013]  Other energy companies estimated that compliance with the proposed amendments to Regulation S-X and reporting Scope 3 emissions would likely exceed $100 million[3014] and $1 million,[3015] respectively.

Another commenter, a multinational energy company, estimated its internal burden hours for Scope 3 emissions reporting to be 650 hours in the first year and 100 hours annually in subsequent years.[3016]  A different commenter reported that it allocates one full-time consultant and 20 employees working part time each year from November to March as part of its process to measure Scope 1, Scope 2, and some Scope 3 emissions, collect and validate data, estimate and review emissions, and obtain third-party limited assurance for GHG-related data in its sustainability report.[3017]  Another commenter that already tracks some Scope 1 emissions estimated that it may incur an additional cost of $10,556,800 or more to track and report Scope 1 emissions from additional facilities as a result of the proposed rules.[3018]  A multinational

---

[3012]    *See* letter from ConocoPhillips.

[3013]    *See* letter from PPL Corporation.

[3014]    *See* letter from Western Energy Alliance.

[3015]    *See* letter from Williams, Inc.

[3016]    *See* letter from Ørsted.

[3017]    *See* letter from Air Products and Chemicals, Inc.

[3018]    *See* letter from Energy Transfer LP.  This commenter derived this cost based on estimates from the EPA's mandatory GHG reporting rule.  *See Mandatory Reporting of Greenhouse Gases*, 74 Fed. Reg. 56, 260, 363 tbl. VII-2 (Oct. 30, 2009).  This commenter estimated this cost to be $7,000,000 in 2006 dollars, which was adjusted for inflation to obtain $10,556,800 in 2023 dollars.

Appellate Case: 24-1628    Page: 742    Date Filed: 03/26/2024 Entry ID: 5377362

fertilizer company estimated that the direct and indirect costs of compliance with the proposed rules would be between $35 million and $55 million, with assurance costs related to financial statement metrics estimated to be $70,000 to $225,000 annually.[3019]

We also reviewed memoranda of staff meetings with external parties that further inform our assessment of the final rules' compliance costs.[3020] One organization presented pricing information for the following relevant services provided: TCFD reporting, excluding measuring emissions and establishing targets ($100,000 average); assessing Scopes 1, 2, and 3 emissions ($75,000 to $125,000); and target setting ($20,000 to $30,000).[3021] A different organization indicated fees would range from $11,000 to $105,000 for services related to GHG accounting (Scopes 1, 2, and 3 emissions).[3022] Another organization estimated that costs for assessing Scopes 1 and 2 emissions would range between $25,000 and $45,000 and assessing Scopes 1, 2, and 3 emissions would cost between $50,000 and $125,000, depending on whether a given company already has emissions-measuring systems and processes in place.[3023]

---

[3019] *See* letter from Nutrien. This estimate includes costs associated with conducting scenario analysis and including the related information in public disclosures; measuring and reporting Scope 1 and 2 emissions by each GHG, obtaining reasonable assurance on Scope 1 and 2 emissions by each GHG; measuring and reporting Scope 3 emissions by each GHG for public disclosure subject to DCP; and disclosure of the proposed Financial Impact Metrics within the audited financial statements, among other proposed disclosures. These costs include internal costs, external professional service fees, and additional systems and internal control processes that the commenter indicated would need to be designed and operating effectively for public disclosure of high-quality information.

[3020] The meeting memoranda are available at the same location as the comment letters in response to the Proposing Release. *See supra* note 19. Some of these meetings occurred prior to the Proposing Release and thus any data included in the memoranda do not reflect specific details of the proposed rules; however, we have considered these memoranda as part of this assessment as they contain relevant cost information.

[3021] *See* Memorandum Concerning Staff Meeting With Representatives of S&P Global (Feb. 4, 2022); *see also* Proposing Release, *supra* note 1027.

[3022] *See* South Pole Memo; *see also* Proposing Release, note 1037. These numbers have been converted from EUR based on the 2022 average exchange rate of $1.0538 USD/EUR, rounded to the nearest $100.

[3023] *See* Memorandum Concerning Staff Meeting with Representatives of Persefoni (Nov. 30, 2021); *see also* Proposing Release, at n. 1036.

738

The cost information in the above sources indicates the variance and the scale of compliance costs the proposed rules would have imposed on registrants. We note, however, that many of the estimates combine the costs of multiple components without providing a breakdown of component costs, which makes it difficult to isolate only the components that are applicable to the proposed or final rules. Furthermore, these voluntary cost estimates may reflect some selection bias such that they may be skewed toward a certain demographic (e.g., large-cap companies) and thus may not be representative of the broad sample of affected registrants. Finally, to the extent that the cost estimates are specific to the proposed rules, they do not account for the changes made to the final rules. For example, the final rules' requirements with respect to financial statements have been narrowed relative to the proposed rules.[3024] In addition, the final rules do not require the disclosure of Scope 3 emissions. Nevertheless, we use this cost information to the extent possible to inform our assessment of the expected compliance costs of the final rules, as outlined in the following subsection.

### b. Direct cost estimates for the final rules

The final rules will impose a number of new disclosure requirements on registrants. These requirements will result in additional compliance costs for registrants, and, depending on the nature of the registrant's operations and its existing disclosure practices, these additional compliance costs could be significant. Using comment letters and other sources, we take a conservative approach (i.e., erring on the side of overstating costs rather than understating them) to estimate approximate compliance costs for the final rules, which are discussed in subsequent sections and summarized immediately below.

---

[3024]  *See*, *e.g.*, *supra* sections II.K.2.c and II.K.3.c.

Appellate Case: 24-1628    Page: 744    Date Filed: 03/26/2024 Entry ID: 5377362

With respect to the Regulation S-K amendments pertaining to governance disclosure (Item 1501); disclosure regarding the impacts of climate-related risks on strategy, business model, and outlook (Items 1502(a) through (e) and (g)); and risk management disclosure (Item 1503), we estimate that compliance costs will be $327,000 in the first year of compliance and $183,000 annually in subsequent years.[3025] For those registrants that conduct scenario analysis and are required to provide attendant disclosures (Item 1502(f)), we estimate the reporting costs will be $12,000 in the first year and $6,000 in subsequent years.[3026] Some registrants will be required to disclose Scope 1 and 2 GHG emissions (Item 1505) after a specified phase in period. We estimate that the compliance costs for these disclosures will be $151,000 in the first year of compliance and $67,000 annually in subsequent years.[3027] After an additional phase in period, applicable registrants will be required to obtain assurance for their emissions disclosures (Item 1506). Limited assurance for emissions disclosures is estimated to cost $50,000 while reasonable assurance is estimated to cost $150,000.[3028] For registrants that voluntarily establish targets or goals and are required to provide attendant disclosures (Item 1504), we estimate the reporting costs will be $10,000 in the first year of establishing the target and $5,000 in subsequent years.[3029] With respect to amendments to Regulation S-X, we estimate an upper bound of $500,000 in the first year of compliance, while the annual cost in subsequent years is

---

[3025] *See* section IV.C.3.b.i.

[3026] *See* section IV.C.3.b.iv.

[3027] *See* section IV.C.3.b.ii.

[3028] *See* section IV.C.3.b.iii.

[3029] *See* section IV.C.3.b.iv.

Appellate Case: 24-1628    Page: 745    Date Filed: 03/26/2024 Entry ID: 5377362

estimated to have an upper bound of $375,000.[3030] Incremental audit fees are estimated to have an upper bound of $23,000 for all years.[3031]

We emphasize that there could be a considerable range in actual compliance costs given that not all costs listed above will apply to all registrants or during all measurement periods. Depending on the registrant, annual compliance costs (averaged over the first ten years of compliance) could range from less than $197,000 to over $739,000.[3032] A registrant's compliance costs may be at the lower end of the cost range if, for example, it does not conduct scenario analysis, does not have material Scope 1 and 2 emissions, has no climate-related target or goal, and has no applicable expenditures or financial statement impacts that require disclosure, thereby avoiding the corresponding costs of the aforementioned disclosure items. However, this registrant may have exposures to material climate risks that necessitate governance disclosure; disclosure regarding climate-related risks that have material impacts on strategy, business model, and outlook; and risk management disclosure. In this case, the cost of these required disclosures—estimated to be $327,000 in the first year of compliance and $183,000 annually in subsequent years[3033]—would comprise the full compliance cost of the final rules. This corresponds with an average annual compliance cost of $197,000 (rounded to the nearest $1,000) over the first ten years of compliance.[3034] Incremental compliance costs would be even lower for

---

[3030]  *See* section IV.C.3.b.v.

[3031]  *Id.*

[3032]  Registrants will incur compliance costs for different disclosure items at different times due to applicable phase in periods. For ease of comprehension and comparability, these estimates are presented as the average annual compliance cost over the first ten years of compliance. *See infra* notes 3034 and 3036 for additional details.

[3033]  *See* section IV.C.3.b.i.

[3034]  ($327,000 + $183,000*(9 years))/10 = $197,400.

741

registrants that already provide these disclosures (either voluntarily or as required by other laws or jurisdictions).[3035]

At the upper end of the cost range, for example, there may be other registrants for which all estimated compliance costs apply. In this example, these registrants could incur an estimated $872,000[3036] in the first year of compliance and lower annual costs in subsequent years. After the respective phase in periods, these registrants would incur additional costs for GHG emissions disclosure, limited assurance, and subsequently reasonable assurance (assuming the registrant is an LAF). This registrant would incur an average annual compliance cost of $739,000 (rounded to the nearest $1,000) over the first ten years of compliance.[3037] These examples highlight the potential range in compliance costs depending on a given registrant's circumstances, including (but not limited to) industry, size, existing climate-related disclosure practices, and whether the registrant's climate-risk exposure exceeds applicable materiality thresholds for disclosure.

Regarding assessing materiality to determine whether disclosure is required under the final rules, we acknowledge that some registrants may need to expend resources to first determine whether particular disclosure items are material, even in cases where registrants ultimately determine they do not need to make disclosure. While commenters provided estimates of the overall costs of measuring and assessing GHG emissions and making disclosure

---

[3035] *See supra* section IV.A for a discussion on existing laws (domestic and foreign) that elicit similar disclosures and current market practices with respect to climate-related disclosures. *See also infra* section IV.C.3.c.

[3036] $327,000 (governance disclosure; disclosure regarding climate-related risks that have material impacts on strategy, business model, and outlook; and risk management disclosure) + $12,000 (reporting cost of scenario analysis) + $10,000 (reporting cost of target or goal) + $500,000 (disclosures related to amendments to Regulation S-X, upper bound) + $23,000 (audit fees, upper bound) = $872,000.

[3037] Total compliance costs are calculated each year for the first ten years of compliance, taking into account the various disclosure items and their respective phase in periods. The average of these annual costs is $738,700.

under TCFD disclosure frameworks, they did not provide a level of detail that would enable us to reliably disaggregate the materiality determination from the costs of disclosure more broadly. We also note that the cost of such a determination could vary depending on the registrant's facts and circumstances and may in some cases be de minimis. While we have not provided a standalone cost estimate of making such materiality determinations, our estimates of the costs of governance disclosure, disclosure regarding the impacts of climate-related risks on strategy, business model, and outlook, and risk management disclosure begin with TCFD disclosure as a starting point.[3038] Thus, to the extent that a materiality or similar assessment is included in TCFD disclosure, this cost is reflected in the Commission's compliance cost estimates with respect to the above disclosure items.

Moreover, the above estimates are conditional upon several factors. First, they depend on the sample of sources and commenters that voluntarily provided relevant cost information.[3039] To the extent that this sample is not representative of the broad set of affected registrants, the resulting estimates may similarly be less representative. In addition to company size and industry, another relevant factor may be the decision to engage third-party advisory services. Some registrants may determine that engaging such advisory services will better position them to comply with the final rules, while others may decide to use in-house resources.[3040] The above estimates incorporate information on both internal costs (*e.g.*, employee hours) and external costs

---

[3038]    See section IV.C.3.b.i.

[3039]    *See supra* section IV.C.3.a.

[3040]    For example, registrants that are required to disclose emissions may be more likely to rely on external services. Registrants facing climate-related risks that are complex or a myriad may also be more likely to engage third party services. We emphasize that the final rules impose no requirement with respect to the use of third-party services and that registrants are free to decide how best to meet compliance based on their specific circumstances.

(*e.g.*, hiring third parties or consultants), as provided by comment letters and other sources.[3041] Second, several analytical assumptions were incorporated in the estimation process. While we endeavored to apply them consistently and in a conservative manner throughout the analysis, actual compliance costs may differ to the extent that these assumptions do not reflect a given registrant's specific circumstances.

The above compliance cost estimates exhibit certain features that may make them conservative. First, the cost estimates from comment letters and other sources, which serve as inputs in our cost estimation process, are almost all from large-cap companies. To the extent that compliance costs increase with company size, smaller registrants can expect lower costs.[3042] Furthermore, there are numerous instances in which analytical assumptions were required due to insufficient information from the source material. Wherever possible, assumptions that tend to overstate actual costs were chosen over those that would tend to understate them. Certain registrants may nonetheless incur costs that exceed our estimates. However, we believe that due to the nature of our cost estimation process, the majority of registrants will incur costs that do not exceed our estimates. Furthermore, our estimates assume registrants have no pre-existing climate-related disclosure practices. As a result, those that already provide disclosures that meet some of the final rules' requirements will face lower incremental costs.[3043]

---

[3041] Some commenters provided TCFD disclosure costs and separate costs for sustainability consultants. *See, e.g.,* letters from Soc. Corp Gov (June 11, 2021, and June 17, 2022). However, the latter were often not explicitly tied to TCFD, but rather associated with sustainability reports or other disclosures and activities not necessarily required by the final rules. In these cases, we only used the TCFD disclosure costs due to their direct relevance while omitting the cost of sustainability consultants as we could not reliably determine what portion were directly attributable to the TCFD and the provisions of interest. For GHG emissions, some companies' estimates included both internal and external costs, some mentioned the use of external costs but did not provide dollar estimates, while others did not engage external services at all. We have incorporated all available information to the extent possible in our estimation process.

[3042] Nevertheless, we recognize that in some cases, certain components of compliance costs may not vary with size and may be higher in proportional terms for smaller registrants.

[3043] *See* section IV.C.3.c.

Appellate Case: 24-1628    Page: 749    Date Filed: 03/26/2024 Entry ID: 5377362

We recognize that some comment letters in response to the proposed rules contained compliance cost estimates that significantly exceed the Commission's estimates of the final rules.[3044] We reiterate that this discrepancy is likely attributable to a number of changes from the proposed rules that reduce compliance costs. For example, the final rules do not require Scope 3 emissions reporting and have less burdensome requirements with respect to the amendments to Regulation S-X, thereby resulting in reduced compliance costs.

Our compliance cost estimation process consists of five elements. First, we estimate the aggregate costs of complying with three specific provisions that have similar counterparts within the TCFD framework: governance disclosure; disclosure regarding climate-related risks that have material impacts on strategy, business model, and outlook; and risk management disclosure. Second, we estimate the cost of assessing and disclosing Scope 1 and 2 emissions. Third, we estimate the cost of obtaining third-party assurance for GHG emissions disclosures. Fourth, we estimate the reporting costs of scenario analysis and targets and goals. Fifth, we estimate the costs associated with complying with the amendments to Regulation S-X and incremental audit costs. We proceed with a review of each element that describes how we arrived at the above compliance cost estimates.

### i. Cost estimates of Governance Disclosure; Disclosure Regarding Impacts of Climate-Related Risks on Strategy, Business Model, and Outlook; and Risk Management Disclosure

We begin by reviewing estimates from commenters and other sources with respect to the costs of TCFD disclosure with the objective of informing our assessment on the costs of similar provisions of the final rules. Specifically, these provisions of interest include governance

---

[3044]   *See* section IV.C.3.c.

disclosure; disclosure regarding climate-related risks that have material impacts on strategy, business model, and outlook; and risk management disclosure. We begin by focusing on these specific provisions separate from other components (*e.g.,* GHG emissions measurement or targets and goals) because these other components are not necessarily required in all circumstances or by all registrants.

In many cases, however, commenters provided one aggregate cost for their TCFD disclosure that also included the costs of GHG emissions measurement or target and goals-related activities. Without a breakdown of component costs, we face challenges in isolating the costs of the relevant provisions. Moreover, some commenters provided only a single aggregate cost that, in addition to their TCFD disclosure, includes several other components not required by the final rules,[3045] which poses similar challenges in separately estimating the component costs.

To account for these challenges, we used an approach that takes these aggregate cost estimates and applies adjustments derived from specific estimates from other sources, allowing us to obtain a more targeted "adjusted cost." For example, some commenters provided their cost estimates specifically for measuring emissions, from which we can determine the median reported emissions-measurement cost. Thus, if a given commenter provided an aggregate cost of TCFD disclosure that includes the measuring of emissions, we applied an adjustment (i.e., subtracted the median reported emissions-measurement cost), which results in an adjusted cost estimate for the remaining portion of TCFD disclosures (i.e., the provisions of interest). We applied similar adjustments throughout the analysis, as described in detail below.

---

[3045]    For example, an anonymous large-cap company "noted that combined costs for producing its first TCFD, SASB, and GRI disclosures were between \$200,00 and \$350,000." *See supra* note 2987.

While this approach can help us arrive at more granular cost estimates, we also recognize its limitations. Primarily, the median reported cost of a given component may be different from the actual cost incurred by a specific registrant (due to differences in company size, industry, climate reporting practices, or other factors) such that applying the adjustment may not yield a true representation of that registrant's cost breakdown. However, we believe this issue is mitigated to some extent because almost all estimates used in this analysis are from large cap companies and thus of relatively comparable size. Furthermore, while a given cost adjustment may be overstated for some registrants and understated for others, these discrepancies should partially offset each other when we subsequently take the median[3046] of the resulting adjusted costs.

Table 8 presents an overview of the cost estimation methodology with respect to the provisions of interest. Column (1) specifies the commenter or other public source that contains cost estimates specific to TCFD disclosures. Some sources contained costs for multiple, anonymous companies. Where applicable, these company descriptions are provided in Column (2). Column (3) shows the ongoing costs of TCFD disclosures before cost adjustments are applied. Some costs are taken directly from the source, whereas in other cases, specific assumptions and calculations are applied to obtain an estimate (see table footnotes for details). For example, if a source provided estimates in the form of FTEs or burden hours, we converted them to dollars according to hourly cost estimates consistent with the PRA.[3047] Some sources only provided an initial cost (i.e., first-year startup cost) without providing ongoing, annual costs.

---

[3046] Throughout the cost estimation process, we use medians instead of means since the former is less sensitive to outliers.

[3047] The PRA assumes that internal burden hours cost $444/hour, while external burden hours cost $600/hour. *See* section V.

In these cases, we estimate the ongoing cost by applying a percentage reduction derived from other sources. Furthermore, because the CDP questionnaire exhibits full alignment with the TCFD recommendations,[3048] we also included estimates for responding to the CDP questionnaire, from which we estimated the equivalent cost for TCFD disclosures by applying a conversion factor.[3049]

We determined that some of the costs in Column (3) include the costs of setting targets and goals or measuring GHG emissions, as indicated in Columns (4) and (5), respectively. Where applicable, these costs are subtracted from Column (3) to obtain the adjusted cost in Column (6), which represents the aggregate, annual ongoing cost estimate for provisions of interest: governance disclosure; disclosure regarding climate-related risks that have material impacts on strategy, business model, and outlook; and risk management disclosure.

---

[3048]   For information on how the CDP questionnaire is fully aligned with the TCFD, *see* CDP, How CDP is aligned to the TCFD, *supra* note 52.

[3049]   Two companies referenced in comment letters noted that it takes a designated number of staff four months to complete the CDP questionnaire and nine months to complete TCFD disclosures. Based on these estimates, we incorporate the assumption that the CDP-to-TCFD cost ratio is 4 to 9 ("4-to-9 ratio"). *See* letters from Soc. Corp. Gov. (June 11, 2021 and June 17, 2022).

**Table 8.** Cost Estimates of Governance Disclosure; Disclosure Regarding Climate-Related Risks that have Material Impacts on Strategy, Business Model, and Outlook; and Risk Management Disclosure

| Commenter or Source | Type of Company (if specified) | Ongoing Cost of TCFD disclosures (pre-adjustment) | Adjustment: setting targets and goals ($54,015) [1] | Adjustment: Scope 1, Scope 2, and some Scope 3 emissions ($79,236) [2] | Adjusted cost [3] |
|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) |
| Society for Corporate Governance (June 11, 2021) | Financial Services company | $1,918,080 [4] | Included | Included | $1,784,829 |
| | Energy company | $8,524,800 [5] | | Included | $8,445,564 |
| | Comm. Services company | $865,385 [6] | Included | Included | $506,862 |
| Society for Corporate Governance (June 17, 2022) | Company 5 | $360,000 [7] | | Included | $280,764 |
| | Company 6 | $2,237,760 [8] | Included | Included | $2,104,509 |
| FCA rule | | $86,270 [9] | | | $86,270 |
| BEIS rule | | $40,694 [10] | | | $40,694 |
| The Climate Risk Disclosure Lab | Large-cap financial institution | $56,000 [11] | | | $56,000 |
| | Mid-cap company | $5,600 [12] | | | $5,600 |
| | Large-cap company | $63,000 [13] | | | $63,000 |
| American Exploration and Production Council | | $280,000 [14] | | | $280,000 |

Appellate Case: 24-1628    Page: 754    Date Filed: 03/26/2024 Entry ID: 5377362

| | | |
|---|---|---|
| S&P Global | $56,000 [15] | $56,000 |
| | | |
| **Median** | | **$183,135** [16] |

1. The adjustment factor for setting targets and goals is $54,015, which is determined by relevant cost estimates presented in Table 9.

2. The adjustment factor for assessing Scope 1, Scope 2, and some Scope 3 emissions is $79,236, which is determined by relevant cost estimates presented in Table 10.

3. The adjusted cost is calculated as Column (3) minus adjustment factors where applicable, as indicated by Columns (4) and (5). If Column (4) indicates "Included," then $54,015 is subtracted from Column (3). Similarly, if Column (5) indicates "Included," then $79,236 is subtracted from Column (3). The net result is the "adjusted cost," presented in Column (6).

4. *See* letter from Soc. Corp. Gov (June 11, 2021). This company reported that three FTEs "plus others" spend nine months for TCFD reporting. (3 FTEs)*(40 hrs/wk)*(36 wks)*($444/hr) = $1,918,080. The source does not specify how many hours are contributed by the "others," thus the estimated cost may be understated.

5. *See id.* This company reported TCFD-aligned reporting process involved 40 people from the company and took six months of nearly full-time participation by 20 core team members. (20 FTEs)*(40 hrs/wk)*(24 wks)*($444/hr) = $8,524,800. The source does not specify how many hours are contributed by those outside of the 20 core members, thus the estimated cost may be understated.

6. *See id.* This company reported spending $1.25 million on both CDP and TCFD disclosures, in addition to several other components. We first estimate the TCFD component by applying the 4-to-9 ratio. ($1.25 million)*(9/13) = $865,385.

7. *See* letter from Soc. Corp. Gov (June 17, 2022). This company reported spending "$160,000 for CDP and other climate-related surveys, including supply chain surveys." To be conservative, we assume that the $160,000 is the cost for CDP only, then apply the 4-to-9 ratio. $160,000*(9/4) = $360,000.

8. *See id.* This company reported that "two employees focus on climate change, including disclosure, and 1.5 employees focus on sustainability reporting overall," spending nine months on its TCFD report. (3.5 FTEs)*(40 hrs/wk)*(36 wks)*($444/hr) = $2,237,760.

9. *See supra* note2995. This is the ongoing cost of "coordination of disclosure inputs across functions" (£69,747 for larger issuers), which is in line with the TCFD disclosure categories of Governance, Strategy, and Risk Management. This cost is converted to USD based on the 2022 average exchange rate. (£69,747)*(1.2369 USD/GBP) = $86,270. This reflects a 56% reduction from initial to ongoing costs, which we consider in determining the appropriate percentage reduction in subsequent calculations.

10. *See supra* note 2996. This figure adds the ongoing costs of disclosure associated with Governance (£9,100), Strategy (£13,000), and Risk Management (£10,800). The total (£32,900) is converted to USD based on the 2022 average exchange rate. (£32,900)*(1.2369 USD/GBP) = $40,694. This reflects a 32% reduction from initial to ongoing costs, which we consider in determining the appropriate percentage reduction in subsequent calculations.

11. *See supra* note 2987. This company reported that the cost of issuing its first TCFD report was less than $100,000. To be conservative, we assume $100,000 is the initial cost. To estimate ongoing costs, we refer to the percentage reduction from initial to ongoing costs as reflected by the FCA rule (56%) and the BEIS rule (32%), of which the median is 44%. ($100,000)*(1 – 0.44) = $56,000.

12. *See id.* This company reported that the cost of producing its first TCFD report was less than $10,000. To be conservative, we assume $10,000 is the initial cost. In estimating ongoing costs, we refer to the percentage reduction from initial to ongoing costs as reflected by the FCA rule (56%) and the BEIS rule (32%), of which the median is 44%. $10,000*(1 – 0.44) = $5,600.

13. *See id.* This company reported that the combined cost for producing their first TCFD, SASB, and GRI disclosures was between $200,000 and $350,000 but did not provide the cost for TCFD only. However, it noted that the cost of preparing its first CDP questionnaire did not exceed $50,000. To be conservative, we assume the initial CDP-related cost is $50,000. We apply the 4-to-9 ratio to convert this to the initial costs of TCFD disclosure and then apply a 44% reduction to estimate the ongoing cost. $50,000*(9/4)*(1 − 0.44) = $63,000.

14. *See* letter from AEPC. This commenter stated that initial costs to report in alignment with certain aspects of the TCFD can be around $500,000. To estimate ongoing costs, we refer to the percentage reduction from initial to ongoing costs as reflected by the FCA rule (56%) and the BEIS rule (32%), of which the median is 44%. $500,000*(1 − 0.44) = $280,000.

15. *See supra* note 3021. This source, which provided indicative fees for TCFD reporting services, noted that the average cost would be around $100,000. To estimate ongoing costs, we refer to the percentage reduction from initial to ongoing costs as reflected by the FCA rule (56%) and the BEIS rule (32%), of which the median is 44%. $100,000*(1 − 0.44) = $56,000.

16. When there is an even number of data points, there is no single middle value. In such cases, the median is computed as the arithmetic mean of the two middle data points. Accordingly, the median of Column (6) is calculated as follows: ($86,270 + $280,000)/2 = $183,135.

We next discuss our estimation process and methodology involved in producing the numbers in Table 8, including which cost estimates were included versus excluded, what assumptions were incorporated, and how the adjustment factors for targets and goals and GHG emissions measurement were calculated and applied. Many commenters did not explicitly state whether the costs of measuring emissions or setting targets and goals were included in their TCFD costs. As a result, we assumed that such costs were included only if such activities were contained in their qualitative description of climate-related disclosure activities. Of the twelve cost estimates presented in Table 8, we assume that three included the cost of target-related

Appellate Case: 24-1628    Page: 756    Date Filed: 03/26/2024 Entry ID: 5377362

activities, as indicated in Column (4).[3050]  We also assume that five estimates included the costs of measuring Scope 1, Scope 2, and some Scope 3 emissions, as indicated in Column (5).[3051]

We next review cost estimates specific to setting targets and goals and assessing GHG emissions (Scope 1, Scope 2, and some Scope 3) from other sources in order to obtain their adjustment factors ($54,015 and $79,236, respectively).  We recognize that the final rules do not necessarily require registrants to incur costs associated with setting targets and goals or measuring all three scopes of GHG emissions.  We review such cost estimates because we determined that some of the sources in Table 8 included them with their overall TCFD-related costs; however, they should not necessarily be interpreted as direct compliance costs resulting from the final rules.  Instead, we use these cost estimates to obtain appropriate adjustment factors that are subsequently subtracted from the applicable estimates in Column (3).

---

[3050]    The Financial Services company stated that it "reports on its progress towards its low-carbon financing and carbon-neutrality goals; the percentage of renewable energy sourced to support its operations and the percentage of energy reductions year over year."  The Communication Services company reports that it gathers metrics/data related to carbon abatement, renewable energy, water conservation, and incurs expenses for monitoring and data quality. (*See* letter from Soc. Corp. Gov (June 11, 2021)).  Company 6 stated that it "gathers data and reports on progress towards the company's low-carbon financing goal, progress toward the company's carbon-neutrality goal, the percentage of renewable energy sourced to support the company's operations, the percentage of energy reduction year-over-year."  (*See* letter from Soc. Corp. Gov (June 17, 2022)).  Based on the description of these activities, we assume that these three companies included the costs of setting targets and goals in their reported costs.  The Large-cap financial institution stated that it "is committed to achieving net-zero emissions by 2050 and is in the process of implementing the Paris Agreement Capital Transition Assessment (PACTA) methodology to align its loan portfolio with the goals of the Paris Agreement."  *See supra* note 2987.  However, given their relatively low reported costs, we assume that the cost of setting targets and goals is not included in order to remain conservative in our estimation.

[3051]    The Financial Services company, Communications Services company, Company 5, and Company 6 all explicitly state that they measure and report Scopes 1, 2, and some Scope 3 emissions.  The Energy company does not explicitly state that it measures emissions, however it states that it requires "consultants in emissions, climate science, and modeling," "multiple engineering disciplines," and "GHG emissions reporting expertise" as part of its disclosures.  *See* letters from Soc. Corp. Gov (June 11, 2021 and June 17, 2022). Thus, we assume that these five companies included the costs of measuring Scope 1, 2, and some Scope 3 emissions within their reported costs.  The Large-cap financial institution and Mid-cap company also report measuring the three scopes of emissions, however given their relatively low reported costs, we assume that the cost of measuring emissions is not included in order to remain conservative in our estimation.

The adjustment factor for setting targets and goals is $54,015, as indicated in Column (4). To obtain this number, we begin by reviewing four sources that provided more specific cost estimates related to targets and goals,[3052] which are presented in Table 9. The BEIS rule estimated that Metrics and Targets (including the cost of data gathering and cost of reporting, unrelated to GHG emissions) would have an ongoing cost of $72,359, while the FCA rule estimated the ongoing cost to be $53,507.

The remaining two sources only provided initial costs. Thus, to estimate the ongoing cost, we referred to the percent reduction from initial to ongoing costs reflected by the BEIS rule (23 percent reduction) and FCA rule (67 percent reduction), which yields a median percent reduction of 45 percent. One source estimated that setting targets would come with an initial cost ranging from $20,000 to $30,000.[3053] We apply the 45 percent reduction to arrive at an ongoing cost estimate of $13,750. Another company reported that it spent $1 million as an initial cost for target baseline and projections.[3054] We similarly apply the 45 percent reduction to arrive at an ongoing cost estimate of $550,000. The median of the ongoing costs of setting targets in Table 9 is $54,015, which is used as the adjustment factor for setting targets and goals (as indicated in Column (4) of Table 9).

---

[3052] These sources generally do not provide sufficient detail on precisely what the targets and goals disclosure would consist of; therefore, it is difficult to determine to what extent the corresponding cost estimates are applicable to the final rules' requirements on targets and goals. We can nevertheless use these sources to help us arrive at better informed compliance cost estimates. Similar reasoning can be applied to the cost estimates of scenario analysis, discussed in section IV.C.3.b.iv.

[3053] *See supra* note 3021.

[3054] *See* letter from Soc. Corp. Gov. (June 17, 2022).

**Table 9.** Ongoing costs of setting targets and goals

| Commenter or Source | Ongoing costs of setting targets and goals |
|---|---|
| BEIS rule | $72,359 [1] |
| FCA rule | $35,671 [2] |
| Society for Corporate Governance (June 17, 2022) | $550,000 [3] |
| S&P Global | $13,750 [4] |

1. *See supra* note 2996. The BEIS rule estimated that the ongoing cost metrics and targets disclosure is £58,500 (£52,000 for annual data gathering and £6,500 for the cost of reporting). We apply the 2022 average exchange rate. (£58,500)*(1.2369 USD/GBP) = $72,359. This reflects a 23% reduction from initial to ongoing costs, which we consider in determining the appropriate percentage reduction in subsequent calculations.

2. *See supra* note 2995. The FCA rule estimated that ongoing costs for metrics and targets disclosure is £43,259; however, this figure includes assessing Scopes 1 and 2 emissions. The corresponding initial cost disaggregates the cost, with two-thirds allocated to metrics and targets unrelated to Scopes 1 and 2 emissions. We assume the ongoing cost reflects the same proportional allocation and then we apply the 2022 average exchange rate. (£43,259)*(2/3)*(1.2369 USD/GBP) = $35,671. This reflects a 67% reduction from initial to ongoing costs, which we consider in determining the appropriate percentage reduction in subsequent calculations.

3. *See* letter from Soc. Corp. Gov (June 17, 2022). "Company 7" in this comment letter reported that it spent $1 million on "building a database for target baseline and projections," but did not provide the ongoing cost. To estimate the ongoing cost, we refer to the percentage reduction from initial to ongoing costs as reflected by the BEIS rule (23%) and the FCA rule (67%), of which the median is 45%. ($1,000,000)*(1 − 0.45) = $550,000.

4. *See supra* note 3021. The S&P Global meeting memorandum provides estimates on the initial cost of setting target ($20,000 - $30,000) but does not provide estimates with respect to the ongoing cost. To estimate the ongoing cost, we refer to the percentage reduction from initial to ongoing costs as reflected by the BEIS rule (23%) and the FCA rule (67%), of which the median is 45%. We apply this median percentage reduction to the midpoint of the initial cost: ($25,000)*(1 − 0.45) = $13,750.

Next, we focus on the adjustment factor for assessing Scope 1, Scope 2, and some Scope 3 emissions (as indicated in Column (5) of Table 8). To obtain this number, we review eight relevant estimates, which are presented in Table 10. Where necessary, modifications or assumptions are applied to the estimates (see table footnotes for details). Lastly, we take the median of these eight data points to obtain the adjustment factor for measuring Scope 1, Scope 2, and some Scope 3 emissions: $79,236. We reiterate that the final rules do not require the disclosure of Scope 1 and 2 emissions in all cases or from all registrants, and Scope 3 disclosures are not required. We reviewed these emissions cost in this section because we subtract them

Appellate Case: 24-1628    Page: 759    Date Filed: 03/26/2024 Entry ID: 5377362

from applicable estimates in Column (3) of Table 8, which we have deemed to include emissions costs.

**Table 10.** Ongoing costs of measuring Scope 1, Scope 2, and some Scope 3 emissions

| Commenter or Source | Company (if specified) | Ongoing costs of measuring Scope 1, Scope 2, and some Scope 3 emissions |
|---|---|---|
| Society for Corporate Governance (June 17, 2022) | Company 9 | $200,000 [1] |
| | Company 10 | $83,472 [2] |
| | Company 11 | $75,000 [3] |
| ERM Survey | | $182,985 [4] |
| Air Products and Chemicals, Inc. | | $4,032,000 [5] |
| Persefoni | | $50,000 [6] |
| S&P Global | | $40,000 [7] |
| South Pole | | $23,184 [8] |

1. *See* letter from Soc. Corp. Gov. (June 17, 2022). Company 9 discloses Scope 1 and Scope 2 and some Scope 3 GHG emissions but does not specify which categories of Scope 3 emissions are reported. The company "conducts the emissions inventory/data gathering in-house at an estimated cost of at least $200,000 annually." Thus, we assume that $200,000 is the ongoing cost of measuring Scope 1, Scope 2, and some Scope 3 emissions. This estimate may be understated as it is presented as a minimum cost.
2. *See id.* Company 10 discloses Scope 1 and Scope 2 and some Scope 3 (fuel and energy-related activities, business travel, and use of sold products) GHG emissions. Approximately five to seven staff members are involved with the emissions calculations and reporting to various agencies and for verification. The company estimates 188 hours for emissions gathering/annual operating reporting across the company's utility and gas infrastructure business unit and preparing its final verification support. Thus, we assume the 188 burden hours is the ongoing costs of measuring the specified scopes of emissions. (188 hours)*($444/hr) = $83,472.
3. *See id.* Company 11 discloses Scope 1, Scope 2, and some Scope 3 (business travel, commuting, waste, downstream leased assets) GHG emissions. The company estimated its internal time and external resources associated with emissions inventory/data gathering to be about $75,000 annually.
4. *See* ERM survey. The ERM survey indicated that the average spend for GHG analysis and/or disclosures is $237,000 annually. This survey category included all costs related to developing GHG inventories, including analysis and disclosure of Scope 1, Scope 2, and/or Scope 3 emissions. This category also included preparation of GHG data for inclusion in public reporting, any analysis related to setting science-based targets, and other similar efforts to understand GHG emissions. Because this estimate includes targets, we subtract the median ongoing cost of targets ($54,015), as reported in Table 9. $237,000 - $54,015 = $182,985.

Appellate Case: 24-1628   Page: 760   Date Filed: 03/26/2024 Entry ID: 5377362

5. *See* letter from Air Products and Chemicals, Inc. This company reports Scope 1, Scope 2, and Scope 3 emissions, but does not specify which categories of Scope 3. The company's emissions reporting process requires one full-time consultant and 20 employees working part-time each year from Nov. to Mar. (1 full-time consultant)*(40 hrs/wk)*(20 weeks)*($600/hr) + (20 employees)*(20 hrs/wk)*(20 wks)*($444/hr) = $4,032,000. However, this estimate may be overstated because it includes the cost of third-party limited assurance for GHG emissions.

6. *See supra* note 3023. Persefoni estimates that the cost of assessing Scope 1, Scope 2, and Scope 3 emissions for companies of "high maturity" (i.e., those that are already measuring/tracking Scope 1, Scope 2, and Scope 3 emissions, among other activities) is $50,000, which we assume to reflect ongoing costs. The commenter further estimates that the corresponding cost for companies that do not already measure/track such emissions would be $125,000. If this figure is assumed to represent initial costs, then the estimates reflect a 60% reduction from initial to ongoing costs, which we consider in determining the appropriate percentage reduction in subsequent calculations.

7. *See supra* note 3021. S&P Global estimated that the cost of assessing Scope 1, Scope 2, and Scope 3 emissions for the first time is between $75,000 and $125,000. We take the midpoint of this range ($100,000) and apply the same percent reduction (60%) reflected in the Persefoni meeting memorandum to estimate ongoing costs. $100,000*(1 – 0.6) = $40,000.

8. *See* South Pole Memo. South Pole indicated that conducting a bottom-up assessment of Scope 1, Scope 2, and Scope 3 emissions for the first time can cost between €10,000 and €100,000. We take the midpoint (€55,000), apply the 2022 average exchange rate ($1.0538 USD/€), and apply the same percent reduction (60% reduction) reflected in the Persefoni meeting memorandum to estimate ongoing costs. (€55,000)*(1.0538 USD/€)*(1 – 0.6) = $23,184.

There were other commenters and sources that contained individual cost estimates specific to only Scope 1,[3055] Scopes 1 and 2 combined,[3056] or only Scope 3 emissions measurement,[3057] as opposed to an aggregate cost that combines all three scopes. However, because we determined that all estimates indicated by Column (5) of Table 8 include the aggregate cost of all three scopes of emissions and to remain conservative in our estimation, we opted not to use estimates of individual scopes of emissions for comparability.[3058]

---

[3055] *See* letters from Soc. Corp. Gov. (June 17, 2022); and IDFA.

[3056] *See supra* notes 3021, 3023, and 2995; *see also* letter from IDFA.

[3057] *See* letters from Williams, Inc.; and Ørsted.

[3058] In some cases, commenters' estimates of assessing Scope 1 emissions are greater than other commenters' combined estimates of assessing Scope 1, Scope 2, and some Scope 3 emissions. However, because the resulting adjustment factor will be *subtracted* from Column (3) of Table 8 to obtain compliance costs, we do not include the greater Scope 1 cost estimates in order to remain conservative and to avoid understating final compliance costs. In the following subsection, however, we include these cost estimates when estimating the combined costs of Scopes 1 and 2 emissions in a similar bid to remain conservative.

Appellate Case: 24-1628    Page: 761    Date Filed: 03/26/2024 Entry ID: 5377362

We have so far obtained the adjustment factors for setting targets and goals ($54,015) and measuring Scope 1, Scope 2, and some Scope 3 emissions ($79,236). We next subtract these amounts, where applicable, from Column (3), from which the result is presented as the adjusted cost in Column (6). The median of the adjusted costs is $183,135. We next extrapolate the initial cost using the assumption of a 44 percent cost reduction[3059] from the first year to subsequent years of these corresponding disclosures. Thus, we estimate that the aggregate compliance costs for governance disclosure; disclosure regarding climate-related risks that have material impacts on strategy, business model, and outlook; and risk management disclosure are $327,000 for the first year and $183,000 for subsequent years (rounded to the nearest $1,000).[3060]

There were additional estimates associated with TCFD disclosure costs that were ultimately not included in this analysis, mainly due to the lack of details needed to obtain a quantitative estimate.[3061] For example, one commenter stated that their "Head of Corporate ESG Strategy and Reporting leads a team of employees that required seven months to gather data and draft disclosures for our 2021 TCFD Report in coordination with numerous subject matter experts across our entire organization."[3062] However, the commenter did not specify how many

---

[3059]  As noted earlier in this subsection, the FCA rule and BEIS rule reflect a 56 % and 32 % reduction in cost, respectively, from initial year to subsequent years regarding the provisions of interest (*i.e.*, governance disclosure; disclosure regarding climate-related risks that have material impacts on strategy, business model, and outlook; and risk management disclosure). The median, 44 %, is used to estimate the initial cost.

[3060]  No commenters or sources offered estimates specific to the cost of the disclosure of material expenditures directly related to climate-related activities as part of a registrant's strategy, transition plan and/or targets and goals. Nevertheless, the Commission's estimates (i.e., $327,000 for the first year and $183,000 annually in subsequent years) should reflect this cost based on our application of conservative assumptions and because of the small expected incremental cost given that registrants will likely be tracking the material expenditures under the financial statement disclosure requirements.

[3061]  *See, e.g.*, letters from Soc. Corp. Gov. (June 11, 2021); Nasdaq; Chamber; and AEPC.

[3062]  *See* letter from Nasdaq.

Appellate Case: 24-1628    Page: 762    Date Filed: 03/26/2024 Entry ID: 5377362

staff or FTEs are involved, which precludes us from reliably calculating burden hours and associated costs. Another commenter asserted that the "actual cost for complete alignment to TCFD could be up to $1,000,000 per registrant over several years." Because the commenter did not provide the number of years, however, we are unable to obtain the annual costs.[3063] Other sources provided costs that had general descriptions (*e.g.*, "implementation costs" or "two FTEs… dedicated to climate reporting") that did not explicitly mention "TCFD" disclosures.[3064] We similarly did not include such estimates given that we cannot reliably infer whether these costs are reflective of TCFD disclosures and the specific provisions of interest.

### ii. Cost estimates of Scope 1 and 2 emissions disclosures

The final rules require the disclosure of Scope 1 and 2 emissions, if material, by LAFs and AFs, while SRCs and EGCs are exempt.[3065] To inform our assessment of the associated cost, we review comment letters and other sources that contain relevant estimates, presented in Table 11. We note that three of the estimates are specific to the cost of assessing Scope 1 emissions only.[3066] Nevertheless, we include them in Table 11 because (a) these Scope 1 emissions cost estimates are generally higher than other estimates that include both Scope 1 and 2 emissions, and (b) the costs can only increase if the Scope 1 emissions estimates are adjusted to also account for Scope 2 emissions (i.e., they are understated with respect to the cost of both Scope 1 and 2 emissions). Thus, we include the Scope 1 emissions cost estimates to remain conservative in our estimation.

---

[3063] *See* letter from AEPC.

[3064] *See, e.g.*, letters from RILA; Nutrien; and Soc. Corp. Gov. (June 11, 2021).

[3065] *See* 17 CFR 229.1505(a)(1).

[3066] The cost estimates that are specific to Scope 1 only are those from the Society for Corporate Governance (Company 4), Energy Transfer LP, and IDFA ($100,000).

Appellate Case: 24-1628     Page: 763     Date Filed: 03/26/2024 Entry ID: 5377362

App.759

Appellate Case: 24-1628    Page: 764    Date Filed: 03/26/2024 Entry ID: 5377362

**Table 11.** Costs of assessing Scope 1 and 2 emissions

| Commenter or Source | Company (if specified) | Ongoing cost |
|---|---|---|
| Persefoni | | $25,000 [1] |
| FCA rule | | $17,836 [2] |
| S&P Global | | $40,000 [3] |
| International Dairy Foods Association | | $66,600 [4] |
| International Dairy Foods Association | | $100,000 [5] |
| Energy Transfer LP | | $10,162,035 [6] |
| Society for Corporate Governance (June 17, 2022) | Company 4 | $300,000 [7] |
| **Median** | | **$66,600** |

760

1. *See supra* note 3023. Persefoni estimated that the ongoing cost is $25,000. This reflects a 44% cost reduction from its initial cost estimate, which we consider in determining the appropriate percentage reduction in subsequent calculations.

2. *See supra* note 2995. The FCA estimates initial costs to be £43,259, which is converted to dollars based on the 2022 average exchange rate. (£43,259)*(1.2369 USD/GBP) = $53,507. The ongoing costs, however, are not explicitly provided, but instead are grouped with another disclosure component. Because the initial costs make up one third of the total initial cost when combined with this other component, we assume that the same proportion holds with respect to ongoing costs. $53,507/3 = $17,836. This reflects a 67% cost reduction from its initial cost estimate, which we consider in determining the appropriate percentage reduction in subsequent calculations.

3. *See supra* note 3021.

4. *See* letter from IDFA. One unnamed company reported that it spends between 100 and 200 hours to maintain automated GHG aggregation and reporting software system for Scope 1 and Scope 2 emissions. We take the midpoint of the burden hours and convert to dollars based on $444/hr. (150 hours)*($444/hr) = $66,600.

5. *See id.* Another unnamed company reported that it spends about $100,000 to maintain its GHG measuring system, with the context suggesting that this is specific to Scope 1 emissions. Although this estimate does not include the cost of assessing Scope 2, it is nevertheless included to remain conservative in our estimation.

6. *See* letter from Energy Transfer LP. This company stated that although it already tracks Scope 1 emissions to some degree, the incremental costs to comply with the proposed rules would be approximately $7 million in 2006 dollars, which is equivalent to $10,162,035 in 2022 dollars. However, because this is only the incremental cost, it is presumably understated with respect to the full cost (i.e., incremental costs are a subset of the full cost of disclosure). It is further understated since the estimate is specific to Scope 1 emissions only, whereas we seek to estimate the costs of assessing Scope 1 and 2 emissions. Nevertheless, because this estimate is greater than the other estimates in Table 11, it is included to remain conservative in our estimation.

7. *See* letter from Soc. Corp. Gov (June 17, 2022). This company estimated that it requires roughly $300,000 annually in staff time for its Scope 1 data collection and reporting. Although this estimate does not include the cost of assessing Scope 2, it is nevertheless included to remain conservative in our estimation.

The median ongoing cost of assessing Scope 1 and 2 emissions in Table 11 is $66,600. To estimate the initial cost, we refer to two sources that reported both initial and ongoing costs to inform our assessment of the percentage reduction between the two costs. One organization's estimated costs reflect a reduction of 44 percent[3067] while another's reflect a reduction of 67 percent.[3068] We use the median (56 percent) to extrapolate the initial cost. As a result, we

---

[3067]    *See supra* note 3023; *see also* footnote 1 in Table 11.

[3068]    *See supra* note 2995; *see also* footnote 2 in Table 11.

Appellate Case: 24-1628     Page: 766     Date Filed: 03/26/2024 Entry ID: 5377362

estimate that the cost of assessing Scope 1 and 2 emissions is $151,000[3069] for the first year and $67,000 for subsequent years (rounded to the nearest $1,000).

### iii. Cost estimates of assurance for Scope 1 and 2 emissions disclosures

With respect to Scope 1 and 2 emissions disclosures, the final rules require assurance at different levels (limited or reasonable) with different phase in periods depending on whether the registrant is an LAF or AF, while SRCs and EGCs are exempt.[3070] To assess the costs of assurance, we reviewed comment letters that provided relevant, quantitative cost estimates, as presented in Table 12.

The estimates displayed varying degrees of assurance "coverage" (i.e., which specific disclosures were being assured). Some commenters reported assurance costs but did not explicitly define what climate-related disclosure items were being assured.[3071] In such cases, we applied the conservative assumption that the reported assurance costs were specific to their GHG emissions disclosures only. Other estimates were specifically attributed to Scope 1 and 2 emissions,[3072] consistent with the final rules' requirements, where applicable. The majority of estimates, however, pertained to the combined assurance costs for all three scopes of emissions,[3073] which presumably overstate the assurance costs for Scope 1 and 2 emissions only. Nevertheless, we include these estimates for two reasons: first, we included them because we cannot reliably isolate the assurance costs for Scope 1 and 2 emissions only (i.e., by excluding

---

[3069]    ($66,600)/(1-0.56) = $151,364.

[3070]    *See supra* section II.I.

[3071]    *See, e.g.,* letters from Soc. Corp. Gov (June 11, 2021 and June 17, 2022); and Persefoni.

[3072]    *See, e.g.,* letters from Soc. Corp. Gov (June 17, 2022); and IDFA.

[3073]    *See, e.g.,* letters from Soc. Corp. Gov (June 11, 2021 and June 17, 2022).

Scope 3 emissions); and second, by including costs that are overstated relative to what the final rules require, we remain conservative in our estimation.

Other commenters, however, stated that their assurance cost estimates covered both their GHG emissions and the proposed financial statement disclosures.[3074] It is likely that a significant portion of these costs is attributable to the proposed financial statement disclosures, which several commenters stated would come with high costs.[3075] We therefore did not include these estimates as they are less likely to be representative of assurance costs for Scope 1 and 2 only compared to other aggregate estimates.

The estimates also varied in the level of assurance, with most estimates equally split between either limited assurance or not specifying the level assurance. To be conservative, any estimates that did not specify the level of assurance were assumed to be limited assurance. One commenter estimated only the incremental cost of switching from limited to reasonable assurance.[3076] While we cannot infer the actual costs of either limited or reasonable assurance in this case, we nevertheless include the incremental cost because it is relatively high, allowing us to remain conservative in our estimation.

---

[3074] *See* letters from Soc. Corp. Gov (June 17, 2022); and Cummins.

[3075] *See* letter from ERM CVS (stating that the "fees for the [attestation for climate-related data, including GHG emissions] may be small compared to the financial audit fees" associated with the proposed rules).

[3076] *See* letter from Salesforce.

Appellate Case: 24-1628    Page: 768    Date Filed: 03/26/2024 Entry ID: 5377362

**Table 12.** Costs of limited assurance for GHG emissions disclosures

| Commenter | Company (if specified) | Limited assurance cost |
|---|---|---|
| Society for Corporate Governance (June 11, 2021) | Basic Materials | $30,000 [1] |
| | Comm. Services | $600,000 [2] |
| | Health Care | $22,000 [3] |
| Society for Corporate Governance (June 17, 2022) | Company 1 | $400,000 [4] |
| | Company 3 | $13,000 [5] |
| | Company 5 | $45,000 [6] |
| | Company 6 | $15,000 [7] |
| | Company 7 | $50,000 [8] |
| | Company 8 | $12,500 [9] |
| | Company 9 | $72,000 [10] |
| | Company 10 | $15,000 [11] |
| | Company 11 | $15,000 [12] |
| | Company 12 | $75,000 [13] |
| | Company 13 | $550,000 [14] |
| Persefoni | | $82,000 [15] |
| International Dairy Foods Association | | $62,500 [16] |
| Salesforce | | $800,000 [17] |
| **Median** | | **$50,000** |

1. *See* letter from Soc. Corp. Gov (June 11, 2021). The Basic Materials company reported spending $30,000 for assurance over its Scope 1, 2, and 3 emissions without specifying the level of assurance.

2. *See id.* The Communication Services ("Comm. Services") company, which discloses Scope 1, 2, and 3 emissions (among other climate-related disclosures), reported that assurance costs are approximately $600,000 annually without specifying the coverage or level of assurance.

3. *See id.* The Health Care company, which discloses Scope 1, Scope 2, and Scope 3 (among other climate-related disclosures), reported that assurance costs are $22,000 without specifying the coverage or level of assurance.

4. *See* letter from Soc. Corp. Gov (June 17, 2022). Company 1 reported spending over $400,000 for "limited assurance from a public company accounting firm over select environmental metrics disclosed in its sustainability report, including its Scope 1, 2 (location- based and market-based), and Scope 3 (including a comparison against the base year) GHG emissions; total energy consumed; percentage grid electricity; percentage renewable energy; and water usage."

5. *See id.* Company 3 currently pays $13,000 annually for limited assurance over its Scope 1, Scope 2, and one category of Scope 3 emissions. The cost estimated may be understated given that this company believes that its current assurance may not be in compliance with the proposed rules and that costs may increase if the rule is adopted as proposed.

6. *See id.* Company 5 reported spending over $45,000 annually for "limited assurance from a professional audit firm for disclosure in its sustainability report of its Scope 1 and 2 GHG emissions and defined categories of its Scope 3 GHG emissions (exclusive of processing and use of, and end-of-life treatment for, sold products, and certain other downstream activities)."

7. *See id.* Company 6 reported spending $15,000 annually for assurance over its Scope 1 and 2 emissions and certain Scope 3 operational emissions (such as emissions associated with business travel and downstream leased assets) without specifying the level of assurance.

8. *See id.* Company 7 reported spending $50,000 annually for assurance over its Scope 1, Scope 2, and some categories of Scope 3 emissions without specifying the level of assurance.

9. *See id.* Company 8 reported spending between $10,000 and $15,000 annually for assurance over its Scope 1 and 2 emissions. We include the midpoint of this range in the table ($12,500).

10. *See id.* Company 9 reported spending $10,000 for reasonable assurance over its Scope 1, Scope 2, and some Scope 3 emissions. It also noted that another firm offered to do the same work for $180,000. To be conservative, we use this higher estimate instead. Next, we extrapolate the cost of limited assurance based on a comment letter, which states that the cost of reasonable assurance could be 2-3 times higher than limited assurance. *See* letter from Center for Climate and Energy Solutions. By taking the midpoint (2.5), we estimate the cost of limited assurance: $180,000/2.5 = $72,000.

11. *See id.* Company 10 reported spending $15,000 annually for limited assurance over its Scope 1, Scope 2, and partial Scope 3 (fuel and energy-related activities and business travel) emissions.

12. *See id.* Company 11 reported spending $15,000 annually for limited assurance over its Scope 1, Scope 2, and some Scope 3 (business travel, commuting, waste, downstream leased assets) emissions.

13. *See id.* Company 12 reported spending $30,000 for limited assurance over its Scope 1, 2, and 3 emissions. It also noted that another firm offered to do the same work for $75,000. To be conservative, we use this higher estimate instead.

14. *See id.* Company 13 reported spending $550,000 for limited assurance over its Scope 1, 2, and 3 emissions.

15. *See* ERM survey. The ERM survey indicates that 28 respondents spend an average of $82,000 for assurance/audits related to climate. According to the commenter, this "survey did not ask issuer respondents to include details of the specific level of assurance or the scope of business practices

covered, whether assurance covered all locations or all business units, or whether it consisted of limited or reasonable assurance. The costs reported by issuer respondents may include third-party assurance of Scope 1 and/or 2 GHG emissions metrics, financial metrics, or both." Although the level and coverage of assurance are unspecified, we apply the conservative assumption that the reported cost pertains to limited assurance of Scope 1 and 2 emissions.

16. *See* letter from IDFA. An unnamed, privately held company reported that it discloses Scope 1 and 2 emissions. It further states that it spends between "$50,000-$75,000 or more that is necessary to periodically hire a 3rd party consultant to review and re-validate the company's internal systems." The level of assurance is unspecified. We include the midpoint of this range in the table ($62,500).

17. *See* letter from Salesforce. This commenter did not provide actual costs of limited or reasonable assurance, but it estimated that its *incremental* cost of switching from limited to reasonable assurance over its Scope 1, 2, and 3 emissions could range from $1 to 3 million. We include this incremental cost since it serves as a lower bound for its reasonable assurance costs. We take the midpoint of this range ($2 million) and convert to limited assurance (see footnote 10 of this table): ($2 million)/2.5 = $800,000. This estimate is understated considering that it is derived from the incremental cost as opposed to actual cost.

Table 12 presents the cost estimates of limited assurance from commenters, with any adjustments or assumptions explained in the table footnotes. The median of these estimates ($50,000) is subsequently used to extrapolate the cost of reasonable assurance. One commenter stated that reasonable assurance may cost two to three times more than limited assurance, based on input from stakeholders with expertise in developing GHG inventories for companies.[3077] We use the upper end of this range and assume that reasonable assurance is three times the cost of limited assurance. As a result, we estimate that the cost of limited assurance for Scope 1 and Scope 2 emissions disclosures is $50,000, while the cost for reasonable assurance is $150,000.

Costs may vary, however, depending on the type of assurance provider. Specifically, assurance provided by a registered public accounting firm may cost more than if it were provided by a different type of service provider. However, the final rules do not require assurance to be obtained from a registered public accounting firm.[3078] Conversely, costs may be lower if a

---

[3077]    *See* letter from Center for Climate and Energy Solutions.

[3078]    One commenter suggested that most registrants will nevertheless seek assurance from registered public accounting firms to comply with the proposed rules. *See* letter from Soc. Corp. Gov. (June 17, 2022). To the extent that this is also true of the final rules, registrants may incur higher assurance costs.

registrant uses its auditor to also provide assurance over its GHG emissions disclosures rather than contracting with a different third-party.  We also note that some of the companies listed in Table 12 indicated that they were unsure as to whether their current assurance practices would meet the proposed rules' requirements.[3079]  We are likewise unable to make this determination without additional details on these companies' assurance practices.  If these companies were to incur additional costs to meet the final rules' assurance requirements, the Commissions' compliance cost estimates may be understated in this regard.  However, we believe that our conservative approach in other aspects (e.g., incorporating assurance costs that cover all three scopes of emissions instead of just Scopes 1 and 2 emissions) mitigate this concern.

### iv.  Estimates of reporting costs for scenario analysis and targets/goals

While the final rules do not require any registrants to undertake activities related to scenario analysis or setting targets and goals, they may require the attendant disclosures under specific circumstances,[3080] which will result in affected registrants incurring associated reporting costs.  To estimate this reporting cost, we first review comment letters and other sources that inform our assessment on the costs of undertaking scenario analysis and targets or goals, then apply the assumption that 10 percent of this cost comprise the reporting cost.[3081]

Table 13 presents the relevant sources of the costs of scenario analysis.[3082]  The FCA rule estimates the ongoing cost to be $40,688 for larger issuers.  The BEIS rule contains ongoing cost

---

[3079]    *See* letter from Soc. Corp. Gov (June 17, 2022).

[3080]    *See* sections II.G and II.D.3.

[3081]    The BEIS rule estimates that in the first year of compliance, the reporting cost of metrics and targets disclosure is approximately 9.4% of the cost of the "annual data gathering" activity associated with metrics and targets (*see supra* note 2996).  We similarly assume that reporting costs are 10% of the cost of undertaking the associated activity.

[3082]    *See supra* note 3052.

estimates for two different types of scenario analysis: qualitative ($32,190) and quantitative ($79,706).  Because the final rules allow for registrants to provide disclosures of either type, where applicable, we include the estimates of both.  Finally, a survey indicates that the respondents' average annual expenditures is $154,000.  The median of these ongoing costs is $60,197. We next extrapolate the initial cost.  Some of the sources provide both the initial and ongoing cost of scenario analysis (see Table 13 footnotes), from which we determine the median percentage cost reduction (50 percent).  This implies an initial cost of $120,394.  Assuming that 10 percent of these costs comprise the reporting costs, we estimate that the reporting costs of scenario analysis is $12,000 in the initial year and $6,000 annually in subsequent years (rounded to the nearest $1,000).

Appellate Case: 24-1628     Page: 773     Date Filed: 03/26/2024 Entry ID: 5377362

**Table 13.** Costs of scenario analysis

| Commenter or Source | Ongoing cost |
|---|---|
| FCA rule | $40,688 [1] |
| BEIS rule: qualitative scenario analysis | $32,190 [2] |
| BEIS rule: quantitative scenario analysis | $79,706 [3] |
| ERM survey | $154,000 [4] |

1. *See supra* note 2995. The FCA rule estimates ongoing costs to be £32,896 for larger issuers, which is converted to dollars based on the 2022 average exchange rate. (£32,896)*(1.2369 USD/GBP) = $40,688. This reflects a 50% reduction from the initial cost estimate ($81,377), which we consider in determining the appropriate percentage reduction in subsequent calculations.

2. *See supra* note 2996. The BEIS rule estimates ongoing costs of *qualitative* scenario analysis to be £26,025, which is converted to dollars based on the 2022 average exchange rate. (£26,025)*(1.2369 USD/GBP) = $32,190. This reflects a 25% reduction from the initial cost estimate ($42,920), which we consider in determining the appropriate percentage reduction in subsequent calculations.

3. *See id.* The BEIS rule estimates ongoing costs of *quantitative* scenario analysis to be £64,440 (£52,040 for writing or quantifying scenarios and £12,400 additional cost for quality assurance and internal verification). This is converted to dollars based on the 2022 average exchange rate. (£64,440)*(1.2369 USD/GBP) = $79,706. The initial cost estimate is $240,194 (£112,400 for developing a model for conducting scenario analysis, £69,390 for writing and quantifying scenarios, and £12,400 additional cost for quality assurance and internal verification, converted to dollars based on the 2022 average exchange rate). This reflects a 67% reduction from initial to ongoing costs, which we consider in determining the appropriate percentage reduction in subsequent calculations.

4. *See* ERM survey. The ERM survey indicates that $154,000 is the average of respondents' expenditures with respect to scenario analysis, which "includes all costs to a company related to conducting assessments of the impact of climate in the short, medium, or long term using scenario analysis as well as TCFD/CDP disclosure of risks and opportunities." The survey does not include data on initial costs.

With respect to the reporting costs of targets and goals disclosure, we refer to Table 9, which presents the ongoing costs of undertaking targets and goals. The median ongoing cost of targets is $54,015. Using the median percent cost reduction from the initial year (45 percent), we extrapolate the initial cost to be $98,209. We assume 10 percent comprise the reporting

Appellate Case: 24-1628    Page: 774    Date Filed: 03/26/2024 Entry ID: 5377362

costs.[3083]  Thus, we estimate that the reporting costs of targets and goals are $10,000 in the initial year of disclosure and $5,000 annually in subsequent years (rounded to the nearest $1,000).

### v. Cost estimates of amendments to Regulation S-X and incremental audit fees

We reviewed comment letters that provided cost estimates pertaining to the amendments to Regulation S-X, which were often in the millions of dollars.[3084]  We considered these estimates, presented in Table 14, when developing our cost estimates but made adjustments to reflect the changes made to the final rules,[3085] which we expect will substantially reduce the compliance burden compared to the proposal.

**Table 14.  Estimated Costs of Amendments to Regulation S-X**

| Commenter | Cost |
| --- | --- |
| Chamber of Commerce[1] | $1.5 – 2.5 million (initial) <br> $1 – 2 million (ongoing) |
| Williams Companies, Inc. | "Millions of dollars"[2] (initial) |
| Western Energy Alliance and U.S. Oil and Gas Association | > $100 million[3] (initial) |

1.  The Chamber of Commerce stated that this estimate was provided by one Well-Known Seasoned Issuer it consulted regarding the proposed amendments.

2.  Williams Cos. estimated the costs of implementing the proposed amendments to Regulation S-X would be in the "millions of dollars" without providing a more specific estimate.

3.  Western Energy Alliance and U.S. Oil and Gas Association stated that this estimate was based on discussions with public companies that estimated costs of over $100 million for large companies when considering the need for new systems and staff training.

---

[3083]    *See supra* note 3081.

[3084]    *See, e.g.,* letters from API; Chamber; NRF; WEA/USOGA; and Williams Cos.

[3085]    *See* section II.K.

We consider the "millions of dollars" estimate provided by Williams Companies, Inc. as the median[3086] cost estimate. Assuming the range "millions of dollars" refers to a number less than $10 million but more than $1 million,[3087] we take the midpoint of $5 million as the starting point for our estimate of the costs of the proposed Regulation S-X amendments.

We believe the $5 million, however, should be adjusted downward as the costs associated with the final rules should be significantly less than the proposed rules. Many of the concerns that commenters expressed about the proposed rules were primarily focused on the expected challenges and costs related to implementing the proposed Financial Impact Metrics, which would have constituted most of the costs associated with the proposed amendments to Regulation S-X. Specifically, these commenters expressed concerns about implementing new accounting processes, policies, controls, and IT systems to identify and distinguish activities related to climate-related risks and transition activities from normal routine business activities and then to calculate the disclosure threshold and track those impacts on a line-by-line basis.[3088] These commenters also highlighted challenges posed by the significant number of estimates and assumptions that, in their view, would be required to prepare the proposed disclosures.[3089]

As discussed in greater detail above, the final rules have been significantly revised compared to the proposal to reduce burdens on registrants. The final rules do not include the

---

[3086] *See supra* note 3046.

[3087] We recognize the possibility that the commenter's language of "millions of dollars" may be referring to a number greater than $10 million. However, if the commenter was referring to "tens of millions" or "hundreds of millions" of dollars, we assume that the commenter would have stated it as such. Without additional information, we believe it is reasonable to read this comment as meaning less than $10 million.

[3088] *See, e.g.*, letter from NRF ("Existing accounting systems are not designed for tracking and reporting such cost impacts, particularly with no meaningful cost threshold, across all line items, because registrants do not have systems in place to collect, calculate, and report these line items, especially at such a granular level.").

[3089] *See, e.g.*, letter from Chamber ("[T]he Proposed Rules require untold estimates, assumptions and judgments against the backdrop of significant data limitations and speculative impacts.").

proposed Financial Impact Metrics, which should result in a substantial reduction in compliance costs and burdens.[3090]  For example, registrants will not be required to disclose any impacts to the Statement of Cash Flows.  Moreover, registrants will not be required to disclose any impacts to revenues, costs savings, or cost reductions, which some commenters stated would be particularly difficult to disclose because such amounts are not currently captured in a registrant's books and records.[3091]  In addition, registrants will not be required to apply the 1% disclosure threshold on a line-by-line basis.

Instead, the final rules focus the financial statement disclosures on expenditures related to a narrower category of activities as compared to the proposal: severe weather events and other natural conditions and the purchase and use of carbon offsets and RECs (one type of transition activity).[3092]  Commenters stated that discrete expenditures of this type are captured in the books and records and would be feasible to disclose.[3093]  Under the final rules, registrants will be required to apply the 1% disclosure threshold to severe weather events and other natural conditions.  In addition, instead of applying the 1% disclosure threshold on a line-by-line basis throughout the financial statements as would have been required under the proposed rules, the 1% disclosure threshold will be applied only to two amounts under the final rules to determine if

---

[3090]   *See* letter from Williams Cos. ("Accounting for climate impacts would require companies to write entirely new and significant accounting policies, design and implement new controls, and develop and potentially pay for new software.").

[3091]   *See, e.g.*, letters from Chamber (stating that "GAAP financial statement line-items do not include amounts for lost revenues, cost savings, or cost reductions"); and Williams Cos. (stating that "lost revenue" does not exist under GAAP).

[3092]   *See* 17 CFR 210.14-02(c), (d), and (e).

[3093]   *See* letters from Autodesk (noting that if a fire or storm destroys a registrant's facilities, the associated costs, impairments, and contingencies would be accounted for and, if material, disclosed under U.S. GAAP); Crowe; Dow; and Nutrien (noting that it would be operationally possible to track specific costs incurred to mitigate transition risks or costs incurred due to severe weather events and natural conditions).

Appellate Case: 24-1628     Page: 777     Date Filed: 03/26/2024 Entry ID: 5377362

disclosure is required.[3094]  Specifically, disclosure is required only if (1) the aggregate amount of expenditures expensed as incurred and losses equals or exceeds one percent of the absolute value of income or loss before income tax expense or benefit; and/or (2) the aggregate amount of the absolute value of capitalized costs and charges equals or exceeds one percent of the absolute value of stockholders' equity or deficit, subject to de minimis thresholds.[3095]  In addition, the final rules prescribe an attribution principle—significant contributing factor—in response to commenters' concerns about their ability to isolate and attribute expenditures to severe weather events and other natural conditions.[3096]

The final rules require registrants to disclose costs, expenditures, and losses incurred in connection with the purchase and use of carbon offsets and RECs only if carbon offsets or RECs have been used as a material component of a registrant's plans to achieve its disclosed climate-related targets or goals.[3097]  As explained above, this requirement is narrower than the proposed rules, which would have required registrants to disclose expenditures incurred to reduce GHG emissions or otherwise mitigate exposure to transition risks in the financial statements.  Although registrants will not be required to disclose expenditures generally related to transition activities in the financial statements, under the final rules, registrants are required to disclose material expenditures incurred that directly result from: (1) disclosed activities to mitigate or adapt to climate-related risk (in management's assessment); (2) disclosed transition plans; and (3)

---

[3094] *See* 17 CFR 210.14-02(b).

[3095] *See id.*

[3096] *See* 17 CFR 210.14-02(g).  *See also* letter from NAM ("Companies would be required to count every single financial impact that could plausibly be attributable to climate risks, weather events, or transition activities, somehow determine the degree of climate causation associated with each, and then aggregate these impacts to determine if they meet the proposed 1% threshold – for each line item in the consolidated financial statements.").

[3097] *See* 17 CFR 210.14-02(e).

Appellate Case: 24-1628     Page: 778     Date Filed: 03/26/2024 Entry ID: 5377362

disclosed targets and goals, as part of the final amendments to Regulation S-K. Since these disclosure requirements are no longer part of the amendments to Regulation S-X, the disclosures will fall outside the scope of the financial statement audit and a company's ICFR, which, along with the materiality qualifier, should further reduce costs and burdens as compared to the proposed rules.[3098]

In addition, the final rules limit the scope of the requirement to disclose estimates and assumptions in the financial statements to only those estimates and assumptions materially impacted by severe weather events and natural conditions and any climate-related targets or transition plans disclosed by the registrant, whereas under the proposed rules, registrants would have been required to disclose estimates and assumptions impacted by transition activities more generally.[3099]

Finally, the final rules require the disclosure for historical fiscal year(s) only to the extent the required information was previously disclosed or required to be disclosed (i.e., on a prospective basis).[3100] Commenters stated that the proposed requirement to provide disclosure for the historical fiscal year(s) included in the consolidated financial statements would be burdensome and costly because, among other things, it would require issuers to "retroactively estimate their historical data."[3101] However, under the final rules, no registrants will be required to provide disclosure for fiscal periods in which they were not required to collect or report the data.

---

[3098]   *See* 17 CFR 229.1502(d)(2), (e)(2) and 17 CFR 229.1504(c)(2).

[3099]   *See* 17 CFR 210.14-02(h).

[3100]   *See* 17 CFR 210.14-01(d).

[3101]   *See* letter from BlackRock; *see also* letter from Autodesk (stating that "it may be prohibitively costly" for registrants to accurately compile the necessary data, particularly for historical periods).

After taking into account the fact that the final rules eliminate many of the primary drivers of the costs identified by commenters, and based on staff knowledge of accounting practices, we are using $500,000 as an estimated initial direct cost of compliance. While this represents a significant reduction from the median cost estimate provided by commenters, we view it as an upper bound estimate given the numerous changes from the proposal and the fact that discrete expenditures of this type are already captured in the books and records and therefore should be less costly to disclose.[3102] Thus, we expect that in many cases, based on staff knowledge of accounting practices, costs will be significantly lower.

Although we anticipate that the amendments to Regulation S-X we are adopting will be significantly less costly to apply than the proposed rules, registrants will incur some implementation costs related to adjustments in processes and systems, including systems of internal control. We expect these adjustments will be far fewer than would have been required under the proposed rules.

With respect to the final amendments to Regulation S-X, registrants may need to adjust their internal processes and systems to (1) identify, track, and disclose the costs, expenditures, charges, and losses incurred as a result of severe weather events and other natural conditions and related to the purchase and use of carbon offsets and RECs; (2) calculate the disclosure thresholds; (3) identify and disclose the amount of relevant recoveries; (4) evaluate and disclose financial estimates and assumptions materially impacted by severe weather events and other natural conditions or disclosed targets; and (5) to provide contextual information.

To calculate the upper bound of the range for ongoing costs, we used the estimates for the initial and ongoing costs related to the proposed amendments to Regulation S-X provided by the

---

[3102]    *See supra* note 3093.

Appellate Case: 24-1628    Page: 780    Date Filed: 03/26/2024 Entry ID: 5377362

Chamber of Commerce to determine that the expected the ongoing costs would be approximately 75% of the initial cost.[3103] Applying that reduction to the upper bound of the Commission's initial cost estimate of $500,000 results in an estimated upper bound of $375,000 for compliance with the amendments to Regulation S-X on an ongoing, annual basis.[3104] As noted above, given the feedback from commenters that our cost estimates in the proposed rules were too low, we have considered the upper bound of the estimated range in evaluating the economic impact of the final rules. However, we acknowledge the precise amount of both the implementation costs and ongoing costs will vary depending on a number of factors including the size and complexity of the registrant (and its financial reporting systems), and the frequency in which the registrant is exposed to severe weather events and other natural conditions, among other factors.

We also consider incremental audit fees resulting from the final rules. To be clear, these incremental audit fees are separate from the fees associated with mandatory assurance over GHG emissions disclosure. In the Proposing Release, we estimated this incremental cost to be $15,000 with respect to the proposed rules.[3105] Several commenters asserted that actual costs would be much higher.[3106] One commenter estimated incremental audit fees of $70,000 to $225,000 per year.[3107] Based on the final rules' significant reductions in the burden of complying with the amendments to Regulation S-X, we expect a corresponding reduction in the cost of the audit. As

---

[3103]    The initial range provided by the Chamber of Commerce was $1.5-$2.5 million while the ongoing estimate was $1 million - $2 million. To arrive at 75%, we take the midpoint of the two ranges ($1.5 million ongoing cost to $2 million initial cost).

[3104]    This figure is based on the $500,000 estimate for initial implementation costs multiplied by 75%. *See id.*

[3105]    *See* Proposing Release, section IV.C.2.a.

[3106]    *See, e.g.*, letters from Nutrien; Soc. Corp. Gov (June 17, 2022); National Association of Manufacturers; Edison Electric Institute; ConocoPhillips; Business Roundtable; Association of American Railroads; Ernst & Young LLP; and ABA.

[3107]    *See* letter from Nutrien.

a result, we are using an upper bound cost estimate of $23,000 in incremental audit fees per year (rounded to the nearest $1,000).

### c.  Factors that Influence Direct Costs

Incremental compliance costs may be relatively lower for registrants that already disclose any of the information required by the final rules.  For instance, covered registrants that already disclose Scope 1 and 2 emissions will face lower incremental costs relative to those that have never previously disclosed such information, all else equal.  As discussed in section A.5.a, the Commission staff found that 41 percent of annual reports on Form 10-K and Form 20-F filed in 2022 contained some degree of climate-related disclosures.  To the extent that these disclosures meet some of the final rules' requirements, these registrants would face lower incremental costs.

Some industry reports also document how a sizeable portion of U.S. companies report climate-related information under one or more third-party frameworks that are either fully or partially aligned with the TCFD disclosure elements.  Registrants with operations in foreign jurisdictions[3108] that have disclosure requirements based on the TCFD's framework for climate-related financial reporting may also face lower incremental costs.[3109]  To the extent that the final rules overlap with the TCFD framework, we expect lower incremental compliance costs for registrants that already provide most or all disclosures according to the TCFD or related frameworks, including the CDP, which has fully integrated the TCFD disclosure elements into

---

[3108]   Morningstar reports that over 35% of S&P 500 revenues came from foreign markets, while this percentage is around 20% for the revenues coming from companies belonging to the Russell 2000 index.  *See* Gabrielle Dibenedetto, *Your U.S. Equity Fund is More Global Than You Think,* Morningstar (Mar. 14, 2019), available at https://www.morningstar.com/articles/918437/your-us-equity-fund-is-more-global-than-you-think.

[3109]   *See* section IV.A.4 for a discussion on International Disclosure Requirements.

Appellate Case: 24-1628     Page: 782     Date Filed: 03/26/2024 Entry ID: 5377362

its disclosure questionnaire, and other frameworks and/or standards partly aligned with the TCFD framework.

Similarly, while registrants in the insurance industry may face higher compliance costs due to their complex exposure to climate-related risks, they have existing disclosure obligations that may effectively lower their incremental costs due to the final rules. As discussed in section IV.A.3, a large subset of insurance companies must, by state law, disclose their climate-related risk assessment and strategy via the NAIC Climate Risk Disclosure Survey. For example, a comment letter by a state insurance commissioner stated that because this survey overlaps extensively with the TCFD recommendations, these companies should be able to easily switch from their current reporting to reporting via the TCFD framework,[3110] and accordingly, similar portions of the final rules.

We reiterate that not all quantifiable cost estimates will be applicable to all registrants. For instance, the final rules will not require SRCs and EGCs to incur costs of assessing their GHG emissions or obtaining the associated assurance. Other registrants may not have to provide certain disclosures due to materiality qualifiers. Risk management disclosure, for example, will only be required with respect to climate risks that are material. Other disclosures that may not apply to all registrants include scenario analysis and targets and goals. The final rules do not require any registrants to undertake such activities, but if registrants voluntarily do so, the related disclosures (and costs) would only be required following a materiality determination. As a result, while certain registrants may incur some costs in order to make the prerequisite materiality determination, those that subsequently deem a disclosure component to be non-material would accordingly avoid the remaining portions of the estimated compliance costs

---

[3110]    *See* letter from Mike Kreidler, Office of the Insurance Commissioner, State of Washington (June 14, 2021).

associated with the disclosure (e.g., drafting, vetting and review, other reporting costs, and assurance in cases where Scope 1 and 2 emissions are not material).

With regard to California state laws on climate-related disclosure, registrants that will be required to comply with the Climate Corporate Data Accountability Act and the Climate-Related Financial Risk Act may experience reduced costs of compliance with the final rules to the extent the California laws impose similar requirements for those registrants that are subject to them. Several commenters asserted that the recently enacted California laws, which reach some of the same entities and require some of the same types of disclosure as these final rules, could affect the benefits and costs of the final rules.[3111] Another commenter stated that the Commission could not rely on the California laws to reduce cost estimates because, based on the compliance dates in the Proposing Release, the final rules would precede the California laws in implementation.[3112] We disagree with that comment, in that enacted laws—even if not fully implemented—imply future costs and benefits, and so we appropriately consider existing enacted laws as part of the baseline against which we consider the economic effects of the final rules.[3113] However, our estimates of the final rules' direct compliance costs do not reflect any adjustments with respect to the California laws because, as discussed below, the details of their implementation are uncertain.

We expect that entities subject to the California laws could have lower incremental information gathering costs with respect to the final rules to the extent that there is overlap in the information that is required to be collected and reported under the final rules and the California

---

[3111] *See, e.g.*, letters from Amer. for Fin. Reform, Public Citizen and Sierra Club (Oct. 26, 2023); Institute for Policy Integrity; and Rep. Maxine Waters.

[3112] Letter from Chamber II.

[3113] *See* SEC Guidance on Economic Analysis (2012), *supra* note 2574 (describing the baseline as "the best assessment of how the world would look in the absence of the proposed action").

laws.  For example, because both the Climate Corporate Data Accountability Act and the final

rules require companies to collect information to disclose their Scope 1 and Scope 2 emissions

and "obtain an assurance engagement of the disclosure," to the extent that the information and

reporting activities overlap, registrants subject to the final rules and the Climate Corporate Data

Accountability Act may face lower incremental information gathering compliance costs.[3114]

However, the extent and overall impact of overlapping disclosure obligations are unclear.[3115]

The scope and requirements of the California laws differ from the final rules, such that

compliance with the final rules could require information collection and reporting activities in

addition to those performed to satisfy the California requirements.[3116]  Additionally, one of the

California laws allows the covered entity to satisfy certain California disclosure requirements

with a disclosure prepared pursuant to another law or regulation.[3117]  Therefore, while the

California requirements may mitigate the costs of the final rules for some registrants, the degree

of mitigation will depend on the regulations ultimately adopted and on the ways in which entities

organize their compliance activities to satisfy reporting obligations in different jurisdictions.

---

[3114]   One commenter agreed that compliance with the California laws could reduce the cost of compliance with the final rules, stating that "…the costs of compliance with other provisions of the proposed rule will be reduced substantially due to overlap with California's new laws."  Letter from Amer. for Fin. Reform. Public Citizen and Sierra Club (Oct. 26, 2023).

[3115]   For example, the Climate Corporate Data Accountability Act directs a state agency to adopt implementing regulations by January 1, 2025 for reporting to begin in 2026.  The details of those regulations are not yet available.

[3116]   One commenter identified two differences in scope between the California laws and the proposed rules: (1) the Climate Corporate Data Accountability Act requires GHG emission disclosures "based on different organizational boundaries" than the proposed rules; and (2) Climate Related Financial Risk Act requires biennial reporting, instead of annual reporting.  *See* letter from Chamber II.  This commenter also stated there could be additional administrative costs related to coordinating compliance with different reporting regimes.  *Id*.  We agree that differences such as these reduce the potential for cost mitigation through overlapping requirements (although we note that, in a change from the proposal, the final rules allow the organizational boundaries to differ from those used in the financial statements; *see supra* note 1034 and accompanying text).

[3117]   *See* Climate Related Financial Risk Act, adding section 38533(b)(1)(A).

One commenter suggested that the California laws could increase compliance costs by increasing demand, and thus the cost, for external consultants and services.[3118] We acknowledge this could occur in the short term; however, over the long-term, we expect that increased demand would cause new providers to enter the market, resulting in a corresponding increase in supply. An increase in the supply of providers would lead to greater competition among the external consultants, resulting in lower fees charged by consultants. To that end, the phased implementation of the final rules should mitigate most costs stemming from any shortage of consultants.

Registrants that have more exposure to material climate-related risks may face higher compliance costs to the extent that they must provide more extensive disclosures. However, we note that industries in which climate-risks are most likely to be material are also those that are already providing some degree of voluntary or mandatory disclosures.[3119]

The incremental costs of the financial statement disclosures may be somewhat higher for companies with exposure to severe weather events or other natural conditions that are difficult to assess, track, and disclose in the financial statements. For example, companies (e.g., banks) with complicated asset structures or with operations in many jurisdictions may incur more costs to identify the expenditures for which a severe weather event or other natural condition was a "significant contributing factor."

Incremental costs, either proportionally or in dollar terms, may be higher for smaller registrants, such as SRCs and EGCs, considering that they are less likely to have climate-related

---

[3118]    *See* letter from Chamber II; *see also supra* note 3125 and accompanying text.

[3119]    *See* section IV.A.5.a.

Appellate Case: 24-1628    Page: 786    Date Filed: 03/26/2024 Entry ID: 5377362

disclosure systems and processes already in place.[3120]  If smaller firms were to face higher proportional fixed costs in meeting the disclosure requirements, they may potentially be placed at a competitive disadvantage relative to larger firms.[3121]  Conversely, incremental costs may be lower for smaller firms to the extent that their assets and operations are less complex, which may allow them to prepare responsive disclosures at lower cost.  We recognize that a portion of the final rules' compliance costs is "fixed" in the sense that the costs do not scale with registrant size or its level of resources.  We therefore expect that smaller registrants will have more difficulty allocating resources to comply with the final rules as compared to larger firms.[3122]  To mitigate these compliance burdens, the final rules provide SRCs and EGCs certain accommodations, including being exempt from the GHG emissions disclosure requirement and the accompanying assurance requirement, as well as an extended phased in compliance period, which will allow such issuers both more time to prepare for initial compliance, as well as the benefit of observing market practices prior to preparing their initial disclosures required in response to the final rules.

We expect compliance costs to decrease over time.  For example, a registrant disclosing climate-related information for the first time is likely to incur initial fixed costs to develop and implement the necessary processes and controls.[3123]  Once the company invests in the

---

[3120]   Commission staff's analysis of registrants' annual filings indicate that SRCs and EGCs are less likely to have climate-related disclosures (as indicated by the presence of climate-related keywords) within their filings (*see* section IV.A.5.a); *see also* section IV.A.5.b.ii for another Commission staff analysis that finds that SRCs and EGCs are less likely to disclose GHG emissions.

[3121]   *See, e.g.*, letters from Chamber and NAM.

[3122]   *See, e.g.*, letter from CrowdCheck Law ("For example, for two companies we have worked with that recently became Exchange Act reporting companies, the estimated costs for the first year of compliance with the proposed rules would represent approximately 18.5% and 15%, respectively, of their entire gross revenues for the year prior to becoming a reporting company."); *see also* letter from Independent Community Bankers (stating that "the compliance cost burden for the smallest community banks is double that of the largest community banks").

[3123]   *See* letter from Financial Executives International's ("FEI") Committee on Corporate Reporting ("CCR") (June 10, 2021); *see also* Proposing Release section IV.C.4.c.

institutional knowledge and systems to prepare the disclosures, the procedural efficiency of these processes and controls should subsequently improve, leading to lower costs in subsequent years.

Mandated climate disclosures may heighten demand for third-party services related to preparing the required disclosures, especially if registrants' current service providers cannot provide the specific services that registrants may seek to comply with the final rules.[3124] In the short term, there could be a potential increase in the prices of such services, leading to higher compliance costs. In the long term, however, this heightened demand is expected to spur competition, innovation, and economies of scale that could over time lower associated costs for such services and improve their availability.[3125] Moreover, the aggregate accumulation of institutional knowledge may lead to a broad convergence of disclosure-related best practices, which could further reduce the costs of the required disclosures.

Overall, the market effects deriving from competition and innovation could enhance the efficiency and availability of relevant services, thereby lowering compliance costs. These positive externalities from standard reporting practices can provide additional market-wide cost savings to the extent that they reduce duplicative effort in the production and acquisition of information.[3126]

### D. Other Economic Effects

The analysis of benefits and costs in section IV.C is generally based on the assumption that the final rules will not cause registrants to change how they manage climate-related risks, but rather how they produce the associated disclosures. In this section, we consider the

---

[3124] *See supra* note 1372 and accompanying text in section II.I.2.c.

[3125] *See also supra* notes 2873, 3118 and accompanying text.

[3126] *See* Christensen *et al.* (2021).

possibility that the rules may influence how some companies approach climate-related risks. For example, if agency conflicts currently prompt some managers to ignore long-run climate-related risks, in an effort to increase short-term cash flows, the additional transparency provided by the final rules may lead managers to focus more on long-run considerations if that is what their shareholders demand. Conversely, if some managers currently are over-prioritizing climate-related risks as compared to what investors view as optimal, the final rules may lead those managers to scale back their level of investment in managing climate-related risks. Generally, we expect that any resulting changes in behavior will primarily stem from investors' improved ability to assess managerial decisions. That is, to the extent the final rules prompt managers to alter their approach to climate-related risks, it may be because they expect that failing to do so might prompt a negative stock price reaction to the disclosures.[3127]

Registrants may change their behavior in response to the proposed disclosure requirements by managing exposures to certain physical or transition risks. For example, empirical evidence shows that mandatory reporting of GHG emissions results in reduced aggregate reported emissions among affected firms.[3128] The final rules will require the disclosure of the location of company properties or operations subject to material physical risks (Item 1502(a)(1)), which could allow investors to better assess companies' exposures to such risks. It is possible that, in response to or anticipation of investor reactions, companies may relocate properties or operations to geographical areas less exposed to physical risks or give

---

[3127] *See* M. Kahn, J. Matsusaka & C. Shu, *Divestment and Engagement: The Effect of Green Investors on Corporate Carbon Emissions* (Oct. 3, 2023), available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4592023 (retrieved from SSRN Elsevier database).

[3128] *See* Jeong-Bon Kim, *et al.*, *supra* note 2586; B. Downar, *et al.*, *supra* note 2776; S. Tomar, *Greenhouse Gas Disclosure and Emissions Benchmarking*, SMU Cox Sch. of Bus. Rsch. Paper No. 19-17 (2021), available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3448904 (retrieved from SSRN Elsevier database); V. Jouvenot & P. Krueger, supra note 2775.

preference to such areas for future business activity. Any such changes to registrant behavior resulting from the final rules may come with the potential cost of lower productivity, profitability, or market share.[3129] In the case of relocation, for example, the alternate location may be more costly to operate. Similarly, we also recognize that some of the costs associated with the final rules may prompt some registrants to abandon or forgo adoption of material targets or goals relating to GHG emissions. To avoid direct costs of compliance or to simply report a lower emissions amount in their required disclosures, some registrants may take steps to reorganize their business in order to shift certain parts of their Scope 1 and Scope 2 emissions into the Scope 3 emissions category.[3130] This potential response from registrants obscures the registrants' true risk exposure and therefore could diminish the benefits of the disclosure related to investors' ability to assess exposure to climate-related transition risks.

Some commenters asserted that the compliance costs of the rules might cause some registrants to reduce their voluntary oversight of climate-related risks. For example, according to one commenter, devoting "resources to meeting the requirements of any final rules the Commission adopts… will detract from other climate-related reporting efforts."[3131] This commenter also asserted that the proposed requirement to "disclose internal information, such as internal carbon pricing, scenario planning, and related information if a company has an emission reduction target, could discourage companies from setting such targets."[3132] We recognize that

---

[3129] At the same time, we recognize that a registrant may optimize for both climate risks and productivity, as these factors are not necessarily mutually exclusive.

[3130] *See* Lucas Mahieux, Haresh Sapra & Gaoqing Zhang, *Climate-Related Disclosures: What Are the Economic Trade-Offs?* (Dec. 1, 2023), available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4507526 (retrieved from SSRN Elsevier database).

[3131] *See* letter from API.

[3132] *Id.*

Appellate Case: 24-1628     Page: 790     Date Filed: 03/26/2024 Entry ID: 5377362

some companies may pursue such avoidance strategies in response to the final rules. Other companies, however, may find the existence of disclosure requirements around climate-related targets and goals to be beneficial for signaling credible value-enhancing commitments to investors and hence may be motivated to engage in setting targets.[3133] More reliable and standardized disclosures about climate-related targets and goals will facilitate investors' understanding of the impact of those targets and goals, and hence could affect registrants' incentives for making such commitments, but the magnitude and direction of any such effects would depend upon registrants' decisions and investors' assessments about the value of those commitments rather than stemming directly from the final rules.

### E. Effects on Efficiency, Competition, and Capital Formation

#### 1. Efficiency

The final rules should have positive effects on market efficiency. As discussed above, the final rules should improve the informativeness and reliability of climate-related risks and financial disclosures. As a result of the disclosures required by the final rules, investors and other market participants should better understand the climate-related risks that registrants are facing, their potential impact (*e.g.*, on future cash flows), and registrants' ability to respond to and manage such risks. Investors and other market participants should thereby better evaluate registrants and make more informed investment and voting decisions. As a result, the required disclosures should reduce information asymmetry and mispricing in the market, improving

---

[3133]     Disclosures filed with the Commission are subject to greater liability and thus may be viewed as more credible than similar disclosures provided via other avenues (e.g., company sustainability reports). In addition, the final rules will require disclosure of details or specifics that some registrants may otherwise not provide in the absence of the final rules.

Appellate Case: 24-1628     Page: 791     Date Filed: 03/26/2024 Entry ID: 5377362

market efficiency. More efficient prices should improve capital formation by increasing overall public trust in markets, leading to greater investor participation and market liquidity.[3134]

Currently, investors may seek information on registrant's climate-related risks from various sources, including those outside of Commission filings. For example, the necessary information may only be available from company websites or from third-party service providers that collect information and offer their analysis for a fee. Once investors locate relevant disclosures, they may need to spend time organizing and compiling information in ways that facilitate comparisons across companies. Because the final rules will make the required disclosures available from a consistent source (i.e., Commission filings) and because the disclosures will be standardized and tagged, we expect the final rules to improve efficiency by reducing the costs associated with compiling and organizing information on climate-related risks and oversight.[3135]

We expect the climate-related disclosures mandated by the final rules will cause differential asset price and financing cost responses across companies and settings, as investors are more easily able to factor this information into their valuation decisions. These expected

---

[3134] *See* Grewal, *et al.*, supra note 2653; M.E. Barth, *et al.*, *Textual Dimensions of Non-Financial Information, Stock Price Informativeness, and Proprietary Costs: Evidence from Integrated Reports*, (July 27, 2023), available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3857927; see also D.S. Dhaliwal *et al.*, *Voluntary Nonfinancial Disclosure and the Cost of Equity Capital: The Initiation of Corporate Social Responsibility Reporting*, 86 Acct. Rev. 59 (2011); S. Kleimeier & M. Viehs, *Carbon Disclosure, Emission Levels, and the Cost of Debt*, (Jan. 7, 2018), available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2719665 (retrieved from SSRN Elsevier database); E.M. Matsumura, *et al.*, *Climate Risk Materiality and Firm Risk*, supra note 2744. *But see* I. Goldstein & L. Yang, *Good Disclosure, Bad Disclosure*, 131 J. of Fin. Econ. 118 (2019).

[3135] One commenter stated that "[t]he Commission offers no support for the view that a rule aimed at consistency should be a stand-alone goal that will promote competition, efficiency, and capital formation." *See* Overdahl exhibit to letter from Chamber. To the extent that the commenter is asserting that the consistency achieved by the final rules does not promote or is somehow at odds with competition, efficiency, and capital formation, we disagree for the reasons outlined in this paragraph. Moreover, the Commission considers benefits and costs of the final rules in addition to the economic effects associated with efficiency, competition, and capital formation. *See* SEC Guidance on Economic Analysis (2012), *supra* note 2574.

Appellate Case: 24-1628     Page: 792     Date Filed: 03/26/2024 Entry ID: 5377362

improvements in market efficiency are broadly consistent with empirical research. For example, one academic study finds evidence that, among companies that voluntarily report emissions via the CDP questionnaire, those with higher emissions (relative to their size and industry peers) pay higher loan spreads.[3136] Another study examined more than 16,000 companies from 2016 through 2020 and found that investors were actively and directly pricing some transition risk into valuations, an action that resulted in a negative correlation between companies' $CO_2$ emissions and their price-to-earnings ratio.[3137]

Empirical research has also documented evidence of current market inefficiencies with respect to climate-related risks. For example, one study found that stock prices of food processing and agricultural companies may exhibit mispricing with respect to drought exposure.[3138] The study documented that drought-exposed companies report reduced future profitability, indicating that drought exposure is a financial risk.[3139] In an efficient market, this risk should result in trading activity that decreases the current stock price and increases the expected return (to compensate investors for bearing this risk). The study, however, found that drought-exposed companies deliver *lower* future returns relative to companies with less exposure, suggesting that the market initially under-reacts to drought exposure.[3140] In other

---

[3136] *See* S. Kleimeier & M. Viehs, *supra* note 3134.

[3137] *See* Lazard Climate Center, *Inaugural Research Findings of the Lazard Climate Center* (Dec. 2021), available at https://www.lazard.com/research-insights/inaugural-research-findings-of-the-lazard-climate-center/; *see also* https://lazard.com/media/ge5oromo/lazard-climate-center-presentation-december-2021.pdf (presentation). The Lazard presentation notes, however, that the effects vary significantly across different types of GHG emissions, market capitalization, and sectors. Large capitalization companies (>$50 billion) experience greater valuation discounts, while larger emitters, such as energy companies, showed the most consistently negative correlation. On average, a 10% decrease in a large U.S. energy company's emissions corresponded with a 3.9% increase in its price-to-earnings ratio.

[3138] *See* H. Hong, *et al.*, *supra* note 2739.

[3139] *See id.*

[3140] *See id.*

Appellate Case: 24-1628     Page: 793     Date Filed: 03/26/2024 Entry ID: 5377362

words, the market fails to sufficiently incorporate the risk of drought exposure into the current stock price, resulting in investors holding mispriced assets and bearing risk for which they are not appropriately compensated. Consistent with this finding, survey responses from institutional investors indicated that such investors believed that equity valuations do not fully reflect climate-related risks.[3141] The final rules may help address these market inefficiencies by eliciting more consistent and reliable information about climate-related risks so that those risks can be better incorporated into asset prices.

We also expect the final rules to increase efficiency by improving comparability of climate-related disclosures and requiring them to be filed in a machine-readable data language (i.e., Inline XBRL).[3142] As discussed in section IV.C.2.i, efficiency gains from standardized reporting practices can provide market-wide cost savings to registrants in the long-term, to the extent that they reduce duplicative effort in registrants' production and acquisition of information (e.g., certain data or third-party services related to preparing the required disclosures, including the reporting of emissions data, may become cheaper in the long run as heightened demand spurs competition, innovation, and economies of scale). Finally, more standardized reporting should also reduce investors' costs of acquiring and processing climate-related information by facilitating investors' analysis of a registrant's disclosure and assessing its management of climate-related risks against those of its competitors.

The inclusion of climate-related information in Commission filings using a machine-readable data language (i.e., Inline XBRL), rather than external reports or company websites,

---

[3141]   *See* Krueger, *et al.*, *supra* note 2790.

[3142]   *See* letters from Impact Capital Managers (indicating that the Inline XBRL requirement will contribute toward the goal of eliciting more consistent, comparable, and reliable disclosure); and Climate Advisers (stating that tagging the new disclosures in Inline XBRL should, by allowing the disclosed information to be more readily incorporated into investors' analyses, promote the efficiency of the U.S. capital markets).

Appellate Case: 24-1628    Page: 794    Date Filed: 03/26/2024 Entry ID: 5377362

should also make it easier for investors to find and compare this information. In that regard, XBRL requirements have been observed to reduce the informational advantages of informed traders and lead to lower cost of capital and higher stock liquidity for filers that provide tagged disclosures.[3143]

We acknowledge commenters who stated that proposed amendments could decrease efficiency by reducing the incentives for reporting companies to develop business strategies, transition plans, or goals, because the amendments would require disclosure of these strategies, plans or goals.[3144] According to these commenters, the benefits of developing these elements could be outweighed by the direct and indirect costs of disclosing them. While this may occur in some circumstances, the efficiency loss is expected to be relatively low as the required disclosures are not highly granular. Thus, in many cases, we believe the benefits of developing business strategies, transition plans or goals will exceed the costs of such disclosure. But we recognize that, more generally, the final rules may divert some resources away from what their best use would otherwise be. As explained above, by removing some of the more prescriptive elements of the proposed rules that could require disclosure of a registrant's competitively sensitive information, the final rules mitigate this concern.

---

[3143]  *See, e.g.*, N. Bhattacharya, Y.J. Cho & J.B. Kim, *Leveling the Playing Field Between Large and Small Institutions: Evidence from the SEC's XBRL Mandate*, 93 Acct. Rev. 51 (2018); B. Li, Z. Liu, W. Qiang & B. Zhang, *The Impact of XBRL Adoption on Local Bias: Evidence from Mandated U.S. Filers*, 39 J. of Acct. and Pub. Policy (2020); W. Sassi, H. Ben Othman & K. Hussainey, *The Impact of Mandatory Adoption of XBRL on Firm's Stock Liquidity: A Cross-Country Study*, 19 J. of Fin. Rep. and Acct. 299 (2021); C. Ra & H. Lee, *XBRL Adoption, Information Asymmetry, Cost of Capital, and Reporting Lags*, 10 iBusiness 93 (2018); S.C. Lai, Y.S. Lin, Y.H. Lin & H.W. Huang, *XBRL Adoption and Cost of Debt*, Int'l. J. of Acct. & Info. Mgmt. (2015); Cong *et al.*, supra note 2948.

[3144]  *See, e.g*., letter from Cato Inst.; Overdahl exhibit to letter from Chamber; and Motor & Equipment Manufacturers Association.

Appellate Case: 24-1628     Page: 795     Date Filed: 03/26/2024 Entry ID: 5377362

Some commenters raised the more general concern that final rules could divert managers' attention from other types of risks that may be more urgent or important to investors.[3145] However, we expect this channel will be somewhat limited. First, the final rules will elicit more disclosures from those registrants for which climate-related risks have materially impacted or are reasonably likely to have material impacts on the registrants' financials or business strategy. Therefore, the final rules are unlikely to demand significant managerial attention in settings in which such attention is not warranted. Second, managers and directors have strong incentives to maximize the market value of the company (as reflected in the stock price). As a result, there is limited upside to selecting policies that prioritize climate over other concerns that investors view as more important determinants of company value.

### 2. Competition

Overall, we expect that by standardizing reporting practices, the final rules would level the playing field among firms, making it easier for investors to assess the climate-related risks of a registrant against those of its competitors. The effects of peer benchmarking can contribute to increased competition for companies in search for capital both across and within industries, whereby registrants can be more easily assessed and compared by investors against alternative options.

Some commenters raised concerns that the proposed rules would have increased competition among registrants for hiring individuals with climate-related expertise and/or GHG emissions attestation providers.[3146] These commenters asserted that the proposed rules could increase the costs of hiring key personnel with relevant experience, which could restrain a

---

[3145] *See, e.g.*, letters from Chamber; Southside Bancshares; and BIO.

[3146] *See, e.g.*, discussions in sections II.E.2.b and II.I.5.b.

registrant's ability to produce climate disclosures and institute climate-related strategies.[3147] While the final rules do not completely eliminate concerns about the costs of hiring or engaging those with climate-related expertise, we have made several changes to mitigate these costs. With respect to GHG emissions assurance, for example, the final rules will permit assurance providers to use the ISO 14064-3 attestation standard, which should limit the circumstances in which registrants need to seek out different attestation engagements. In addition, the extended phase in periods for compliance with the GHG emissions disclosure and assurance requirements will provide additional time for registrants to seek out, and the markets to respond to increased demand for, climate-related professional services.

Some commenters stated that the proposed amendments would harm the competitive position of Commission registrants relative to their peers who do not face such disclosure requirements.[3148] In particular, these commenters stated that Commission registrants would face direct costs of compliance, and indirect costs such as the risk of disclosure of proprietary business information, while other companies would not face these costs.[3149] Relative to the proposed rules, the final rules take a number of steps to reduce the costs of complying with the final rules.[3150] For example, we have eliminated the requirement to disclose Scope 3 emissions, we have significantly narrowed the Regulation S-X requirements, and the final rules for subpart 1500 of Regulation S-K include additional materiality qualifiers and less prescriptive disclosure requirements. Moreover, as discussed above, a number of these changes from the proposal will

---

[3147]    *See, e.g.*, letter from Can. Bankers

[3148]    *See* letters from API; Matthew Winden; and Southside Bancshares, Inc.

[3149]    *Id*.

[3150]    *See* section IV.C.2.

serve to limit the circumstances in which disclosure of potentially competitive business information will be required.

Similarly, one commenter noted that public companies could be placed at a competitive disadvantage when bidding to acquire a private target company because they would need to screen prospective targets for their ability to produce the disclosures required by the proposed rules.[3151] Any such competitive disadvantage will be mitigated under the final rules, as compared to the proposed rules, because we no longer are applying disclosure requirements to a private company that is a party to a business combination transaction, as defined by Securities Act Rule 165(f), involving securities offerings registered on Form S-4 or F-4.

Commenters also raised concerns about disproportionate effects for smaller companies, as discussed above in section IV.C.3.c. Any costs that disproportionately impact smaller companies—such as those that do not scale with the size of the registrant—may limit the ability of smaller registrants to compete with larger registrants. As discussed above, the final rules do not require SRCs and EGCs to provide GHG emissions disclosures and provide SRCs and EGCs with longer phase in periods to delay implementation costs. This delay may effectively lower implementation costs for SRCs and EGCs to the extent that, by the time they are required to report, SRCs and EGCs can look to the disclosure practices developed by other registrants to assist them in preparing their own disclosures.

---

[3151] Letter from Shearman Sterling. *See also supra* 2461 and accompanying text.

### 3. Capital Formation

More consistent, comparable, and reliable disclosures could lead to capital market benefits in the form of improved liquidity and lower costs of capital.[3152]  These benefits would stem from reductions in information asymmetries brought about by the required disclosure of climate-related information.[3153]  The reduction in information asymmetry between managers and investors could allow investors to better estimate future cash flows, which could reduce investors' uncertainty, thus lowering the costs of capital.[3154]  In addition, less information asymmetry *among* investors could mitigate adverse selection problems by reducing the informational advantage of investors that have sufficient resources to become more informed about a registrant's exposure to and management of climate-related risks.[3155]  This is likely to

---

[3152] *See* D.W. Diamond & R.E. Verrecchia, *Disclosure, Liquidity, and the Cost of Capital*, 46 J. Fin. 1325 (1991) (finding that revealing public information to reduce information asymmetry can reduce a company's cost of capital through increased liquidity); *see also* C. Leuz & R.E. Verrecchia, *The Economic Consequences of Increased Disclosure*, 38 J. Acct. Res. 91 (2000).  Several studies provide both theoretical and empirical evidence of the link between information asymmetry and cost of capital.  *See, e.g.*, T.E. Copeland & D. Galai, *Information Effects on the Bid-Ask Spread*, 38 J. Fin. 1457 (1983) (proposing a theory of information effects on the bid-ask spread); Easley *et al.*, *supra* note 2753 (showing that differences in the composition of information between public and private information affect the cost of capital, with investors demanding a higher return to hold stocks with greater private information.).

[3153] *See, e.g.,* Christensen *et al.* (2021), at 1147 (noting "[A] primary benefit of corporate disclosure is to mitigate information asymmetries between the firm and its investors as well as among investors . . . [T]he general takeaway from this large literature is that more and better disclosure can lead to tangible capital-market benefits in the form of improved liquidity, lower cost of capital, higher asset prices (or firm value), and potentially better corporate decisions . . . To the extent that mandatory CSR reporting and CSR standards improve the information available to investors, the same theories and many of the prior findings should apply when considering the economic effects of the mandate or standard.").

[3154] *See* Diamond *et al.*, *supra* note 3152; Lambert, *et al.*, Accounting Information, *supra* note 2753; Christopher Armstrong, John Core, Daniel Taylor & Robert Verrecchia, *When Does Information Asymmetry Affect the Cost of Capital?*, 49 J. of Acct. Rsch. 1 (2011).  We note that these articles also detail limited theoretical circumstances under which more reliable disclosures could lead to a higher cost of capital, such as in the case where improved disclosure is sufficient to reduce incentives for market making.

[3155] *See* Verrecchia, *et al.*, *supra* note 2748.

improve stock liquidity (*i.e.*, narrower bid-ask spreads), which could attract more investors and reduce the cost of capital overall.[3156]

There are two additional channels through which the disclosures could impact cost of capital. The first arises because some investors may have preferences to invest with companies that are more or less exposed to climate-related risks about which the final rules will elicit disclosure. To the extent the disclosures provide more complete and reliable information about a registrant's material climate-risks and how such risks are being managed, shifts in investor demand for the registrant's securities could increase or decrease (depending on investor preferences and how they factor this information into their investment decision-making).[3157] The

---

[3156]    One commenter asserted that this first channel does not apply to corporate disclosures, as it pertains only to bid-ask spreads set by market makers concerned with trading against parties with more information about order flow. *See* Overdahl exhibit to letter from Chamber. We disagree. Market makers concerned about trading against more informed parties will set larger bid-ask spreads regardless of the reason for the asymmetric information. In this setting, corporate disclosures of material climate-related information would reduce information asymmetries between market makers and other traders who have, for example, learned about a company's climate related risks through proprietary research. *See* letters from Calvert ("Calvert purchases third party vendor data to support our ability to assess companies on their ESG factors and that provide specific data related to climate change, where available. Often vendor information is estimated when a company has not disclosed information on its climate-related risks. Sometimes the estimates are made across industries, based on what other more proactive peers have disclosed."); Boston Trust Walden (reporting: "our analysts examine quantitative and qualitative climate-related corporate disclosure to enhance our understanding of the existing and potential financial outcomes associated, ranging from risks (e.g., losing the license to operate) to opportunities (e.g., generating new sources of revenue)"). We also note that corporate disclosures of material climate-related information reduce information asymmetries between affiliated investors and other investors. *See also* Glosten *et al.*, *supra* note 2748, for evidence that informed traders may take advantage of "private information or superior analysis" when making investment decisions). This commenter also asserted that the Commission must consider the potential efficiency losses that may result from investors no longer having the same incentives to invest in this type of proprietary research. We disagree with the commenter that there would be an efficiency loss. The primary benefit of proprietary research is more accurate prices. If disclosures obviate the need for proprietary research by achieving price discovery in the absence of that research, there is not an efficiency loss from the lack of research. This commenter also argues that voluntary disclosure regimes should enable corporate issuers to lower their cost of capital by reducing information asymmetry. *See supra* note 3154. We discuss shortcomings related to a voluntary disclosure regime in this context in section IV.B.2, and we cite to academic evidence in *supra* notes 2748 and 3153 that mandatory reporting that improves the information available to investors can lead to tangible capital market benefits.

[3157]    *See* Yang, *supra* note 2827; Avramov, Cheng, Lioui & Tarelli, *Sustainable Investing with ESG Rating Uncertainty*, 145 J. of Fin. Econ. (Oct. 2022); L. Pastor, R. Stambaugh & L. Taylor, *Sustainable Investing in Equilibrium*, 142 J. Fin. Econ. 550 (2021); P. Bolton & M. Kacperczyk, *supra* note 2744; Li *et al.*, *supra* note 2657.

Appellate Case: 24-1628    Page: 800    Date Filed: 03/26/2024 Entry ID: 5377362

second results from the fact that some aspects of climate risk may not be diversifiable and therefore could command a risk premium. Academic research suggests that investors demand a higher return to hold assets that are more exposed to non-diversifiable climate-related risk (including both transition and physical risks).[3158] If the disclosures cause investors to update their expectations of a registrant's exposure to this type of risk, the cost of capital could adjust accordingly.

More generally, if compliance costs with the final rules are sufficiently high, this could influence the marginal company's decision to exit public markets or refrain from going public in the first place to avoid having to comply with the disclosure requirements. This concern was echoed by a number of commenters.[3159] Companies may choose this strategy if they believe the potential compliance costs from the final rules outweigh the benefits of being a registered public company including, for example, a more liquid market for the company's securities and the associated reduction in cost of capital. Uptake of this avoidance strategy may widen the transparency gap between public and private companies, negatively affecting capital markets' information efficiency, and potentially reducing the size of the public markets.[3160] However, we note that this avoidance strategy will come with significant disadvantages. For example, any companies deterred from registration because of the final rules would face more limited access to

---

[3158]   *See, e.g.,* Bolton *et al.*, *supra* note 3157 (finding that investors demand compensation for exposure to carbon emissions risk); Acharya *et al.*, *supra* note 2905 (finding higher expected returns for exposure to physical risks); Huynh & Xia (2021).

[3159]   *See* letters from Elaine Henry; API; Cunningham *et al.*; Matthew Winden; Southside Bancshares Inc.; David Burton; AEPC; CCMR; Chamber; Petrol. OK; and AGs of Cal. *et al.*

[3160]   *See* Overdahl exhibit to letter from Chamber.

Appellate Case: 24-1628    Page: 801    Date Filed: 03/26/2024 Entry ID: 5377362

the capital markets, implying higher financing costs and debt-ratios.[3161]  On balance, we believe the benefits of being a public registered company are sufficiently strong such that it is unlikely many companies will choose to avoid becoming or continuing as a public registered company as a result of the final rules.  In this regard, we note that the final rules include a number of changes from the proposal intended to mitigate the compliance burden on registrants and lessen disproportionate impacts on smaller and emerging growth firms.

### F.  **Reasonable Alternatives**

#### 1.  **Adopt a more (or less) principles-based approach to Regulation S-K disclosures**

Many commenters recommended a more principles-based approach (either overall or with respect to specific provisions) that would permit registrants to determine the type of climate-related information to disclose based on what they deem to be appropriate.[3162]  Such an approach might reduce reporting costs because registrants would be required to report only information that they determine to be appropriate given their unique circumstances.  To the extent that the more prescriptive elements of the final rules result in disclosure that is less useful for investors, a principles-based approach could benefit investors by reducing the incidence of less material or even boilerplate disclosure.[3163]  A principles-based approach would also reduce the risk that the disclosure requirements could lead registrants to change their risk management

---

[3161]   *See* Omer Brav, *Access to Capital, Capital Structure, and the Funding of the Firm*, 64 J. of Fin. 263 (2009); Anthony Saunders & Sascha Steffen, *The Costs of Being Private: Evidence from the Loan Market*, 24 Rev. of Fin. Stud. 4091 (2011); E.P. Gilj & J.P Taillard, *Do Private Firms Invest Differently than Public Firms? Taking Cues from the Natural Gas Industry*, 71 J. of Fin. 1733 (2016).

[3162]   *See*, *e.g.*, letters from Beller, *et al.* and Microsoft; Sullivan Cromwell; Airlines for America; BOA; Business Roundtable; Soc. Corp. Gov; and Overdahl exhibit to letter from Chamber.

[3163]   Similarly, one commenter described "1) the ability of a principles-based approach to evolve in order to keep pace with emerging issues; and 2) the flexibility of a principles-based approach to correct deficiencies or excesses in disclosure without the need for the Commission to continuously add to or update the underlying disclosure rules as new issues arise."  Overdahl exhibit to letter from Chamber.  We acknowledge that a principles-based approach can present these benefits and that prescriptive rules may need updates.

strategies in ways that are less than optimal for the sake of achieving what they perceive to be more favorable climate-related disclosure.

On the other hand, a more principles-based approach would not fully achieve many of the intended benefits of the rules, which are focused on enhancing the consistency and comparability of existing voluntary disclosure arrangements. In addition, a principles-based approach could increase shareholder confusion because the choice of climate metrics and other details (e.g., time horizon) may vary significantly across registrants. Also, a principles-based approach may allow registrants to selectively choose the measures or time horizon that result in the most favorable disclosures. In the final rules, we elected to include prescriptive disclosure requirements (with certain modifications to address commenter concerns) to avoid such cherry-picking of information and to ensure that investors are provided with more consistent and comparable information about climate-related risks.

We similarly considered whether the final rules should be more prescriptive. This would generally improve investors' ability to compare disclosures across registrants since disclosures would be less tailored to each registrant's specific circumstances. A more prescriptive approach would also reduce the risk of boilerplate disclosures. However, we decided against this approach in light of commenters' concerns about the costs of compliance with the proposed rules, as well as the importance of allowing registrants the flexibility to provide investors with the most useful and relevant disclosures. Accordingly, in response to commenters, the final rules include additional materiality qualifiers and take a less prescriptive approach in a number of areas, which should help to mitigate some of the concerns expressed with respect to the proposed rules while continuing to elicit more decision-useful information for investors about climate-related risks.

## 2. Different approaches to assurance over GHG emissions disclosures

We considered several alternative approaches to assurance over GHG emissions disclosure. For example, the Commission could not require that any GHG emissions disclosure be subject to assurance. Alternatively, the Commission could require reasonable assurance of all GHG emissions disclosures rather than only for LAFs. The Commission could also prescribe more restrictive requirements for attestation standards and assurance providers. Inherent in these choices is a tradeoff between compliance costs and the reliability of the disclosures. For example, while requiring reasonable assurance for all GHG emissions would have likely resulted in more reliable disclosures, it would have imposed considerable costs on registrants, based on feedback from commenters about the costs of obtaining reasonable assurance.[3164]

We also considered taking a less prescriptive approach to the independence requirements for assurance providers in the final rules. For example, we considered not adopting a requirement for the GHG emissions assurance provider to be independent with respect to the registrant and any of its affiliates and/or instead requiring disclosure about any potentially independence-impairing relationship.[3165] This approach would help to mitigate concerns commenters raised about a potential shortage of qualified GHG emissions assurance providers increasing the costs for registrants[3166] and potential burdens on registrants related to the need to assess the independence of assurance providers.[3167] However, not imposing an independence requirement or only requiring disclosure about potential conflicts would not provide the same

---

[3164] *See, e.g.*, letter from Salesforce (estimating that obtaining reasonable assurance rather than limited assurance over their emissions disclosures would increase their expected costs by $1-$3 million).

[3165] *See* 17 CFR 229.1506(b)(2).

[3166] *See, e.g.*, letters from AEPC; Climate Risk Consortia; and Soc. Corp. Gov.

[3167] *See, e.g.*, letter from Soc. Corp. Gov.

confidence to investors that the attestation provider will perform the engagement in an objective and impartial manner. This in turn would diminish one of the key benefits of requiring assurance over GHG emissions disclosures, which is to improve the reliability of such disclosures.

We acknowledge that the independence requirement in the final rules may result in some registrants that are already obtaining assurance voluntarily needing to retain a new GHG emissions assurance provider that meets the independence requirement or may make it more difficult for a registrant that has not obtained GHG assurance before to find an available provider. These costs are mitigated by the modifications in the final rules that provide registrants subject to the assurance requirement with a multi-year phase in period before they are required to obtain an attestation report. The phase in period will give registrants time to find a provider that meets the independence requirement or provide existing service providers time to unwind any existing conflicts in order to meet the independence requirement. It will also give non-accountant attestation providers time to familiarize themselves with the independence requirement and adapt their business practices accordingly.

### 3. Different thresholds for financial statement disclosures

We considered alternative criteria for disclosure under the amendments to Regulation S-X, such as using a more principles-based materiality approach. In general, materiality thresholds can help ensure that the disclosure elicited is most likely to factor into an investor's decision or voting decisions. While materiality is used as the threshold for disclosures in certain contexts, we believe that registrants will benefit from the certainty associated with a set of bright line quantitative thresholds. In doing so, investors will have disclosures that are more consistent across registrants due to the predictable application of quantitative thresholds. As discussed above, we have significantly modified the scope of the proposed disclosures and threshold and

Appellate Case: 24-1628    Page: 805    Date Filed: 03/26/2024 Entry ID: 5377362

have included de minimis exceptions to focus the requirements on providing material disclosure to investors.  However, we decided not to eliminate the bright-line thresholds entirely and move to a more principles-based disclosure standard because the quantitative disclosure threshold provides registrants with greater clarity in implementing the rules, reduces the risk of underreporting, and increases consistency and comparability.  This approach is consistent with the feedback we received from some commenters that expressed concerns about the risks of underreporting in the context of the financial statements, as evidenced by the limited climate-related disclosure under current accounting standards despite increasing demand by investors for such disclosure.

We considered not including de minimis disclosure thresholds. A de minimis threshold is more likely to be triggered for smaller registrants; so, not including a de minimis threshold would have resulted in similar rates of disclosure from both large and small companies.  However, this approach would have been more likely to elicit disclosures that are not decision-useful to investors.  In particular, for some registrants, shareholders' equity and income or losses before taxes may not scale meaningfully with the magnitude of the registrant's operations, for example, if the registrant is highly leveraged or was not very profitable (or very unprofitable) during the period.  Including de minimis thresholds will avoid triggering overly granular disclosure in such anomalous situations.

Following feedback from commenters, we also considered limiting the new Regulation S-X disclosures to registrants in certain sectors.  While restricting disclosure to specific sectors would limit the costs of disclosure, it would result in a lack of information about other sectors, which can be affected by severe weather events or other natural conditions.  By specifying disclosures for certain sectors, the Commission would also risk making a determination about

which sectors to include and exclude that may become obsolete in the future if conditions change. For sectors that are not generally affected by severe weather events or other natural conditions, the costs associated with these disclosures are likely to be moot.

### 4. Permit disclosures to be furnished rather than filed

We considered the possibility of permitting some or all of the required disclosures to be furnished rather than filed. Although some commenters expressed a desire for furnished disclosures, stating that it would lower the legal liability for registrants who are required to provide climate-related disclosures under the final rules,[3168] furnished disclosures may also limit the benefit for investors who rely on complete and accurate information from registrants about their climate-related risks and their efforts to address these risks.[3169] By contrast, requiring registrants to file, rather than furnish, the climate-related disclosures provided pursuant to the final rules will give investors the ability to bring suit if registrants fail to comply with the new disclosure requirements, for instance under Exchange Act section 18.[3170] This will improve the avenues of redress available to investors in the case of false or misleading statements with respect to material facts and, in turn, provide benefits to investors to the extent they rely on the disclosures required under the final rules to make investment or voting decisions. Further, treating these disclosures as filed will help promote their accuracy and consistency to the extent registrants seek to avoid liability (under, for example, section 18) by taking additional care to ensure that disclosures are accurate. We believe, therefore, that information about climate-

---

[3168] *See*, *e.g.*, letter from CCMR; *see also* section II.K.2.

[3169] *See* discussion in II.K.3.

[3170] Climate-related disclosures provided pursuant to the final rules also will be subject to section 11 liability if included in, or incorporated by reference into, a Securities Act registration statement.

related risks should be subject to the same liability as other important business or financial information that the registrant includes in its registration statements and periodic reports.

We acknowledge that requiring these disclosures to be filed may increase registrants' litigation risks (and, therefore, their costs of complying with the final rules) relative to an alternative approach that would allow registrants to furnish the disclosures. The modifications we have made to the proposed rules, however, should help to mitigate those concerns. These modifications include: limiting the scope of the GHG emissions disclosure requirement;[3171] revising several provisions regarding the impacts of climate-related risks on strategy, targets and goals, and financial statement effects so that registrants will be required to provide the disclosures only in certain circumstances, such as when material to the registrant;[3172] and adopting a provision stating that disclosures (other than historic facts) provided pursuant to certain of the new subpart 1500 provisions of Regulation S-K constitute "forward-looking statements" for the purposes of the PSLRA safe harbors.[3173] We also are providing registrants with a phase in period based on filer status to give them additional time to prepare to provide the climate-related disclosures, which will constrain registrants resources less over the short run, which could effectively lower implementation costs.[3174]

Finally, regardless of whether the information is filed or furnished, registrants may be subject to potential liability under Securities Act section 17(a), Exchange Act section 10(b), and/or Rule 10b-5, as applicable, for false or misleading material statements in the information disclosed pursuant to the final rules.

---

[3171]    *See supra* section II.H.3.

[3172]    *See supra* sections II.D.3, II.G.3, and II.H.3.

[3173]    *See supra* section II.J.3.

[3174]    *See supra* section II.O.3.

### 5. Exempt SRCs/EGCs

We considered completely exempting SRCs and EGCs from the final rules. While such a broad exemption would avoid burdening newly public and/or smaller registrants with the costs of the final rules, which include some fixed costs that would disproportionately affect smaller registrants, such an alternative would leave significant gaps in the information set on climate-related risks faced by registrants, thereby significantly detracting from comparability and other informational benefits of the final rules. We have, however, made a number of changes from the proposal, such as generally reducing the prescriptiveness of the proposed rules, which should help to mitigate the compliance burden for all registrants, including SRCs and EGCs. We are also providing phase in periods based on filer status, which will provide registrants that are SRCs or EGCs with additional time to prepare to make disclosure under the final rules.

For emissions-related disclosures, there exists a similar trade-off between costs and benefits of exempting SRCs and EGCs. However, based in part on the analysis performed by Commission staff, which indicated extremely low rates of disclosure for SRCs and EGCs, we have exempted SRCs and EGCs from the requirement to disclose GHG emissions data given the significant compliance burden that such disclosure could impose on smaller registrants.[3175]

### 6. Permit registrants to rely on home-country disclosure frameworks / substituted compliance

In light of the fact that several other jurisdictions have adopted or are currently pursuing climate-related disclosure frameworks, some commenters suggested that that the Commission consider allowing registrants to comply with the proposed rules by using disclosures provided in

---

[3175] *See* section II.L.3 and *supra* note 946 and accompanying text.

these other jurisdictions.[3176] While this substituted compliance approach has the potential to reduce costs to the extent that there are overlapping disclosure requirements, we have determined, at this time, that it is premature to allow for substituted compliance with the final rules, given the current status of such requirements in other jurisdictions. Accordingly, the Commission intends to observe how reporting under international climate-related reporting requirements and practices develop before making any determination whether such an approach would result in consistent, reliable, and comparable information for investors. As noted above,[3177] the Commission may consider such accommodations in the future depending on developments in the international climate reporting practices and our experience with disclosures under the final rules.[3178]

Similarly, some commenters suggested that, in lieu of the proposed GHG emissions disclosure requirements, we should require registrants to submit GHG emissions data that they publicly report under other regulatory regimes, such as the GHGRP.[3179] Under such an approach, registrants would not need to track and report GHG emissions data that they are not already collecting for other regulatory purposes, and thus registrants would not incur certain direct compliance costs associated with disclosing this information under the final rules (although they would assume new securities law liability for including the information in Commission filings). However, as discussed in detail in section IV.C.2.e, reporting under other regulatory regimes, such as the GHGRP, serves different purposes than disclosure under the

---

[3176] *See* letters from AllianceBernstein; Davis Polk; Linklaters L; PGIM; PwC; and SAP SE.

[3177] *See supra* section II.L.3.

[3178] *See*, *e.g.*, section IV.A. discussing the domestic and international disclosure requirements that are still being developed and finalized at this time.

[3179] *See* letter from Grundfest; Memorandum of Meeting with Grundfest and Wilson (June 28, 2023).

Federal securities laws, and the information reported is not always presented in ways that are decision-useful for investors.  Accordingly, we have decided not to adopt such an alternative.

### 7.  Alternative tagging requirements

With respect to Inline XBRL tagging, we considered changing the scope of disclosures required to be tagged, for example by removing the tagging requirements for climate-related disclosures for all or a subset of registrants (such as SRCs).  As another example, we considered requiring only a subset of proposed climate-related disclosures, such as the quantitative climate-related disclosures, to be tagged in Inline XBRL.  Narrowing the scope of climate-related disclosures to be tagged could have provided some incremental cost savings for registrants compared to the final rules, because incrementally less time would have been required to select and review the particular tags to apply to the climate-related disclosures.

However, we believe any such incremental cost savings would have been low because all affected registrants are required to tag certain of their disclosures (including both quantitative and qualitative disclosures) in Inline XBRL.[3180]  Moreover, narrowing the scope of tagging requirements would have diminished the extent of informational benefits that would accrue to investors by reducing the volume of climate-related information that would become less costly to process and easier to compare across time and registrants.  For example, an alternative whereby only quantitative climate-related disclosures would be tagged would have inhibited investors from efficiently extracting or searching climate-related disclosures about registrants' governance; strategy, business model, and outlook; risk management; and targets and goals, thus creating the need to manually run searches for these disclosures through entire documents.  Such an alternative would also have inhibited the automatic comparison and redlining of these

---

[3180]     *See supra* section IV.c.2.ix.

disclosures against prior periods, and the performance of targeted machine learning assessments (tonality, sentiment, risk words, etc.) of specific narrative climate-related disclosures outside the financial statements rather than the entire unstructured document.

## V. PAPERWORK REDUCTION ACT

### A. Summary of the Collections of Information

Certain provisions of our rules and forms that will be affected by the final rules contain "collection of information" requirements within the meaning of the Paperwork Reduction Act of 1995 ("PRA").[3181] The Commission published a notice requesting comment on changes to these collections of information in the Proposing Release and submitted these requirements to the Office of Management and Budget ("OMB") for review in accordance with the PRA.[3182] The hours and costs associated with preparing and filing the forms and reports constitute reporting and cost burdens imposed by each collection of information.[3183] An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information requirement unless it displays a currently valid OMB control number. Compliance with the information collections is mandatory. Responses to the information collections are not kept confidential and there is no mandatory retention period for the information disclosed. The titles for the affected collections of information are:

- Form S-1 (OMB Control No. 3235-0065);

- Form F-1 (OMB Control No. 3235-0258);

---

[3181] 44 U.S.C. 3501 *et seq.*

[3182] 44 U.S.C. 3507(d) and 5 CFR 1320.11.

[3183] The paperwork burdens for Regulation S-X, Regulation S-K, Regulation C, and Regulation S-T are imposed through the forms, schedules, and reports that are subject to the requirements in these regulations and are reflected in the analysis of those documents.

- Form S-4 (OMB Control No. 3235-0324);

- Form F-4 (OMB Control No. 3235-0325);

- Form S-11 (OMB Control No. 3235-0067);

- Form 10 (OMB Control No. 3235-0064);

- Form 20-F (OMB Control No. 3235-0288); and

- Form 10-K (OMB Control No. 3235-0063).

The final rules will require registrants filing Securities Act registration statements on Forms S-1, F-1, S-4, F-4, and S-11 to include the climate-related disclosures required under subpart 1500 of Regulation S-K and Article 14 of Regulation S-X. The final rules will further require registrants filing Exchange Act annual reports on Forms 10-K and 20-F and Exchange Act registration statements on Forms 10 and 20-F to include the climate-related disclosures required under subpart 1500 of Regulation S-K and Article 14 of Regulation S-X. Registrants may include the climate-related disclosures required under subpart 1500 in a part of the registration statement or annual report that is separately captioned as Climate-Related Disclosure or in another appropriate section, such as Risk Factors, MD&A, or Description of Business. Registrants will be required to include the climate-related disclosures required under Article 14 in a note to the financial statements.

In addition, if a registrant is an LAF or AF that is not an SRC or EGC, the final rules may require the registrant to disclose its Scope 1 and/or Scope 2 emissions. Such registrant will also be required to file an attestation report in connection with its Scope 1 and/or Scope 2 emissions disclosure. For purposes of Exchange Act reporting on domestic forms, although a U.S. registrant may incorporate by reference such disclosure from its Form 10-Q for the second fiscal quarter in the fiscal year immediately following the year to which the GHG emissions metrics

disclosure relates, we have attributed the paperwork burden associated with the GHG emissions disclosure requirement and the related attestation report to the Form 10-K annual report. This is because the GHG emissions disclosure and related attestation report are requirements of, and relate to the same fiscal year-end as, the Form 10-K.

A description of the final rules including the need for the climate-related information and its intended use, as well as a description of the likely respondents, can be found in section II above, and a discussion of the economic effects of the final rules can be found in section IV above.

### B. Current Inventory Update to Reflect $600 Per Hour Rather than $400 Per Hour Outside Professional Costs Rate

At the outset, we note that the current OMB inventory for the above-referenced collections of information reflect an average hourly rate of $400 per burden hour borne by outside professionals. Similarly, in the Proposing Release, the Commission used an estimated cost of $400 per hour, recognizing that the costs of retaining outside professionals may vary depending on the nature of the professional services.[3184] The Commission recently determined to increase the estimated costs of such hourly rate to $600 per hour[3185] to adjust the estimate for inflation from Aug. 2006.[3186] In order to more accurately present the burden changes as a result of the final rules in the context of the current burden inventory, we are presenting updated numbers for the current inventory for professional cost burden for each of the affected

---

[3184]   *See* Proposing Release, section V.C.

[3185]   We recognize that the costs of retaining outside professionals may vary depending on the nature of the professional services, but for purposes of this PRA analysis, we estimate that such costs would be an average of $600 per hour.

[3186]   *See* Listing Standards for Recovery of Erroneously Awarded Compensation, Rel. No. 33-11126 (Oct. 26, 2022) [87 FR 73076 (Nov. 28, 2022)].

collections of information to reflect the updated $600 per hour rate where it has not yet been reflected in the current burden inventory last approved by OMB. This update is solely derived from the change in the hourly rate; it is not a new burden imposed by the final rules. The updated cost estimates using the $600 per hour rate are set out in the following PRA Table 1:[3187]

**PRA Table 1: Change in PRA Burden Due to Updated Outside Professional Cost Estimate**

| Collection of Information | Current Inventory Professional Cost Burden (@ $400/hr.) | Updated Professional Cost Burden (@ 600/hr.) | Increased Burden Due to Update |
|---|---|---|---|
| | (A) | (B) | (C) = (B) – (A) |
| Form S-1 | $174,015,643 | $261,023,465 | $87,007,822 |
| Form F-1 | $32,130,375 | $48,195,563 | $16,065,188 |
| Form S-4 | $675,605,379 | $1,013,408,069 | $337,802,690 |
| Form F-4 | $17,013,425 | $25,520,138 | $8,506,713 |
| Form S-11 | $14,790,168 | $22,185,252 | $7,395,084 |
| Form 10 | $12,851,488 | $19,277,232 | $6,425,744 |
| Form 20-F | $576,533,425 | $864,800,138 | $288,266,713 |
| Form 10-K | $1,835,594,519 | $2,753,391,779 | $917,797,260 |

### C. Summary of Comment Letters

In the Proposing Release, the Commission requested comment on the PRA burden hour and cost estimates and the analysis used to derive the estimates.[3188] While a number of parties commented on the potential costs of the proposed rules, only a few commenters mentioned the PRA analysis.[3189] One commenter stated that it opposed the rule proposal in part because, in its

---

[3187] The table uses the percentage estimates we typically use for the burden allocation for each response. *See infra* PRA Table 2.

[3188] *See* Proposing Release at section V.D.

[3189] *See* letters from D. Burton, Heritage Fdn; Institute for Energy Research (June 17, 2022) ("IER"); and Gregory Lau (June 16, 2022) ("G. Lau").

view, it would "more than doubl[e] the total paper-work compliance costs to public corporations."[3190]  Two commenters stated that the Commission had underestimated the compliance burden and costs of the proposed rules.[3191]  One of the commenters stated that "besides failing to monetize the internal compliance burden hours, the PRA Table ignores: 1. litigation costs; 2. cost not easily and directly allocable to filling out the forms listed in [the PRA Table]; 3. costs imposed on non-issuers; and 4. [t]he cost to investors, issuers and workers caused by adverse economic effects of the rule."[3192]

While we acknowledge the commenters' concerns about costs of the proposal, for the reasons discussed in section II and elsewhere throughout this release, we believe the information required by the final rules is necessary and appropriate in the public interest and for the protection of investors.  Further, a discussion of the economic effects of the final rules, including consideration of comments that expressed concern about the expected costs associated with the proposed rules, can be found in section IV above.  With regard to the calculation of paperwork burdens, we note that both the Proposing Release's PRA analysis and our PRA analysis of the final rules estimate the incremental burden of each new or revised disclosure requirement individually and fully comport with the requirements of the PRA.  We further note that the costs that one commenter stated we had not included are not costs that are required to be considered or typically included in a PRA analysis.[3193]  Further, our estimates reflect the modifications to the proposed rules that we are adopting in response to commenter concerns, including streamlining

---

[3190]    *See* letter from IER.

[3191]    *See* letters from D. Burton, Heritage Fdn.; and G. Lau.

[3192]    D. Burton, Heritage Fdn.

[3193]    *See id.*

some of the proposed rule's elements to address concerns regarding the level of detail required and the anticipated costs of compliance.

### D. Sources of Cost Estimates

We based the paperwork burden of the proposed rules in part on the BEIS impact assessment for the UK climate disclosure rules as well as the input from commenters to a request for public input.[3194] Our estimates of the paperwork burden associated with the final rules are based on the direct cost estimates discussed in the Economic Analysis.[3195] As discussed above in more detail in section IV.C.3.b, those direct cost estimates are based primarily on two cost estimates for similar UK climate disclosure rules (i.e., the 2021 BEIS impact assessment and the 2021 FCA cost-benefit analysis)[3196] and on cost estimates provided by several commenters.[3197] While we believe that the direct cost estimates provide a reasonable means of determining the estimated collection of information burden associated with the final rules, they likely represent an upper bound of the paperwork burden of the final rules as they reflect a conservative approach (i.e., erring on the side of overstating costs rather than understating them) to estimate approximate compliance costs for the final rules.

### E. Incremental and Aggregate Burden and Cost Estimates of the Final Rules

Below we estimate the incremental and aggregate increase in paperwork burden resulting from the final rules. These estimates represent an average multi-year burden for all issuers, both large and small. While we typically calculate a three-year average for PRA purposes, because

---

[3194] *See* Proposing Release, section V.B.

[3195] *See supra* section IV.C.3.

[3196] *See* FCA, *Enhancing climate-related disclosures by standard listed companies and seeking views on ESG topics in capital markets,* CP21-18 (June 2021), available at https://www.fca.org.uk/publication/consultation/cp21-18.pdf; and BEIS Final Stage Impact Assessment.

[3197] *See supra* section IV.C.3.b.

one of the amendment's requirements will not be phased in until the ninth year of initially providing the disclosures required by the amendments,[3198] we have estimated a nine-year average PRA burden. In deriving our estimates, we recognize that the burdens will likely vary among individual registrants based on a number of factors, including the nature of their business, the size and complexity of their operations, and whether they are subject to similar climate-related disclosure requirements in other jurisdictions or already preparing similar disclosures on a voluntary basis. For purposes of the PRA, the burden is to be allocated between internal burden hours and outside professional costs.

PRA Table 2 below sets forth the percentage estimates we typically use for the burden allocation for each affected collection of information.

**PRA Table 2. Standard Estimated Burden Allocation for Specified Collections of Information**

| Collection of Information | Internal | Outside Professionals |
|---|---|---|
| Forms S-1, F-1, S-4, F-4, S-11, 10, and 20-F | 25% | 75% |
| Form 10-K | 75% | 25% |

### 1. Calculation of the Paperwork Burden Estimates of the Final Rules

When estimating the paperwork burden of the proposed rules, we considered the effects of three sets of climate-related information that would be required to be filed on the Commission's forms under those rules: climate-related disclosures regarding governance, strategy, and risk management; GHG emissions metrics and targets; and financial statement metrics. When estimating the paperwork burden of the final rules, we have modified the sets of

---

[3198]    *See supra* sections II.I and O (regarding the requirement for LAFs to obtain a reasonable assurance attestation report in fiscal 2033 when the initial compliance date for most other disclosures required by LAFs is in fiscal year 2026).

Appellate Case: 24-1628    Page: 818    Date Filed: 03/26/2024 Entry ID: 5377362

information considered to reflect changes made from the proposed rules.  First, we have

separated disclosures related to targets from disclosures related to metrics.  Second, we have

replaced "financial statement metrics" with "financial statement disclosures."  This modification

reflects the fact that the final rules do not use the term "metrics" to describe the amendments to

Regulation S-X because it is more accurate to characterize the disclosures as financial statement

effects.[3199]

The estimated burden hours and costs of the final rules are generally lower than the

estimated burden hours and costs of the proposed rules.  This is due to changes from the

proposed rules that we are adopting in the final rules.  For example, the final rules include

materiality qualifiers and other revisions in the disclosure categories regarding governance, risk

management, and strategy, including transition plans, scenario analysis, targets and goals, and

GHG emissions metrics.  In addition, we have revised the average salary rate from that used for

the proposed PRA estimates to convert some of commenters' cost estimates into burden hours,

consistent with existing OMB guidance.[3200]

---

[3199]  *See supra* note 1705.

[3200]  The PRA estimates for the proposed rules used an hourly rate that was based on an average annual salary of a climate specialist, according to Glassdoor, but which did not reflect additional labor costs.  *See* Proposing Release, section V.B.  We have based the PRA estimates for the Regulation S-K subpart 1500 disclosure requirements on average salary rates according to SIFMA Management and Professional Salaries Data, which the staff has updated to account for inflation through September 2023 and which includes overall costs and overhead associated with the reported professional and management positions.  The SIFMA data provides a more realistic cost basis for determining the PRA burdens associated with the final rules because of this additional information, and is consistent with OMB guidance that, when determining burden hours, "all wages need to be fully-loaded, meaning they reflect the full cost of labor."  OMB, *A Guide to the Paperwork Reduction Act*, available at https://pra.digital.gov/burden/.  In addition, unlike the PRA estimates for the proposed rules, which were based solely on the average annual salary of a climate specialist, we have based the PRA burden hour estimates of the subpart 1500 rules on the median salary rates of in-house legal counsel and systems analyst/database administrators, whom we believe in conjunction with each other will most likely perform the work underlying the disclosures of governance,

Appellate Case: 24-1628     Page: 819     Date Filed: 03/26/2024 Entry ID: 5377362

The following PRA Table 3 shows the estimated number of total burden hours resulting from the final rules based on the initial and ongoing cost estimates for the above-described sets of information as discussed in section IV above. To derive the estimated total number of burden hours, we first applied the appropriate percentage estimate from PRA Table 2 to allocate the portion of the cost estimate for each set of information pertaining to the internal burden and the portion pertaining to external professional costs. We then converted the costs to internal burden hours using a conversion rate of $441/hr. for governance, strategy, and risk management, scenario analysis, Scopes 1 and 2 emissions, targets and goals, and financial statement disclosures.[3201] We similarly converted external professional costs into burden hours using a conversion rate of $600/hr. We then added internal and external burden hours to obtain the total number of estimated burden hours for each set of information. All numbers have been rounded to the nearest whole number.

strategy, risk management, targets and goals, and Scope 1 and 2 GHG emissions metrics. We therefore have taken the average of the median salary rates for SIFMA-listed attorney positions (Attorney and Assistant General Counsel, which average $525/hr.) and SIFMA-listed system analyst/database administrator positions (Systems Analyst, Sr. Systems Analyst, and Sr. Database Administrator, which average $356/hr.) calculated as follows: $525/hr. + $356/hr. = $881/hr. $881/2 = $441/hr.

[3201] *Id.*

**PRA Table 3.  Estimated Total Burden Hour Effects of the Final Rules**

| Disclosure Item | Estimated Initial Burden | | | | | Estimated Ongoing Burden | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Total Initial Costs (from Direct Cost Estimates in Economic Analysis) | Internal Burden Hour Effect | Total Professional Costs | External Burden Hour Effect | Total Initial Burden Hour Effect | Total Ongoing Costs (from Direct Cost Estimates in Economic Analysis) | Internal Burden Hour Effect | Total Professional Costs | External Burden Hour Effect | Total Ongoing Burden Hour Effect |
| | (A) | (B)[1] | (C)[2] | (D)[3] | (E) = (B) + (D) | (F) | (G)[4] | (H)[5] | (I)[6] | (J) = (G) + (I) |
| **Collection of Information: Forms S-1, F-1, S-4, F-4, S-11, 10, and 20-F** | | | | | | | | | | |
| Governance, strategy, risk management | $327,000 | 185 hrs. | $245,250 | 409 hrs. | 594 hrs. | $183,000 | 104 hrs. | $137,250 | 229 hrs. | 332 hrs. |
| Scenario analysis | $12,000 | 7 hrs. | $9,000 | 15 hrs. | 22 hrs. | $6,000 | 3 hrs. | $4,500 | 8 hrs. | 11 hrs. |
| Targets | $10,000 | 6 hrs. | $7,500 | 13 hrs. | 18 hrs. | $5,000 | 3 hrs. | $3,750 | 6 hrs. | 9 hrs. |
| Scope 1 and 2 emissions | $151,000 | 86 hrs. | $113,250 | 189 hrs. | 274 hrs. | $67,000 | 38 hrs. | $50,250 | 84 hrs. | 122 hrs. |
| Financial statement disclosures | $500,000 | 283 hrs. | $375,000 | 625 hrs. | 908 hrs. | $375,000 | 213 hrs. | $281,250 | 469 hrs. | 681 hrs. |
| **Collection of Information: Form 10-K** | | | | | | | | | | |
| Governance, strategy, risk management | $327,000 | 556 hrs. | $81,750 | 136 hrs. | 692 hrs. | $183,000 | 311 hrs. | $45,750 | 76 hrs. | 387 hrs. |
| Scenario analysis | $12,000 | 20 hrs. | $3,000 | 5 hrs. | 25 hrs. | $6,000 | 10 hrs. | $1,500 | 3 hrs. | 13 hrs. |
| Targets | $10,000 | 17 hrs. | $2,500 | 4 hrs. | 21 hrs. | $5,000 | 9 hrs. | $1,250 | 2 hrs. | 11 hrs. |
| Scope 1 and 2 emissions | $151,000 | 257 hrs. | $37,750 | 63 hrs. | 320 hrs. | $67,000 | 114 hrs. | $16,750 | 28 hrs. | 142 hrs. |
| Financial statement disclosures | $500,000 | 850 hrs. | $125,000 | 208 hrs. | 1,059 hrs. | $375,000 | 638 hrs. | $93,750 | 156 hrs. | 794 hrs. |

Notes:
[1] Column B values for this PRA Table 3 are calculated as follows: ((Column A value) x (Relevant percentage for Internal from PRA Table 2)) / ($441/hr.).
[2] Column C values for this PRA Table 3 are calculated as follows: (Column A value) x (Relevant percentage for Outside Professionals from PRA Table 2).
[3] Column D values for this PRA Table 3 are calculated as follows: (Column C value) / ($600/hr.).
[4] Column G values for this PRA Table 3 are calculated as follows: ((Column F value) x (Relevant percentage for Internal from PRA Table 2)) / ($441/hr.).
[5] Column H values for this PRA Table 3 are calculated as follows: (Column F value) x (Relevant percentage for Outside Professionals from PRA Table 2).
[6] Column I values for this PRA Table 3 are calculated as follows: (Column H value) / ($600/hr.).

The next three tables summarize the paperwork burden effects for three groups of registrants: (1) LAFs; (2) AFs that are not SRCs or EGCs ("non-exempt AFs") and (3) SRCs, EGCs, and NAFs. The first two tables summarize, respectively, the estimated internal burden hour (PRA Table 4A) and external professional cost effects (PRA Table 4B) of the final rules. Both tables show the phase in for the Scopes 1 and 2 emissions disclosure requirements. Both LAFs and non-exempt AFs are subject to the requirement to disclose their Scopes 1 and 2 emissions if material. LAFs must comply with the GHG emissions disclosure requirement beginning with their second fiscal year of compliance with the final rules, while non-exempt AFs must comply beginning with their third fiscal year of compliance.[3202]

The tables span the first nine years of compliance in order to cover the first year of the paperwork burden associated with the requirement to obtain a reasonable assurance attestation report, which LAFs must comply with in their ninth year of compliance. For comparability purposes, we have also estimated the paperwork burden effects for non-exempt AFs and SRCs, EGCs, and NAFs over a nine-year span, and have taken a nine-year average for each of the three groups of registrants.[3203]

---

[3202] The final rules provide a phase in for another set of information—the material expenditures disclosure requirement, which will be provided pursuant to either Item 1502, as part of a registrant's strategy disclosure, or Item 1504 of Regulation S-K, as part of a registrant's targets and goals disclosure. All three groups of registrants must comply with the material expenditures disclosure requirement in the fiscal year immediately following the fiscal year of their initial compliance date for the final rules based on their filer status. As explained in section IV.C.3, we have assumed that costs for the material expenditures disclosure have been included in the cost estimates considered for strategy or targets and goals disclosures. *See supra* note 3060 and accompanying text. Because the material expenditures disclosure will comprise only part of a registrant's strategy or targets and goals disclosure and because most of the disclosure requirements pursuant to Item 1502 and Item 1504 are not subject to a phase in, the tables below do not account for the material expenditures phase in.

[3203] In each table, all numbers have been rounded to the nearest whole number.

After a three-year phased in compliance period of reporting their GHG emissions, both LAFs and non-exempt AFs will be required to obtain an attestation report to verify their GHG emissions disclosure.  While LAFs will initially be required to obtain an attestation report at the limited assurance level, after a four-year transition period, they will be required to obtain an attestation report at the reasonable assurance level.  We estimate that a reasonable assurance attestation report will be more costly than a limited assurance report.  PRA Table 4C summarizes the paperwork burden effects estimated to result from the attestation report requirement for these two groups of registrants over a nine-year span.[3204]

---

[3204]    *See supra* section IV.C.3.b.iii for further discussion of these attestation report estimates.

Appellate Case: 24-1628      Page: 823      Date Filed: 03/26/2024  Entry ID: 5377362

**PRA Table 4A.  Estimated Internal Burden Effects of the Final Rules Over the First Nine Years of Compliance**

| Disclosure Item | All Registrants | LAFs | | | Non-Exempt AFs | | | | SRCs, EGCs, and NAFs | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Year 1 | Year 2 | Years 3-9 | 9-Year Average[1] | Year 2 | Year 3 | Years 4-9 | 9-Year Average[2] | Years 2-9 | 9-Year Average[3] |
| **Collection of Information: Forms S-1, F-1, S-4, F-4, S-11, 10, and 20-F** | | | | | | | | | | |
| Governance, strategy, risk management | 185 hrs. | 104 hrs. | 104 hrs. | 113 hrs. | 104 hrs. | 104 hrs. | 104 hrs. | 113 hrs. | 104 hrs. | 113 hrs. |
| Scenario analysis | 7 hrs. | 3 hrs. | 3 hrs. | 4 hrs. | 3 hrs. | 3 hrs. | 3 hrs. | 4 hrs. | 3 hrs. | 4 hrs. |
| Targets | 6 hrs. | 3 hrs. | 3 hrs. | 3 hrs. | 3 hrs. | 3 hrs. | 3 hrs. | 3 hrs. | 3 hrs. | 3 hrs. |
| Scope 1 and 2 emissions | 0 hrs. | 86 hrs. | 38 hrs. | 39 hrs. | 0 hrs. | 86 hrs. | 38 hrs. | 35 hrs. | 0 hrs. | 0 hrs. |
| Financial statement disclosures | 283 hrs. | 213 hrs. | 213 hrs. | 220 hrs. | 213 hrs. | 213 hrs. | 213 hrs. | 220 hrs. | 213 hrs. | 220 hrs. |
| **Total** | | | | **379 hrs.** | | | | **375 hrs.** | | **340 hrs.** |
| **Collection of Information: Form 10-K** | | | | | | | | | | |
| Governance, strategy, risk management | 556 hrs. | 311 hrs. | 311 hrs. | 338 hrs. | 311 hrs. | 311 hrs. | 311 hrs. | 338 hrs. | 311 hrs. | 338 hrs. |
| Scenario analysis | 20 hrs. | 10 hrs. | 10 hrs. | 11 hrs. | 10 hrs. | 10 hrs. | 10 hrs. | 11 hrs. | 10 hrs. | 11 hrs. |
| Targets | 17 hrs. | 9 hrs. | 9 hrs. | 9 hrs. | 9 hrs. | 9 hrs. | 9 hrs. | 9 hrs. | 9 hrs. | 9 hrs. |
| Scope 1 and 2 emissions | 0 hrs. | 257 hrs. | 114 hrs. | 117 hrs. | 0 hrs. | 257 hrs. | 114 hrs. | 104 hrs. | 0 hrs. | 0 hrs. |
| Financial statement disclosures | 850 hrs. | 638 hrs. | 638 hrs. | 661 hrs. | 638 hrs. | 638 hrs. | 638 hrs. | 661 hrs. | 638 hrs. | 661 hrs. |
| **Total** | | | | **1,138 hrs.** | | | | **1,125 hrs.** | | **1,021 hrs.** |

Notes:
[1] 9-Year Average values for this column are calculated as follows: ((Year 1 value for All Registrants) + (Year 2 value for LAFs) + ((Years 3-9 value for LAFs) x 7)) / 9.
[2] 9-Year Average values for this column are calculated as follows: ((Year 1 value for All Registrants) + (Year 2 value for non-exempt AFs) + (Year 3 value for non-exempt AFs) + ((Years 4-9 value for non-exempt AFs) x 6)) / 9.
[3] 9-Year Average values for this column are calculated as follows: ((Year 1 value for All Registrants) + ((Years 2-9 value for SRCs, EGCs, and NAFs) x 8)) / 9.

Appellate Case: 24-1628    Page: 824    Date Filed: 03/26/2024 Entry ID: 5377362

**PRA Table 4B.  Estimated External Professional Cost Effects of the Final Rules Over the First Nine Years of Compliance**

| Disclosure Item | All Registrants | LAFs | | | Non-Exempt AFs | | | | SRCs, EGCs, and NAFs | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Year 1 | Year 2 | Years 3-9 | 9-Year Average[1] | Year 2 | Year 3 | Years 4-9 | 9-Year Average[2] | Years 2-9 | 9-Year Average[3] |
| **Collection of Information: Forms S-1, F-1, S-4, F-4, S-11, 10, and 20-F** | | | | | | | | | | |
| Governance, strategy, risk management | $245,250 | $137,250 | $137,250 | $149,250 | $137,250 | $137,250 | $137,250 | $149,250 | $137,250 | $149,250 |
| Scenario analysis | $9,000 | $4,500 | $4,500 | $5,000 | $4,500 | $4,500 | $4,500 | $5,000 | $4,500 | $5,000 |
| Targets | $7,500 | $3,750 | $3,750 | $4,167 | $3,750 | $3,750 | $3,750 | $4,167 | $3,750 | $4,167 |
| Scope 1 and 2 emissions | $0 | $113,250 | $50,250 | $51,667 | $0 | $113,250 | $50,250 | $46,083 | $0 | $0 |
| Financial statement disclosures | $375,000 | $281,250 | $281,250 | $291,667 | $281,250 | $281,250 | $281,250 | $291,667 | $281,250 | $291,667 |
| **Total** | | | | **$501,750** | | | | **$496,167** | | **$450,083** |
| **Collection of Information: Form 10-K** | | | | | | | | | | |
| Governance, strategy, risk management | $81,750 | $45,750 | $45,750 | $49,750 | $45,750 | $45,750 | $45,750 | $49,750 | $45,750 | $49,750 |
| Scenario analysis | $3,000 | $1,500 | $1,500 | $1,667 | $1,500 | $1,500 | $1,500 | $1,667 | $1,500 | $1,667 |
| Targets | $2,500 | $1,250 | $1,250 | $1,389 | $1,250 | $1,250 | $1,250 | $1,389 | $1,250 | $1,389 |
| Scope 1 and 2 emissions | $0 | $37,750 | $16,750 | $17,222 | $0 | $37,750 | $16,750 | $15,361 | $0 | $0 |
| Financial statement disclosures | $125,000 | $93,750 | $93,750 | $97,222 | $93,750 | $93,750 | $93,750 | $97,222 | $93,750 | $97,222 |
| **Total** | | | | **$167,250** | | | | **$165,389** | | **$150,028** |

Notes:
[1] 9-Year Average values for this column are calculated as follows: ((Year 1 value for All Registrants) + (Year 2 value for LAFs) + ((Years 3-9 value for LAFs) x 7)) / 9.
[2] 9-Year Average values for this column are calculated as follows: ((Year 1 value for All Registrants) + (Year 2 value for non-exempt AFs) + (Year 3 value for non-exempt AFs) + ((Years 4-9 value for non-exempt AFs) x 6)) / 9.
[3] 9-Year Average values for this column are calculated as follows: ((Year 1 value for All Registrants) + ((Years 2-9 value for SRCs, EGCs, and NAFs) x 8)) / 9.

Appellate Case: 24-1628     Page: 825     Date Filed: 03/26/2024 Entry ID: 5377362

**PRA Table 4C.  Estimated Paperwork Burden Effects of the Attestation Requirement Over the First Nine Years of Compliance**

| Collection of Information: Forms S-1, F-1, S-4, F-4, S-11, 10, 20-F, and 10-K | | | | | | |
|---|---|---|---|---|---|---|
| **Assurance Costs for LAFs** | | | | **Assurance Costs for Non-Exempt AFs** | | |
| **Years 1-4** | **Years 5-8** | **Year 9** | **9-Year Average[1]** | **Years 1-5** | **Years 6-9** | **9-Year Average[2]** |
| $0 | $50,000 | $150,000 | **$38,889** | $0 | $50,000 | **$22,222** |
| Notes:<br>[1] 9-Year Average values for this column are calculated as follows: (((Years 1-4 value for LAFs) x 4) + ((Years 5-8 value for LAFs) x 4) + (Year 9 value for LAFs)) / 9.<br>[2] 9-Year Average values for this column are calculated as follows: (((Years 1-5 value for non-exempt AFs) x 5) + ((Years 6-9 value for non-exempt AFs) x 4)) / 9. | | | | | | |

## 2. Estimated Number of Affected Respondents

We estimate that the final rules will change the paperwork burden per response for each affected collection of information.  However, we do not believe that the above-described paperwork burdens will affect all the filers for each collection of information.  Because the final rules include materiality qualifiers and otherwise will not require disclosure in all instances from all registrants, but rather depend on the registrant's particular facts and circumstances, we estimate that only a certain percentage of filers of each form will be required to provide the climate-related disclosures.  We have based the estimated percentages on third-party surveys of current climate-related disclosure practices, commenters' estimates of companies likely to disclose climate-related risks and metrics, and staff estimates of current climate-related disclosure practices.[3205]

The following PRA Table 5 provides the percentage of filers for each collection of information that we estimate will be affected by the final rules.

---

[3205]    In particular, we have considered the percentages of surveyed companies, both issuers with larger market capitalization and all other registrants, providing climate-related disclosures as reported by the TCFD in TCFD, 2022 Status Report (Oct. 2022).  That report included climate-related data from companies with a market capitalization ranging from greater than $12.2 billion to less than $3.4 billion.  In addition, we have considered aspects of the third-party surveys discussed in section IV, such as the 2021 S&P Global Corporate Sustainability Assessment and estimates of climate-related risk and metrics reporting provided by commenters, such as Amer. for Fin. Reform and Public Citizen (Oct. 26, 2023).  That commenter included climate-related data pertaining to Fortune 1000 companies with individual annual revenues over $2 billion.  However, none of the estimates considered included companies that directly matched the registrants that will be affected by the final rules.  Therefore, the estimated percentages of LAFs, AFs, and all other registrants affected by the final rules, as provided in the table below, may underestimate or overestimate the actual number of affected respondents.

**PRA Table 5.  Estimated Percentage of Filers for Each Collection of Information That Will Be Affected By the Final Rules**

| Form | No. of Respondents[1] | | | | Disclosure Item | Percentage of Respondents Affected[2] | | | No. of Affected Respondents | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Total | LAFs | Non-Exempt AFs | SRCs, EGC, and NAFs | | LAFs | Non-Exempt AFs | SRCs, EGCs, and NAFs | LAFs | Non-Exempt AFs | SRCs, EGCs, and NAFs |
| **Form S-1** | **898** | 296 | 45 | 557 | Governance, strategy, risk management | 65%[3] | 45% | 30% | 192 | 20 | 167 |
| | | | | | Scenario analysis | 25% | 20% | 10% | 74 | 9 | 56 |
| | | | | | Targets | 50% | 35% | 25% | 148 | 16 | 139 |
| | | | | | Scope 1 and 2 emissions | 65% | 35% | 20% | 192 | 16 | 111 |
| | | | | | Financial statement disclosures | 50% | 35% | 25% | 148 | 16 | 139 |
| | | | | | **Average No. of Affected Respondents:** | | | | **151** | **15** | **123** |
| **Form F-1** | **66** | 22 | 7 | 37 | Governance, strategy, risk management | 65% | 45% | 30% | 14 | 3 | 11 |
| | | | | | Scenario analysis | 25% | 20% | 10% | 6 | 1 | 4 |
| | | | | | Targets | 50% | 35% | 25% | 11 | 2 | 9 |
| | | | | | Scope 1 and 2 emissions | 65% | 35% | 20% | 14 | 2 | 7 |
| | | | | | Financial statement disclosures | 50% | 35% | 25% | 11 | 2 | 9 |
| | | | | | **Average No. of Affected Respondents:** | | | | **11** | **2** | **8** |
| **Form S-4** | **588** | 194 | 29 | 365 | Governance, strategy, risk management | 65% | 45% | 30% | 126 | 13 | 110 |
| | | | | | Scenario analysis | 25% | 20% | 10% | 49 | 6 | 37 |
| | | | | | Targets | 50% | 35% | 25% | 97 | 10 | 91 |
| | | | | | Scope 1 and 2 emissions | 65% | 35% | 20% | 126 | 10 | 73 |
| | | | | | Financial statement disclosures | 50% | 35% | 25% | 97 | 10 | 91 |
| | | | | | **Average No. of Affected Respondents:** | | | | **99** | **10** | **80** |
| **Form F-4** | **39** | 13 | 4 | 22 | Governance, strategy, risk management | 65% | 45% | 30% | 8 | 2 | 7 |
| | | | | | Scenario analysis | 25% | 20% | 10% | 3 | 1 | 2 |
| | | | | | Targets | 50% | 35% | 25% | 7 | 1 | 6 |
| | | | | | Scope 1 and 2 emissions | 65% | 35% | 20% | 8 | 1 | 4 |
| | | | | | Financial statement disclosures | 50% | 35% | 25% | 7 | 1 | 6 |
| | | | | | **Average No. of Affected Respondents:** | | | | **7** | **1** | **5** |
| **Form S-11** | **67** | 22 | 3 | 42 | Governance, strategy, risk management | 65% | 45% | 30% | 14 | 1 | 13 |
| | | | | | Scenario analysis | 25% | 20% | 10% | 6 | 1 | 4 |

Appellate Case: 24-1628    Page: 828    Date Filed: 03/26/2024 Entry ID: 5377362

App.823

| Form | Total | | | | Category | % | % | % | No. | No. | No. |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Targets | 50% | 35% | 25% | 11 | 1 | 11 |
| | | | | | Scope 1 and 2 emissions | 65% | 35% | 20% | 14 | 1 | 8 |
| | | | | | Financial statement disclosures | 50% | 35% | 25% | 11 | 1 | 11 |
| | | | | | **Average No. of Affected Respondents:** | | | | **11** | **1** | **9** |
| **Form 10** | **216** | 71 | 11 | 134 | Governance, strategy, risk management | 65% | 45% | 30% | 46 | 5 | 40 |
| | | | | | Scenario analysis | 25% | 20% | 10% | 18 | 2 | 13 |
| | | | | | Targets | 50% | 35% | 25% | 36 | 4 | 34 |
| | | | | | Scope 1 and 2 emissions | 65% | 35% | 20% | 46 | 4 | 27 |
| | | | | | Financial statement disclosures | 50% | 35% | 25% | 36 | 4 | 34 |
| | | | | | **Average No. of Affected Respondents:** | | | | **36** | **4** | **29** |
| **Form 20-F** | **729** | 241 | 80 | 408 | Governance, strategy, risk management | 65% | 45% | 30% | 157 | 36 | 122 |
| | | | | | Scenario analysis | 25% | 20% | 10% | 60 | 16 | 41 |
| | | | | | Targets | 50% | 35% | 25% | 121 | 28 | 102 |
| | | | | | Scope 1 and 2 emissions | 65% | 35% | 20% | 157 | 28 | 82 |
| | | | | | Financial statement disclosures | 50% | 35% | 25% | 121 | 28 | 102 |
| | | | | | **Average No. of Affected Respondents:** | | | | **123** | **27** | **90** |
| **Form 10-K** | **8,292** | 2,736 | 415 | 5,141 | Governance, strategy, risk management | 65% | 45% | 30% | 1,778 | 187 | 1,542 |
| | | | | | Scenario analysis | 25% | 20% | 10% | 684 | 83 | 514 |
| | | | | | Targets | 50% | 35% | 25% | 1,368 | 145 | 1,285 |
| | | | | | Scope 1 and 2 emissions | 65% | 35% | 20% | 1,778 | 145 | 1,028 |
| | | | | | Financial statement disclosures | 50% | 35% | 25% | 1,368 | 145 | 1,285 |
| | | | | | **Average No. of Affected Respondents:** | | | | **1,395** | **141** | **1,131** |

Notes:
[1] The number of respondents for each group of registrants is based on the approximate percentage of respondents in 2022 that were LAFs, non-exempt AFs, and all other registrants (SRCs, EGCs, and NAFs).  As discussed in Section IV, the number of domestic registrants and foreign private issuers affected by the final rules is estimated as the number of companies that filed a unique Form 10-K or Form 20-F during calendar year 2022, excluding asset-backed securities issuers.  Of domestic respondents, approximately 33% were LAFs, 5% were non-exempt AFs, and 62% were all other registrants (SRCs, EGCs, and NAFs).  Of foreign respondents, approximately 33% were LAFs, 11% were non-exempt AFs, and 56% were all other registrants (SRCs, EGCs, and NAFs).

[2] All percentages for LAFs, non-exempt AFs, and all other registrants (SRCs, EGCs, and NAFs) rounded to nearest 5%.

[3] For example, according to the TCFD 2022 Status Report, an average of 48% of the largest companies provided disclosures related to governance, strategy, and risk management (excluding scenario analysis), 68% of LAFs provided some climate-related disclosures in Commission filings in 2022 as discussed in Section IV above, and 73% of Fortune 1000 companies will likely be required to disclose their climate risks and strategies pursuant to recent California law, according to one commenter.  *See* letter from Amer. for Fin. Reform, Public Citizen, and Sierra Club (Oct. 26, 2023).  48 + 68 + 73 = 189; 189/3 = 63, which we have rounded up to 65%.

App.824

**3. Summary of the Estimated Burden Hour and Cost Increases Resulting from the Final Rules**

The following two tables provide:

- The calculation of the incremental and aggregate change in burden hour and professional cost estimates of current responses resulting from the final rules (PRA Table 6); and

- The program change and total requested change in paperwork burden for the final rules (PRA Table 7).

Appellate Case: 24-1628    Page: 830    Date Filed: 03/26/2024 Entry ID: 5377362

**PRA Table 6.  Calculation of the Incremental and Aggregate Change in Burden Hour and Cost Estimates of Current Responses Resulting from the Final Rules**[1]

| Form | Filed By | Average Number of Affected Respondents (From PRA Table 5) | Average Internal Burden Hour Increase per Affected Respondent (From PRA Table 4A) | Aggregate Internal Burden Hour Increase for Affected Respondents | Average Professional Cost Increase per Affected Respondent (From PRA Table 4B) | Aggregate Professional Cost Increase for Affected Respondents | Average Assurance Cost Increase per Affected Respondent (From PRA Table 4C) | Aggregate Assurance Cost Increase for Affected Respondents | Aggregate Professional and Assurance Cost Increase for Affected Respondents |
|---|---|---|---|---|---|---|---|---|---|
| | | (A) | (B) | (C) = (A) x (B) | (D) | (E) = (A) x (D) | (F) | (G) = (A) x (F) | (H) = (E) + (G) |
| **Form S-1** | LAFs | 151 | 379 | 57,252 | $501,750 | $75,744,180 | $38,889 | $5,870,667 | $81,614,847 |
| | Non-Exempt AFs | 15 | 375 | 5,738 | $496,167 | $7,591,350 | $22,222 | $340,000 | $7,931,350 |
| | SRCs, EGCs, and NAFs | 123 | 340 | 41,688 | $450,083 | $55,153,212 | $0 | $0 | $55,153,212 |
| | **Total** | **289** | | **104,678** | | **$138,488,742** | | **$6,210,667** | **$144,699,408** |
| **Form F-1** | LAFs | 11 | 379 | 4,255 | $501,750 | $5,629,635 | $38,889 | $436,333 | $6,065,968 |
| | Non-Exempt AFs | 2 | 375 | 893 | $496,167 | $1,180,877 | $22,222 | $52,889 | $1,233,766 |
| | SRCs, EGCs, and NAFs | 8 | 340 | 2,769 | $450,083 | $3,663,678 | $0 | $0 | $3,663,678 |
| | **Total** | **22** | | **7,917** | | **$10,474,190** | | **$489,222** | **$10,963,412** |
| **Form S-4** | LAFs | 99 | 379 | 37,523 | $501,750 | $49,643,145 | $38,889 | $3,847,667 | $53,490,812 |
| | Non-Exempt AFs | 10 | 375 | 3,698 | $496,167 | $4,892,203 | $22,222 | $219,111 | $5,111,314 |
| | SRCs, EGCs, and NAFs | 80 | 340 | 27,318 | $450,083 | $36,141,692 | $0 | $0 | $36,141,692 |
| | **Total** | **189** | | **68,539** | | **$90,677,040** | | **$4,066,778** | **$94,743,818** |
| **Form F-4** | LAFs | 7 | 379 | 2,514 | $501,750 | $3,326,603 | $38,889 | $257,833 | $3,584,436 |
| | Non-Exempt AFs | 1 | 375 | 510 | $496,167 | $674,787 | $22,222 | $30,222 | $705,009 |
| | SRCs, EGCs, and NAFs | 5 | 340 | 1,647 | $450,083 | $2,178,403 | $0 | $0 | $2,178,403 |
| | **Total** | **13** | | **4,671** | | **$6,179,793** | | **$288,056** | **$6,467,848** |
| **Form S-11** | LAFs | 11 | 379 | 4,255 | $501,750 | $5,629,635 | $38,889 | $436,333 | $6,065,968 |
| | Non-Exempt AFs | 1 | 375 | 383 | $496,167 | $506,090 | $22,222 | $22,667 | $528,757 |
| | SRCs, EGCs, and NAFs | 9 | 340 | 3,143 | $450,083 | $4,158,770 | $0 | $0 | $4,158,770 |
| | **Total** | **21** | | **7,781** | | **$10,294,495** | | **$459,000** | **$10,753,495** |
| **Form 10** | LAFs | 36 | 379 | 13,733 | $501,750 | $18,168,368 | $38,889 | $1,408,167 | $19,576,534 |
| | Non-Exempt AFs | 4 | 375 | 1,403 | $496,167 | $1,855,663 | $22,222 | $83,111 | $1,938,774 |

Appellate Case: 24-1628    Page: 831    Date Filed: 03/26/2024 Entry ID: 5377362

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | SRCs, EGCs, and NAFs | 29 | 340 | 10,029 | $450,083 | $13,268,457 | $0 | $0 | $13,268,457 |
| | **Total** | **69** | | **25,164** | | **$33,292,488** | | **$1,491,278** | **$34,783,765** |
| **Form 20-F** | LAFs | 123 | 379 | 46,614 | $501,750 | $61,670,093 | $38,889 | $4,779,833 | $66,449,926 |
| | Non-Exempt AFs | 27 | 375 | 10,201 | $496,167 | $13,495,733 | $22,222 | $604,444 | $14,100,178 |
| | SRCs, EGCs, and NAFs | 90 | 340 | 30,536 | $450,083 | $40,399,480 | $0 | $0 | $40,399,480 |
| | **Total** | **240** | | **87,351** | | **$115,565,306** | | **$5,384,278** | **$120,949,584** |
| **Form 10-K** | LAFs | 1,395 | 1,138 | 1,587,578 | $167,250 | $233,373,960 | $38,889 | $54,264,000 | $287,637,960 |
| | Non-Exempt AFs | 141 | 1,125 | 158,751 | $165,389 | $23,336,372 | $22,222 | $3,135,556 | $26,471,928 |
| | SRCs, EGCs, and NAFs | 1,131 | 1,021 | 1,154,316 | $150,028 | $169,684,417 | $0 | $0 | $169,684,417 |
| | **Total** | **2,667** | | **2,900,645** | | **$426,394,749** | | **$57,399,556** | **$483,794,305** |

Notes:
[1] All numbers rounded to nearest whole number.

Appellate Case: 24-1628    Page: 832    Date Filed: 03/26/2024 Entry ID: 5377362

## PRA Table 7. Requested Change in Paperwork Burden for the Final Rules

| Form | Current Burden, as Adjusted[1] | | | Program Change | | | Requested Change in Burden | | |
|---|---|---|---|---|---|---|---|---|---|
| | Current Annual Responses (From PRA Table 5) | Current Internal Burden Hours | Current External Cost Burden, as Adjusted (From PRA Table 1)[1] | No. of Affected Responses (From PRA Table 6) | Change in Internal Burden Hours (From PRA Table 6) | Change in External Costs (Professional and Assurance Costs) (From PRA Table 6) | Annual Responses | Internal Burden Hours | External Cost Burden |
| | (A) | (B) | (C) | (D) | (E) | (F) | (G) | (H) = (B) + (E) | (I) = (C) + (F) |
| Form S-1 | 898 | 141,978 | $261,023,465 | 289 | 104,678 | $144,699,408 | 898 | 246,656 | $405,722,873 |
| Form F-1 | 66 | 26,571 | $48,195,563 | 22 | 7,917 | $10,963,412 | 66 | 34,488 | $59,158,975 |
| Form S-4 | 588 | 560,988 | $1,013,408,069 | 189 | 68,539 | $94,743,818 | 588 | 629,527 | $1,108,151,886 |
| Form F-4 | 39 | 13,999 | $25,520,138 | 13 | 4,671 | $6,467,848 | 39 | 18,670 | $31,987,986 |
| Form S-11 | 67 | 12,101 | $22,185,252 | 21 | 7,781 | $10,753,495 | 67 | 19,882 | $32,938,747 |
| Form 10 | 216 | 10,821 | $19,277,232 | 69 | 25,164 | $34,783,765 | 216 | 35,985 | $54,060,997 |
| Form 20-F | 729 | 479,303 | $864,800,138 | 240 | 87,351 | $120,949,584 | 729 | 566,654 | $985,749,721 |
| Form 10-K | 8,292 | 13,988,811 | $2,753,391,779 | 2,667 | 2,900,645 | $483,794,305 | 8,292 | 16,889,456 | $3,237,186,084 |
| **Total** | | **15,234,572** | **$5,007,801,633** | | **3,206,746** | **$907,155,635** | | **18,441,318** | **$5,914,957,268** |

Notes:
[1] Current cost burden updated to reflect change in hourly rate of the costs of outside professionals to $600/hr., as reflected in PRA Table 1.

Appellate Case: 24-1628     Page: 833     Date Filed: 03/26/2024 Entry ID: 5377362

App.828

## VI. FINAL REGULATORY FLEXIBILITY ACT ANALYSIS

The Regulatory Flexibility Act ("RFA") requires the Commission, in promulgating rules under section 553 of the Administrative Procedure Act,[3206] to consider the impact of those rules on small entities. We have prepared this Final Regulatory Flexibility Analysis ("FRFA") in accordance with section 604 of the RFA.[3207] An Initial Regulatory Flexibility Analysis ("IRFA") was prepared in accordance with the RFA and was included in the Proposing Release.[3208]

### A. Need for, and Objectives of, the Final Amendments

The final amendments add a new subpart 1500 to Regulation S-K and a new Article 14 to Regulation S-X, which will require registrants to provide certain climate-related disclosures in their Securities Act and Exchange Act registration statements and Exchange Act reports. These requirements will elicit more complete and useful information about the impacts of climate-related risks on registrants to improve the consistency, comparability, and reliability of climate-related information for investors. As required by the RFA, this FRFA describes the impact of the final amendments on small entities. The need for, and objectives of, the final rules are described in sections I and II above. We discuss the economic impact and potential alternatives to the amendments in section IV, and the estimated compliance costs and burdens of the amendments for purposes of the PRA in section V.

---

[3206] 5 U.S.C. 553.

[3207] 5 U.S.C. 604.

[3208] Proposing Release at section VI.

Appellate Case: 24-1628    Page: 834    Date Filed: 03/26/2024 Entry ID: 5377362

### B.  Significant Issues Raised by Public Comments

In the Proposing Release, the Commission requested comment on any aspect of the IRFA, and particularly on the number of small entities that would be affected by the proposed amendments, the existence or nature of the potential impact of the proposed amendments on small entities discussed in the analysis, how the proposed amendments could further lower the burden on small entities, and how to quantify the impact of the proposed amendments.

We received one comment letter on the IRFA from the U.S. Small Business Administration's Office of Advocacy ("Advocacy").[3209]  Advocacy's letter expressed concern that "the IRFA does not adequately describe the regulated small entities and potential impacts on those entities."[3210]  In the Proposing Release, the Commission estimated that the proposed amendments would apply to 1,004 registrants that may be considered small entities.[3211] Advocacy's comment letter stated that this estimate did "not provide additional information, such as the North American Industry Classification System ("NAICS") classifications of the affected entities" and did not "break down the affected entities into smaller size groups (e.g., based on total assets)."[3212]

The comment letter from Advocacy also addressed the discussion of alternatives within the IRFA and the Commission's explanation of why it did not ultimately propose such alternatives.  Advocacy also stated that "[t]he RFA requires that an IRFA provide significant,

---

[3209]    *See* letter from U.S. Small Business Administration Office of Advocacy (June 17, 2022) ("Advocacy"). Some commenters, while not specifically addressing the IRFA, did address the impact of the proposed rules on SRCs.  *See* letters from Soc. Corp. Gov. (Nov. 11, 2022); BIO; FFAC; CCR; HDA; ICI; Jones Day; NACCO; NAHB; Rho Impact; CBD; Grant Eisenhofer; ICBA; and Williams Cos.

[3210]    *See* letter from Advocacy.

[3211]    Proposing Release at 16617.

[3212]    *See* letter from Advocacy*.*

feasible alternatives that accomplish an agency's objectives," and stated that the IRFA did not satisfy this requirement because it listed "broad categories of potential alternatives to the proposed rules but [did] not analyze specific alternatives that w[ere] considered by the SEC" and because it did not "contain a description of any additional regulatory alternatives which accomplish the SEC's stated objectives and which would further minimize the significant economic impact of the proposal on small entities."[3213]  Finally, Advocacy stated that the Commission had not "considered the impacts of the proposal to indirectly regulated small entities" as a result of the proposed requirement for Scope 3 emissions data from certain registrants.[3214]  Advocacy stated that "[m]any of these upstream and downstream parties will be small, privately-owned companies that do not have public reporting requirements," and as result such "small businesses are unsure what information they would be expected to provide to public companies, how to collect the necessary information, and whether their businesses would be able to absorb the associated costs."[3215]

### 1.  Estimate of Affected Small Entities and Impact to Those Entities

With respect to the adequacy of the Proposing Release's estimate of affected small entities, the RFA requires "a description of and, where feasible, an estimate of the number of small entities to which the proposed rule will apply."[3216]  Advocacy's published guidance recommends agencies use NAICS classifications to help in "identifying the industry,

---

[3213]    *See id.*

[3214]    *See id.*

[3215]    *See id.*

[3216]    5 U.S.C. 603(b)(3).

governmental and nonprofit sectors they intend to regulate."[3217]  Here, given that the rulemaking

applies to and impacts all public company registrants, regardless of industry or sector, we do not

believe that further breakout of such registrants by industry classification is necessary or would

otherwise be helpful to such entities in understanding the impact of the proposed or final rules.

In this case, small entities in certain industries and sectors are not necessarily more affected than

others, as climate-related risks may exist across all industries and sectors, and may or may not

exist for a particular registrant irrespective of the industry classification.[3218]  For the same

reasons, we are not breaking down the affected entities into smaller size groups (e.g., based on

total assets), as recommended by Advocacy.  Given the nature of the final rules, we believe that

our estimate below of the number of small entities to which the final rules will apply adequately

describes and estimates the small entities that will be affected.[3219]

We disagree with the statement in Advocacy's comment letter that "SEC expects that the

costs associated with the proposed amendments to be similar for large and small entities."  The

Commission explained in the IRFA that the proposed amendments would apply to small entities

to the same extent as other entities, irrespective of size, and that therefore, the Commission

expected that "the *nature* of any benefits and costs associated with the proposed amendments to

be similar for large and small entities" (emphasis added).[3220]  The analysis with respect to the

*nature* of the costs (and benefits) of the proposed rules detailed in the Economic Analysis of the

---

[3217]     U.S. Small Business Administration Office of Advocacy, A Guide for Government Agencies: How to
          Comply with the Regulatory Flexibility Act (Aug. 2017), at 18, available at
          https://www.sba.gov/sites/default/files/advocacy/How-to-Comply-with-the-RFA-WEB.pdf.

[3218]     A breakout would be relevant where, for example, the Commission finds that small entities generally would
          not be affected by a rule but small entities in a particular industry would be affected.

[3219]     *See infra* section VI.C.

[3220]     Proposing Release at section VI.D.

App.832

Proposing Release was referenced in the IRFA to help small entities understand such impacts, not to imply that small entities face the same proportional costs as large entities. Indeed, the Commission went on to state in both the IRFA and the Economic Analysis of the Proposing Release that costs "can vary significantly depending on firm characteristics, such as firm size, industry, business model, the complexity of the firm's corporate structure, starting level of internal expertise, etc."[3221]

The Commission solicited comments on the proposal's potential effect on small entities, and specifically acknowledged that their varied characteristics, including "the nature and conduct of their businesses make[s] it difficult to project the economic impact on small entities with precision."[3222] We note that the proposal, while not exempting small entities from the full scope of the proposed amendments, did exempt SRCs, which would generally include all estimated small entities that would be subject to the proposed rules, from the proposed Scope 3 emissions disclosure requirements and from the proposed GHG attestation requirements. Under the proposal, SRCs also were afforded a longer transition period to comply with the proposed rules than other registrants.

We nonetheless recognize the concerns raised by Advocacy and others regarding the costs to small entities subject to the proposed rules, as well as the concerns about the indirect impact to small entities not subject to the proposed rules. We discuss the economic effects, including costs, of the final rules across all entities in section IV above. We recognize that, to the extent the costs of the final rules are generally fixed across entities, they would be proportionally more costly for smaller companies. However, as discussed both above and below, to help mitigate that

---

[3221]   *Id.* at 21441.

[3222]   *Id.* at 21463.

App.833

Appellate Case: 24-1628     Page: 838     Date Filed: 03/26/2024 Entry ID: 5377362

relatively greater burden to smaller companies and to respond to commenter concerns, we have made a number of changes in the final rules to ease these burdens, including providing SRCs, EGCs and NAFs with the longest phase in periods for compliance as well as excluding them entirely from some of the requirements, such as the GHG emissions disclosure and related assurance requirements. Additionally, certain changes from the proposal, including streamlining the requirements, making them less prescriptive and adding materiality qualifiers, will reduce the overall burden of the final rules for all registrants, including small entities. Accordingly, we believe that both this FRFA and our prior IRFA adequately describe and analyze the relative impact of costs to small entities.

### 2. Consideration of Alternatives

The IRFA's discussion of significant alternatives, and our discussion of alternatives below, satisfy the RFA. The relevant RFA requirement provides that an IRFA "shall also contain a description of any significant alternatives to the proposed rule *which accomplish* the stated objectives of applicable statutes and which minimize any significant economic impact of the proposed rule on small entities."[3223] In the Proposing Release, the Commission discussed each of the types of significant alternatives noted in section 603 of the RFA and concluded that none of these alternatives would accomplish the stated objectives of the rulemaking while minimizing any significant impact on small entities. In addition, section IV.F of the Proposing Release discussed reasonable alternatives to the proposed rules and their economic impacts. Similarly, in addition to the discussion in section VI.E below, in section IV.F of this release we also discuss reasonable alternatives of the final rules and their economic impacts.

---

[3223]    5 U.S.C. 603(c) (emphasis added).

While not commenting on the alternatives raised in the IRFA specifically, several commenters asked the Commission to provide further exemptions not only for SRCs as proposed, but also for other small businesses without reporting obligations that may have faced upstream or downstream reporting obligations under the proposed rules.[3224] One of these commenters stated that while "appreciat[ive] that the Commission proposes to exempt small companies from a portion of the reporting requirements (Scope 3)" small companies in the biotechnology industry "will be disproportionately affected by the proposed rule while providing limited benefit to investors."[3225] This commenter also asserted that the proposed exemptions would not provide relief to smaller companies that "have no product revenues but often fall outside of the scope of smaller reporting companies due to existing public float threshold."[3226] Failure to consider these companies, it argued, could lead to "diminishing incentives" to go public and potentially duplicative regulation.[3227] Another commenter reiterated this concern, stating that Scope 3 emission requirements extend beyond registrants to privately owned entities, specifically those without the resources to comply with the proposed disclosures.[3228]

Advocacy stated it was concerned about the potential upstream and downstream effects of Scope 3 emissions disclosure requirements on non-regulated small businesses.[3229] Several

---

[3224] *See* SBCFAC Recommendation; Small Business Forum Recommendation (2023); and letters from OOIDA; NAHB; and NACS.

[3225] Letter from BIO. However, some commenters disputed this characterization. *See* letter from Amer. for Fin. Reform, Sunrise Project *et al.*, (stating that "[o]ffering a wholesale exemption is unsupported by the extensive research, discussed throughout these comments, showing that climate-related financial risks are widely dispersed throughout the economy and not limited to large registrants. In addition, given their smaller size, SRCs are likely to have significantly less costs in assessing and disclosing Scope 3 emissions than large registrants.").

[3226] *See* letter from BIO.

[3227] *See id.*

[3228] *See* letter from Independent Community Banks of North Dakota (July 14, 2022).

[3229] *See* letter from Advocacy.

835

commenters raised similar concerns.[3230]  While small businesses without reporting requirements were not obligated under the proposed rules to provide this information, several commenters expressed concerns that companies with reporting obligations would compel the collection of this information as a condition of doing business with these businesses.[3231]

The Commission also received comments that explicitly opposed a wholesale exemption for smaller companies, pointing to the need for greater transparency about climate-related risks irrespective of a registrant's size.[3232]  Some of these commenters explained their opposition to a wholesale exemption by stating that smaller companies may face disproportionately greater climate-related risks, and asserted that the additional proposed phase in period was adequate to ensure smaller companies had time to comply with the proposed rules.[3233]

Another commenter stated that, with respect to the proposal to require disclosure about the climate expertise of board members, small companies' "operations and limited resources do not naturally lend themselves to requiring discrete board expertise for every risk, including climate-related risk."[3234]  This commenter also stated that requiring the disclosure of board

---

[3230]   *See* letter from AFPA ("The SEC should carefully consider that the potential burdens of the proposal are not limited to public companies subject to SEC regulation, as private companies, including innumerable small businesses, also are expected to face inquiries from many SEC-regulated customers as a result of the rules.").

[3231]   *See* letter from Venture Dairy Cooperative ("Although this proposed rule is likely well intended as a step to both measure and monitor climate related information on publicly traded companies on Wall Street, this extension of reporting on Scope 3 emissions will inevitably filter down the supply chain to our nation's family farms who grow and raise the food we eat.").  *See also* letters from IDFA and PDMPA.

[3232]   *See* letters from Anthesis Bailard; CalSTRS CBD; Change Finance; ClientEarth; Defenders Wildlife; Essex Invest. Mgmt.; IASJ IEN; FFAC; Grant Eisenhofer; NCF; OMERA PWHC LLP; Prentiss; S. Lloyd; Sweep; Terra Alpha; UNCA; and WAP.

[3233]   *See* letter from ICI ("In addition, we support the Commission not proposing generally to exempt SRCs or EGCs from the entire scope of the proposed climate-related disclosure rules because climate-related risks may pose a significant risk to the operations and financial condition of smaller companies. At the same time, providing them with more time than other companies to comply with any new requirements could mitigate the Proposal's compliance burden for smaller companies by giving them additional time to allocate the resources necessary to compile and prepare climate-related disclosures.").

[3234]   *See* letter from NRP.

expertise for a smaller company could lead to the selection of board members without other requisite skills.

The Commission considered the comments on the Proposing Release, including those addressing the impact of the proposed reporting obligations on small entities. The final rules address several concerns raised by Advocacy and other commenters and modify the proposal in ways that will significantly reduce costs to smaller reporting companies, including small entities that meet the definition of SRCs, EGCs, and NAFs. For example, SRCs, EGCs and NAFs are not subject to the requirement to disclose Scope 1 and 2 emissions, as discussed above. Additionally, the Commission is not adopting the proposal to require disclosure of Scope 3 emissions for any entities. This will address any concerns about the possible impacts of the proposed Scope 3 requirements on small entities, including private companies, in a reporting company's value chain. Additionally, as a result of eliminating the reference to negative climate-related impacts on a registrant's value chain from the proposed definition of climate-related risks, the final rules further limit the burdens of climate risk assessment on parties in a registrant's value chain that might have occurred under the rule proposal.

We agree with commenters that stated that smaller companies should not be fully exempted from the final rules because they could face material climate risks about which investors need information to make informed voting and investment decisions.[3235] As with other sized entities, many of the changes we have made to streamline the rules and provide additional flexibility to registrants to tailor their disclosures based on their particular facts and circumstances will similarly benefit smaller companies. For example, the changes made to the governance and risk management sections are less prescriptive and more principles-based, which

---

[3235] *See, e.g.*, *supra* notes 2410-2413.

App.837

Appellate Case: 24-1628    Page: 842    Date Filed: 03/26/2024 Entry ID: 5377362

will allow smaller companies to avoid disclosure requirements that are not compatible with their business.  Additionally, as discussed in section II.O, we are providing SRCs, EGCs, and NAFs with significant additional time to comply with the final rules, with the earliest disclosures being required no sooner than the filings that are required to include financial information for fiscal year 2027.

### C. Small Entities Subject to the Final Amendments

The final rules apply to registrants that are small entities.  The RFA defines "small entity" to mean "small business," "small organization," or "small governmental jurisdiction."[3236]  For purposes of the RFA, under our rules, a registrant, other than an investment company, is a "small business" or "small organization" if it had total assets of $5 million or less on the last day of its most recent fiscal year and is engaged or proposing to engage in an offering of securities that does not exceed $5 million.[3237]  An investment company, including a business development company,[3238] is considered to be a "small business" if it, together with other investment companies in the same group of related investment companies, has net assets of $50 million or less as of the end of its most recent fiscal year.[3239]  We estimate that, as of December 31, 2022, there were approximately 800 issuers and 10 business development companies that may be considered small entities that would be subject to the final amendments.

---

[3236]   5 U.S.C. 601(6).

[3237]   *See* 17 CFR 240.0-10(a).

[3238]   Business development companies are a category of closed-end investment company that are not registered under the Investment Company Act [15 U.S.C. 80a-2(a)(48) and 80a-53 through 64].

[3239]   17 CFR 270.0-10(a).

Appellate Case: 24-1628      Page: 843      Date Filed: 03/26/2024 Entry ID: 5377362

### D. Projected Reporting, Recordkeeping, and other Compliance Requirements

As noted above, requirements to disclose material GHG emissions information and obtain assurance over that information will not apply to SRCs, EGCs, or NAFs in response to concerns raised by commenters.  For the remainder of the requirements, we continue to expect that the nature of any benefits and costs associated with the amendments to be similar for large and small entities, and so we refer to the discussion of the amendments' economic effects on all affected parties, including small entities, in section IV above.  Also consistent with the discussion in sections II and IV above, we acknowledge that, to the extent that a smaller entity would be required to provide disclosure under the final rules, it may face costs that are proportionally greater as it may be less able to bear such costs relative to larger entities.[3240]  The costs of preparing the disclosure would be a primary contributing factor given that compliance with certain provisions of the final amendments may require the use of professional skills, including legal, accounting, and technical skills.  We also anticipate that the economic benefits and costs likely could vary widely among small entities based on a number of factors, such as the nature and conduct of their businesses, including whether and how they managed any material climate-related risks, which makes it difficult to project the economic impact on small entities with precision.  To the extent that the disclosure requirements have a greater effect on smaller registrants relative to large registrants, they could result in adverse effects on competition.

---

[3240]    We note that some commenters stated that SRCs may have proportionately lower expenses.  *See* letter from Amer. for Fin. Reform, Sunrise Project *et al.*

### E. Agency Action to Minimize Effect on Small Entities

The RFA directs us to consider alternatives that would accomplish our stated objectives, while minimizing any significant adverse impact on small entities. Accordingly, we considered the following alternatives:

1. Exempting small entities from all or part of the requirements;

2. Establishing different compliance or reporting requirements that consider the resources available to small entities;

3. Using performance rather than design standards; and

4. Clarifying, consolidating, or simplifying compliance and reporting requirements under the rules for small entities.

The rules are intended to allow investors to make more informed investment and voting decisions about the impact of climate-related risks on registrants' business and financial condition. As explained in section I.A. above, current requirements are not yielding consistent and comparable disclosure sufficient to meet investors' needs. The disclosure that does exist is scattered in various parts of registrants' filings and public disclosures and provided at different intervals, making it difficult for investors to locate, analyze, and compare across registrants.

Given the current disclosure landscape, exempting small entities entirely from the rules or otherwise clarifying, consolidating, or simplifying compliance and reporting requirements under the rules for small entities would frustrate the rulemaking's goal of providing investors with more consistent, comparable and timely disclosure about climate-related risks across all registrants. However, as discussed in section II above, we have consolidated and simplified the disclosure requirements for all entities, which should ease small entities' compliance as well. Further, as some commenters noted, smaller companies may face equal or greater climate-related

Appellate Case: 24-1628    Page: 845    Date Filed: 03/26/2024 Entry ID: 5377362

risk than larger companies, making the disclosures important for investors in these companies.[3241]  However, we have determined to require the disclosure of Scope 1 and Scope 2 GHG emissions only in certain circumstances from the largest filers, thereby excluding smaller companies from these provisions.  We believe that this strikes an appropriate balance between the needs of investors in smaller companies, including small entities, to understand the likely impacts of material climate-related risks and the costs associated with compliance.

We also believe the rulemaking's stated objectives can be achieved by providing smaller companies with additional time to comply.  Therefore, smaller companies, including small entities that are SRCs, EGCs and NAFs, will be provided with more than two years from the effective date of the final rules before compliance is required; specifically, these entities must begin to comply in filings that are required to include financial information for fiscal year 2027.  These changes will benefit small entities and other small companies, both by giving them an extended compliance period to establish disclosure controls and procedures and by allowing them to observe and learn from best practices as they develop among larger registrants.

Similarly, the final rules incorporate a combination of performance and design standards with respect to all affected registrants, including small entities, in order to balance the objectives and compliance burdens of the final rules.  While the final rules use design standards to promote uniform compliance requirements for all registrants and to address the disclosure concerns underlying the amendments, which apply to entities of all sizes, they also incorporate elements of performance standards to give registrants sufficient flexibility to craft meaningful disclosure that is tailored to their particular facts and circumstances.  For example, the final rules require a registrant to describe the actual and potential material impacts of any material climate-related

---

[3241]     *See supra* note 3233.

Appellate Case: 24-1628     Page: 846     Date Filed: 03/26/2024 Entry ID: 5377362

risk on the registrant's strategy, business model, and outlook. The rules also provide a non-exhaustive list of examples of disclosure items that a registrant should include, if applicable, in providing responsive disclosure rather than specifying more prescriptive set of disclosures, as in the proposal.

**STATUTORY AUTHORITY**

The amendments contained in this release are being adopted under the authority set forth in sections 7, 10, 19(a), and 28 of the Securities Act, as amended, and sections 3(b), 12, 13, 15, 23(a), and 36 of the Exchange Act, as amended.

**List of Subjects in 17 CFR Parts 210, 229, 230, 232, 239, and 249**

Accountants; Accounting; Administrative practice and procedure, Reporting and recordkeeping requirements, Securities.

**Text of Amendments**

For the reasons set out in the preamble, the Commission is adopting amendments to title 17, chapter II of the Code of Federal Regulations as follows:

**PART 210–FORM AND CONTENT OF AND REQUIREMENTS FOR FINANCIAL STATEMENTS, SECURITIES ACT OF 1933, SECURITIES EXCHANGE ACT OF 1934, INVESTMENT COMPANY ACT OF 1940, INVESTMENT ADVISERS ACT OF 1940, AND ENERGY POLICY AND CONSERVATION ACT OF 1975**

1. The authority citation for part 210 continues to read as follows:

**Authority:** 15 U.S.C. 77f, 77g, 77h, 77j, 77s, 77z-2, 77z-3, 77aa(25), 77aa(26), 77nn(25), 77nn(26), 78c, 78j-1, 78*l*, 78m, 78n, 78*o*(d), 78q, 78u-5, 78w, 78*ll*, 78mm, 80a-8, 80a20, 80a-29, 80a-30, 80a-31, 80a-37(a), 80b-3, 80b-11, 7202 and 7262, and sec. 102(c), Pub. L. 112-106, 126 Stat. 310 (2012), unless otherwise noted.

Appellate Case: 24-1628     Page: 847     Date Filed: 03/26/2024 Entry ID: 5377362

2. Amend § 210.8-01 by revising paragraph (b) to read as follows:

**§ 210.8-01 General requirements for Article 8.**

* * * * *

(b) Smaller reporting companies electing to prepare their financial statements with the form and content required in Article 8 need not apply the other form and content requirements in 17 CFR part 210 (Regulation S-X) with the exception of the following:

(1) The report and qualifications of the independent accountant shall comply with the requirements of §§ 210.2-01 through 210.2-07 (Article 2); and

(2) The description of accounting policies shall comply with § 210.4-08(n); and

(3) Smaller reporting companies engaged in oil and gas producing activities shall follow the financial accounting and reporting standards specified in § 210.4-10 with respect to such activities; and

(4) Sections 210.14-01 and 210.14-02 (Article 14).

* * * * *

3. Add an undesignated center heading and §§ 210.14-01 and 210.14-02 to read as follows:

**Article 14 Disclosure of Severe Weather Events and Other Information**

**§ 210.14-01 Instructions related to disclosure of severe weather events and other information.**

(a) *General*. A registrant must include disclosure pursuant to § 210.14-02 in any filing that is required to include disclosure pursuant to subpart 229.1500 of this chapter and that also requires the registrant to include its audited financial statements. The disclosure pursuant to § 210.14-02 must be included in a note to the financial statements included in such filing.

Appellate Case: 24-1628    Page: 848    Date Filed: 03/26/2024 Entry ID: 5377362

(b) *Definitions.* The definitions in § 229.1500 (Item 1500 of Regulation S-K) apply to §§ 210.14-01 and 210.14-02 (Article 14) except where otherwise indicated.

(c) *Basis of calculation.* When calculating the financial statement effects in this Article 14, except where otherwise indicated, a registrant must:

(1) Use financial information that is consistent with the scope of its consolidated financial statements included in the filing; and

(2) Apply the same accounting principles that it is required to apply in the preparation of its consolidated financial statements included in the filing.

(d) *Periods to be disclosed.* Disclosure must be provided for the registrant's most recently completed fiscal year, and to the extent previously disclosed or required to be disclosed, for the historical fiscal year(s), for which audited consolidated financial statements are included in the filing.

## § 210.14-02 Disclosures related to severe weather events and other information.

(a) *Contextual information.* Provide contextual information, describing how each specified financial statement effect disclosed under § 210.14-02(b) through (h) was derived, including a description of significant inputs and assumptions used, significant judgments made, other information that is important to understand the financial statement effect and, if applicable, policy decisions made by the registrant to calculate the specified disclosures.

(b) *Disclosure thresholds.*

(1) Disclosure of the aggregate amount of expenditures expensed as incurred and losses pursuant to paragraph (c) of this section is required if the aggregate amount of expenditures expensed as incurred and losses equals or exceeds one percent of the absolute value of income or loss before income tax expense or benefit for the relevant fiscal year. Such disclosure is not

required, however, if the aggregate amount of expenditures expensed as incurred and losses is less than $100,000 for the relevant fiscal year.

(2) Disclosure of the aggregate amount of capitalized costs and charges incurred pursuant to paragraph (d) of this section is required if the aggregate amount of the absolute value of capitalized costs and charges equals or exceeds one percent of the absolute value of stockholders' equity or deficit at the end of the relevant fiscal year.  Such disclosure is not required, however, if the aggregate amount of the absolute value of capitalized costs and charges is less than $500,000 for the relevant fiscal year.

(c) *Expenditures expensed as incurred and losses resulting from severe weather events and other natural conditions*.  Disclose the aggregate amount of expenditures expensed as incurred and losses, excluding recoveries, incurred during the fiscal year as a result of severe weather events and other natural conditions, such as hurricanes, tornadoes, flooding, drought, wildfires, extreme temperatures, and sea level rise.  For example, a registrant may be required to disclose the amount of expense or loss, as applicable, to restore operations, relocate assets or operations affected by the event or other natural condition, retire affected assets, repair affected assets, recognize impairment loss on affected assets, or otherwise respond to the effect that severe weather events and other natural conditions had on business operations.  Disclosure pursuant to this paragraph must separately identify where the expenditures expensed as incurred and losses are presented in the income statement.

(d) *Capitalized costs and charges resulting from severe weather events and other natural conditions*.  Disclose the aggregate amount of capitalized costs and charges, excluding recoveries, incurred during the fiscal year as a result of severe weather events and other natural conditions, such as hurricanes, tornadoes, flooding, drought, wildfires, extreme temperatures,

845

Appellate Case: 24-1628    Page: 850    Date Filed: 03/26/2024 Entry ID: 5377362

and sea level rise. For example, a registrant may be required to disclose the amount of capitalized costs or charges, as applicable, to restore operations, retire affected assets, replace or repair affected assets, recognize an impairment charge for affected assets, or otherwise respond to the effect that severe weather events and other natural conditions had on business operations. Disclosure pursuant to this paragraph must separately identify where the capitalized costs and charges are presented in the balance sheet.

(e) *Carbon offsets and RECs*.

(1) If carbon offsets or RECs have been used as a material component of a registrant's plans to achieve its disclosed climate-related targets or goals, disclose the aggregate amount of carbon offsets and RECs expensed, the aggregate amount of capitalized carbon offsets and RECs recognized, and the aggregate amount of losses incurred on the capitalized carbon offsets and RECs, during the fiscal year. In addition, disclose the beginning and ending balances of the capitalized carbon offsets and RECs for the fiscal year. Disclosure pursuant to this paragraph must separately identify where the expenditures expensed, capitalized costs, and losses are presented in the income statement and the balance sheet.

(2) If a registrant is required to provide disclosure pursuant to paragraph (e)(1) of this section, then a registrant must state its accounting policy for carbon offsets and RECs as part of the contextual information required by paragraph (a) of this section.

(f) *Recoveries*. If a registrant is required to provide disclosure pursuant to paragraphs (c) or (d) of this section, then as part of the contextual information required by paragraph (a) of this section, a registrant must state separately the aggregate amount of any recoveries recognized during the fiscal year as a result of severe weather events and other natural conditions for which capitalized costs, expenditures expensed, charges, or losses are disclosed pursuant to paragraphs

(c) or (d) of this section.  Disclosure pursuant to this paragraph must separately identify where the recoveries are presented in the income statement and the balance sheet.

(g) *Attribution*.  For purposes of providing disclosure pursuant to paragraphs (c), (d), and (f) of this section, a capitalized cost, expenditure expensed, charge, loss, or recovery results from a severe weather event or other natural condition when the event or condition is a significant contributing factor in incurring the capitalized cost, expenditure expensed, charge, loss, or recovery.  If an event or condition is a significant contributing factor in incurring a cost, expenditure, charge, loss, or recovery, then the entire amount of such cost, expenditure, charge, loss, or recovery must be included in the disclosure pursuant to paragraphs (c), (d), and (f) of this section.

(h) *Financial estimates and assumptions materially impacted by severe weather events and other natural conditions or disclosed targets or transition plans*.  Disclose whether the estimates and assumptions the registrant used to produce the consolidated financial statements were materially impacted by exposures to risks and uncertainties associated with, or known impacts from, severe weather events and other natural conditions, such as hurricanes, tornadoes, flooding, drought, wildfires, extreme temperatures, and sea level rise, or any climate-related targets or transition plans disclosed by the registrant.  If yes, provide a qualitative description of how the development of such estimates and assumptions were impacted by such events, conditions, targets, or transition plans.

**PART 229—STANDARD INSTRUCTIONS FOR FILING FORMS UNDER SECURITIES ACT OF 1933, SECURITIES EXCHANGE ACT OF 1934 AND ENERGY POLICY AND CONSERVATION ACT OF 1975—REGULATION S-K**

4. The authority citation for part 229 continues to read as follows:

**Authority:** 15 U.S.C. 77e, 77f, 77g, 77h, 77j, 77k, 77s, 77z-2, 77z-3, 77aa(25), 77aa(26), 77ddd, 77eee, 77ggg, 77hhh, 77iii, 77jjj, 77nnn, 77sss, 78c, 78i, 78j, 78j-3, 78l, 78m, 78n, 78n-1, 78o, 78u-5, 78w, 78ll, 78 mm, 80a-8, 80a-9, 80a-20, 80a-29, 80a-30, 80a-31(c), 80a37, 80a-38(a), 80a-39, 80b-11 and 7201 et seq.; 18 U.S.C. 1350; sec. 953(b), Pub. L. 111-203, 124 Stat. 1904 (2010); and sec. 102(c), Pub. L. 112-106, 126 Stat. 310 (2012).

5. Amend § 229.601 by:

a. In the exhibit table in paragraph (a), revising entry 27; and

b. Revising paragraph (b)(27).

The revisions read as follows:

**§ 229.601 (Item 601) Exhibits.**

(a) * * *

| | EXHIBIT TABLE | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Securities Act Forms | | | | | | | | | | Exchange Act Forms | | | | | |
| | S-1 | S-3 | SF-1 | SF-3 | S-4¹ | S-8 | S-11 | F-1 | F-3 | F-4¹ | 10 | 8-K² | 10-D | 10-Q | 10-K | ABS-EE |
| | | | | | | | * | * | * | * | * | * | * | | | |
| (27) Letter re GHG emissions attestation provider | X | X | | | X | | X | X | X | X | | | | X | X | |
| | | | | | | | * | * | * | * | * | * | * | | | |

[1] An exhibit need not be provided about a company if: (1) With respect to such company an election has been made under Form S-4 or F-4 to provide information about such company at a level prescribed by Form S-3 or F-3; and (2) the form, the level of which has been elected under Form S-4 or F-4, would not require such company to provide such exhibit if it were registering a primary offering.

[2] A Form 8-K exhibit is required only if relevant to the subject matter reported on the Form 8-K report. For example, if the Form 8-K pertains to the departure of a director, only the exhibit described in paragraph (b)(17) of this section need be filed. A required exhibit may be incorporated by reference from a previous filing.

* * * * *

Appellate Case: 24-1628    Page: 853    Date Filed: 03/26/2024 Entry ID: 5377362

(b) * * *

(27) *Letter re GHG emissions attestation report*.  A letter, where applicable, from the attestation provider that acknowledges awareness of the use in a registration statement of a GHG emissions attestation report that pursuant to 17 CFR 230.436(i)(1) (Rule 436(i)(1)) under the Securities Act is not considered a part of a registration statement prepared or certified by a person within the meaning of sections 7 and 11 of the Securities Act.  Such letter may be filed with the registration statement, an amendment thereto, or a report on Form 10-K (§ 249.310), Form 10-Q (§ 249.308a), or Form 20-F (§ 249.220f), which is incorporated by reference into the registration statement.

* * * * *

6. Add subpart 229.1500, consisting of §§ 229.1500 through 229.1508, to read as follows:

**Subpart 229.1500—Climate-Related Disclosure**

Sec.

229.1500 (Item 1500) Definitions.

229.1501 (Item 1501) Governance.

229.1502 (Item 1502) Strategy.

229.1503 (Item 1503) Risk management.

229.1504 (Item 1504) Targets and goals.

229.1505 (Item 1505) GHG emissions metrics.

229.1506 (Item 1506) Attestation of Scope 1 and Scope 2 emissions disclosure.

229.1507 (Item 1507) Safe harbor for certain climate-related disclosures.

229.1508 (Item 1508) Interactive data requirement.

Appellate Case: 24-1628    Page: 854    Date Filed: 03/26/2024 Entry ID: 5377362

**Subpart 229.1500—Climate-Related Disclosure**

**§ 229.1500 (Item 1500) Definitions.**

As used in this subpart, these terms have the following meanings:

*Carbon offsets* represents an emissions reduction, removal, or avoidance of greenhouse gases ("GHG") in a manner calculated and traced for the purpose of offsetting an entity's GHG emissions.

*Climate-related risks* means the actual or potential negative impacts of climate-related conditions and events on a registrant's business, results of operations, or financial condition. Climate-related risks include the following:

(1) *Physical risks* include both acute risks and chronic risks to the registrant's business operations.

(2) *Acute risks* are event-driven and may relate to shorter term severe weather events, such as hurricanes, floods, tornadoes, and wildfires, among other events.

(3) *Chronic risks* relate to longer term weather patterns, such as sustained higher temperatures, sea level rise, and drought, as well as related effects such as decreased arability of farmland, decreased habitability of land, and decreased availability of fresh water.

(4) *Transition risks* are the actual or potential negative impacts on a registrant's business, results of operations, or financial condition attributable to regulatory, technological, and market changes to address the mitigation of, or adaptation to, climate-related risks, including such non-exclusive examples as increased costs attributable to changes in law or policy, reduced market demand for carbon-intensive products leading to decreased prices or profits for such products, the devaluation or abandonment of assets, risk of legal liability and litigation defense costs, competitive pressures associated with the adoption of new technologies, and reputational impacts

850

(including those stemming from a registrant's customers or business counterparties) that might trigger changes to market behavior, consumer preferences or behavior, and registrant behavior.

*Carbon dioxide equivalent* or *$CO_2e$* means the common unit of measurement to indicate the global warming potential ("GWP") of each greenhouse gas, expressed in terms of the GWP of one unit of carbon dioxide.

*Emission factor* means a multiplication factor allowing actual GHG emissions to be calculated from available activity data or, if no activity data are available, economic data, to derive absolute GHG emissions. Examples of activity data include kilowatt-hours of electricity used, quantity of fuel used, output of a process, hours of operation of equipment, distance travelled, and floor area of a building.

*GHG* or *Greenhouse gases* means carbon dioxide ($CO_2$), methane ($CH_4$), nitrous oxide ($N_2O$), nitrogen trifluoride ($NF_3$), hydrofluorocarbons (HFCs), perfluorocarbons (PFCs), and sulfur hexafluoride ($SF_6$).

*GHG emissions* means direct and indirect emissions of greenhouse gases expressed in metric tons of carbon dioxide equivalent ($CO_2e$), of which:

(1) Direct emissions are GHG emissions from sources that are owned or controlled by a registrant.

(2) Indirect emissions are GHG emissions that result from the activities of the registrant but occur at sources not owned or controlled by the registrant.

*Internal carbon price* means an estimated cost of carbon emissions used internally within an organization.

*Operational boundaries* means the boundaries that determine the direct and indirect emissions associated with the business operations owned or controlled by a registrant.

851

*Organizational boundaries* means the boundaries that determine the operations owned or controlled by a registrant for the purpose of calculating its GHG emissions.

*Renewable energy credit* or *certificate* or *REC* means a credit or certificate representing each megawatt-hour (1 MWh or 1,000 kilowatt-hours) of renewable electricity generated and delivered to a power grid.

*Scenario analysis* means a process for identifying and assessing a potential range of outcomes of various possible future climate scenarios, and how climate-related risks may impact a registrant's business strategy, results of operations, or financial condition over time.

*Scope 1 emissions* are direct GHG emissions from operations that are owned or controlled by a registrant.

*Scope 2 emissions* are indirect GHG emissions from the generation of purchased or acquired electricity, steam, heat, or cooling that is consumed by operations owned or controlled by a registrant.

*Transition plan* means a registrant's strategy and implementation plan to reduce climate-related risks, which may include a plan to reduce its GHG emissions in line with its own commitments or commitments of jurisdictions within which it has significant operations.

## § 229.1501 (Item 1501) Governance.

(a) Describe the board of directors' oversight of climate-related risks. If applicable, identify any board committee or subcommittee responsible for the oversight of climate-related risks and describe the processes by which the board or such committee or subcommittee is informed about such risks. If there is a climate-related target or goal disclosed pursuant to § 229.1504 or transition plan disclosed pursuant to § 229.1502(e)(1), describe whether and how the board of directors oversees progress against the target or goal or transition plan.

Appellate Case: 24-1628    Page: 857    Date Filed: 03/26/2024 Entry ID: 5377362

(b) Describe management's role in assessing and managing the registrant's material climate-related risks.  In providing such disclosure, a registrant should address, as applicable, the following non-exclusive list of disclosure items:

(1) Whether and which management positions or committees are responsible for assessing and managing climate-related risks and the relevant expertise of such position holders or committee members in such detail as necessary to fully describe the nature of the expertise;

(2) The processes by which such positions or committees assess and manage climate-related risks; and

(3) Whether such positions or committees report information about such risks to the board of directors or a committee or subcommittee of the board of directors.

*Instruction 1 to Item 1501*:  In the case of a foreign private issuer with a two-tier board of directors, for purposes of paragraph (a) of this section, the term "board of directors" means the supervisory or non-management board. In the case of a foreign private issuer meeting the requirements of § 240.10A–3(c)(3) of this chapter, for purposes of paragraph (a) of this section, the term "board of directors" means the issuer's board of auditors (or similar body) or statutory auditors, as applicable.

*Instruction 2 to Item 1501*:  Relevant expertise of management in paragraph (b)(1) of this section may include, for example: Prior work experience in climate-related matters; any relevant degrees or certifications; any knowledge, skills, or other background in climate-related matters.

**§ 229.1502 (Item 1502) Strategy.**

(a) Describe any climate-related risks that have materially impacted or are reasonably likely to have a material impact on the registrant, including on its strategy, results of operations, or financial condition.  In describing these material risks, a registrant must describe whether such

risks are reasonably likely to manifest in the short-term (i.e., the next 12 months) and separately

in the long-term (i.e., beyond the next 12 months). A registrant must disclose whether the risk is

a physical or transition risk, providing information necessary to an understanding of the nature of

the risk presented and the extent of the registrant's exposure to the risk, including the following

non-exclusive list of disclosures, as applicable:

(1) If a physical risk, whether it may be categorized as an acute or chronic risk, and the

geographic location and nature of the properties, processes, or operations subject to the physical

risk.

(2) If a transition risk, whether it relates to regulatory, technological, market (including

changing consumer, business counterparty, and investor preferences), or other transition-related

factors, and how those factors impact the registrant. A registrant that has significant operations

in a jurisdiction that has made a GHG emissions reduction commitment should consider whether

it may be exposed to a material transition risk related to the implementation of the commitment.

(b) Describe the actual and potential material impacts of any climate-related risk

identified in response to paragraph (a) of this section on the registrant's strategy, business model,

and outlook, including, as applicable, any material impacts on the following non-exclusive list of

items:

(1) Business operations, including the types and locations of its operations;

(2) Products or services;

(3) Suppliers, purchasers, or counterparties to material contracts, to the extent known or

reasonably available;

(4) Activities to mitigate or adapt to climate-related risks, including adoption of new

technologies or processes; and

(5) Expenditure for research and development.

(c) Discuss whether and how the registrant considers any impacts described in response to paragraph (b) of this section as part of its strategy, financial planning, and capital allocation, including, as applicable:

(1) Whether the impacts of the climate-related risks described in response to paragraph (b) have been integrated into the registrant's business model or strategy, including whether and how resources are being used to mitigate climate-related risks; and

(2) How any of the targets referenced in § 229.1504 or transition plans referenced in paragraph (e) of this section relate to the registrant's business model or strategy.

(d)(1) Discuss how any climate-related risks described in response to paragraph (a) of this section have materially impacted or are reasonably likely to materially impact the registrant's business, results of operations, or financial condition.

(2) Describe quantitatively and qualitatively the material expenditures incurred and material impacts on financial estimates and assumptions that, in management's assessment, directly result from activities disclosed under paragraph (b)(4) of this section.

(e)(1) If a registrant has adopted a transition plan to manage a material transition risk, describe the plan. To allow for an understanding of the registrant's progress under the plan over time, a registrant must update its annual report disclosure about the transition plan each fiscal year by describing any actions taken during the year under the plan, including how such actions have impacted the registrant's business, results of operations, or financial condition.

(2) Include quantitative and qualitative disclosure of material expenditures incurred and material impacts on financial estimates and assumptions as a direct result of the transition plan disclosed under paragraph (e)(1) of this section.

(f) If a registrant uses scenario analysis to assess the impact of climate-related risks on its business, results of operations, or financial condition, and if, based on the results of such scenario analysis, the registrant determines that a climate-related risk is reasonably likely to have a material impact on its business, results of operations, or financial condition, the registrant must describe each such scenario including a brief description of the parameters, assumptions, and analytical choices used, as well as the expected material impacts, including financial impacts, on the registrant under each such scenario.

(g)(1) If a registrant's use of an internal carbon price is material to how it evaluates and manages a climate-related risk identified in response to paragraph (a) of this section, disclose in units of the registrant's reporting currency:

(i) The price per metric ton of $CO_2e$; and

(ii) The total price, including how the total price is estimated to change over the time periods referenced in paragraph (a) of this section, as applicable.

(2) If a registrant uses more than one internal carbon price to evaluate and manage a material climate-related risk, it must provide the disclosures required by this section for each internal carbon price and disclose its reasons for using different prices.

(3) If the scope of entities and operations involved in the use of an internal carbon price described pursuant to this section is materially different from the organizational boundaries used for the purpose of calculating a registrant's GHG emissions pursuant to §229.1505, briefly describe this difference.

**§ 229.1503 (Item 1503) Risk management.**

(a) Describe any processes the registrant has for identifying, assessing, and managing material climate-related risks.  In providing such disclosure, registrants should address, as applicable, the following non-exclusive list of disclosure items regarding how the registrant:

(1) Identifies whether it has incurred or is reasonably likely to incur a material physical or transition risk;

(2) Decides whether to mitigate, accept, or adapt to the particular risk; and

(3) Prioritizes whether to address the climate-related risk.

(b) If managing a material climate-related risk, the registrant must disclose whether and how any processes described in response to paragraph (a) of this section have been integrated into the registrant's overall risk management system or processes.

### § 229.1504 (Item 1504) Targets and goals.

(a) A registrant must disclose any climate-related target or goal if such target or goal has materially affected or is reasonably likely to materially affect the registrant's business, results of operations, or financial condition.  A registrant may provide the disclosure required by this section as part of its disclosure in response to §§ 229.1502 or 229.1503.

(b) In providing disclosure required by paragraph (a) of this section, a registrant must provide any additional information or explanation necessary to an understanding of the material impact or reasonably likely material impact of the target or goal, including, as applicable, but not limited to, a description of:

(1) The scope of activities included in the target;

(2) The unit of measurement;

(3) The defined time horizon by which the target is intended to be achieved, and whether the time horizon is based on one or more goals established by a climate-related treaty, law, regulation, policy, or organization;

(4) If the registrant has established a baseline for the target or goal, the defined baseline time period and the means by which progress will be tracked; and

(5) A qualitative description of how the registrant intends to meet its climate-related targets or goals.

(c) Disclose any progress made toward meeting the target or goal and how any such progress has been achieved. A registrant must update this disclosure each fiscal year by describing the actions taken during the year to achieve its targets or goals.

(1) Include a discussion of any material impacts to the registrant's business, results of operations, or financial condition as a direct result of the target or goal or the actions taken to make progress toward meeting the target or goal.

(2) Include quantitative and qualitative disclosure of any material expenditures and material impacts on financial estimates and assumptions as a direct result of the target or goal or the actions taken to make progress toward meeting the target or goal.

(d) If carbon offsets or RECs have been used as a material component of a registrant's plan to achieve climate-related targets or goals, separately disclose the amount of carbon avoidance, reduction or removal represented by the offsets or the amount of generated renewable energy represented by the RECs, the nature and source of the offsets or RECs, a description and location of the underlying projects, any registries or other authentication of the offsets or RECs, and the cost of the offsets or RECs.

**§ 229.1505 (Item 1505) GHG emissions metrics.**

Appellate Case: 24-1628    Page: 863    Date Filed: 03/26/2024 Entry ID: 5377362

(a)(1) A registrant that is a large accelerated filer or an accelerated filer, each as defined in § 240.12b-2 of this chapter, must disclose its Scope 1 emissions and/or its Scope 2 emissions, if such emissions are material, for its most recently completed fiscal year and, to the extent previously disclosed in a Commission filing, for the historical fiscal year(s) included in the consolidated financial statements in the filing.

(2) For any GHG emissions required to be disclosed pursuant to paragraph (a)(1) of this section:

(i) Disclose the registrant's Scope 1 emissions and/or Scope 2 emissions separately, each expressed in the aggregate, in terms of $CO_2e$. In addition, if any constituent gas of the disclosed emissions is individually material, disclose such constituent gas disaggregated from the other gases.

(ii) Disclose the registrant's Scope 1 emissions and/or Scope 2 emissions in gross terms by excluding the impact of any purchased or generated offsets.

(3)(i) A smaller reporting company, as defined by §§ 229.10(f)(1), 230.405, and 240.12b-2 of this chapter, and an emerging growth company, as defined by §§ 230.405 and 240.12b-2 of this chapter, are exempt from, and need not comply with, the disclosure requirements of this section.

(ii) A registrant is not required to include GHG emissions from a manure management system when disclosing its overall Scopes 1 and 2 emissions pursuant to paragraph (a)(1) of this section so long as implementation of such a provision is subject to restrictions on appropriated funds or otherwise prohibited under federal law.

Appellate Case: 24-1628    Page: 864    Date Filed: 03/26/2024 Entry ID: 5377362

(b)(1) Describe the methodology, significant inputs, and significant assumptions used to calculate the registrant's GHG emissions disclosed pursuant to this section. This description must include:

(i) The organizational boundaries used when calculating the registrant's disclosed GHG emissions, including the method used to determine those boundaries. If the organizational boundaries materially differ from the scope of entities and operations included in the registrant's consolidated financial statements, provide a brief explanation of this difference in sufficient detail for a reasonable investor to understand;

(ii) A brief discussion of, in sufficient detail for a reasonable investor to understand, the operational boundaries used, including the approach to categorization of emissions and emissions sources; and

(iii) A brief description of, in sufficient detail for a reasonable investor to understand, the protocol or standard used to report the GHG emissions, including the calculation approach, the type and source of any emission factors used, and any calculation tools used to calculate the GHG emissions.

(2) A registrant may use reasonable estimates when disclosing its GHG emissions as long as it also describes the underlying assumptions, and its reasons for using, the estimates.

(c)(1) Any GHG emissions metrics required to be disclosed pursuant to this section in a registrant's annual report on Form 10-K filed with the Commission may be incorporated by reference from the registrant's Form 10-Q for the second fiscal quarter in the fiscal year immediately following the year to which the GHG emissions metrics disclosure relates, or may be included in an amended annual report on Form 10-K no later than the due date for such Form 10-Q. If the registrant is a foreign private issuer, as defined in §§ 230.405 and 240.3b-4(c) of

Appellate Case: 24-1628    Page: 865    Date Filed: 03/26/2024 Entry ID: 5377362

this chapter, such information may be disclosed in an amendment to its annual report on Form 20-F (§249.220f of this chapter), which shall be due no later than 225 days after the end of the fiscal year to which the GHG emissions metrics disclosure relates.  In either case, the registrant must include an express statement in its annual report indicating its intention to incorporate by reference this information from either a quarterly report on Form 10-Q or amend its annual report on Form 10-K or Form 20-F to provide this information by the due date specified by this section.

(2) In the case of a registration statement filed under the Securities Act of 1933 [15 U.S.C. 77a *et seq.*] or filed on Form 10 (§ 249.210 of this chapter) or Form 20-F (§ 249.220f of this chapter) under the Securities Exchange Act of 1934 [15 U.S.C. 78a *et seq.*], any GHG emissions metrics required to be disclosed pursuant to paragraph (a) of this section must be provided as of the most recently completed fiscal year that is at least 225 days prior to the date of effectiveness of the registration statement.

**§ 229.1506 (Item 1506) Attestation of Scope 1 and Scope 2 emissions disclosure**

(a) *Attestation.*

(1) A registrant that is required to provide Scope 1 and/or Scope 2 emissions disclosure pursuant to § 229.1505 must include an attestation report covering such disclosure in the relevant filing, subject to the following provisions:

(i) For filings made by an accelerated filer beginning the third fiscal year after the compliance date for § 229.1505 and thereafter, the attestation engagement must, at a minimum, be at a limited assurance level and cover the registrant's Scope 1 and/or Scope 2 emissions disclosure;

861

(ii) For filings made by a large accelerated filer beginning the third fiscal year after the compliance date for § 229.1505, the attestation engagement must, at a minimum, be at a limited assurance level and cover the registrant's Scope 1 and/or Scope 2 emissions disclosure; and

(iii) For filings made by a large accelerated filer beginning the seventh fiscal year after the compliance date for § 229.1505 and thereafter, the attestation engagement must be at a reasonable assurance level and cover the registrant's Scope 1 and/or Scope 2 emissions disclosure.

(2) Any attestation report required under this section must be provided pursuant to standards that are:

(i) Publicly available at no cost or that are widely used for GHG emissions assurance; and

(ii) Established by a body or group that has followed due process procedures, including the broad distribution of the framework for public comment.

(3) A registrant that is required to provide Scope 1 and/or Scope 2 emissions disclosure pursuant to § 229.1505 that obtains voluntary assurance over its GHG emissions disclosure prior to the first required fiscal year for assurance must comply with paragraph (e) of this section. Voluntary assurance obtained by such registrant after the first required fiscal year that is in addition to any required assurance must follow the requirements of paragraphs (b) through (d) of this section and must use the same attestation standard as the required assurance over Scope 1 and/or Scope 2 emissions disclosure.

(b) *GHG emissions attestation provider.* The GHG emissions attestation report required by paragraph (a) of this section must be prepared and signed by a GHG emissions attestation provider. A GHG emissions attestation provider means a person or a firm that has all of the following characteristics:

862

App.862

(1) Is an expert in GHG emissions by virtue of having significant experience in measuring, analyzing, reporting, or attesting to GHG emissions. Significant experience means having sufficient competence and capabilities necessary to:

(i) Perform engagements in accordance with attestation standards and applicable legal and regulatory requirements; and

(ii) Enable the service provider to issue reports that are appropriate under the circumstances.

(2) Is independent with respect to the registrant, and any of its affiliates, for whom it is providing the attestation report, during the attestation and professional engagement period.

(i) A GHG emissions attestation provider is not independent if such attestation provider is not, or a reasonable investor with knowledge of all relevant facts and circumstances would conclude that such attestation provider is not, capable of exercising objective and impartial judgment on all issues encompassed within the attestation provider's engagement.

(ii) In determining whether a GHG emissions attestation provider is independent, the Commission will consider:

(A) Whether a relationship or the provision of a service creates a mutual or conflicting interest between the attestation provider and the registrant (or any of its affiliates), places the attestation provider in the position of attesting to such attestation provider's own work, results in the attestation provider acting as management or an employee of the registrant (or any of its affiliates), or places the attestation provider in a position of being an advocate for the registrant (or any of its affiliates); and

Appellate Case: 24-1628    Page: 868    Date Filed: 03/26/2024 Entry ID: 5377362

(B) All relevant circumstances, including all financial or other relationships between the attestation provider and the registrant (or any of its affiliates), and not just those relating to reports filed with the Commission.

(iii) The term "affiliate" as used in this section has the meaning provided in §210.2-01 of this chapter, except that references to "audit" are deemed to be references to the attestation services provided pursuant to this section.

(iv) The term "attestation and professional engagement period" as used in this section means both:

(A) The period covered by the attestation report; and

(B) The period of the engagement to attest to the registrant's GHG emissions or to prepare a report filed with the Commission ("the professional engagement period"). The professional engagement period begins when the GHG attestation service provider either signs an initial engagement letter (or other agreement to attest to a registrant's GHG emissions) or begins attest procedures, whichever is earlier.

(c) *Attestation report requirements*. The form and content of the attestation report must follow the requirements set forth by the attestation standard (or standards) used by the GHG emissions attestation provider.

(d) *Additional disclosure by the registrant*. In addition to including the GHG emissions attestation report required by paragraph (a) of this section, a large accelerated filer and an accelerated filer must disclose, alongside the GHG emissions disclosure to which the attestation report relates, after requesting relevant information from any GHG emissions attestation provider as necessary:

App.864

Appellate Case: 24-1628    Page: 869    Date Filed: 03/26/2024 Entry ID: 5377362

(1) Whether the GHG emissions attestation provider is subject to any oversight inspection program, and if so, which program (or programs), and whether the GHG emissions attestation engagement is included within the scope of authority of such oversight inspection program.

(2)(i) Whether any GHG emissions attestation provider that was previously engaged to provide attestation over the registrant's GHG emissions disclosure pursuant to paragraph (a) of this section for the fiscal year period covered by the attestation report resigned (or indicated that it declined to stand for re-appointment after the completion of the attestation engagement) or was dismissed. If so,

(A) State whether the former GHG emissions attestation provider resigned, declined to stand for re-appointment, or was dismissed and the date thereof; and

(B) State whether during the performance of the attestation engagement for the fiscal year period covered by the attestation report there were any disagreements with the former GHG emissions attestation provider on any matter of measurement or disclosure of GHG emissions or attestation scope of procedures. Also,

(*1*) Describe each such disagreement; and

(*2*) State whether the registrant has authorized the former GHG emissions attestation provider to respond fully to the inquiries of the successor GHG emissions attestation provider concerning the subject matter of each such disagreement.

(ii) The term "disagreements" as used in this section shall be interpreted broadly, to include any difference of opinion concerning any matter of measurement or disclosure of GHG emissions or attestation scope or procedures that (if not resolved to the satisfaction of the former GHG emissions attestation provider) would have caused it to make reference to the subject matter of the disagreement in connection with its report. It is not necessary for there to have

Appellate Case: 24-1628    Page: 870    Date Filed: 03/26/2024 Entry ID: 5377362

been an argument to have had a disagreement, merely a difference of opinion. For purposes of this section, however, the term disagreements does not include initial differences of opinion based on incomplete facts or preliminary information that were later resolved to the former GHG emissions attestation provider's satisfaction by, and providing the registrant and the GHG emissions attestation provider do not continue to have a difference of opinion upon, obtaining additional relevant facts or information. The disagreements required to be reported in response to this section include both those resolved to the former GHG emissions attestation provider's satisfaction and those not resolved to the former provider's satisfaction. Disagreements contemplated by this section are those that occur at the decision-making level, i.e., between personnel of the registrant responsible for presentation of its GHG emissions disclosure and personnel of the GHG emissions attestation provider responsible for rendering its report.

(iii) In determining whether any disagreement has occurred, an oral communication from the engagement partner or another person responsible for rendering the GHG emissions attestation provider's opinion or conclusion (or their designee) will generally suffice as a statement of a disagreement at the "decision-making level" within the GHG emissions attestation provider and require disclosure under this section.

(e) *Disclosure of voluntary assurance.* A registrant that is not required to include a GHG emissions attestation report pursuant to paragraph (a) of this section must disclose in the filing the following information if the registrant's GHG emissions disclosure in the filing were subject to third-party assurance:

(1) Identification of the service provider of such assurance;

(2) Description of the assurance standard used;

(3) Description of the level and scope of assurance services provided;

866

(4) Brief description of the results of the assurance services;

(5) Whether the service provider has any material business relationships with or has provided any material professional services to the registrant; and

(6) Whether the service provider is subject to any oversight inspection program, and if so, which program (or programs) and whether the assurance services over GHG emissions are included within the scope of authority of such oversight inspection program.

(f) *Location of Disclosure.* A registrant must include the attestation report and disclosure required by this section in the filing that contains the GHG emissions disclosure to which the report and disclosure relate. If, in accordance with the requirements in § 229.1505, a registrant elects to incorporate by reference its GHG emissions disclosure from its Form 10-Q (§ 249.308a of this chapter) for the second fiscal quarter in the fiscal year immediately following the year to which the GHG emissions disclosure relates or to provide this information in an amended annual report on Form 10-K (§ 249.310 of this chapter) or 20-F (§ 249.220f of this chapter), then the registrant must include an express statement in its annual report indicating its intention to incorporate by reference the attestation report from either a quarterly report on Form 10-Q or amend its annual report on Form 10-K or Form 20-F to provide the attestation report by the due date specified in § 229.1505.

*Instruction 1 to Item 1506:* A registrant that obtains assurance from an attestation provider at the limited assurance level should refer to § 229.601(b)(27) and paragraph 18 of Form 20-F's Instructions as to Exhibits.

## § 229.1507 (Item 1507) Safe harbor for certain climate-related disclosures

(a)(1) The safe harbors for forward-looking statements in section 27A of the Securities Act of 1933 (15 U.S.C. 77z-2) and section 21E of the Securities Exchange Act of 1934 (15

867

Appellate Case: 24-1628    Page: 872    Date Filed: 03/26/2024 Entry ID: 5377362

U.S.C. 78u-5) ("statutory safe harbors") apply as provided in this section to information provided pursuant to §§ 229.1502(e), 229.1502(f), 229.1502(g), and 229.1504.

(2) The safe harbor provided by this section applies to a forward-looking statement specified in the statutory safe harbors:

(i) Made in connection with an offering of securities by a blank check company, as specified in 15 U.S.C 77z-2(b)(1)(B) and 15 U.S.C. 78u-5(b)(1)(B);

(ii) Made with respect to the business or operations of an issuer of penny stock, as specified in 15 U.S.C 77z-2(b)(1)(C) and 15 U.S.C. 78u-5(b)(1)(C);

(iii) Made in connection with a rollup transaction, as specified in 15 U.S.C 77z-2(b)(1)(D) and 15 U.S.C. 78u-5(b)(1)(D);

(iv) Made in connection with an initial public offering, as specified in 15 U.S.C 77z-2(b)(2)(D) and 15 U.S.C. 78u-5(b)(2)(D); and

(v) Made in connection with an offering by, or relating to the operations of, a partnership, limited liability company, or a direct participation investment program, as specified in 15 U.S.C 77z-2(b)(2)(E) and 15 U.S.C. 78u-5(b)(2)(E).

(3) Notwithstanding 15 U.S.C. 77z-2(a)(1) and 15 U.S.C. 78-u(a)(1), the safe harbor provided by this section will apply where an issuer that, at the time that the statement is made, is not subject to the reporting requirements of section 13(a) or section 15(d) of the Securities Exchange Act of 1934.

(b) For purposes of paragraph (a) of this section, all information required by §§ 229.1502(e), 229.1502(f), 229.1502(g), and 229.1504 is considered a *forward-looking statement* for purposes of the statutory safe harbors, except for historical facts, including, as non-exclusive examples, terms related to carbon offsets or RECs described pursuant to § 229.1504

and statements in response to §§ 229.1502(e) or 229.1504 about material expenditures actually incurred.

**§ 229.1508 (Item 1508) Interactive data requirement.**

Provide the disclosure required by this subpart 1500 in an Interactive Data File as required by § 232.405 of this chapter (Rule 405 of Regulation S-T) in accordance with the EDGAR Filer Manual.

**PART 230--GENERAL RULES AND REGULATIONS, SECURITIES ACT OF 1933**

7. The authority citation for part 230 continues to read, in part, as follows:

**Authority:** 15 U.S.C. 77b, 77b note, 77c, 77d, 77f, 77g, 77h, 77j, 77r, 77s, 77z-3, 77sss, 78c, 78d, 78j, 78*l*, 78m, 78n, 78*o*, 78*o*-7 note, 78t, 78w, 78*ll*(d), 78mm, 80a-8, 80a-24, 80a-28, 80a-29, 80a-30, and 80a-37, and Pub. L. 112-106, sec. 201(a), sec. 401, 126 Stat. 313 (2012), unless otherwise noted.

* * * * *

Sections 230.400 to 230.499 issued under secs. 6, 8, 10, 19, 48 Stat. 78, 79, 81, and 85, as amended (15 U.S.C. 77f, 77h, 77j, 77s).

* * * * *

8. Revise § 230.436 by adding paragraph (i) to read as follows:

**§ 230.436  Consents required in special cases.**

* * * * *

(i) Notwithstanding the provisions of paragraphs (a) and (b) of this section, the following shall not be considered part of the registration statement prepared or certified by a person within the meaning of sections 7 and 11 of the Act:

869

Appellate Case: 24-1628    Page: 874    Date Filed: 03/26/2024 Entry ID: 5377362

(1) A report by an attestation provider covering Scope 1, Scope 2, and/or Scope 3 GHG emissions at a limited assurance level; and

(2) Any description of assurance regarding a registrant's GHG emissions disclosure provided in accordance with § 229.1506(e) of this chapter.

## PART 232—REGULATION S-T—GENERAL RULES AND REGULATIONS FOR ELECTRONIC FILINGS

9. The general authority citation for part 232 continues to read as follows:

**Authority:** 15 U.S.C. 77c, 77f, 77g, 77h, 77j, 77s(a), 77z-3, 77sss(a), 78c(b), 78*l*, 78m, 78n, 78*o*(d), 78w(a), 78*ll*, 80a-6(c), 80a-8, 80a-29, 80a-30, 80a-37, 80b-4, 80b-6a, 80b-10, 80b-11, 7201 et seq.; and 18 U.S.C. 1350, unless otherwise noted.

* * * * *

10. Amend §232.405 by adding paragraph (b)(4)(vii) to read as follows:

**§232.405 Interactive Data File submissions.**

* * * * *

(b) * * *

(4) * * *

(vii) The climate-related information required by §§ 229.1500 through 229.1507 of this chapter (subpart 1500 of Regulation S-K).

* * * * *

## PART 239—FORMS PRESCRIBED UNDER THE SECURITIES ACT OF 1933

11. The general authority citation for part 239 continues to read as follows:

**Authority:** 15 U.S.C. 77c, 77f, 77g, 77h, 77j, 77s, 77z-2, 77z-3, 77sss, 78c, 78*l*, 78m, 78n, 78*o*(d), 78*o*-7 note, 78u-5, 78w(a), 78*ll*, 78mm, 80a-2(a), 80a-3, 80a-8, 80a-9, 80a-10, 80a-

Appellate Case: 24-1628    Page: 875    Date Filed: 03/26/2024 Entry ID: 5377362

13, 80a-24, 80a-26, 80a-29, 80a-30, 80a-37, and sec. 71003 and sec. 84001, Pub. L. 114-94, 129 Stat. 1321, unless otherwise noted.

* * * * *

12. Amend Form S-1 (referenced in § 239.11) by adding Item 11(o) to Part I.

**Note: Form S-1 is attached as Appendix A to this document. Form S-1 will not appear in the Code of Federal Regulations.**

13. Amend Form S-3 (referenced in § 239.13) by adding Item 12(e) to Part I.

**Note: Form S-3 is attached as Appendix B to this document. Form S-3 will not appear in the Code of Federal Regulations.**

14. Amend Form S-11 (referenced in § 239.18) by replacing Item 9 to Part I.

**Note: Form S-11 is attached as Appendix C to this document. Form S-11 will not appear in the Code of Federal Regulations.**

15. Amend Form S-4 (referenced in § 239.25) by adding General Instructions B.3 and C.3.

**Note: Form S-4 is attached as Appendix D to this document. Form S-4 will not appear in the Code of Federal Regulations.**

16. Amend Form F-3 (referenced in § 239.33) by adding paragraph (g) to Item 6 to Part I.

**Note: Form F-3 is attached as Appendix E to this document. Form F-3 will not appear in the Code of Federal Regulations.**

17. Amend Form F-4 (referenced in § 239.34) by adding General Instructions B.3 and C.3.

**Note: Form F-4 is attached as Appendix F to this document. Form F-4 will not appear in the Code of Federal Regulations.**

Appellate Case: 24-1628    Page: 876    Date Filed: 03/26/2024 Entry ID: 5377362

**PART 249—FORMS, SECURITIES EXCHANGE ACT OF 1934**

18. The authority citation for part 249 continues to read, in part, as follows:

**Authority:** 15 U.S.C. 78a *et seq*. and 7201 *et seq*.; 12 U.S.C. 5461 *et seq*.; 18 U.S.C. 1350; Sec. 953(b) Pub. L. 111-203, 124 Stat. 1904; Sec. 102(a)(3) Pub. L. 112-106, 126 Stat. 309 (2012), Sec. 107 Pub. L. 112-106, 126 Stat. 313 (2012), Sec. 72001 Pub. L. 114-94, 129 Stat. 1312 (2015), and secs. 2 and 3 Pub. L. 116-222, 134 Stat. 1063 (2020), unless otherwise noted.

* * * * *

Section 249.220f is also issued under secs. 3(a), 202, 208, 302, 306(a), 401(a), 401(b), 406 and 407, Pub. L. 107-204, 116 Stat. 745, and secs. 2 and 3, Pub. L. 116-222, 134 Stat. 1063.

* * * * *

Section 249.308a is also issued under secs. 3(a) and 302, Pub. L. 107-204, 116 Stat. 745.

* * * * *

Section 249.310 is also issued under secs. 3(a), 202, 208, 302, 406 and 407, Pub. L. 107-204, 116 Stat. 745.

* * * * *

19. Amend Form 10 (referenced in § 249.210) by adding Item 3.A ("Climate-Related Disclosure").

**Note: Form 10 is attached as Appendix G to this document. Form 10 will not appear in the Code of Federal Regulations.**

20. Amend Form 20-F (referenced in § 249.220f) by:

a. Adding Item 3.E ("Climate-related disclosure"); and

b. Revising the Instructions as to Exhibits.

Appellate Case: 24-1628    Page: 877    Date Filed: 03/26/2024 Entry ID: 5377362

**Note: Form 20-F is attached as Appendix H to this document. Form 20-F will not appear in the Code of Federal Regulations.**

21. Amend Form 10-Q (referenced in § 249.308a) by adding Item 1.B ("Climate-Related disclosure") to Part II ("Other Information").

**Note: Form 10-Q is attached as Appendix I to this document. Form 10-Q will not appear in the Code of Federal Regulations**.

22. Amend Form 10-K (referenced in § 249.310) by:

a. Revising paragraph (1)(g) of General Instruction J ("Use of this Form by Asset-backed Issuers"); and

b. Adding Item 6 ("Climate-Related Disclosure") to Part II.

**Note: Form 10-K is attached as Appendix J to this document. Form 10-K will not appear in the Code of Federal Regulations.**


By the Commission.

Dated: March 6, 2024.

**Vanessa A. Countryman,**

*Secretary*.

Note: The following appendices will not appear in the Code of Federal Regulations.

**Appendix A—Form S-1**

<div align="center">

**FORM S-1**

</div>

\* \* \* \* \*

PART I—INFORMATION REQUIRED IN PROSPECTUS

\* \* \* \* \*

Item 11. Information with Respect to the Registrant.

\* \* \* \* \*

(o) Information required by subpart 1500 of Regulation S-K (17 CFR 229.1500 through 229.1507), in a part of the registration statement that is separately captioned as *Climate-Related Disclosure*. A registrant may include disclosure that is responsive to the topics specified in Items 1500 through 1507 of Regulation S-K in other parts of the registration statement (*e.g.*, Risk Factors, Business, or Management's Discussion and Analysis), in which case it should consider whether cross-referencing the other disclosures in the separately captioned section would enhance the presentation of the climate-related disclosures for investors.

\* \* \* \* \*

Appellate Case: 24-1628    Page: 879    Date Filed: 03/26/2024 Entry ID: 5377362

**Appendix B—Form S-3**

<center>**FORM S-3**</center>

\* \* \* \* \*

PART I

INFORMATION REQUIRED IN PROSPECTUS

\* \* \* \* \*

Item 12. Incorporation of Certain Information by Reference.

\* \* \* \* \*

(e) If a registrant is required to disclose its Scope 1 emissions and/or its Scope 2 emissions pursuant to 17 CFR 229.1505(a), the GHG emissions metrics disclosure that would be incorporated by reference must be as of the most recently completed fiscal year that is at least 225 days prior to the date of effectiveness of the registration statement.  Accordingly, if a registrant has filed its annual report on Form 10-K for the most recently completed fiscal year and, in reliance on 17 CFR 229.1505(c)(1) has not yet filed its Form 10-Q for the second fiscal quarter containing the disclosure required by 17 CFR 229.1505(a), it must incorporate by reference its GHG emissions metrics disclosure for the fiscal year that is immediately prior to its most recently completed fiscal year.

\* \* \* \* \*

Appellate Case: 24-1628    Page: 880    Date Filed: 03/26/2024 Entry ID: 5377362

**Appendix C—Form S-11**

# FORM S-11

\* \* \* \* \*

PART I. INFORMATION REQUIRED IN PROSPECTUS

\* \* \* \* \*

Item 9. Climate-related disclosure.  Provide the information required by subpart 1500 of Regulation S-K (17 CFR 229.1500 through 229.1507), in a part of the registration statement that is separately captioned as *Climate-Related Disclosure*.  A registrant may include disclosure that is responsive to the topics specified in Items 1500 through 1507 of Regulation S-K in other parts of the registration statement (*e.g.*, Risk Factors, Business, or Management's Discussion and Analysis), in which case it should consider whether cross-referencing the other disclosures in the separately captioned section would enhance the presentation of the climate-related disclosures for investors.

\* \* \* \* \*

Appellate Case: 24-1628    Page: 881    Date Filed: 03/26/2024 Entry ID: 5377362

**Appendix D—Form S-4**

<h1 style="text-align:center">FORM S-4</h1>

\* \* \* \* \*

<h2 style="text-align:center">GENERAL INSTRUCTIONS</h2>

\* \* \* \* \*

**B. Information with Respect to the Registrant.**

\* \* \* \* \*

3. If the registrant is subject to the reporting requirements of Section 13(a) or 15(d) of the Exchange Act, then, in addition to the information otherwise required to be provided by this Form, the information required by subpart 1500 of Regulation S-K (17 CFR 229.1500 through 229.1507) must be provided with respect to the registrant, in a part of the registration statement that is separately captioned as *Climate-Related Disclosure*. A registrant may include disclosure that is responsive to the topics specified in Items 1500 through 1507 of Regulation S-K in other parts of the registration statement (*e.g.*, Risk Factors, Business, or Management's Discussion and Analysis), in which case it should consider whether cross-referencing the other disclosures in the separately captioned section would enhance the presentation of the climate-related disclosures for investors. A registrant may incorporate by reference the information required by Items 1500 through 1507 of Regulation S-K to the extent it is permitted to incorporate by reference the other information required by this Form and by the same means provided by this Form.

\* \* \* \* \*

**C. Information with Respect to the Company Being Acquired.**

\* \* \* \* \*

Appellate Case: 24-1628    Page: 882    Date Filed: 03/26/2024 Entry ID: 5377362

3. If the company being acquired is subject to the reporting requirements of Section 13(a) or 15(d) of the Exchange Act, then, in addition to the information otherwise required to be provided by this Form, the information required by subpart 1500 of Regulation S-K (17 CFR 229.1500 through 229.1507) must be provided with respect to the company being acquired, in a part of the registration statement that is separately captioned as *Climate-Related Disclosure*. Disclosure with respect to the company being acquired that is responsive to the topics specified in Items 1500 through 1507 of Regulation S-K may be included in other parts of the registration statement (*e.g.*, Risk Factors, Business, or Management's Discussion and Analysis), in which case it should be considered whether cross-referencing the other disclosures in the separately captioned section would enhance the presentation of the climate-related disclosures for investors. The information required by Items 1500 through 1507 of Regulation S-K may be incorporated by reference to the extent the other information required by this Form with respect to the company being required is permitted to be incorporated by reference and by the same means provided by this Form.

* * * * *

878

**Appendix E—Form F-3**

## FORM F-3

\* \* \* \* \*

PART I—INFORMATION REQUIRED IN THE PROSPECTUS

\* \* \* \* \*

Item 6. Incorporation of Certain Information by Reference.

\* \* \* \* \*

(g) If a registrant is required to disclose its Scope 1 emissions and/or its Scope 2 emissions pursuant to 17 CFR 229.1505(a), the GHG emissions metrics disclosure that would be incorporated by reference must be as of the most recently completed fiscal year that is at least 225 days prior to the date of effectiveness of the registration statement. Accordingly, if a registrant has filed its annual report on Form 20-F for the most recently completed fiscal year and, in reliance on 17 CFR 229.1505(c)(1), has not yet filed an amended Form 20-F containing the disclosure required by 17 CFR 229.1505(a), it must incorporate by reference its GHG emissions metrics disclosure for the fiscal year that is immediately prior to its most recently completed fiscal year.

\* \* \* \* \*

**Appendix F—Form F-4**

## FORM F-4

\* \* \* \* \*

### GENERAL INSTRUCTIONS

\* \* \* \* \*

**B. Information with Respect to the Registrant.**

\* \* \* \* \*

3. If the registrant is subject to the reporting requirements of Section 13(a) or 15(d) of the Exchange Act, then, in addition to the information otherwise required to be provided by this Form, the information required by subpart 1500 of Regulation S-K (17 CFR 229.1500 through 229.1507) must be provided with respect to the registrant, in a part of the registration statement that is separately captioned as *Climate-Related Disclosure*. A registrant may include disclosure that is responsive to the topics specified in Items 1500 through 1507 of Regulation S-K in other parts of the registration statement (*e.g.*, Risk Factors, Business, or Management's Discussion and Analysis), in which case it should consider whether cross-referencing the other disclosures in the separately captioned section would enhance the presentation of the climate-related disclosures for investors. A registrant may incorporate by reference the information required by Items 1500 through 1507 of Regulation S-K to the extent it is permitted to incorporate by reference the other information required by this Form and by the same means provided by this Form.

**C. Information with Respect to the Company Being Acquired.**

\* \* \* \* \*

3. If the company being acquired is subject to the reporting requirements of Section 13(a) or 15(d) of the Exchange Act, then, in addition to the information otherwise required to be provided by this Form, the information required by subpart 1500 of Regulation S-K (17 CFR 229.1500 through 229.1507) must be provided with respect to the company being acquired, in a part of the registration statement that is separately captioned as *Climate-Related Disclosure*. Disclosure that is responsive to the topics specified in Items 1500 through 1507 of Regulation S-K may be included in other parts of the registration statement (*e.g.*, Risk Factors, Business, or Management's Discussion and Analysis), in which case it should be considered whether cross-referencing the other disclosures in the separately captioned section would enhance the presentation of the climate-related disclosures for investors. The information required by Items 1500 through 1507 of Regulation S-K may be incorporated by reference to the extent the other information required by this Form with respect to the company being required is permitted to be incorporated by reference and by the same means provided by this Form.

\* \* \* \* \*

Appellate Case: 24-1628     Page: 886     Date Filed: 03/26/2024 Entry ID: 5377362

**Appendix G—Form 10**

<div align="center">

**FORM 10**

</div>

\* \* \* \* \*

Item 3.A Climate-Related Disclosure**.**

Provide the information required by subpart 1500 of Regulation S-K (17 CFR 229.1500 through 229.1507), in a part of the registration statement that is separately captioned as *Climate-Related Disclosure*. A registrant may include disclosure that is responsive to the topics specified in Items 1500 through 1507 of Regulation S-K in other parts of the registration statement (*e.g.*, Risk Factors, Business, or Management's Discussion and Analysis), in which case it should consider whether cross-referencing the other disclosures in the separately captioned section would enhance the presentation of the climate-related disclosures for investors.

\* \* \* \* \*

**Appendix H—Form 20-F**

<div align="center">

**FORM 20-F**

\* \* \* \* \*

PART I

</div>

\* \* \* \* \*

Item 3.  Key Information

\* \* \* \* \*

**E.      Climate-related disclosure.**

The company must provide disclosure responsive to the topics specified in subpart 1500 of Regulation S-K (17 CFR 229.1500 through 229.1507) in a part of the registration statement or annual report that is separately captioned as *Climate-Related Disclosure*.  A registrant may include disclosure that is responsive to the topics specified in Items 1500 through 1507 of Regulation S-K in other parts of the registration statement or annual report (*e.g.*, Risk Factors, Business, or Management's Discussion and Analysis), in which case it should consider whether cross-referencing the other disclosures in the separately captioned section would enhance the presentation of the climate-related disclosures for investors.

\* \* \* \* \*

**INSTRUCTIONS AS TO EXHIBITS**

\* \* \* \* \*

18. *Letter re GHG emissions attestation report*.  A letter, where applicable, from the GHG emissions attestation provider that acknowledges awareness of the use in a registration statement of a GHG emissions attestation report that pursuant to Rule 436(i)(1) (17 CFR 230.436(i)(1)) under the Securities Act is not considered a part of a registration statement

<div align="center">883</div>

prepared or certified by a person within the meaning of sections 7 and 11 of the Securities Act. Such letter may be filed with the Form 20-F if the Form 20-F is incorporated by reference into a Securities Act registration statement.

**19 through 96 [Reserved]**

* * * * *

**Appendix I—Form 10 Q**

## FORM 10-Q

\* \* \* \* \*

Item 1B. Climate-Related Disclosure.  A registrant that is required to disclose its Scope 1 and/or Scope 2 emissions pursuant to Item 1505 of Regulation S-K (17 CFR 229.1505) and elects to provide this disclosure in a Form 10-Q must provide this disclosure in its Form 10-Q for the second quarter in the fiscal year immediately following the fiscal year to which those GHG emissions relate.

\* \* \* \* \*

**Appendix J—Form 10-K**

<div align="center">

**FORM 10-K**

</div>

\* \* \* \* \*

<div align="center">

**GENERAL INSTRUCTIONS**

</div>

\* \* \* \* \*

J. Use of this Form by Asset-Backed Issuers.

\* \* \* \* \*

(1) \* \* \*

(g) Item 6, Climate-Related Disclosure;

\* \* \* \* \*

Part II

\* \* \* \* \*

Item 6. Climate-Related Disclosure

Provide the disclosure required by subpart 1500 of Regulation S-K (17 CFR 229.1500 through 229.1507) in a part of the annual report that is separately captioned as *Climate-Related Disclosure*. A registrant may include disclosure that is responsive to the topics specified in Items 1500 through 1507 of Regulation S-K in other parts of the annual report (*e.g.*, Risk Factors, Business, or Management's Discussion and Analysis), in which case it should consider whether cross-referencing the other disclosures in the separately captioned section would enhance the presentation of the climate-related disclosures for investors.

\* \* \* \* \*

# Press Briefing by Principal Deputy Press Secretary Karine Jean-Pierre

James S. Brady Press Briefing Room

2:43 P.M. EDT

MS. JEAN-PIERRE: All right, good afternoon, everyone. I have a few things at the top.

Today, the United States reached an important milestone. We have donated and delivered 200 million COVID-19 vaccine doses to the world. This is another milestone as the United States leads the world twe- — COVID-19 response — the result of an unprecedented logistical and operational endeavor.

Donating vaccines is one urgent effort we are taking to tackle this pandemic globally. And we've committed to donate 1.2 billion, along with lifesaving assistance, to countries in need to enhance their ability to get shots into arms.

We also reiterate support for an intellectual property waiver and bolstering manufacturing here at home and abroad.

As we recognize this milestone, it's clear that the world must do more in our global COVID-19 response. Other countries must step up, like the United States, and act with more urgency to stamp out the various — the virus everywhere.

We also need every WTO member to step up as well and support an intellectual property waiver, and every company must act ambitiously and urgently to expand manufacturing now.

So, we're glad to lead this effort, but this is a global pandemic and it requires a global response. We will continue to push everyone to do more in our fight against COVID-19.

Also, today we learned that the initial unemployment claims fell to another pre-pandemic low — I think there's — there we go — (a chart is displayed) — down to 290,000 for the first time in almost 20 months. The four-week average similarly fell to a new low, down more than 60 percent from when the Pres- — from when President Biden took office. Again, as you can see from the chart behind me.

This is a testament to the progress we've made on the economy thanks to President Biden's success in getting Americans vaccinated and getting the economic relief to the middle class.

The week before the President took office, jobless claims were at nearly 900,000; now they're down to 290,000. We've created nearly 5 million jobs in eight months; that's 600,000 new jobs every month on average — 10 times the rate we inherited.

Growth is up, wages are up, and our unemployment rate is down below 5 percent — 18 months faster than forecasted — forecasters predicted earlier this year.

We know we will have more work to do, and America is facing the same challenges on supply chains that most other developed countries are facing as well. But thanks to the work of this administration, we're leading the world in outright recovery, and we're in a year of unprecedented growth. And we can build on that progress by passing the President's economic agenda for growth, jobs, and rebuilding the middle class.

And one final thing. On a personal note, I'm wearing purple today, and so is some of my teammates, in honor of Domestic Violence Awareness Month, as some of you might know, as well as Spirit Day, which is an opportunity to stand up against LGBTQ+ bullying and harassment.

Both of these issues have been made worse by COVID-19. Sadly, domestic violence affects millions of people in the United States. It harms the physical

and emotional health of survivors and their families, undermines communities, and is a stain on the conscience of our country.

Tragically, 1 in 4 women and 1 in 10 men have experienced sexual violence, physical violence, or stalking by an intimate partner.

In response, the President's Rescue Plan provided a total of $1 billion for service programs: $450 million to support domestic violence and sexual assault service providers, and his administration allocated an additional $550 million of COVID mitigating funding for domestic violence shelters to improve their ability to help survivors during the pandemic.

As you all know, the President has said this — that his proudest legislative accomplishment is writing and championing the Violence Against Women Act, which transformed the nation's response to domestic violence and was passed and then reauthorized three times on a bipartisan basis. Today, he renews his call for the Senate to move swiftly in a bipartisan manner to reauthorize VAWA and strengthen its protections for all survivors.

And on Spirit Day, we recognize that LGBTQI+ youth disproportionately face bullying and harassment. A majority — a majority of LGBTQI+ youth in middle or high school were bullied last year. Even more, 70 percent heard homophobic remarks from teachers or school staff, and 75 percent have experienced discrimination based on their sexual orientation or gender identity in their lifetime.

This bullying and harassment can have life-threatening consequences, as we all know. More than half of transgender and nonbinary youth have seriously considered suicide in the past. This reinforces the need for the Senate to pass the Equality Act, which will provide long-overdue federal civil rights protections to LGBTQI+ Americans and their families.

You know, a younger staffer recently told me that, in high school, he noticed how many people wore purple on Spirit Day and how much that meant to him as a — as a young closeted teen.

I could only have — I could only hope that young people who might be watching or sees clips of this briefing will know that they are supported and represented in the highest levels of government today.

So today I join people around the world in wearing purple to show solidarity with victims of domestic violence and with lesbian, gay, bisexual, transgender, queer, and intersex youth.

Our administration stands with you, we support you, and we love you.

With that, Darlene.

Q Thanks, Karine. Two questions, international focused. The Haitian gang leader who's accused of kidnapping the 17 American missionaries — he was seen on video today saying that he will kill them if he doesn't get what he is demanding, which has been $17 million. How seriously does the U.S. take the threat? And what else can you say in terms of a U.S. government response to that?

MS. JEAN-PIERRE: So, Secretary Blinken, when he was in Ecuador this past week — actually, on Tuesday — spoke to this. And I'll just read out a couple of things that he said that I think is important for all of you:

"We have in the administration been relentlessly focused on this, including sending a team to Haiti from the State Department; working very closely with the FBI, which is the lead in these kinds of matters; in constant communication with the Haitian National Police, the church that the missionaries belong to, as well as the Haitian government. And we will do everything that we can to help resolve the situation."

And on Haiti's security, which is something that he also touched on in his — in his comments was:

"We have been working closely with the Haitian National Police to try to build their capacity, as well as help put in place programs that can effectively deal with the gangs. But it's a very challenging and long-term process. We're focused on it, but is it absolutely essential that this security dynamic change if Haiti is going to make real progress."

So, we're doing everything that we can. As I mentioned, the FBI, the State Department staff is on the ground. I don't have anything else to report, as you can imagine. And I think Jen said this a couple of days ago: For privacy and security reasons, we can't say more.

Q Okay. Second question. State Department Counselor Derek Chollet told us — told the AP today that, with regard to the situation in Burma, that it's "getting worse...from a humanitarian point of view, from a security point of view, in terms of the economy and lack of progress on politics." So, the question is: Why hasn't the administration yet sanctioned American and French oil and gas companies, which — that are working in Myanmar because they're the biggest — the single-largest source of foreign currency revenue for Myanmar?

MS. JEAN-PIERRE: So, we've spoken to the atrocities that are happening in Burma not too long ago. I don't have any updates. That's a very good question, Darlene, but I have to get back and talk to the team, and hopefully we'll have something to share. I don't have anything more on that.

Q Thank you.

Q Could you give us an update on the budget negotiations? How close are you to a deal? And are you still insisting there be tax increases on corporations and higher earners?

MS. JEAN-PIERRE: So, as you can imagine, you know, we are focused on this every day. This is a priority — continues to be a priority for the President.

Yesterday, as you know — a couple of days ago, the President spent hours meeting with congressional members. And everyone basically said the same, which is there's progress. And we're moving forward in a way that we can really truly help Americans and invest in economic growth for the middle class. So, that is the focus. And we believe, you know, the progress will continue these next couple of days.

As far as the taxes, the President has been very, very clear that this bill — the Build Back Better plan and the Bipartisan Infrastructure Bill, which are his two economic policies — that's going to, again, help the middle class and do that economic growth.

And as we're talking about physical — physical infrastructure and human infrastructure, is going to be paid for. We see the cost as zero because it's going to be paid for. And the way that we see it happening is making sure that the wealthiest among us — the top corporations — pay their fair share. There

shouldn't — there shouldn't be a reason why teachers and — teachers and firefighters are playing [paying] more in taxes than billionaires.

So, that's our focus. That's our promise. And that's what we're going to continue working towards.

Q And secondly, Karine, the Fed today banned stock purchases by top officials at the Fed in response to ethics questions. Is this something that you welcome? Does it impact the President's thinking on whether to reappoint Jerome Powell as Fed Chairman?

MS. JEAN-PIERRE: So, Steve, I'll say this: We deeply respect the independence of the Federal Reserve and won't comment on — you know, on these recent developments. But President Biden believes that all government agencies and officials, including independent agencies, should be held to the highest ethical standards, including the avoidance — the avoidance of any suggestions of conflicts of interest.

Q Thanks, Karine. It's looking more and more like the Clean Energy Performance Program might not make it in the final version of the reconciliation package. That was a really big part of how the President planned to meet his own admission goals. So what message does that send other countries ahead of COP26?

MS. JEAN-PIERRE: So, you know, President Biden reestablished U.S. leadership on day one, and as you've heard us say — as you have heard us say when it comes to acting on climate change every day since, from day one.

The President will advance his climate agenda using every tool at his disposal and can make significant progress in curbing emissions, growing our economy, and good-paying union jobs.

And so he could do that without Congress. There was actually a report that came out this week from the Rhodium Group. An independent research firm reinforced the fact that the U.S. has multiple pathways to meet President Biden's pledge to reduce emission 50 to 52 percent below the 2005 levels by 2030.

So we'll continue to work with our colleagues in Congress on Clean Electricity Performance Program, but this — but this independent analysis

lays out a path to the President's climate goal without a CEPP in place. And so, we'll just continue to do the whole-of-government approach that we've been doing this past 9, 10 months.

Q But if he can't get his biggest climate priority passed through Congress, how can he point to the United States being a leader on this issue?

MS. JEAN-PIERRE: Because we have had other ways of doing that. We don't need — what we're saying is we don't need the — we don't need Congress. We can do it without Congress, as I just — as I just laid out.

Let me give you some examples of what we've already done. So, leading the shift towards electric — electric vehicles, which you've heard us talk about many times, which is bringing together auto — automakers and autoworkers; phasing out super pollutants like HFCs to greatly reduce emissions; make — making across-government investment in clean energy like offshore wind and solar; making historic commitments to use every lever at his disposal to advance environmental justice and spur economic opportunity for disadvantaged communities.

And extreme weather events increase in frequency and ferocity, the U.S. has taken bold step to strengthen the nation's resiliency to sev- — to severe — to severe impacts of a challenging climate.

So we have done a lot here — the President has. He sound — he has signed multiple executive orders to make sure that we are leading in this effort.

And remember, we are coming from four years of climate change — four years before, as — where climate change was not — dealing with climate change was not a priority. And so, this President has been doing that since day one of his administration and will continue to do that.

Q Is it still the White House's goal that there's a discontinuation of any fossil fuel subsidies in the President's budget — in the reconciliation package?

MS. JEAN-PIERRE: I'm not going to negotiate from here. As you can imagine, things are being worked out as — you know, kind of, as we speak these last couple of weeks and, certainly, every day. And so, we are going to continue to work towards delivering for the American public and making sure that we get to our climate change goals.

Q Me?

MS. JEAN-PIERRE: Yep.

Q Thanks, Karine.

MS. JEAN-PIERRE: Go ahead. Sorry. Go ahead, Weijia.

Q I just want to be clear. Thank you.

MS. JEAN-PIERRE: Hi, Weijia.

Q Hi. Great to see you.

MS. JEAN-PIERRE: Good to see you. Go ahead, it's your turn.

Q So just following up on that report you just mentioned, you said it does not include CEPP. Does it include a carbon tax?

MS. JEAN-PIERRE: So, like I said, we are — you know, we are, right now, working towards making sure we deliver for the American public, and we're not going to — the President has been really clear his red line is making sure that that $400,000 —

Q Oh, no, I'm sorry — on climate.

MS. JEAN-PIERRE: Oh, on climate.

Q Yeah.

MS. JEAN-PIERRE: Oh, I am so sorry. When it comes — can you say more?

Q You mentioned a report that you were citing that showed —

MS. JEAN-PIERRE: Yeah, the Rhodium. Yep.

Q — even if there was no CEPP passed by Congress, that we'd still be able to meet the President's goals to reduce pollution.

MS. JEAN-PIERRE: Mm-hmm.

Q My question was whether that plan included a carbon tax or not? And the reason I ask —

MS. JEAN-PIERRE: Yep. Yep.

Q — is because Senator Schumer released his own plan that showed: If we don't have CEPP, that's one thing, but if you don't have that and you don't have the carbon tax — which Senator Manchin has opposed — there's really going to be a significant gap in reaching those goals. So, I'm wondering, when you say "we have a plan that includes steps that are not approved by Congress," what they are to get there.

MS. JEAN-PIERRE: So, the — the report that I just mentioned, I can't speak to the specifics of it. All I can tell you is that what it laid out is saying that we can reach our goals. But I — I would have to look — we would have to check out about the carbon tax, specifically.

But, look, there are a number of ideas being debated. And the President asked members to submit their own proposals. So that's what we're doing. We're negotiating. And the President has put forward his own plan for addressing climate change that doesn't involve a corporate carbon fee. That is — that is what our plan currently has, and then we'll see what — what people bring to the table.

Q Okay. And then since you brought up the — the corporate tax rate again —

MS. JEAN-PIERRE: Yes.

Q I did have a follow up, also. You said, "That's our promise," earlier when you were asked about whether the President would — is still committed to raising corporate taxes. Can you just clarify what that was?

MS. JEAN-PIERRE: Well, meaning the promises, like this is going to be paid for. There is zero cost because it's going to be paid for. And so, we are not going to put the burden on the working everyday people.

What we're trying to do with our ec- — with the President's economic policies — the Bipartisan Infrastructure Bill and the Build Back Better Agenda — is to make sure that we invest in people, that we invest in our infrastructure. Right? Something that hasn't been done in this country for

**App.895**

decades. Making sure that we are competitive again across the globe, which we haven't seen in some time.

So what our promise is, is that we are not going to raise taxes against anyone who is making 400- — more than fo- — less than $400,000. That is our promise and that's what we're sticking to.

Q But the corporate tax rate, is that negotiable or not for the President?

MS. JEAN-PIERRE: I — like I — we're — we — there are multiple ways that people are coming forward and trying to figure out how we're going to move forward with this plan, with the Build Back Better Agenda. And that's — you know, that's what we're working towards. Right?

But I'm saying that our red line, the President's red line is to make sure that this is paid for and that we don't raise taxes on anybody who is making less than 400,000. That's — that's what I'm saying.

Q And just one more on Senator Manchin who, a short time ago, said he does not believe there will be a framework on the bill done by the end of the week. He also added that, "This is not going to happen anytime soon..." because we're "trying to get a meeting of the minds."

MS. JEAN-PIERRE: Yep.

Q Did the President expect a framework to be agreed upon by tomorrow? And is he concerned that Manchin does not seem to have the same sense of urgency that he — the President — has been expressing all week?

MS. JEAN-PIERRE: So, look, we have been working with Manchin — with Senator Manchin in good faith. We see him as a partner in these discussions. And, you know, as far as the timeline — look, you saw — you saw, two days ago, congressional members coming out of the White House saying how much progress there was and saying that — saying that there was a sense of urgency, which is what — we all have been pretty much on the same page.

The thing to remember is Democrats pretty much agree on — on the — on BIF and Build Back Better. And what I mean by that is they know that this is going to be something that's going to deliver for the American public. And we

know that this is going to help the economy with jobs — good-paying jobs, good-paying union jobs — but also just the middle-class Americans.

So, we are all on the same page on — with that. And so, we see that progress is coming along. We think that in the next couple days we're going to continue to see progress. We're not putting a timeline on this. We're not going to go into the legislative mechanics of this.

But we're going to get this done because we have to get this done for the American public. And that's our focus.

Q Karine?

Q Thank you.

Q Thanks, Karine. So the year Joe Biden was sworn in as President, promising a more humane immigration system, is the same year that an all-time record 1.7 million migrants have been detained at the southern border. Is that a coincidence?

MS. JEAN-PIERRE: So, thanks for the question, Peter.

First, I'll say that DHS will formally release its monthly September operational update sometime soon, so I'm not going to go into — get ahead of that or go into the numbers. I think that's what you're — you're mentioning right now.

But secondly, you know, I would add — and you hear us talk about this all the time — we continue to enforce Title 42 and expel single adults and families when possible. And we continue to be very, very clear that no one should attempt to irregularly migrate here or enter the United States.

So, it's unsafe. It's unlawful. It's a public health risk, which is why we're using Title 42 — because it's not our immigration policy; it's a public health authority.

And so, those attempting to come in irregularly, migrate irregularly will be subjected to border restriction, including Title 42, as I just mentioned.

Q And you're telling people not to come. That's been the line for a couple months. It's been very well documented that a lot of these migrants are just released with a notice to appear or a notice to report and that something close to 80 percent don't appear or report. So do officials around here consider that that could be something that is attractive to migrants who figure, "If I can just get in, I can stay"?

MS. JEAN-PIERRE: Again, I'm not going to get into the numbers because I know that you're leaning into the numbers in asking me these questions.

But, look, we've been very clear, and we've been clear for the last 10 months. Again, the CDC has determined that the continued expulsion of certain individuals under Title 42 is necessary due to the risk of transmission and spread of COVID-19 in congregate settings, such as CBP stations, as well as the threat from emerging variants.

So, if it's not possible, which is what I think you are alluding to there, there is an exception if we have operational capacity constraints, including the makeup of the specific family unit and agreements with the country of origin or last residence.

Another determining factor is detention capacity both within ICE and CBP. There's also an extension for acute humanitarian need, such as the urgent medical situation. There is an exception on the Convention against Torture. If someone makes a legitimate claim that they would suffer torture if they — they've returned to the country from which they have come.

As we have stated, those who cannot be expelled are placed into immigration proceedings. But as — to be clear: We are still expelling single adults and families when possible using Title 42. That remains the policy. That has not changed.

Q Okay. And a follow-up about something that you just said. You guys say that President Biden does not want to raise taxes on anyone making less than $400,000 a year, but there's a new Fox poll that finds 83 percent of registered voters are noticing bills for groceries and everyday items increasing. So how is that any different than a new tax?

MS. JEAN-PIERRE: Well, look — and when you say — can you give me a little bit more? Like what's the —

Q Well, the supply chain is all backed up; there are bottlenecks — empty shelves, prices going up. People are paying more. And so, how is that any different than a new tax?

MS. JEAN-PIERRE: So I would say this: You know, we are — we're dealing with a historic and evolving pandemic that is impacting our economy. Right? We have seen it for the past year and a half. That's what people have been dealing with.

And it is having an outsized impact on our global supply chain. And the President understands how much a squeeze it is when families see their prices rise.

And so, he understands that, and that's why he's — we've been using every tool in our toolbelt to make sure that we deal with that in a real way so that people understand that the President is doing everything that he can to deal with those issues.

So, there's a couple of things. So, we got to think about the progress that we've made on how far we've come for the mess that we inherited from the previous President.

We — we've already averaged 600,000 jobs, which I mentioned at the top — at the top — those are jobs per month — compared to just 60,000 before we came in. That's almost five million total in eight months. We've increased economic growth projection for 2021, and more than have — and have new unemployment claims.

So, we are in a different place than where we were before the President came into office. And so, we're going to continue building on basically the American Rescue Plan. This is why we're trying to pass the President's domestic economic policies.

Q And to that point, the Majority Leader — or the Minority Leader in the House, Kevin McCarthy, wrote a letter to the President. He says, "We must address the global supply chain and ports crisis before Congress even

considers additional social spending and taxation legislation." Is that something that you would consider?

MS. JEAN-PIERRE: So here's the thing: Jen responded to — this is the letter — the letter from McCarthy?

Q Mm-hmm. Yeah.

MS. JEAN-PIERRE: Is that what we're talking about?

Q Yeah.

MS. JEAN-PIERRE: Okay. Yeah, wonderful letter.

So she responded to this earlier. And let me just add to this a little bit. It's — I've already kind of talked about this, but there's a little bit more that I want to lean into.

So, under the Trump-McCarthy economy, this time last year, fewer Americans were working — which is what I was just saying — job growth was flattening, and families were facing down a dark winter with less economic security than ever before and a pandemic raging out of control. That was the holiday season under the McCarthy-Trump holiday season. So that's something to remember. This was a different time, a year ago.

And so, fast forward a year from there — from then: Nearly 80 percent adults are vaccinated. We've created 5 million jobs. Americans have money in their pockets, and they're spending it, resulting in record volume of good — goods through our ports, and our roads and rails.

Kevin McCarthy and his caucus voted against that bill that made that happen. They did not do anything to help the American public when we needed them — when the American public needed it. And I'm talking about the American Rescue Plan —

Q So — I understand.

MS. JEAN-PIERRE: — to be clear, which has helped — which has helped turn on the economy; which has helped, as I said, make sure that people are getting vaccinated to protect their lives and go back to work.

Q Okay. And so, last one: Are you saying that you — as you compare holiday season this year to holiday season last year, are you saying that if Christmas gifts don't get delivered this year — because the supply chain is backed up, because of bottlenecks — that people are going to blame Donald Trump, or are they going to blame Joe Biden?

MS. JEAN-PIERRE: That's not what I'm saying. I'm saying that we're in a different place than we were a year ago. And the reason why is because the President took action. The reason why is Democrats came together and they passed the American Rescue Plan, put — put checks into pockets, made sure that — that we were dealing with issues that pushed women out of the workforce, which is the Child Tax Credit, childcare — all those things that really benefited everyday people who were being left behind.

Now what we're doing is we're making sure that we continue the investment — right? — the Build Back Better Agenda; BIF –the Bipartisan Infrastructure Bill, which 19 Republican senators voted for. Those two pieces of legislation, that is the — that is the President's plan on how do we actually build back better and not leave anyone behind and do that economic growth for the — for the middle class. And so, that's what we're talking about and that's what we're continuing to do.

For the supply chain, the President is doing everything that he can. He is bringing in the private sector. He's brought in the labor. When we talk about the meeting that he did last week for the ports — right? — we talked about Long Beach and the Los Angeles ports. And that's what we — that's one of the things that we can do as a government is do it in good faith, bring everybody together, and figure out how to fix the short-term problem that we're having.

So, that — and we've been working on this since the President walked into — walked into the White House.

Yeah, Peter.

Q Hi, Karine. Nice to see you.

MS. JEAN-PIERRE: Nice to see you.

Q Does the White House — does the White House believe that Senator Kyrsten Sinema is negotiating in good faith?

MS. JEAN-PIERRE: Yes, we believe that Senator Sinema is negotiating in good faith.

Let me just say that the President considers Senator Sinema an important partner in getting his economic agenda passed, and he values her work, her engagement, and her commitment to working with him to deliver for the American people.

We have been in touch nonstop, through the course of the last several days, with her and her team — of course, at the President's level — but also through calls, meetings with senior staff, some of my colleagues.

And, yes, to answer your question again: We are definitely — we definitely do believe that she is working with us in good faith, and we are working with her in good faith.

Q Was it during those last several days that Senator Sinema told the President or the White House that she was opposed to the corporate tax rate? And if not, when did she communicate that to the President or to the White House?

MS. JEAN-PIERRE: I'm not going to go into private conversations.

Q Not with President. How — when did she communicate it to the White House?

MS. JEAN-PIERRE: I — we're not — I'm not going to do that from here, but what I will say: The President is working to pass game-changing investments in economic growth that benefits the middle class, as I have been saying — this economic growth paid for by having the richest taxpayers and big corporations pay their fair share, and without raising taxes on any Americans making less than $400,000.

Again, the price tag for this legislation is zero. There is an expansive menu of options for how to finance the President's plan. And so, that's what we're going to be discussing and negotiating and trying to figure out so we can, again, deliver for the American public.

Q And just for clarity — I mean, everyone gets that the price tag isn't actually zero. These new programs do cost money, right?

So why not level with American voters and say that there is a cost here but you're aiming to do it without raising the deficit?

MS. JEAN-PIERRE: No, we are being honest with the American people. We are being (inaudible).

Q But it does cost something, we agree, right?

MS. JEAN-PIERRE: No, it is — we are — it is costing — it is going to bring zero dollars to the — to the deficit. And we're being very clear about that, because that's what we want to make sure that we're doing, right?

Because here, once again, we have had people who have been left behind. After this — after this — the COVID-19 pandemic that we've been living in for a year and a half, we saw even more — more severely how much people have been left behind — and not just been from the COVID. I mean, before then, people — middle-class people, working people have been not part of the economy. And now we want to deal them back in. It's been a long time since we did that.

The President talked about that when he was in Scranton, Pennsylvania, yesterday. He's going to talk about that, take questions from everyday people today at the CNN Town Hall, which he's very much looking forward to. And he'll probably be asked that question, and he'll answer it, as well, tonight.

Q So, for clarity, there's a cost, but it's not to def- — it doesn't raise the deficit, these things we do (inaudible)?

MS. JEAN-PIERRE: The price tag for this legislation, Peter, is zero dollars.

Q Okay. Let me ask you, if I can ask one final question. A little bit earlier — just for clarity as we look ahead to the COP 26 a week and a half out from now. You said earlier that the President, the White House doesn't need Congress. Does — just for — to make sure I get this right — does the — is it the President's position that he does not need Congress for transformative change in combating climate?

MS. JEAN-PIERRE: No, he believes that — what I'm saying is that there are a number of pathways to meeting our emission goals and targets. That's all we're saying.

Yes, we —

Q Can you do that without Congress?

MS. JEAN-PIERRE: We can. That's what I'm saying. Because we're there are many tools that we're using to get there.

Would — do we want to — to work with Congress? Absolutely. That's why the President added that into his economic policy. For — so, for sure, in his legislation — he put it in there because he wants to get it done.

What we're saying is our climate vision is integrated throughout everything that we do in the whole-of-government effort launched on day one that we did with an executive order.

The President will advance his climate agenda using every tool — again, every tool at his disposal and make — can make a significant progress in curbing emissions, growing our economy, and good-paying union jobs. So, that's what we're going to continue to do.

Do we want to work with Congress? Absolutely. But we're saying that we're already doing the work to hit our goal, and that's why I referenced the — the report earlier when I was answering Weijia's question.

Q Thank you, Karine.

Q Can I follow up real quick on — well, a few things. But first, let me just say — I'll add my voice to, I'm sure there have been dozens, who would humbly request that the President of the United States not only do a town hall, but show up either in this room or in the East Room to appear before the full press for a robust round of questions that will, no doubt, benefit the American public.

MS. JEAN-PIERRE: But, Brian, he takes questions all the time.

Q I hear you.

MS. JEAN-PIERRE: All the time.

Q Just — I'm just adding my request to that.

MS. JEAN-PIERRE: You know, Martha is here. She tracks that. And he — he's —

Q Yes, but some of us have not had a chance to ask him —

MS. JEAN-PIERRE: I get it. I get it. But this is — this is a large White House Press Corps. But he does take questions.

Q Yes, it is. Yes, it is.

Q And my follow-up to Peter — I just want to — I know you don't want to talk too much about the questions with Sinema, but is it safe to say the White House was not blindsided by her stance? You didn't find out about it publicly, right? There was a discussion. You knew about it ahead of time.

MS. JEAN-PIERRE: I'm not going to go into our con- — private conversations with anybody. It doesn't matter if it's Senator Sinema or a House member. We're not going —

Q So, it could've been a surprise?

MS. JEAN-PIERRE: We're not — we're going to do that here. I'm not going to do that from this podium. I am just saying that we are working in good faith with her, and she is working in good faith with us.

Q And then, finally, there are several Democratic strategists — Norm Eisen and a couple of others — who said that yesterday was a "dark day" for democracy. Does the White House share that view? If not, why not? And what do you plan to do to move forward?

MS. JEAN-PIERRE: Which — what —

Q A "dark day" for democracy and what happened up on the Hill yesterday —

Q Filibuster.

MS. JEAN-PIERRE: Oh. You're talking about the Voting Rights. Okay. You have to give me a little bit more. (Laughs.) There's so much going on.

Q Yes, there is.

MS. JEAN-PIERRE: Yeah. You know, the President talked about this today, and he's been very clear on this for the past several — several months as we've been dealing with, you know, voting rights and these pieces of legislation that are creeping up across the — across the country.

And as he said in his joint address to Congress, he believes that, "If we truly want to restore the soul of America, we need to protect the sacred right to vote." And that is something that the President truly believes.

He was just the MLK monument, celebrating the 10th anniversary. He spoke — he spoke to this.

So, he believes the right to vote is the cornerstone of our democracy, and has repeatedly urged Congress to act to protect the right to vote and access to voting.

He has addressed this issue in front of Congress, as I just mentioned. He has addressed this issue privately with members of Congress and senators of both parties. He has addressed this issue with civil rights leaders at the White House.

And anyone who knows this President has followed his — this President's career knows his belief is core to who he is. And he will continue to work with Congress every day until they are able to pass something.

And one more thing I just want to add: He's also used — and made sure to use the power of the federal government to do everything that we can from the federal government to deal with voting access.

Q But, to be clear, does it he think it was a "dark day" yesterday?

MS. JEAN-PIERRE: I mean, I — he — it was disappointing what we saw yesterday. And we've got to remember: What happened yesterday is that Republicans would not allow a debate. They would not allow a debate. Not that — not that they voted on it; they just wouldn't allow a debate to talk about why we should make voting more accessible for Americans.

Now, that is — that is shameful, and that is problematic for our democracy. As I said, voting is the cornerstone of our democracy, and it shouldn't be that way.

App.906

Q Thanks.

Q Thanks. Among the new ethics rules that the Federal Reserve announced today, there's a prohibition on trading individual stocks. Does the President believe that lawmakers should be subject to that same prohibition on trading individual stocks?

MS. JEAN-PIERRE: I don't think his position has changed on that. Let me get back to you to see if we have anything — an update to share on that.

Q And then, when he announced the Build Back Better Agenda earlier this year, he spoke about it in terms of generational and transformational change. Is he concerned at all that in those negotiations his initial vision for the plan is being significantly watered down?

MS. JEAN-PIERRE: No, absolutely not. He thinks that this — when we reach a deal, which we believe that will happen — the President said this yesterday himself, he believes a deal will happen — it will be transformational.

Both the Build Back Better Agenda and the Bipartisan Infrastructure Deal are historical within their own right. And it's going to make transformational change. It's going to be historical. It's going to create good union jobs. It has the human infrastructure to make sure that people are truly getting a break — a tax break — making — dealing with eldercare, childcare — things that are really crushing Americans in this country.

And also, let's not forget the Child Tax Credit, which has cut poverty by 50 percent. That was in the American Rescue Plan. We're hoping to extend that in the Build Back Better Agenda, and that's what we're going to continue to work towards.

Q Are you aware of White House staff that have been offered booster shots through the White House itself? And have — I mean, I wasn't sure if it's considered a high-risk environment or not.

MS. JEAN-PIERRE: Well, as — you know, we follow the CDC guidance. That's going to be our focus: making sure that we look — listen to the public health officials. And whatever the guidance puts out, that's what we're going to follow. I don't have any more on booster shots for White House staffers. I'm sure many have them. Everybody falls in a different category. And so, I

can probably check in and find out more, but, yes, we follow the public health guidance.

Q Thanks, Karine. Back on immigration for a sec. The President's nominee to lead Customs and Border Protection said in his Senate confirmation hearing yesterday that he supported the continued use of Title 42. He also indicated it was his view that certain sections of the border wall should be finished. Does the President agree?

MS. JEAN-PIERRE: Well, as you know, we have said that — I have to look at this — the comments. I have not seen them, so I want to make sure I read it within context.

But we have talked about the border wall here, in general, as a way that it's been used in a — to, you know — to close the border. And we feel that it is a policy that doesn't work. And it's not just us; you know, experts have said that. The border wall is not — is not an effective policy.

As far as those comments, I can't comment on that. I actually — I have not seen it, I have not read them, and I need to read it in context.

Q I have one more question about Title 42. There's a report this morning from a group called Human Rights First that says that, through the use of Title 42 and also prohibiting — basically turning migrants away at the border, seven thou- — 7,600 kidnappings, assaults, and other attacks have taken place against migrants and asylum seekers.

Does this administration believe it deserves any of the blame for that?

MS. JEAN-PIERRE: Well, that's — I — again, I have not seen that report. That does sound horrifying. Not something that, you know, we would — you know, agree with or be proud of, certainly. So I have to read the report. I have not seen it. And hopefully we can get back to you on that one as well.

Okay. Justin.

Q Hey. First, I just wanted to go back to that last question that Peter asked you to make sure that we're crystal clear on it. When you say, "We don't need Congress. We can do it without Congress," do you mean meaningful

App.908

reductions of greenhouse gases? Or do you mean — because what it sounded like you meant was hit the 50 to 52 percent reduction.

MS. JEAN-PIERRE: Yeah, it's hitting our goal — it's hitting the goal that we set out.

Q So you think you can hit 50 to 52 percent —

MS. JEAN-PIERRE: Yes, which is —

Q — without Congress at all?

MS. JEAN-PIERRE: — which is why I — I laid out the report that was put out this week. An independent research firm reinforced the fact that the U.S. has multiple pathways to meet President Biden's pledge to reduce emissions 50 to 52 percent below the 2005 levels in 2030.

Q Right. But my understanding of that report is that it's multiple congressional pathways that would preclude the CEPP program but would have other congressional legislation as part of it, which is a different thing than what you seem to be saying, which is that you don't need Congress at all to accomplish this goal.

MS. JEAN-PIERRE: Okay. What I'm saying — I — speaking specifically to Build Back Better. That's what I was saying. Because, to me, that's what I was hearing — is that — as we're working through Build Back Better Agenda and the Bipartisan Infrastructure Bill.

And so, we're saying that there are multiple pathways and that we have taken some — a whole-of-government approach — to get to that — to the number that I just listed for the emissions.

Q Okay.

MS. JEAN-PIERRE: — on reducing emissions.

Q So, I think what we're saying is that there are multiple congressional pathways to get to that point.

MS. JEAN-PIERRE: I'm just saying there are multiple pathways, and some of them that we have already taken on our end to get to that. We're doing

executive orders, and we'll continue to do that. That's what — that's what I'm saying. I'm specifically talking about the Build Back Better Agenda.

Q Okay. Then just one on scheduling: Could you talk through if the President has additional congressional meetings planned through the rest of the week and then if we expect to see him campaign for Governor McAuliffe by — before he leaves for —

MS. JEAN-PIERRE: I don't have anything new to — you know, any new trips to call out for you or read out for any of you. As you know, he's going to go to New Jersey on Monday, which we announced yesterday.

I can say this: We are talking to members in Congress on every level of the administration. We have my colleagues who are in constant contact with Democrats on the House and the Senate side, and we'll continue to have those conversations.

The President, two days — two days ago, met for hours with members of both House and Senate in the Democratic Pa- — in the Democratic — Democrats, I should say. So, we're going to continue to do that.

Q Thank you. I know that earlier you said that whatever comes out of this — you know, the negotiations — over the Build Back Better plan — human infrastructure — that it's still going to be transformational.

But, I guess, what do you say to those people who are saying that the White House and Democrats are compromising too much already? Because there's talk of taking out of — the Clean Power Plan. There's talk of, you know, limiting how long — the Child Tax Credit to a year.

There are people who are saying that too much is being sacrificed. And so, what is your message to them — to the people who are saying this is not going to be transformational?

MS. JEAN-PIERRE: Well, I would say the bill is not done yet. I would say the negotiations are still happening. And so, we're going to continue to have those conversations. And the President is going to continue to fight for these — for this — for the Build Back Better agenda.

This is his policy. This is something that he believes that the American people need and that human infrastructure — finally investing in the middle class. And so, he's going to continue to — continue to work — work for the American public.

And so, that's not going to stop. I'm going to — I — what I — again, I would say to you like, "Let's — let us negotiate."

And when — when folks came out two days ago, people said there was progress. People said that we're getting — we're getting to a place where they feel like there's going to be a deal.

So let the process continue. This is a — this is democracy in action, as you can imagine. And we'll have something that — whatever we end up with will be transformational, will be historic. And — because this is — what we're talking about — these two bills — we haven't seen that type of investment in generations. We really haven't.

And now this President has decided to make those investments, and so we're going to work with Democrats on the Hill to get that done.

Q And a question on Joe Manchin. There were reports that he was thinking about becoming an independent. He seemed to confirm or to say that he had offered — maybe to the White House and to — maybe to the Senate leadership — that maybe he would become an independent if that is what the White House or Senate leadership wanted him to do.

Can you talk about that? Does the White House have a position on that? Do they have a problem with Joe Manchin being in the Democratic Party?

MS. JEAN-PIERRE: I think Joe Manchin spoke to this pretty clearly, recently, as humanly possible. He was very clear about — when he was asked this directly. I really don't have anything — anything else to say about that.

Look, the relationship that the President has, that we have with Joe Manchin is strong. It's a mutual — the President has a mutual respect, and they have — they have shared values.

And so, again, we've been working in good faith with him. He's been working in good faith with us. And he actually spoke — spoke to that, I believe,

yesterday, recently, and was very clear.

Q And so, you want — the White House wants him in the Democratic Party? You can just say that?

MS. JEAN-PIERRE: I — I — that's his — for his — that's his decision to make. That's not my decision to make. I'm not going to — you know, we're not going to say what — you know, what party somebody belongs to. That's for — that's for them to make. And that's, you know, for him to answer, which he did. He answered that very, very clearly.

I cannot say the words that he used from here, but he did very much answer that question. (Laughter.)

And I'm going to — I'm going to leave because I — leave that there because my daughter, at some point, is going to see this. And so, she'll call me out. So, I can't use those words.

But look, we — the President has, you know, respect for Senator Manchin. Again, he sees him as a partner in these — in this — in this process, in trying to get work done for the American people, trying to pass this economic — you know, economic bill for the middle class, as I've been saying.

And so, this is critical. This is important. And we need to get it done.

Go ahead, Michael.

Q Thank you. Two questions: one on voting rights and climate. On voting rights, given the President's remarks earlier today at the MLK — MLK Memorial, does the President think that Martin Luther King, Jr., if he were around today, would find it satisfactory to not break the filibuster in an effort to save what the President has called "the cornerstone of democracy"?

MS. JEAN-PIERRE: Oh my god. That's such an unfair question. You're asking me what Dr. King would think?

Q Mm-hmm.

MS. JEAN-PIERRE: Oh my gosh.

Appellate Case: 24-1628    Page: 917    Date Filed: 03/26/2024 Entry ID: 5377362

Q You know, I'd assume — I'm assuming the President must have thought something about that in preparing for the remarks today, which were highly symbolic given — given Martin Luther King's —

MS. JEAN-PIERRE: Geez, Michael. (Laughs.) You know, I'll say — I'll say this: The President has been absolutely clear that protecting Americans' constitutional rights and the integrity of our elections from this — from the systematic assault Republicans have been engaged in across the country is a must and that hi- — that this historic threat requires strong voting rights legislation. And that's what he is working on. That's what he talked about today, and he's talked about it multiple times.

One of the — one of the times that was very striking, as we know, was when he went to Philadelphia and really made a strong argument for protecting the — the corner- — the cornerstone of our democracy.

Look, dozens of White House staff work on this priority every day, and it's fundamental to upholding the rule of law.

And not only that, again, he has done — he has done — he's taken a lot of actions as President. He's done a historic executive order, which was done on the anniversary of Selma, Bloody Sunday. And instead — on that day, instead of just speaking and saying nice words or commemorating that day — which was a difficult, sad day — he took action.

And so — so that's one way he did. He — he doubled the voting rights staff in the Civil Rights Division at the DOJ. He appointed the Vice President as — at her request — to lead this administration-wide effort, using the bully pulpit and convening power of the White House.

So, we're going to continue to do the work. It's not — it's not over. And we're going to continue to do everything that we can from here to make sure that people's rights are protected.

And also, the John Lewis bill, from what I understand, is going to be coming to the floor. And so, Senator Schumer is doing everything that he can with — with his members and senators on the Hill to get that done.

Q Okay. And then on — just on climate. Not to beat a dead horse, but to follow up on Justin's question.

MS. JEAN-PIERRE: Yeah.

Q As I understand it, the negotiators on Capitol Hill, as they are trying to figure out what's in and what's out of the Build Back Better — the social, the human infrastructure piece of this — that they are very much focused on climate pieces in that legislation — maybe not the original proposal that the President had made but, you know, sort of what other pieces that add up to, you know, tens of billions, hundreds of billions of dollars.

Are you now saying that, in an effort to pare down the bill, you guys would be happy if Congress does nothing?

MS. JEAN-PIERRE: No, we're not — I'm not saying we would be —

Q Because it sounded, again, like — as Justin, I think, suggested —

MS. JEAN-PIERRE: Let me — let me be —

Q — it sounded like you were saying that —

MS. JEAN-PIERRE: Let me be clear because, clearly, I'm not being clear. Let me be clear, as a spokesperson: No, we would not be happy if it was not included.

We're going to continue to fight for those pieces in the legislation. That is not — you know, that is not the — you know, that is not — what we're saying: It's not the end of it. There are multiple — we're saying where — there are the multiple — multiple other pathways.

But the President — this is the President's bill. You know, we're talking both BIF and both BBB. This is something that he wanted in that — those pieces of — those pieces of legislation that he wanted in that agenda. And he's going to continue to fight for every component of it.

So, we want it in there. People keep asking us or saying to us, "You're not going to hit your goals. You're not going to hit your — your emissions, your reduction goals."

And we're saying that we have done the work already. We're going to continue to use an all-of-government approach to do that. And I was just

citing a report that said that we're can still — we can still hit that goal.

And that's — that's all I'm saying.

Q Okay.

MS. JEAN-PIERRE: We're not going to stop fighting. Absolutely not.

Go ahead.

Q Thanks, Karine. Given some of the reports we've seen the last week and a half, does the President believe that the U.S. has a sufficient amount of visibility into China's weapons programs and defense capabilities at this moment in time?

MS. JEAN-PIERRE: So, you're talking about the missile that we saw —

Q Hypersonic.

MS. JEAN-PIERRE: — recently — the hypersonic glide missile.

So, Jen talked about this yesterday when — after the President was asked. So, we're not going to comment on the specific report, but, generally speaking, we have made clear our concerns about the military capabilities that the PRC continues to pursue.

And so, you know, again, I'm not going to comment on this specific report. But generally speaking, we have made clear our concerns about their capabilities and continue to pursue which — which only increases — the PCR [PRC] continues to pursue, which only increases tensions in the region and beyond.

So, I can't comment on the report. But, yes, do we have concerns? We do. And then we're going to — we're going to continue to speak out.

Q But generally, do you feel — does the White House feel like it has the visibility it needs into those programs or capabilities?

MS. JEAN-PIERRE: I can't speak to that from here. Like I said, you know, we're — we just made clear our concerns about the military capabilities that the PRC has.

Q And then just one more on Build Back Better: You guys have been very steadfast about the entire bill will be paid for. Is that a red line? Like, as you guys look through options right now, through the buffet of potential revenue-raisers that are on the table, is deficit spending completely off the table as you look forward?

MS. JEAN-PIERRE: And we've been very clear about that. The red line for the President has been: We are not going to raise taxes for Americans making less than $400,000.

Q Two different things, though.

MS. JEAN-PIERRE: Yep, you're ta- — go ahead.

Q No, no. I'm not trying to be short. But in terms of as you're looking for ways to finance the proposal, deficit financing is off the table; it has to be paid for in full.

MS. JEAN-PIERRE: It has to be paid for. I'm just — because you asked me what his redline was, I just wanted to make sure I said that. But it has to be paid for, and we want to make sure that the wealthiest among us — the billionaires and the big corporations — pay their fair share. That's only right.

Again — and I said this earlier — the firefighters and teachers should not be paying more in taxes than billionaires. And the President has been very clear about that. And so, that's — that's what I was trying to get to.

Q Thanks, Karine.

Q (Cross-talk.)

Q — the proposed corporate tax rates. What if they don't happen? What if they're not hiked?

Q Thanks — thanks, Karine. Earlier today, President Biden spoke on voting rights and said, quote, "And I know the moment we're in. I know the stakes. This is far from over." Has the failure of last night's vote on voting rights at all changed his thinking on Democrats' strategy on this issue, particularly on legislation on the filibuster? Is he reconsidering the general approach to this and how to get something passed?

Appellate Case: 24-1628    Page: 921    Date Filed: 03/26/2024 Entry ID: 5377362

MS. JEAN-PIERRE: No, he's just going to continue to speak out against it. He used today as an opportunity to do that. He's going to continue to work with Congress.

Like I said, we have White House officials working on this every day from the Office of Public Engagement to Domestic Policy Council and others who are making this a priority.

This is a priority for him, and Chuck Schumer is continu- — Senator Schumer is continuing to work on this — voting rights — the John Lewis Voting Rights Bill is going to, hopefully, come to the floor soon. And we're going to let him take that lead. And we're going to continue to make sure that we make it really clear the urgency of getting this done.

Q And then, on communicating on this issue, this also comes on, recently, the collapse of police reform talks, comprehensive immigration reform was struck from the reconciliation package. Does this administration have a message to communities of color, in particular — who, in many cases, clinched the victory for President Biden; who voted for him for these issues? Do you all have a message?

MS. JEAN-PIERRE: So, you know, first off, anyone who knows this President knows he's not going to give up fighting for voting rights. You know, as we said, this was a setback. That's the same for police reform.

So, he wished the negotiations — bipartisan negotiations had led to a bill, but we're not going to give up the fight. And so, we're going to continue to work.

You know, we are — you hear us say it all the time — we are the most diverse Cabinet in history. We have made historic investments in HBCU and reformed housing policies. Equity was at the forefront of the American Rescue Plan and at the forefront of the Build Back Better plan.

Our agenda for the Black community is not about one or two bills. Clearly, those bills are critical and important, and we're going to continue to work very hard towards them. But it is weaved throughout numerous policies, initiatives, executive orders, legislation we work on every day.

The center of everything — at the center of everything that the President does is make sure that there's equity. And so, we're going to continue to do

that and make sure that, again, we don't leave anybody behind.

Q A different angle on police: Police unions across the country right now — we're seeing from Seattle to Los Angeles to Chicago — are protesting vaccine mandates that are being implemented by Democratic governors in these cases. As a proponent of vaccine mandates, what does President Biden believe — how does President Biden believe these situations should be resolved?

MS. JEAN-PIERRE: So, as we know, the vaccine is safe, the vaccine is highly effective, and the vaccine is the best way out of this pandemic.

So, the President strongly believes that all eligible people should be vaccinated. And he certainly believes that frontline workers, like police officers, should get vaccinated.

Vaccines not only protect officers, they protect their families, they protect the people that they — that they serve, and so — or are dedicating to protect. So, that is important and critical. And so, we know that vaccine requirements work. And so, we're going to continue to encourage that work.

Q And then finally, on climate policy: You've mentioned how, with or without Congress, you're able to create progress on this. But, as we've seen with previous administrations, policies can be easily undone should a change in administration take place or should the policies not prove durable enough.

So, are you all looking to not have a repeat of what was — of what took place between the Obama and Trump administrations on environmental policy? Are you all looking for ways to create more durable policy regimes than what —

MS. JEAN-PIERRE: I mean, what we're working on right now is to be in a better place than we have been the last four years. And we're going to do that when it comes to climate change. We're going to make sure we do that domestically and be leaders on the global stage as well, which is what the President has been doing the last several months, from day one, when he signed an executive order getting back into the Paris Accord.

So, we're going to do that work. And we're not going to — you know, we're just going to focus on what is in front of us at the moment.

Go ahead, Karen.

Q Thanks, Karine. The WHO said this week that Europe was the only region where COVID cases increased last week. And officials yesterday said that, in the UK, cases were up 16 percent since last week.

How concerned is the White House about this ahead of the President's trip to Europe next week? And are there any extra COVID precautions that you guys will be taking for him, for senior staff on those two stops?

MS. JEAN-PIERRE: Well, as you know, Karen, we follow the science, we follow the public guidance that we receive, and so that's what we're going to do — we're going to — in order to protect the President and his staff.

And so that's, kind of, going to be, you know, whatever the public health guidance tells us to do and in partnership, clearly, with the countries that we're visiting and making sure that we're following their protocols as well.

And so that's going to be — that's going to be our focus.

Q But no extra concerns that these numbers are increasing in a country he's going to?

MS. JEAN-PIERRE: I have not — again, I have not seen those numbers. I'm just saying that that's what we do. We let science lead, and we listen to the public health experts.

Q Karine, a follow up on — one on inflation and the supply chain. You mentioned at the top that unemployment is down, wages are up, and that's a testament to the progress that President Biden has made on the economy.

But there's no mention of inflation in that. And while wages are up almost 4.5 percent, inflation is up 5 percent. So any bump in pay that people are seeing in their paycheck is getting wiped out when they're going to the store and paying more for everything.

So what do you say to people who are looking at their budget, and they're saying, "This doesn't feel like progress under President Biden; it feels like a pay cut."

MS. JEAN-PIERRE: So, let me first say this — and I said this earlier — the President, he knows how even a small price increase really can squeeze too many families — like that is something that he's aware of.

And so we're working on a wide variety of economic programs to help — right? — which is why the Build Back Better plan to work out — to work on our supply chain issues is incredibly important.

We're using every tool at our disposal to lower prices for working people and bring economic relief. Right? If you think about the human infrastructure, the Build Back Better plan, we're talking about prescription drugs; we're talking about paid leave, sick leave, medical leave; we're talking about community college. We're talking about things that's really going to give that economic relief, that middle-class tax cut for everyday people. So, we're going to continue to do that work.

The American Rescue Plan actually helped the American public a lot. It did. It put checks in people's pockets. I talked about the Child Tax Credit. I talked about the childcare components in it. There was a lot there that gave some relief — that gave some relief to Americans here.

And so, the Build Back Better plan is just an extension of that, if you will. It's to invest that long-term investment to make sure that people feel that relief.

Look, we were in a very different place a year ago, not to say that some people are not still feeling the squeeze — totally understand that. But, you know, a year ago, we were — people were getting sick, they were losing their jobs. You know, women were leaving the workforce.

And so, we've been able to turn things around, start the economy back up — again, 600,000 jobs a month; nearly 5 million jobs in the first eight months. That matters. Now we just have to continue doing the work.

It's going to take time; we're not done.

Q And then, just quickly, on the supply chain. You know, there's a lot to talk about Christmas presents not arriving on time. But the issue is more severe and critical than that. I mean, it's affecting small businesses. Autobody shops can't get parts to fix cars, so they can't make money.

Ninety percent of school nutrition programs say they're worried about continued supply chain issues, according to a School Nutrition Association survey. Some schools are making last-minute grocery store trips just to feed their students.

So, if this is an issue that the White House has been working on and aware of since February, why does it seem like this is a problem that is getting worse, not better?

MS. JEAN-PIERRE: I would say this: When it comes to the supply chain, you know, it's a — there are complexities there when you think about, you know, the — when we learn about the global supply chain as well — right? Those are — so that's one thing that you kind of have to put it in the — in the bigger picture.

So — but it is a complex system that requires private sector collaboration and coordination to improve efficiency and get through the backlog. And that's what we're seeing currently as we're talking about the supply chain. These are just some of the players in the game.

There are port directors, terminal operators, ocean carriers, railroad, truckers, warehouse — warehouses, and retailers, and let's not forget consumers who have a record level of demand as we have made a historic economic recovery.

Because we have — we have — the forecasters — the economic forecasters did not see — did not think we would be where we are today; we have surpassed that. So, we have had some historic economic recovery.

Do we have more work to do? Absolutely. That's why we're trying to get this Build Back Better plan. But the Biden administration, as it comes to the supply chain, continues to serve as an honest broker — I mentioned this before — making sure that we find areas of collaboration to ensure we can move goods movement supply chain toward a 24/7 model.

But again, you know, we want — the President understands. He understands the squeeze that people are feeling — everyday Americans are feeling. That's why he's working every day to make sure that we pass his economic policies.

Q Thanks, Karine.

App.921

MS. JEAN-PIERRE: All right. Thanks, everybody.

3:45 P.M. EDT

NOVEMBER 13, 2021

# FACT SHEET: Renewed U.S. Leadership in Glasgow Raises Ambition to Tackle Climate Crisis

*International Community Put Forward Innovative Efforts to Build a Clean Energy Economy and Create Jobs*

*The United States Will Continue to Push for Action Beyond Glasgow and Keep 1.5 Degrees Celsius Goal Alive*

On day one at the U.N. Framework Convention on Climate Change Conference of the Parties (COP26), President Joe Biden made clear that Glasgow must raise global ambition during this decisive decade of climate action to preserve our shared future. The President reiterated that tackling the climate crisis requires the whole of society – communities, businesses, states, local governments, Tribal nations and nations around the world – to come together to deliver economic prosperity, peace, and security. The President and United States have led by the power of example, taking bold steps to reduce emissions and create economic opportunity at home and abroad, while rallying other countries to step up. On his first day in office, President Biden rejoined the Paris Agreement, restored U.S. leadership on the world stage, and reestablished our position to tackle the climate crisis at home and abroad. He convened the first-ever Leaders Summit on Climate that affirmed the need for unprecedented global cooperation and ambition and convened a U.S.-led Major Economies Forum on Energy and Climate. Congress passed President Biden's Bipartisan Infrastructure Deal, which will expand access to clean drinking water, make unprecedented investments in clean energy infrastructure, and is a critical step towards reaching our goal of a net-zero emissions economy by 2050. When paired with the Build Back Better Framework which the President also looks forward to signing into law, these once-in-a-generation investments will reduce our emissions by well over one gigaton this decade – ensuring we meet President Biden's

Appellate Case: 24-1628    Page: 928    Date Filed: 03/26/2024 Entry ID: 5377362

commitment to reduce U.S. emissions by 50-52% from 2005 levels in 2030 and unlock the full potential of a clean energy economy that combats climate change, advances environmental justice, and creates good-paying, union jobs.

Today, as COP26 ended, over 190 countries concluded negotiations on a text that includes a global commitment to tackle the climate crisis and keep the goal to limit global warming to 1.5 degrees Celsius within reach. The text sets out a path to increase the commitments and actions of countries starting next year, outlines new rules of the road for the Paris Agreement that will provide transparency for countries to turn words into actions, and doubles the amount of support that is going to vulnerable countries to enhance their resilience to the crisis. But it is not enough. More work remains as we leave Glasgow to get where science tells us we need to be and the United States will continue to push for more progress at home and abroad in this decisive decade for climate action.

As the U.S. engaged in intensive diplomacy and partnership with countries around the world, collective action increased global ambition, innovation and action to tackle the climate crisis. At the close of COP26:

- 90% of the world's GDP now has net zero commitments and 154 countries put forward new climate action plans to cut emissions or "NDCs". In April, President Biden announced a new target for the United States to achieve a 50-52 percent reduction from 2005 levels in economy-wide net greenhouse gas pollution in 2030 and convened the Leaders Summit on Climate to secure stronger targets from world leaders.

- The United States and European Union announced that over 100 countries, covering nearly half of global methane emissions and almost 70% of global GDP signed the Global Methane Pledge, including six of the world's top 10 methane emitters. This complements the U.S. Methane Emissions Reduction Action Plan – bold steps announced by President Biden to redouble efforts from across the government to dramatically reduce U.S. methane emissions, cut consumer costs, protect workers and communities, maintain and create thousands of high-quality, union jobs, and promote U.S. innovation and manufacturing of critical new technologies.

Appellate Case: 24-1628    Page: 929    Date Filed: 03/26/2024 Entry ID: 5377362

- Developed countries made progress towards the $100 billion climate finance mobilization goal. In April, President Biden has released the first-ever U.S. International Climate Finance Plan and announced a quadrupling of the U.S. international climate finance pledge at the UN General Assembly in September, including the largest U.S. commitment ever made to reduce climate impacts on those most vulnerable to climate change worldwide.

- The U.S. announced our first-ever contribution to the Adaptation Fund which at COP26 received $356 million in new support from contributing national and regional governments. President Biden announced the launch of the President's Emergency Plan for Adaptation and Resilience (PREPARE), a whole-of-government initiative that will serve as the cornerstone of the U.S. Government response to addressing the increasing impacts of the global climate crises in order to enhance global stability.

- Twenty-five countries, including the United States, and five financial institutions pledged to end new international finance for unabated fossil fuel energy by the end of 2022, except in limited and clearly defined circumstances that are consistent with the 1.5 degrees Celsius warming limit, reorienting tens of billions of dollars of public finance and trillions of private finance towards low carbon priorities.

- Over $20 billion of new public and philanthropic finance has been committed to support developing countries to transition away from coal.

- Countries representing 90% of global forest cover pledged to reduce deforestation to zero by 2030, backed by the biggest ever commitment of public funds for forest conservation and a global roadmap to make 75% of forest commodity supply chains sustainable. Twelve countries signed the Global Forest Finance Pledge: a target of $12 billion to combat deforestation. The United States released the Plan to Conserve Global Forests: Critical Carbon Sinks, a first-of-its-kind, whole-of-government effort to preserve global ecosystems which serve as vital carbon sinks.

- The United States launched the First Movers Coalition with more than 25 Founding Members including some of the largest companies in the world, across a wide range of industries, with hundreds of billions of

dollars in purchasing power. The buyers' clubs assembled by this initiative will create early market demand for innovations across eight "need-to-abate" sectors—steel, trucking, shipping, aviation, aluminum, concrete, chemicals, and direct air capture—which represent more than one-third of the world's carbon emissions today, and is expected to grow in the coming decades.

- China joined the United States, the world's two biggest economies and emitters, in committing in a new Joint Declaration to collaborate on increased ambition to keep 1.5 degrees Celsius warming within reach, and China for the first time committed to develop a plan to address methane emissions and accelerate its coal phase-down.

- The United States, UK, EU, France, and Germany announced a partnership with South Africa to chart a course from coal to clean energy through the creation of new jobs and opportunities for South African coal communities. This partnership will seek to prevent up to 1-1.5 gigatons of emissions over the next 20 years in support of South Africa's accelerated transition to a low emission, climate resilient economy, and aims to mobilize $8.5 billion for the first phase of financing, through various mechanisms including grants, concessional loans, investments, risk sharing, and other instruments for private sector mobilization. This partnership comes as the United States continues to redouble efforts to invest in our nation's energy communities, including delivering the largest investment in American history to tackle legacy pollution while creating thousands of new good paying jobs as part of the President's Bipartisan Infrastructure Deal.

- The United States and the United Arab Emirates launched the Agriculture Innovation Mission for Climate alongside more than 30 countries and more than 45 non-government partners to increase and accelerate agricultural and food systems innovation in support of climate action. The initiative has already garnered an $4 billion in increased investment in climate smart agriculture and food systems innovation, with the United States planning to mobilize $1 billion over five years.

###



ADVANCE VERSION

FCCC/PA/CMA/2021/10/Add.1

United Nations

Framework Convention on
Climate Change

Distr.: General
8 March 2022

Original: English

---

Conference of the Parties serving as the meeting
of the Parties to the Paris Agreement

# Report of the Conference of the Parties serving as the meeting of the Parties to the Paris Agreement on its third session, held in Glasgow from 31 October to 13 November 2021

**Addendum**

**Part two: Action taken by the Conference of the Parties serving as the meeting of the Parties to the Paris Agreement at its third session**

## Contents

### Decisions adopted by the Conference of the Parties serving as the meeting of the Parties to the Paris Agreement

| Decision | | Page |
|---|---|---|
| 1/CMA.3 | Glasgow Climate Pact............................................................................................ | 2 |
| 2/CMA.3 | Guidance on cooperative approaches referred to in Article 6, paragraph 2, of the Paris Agreement ............................................................................................ | 11 |
| 3/CMA.3 | Rules, modalities and procedures for the mechanism established by Article 6, paragraph 4, of the Paris Agreement........................................................................ | 25 |
| 4/CMA.3 | Work programme under the framework for non-market approaches referred to in Article 6, paragraph 8, of the Paris Agreement........................................................ | 41 |

Appellate Case: 24-1628    Page: 932    Date Filed: 03/26/2024 Entry ID: 5377362

## Decision 1/CMA.3

## Glasgow Climate Pact

*The Conference of the Parties serving as the meeting of the Parties to the Paris Agreement*,

*Recalling* Article 2 of the Paris Agreement,

*Also recalling* decisions 3/CMA.1 and 1/CMA.2,

*Noting* decision 1/CP.26,

*Recognizing* the role of multilateralism in addressing climate change and promoting regional and international cooperation in order to strengthen climate action in the context of sustainable development and efforts to eradicate poverty,

*Acknowledging* the devastating impacts of the coronavirus disease 2019 pandemic and the importance of ensuring a sustainable, resilient and inclusive global recovery, showing solidarity particularly with developing country Parties,

*Also acknowledging* that climate change is a common concern of humankind, Parties should, when taking action to address climate change, respect, promote and consider their respective obligations on human rights, the right to health, the rights of indigenous peoples, local communities, migrants, children, persons with disabilities and people in vulnerable situations and the right to development, as well as gender equality, empowerment of women and intergenerational equity,

*Noting* the importance of ensuring the integrity of all ecosystems, including in forests, the ocean and the cryosphere, and the protection of biodiversity, recognized by some cultures as Mother Earth, and *also noting* the importance for some of the concept of 'climate justice', when taking action to address climate change,

*Expressing appreciation* to the Heads of State and Government who participated in the World Leaders Summit in Glasgow and for the increased targets and actions announced and the commitments made to work together and with non-Party stakeholders to accelerate sectoral action by 2030,

*Recognizing* the important role of indigenous peoples, local communities and civil society, including youth and children, in addressing and responding to climate change and *highlighting* the urgent need for multilevel and cooperative action,

## I.   Science and urgency

1.      *Recognizes* the importance of the best available science for effective climate action and policymaking;

2.      *Welcomes* the contribution of Working Group I to the Intergovernmental Panel on Climate Change Sixth Assessment Report[1] and the recent global and regional reports on the state of the climate from the World Meteorological Organization and *invites* the Intergovernmental Panel on Climate Change to present its forthcoming reports to the Subsidiary Body for Scientific and Technological Advice in 2022;

3.      *Expresses alarm and utmost concern* that human activities have caused around 1.1 °C of warming to date, that impacts are already being felt in every region and that carbon budgets consistent with achieving the Paris Agreement temperature goal are now small and being rapidly depleted;

---

[1] Intergovernmental Panel on Climate Change. 2021. *Climate Change 2021: The Physical Science Basis. Contribution of Working Group I to the Sixth Assessment Report of the Intergovernmental Panel on Climate Change*. V Masson-Delmotte, P Zhai, A Pirani, et al. (eds.). Cambridge: Cambridge University Press. Available at https://www.ipcc.ch/report/ar6/wg1/.

App.928

Appellate Case: 24-1628      Page: 933      Date Filed: 03/26/2024 Entry ID: 5377362

4.    *Recalls* Article 2, paragraph 2, of the Paris Agreement, which provides that the Paris Agreement will be implemented to reflect equity and the principle of common but differentiated responsibilities and respective capabilities in the light of different national circumstances;

5.    *Stresses* the urgency of enhancing ambition and action in relation to mitigation, adaptation and finance in this critical decade to address the gaps in the implementation of the goals of the Paris Agreement;

## II.    Adaptation

6.    *Notes with serious concern* the findings from the contribution of Working Group I to the Intergovernmental Panel on Climate Change Sixth Assessment Report, including that climate and weather extremes and their adverse impacts on people and nature will continue to increase with every additional increment of rising temperatures;

7.    *Emphasizes* the urgency of scaling up action and support, including finance, capacity-building and technology transfer, to enhance adaptive capacity, strengthen resilience and reduce vulnerability to climate change in line with the best available science, taking into account the priorities and needs of developing country Parties;

8.    *Welcomes* the adaptation communications and national adaptation plans submitted to date, which enhance the understanding and implementation of adaptation actions and priorities;

9.    *Urges* Parties to further integrate adaptation into local, national and regional planning;

10.    *Requests* Parties that have not yet done so to submit their adaptation communications in accordance with decision 9/CMA.1 ahead of the fourth session of the Conference of the Parties serving as the meeting of the Parties to the Paris Agreement (November 2022) so as to provide timely input to the global stocktake;

11.    *Recognizes* the importance of the global goal on adaptation for the effective implementation of the Paris Agreement and *welcomes* the launch of the comprehensive two-year Glasgow–Sharm el-Sheikh work programme on the global goal on adaptation;

12.    *Notes* that the implementation of the Glasgow–Sharm el-Sheikh work programme will start immediately after the third session of the Conference of the Parties serving as the meeting of the Parties to the Paris Agreement;

13.    *Invites* the Intergovernmental Panel on Climate Change to present to the Conference of the Parties serving as the meeting of the Parties to the Paris Agreement at its fourth session the findings from the contribution of Working Group II to its Sixth Assessment Report, including those relevant to assessing adaptation needs, and *calls upon* the research community to further the understanding of global, regional and local impacts of climate change, response options and adaptation needs;

## III.    Adaptation finance

14.    *Notes with concern* that the current provision of climate finance for adaptation remains insufficient to respond to worsening climate change impacts in developing country Parties;

15.    *Urges* developed country Parties to urgently and significantly scale up their provision of climate finance, technology transfer and capacity-building for adaptation so as to respond to the needs of developing country Parties as part of a global effort, including for the formulation and implementation of national adaptation plans and adaptation communications;

16.    *Recognizes* the importance of the adequacy and predictability of adaptation finance, including the value of the Adaptation Fund in delivering dedicated support for adaptation, and *invites* developed country Parties to consider multi-annual pledges;

Appellate Case: 24-1628    Page: 934    Date Filed: 03/26/2024 Entry ID: 5377362

17.    *Welcomes* the recent pledges made by many developed country Parties to increase their provision of climate finance to support adaptation in developing country Parties in response to their growing needs, including contributions made to the Adaptation Fund and the Least Developed Countries Fund, which represent significant progress compared with previous efforts;

18.    *Urges* developed country Parties to at least double their collective provision of climate finance for adaptation to developing country Parties from 2019 levels by 2025, in the context of achieving a balance between mitigation and adaptation in the provision of scaled-up financial resources, recalling Article 9, paragraph 4, of the Paris Agreement;

19.    *Calls upon* multilateral development banks, other financial institutions and the private sector to enhance finance mobilization in order to deliver the scale of resources needed to achieve climate plans, particularly for adaptation, and *encourages* Parties to continue to explore innovative approaches and instruments for mobilizing finance for adaptation from private sources;

## IV.    Mitigation

20.    *Reaffirms* the Paris Agreement temperature goal of holding the increase in the global average temperature to well below 2 °C above pre-industrial levels and pursuing efforts to limit the temperature increase to 1.5 °C above pre-industrial levels;

21.    *Recognizes* that the impacts of climate change will be much lower at the temperature increase of 1.5 °C compared with 2 °C and *resolves* to pursue efforts to limit the temperature increase to 1.5 °C;

22.    *Recognizes* that limiting global warming to 1.5 °C requires rapid, deep and sustained reductions in global greenhouse gas emissions, including reducing global carbon dioxide emissions by 45 per cent by 2030 relative to the 2010 level and to net zero around mid-century as well as deep reductions in other greenhouse gases;

23.    *Also recognizes* that this requires accelerated action in this critical decade, on the basis of the best available scientific knowledge and equity, reflecting common but differentiated responsibilities and respective capabilities in the light of different national circumstances and in the context of sustainable development and efforts to eradicate poverty;

24.    *Welcomes* efforts by Parties to communicate new or updated nationally determined contributions, long-term low greenhouse gas emission development strategies and other actions that demonstrate progress towards achievement of the Paris Agreement temperature goal;

25.    *Notes with serious concern* the findings of the synthesis report on nationally determined contributions under the Paris Agreement,[2] according to which the aggregate greenhouse gas emission level, taking into account implementation of all submitted nationally determined contributions, is estimated to be 13.7 per cent above the 2010 level in 2030;

26.    *Emphasizes* the urgent need for Parties to increase their efforts to collectively reduce emissions through accelerated action and implementation of domestic mitigation measures in accordance with Article 4, paragraph 2, of the Paris Agreement;

27.    *Decides* to establish a work programme to urgently scale up mitigation ambition and implementation in this critical decade and *requests* the Subsidiary Body for Implementation and the Subsidiary Body for Scientific and Technological Advice to recommend a draft decision on this matter for consideration and adoption by the Conference of the Parties serving as the meeting of the Parties to the Paris Agreement at its fourth session, in a manner that complements the global stocktake;

---

[2]    See document FCCC/PA/CMA/2021/8/Rev.1 and
https://unfccc.int/sites/default/files/resource/message_to_parties_and_observers_on_ndc_numbers.pdf.

App.930
Appellate Case: 24-1628    Page: 935    Date Filed: 03/26/2024 Entry ID: 5377362

28.     *Urges* Parties that have not yet communicated new or updated nationally determined contributions to do so as soon as possible in advance of the fourth session of the Conference of the Parties serving as the meeting of the Parties to the Paris Agreement;

29.     *Recalls* Article 3 and Article 4, paragraphs 3, 4, 5 and 11, of the Paris Agreement and *requests* Parties to revisit and strengthen the 2030 targets in their nationally determined contributions as necessary to align with the Paris Agreement temperature goal by the end of 2022, taking into account different national circumstances;

30.     *Also requests* the secretariat to annually update the synthesis report on nationally determined contributions under the Paris Agreement, referred to in decision 1/CMA.2, paragraph 10, to be made available to the Conference of the Parties serving as the meeting of the Parties to the Paris Agreement at each of its sessions;

31.     *Decides* to convene an annual high-level ministerial round table on pre-2030 ambition, beginning at the fourth session of the Conference of the Parties serving as the meeting of the Parties to the Paris Agreement;

32.     *Urges* Parties that have not yet done so to communicate, by the fourth session of the Conference of the Parties serving as the meeting of the Parties to the Paris Agreement, long-term low greenhouse gas emission development strategies referred to in Article 4, paragraph 19, of the Paris Agreement towards just transitions to net zero emissions by or around mid-century, taking into account different national circumstances;

33.     *Invites* Parties to update the strategies referred to in paragraph 32 above regularly, as appropriate, in line with the best available science;

34.     *Requests* the secretariat to prepare a synthesis report on long-term low greenhouse gas emission development strategies referred to in Article 4, paragraph 19, of the Paris Agreement to be made available to the Conference of the Parties serving as the meeting of the Parties to the Paris Agreement at its fourth session;

35.     *Notes* the importance of aligning nationally determined contributions with long-term low greenhouse gas emission development strategies;

36.     *Calls upon* Parties to accelerate the development, deployment and dissemination of technologies, and the adoption of policies, to transition towards low-emission energy systems, including by rapidly scaling up the deployment of clean power generation and energy efficiency measures, including accelerating efforts towards the phasedown of unabated coal power and phase-out of inefficient fossil fuel subsidies, while providing targeted support to the poorest and most vulnerable in line with national circumstances and recognizing the need for support towards a just transition;

37.     *Invites* Parties to consider further actions to reduce by 2030 non-carbon dioxide greenhouse gas emissions, including methane;

38.     *Emphasizes* the importance of protecting, conserving and restoring nature and ecosystems to achieve the Paris Agreement temperature goal, including through forests and other terrestrial and marine ecosystems acting as sinks and reservoirs of greenhouse gases and by protecting biodiversity, while ensuring social and environmental safeguards;

39.     *Recognizes* that enhanced support for developing country Parties will allow for higher ambition in their actions;

## V.    Finance, technology transfer and capacity-building for mitigation and adaptation

40.     *Urges* developed country Parties to provide enhanced support, including through financial resources, technology transfer and capacity-building, to assist developing country Parties with respect to both mitigation and adaptation, in continuation of their existing obligations under the Convention and the Paris Agreement, and *encourages* other Parties to provide or continue to provide such support voluntarily;

Appellate Case: 24-1628    Page: 936    Date Filed: 03/26/2024 Entry ID: 5377362

41.     *Notes with concern* the growing needs of developing country Parties, in particular due to the increasing impacts of climate change and increased indebtedness as a consequence of the coronavirus disease 2019 pandemic;

42.     *Welcomes* the first report on the determination of needs of developing country Parties related to implementing the Convention and the Paris Agreement[3] and the fourth Biennial Assessment and Overview of Climate Finance Flows[4] by the Standing Committee on Finance;

43.     *Emphasizes* the need to mobilize climate finance from all sources to reach the level needed to achieve the goals of the Paris Agreement, including significantly increasing support for developing country Parties, beyond USD 100 billion per year;

44.     *Notes with deep regret* that the goal of developed country Parties to mobilize jointly USD 100 billion per year by 2020 in the context of meaningful mitigation actions and transparency on implementation has not yet been met and *welcomes* the increased pledges made by many developed country Parties and the *Climate Finance Delivery Plan: Meeting the US$100 Billion Goal*[5] and the collective actions contained therein;

45.     *Calls upon* developed country Parties to provide greater clarity on their pledges referred to in paragraph 44 above through their next biennial communications under Article 9, paragraph 5, of the Paris Agreement;

46.     *Urges* developed country Parties to fully deliver on the USD 100 billion goal urgently and through to 2025 and *emphasizes* the importance of transparency in the implementation of their pledges;

47.     *Urges* the operating entities of the Financial Mechanism, multilateral development banks and other financial institutions to further scale up investments in climate action and *calls for* a continued increase in the scale and effectiveness of climate finance from all sources globally, including grants and other highly concessional forms of finance;

48.     *Re-emphasizes* the need for scaled-up financial resources to take into account the needs of those countries particularly vulnerable to the adverse effects of climate change and in this regard *encourages* relevant multilateral institutions to consider how climate vulnerabilities should be reflected in the provision and mobilization of concessional financial resources and other forms of support, including special drawing rights;

49.     *Welcomes with appreciation* the initiation of deliberations on a new collective quantified goal on climate finance and *looks forward* to the ad hoc work programme established under decision 9/CMA.3 and to engaging constructively in the actions contained therein;

50.     *Underscores* the importance of the deliberations referred to in paragraph 49 above being informed by the need to strengthen the global response to the threat of climate change in the context of sustainable development and efforts to eradicate poverty and to make finance flows consistent with a pathway towards low greenhouse gas emission and climate-resilient development taking into account the needs and priorities of developing countries and building on the work of the Standing Committee on Finance;

51.     *Emphasizes* the challenges faced by many developing country Parties in accessing finance and *encourages* further efforts to enhance access to finance, including by the operating entities of the Financial Mechanism;

52.     *Notes* the specific concerns raised with regard to eligibility and ability to access concessional forms of climate finance and *re-emphasizes* the importance of the provision of scaled-up financial resources, taking into account the needs of developing country Parties that are particularly vulnerable to the adverse effects of climate change;

---

[3]   See document FCCC/CP/2021/10/Add.2–FCCC/PA/CMA/2021/7/Add.2.
[4]   See document FCCC/CP/2021/10/Add.1–FCCC/PA/CMA/2021/7/Add.1.
[5]   See https://ukcop26.org/wp-content/uploads/2021/10/Climate-Finance-Delivery-Plan-1.pdf.

App.932

53.     *Encourages* relevant providers of financial support to consider how vulnerability to the adverse effects of climate change could be reflected in the provision and mobilization of concessional financial resources and how they could simplify and enhance access to finance;

54.     *Underscores* the urgency of enhancing understanding and action to make finance flows consistent with a pathway towards low greenhouse gas emission and climate-resilient development in a transparent and inclusive manner in the context of sustainable development and poverty eradication;

55.     *Calls upon* developed country Parties, multilateral development banks and other financial institutions to accelerate the alignment of their financing activities with the goals of the Paris Agreement;

56.     *Acknowledges* the progress made on capacity-building, particularly in relation to enhancing the coherence and coordination of capacity-building activities towards the implementation of the Convention and the Paris Agreement;

57.     *Recognizes* the need to continue supporting developing country Parties in identifying and addressing both current and emerging capacity-building gaps and needs, and to catalyse climate action and solutions to respond;

58.     *Welcomes* the outcomes of the "COP26 Catalyst for Climate Action" and the strong commitments made by many Parties to take forward action on capacity-building;

59.     *Also welcomes* the joint annual reports of the Technology Executive Committee and the Climate Technology Centre and Network for 2020 and 2021[6] and *invites* the two bodies to strengthen their collaboration;

60.     *Emphasizes* the importance of strengthening cooperative action on technology development and transfer for the implementation of mitigation and adaptation action, including accelerating, encouraging and enabling innovation, and the importance of predictable, sustainable and adequate funding from diverse sources for the Technology Mechanism;

## VI.    Loss and damage[7]

61.     *Acknowledges* that climate change has already caused and will increasingly cause loss and damage and that, as temperatures rise, impacts from climate and weather extremes, as well as slow onset events, will pose an ever-greater social, economic and environmental threat;

62.     *Also acknowledges* the important role of a broad range of stakeholders at the local, national and regional level, including indigenous peoples and local communities, in averting, minimizing and addressing loss and damage associated with the adverse effects of climate change;

63.     *Reiterates* the urgency of scaling up action and support, as appropriate, including finance, technology transfer and capacity-building, for implementing approaches for averting, minimizing and addressing loss and damage associated with the adverse effects of climate change in developing country Parties that are particularly vulnerable to these effects;

64.     *Urges* developed country Parties, the operating entities of the Financial Mechanism, United Nations entities and intergovernmental organizations and other bilateral and multilateral institutions, including non-governmental organizations and private sources, to provide enhanced and additional support for activities addressing loss and damage associated with the adverse effects of climate change;

---

[6]  FCCC/SB/2020/4 and FCCC/SB/2021/5.
[7]  It is noted that discussions related to the governance of the Warsaw International Mechanism for Loss and Damage associated with Climate Change Impacts did not produce an outcome; this is without prejudice to further consideration of this matter.

Appellate Case: 24-1628    Page: 938    Date Filed: 03/26/2024 Entry ID: 5377362

65. *Recognizes* the importance of demand-driven technical assistance in building capacity to implement approaches to avert, minimize and address loss and damage associated with the adverse effects of climate change;

66. *Welcomes* the further operationalization of the Santiago network for averting, minimizing and addressing loss and damage associated with the adverse effects of climate change, including the agreement on its functions and process for further developing its institutional arrangements;

67. *Decides* that the Santiago network will be provided with funds to support technical assistance for the implementation of relevant approaches to avert, minimize and address loss and damage associated with the adverse effects of climate change in developing countries in support of the functions set out in paragraph 9 of decision 19/CMA.3;

68. *Also decides* that the modalities for the management of funds provided for technical assistance under the Santiago network and the terms for their disbursement shall be determined by the process set out in paragraph 10 of decision 19/CMA.3;

69. *Further decides* that the body providing secretarial services to facilitate work under the Santiago network to be determined in accordance with paragraph 10 of decision 19/CMA.3 will administer the funds referred to in paragraph 67 above;

70. *Urges* developed country Parties to provide funds for the operation of the Santiago network and for the provision of technical assistance as set out in paragraph 67 above;

71. *Acknowledges* the importance of coherent action to respond to the scale of needs caused by the adverse impacts of climate change;

72. *Resolves* to strengthen partnerships between developing and developed countries, funds, technical agencies, civil society and communities to enhance understanding of how approaches to averting, minimizing and addressing loss and damage can be improved;

73. *Decides* to establish the Glasgow Dialogue between Parties, relevant organizations and stakeholders to discuss the arrangements for the funding of activities to avert, minimize and address loss and damage associated with the adverse impacts of climate change, to take place each year at the first session of the Subsidiary Body for Implementation until it is concluded at its sixtieth session (June 2024);

74. *Requests* the Subsidiary Body for Implementation to organize the Glasgow Dialogue in cooperation with the Executive Committee of the Warsaw International Mechanism for Loss and Damage associated with Climate Change Impacts;

# VII.  Implementation

75. *Resolves* to move swiftly with the full implementation of the Paris Agreement;

76. *Welcomes* the start of the global stocktake and *expresses its determination* for the process to be comprehensive, inclusive and consistent with Article 14 of the Paris Agreement and decision 19/CMA.1, in the light of paragraph 5 above;

77. *Encourages* the high-level champions to support the effective participation of non-Party stakeholders in the global stocktake;

78. *Recalls* the Katowice climate package and *welcomes with appreciation* the completion of the Paris Agreement work programme, including the adoption of decisions on the following:

(a)     Common time frames for nationally determined contributions referred to in Article 4, paragraph 10, of the Paris Agreement (decision 6/CMA.3);

(b)     Methodological issues relating to the enhanced transparency framework for action and support referred to in Article 13 of the Paris Agreement (decision 5/CMA.3);

(c)     Modalities and procedures for the operation and use of a public registry referred to in Article 4, paragraph 12, of the Paris Agreement (decision 20/CMA.3);

Appellate Case: 24-1628     Page: 939     Date Filed: 03/26/2024 Entry ID: 5377362

App.934

(d)    Modalities and procedures for the operation and use of a public registry referred to in Article 7, paragraph 12, of the Paris Agreement (decision 21/CMA.3);

(e)    Guidance on cooperative approaches referred to in Article 6, paragraph 2, of the Paris Agreement (decision 2/CMA.3);

(f)    Rules, modalities and procedures for the mechanism established by Article 6, paragraph 4, of the Paris Agreement (decision 3/CMA.3);

(g)    Work programme under the framework for non-market approaches referred to in Article 6, paragraph 8, of the Paris Agreement (decision 4/CMA.3);

79.    *Urges* Parties to swiftly make the necessary preparations for ensuring timely reporting under the enhanced transparency framework in line with Article 13 of the Paris Agreement and the timelines set out in decision 18/CMA.1;

80.    *Acknowledges* the call from developing countries for increased support for the implementation of the enhanced transparency framework under Article 13 of the Paris Agreement in a timely, adequate and predictable manner;

81.    *Welcomes* decision 7/CP.26, in which the Global Environment Facility is encouraged, as part of the eighth replenishment process, to duly consider ways to increase the financial resources allocated for climate, and *recognizes* that the Capacity-building Initiative for Transparency, established pursuant to decision 1/CP.21, paragraph 84, will continue to support developing country Parties, upon their request, in building their institutional and technical capacity in relation to the enhanced transparency framework;

82.    *Welcomes* decision 12/CMA.3, in which the Global Environment Facility is requested to continue to facilitate improved access to the Capacity-building Initiative for Transparency by developing country Parties, and *encourages* the Global Environment Facility to work closely with other institutions and initiatives to enhance these efforts, such as the Taskforce on Access to Climate Finance and the "COP26 Catalyst for Climate Action";

83.    *Takes note* of the revised terms of reference of the Consultative Group of Experts, contained in the annex to decision 14/CP.26;

84.    *Recognizes* the need to take into consideration the concerns of Parties with economies most affected by the impacts of response measures, particularly developing country Parties, in line with Article 4, paragraph 15, of the Paris Agreement;

85.    *Also recognizes* the need to ensure just transitions that promote sustainable development and eradication of poverty, and the creation of decent work and quality jobs, including through making financial flows consistent with a pathway towards low greenhouse gas emission and climate-resilient development, including through deployment and transfer of technology, and provision of support to developing country Parties;

# VIII.    Collaboration

86.    *Notes* the urgent need to close the gaps in implementation towards the goals of the Paris Agreement and *invites* the Secretary-General of the United Nations to convene world leaders in 2023 to consider ambition to 2030;

87.    *Recognizes* the importance of international collaboration on innovative climate action, including technological advancement, across all actors of society, sectors and regions, in contributing to progress towards the goals of the Paris Agreement;

88.    *Also recognizes* the important role of non-Party stakeholders, including civil society, indigenous peoples, local communities, youth, children, local and regional governments and other stakeholders, in contributing to progress towards the goals of the Paris Agreement;

89.    *Welcomes* the improvement of the Marrakech Partnership for Global Climate Action[8] for enhancing ambition, the leadership and actions of the high-level champions, and the work

---

[8]    See https://unfccc.int/sites/default/files/resource/Improved%20Marrakech%20Partnership%202021-2025.pdf.

Appellate Case: 24-1628    Page: 940    Date Filed: 03/26/2024 Entry ID: 5377362

of the secretariat on the Non-State Actor Zone for Climate Action platform to support accountability and track progress of voluntary initiatives;

90.     *Also welcomes* the high-level communiqué[9] on the regional climate weeks and *encourages* the continuation of regional climate weeks where Parties and non-Party stakeholders can strengthen their credible and durable response to climate change at the regional level;

91.     *Urges* Parties to swiftly begin implementing the Glasgow work programme on Action for Climate Empowerment, respecting, promoting and considering their respective obligations on human rights as well as gender equality and empowerment of women;

92.     *Also urges* Parties and stakeholders to ensure meaningful youth participation and representation in multilateral, national and local decision-making processes, including under the Paris Agreement;

93.     *Emphasizes* the important role of indigenous peoples' and local communities' culture and knowledge in effective action on climate change and *urges* Parties to actively involve indigenous peoples and local communities in designing and implementing climate action;

94.     *Expresses its recognition* of the important role observer organizations play, including the nine non-governmental organization constituencies, in sharing their knowledge, and their calls to see ambitious action to meet the goals of the Paris Agreement and in collaborating with Parties to that end;

95.     *Encourages* Parties to increase the full, meaningful and equal participation of women in climate action and to ensure gender-responsive implementation and means of implementation, which are vital for raising ambition and achieving climate goals;

96.     *Takes note* of the estimated budgetary implications of the activities to be undertaken by the secretariat referred to in this decision;

97.     *Requests* that the actions of the secretariat called for in this decision be undertaken subject to the availability of financial resources.

*12th plenary meeting*
*13 November 2021*

---

[9]   Available at https://unfccc.int/regional-climate-weeks/rcw-2021-cop26-communique.

App.936

Appellate Case: 24-1628     Page: 941     Date Filed: 03/26/2024 Entry ID: 5377362

## Decision 2/CMA.3

## Guidance on cooperative approaches referred to in Article 6, paragraph 2, of the Paris Agreement

*The Conference of the Parties serving as the meeting of the Parties to the Paris Agreement*,

*Recalling* the Paris Agreement,

*Also recalling* the tenth preambular paragraph of the Paris Agreement, in which Parties take into account the imperatives of a just transition of the workforce and the creation of decent work and quality jobs in accordance with nationally defined development priorities,

*Further recalling* the eleventh preambular paragraph of the Paris Agreement, acknowledging that climate change is a common concern of humankind, Parties should, when taking action to address climate change, respect, promote and consider their respective obligations on human rights, the right to health, the rights of indigenous peoples, local communities, migrants, children, persons with disabilities and people in vulnerable situations and the right to development, as well as gender equality, empowerment of women and intergenerational equity,

*Recalling* Article 2 of the Paris Agreement and decision 1/CP.21,

*Also recalling* Article 4, paragraph 2, of the Paris Agreement,

*Further recalling* Article 6 of the Paris Agreement and decisions 1/CP.21, paragraph 36, 8/CMA.1 and 9/CMA.2,

*Cognizant* of decision 5/CMA.3,

1.    *Adopts* the guidance on cooperative approaches referred to in Article[1] 6, paragraph 2, as contained in the annex;

2.    *Clarifies* that the annex requires information to be reported in the structured summary pursuant to paragraph 77(d) of the annex to decision 18/CMA.1 (Modalities, procedures and guidelines for the transparency framework for action and support referred to in Article 13 of the Paris Agreement), including the information to be reported as per paragraph 77(d)(iii);

3.    *Requests* the Subsidiary Body for Scientific and Technological Advice to undertake the following work, on the basis of the guidance in the annex, to develop recommendations, for consideration and adoption by the Conference of the Parties serving as the meeting of the Parties to the Paris Agreement at its fourth session (November 2022), on:

    (a)    The special circumstances of the least developed countries and small island developing States;

    (b)    Elaboration of further guidance in relation to corresponding adjustments for multi-year and single-year nationally determined contributions, in a manner that ensures the avoidance of double counting, on:

        (i)    Methods for establishing an indicative trajectory, trajectories or budget and for averaging, including with respect to relevant indicators, and for calculating cumulative emissions by sources and removals by sinks;

        (ii)    Methods for demonstrating the representativeness of averaging for corresponding adjustments by quantifying how much the yearly transaction volume differs from the average for the period;

        (c)    Consideration of whether internationally transferred mitigation outcomes could include emission avoidance;

---

[1]    "Article" refers to an Article of the Paris Agreement, unless otherwise specified.

Appellate Case: 24-1628    Page: 942    Date Filed: 03/26/2024 Entry ID: 5377362

4.     *Invites* submissions from Parties on options for the tables and outlines for the information required pursuant to chapter IV of the annex (Reporting) by 31 March 2022 via the submission portal;[2]

5.     *Requests* the secretariat to organize a technical workshop, ensuring broad participation of Parties, to develop options for the tables and outlines for the information required pursuant to chapter IV of the annex (Reporting), including the agreed electronic format referred to in chapter IV.B of the annex (Annual information), on the basis of the information in those chapters, for consideration by the Subsidiary Body for Scientific and Technological Advice at its fifty-sixth session (June 2022);

6.     *Also requests* the Subsidiary Body for Scientific and Technological Advice to develop tables and outlines for the information required pursuant to chapter IV of the annex (Reporting), including the agreed electronic format referred to in chapter IV.B of the annex (Annual information), on the basis of the submissions referred to in paragraph 4 above and taking into account the options developed pursuant to paragraph 5 above, for consideration and adoption by the Conference of the Parties serving as the meeting of the Parties to the Paris Agreement at its fourth session;

7.     *Further requests* the Subsidiary Body for Scientific and Technological Advice to develop recommendations for guidelines for the reviews pursuant to chapter V of the annex (Review), including in relation to the Article 6 technical expert review team, in a manner that minimizes the burden on Parties and the secretariat, for consideration and adoption by the Conference of the Parties serving as the meeting of the Parties to the Paris Agreement at its fourth session, that include:

(a)     Provisions ensuring that the reviews assess consistency of the information provided on the cooperative approach with that in the annex;

(b)     That reviews are desk reviews or centralized reviews (as per the descriptions in paragraphs 152 and 154 of the annex to decision 18/CMA.1) and are conducted at regular intervals each year;

(c)     Development of modalities for reviewing information that is confidential;

(d)     That the reviews ensure consistency between the reporting of all of the Parties participating in a cooperative approach in respect of that cooperative approach;

(e)     That the reviews specify recommended action to be taken when inconsistencies are identified, and provisions on how a Party should respond to those recommendations and the implications of non-responsiveness, if any;

(f)     The composition of the Article 6 technical expert review team, how the team interacts with the participating Party when undertaking the review, the implications of paragraph 176 of the annex to decision 18/CMA.1 in respect of the composition of Article 13 review teams, and the training programme for the Article 6 technical experts;

(g)     Coordination of the Article 6 technical expert review with the technical expert review referred to in chapter VII of the annex to decision 18/CMA.1, including ensuring that Article 6 technical expert reviews in a given review cycle are completed in advance of, and the relevant reports are provided to, the technical expert review referred to in chapter VII of the annex to decision 18/CMA.1;

8.     *Invites* submissions from Parties on options for implementing the infrastructure requirements referred to in chapter VI of the annex (Recording and tracking) by 31 March 2022;

9.     *Requests* the secretariat to organize a technical workshop, ensuring broad participation of Parties, to develop options for implementing the infrastructure requirements, including guidance for registries, the international registry, the Article 6 database and the centralized accounting and reporting platform referred to in chapter VI of the annex (Recording and tracking), for consideration by the Subsidiary Body for Scientific and Technological Advice at its fifty-sixth session;

---

[2]   https://www4.unfccc.int/sites/submissionsstaging/Pages/Home.aspx.

App.938

Appellate Case: 24-1628     Page: 943     Date Filed: 03/26/2024 Entry ID: 5377362

10.     *Also requests* the Subsidiary Body for Scientific and Technological Advice, on the basis of the submissions referred to in paragraph 8 above and taking into account the options developed pursuant to paragraph 9 above, to make recommendations relating to infrastructure, including guidance for registries, the international registry, the Article 6 database and the centralized accounting and reporting platform referred to in chapter VI of the annex (Recording and tracking), for consideration and adoption by the Conference of the Parties serving as the meeting of the Parties to the Paris Agreement at its fourth session;

11.     *Affirms* that the guidance will not infringe on the nationally determined nature of nationally determined contributions;

12.     *Requests* the secretariat to design and, following consultation with Parties, implement a capacity-building programme, including through its regional collaboration centres, to assist Parties, particularly developing country Parties, intending to participate in cooperative approaches, including to:

        (a)     Support the development of institutional arrangements, including in relation to reporting, in order to enable Parties to engage in cooperative approaches;

        (b)     Help Parties ensure that cooperative approaches in which they participate support ambition;

        (c)     Assist the least developed countries and small island developing States in meeting the participation requirements as set out in chapter II of the annex (Participation);

13.     *Also requests* the secretariat to prepare annually a compilation and synthesis of the results of the Article 6 technical expert review, including identification of recurring themes and lessons learned, for consideration by the Conference of the Parties serving as the meeting of the Parties to the Paris Agreement, including in the context of its review of the guidance;

14.     *Decides* to review the guidance at its tenth session (2028) and to complete the review by no later than at its twelfth session (2030) in order to coordinate the timing of the review with that of the review undertaken in accordance with paragraph 18 of decision 4/CMA.1;

15.     *Requests* the Subsidiary Body for Scientific and Technological Advice to commence its work in 2028 to develop recommendations in relation to the review referred to in paragraph 14 above and *decides* that the relevant work of the Subsidiary Body for Scientific and Technological Advice shall include, but is not limited to:

        (a)     Participation responsibilities referred to in chapter II of the annex (Participation);

        (b)     Implementation of chapter III of the annex (Corresponding adjustments), including consideration of other methods in addition to those set out in chapter III.B of the annex (Application of corresponding adjustments) and elaboration of guidance to provide for a single method for corresponding adjustments, to be applied from 2031 onward;

        (c)     Implementation of chapter IV of the annex (Reporting);

        (d)     Implementation of chapter V of the annex (Review);

        (e)     Consideration of any need for safeguards and limits in addition to those already operationalized through the annex;

16.     *Requests* the secretariat to support the forum on the impact of the implementation of response measures (referred to in para. 33 of decision 1/CP.21) in considering ways to address negative social or economic impacts, especially on developing country Parties, resulting from activities under Article 6, paragraph 2, as requested by the forum;

17.     *Invites* the Adaptation Fund to report in its annual reports to the Conference of the Parties serving as the meeting of the Parties to the Paris Agreement on funding related to participation in cooperative approaches pursuant to paragraph 37 of chapter VII of the annex (Ambition in mitigation and adaptation actions);

18.     *Takes note* of the estimated budgetary implications of the activities to be undertaken by the secretariat referred to in this decision;

19.     *Requests* that the actions called for in this decision be undertaken subject to the availability of financial resources;

20.     *Invites* Parties to make contributions to the Trust Fund for Supplementary Activities for operationalizing the guidance and for supporting the workshops referred to in paragraphs 5 and 9 above and the capacity-building programme referred to in paragraph 12 above.

Appellate Case: 24-1628    Page: 945    Date Filed: 03/26/2024 Entry ID: 5377362

## Annex

### Guidance on cooperative approaches referred to in Article 6, paragraph 2, of the Paris Agreement

## I. Internationally transferred mitigation outcomes

1.    Internationally transferred mitigation outcomes (ITMOs) from a cooperative approach are:

(a)    Real, verified and additional;

(b)    Emission reductions and removals, including mitigation co-benefits resulting from adaptation actions and/or economic diversification plans or the means to achieve them, when internationally transferred;

(c)    Measured in metric tonnes of carbon dioxide equivalent (t $CO_2$ eq) in accordance with the methodologies and metrics assessed by the Intergovernmental Panel on Climate Change and adopted by the Conference of the Parties serving as the meeting of the Parties to the Paris Agreement (CMA) or in other non-greenhouse gas (GHG) metrics determined by the participating Parties that are consistent with the nationally determined contributions (NDCs) of the participating Parties;

(d)    From a cooperative approach referred to in Article[1] 6, paragraph 2, (hereinafter referred to as a cooperative approach) that involves the international transfer of mitigation outcomes authorized for use towards an NDC pursuant to Article 6, paragraph 3;

(e)    Generated in respect of or representing mitigation from 2021 onward;

(f)    Mitigation outcomes authorized by a participating Party for use for international mitigation purposes other than achievement of an NDC (hereinafter referred to as international mitigation purposes) or authorized for other purposes as determined by the first transferring participating Party (hereinafter referred to as other purposes) (international mitigation purposes and other purposes are hereinafter referred to together as other international mitigation purposes);

(g)    Article 6, paragraph 4, emission reductions issued under the mechanism established by Article 6, paragraph 4, when they are authorized for use towards achievement of NDCs and/or authorized for use for other international mitigation purposes;

2.    A "first transfer" is:

(a)    For a mitigation outcome authorized by a participating Party for use towards the achievement of an NDC, the first international transfer of the mitigation outcome or;

(b)    For a mitigation outcome authorized by a participating Party for use for other international mitigation purposes, (1) the authorization, (2) the issuance or (3) the use or cancellation of the mitigation outcome, as specified by the participating Party.

## II. Participation

3.    Each Party participating in a cooperative approach that involves the use of ITMOs (hereinafter referred as a participating Party) shall ensure that its participation in the cooperative approach and the authorization, transfer and use of ITMOs is consistent with this guidance and relevant decisions of the CMA and that it applies this guidance to all corresponding adjustments and cooperative approaches in which it participates.

4.    Each participating Party shall ensure that:

(a)    It is a Party to the Paris Agreement;

---

[1] "Article" refers to an Article of the Paris Agreement, unless otherwise specified.

Appellate Case: 24-1628    Page: 946    Date Filed: 03/26/2024 Entry ID: 5377362

(b)    It has prepared, communicated and is maintaining an NDC in accordance with Article 4, paragraph 2;

(c)    It has arrangements in place for authorizing the use of ITMOs towards achievement of NDCs pursuant to Article 6, paragraph 3;

(d)    It has arrangements in place that are consistent with this guidance and relevant decisions of the CMA for tracking ITMOs;

(e)    It has provided the most recent national inventory report required in accordance with decision 18/CMA.1;

(f)    Its participation contributes to the implementation of its NDC and long-term low-emission development strategy, if it has submitted one, and the long-term goals of the Paris Agreement.

5.    In relation to the least developed countries and small island developing States, pursuant to Article 4, paragraph 6, their special circumstances shall be recognized where this guidance relates to NDCs, and other aspects of their special circumstances may be recognized in further decisions of the CMA relating to this guidance.

# III.    Corresponding adjustments

## A.    Internationally transferred mitigation outcome metrics

6.    For all ITMOs (ITMOs in a non-GHG metric determined by the participating Parties and ITMOs measured in t $CO_2$ eq), each participating Party shall apply corresponding adjustments consistently with this guidance and relevant future decisions of the CMA.

## B.    Application of corresponding adjustments

7.    Each participating Party shall apply corresponding adjustments in a manner that ensures transparency, accuracy, completeness, comparability and consistency; that participation in cooperative approaches does not lead to a net increase in emissions across participating Parties within and between NDC implementation periods; and that corresponding adjustments shall be representative and consistent with the participating Party's NDC implementation and achievement. Each participating Party shall apply one of the following methods consistently throughout the NDC period:

(a)    Where the participating Party has a single-year NDC:

(i)    Providing an indicative multi-year emissions trajectory, trajectories or budget for the NDC implementation period that is consistent with implementation and achievement of the NDC, and annually applying corresponding adjustments for the total amount of ITMOs first transferred and used for each year in the NDC implementation period;

(ii)    Calculating the average annual amount of ITMOs first transferred and used over the NDC implementation period, by taking the cumulative amount of ITMOs and dividing by the number of elapsed years in the NDC implementation period and annually applying indicative corresponding adjustments equal to this average amount for each year in the NDC implementation period and applying corresponding adjustments equal to this average amount in the NDC year;

(b)    Where the participating Party has a multi-year NDC, calculating a multi-year emissions trajectory, trajectories or budget for its NDC implementation period that is consistent with the NDC, and annually applying corresponding adjustments for the total amount of ITMOs first transferred and used each year in the NDC implementation period and cumulatively at the end of the NDC implementation period.

8.    Each participating Party with an NDC measured in t $CO_2$ eq shall apply corresponding adjustments pursuant to paragraph 7 above, resulting in an emissions balance as referred to

App.942
Appellate Case: 24-1628    Page: 947    Date Filed: 03/26/2024 Entry ID: 5377362

in paragraph 77(d)(ii) of the annex to decision 18/CMA.1, reported pursuant to paragraph 23 below for each year, by applying corresponding adjustments in the following manner to the anthropogenic emissions by sources and removals by sinks from the sectors and GHGs covered by its NDC consistently with this chapter and relevant future decisions of the CMA:

(a)     Adding the quantity of ITMOs authorized and first transferred, for the calendar year in which the mitigation outcomes occurred, pursuant to paragraph 7 above;

(b)     Subtracting the quantity of ITMOs used pursuant to paragraph 7 above for the calendar year in which the mitigation outcomes are used towards the implementation and achievement of the NDC, ensuring that the mitigation outcomes are used within the same NDC implementation period as when they occurred.

9.     Each participating Party with an NDC containing non-GHG metrics determined by the participating Parties engaging in a cooperative approach involving ITMOs traded in non-GHG metrics shall apply corresponding adjustments pursuant to paragraph 7 above, on the basis of ITMOs recorded in a metric-specific registry account, resulting in an annual adjusted indicator, reported pursuant to paragraph 23 below, by applying corresponding adjustments to the annual level of the relevant non-GHG indicator that was selected pursuant to paragraph 65 of the annex to decision 18/CMA.1 and is being used by the Party to track progress towards the implementation and achievement of its NDC, consistently with this chapter and relevant future decisions of the CMA, in the following manner:

(a)     Subtracting the quantity of ITMOs authorized and first transferred, for the calendar year in which the mitigation outcomes occurred, pursuant to paragraph 7 above;

(b)     Adding the quantity of ITMOs used pursuant to paragraph 7 above for the calendar year in which the mitigation outcomes are used towards the implementation and achievement of the NDC, ensuring that the mitigation outcomes are used within the same NDC implementation period as when they occurred.

10.     Each participating Party with a first or first updated NDC consisting of policies and measures that are not quantified shall apply corresponding adjustments pursuant to paragraph 7 above, resulting in an emissions balance, as referred to in decision 18/CMA.1, reported pursuant to paragraph 23 below for each year, by applying corresponding adjustments in the following manner to the anthropogenic emissions by sources and removals by sinks for those emission or sink categories affected by the implementation of the cooperative approach and its mitigation activities and by those policies and measures that include the implementation of the cooperative approach and its mitigation activities, as applicable, consistently with this chapter and relevant future decisions of the CMA:

(a)     Adding the quantity of ITMOs authorized and first transferred, for the calendar year in which the mitigation outcomes occurred, pursuant to paragraph 7 above;

(b)     Subtracting the quantity of ITMOs used pursuant to paragraph 7 above for the calendar year in which the mitigation outcomes are used towards the implementation and achievement of the NDC, ensuring that the mitigation outcomes are used within the same NDC implementation period as when they occurred.

11.     Where, in this annex, the terms sectors and GHGs apply in relation to an NDC, that provision shall be read as referring to sectors and GHGs, or categories in the case referred to in paragraph 10 above.

12.     Additions and subtractions for an NDC implementation period shall be considered final, prior to the initiation of the review of the first biennial transparency report that contains information on the end year or end of the period of the NDC, by a date to be determined by the CMA.

13.     A participating Party that first transfers ITMOs from emission reductions and removals covered by its NDC shall apply corresponding adjustments consistently with this guidance.

14.     A participating Party that first transfers ITMOs from emission reductions and removals that are not covered by its NDC shall apply corresponding adjustments consistently with this guidance.

Appellate Case: 24-1628    Page: 948    Date Filed: 03/26/2024 Entry ID: 5377362

15. This chapter shall not require a participating Party to update its NDC.

## C. Other international mitigation purposes

16. Where a participating Party authorizes the use of mitigation outcomes for other international mitigation purposes, it shall apply a corresponding adjustment for the first transfer of such mitigation outcomes consistently with this guidance.

## D. Safeguards and limits to the transfer and use of internationally transferred mitigation outcomes

17. Each participating Party shall ensure that the use of cooperative approaches does not lead to a net increase in emissions of participating Parties within and between NDC implementation periods or across participating Parties, and shall ensure transparency, accuracy, consistency, completeness and comparability in tracking progress in implementation and achievement of its NDC by applying safeguards and limits set out in further guidance from the CMA.

# IV. Reporting

## A. Initial report

18. Each participating Party shall submit an Article 6, paragraph 2, initial report (hereinafter referred to as an initial report) no later than authorization of ITMOs from a cooperative approach or where practical (in the view of the participating Party) in conjunction with the next biennial transparency report due pursuant to decision 18/CMA.1 for the period of NDC implementation. The initial report shall contain comprehensive information to:

(a) Demonstrate that the participating Party fulfils the participation responsibilities referred to in chapter II above (Participation);

(b) Provide, where the participating Party has not yet submitted a biennial transparency report, the information referred to in paragraph 64 of the annex to decision 18/CMA.1;

(c) Communicate the ITMO metrics and the method for applying corresponding adjustments as per chapter III.B above for multi- or single-year NDCs that will be applied consistently throughout the period of NDC implementation and where the method is a multi-year emissions trajectory, trajectories or budget, describe the method;

(d) Quantify the Party's mitigation information in its NDC in t $CO_2$ eq, including the sectors, sources, GHGs and time periods covered by the NDC, the reference level of emissions and removals for the relevant year or period, and the target level for its NDC; or, where this is not possible, provide the methodology for the quantification of the NDC in t $CO_2$ eq;

(e) Quantify the NDC, or the portion in the relevant non-GHG indicator, in a non-GHG metric determined by each participating Party, if applicable;

(f) For a first or first updated NDC consisting of policies and measures that is not quantified, quantify the emission level resulting from the policies and measures that are relevant to the implementation of the cooperative approach and its mitigation activities for the categories of anthropogenic emissions by sources and removals by sinks as identified by the host Party pursuant to paragraph 10 above, and the time periods covered by the NDC;

(g) Provide, for each cooperative approach, a copy of the authorization by the participating Party, a description of the approach, its duration, the expected mitigation for each year of its duration, and the participating Parties involved and authorized entities;

Appellate Case: 24-1628     Page: 949     Date Filed: 03/26/2024 Entry ID: 5377362

(h)     Describe how each cooperative approach ensures environmental integrity, including:

(i)     That there is no net increase in global emissions within and between NDC implementation periods;

(ii)     Through robust, transparent governance and the quality of mitigation outcomes, including through conservative reference levels, baselines set in a conservative way and below 'business as usual' emission projections (including by taking into account all existing policies and addressing uncertainties in quantification and potential leakage);

(iii)     By minimizing the risk of non-permanence of mitigation across several NDC periods and how, when reversals of emission reductions or removals occur, the cooperative approach will ensure that these are addressed in full;

(i)     Describe how each cooperative approach will:

(i)     Minimize and, where possible, avoid negative environmental, economic and social impacts;

(ii)     Reflect the eleventh preambular paragraph of the Paris Agreement, acknowledging that climate change is a common concern of humankind, Parties should, when taking action to address climate change, respect, promote and consider their respective obligations on human rights, the right to health, the rights of indigenous peoples, local communities, migrants, children, persons with disabilities and people in vulnerable situations and the right to development, as well as gender equality, empowerment of women and intergenerational equity;

(iii)     Be consistent with the sustainable development objectives of the Party, noting national prerogatives;

(iv)     Apply any safeguards and limits set out in further guidance from the CMA pursuant to chapter III.D above (Safeguards and limits to the transfer and use of internationally transferred mitigation outcomes);

(v)     Contribute resources for adaptation pursuant to chapter VII below (Ambition in mitigation and adaptation actions), if applicable;

(vi)     Deliver overall mitigation in global emissions pursuant to chapter VII below (Ambition in mitigation and adaptation actions), if applicable.

19.     For each further cooperative approach, each participating Party shall submit the information referred to in paragraph 18(g–i) above in an updated initial report and for inclusion in the centralized accounting and reporting platform referred to in chapter VI.C below (Centralized accounting and reporting platform) and include it in the next biennial transparency report due.

## B.     Annual information

20.     Each participating Party shall, on an annual basis by no later than 15 April of the following year and in an agreed electronic format, submit for recording in the Article 6 database referred to in chapter VI.B below (Article 6 database):

(a)     Annual information on authorization of ITMOs for use towards achievement of NDCs, authorization of ITMOs for use towards other international mitigation purposes, first transfer, transfer, acquisition, holdings, cancellation, voluntary cancellation, voluntary cancellation of mitigation outcomes or ITMOs towards overall mitigation in global emissions, and use towards NDCs;

(b)     In respect of the above, the cooperative approach, the other international mitigation purpose authorized by the Party, the first transferring participating Party, the using participating Party or authorized entity or entities, as soon as known, the year in which the mitigation occurred, the sector(s) and activity type(s), and the unique identifiers.

Appellate Case: 24-1628     Page: 950     Date Filed: 03/26/2024 Entry ID: 5377362

## C. Regular information

21. Each participating Party shall include, as an annex to its biennial transparency reports that are submitted in accordance with paragraph 10(b) of the annex to decision 18/CMA.1 and no later than 31 December of the relevant year, the following information in relation to its participation in cooperative approaches:

(a) How it is fulfilling the participation responsibilities referred to in chapter II above (Participation);

(b) Updates to the information provided in its initial report as per chapter IV.A above (Initial report), and any previous biennial transparency reports for any information that is not included in the biennial transparency report pursuant to paragraph 64 of the annex to decision 18/CMA.1;

(c) Authorizations and information on its authorization(s) of use of ITMOs towards achievement of NDCs and authorization for use for other international mitigation purposes, including any changes to earlier authorizations, pursuant to Article 6, paragraph 3;

(d) How corresponding adjustments undertaken in the latest reporting period, pursuant to chapter III above (Corresponding adjustments), ensure that double counting is avoided in accordance with paragraph 36 of decision 1/CP.21 and are representative of progress towards implementation and achievement of its NDC, and how those corresponding adjustments ensure that participation in cooperative approaches does not lead to a net increase in emissions across participating Parties within and between NDC implementation periods;

(e) How it has ensured that ITMOs that have been used towards achievement of its NDC or mitigation outcome(s) authorized for use and that have been used for other international mitigation purposes will not be further transferred, further cancelled or otherwise used.

22. Each participating Party shall also include, as an annex to its biennial transparency reports that are submitted in accordance with paragraph 10(b) of the annex to decision 18/CMA.1 and no later than 31 December of the relevant year, the following information on how each cooperative approach in which it participates:

(a) Contributes to the mitigation of GHGs and the implementation of its NDC;

(b) Ensures environmental integrity, including:

(i) That there is no net increase in global emissions within and between NDC implementation periods;

(ii) Through robust, transparent governance and the quality of mitigation outcomes, including through conservative reference levels, baselines set in a conservative way and below 'business as usual' emission projections (including by taking into account all existing policies and addressing uncertainties in quantification and potential leakage);

(iii) By minimizing the risk of non-permanence of mitigation across several NDC periods and when reversals of emission removals occur, ensuring that these are addressed in full;

(c) Where a mitigation outcome is measured and transferred in t $CO_2$ eq, provides for the measurement of mitigation outcomes in accordance with the methodologies and metrics assessed by the Intergovernmental Panel on Climate Change and adopted by the CMA;

(d) Where a mitigation outcome is measured and first transferred in a non-GHG metric determined by the participating Parties, ensures that the method for converting the non-GHG metric into t $CO_2$ eq is appropriate for the specific non-GHG metric and the mitigation scenario in which it is applied, including how the conversion method:

(i) Represents the emission reductions or removals that occur within the geographical boundaries and time frame in which the non-GHG mitigation outcome was generated;

App.946

Appellate Case: 24-1628    Page: 951    Date Filed: 03/26/2024 Entry ID: 5377362

(ii)    Is appropriate for the specific non-$CO_2$ eq metric, including a demonstration of how the selection of the conversion method and conversion factor(s) applied take into consideration the specific scenario in which the mitigation action occurs;

(iii)   Is transparent, including a description of the method, the source of the underlying data, how the data are used, and how the method is applied in a conservative manner that addresses uncertainty and ensures environmental integrity;

(e)    Provides for, as applicable, the measurement of mitigation co-benefits resulting from adaptation actions and/or economic diversification plans;

(f)    Minimizes and, where possible, avoids negative, environmental, economic and social impacts;

(g)    Reflects the eleventh preambular paragraph of the Paris Agreement, acknowledging that climate change is a common concern of humankind, Parties should, when taking action to address climate change, respect, promote and consider their respective obligations on human rights, the right to health, the rights of indigenous peoples, local communities, migrants, children, persons with disabilities and people in vulnerable situations and the right to development, as well as gender equality, empowerment of women and intergenerational equity;

(h)    Is consistent with and contributes to the sustainable development objectives of the Party, noting national prerogatives;

(i)    Applies any safeguards and limits set out in further guidance from the CMA pursuant to chapter III.D above (Safeguards and limits to the transfer and use of internationally transferred mitigation outcomes);

(j)    Contributes resources for adaptation pursuant to chapter VII below (Ambition in mitigation and adaptation actions), if applicable;

(k)    Delivers overall mitigation in global emissions pursuant to chapter VII below (Ambition in mitigation and adaptation actions), if applicable.

23.    Each participating Party shall submit the following annual information (reported biennially) in a manner consistent with chapter III.B above (Application of corresponding adjustments) and any updates to information submitted for previous years in the NDC implementation period to the Article 6 database pursuant to chapter VI.B below (Article 6 database) and shall include it in the structured summary (required pursuant to paragraph 77(d) of the annex to decision 18/CMA.1 as part of the biennial transparency report):

(a)    Annual anthropogenic emissions by sources and removals by sinks covered by its NDC or, where applicable, for the emission or sink categories as identified by the host Party pursuant to paragraph 10 above (as part of the information referred to in para. 77(d)(i) of the annex to decision 18/CMA.1);

(b)    Annual anthropogenic emissions by sources and removals by sinks covered by its NDC or, where applicable, from the portion of its NDC in accordance with paragraph 10 above;

(c)    Annual quantity of ITMOs first transferred;

(d)    Annual quantity of mitigation outcomes authorized for use for other international mitigation purposes and entities authorized to use such mitigation outcomes, as appropriate;

(e)    Annual quantity of ITMOs used towards achievement of its NDC;

(f)    Net annual quantity of ITMOs resulting from paragraph 23(c–e) above;

(g)    Total quantitative corresponding adjustments used to calculate the emissions balance and/or annual adjusted indicator referred to in paragraph 23(k) below, in accordance with the Party's method for applying corresponding adjustments consistent with chapter III.B above (Application of corresponding adjustments);

(h)    The cumulative information in respect of the annual information referred to in paragraph 23(f) above, as applicable;

Appellate Case: 24-1628    Page: 952    Date Filed: 03/26/2024 Entry ID: 5377362

(i)    The annual level of the relevant non-GHG indicator that is being used by the Party to track progress towards the implementation and achievement of its NDC and was selected pursuant to paragraph 65 of the annex to decision 18/CMA.1;

(j)    For the information referred to in paragraph 23(c–e) above, the amounts per cooperative approach, sector, transferring Party, using Party and vintage of the ITMO for each cooperative approach (in the annex referred to in para. 22 above);

(k)    For metrics in:

(i)    Tonnes of $CO_2$ eq or non-GHGs, an annual emissions balance consistent with chapter III.B above (Application of corresponding adjustments) (as part of the information referred to in para. 77(d)(ii) of the annex to decision 18/CMA.1);

(ii)    Non-GHGs, for each non-GHG metric determined by participating Parties, annual adjustments resulting in an annual adjusted indicator, consistently with paragraph 9 in chapter III.B above (Application of corresponding adjustments) and future decisions of the CMA (as part of the information referred to in para. 77(d)(iii) of the annex to decision 18/CMA.1);

(l)    In biennial transparency reports that contain information on the end year of the NDC implementation period, in its assessment of whether it has achieved the target(s) for its NDC pursuant to paragraphs 70 and 77 of decision 18/CMA.1, the application of the necessary corresponding adjustments consistently with chapter III above (Corresponding adjustments) and consistently with future decisions of the CMA.

24.    Information submitted by a Party pursuant to this chapter that is not identified by that Party as confidential (non-confidential information) shall be made public on the centralized accounting and reporting platform.

## V.    Review

25.    An Article 6 technical expert review consists of a desk or centralized review of the consistency of the information submitted by the Party under chapter IV.A and C above (Reporting) with this guidance. An Article 6 technical expert review shall be undertaken in a manner that minimizes burden on Parties and the secretariat.

26.    An Article 6 technical expert review team shall review the information submitted pursuant to chapter IV.A and C above (Reporting) in accordance with guidelines adopted by the CMA. To the extent possible, information submitted by all the participating Parties on a cooperative approach shall be reviewed as part of the review.

27.    The Article 6 technical expert review team shall prepare a report on its review, pursuant to paragraph 26 above, that shall, if applicable, include recommendations to the participating Party on how to improve consistency with this guidance and relevant decisions of the CMA, including on how to address inconsistencies in quantified information that is reported under chapter IV.B–C above (Reporting) and/or identified by the secretariat as part of the consistency check.

28.    The Article 6 technical expert review team shall forward its reports for consideration in the technical expert review referred to in chapter VII of the annex to decision 18/CMA.1 in accordance with the guidelines referred to in paragraph 26 above, and the reports shall be made publicly available on the centralized accounting and recording platform.

## VI.    Recording and tracking

### A.    Tracking

29.    Each participating Party shall have, or have access to, a registry for the purpose of tracking and shall ensure that such registry records, including through unique identifiers, as applicable, authorization, first transfer, transfer, acquisition, use towards NDCs,

Appellate Case: 24-1628    Page: 953    Date Filed: 03/26/2024 Entry ID: 5377362

authorization for use towards other international mitigation purposes, and voluntary cancellation (including for overall mitigation in global emissions, if applicable), and shall have accounts as necessary.

30.     The secretariat shall implement an international registry for participating Parties that do not have or do not have access to a registry. The international registry shall be able to perform the functions set out in paragraph 29 above. Any Party may request an account in the international registry.

31.     The international registry shall be part of the centralized accounting and reporting platform referred to in chapter VI.C below (Centralized accounting and reporting platform).

## B.    Article 6 database

32.     For transparency in relation to cooperative approaches, to record and compile the information submitted by participating Parties pursuant to chapter IV.B–C above (Reporting) and to support the review referred to in chapter V above (Review), the secretariat shall implement an Article 6 database as part of and integrated with the centralized accounting and reporting platform referred to in chapter VI.C below (Centralized accounting and reporting platform). The Article 6 database shall enable the following:

(a)     Recording of corresponding adjustments and emissions balances and information on ITMOs first transferred, transferred, acquired, held, cancelled, cancelled for overall mitigation in global emissions, if any, and/or used by participating Parties, through identification of ITMOs by unique identifiers that identify, at the minimum, the participating Party, vintage of underlying mitigation, activity type and sector(s);

(b)     Identifying inconsistencies to be notified to the participating Party or participating Parties, as applicable.

33.     The secretariat shall:

(a)     Check the consistency of information reported by a participating Party pursuant to chapter IV above (Reporting) for recording in the Article 6 database with the requirements of this guidance and across the participating Parties in a cooperative approach (consistency check);

(b)     Notify the participating Party(ies) of any inconsistencies identified in the information reported by the Party, including compared with information reported by another participating Party;

(c)     Provide information relevant to the participating Party's cooperative approach(es) (and other participating Parties, as relevant), including the consistency check to the Article 6 technical expert review team in accordance with the guidelines referred to in paragraph 26 above;

(d)     Make non-confidential information in the consistency check publicly available on the centralized accounting and reporting platform.

34.     Any amendments to the information recorded in the Article 6 database, including in response to any inconsistencies raised by the secretariat through the consistency check or as a result of recommendations arising from the Article 6 technical expert review pursuant to chapter V above (Review), shall be submitted by the participating Party to be recorded in the Article 6 database.

## C.    Centralized accounting and reporting platform

35.     For transparency in relation to cooperative approaches and to support the review referred to in chapter V above (Review), the secretariat shall establish and maintain a centralized accounting and reporting platform for publishing information submitted by participating Parties pursuant to chapter IV above (Reporting).

Appellate Case: 24-1628    Page: 954    Date Filed: 03/26/2024 Entry ID: 5377362

36.     The secretariat shall:

(a)     Maintain public information on cooperative approaches and ITMOs by extracting relevant non-confidential information from the information submitted by participating Parties pursuant to chapter IV above (Reporting);

(b)     Maintain links to the publicly available information submitted by participating Parties on the cooperative approaches in which they participate;

(c)     Provide an annual report to the CMA on the activities in relation to this chapter, including information on recorded ITMOs, corresponding adjustments and emission balances.

## VII.    Ambition in mitigation and adaptation actions

37.     Participating Parties and stakeholders using cooperative approaches are strongly encouraged to commit to contribute resources for adaptation, in particular through contributions to the Adaptation Fund, and to take into account the delivery of resources under Article 6, paragraph 4, to assist developing country Parties that are particularly vulnerable to the adverse effects of climate change to meet the costs of adaptation.

38.     Each participating Party shall report as part of their reporting in accordance with chapter IV.C above (Regular information) on any contributions made pursuant to paragraph 37 above.

39.     Participating Parties and stakeholders are strongly encouraged to cancel ITMOs that are not counted towards any Party's NDC or for other international mitigation purposes, to deliver overall mitigation in global emissions, and to take into account the delivery of overall mitigation in global emissions under the mechanism established by Article 6, paragraph 4.

40.     Each participating Party shall report as part of their reporting in accordance with chapter IV.C above (Regular information) on any delivery of overall mitigation in global emissions related to its participation in cooperative approaches.

*12th plenary meeting*
*13 November 2021*

App.950

## Decision 3/CMA.3

## Rules, modalities and procedures for the mechanism established by Article 6, paragraph 4, of the Paris Agreement

*The Conference of the Parties serving as the meeting of the Parties to the Paris Agreement*,

*Recalling* the Paris Agreement,

*Also recalling* the tenth preambular paragraph of the Paris Agreement, in which Parties take into account the imperatives of a just transition of the workforce and the creation of decent work and quality jobs in accordance with nationally defined development priorities,

*Further recalling* the eleventh preambular paragraph of the Paris Agreement, acknowledging that climate change is a common concern of humankind, Parties should, when taking action to address climate change, respect, promote and consider their respective obligations on human rights, the right to health, the rights of indigenous peoples, local communities, migrants, children, persons with disabilities and people in vulnerable situations and the right to development, as well as gender equality, empowerment of women and intergenerational equity,

*Recalling* the mechanism established by Article 6, paragraph 4, of the Paris Agreement and the aims referred to therein,

*Also recalling* decisions 1/CP.21, 8/CMA.1, 13/CMA.1 and 9/CMA.2,

*Cognizant* of decision 2/CMP.16,

1.   *Adopts* the rules, modalities and procedures for the mechanism established by Article[1] 6, paragraph 4, as contained in the annex;

2.   *Designates* the body that will supervise the mechanism with its membership and rules of procedure as set out in the annex and names it the Supervisory Body;

3.   *Invites* the nomination of members and alternate members for the Supervisory Body pursuant to paragraph 9 of the annex;

4.   *Decides* that at least two meetings of the Supervisory Body shall be held in 2022;

5.   *Requests* the Supervisory Body to:

(a)   Develop provisions for the development and approval of methodologies, validation, registration, monitoring, verification and certification, issuance, renewal, first transfer from the mechanism registry, voluntary cancellation and other processes pursuant to chapters V.B–L and VIII of the annex (Delivering overall mitigation in global emissions);

(b)   In the context of developing and approving new methodologies for the mechanism:

(i)   Review the baseline and monitoring methodologies in use for the clean development mechanism under Article 12 of the Kyoto Protocol with a view to applying them with revisions, as appropriate, pursuant to chapter V.B of the annex (Methodologies) for the activities under the mechanism (hereinafter referred to as Article 6, paragraph 4, activities);

(ii)   Consider the baseline and monitoring methodologies used in other market-based mechanisms as a complementary input to the development of baselines and monitoring methodologies pursuant to chapter V.B of the annex (Methodologies);

(c)   Review the sustainable development tool in use for the clean development mechanism and other tools and safeguard systems in use in existing market-based

---

[1]   "Article" refers to an Article of the Paris Agreement, unless otherwise specified.

Appellate Case: 24-1628      Page: 956      Date Filed: 03/26/2024 Entry ID: 5377362

mechanisms to promote sustainable development with a view to developing similar tools for the mechanism by the end of 2023;

(d)     Review the accreditation standards and procedures of the clean development mechanism with a view to applying them with revisions, as appropriate, for the mechanism by the end of 2023;

(e)     Expeditiously accredit operational entities as designated operational entities;

(f)     Ensure the implementation of the requirements referred to in paragraph 29 of the annex in relation to the least developed countries and small island developing States;

(g)     Consider ways to encourage participation by small and micro businesses in the mechanism, in particular in the least developed countries and small island developing States;

(h)     Consider opportunities to engage with the Local Communities and Indigenous Peoples Platform and its Facilitative Working Group;

(i)     Consider the gender action plan and the incorporation of relevant actions into the work of the Supervisory Body;

6.     *Also requests* the Supervisory Body to elaborate and further develop, on the basis of the rules, modalities and procedures contained in the annex, recommendations, for consideration and adoption by the Conference of the Parties serving as the meeting of the Parties to the Paris Agreement at its fourth session (November 2022), on:

(a)     Its rules of procedure (including in relation to transparency of meetings), and to operate and hold meetings on the basis of the annex pending any further decisions by the Conference of the Parties serving as the meeting of the Parties to the Paris Agreement on the rules of procedure;

(b)     Appropriate levels for the share of proceeds for administrative expenses and its operation, including in order to enable a periodic contribution to the share of proceeds for adaptation for the Adaptation Fund;

(c)     Activities involving removals, including appropriate monitoring, reporting, accounting for removals and crediting periods, addressing reversals, avoidance of leakage, and avoidance of other negative environmental and social impacts, in addition to the activities referred to in chapter V of the annex (Article 6, paragraph 4, activity cycle);

(d)     The application of the requirements referred to in chapter V.B of the annex (Methodologies);

7.     *Further requests* the Subsidiary Body for Scientific and Technological Advice to develop, on the basis of the rules, modalities and procedures contained in the annex, recommendations, for consideration and adoption by the Conference of the Parties serving as the meeting of the Parties to the Paris Agreement at its fourth session, on:

(a)     Further responsibilities of the Supervisory Body and of Parties that host Article 6, paragraph 4, activities (hereinafter referred to as host Parties) in order for such host Parties to elaborate and apply national arrangements for the mechanism under the approval and supervision of the Supervisory Body;

(b)     Processes for implementation of the transition of activities from the clean development mechanism to Article 6, paragraph 4, in accordance with chapter XI.A of the annex (Transition of clean development mechanism activities);

(c)     Processes for implementation of chapter XI.B of the annex (Use of certified emission reductions towards first or first updated nationally determined contributions);

(d)     Reporting by host Parties on their Article 6, paragraph 4, activities and the Article 6, paragraph 4, emission reductions issued for the activities, while avoiding unnecessary duplication of reporting information that is already publicly available;

(e)     The operation of the mechanism registry referred to in chapter VI of the annex (Mechanism registry);

Appellate Case: 24-1628     Page: 957     Date Filed: 03/26/2024 Entry ID: 5377362

App.952

(f) The processes necessary for implementation of the share of proceeds to cover administrative expenses and the share of proceeds to assist developing country Parties that are particularly vulnerable to the adverse effects of climate change to meet the costs of adaptation in accordance with chapter VII of the annex (Levy of share of proceeds for adaptation and administrative expenses);

(g) The processes necessary for the delivery of overall mitigation in global emissions in accordance with chapter VIII of the annex (Delivering overall mitigation in global emissions);

(h) The consideration of whether activities could include emission avoidance and conservation enhancement activities;

8. *Requests* the Supervisory Body to evaluate the implementation of the share of proceeds set out in chapter VII of the annex (Levy of share of proceeds for adaptation and administrative expenses) no later than in 2026 and every five years thereafter and, following such review, to make recommendations on possible improvements in order to optimize the resources available to the Adaptation Fund for consideration and adoption by the Conference of the Parties serving as the meeting of the Parties to the Paris Agreement;

9. *Also requests* the Supervisory Body to evaluate the implementation and delivery of overall mitigation in global emissions set out in chapter VIII of the annex (Delivering overall mitigation in global emissions), including the percentage applied, no later than in 2026 and every five years thereafter and, following such review, to make recommendations on possible improvements in order to optimize the delivery of overall mitigation in global emissions for consideration and adoption by the Conference of the Parties serving as the meeting of the Parties to the Paris Agreement;

10. *Decides* that the Conference of the Parties serving as the meeting of the Parties to the Paris Agreement shall review the rules, modalities and procedures for the mechanism at its tenth session (2028) with a view to completing the review by no later than at its twelfth session (2030);

11. *Requests* the Subsidiary Body for Scientific and Technological Advice to develop recommendations with respect to the review referred to in paragraph 10 above taking into account:

(a) Any recommendations of the Supervisory Body pursuant to paragraphs 8–9 above;

(b) Consideration of any need for further safeguards;

12. *Also requests* the Supervisory Body to support the forum on the impact of the implementation of response measures (referred to in para. 33 of decision 1/CP.21) in considering ways to address any negative social or economic impacts, especially those on developing country Parties, resulting from Article 6, paragraph 4, activities, as requested by the forum;

13. *Notes with appreciation* decision 2/CMP.16, pursuant to which the Conference of the Parties serving as the meeting of the Parties to the Kyoto Protocol allocated funds from the Trust Fund for the Clean Development Mechanism under Article 12 of the Kyoto Protocol to the Trust Fund for Supplementary Activities for the purpose of expediting implementation of the Article 6, paragraph 4, mechanism;

14. *Requests* the secretariat, including through its regional collaboration centres and in consultation with the Supervisory Body, to design and implement, in consultation with Parties, a capacity-building programme to assist Parties wishing to voluntarily participate in the mechanism to, inter alia:

(a) Establish the necessary institutional arrangements to implement the requirements contained in the annex;

(b) Develop the technical capacity to design and set baselines for application in host Parties;

Appellate Case: 24-1628   Page: 958   Date Filed: 03/26/2024 Entry ID: 5377362

15.     *Takes note* of the estimated budgetary implications of the activities to be undertaken by the secretariat referred to in this decision;

16.     *Requests* that the actions called for in this decision be undertaken subject to the availability of financial resources;

17.     *Invites* Parties to make contributions to the Trust Fund for Supplementary Activities for the purpose of operationalizing the mechanism, which shall be reimbursed upon request.

Appellate Case: 24-1628     Page: 959     Date Filed: 03/26/2024 Entry ID: 5377362

**Annex**

### Rules, modalities and procedures for the mechanism established by Article 6, paragraph 4, of the Paris Agreement

## I. Definitions

1. For the purpose of these rules, modalities and procedures:

(a) An "**Article 6, paragraph 4, activity**" is an activity that meets the requirements of Article[1] 6, paragraphs 4–6, these rules, modalities and procedures, and any further relevant decisions of the Conference of the Parties serving as the meeting of the Parties to the Paris Agreement (CMA);

(b) An "**Article 6, paragraph 4, emission reduction**" (A6.4ER) is issued for mitigation achieved pursuant to Article 6, paragraphs 4–6, these rules, modalities and procedures, and any further relevant decisions of the CMA. It is measured in carbon dioxide equivalent and is equal to 1 tonne of carbon dioxide equivalent calculated in accordance with the methodologies and metrics assessed by the Intergovernmental Panel on Climate Change and adopted by the CMA or in other metrics adopted by the CMA pursuant to these rules, modalities and procedures;

(c) "**International mitigation purposes**", "**other purposes**" and "**other international mitigation purposes**" have the same meanings as provided in paragraph 1(f) of the annex to decision 2/CMA.3.

## II. Role of the Conference of the Parties serving as the meeting of the Parties to the Paris Agreement

2. The CMA shall provide guidance to the Supervisory Body by taking decisions on, inter alia:

(a) The rules of procedure of the Supervisory Body;

(b) Recommendations made by the Supervisory Body relating to these rules, modalities and procedures;

(c) Matters relating to the operation of the mechanism established by Article 6, paragraph 4, as appropriate.

## III. Supervisory Body

3. The Supervisory Body shall supervise the mechanism under the authority and guidance of the CMA and be fully accountable to the CMA.

### A. Rules of procedure

4. The Supervisory Body shall comprise 12 members from Parties to the Paris Agreement, ensuring broad and equitable geographical representation and striving to ensure gender-balanced representation, as follows:

(a) Two members from each of the five United Nations regional groups;

(b) One member from the least developed countries;

(c) One member from small island developing States.

---

[1] "Article" refers to an Article of the Paris Agreement, unless otherwise specified.

Appellate Case: 24-1628   Page: 960   Date Filed: 03/26/2024   Entry ID: 5377362

5.     The CMA shall elect members and an alternate for each member of the Supervisory Body on the basis of nominations by the respective groups and constituencies.

6.     Members and alternate members shall serve in their individual expert capacity.

7.     Members and alternate members shall possess relevant scientific, technical, socioeconomic or legal expertise.

8.     Members and alternate members shall serve for a term of two years.

9.     Notwithstanding paragraph 8 above, in the first election of members and alternate members, the CMA shall elect half of the members and their alternate members for a term of three years and the other half for a term of two years. At the expiry of the term of these members and their alternate members and thereafter, the CMA shall elect replacement members and their alternate members for a term of two years. The members and their alternate members shall remain in office until their successors have been elected.

10.     The term of service of a member shall start at the first meeting of the Supervisory Body in the calendar year following their election and shall end immediately before the first meeting of the Supervisory Body in the calendar year in which the term ends.

11.     The maximum number of terms of any individual shall be two terms, whether consecutive or not and including any period as an alternate member.

12.     If a member or alternate member resigns or is otherwise unable to continue as a member or alternate member, the Supervisory Body may decide, bearing in mind the proximity to the next session of the CMA, to appoint a replacement member or replacement alternate member from the same constituency to serve the remainder of the term on the basis of a nomination from the relevant constituency, in which case the appointment shall count as one term.

13.     Members and alternate members may be suspended, or their membership terminated by the CMA, if:

    (a)     They fail to disclose a conflict of interest;

    (b)     They fail to attend two consecutive meetings without proper justification.

14.     Participation costs for members and alternate members will be covered by the share of proceeds for administrative expenses.

15.     Members and alternate members shall avoid actual, potential and perceived conflicts of interest and shall:

    (a)     Declare any actual, potential or perceived conflict of interest at the start of a meeting;

    (b)     Recuse themselves from participating in any work of the Supervisory Body, including decision-making, in relation to which they have an actual, potential or perceived conflict of interest;

    (c)     Refrain from behaviour that may be incompatible with the requirements of independence and impartiality.

16.     Members and alternate members shall ensure confidentiality, in line with relevant best practice and decisions of the CMA and the Supervisory Body.

17.     At least three fourths of the members, including alternate members only when they are acting as members, shall constitute a quorum for meetings of the Supervisory Body.

18.     Each year, the Supervisory Body shall elect a Chair and a Vice-Chair from among its members. The Chair and the Vice-Chair shall remain in office until their successors have been elected.

19.     Meetings of the Supervisory Body shall be open to the public, including via electronic means, and a recording shall be made available via electronic means unless closed for reasons of confidentiality.

App.956

Appellate Case: 24-1628     Page: 961     Date Filed: 03/26/2024 Entry ID: 5377362

20.     Documents for meetings of the Supervisory Body shall be made publicly available, unless they are confidential.

21.     The Supervisory Body shall ensure transparency of decision-making and make publicly available its decision-making framework and decisions, including standards, procedures and related documents.

22.     Decisions of the Supervisory Body shall be taken by consensus whenever possible. If all efforts at reaching consensus have been exhausted, decisions shall be put to vote and adopted by a majority of three fourths of the members, including alternate members only when they are acting as members, present and voting.

23.     The Supervisory Body shall adopt reports on its meetings and make them publicly available.

## B.     Governance and functions

24.     The Supervisory Body shall, in accordance with relevant decisions of the CMA:

        (a)     Establish the requirements and processes necessary to operate the mechanism, relating to, inter alia:

        (i)     The accreditation of operational entities as designated operational entities;

        (ii)     The development and/or approval of methodologies (hereinafter referred to as mechanism methodologies) and standardized baselines for Article 6, paragraph 4, activities;

        (iii)     The registration of activities as Article 6, paragraph 4, activities, the renewal of crediting periods of registered Article 6, paragraph 4, activities and the issuance of A6.4ERs;

        (iv)     Ensuring that activities follow reasonable maximum time intervals between the steps in the activity cycle;

        (v)     The registry for the mechanism;

        (vi)     The share of proceeds levied to assist developing country Parties that are particularly vulnerable to the adverse effects of climate change to meet the costs of adaptation as set out in chapter VII below (Levy of share of proceeds for adaptation and administrative expenses);

        (vii)     The delivery of overall mitigation in global emissions as set out in chapter VIII below (Delivering overall mitigation in global emissions);

        (viii)     The approval and supervision of host Party national arrangements for accreditation of operational entities; development of mechanism methodologies, including applying baselines and other methodological requirements as defined in chapter V.B below (Methodologies); and application of the crediting periods and renewal of crediting periods consistent with or more stringent than as set out in chapter V.A, C and I below;

        (ix)     The eleventh preambular paragraph of the Paris Agreement, acknowledging that climate change is a common concern of humankind, Parties should, when taking action to address climate change, respect, promote and consider their respective obligations on human rights, the right to health, the rights of indigenous peoples, local communities, migrants, children, persons with disabilities and people in vulnerable situations and the right to development, as well as gender equality, empowerment of women and intergenerational equity;

        (x)     The application of robust, social and environmental safeguards;

        (xi)     The development of tools and approaches for assessing and reporting information about how each activity is fostering sustainable development, while acknowledging that the consideration of sustainable development is a national prerogative;

Appellate Case: 24-1628     Page: 962     Date Filed: 03/26/2024 Entry ID: 5377362

(xii)    Ensuring that the mechanism facilitates achievement of the long-term goals of the Paris Agreement;

(b)    Accredit operational entities as designated operational entities;

(c)    Support the implementation of the mechanism by, inter alia:

(i)    Developing and maintaining a public website for information related to proposed and registered Article 6, paragraph 4, activities, subject to confidentiality;

(ii)    Taking appropriate measures to promote the regional availability of designated operational entities in all regions;

(iii)    Promoting public awareness of the mechanism;

(iv)    Facilitating dialogue with host Parties and other stakeholders in the mechanism;

(v)    Providing public information to the CMA on all registered Article 6, paragraph 4, activities hosted by each Party and all A6.4ERs issued for those activities;

(vi)    Implementing capacity-building activities;

(d)    Report annually to the CMA.

## C.    Role of the secretariat

25.    Pursuant to Article 17 and in accordance with relevant decisions of the CMA, the secretariat shall serve as the secretariat of the Supervisory Body and perform its functions in the operation of the mechanism in accordance with these rules, modalities and procedures.

# IV.    Participation responsibilities

26.    Each host Party of Article 6, paragraph 4, activities shall, prior to participating in the mechanism, ensure that:

(a)    It is a Party to the Paris Agreement;

(b)    It has prepared, has communicated and is maintaining a nationally determined contribution (NDC) in accordance with Article 4, paragraph 2;

(c)    It has designated a national authority for the mechanism and has communicated that designation to the secretariat;

(d)    It has indicated publicly to the Supervisory Body how its participation in the mechanism contributes to sustainable development, while acknowledging that the consideration of sustainable development is a national prerogative;

(e)    It has indicated publicly to the Supervisory Body the types of Article 6, paragraph 4, activity that it would consider approving pursuant to chapter V.C below (Approval and authorization) and how such types of activity and any associated emission reductions would contribute to the achievement of its NDC, if applicable, its long-term low greenhouse gas (GHG) emission development strategy, if it has submitted one, and the long-term goals of the Paris Agreement.

27.    A host Party may specify to the Supervisory Body, prior to participating in the mechanism:

(a)    Baseline approaches and other methodological requirements, including additionality, to be applied for Article 6, paragraph 4, activities that it intends to host, in addition and subject to and consistent with these rules, modalities and procedures, under the supervision of the Supervisory Body, and subject to further relevant decisions of the CMA, with an explanation of how those approaches and requirements are compatible with its NDC and, if it has submitted one, its long-term low GHG emission development strategy;

Appellate Case: 24-1628    Page: 963    Date Filed: 03/26/2024 Entry ID: 5377362

(b)     Crediting periods to be applied for Article 6, paragraph 4, activities that it intends to host, including whether the crediting periods may be renewed, subject to these rules, modalities and procedures and under the supervision of the Supervisory Body, and in accordance with further relevant decisions of the CMA, with an explanation of how those crediting periods are compatible with its NDC and, if it has submitted one, its long-term low GHG emission development strategy.

28.     Each host Party shall ensure that, on a continuing basis:

(a)     It is maintaining an NDC in accordance with Article 4, paragraph 2;

(b)     Its participation in the mechanism contributes to the implementation of its NDC and its long-term low GHG emission development strategy, if it has submitted one.

29.     In relation to the least developed countries and small island developing States, pursuant to Article 4, paragraph 6, their special circumstances shall be recognized where these rules, modalities and procedures relate to NDCs, and other aspects of their special circumstances may be recognized in further decisions of the CMA relating to these rules, modalities and procedures.

# V.     Article 6, paragraph 4, activity cycle

## A.     Activity design

30.     The public or private entities participating in an activity (hereinafter referred to as activity participants) that wish to register the activity as an Article 6, paragraph 4, activity shall design the activity according to the requirements in this chapter and any other relevant requirements adopted by the CMA or the Supervisory Body.

31.     The activity:

(a)     Shall be designed to achieve mitigation of GHG emissions that is additional, including reducing emissions, increasing removals and mitigation co-benefits of adaptation actions and/or economic diversification plans (hereinafter collectively referred to as emission reductions), and not lead to an increase in global emissions;

(b)     May be a project, programme of activities or other type of activity approved by the Supervisory Body;

(c)     Shall be designed to achieve emission reductions in the host Party;

(d)     Shall also:

(i)     Deliver real, measurable and long-term benefits related to climate change in accordance with decision 1/CP.21, paragraph 37(b);

(ii)     Minimize the risk of non-permanence of emission reductions over multiple NDC implementation periods and, where reversals occur, ensure that these are addressed in full;

(iii)     Minimize the risk of leakage and adjust for any remaining leakage in the calculation of emission reductions or removals;

(iv)     Minimize and, where possible, avoid negative environmental and social impacts;

(e)     Shall undergo local and, where appropriate, subnational stakeholder consultation consistent with applicable domestic arrangements in relation to public participation and local communities and indigenous peoples, as applicable;

(f)     Shall apply a crediting period for the issuance of A6.4ERs, that is a maximum of 5 years renewable a maximum of twice, or a maximum of 10 years with no option of renewal, that is appropriate to the activity, or, in respect of activities involving removals, a crediting period of a maximum of 15 years renewable a maximum of twice that is appropriate to the activity, and that is subject to approval by the Supervisory Body, or any shorter

Appellate Case: 24-1628     Page: 964     Date Filed: 03/26/2024 Entry ID: 5377362

crediting period specified by the host Party pursuant to paragraph 27(b) above. The crediting period shall not start before 2021.

32.    The activity shall apply a mechanism methodology that has been developed in accordance with chapter V.B below (Methodologies) and approved by the Supervisory Body following its technical assessment, in order to:

(a)    Set a baseline for the calculation of emission reductions to be achieved by the activity;

(b)    Demonstrate the additionality of the activity;

(c)    Ensure accurate monitoring of emission reductions;

(d)    Calculate the emission reductions achieved by the activity.

## B.    Methodologies

33.    Mechanism methodologies shall encourage ambition over time; encourage broad participation; be real, transparent, conservative, credible and below 'business as usual'; avoid leakage, where applicable; recognize suppressed demand; align with the long-term temperature goal of the Paris Agreement; contribute to the equitable sharing of mitigation benefits between the participating Parties; and, in respect of each participating Party, contribute to reducing emission levels in the host Party, and align with its NDC, if applicable, its long-term low GHG emission development strategy, if it has submitted one, and the long-term goals of the Paris Agreement.

34.    Mechanism methodologies shall include relevant assumptions, parameters, data sources and key factors and take into account uncertainty, leakage, policies and measures, and relevant circumstances, including national, regional or local, social, economic, environmental and technological circumstances, and address reversals, where applicable.

35.    Mechanism methodologies may be developed by activity participants, host Parties, stakeholders or the Supervisory Body. Mechanism methodologies shall be approved by the Supervisory Body where they meet the requirements of these rules, modalities and procedures and the requirements established by the Supervisory Body.

36.    Each mechanism methodology shall require the application of one of the approach(es) below to setting the baseline, while taking into account any guidance by the Supervisory Body, and with justification for the appropriateness of the choices, including information on how the proposed baseline approach is consistent with paragraphs 33 and 35 above and recognizing that a host Party may determine a more ambitious level at its discretion:

A performance-based approach, taking into account:

(i)    Best available technologies that represent an economically feasible and environmentally sound course of action, where appropriate;

(ii)    An ambitious benchmark approach where the baseline is set at least at the average emission level of the best performing comparable activities providing similar outputs and services in a defined scope in similar social, economic, environmental and technological circumstances;

(iii)    An approach based on existing actual or historical emissions, adjusted downwards to ensure alignment with paragraph 33 above.

37.    Standardized baselines may be developed by the Supervisory Body at the request of the host Party or may be developed by the host Party and approved by the Supervisory Body. Standardized baselines shall be established at the highest possible level of aggregation in the relevant sector of the host Party and be consistent with paragraph 33 above.

38.    Each mechanism methodology shall specify the approach to demonstrating the additionality of the activity. Additionality shall be demonstrated using a robust assessment that shows the activity would not have occurred in the absence of the incentives from the mechanism, taking into account all relevant national policies, including legislation, and

App.960

representing mitigation that exceeds any mitigation that is required by law or regulation, and taking a conservative approach that avoids locking in levels of emissions, technologies or carbon-intensive practices incompatible with paragraph 33 above.

39.     The Supervisory Body may apply simplified approaches for demonstration of additionality for any least developed country or small island developing State at the request of that Party, in accordance with requirements developed by the Supervisory Body.

## C.     Approval and authorization

40.     The host Party shall provide to the Supervisory Body an approval of the activity, prior to a request for registration. The approval shall include:

        (a)     Confirmation that and information on how the activity fosters sustainable development in the host Party;

        (b)     Approval of any potential renewal of the crediting period, if the Party intends to allow the activity to continue beyond the first crediting period, where the Party has specified that the crediting periods of Article 6, paragraph 4, activities that it intends to host may be renewed pursuant to paragraph 27(b) above;

        (c)     Explanation of how the activity relates to the implementation of its NDC and how the expected emission reductions or removals contribute to the host Party's NDC and the purposes referred to in Article 6, paragraph 1.

41.     The host Party shall provide to the Supervisory Body the Article 6, paragraph 4(b), authorization of public or private entities to participate in the activity as activity participants under the mechanism.

42.     The host Party shall provide a statement to the Supervisory Body specifying whether it authorizes A6.4ERs issued for the activity for use towards achievement of NDCs and/or for other international mitigation purposes as defined in decision 2/CMA.3. If the host Party authorizes any such uses, the Party may provide relevant information on the authorization, such as any applicable terms and provisions. If the host Party authorizes A6.4ERs for use for other international mitigation purposes, it shall specify how it defines "first transfer" consistently with paragraph 2(b) of the annex to decision 2/CMA.3.

43.     A6.4ERs may only be used towards NDCs or towards international mitigation purposes if they are authorized in accordance with paragraph 42 above. The host Party shall apply corresponding adjustments for such A6.4ERs first transferred in accordance with chapters IX (Avoiding the use of emission reductions by more than one Party) and X (Use of emission reductions for other international mitigation purposes) below and shall apply corresponding adjustments for the associated A6.4ERs levied for a share of proceeds in accordance with chapter VII below (Levy of share of proceeds for adaptation and administrative expenses) and cancelled for overall mitigation of global emissions in accordance with chapter VIII below (Delivering overall mitigation in global emissions).

44.     The host Party shall apply a corresponding adjustment for A6.4ERs that are authorized for other purposes, in accordance with chapter X below (Use of emission reductions for other international mitigation purposes), and shall apply corresponding adjustments for the associated A6.4ERs levied for a share of proceeds in accordance with chapter VII below (Levy of share of proceeds for adaptation and administrative expenses) and cancelled for overall mitigation of global emissions in accordance with chapter VIII below (Delivering overall mitigation in global emissions).

45.     Other participating Parties shall provide to the Supervisory Body the Article 6, paragraph 4(b), authorization for public or private entities to participate in the activity as activity participants under the mechanism prior to any first transfer of any A6.4ERs to the mechanism registry account of such Party or public or private entity.

Appellate Case: 24-1628     Page: 966     Date Filed: 03/26/2024 Entry ID: 5377362

## D. Validation

46.     A designated operational entity shall independently assess the activity against the requirements set out in these rules, modalities and procedures, further relevant decisions of the CMA and relevant requirements adopted by the Supervisory Body (hereinafter referred to as validation).

## E. Registration

47.     If the designated operational entity concludes that the outcome of the validation is positive, it shall submit to the Supervisory Body a request for registration with the validation outcome in accordance with the relevant requirements adopted by the Supervisory Body.

48.     The activity participants shall pay a share of proceeds, at a level determined by the CMA, taking into account the likely scale of the activity, to cover the administrative expenses for registering the activity when submitting a request for registration.

49.     If the Supervisory Body decides that the validation and its outcome meet the relevant requirements adopted by the Supervisory Body, it shall register the activity as an Article 6, paragraph 4, activity.

## F. Monitoring

50.     The activity participants shall monitor emission reductions achieved by the activity during each monitoring period, in accordance with the relevant requirements adopted by the Supervisory Body. The activity participants shall also monitor potential reversals over a period to be decided by the Supervisory Body.

## G. Verification and certification

51.     A designated operational entity shall independently review and determine the implementation of, and the emission reductions achieved by, the Article 6, paragraph 4, activity during the monitoring period (hereinafter referred to as verification) against the requirements set out in these rules, modalities and procedures, further relevant decisions of the CMA and relevant requirements adopted by the Supervisory Body, and provide written assurance of the verified emission reductions (hereinafter referred to as certification).

## H. Issuance

52.     For the issuance of A6.4ERs, the designated operational entity shall submit to the Supervisory Body a request for issuance with the verification outcome and certification in accordance with the relevant requirements adopted by the Supervisory Body.

53.     If the Supervisory Body decides that the verification, certification and their outcome meet the relevant requirements adopted by the Supervisory Body, it shall approve the issuance of A6.4ERs.

54.     The mechanism registry administrator shall, in accordance with the relevant requirements adopted by the Supervisory Body, issue the A6.4ERs into the mechanism registry.

55.     The mechanism registry shall distinguish A6.4ERs that are authorized for use towards the achievement of NDCs and/or for use for other international mitigation purposes pursuant to chapter V.C above (Approval and authorization), including any specified uses for which the A6.4ERs are authorized.

Appellate Case: 24-1628     Page: 967     Date Filed: 03/26/2024 Entry ID: 5377362

## I. Renewal of the crediting period

56.     The crediting period of a registered Article 6, paragraph 4, activity may be renewed in accordance with further relevant decisions of the CMA and relevant requirements adopted by the Supervisory Body, if the host Party has approved such renewal in accordance with paragraph 27(b) above.

57.     The renewal of a crediting period shall be approved by the Supervisory Body and the host Party following a technical assessment by a designated operational entity to determine necessary updates to the baseline, the additionality and the quantification of emission reductions.

## J. First transfer from the mechanism registry

58.     At issuance, the mechanism registry administrator shall effect a first transfer of 5 per cent of the issued A6.4ERs to an account held by the Adaptation Fund in the mechanism registry for assisting developing country Parties that are particularly vulnerable to the adverse effects of climate change to meet the costs of adaptation.

59.     At issuance, the mechanism registry administrator shall also effect a first transfer, for cancellation, of a minimum of 2 per cent of the issued A6.4ERs to the account for cancellation for delivering overall mitigation in global emissions in accordance with chapter VIII below (Delivering overall mitigation in global emissions).

60.     The mechanism registry administrator shall forward or effect a first transfer, as applicable, of the remaining issued A6.4ERs in accordance with the instructions of the activity participants and with any further modalities adopted by the CMA and relevant requirements adopted by the Supervisory Body.

## K. Voluntary cancellation

61.     Activity participants may voluntarily request the mechanism registry administrator to cancel in the mechanism registry a specified amount of A6.4ERs issued in respect of their Article 6, paragraph 4, activity.

## L. Other processes associated with Article 6, paragraph 4, activities

62.     Stakeholders, activity participants and participating Parties may appeal decisions of the Supervisory Body or request that a grievance be addressed by an independent grievance process.

# VI. Mechanism registry

63.     The mechanism registry shall contain at least a pending account, holding account, retirement account, cancellation account, account for cancellation towards overall mitigation in global emissions and a share of proceeds for adaptation account, as well as a holding account for each Party and each public or private entity authorized per Article 6, paragraph 4(b), by a Party that requests an account where that entity meets the requisite identification requirements developed by the Supervisory Body. The mechanism registry shall be connected to the international registry referred to in decision 2/CMA.3.

64.     The mechanism registry shall be developed and operationalized in accordance with the relevant requirements adopted by the Supervisory Body that shall include operating at best practice standards for registries.

65.     The secretariat shall serve as the mechanism registry administrator and maintain and operate the mechanism registry under the supervision of the Supervisory Body.

Appellate Case: 24-1628    Page: 968    Date Filed: 03/26/2024    Entry ID: 5377362

# VII. Levy of share of proceeds for adaptation and administrative expenses

66.     The share of proceeds that is levied to assist developing country Parties that are particularly vulnerable to the adverse effects of climate change to meet the costs of adaptation shall be delivered to the Adaptation Fund pursuant to decisions 13/CMA.1 and 1/CMP.14.

67.     The share of proceeds to assist developing country Parties that are particularly vulnerable to the adverse effects of climate change to meet the costs of adaptation shall be comprised of:

(a)     A levy of 5 per cent of A6.4ERs at issuance;

(b)     A monetary contribution related to the scale of the Article 6, paragraph 4, activity or to the number of A6.4ERs issued, to be set by the Supervisory Body;

(c)     After the mechanism becomes self-financing, a periodic contribution from the remaining funds received from administrative expenses as per paragraph 68 below, after setting aside the operating costs for the mechanism and an operating reserve, at a level and frequency to be determined by the CMA.

68.     The share of proceeds to cover administrative expenses shall be set in monetary terms at a level and implemented in a manner to be determined by the CMA.

# VIII. Delivering overall mitigation in global emissions

69.     Delivery of overall mitigation in global emissions shall be enhanced through mandatory cancellation of A6.4ERs that are also accounted for in accordance with the following:

(a)     The mechanism registry administrator shall effect a first transfer of a minimum of 2 per cent of the issued A6.4ERs to the cancellation account in the mechanism registry for overall mitigation in accordance with chapter V above (Article 6, paragraph 4, activity cycle), where those A6.4ERs shall be cancelled;

(b)     The cancelled A6.4ERs shall not be further transferred or used for any purpose, including towards achievement of any NDC or for other international mitigation purposes or for other purposes;

(c)     At first transfer of the remaining issued A6.4ERs, the host Party shall make a corresponding adjustment consistently with decision 2/CMA.3 for the number of issued A6.4ERs first transferred.

70.     In addition to the above, Parties, activity participants and stakeholders may also request the voluntary cancellation of A6.4ERs in the mechanism registry for the purpose of delivering further overall mitigation in global emissions that have been correspondingly adjusted in accordance with chapter III.B of decision 2/CMA.3.

# IX. Avoiding the use of emission reductions by more than one Party

71.     Where a host Party has authorized A6.4ERs for use towards the achievement of NDCs pursuant to chapter V.C above (Approval and authorization), it shall apply a corresponding adjustment for the first transfer of all authorized A6.4ERs, consistently with decision 2/CMA.3.

App.964
Appellate Case: 24-1628     Page: 969     Date Filed: 03/26/2024 Entry ID: 5377362

# X. Use of emission reductions for other international mitigation purposes

72.     Where a host Party has authorized A6.4ERs for use for other international mitigation purposes pursuant to chapter V.C above (Approval and authorization) above, it shall apply a corresponding adjustment for the first transfer of all authorized A6.4ERs, consistently with decision 2/CMA.3.

# XI. Transition of clean development mechanism activities and use of certified emission reductions towards first nationally determined contribution

## A. Transition of clean development mechanism activities

73.     Project activities and programmes of activities registered under the clean development mechanism under Article 12 of the Kyoto Protocol (CDM) or listed as provisional as per the temporary measures adopted by the Executive Board of the CDM may transition to the mechanism and be registered as Article 6, paragraph 4, activities subject to all of the following conditions:

(a)     The request to transition the CDM project activity or programme of activity being made to the secretariat and the CDM host Party as defined by decision 3/CMP.1 by or on behalf of the project participants that were approved by that CDM host Party by no later than 31 December 2023;

(b)     The approval for such transition of the CDM project activity or programme of activity being provided to the Supervisory Body by the CDM host Party by no later than 31 December 2025;

(c)     Subject to paragraph 73(d) below, the compliance with these rules, modalities and procedures, including on the application of a corresponding adjustment consistent with decision 2/CMA.3, relevant requirements adopted by the Supervisory Body and any further relevant decisions of the CMA;

(d)     The activity may continue to apply its current approved CDM methodology until the earlier of the end of its current crediting period or 31 December 2025, following which it shall apply an approved methodology pursuant to chapter V.B above (Methodologies).

74.     The Supervisory Body shall ensure that small-scale CDM project activities and CDM programmes of activities undergo an expedited transition process in accordance with decisions of the Supervisory Body by prioritizing the requests to transition from such activities following the approval referred to in paragraph 73(b) above.

## B. Use of certified emission reductions towards first or first updated nationally determined contributions

75.     Certified emission reductions (CERs) issued under the CDM may be used towards achievement of an NDC provided the following conditions are met:

(a)     The CDM project activity or programme of activities was registered on or after 1 January 2013;

(b)     The CERs shall be transferred to and held in the mechanism registry and identified as pre-2021 emission reductions;

(c)     The CERs may be used towards achievement of the first NDC only;

(d)     The CDM host Party shall not be required to apply a corresponding adjustment consistently with decision 2/CMA.3 in respect of the CERs and not be subject to the share of

Appellate Case: 24-1628     Page: 970     Date Filed: 03/26/2024 Entry ID: 5377362

proceeds pursuant to chapter VII above (Levy of share of proceeds for adaptation and administrative expenses);

(e)     CERs not meeting the conditions referred to in paragraph 75(a–d) above may only be used for achievement of an NDC in accordance with a relevant future decision of the CMA;

(f)     Temporary CERs and long-term CERs shall not be used towards NDCs.

*12th plenary meeting*
*13 November 2021*

App.966

## Decision 4/CMA.3

## Work programme under the framework for non-market approaches referred to in Article 6, paragraph 8, of the Paris Agreement

*The Conference of the Parties serving as the meeting of the Parties to the Paris Agreement*,

*Recalling* the framework for non-market approaches to sustainable development referred to in Article 6, paragraph 9, of the Paris Agreement,

*Also recalling* the tenth preambular paragraph of the Paris Agreement, in which Parties take into account the imperatives of a just transition of the workforce and the creation of decent work and quality jobs in accordance with nationally defined development priorities,

*Further recalling* the eleventh preambular paragraph of the Paris Agreement, acknowledging that climate change is a common concern of humankind, Parties should, when taking action to address climate change, respect, promote and consider their respective obligations on human rights, the right to health, the rights of indigenous peoples, local communities, migrants, children, persons with disabilities and people in vulnerable situations and the right to development, as well as gender equality, empowerment of women and intergenerational equity,

*Recalling* the objective, referred to in decision 1/CP.21, paragraph 39, of the work programme under the framework for non-market approaches referred to in Article 6, paragraph 8, of the Paris Agreement,

*Recognizing* that the work programme is to be implemented in the context of the Paris Agreement in its entirety, including its preamble,

1.    *Recognizes* the importance of integrated, holistic and balanced non-market approaches to enable voluntary cooperation being available to Parties to assist in the implementation of their nationally determined contributions, in the context of sustainable development and poverty eradication, in a coordinated and effective manner;

2.    *Adopts* the work programme under the framework for non-market approaches referred to in decision 1/CP.21, paragraph 39, as contained in the annex;

3.    *Decides* that initial focus areas of the work programme activities, referred to in paragraph 8(a)(i).a of the annex, include, but are not limited to, the following:

(a)    Adaptation, resilience and sustainability;

(b)    Mitigation measures to address climate change and contribute to sustainable development;

(c)    Development of clean energy sources;

4.    *Requests* the Glasgow Committee on Non-market Approaches to develop and recommend a schedule for implementing the work programme activities referred to in chapter V of the annex (Work programme activities), which may contain the timeline and expected outcomes for each activity, including specifications for the UNFCCC web-based platform referred to in paragraph 8(b)(i) of the annex, such as its functions, form, target users and information to be contained thereon, with a view to supporting the effective implementation of the work programme, for consideration and adoption by the Conference of the Parties serving as the meeting of the Parties to the Paris Agreement at its fourth session (November 2022);

5.    *Encourages* Parties, public and private sector stakeholders and civil society organizations to actively engage in the research, development and implementation of non-market approaches;

Appellate Case: 24-1628    Page: 972    Date Filed: 03/26/2024    Entry ID: 5377362

6.      *Invites* Parties and observers to submit via the submission portal[1] by 28 February 2022 views and information on:

(a)      Existing relevant non-market approaches that may be facilitated under the framework in the initial focus areas referred to in paragraph 3 above that are in accordance with the provisions referred to in chapter II of the annex (Non-market approaches under the framework);

(b)      Examples of potential additional focus areas of non-market approaches that may be facilitated under the framework (e.g. social inclusivity, financial policies and measures, circular economy, blue carbon, just transition of the workforce, adaptation benefit mechanism) and existing relevant non-market approaches that may be facilitated under the framework in the potential additional focus areas that are in accordance with the provisions referred to in chapter II of the annex (Non-market approaches under the framework);

(c)      The UNFCCC web-based platform referred to in paragraph 8(b)(i) of the annex, including how to operationalize it (e.g. functions, form, target users, information to be contained thereon, timeline for development and implementation, and lessons learned from existing relevant tools, including under the Convention and the Paris Agreement);

(d)      The schedule for implementing the work programme activities;

7.      *Requests* the secretariat to prepare a synthesis report on the matters referred to in paragraph 6 above for consideration by the Glasgow Committee on Non-market Approaches at its 1st meeting, to be held in June 2022;

8.      *Also requests* the secretariat to:

(a)      Organize an in-session workshop, with the broad participation of relevant experts, on the matters referred to in paragraph 6 above, taking into consideration the submissions and synthesis report on the matters, to be held in conjunction with the fifty-sixth session of the Subsidiary Body for Scientific and Technological Advice (June 2022);

(b)      Prepare a report on that workshop for consideration by the Glasgow Committee on Non-market Approaches at its 2nd meeting, to be held in November 2022;

9.      *Decides* to review the report of the Glasgow Committee on Non-market Approaches and provide guidance on the framework and the work programme, as appropriate;

10.      *Requests* the Subsidiary Body for Scientific and Technological Advice to review the work programme, including its activities, at its sixty-fourth (June 2026) and sixty-fifth (November 2026) sessions with a view to enhancing the effectiveness of the work programme, taking into account relevant inputs, including the outcomes of the global stocktake, and to make recommendations thereon for consideration and adoption by the Conference of the Parties serving as the meeting of the Parties to the Paris Agreement by no later than at its eighth session (2026);

11.      *Takes note* of the estimated budgetary implications of the activities to be undertaken by the secretariat referred to in this decision;

12.      *Requests* that the actions called for in this decision be undertaken subject to the availability of financial resources;

13.      *Invites* Parties to make contributions to the Trust Fund for Supplementary Activities for implementing the work programme.

---

[1]      https://www4.unfccc.int/sites/submissionsstaging/Pages/Home.aspx.

**App.968**

Appellate Case: 24-1628      Page: 973      Date Filed: 03/26/2024 Entry ID: 5377362

## Annex

### Work programme under the framework for non-market approaches referred to in Article 6, paragraph 8, of the Paris Agreement

## I. Principles

1.    The following principles, in addition to the elements reflected in Article[1] 6, paragraphs 8–9, and decision 1/CP.21, paragraph 39, guide the implementation of the framework for non-market approaches (NMAs) referred to in Article 6, paragraph 9, and the work programme under the framework referred to in decision 1/CP.21, paragraph 39:

(a)    The framework:

(i)    Facilitates the use and coordination of NMAs in the implementation of Parties' nationally determined contributions (NDCs) in the context of sustainable development and poverty eradication;

(ii)    Enhances linkages and creates synergies between, inter alia, mitigation, adaptation, finance, technology development and transfer, and capacity-building, while avoiding duplication of the efforts under the framework with the work of the subsidiary and constituted bodies under the Convention and the Paris Agreement, taking into account the mandates of these bodies;

(b)    NMAs facilitated under the framework represent:

(i)    Voluntary cooperative actions that are not reliant on market-based approaches and that do not include transactions or quid pro quo operations;

(ii)    Integrated, innovative and transformational actions that have significant potential to deliver higher mitigation and adaptation ambition;

(iii)    Actions that support the implementation of NDCs of Parties hosting NMAs (hereinafter referred to as host Parties) and contribute to achieving the long-term temperature goal of the Paris Agreement;

(c)    The work programme, consistently with its objective referred to in decision 1/CP.21, paragraph 39, aims to identify measures to facilitate NMAs and enhance linkages and create synergies as referred to in paragraph 1(a) above.

## II. Non-market approaches under the framework

2.    Each NMA facilitated under the framework, in the context of Article 6, paragraph 8:

(a)    Aims to:

(i)    Promote mitigation and adaptation ambition;

(ii)    Enhance participation of public and private sector and civil society organizations in the implementation of NDCs;

(iii)    Enable opportunities for coordination across instruments and relevant institutional arrangements;

(b)    Assists participating Parties in implementing their NDCs in an integrated, holistic and balanced manner, including through, inter alia:

(i)    Mitigation, adaptation, finance, technology development and transfer, and capacity-building, as appropriate;

---

[1]  "Article" refers to an Article of the Paris Agreement, unless otherwise specified.

Appellate Case: 24-1628    Page: 974    Date Filed: 03/26/2024 Entry ID: 5377362

(ii)     Contribution to sustainable development and poverty eradication.

3.     In addition, each NMA facilitated under the framework:

(a)     Is identified by the participating Parties on a voluntary basis;

(b)     Involves more than one participating Party;

(c)     Does not involve the transfer of any mitigation outcomes;

(d)     Facilitates the implementation of NDCs of host Parties and contributes to achieving the long-term temperature goal of the Paris Agreement;

(e)     Is conducted in a manner that respects, promotes and considers respective obligations of Parties on human rights, the right to health, the rights of indigenous peoples, local communities, migrants, children, persons with disabilities and people in vulnerable situations and the right to development, as well as gender equality, empowerment of women and intergenerational equity, consistently with the eleventh preambular paragraph of the Paris Agreement;

(f)     Minimizes and, where possible, avoids negative environmental, economic and social impacts.

## III.     Governance of the framework

4.     The Glasgow Committee on Non-market Approaches is hereby established to implement the framework and the work programme by providing Parties with opportunities for non-market-based cooperation to implement mitigation and adaptation actions in their NDCs.

5.     The Glasgow Committee will be convened by the Chair of the Subsidiary Body for Scientific and Technological Advice (SBSTA) and operate in accordance with the procedures applicable to contact groups and under the guidance of the Chair. It will meet in conjunction with the first and second sessional period meeting of the SBSTA each year, with its 1st meeting to take place in conjunction with SBSTA 56 (June 2022).

6.     The SBSTA will consider whether institutional arrangements for the framework that will supersede the Glasgow Committee are needed and make recommendations for consideration and adoption by the Conference of the Parties serving as the meeting of the Parties to the Paris Agreement (CMA) at its ninth session (2027).

## IV.     Modalities of the work programme

7.     The modalities of the work programme may include, as appropriate:

(a)     Workshops;

(b)     Engagement with public and private sector stakeholders, including technical experts, businesses, civil society organizations and financial institutions;

(c)     Submissions from Parties, observers and public and private sector stakeholders;

(d)     Technical papers and synthesis reports prepared by the secretariat;

(e)     The collaboration, where needed, of the Glasgow Committee with relevant bodies, institutional arrangements and processes under or related to the Convention and the Paris Agreement, taking into account their mandates.

## V.     Work programme activities

8.     The work programme will be initiated in 2022 and include, but not be limited to, the following activities:

Appellate Case: 24-1628     Page: 975     Date Filed: 03/26/2024 Entry ID: 5377362

(a)    Identifying measures for enhancing existing linkages, creating synergies and facilitating coordination and implementation of NMAs:

(i)    Identification of NMAs:

a.    Identifying focus areas of the work programme activities;

b.    Identifying existing NMAs under the framework that are in accordance with the provisions referred to in chapter II above (Non-market approaches under the framework);

(ii)    Identification of measures:

a.    Identifying and evaluating positive and other experience of existing linkages, synergies, coordination and implementation in relation to NMAs;

b.    Identifying measures for enhancing existing linkages, creating synergies and facilitating coordination and implementation of NMAs, including in the local, subnational, national and global context;

(b)    Implementing measures:

(i)    Developing and implementing tools, with the assistance of the secretariat, including a UNFCCC web-based platform for recording and exchanging information on NMAs, including information identified through the work programme, and supporting the identification of opportunities for participating Parties to identify, develop and implement NMAs;

(ii)    Identifying and sharing information, best practices, lessons learned and case studies in relation to developing and implementing NMAs, including on how to:

a.    Replicate successful NMAs, including in the local, subnational, national and global context;

b.    Facilitate enabling environments and successful policy frameworks;

c.    Enhance the engagement in NMAs by the private sector, civil society organizations and vulnerable and impacted sectors and communities;

d.    Leverage and generate mitigation co-benefits resulting from adaptation actions and/or economic diversification plans that assist the implementation of NDCs;

e.    Promote cooperation on NMAs between Parties that supports the implementation of ambitious NDCs contributing to the achievement of the long-term temperature goal of the Paris Agreement, including in relation to the development of NMAs;

f.    Estimate and report the impacts of NMAs on mitigation and adaptation;

g.    Establish guidelines, procedures and safeguards to facilitate NMAs;

(iii)    Identifying initiatives, programmes and projects for facilitating NMAs that support the implementation of NDCs to allow for higher mitigation and adaptation ambition in NDCs by:

a.    Establishing linkages with bodies, institutional arrangements and processes under or related to the Convention and the Paris Agreement in relation to, inter alia, mitigation, adaptation, finance, technology development and transfer, and capacity-building, as appropriate;

b.    Mapping the initiatives, programmes and projects at the local, subnational and national level, including those that support Parties in meeting the requirements for receiving support and provide capacity-building for the implementation of NMAs.

Appellate Case: 24-1628    Page: 976    Date Filed: 03/26/2024 Entry ID: 5377362

## VI. Reporting

9.      The progress and outcomes of the work programme will be reported at each session of the CMA, as appropriate, on the basis of information resulting from implementation of the work programme activities, which will also serve as inputs to the review of the work programme at CMA 7 (November 2025), with the report to include the following, as relevant:

(a)      Results of the implementation of the work programme activities;

(b)      Recommendations on how to enhance existing linkages and create synergies and how to facilitate coordination and implementation of NMAs;

(c)      Recommendations on how to facilitate support for NMAs, including through engagement with relevant bodies, institutional arrangements and processes under the Convention and the Paris Agreement related to, inter alia, mitigation, adaptation, finance, technology development and transfer, and capacity-building;

(d)      Recommendations on work programme activities in implementing the framework.

*12th plenary meeting*
*13 November 2021*

—————————

App.972

Appellate Case: 24-1628      Page: 977      Date Filed: 03/26/2024 Entry ID: 5377362

# Green Regs and Spam[1]: Statement on the Enhancement and Standardization of Climate-Related Disclosures for Investors



**Commissioner Hester M. Peirce**

**March 6, 2024**

Thank you, Mr. Chair. The final rule is different from the proposal, but it still promises to spam investors with details about the Commission's pet topic of the day—climate. As we have heard already, the recommendation before us eliminates the Scope 3 reporting requirements, reworks the financial statement disclosures, and removes some of the other overly granular disclosures. But these changes do not alter the rule's fundamental flaw—its insistence that climate issues deserve special treatment and disproportionate space in Commission disclosures and managers' and directors' brain space. Because the Commission fails to justify that disparate treatment, I dissent.

The Commission does not point to a persuasive reason to reject the existing principles-based, materiality focused approach to climate risk. While the Commission insinuates that companies focus too little on climate risks, it offers scant concrete evidence of inappropriate reserve, and even highlights that 36% of annual Commission filings include climate information.[2] Our existing disclosure regime already requires companies to inform investors about material risks and trends—including those related to climate—by empowering companies to tell their unique story to investors. The Commission's 2010 climate guidance explains how climate-related issues, particularly pertaining to a company's financial condition, could be required in disclosures under the Commission's existing regime.[3] Under current rules, companies may have to disclose, among other things, information relating to the "[i]mpact of legislation and regulation," "international accords," "[i]ndirect consequences of regulation and business trends," and "[p]hysical impacts of climate change."[4] And, although the responsibility for disclosing lies with the company, the Commission's Division of Corporation Finance reviews company filings and sends comment letters to companies to ensure that they are fulfilling this responsibility. Companies that do not make accurate or complete disclosures could face enforcement actions or private lawsuits.

The Commission does not persuasively explain why principles-based rules, staff disclosure review, and enforcement actions are not effective in eliciting the climate disclosure the objectively reasonable investor needs. To the contrary, the Commission has a strong view of the power of existing rules to elicit climate disclosure. For example, the Commission today, in deciding not to adopt the proposed financial statement metrics, warned that companies might have to make those disclosures anyway under existing rules.[5]

The Commission, in adopting today's climate prescriptions, dismisses the role that materiality ought to play in balancing the costs and benefits of disclosure. Information is material if there is a substantial likelihood that an

objectively reasonable investor would consider the information important to an investment or voting decision.[6] All reasonable investors value financial returns, but they may diverge on which non-economic considerations are important.[7] A regime rooted in materiality helps companies inform investors without spamming them with information that is irrelevant to the company's financial picture.[8]

This rule replaces our current principles-based regime with dozens of pages of prescriptive climate-related regulations. While the Commission has decorated the final rule with materiality ribbons, the rule embraces materiality in name only.[9] The resulting flood of climate-related disclosures will overwhelm investors, not inform them. The rule mandates specific granular disclosures. These include, to list a few, the process of how a company's board oversees and is informed of climate risk,[10] how a company's management assesses and manages material climate risk,[11] which management positions manage climate risk and the associated expertise, [12] the geographic location of physical climate risk,[13] and how climate risks affect items like a company's "[p]roducts or services," "suppliers," climate mitigation activities, and "expenditures for research and development."[14] Protestations of materiality also trip over the absurdly low de minimis thresholds for disclosing how severe weather events and other natural conditions affect a company's financial statements. The threshold is only $100,000 for expenditures expensed as incurred and losses in the income statement[15] and $500,000 for capitalized costs and charges recognized on the balance sheet.[16]

By rejecting a principles-based regime grounded in materiality for climate, the Commission could trigger a hodgepodge of requirements tailored to meet the demands of a vast and ever-expanding panoply of special interests.[17] A pro-life investor, an anti-cannabis investor, or an anti-war investor might want idiosyncratic information to assess a company's performance on those respective issues. Employees, customers, suppliers, social activists, local communities, and other interested non-investors will now line up to get the information they want to know included in disclosures for which shareholders have to pay. Even asset managers – whom the Release wrongly classifies as investors – and institutional investors may be driven by something other than financial returns when they seek information.[18] An asset manager, for example, may need data – not to serve its clients – but to satisfy a climate pledge the adviser made when it voluntarily joined a climate action organization. [19]

However well-intentioned, these particularized interests do not justify forcing investors who do not share them to foot the bill. Congress did not create this agency to satisfy the wants of every investor, but to serve the interests of the objectively reasonable investor seeking a return on her capital. We lack the expertise to oversee these special interest disclosures, and only a mandate from Congress should put us in the business of facilitating the disclosure of information not clearly related to financial returns.[20] As Commissioner Roberta Karmel concluded in 1978, when debates about the role of Commission disclosure were raging as they are today: "[D]espite the legitimate concerns of ethical investors, I believe we should exercise caution in applying a non-economic standard of materiality to disclosure requirements . . . ."[21] Wading into non-economic issues involves tradeoffs that only our nation's elected representatives have the authority and expertise to make.[22] If we lose our focus on objectively reasonable investors, special interest groups will turn to us to achieve what they cannot accomplish through normal political channels.

Despite cost-saving changes from the proposed rule, the final rule will prove expensive for public companies and their shareholders who will be paying for climate disclosure spam. The Commission performs impressive math-crobatics to slash the anticipated cost of the rule by almost 90 percent,[23] but even with these potentially understated estimates, the Commission still must concede that this rule will increase the typical external costs of being a public company by around 21%.[24] The rule is particularly likely to overwhelm small public companies, many of which are already struggling under the costs of being public.[25] At a time when few companies are choosing to go public,[26] why would we add so substantially to the price tag?

To comply with the new rule, public companies will need elaborate internal control systems and disclosure control procedures to capture and distill information related to physical and transition risks, severe weather events, severe natural conditions, and greenhouse gas emissions.[27] They will hire third-party climate consultants, assurance

providers,[28] internal and external counsel, and information technology professionals; face legal liability through Commission actions and the inevitable flood of class actions for their mandated filed disclosures;[29] and bear the indirect costs of lost management time, board distraction,[30] and disruptive changes in company operations. The new financial statement disclosures could force smaller companies to overhaul their existing accounting software. [31] Even companies that do not end up reporting material climate risks or expenditures will be forced to invest in systems to reach a determination that they do not have material items to disclose.[32] The Commission does not take full account of the costs to make such a non-materiality determination.[33] Requiring public disclosure of such extensive climate information, including on governance processes, will reduce companies' flexibility in responding to all kinds of risks, including climate risks, and deter them from engaging in substantive improvements to business processes.[34]

The rule's anticipated benefits do not outweigh the costs. Proponents of a Commission climate rule hope that it will yield more accurate, comparable, and complete climate disclosures. If we do not look at it too closely, the final rule might appear to fulfill those hopes. But a closer inspection brings us crashing back to the reality that many climate disclosures are high-priced guesses about the present and future. Measurement and reporting are not standardized within companies, let alone across companies.

Attempts to treat climate data on par with financial data are strained. Despite ongoing efforts to improve climate data collection and analysis, they are still imprecise.[35] For example, commenters highlighted the difficulty of accurately predicting potential physical climate risks[36] and transition risks.[37] Technical compliance with this rule will produce authoritative-looking results, but underlying them will be layers of assumptions and extrapolations. Different companies will take different approaches to resolving these uncertainties, which will undermine comparability.[38] More bespoke disclosures, such as the current rules allow, better inform investors, and, over time, companies likely would coalesce around approaches that generated reliable and comparable disclosures. Letting that process play out organically would be superior to the top-down approach we are embracing today.[39] The final rule attempts to short-cut this admittedly protracted market-driven process, but the result will be unreliable disclosures that mask real differences across companies. Also concerning is the possibility that the back-of-the-envelope guesswork underlying climate disclosures will bleed into the financial statements and other disclosures, thus undermining the effectiveness of our disclosure and financial reporting regime. As efforts to integrate financial and climate reporting proceed, the lower standards accepted by necessity for climate reporting and assurance could bring down the quality of financial reporting.

While the Commission feigns agnosticism about how public companies should think about climate risks, the prescriptive nature of this new climate regime will affect corporate behavior. Through an extensive set of leading disclosure items, the Commission steps into the shoes of the corporate board, nudges corporate decision-making, and distorts corporate supply chains.[40] These new disclosure requirements are rooted in what "the Commission believes should matter to investors."[41] The Commission is forcing individual public companies to operate in a conduct-altering disclosure regime that may have no direct relevance to their situation. The Commission argues that it is well within its authority in adopting this rule, but the argument we make for our authority here has no limiting principle.

The Commission could have simply required companies to disclose material climate risks that they already recognize and explain how they manage them.[42] Such an approach would not have conveyed an expectation that companies devote vast new resources to assessing, managing, and disclosing climate risks that the Commission has identified for them. It also would have been consistent with the current required disclosure of "material events and uncertainties known to management that are reasonably likely to cause reported financial information."[43]

We should be re-proposing this rule not adopting it. The final rule differs quite dramatically from the proposal, both by excluding major provisions and including new rule elements. A re-proposal would have helped us better assess these changes. It also would have helped us to understand recent legal developments in California and Europe that raise complex cost and mutual recognition issues.[44] Rather than grappling with these issues in the cost-

<span style="text-align:right;display:block;">App.975</span>

benefit analysis, the Commission confesses to lacking the data to accurately assess them.[45] This approach does not give fair notice to the public or allow commenters the opportunity to address anything that closely resembles today's final rule.[46]

Although I do not support the recommendation before us, I do want to acknowledge the multi-year effort underlying it. Analyzing these difficult issues and the voluminous comment letters was a monumental challenge. I appreciate all the long and late hours you devoted to producing today's rule. I also appreciate the many hours you spent with me and my staff discussing the rule. Thank you to Mika Morse, Erik Gerding, Luna Bloom, Valian Afshar, Elliot Staffin, and other staff in the Division of Corporation Finance, Shaz Niazi, Erin Nelson, Mamta Soni, and Meagan Van Orden in the Office of Chief Accountant, the Division of Economic and Risk Analysis, and the Office of General Counsel, as well as others throughout the Commission who worked on this rule.

I have several questions:

1. Although the cost estimates for this rule are dramatically lower than the cost estimates for the proposed rule, my understanding is that, based on our estimates, 15 percent of a company's annual SEC disclosure costs would be attributable to climate disclosures.[47]

    1. Do we plan to go back in several years to assess the accuracy of these estimates and whether the benefits of the rule outweigh the costs? If so, what metrics do we plan to use for assessing whether the rule has succeeded in meeting its objectives?

    2. Our cost estimates omit the cost for large accelerated filers and accelerated filers to make a materiality determination on their Scopes 1 and 2 emissions if such companies ultimately omit this data from their disclosures. Do you have any sense of what it could cost companies to make a materiality assessment?

2. The Release promises investors "more detailed, consistent, reliable, and comparable information about climate-related effects on a registrant's business and financial condition."[48] Does any company's climate reporting today reflect the same level of consistency, reliability, and comparability that financial reporting does? If not, how long do you think it will take for climate reporting to be as consistent, reliable, and comparable as financial reporting?

3. Even with Scope 3 off the table, the greenhouse gas emissions disclosures seem to be something new. One commenter explained it this way: "The SEC's justification for the disclosure is that governments, regulators, or consumers might take action against GHG emissions that might cause a negative financial effect at the company that might be significant to a reasonable investor. The reliance on this series of possibilities is on top of the reliance on the uncertain and imprecise methods for calculating GHG emissions. The chain connecting an undependable disclosure of GHG emissions to a material financial effect on the disclosing company is long and speculative. The outward look and the speculative nature of requiring disclosure of GHG emissions make that disclosure obligation different from nearly all other mandatory SEC disclosures."[49]

    1. Why isn't this commenter right that we are dealing with a new kind of rule here, and perhaps one for which we have no statutory authority?

    2. What unique enforcement challenges does such a rule pose?

4. Given that we take the position that we have broad authority to mandate climate disclosures, do we have the authority to preempt California's recently passed disclosure law, which appears to be intended to serve as a national standard?

5. The term "natural condition" is undefined.

    1. What is a severe natural condition?

    2. Is a global health pandemic a severe natural condition?[50]

    3. If so, is it covered by the rule? If not, what in the rule text tells me that it is not covered?

4. Why don't investors need disaggregated disclosure of capitalized costs, expenditures expensed, charges, and losses incurred as a result of severe global pandemics to better understand the effect such events have on the financial statements?

6. Applying the final rule, even though it is easier than what was proposed, presents challenges.

　　1. Consider a company that is building a new asset. It considers flood risk because the company, in its two-hundred year history, has experienced a flood every ten years. Would the company's decisions relating to managing flood risk for an asset qualify either as an activity to mitigate climate risk or a transition plan?

　　2. If a company creates a low-carbon product or expands its supply of a low-carbon product because of increased customer demand, without considering whether the increase is due to climate change, where does that activity fall under the rules?[51]

　　3. How should a public company disclose transition risk if electoral outcomes could drastically alter the risk it faces?

　　4. Does "climate-related risk" include a situation in which there is reduced demand for electric vehicles, as a result of consumer demand, political, legal, or other factors?

　　5. Would an automobile manufacturer's decision to shift away from EVs to accommodate consumer preferences be considered a "transition plan"?

7. I expect that companies will spend a substantial amount of time, money, and stress on putting controls in place to comply with various aspects of the rule and then obtaining assurance where that is required.

　　1. What similarities and differences do you anticipate seeing as compared with issuers' experience with developing and obtaining auditor attestation for internal controls under the Sarbanes-Oxley Act?

　　2. Are there lessons we learned from that experience that we can apply here?

8. The rule permits issuers to hire non-auditor assurance providers.

　　1. Will a non-accountant assurance provider be able to come to the Office of Chief Accountant for advice on complying with, and no-action relief from, the independence requirements and no-action relief?

　　2. If so, how will the Commission be apprised of advice and relief given?

---

[1] Someone beat me to this title, but it is nonetheless apt. https://www.flickr.com/photos/regs11/11819953095/.

[2] Release at 617, Table 4.

[3] *Commission Guidance Regarding Disclosure Related to Climate Change* (Feb. 8, 2010), https://www.sec.gov/files/rules/interp/2010/33-9106.pdf. The financial nature of this 29-page guidance is evident in that it references the term "financial" 51 times and clarifies that climate information could be relevant to items like risk factors and "Management's Discussion and Analysis of Financial Conditions and Results of Operation." *Id.* at 15, citing Item 503(c) of Regulation S-K and Item 303 of Regulation S-K.

[4] *Id.* at 21-27.

[5] *See* Release at 448 ("[W]e emphasize that registrants currently have an obligation under GAAP to consider material impacts on the financial statements, and the fact that the impact may be driven by climate-related matters does not alter registrants' financial reporting obligations. Therefore, a registrant should consider whether it currently has an obligation to disclose information that would have been covered by the proposed Financial Impact Metrics.") (footnote omitted).

[6] *See Basic Inc. v. Levinson*, 485 U.S. 224, 231 (1988); *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976).

[7] *See* Sean Griffith, *What's "Controversial" About ESG? A Theory of Compelled Commercial Speech under the First Amendment,* 101 Nebraska L. Rev. 876, 921 (2023), https://ssrn.com/abstract=4118755 ("Because all investors invest with an expectation of a financial return, the interest that investors, as a class, share is the financial return of the investment. Investors, like all people, may have other interests besides financial return. People might care about clean water, breathable air, and puppies. But, given a large enough group, there will be others who are indifferent, opposed, or even if they share the same general preferences, have an ordinal ranking of preferences that renders them opposed to action on a specific issue. In markets, the law of large numbers will operate to cancel out offsetting preferences, leaving the one interest that all investors share—that is, their interest in a financial return.").

[8] Dave Lynn, *SEC Historical Society*: *The Evolution of Materiality* at 5:29 (Feb. 15, 2024), https://www.sechistorical.org/museum/events/materiality-2024.php ("We don't have a system here in the United States where companies do a data dump of information and then rely on investors to sort out that information. We have a system where we are carefully curating the information that investors have access to and that's a way of avoiding the problem of having investors be subject to information overload.").

[9] The Release uses "material" or "materiality" almost one thousand times. Even so, materiality is still missing in some key places. For example, the required board disclosures in item 1501(a) do not reference materiality. Item 1501(b) references materiality when it clarifies that companies need only describe how their management handles "material climate-related risks." However, this forces companies with material climate risk to provide Item 1501(b)'s disclosures, even if it is immaterial information.

[10] 17 CFR § 229.1501(a).

[11] 17 CFR § 229.1501(b).

[12] 17 CFR § 229.1501(b)(1).

[13] 17 CFR § 229.1502(a)(1).

[14] 17 CFR § 229.1502(b).

[15] 17 CFR § 210.14-02(b)(1).

[16] 17 CFR § 210.14-02(b)(2).

[17] *What's "Controversial" About ESG?* at 918-919 ("Investors might want . . . disclosure of affirmative information to assist them in evaluating whether to invest. What disclosures are these? Since publicly traded companies have a vast number of investors, each with their own preferences, the answer might be literally anything. Some investors will want more detail about the company's operations—board minutes, for example, or details from financial advisors' presentations to the board. Other investors will want the disclosure of non-financial information that they consider important. For example, pro-life investors might want granular details about whether a company's products are used in manufacturing or distributing abortifacients or, more broadly, corporate health insurance plans' coverage of women's health. Other investors may want to know whether a corporation engages in offshoring or the extent to which it imports materials from countries known to abuse human rights. Others will want to know about the company's diversity policies.").

[18] *See*, *e.g.*, Letter from Cato Institute at 5 (Jun. 17, 2022), https://www.sec.gov/comments/s7-10-22/s71022-20132199-302715.pdf ("[M]any of the large institutional investors cited by the Commission are also conflicted, either seeking to meet climate pledges of their own or seeking to profit from pursuing what appear to be popular strategies.") (citations omitted); Paul Mahoney & Julia Mahoney, *The New Separation of Ownership and Control: Institutional Investors and ESG,* 2 COLUM. Bus. L. REV. 840, 851-2 (2021) ("Why, then, are institutional investors and political activists pressing for the SEC to require an expanded and standardized set of ESG disclosures . . . ?

For political activists, the answer is straightforward: they want to use the information to prod companies to change policies in socially-motivated directions . . . . Such disclosures facilitate an ordinal ranking of companies that can serve as a focal point to organize boycotts, demonstrations, and social media campaigns against 'brown' companies. The SEC should consider the possibility that this is also an important goal of institutional investors who argue for ESG disclosures.").

[19] For example, Climate Action 100+ is composed of over 700 global investors across 33 markets with more than $68 trillion in assets under management ("AUM"). *See* Climate Action 100+, *About Climate Action 100+*, https://www.climateaction100.org/whos-involved/investors/ (last visited Mar. 2, 2024). Signatories are expected to "[i]mplement a strong governance framework" on climate risk, "[t]ake action to reduce greenhouse gas emissions across the value chain," and "[p]rovide enhanced corporate disclosure and implement transition plans to deliver on robust targets." Climate Action 100+, *The Three Goals*, https://www.climateaction100.org/the-three-goals/ (last visited Mar. 2, 2024). Some asset managers have backed away from these pledges. *See, e.g.,* Simon Jessop, Invesco joins list of US asset managers to exit CA100+ climate group, Reuters (Mar. 1, 2024), https://www.reuters.com/sustainability/invesco-joins-list-us-asset-managers-exit-ca100-climate-group-2024-03-01/ ("Invesco on Friday became the fifth major U.S. investor to exit or scale back their involvement with the Climate Action 100+ coalition of investors . . . . Invesco said in a statement it had 'decided to withdraw from the Climate Action 100+ initiative as we believe our clients' interests in this area are better served through our existing investor-led and client-centric issuer engagement approach.'").

[20] *See* Letter from Andrew Vollmer at 6 (Apr. 12, 2022), https://www.sec.gov/comments/s7-10-22/s71022-20123525-279742.pdf ("Andrew Vollmer 1") ("The statutory context of the Securities Act and the Securities Exchange Act limits the SEC's power to issue disclosure rules to specific types of information closely related to the disclosing company's value and prospects for financial success. . . . Some exceptions exist, but Congress, not the SEC, has introduced those."); Letter from Society for Corporate Governance at 8 (Jun. 17, 2022), https://sec.gov/comments/s7-10-22/s71022-20132044-302525.pdf ("Notably, as the Commission itself has pointed out, when Congress wishes to later expand the subject matter of mandatory disclosures beyond matters that are financial in nature, it specifically does so by statute, as it has done for topics such as executive compensation, corporate governance, and conflict minerals.") (citations omitted).

[21] Commissioner Roberta Karmel, *Changing Concepts of Materiality*, SEC (Apr. 12, 1978), https://www.sec.gov/news/speech/1978/041278karmel.pdf.

[22] *See* Letter from United States Senators Pat Toomey, Richard Shelby, Mike Crapo, Tim Scott, M. Michael Rounds, Thom Tillis, John Kennedy, Bill Hagerty, Cynthia Lummis, Jerry Moran, Kevin Cramer, and Steve Daines at 2 (Jun. 15, 2022), https://www.sec.gov/comments/s7-10-22/s71022-20133994-303877.pdf ("Addressing matters like global warming requires political decisions involving tradeoffs. In a democratic society, those tradeoffs must be made by elected representatives, who are accountable to the American people, not unelected financial regulators.").

[23] The Commission estimated that the proposed rule would have imposed a cumulative external cost burden on public companies of around $6.4 billion annually for filing the Form S-1 and the Form 10-K. Those same cumulative costs in the final rule are now $628 million annually. To be consistent with the final rule's hourly costs, I adjusted the estimated hourly professional costs in the proposed rule from $400 to $600 to reach the proposed rule's cost of $6.4 billion. *See The Enhancement and Standardization of Climate-Related Disclosures for Investors,*87 FR 21334, 21461, PRA Table 4 (April 11, 2022), https://www.govinfo.gov/content/pkg/FR-2022-04-11/pdf/2022-06342.pdf ("Proposed Rule"). For the final costs *see* Release at 827, PRA Table 7.

[24] Release at 827, PRA Table 7. The "typical" numbers refer to the external cost burden of filing the Form S-1 and the Form 10-K.

[25] *See*, *e.g.*, Letter from the Biotechnology Innovation Organization (Jun. 17, 2022), https://www.sec.gov/comments/s7-10-22/s71022-20132154-302645.pdf (arguing that emerging biotechnology companies will have to spend resources on materiality determinations, board disclosures, and management level

disclosures; noting that the management level disclosures will force companies to hire consultants and lawyers to complete; and arguing that a final rule that imposes excessive costs on smaller companies will reduce the number of companies that go public and ensure that the only companies that can go public will be large).

[26] Annual IPOs have dropped by around 40% from the 1990s. The 1990s averaged around 412 IPOs per year compared to an average of 248 each year over the last ten years. Data calculated from Table 15b of this dataset. *See* Jay Ritter, Initial Public Offerings: Updated Statistics, Special Purpose Acquisition Company (SPAC) IPOs, 1990-2023 (Feb. 23, 2024), https://site.warrington.ufl.edu/ritter/files/IPO-Statistics.pdf.

[27] For example, the Commission admits that companies with material Scopes 1 and 2 emissions levels "may . . . need to adopt further controls and procedures, including measurement technologies and other tools to track and report the information to the extent they do not already do so." Release at 684. Even companies that already track related emissions could have to invest "in systems or technologies to better measure Scope 1 and Scope 2 emissions" to improve their data. *Id.* at 685.

[28] *See, e.g.*, Letter from American Hotel & Lodging Association at 7 (Jun. 17, 2022), https://www.sec.gov/comments/s7-10-22/s71022-20132072-302553.pdf ("Obtaining 'limited assurance' is a time- and resource-intensive process that would consume a large proportion of our members' sustainability budgets."); Letter from ConocoPhillips at 14 (Jun. 17, 2022), https://www.sec.gov/comments/s7-10-22/s71022-20131839-302285.pdf ("[T]he availability of assurance providers is currently insufficient to meet demand and will likely trigger a surge in costs: the current estimate for assurance costs reflected within the Proposal of $15,000 is grossly underestimated; when comparing to current assurance services of a similar size provided by our external financial statement auditors, costs could easily be many orders of magnitude larger than the amount estimated within the Proposal."); Letter from Corteva Agriscience at 7 (Jun 17, 2022), https://www.sec.gov/comments/s7-10-22/s71022-20132346-302911.pdf ("Because GHG emissions disclosures and the related assurance practices are developing practices, for both registrants and assurance providers, we expect the preparation for, and execution of, these assurance engagements to be time consuming and costly.").

[29] *See* Letter from Transocean at 10-11 (Jun. 16, 2022), https://www.sec.gov/comments/s7-10-22/s71022-20131743-302178.pdf ("Moreover, we believe that inclusion of climate-related information in filings to the Commission significantly increases risk of shareholder litigation, including from the active plaintiff bar, a risk that investors in registrants should not be forced to bear."); Letter from Professor Amanda Rose at 2 (Jun. 17, 2022), https://www.sec.gov/comments/s7-10-22/s71022-20132215-302734.pdf (discussing the climate risk disclosures and arguing that "[i]f the proposal becomes law in its current form, any registrant that experiences a climate-related event that has a negative effect on its stock price will be vulnerable to a federal securities fraud class action.").

[30] *See, e.g.*, Letter from Western Midstream at 2 (June 15, 2022), https://www.sec.gov/comments/s7-10-22/s71022-20131435-301619.pdf ("Even investors who are appreciative of climate-related disclosures are highly unlikely to elevate those concerns above financial return or tolerate the diversion of significant financial or managerial resources to improve climate-related disclosures without a corresponding improvement in financial performance."); Letter from Sharfman and Copland at 13-14 (June 16, 2022), https://www.sec.gov/comments/s7-10-22/s71022-20131661-302049.pdf (explaining that disclosures about "the whether and how of board decision-making . . . make the board extremely vulnerable to second-guessing and public criticism by shareholders and investment advisers to index funds who lack the information, experience, and skill to make informed decisions.").

[31] *See, e.g.*, Letter from CohnReznick LLP at 5 (Jun. 22, 2022), https://www.sec.gov/comments/s7-10-22/s71022-20132716-303207.pdf ("We observe that many smaller and middle-market issuers utilize standard general ledger accounting packages that offer limited expenditure tracking functionality. Such smaller and middle-market issuers often prepare their cash flow statements on a consolidated basis using simple spreadsheets outside of their general accounting system.").

[32] *See* Release at 742 (noting that "some registrants may need to expend resources to first determine whether particular disclosure items are material, even in cases where registrants ultimately determine they do not need to make disclosure.").

App.980

[33] The Commission clarifies that it has "not provided a standalone cost estimate of making . . . materiality determinations . . . ." *Id.* at 743.

[34] Letter from Amberwave at 8 (Jun. 8, 2022), https://www.sec.gov/comments/s7-10-22/s71022-20130710-299591.pdf ("By imposing the Commission's preferred measures and standardizing market practices, we expect the Climate Proposals to harm innovation in environmental disclosures, and as a result, harm investors and undermine environmental policy aims over the long-term."); Charles Whitehead, Is Now the Right Time to Mandate Costly Climate Disclosure?, The CLS Blue Sky Blog (Mar. 29, 2022), https://clsbluesky.law.columbia.edu/2022/03/29/is-now-the-right-time-to-mandate-costly-climatedisclosure/ ("The upshot is that the new Climate Rules will impose higher costs on private and public companies that are pursing early-stage low-carbon technologies precisely at a time when we need to be able to efficiently fund and grow those and future businesses."); Letter from Americans for Tax Reform at 5 (Jun. 16, 2022), https://www.sec.gov/comments/s7-10-22/s71022-20131656-302041.pdf ("[R]ecent academic research has shown that adopting more extensive disclosure requirements harms innovation. A study of European countries found that 'more-extensive financial-reporting mandates were negatively associated with innovation inputs such as personnel working in research and development, and with outputs such as new processes and products.' The SEC's attempt to copy European climate disclosures will harm innovation, not improve it.") (quoting Martin Daks, *Mandated Financial Disclosure Leads to Fewer Innovative Companies*, Chicago Booth Review (Jun. 6, 2022), https://www.chicagobooth.edu/review/mandated-financial-disclosure-leads-fewer-innovative-companies).

[35] *See*, *e.g.*, Letter from Benjamin Zycher at 2-3 (Jun. 17, 2022), https://sec.gov/comments/s7-10-22/s71022-20132286-302818.pdf ("No public company and few, if any, government administrative agencies are in a position to evaluate climate phenomena, whether ongoing or prospective, with respect to which the scientific uncertainties are vastly greater than commonly asserted. The range of alternative assumptions about central parameters is too great to yield clear implications for the climate 'risks' facing specific public companies, economic sectors, and geographic regions.").

[36] *See*, *e.g.*, Letter from Independent Petroleum Association of America at 4 (Jun. 13, 2022), https://www.sec.gov/comments/s7-10-22/s71022-20131018-300379.pdf ("IPAA") ("Similarly, determining the nature and scope of physical risks depends on the assumptions that are used to assess the magnitude and type of climate related events. There is a wide array of assumptions that can be used to develop climate risk scenarios; it is an inexact science."); Letter from Boyden Gray and Associates PLLC at 105-110 (Jun. 17, 2022), https://www.sec.gov/comments/s7-10-22/s71022-20132160-302652.pdf (listing multiple reasons why the Commission's "required disclosure of 'chronic risks' [is] far too speculative."); Letter from Energy Transfer LP at 36 (Jun. 17, 2022), https://www.sec.gov/comments/s7-10-22/s71022-20132080-302561.pdf ("[D]etermining physical risks requires the use of assumptions, speculations, and models to determine those risks, all of which can result in radically different results."); Letter from John R. Ashcroft, Missouri Secretary of State, at 2 (Jun. 8, 2022), https://www.sec.gov/comments/s7-10-22/s71022-20130705-299575.pdf ("[P]redicting [the] potential future occurrence and likely impact [of physical climate risk] on a company or its business associates with any degree of assurance seems a formidable, speculative task unlikely to provide consistent, reliable decision useful information. I do not believe requiring public companies to calculate the risks of future weather conditions to be realistic, any more than I can predict when and where the next Midwestern tornado will wreak havoc.").

[37] *See, e.g.,* Letter from Cato Institute at 12 ("Seeking to estimate risk to a particular company . . . from potential changes in markets, technology, law, or policy in response to climate change is a task that rests, at best, on informed speculation."); Letter from Dave Gaddis (May 31, 2022), https://www.sec.gov/comments/s7-10-22/s71022-296328.htm ("These transition assessments are rooted in prophecies of coming governmental and market action, but experience teaches us that such prophecies often do not come to fruition. Markets and technology are inherently unpredictable. Domestic legislative efforts in this context have failed for decades, and international agreements, like the Paris Accords, have seen the United States in and out and back in again. How could this proposal thus elicit comparable, consistent, and reliable disclosure on these topics?"); Letter from IPAA at 5 ("[P]rojecting regulatory, technological and market changes across time is virtually impossible to do with

accuracy. No projection in 2019 would have included a COVID pandemic or a Russian invasion of Ukraine. Energy demand projections over time have consistently been limited with respect to both total supply and demand and segment supply and demand.").

[38] *See*, *e.g.*, Letter from David Burton at 8 (Jun. 17, 2022), https://www.sec.gov/comments/s7-10-22/s71022-20131980-302443.pdf ("A choice of discount rate would need to be made. Estimates would need to be made of the cost of various aspects of climate change (sea level rises, the impact on agriculture, etc.). Estimates would need to be made of the cost of various remediation techniques. Guesses would need to be made about the rate of technological change. Guesses would need to be made about the regulatory, tax and other responses of a myriad of governments. Estimates would need to be made using conventional economic techniques regarding the economic impact of those changes which, in turn, will reflect a wide variety of techniques and in many cases a thin or non-existent empirical literature. Guesses would need to be made of market responses to all of these changes since market participants will not stand idly by and do nothing as markets, technology and the regulatory environment change.").

[39] Letter from Professor J.W. Verret at 5 (Jun. 8, 2022), https://www.sec.gov/comments/s7-10-22/s71022-20130713-299599.pdf ("[C]limate reporting could benefit from continued evolution and competition between various organically developed methodologies utilized in the existing voluntary reporting dynamic. . . . Financial accounting did not evolve through some top-down edict requiring immediate standardization but instead evolved through feedback from technical practitioners over hundreds of years."); Letter from Energy Transfer LP at 11 ("[V]oluntary disclosure regimes allow the time and space necessary for these standards to evolve and organically adjust to investor needs, while the Proposed Rule would ossify the requirements before they have had time to fully develop.").

[40] Dropping Scope 3 disclosures and the requirement to analyze climate risks across a company's value chain should help farmers, small companies, and others in the supply chains of companies that would have had to assist public companies in making these disclosures under the proposal. But these entities are not off the hook. Companies must still disclose material physical and transition risks, including risks in their supply chains. The Release provides that companies must still disclose supply chain risk if it "has materially impacted or is reasonably likely to materially impact" the company. Release at 91. The Release says that a company "may be able to assess the material risks posed by its value chain without having to request input from third parties in its value chain." *Id*. But public companies likely will demand information from their suppliers. Companies could cut suppliers that cannot meet their information demands or streamline their supply chains to enable them to work with a smaller number of suppliers on building systems to collect the required information. Smaller suppliers are likely to suffer disproportionately.

[41] Letter from Energy Infrastructure Council at 3 (Jun. 17, 2022), https://www.sec.gov/comments/s7-10-22/s71022-20131767-302201.pdf.

[42] *See* Letter from PricewaterhouseCoopers LLP at 3 (Jun. 17, 2022), https://www.sec.gov/comments/s7-10-22/s71022-20132060-302540.pdf ("Given the uncertainty surrounding climate change—particularly over the long term—there is a risk that a broad requirement to disclose all climate-related risks that are 'reasonably likely to have a material impact on the registrant' may trigger a long list of boilerplate disclosures. Focusing disclosures on the climate information that the registrant's management uses to make strategic decisions would improve its usefulness, while simultaneously reducing the burden on registrants. We recommend an approach that leverages the MD&A principle of allowing investors to look at a company 'through the eyes of management,' tailoring disclosure of risks through the application of a management lens.").

[43] 17 CFR § 229.303(a) (Item 303) Management's discussion and analysis (MD&A) of financial condition and results of operations (emphasis added). I am not implying that MD&A is a model of clarity. *See*, *e.g.*, Letter from Andrew Vollmer at 8-10 (May 9, 2022), https://www.sec.gov/comments/s7-10-22/s71022-20128334-291089.pdf (arguing that the process for "preparing the Management's Discussion and Analysis (MD&A) section for a registration statement or annual report . . . is incomprehensible.").

[44] *See* Letter from the U.S. Chamber of Commerce at 1-2 (Dec. 6, 2023), https://www.sec.gov/comments/s7-10-22/s71022-308399-793602.pdf (noting that commenters have cited to California's new climate laws and the European Union's finalized sustainability standards – both issued after the SEC's proposed public company climate rule – as an argument for and against finalizing a public company climate rule.); Letter from Senators Bill Hagerty and Joe Manchin III at 1 (Nov. 3, 2023), https://www.sec.gov/comments/s7-10-22/s71022-296539-721142.pdf ("[T]he effort to finalize the March 2022 proposal is concerning because recent developments [in California] should compel the SEC to solicit further public feedback on certain assumptions and the economic analysis underlying its proposal.").

[45] The Release explains that companies that must also follow California's laws could face lower incremental regulatory costs for today's final rule due to overlapping regulatory requirements. Release at 778. However, the "scope and requirements of the California laws differ from the final rules" and so today's final rule could instead create additional regulatory costs. *Id.* at 779. All told, "the extent and overall impact of overlapping disclosure obligations are unclear." *Id.* Similarly, the Commission admits to "uncertainty as to the parameters of other jurisdictions' [climate] requirements," including Europe's. *Id.* at 611. Admittedly, California and the European Union have not yet implemented all the rules at issue. However, commenters still could have helped the Commission developed a more precise understanding of these developments. At least we could have reopened the comment period as we did after Congress imposed a new excise tax on share repurchases. The Commission re-opened the proposal's comment period to obtain feedback on how the tax altered the proposal's economic analysis. *See Reopening of Comment Period for Share Repurchase Disclosure Modernization*, 87 FR 75975 (Dec. 12, 2022), https://www.govinfo.gov/content/pkg/FR-2022-12-12/pdf/2022-26898.pdf. The United States Court of Appeals for the Fifth Circuit vacated our final share repurchase rule. *See Chamber of Commerce of United States v. SEC*, 85 F.4th 760 (5th Cir. 2023).

[46] The vast scope of changes from the proposed rule to today's final rule is also clear in the drop in overall external cost burden for the typical company. *See supra* footnote 23.

[47] Release at 827, PRA Table 7. This number refers to the external cost burden of filing the Form 10-K.

[48] Release at 22.

[49] Letter from Andrew Vollmer 1 at 16.

[50] The Release states that "although there is significant overlap between the disclosure of climate-related physical risks pursuant to Regulation S-K and the severe weather events and other natural conditions that a registrant identifies pursuant to Rule 14-02, the events covered by Rule 14-02 would also cover severe weather events and other natural conditions that are not necessarily related to climate." *Id.* at 485.

[51] The inspiration for this question came from the Energy Infrastructure Council's comment letter, available at https://www.sec.gov/comments/s7-10-22/s71022-20131767-302201.pdf.

## Statement

# A Climate Regulation under the Commission's Seal: Dissenting Statement on The Enhancement and Standardization of Climate-Related Disclosures for Investors



**Commissioner Mark T. Uyeda**

**March 6, 2024**

Thank you, Chair Gensler, and thank you to the staff for your presentations.

**A Roadmap for Abuse**

Today, much emphasis will be placed on how this rule has been dialed-back from the proposal, is focused on providing material information to investors, and that the Commission is not a climate regulator. To that, I emphasize the advice that I give to would-be investors: do not rely on the marketing materials and read the prospectus instead. By the time you finish reading all 886 pages of today's release, you will conclude that this rule is climate regulation promulgated under the Commission's seal.

Today's rule is the culmination of efforts by various interests to hijack and use the federal securities laws for their climate-related goals. In doing so, they have created a roadmap for others to abuse the Commission's disclosure regime to achieve their own political and social goals. First, they purchase shares in public companies under the guise of becoming "investors," but not with the primary intention of seeking financial return. Rather, they use their holdings as a means to force companies to disclose information related to political and social issues important to them but that may not be relevant to those companies' business or shareholders generally. After some companies capitulate to their demands, they ask the Commission to adopt rules requiring the disclosure from all companies. Citing such "investor demand" for the information and the need to have "consistent and comparable" disclosure, a politically-oriented Commission might pursue such a rulemaking. If it does, then the result is using disclosure not as a tool to aid investors, but to bypass Congress to achieve political and social change without the corresponding accountability to the electorate.

The Commission is a securities regulator without statutory authority or expertise to address political and social issues. In adopting new disclosure rules, the Commission should understand the informational needs of a "reasonable investor." This is precisely what the Supreme Court called for in TSC Industries v. Northway, when it stated that "the question of materiality, it is universally agreed, is an objective one, involving the significance of an omitted or misrepresented fact to a reasonable investor." [1] The Court further noted that disclosure policy

embodied in regulation is "not without limit."[2] Thus, before requiring disclosure, the Commission should assess whether the benefits of the information to the reasonable investor outweigh the costs of producing the disclosure. Unfortunately, this analysis did not occur for today's rulemaking. Instead, the Commission ventured outside of its lane and set a precedent for using its disclosure regime as a means for driving social change. If left unchecked, we may see further misuse of the Commission's rules for political and social issues and an erosion of the agency's reputation as an independent financial regulator.

**A Major Question Implicated**

The Commission asserts that the federal securities laws allow it to require information "necessary or appropriate in the public interest or for the protection of investors" and explains how it has relied on these provisions over the past 90 years to adopt various disclosure rules.[3] But the Supreme Court has made clear that a "colorable textual basis" may be insufficient to support an assertion of regulatory authority, especially if Congress was unlikely "to delegate a policy decision of such economic and political magnitude to [the] administrative agency." [4] In explaining the major questions doctrine, the Court stated that "[e]xtraordinary grants of regulatory authority are rarely accomplished through 'modest word,' 'vague terms,' or 'subtle device[s].'"[5]

Today's rulemaking is an extraordinary exercise of regulatory authority by the Commission that involves an economically and politically significant policy decision. The Commission adopts an entirely new subpart of Regulation S-K and an entirely new article of Regulation S-X for one topic – climate change – applicable to all public companies. In doing so, the rulemaking elevates climate above nearly all other issues facing public companies.

In no other context is a company required to provide an explanation of expenses that exceed one percent of income before taxes and analyze the significant contributing factor to the expense. For no other risk does the Commission require prescriptive, forward-looking disclosure of the risk's impacts on the company's strategy, business model, outlook, financial planning, and capital allocation. Today's rule also requires disclosure of climate-related targets and goals, even though the Commission has no similar requirements for a company's targets and goals related to other, more important matters affecting the company, such as financial performance, product development, customer acquisition, or market expansion. Finally, the requirement to disclose GHG emissions and obtain an attestation report on such disclosure is in a class of its own without comparison in the Commission's disclosure regime.

The Commission does not articulate any limiting principle for its claimed authority and why today's rule is within that limiting principle. Perhaps the Commission does not believe that there are limitations. The Supreme Court has stated that, in extraordinary cases – which I believe includes today's rule – an agency must cite to "something more than a merely plausible textual basis for [its] action. The agency instead must point to 'clear congressional authorization' for the power it claims."[6] The Commission has not done so for this rulemaking.

**A Flawed Process**

Even without the major questions doctrine and concerns about statutory authority, the Commission conducted a flawed process by not re-proposing the rule, raising the question of whether appropriate notice was provided under the Administrative Procedure Act.[7]

The Commission proposed this rulemaking nearly two years ago and received thousands of comment letters. Many commenters focused on the controversial part to require companies to disclose their scope 3 emissions. Given the proposal's expansive nature and its hundreds of requests for feedback, most commenters did not focus on, or address, every single issue or alternative raised. By removing the requirement to disclose scope 3 emissions and making numerous other substantive changes, the final rule differs significantly from the proposal. One only need to run a comparison of the proposed rule text and the final rule text to visualize page after page of extensive red ink reflecting strikethroughs and additions.

The Commission has essentially admitted that the proposal did not get it right. Accordingly, the Commission should have re-proposed this rule with an updated economic analysis and solicited additional public feedback. Doing so would have provided the public with an opportunity to focus on aspects of the proposal that they did not initially consider and submit comments on any revised requirements. At the minimum, a re-proposal could have resulted in a better estimate of the costs and benefits associated with this rulemaking. As the release notes, "[m]any commenters provided aggregate cost estimates that did not include certain elements required by the final rules, or included other elements that are not required in the final rules [and it was] difficult to use these cost estimates to quantify the direct costs of the final rules."[8]

**An Intrusion into the Boardroom**

The practical effect of today's rule is that companies' boards and management will need to spend more time and resources to think about, assess, and discuss climate change, even if no disclosure is ultimately made. Audit committees will be required to determine what it means to have had a "severe weather event and other natural condition." Lawyers and accountants will need to become well versed in hurricane categories and the Enhanced Fujita Scale.[9] But there is an opportunity cost to all of this. By forcing companies to spend more time and resources on climate discussions, the Commission creates the risk that companies may ignore, or not pay sufficient attention to, other matters that could have greater and more immediate impacts.

After the rule goes into effect, companies will have a duty to provide prescriptive, climate-related disclosure knowing that any non-disclosure, including assessments of materiality, will be judged in hindsight. To avoid potential liability, companies may voluntarily disclose climate-related information despite concluding that the information is immaterial. Even when a company does not ultimately make any disclosure, it will have spent considerable resources to gather and assess climate-related information, including potentially measuring its GHG emissions, in order to have effective disclosure controls and procedures and, where applicable, internal controls over financial reporting.[10] The takeaway is that climate will be nearly everything, everywhere, all at once for public companies.

The primary financial beneficiaries of today's rulemaking will be the ESG consultants, auditors, attestation providers, and attorneys who will advise on compliance with the new provisions. Keep in mind that not one dime of money spent on compliance will be used for actual reductions in GHG emissions, and that shareholders will be footing this bill.

**A Lack of Exemptions**

Today's rule will eventually be felt by all public companies. While the Commission could have exempted smaller reporting companies and emerging growth companies ("EGCs") from all aspects of today's rule, it limited the relief only to disclosure of GHG emissions. EGCs did not receive an "on-ramp" for the disclosure requirements, which was the impetus for more companies to go public as part of the JOBS Act.[11] Accordingly, after the compliance date for EGCs begins, they will need to provide climate-related disclosure on day one. Also, do not be fooled into thinking that limiting GHG emission disclosure to large accelerated filers and accelerated filers provides meaningful relief because a company with a public float as low as $250 million may still be required to report its GHG emissions.[12]

Finally, the Commission continues to diverge from its historic practice of largely deferring to the disclosures made by foreign private issuers ("FPIs") pursuant to their home country reporting requirements. For climate-related disclosure, many foreign jurisdictions have adopted, or announced plans to adopt, their own disclosure requirements.[13] The Commission could have eased the reporting burdens of FPIs and made the U.S. capital markets more attractive to them by allowing these foreign companies to report climate-related information pursuant to their home country requirements. Such an approach may also encourage foreign regulators to allow mutual recognition of the Commission's rules with respect to U.S. companies with foreign operations. Unfortunately, the Commission's decision today may subject U.S. companies to multiple regulations on climate disclosure and make the U.S. capital markets less attractive to foreign companies.

**A Thank You to the Staff**

Because of the concerns that I have with today's rule, I am unable to support it. There are many important political and social issues facing the country, but the place to resolve those concerns is in the halls of Congress, not the Commission.

I thank the staff of the Division of Corporation Finance ("CorpFin"), the Office of the Chief Accountant ("OCA"), the Division of Economic and Risk Analysis, and the Office of the General Counsel for their work. Many staff members have been working on this rulemaking for more than two years. During this time, they have reviewed thousands of comment letters, met with the public, and worked through different iterations of the rule. While I disagree with the procedural and policy aspects of today's rulemaking, the staff's efforts to complete the rulemaking should be recognized. I would especially like to thank Luna Bloom and Valian Afshar from CorpFin and Shaz Niazi, Erin Nelson, and Meagan Van Orden from OCA for their engagement with me and my office.

---

[1] *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 445 (1976).

[2] *Id.* at 448.

[3] Section II.B of The Enhancement and Standardization of Climate-Related Disclosures for Investors, Release No. 33-11275 (March 6, 2024) (the "Adopting Release"), available at https://www.sec.gov/files/rules/final/2024/33-11275.pdf.

[4] *West Virginia v. Environmental Protection Agency*, 597 U.S. 697, 723 (2022) (citing *Food and Drug Admin v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000)).

[5] *Id.*

[6] *West Virginia, supra* note 4, at 723.

[7] 5 U.S.C. 553(b)(3) (requiring notice of "either the terms and substance of the proposed rule or a description of the subject and issues involved").

[8] The Adopting Release at p.726.

[9] The Enhanced Fujita Scale is used to assign a tornado a rating based on estimated wind speeds and related damage. *See* The Enhanced Fujita Scale (EF Scale), available at https://www.weather.gov/oun/efscale. Tornadoes are included as an example of a "severe weather event" in today's rule.

[10] Companies should be mindful of this obligation given the Commission's recent enforcement actions focused on ineffective controls. *See, e.g.*, In the Matter of Activision Blizzard, Inc., Release No. 34-96796 (Feb. 3, 2023), available at https://www.sec.gov/files/litigation/admin/2023/34-96796.pdf.

[11] *See* Rebuilding the IPO On-Ramp, IPO Task Force (Oct. 20, 2011) at 19, available at https://www.sec.gov/info/smallbus/acsec/rebuilding_the_ipo_on-ramp.pdf.

[12] I have previously discussed the need to reassess the thresholds for a company to qualify as a large accelerated filer and an accelerated filer. *See* Mark T. Uyeda, Remarks at the Practising Law Institute's 55th Annual Institute on Securities Regulation (Nov. 7, 2023), available at https://www.sec.gov/news/speech/uyeda-remarks-practicing-law-institute-110723.

[13] *See* the Adopting Release at p.607-611.

App.988

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit www.djreprints.com.

https://www.wsj.com/articles/secs-gensler-bracing-for-lawsuits-over-climate-rule-60165fec

**RISK & COMPLIANCE JOURNAL**

# SEC's Gensler Bracing for Lawsuits Over Climate Rule

Gensler said legal challenges are part of the democratic process but added that the agency is focused on 'sustainable rulemaking'

By *Richard Vanderford*  [Follow]

*Feb. 13, 2024 5:54 pm ET*



Chair Gary Gensler has repeatedly stressed the SEC's intent is to make sure investors are supplied with the information they need. PHOTO: EVELYN HOCKSTEIN/REUTERS

Securities and Exchange Commission head Gary Gensler said possible lawsuits challenging the agency's proposed climate disclosure rule would be "part of our democracy," but added that the SEC is working to craft a rule that holds up to judicial scrutiny.

The SEC has yet to release a final version of climate regulations first proposed nearly two years ago. But the wide-ranging proposal—which would require companies to report on climate-related risks and carbon emissions—has been criticized even from within the agency and is expected to face legal challenges.

Gensler, who spoke at Yale Law School on Tuesday, suggested that the agency's being forced to defend the rule in court is part of the process.

"That's part of our democracy. We live in a great democracy," Gensler said. "That's what the public wants. I think we're doing everything according to the law and how the courts interpret the law, but as the courts shift their interpretations, jobs like mine are both more challenging and more interesting."

Many public companies already provide investors with some sort of climate-related disclosures, but the SEC rule is meant to make that reporting more consistent. Any litigation could make the timeline for businesses' complying with the rule uncertain.

Gensler said that he is focused on making regulations that can stand up to legal challenges.

"Sustainable rulemaking is really important—doing something the public understands, the courts understand, that's within the law. You can affect tens of millions of people's lives for decades," he said.

If a rule is thrown out, that long-lasting impact doesn't happen, Gensler said.

Thousands of businesses, trade groups and individuals weighed in on the proposal in the public comment period, and Gensler has said the SEC is weighing those remarks as it considers the rule's final form. Businesses are closely watching to learn what the SEC will do, including whether it will require detailed reporting of emissions up and down the value chain.

Since the commission put out its climate proposal, the U.S. Supreme Court issued a decision sharply curtailing the executive branch's authority to make policy without congressional direction, striking down an Obama-era Environmental Protection Agency regulatory scheme.

The high court this year heard arguments on whether to scrap what is known as the "Chevron deference," a legal precedent that directs courts to defer to an agency's interpretation of the law governing it when the statutory language is ambiguous.

App.990

Gensler has repeatedly stressed that the SEC's intent is to make sure investors are supplied with the information they need.

"We are not a climate regulator," he said Tuesday. "We are not a climate risk regulator. We're a securities regulator."

Write to Richard Vanderford at Richard.Vanderford@wsj.com



June 16, 2022

Vanessa A. Countryman
Secretary
US Securities and Exchange Commission
100 F Street NE
Washington, DC 20549

*Via email:* [rule-comments@sec.gov](mailto:rule-comments@sec.gov)

**Re:** **File Number S7-10-22**
**The Enhancement and Standardization of Climate-Related Disclosures for Investors**

Dear Ms. Countryman:

The U.S. Chamber of Commerce appreciates the opportunity to comment on the proposed rules (the "Proposed Rules") of the Securities and Exchange Commission ("SEC" or "Commission") governing climate and the environment in Release No. 33-11042 (the "Proposing Release").[1] Combating climate change requires citizens, governments and businesses to work together. American businesses play a vital role in creating innovative solutions and reducing greenhouse gases ("GHGs") to protect our planet. The SEC, working in coordination with other government agencies whose primary responsibility it is to protect the environment, also has a role to play to the extent climate risk implicates the SEC's tripartite mission of investor protection, maintaining fair, orderly and efficient markets, and facilitating capital formation.

The Chamber believes that policy solutions addressing climate change should serve the goal of reducing emissions as much and as quickly as possible based on what the pace of innovation allows and the feasibility of implementing technical solutions at scale. The Chamber also believes that practical, flexible, predictable and durable market-based solutions and mechanisms are at the core of efforts to address climate risk and are reflected in the actions of the Chamber's members. Promoting private sector innovation across industry sectors will be central to solving climate change.

The Chamber supports climate policy that includes the disclosure of material information for investors to use, as well as policies that are not distorted or duplicative as a result of overlapping regulations and are not skewed by political interests. U.S. climate policy should recognize the need for action, while maintaining the national and international competitiveness of U.S. industry and commerce and ensuring consistency with free enterprise and free trade principles. Climate policy should also be informed by the best science and observations available and a rigorous assessment of available alternatives, outcomes, and cost-benefit tradeoffs to ensure that the optimal policies are implemented. We must consider the significant progress that the private sector has spurred by

---

[1] Release No. 33-11042, *The Enhancement and Standardization of Climate-Related Disclosures for Investors*, 87 Fed. Reg. 21,334 (Apr. 11, 2022).

App.992

committing billions of dollars to research and development that have led to the creation and implementation of innovations that help manage climate risk and accelerate emissions reductions.

We are concerned that the Proposed Rules, when viewed holistically, do not strike the right balance and may, in fact, prove counterproductive by mandating that companies produce extensive amounts of information that is not material, thus obscuring for investors what is most important to making informed voting and investment decisions and creating confusion and misimpressions. This is not consistent with the SEC's longstanding tripartite mission and its stated goals in issuing the Proposed Rules. Mindful of the SEC's mission under the federal securities laws, the Chamber submits this comment letter to help the SEC improve the Proposed Rules to better serve the interests of investors and the U.S. capital markets without impeding the progress the business community has already made – and continues to make – in providing climate-related disclosure to investors and in developing strategies and technologies to reduce climate risk and its potential adverse impacts on society.

The Chamber is committed to working constructively with the SEC to develop and ensure an effective, standardized and consistent mandatory disclosure regime under the federal securities laws so that the marketplace has the benefit of material climate-related information that informs investor decision making as investors seek out financial returns. We agree that material climate risks and impacts should be disclosed to investors, and that the Commission's 2010 climate change interpretive guidance has been instrumental in improving the quantity and quality of disclosures on this topic.[2] However, the current Proposed Rules are vast and unprecedented in their scope, complexity, rigidity and prescriptive particularity, and exceed the bounds of the SEC's lawful authority as proposed. The Chamber respectfully urges the SEC to address the issues identified below before adopting any final rules.

    1.    <u>Ground Any Final Rules in Materiality.</u>

As with other areas of disclosure, the traditional and longstanding conception of materiality continues to serve as a critical bedrock in which to ground disclosure requirements to prevent an "avalanche" of information that can disadvantage investors. Basing disclosure mandates in materiality also serves to ensure that the SEC adheres to the purpose that the agency was established to serve, deferring to appropriate parts of government to take the lead on other valid goals and objectives.[3] As the Proposed Rules acknowledge, public companies now disclose significant amounts of information about the actual and potential impacts of climate change on their businesses, and both the quantity and quality of this disclosure has greatly increased over the past decade, and it continues to do so. Voluntary disclosures have been effective in detailing this information, as have existing disclosure mandates, including regarding risk factors and management's discussion and analysis ("MD&A"). The Proposed Rules should not mandate that companies disclose climate-related information that is not material.

---

[2] Release No 33-9106, *Commission Guidance Regarding Disclosure Related to Climate Change*, 75 Fed. Reg. 6,290 (Feb. 8, 2010).

[3] The Chamber addresses many of these issues in its 2017 white paper, *Essential Information: Modernizing our Corporate Disclosure System*.

The Chamber believes companies should disclose climate risks when material, and the SEC can provide companies with valuable structure and direction as to how to do so. A consistent theme of this comment letter, however, is that the Proposed Rules are too much, too soon and too inflexible.

Accordingly, any final rules adopted should be grounded in the established understanding of materiality, should be sensitive to the practical difficulties of meeting certain proposed disclosure requirements (including with respect to applicable compliance deadlines), and should be otherwise tailored to achieve an appropriate objective consistent with the SEC's mission and authority without potentially causing unnecessary adverse consequences, including for investors. As a result, any regulatory requirements the SEC ultimately does adopt should be revised from the current Proposal to reflect the alternatives presented below to more effectively advance the SEC's mission and provide investors with reliable, material information that assists them in making informed investment and voting decisions.

If finalized in their current form, the Proposed Rules would create significant implementation problems due to their massive scope and prescriptive particularity, centering around the inherent complexity in collecting required data and completing the calculations and analysis necessary to make the proposed disclosures. It is difficult to recall any other instance in which the SEC has mandated disclosures where there are so many significant uncertainties, data limitations and practical difficulties in developing the required information. A more streamlined approach that is principles-based, less prescriptive, and qualified by commonly-understood and traditionally-applied principles of materiality will produce a better outcome for the registrants that must prepare the disclosure and the investors who will consume it, leading to a rule that more effectively advances the SEC's mission and at a much lower cost than the current Proposal.

2.  The SEC Should Not Finalize Financial Reporting Rules Covering Climate Change.

Proposed Article 14 of Regulation S-X is largely unworkable, and such disclosures are not likely to be material or useful for investors. The proposed requirements represent transformative rulemaking from the standpoint of financial reporting and disclosure controls, processes and procedures, but are not based on a legislative mandate and cannot be complied with using incremental builds on existing controls, processes and procedures given the vast and unprecedented scope, granularity, complexity and prescriptiveness of the Proposed Rules. Furthermore, the Proposed Rules require untold estimates, assumptions and judgments against the backdrop of significant data limitations and speculative impacts. The rigid and detailed mandates of proposed Article 14 are in stark contrast to the flexible principles regarding disclosure of climate-related financial impacts contemplated by TCFD and extend far beyond what is warranted to respond to what investors have called for, particularly in light of the high costs of compliance – costs that will be even higher to the extent these disclosures are subject to the financial statements audit. We urge the SEC not to adopt the component of the Proposed Rules for GAAP footnote disclosure of climate-related financial metrics. The SEC should instead defer to the Financial Accounting Standards Board ("FASB") for setting GAAP. To the extent the SEC nonetheless moves forward in a final rule with financial reporting requirements, such disclosures should be

disclosed pursuant to existing MD&A disclosure requirements rather than be included in a registrant's financial statements. Further, if the SEC ultimately does mandate disclosures in the financial statements, materiality should be the standard for determining what must be reported instead of the 1% threshold as proposed by the Commission.

3.   <u>Scope 3 Emissions Reporting Should Be Entirely Voluntary</u>.

Scope 3 emissions reporting should not be mandated, because of the myriad difficulties that the SEC itself recognizes in the Proposing Release. These difficulties compromise the usefulness of Scope 3 emissions disclosure, particularly when disclosed on the scale that the Proposed Rules contemplate. In its current state, when viewed in the aggregate, the nature and amount of estimation required to calculate Scope 3 emissions renders that information not material for investors. Instead of mandating Scope 3 emissions disclosures as the Proposed Rules do, the SEC should allow companies to disclose Scope 3 emissions on a voluntary basis as each company determines is appropriate. To help address the significant issues with Scope 3 emissions reporting that make mandating such reporting problematic, the Chamber stands ready to collaborate constructively to help facilitate discussions among the SEC, the EPA, the business community and other stakeholders to continue developing workable practices and methodologies that could produce consistent, comparable, and reliable Scope 3 emissions reporting on a practicable and achievable basis.

4.   <u>Permit a More Reasonable Compliance Period and Allow for a Reporting Deadline Later in the Year for Emissions Data</u>.

The Commission should, in any final rules, extend the initial compliance deadlines by at least two years to provide the issuer community sufficient time to develop systems, controls, and audit methodologies over whatever new disclosures are ultimately adopted. This additional time will allow the SEC to better promote more reliable disclosures than a hurried compliance period. In addition to the initial compliance deadline being too soon as proposed, the timing of disclosure during the annual reporting process also presents compliance challenges.

Much of the emissions-related information in the Proposed Rules would be required in Form 10-K. Particularly for companies with a calendar fiscal year, this deadline is unreasonably tight, and for most companies (even large accelerated filers) there will be significant challenges in providing emissions-related disclosures by the required deadlines. Any perceived benefit associated with disclosures being made at the same time as a company's annual report is outweighed by the benefit of allowing companies more time so that they have a realistic opportunity to prepare disclosures that will, in turn, be more reliable and useful to investors. In short, investors benefit when registrants have the time and ability to collect the requisite data and subject the information to an effective disclosure process and set of controls and procedures. The Proposing Release acknowledges as much by permitting registrants to make use of fourth-quarter estimates under certain circumstances under proposed Regulation S-K Item 1504(e)(4)(i) as long as the registrant promptly discloses in a subsequent filing any material difference between the estimate used and the actual, determined GHG emissions data for the fourth fiscal quarter. While

we appreciate the Commission's effort to allow an accommodation here, its proposed approach is not workable.

Indeed, the SEC's need to allow companies to use a fourth quarter estimate to meet their GHG emissions disclosure obligations is not only an accommodation the SEC has never needed to make before, but it underscores that the SEC recognizes that many companies simply will not be able to meet the emissions disclosure deadline for a variety of reasons. For example, key emissions data needed to complete the required audit may not arrive until it is too close to the deadline to be prepared for external assurance and made subject to such assurance. Moreover, including data based on these types of estimates, subject to future correction when the actual data is available, would pose significant challenges for any third party auditor of the resulting disclosure and could provide fodder for opportunistic third parties, such as politically-motivated activists, not motivated by the best interests of investors. This accommodation is not adequate to address the risk of being second-guessed and the attendant liability. It also does not help to ease potential investor confusion – if anything, use of a fourth-quarter estimate that is subsequently updated will likely spawn investor confusion and creates liability risk.

Additionally, accelerated and large accelerated filers with a calendar fiscal year would be required to make emissions disclosures under the Proposed Rules *before* the March 31 EPA reporting deadline for similar information. The March 31 EPA deadline is followed by an EPA comment period whereby disclosures are often modified in response to EPA comments, and these disclosures often do not become final until the fourth quarter of the calendar year.

Rather than front-running the EPA reporting process or providing the unusual workaround that permits disclosure of GHG emissions on the basis of a quarterly estimate, the Commission should delay the reporting deadline for emissions information to later in the year. There is already a basis for this concept within the SEC's rules. Form SD, for example, is not due until May 31. Therefore, the Commission should delay the GHG emissions reporting deadline to later in the year to avoid the need for estimates and updates to those estimates and the duplication of reporting information that is the same or similar as that reported to environmental regulators like the EPA. If the Proposed Rules are not modified to allow for a later reporting deadline, it is imperative that the SEC coordinate with the EPA to ensure consistency between the reporting regimes. To accommodate companies with different fiscal years and to allow sufficient time to collect the necessary data for reporting, any disclosure on emissions (including scope emissions) should be due no earlier than 180 days after the due date for Form 10-K for that particular registrant. If a company files emissions reports with another regulator, such as the EPA, and that regulator requires any amendment or modification of such emissions data, then the affected company should be permitted to amend its SEC disclosure without penalty or exposure to additional liability.

5.    Provide for Reporting Outside the Form 10-K and Form 10-Q.

To the extent climate-related information is responsive to an existing disclosure mandate under Regulation S-K (e.g., MD&A or risk factors) it should continue to appear in Form 10-K and Form 10-Q, as applicable. However, if the Commission proceeds with requiring a separate set of bespoke climate disclosures along the lines of proposed Subpart 1500 of Regulation S-K, the

required information is better suited for disclosure outside the Form 10-K and Form 10-Q. Climate disclosure of the nature and magnitude that the Proposing Release contemplates is of a different character than traditional financial and operational information that is material, whether forward-looking or historical. Among the many benefits of disclosure outside Form 10-K and Form 10-Q is that it will signal to investors that the disclosure is of a different tenor than other information that has long been required under the federal securities laws, which will work to mitigate the potential for investor confusion and distraction as discussed at length below.

6.  Scope 1 Emissions Reporting Should Track EPA Regulations.

Where other disclosure systems exist, the SEC should endeavor to reduce duplication and the costs therein that are ultimately borne by investors. Elsewhere in this letter we discuss the practical challenges and shortcomings of mandated Scope 3 reporting at the current time, and as a result express the view that Scope 3 reporting should continue to be voluntary. Unlike Scope 3, however, Scope 1 reporting is already required for many issuers under EPA rules, and EPA disclosure requirements are an appropriate basis for any Scope 1 requirements adopted by the SEC. In the Proposing Release, the SEC states that "GHG emissions data compiled for the EPA's own GHG emissions reporting program would be consistent with the GHG Protocol's standards, and thus with the proposed rules," and therefore "a registrant may use that data in partial fulfillment of its GHG emissions disclosure obligations pursuant to the proposed rules."[4]

The SEC should not develop its own Scope 1 emissions reporting standards since the EPA has for years already required reporting on this information.[5] In addition to mitigating potential investor confusion were the information to appear in Form 10-K, this approach would also lead to better alignment between what the SEC proposes to mandate and environmental-related disclosures that public companies already make with the EPA or via other means of reporting.

7.  Provide a Transition Period for Prior Years.

The Proposed Rules would require companies to provide GHG emissions disclosure and climate-related financial statements metrics for each year covered by the first annual report when the rules become effective. This requirement does not include a clear transition provision. In other words, even for the companies that have not started voluntarily disclosing any information, precise, quantified disclosure of metrics they have not previously tracked or reported would be required not only for the fiscal year covered by the first annual report under the newly effective reporting regime, but also for the two prior fiscal years. For example, Proposed Rule 14-01 of Regulation S-X would require disclosure for a registrant's most recently completed fiscal year and for the historical fiscal year(s) included in the registrant's consolidated financial statements in the applicable SEC filing. The Proposing Release refers to Securities Act Rule 409 and Exchange Act Rule 12b-21[6] as providing potential relief from the requirement to report on more

---

[4] Proposing Release, 87 Fed. Reg. at 21,374.
[5] Any mandatory SEC GHG emissions reporting should be net of any offsets, rather than via the unusual convention in the Proposing Release that would require reporting on a gross basis without the use of offsets, which is contrary to market practices and would not accurately reflect a company's efforts to mitigate emissions.
[6] Proposing Release, 87 Fed. Reg. at 21,364.

than one year in the first year reporting is due. Nonetheless, subject to our position (described in detail elsewhere in this letter) that the SEC should not finalize financial reporting rules covering climate change, to the extent the Commission maintains this requirement and finalizes any mandate for retroactive disclosure, a clearer transition period is warranted without reliance on separate SEC rules.

For many companies, even those that have already established some level of voluntary reporting, historical information may only be available at great cost and difficulty and, even then, could be subject to significant uncertainties that would make the disclosure unreliable, if it could be provided at all. The need for third party assurance of this information, which would start as soon as the next year for GHG emissions and in the initial year for the climate-related financial statements metrics, further compounds this difficulty. If the requirements for disclosure around these metrics are maintained in any final rules, they should not apply retrospectively. While companies could be encouraged to provide information, if available, about the retrospective periods, companies should only be required to disclose new information for the year for which the first compliant annual report or other SEC filing is due.

## <u>SUMMARY OF KEY ISSUES</u>

The remainder of this comment letter expands our discussion of many of the above alternatives and provides additional explanation as to why the totality of the Proposed Rules, as currently structured, are in many important respects unworkable and require further refinement to best serve the SEC's mission. As discussed more fully below, the Proposed Rules not only should be revised, if adopted, to reflect the above, but also should account for the following key legal, policy and economic considerations to improve them:

- **The SEC has not demonstrated that the sweeping scope of the Proposed Rules as drafted is warranted.** The Proposing Release repeatedly cites a demand for climate disclosure from select institutional investors. Although such interests warrant appropriate attention, they do not justify the whole of the Proposed Rules in terms of their combined breadth and prescriptive particularities, especially given the fact that these select investors have not requested all the required information contemplated by the Proposed Rules, nor have they requested it from all companies that are subject to reporting obligations under the Securities Exchange Act of 1934, as amended (the "Exchange Act"). Moreover, the Proposing Release is frequently dismissive of the significant climate and environmental disclosures that public companies already make, while at the same time using existing company disclosures to justify their extremely low estimate of the cost to comply with the Proposed Rules. The SEC should take a more tailored approach to disclosure.

- **If adopted, the Proposed Rules would impose weighty obligations unprecedented in the SEC's history.** The Proposed Rules, taken as a whole, would impose a vast and costly new reporting regime on public companies that dwarfs even Sarbanes Oxley implementation costs. They are in stark contrast to other critical disclosure obligations that are focused on financial disclosures, are principles-based and present information in a curated way, as viewed "through the eyes of management." The Proposed Rules would transform periodic SEC reports from

filings that center on the financial and operating performance of companies into filings that, in notable respects, resemble what an environmental regulator might require and, in some cases, already requires.

- **The Proposed Rules exceed the Commission's statutory authority.** The SEC does not have general authority to impose climate- and environmental-focused regulation in the comprehensive fashion contemplated by the Proposed Rules.

- **The Proposed Rules would substantially revise the longstanding and traditional conception of materiality.** The Proposed Rules substantially deviate from the longstanding and traditional conception of materiality under the federal securities laws that for decades has advanced the best interests of investors, encouraged capital formation and helped ensure the integrity of our capital markets. The Proposed Rules often call for the disclosure of granular climate-related information that is required to be provided even if such information is immaterial under the standard of materiality the Supreme Court handed down decades ago.

- **The Proposed Rules raise serious constitutional questions.** The Proposed Rules raise significant First Amendment issues that must be addressed. The First Amendment imposes important limits on the government's ability to compel speech, including disclosure mandates under the federal securities laws like those provided for in the Proposed Rules. In their current form, the Proposed Rules violate the First Amendment. Further, the Proposed Rules are grounded in a reading of the SEC's authority that violates the non-delegation doctrine.

- **The Proposed Rules, if adopted as proposed, would result in extensive disclosure of non-material information that is not useful to investors.** Putting aside the significant burdens that would be placed on public companies to collect, prepare, and validate the new disclosures the Proposed Rules would compel, there remains substantial doubt that these new requirements will lead to better understanding of the complicated topic they cover. To the contrary, the totality of new, extensive disclosures under the Proposed Rules risk inundating investors with immaterial information and creating unnecessary confusion and misunderstanding, particularly as to the certainty of the disclosures and the meaning of the various mandated new metrics. Moreover, the new disclosure requirements – because of their unprecedented extensive, detailed, and prescriptive nature as compared to any other disclosure requirements under the federal securities laws – would place disproportionate emphasis on climate risk relative to other matters, which would make it harder for investors to discern and use the material information about non-climate related matters contained elsewhere in annual reports and registration statements or even the material climate-related information that companies already disclose in filings. Indeed, it is important to underscore that material climate-related disclosures already are made by companies, including as part of their risk factor and MD&A disclosures.

- **The Proposed Rules, if enacted, would discourage companies from entering or remaining in the public markets.** Seeing the vast cost and complexity of the new climate reporting regime, the real potential to divert managerial resources from other elements of the business, including resources needed to implement actions that actually reduce GHG emissions, and the opportunity for increased shareholder activism, many private companies will avoid accessing

the public markets, limiting opportunities for retail investors to participate in the next generation of public company value creation. Many existing U.S.-listed public companies are likely to reach a similar conclusion and pursue efforts to exit the U.S. public markets while also avoiding transactional opportunities that could create value for U.S. shareholders, such as potential mergers, if pursuing such opportunities would require them to become subject to SEC-mandated disclosure obligations.

- **The nature and degree of the SEC's reliance on unregulated standard setters raise concern.** Many companies have been guided in their voluntarily reporting of climate-related risks and GHG emissions by the TCFD recommendations and the GHG Protocol. While voluntary reporting under these or other voluntary standards is entirely appropriate, the analysis is different when the SEC transforms voluntary standards into mandatory ones. The Chamber believes that, if the SEC adopts climate-related rules, the TCFD recommendations and the GHG Protocol should be considered and taken into account in preparing the rule. However, the SEC may not rely on TCFD and the GHG Protocol without undertaking a rigorous analysis of their appropriateness as mandatory requirements as compared to voluntary guidelines and frameworks. These organizations were created to address various policy considerations and respond to constituencies beyond those of the U.S. capital markets and investors. The process for third parties developing these voluntary standards is not subject to the rigors of the Administrative Procedure Act, and many of the standards address topics and are intended to achieve objectives far removed from the SEC's core expertise and authority as a capital markets regulator.

- **The SEC should not impose a GHG emissions attestation requirement.** The proposed GHG emissions attestation requirement poses significant implementation challenges. Instead of a mandatory assurance regime, GHG emissions attestation should continue to be voluntary.

- **If the SEC mandates Scope 3 disclosures, then it should revise and expand the disclosure safe harbor.** While the Chamber is of the view that requiring reporting of Scope 3 emissions would exceed the Commission's authority, should the SEC mandate their disclosure, then the proposed safe harbor from Scope 3 emissions disclosure liability is too narrowly crafted and does not provide adequate relief. Furthermore, the Commission should employ a meaningful safe harbor not just for Scope 3 emissions disclosures, but rather should provide a meaningful safe harbor to cover the entirety of the disclosure provided in response to any final rules in light of the unique challenges that the SEC itself recognizes companies must overcome to meet the proposed climate-related disclosure obligations.

- **The SEC should extend the effective dates of any final rules.** Given the scope and breadth of the Proposed Rules, as well as the new processes, procedures, systems and controls companies will be required to develop to ensure their ability to comply, a significantly longer transition period is needed. To provide a reasonable transition to compliance with any final rules, the Commission should provide for effective compliance dates two years beyond those indicated in the Proposing Release. To accommodate special challenges posed in mergers and acquisitions, the Commission should permit companies to delay reporting on acquired businesses for an additional year from the date of acquisition.

- **The economic analysis in the Proposing Release is incomplete and substantially underestimates compliance costs.** As the Commission's former Chief Economist, James Overdahl, explains in the report attached hereto as <u>Annex A</u> (the "Overdahl Report"), the Commission has failed to adequately assess the existing economic baseline, underestimated and ignored substantial costs of the Proposed Rules, and disregarded marginal costs and benefits, among other significant defects in the Commission's economic analysis.

- **The compressed comment period has significantly impeded the public's ability to comment on the Proposed Rules in a thorough way.** The Proposed Rules run 140 pages in the *Federal Register* and pose over 700 discrete questions. Even with a 28-day extension to the public comment period, the comment period duration has not afforded the public sufficient opportunity to study the vast Proposing Release and perform the kind of sophisticated analysis required by a rulemaking of such breadth and complexity. At the same time, the Commission has proposed a litany of other rules, all with similarly brief comment periods that overlap one another, which in total run over 1,000 pages in the *Federal Register*. The Chamber's own efforts to gather member feedback while analyzing and responding to the Proposing Release were substantially impeded by the inadequate comment period.

<center>*       *       *</center>

<center><u>**OUTLINE OF DISCUSSION**</u></center>

I.  THE SWEEPING BREADTH, PARTICULARITY AND PRESCRIPTIVENESS OF THE PROPOSED RULES IS NOT WARRANTED.

    A.  The SEC has not demonstrated that the sweeping scope of the Proposed Rules as drafted is warranted.

    B.  If adopted, the Proposed Rules would impose weighty obligations unprecedented in the SEC's history.

        1.  Compliance with the Proposed Rules would impose significant burdens and costs on registrants.

        2.  Climate disclosures should be materiality-focused and principles-based.

        3.  The climate-related information required by the Proposed Rules could be provided in response to a number of existing disclosure requirements.

        4.  There is potential for misuse of SEC-mandated climate information.

        5.  The Proposed Rule seems aligned with implementing the Administration's climate change goals.

    C.  The Proposed Rules exceed the Commission's statutory authority.

        1.  The SEC's authority is limited to disclosure of information that is financial in nature and necessary for investors to assess a security's value.

        2.  The Proposed Rules are neither necessary nor appropriate for investor protection or the public interest.

D. The Proposed Rules would substantially revise the longstanding and traditional conception of materiality.

E. The Proposed Rules raise serious constitutional questions.

    1. The Proposed Rules violate the First Amendment.

    2. The Proposed Rules are grounded in a reading of the SEC's authority that violates the non-delegation doctrine.

II. THE PROPOSED RULES WILL LEAD TO SERIOUS ADVERSE CONSEQUENCES IF NOT SIGNIFICANTLY IMPROVED

A. The Proposed Rules, if adopted as proposed, would result in extensive disclosure of non-material information that is not useful to investors.

B. The Proposed Rules, if enacted, would discourage companies from entering or remaining in the U.S. public markets.

III. THE PROPOSED RULES MUST BE SUBSTANTIALLY REVISED IF ADOPTED.

A. The nature and degree of the SEC's reliance on unregulated standard setters raise concern.

B. The SEC should not create new financial reporting rules covering climate change.

    1. The proposed 1% materiality threshold is unworkable.

    2. Proposed Article 14 presents innumerable implementation difficulties and will result in extensive disclosure of immaterial information.

    3. The SEC should not bypass the traditional FASB standard-setting process.

    4. The climate-related financial statement metrics depart significantly from the TCFD recommendations.

C. The SEC should not impose a GHG emissions attestation requirement.

    1. The proposed attestation requirements are an unnecessary departure from longstanding practice and pose significant implementation challenges.

    2. Third-party attestation of Scope 1 and 2 emissions adds another costly layer to the proposed reporting requirements.

    3. Attestation should continue to be voluntary.

D. Scope 3 emissions reporting should be entirely voluntary.

    1. Scope 3 emissions are difficult to identify and accurately quantify and are uniquely uncertain and speculative.

    2. Gathering reliable data to quantify Scope 3 emissions is costly.

    3. The safe harbor provision for Scope 3 emissions disclosures does not provide the relief that is required for companies that would be subject to this reporting requirement.

4. Scope 3 emissions disclosures are inherently incomparable.

E. If the SEC mandates Scope 3 disclosures, then it should revise and expand the disclosure safe harbor.

1. The proposed safe harbor is too narrow.

2. The scope of Securities Act Rule 409 and Exchange Act Rule 12b-21 should be expanded and clarified with respect to climate-related disclosures.

F. The SEC should provide a transition period for prior years.

G. The SEC should permit a more reasonable compliance period and allow for a reporting deadline later in the year for emissions data.

H. The SEC should permit omission of disclosure by registrants that are wholly-owned subsidiaries of other reporting companies.

I. The SEC should not require reporting on an organizational boundary basis.

J. The SEC should extend the effective dates of any final rules.

1. The Proposed Rules do not allow for sufficient transition time.

2. The Commission should permit additional transition time for acquired businesses or assets.

IV. THE COST-BENEFIT ANALYSIS IN THE PROPOSING RELEASE IS INADEQUATE TO JUSTIFY THE ENTIRETY OF THE PROPOSED RULES.

A. The economic analysis in the Proposing Release is incomplete and substantially underestimates compliance costs.

B. The compressed comment period has significantly impeded the public's ability to comment on the Proposed Rules in a thorough way.

\*     \*     \*

## DISCUSSION

I. THE SWEEPING BREADTH, PARTICULARITY AND PRESCRIPTIVENESS OF THE PROPOSED RULES IS NOT WARRANTED.

**A. The SEC has not demonstrated that the sweeping scope of the Proposed Rules as drafted is warranted.**

The Proposing Release repeatedly cites a demand for climate disclosure from select institutional investors. Investor demand for certain information may be driven by reasons other than such information being necessary to make a voting or investment decision and does not necessarily establish the materiality of such information for purposes of federal securities regulation. Although such interests warrant appropriate attention, they do not justify the whole of

the Proposed Rules in terms of their combined breadth and prescriptive particularities. As an initial matter, investor demand for more climate information from public companies is not tantamount to investor demand for the totality of the Proposed Rules and the countless granular disclosure mandates the Proposed Rules would impose on companies. Moreover, although a part of the assessment, demand by certain investors for information does not substitute for a rigorous cost-benefit analysis by the SEC that considers the full range of institutional and retail investors, as well as other policy goals and objectives consonant with the SEC's mission as a capital markets (as compared to environmental) regulator.

In the context of the totality of material information that is made available to investors with a direct nexus to valuing a company and corresponding investor decision making, the Proposed Rules place disproportionate emphasis on matters relating to climate if the regulatory objective is to help investors seek and earn investment returns. The Proposed Rules are difficult to justify in the aggregate if the SEC is adhering to its traditional mission rather than regulating more akin to how a climate regulator would regulate.

The Proposing Release is frequently dismissive of the significant climate and environmental disclosures that public companies already make, both within SEC filings and in stand-alone sustainability or ESG reports, except to the extent the Proposing Release argues that because companies currently voluntarily disclose some of the information the Proposed Rules would mandate, the burden of the SEC's extensive and comprehensive proposed requirements is lessened. As discussed in more detail herein, the SEC is underestimating the value of the existing disclosures and the extent and difficulty of what companies will need to undertake to come into compliance notwithstanding present disclosure practices. All this causes pause when it comes to determining the marginal benefit versus marginal cost of the Proposed Rules when taken as a whole in light of other useful climate-related information investors already can access. The fundamental issue of whether full compliance with the Proposed Rules will have any meaningful benefit on climate or the environment is not within the SEC's mandate and not addressed in the Proposing Release.

There is great variation in the impacts climate-related risks may have on a company, in whether those impacts are material, and in what climate-related risks may impact a company. Likewise, the impacts of climate change on individual businesses are often far from certain, as the Proposing Release acknowledges, particularly when attempting to predict impacts that are years or even decades away and rooted in numerous scientific and economic uncertainties, which are unknown or even unknowable at this time. After accounting for uncertainty and discounting to present value, the effects of climate change are often not material for those seeking a financial return on their investments.

Record evidence confirms that climate-related information is often not material. The recent comment letter exchanges based on the form climate disclosure comment letter (i.e., a "Dear CFO,…" letter) published by the SEC staff in September 2021 similarly undercut the notion that

climate-related information is often material.[7] In these exchanges, companies generally stated that the climate-related disclosures requested by the SEC staff – which resembled disclosures contemplated by the Proposed Rules – were not being included in the applicable filing because such disclosures were not material for financial and operating performance purposes.[8] The Sustainability Accounting Standards Board ("SASB") has made consistent findings – that climate-related risks are unlikely to be financially material to many industries – in its recently published climate risk technical bulletin.[9]

The proliferation of sustainability and ESG reports that include climate disclosure (often based on some of the same GHG Protocol and TCFD standards the SEC cites approvingly in the Proposing Release) over the past decade represent an effective forum that allows companies to voluntarily provide the customized kind of disclosure most appropriate to understanding their business. SEC periodic reports that companies file also routinely include climate-related disclosure, when material. Accordingly, the SEC has not demonstrated that the entirety of the expansive detailed disclosures that the Proposed Rules would mandate are warranted given that investors are already receiving material climate-related information under the SEC's current disclosure requirements as well as other climate-related information contained in sustainability or ESG reports that companies issue, going above-and-beyond the material information the federal securities laws currently mandate.

Further, the valuation of a company is based on a multitude of factors, including public perception of its brand and products, expertise of its management team, earnings and other financial metrics, the intrinsic value of its tangible and intangible assets and prospects for future growth. Climate, when material, is only one part of many considerations in the valuation picture. And even then, climate-related information can largely be extracted from publicly observable information, such as industry sector, company size, and the like. The type of disclosure requirements embodied in the Proposed Rules would place disproportionate emphasis on climate risk relative to other matters, which would make it harder for investors to discern and use the material information about non-climate-related matters contained elsewhere in annual reports and registration statements or even the material climate-related information that companies already disclose in filings, including as part of their risk factor and MD&A disclosures. The Proposed Rules should not mandate that companies disclose climate-related information that is not material.

**B.**    **If adopted, the Proposed Rules would impose weighty obligations unprecedented in the SEC's history.**

---

[7] Div. of Corp. Fin., Sec's & Exch. Comm'n, *Sample Letter to Companies Regarding Climate Change Disclosures* (modified Sept. 22, 2021), available at https://www.sec.gov/corpfin/sample-letter-climate-change-disclosures.

[8] *See* Nicola M. White, *SEC Drops Hints About ESG Rule in Retorts to Vague Disclosures*, Bloomberg Law (Mar. 18, 2022), available at https://news.bloomberglaw.com/securities-law/sec-scrutiny-of-big-companies-sheds-light-on-climate-priorities.

[9] Sustainability Accounting Standards Board, *Climate Risk – Technical Bulletin* (April 12, 2021), available at https://www.sasb.org/knowledge-hub/climate-risk-technical-bulletin/

    1. <u>Compliance with the Proposed Rules would impose significant burdens and costs on registrants.</u>

  The Proposed Rules, taken as a whole, would impose a vast and costly new reporting regime on public companies that goes well beyond the climate disclosures that companies generally make under current disclosure requirements and market practices. Indeed, it is exceedingly difficult to determine from the Proposed Rules the outer limits of what an issuer would have to disclose.

  The Proposed Rules are in stark contrast to other critical disclosure obligations that the SEC has mandated public companies make. Rather than impose across all public companies a one-size-fits-all set of prescriptive disclosure mandates, as the Proposed Rules would, the SEC's longstanding central disclosures seek to present information in a curated way, as viewed "through the eyes of management,"[10] as the most effective manner of ensuring that investors have actionable, material information without inundating them with information of less significance. Conversely, with the Proposed Rules, the SEC departs from the approach that has guided the agency for decades in fashioning its disclosure framework, singling out climate risk as uniquely deserving, in the SEC's view, of an extensive set of detailed disclosure requirements that will yield disclosures that contain a tremendous amount of new, often immaterial information that is sure to overwhelm and will often not be useful to investors. Furthermore, because a great deal of the climate-related risk disclosures that the Proposed Rules mandate are so speculative and uncertain and, in some instances, the requisite information is not available and compliance with the obligations would be unworkable, the current Proposed Rules would fall short of the Commission's goal of increased consistency and comparability of disclosures across public companies. Therefore, expectations regarding enhanced reliability and comparability must be tempered, and this justification for the Proposed Rules must be questioned.

  The Proposed Rules would transform periodic SEC reports from filings that center on the financial and operating performance of companies into filings that center on climate change and, in notable respects, resemble what an environmental regulator might require. The Proposing Release inadequately justifies the need for the totality of the SEC's numerous scientific and technical policy choices that are embedded in the Proposed Rules, instead unduly deferring to the stated preferences of a limited number of institutional investment firms and non-governmental organizations, as well as the conclusions reached by third-party voluntary standard setters that the SEC neither supervises nor regulates.

  The Commission makes clear that it believes building on the TCFD recommendations will result in substantial compliance cost savings by enabling companies to efficiently leverage the framework with which many investors and issuers are already familiar. The Chamber disputes this notion. If the Proposed Rules are adopted, the compliance burden on all companies, even those that already report to some extent under TCFD, would be expanded dramatically. Notwithstanding

---

[10] *See, e.g.*, Release No. 33-10890, *Management's Discussion and Analysis, Selected Financial Data, and Supplementary Financial Information*, 86 Fed. Reg. 2,080, at 2,089 (Nov. 19, 2020) (citing prior Commission interpretive releases from 1989 and 2003 that also reference "the eyes of management").

the fact that the SEC has modeled the Proposed Rules in part on the TCFD recommendations in a stated attempt to mitigate the compliance burden for issuers,[11] the reality is that even those companies that have already spent significant time and resources establishing climate-related reporting infrastructure have a great deal of work to do if the Proposed Rules are made final in their current form.[12] As data presented in the Proposing Release makes clear,[13] U.S. companies currently select elements of the TCFD recommendations to follow and predominantly do not adhere to all parts of the framework. A similar conclusion can be drawn from the global reporting data that the Proposing Release itself references, as presented in the TCFD's 2021 status report (the "2021 TCFD Status Report").[14] Instead of disclosing everything that TCFD contemplates, companies have focused on that which is most meaningful to understanding their business and the potential risks and impacts climate may impose upon it, and what is reported varies in its extent and depth, in accordance with the latitude afforded by the TCFD recommendations. This is consistent with the principles-based nature of the TCFD recommendations, which are distinctly different than the granular and prescriptive disclosure mandates of the Proposed Rules.

The Proposed Rules go well beyond the TCFD recommendations, and some of the disclosures required by the Proposed Rules, such as the climate-related financial statements metrics contemplated by the proposed new Article 14 of Regulation S-X, have no real precedent in the TCFD recommendations. We note that given the lack of clarity as to how companies could operationalize the estimation of climate risk financial impacts demanded by proposed new Article 14 of Regulation S-X – in light of, among other things, the significant estimates and assumptions that would be required for each significant climate risk identified by a company – we anticipate that many companies would need a dedicated team to perform the analysis in each reporting period, comprising several functions (e.g., Finance, Sustainability, Environmental), to evaluate changes in operational costs that may be driven by climate-related events or transition activities. Various new processes and controls would need to be implemented to gather the data, perform the estimates, and comply with the Sarbanes-Oxley Act of 2002 (as amended, the "Sarbanes-Oxley Act"). Also, given the significant estimates and assumptions that would be involved and the need for new Article 14 disclosures to be audited, there would be significant additional costs associated with external audits.[15]

---

[11] Proposing Release, 87 Fed. Reg. at 21,346.

[12] For example, a Well Known Seasoned Issuer that has made TCFD-aligned disclosures public on its website (including Scope 1, Scope 2 and Scope 3 GHG emissions disclosures) estimates that, combined with the amounts the company currently spends on voluntary climate disclosure, the company would need to spend a total of approximately $35 million over five years to implement climate-related reporting in order to comply with the Proposed Rules if they are made final in their current form. Within this amount, the company estimates one-time expenses of $19 million and recurring expenses averaging $3.1 million per year. The primary categories of expenses are audit fees, professional services, subscriptions, labor, licenses and training. These amounts are in stark contrast to the SEC's estimated cost of compliance for non-SRC registrants at $640,000 in year 1 and $530,000 in subsequent years.

[13] Proposing Release, 87 Fed. Reg. at 21,423.

[14] Task Force on Climate-related Financial Disclosures, *2021 Status Report* (October 2021), available at https://assets.bbhub.io/company/sites/60/2022/03/GPP_TCFD_Status_Report_2021_Book_v17.pdf.

[15] One Well-Known Seasoned Issuer we consulted with estimates the costs for compliance with proposed new Article 14 of Regulation S-X alone would be approximately $1.5 million - $2.5 million in year 1 of compliance, and likely $1.0 million - $2.0 million annually on an ongoing basis.

The cost – both in terms of expenses that would directly impact companies' financial performance and in terms of the diversion of time and attention of management away from the matters that are most financially and operationally material to the company – would be significant and would meaningfully exceed the estimates set forth by the SEC in the Proposing Release. We also note that the burden of compliance costs, relatively speaking, would fall heaviest on smaller companies that are far more likely to be starting from scratch in providing climate-related information and also are not able to benefit from the economies of scale of larger companies that mitigate the impact of fixed costs, which would be higher proportionately for smaller companies.

Private companies also would be swept up in the new requirements since they make up significant parts of public companies' value chains. It is not a surprise that more than two decades after the release of the GHG Protocol, it remains necessary for virtually all companies to rely upon assumptions, estimates and judgment to develop their Scope 3 emissions inventories and draw the requisite conclusions. The Proposing Release makes no effort to quantify the burdens and costs on private companies that would be required to expend significant time and effort measuring emissions and replying to requests for climate data from public companies upstream or downstream from them in the supply chain. Nor does the Proposing Release address the consequences if a registrant is unable to obtain the necessary information from private companies to meet a registrant's reporting obligations reliably.

More indirectly, but no less importantly, private companies face the potential adverse consequence of losing revenues, profits and valuable commercial relationships if public companies choose not to continue to do business with them because of their inability to provide data needed for public companies to comply with the Proposed Rules, and the Proposed Rules may also disincentivize registrants from using small, local and diverse suppliers in the first place.

2.      Climate disclosures should be materiality-focused and principles-based.

The Supreme Court's traditional materiality standard should continue to be the guidepost that the SEC adheres to when crafting new disclosure obligations applicable to filed reports by reporting companies. Preserving the materiality standard will continue to ensure issuer and investor confidence in the relevance of information that promotes market efficiency, competition, liquidity and price discovery. Pursuing the more prescriptive set of disclosure mandates contemplated by the Proposed Rules could ultimately result in a disclosure system that does not provide investors with relevant information related to climate and other ESG matters and, conversely, inundates investors with disclosures that obfuscate what is truly material by giving these matters, on a prescriptive basis, disproportionate prominence relative to other matters. A far-reaching "one-size-fits-all" collection of such detailed and granular disclosure mandates that deprives management of the opportunity to emphasize in the company's disclosures what is most important to the company's strategy and risk management could prove counterproductive for investor protection, capital formation, competition and efficiency.

The Proposed Rules are prescriptive and require information to be provided whether or not it is material. This shortcoming is most prominently the case with respect to GHG emissions reporting and the climate-related financial metrics mandated by proposed Regulation S-X Article

Vanessa A. Countryman
June 16, 2022
Page 18

14, which we discuss in more detail elsewhere in this letter; but there are other elements of the Proposed Rules that represent prescriptive requirements without a materiality qualifier. Case in point: the approach the SEC takes in proposed Regulation S-K Items 1502 (Climate-Related Risks and Impacts on Strategy, Business Model and Outlook), 1503 (Risk Management), 1504 (GHG Emissions Metrics) and 1506 (Targets and Goals) is a dramatic departure from the approach the SEC has taken in Regulation S-K Items 105 (Risk Factors) and 303 (MD&A).

A materiality-focused and principles-based approach to climate-related disclosures, consistent with the Commission's longstanding approach to disclosure, would be better suited to providing investors with relevant, useful information. Under this approach, all (or even some) of the disclosures required to be provided in response to proposed Regulation S-K Items 1501, 1502, 1503, 1504 and 1506 as well as proposed Article 14 would be qualified with a statement that responsive information need only be provided to the extent material to understanding a company's business and its financial and operating performance, including the material risks the business faces. Companies would then be able to evaluate and adapt the information they provide so that disclosures are most useful and give investors a view of what is material to the company when it comes to climate related matters through the eyes of management. This would be consistent with the objective articulated in the Proposing Release that the narrative discussion and analysis regarding climate should "serve a similar function to the MD&A but will focus on climate-related risk specifically."[16]

This approach is consonant with how federal securities law disclosure mandates have been crafted for decades. If maintained, this approach will continue to allow reporting of material climate-related information in SEC filings to evolve over time so that what is disclosed does not overload investors and does not become outdated as our understanding of climate risk and risk management techniques change. Accordingly, materiality-focused and principles-based disclosure obligations would continue to serve the interests of both the companies responsible for preparing disclosures and the investors who use the information. For Proposed Rules that regulate disclosures concerning a subject that is as dynamic as climate risk, allowing companies this flexibility is critical so that disclosures remain relevant as facts and circumstances evolve and the relative significance of different risks (and opportunities) to the company changes. The best way to ensure that disclosures are as dynamic as the facts and circumstances they describe is to allow companies flexibility in determining what matters most and what makes for the most effective communications with investors and the marketplace. This would also help address the First Amendment concerns associated with the Proposed Rules.

As the SEC articulated in its recent adopting release updating the rules governing MD&A, a "materiality-focused and principles-based approach facilitates disclosure of complex and often rapidly evolving areas, without the need to continuously amend the text of the rule to update or impose additional prescriptive requirements."[17]

[16] Proposing Release, 87 Fed. Reg. at 21,348.
[17] *See generally* Release No. 33-10890, *supra* note 10.

In practice, companies need to be able to wield flexibility in reporting the information they and their investors deem relevant without overwhelming investors with information that is not useful when it comes to understanding that company's financial and operating performance. Including the ability to omit inapplicable, irrelevant and immaterial requirements in line with the SEC's typical materiality-focused and principles-based approach provides issuers the ability to precisely disclose useful information to investors without distracting them with information that is not useful and could be counterproductive.

As the SEC articulated in its recent adopting release on Modernization of Regulation S-K Items 101, 103 and 105:

> Each registrant's disclosure must be tailored to its unique business … and facts and circumstances …. [W]e did not include more prescriptive requirements because we recognize that the exact measures and objectives included in human capital management disclosure may evolve over time and may depend, and vary significantly, based on factors such as the industry, the various regions or jurisdictions in which the registrant operates, the general strategic posture of the registrant … as well as the then current macro-economic and other conditions that affect human capital resources, such as national or global health matters …. Given the varied and evolving nature of human capital considerations, we believe that this approach will likely lead to more meaningful disclosure being provided to investors.[18]

While the passage above refers to human capital management - another subset of ESG disclosures - the SEC's analysis in that context also should apply equally to climate-related disclosures. The Commission has not convincingly justified why, fewer than two years later, such a markedly different approach is warranted.

The TCFD recommendations, which serve as the putative model for the SEC's approach to climate-related disclosures, do not take a rigid and prescriptive approach and instead establish a principles-based framework that acknowledges the dynamic and varied landscape of climate-related disclosures. The TCFD recommendations, when they were first published in 2017[19] and as updated in 2021 (the "2021 TCFD Implementation Annex"), set forth as a fundamental tenet that "changes in disclosures and related approaches or formats (e.g., due to shifting climate-related issues and evolution of risk practices, governance, measurement methodologies, or accounting practices) can be expected due to the relative immaturity of climate-related disclosures." [20] The

---

[18] Release No. 33-10825, *Modernization of Regulation S-K Items 101, 103, and 105*, 85 Fed. Reg. 63,726, 63,739 (Aug. 26, 2020).

[19] Task Force on Climate-related Financial Disclosures, *Recommendations of the Task Force on Climate-related Financial Disclosures* (June 2017), available at https://assets.bbhub.io/company/sites/60/2021/10/FINAL-2017-TCFD-Report.pdf.

[20] Task Force on Climate-related Financial Disclosures, *Implementing the Recommendations of the Task Force on Climate-related Financial Disclosures* (June 2017), available at https://assets.bbhub.io/company/sites/60/2021/07/2021-TCFD-Implementing_Guidance.pdf, at 71 .

2021 TCFD Implementation Annex also acknowledges that "the level of exposure and the impact of climate-related risks differ by sector, industry, geography, and organization."[21] In this context, the analysis of current disclosure practices contained in the 2021 TCFD Status Report illustrates that, in practice, different companies and industries have taken advantage of the flexibility of the TCFD recommendations in tailoring their disclosures.[22] Given the Proposed Rules' reliance on the TCFD recommendations, the Commission must justify why it is appropriate to codify, as a hard and fast SEC regulation, recommendations that the TCFD itself has indicated must be flexible and periodically updated.

>   3.   <u>The climate-related information required by the Proposed Rules could be provided in response to a number of existing disclosure requirements.</u>

As the Proposing Release frequently acknowledges, and as described below, almost all of the new disclosures required, if qualified by materiality, would be responsive to requirements under the SEC's existing rules. These disclosure requirements demonstrate that companies are already required to disclose material ESG information under current law; in other words, the characterization of information as related to climate or other topics now considered to fall under the "ESG umbrella" does not render, when material, such information qualitatively different from any other information companies are required to disclose under current securities regulation and does not justify any different treatment for such information. For example, in the Proposing Release, the SEC states that no climate-related compensation disclosure requirement has been proposed because the SEC believes that the existing rules requiring a compensation discussion and analysis should already provide a framework for relevant climate-related disclosure in this area.[23] The same should be true with respect to other relevant and material climate-related information. To the extent there is concern that companies are not adequately disclosing material climate-related information, the SEC could provide issuers updated or additional interpretive guidance regarding potential disclosure topics and considerations to keep in mind as they identify material climate-related information in response to extant disclosure mandates, as detailed below.

- *Proposed Article 14 of Regulation S-X.* As discussed in more detail elsewhere in this letter, this component of the Proposed Rules generally requires quantitative and qualitative disclosures of the financial impacts of climate-related matters, including climate-related financial statement metrics, in companies' historical financial statements. To the extent disclosures responsive to this proposed requirement are material, they could be disclosed pursuant to existing MD&A requirements.

The overall objective of MD&A, as set forth in Regulation S-K Item 303(a), is:

>   [T]o provide material information relevant to an assessment of the financial condition and results of operations of the registrant including an evaluation

---

[21] *Id.* at 9.

[22] The 2021 TCFD Status Report found that the percentage of companies with responsive disclosure ranged from 13% to 52% for the 11 categories of disclosure in the TCFD recommendation. The percentages also varied by industry, ranging from 38% for materials and buildings companies to 16% for technology and media companies.

[23] Proposing Release, 87 Fed. Reg. at 21,360.

of the amounts and certainty of cash flows from operations and from outside sources. The discussion and analysis must focus specifically on material events and uncertainties known to management that are reasonably likely to cause reported financial information not to be necessarily indicative of future operating results or of future financial condition. This includes descriptions and amounts of matters that have had a material impact on reported operations, as well as matters that are reasonably likely based on management's assessment to have a material impact on future operations.

More specifically, Regulation S-K Item 303(b) requires discussion and analysis of, among other things, (i) the underlying reasons for material changes from period-to-period in one or more line items in quantitative and qualitative terms without regard for offsets, (ii) any known trends or any known demands, commitments, events or uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in any material way, (iii) the registrant's material cash requirements, including commitments for capital expenditures, (iv) any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations, and (v) material changes in financial condition from period to period. There is nothing in Item 303(b) that excludes discussion of these items if they are related to climate change.

These requirements focus management on describing the impacts of risks and events that have affected and may affect the company's financial results, including climate-related risks and events, which is the essence of the Proposed Rule, and are presented with as much contextual information, qualitative and quantitative, as management determines is useful and appropriate for investors to make informed decisions about the company. Therefore, any such items related to climate change should already be discussed by management pursuant to Item 303(b), and the Proposed Rule is unnecessary.

- *Proposed Item 1501 of Regulation S-K.* This element of the Proposed Rules generally requires disclosure describing the board's oversight of climate-related risks and management's role in assessing and managing climate-related risks.

Disclosure of the type that would be responsive to proposed Regulation S-K Item 1501 could be provided pursuant to Regulation S-K Item 407(h), which requires disclosure regarding the extent of the board's role in the risk oversight of the registrant, such as how the board administers its oversight function. As an actual matter, many companies already choose (even to the extent not required to do so by applicable SEC rules) to provide extensive and detailed disclosures regarding their governance structures and practices with respect to ESG matters relevant to the company and its operations, including climate change and the environment, as part of detailed narrative descriptions in annual proxy statements regarding their overall governance. Such current disclosures could be leveraged to accomplish the objectives of this element of the Proposed Rules. Instead of proposing a completely new rule, the SEC could instead revise the existing rule to focus companies on providing climate-related risk information, to the extent material. Moreover, Regulation S-

K Item 401(e)(1) already requires a discussion of the specific experience, qualifications, attributes or skills that led each director to be nominated to serve on the board. This requirement provides an alternative to the mandatory requirement in proposed Regulation S-K Item 1501(a)(ii) to disclose whether any board member has expertise in climate-related risks and related details because it underscores that, to the extent relevant, information regarding such expertise is already subject to disclosure under existing SEC rules.

- *Proposed Item 1502 of Regulation S-K.* These Proposed Rules generally require disclosure of climate-related risks applicable to the company and related information regarding the company's approach to climate-related risks and their actual or potential impact on the registrant's strategy, business model, outlook, financial planning, capital allocation and consolidated financial statements.

  Key features of this proposed requirement are already required to be disclosed if material, as the SEC suggested in its 2010 guidance[24] on how existing disclosure rules may require disclosure of the impacts of climate change on a registrant's business or financial condition, in a company's disclosures under business (Regulation S-K Item 101), risk factors (Regulation S-K Item 105), legal proceedings (Regulation S-K Item 103) and MD&A (Regulation S-K Item 303). While not a focus in the 2010 guidance given that subsequent amendments to the applicable rules had not yet taken effect, we note Regulation S-K Item 101(a)(1)(i), which contemplates disclosure of any material changes to a previously disclosed business strategy. This disclosure enhancement is worth noting because it presumably would, for some companies depending on their respective facts and circumstances, contemplate disclosure of transition plans or other climate-related strategies adopted by a company and confirms that any such disclosure is subject to update.

  Additionally, the Regulation S-K Item 102 requirement for a company to disclose the location and general character of the registrant's principal physical properties could result in the provision of disclosures regarding properties subject to physical risk like those contemplated by proposed Regulation S-K Item 1502(a)(1)(i), but would require only material information, not the immaterial information (such as the zip code location of all of a company's assets) contemplated by proposed Regulation S-K Item 1502(a)(1)(i).

- *Proposed Item 1503 of Regulation S-K.* This element of the Proposed Rules generally requires disclosure of any processes the registrant has for identifying, assessing and managing climate-related risks and also requires certain disclosures regarding any transition plan that has been adopted by a company. The analysis above regarding proposed Regulation S-K Items 1501 and 1502 would generally apply here, too.

- *Proposed Item 1504 of Regulation S-K.* This element of the Proposed Rules generally requires disclosure of GHG emissions. The analysis above regarding proposed Regulation S-K Item 1502 would generally apply here, too.

---

[24] *See* Commission Guidance Regarding Disclosure Related to Climate Change, *supra* note 2.

● *Proposed Item 1506 of Regulation S-K.* This element of the Proposed Rules generally requires certain disclosures regarding any targets or goals (including interim targets or goals) related to the reduction of GHG emissions set by a company, or any other climate-related target or goal to which the company is subject. These required disclosures would include the parameters of the target or goal (such as what metric does the target or goal relate to and over what time period is it supposed to be achieved), how the company intends to meet the target or goal and a requirement to disclose annual progress updates towards achievement of the target or goal. Proposed Regulation S-K Item 1506(a)(2) makes clear that a company may provide the disclosures required by proposed Regulation S-K Item 1506 as part of the company's disclosure in response to proposed Regulation S-K Item 1502 and 1503, and our analysis regarding such proposed items set forth above would also apply here. This analysis includes our belief that targets, goals and related information – including how the company intends to meet the target or goal and then provide annual progress – should be required to be disclosed only if it is material.

As noted above, many businesses have disclosed climate risk since the release of the 2010 guidance. This raises the question whether such a prescriptive approach, as employed by the SEC in the Proposed Rules, will provide any more material information or if, rather, an approach that seeks to enhance the 2010 guidance would suffice as an alternative to increase disclosure if needed.

4.      There is potential for misuse of SEC-mandated climate information.

We are also concerned about the future potential for non-investor groups to use information disclosed under the Proposed Rules in a way that is detrimental to a company's investors. We are particularly apprehensive that special interest groups, making use of newly required information that by the Commission's own admission depends substantially on estimates and may be incomplete, will increase the frequency and magnitude of boycotts, protests and other pressure campaigns against public companies, private companies in their supply chains and individual executives and employees. The frequency of shareholder proposals under Rule 14a-8 is also likely to increase, further adding costs and leading to additional diversion of management time and attention from other strategic pursuits associated with running the business. Activist investors who do not represent the broad interests of all investors may seek to use information disclosed under the Proposed Rules to ratchet up pressure on public companies as well.

The Commission has failed to consider how these investor and non-investor groups can be expected to use the proposed disclosures to pursue their own "self-interested objectives rather than the goal of maximizing shareholder value."[25] Given the scope, breadth and depth of the Proposed Rules' disclosure mandates that all public companies would be subject to – and that would indirectly impact private companies that are part of public companies' value chains – an increase in "greenwashing" lawsuits seems likely, and could be accompanied by an increase in SEC enforcement actions. As discussed in more detail elsewhere in this letter, the Proposed Rules contemplate an additional new safe harbor, but its scope is too narrow. We have requested expansion of this safe harbor, but, even if the safe harbor is improved, companies are still subject

---

[25] *Bus. Roundtable & U.S. Chamber of Commerce v. SEC*, 647 F.3d 1144, 1152 (D.C. Cir. 2011).

to significant potential litigation costs as a result of the Proposed Rules. Safe harbors do not prevent opportunistic plaintiff's lawyers from filing suits, which must be defended at significant expense, even if they do not ultimately result in any legal liability for the company.

     5.    <u>The Proposed Rule seems aligned with implementing the Administration's climate change goals.</u>

Because of their unprecedented breadth, particularity, and prescriptiveness, the Proposed Rules appear to be set forth as part of a broader effort by the Biden Administration to address climate change challenges. The Biden Administration has taken concrete steps to prioritize climate change and institute mandatory climate reporting in various arenas.[26] Climate-risk disclosure has

---

[26] *See, e.g.,*

- Executive Order 14008, 86 Fed. Reg. 7,619 (Feb. 1, 2021), available at https://www.govinfo.gov/content/pkg/FR-2021-02-01/pdf/2021-02177.pdf (This Order announced the Biden Administration's whole-of-government approach to climate change for both domestic and foreign affairs. In a relevant part, the Order stated that "[t]he Federal Government must drive assessment, <u>disclosure</u> and mitigation of climate pollution and climate-related risks in every sector of our economy, marshalling the creativity, courage and capital necessary to make our Nation resilient in the face of this threat" (86 Fed. Reg. at 7,622 (emphasis added)).

- Executive Order 14030, 86 Fed. Reg. 27967 (May 25, 2021), available at https://www.govinfo.gov/content/pkg/FR-2021-05-25/pdf/2021-11168.pdf (This Order asked key federal agencies and financial regulators to embed climate risk considerations into all aspects of federal government spending and oversight. This was an early step taken by the Administration in developing a government-wide strategy on climate-related financial risk).

- G7 "Carbis Bay communique" White House Statement (June 13, 2021), available at https://www.whitehouse.gov/briefing-room/statements-releases/2021/06/13/carbis-bay-g7-summit-communique/ (This statement committed the United States to enhance climate disclosures in the context of addressing the "climate and environment," not for purposes of protecting investors. The Administration explained that it "[supported] moving towards mandatory climate-related financial disclosures that are based on the Task Force on Climate-related Financial Disclosures (TCFD) framework, in line with domestic regulatory frameworks").

- U.S. and EU Global Methane Pledge (September 18, 2021), https://www.whitehouse.gov/briefing-room/statements-releases/2021/09/18/joint-us-eu-press-release-on-the-global-methane-pledge/ (An initiative to reduce global methane emissions by at least 30% from 2020 levels by 2030 and move towards using best available inventory methodologies to quantify methane emissions, with a particular focus on high-emissions sources). In November 2021, the Global Methane Pledge was unveiled at the UN Climate Change Conference COP-26, which was held in Glasgow.

- Plan to Conserve Global Forests: Critical Carbon Sinks (November 1, 2021), available at https://www.whitehouse.gov/wp-content/uploads/2021/11/Plan_to_Conserve_Global_Forests_final.pdf (Outlining the Administration's plans to support global efforts toward conserving global terrestrial carbon sinks and listing as one program was the Consortium on Forest Climate Risk Management, which would "support the development and adoption of best practice for forest-related climate financial disclosure").

become an ongoing focal point in the broader goal of addressing climate change. We note that alignment with the broader policy goals of an administration does not merit rulemaking at the SEC on its own; indeed, such rulemaking necessitates alignment with the SEC's core mission of investor protection, fair, orderly, and efficient markets, and capital formation, consistent with the limits of the Commission's statutory authority.

### C. The Proposed Rules exceed the Commission's statutory authority.

The SEC does not have general authority to impose climate- and environmental-focused regulation in the comprehensive fashion contemplated by the Proposed Rules. Compliance with the Proposed Rules could have considerable impacts on the U.S. economy, such as through the redirection of capital flows, and have behavioral effects that extend far beyond the disclosure of additional climate-related information by public companies, including imposing direct and indirect obligations on the countless businesses upstream and downstream of public companies, many of which are privately held and not ordinarily subject to the SEC's mandatory disclosure regime under the federal securities laws.

With many other federal agencies clearly and explicitly tasked with detailed delegations of authority for regulating specific aspects of the environment, we do not believe that Congress intended for the SEC to set major environmental policy for American businesses or resolve major questions relating to climate change. Under what is sometimes called the "major questions doctrine," the "Supreme Court has repeatedly rejected agency attempts to take major regulatory action without *clear* congressional authorization."[27] Likewise, if the SEC could enact any rule or regulation whenever the "public interest" demands without a limiting principle, that would seem to give the SEC broad oversight authority over areas it has not traditionally regulated—an outcome Congress clearly did not intend. Additionally, an expansive "public interest" mandate that is not tightly tethered to the SEC's traditional tripartite mission risks the politicization of the SEC and the federal securities laws that the agency administers and enforces.

The Proposed Rules exceed the Commission's statutory authority. Like other federal agencies, the Commission "literally has no power to act . . . unless and until Congress confers power upon it."[28] Here, the Commission offers the Proposed Rules "under the authority set forth in Sections 7, 10, 19(a) and 28 of the Securities Act, as amended, and Sections 3(b), 12, 13, 15, 23(a) and 36 of the Exchange Act, as amended."[29] The Proposed Rules, as drafted, exceed this authority in two independent ways: First, the Commission's statutory authority is limited to requiring the disclosure of information that is both financial in nature and necessary for investors to assess a security's value; this authority does not extend to requiring public companies to broadly disclose climate-related information, particularly considering the serious constitutional concerns presented by the expansive interpretation the Commission proposes here, as discussed below.

---

[27] *U.S. Telecom Ass'n v. FCC*, 855 F.3d 381, 420 (D.C. Cir. 2017) (Kavanaugh, J., dissenting from the denial of reh'g en banc).

[28] *N.Y. Stock Exch. LLC v. SEC*, 962 F.3d 541, 553 (D.C. Cir. 2020) (alteration in original) (quoting *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986)).

[29] Proposing Release, 87 Fed. Reg. at 21,462; *accord id.* at 21,464.

Appellate Case: 24-1628     Page: 1021     Date Filed: 03/26/2024 Entry ID: 5377362

Second and similarly, the Proposed Rules are neither necessary nor appropriate for investor protection or the public interest. For both reasons, the Commission lacks authority to finalize the Proposed Rules.

    1.    <u>The SEC's authority is limited to disclosure of information that is financial in nature and necessary for investors to assess a security's value.</u>

In the Proposing Release, the Commission claims a "broad authority" to require the disclosure of any information the Commissions deems "'necessary or appropriate in the public interest or for the protection of investors.'"[30] The Commission does not have that power. The cited statutory provisions "must be read in their context and with a view to their place in the overall statutory scheme."[31] (They must also be read to avoid unnecessarily triggering serious constitutional concerns.[32]) As the Commission has previously recognized, those provisions, read in context, limit the Commission's authority to requiring the disclosure of information that is both financial in nature and necessary for investors to assess a security's value.[33] The Commission does not have a freewheeling authority to require the disclosure of any information the Commission deems in the public interest.[34]

The Commission cites two "residual" clauses—in Sections 7(a)(1) and 10(c) of the Securities Act—but those clauses, read in context, demonstrate the *limited* nature of the Commission's authority. The residual clauses follow a list of specified categories of information and then empower the Commission to require the disclosure of "such other information" as the Commission deems "necessary or appropriate in the public interest or for the protection of investors."[35] While seemingly broad, these clauses are anything but.[36] Under the rule of *ejusdem generis*, the residual clauses are "controlled and defined by reference to the enumerated categories [of information] . . . which are recited just before [them]."[37] These clauses, in other words, must be "construed to embrace only [information] similar in nature to [the information] enumerated by the preceding specific words" in the statute.[38]

---

[30] *Id.* at 21,335 & n.3.

[31] *Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 320 (2014) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000)).

[32] *See Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Engr's*, 531 U.S. 159, 172 (2001) (recognizing that a court must construe a statute to "avoid" constitutional problems so as "not to needlessly reach constitutional issues").

[33] *See, e.g.*, *Nat. Res. Def. Council, Inc. v. SEC*, 606 F.2d 1031, 1039 (D.C. Cir. 1979) ("[T]hese laws, in the Commission's view, were designed generally to require disclosure of financial information in the narrow sense only.").

[34] *See, e.g.*, Release No. 33-10064, *Business and Financial Disclosure Required By Regulation S-K*, 81 Fed. Reg. 23,916, 23,970 & n.663 (Apr. 22, 2016) ("[D]isclosure relating to environmental and other matters of social concern should not be required of all registrants unless appropriate to further a specific congressional mandate or unless, under the particular facts and circumstances, such matters are material. . . . [T]he Commission . . . is generally not authorized to consider the promotion of social goals unrelated to the objectives of the federal securities laws . . . .").

[35] 15 U.S.C. §§ 77g(a)(1), 77j(c).

[36] *See, e.g.*, *Cement Kiln Recycling Coal. v. EPA*, 493 F.3d 207, 221 (D.C. Cir. 2007) (narrowly interpreting the residual phrase, "other factors as may be appropriate").

[37] *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 115 (2001).

[38] *Id.* at 114-15.

Appellate Case: 24-1628    Page: 1022    Date Filed: 03/26/2024    Entry ID: 5377362

In both Sections 7(a)(1) and 10(c), the enumerated categories of information preceding the residual clause concern information that is financial in nature and material to an investor's evaluation of a security. In both sections, the residual clause comes directly after a statutory command for certain disclosures to be accompanied by the information or documents specified in Schedule A (or some subset thereof).[39] Schedule A lists 32 categories of information or documents that materially relate to a company's financial condition. For example, Schedule A requires a company to disclose the proceeds to be derived from the sale of a security, the price at which the security will be offered, a balance sheet, and a profit and loss statement.[40] As the Commission itself has recognized, these and other items specified in Schedule A are all "financial in nature" and are "'indispensable to any accurate judgment upon the value of a security.'"[41] Under the rule of *ejusdem generis*, the residual clauses must be read in this context and can extend only to those categories of information that "share the common attribute of the listed items" in Schedule A.[42] Broad climate-related disclosures fall well outside this range.

Sections 12(b)(1) and 13(a)(1) of the Exchange Act are similarly circumscribed in terms of their grant of rulemaking authority. Section 12(b)(1) authorizes the Commission to require the disclosure of "information," "as necessary or appropriate in the public interest or for the protection of investors, *in respect of*" specific categories of information.[43] Section 13(a)(1) authorizes the Commission to require that same information be kept "reasonably current."[44] As in Sections 7(a)(1) and 10(c) of the Securities Act, discussed above, the specific categories of information referenced in Sections 12(b)(1) and 13(a)(1) of the Exchange Act are all financial in nature and materially related to the financial condition of the company, such as: the nature of the company's business; the terms of any outstanding securities; the remuneration to directors; balance sheets; profit and loss statements; and "further financial statements."[45] Again, none of these items bear any similarity to broad climate disclosures.

Section 13(a)(2) of the Exchange Act is likewise focused on material, financially focused information. That provision authorizes the Commission to require public companies to file "annual reports" and "quarterly reports,"[46] which, read in context, mean *financial* reports. Section 13(a)(2) itself contemplates that the annual reports will be certified by "independent public accountants," a requirement that makes sense only in the context of financial reporting.[47] Section 13(b)(1) demonstrates that these "reports" concern (among other things) "the balance sheet and the earnings statement," "the appraisal or valuation of assets and liabilities," and "depreciation and depletion"[48]

---

[39] 15 U.S.C. § 77g(a)(1), 77j(a)(1), (c); *see also id.* § 77aa (Schedule A).

[40] *Id.* § 77aa sched. A(15), (16), (25), (26).

[41] Business and Financial Disclosure, 81 Fed. Reg. at 23,921 (quoting H.R. Rep. No. 73-85, at 3 (1933), 1933 WL 983, at *4).

[42] *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 224 (2008).

[43] 15 U.S.C. § 78*l*(b)(1) (emphasis added).

[44] *Id.* § 78m(a)(1).

[45] *Id.* § 78l(b)(1).

[46] *Id.* § 78m(a)(2).

[47] *Id.*

[48] *Id.* § 78m(b)(1).

– all material financial information. Like the other provisions cited by the Commission, Section 13(a)(2) cannot reasonably be read to extend beyond material, financially focused disclosures.

The collection of provisions the Commission cites at the end of the Proposing Release does not support the Proposed Rules either.[49] Some provisions merely supply definitions or the authority to define trade terms,[50] which cannot support the Commission's substantive proposal. Other provisions authorize exemptions from general statutory requirements,[51] but have no purchase where the Commission seeks to require conduct, as here. Other provisions still apply some of the disclosure requirements discussed above to different types of companies,[52] but do not expand the scope of information within the Commission's authority. Finally, the Commission also cites provisions granting it general authority to issue regulations in the public interest.[53] However, these general rulemaking grants do not "empower the agency to pursue rulemaking that is not otherwise authorized."[54] To the contrary, these provisions authorize the Commission only to "carry out" its duties under other statutory provisions,[55] which, as discussed, do not themselves authorize the Proposed Rules.

The "sheer scope" of the Commission's claimed authority strongly "counsels against" it.[56] When Congress intends to "assign to an agency decisions of vast 'economic and political significance,'" Congress "speak[s] clearly."[57] In fact, when Congress has previously sought to empower the Commission to require disclosures of far less economic and political significance than the Proposed Rules, Congress has done so expressly. In the Dodd-Frank Act, for example, Congress explicitly required the Commission to issues rules requiring companies to disclose the presence of so-called "conflict minerals" in their products.[58] The Commission can point to no similar authorizing language here. That silence is telling. If Congress really wanted to "bring about an enormous and transformative expansion in the [SEC's] regulatory authority"[59]—to allow the Commission to require extensive disclosures on an issue of enormous public debate, at an external cost of more than $6 billion per year (under the SEC's own estimate)[60]—Congress would have said so clearly and explicitly. Yet, Congress said no such thing.

Congress's silence is particularly telling here, in light of the serious constitutional questions the Commission's conception of its authority would present. When an agency's "interpretation of a statute invokes the outer limits of Congress' power, [the courts] expect a clear indication that

---

[49] *See* Proposing Release, 87 Fed. Reg. at 21,464.
[50] *See* 15 U.S.C. § 78c(b).
[51] *See id.* § 77z-3, 78mm.
[52] *See id.* § 78o(d)(1).
[53] *See id.* §§ 77s(a), 78w(a)(1).
[54] *N.Y. Stock Exch.*, 962 F.3d at 556.
[55] *Id.* at 561; *see also Colo. River Indian Tribes v. Nat'l Indian Gaming Comm'n*, 466 F.3d 134, 139 (D.C. Cir. 2006) ("An agency's general rulemaking authority does not mean that the specific rule the agency promulgates is a valid exercise of that authority.")
[56] *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 141 S. Ct. 2485, 2489 (2021).
[57] *Util. Air Regulatory Grp.*, 573 U.S. at 324 (quoting *Brown & Williamson*, 529 U.S. at 160).
[58] *See* 15 U.S.C. § 78m(p).
[59] *Util. Air Regulatory Grp.*, 573 U.S. at 324 (quoting *Brown & Williamson*, 529 U.S. at 159).
[60] *See* Proposing Release, 87 Fed. Reg. at 21,461.

Congress intended that result."[61] Here, the Commission's reading of its authority approaches (and exceeds) those limits in two different ways. First, as detailed below, the compulsion of speech on a matter of public controversy violates the First Amendment, particularly where, as here, that compulsion is not narrowly tailored to protecting investors from fraud. Second, by asserting an unfettered authority to require the disclosure of any information the Commission deems appropriate, the Commission has impermissibly usurped Congress's legislative power, in violation of the non-delegation doctrine. The Commission should construe its authority to avoid these issues.

2.     <u>The Proposed Rules are neither necessary nor appropriate for investor protection or the public interest.</u>

The Proposed Rules exceed the Commission's statutory authority in another way: they are neither necessary nor appropriate for investor protection or the public interest.[62]

The Commission repeatedly conflates the "protection of investors" (the statutory standard)[63] with "investor demand" (a phrase that appears throughout the Proposing Release).[64] These are not the same thing.[65] As discussed earlier, investors may demand information for a variety of reasons. Some may wish to guide their investing based on moral beliefs, rather than financial considerations.[66] Others, such as some government pension funds, may wish to pursue a political agenda unrelated to the financial assessment of a potential investment.[67] Others still may wish to have publicly traded companies bear the costs of producing and standardizing information that facilitates their investment strategies.[68] None of this concerns the "protection of investors."

Investors need protection from fraud and material risks. At the time Congress enacted the Securities Act and Exchange Act, the concept of materiality was a background assumption already baked into pre-existing common law;[69] in light of that background, the concept of materiality has been the "cornerstone" of America's securities laws from the outset.[70] Here, however, the Commission has failed to show that the broad and detailed climate-related disclosures it contemplates are generally material to investors' investment decisions. In fact, the record evidence cuts decisively in the other direction: investors ordinarily do not uniformly base their decisions on

---

[61] *Solid Waste Agency*, 531 U.S. at 172 ("This requirement stems from our prudential desire not to needlessly reach constitutional issues and our assumption that Congress does not casually authorize administrative agencies to interpret a statute to push the limit of congressional authority.").

[62] *See generally* Letter from Law and Finance Professors (Apr. 25, 2022), available at https://www.sec.gov/comments/s7-10-22/s71022-20126528-287180.pdf..

[63] *See, e.g.*, 15 U.S.C. § 77g(a)(1).

[64] *See, e.g.*, Proposing Release, 87 Fed. Reg. at 21,335.

[65] *See, e.g., TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 448-49 (1976) (Marshall, J.) (rejecting the idea that a fact is material if it "might" be important to an investor, because such a standard would overload investors "in an avalanche of trivial information").

[66] *See* Letter from Law and Finance Professors at 8 (Apr. 25, 2022), available at https://www.sec.gov/comments/s7-10-22/s71022-20126528-287180.pdf.

[67] *See id.* at 5.

[68] *See* Letter from Law and Finance Professors at 4-5.

[69] *See Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 2002 (2016) ("[T]he common law could not have conceived of 'fraud' without proof of materiality.").

[70] Business and Financial Disclosures, 81 Fed. Reg. at 23,924.

climate factors,[71] because those factors generally are not material. Nor do investors ordinarily base their decisions on the granular-level details that the Proposed Rules would require be disclosed.

Just as the Proposed Rules cannot be justified on investor protection grounds, they cannot be justified on public interest grounds. Contrary to the Commission's current assertion, "public interest" does not refer to the promotion of any social goal the Commission deems worthy.[72] Rather, as explained in detail above, the phrase "public interest" refers to other goals that are related to the objectives of the securities laws,[73] such as the promotion of capital formation.[74] Matters outside the scope of these objectives, such as reductions in GHG emissions, are left to other agencies, such as the EPA. Here, the Commission has entirely failed to establish that the Proposed Rules will further the objectives of the securities laws. As discussed, the Proposed Rules would deter capital formation, stifle competition and reduce efficiency across the board. The Commission has shown no market failure that the Proposed Rules would correct.[75] In these circumstances, the Commission cannot justify the Proposed Rules as measures necessary to further the public interest within the legal meaning of that term.

### D.    The Proposed Rules would substantially revise the longstanding and traditional conception of materiality.

The Proposed Rules substantially deviate from the longstanding and traditional conception of materiality under the federal securities laws that for decades has advanced the best interests of investors, encouraged capital formation and helped ensure the integrity of our capital markets. Instead, the Proposed Rules repeatedly call for the disclosure of granular climate-related information even though the required information often is immaterial under the standard of materiality the Supreme Court handed down decades ago.

In the landmark case of *TSC Industries, Inc. v. Northway, Inc.*,[76] Justice Marshall, writing for a unanimous Supreme Court, articulated a meaningful standard of materiality that was designed to provide investors with the significant information they need to make informed voting and investing decisions, but with a caution – namely, that the "disclosure policy" under the federal securities laws "is not without limit"[77] because investors should be safeguarded from being overwhelmed with information that runs counter to the goal of better investor decision making.[78] The Court operationalized this principle in its decision – subsequently affirmed by the Court in *Basic, Inc. v. Levinson*[79] – by rejecting the notion that information is material if it "might" be important to an investor in favor of the following test:  information is material for purposes of

---

[71] *See* Austin Moss et al., *The Irrelevance of ESG Disclosure to Retail Investors: Evidence from Robinhood (*2020), available at https://papers.ssrn.com/abstract_id=3604847.

[72] Business and Financial Disclosure, 81 Fed. Reg. at 23,970 n.663 ("[T]he Commission . . . is generally not authorized to consider the promotion of social goals unrelated to the objectives of the federal securities laws . . . .").

[73] *See id.*

[74] *See, e.g.*, 15 U.S.C. § 77b(b).

[75] *See* Overdahl Report at ¶¶ 26-56.

[76] 426 U.S. 438 (1976).

[77] *Id.* at 448.

[78] *See id.* at 448-9.

[79] 485 U.S. 224 (1988).

federal securities regulation if "there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote" or invest.[80]   As an alternative articulation, Justice Marshall wrote that for information to be material "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available,"[81] indicating that the materiality of a particular item of information is to be judged against the backdrop of other information that companies disclose or investors otherwise have access to.

The standard of materiality that the Court formulated, and that extensive lower court jurisprudence has applied over the years, not only helps shield investors from the harms of information overload, but it also appropriately tethers federal securities regulation to the reason the SEC and the federal securities laws exist in the first place – that is, to protect investors; maintain fair, orderly and efficient markets; and facilitate capital formation. Traditionally, materiality has centered on information that is important for investors focused on understanding the financial and operating performance of companies as investors attempt to gain wealth and earn income. In other words, investment returns – as compared to other interests that, even when worthwhile, fall outside the SEC's remit – is the well-established touchstone of materiality. Bounding the meaning of materiality with reference to the SEC's mission keeps the SEC and the federal securities laws from being politicized, injects regulatory certainty and predictability into the U.S. capital markets, avoids placing the SEC in the difficult position of regulating outside its expertise, and protects investors.

The Chamber shares the goal of providing material information to investors so that they can make informed voting and investment decisions. Unfortunately, in unprecedented respects, the Proposed Rules go well beyond the limits of materiality that the courts have set and that have steadily guided the SEC's development and administration of disclosure requirements historically. This comment letter details many examples from the Proposed Rules demonstrating the SEC's meaningful deviation from the Supreme Court's abiding approach to materiality, several themes and consequences of which are highlighted below.

*First*, the Proposed Rules place particular emphasis on institutional investors, including their appreciable assets under management ("AUM"), that, according to the Proposing Release, "have demanded climate-related information."[82]   In general, while investor demand is a valid consideration, that investors have expressed an interest in information has not been determinative, standing alone, that the information must be recognized as material under the federal securities laws. This is for good reason. Investors may demand information for all sorts of reasons unrelated to the objectives of the federal securities laws.

If investor desire for information necessarily rendered it material as a matter of law, public company disclosure documents would endlessly expand with each investor's claim for more information, causing disclosure documents to become increasingly dense and voluminous, if not

---

[80] *TSC Industries*, 426 U.S. at 449.
[81] *See id*. at 449-50.
[82] Proposing Release, 87 Fed. Reg. at 21,340.

impenetrable. If investor demand were, in-and-of-itself, dispositive of materiality, materiality would essentially be read out of the federal securities laws because there will always be some investors that demand some element of information. That is particularly true for issues as to which some investors have ideological interests in seeking expanded disclosure.

Additionally, the particular weight the SEC places on investor demand in the Proposing Release is ultimately unworkable as a practical basis for determining the content and contours of the mandatory disclosure regime because it places the SEC in what would be an impossible bind. The SEC eventually would have to decide *which investors' demand* and *how much AUM* clears the hurdle for concluding something is material (not to mention that the formulation in the Proposing Release does not adequately account for retail investors). If the degree of investor demand were the predominant test of materiality, how would the Commission address a situation where other investors argue against the very same disclosures, such as on the grounds that the information is not useful, distracts attention from more useful information, or is too costly and time-consuming for companies to develop and prepare? Making these sorts of value judgments across diverse investor preferences and establishing quantitative AUM thresholds like this would jeopardize the Commission's integrity as an unbiased regulator. It also would exacerbate the very real First Amendment concerns discussed later in this letter.

The Chamber appreciates that investor demand can be a factor relevant to evaluating materiality. However, the SEC must still determine that the information sought is material for investors as a whole, including for retail investors, is in accord with the SEC's mission and statutory authority, and that the benefits of mandatory disclosure justify its costs. The concept of materiality, as traditionally conceived and understood, has served investors and the U.S. economy exceptionally well for decades in calibrating mandatory disclosures and ensuring that the sheer volume of information does not overwhelm investors to the detriment of investors' best interests.

*Second*, the Chamber does not at all dismiss the relevance of investor interest in climate-related information and believes that the progress companies have made and continue to make in disclosing more-and-more climate-related information is of great note and accomplishment. In fact, the Chamber has repeatedly acknowledged that climate-related information can be material under the traditional conception of materiality and has to be disclosed when it is.[83] However, a demand by investors for climate-related information is not dispositive of the materiality of that information, and generally is not tantamount to a demand by investors for the specific disclosure requirements in the Proposed Rules or the totality of everything in the Proposed Rules, which sweep farther in their breadth and detail than existing voluntary disclosure standards, characterized by flexibility that allows companies to tailor their disclosures so they are more useful and informative than following prescriptive mandates. In some cases, the Proposed Rules require more disclosure than key environmental regulators like the EPA do and substantially more disclosure than the TCFD recommendations themselves.[84]

---

[83] *See generally* U.S. Chamber of Commerce, *ESG Reporting Best Practices* (Fall 2019), available at https://www.projectgo.com/wp-content/uploads/2019/10/CCMC_ESG-Booklet_v4-DIGITAL.pdf.

[84] For example, the EPA's Greenhouse Gas Reporting Program requires reporting on direct emissions from individual sources under the Clean Air Act, not on a company-wide basis, including Scope 1, 2 and 3 emissions. The

*Third*, the Proposed Rules upset the balance that materiality for years has been calibrated to achieve. The following selections from the Proposing Release are illustrative, but not exhaustive.

- Under the Proposed Rules, public companies would have to disclose "climate-related risks," defined to include "the actual or potential negative impacts of climate-related conditions and events on a registrant's consolidated financial statements, business operations, or value chains, as a whole."[85] It is far from clear what constitutes a "potential" impact. "Potential" is more tenuous and speculative than the *Basic v. Levinson* materiality test for forward-looking statements calling for the "indicated probability" of an event and its "anticipated magnitude" to be balanced.[86]

- Proposed "transition risk" disclosures require far-reaching information concerning, among other things, the impacts on a company's "value chain" associated with a range of current or future developments, such as those relating to change in law or policy, changes in market demand, technological advances, competitive pressures and reputational impacts that "might trigger changes to market behavior, consumer preferences or behavior, and registrant behavior."[87] The use of the word "might" in the Proposed Rules is notable in light of the Supreme Court's explicit rejection of "might" as the test of materiality in *TSC*.[88] Further, it is very difficult to discern the outer boundaries of what these disclosure requirements mandate given their stated breadth.

- Companies would be required to disclose climate-related risks that "may manifest over the short, medium, and long term,"[89] as defined by the company. We do not ask the SEC to define these time frames, but we do note that, in the context of climate events and associated impacts, long term could be many years from now, perhaps even generations. Depending on what constitutes "long term" for these purposes, companies might have to disclose information that, because what it covers is so indeterminate, off in the future, and subject to change, would not be relevant or informative to include in a typical model of asset valuation or, worse, lead to unreasonable speculation. Consideration of potential impacts decades from now is considerably outside the time frames considered in materiality assessments that companies conduct today. Furthermore, the word "may" seems akin to "potential" and, in any case, is reminiscent of the word "might" that the Court intentionally steered away from in *TSC*. "May" bears no similarity to the use of the word "known" in Regulation S-K Item 303 providing for MD&A.

---

Proposed Rules also go much further than federal environmental regulatory requirements regarding reporting of climate risks. Neither the EPA nor any other agency has defined such risks specifically for companies, nor attempted to require such reporting under the environmental laws.

[85] Proposing Release, 87 Fed. Reg. at 21,349.
[86] *Basic*, 485 U.S. at 238-9.
[87] Proposing Release, 87 Fed. Reg. at 21,466.
[88] *TSC Industries*, 426 U.S. at 445-7.
[89] Proposing Release, 87 Fed. Reg. at 21,467.

Appellate Case: 24-1628     Page: 1029     Date Filed: 03/26/2024 Entry ID: 5377362

- Regarding the disclosure of "physical risks," the Proposed Rules would obligate companies to describe the "location and nature of the properties, processes, or operations subject to the physical risk."[90] "Location" is defined to mean a ZIP code or, in a jurisdiction that does not use ZIP codes, a similar subnational postal zone or geographic location. If the risk concerns "flooding," companies would also have to disclose "the percentage of those assets (square meters or acres) that are located in flood hazard areas."[91] If the risk concerns "high or extremely high water stress" locations, companies would have to disclose "the amount of assets (e.g., book value and as a percentage of total assets) located in those regions." No other Regulation S-K disclosure Item requires information that is this particular – down to a ZIP code or plot sizes. For example, the materiality of providing the ZIP code for thousands or possibly hundreds of thousands of individual electric transmission and distribution towers and poles for electric utilities is of questionable value to investors. Disclosure of information at this level of granularity, particularly if the disclosure regards the value of assets, would improperly expose competitively sensitive information. Additionally, requiring ZIP code-level reporting could threaten national security, as it would essentially provide a map to bad actors of areas of critical business assets used by both the private and public sectors. Moreover, the meaning of "flood hazard areas" and regions of "high or extremely high water stress" is not clear. Companies will interpret these terms differently, resulting in lack of comparability for investors.

- The Proposed Rules would mandate that companies address numerous distinct items regarding climate-related risk management. The specifics of this proposed disclosure stand in sharp contrast to current risk factor disclosure requirements under Regulation S-K Item 105, which is principles-based and requires a company to discuss "material factors that make an investment . . . speculative or risky."[92]

- The Proposing Release would mandate the disclosure of Scope 3 emissions, but Scope 3 concern data of *other* companies, not the issuer.[93] Requiring issuers to report the data of other companies is inconsistent with traditional materiality-based standards, and is improper, inherently unreliable, and exceeds the Commission's authority.

- When assessing materiality of Scope 3 emissions, the Proposing Release says, "registrants should consider whether Scope 3 emissions make up a relatively significant portion of their overall GHG emissions."[94] Indeed, the Commission suggests a 40% quantitative threshold of Scope 3 emissions as compared to a company's total emissions is material for purposes of the proposed Scope 3 disclosure requirement. The proportion of a company's Scope 3 emissions as compared to its overall emissions is an arbitrary threshold and cannot be squared with the traditional materiality test under the federal securities laws, which asks

---

[90] *Id* at 21,350.
[91] *Id*.
[92] 17 C.F.R. §229.105.
[93] This is true of Scope 2 emissions, as well.
[94] Proposing Release, 87 Fed. Reg. at 21,379

Appellate Case: 24-1628     Page: 1030     Date Filed: 03/26/2024 Entry ID: 5377362

whether the information is significant to a reasonable investor focused on investment returns.

- The Proposing Release notes that a company may have "gaps in the data required to calculate its GHG emissions."[95] We agree that companies are at various places along the continuum of how to collect GHG data. The Proposed Rules go on to state, "A registrant's GHG emissions disclosure should provide investors with a reasonably complete understanding of the registrant's GHG emissions in each scope of emissions."[96] The standard of "reasonably complete [investor] understanding" differs from the historical securities law focus on ensuring that there are no material misstatements or omissions when disclosures are made.

- The Commission proposes to require that companies disclose the financial statement impacts on a line-item by line-item basis of severe weather events, other natural conditions, transition activities and identified climate-related risks unless the aggregated impact is less than 1% of the total line item for the relevant year.[97] As discussed elsewhere in this letter, one percent has not typically been the threshold for quantitative financial statement line-item materiality, especially since a given line item itself might not be material for a given company. Furthermore, there is no other financial statement disclosure requirement under Regulation S-X that requires any similar disclosure for any other specific type of risk.

- The Commission proposes requiring detailed disclosure, including ongoing updates, regarding transition plans and any climate-related targets or goals without regard to the materiality of such plans, targets or goals and whether or not they have been publicly disclosed. Targets, goals and related information – including how a company intends to meet its target or goal and disclosures concerning the company's annual progress doing so – should only be mandated if material. While targets and goals related to GHG emissions are generally the most common, the Proposed Rules also require disclosure of *any* climate-related target or goal (e.g., regarding energy usage, water usage, conservation or ecosystem restoration, or revenues from low-carbon products) whether or not such target or goal has been publicly disclosed. Practically speaking, the impact of this requirement will not only discourage companies from conceiving and publishing targets or goals but may also chill private and preliminary discussions at the board or management level of constructive initiatives that could be construed as potentially implicated by this disclosure obligation. This ultimately could lead to dampened enthusiasm and organizational efforts within companies in pursuit of these worthy objectives and therefore, fewer achievements beneficial for the climate and environment would be realized.

- The Commission proposes required disclosure regarding "any analytical tools, such as scenario analysis, that the registrant uses to assess the impact of climate-related risks on its business and consolidated financial statements and to support the resilience of its strategy

---

[95] *Id* at. 21,387.
[96] *Id.*
[97] *Id.* at 21,366.

and business model."[98] If companies are mandated to disclose scenario analyses and similar tools that they use and implement, this would present significant risk and cost for reporting companies with little value to investors. Moreover, requiring these disclosures irrespective of materiality may be a deterrent for a company to perform such analyses and may prove unhelpful for investors because analytical tools like scenario analysis still are in early stages of development and based on many assumptions, some of which could be extremely remote and unlikely but nonetheless a company may consider them in order to be exhaustive. Some scenarios may be useful as an input to internal planning and risk assessment but not have been conceived or implemented in contemplation of public disclosure. Publicly disclosing scenario analyses and related information and analysis could do competitive harm to companies by exposing sensitive information that is not material. Additionally, for most companies, preparing a scenario analysis will require retaining a third-party expert with climate projection expertise. If the requirement to disclose analytical tools is retained, such disclosure should only be required if the outcome of the scenario or similar analysis identifies a material climate-related risk (or, at the option of the company, climate-related opportunity).

- The degree and detail of climate-related governance disclosures that the SEC proposes for the board of directors and management exceeds what the SEC mandates regarding the board oversight of and management's assessment and management of any other risk a company faces. Furthermore, proposed Regulation S-K Item 1501(a)(ii) requires disclosure regarding board members' climate-risk expertise. If this disclosure requirement were adopted, then any board member identified as having such expertise should have the same protections[99] as an audit committee financial expert under current rules or a cybersecurity expert under the recently proposed cybersecurity rules.[100] That said, the Chamber is not supportive of this proposed requirement, especially insofar as it represents an emerging SEC trend of implicitly mandating "subject matter experts" on the board of directors,[101] which could crowd out the broader enterprise governance and risk oversight skills and experience that directors must have. Specialized board experts should not proliferate due to government regulation, and, even more practically, finding qualified board members with particular subject-matter expertise could be difficult, creating a supply and demand imbalance that would be more costly to the quality of corporate governance – with respect to climate-related risks and other matters – than it would be helpful. Indeed,

---

[98] *Id.* at 21,468.

[99] Generally, these protections are as follows: (i) a person who is determined to have applicable expertise will not be deemed an expert for any purpose, including, without limitation, for purposes of Section 11 of the Securities Act, as a result of being designated or identified as a director with such applicable expertise; (ii) the designation or identification of a person as having applicable expertise does not impose on such person any duties, obligations or liability that are greater than the duties, obligations and liability imposed on such person as a member of the board of directors in the absence of such designation or identification; and (iii) the designation or identification of a person as having applicable expertise does not affect the duties, obligations or liability of any other member of the board of directors.

[100] Release No. 33-11038, *Cybersecurity Risk Management, Strategy, Governance, and Incident Disclosure,"* 87 Fed. Reg. 16590 (March 23, 2022).

[101] *See id.*

the Commission has not provided sufficient evidence that having climate "experts" on boards would increase the effectiveness of companies' climate-related risk postures or advance the SEC's mission.

- By way of further illustration and in addition to items noted above, we note the following non-exhaustive list from proposed Regulation S-K Items 1502 and 1503 of disclosure that a public company would have to provide untethered from any materiality threshold or qualification:

  o the location (defined under proposed Item 1500(k) as a ZIP code or, in a jurisdiction that does not use ZIP codes, a similar subnational postal zone or geographic location) properties, processes, or operations subject to any identified physical risk (Item 1502(a)(1)(i));

  o if a risk concerns the flooding of buildings, plants, or properties located in flood hazard areas, the percentage of those assets (square meters or acres) that are located in flood hazard areas in addition to their location (Item 1502(a)(1)(i)(A));

  o the amount of assets (e.g., book value and as a percentage of total assets) located in regions of high or extremely high water stress and the percentage of the registrant's total water usage from water withdrawn in those regions (Item 1502(a)(1)(i)(B));

  o the actual and potential impacts of any climate-related risks identified (Item 1502(b));

  o whether and how any impacts described are considered as part of the registrant's business strategy, financial planning and capital allocation and, if applicable, the role that carbon offsets or renewable energy credits (RECs) play in the registrant's climate-related business strategy (Item 1502(c));

  o the existence of, and information related to, any internal carbon price maintained by the registrant (Item 1502(e));

  o any processes the registrant has for identifying, assessing and managing climate-related risks (Item 1503(a)); and

  o whether and how any processes described are integrated into the registrant's overall risk management system or processes and how any separate board or management committee that is responsible for assessing and managing climate-related risks interacts with the registrant's board or management committee governing risks (Item 1503(b)).

*Fourth*, underlying the U.S. securities laws is the expectation – embodied in the materiality requirement – that investors will make better decisions with the benefit of the required disclosure.

However, that is not necessarily the real-world result of any-and-all possible disclosure mandates. As the Supreme Court expressed in *TSC*, it is "hardly conducive to informed decision-making" if investors are inundated with information.[102]  The Proposing Release introduces another concern: that much of what the SEC would obligate companies to disclose is more speculative and uncertain than any other disclosures that companies currently make.

To its credit, the SEC mentions this in the Proposing Release. For example, it states, "We recognize that the methodologies pertaining to the measurement of GHG emissions, particularly Scope 3 emissions, are evolving."[103]  The Commission also allows, "We acknowledge that a registrant's material Scope 3 emissions is a relatively new type of metric, based largely on third-party data, that we have not previously required."[104]  Also notable is the SEC's statement, "While we encourage registrants to provide as accurate a measurement of its GHG emissions as is reasonably possible, we recognize that, in many instances, direct measurement of GHG emissions at the source, which would provide the most accurate measurement, may not be possible."[105]  In light of this, the SEC proposes to allow companies some flexibility in how they determine certain disclosures, such as GHG emissions, and would require companies to describe the methodologies, assumptions, calculation tools and data (and data gaps) that underpin certain of the mandated disclosures.

The SEC concludes from "the uncertainty surrounding the future path of climate change and the evolving nature of the science and methodologies measuring their economic impacts"[106] that companies may under-disclose climate-related risks.[107] However, a different conclusion seems warranted. Climate-related disclosures, to the extent grounded in data limitations, uncertainties around impact, distant time horizons and ongoing scientific and technological learning, can run counter to informed investor decision making if, as a result, climate-related disclosures spawn investor confusion and create misimpressions and misunderstandings. The concern is that investors will misinterpret mandated climate-related information that companies disclose as having greater precision, objectivity and certitude than warranted, especially when the disclosure takes the form of a definitive numerical value such as emissions of $CO_2e$. For investors to assess these types of quantitative climate-related disclosures, the data, assumption, modelling and scientific nuances and judgments that are the basis of the disclosures must also be assessed to place climate-related information in its proper context, including in connection with comparisons to other companies.

*Fifth*, the animating philosophy of the federal securities laws is to provide investors with material information and then allow investors to decide how capital will be allocated across our economy. Congress did not give the SEC merit review authority. Although the Proposed Rules do not constitute quintessential merit regulation, they could have a comparable effect, even if the mechanism is more subtle than direct substantive environmental regulation.

---

[102] *See TSC Industries*, 426 U.S. at 449.
[103] Proposing Release, 87 Fed. Reg. at 21,377.
[104] *Id.* at 21,381.
[105] *Id*. at 21,387.
[106] *Id*. at 21,427.
[107] *See id*.

Without question, the Proposed Rules call for far more sweeping and detailed disclosures on a single topic (i.e., climate) than any other disclosure mandate that the SEC has adopted, or that Congress has enacted, regarding any other topic throughout the SEC's nearly 90-year history. Against the backdrop of all the material information that drives valuations and investor decisions, the Proposed Rules place unique weight on mandating disclosures relating to climate, particularly when one considers that material climate-related information already is required to be disclosed by companies pursuant to existing disclosure requirements, such as risk factor disclosures and MD&A, and that companies provide additional climate-related information voluntarily in sustainability or ESG reports. By singling out climate to the unprecedented degree that the Proposing Release does, the SEC is bound to heighten the salience of climate-related information above other information bearing on a company's financial and operating performance. The likely result is to affect how capital is allocated, with the Proposed Rules' disclosure regulation taking on attributes that resemble merit regulation.

To best serve the goal of improving investor decision making without securities regulation itself unduly influencing the choices investors and the companies they invest in make, any final rules that are adopted must adhere to the longstanding conception of materiality that the Supreme Court handed down decades ago.

### E. The Proposed Rules raise serious constitutional questions.

#### 1. The Proposed Rules violate the First Amendment.

The First Amendment "prohibits the government from telling people what they must say."[108] The Proposed Rules violate this right by forcing companies to engage in costly speech on a matter that is the subject of much political debate.[109]

Strict scrutiny applies here. The Proposed Rules compel speech and are thus necessarily based on the content of the speech.[110] Furthermore, the Proposed Rules implicate political speech.[111] Addressing climate change is an important political issue and the subject of robust public debate that includes discussion of the specific consequences climate change may have and the responsibilities corporations have to address climate change. Prominent political figures fall on every side of this debate.[112] The Proposed Rules would inevitably force all public companies into the middle of it, compelling them to discuss, at great cost, issues that are often highly complex and fraught with uncertainty and controversy. This is a "significant encroachment[ ] on First Amendment rights," which "cannot be justified by a mere showing of some legitimate

---

[108] *Rumsfeld v. Forum for Academic & Institutional Services, Inc.*, 547 U.S. 47, 61 (2006).

[109] *See* Letter from Law and Finance Professors at 8 (Apr. 25, 2022), available at https://www.sec.gov/comments/s7-10-22/s71022-20126528-287180.pdf.

[110] *R.J. Reynolds Tobacco Co. v. FDA*, 696 F.3d 1205, 1211 (D.C. Cir. 2012).

[111] *See Citizens United v. FEC*, 558 U.S. 310, 340 (2010) ("Laws that burden political speech are 'subject to strict scrutiny' . . . .").

[112] *See, e.g.*, Comments of Rep. Bill Huizenga (Aug. 23, 2021), available at https://www.sec.gov/comments/s7-10-22/s71022-20127683-288889.pdf; Comments from Elizabeth Warren (June 11, 2021), available at https://www.sec.gov/comments/climate-disclosure/cll12-8911344-244296.pdf.

governmental interest."[113] Rather, the compulsion of speech contemplated here must survive strict scrutiny—it must be narrowly tailored to promote a compelling government interest.[114] And if a less restrictive alternative would serve the Commission's purpose, that alternative must be taken.[115]

The Proposed Rules cannot survive strict scrutiny. In the First Amendment context, the government cannot "rest on . . . speculation or conjecture."[116] It needs evidence. And, here, the record lacks evidence that the Proposed Rules would in fact further a compelling government interest. The only potentially compelling government interest the Commission could cite is protecting investors from fraud or other material risks; the "simple interest in providing" the public with "additional relevant information" does not suffice.[117] On the investor-protection front, however, the Commission has not come close to meeting its burden. The Commission has not shown that investors are not receiving material information relating to climate or are being harmed by a lack of additional climate-related disclosures beyond those required to be disclosed under existing rules. Nor has the Commission shown that the Proposed Rules would protect investors from harm. Rather, the record shows that the Proposed Rules would not. They would inundate investors with a great amount of immaterial information, lead to significant confusion and fail to provide information that investors would actually act upon.[118]

Moreover, the Proposed Rules are not narrowly tailored. There are many less burdensome means of furthering any compelling interest in protecting investors. For instance, the securities laws *already* require public companies to disclose material risks. The Commission has not shown why any new rule should not be limited by materiality, nor why the Commission's existing guidance is not sufficient to ensure that these requirements are satisfied or why, even if it were not sufficient, augmenting such guidance – a more narrowly tailored solution – would not achieve the goal of investor protection. Similarly, the Commission has failed to demonstrate why its enforcement authority does not adequately ensure the protection of investors. In these circumstances, the Commission cannot establish that using its existing powers, or a reasonable, less-restrictive alternative, would not suffice—the Commission has not even "tried."[119] In these comments, the Chamber identifies a number of more measured approaches that would be narrower and less burdensome than what the Commission has proposed.

The SEC is not exempt from the requirements of the First Amendment, as the U.S. Court of Appeals for the D.C. Circuit made clear in the 2015 "conflict minerals" case.[120] The court there confronted an SEC rule that required companies to disclose, among other things, whether their

---

[113] *Buckley v. Valeo*, 424 U.S. 1, 64 (1976) (per curiam).

[114] *Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2371 (2018).

[115] *Id.* at 2376.

[116] *Nat'l Ass'n of Mfrs.& U.S. Chamber of Commerce v. SEC*, 800 F.3d 518, 526 (D.C. Cir. 2015).

[117] *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 348 (1995); *see also Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 798 (1988) (state interest in "informing donors how the money they contribute is spent" not sufficiently "weighty" to justify compelled speech).

[118] *See* Moss et al., *supra* note 71.

[119] *Bruni v. City of Pittsburgh*, 824 F.3d 353, 370 (3d Cir. 2016).

[120] *See NAM*, 800 F.3d 518.

Appellate Case: 24-1628     Page: 1036     Date Filed: 03/26/2024 Entry ID: 5377362

products were free of so-called "conflicts minerals." The court agreed with the National Association of Manufacturers and the Chamber that this disclosure requirement violated the First Amendment. And in doing so, it made clear that the SEC's long history of requiring disclosures did not mean that new SEC disclosure requirements were presumptively permissible under the First Amendment or subject to relaxed First Amendment scrutiny.[121]

The Commission cannot proceed in the expectation that a lesser degree of First Amendment scrutiny will apply here. Although the Supreme Court has subjected some compelled disclosures to lesser scrutiny, it has done so only where the disclosures involved "commercial advertising" and concerned "purely factual and uncontroversial information."[122] Neither standard is met here. The Proposed Rules compel speech outside of the advertising context—going far beyond "commercial speech" that merely "propos[es] a commercial transaction"[123]—and they plainly concern an issue that is controversial. The subject matter of the Proposed Rules alone subjects them to heightened scrutiny; the impact that corporations have on climate change, and the steps they should take to address it, is "anything but an 'uncontroversial' topic."[124] Indeed, it must be expected that some participants in the climate debate will use companies' disclosures about emissions and about their plans to address them, as a basis to criticize the companies or to call for increased regulation or other concerted action, whether by regulators or by the companies themselves.[125] Similar concerns underlaid the invalidation of the conflict mineral disclosure on First Amendment grounds, where the court perceived that SEC disclosures would be used to "stigmatize" companies and attempt to "shape their behavior."[126] By compelling companies to talk on the government's terms, the Proposed Rules would also necessitate public pronouncements regarding subjective judgment calls about future risks; force companies into politically charged discussions about why they do or do not have certain policies or expertise; and "skew the public debate."[127]

The Proposed Rules would not survive even a lesser level of constitutional scrutiny. Under intermediate scrutiny, the Proposed Rules fail because the Commission has not shown why less-

---

[121] *See id.* at 521 ("To support the conflict minerals disclosure rule, the dissent argues that the rule is valid because the United States is thick with laws forcing '[i]ssuers of securities' to 'make all sort of disclosures about their products.'" Charles Dickens had a few words about this form of argumentation: 'Whatever is right'; an aphorism that would be as final as it is lazy, did it not include the troublesome consequence, that nothing that ever was, was wrong." (citations omitted)).

[122] *Id.* at 522-23.

[123] *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626, 637 (1985).

[124] *Nat'l Inst. of Family & Life*, 138 S. Ct. at 2372.

[125] *See, e.g.*, Basit Mahmood, *There are 100 Companies Responsible for Climate Change, Activist Says*, Newsweek (Sept. 8, 2020), https://www.newsweek.com/climate-change-xr-extinction-rebellion-fossil-fuels-climate-greenhouse-gasses-emissions-1530084; Desmond Tutu, *We Need an Apartheid-Style Boycott to Save the Planet*, Guardian (Apr. 10, 2014), https://www.theguardian.com/commentisfree/2014/apr/10/divest-fossil-fuels-climate-change-keystone-xl; Alastair Marsh & Danielle Bochove, *Dear Bank CEO, You are Cordially Invited to Defund this Pipeline*, Bloomberg (July 1, 2021), https://www.bloomberg.com/news/articles/2021-07-01/how-climate-activists-pressure-banks-to-defund-the-oil-industry; Andrew Edgecliffe-Johnson, *Activists Target Public Relations Groups for Greenwashing Fossil Fuels*, Financial Times (Jan. 11, 2022), https://www.ft.com/content/f90562d6-6673-457a-901e-257eb4578d98.

[126] *NAM*, 800 F.3d at 530.

[127] *Id.*

restrictive alternatives would be inadequate.[128] Moreover, as discussed elsewhere in this letter, the Proposed Rules are more extensive than necessary to serve the Commission's purpose.[129] Under even lesser scrutiny, the Proposed Rules fail, since they are "unjustified," "unduly burdensome," and "broader than reasonably necessary."[130] Simply put, under any standard, the Proposed Rules cannot survive First Amendment scrutiny and, accordingly, should be withdrawn.

    2.   <u>The Proposed Rules are grounded in a reading of the SEC's authority that violates the non-delegation doctrine.</u>

The Proposed Rules are also grounded in a conception of the SEC's authority that violates the non-delegation doctrine. As discussed, the Commission claims a "broad authority" to promulgate any disclosure requirements that the Commission deems "'necessary or appropriate in the public interest or for the protection of investors.'"[131] This understanding of the Commission's rulemaking authority cannot be squared with the Constitution's separation of powers and, in particular, with the non-delegation doctrine, which "bars Congress from transferring its legislative power to another branch of Government."[132]

It is well-settled that a congressional conferral of rulemaking authority on a regulatory agency must "lay down . . . an intelligible principle" to guide the agency's exercise of that authority.[133] As traditionally understood, the intelligible-principle standard requires "Congress, and not the Executive Branch, to make the policy judgments."[134] Congress may authorize the Executive Branch "to make factual findings," for example, but Congress, not the Executive Branch, must "set forth the facts that the executive must consider and the criteria against which to measure them."[135] A majority of the Supreme Court has recently expressed its support for reinvigorating this important structural safeguard.[136]

The SEC's claimed authority to promulgate any disclosure requirements that it deems—in its sole discretion—necessary or appropriate in the public interest or to protect investors violates the traditional understanding of the intelligible-principle requirement in a number of ways. Most notably, the SEC's position fails the "most important []" consideration in the traditional test: The Proposed Rules reflect "policy judgments" of the "Executive Branch," not of "Congress."[137] Moreover, in "proposing to require disclosures about climate-related risks and metrics reflecting

---

[128] *Id.* at 556.

[129] *Id*.

[130] *Nat'l Inst. of Family & Life*, 138 S. Ct. at 2377.

[131] Proposing Release, 87 Fed. Reg. at 21,335 (citing 15 U.S.C. §§ 77g, 78l, 78m, 78o).

[132] *Gundy v. United States*, 139 S. Ct. 2116, 2121 (2019) (plurality opinion).

[133] *Id.* at 372 (alteration in original) (quoting *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928)).

[134] *Gundy*, 139 S. Ct. at 2141 (Gorsuch, J., dissenting).

[135] *Id.*

[136] *See id.* at 2131 (Alito, J., concurring in the judgment); *id.* at 2137–42 (Gorsuch, J., with whom Roberts, C.J., and Thomas, J., join, dissenting); *Paul v. United States*, 140 S. Ct. 342, 342 (2019) (Kavanaugh, J., respecting the denial of certiorari).

[137] *Gundy*, 139 S. Ct. at 2141 (Gorsuch, J., dissenting).

Appellate Case: 24-1628    Page: 1038    Date Filed: 03/26/2024    Entry ID: 5377362

those risks,"[138] the Proposed Rules do not merely fill in "gaps" in the statutory scheme or "mak[e] factual findings,"[139] but craft a novel, expansive and generally applicable policy. Proceeding with the Proposed Rules would therefore transgress the constitutional separation of powers.

## II.   THE PROPOSED RULES WILL LEAD TO SERIOUS ADVERSE CONSEQUENCES IF NOT SIGNIFICANTLY IMPROVED

### A.   The Proposed Rules, if adopted as proposed, would result in extensive disclosure of non-material information that is not useful to investors.

The Chamber has supported the SEC's recent bipartisan efforts across several administrations under the SEC's disclosure effectiveness initiative to streamline disclosures and make them even more meaningful, which has markedly improved the overall quality and usability of public company disclosure. This laudable project has sought to provide timely, useful information to our markets through simplification of disclosure mandates, a focus on what is most significant when evaluating a business and its operations, improvement in the readability and navigability of public company reports filed with the SEC, and the removal of repetitive and otherwise distracting information that does not appreciably advance the goal of informed investor decision making. The framers of the TCFD recommendations are in accord and have been guided by the principles, consistent with the SEC's longstanding and prudent approach, that "[d]isclosures should be eliminated if they are immaterial or redundant to avoid obscuring relevant information"[140] and that companies should "avoid generic or boilerplate disclosures that do not add value to users' understanding of issues."[141] Given its heavy reliance on the TCFD recommendations in other respects, the Commission has not adequately explained its decision to depart sharply from the TCFD recommendations in this respect.

We are deeply concerned that the Proposed Rules, especially when taken as a whole, mark a significant step backward from the worthy objectives of the SEC's disclosure effectiveness initiative. In many instances, the Proposed Rules may actually spawn investor confusion and create misimpressions and misunderstandings that, if anything, could undercut the goals of more informed decision making and investor protection. In turn, they could potentially stifle capital formation in the public markets.

Putting aside the significant burdens that would be placed on public companies to collect, prepare and validate the new disclosures the Proposed Rules would compel, there remains substantial doubt that these new requirements will lead to better understanding of the complicated topic they cover. To the contrary, the totality of new, extensive disclosures under the Proposed Rules risk inundating investors with immaterial information and creating unnecessary confusion and misunderstanding, particularly as to the certainty of the disclosures and the meaning of the various mandated new metrics. Moreover, the new disclosure requirements, because of their unprecedented extensive, detailed, and prescriptive nature as compared to any other disclosure

[138] Proposing Release, 87 Fed. Reg. at 21,335.
[139] *Gundy*, 139 S. Ct. at 2141 (Gorsuch, J., dissenting).
[140] 2021 TCFD Implementation Annex at 132.
[141] *Id.*

requirements under the federal securities laws, would place disproportionate emphasis on climate risk relative to other matters. This would make it harder for investors to discern and use the material information about non-climate related matters contained elsewhere in annual reports and registration statements or even the material climate-related information that companies already disclose in filings. Indeed, it is important to underscore that material climate-related disclosures already are made by companies, including as part of their risk factor and MD&A disclosures.

The Proposing Release frequently cites the preferences of some institutional investors but says conspicuously little about retail investors. A recent survey[142] conducted by Finra and National Opinion Research Center ("NORC") at the University of Chicago tested the ESG perceptions and preferences of 1,228 randomly selected retail investors. The study included questions about retail investors' awareness and use of ESG investments, and their perception of socially responsible and environmentally sustainable investing. A quarter of the sample incorrectly believed that ESG stands for "earnings, stock, growth." More than half of the survey respondents—54% —never or rarely considered environmental impacts when making investment decisions. To survey respondents, environmental factors were the least important considerations relative to social, governance and financial considerations when making investment decisions.

The problem of creating unnecessary confusion and misunderstanding, particularly as to the certainty of the disclosure, is particularly acute with respect to Scope 3 emissions disclosures. This is one of the reasons, as described in more detail elsewhere in this letter, we believe reporting of Scope 3 emissions should be entirely voluntary. Scope 3 emissions disclosures are not likely to be comparable across companies since even under the Proposed Rules they are a function of disparate company sizes, methodologies, data and assumptions. Moreover, this lack of comparability is consistent with the design of the GHG Protocol standard for Scope 3 emissions, which is not intended to allow investors to compare one company's Scope 3 emissions to another company's Scope 3 emissions.[143]

In view of the litany of required caveats, qualifications and explanations set forth in proposed Regulation S-K Item 1504(e), the SEC has failed to demonstrate that, notwithstanding the degree to which the disclosure is ultimately subject to significant assumptions and limitations, investors will be able to absorb the information in a way that will assist them in making investment decisions. The risk is that the disclosure elicited by the Proposed Rules will provide merely a veneer of comparability – indeed, false comfort that there is comparability – and will thereby obscure potentially vast differences across the quantitative emissions companies disclose as companies utilize diverse and varying data and methodologies in their good faith attempts to navigate the complexities and uncertainties embedded in the Proposed Rules' disclosure mandates.

---

[142] *Investors say they can change the world, if they only knew how: Six things to know about ESG and retail investors* (Mar. 2022), available at https://www.finrafoundation.org/knowledge-we-gain-share/consumer-insights-money-investing.

[143] *See* GHG Protocol, *Corporate Value Chain (Scope 3) Accounting and Reporting Standard*, available at https://ghgprotocol.org/standards/scope-3-standard, at 6 ("Use of this standard is intended to enable comparisons of a company's GHG emissions over time. It is not designed to support comparisons between companies based on their Scope 3 emissions. Differences in reported emissions may be a result of differences in inventory methodology or differences in company size or structure.").

Commissioner Peirce expressed a similar concern that, from the standpoint of investor protection and fair and efficient markets, the mandated Scope 3 emissions disclosures could create confusion:

> Requiring companies to put these faulty quantitative analyses in an official filing will further enhance their apparent reliability, while in fact leaving investors worse off, as Commission-mandated disclosures will lull them into thinking that they understand companies' emissions better than they actually do.[144]

The Proposing Release highlights an additional reason why too much disclosure that is too intricate and requires too much contextualizing can harm investors even if they are receiving more information on an absolute basis: "the complex and multidimensional nature of certain climate-related risks may further impede investors' abilities to detect misreporting."[145]

### B. The Proposed Rules, if enacted, would discourage companies from entering or remaining in the U.S. public markets.

There is an inflection point for all companies at which the costs and burdens of a U.S. public listing outweigh the benefits of that listing. Exacerbating the degree to which the Proposed Rules could make the U.S. public markets less attractive, notwithstanding the few accommodations afforded emerging growth companies and smaller reporting companies under the Proposed Rules, the aggregate impact of the new disclosure obligations would be borne disproportionately by these types of companies.

The Chamber is deeply concerned that the Proposed Rules will serve as a disincentive for private companies to enter the U.S. public markets and make many public companies (particularly those that are not accelerated filers) reassess the value proposition of remaining public. In 2012, bipartisan congressional majorities passed the Jumpstart Our Business Startups Act to reverse the decline of the number of public companies by providing incentives to go public. The Commission should not undermine the congressionally mandated policy goals under this important legislation via this rulemaking.

Beyond the additional out-of-pocket costs associated with hiring new employees who are climate specialists, retaining third-party environmental consultants and attestation firms, and developing new systems and controls to track and report climate data at the granular detail that the Proposed Rules require, compliance with the reporting regime contemplated by the Proposed Rules will place many new responsibilities on corporate managers and senior executives. There is an opportunity cost associated with these new responsibilities. Time spent on climate reporting is time away from other strategic and operational pursuits intended to grow the business, manage relevant risks and enhance investor returns.

---

[144] Statement of Commissioner Hester Peirce, *We are Not the Securities and Environment Commission - At Least Not Yet* (Mar. 21, 2022), available at https://www.sec.gov/news/statement/peirce-climate-disclosure-20220321#_ftn74. (hereinafter "Peirce Statement").

[145] Proposing Release, 87 Fed. Reg. at 21,427.

While the Proposed Rules are ostensibly targeted towards investors, inevitably there are many non-investor groups that will make use of the information for purposes other than enhancing shareholder value. Many activist organizations are motivated differently than investors and such groups are not always aligned with traditional investors in seeking to increase shareholder value over the long term. Instead, some interested parties may use information called for by the Proposed Rules in a way that will diminish sustainable financial returns in exchange for achieving other objectives. Dramatically increasing the likelihood of pressure campaigns on the part of groups whose interests are adverse to traditional investors should not be an objective of any SEC rulemaking. The Commission should guard against such foreseeable outcomes and mitigate against the possibility that its rules will unintentionally frustrate the SEC's mission.

Many private companies will avoid accessing the public markets altogether, seeing the vast cost and complexity of the climate reporting regime that the Proposed Rules in their entirety would create, the real potential to divert managerial resources from other elements of the business, and the opportunity for increased activism. Many private companies will continue to seek debt and equity financing from private sources and remain private indefinitely. The capital markets suffer when fewer opportunities exist for investors to participate in the next generation of public company value creation. Retail investors, who typically do not have access to the private markets in the same way institutional investors do, are disproportionately disadvantaged when regulation discourages companies from going public or remaining public. Many existing U.S.-listed public companies are likely to reach a similar conclusion and pursue efforts to exit the U.S. public markets while also avoiding transactional opportunities that could create value for U.S. shareholders, such as potential mergers, if pursuing such opportunities would require them to become subject to SEC-mandated disclosure obligations. Along similar lines, to avoid related disclosure obligations, some companies may sell assets to private buyers in transactions that are on terms that adversely impact the value of publicly traded shares of common stock.

To facilitate the transition from private to public and help encourage IPOs, companies that are at a relatively early stage of development and therefore qualify as emerging growth companies under the SEC rules may take advantage of certain accommodations and scaled disclosure requirements. For these same reasons, emerging growth companies should also be permitted additional transition time to comply with the Proposed Rules. Failure to do so could further discourage private companies from going public. At a minimum, given the fact that, as the SEC notes, in comparison to smaller reporting companies, emerging growth companies "may similarly face resource constraints related to company size or age,"[146] emerging growth companies should be entitled to the same accommodations, for example exemption from Scope 3 emissions reporting requirements, as smaller reporting companies.

In placing new burdens on companies, the SEC must evaluate how the Proposed Rules will impact the competitiveness of the U.S. capital markets. The SEC has failed to provide an analysis for comment in this regard.

---

[146] Proposing Release, 87 Fed. Reg. at 21,450.

III.    THE PROPOSED RULES MUST BE SUBSTANTIALLY REVISED IF ADOPTED.

   A.    **The nature and degree of the SEC's reliance on unregulated standard setters raise concern.**

   Many companies have been guided in their voluntary reporting of climate-related risks and GHG emissions by the TCFD recommendations and the GHG Protocol. While voluntary reporting under these or other voluntary standards is entirely appropriate, the analysis is different when the SEC transforms voluntary standards into mandatory ones. The Chamber believes that, if the SEC adopts climate-related rules, the TCFD recommendations and the GHG Protocol should be considered and taken into account in preparing the rule. However, the SEC may not rely on TCFD and the GHG Protocol without undertaking a rigorous analysis of their appropriateness as mandatory requirements as compared to voluntary guidelines and frameworks. These organizations were created to address various policy considerations and respond to constituencies beyond those of the U.S. capital markets and investors. The process for third parties developing these voluntary standards is not subject to the rigors of the Administrative Procedure Act, and many of the standards address topics and are intended to achieve objectives far removed from the SEC's core expertise and authority as a capital markets regulator. Accordingly, while there can be practical reasons for drawing from well-established frameworks to the extent registrants have considerable experience applying them and they have proven to be workable, there are concerns with grounding the Proposed Rules in third-party standards that were not designed with an emphasis on the SEC's statutory mission as compared to a broader set of environmental and geopolitical ambitions.  Moreover, it is a fundamental change to essentially transform a voluntary disclosure standard into a mandatory requirement under the SEC's regulatory regime. Third-party standard setters can rightly inform the Commission's policy approach but should not be given an outsized role in determining and justifying the SEC's approach given their structure and purpose.

   Section 4A of the Exchange Act provides the express authority of the SEC to delegate functions to a division of the SEC, an individual SEC commissioner, an administrative law judge, or an employee or employee board, but not to any other party. When Congress has intended to authorize the SEC to delegate authority to a third party, such as FASB or the Public Company Accounting Oversight Board (the "PCAOB"), Congress has done so explicitly by statute, and has imposed important conditions that appear lacking in the case of the various third-party standard setters (most notably the TCFD and the GHG Protocol) that the Proposed Rules are grounded in.

   The PCAOB was established by an express act of Congress, pursuant to Section 101 of the Sarbanes-Oxley Act. Regarding the parameters within which the PCAOB must operate, the Sarbanes-Oxley Act provides for:

   ● the explicit duties of the PCAOB, which are subject to the SEC's oversight and enforcement authority over the PCAOB pursuant to Section 107 of the Sarbanes-Oxley Act (as described below) and include registration and oversight of and enforcement authority over registered public accounting firms, setting its own budget and managing the operations of its staff and performing such other duties or functions as the PCAOB (or the

SEC, by rule or order) determines are necessary or appropriate to otherwise to carry out the Sarbanes-Oxley Act, in order to protect investors, or to further the public interest;

- standards and qualifications for who can serve as a board member of the PCAOB, including that each board member must serve on the PCAOB full time and be financially independent of any public accounting firm, and procedures for appointing and replacing members of the PCAOB, which is an authority reserved for the SEC; and

- the powers of the PCAOB to include administering the self-funding mechanism established pursuant to Section 109 of the Sarbanes-Oxley Act, which is subject to SEC approval and contemplates the assessment of audit support fees on public company issuers and registered broker-dealers[147] in an aggregate amount that is based on an SEC-approved budget and does not exceed the recoverable budget expenses.

The SEC's oversight and enforcement authority over the PCAOB pursuant to Section 107 of the Sarbanes-Oxley Act expressly includes:

- authority to cause the PCAOB to make and disseminate such reports as the SEC, by rule, prescribes as necessary or appropriate in the public interest, for the protection of investors, or otherwise in furtherance of the purposes of the Exchange Act and to examine the PCAOB's records;[148]

- a requirement that all PCAOB rules (with limited exceptions for initial or transitional standards) receive prior SEC approval in accordance with the process applicable to rules of self-regulatory organizations set forth in Section 19(b) of the Exchange Act, which provides for publication, hearings and standards for approval and disapproval;

- a provision allowing the SEC, by rule, to amend PCAOB rules in accordance with the process applicable to rules of self-regulatory organizations set forth in Section 19(c) of the Exchange Act as the SEC deems necessary or appropriate in furtherance of the purposes of the Sarbanes-Oxley Act;

- provisions allowing the SEC to review and modify disciplinary actions taken by the PCAOB; and

- provisions allowing the SEC to rescind the PCAOB of enforcement responsibilities and censure or impose limitations upon the activities, functions and operations of the PCAOB or censure or remove members of the PCAOB.

---

[147] *See, e.g.*, the most recent announcement of the PCAOB budget and the related annual accounting support fee, available at https://www.sec.gov/news/press-release/2021-260.

[148] These are the authorities the SEC over a "registered securities association" pursuant to Section 17(a)(1) and 17(b)(1) of the Exchange Act. Section 107(a) of the Sarbanes-Oxley provides that such sections shall apply to the PCAOB as fully as if the PCAOB was a "registered securities association" for purposes of such sections.

Section 108 of the Sarbanes-Oxley Act amended Section 19 of the Securities Act to add a new Section 19(b) thereby establishing criteria for the SEC to exercise its authority to recognize an accounting-standard setting body as "generally accepted" for purposes of establishing accounting principles to be used under the federal securities laws and, shortly thereafter, the SEC made the determination required such that FASB would continue to serve in that role.[149] To meet these criteria (as the SEC determined FASB did), a standard-setting body must:

- be organized as a private entity;

- have, for administrative and operational purposes, a board of trustees serving in the public interest, the majority of whom are not, concurrent with their service on such board, and have not been during the two-year period preceding such service, associated persons of any registered public accounting firm;

- be funded as provided in Section 109 of the Sarbanes-Oxley Act as described above;

- have adopted procedures to ensure prompt consideration, by majority vote of its members, of changes to accounting principles necessary to reflect emerging accounting issues and changing business practices; and

- have considered, in adopting accounting principles, the need to keep standards current in order to reflect changes in the business environment, the extent to which international convergence on high quality accounting standards is necessary or appropriate in the public interest and for the protection of investors.

It is also worth noting the express statutory provisions in Sections 6 and 19 of the Exchange Act, which govern the relationship between registered national securities exchanges and registered self-regulatory organizations require, among other things, similar SEC oversight over rulemaking by a national securities exchange or a self-regulatory organization as applies to the PCAOB and FASB.

Even if Congress had delegated authority to the SEC to subsequently delegate the authority over climate-related standards to third parties, the substantive and procedural structure and composition of the TCFD and the GHG Protocol do not meet the requirements set forth by the applicable statutes for when the SEC may delegate authority to a third party. Neither the TCFD nor the GHG Protocol has a self-funding mechanism in accordance with Section 109 of the Sarbanes-Oxley Act, and the SEC does not have any direct (or indirect) oversight over either body or its rulemaking process. More specifically:

- the members of their governing bodies are not independent, and the SEC has no direct influence over, let alone authority to appoint or remove, members;

---

[149] Release No. 33-8221, *Policy Statement: Reaffirming the Status of the FASB as a Designated Private-Sector Standard Setter* (Apr. 25, 2003), available at https://www.sec.gov/rules/policy/33-8221.htm#P53_8931.

● the process by which rules and guidance are adopted is opaque, and the SEC has no direct influence, let alone authority, over such process; and

● the sources and amounts of funding for these organizations are not transparent.

To be clear, we are not saying that the TCFD and GHG Protocol processes are not appropriate for the purposes for which they were intended or that they do not provide value to the climate reporting landscape including, perhaps, serving as an alternative to the SEC proposing any new rules on climate-related risks. However, we are indicating that it is of great consequence that their standard-setting processes, governance and sources of funding do not comport with what Congress has required when Congress has allowed the SEC to delegate authority to other bodies.

While compliance with the TCFD recommendations or the GHG Protocol is not mandatory,[150] the SEC has relied on them in crafting the mandatory requirements of the Proposed Rules.[151] Accordingly, companies will look to guidance published by the TCFD, the GHG Protocol and various other third-party organizations and industry groups as to how to apply the TCFD and the GHG Protocol, including guidance that the SEC has recommended to companies in the Proposing Release.[152] This may prove problematic in practice given that the Proposed Rules deviate from the TCFD and the GHG Protocol in many respects. Some of these deviations are relatively clear and are analyzed by the SEC in the Proposing Release.[153] Other deviations and inconsistencies, however, are more subtle and may reveal themselves to companies only when they are further immersed in the granular details of the process that will be required to produce disclosures responsive to the Proposed Rules.

Even though companies are not required to follow the TCFD and the GHG Protocol standards and related guidance, companies seeking to navigate the intricacies of the Proposed Rules will also consult with the rules and other guidance published by the TCFD, the GHG Protocol and third parties when doing so, particularly when a question arises as to how to resolve or address an uncertainty or inconsistency. Moreover, neither the TCFD nor the GHG Protocol is

---

[150] *See* Proposing Release, 87 Fed. Reg. at 21,377. ("While we expect that many registrants would choose to follow the standards and guidance provided by the GHG Protocol when calculating their GHG emissions, the proposed rules would not require registrants to do so").

[151] *See id*. at 21,343 ("Our proposed climate-related disclosure framework is modeled in part on the TCFD's recommendations"); *Id*. at 21,345 ("We have based our proposed GHG emissions disclosure requirement primarily on the GHG Protocol's concept of scopes and related methodology"); and *Id.* at 21,374 ("We also have proposed definitions of Scope 1, Scope 2, and Scope 3 emissions that are substantially similar to the corresponding definitions provided by the GHG Protocol")

[152] *See, e.g.,* Partnership for Carbon Accounting Financials, Global GHG Accounting & Reporting Standard for the Financial Industry (2020), available at https://carbonaccountingfinancials.com/files/downloads/PCAF-Global-GHG-Standard.pdf.

[153] *See, e.g.,* Proposing Release, 87 Fed. Reg. at 21,384-5 (discussing the differences between the approach to organizational boundaries contemplated by the Proposed Rules and the GHG Protocol). The GHG Protocol bases its organizational boundaries on either an equity share or a control approach. The Proposed Rules would have a registrant use the same scope of entities, operations, assets, and other holdings within its business organizations included in its GAAP consolidated financial statements.

Appellate Case: 24-1628     Page: 1046     Date Filed: 03/26/2024 Entry ID: 5377362

static, as each engages on an ongoing basis in considering and proposing updates.[154] While the updates may be based on stakeholder input, the process by which they are conceived and finalized is not fully transparent or subject to oversight by or consultation with the SEC. The same is generally true for any related guidance that may be published by a third-party organization or an industry group.

The dynamic described above is but one more reason why the Proposed Rules should be principles-based and only require disclosure that is material. We fear the prescriptive nature of the Proposed Rules means they will not have the flexibility necessary to accommodate improvements in the understanding, standards, and practices for climate-related reporting as those understandings, standards, and practices develop and evolve. The consequences will be to "lock in" TCFD and GHG standards as they exist at the time the SEC considered them in crafting the Proposed Rules, stifling improvement in U.S. practices and creating conflicts as other practices develop and improve over time. How are companies to address these conflicts? Moreover, there can be no assurance that future changes will be changes that the SEC would agree with, from a practical or a policy perspective, and there is no mechanism to address this other than the cumbersome process of amending the SEC's rules. With changes in third-party guidance, how the Proposed Rules are interpreted and applied by companies will change, and the SEC will have no role in overseeing any of those changes as they will have been determined by what third parties do and promulgate in guidance.

An even more important conflict along these lines may arise from the fact that the missions of the TCFD and the GHG Protocol are not coextensive with the SEC's mission. The TCFD's mission is the "widespread adoption [of the TCFD recommendations] by companies in the financial and non-financial sectors" within the remit granted by the FSB, which is an international body composed primarily of representatives of the G20 governments[155] that established the TCFD, with the intent of causing "companies' and investors' understanding of the potential financial implications associated with transitioning to a lower-carbon economy … [to] grow."[156] The FSB monitors and makes recommendations about the global financial system and has a mandate to "promote[] international financial stability . . . by coordinating national financial authorities and international standard-setting bodies as they work toward developing strong regulatory, supervisory and other financial sector policies."[157]

The GHG Protocol is "a multi-stakeholder partnership of businesses, nongovernmental organizations (NGOs), governments and others convened by the World Resources Institute (WRI) and the World Business Council for Sustainable Development (WBCSD)[, and the] mission of the GHG Protocol is to develop internationally accepted greenhouse gas (GHG) accounting and reporting standards and tools, and to promote their adoption in order to achieve a low emissions

---

[154] *See, e.g.*, 2021 TCFD Implementation Guidance, at 4 (summarizing recent changes to the TCFD recommendations).

[155] See the current list of members at https://www.fsb.org/about/organisation-and-governance/members-of-the-financial-stability-board/.

[156] https://www.fsb-tcfd.org/about/

[157] https://www.fsb.org/about/#mandate

economy worldwide."[158] The WRI is a global non-profit organization that "works with governments, businesses and civil society to transition toward a zero-carbon economy where all people can thrive,"[159] and the WBCSD is a "global, CEO-led community of over 200 of the world's leading sustainable businesses working collectively to accelerate the system transformations needed for a net zero, nature positive and more equitable future."[160]

These third-party standard setters could be influenced by a variety of considerations that are in conflict with the SEC's mission, which may ultimately cause the Proposed Rules to have an effect that is contrary to what is intended and adverse to the best interests of U.S. investors and our capital markets. The TCFD recommendations and GHG Protocol were developed to address a series of environmental, geopolitical and other public policy objectives beyond those of the federal securities laws. The important but unanswered questions about organizational governance, due process and funding sources for these third-party standard setters may present other, potentially serious, conflicts of interest. Moreover, these organizations are not directly or indirectly accountable to the SEC.

## B. The SEC should not create new financial reporting rules covering climate change.

Proposed Article 14 of Regulation S-X is largely unworkable, and such disclosures are not likely to be material or useful for investors. The proposed requirements represent transformative rulemaking from the standpoint of financial reporting and disclosure controls, processes and procedures, but are not based on a legislative mandate and cannot be complied with using incremental builds on existing controls, processes and procedures given the vast and unprecedented scope, granularity, complexity and prescriptiveness of the Proposed Rules. Furthermore, the Proposed Rules require untold estimates, assumptions and judgments against the backdrop of significant data limitations and speculative impacts. The rigid and detailed mandates of proposed Article 14 are in stark contrast to the flexible principles regarding disclosure of climate-related financial impacts contemplated by TCFD and, the Chamber believes, go far beyond what is warranted to respond to what investors have called for, particularly in light of the high costs of compliance – costs that will be even higher to the extent these disclosures are subject to the financial statements audit.

From an overarching perspective, disclosing climate-related effects by financial statement line-item, as defined at the 1% level (using absolute values) applied to each line-item, is at odds with the measurement uncertainty inherent in such financial metrics. It requires much more precision than is reasonable to expect or, for that matter, has been required by the SEC up to this point in financial reporting. These requirements will not provide climate-related information that is consistent or comparable – either over time or cross-sectionally. Further, the myriad disclosure requirements under the Proposed Rules will rapidly lead both regulators and registrants away from the core principles of market regulation and financial reporting that have been the cornerstone of

---

[158] GHG Protocol, *Corporate Value Chain (Scope 3) Accounting and Reporting Standard*, available at https://ghgprotocol.org/standards/scope-3-standard, at 4.
[159] https://www.wri.org/climate
[160] https://www.wbcsd.org/Overview/About-us

our capital markets. The resulting complexity from implementing these requirements will obscure the fundamentals of fair markets, as well as what is essential to the resiliency of adaptive enterprises.

We urge the SEC not to adopt the component of the Proposed Rules for GAAP footnote disclosure of climate-related financial metrics. The SEC should instead defer to the FASB for setting GAAP. To the extent the SEC nonetheless moves forward in a final rule with financial reporting requirements, such disclosures should be disclosed pursuant to existing MD&A disclosure requirements rather than be included in a registrant's financial statements. Further, if the SEC ultimately does mandate disclosures in the financial statements, materiality should be the standard for determining what must be reported instead of the 1% threshold as proposed by the Commission.

### 1. The proposed 1% materiality threshold is unworkable.

The Proposed Rules would require a registrant to consider the impacts of climate-related financial metrics at the 1% level for all line-items (and years) in the consolidated, annual, audited financial statements (without considering any qualitative or other factors). We believe the justification for this threshold is not compelling and that the support for it is thin.

The Proposing Release provides only three instances of the SEC using a 1% threshold among all the SEC's many rules and regulations. The three involve either investment companies (not registrants) or focus on one specific type of transaction (i.e., excise taxes included in sales and revenues or related party transactions).[161] These instances do not provide justification or support for requiring public companies to apply a 1% threshold at the line-item level (using absolute values) across a registrant's (comparative) consolidated balance sheets, income statements and statements of cash flow, as proposed. The level of granularity and prescriptiveness in this regard is unprecedented.

In applying the 1% threshold, the Proposing Release would also require the aggregation of unrelated and individually immaterial climate events within each financial statement line-item, with both positive and negative events and transactions counted together to reach 1%. A problem with this approach can be illustrated by assuming a calendar-year reporting registrant has operations affected by two events – a June wildfire under drought conditions in California and a September hurricane in Florida – and the effects of each individual event are immaterial. Nonetheless, the Proposing Release would require the registrant to aggregate the impacts of these individually immaterial events for each financial statement line-item to determine whether (the absolute values of) the combined effects exceed 1% of any reported line-item amount. We do not support such an aggregation approach.

The Proposing Release is transformative, and we believe that no registrants—even large accelerated filers—have experience developing the necessary information to disclose the climate-related metrics as proposed at the 1% level considering each financial statement line-item.

---

[161] Proposing Release, 87 Fed. Reg. at 21,366 n. 347.

Registrant accounting systems do not have separate accounts that record the SEC-defined climate-related activities. Rather, the amounts are embedded in existing (traditional) accounts and a registrant would have to develop approaches for determining them. Moreover, registrant control systems likely do not operate at a 1% level of precision across all financial statement line-items. All registrants will need to consider the implications of any final rule for both their accounting systems and internal controls over financial reporting, whether subject to both Sarbanes-Oxley Act Sections 404(a) and (b) or only Section 404(a). The Proposed Rules would require significant effort to ensure tracking and aggregation of expansive data elements to meet the rule, likely resulting in significantly burdensome and costly investments in systems and IT.

We further note that increasing the 1% threshold to a higher numeric threshold or allowing it to be calculated on a net basis would not improve the workability of proposed new Article 14 of Regulation S-X. Because it is impossible for a registrant to know at the beginning of a period what its results will be for each line item at the end of that period, controls in place at the beginning of the period would need to capture effectively all transactions and assess if each one should be counted towards that numeric threshold. Simply increasing the arbitrary 1% threshold to a higher arbitrary threshold would not resolve that issue; registrants would still need to evaluate each transaction to determine if it counts towards that threshold and would not be able to calculate a dollar value for that threshold until the end of the relevant period. In short, the cost and burden must be incurred by a registrant even if no disclosure is ever required.

2.   Proposed Article 14 presents innumerable implementation difficulties and will result in extensive disclosure of immaterial information.

The vast scope and breadth of proposed Article 14 cannot be understated, and it presents innumerable additional implementation difficulties for registrants, which would not be solved by simply raising the 1% threshold. We have identified and discuss ten types of matters that are representative of these additional complications. To be clear, the difficulties under proposed Article 14 are not limited to these ten topics, as the challenges to operationalize the proposed climate-related financial metrics are manifold.

*First*, the financial metric definitions are overly broad and will not be easily understood or consistently interpreted by financial statement users, preparers and auditors. Because they introduce a new lexicon of subjective, often-undefined terms, they will also present significant challenges for financial statement users and preparers who are not trained as climate scientists or environmental engineers. In some instances, the Proposing Release provides examples "for further clarity." However, the SEC always cautions that these examples are not exhaustive. Thus, while helpful, they do not resolve all issues.

As one example, under the requirement to disclose the financial impacts of severe weather events and other natural conditions, the examples incorporated in the Proposing Release include flooding, drought, wildfires, extreme temperatures and sea level rise. But this is not an exhaustive list. Does the SEC intend earthquakes to be included under "other natural conditions"? Earthquakes are not typically associated with climate change, but they may be considered a natural condition.

Further, as another example, the definition of "wildfires" within the Proposing Release requires clarification. One commonly accepted definition is "a large, destructive fire that spreads quickly over woodland or brush." Would the SEC consider fires started by humans, whether accidentally or intentionally, to be wildfires that require determination of the impact on every financial statement line-item? An intentionally started fire would not seem to be causally attributable to climate change. Alternatively, are these types of fires to be excluded from the financial metrics – along with other fires such as fires in over-populated areas, but not involving significant "woodland or brush"? On the other hand, if such fires occur under drought conditions that may be linked to climate change, would that cause them to be included, at least to the extent the drought conditions made the fire worse? Then how would one determine if the drought conditions are typical in the history of the planet and unrelated to climate change or what the impact of the fire would have been had there been no drought? Financial statement preparers, many of whom are not also trained as climate scientists, are not well positioned to resolve these kinds of thorny interpretive questions, some of which simply are indeterminable. Similarly, what are "severe weather events," the impacts of which are to be reported? "Severe weather" could be interpreted as a severe summer thunderstorm or a category 4 or 5 hurricane. How severe would a thunderstorm have to be to qualify? How would it be determined that a particular thunderstorm was related to climate change? Again, financial statement preparers are not trained as climate scientists and are therefore not positioned to resolve these kinds of interpretive questions.

Financial metrics related to transition activities, which involve efforts to reduce GHG emissions or otherwise mitigate exposure to transition risks, would similarly present a need for clarification. For example, the Proposing Release states that "a registrant may be required to disclose the amount of expense or capitalized costs, as applicable, related to research and development of new technologies, purchase of assets, infrastructure, or products that are *intended* to reduce GHG emissions, increase energy efficiency, offset emissions (purchase of energy credits), or improve other resource efficiency."[162] However, what if a registrant undertakes such activities without the *intent* (another term that is not defined in the Proposed Rules and could have a wide range of reasonable interpretations under the circumstances) to do so, but the activities result in the reduction of GHG emissions, increase energy efficiency, or improve other resource efficiency as a by-product? Does the SEC intend that, nevertheless, the registrant should include these expenses or capitalized costs as climate-related in the financial metric? What if the activities are part of routine periodic capital investments and maintenance or product development cycles and not a direct response to transition risks, or what if it is both simultaneously? Additionally, as mentioned above, registrant accounting systems do not have separate accounts that record the SEC-defined climate-related activities, for example, categorization of expenses related to either severe weather events or transition risk, and thus registrants would have to develop new cost based accounting systems, as this level of expense "tagging" is not commonplace in most companies. In addition to the initial system design and cost, companies will then need to develop new processes and training for employees to assist in the consistent "tagging" of expenses.

Registrants may also encounter difficulties because there are some impacts that are required to be disclosed under proposed Article 14 that are not also required to be disclosed under

---

[162] *Id*. at 21,433.

proposed Regulation S-K Item 1502. Proposed Regulation S-K Item 1502 requires the disclosure of impacts from climate-related risks (and, at the registrant's option, opportunities) reasonably likely to have a material impact. Proposed Article 14 requires disclosure related to the impacts that are disclosed under proposed Regulation S-K Item 1502 as well as from other events, regardless of whether such events have a material impact on the registrant or its consolidated financial statements. Not only will this create confusion, both for preparers and users of the information, but it will also put pressure on registrants concerned with the apparent inconsistency to disclose events that are *not* reasonably likely to have a material impact on the registrant merely because such events would require disclosure under proposed Article 14. This will add to the complexity of the disclosure without any benefit by eliciting immaterial information under proposed Regulation S-K Item 1502, adding to the burden of the disclosure while also obscuring the portions of the responsive disclosure that are most important to the registrant. If the financial statements metric requirement is maintained, this disclosure "disconnect" should be resolved: only impacts that relate to events that are material to the registrant, and therefore are required to be disclosed pursuant to proposed Regulation S-K Item 1502, should require disclosure under Article 14.

*Second*, the boundaries for defining the types of climate-related effects to include in determining the financial statement metrics also lack clarity. For example, does the SEC contemplate that a registrant would include both direct and indirect effects of climate-related events in determining the financial statement metrics? This is a matter of particular concern because the types of indirect effects could be endless and the challenges in determining how such effects should be reflected, if at all, in GAAP financial statement line-items would be substantial.

*Third*, an additional category of questions involves the SEC's expectations on how registrants should sort out the SEC-defined climate activities from other non-climate activities and allocate the amounts to each for determining the registrant's line-item disclosures at a 1% threshold – as well as determine the aggregate amounts of expenditures expensed and capitalized costs incurred during the year. Clearly, determining each of the climate-related financial metrics will require many assumptions, estimates and judgments, such as identifying any relevant amounts embedded in financial statement line-items (computing aggregate amounts for expenditures expensed and capitalized costs) and allocating those amounts to climate-related activities. Some of the questions posed in the Proposing Release recognize these issues, as does the proposed requirement to disclose contextual information on these estimates and assumptions.

However, such contextual disclosure does not solve the essential problem for registrants or their auditors because they are still left with the practical difficulty of sorting through and categorizing activities and their impacts in the manner proposed Article 14 would require. Also, what is the SEC's expectation with respect to disclosures on a requirement to describe how each specified metric was derived, including a description of significant inputs and assumptions used, and, if applicable, policy decisions made by the registrant to calculate the specific metric?[163] How detailed and all-encompassing are these disclosures expected to be? The Proposing Release provides no guidance on important issues such as this.

---

[163] *Id.* at 21,363.

*Fourth*, another important consideration is that the Proposing Release definitions and descriptions for the climate-related financial metrics do not necessarily comport with GAAP or extant SEC terminology. For example, GAAP financial statement line-items do not include amounts for lost revenues, cost savings, or cost reductions. It would represent a complete shift in the financial reporting regime to provide "what if" disclosures such as these under the umbrella of GAAP. Any climate-related financial statement metrics should be based on items clearly recognized, measured, and reported under GAAP.

Further, one of the proposed metrics requires the disclosure of the impact of any climate-related risks (separately by physical risks and transition risks) on any of several other proposed financial statement metrics.[164]   In this regard, the Proposed Rules use the terms "actual or potential" in defining climate-related risks, transition risks, and climate-related opportunities. Yet, "potential" is not a defined term under GAAP or SEC regulations, nor does it comport with a likelihood that is defined by FASB or the SEC. Additionally, the Proposed Rules include an example of disclosing impacts of "changes to revenues or costs from disruptions to business operations or supply chains," resulting in companies disclosing estimates of lost revenues or opportunity costs, which are amounts not recorded in the financial statements. Thus, it is not obvious whether or how financial statement line-items include the climate-related amounts or were impacted by the climate-related risks to be disclosed, as defined and described in the Proposing Release.

*Fifth*, another matter adding confusion is that the text of the Proposed Rules and the narrative in the Proposing Release do not necessarily agree. For example, rather than using "potential" as in the Proposed Rules, the narrative text states that "the proposed rules would require a registrant to disclose information about … How any climate-related risks identified by the registrant have had or *are likely to have* a material impact on its business and consolidated financial statements, which may manifest over the short-, medium-, or long-term."[165]

*Sixth*, the text of the Proposed Rules defines climate-related risks and opportunities such that a registrant must consider the impacts on the registrant's consolidated financial statements, business operations and value chains. In addition, climate-related risks include physical risks and transition risks and, in turn, these risks involve both acute and chronic risks to a registrant's business operations or those with whom it does business. It is near-impossible for a registrant to determine the impacts of this sprawling set of risks on GAAP financial statement line-items and to compute the required climate-related metrics for its entire value chain. Making these determinations will further require registrants to make judgments and assessments that do not easily lend themselves to the mathematical precision associated with the correlating accounting disclosures. The Proposing Release provides no guidance on this point, again leaving registrants and their financial statement preparers and auditors at a significant disadvantage.

*Seventh*, yet another matter that is unclear, also in regard to the impact of any climate-related risks, is what the SEC contemplates as to the nature of this computation. For example, are

---

[164] *Id*. at 21,345.
[165] *Id.*

Appellate Case: 24-1628     Page: 1053     Date Filed: 03/26/2024 Entry ID: 5377362

these impacts expected to be disclosed as dollar amounts or in some other quantitative fashion? This simple distinction has a cascading effect on the nature of the reporting and the associated assurance over it. The Proposing Release is again silent.

*Eighth*, it is noteworthy that the Proposing Release contemplates consideration of risks and uncertainties over short-, medium-, and long-term time horizons. Requiring the use of an unlimited time horizon in determining the required climate-related financial metrics poses a more than difficult challenge for registrants. It is certain to require the disclosure of numbers bound to be incorrect – and likely materially incorrect. What is unknowable cannot be computed and disclosed.

We appreciate that the Proposing Release states that the SEC is not proposing to specify a range of years to define the various time horizons. Rather, a registrant would be required to describe how it defines short-, medium-, and long-term in order to allow flexibility in determining the most appropriate horizons for the registrant's circumstances. However, this approach does not solve the fundamental forecasting challenges for registrants or auditors. Further, this approach will diminish comparability of the information among registrants and represents one of many areas in the Proposing Release for second-guessing, including through private litigation and SEC enforcement.

*Ninth*, we are uncertain what the SEC means in using the phrase "financial statements as a whole" in defining climate-related risks and climate-related opportunities. We cannot reconcile this terminology with the climate-related metric disclosure requirements involving every line-item in the financial statements at the 1% level. Were the SEC to proceed with a requirement of this kind, it should clarify what is meant by this ambiguous term and provide further instruction to financial statement preparers on its ramifications for the financial reporting process.

*Tenth*, the myriad of practical challenges – including the necessity for untold estimates, assumptions, and judgments – raises concerns about the auditability of the proposed footnote for financial statement climate metrics and related internal control over financial reporting. Further, auditor quantitative materiality considerations in planning and conducting audits do not operate at the 1% level for every financial statement line-item.[166]  Even if these concerns can be addressed, the proposed footnote disclosures would leave auditors, and thereby registrants, open to undue second-guessing through the PCAOB inspection process – as has been learned from experience in implementing Section 404 of the Sarbanes-Oxley Act.

3.      The SEC should not bypass the traditional FASB standard-setting process.

In important ways, the rulemaking is an unprecedented action by the SEC, particularly in the post-Sarbanes-Oxley Act era. The Proposing Release departs from the SEC's designation of, and reliance on, FASB as the standard setter for GAAP financial statements (which include footnote disclosures); diminishes the role of FASB as an independent GAAP standard setter; and overlooks FASB's currently underway projects related to disclosing disaggregated information

---

[166] *See* A. Eilifsen and W. F. Messier, Jr.,  *Materiality Guidance of the Major Auditing Firms*, in Auditing: A Journal of Practice & Theory (May 2015)at 3-26.

and ESG-related reporting matters that are based on extensive outreach and feedback, including from investors.  In addition, if provisions in the Proposing Release had been contemplated, FASB may not have promulgated some standards in their current form (e.g., the ASU on Financial Instruments – Credit Losses (Topic 326) that focuses on estimation of expected losses over the life of the loans).  In circumventing FASB, the Proposing Release represents a problematic precedent for the SEC by using financial reporting for purposes that, to some degree, fall outside the SEC's tripartite mission.

Long ago the SEC delegated day-to-day responsibility for setting the form and content of registrants' financial statements to an independent private sector body. In keeping with this delegation, the SEC formally recognized FASB as the authoritative GAAP standard setter at the time of FASB's formation,[167] which the SEC reaffirmed after enactment of the Sarbanes-Oxley Act, in accordance with Section 108 of the Act.[168] To date, FASB is the only GAAP standard-setting body recognized by the SEC under Section 108 of the Sarbanes-Oxley Act.[169]

FASB has developed a robust and comprehensive set of due process procedures for all standard setting.[170] Under these due process procedures, FASB's board identifies financial reporting issues based on requests or recommendations from stakeholders. The FASB regularly undertakes a formal agenda-setting process. The FASB board votes whether to add a project to its technical agenda based on the FASB staff's analysis of the relevant issues. FASB then deliberates the various issues at one or more public meetings, and then FASB issues an exposure draft of the new or amended standard. The FASB board typically holds one or more public roundtables to debate the exposure draft and reviews written comment letters from the public. In many cases, public feedback necessitates further revision to the proposed standard and the issuance of a revised exposure draft. After all public comments are considered, FASB issues an amendment to its Accounting Standards Codification.

The FASB process also allows for gradual evolution of accounting standards in a careful, deliberate way that, among many other benefits, seeks to thoroughly consider all unintended consequences.

---

[167] *See* Accounting Series Release No. 150 (issued Dec. 20, 1973).

[168] *See* Release No. 33-8221, *Policy Statement: Reaffirming the Status of the FASB as a Designated Private-Sector Standard Setter* (Apr. 25, 2003), available at https://www.sec.gov/rules/policy/33-8221.htm#P53_8931.

[169] Although the SEC accepts filings from foreign private issuers (FPIs) containing financial statements prepared in accordance with International Financial Reporting Standards (IFRS) as promulgated by the International Accounting Standards Board (IASB) without reconciliation to U.S. GAAP, the SEC has never recognized the IASB under Section 108 of the Sarbanes-Oxley Act. Apparently, a requirement in the Proposing Release (see footnote 319, page 21,364) would be the first time the SEC has added to IFRS. That footnote also describes the requirement that FPI's in filings using home country GAAP (with appropriate reconciliation to U.S. GAAP) would have to use U.S. GAAP as the basis for calculating and disclosing the climate-related financial metrics.

[170] *See generally* FASB Rules of Procedure (Aug. 10, 2021), available at https://www.fasb.org/page/ShowPdf?path=FASB_Rules_of_Procedures-Aug-2021.pdf&title=Rules%20of%20Procedure-August%2010,%202021.

Promulgating the Proposed Rules for climate-related GAAP footnote disclosures in a manner that bypasses FASB represents a significant departure from both the spirit and substance of the SEC's longstanding policy and approach to accounting standards, financial reporting and its reaffirmation of FASB in 2003. It undermines the well-developed and collegial working relationship between FASB and the SEC staff in addressing GAAP financial reporting and disclosure matters post-Sarbanes-Oxley Act, and it represents a potential challenge to the independence of FASB.

Importantly, FASB currently has its own projects underway on disclosing disaggregated financial statement amounts and on accounting for financial instruments with ESG-linked features and regulatory credits. These projects represent the culmination of extensive stakeholder outreach and feedback, including discussions with FASB advisory groups – both the Financial Accounting Standards Advisory Council (FASAC) and the Investor Advisory Committee (IAC).

The objective of the disaggregated financial statement project (Disaggregation – Income Statement Expenses (formerly known as the Financial Performance Reporting – Disaggregation of Performance Information)) is to improve the decision usefulness of business entities' income statements through the disaggregation of certain expense captions. In February 2022, the FASB board decided to revise the scope and objective of the project to focus on improving the decision usefulness of income statements through the disaggregation of (1) selling, general and administrative expenses, (2) cost of services and other cost of revenues, and (3) cost of tangible goods sold.

Moreover, as it does in all its standard-setting projects, in these projects, FASB is using its Conceptual Framework (Statements of Financial Accounting Concepts (SFACs)) to guide the development of sound, internally consistent standards for financial reporting and disclosure in order to provide useful information for investors. It is also worth noting the SFACs include guidance on materiality that aligns with the securities laws that FASB also considers in promulgating GAAP.

The Proposing Release has unintended consequences for current and future FASB projects. For example, on one hand, it creates a disincentive for registrants to disclose disaggregated line-items in the financial statements,[171] such as an ongoing FASB project involving the disaggregation of performance information, which FASB added to its technical agenda in September 2017.[172] On the other hand, it provides an opening for special interest groups to call on the SEC to promote more 1% line-item disclosures relating to topics other than climate-related risks.

The SEC's proposal sets a troubling precedent for undercutting FASB's approach to standard-setting, which is grounded in the Conceptual Framework and occurs through a transparent, deliberative due process. With its pervasive requirement for registrants (and their

---

[171] The Proposing Release appears not to require the application of the "1% line-item" test to disaggregated amounts reported by a registrant in the GAAP footnotes (e.g., footnote disclosure of the disaggregated amounts included in a line-item for "other income/(loss)" on the income statement).

[172] Financial Accounting Standards Board: Financial Performance Reporting – Income Statement Expenses (previously: Financial Performance Reporting – Disaggregation of Performance Information).

auditors) to consider every line-item of the financial statements (balance sheet, income statement (statement of comprehensive income) and statement of cash flows) for climate-related amounts at a threshold of 1% of that line-item, the SEC is carving out a "special case" for disclosure of disaggregated information.

In summary, FASB's standard-setting practice proceeds at a deliberate pace over time, involving multiple opportunities for public input and comment to incorporate each stakeholder's perspective. In this way, FASB carefully achieves a balanced result that incorporates the varying perspectives of financial statement users and preparers, investors, auditors and regulators. The Chamber does not see a justification here for the SEC to circumvent FASB's role as an independent GAAP standard setter and thereby to deviate from the traditional path for developing financial reporting standards, particularly in light of the numerous complexities and unintended consequences associated with proposed Article 14.

4.     <u>The climate-related financial statement metrics depart significantly from the TCFD recommendations.</u>

Proposed Article 14 appears to be informed by the TCFD recommendation that organizations should describe the impact of climate-related issues on their financial performance (e.g., revenues, costs) and financial position (e.g., assets, liabilities). The Proposed Rules, however, do not provide nearly the same flexibility that TCFD does in terms of allowing companies to only provide quantitative information that it is possible to provide:

> These impacts may be described in qualitative, quantitative, or a combination of both qualitative and quantitative terms. The Task Force encourages organizations to include quantitative information, where data and methodologies allow.[173]

Additionally, the TCFD recommendations are more flexible than proposed Article 14 in not dictating that climate impacts on specific line items be disclosed, nor in directing companies to use a 1% threshold to determine what impacts should be disclosed.

Moreover, the Proposed Rules do not take into account the empirical evidence and analysis included in TCFD publications that serve to illustrate the significant challenges entailed in producing objectively verifiable amounts in response to certain elements of this requirement. The 2021 TCFD Status Report contains an analysis of the state of play with respect to disclosure of financial impacts of climate-related risks. This analysis makes clear that companies do not often make disclosures about financial impacts that are quantitative rather than qualitative. It further illustrates that when companies do make quantitative disclosures about financial impacts, such quantitative disclosures are primarily focused on forward-looking potential financial impacts estimated based on scenario analysis rather than the comprehensive, granular and precise actual financial impacts (i.e., impacts on historical financial statements) that the Proposed Rules would require companies to include in their audited financial statements. The 2021 TCFD Status Report

---

[173] 2021 TCFD Implementation Annex, at 26 n.38.

goes on to state that quantitative disclosures primarily focus on potential financial impacts rather than actual financial impacts in light of how "challenging [it is] to identify and disaggregate from other non-climate events … when a monetary effect has multiple drivers in addition to climate (e.g., technology trends, political instability)."[174] In other words, the objective quantification of certain climate-related financial statement metrics demanded by the Proposed Rules are unworkable because the determinations required to attribute specific monetary amounts to specific events are so inherently subjective and whether an impact is "climate-related" is often unknowable. The challenges identified by the TCFD in quantifying actual financial impacts also include "difficulties with obtaining relevant data and selecting and applying assessment methodologies" and "divergent time horizons between accounting and climate reporting frameworks."[175] We note the SEC recognition of these significant challenges as well.[176]

The fact that some companies published examples of climate-related quantitative actual financial impacts does not justify requiring all companies to examine every line item in their financial statements and develop comprehensive and all-inclusive reporting. The limited examples of quantitative actual financial impacts contained in TCFD's 2021 guidance on metrics, targets and transition plans (the "2021 TCFD Metrics Guidance")[177] – which the SEC cites in the Proposing Release as "examples that illustrate the feasibility of some of the disclosures that would be required by the proposed rules"[178] – are limited, discrete examples and do not invoke the comprehensive and granular level of detail on each line item for each impact that the Proposed Rules demand:

- The TCFD identifies the "proportion of earnings before interest, taxes, depreciation and amortization (EBITDA) aligned to low-carbon products, services and technologies" as an example of disclosure of actual financial impact, but what is presented are three line items which correspond to information that is derived from reported information by specific reporting segments (business lines) that constitute an example of a company's low-carbon products, services and technologies businesses.[179]

- Of three examples of actual quantitative financial impacts, two cover the impacts as they relate to certain costs directly attributable to extreme weather events and one covers the impacts as they relate to an estimate of fuel costs saved due to the use of "one of the cleanest and efficient [generation fleets] in the country," a single number included in a stand-alone sustainability report not subject to any external assurance and not accompanied by contextual disclosure describing how the number was calculated (i.e. over what period,

---

[174] 2021 TCFD Status Report, at 63.

[175] *Id.* at 65.

[176] *See* questions 60 and 61 in the Proposing Release, 87 Fed. Reg. at 21,368-9.

[177] *See* Task Force on Climate-related Financial Disclosures, *Guidance on Metrics, Targets and Transition Plans* (October 2021), available at https://assets.bbhub.io/company/sites/60/2021/07/2021-Metrics_Targets_Guidance-1.pdf, at 57.

[178] Proposing Release, 87 Fed. Reg. at 21,365 n.337.

[179] 2021 TCFD Metrics Guidance, page 50.

Appellate Case: 24-1628     Page: 1058     Date Filed: 03/26/2024 Entry ID: 5377362

measured against what baseline and subject to what other assumptions and estimates) and what it represents.[180]

## C. The SEC should not impose a GHG emissions attestation requirement.

1. <u>The proposed attestation requirements are an unnecessary departure from longstanding practice and pose significant implementation challenges.</u>

The Chamber strongly believes in the value of financial statement audits by independent auditors and appreciates the important role of audits and other types of assurance services in our public and private markets. However, from the standpoint of imposing regulatory requirements for assurance services, the Proposing Release breaks new ground. It not only renders the climate-related financial metrics subject to annual audit under the GAAP umbrella, but also requires registrants to obtain assurance over GHG emissions disclosures provided outside the financial statements. The SEC has not adequately explained, however, why this information, unlike all the other qualitative and quantitative information companies are required to provide outside the financial statements by other Regulation S-K requirements, needs to be audited. Companies and their management are relied upon as a matter of course to provide information that is accurate and complete in all material respects, and there are robust systems, controls and processes in place to ensure that is the case. Attestation is not needed and is an unnecessary and costly departure from longstanding practice. Moreover, in a departure from the current market practice of some companies that choose to seek assurance of their voluntary disclosure at a "limited assurance" level, the Proposing Release would also mandate assurance at the higher "reasonable assurance" level.

Further, the SEC provides that assurance on GHG disclosures can be provided by either PCAOB-registered or non-PCAOB registered firms. The Proposing Release would also result in new obligations on the PCAOB. Both the GHG and climate-related financial statement metric assurance requirements have consequences, for PCAOB-registered or non-PCAOB registered firms alike, regarding legal liability and regulatory enforcement risks.

Implementing the assurance provisions of the Proposing Release – for financial statement audits (whether integrated or financial statement only) and attestation engagements on GHG disclosures (whether under limited or reasonable assurance) – will require much work by audit firms. This work will take time. For example, any final rule will require audit firms to educate their workforce around the world who perform public company audits; to develop new systems, processes and global methodologies (considering both group audits and audits of FPIs); and (similar to registrants) to obtain interpretive guidance from the SEC, as well as the PCAOB, as to the meanings of the myriad undefined terms in proposed Article 14.

The largest audit firms may accommodate these challenges, although doing so within the proposed time frames will be challenging at best and will likely require an extension of any

---

[180] *Id.* at 63.

compliance dates. Even with a postponement of the compliance dates of any final rules, smaller audit firms may face even more of a challenge.

The Proposed Rules also have meaningful implications for audit standard setters like the PCAOB. If the Proposed Rules are made final, the PCAOB would be called on to provide guidance on implementing each of the required assurance-related provisions. Additionally, the PCAOB may need to consider updating its standards, particularly the attestation standards that auditors use to provide limited or reasonable assurance on GHG emissions.

Unlike the attestation standards of the AICPA Auditing Standards Board (ASB) and the International Auditing and Assurance Standards Board (IAASB), the PCAOB attestation standards have not been updated in more than two decades. Except for conforming amendments, the PCAOB's current attestation standards remain as the AICPA ASB attestation standards that the PCAOB adopted in 2003 as "interim" standards, although the PCAOB subsequently dropped the term "interim."

The Proposing Release also has implications for the PCAOB's other regulatory activities including inspections and enforcement. While the Proposal is unclear as to whether any climate-related assurance engagements would be subject to these activities for PCAOB registered and inspected CPA firms, investors generally may expect this to be the case. Further, notwithstanding the proposal for registrant disclosures when using non-CPA firms or non-PCAOB registered CPA firms for assurances on GHG emissions, confusion over the role of the PCAOB regarding these assurance providers will likely ensue.

The Proposing Release comes at a time when talent constraints are a major problem for registrants, accounting firms and regulators alike. Current staffing challenges in hiring and retaining the right people highlight a capacity problem for implementing this sea-change in SEC disclosure and attestation requirements.

        2.      <u>Third-party attestation of Scope 1 and 2 emissions adds another costly layer to the proposed reporting requirements.</u>

While some companies are already reporting in some form their Scope 1 and Scope 2 emissions, the broad and mandatory nature of this proposed reporting requirement would likely require companies to re-analyze whether their prior calculations and determinations meet all of the requirements of the Proposed Rules and adjust if necessary to address any deviation between what companies may have been disclosing in accordance with the GHG Protocol already disclosures and disclosures that would be compliant with the Proposed Rules.[181] The Chamber has two primary concerns in this regard. First, Scope 1 emissions calculations are generally based on fuel consumption for most industries, which is not a relatively complicated calculation. Accordingly, the attestation requirement is unlikely to add value relative to the cost. Second and similarly for Scope 2 emissions, objective information like purchase records and average emissions factors are

---

[181] For example, a company that had been using different organizational and operational boundaries than those that are permitted by the Proposed Rule.

typically used to calculate such emissions, meaning that the attestation requirement would add cost but not commensurate value in terms of giving investors greater confidence in relying on the information.

Independence is foundational in providing assurance services. However, in terms of burden, ensuring that attestation providers meet all of the qualifications and also are "independent" within the meaning of the Proposed Rules will limit the available pool of providers. At this point in time, there are a limited number of providers who would be available to perform the required attestations, and many of these same firms have been employed by companies in their efforts to generate recommendations and techniques for reducing GHG emissions as well as for development of voluntary reports. Consultants who are already familiar with the processes of a given company may not meet the independence requirements. Companies will be hard pressed with internal staffing challenges, which have only been exacerbated in the COVID-19 pandemic, to meet the new requirements, even if they have already been reporting Scope 1 and 2 emissions. This is because the new layer of regulatory assurance (even limited assurance) will require resources to be devoted to preparing for the attestation exercise.

We highlight that the TCFD recommendations and the GHG Protocol do not require attestation, and, as discussed above, the SEC's basis for requiring attestation of Scope 1 and Scope 2 emissions is unclear.

If the SEC proceeds with mandated Scope 1 and Scope 2 emissions disclosures, no assurance should be required, given that there is no indication that companies are not appropriately reporting their Scope 1 and 2 emissions in the current voluntary regimes. The Commission has not provided evidence that there is a real benefit in terms of data quality if these costly additional attestation requirements are imposed. Alternatively, to the extent companies are obtaining assurances, the SEC's alternative that registrants disclose what type of assurance, if any, they are obtaining may be appropriate. Depending on the nature of the operations of a company, there may be limited value to any outside assurance, because a calculation may be based on straightforward records. If a company has a more complex calculation, it may choose to provide an assurance level.

3.      Attestation should continue to be voluntary.

Attestation over GHG emissions should not be mandatory. Instead, as mentioned above, the SEC should allow a commensurate market-based approach to third-party assurance for climate-related reporting for companies that choose to take that approach. Companies are in the best position to determine how to signal to investors the use of outside expertise through third-party assurance, how that assurance is suited to their individual circumstances and, if so, the type of assurance signal to provide. A market-based approach allows for good practices regarding third-party assurance to evolve along with the evolution of climate-change reporting and the criteria for such reporting.

Alternatively, if attestation is required at all, it should be required only for disclosures the issuer has determined to be material and then only at the "limited assurance" level. The federal

securities laws do not support a costly attestation requirement for matters that are not material to investors.

Moreover, as discussed in more detail above, if the climate-related financial statement metrics requirement is maintained in substantially the form proposed, we would suggest, among other things as described elsewhere in this letter, permitting these disclosures to take place outside of the audit process.

### D. Scope 3 emissions reporting should be entirely voluntary.

Scope 3 emissions reporting should not be mandated because the myriad difficulties that the SEC recognizes in the Proposing Release compromise the usefulness of Scope 3 emissions disclosure, particularly when they are beyond a company's direct control and require disclosure on the scale that the Proposed Rules contemplate. Instead of mandating Scope 3 emissions disclosure as the Proposed Rules do, the SEC should allow companies to disclose Scope 3 emissions on a voluntary basis as each company determines is appropriate.[182]

To help address the significant issues with Scope 3 emissions reporting that make mandating such reporting problematic, the Chamber stands ready to collaborate constructively to help facilitate discussions among the SEC, the EPA, the business community and other stakeholders to continue developing workable practices and methodologies that could produce Scope 3 emissions reporting, if material, on a practicable and achievable basis. Scope 3 emissions may be broadly categorized as either emissions generated by a company's suppliers or emissions generated by consumers of a company's products and everything in between, up and down the company's value chain.

The Chamber agrees that, as with other requirements, a materiality qualifier, consistent with the longstanding conception of materiality discussed above, is essential if any Scope 3 emissions disclosure is to be required.[183] That being said, we do not believe that Scope 3 emissions should be included as a separate mandated disclosure category for several reasons, chiefly that there are significant challenges in providing accurate, reliable calculations of a company's actual Scope 3 emissions.

Moreover, the Proposing Release contains commentary that will make the materiality determination regarding Scope 3 emissions a fraught one for many companies. Companies will feel pressured to disclose Scope 3 emissions not only because of the SEC's apparent bias towards finding that Scope 3 emissions are material, as discussed below, but also because of uncertainty about the standard of "understandability" that the SEC would apply in evaluating whether a company has made an adequate disclosure "to investors to understand the basis for that determination" that the SEC suggests should be made. A determination as to whether or not a disclosure is material should always have a reasonable basis, but it is not consistent with the SEC's

---

[182] In recommending that Scope 3 emissions disclosures should be voluntary, the Chamber recognizes that a range of views and practices exist currently among companies when it comes to making certain Scope 3 emissions disclosures.

[183] Materiality should be a precondition for any mandatory Scope 1 or Scope 2 reporting as well.

typical practice to require disclosure that would allow investors to "understand" such a basis and related information. This inconsistency with current practice highlights an unnecessary distrust of public companies and managements' determinations with respect to materiality and unnecessarily increases the costs associated with compliance with these already burdensome rules.

Compounding the difficulty and problematic nature of the materiality determination described in the preceding paragraph, the Proposing Release includes commentary that supports the inference that the SEC has improperly predetermined the outcome when it comes to materiality and prefers for companies to disclose Scope 3 emissions even though the Proposed Rules do not technically require it for all companies:

> Scope 3 emissions information may be material in a number of situations to help investors gain a more complete picture of the transition risks to which a registrant may be exposed. … When assessing the materiality of Scope 3 emissions, registrants should consider whether Scope 3 emissions make up a relatively significant portion of their overall GHG emissions. While we are not proposing a quantitative threshold for determining materiality, we note that some companies rely on, or support reliance on, a quantitative threshold such as 40 percent when assessing the materiality of Scope 3 emissions.[184]

While the Proposed Rules do not require Scope 3 emissions if they are not material, the Proposing Release suggests otherwise. As Commissioner Peirce sums it up in her analysis: "the Commission suggests that such emissions generally are material" and that any "materiality doubts" should be resolved in favor of disclosure.[185]

The "40 percent test" also yields the illogical conclusion that if a company with relatively low Scope 1 and 2 emissions concludes that its total GHG emissions are immaterial, its Scope 3 emissions would be material solely because of the proportion they comprise of the company's total emissions. This formulation for determining whether Scope 3 emissions must be disclosed does not find support in the longstanding standard of materiality under the federal securities laws. In addition to the fact that such a conclusion does not make sense in the context of materiality determinations for federal securities law purposes, some companies may feel pressured to disclose their Scope 3 emissions simply because such emissions make up 40% (or perhaps even less) of their otherwise immaterial total emissions.

If the SEC maintains the Scope 3 emissions requirement subject to a materiality determination, the commentary in the Proposing Release should be replaced with guidance that makes clear that the standard governing materiality in this context is the same as it would be in any other relevant context under the securities laws: Scope 3 emissions are material if there is a

---

[184] Proposing Release, 87 Fed. Reg. at 21,378-21,379.
[185] *See* Peirce Statement, supra note 144.

substantial likelihood that a reasonable investor would consider them important when making an investment or voting decision.

The Proposed Rules would also require non-material Scope 3 emissions disclosure if a registrant has set a GHG emissions reduction target or goal that includes Scope 3 emissions. The Chamber respectfully disagrees that the mere existence of a target or goal should mandate an obligation to disclose non-material emissions. The fact that a company has set a target or goal for a category of Scope 3 emissions means that company has examined its Scope 3 emissions and made a determination that certain categories warrant a target or goal for any variety of business reasons. Whether disclosure should be mandated should turn on materiality, rather than turning on the setting of a target or goal in-and-of-itself. For those companies for which certain Scope 3 emissions are material under the federal securities laws, these companies should not be required to disclose other Scope 3 categories that the company has determined are not in fact material. Further, this requirement to disclose Scope 3 whenever a goal or target is set could discourage companies from setting targets or goals for Scope 3.

      1.    <u>Scope 3 emissions are difficult to identify and accurately quantify and are uniquely uncertain and speculative.</u>

As compared with Scope 1 and Scope 2 emissions, which themselves can be challenging to quantify, Scope 3 emissions disclosures present even more challenges and, in the degree to which they are uncertain and speculative, would constitute an unprecedented disclosure mandate. This is not least because Scope 3 emissions are composed of upstream and downstream emissions that are far more difficult to determine precisely, requiring companies to rely on third parties for data, make myriad assumptions and choose from still evolving methodologies. Thus, mandating disclosure of Scope 3 emissions moves even farther away from providing data to a reasonable investor that is material.

The vastness of the scope of emissions that fall under Scope 3 emissions, which attempts to quantify emissions throughout a company's value chain, includes[186] 15 different emissions categories which must be addressed without regard to materiality under the Proposed Rules:

(1) purchased goods and services;
(2) capital goods;
(3) fuel- and energy-related activities;
(4) upstream transportation and distribution;
(5) waste generated in operations;
(6) business travel;
(7) employee commuting;
(8) upstream leased assets;
(9) downstream transportation and distribution;
(10) processing of sold products;
(11) use of sold products;

---

[186] *See* Proposing Release, 87 Fed. Reg. at 21,380.

(12) end-of-life treatment of sold products;
(13) downstream leased assets;
(14) franchises; and
(15) investments.

This underscores what the SEC acknowledges: that "depending on the size and complexity of a company and its value chain, the task of calculating Scope 3 emissions could be challenging."[187]

Even in excluding the requirement for reporting of Scope 3 emissions for smaller reporting companies, the SEC acknowledges "the potential relative difficulty in data collection and measurement."[188] Additionally, the SEC acknowledges that the methodologies for evaluating GHG emissions continue to evolve, particularly for Scope 3 emissions.[189] Further, the calculation of Scope 3 emissions is largely dependent on third-party data that may only be available at industry-average or national-average basis, or simply not available at all.[190] To a significant extent, the calculation of Scope 3 emissions will require collecting data from third parties over which companies have no direct control and in many instances have no ability to influence (or may only be able to exert influence at the expense of financial performance, such as paying more under contracts in exchange for an agreement that the counterparty will provide the information needed for Scope 3 emissions calculations). For some types of businesses, such as large manufacturers with multitudes of privately held suppliers or large franchisors with multitudes of franchisees, these challenges may be insurmountable. Developing actual knowledge of how products are actually being used by customers during the products' lifetime is almost impossible. Companies do not control their own products once they are sold, and there are numerous ways – some perhaps unanticipated – in which products may be used and the time frames over which associated GHG emissions will occur based on that use and where the product is in the value chain when it is sold by the particular registrant to various consumers, customers or contractual counterparties.[191] Also, for companies that create components used by other companies to create their own end-use products, detailed and variable knowledge about the end-use products in order to allocate emissions to an intermediate product will be necessary. In many cases this will be impossible, and companies would need to use countless assumptions in the calculations. One clear example is military products and their use. This information is unlikely to be available for national security reasons.

---

[187] *Id*. at 21,390.

[188] *Id*. at 21,377.

[189] *Id*. at 21,411.

[190] *See id*. at 21,380-1.

[191] The SEC states that it anticipates some of these challenges may be ameliorated by relying on other companies' Scope 1 and 2 emissions to determine their own Scope 3 emissions. While this concept is theoretically appealing, it is unlikely to play out in practice. The basic idea being offered is that Company A will be able to examine the Scope 1 and 2 emissions disclosures of Companies B, C, and D to determine Company A's upstream or downstream Scope 3 emissions. As a practical matter, Companies B, C, and D will have complex commercial relationships with a range of other entities, such that each of their Scope 1 and 2 emissions will not easily be disaggregated to capture in the Scope 3 emissions of Company A. We think that the SEC cannot rely at all on the notion that companies' Scope 1 and 2 publicly-available data will be able to inform other companies' Scope 3 calculations.

There are a variety of other difficulties and challenges associated with the process required to calculate Scope 3 emissions, many of which underscore the inherent unreliability and subjectivity that characterizes Scope 3 emissions information. The TCFD itself[192] has published the following non-exhaustive list of these difficulties and challenges:

- organizations struggle to collect relevant and sufficiently granular primary data and to manage the amount of data needed to determine Scope 3 GHG emissions;

- using secondary data or industry average GHG emissions factors presents issues, such as how to account for uncertainties in industry-average GHG emissions factors around data collection or quality and an uneven distribution of GHG emissions within an industry;

- it is a challenge to estimate GHG emissions for suppliers that do not calculate their own emissions;

- it is a challenge to of define an appropriate calculation approach for each Scope 3 category;[193]

- double counting may occur when GHG emissions are aggregated across multiple organizations;

- users of an organization's disclosures must understand sources of uncertainty regarding whether a value accurately represents the activity in an organization's value chain, whether variations in calculated GHG emissions are due to methodological choices and whether there are any limitations as a result of the modeling approaches used to reflect the real world;

- establishing clear value chain boundaries when calculating Scope 3 GHG emissions presents another challenge, as the GHG Protocol allows companies flexibility in choosing which, if any, Scope 3 activities to include in their calculation; and

- while in principle the 15 GHG emissions categories defined for Scope 3 emissions by the GHG Protocol (which are consistent with the 15 categories included in the Proposed Rules) are designed to be mutually exclusive, in practice there can be overlaps in reporting boundaries due to a company's involvement at multiple points in the life cycle of products and can result in double counting of Scope 3 GHG emissions.

Given these difficulties, which also are discussed elsewhere in this letter, the reporting of Scope 3 emissions as proposed should not be required from any company. At the very least, if Scope 3 emissions are to be reported in SEC filings, then the reporting of Scope 3 emissions should be entirely voluntary. While it is true that several companies and organizations are working to improve methodologies regarding Scope 3 emissions calculation, such measurements still would

---

[192] 2021 TCFD Metrics Guidance at 57.

[193] With respect to each category, the GHG Protocol allows companies to choose from among multiple calculation methods and rely on different sources of data.

not address the fundamental challenge of lack of reliance on third parties for essential data. The notion that the SEC should move forward with these regulations now, while those systems are in the earliest stages of development, is inappropriate. Indeed, it underscores the points made elsewhere in this letter that mandating Scope 3 emissions disclosures would not only fail a materiality test but would also be counterproductive in that the disclosures will cause confusion, given the current state of methodologies and significant data limitations.

2.    Gathering reliable data to quantify Scope 3 emissions is costly.

The Proposing Release anticipates vast increases in reporting burden hours and associated costs of reporting.

In many instances, the amount of Scope 3 emissions will depend on how a product or raw material is used or produced, respectively. The ability of companies to track materials and production upstream and use of products downstream is limited in today's complex, world-wide markets. It is unrealistic and unreasonable to conclude that companies will be able to accomplish this tracing across multiple tiers of entities throughout their value chains, particularly to the level of detail that the SEC seeks in the Proposed Rules to the extent many suppliers and customers of certain registrants would not be subject to Scope 3 disclosure requirements.

The Proposing Release does not adequately account for these costs and burdens.[194] If these costs and burdens were fully considered, the Proposed Rules would not require disclosure of Scope 3 emissions from any entity, given the relative value of the disclosure compared with the burden of preparing and making the disclosure. As detailed elsewhere in this letter, to allow sufficient time to collect the necessary data for reporting, to the extent any final rules require disclosure of Scope 3 emissions from any registrant, such disclosure (along with any other emissions disclosure) should be due no earlier than 180 days after the due date for Form 10-K for that particular registrant.

3.    The safe harbor provision for Scope 3 emissions disclosures does not provide the relief that is required for companies that would be subject to this reporting requirement.

The SEC states that it recognizes that registrants *may* need to rely on assumptions about how customers will use their products to calculate Scope 3 emissions. There is no question that registrants *will* need to rely on various assumptions in calculating Scope 3 emissions, made all the more difficult by significant data limitations and methodological variability. Indeed, inherent in estimating any emissions are key assumptions, be they for Scope 1, 2, or 3 emissions calculations, but assumptions, as well as uncertainties, will be most acute in the area of Scope 3 emissions.[195]

---

[194] Indeed, a Well-Known Seasoned Issuer we consulted estimates that the costs for compliance with proposed Scope 3 reporting will be $15.6 million over five years.

[195] *See* Proposing Release, 87 Fed. Reg. at 21,388.

The Proposing Release states that the SEC seeks to alleviate concerns that registrants may have about liability for information that would be derived largely from third-parties in the value chain, yet it would provide an inadequate safe harbor, as discussed in more detail elsewhere in this letter.

<div align="center">

4.    <u>Scope 3 emissions disclosures are inherently incomparable.</u>

</div>

The SEC states that the Proposed Rules are intended to provide comparable data that is useful, when in fact the Proposing Release highlights discrepancies in the reliability of different data sources for determining Scope 3 emissions.[196] There are multiple methods for estimating Scope 3 emissions depending on the data that is available and used. The method chosen by a particular company can be dependent upon a company's business operations, its size, as well as the complexity required to estimate Scope 3 emissions along with other judgments a registrant makes in determining which methodology to use. Moreover, the data needed to quantify Scope 3 emissions vary in availability and quality. Even if third-party attestation of Scope 3 emissions could be obtained (and we recognize it is not required and should not be required), it can often differ based on which party does the attestation, adding an additional layer of complexity to an already complex process.

As discussed earlier in this letter, the risk is that the disclosure elicited by the Proposed Rules will provide merely a veneer of comparability – indeed, false comfort that there is comparability – and will thereby obscure potentially material differences across the quantitative emissions companies disclose, since companies utilize diverse and varying data and methodologies in their good faith attempts to navigate the complexities and uncertainties embedded in the Proposed Rules' disclosure mandates.

It is also worth noting that the GHG Protocol discourages the reporting of the same Scope 3 emissions that other companies are reporting. Here, the Proposed Rules ignore that suggestion and propose multiple overlapping reporting of emissions by companies, which would lead to many tons of $CO_2e$ being accounted for multiple times by multiple reporting companies. A simple hypothetical illustrates the problems with the Proposed Rules' approach. Take as an example an automobile. The factory producing the automobile is likely to produce Scope 1 emissions during the manufacturing process, and it purchases electricity to power the factory from the local utility. To the manufacturer, the emissions associated with the electricity are its Scope 2 emissions. These same emissions are double counted by the utility providing that electricity as its Scope 1 emissions. If the automobile is powered by electricity, it will generate emissions associated with its operation through its consumption of electricity, and those emissions will constitute Scope 3 emissions both for the manufacturer and the utility. A bank that provides financing to the utility or the manufacturer will also have to capture their emissions as part of the bank's own Scope 3 emissions disclosure – the same emissions are accounted for multiple times by various other entities under the Scope 3 emissions reporting regime. The dealer that sells the automobile to the end consumer would also recognize Scope 3 emissions from its production, distribution, use and disposition, just to name a few categories which the manufacturer would also recognize. If the automobile is

---

[196] *See id.* at 21,393.

powered by internal combustion, many of the same opportunities for double-counting exist, with the likelihood that several additional companies may each have to account for the Scope 3 emissions of the same automobile: the exploration and production company upstream that extracts crude oil from the earth; the refiner that processes crude oil into gasoline; the pipeline company that transports the refined gasoline to market; the transportation company that trucks the gasoline from a distribution facility to the service station; and finally the service station itself that sells gasoline to the owner of the automobile. We note again that the design of the GHG Protocol standard for Scope 3 emissions is not intended to allow investors to compare one company's Scope 3 emissions to another company's Scope 3 emissions.[197]

This simple hypothetical presents one of the principal public policy questions on reporting emissions: how many times are the same emissions associated with a single consumer product to be counted under the current emissions accounting approach? Investors would not benefit, and would be inherently confused, through the disclosure of the same emissions by multiple unrelated companies, which would ultimately in the aggregate produce emissions calculations that are incorrect and overstated by orders of magnitude.

Again, for the foregoing reasons, we urge that Scope 3 emissions be excluded from any mandated reporting requirements in favor of a voluntary reporting approach.

### E. If the SEC mandates Scope 3 disclosures, then it should revise and expand the disclosure safe harbor.

1. <u>The proposed safe harbor is too narrow.</u>

As the Proposing Release itself acknowledges, reporting on Scope 3 emissions poses many difficulties and challenges.[198] The Proposing Release acknowledges it "may be difficult to obtain activity data from suppliers and other third parties in a registrant's value chain, or to verify the accuracy of that information."[199] The Proposing Release continues, "It may also be necessary to rely heavily on estimates and assumptions to generate Scope 3 emissions data."[200] Indeed, Scope 3 emissions disclosures are based on numerous and significant uncertainties.

The challenges associated with definitively reporting on climate-related information are not limited to Scope 3 emissions, however. Much of the climate-related information that the Proposing Release calls for requires significant management estimates and judgment, relies in whole or in part on information provided by unaffiliated third parties, and is dependent on a reporting regime that is in its infancy. It is extremely difficult for a company to isolate the exact

---

[197] See GHG Protocol, *Corporate Value Chain (Scope 3) Accounting and Reporting Standard*, available at https://ghgprotocol.org/standards/scope-3-standard, at 6 ("Use of this standard is intended to enable comparisons of a company's GHG emissions over time. It is not designed to support comparisons between companies based on their Scope 3 emissions. Differences in reported emissions may be a result of differences in inventory methodology or differences in company size or structure.").

[198] *See* Proposing Release, 87 Fed. Reg. at 21,390.

[199] *Id.*

[200] *Id.*

extent to which climate change in-and-of-itself has impacted the company in the way the Proposed Rules contemplate through their detailed qualitative and quantitative disclosure prescriptiveness. Reporting concepts, measurement tools and other methodologies continue to evolve at a rapid pace, and we continue to learn more about climate science. Elements of the Proposed Rules, such as targets and goals, are inherently subjective and often forward-looking; targets and goals are also often prepared only for internal management analysis on a proprietary basis and are not necessarily designed with public disclosure in mind. Assurance principles are unsettled, as are key concepts of legal liability around climate information. The familiarity of the Commission and its staff with climate-reporting concepts and methodologies is also still developing.

In light of these factors, the Chamber has significant concern regarding the potential for second-guessing and liability regarding the disclosure of climate-related information were the Proposed Rules to be enacted.

We appreciate the Commission's recognition of the liability environment and believe the proposed Scope 3 safe harbor is a good starting point for any expanded climate disclosures. However, the safe harbor must be significantly expanded to be meaningful. Our concern is that the proposed safe harbor from Scope 3 emissions disclosure liability is too narrowly crafted and does not provide adequate relief. Furthermore, the Commission should employ a meaningful safe harbor not just for Scope 3 emissions disclosures, but rather should provide a meaningful safe harbor to cover the entirety of the disclosure provided in response to any final rules in light of the unique challenges that the SEC itself recognizes companies must overcome to meet the proposed climate-related disclosure obligations. Such a safe harbor should mimic the one available under the Private Securities Litigation Reform Act, but not be limited only to forward-looking information. Instead, the totality of SEC-mandated climate-related disclosure, excluding governance disclosure, should benefit from such a safe harbor. Likewise, climate-related disclosures made in an initial public offering registration statement should have the benefit of such a safe harbor as well.

We also believe the SEC should make clear that the safe harbor applies to the reporting company as well as any publicly-traded company providing data to other publicly-traded companies on Scope 3 emissions.

We acknowledge that the proposed Scope 3 safe harbor is grounded to some degree in Rule 175 under the Securities Act. But like Rule 175, the proposed Scope 3 safe harbor is heavily conditional, and, like Rule 175, in particular requires a registrant to act on a "reasonable basis" and in "good faith." These concepts are not well understood in the context of the federal securities laws, and the requirement to act reasonably could be construed to imply a negligence standard.

Since a cause of action under Rule 10b-5 of the Exchange Act requires a showing of scienter, the loss of a potential safe harbor on a showing of negligence appears to create a conceptual mismatch, and as a practical matter would render the purported safe harbor illusory. Conversely, if an issuer acts reasonably and in good faith, the proposed safe harbor would seem to provide no additional insulation against many other claims under the federal securities laws. For example, a safe harbor rooted in non-negligence would seem to provide no defense against a claim sounding in negligence, such as one initiated by the Commission under Section 17(a)(2) or 17(a)(3)

of the Securities Act, again diluting the practical value of the proposed safe harbor. And Section 11 of the Securities Act includes an affirmative due diligence defense already. It is also unclear from the Proposing Release whether the proposed safe harbor is intended only to serve as a defense to a claim in an SEC enforcement action, or whether it would extend to private securities litigation as well – the Chamber holds it should do both.

2.   The scope of Securities Act Rule 409 and Exchange Act Rule 12b-21 should be expanded and clarified with respect to climate-related disclosures.

In multiple instances in the Proposing Release, the SEC refers to the availability of Securities Act Rule 409 and Exchange Act Rule 12b-21 as a basis for non-compliance with requirements of the Proposed Rules that the SEC anticipates will be difficult for certain companies to meet due to the complexity, uncertainty or potential unavailability of information necessary to prepare responsive disclosure. Rule 409 and Rule 12b-21 generally provide that information that would otherwise be required in an annual report or registration statement need be given only insofar as it is known or reasonably available to the registrant. If any required information is unknown and not reasonably available to the registrant, either because the obtaining thereof could involve unreasonable effort or expense, or because it rests peculiarly within the knowledge of another person not affiliated with the registrant, the information may be omitted, subject to the following conditions: (a) the registrant shall give such information on the subject as it possesses or can acquire without unreasonable effort or expense, together with the sources thereof; and (b) the registrant shall include a statement either showing that unreasonable effort or expense would be involved or indicating the absence of any affiliation with the person within whose knowledge the information rests and stating the result of a request made to such person for the information. Moreover, historically, the availability of Securities Act Rule 409 and Exchange Act Rule 12b-21 has had very little, if any, practical impact.

If the Commission intends for companies, as a practical matter, to be able to avail themselves of Securities Act Rule 409 and Exchange Act Rule 12b-21 under various circumstances associated with compliance with the Proposed Rules to the extent contemplated by the Proposing Release, then the Commission should make clear that Securities Act Rule 409 and Exchange Act Rule 12b-21 will apply in all instances where, due to the myriad challenges inherent in, and that may arise in connection with, efforts to comply with the Proposed Rules, companies may need to avail themselves of the reasonable accommodations contemplated by such rules in connection with preparing and reporting climate-related disclosures. Moreover, there should be a presumption in favor of any determination by a company to avail itself of these rules and a safe harbor from liability with respect to any such determination and any alleged omission or misstatement resulting from the exclusion of information from an annual report or registration statement in reliance on Securities Act Rule 409 and Exchange Act Rule 12b-21.

F.   **The SEC should provide a transition period for prior years.**

The Proposed Rules would require companies to provide GHG emissions disclosure and climate-related financial statements metrics for each year covered by the first annual report when the rules become effective. This requirement does not include a clear transition provision. In other

words, even for the companies that have not started voluntarily disclosing any information, precise, quantified disclosure of metrics they have not previously tracked or reported would be required not only for the fiscal year covered by the first annual report under the newly effective reporting regime, but also for the two prior fiscal years. For example, proposed Rule 14-01 of Regulation S-X would require disclosure for a registrant's most recently completed fiscal year and for the historical fiscal year(s) included in the registrant's consolidated financial statements in the applicable SEC filing. The Proposing Release refers to Securities Act Rule 409 and Exchange Act Rule 12b-21[201] as providing potential relief from the requirement to report on more than one year in the first year reporting is due. Nonetheless, subject to our position (discussed in detail elsewhere in this letter) that the SEC should not finalize financial reporting rules covering climate change, to the extent the Commission maintains this requirement and finalizes any mandate for retroactive disclosure, a clearer transition period is warranted without reliance on separate SEC rules.

For many companies, even those that have already established some level of voluntary reporting, historical information may only be available at great cost and difficulty and, even then, could be subject to significant uncertainties that would make the disclosure unreliable, if it could be provided at all; accordingly, no disclosures should be required for periods prior to the adoption of any final rules. The need for third party assurance of this information, which would start as soon as the next year for GHG emissions and in the initial year for the climate-related financial statements metrics, further compounds this difficulty. If the requirements for disclosure around these metrics are maintained in any final rules, they should not apply retrospectively. While companies could be encouraged to provide information, if available, about the retrospective periods, companies should only be required to disclose new information for the year for which the first compliant annual report or other SEC filing is due.

### G.  The SEC should permit a more reasonable compliance period and allow for a reporting deadline later in the year for emissions data.

The Commission should, in any final rules, extend the initial compliance deadlines by at least two years to provide the issuer community sufficient time to develop systems, controls, and audit methodologies over whatever new disclosures are ultimately adopted. This additional time will allow the SEC to better promote more reliable disclosures than a hurried compliance period. In addition to the initial compliance deadline being too soon as proposed, the timing of disclosure during the annual reporting process also presents compliance challenges.

Much of the emissions-related information in the Proposed Rules would be required in Form 10-K. Particularly for companies with a calendar fiscal year, this deadline is unreasonably tight, and for most companies (even large accelerated filers), there will be significant challenges in providing emissions-related disclosures by the required deadlines. Any perceived benefit associated with disclosures being made at the same time as a company's annual report is outweighed by the benefit of allowing companies more time so that they have a realistic opportunity to prepare disclosures that will, in turn, be more reliable and useful to investors. In short, investors benefit when registrants have the time and ability to collect the requisite data and

---

[201] Proposing Release, 87 Fed. Reg. at 21,364.

subject the information to an effective disclosure process and set of controls and procedures. The Proposing Release acknowledges as much by permitting registrants to make use of fourth-quarter estimates under certain circumstances under proposed Regulation S-K Item 1504(e)(4)(i) as long as the registrant promptly discloses in a subsequent filing any material difference between the estimate used and the actual, determined GHG emissions data for the fourth fiscal quarter. While we appreciate the Commission's effort to allow an accommodation here, its proposed approach is not workable.

Indeed, the SEC's need to allow companies to use a fourth quarter estimate to meet their GHG emissions disclosure obligations is not only an accommodation the SEC has never needed to make before, but it underscores that the SEC recognizes that many companies simply will not be able to meet the emissions disclosure deadline for a variety of reasons. For example, key emissions data needed to complete the required audit may not arrive until it is too close to the deadline to be prepared for external assurance and made subject to such assurance. Moreover, including data based on these types of estimates, subject to future correction when the actual data is available, would pose significant challenges for any third-party auditor of the resulting disclosure and could provide fodder for opportunistic third parties not motivated by the best interests of investors. This accommodation is not adequate to address the risk of being second-guessed and the attendant liability. It also does not help to ease potential investor confusion – if anything, use of a fourth-quarter estimate that is subsequently updated likely spawns investor confusion and creates liability risk.

In addition, accelerated and large accelerated filers with a calendar fiscal year would be required to make emissions disclosures under the Proposed Rules *before* the March 31 EPA deadline for similar information. The March 31 EPA deadline is followed by an EPA comment period whereby disclosures are often modified in response to EPA comments, and these disclosures often do not become final until the fourth quarter of the calendar year.

Rather than front-running the EPA reporting process or providing the unusual workaround that permits disclosure of GHG emissions on the basis of a quarterly estimate, the Commission should delay the reporting deadline for emissions information to later in the year. There is already a basis for this concept within the SEC's rules. Form SD, for example, is not due until May 31. Therefore, the Commission should delay the GHG emissions reporting deadline to later in the year in order to avoid the need for estimates and updates to those estimates and the duplication of reporting information that is the same or similar as that reported to environmental regulators like the EPA. If the Proposed Rules are not modified to allow for a later reporting deadline, it is imperative for the SEC to coordinate with the EPA to ensure consistency between the reporting regimes. To accommodate companies with different fiscal years and to allow sufficient time to collect the necessary data for reporting, any disclosure on emissions (including scope emissions) should be due no earlier than 180 days after the due date for Form 10-K for that particular registrant. If a company files emissions reports with another regulator, such as the EPA, and that regulator requires any amendment or modification of such emissions data, then the affected company should be permitted to amend its SEC disclosure without penalty.

**H.    The SEC should permit omission of disclosure by registrants that are wholly-owned subsidiaries of other reporting companies.**

The Commission has for many years permitted registrants that are wholly-owned subsidiaries of other registrants to omit certain information from Exchange Act periodic reports. General Instruction I to Form 10-K and General Instruction H to Form 10-Q provide the conditions for this exemption and detail certain disclosures by the wholly-owned subsidiary (such as the Business or MD&A discussions) that may be omitted. We urge the Commission to expand this accommodation to wholly-owned subsidiaries as it concerns climate reporting.

We believe parent-level reporting for wholly-owned subsidiaries would be sufficient for investors. Under both an organizational-boundary and an operational-boundary approach, information for wholly-owned subsidiaries would already be subsumed into a parent's climate reporting. Reporting on an operational boundary approach would also align with the way that most companies currently track climate and emissions data for wholly-owned subsidiaries, which are often not managed with a view towards doing so on a stand-alone basis. In addition to eliminating the need to provide duplicative information for two or more registrants under common ownership, this accommodation would have the additional benefit of reducing compliance costs for the wholly-owned subsidiary.

**I.    The SEC should not require reporting on an organizational boundary basis.**

In a departure from the GHG Protocol, the Proposed Rules would require emissions reporting on an organizational boundary and operational boundary basis using the same scope of entities, operations, assets and other holdings as those included in a registrant's consolidated financial statements. The Commission's approach is contrary to the one embodied in the GHG Protocol, which permits companies to rely on operational boundaries or equity ownership. Further, most companies currently report on emissions data using an operational boundary approach rather than an organizational boundary one.

The Proposed Rules would require registrants to maintain two different sets of records for GHG emissions reporting. The Proposed Rules would also require reporting on joint ventures, minority investments, and other operating interests in which the registrant does not maintain operational control. We believe this approach would be confusing to investors by implying control when none in fact exists and will further compound the difficulty of tracking and obtaining reliable data since a registrant may have no practical ability to obtain such data from entities it does not control. It is also unclear how a registrant would obtain third-party assurance over data outside its control that has been supplied by third parties. Accordingly, we request that any final rules permit disclosure on the basis of operational boundaries or equity ownership rather than organizational ones.

**J.    The SEC should extend the effective dates of any final rules.**

Given the scope and breadth of the Proposed Rules, as well as the new processes, procedures, systems and controls companies will be required to develop to ensure their ability to

Appellate Case: 24-1628    Page: 1074    Date Filed: 03/26/2024 Entry ID: 5377362

comply, a significantly longer transition period is needed. To meet the compliance deadlines indicated in the Proposing Release, many registrants would be required to begin developing systems and controls now—an impossible task since there are no final rules to design those systems and controls around and a task that is inconsistent with the objectives and spirit of a notice and comment period following the proposal of new rules. Accordingly, to provide a reasonable transition to any final rules, we recommend that the Commission provide for effective dates two years beyond those indicated in the Proposing Release.

1.    The Proposed Rules do not allow for sufficient transition time.

The Proposing Release calls for the climate-related financial metric disclosures to apply to large accelerated filers in fiscal year 2023, accelerated and non-accelerated filers in fiscal year 2024, and smaller reporting companies in fiscal year 2025. With disclosure requirements this unique and sweeping in scale and scope considering only the climate-related financial metrics, even large accelerated filers will need at least two years after any rules are finalized by the SEC in order to implement the requisite systems, controls, procedures and practices globally across all subsidiaries and operations in a reasonable and appropriate way. Extensive effort will be required by registrants to understand the requirements; educate management, employees, boards and investors; onboard new employees with appropriate skill sets, human resources that are likely to be in short supply as every public company seeks to staff up; modify accounting systems, the control environment and otherwise implement processes to obtain the necessary data to make the required determinations and disclosures; and integrate a final rule into registrants' other non-accounting systems and operations.

Many issues will need to be addressed by the SEC staff, registrants and auditors in implementing final rules. Were the SEC to adopt final rules substantially similar to those proposed, the challenges would multiply exponentially. To illustrate, the Proposing Release does not specify what the SEC's expectations are for applying Staff Accounting Bulletins 99 and 108 in the context of the climate-related financial metrics. It is also uncertain how the Proposing Release comports with existing internal control frameworks and SEC definitions of material weaknesses, significant deficiencies and similar terminology and standards. Likewise, it is unclear how the Proposing Release would align with registrants' management review controls, along with auditors' quantitative materiality considerations in planning and conducting audits, which at the present time typically do not operate at a 1% precision level for every financial statement line-item.[202]

An additional two years will allow time for the SEC staff to engage in the necessary outreach and education activities, respond to questions, and provide clarifying guidance, which even large accelerated filers and their auditors will need. Likewise, a more realistic transition period would give the PCAOB an opportunity to consider any needed guidance for auditors and engage in any appropriate standard-setting on its end. In response, issuers would gain the necessary time needed to develop responsive policies, processes, systems and controls to ensure compliance with the new rules. Moreover, it would give auditors time to develop plans, processes and

---

[202] *See, e.g.*, A. Eilifsen and W. F. Messier, Jr., *Materiality Guidance of the Major Auditing Firms,* Auditing: A Journal of Practice & Theory (May 2015), at 3-26.

procedures to appropriately encompass the climate-related financial metrics in the audits of registrants – whether integrated or financial statement-only audits. Of course, the SEC can always allow voluntary early disclosure for those registrants desiring and able to do so.

> 2.  The Commission should permit additional transition time for acquired businesses or assets.

The Proposed Rules do not appear to provide transitional relief for acquired assets or acquired businesses. The absence of a transition period for acquisitions places a public acquiror at several disadvantages. Without this permitted transition, for an acquisition or merger completed later in the fiscal year, a registrant would be required to include the acquired company or assets in the subsequent year's climate disclosures. This outcome would give a reporting company very little time to establish systems and controls over the acquired business or assets, gather data and prepare the necessary disclosure. Beyond the compliance challenges that rapid reporting of data on acquired businesses or assets would present, the need to report so quickly may make a public acquiror a less attractive bidder, and it may discourage certain M&A activity entirely. Public companies may also find acquiring private companies not already subject to SEC disclosure rules less attractive. We do not believe that the Proposed Rules, if adopted, should be permitted to have these kinds of unintended consequences on the marketplace for mergers and acquisitions.

Accordingly, we recommend that any final rules include a transition period of at least one year for acquired businesses or assets. The Commission permitted a similar accommodation when it adopted the conflict minerals reporting rules, permitting registrants to delay the reporting on an acquired company's products until the end of the first calendar year that begins no sooner than eight months after the closing date of the acquisition. The Commission also permits a period of up to one year from the date of an acquisition during which management may omit an assessment of an acquired business's internal controls over financial reporting from its assessment of the registrant's internal controls. A similar transition period here is warranted.

## IV.   THE COST-BENEFIT ANALYSIS IN THE PROPOSING RELEASE IS INADEQUATE TO JUSTIFY THE ENTIRETY OF THE PROPOSED RULES.

### A.   The economic analysis in the Proposing Release is incomplete and substantially underestimates compliance costs.

The Commission "has a unique obligation to consider the effect of a new rule upon 'efficiency, competition and capital formation.'"[203] The Commission's "failure to 'apprise itself—and hence the public and the Congress—of the economic consequences of a proposed regulation' makes promulgation of the rule arbitrary and capricious and not in accordance with law."[204] The Commission's economic analysis is faulty in a number of important respects and fails to support the Proposed Rules. To begin, the Commission fails to "accurately assess any potential increase or decrease" in efficiency, competition and capital formation because the Commission does not

---

[203] *Bus. Roundtable v. SEC*, 647 F.3d 1144, 1148 (D.C. Cir. 2011) (quoting 15 U.S.C. §§ 78c(f), 78w(a)(2), 80a-2(c)).

[204] *Id.* (quoting *Chamber of Commerce of U.S. v. SEC*, 412 F.3d 133, 144 (D.C. Cir. 2005)).

Appellate Case: 24-1628     Page: 1076     Date Filed: 03/26/2024 Entry ID: 5377362

adequately "assess the baseline level" of information disclosure under pre-existing law.[205] As James A. Overdahl, the Commission's former Chief Economist, explains, the Commission's economic analysis narrowly focuses on specific, climate-related disclosure practices, while "fail[ing] to account for the full scope of the Commission's longstanding baseline of using a principles-based approach to disclosure based on the concept of materiality."[206] By failing to adequately consider the pre-existing principles-based approach, the Commission fails to recognize that material information, including climate-related information, is already disclosed under the existing regulatory regime.[207]

The Commission has likewise failed to demonstrate that a market failure exists with respect to the current principles-based approach. "Rules are not adopted in search of regulatory problems to solve; they are adopted to correct problems with existing regulatory requirements that an agency has delegated authority to address."[208] "That is not the situation that we [face] in this case."[209] As Overdahl explains, the "proposed rule[s] depart[] from the principles-based approach for the disclosure of material information without convincing evidence of any [existing] market failure that would warrant such a departure."[210] In fact, existing voluntary disclosures, which are in addition to the mandatory disclosures required by the Commission's existing principles-based framework, are already "widely practiced," are "increasing," and are "consistent with the types of disclosures to which the SEC has [previously] shown favor."[211] The Commission rightly notes that a top priority of some investors is to require increased climate disclosures from the companies they invest in. It is incumbent on the Commission to explain why demand by those investors will not be sufficient to produce adequate disclosures, with the added benefit that this private ordering—unlike the Proposed Rules—would allow for further evolution in best practices in an area that concededly is still developing. The Proposed Rules fail to address these considerations.

The Commission has also failed to adequately consider the Proposed Rules' costs. As Overdahl details, the Commission's "analysis is incomplete and excludes several potentially significant drivers of cost related to the proposed rule."[212] Even the costs the Commission does consider are not assessed in a logical fashion. As the D.C. Circuit has explained, the failure to "view a cost at the margin[] is illogical and, in an economic analysis, unacceptable."[213] Here, the Commission has failed to consider the marginal costs and benefits of aspects of the proposal.[214] While, for example, the Commission quibbles with the accuracy of existing Scope 3 emissions estimates, the Commission fails to consider the marginal improvement that would be offered by the costly and expansive reporting proposals in light of their marginal cost. Similarly, the Commission views the costs of the Proposed Rules as whole; it does not assess the marginal cost

---

[205] *Am. Equity Inv. Life Ins. Co. v. SEC*, 613 F.3d 166, 178 (D.C. Cir. 2010).
[206] Overdahl Report at ¶ 11. Overdahl's Report is hereby incorporated by reference.
[207] *Id.* at ¶ 29.
[208] *N.Y. Stock Exchange LLC v. SEC*, 962 F.3d 541, 556–57 (D.C. Cir. 2020).
[209] *Id.* at 557.
[210] Overdahl Report at ¶ 26.
[211] *Id.* at ¶ 44.
[212] *Id.* At ¶ 58.
[213] *Bus. Roundtable*, 647 F.3d at 1151.
[214] Overdahl Report at ¶¶ 34, 69-70.

and benefit of each requirement in light of the marginal cost and benefit of each of the other requirements. This is not acceptable in an economic analysis.

Beyond these shortcomings, the Commission's calculations for direct costs are incomplete. By the SEC's own calculations shown in Table 4[215], the Proposed Rules will impose on companies an aggregate additional annual reporting burden of 24,689,099 internal employee hours of work to comply, and an additional annual cost for external consultants and services of $6,378,073,242. The SEC does not calculate the dollar amount for the estimated 24.7 million employee hours. Based on the $200 per hour opportunity cost for internal professional employee labor typically applied in other regulatory impact contexts, the resulting amount is $4,937,819,800 aggregate annual cost for internal labor time at affected companies to comply with the proposed new reporting requirements. This is the economic opportunity cost of taking 24.7 million hours of effort away from productive work generating revenues to cover employee compensation, contribution to fixed overhead costs and contribution to profits and redirecting those hours to compliance with a government-mandated paperwork filing requirement. Combined with the SEC's estimate of external services compliance costs of $6,378,073,242, the total annual aggregate compliance cost amounts to at least $11,315,893,042. Nowhere in its proposed regulatory analysis does the SEC demonstrate that the annual benefits ascribed to the Proposed Rules could offset such a cost sum.

There is reason to think that the direct cost could be even greater. The hours burden on which the $11.3 billion annual cost calculation is based comes from the SEC's information collection report to the Office of Information and Regulatory Affairs (OIRA) to secure approval under the Paperwork Reduction Act so that companies can legally be compelled to report information on the subject forms. The SEC and other federal agencies seldom conduct empirical surveys or audits of the reporting public to support their estimates of reporting time burdens imposed on businesses and private citizens, and thus there is no evidence that the SEC's time burden estimates have any empirical basis. There are analyses indicating that agencies have substantially underestimated the burden hours for paperwork.[216] If the SEC similarly underestimates the actual time burdens, then the Commission would have significantly undercalculated the cost of the paperwork reporting requirements. The Commission has not given adequate attention to the full ramifications of the cost impacts of the proposed rule.

### B. The compressed comment period has significantly impeded the public's ability to comment on the Proposed Rules in a thorough way.

---

[215] Proposing Release, 87 Fed. Reg. at 21,461/

[216] For example: (i) U.S. Government Accountability Office, *Paperwork Reduction Act: Agencies Could Better Leverage Review Processes and Public Outreach to Improve Burden Estimates*, GAO-18-381, July 2018 available at https://www.gao.gov/assets/gao-18-381.pdf; (ii) Samaha, Adam M. *Death and Paperwork Reduction*, Duke Law Journal 65, no. 2 (2015) available at https://www.jstor.org/stable/24692159 at 279-344; (iii) "Evaluating the Paperwork Reduction Act:  Are Burdens Being Reduced?"  Hearing Before the Committee on Small Business, United States House of Representatives, March 29, 2017 available at https://www.govinfo.gov/content/pkg/CHRG-115hhrg24759/pdf/CHRG-115hhrg24759.pdf at 7. In this hearing record Sam Batkins describes the Federal Trade Commission under-reporting its burden by a magnitude of 12;  and Brady, Demian, *Increasing Complexity Brings Back Bigger Compliance Burdens,* National Taxpayers Union Foundation, April 18, 2022 available at https://www.ntu.org/library/doclib/2022/04/2022-tax-complexity.pdf.

The SEC originally posted a 510-page draft of the Proposing Release to its website after the March 21, 2022 open meeting. Shortly thereafter, it was replaced with a 506-page draft. The final version conformed to the *Federal Register*, which was published on April 11, 2022, runs 490 pages, though a redline comparison of the final document to earlier drafts reveals that the Commission not only deleted text, but also inserted new, additional justifications for the Proposed Rules. Commissioner Peirce's dissenting remarks referenced yet a different document of 534 pages in length,[217] which is presumably the draft that the commissioners reviewed in advance of the March open meeting.

The Proposing Release poses well over 700 discrete questions for commenters. It is simply not possible to address each and every one of the Commission's questions or provide the thoughtful, sophisticated analysis of the overall impacts of the Proposed Rules within 90 or even 120 days. Given the far-reaching consequences of the Proposed Rules and their likely impact on the U.S. economy for decades to come, we are uncertain why such a compressed time frame as the Commission allowed for comment was necessary.

In light of our desire to work with the SEC in pursuit of a common goal, on April 19, 2022, we submitted a request for the Commission to extend the public comment period for at least 60 more days.[218] While we appreciate the 28-day extension the SEC granted from the original deadline subsequent to our request and have done our best to make use of that time, the need was for the Commission to grant a longer comment period to afford the public adequate time to study the vast Proposing Release and to provide the public (including the Chamber and its members) a full opportunity to perform the kind of sophisticated analysis required by a rulemaking of such breadth and complexity. In our letter requesting an extension, we also noted that the Commission has simultaneously proposed a litany of other proposed rules, all with brief comment periods that overlap one another, which in total run over 1,000 pages in the *Federal Register*.

Companies, investors and other members of the public and stakeholders have been working at full capacity to digest and comment on these many outstanding proposals during a critical time when many significant developments are affecting the world and requiring considerable attention and focus. The release of so many proposed rules with overlapping comment periods has impeded the public's ability to provide thoughtful, reasoned comments within these compressed time frames. We do not understand the urgency to push through so many sweeping and transformative proposals at the same time in a way that curbs the public's ability to provide meaningful comment. Rules adopted in this way are sure to have numerous unintended consequences that will require further revision or modification in the future.

The Chamber's own efforts to gather member feedback while analyzing and responding to the Proposing Release, even with the 28-day extension, were substantially impeded by the inadequate comment period, and we were regrettably unable to take up many of the important questions included in the Proposing Release or carefully address in this letter all of the items from the Proposing Release that merit meaningful comment and input. Our silence in this letter as to

---

[217] Peirce Statement, *supra* note 144.
[218] The entire letter is available at https://www.sec.gov/comments/s7-10-22/s71022-20124058-280187.pdf.

any individual element of the Proposed Rules should therefore not be understood to indicate acceptance of it. Rather, our failure to comment on any particular issue is further evidence of our limited ability to digest the totality of the Proposing Release in the limited time the SEC allotted.

## **CONCLUSION**

American businesses play a vital role in creating innovative solutions and addressing national and global challenges, including mitigating climate change. A challenge of this magnitude requires collaboration between government and the private sector to advance the best ideas and policies. The current approach employed by the Commission is too prescriptive and will not substantially improve the quality of climate-related information to be provided to investors. The Chamber has laid forth a constructive path forward for the SEC to follow to craft a more practical and durable approach to climate disclosure that builds on the important work that American businesses are already doing in this space and that better aligns with the SEC's mission and the underpinnings of the federal securities disclosure regime.

Sincerely,

Tom Quaadman
Executive Vice President
Center for Capital Markets Competitiveness
U.S. Chamber of Commerce

<u>Annex A</u>

[OVERDAHL REPORT ENCLOSED]

Appellate Case: 24-1628     Page: 1081     Date Filed: 03/26/2024 Entry ID: 5377362

# The SEC's Proposed Rule for The Enhancement and Standardization of Climate-Related Disclosures for Investors

James A. Overdahl, Ph.D., Partner, Delta Strategy Group*

June 16, 2022

* James A. Overdahl is a partner at Delta Strategy Group in Washington D.C. where he is a specialist in financial markets and the U.S. regulatory environment. He was SEC chief economist from 2007−2010. He acknowledges financial support from the Chamber of Commerce of the United States of America. All views are his own and do not necessarily reflect the views of Delta Strategy Group or the Chamber of Commerce of the United States of America.

# I.    Executive Summary

1.    The purpose of this report is to provide economic analysis to assist the United States Securities and Exchange Commission (the "SEC" or the "Commission") in its deliberations with respect to new rules proposed under the Securities Act of 1933 (the "Securities Act") and the Securities Exchange Act of 1934 ("Exchange Act") entitled "The Enhancement and Standardization of Climate-Related Disclosures for Investors."[1]

2.    Based on my review of the proposed rule, and my own experience and discussions with market participants, I have concluded that:

    a.  The Commission has not sufficiently demonstrated that a market failure exists with respect to climate-related disclosures.  The Commission fails to adequately support its view that a prescriptive rules-based approach to climate-related disclosures is needed to address alleged market failures.

    b.  Although the Commission discusses the possibility of various types of market failures with respect to the current disclosure regime, in each case it has failed to demonstrate that such market failures actually exist in practice.

    c.  The Commission's economic analysis of the proposed rule uses an inappropriately narrow baseline that focuses on topic-specific climate-related disclosure practices that fails to account for the full scope of the Commission's longstanding baseline of using a principles-based approach to disclosure relying upon the concept of materiality.

    d.  The Commission's goal of creating a single unified system for disclosing climate-related information comes at the cost of foregoing an efficient evolutionary process for information discovery that comes from registrants having the choice of competing disclosure frameworks that they can join or leave voluntarily.

    e.  The Commission's estimate of incremental costs associated with the proposed rule are disproportionately high relative to any conceivable incremental benefit.  The Commission estimates that the cost of producing

---

[1] "The Enhancement and Standardization of Climate-Related Disclosures for Investors," the Securities and Exchange Commission, 17 CFR 210, 229, 232, 239, and 249, [Release Nos. 33-11042; 34-94478; File No. S7-10-22], RIN 3235-AM87, Federal Register, Vol. 87, No. 69, March 21, 2022 ("Proposing Release").

a 10-K disclosure would more than double but has failed to demonstrate that the incremental benefit exceeds this incremental cost.

    f.   The Commission fails to address important categories of indirect costs that are likely to result from the proposed rule.

    g.   The additional cost of mandated ESG disclosure, by influencing the decision of firms choosing whether to stay private or go public, will reinforce a trend in U.S. equity markets of firms that choose to go public being bigger and older than they used to be.

    h.   The Commission fails to adequately consider the impact of the proposed rule on efficiency, competition, and capital formation.

## II.    Overview of the Proposed Rule and Asserted Benefits

3.     On March 21, 2022, the SEC issued for public comment amendments to its rules under the Securities Act and the Exchange Act that would require registrants to provide certain climate-related information in their registration statements and annual reports.[2]

4.     The proposed rules would require a registrant to disclose information about (among other things): (1) the registrant's governance of climate-related risks and relevant risk management processes; (2) how any climate-related risks identified by the registrant have had or are likely to have a material impact on its business and consolidated financial statements, which may manifest over the short-, medium-, or long-term; (3) how any identified climate-related risks have affected or are likely to affect the registrant's strategy, business model, and outlook; and (4) the impact of climate-related events (which, according to the Commission, include severe weather events and other natural conditions) and transition activities on the line items of a registrant's consolidated financial statements, as well as on the financial estimates and assumptions used in the financial statements. In addition, for registrants that already conduct scenario analysis, have developed transition plans, or publicly set climate-related targets or goals, the proposed amendments would require certain disclosures to enable investors to understand those aspects of the registrants' climate risk management.

---

[2] See Proposing Release.

5.    The proposed rules also would require a registrant to disclose information about its direct greenhouse gas ("GHG") emissions (Scope 1) and indirect emissions from purchased electricity or other forms of energy (Scope 2).  In addition, a registrant would be required to disclose GHG emissions from upstream and downstream activities in its value chain (Scope 3) if material or if the registrant has set a GHG emissions target or goal that includes Scope 3 emissions.  According to the Proposing Release, these proposals for GHG emissions disclosures would provide investors with decision-useful information to assess a registrant's exposure to, and management of, climate-related risks and, in particular, transition risks.  The proposed rules would provide a safe harbor for liability from the Scope 3 emissions disclosure and an exemption from the Scope 3 emissions disclosure requirement for smaller reporting companies.  The proposed disclosures are motivated by the voluntary disclosures that some companies currently provide based on various third-party disclosure frameworks.

6.    Under the proposed rule changes, accelerated filers and large accelerated filers would be required to include an attestation report from an independent attestation service provider covering Scopes 1 and 2 emissions disclosures, with a phase-in over time.  The proposed rules would include a phase-in period for all registrants, with the compliance date dependent on the registrant's filer status, and an additional phase-in period for Scope 3 emissions disclosure.

### III.    Overview of the Use of Economic Analyses in SEC Rulemaking

7.    The purpose of this report is to provide economic analysis to assist the Commission in its deliberations with respect to the proposed rule changes.  I have framed my analysis using the SEC's protocol for conducting economic analyses in rulemaking[3] as well as Federal statutes requiring the SEC to consider the economic impact of its proposed rules on efficiency, competition, and capital formation.[4]  I have also formed my

---

[3] https://www.sec.gov/divisions/riskfin/rsfi_guidance_econ_analy_secrulemaking.pdf.
[4] Section 2(b) of the Securities Act, 15 U.S.C. 77b (b), and Section 3(f) of the Exchange Act, 17 U.S.C. 78c(f) require the Commission, when engaging in rulemaking where it is required to consider or determine whether an action is necessary or appropriate in the public interest, to consider, in addition to the protection of investors, whether the action will promote efficiency, competition, and capital formation.  Further, Section 23(a)(2) of the Exchange Act, 17 U.S.C. 78w(a)(2) requires the Commission, when making rules under the Exchange Act, to consider the impact that the rules would have on competition, and prohibits the Commission from adopting any rule that would impose a burden on competition not necessary or appropriate in furtherance of the Exchange Act.

views based upon my own experience in assessing the economic impact of Federal rules over the past 30 years, including my experience as the SEC's Chief Economist from 2007-2010. In my role as Chief Economist, I directed the Commission's process for assessing the likely economic impact of proposed rules and rule changes. I have also based my views on information I have gathered from discussions with industry practitioners.

8.      The primary purpose for conducting a rigorous assessment of the likely economic impact of any proposed rule change is to promote transparency and accountability in regulatory decisions. It is only after careful consideration of the economic impact that the Commission can determine whether there is a reasonable basis for exercising its rulemaking authority. To justify its exercise of rulemaking authority, the SEC has a duty under the Administrative Procedure Act ("APA"), as applied under the SEC's governing statutes, to adequately consider whether a regulatory action "will promote efficiency, competition and capital formation."[5] The Exchange Act additionally prohibits any rulemaking that "would impose a burden on competition not necessary or appropriate in furtherance of the purposes" of the statute.[6]

9.      As the Commission acknowledges, the economic analysis contained in the Proposing Release is preliminary. To gain a more complete understanding of the likely economic impact of the proposed rule, the Commission has invited public comment to a set of questions. Included in these questions is an open-ended invitation for commenters to advise the Commission as to whether it has assessed all the costs and benefits to market participants who would be affected by the proposed rule.

10.     With respect to the economic analyses contained in the Proposing Release, I find that the Commission's assessment of the likely economic impact of the proposed rule change is incomplete and fails to include rigorous analyses of significant questions the Commission needs to consider before concluding that there is a reasonable basis for the proposed rule changes.

---

[5] 15 U.S.C. §§ 78c(f), 77b(b).
[6] *Id.* § 78w(a)(2).

## IV. Critique of the Content of the Economic Analysis Section Contained in the Proposing Release

### A. The Baseline for the SEC's Economic Analysis Fails to Adequately Consider the Commission's Longstanding Principles-Based Disclosure Regime.

11.     As described in the SEC's guidance for conducting economic analysis in rulemaking, the Commission must specify an appropriate baseline as a first step in the process of evaluating the economic consequences of a proposed rule.  However, the baseline specified in the Proposing Release is inappropriate because it fails to adequately consider the full scope of the Commission's longstanding approach to principles-based disclosure of material information.  Instead, the baseline specified by the Commission focuses on observed climate-related disclosure practices of firms and the use of climate-related disclosures by investors and other market participants.  By using a baseline that focuses on narrow and topic-specific climate-related disclosure practices, the Commission fails to account for the full scope of the Commission's longstanding baseline of using a principles-based approach to disclosure relying upon the concept of materiality.

12.     The principles-based approach to the disclosure of material information has been described as "the cornerstone" and as a "guiding principle" of the disclosure system established by the federal securities laws.[7]  As Katz and McIntosh (2021a) have observed, "[t]he word 'material' was first introduced in the U.S. Securities Act of 1933, and, at least since the 1940s, the SEC has defined 'material information' in the context of financial statements as 'those matters as to which an average prudent investor ought reasonably to be informed before purchasing the security registered.'"[8]  Katz and McIntosh (2021b) observe that "[t]he SEC disclosure framework was designed to require reporting of information that is financially material to investors, not information that may be important at a societal level."[9]

---

[7] David A. Katz and Laura A. McIntosh, "Corporate Governance Update: 'Materiality' in America and Abroad," *Harvard Law School Forum on Corporate Governance*, May 1, 2021 ("Katz and McIntosh (2021a)"), pages 1 and 4.  Available at: https://corpgov.law.harvard.edu/2021/05/01/corporate-governance-update-materiality-in-america-and-abroad/.

[8] Katz and McIntosh (2021), page 1.

[9] David A. Katz and Laura A. McIntosh, "SEC Regulation of ESG Disclosures," *Harvard Law School Forum on Corporate Governance*, May 28, 2021 ("Katz and McIntosh (2021b)"), pages 1-5.  Available at: https://corpgov.law.harvard.edu/2021/05/28/sec-regulation-of-esg-disclosures/.

13.     Mandated materiality-based disclosures for public firms have clear but limited objectives under the securities laws.  Historically, the Commission's objective for mandating the disclosure of material information has been to provide decision-useful information to a reasonable investor at a specific point in time.  The Commission has always required firms to disclose financially material information about their structure, operations, and plans for the future.  These disclosures are intended to protect investors and promote capital market efficiency.  By using a baseline that captures only climate-related disclosure practices, the Commission is in effect suggesting that anything climate-related should be presumed to be material.  However, under a principles-based approach, something that is truly material to investors would be subject to disclosure whether or not it was designated as part of a topic-specific category such as climate or environmental, social, and governance ("ESG").

14.     One consequence of using a narrow, topic-specific baseline is that the resulting economic analysis will underestimate the cost of the proposed rule by failing to account for important features of the principles-based approach to the disclosure of material information.  These features include: 1) the ability of a principles-based approach to evolve in order to keep pace with emerging issues; and 2) the flexibility of a principles-based approach to correct deficiencies or excesses in disclosure without the need for the Commission to continuously add to or update the underlying disclosure rules as new issues arise.[10]

15.     The Proposing Release evaluates the mandated climate-related disclosures from the proposed rule relative to current climate-related disclosure practices.  When examining these practices, the Commission observes variation in the intensity of disclosure, particularly when comparing practices across industries.  The Commission conducted an analysis of climate-related disclosures related to business impact, emissions, international climate accords, and physical risks contained in 10-K filings submitted to the Commission between June 27, 2019, and December 31, 2020.  The Commission found "…heterogeneity, both within the quantity and content of climate-related disclosures across industries…"[11]  For example, the oil and gas industry had a much

---

[10] See, William Hinman, Director, Division of Corporation Finance, "Applying a Principles-Based Approach to Disclosing Complex, Uncertain and Evolving Risks," Remarks at the 18th Annual Institute on Securities Regulation in Europe (Mar. 15, 2019), available at https://www.sec.gov/news/speech/hinman-applying-principles-based-approach-disclosure-031519.
[11] Proposing Release, page 21419; figures 4 and 5 on pages 21420 and 21421.

higher intensity score for ESG disclosure than did the interactive media and services industry or consumer retailing. The Commission's analysis is consistent with other studies showing that there is significant variation in disclosure practices for GHG emissions across various industries and that the intensity of disclosures will depend on the carbon footprint of the industries.[12]

16. The Commission also finds that a number of firms report ESG factors using third party reporting frameworks. The Commission cites the survey conducted by the U.S. Chamber of Commerce's Center for Capital Markets Competitiveness ("CCMC") in collaboration with several other organizations ("CCMC Survey") on a sample of U.S. public companies – 436 companies across 17 industries that range from small to large in terms of market capitalization.[13] According to the survey, over half of the companies (52%) are currently publishing a corporate social responsibility ("CSR"), sustainability, ESG or similar report whose content commonly includes information regarding climate-related risks. The most frequently discussed topics in these reports are energy (74%), emissions (70%), environmental policy (69%), water (59%), climate mitigation strategy (57%), and supplier environmental policies (35%). Among the registrants that report climate-related information to the public, the majority disclose such information via external reports or company websites rather than regulatory filings. The CCMC Survey finds that about a third (34%) of the respondents disclose climate change, greenhouse gas emissions, or energy sourcing in their SEC filings information on risks. Among these firms, 82% disclose such information in the Risk Factors section, 26% in the Management Discussion and Analysis ("MD&A") section, 19% in the Description of Business section, and 4% in the Legal Proceedings section. The Commission also found that among the companies that provide climate-related disclosures, a considerable portion include some form of third-party assurance for these disclosures.[14]

17. The Commission concludes from its analysis of baseline climate-related disclosures that: "To the extent that registrants' current climate-related disclosures overlap with the proposed rules, registrants may face lower incremental compliance

---

[12] Proposing Release, page 21422, footnote 764, citing research conducted by Morningstar.
[13] See "Climate Change & ESG Reporting from the Public Company Perspective (2021)," available at https://www.centerforcapitalmarkets.com/wp-content/uploads/2021/08/CCMC_ESG_Report_v4.pdf.
[14] Proposing Release, pages 21422 and 21424.

costs."[15]  However, to properly measure the incremental compliance costs, the Commission would need to compare differences in the approach to disclosure between an appropriate baseline and the proposed rule.  In other words, a proper assessment of the economic consequences of the proposed rule requires an analysis of the difference between an appropriate baseline case using a principles-based disclosure regime relying on the concept of materiality versus the rules-based prescriptive disclosure requirements contained in the proposed rule.

18.     A stated objective of the proposed rule is to provide investors with more consistent climate-related disclosures.  The rules-based prescriptive disclosure approach described in the proposed rule is aimed at providing consistent climate-related disclosures across all registrants.[16]  The Commission offers no support for the view that a rule aimed at consistency should be a stand-alone goal that will promote competition, efficiency, and capital formation.  Instead, the Commission argues that "investors' demand for climate-related information is often met by inconsistent and incomplete disclosures due to the considerable variation in the coverage, specificity, location, and reliability of information related to climate risk."[17]

19.     This stand-alone goal of consistency is also unsupported in the academic literature.  By way of example, the academic literature in accounting favors a principles-based approach over a rules-based approach aimed at enforcing consistency.  Kothari et al. (2010) supports the notion that a principles-based approach can lead to greater innovation than a rules-based approach and that this innovation is consistent with promoting efficiency.[18]  Principles-based regulation also has the advantage of preserving flexibility and allowing standards to evolve in response to market forces.  In addition, the academic literature on financial disclosures suggests, for example, that the enforcement of uniform disclosure standards on diverse firms could have a "constraining impact" because "in practice, firms differ and change over time."[19]

---

[15] Proposing Release, page 21422.
[16] Proposing Release, page 21335 ("The disclosure of this information would provide consistent, comparable, and reliable—and therefore decision-useful—information to investors to enable them to make informed judgments about the impact of climate-related risks on current and potential investments.").
[17] Proposing Release, page 21425.
[18] S.P. Kothari et al., "Implications for GAAP from an Analysis of positive Research in Accounting," *Journal of Accounting and Economics*, Vol. 50, 2010, pages 246-286 at page 277.
[19] Anne Beyer et al., "The Financial Reporting Environment: Review of the Recent Literature," *Journal of Accounting and Economics*, Vol. 50, 2010, pages 296-343 ("Beyer et al. (2010)") at page 319.

20.     An inference from the academic literature on principles-based versus rules-based disclosure regimes is that the variation in disclosure practices observed by the Commission may simply be a reflection of a principles-based approach successfully operating in response to market forces as opposed to a market failure requiring a prescriptive, rules-based solution offered by the Commission. For example, the Commission finds that firms in the electric services and oil and gas industries "have the most ample climate-related discussion."[20] This is an indication that the principles-based approach is working successfully as these are industries where climate-related factors are more likely to have a material impact on the present value of discounted expected future cash flows. The same cannot be said for other industries, such as the interactive media industry or the consumer retailing industry.

21.     The Commission emphasizes the need for a single, unified system for tracking and disclosing climate-related information. However, such a system comes at the cost of foregoing an efficient evolutionary process for information discovery that comes from registrants having the choice of competing disclosure frameworks that they can join or leave voluntarily. If climate-related disclosure is really about creating value for investors, competition is essential to producing a high-quality outcome, just as it is in the market for any other product or service.

22.     The Commission asserts that investors have expressed a need for information on climate-related risks as they relate to companies' operations and financial condition.[21] The Commission cites the results of recent surveys showing that climate risks are among the most important priorities for a broad set of large asset managers. The Commission also cites the efforts of some large institutional investors to improve corporate disclosures on climate-related risks. The Commission argues that these surveys and efforts by asset managers show that there is an underproduction of climate-related disclosure under the current principles-based disclosure regime that can be remedied only by the rules-based prescriptive disclosure regime contained in the proposed rule.

23.     However, not all investor surveys support the Commission's view. For example, as discussed below, a March 2022 survey from the Boston Consulting Group shows

---

[20] Proposing Release, page 21419.
[21] Proposing Release, pages 21424-21425.

institutional investors are not viewing climate-related risks as not one of the most pressing issues.

24.     In any case, the demand for more disclosure by some investors needs to be evaluated carefully by the Commission.  As former SEC commissioner Roberta Karmel observed in 1978:

> I believe we should exercise caution in applying a non-economic standard of materiality to disclosure requirements… Because some investors may want certain information in order to make an investment or voting  decision does not mean that mandatory disclosure of such information would be necessary or appropriate in the public interest or for the protection of investors.[22]

25.     If investors demand climate-related disclosures for non-economic reasons, then mandating such disclosures is outside the scope of the economic standard of materiality.  In addition, the demand for non-economic climate-related disclosures by some asset managers may be a reflection on principal-agent issues between asset managers and underlying investors.  The possibility of some asset managers having self-interested incentives that are not consistent with the interests of underlying investors is not addressed in the Proposing Release.

### B.     The Commission has Failed to Demonstrate a Market Failure

#### 1.     The Commission does not adequately explain why the current principles-based disclosure regime has failed

26.     The Commission's guidelines for conducting economic analysis in rulemaking require that the Commission clearly identify the justification for the proposed rule.  This means identifying any market failure that may be reasonably addressed by the exercise of the Commission's rulemaking authority.   With respect to the proposed rule, the Commission has failed to demonstrate a market failure with respect to the current principles-based disclosure regime and has failed to clearly explain why the proposed rule is required to meet its statutory objectives.  The proposed rule departs from the principles-

---

[22] Former SEC Commissioner Roberta Karmel, speech to the National Investor Relations Institute, New York Chapter, April 12, 1978, page 12.  Available at: https://www.sec.gov/news/speech/1978/041278karmel.pdf.

based approach for the disclosure of material information without convincing evidence of any market failure that would warrant such a departure.

27.     Frequently, a proposed rule will be a response to a market failure that market participants cannot solve because of collective action problems. Traditional market failures include market power, externalities, principal-agent problems (such as economic conflicts of interest), and asymmetric information. In addition to alleging certain market failures (discussed below), the Commission states its basis for the proposed rule is "to provide more consistent, comparable, and reliable information for investors…."[23]

28.     The Proposing Release mentions "market failures" in two instances. In the first instance the Commission describes what it calls "key market failures with regard to disclosure," which include "(1) disclosures are not costless; (2), there are agency problems; (3) managers may inaccurately present information; and (4) investor responses may be unpredictable and non-unfirm (*sic*)."[24] In the second instance, the Commission states that the purpose of the proposed rule is to address the alleged market failures described above by providing investors "with climate-related information that is more comparable, consistent, and reliable and presented in a centralized location."[25]

29.     The Proposing Release addresses the first identified alleged market failure (i.e., disclosures are not costless) by describing how, in theory, information externalities could cause an underproduction of disclosure. The Commission states: "…theoretically, in the absence of mandated disclosure requirements, registrants fully internalize the costs of disclosure but not the benefits, which may lead them to rationally under-disclose relative to what is optimal from the investors' perspective."[26] In addition, the Commission observes that: "Some studies point to the potential for substantial underreporting of material climate-related information within the current voluntary reporting regime."[27] However, the Commission stops short of affirmatively concluding that a market failure

---

[23] Proposing Release, page 21338.

[24] Proposing Release, page 21426.

[25] Proposing Release, page 21428: "The proposed rules aim to address these market failures by requiring more specificity around the way registrants disclose climate-related risks and their impacts on business activities and operations in the short, medium, and long-term. By requiring comprehensive and standardized climate-related disclosures along several dimensions, including disclosure on governance, business strategy, risk management, financial statement metrics, GHG emissions, and targets and goals, the proposed rules would provide investors with climate-related information that is more comparable, consistent, and reliable and presented in a centralized location."

[26] Proposing Release, page 21426 (footnote omitted).

[27] Proposing Release, page 21428 (footnote omitted).

Appellate Case: 24-1628     Page: 1093     Date Filed: 03/26/2024 Entry ID: 5377362

exists in the existing disclosure regime that would prevent material climate-related information from being disclosed. The Commission cites academic literature to suggest that the mandated disclosure contained in the proposed rule may provide the benefit of a positive externality "as more firms disclose how measures of climate risk affect their business operations, investors would gain a better understanding of how those same climate risks may affect other similar firms."[28] However, the Commission supports this claim only with vigorous assertion as opposed to rigorous analysis. Moreover, using externalities as justification for the mandate expands the definition of materiality to beyond what is relevant for investors in the particular security, as discussed further below. In addition, given that firms are already disclosing material information (as required), it is not clear from the Proposing Release what additional positive externalities the proposed rules would create.

30.     The Proposing Release addresses the second identified alleged market failure (i.e., agency problems) by describing how if agency problems exist "… investors can no longer be sure if the absence of disclosure under a voluntary regime reflects good or bad news for the firm, given that some managers may have self-serving incentives."[29] The Commission asserts that agency problems are particularly pronounced with respect to climate-related disclosures due to potential conflicts between short-term profitability and long-term climate risk horizons.[30] However, the Commission offers no evidence to support this claim. The Commission concludes that "… the benefits of a mandatory reporting regime may be more pronounced in settings in which disclosure-related conflicts of interests exist between managers and shareholders."[31] However, the Commission again supports this conclusion only with vigorous assertion as opposed to rigorous analysis. In addition, the Commission has failed to provide evidence as to how extensive the claimed agency problems are with respect to climate-related disclosures.

31.     The Proposing Release addresses the third identified alleged market failure (i.e., misrepresentation by managers) by describing how, under certain circumstances, managers would have an "incentive to misreport by providing disclosures with a

---

[28] Proposing release, page 21429 (footnote omitted).
[29] Proposing Release, page 21426.
[30] Proposing Release, page 21427 ("Impediments to climate-related disclosures may be exacerbated due to agency problems related to potential conflicts between short-term profitability and long-term climate risk horizons.").
[31] Proposing Release, page 21426.

favorable bias, the extent of which depends on the cost of misreporting."[32] Such misreporting is often described as "cheap talk" or "greenwashing" – the set of activities conducted by firms to falsely convey to investors that their practices are aligned with environmental or other ESG principles.[33] To support this conclusion of an alleged market failure, the Commission relies on suggestions found in general theoretical research as opposed to actual practice.[34] In addition, the Commission has failed to provide any factual evidence as to how extensive a problem the intentional misrepresentation of information is with respect to climate disclosure or why the Commission's current regulations or enforcement powers are not sufficient to address the alleged issue.

32.      The Proposing Release addresses the fourth identified alleged market failure (i.e., uncertain investor response) by describing how "if there are varying levels of sophistication among investors in their ability to understand disclosures, then again, some managers may be uncertain about how reports may be interpreted, leading them to abstain from some disclosures."[35] Although the Commission provides a citation to a published academic paper to support this possibility, no evidence is offered to support the conclusion that this type of market failure has actually occurred with respect to disclosure or how extensive this alleged market failure might be in practice. In addition, it is unclear how additional mandated climate-related disclosure will provide a useful remedy to the alleged market failure of investors having differing levels of sophistication and differing levels of ability to understand disclosures.

33.      In addition to the alleged market failures explicitly mentioned by the Commission, the Proposing Release also addresses other climate-specific factors that exacerbate impediments to voluntary disclosure. In particular, the Commission observes that the complexity and uncertainty of climate-related factors and the multidimensional nature of the information can inhibit voluntary disclosure of climate-related risks. The Commission notes that physical and transition risks can materialize over highly uncertain time horizons that can range from the immediate future to several decades. However, such risks may not be judged by investors to be decision-useful when assessed using the present value of discounted expected future cash flows. The Commission argues that

---

[32] Proposing Release, page 21426.
[33] Proposing Release, pages 21426 and 21429.
[34] Proposing Release, page 21426.
[35] Proposing Release, page 21427 (footnote omitted).

these factors give managers more discretion to communicating economic impacts and risks.[36]  The Commission asserts that agency problems are particularly pronounced under such circumstances due to potential conflicts between short-term profitability and long-term climate risk horizons.[37]  The Commission also argues that the uncertainty and complexity of climate-related risks "are likely to cause substantial heterogeneity with respect to investors' interpretation of related disclosures and their understanding of firms' exposures to such risks, resulting in heterogeneous and unpredictable investor responses. In this circumstance, managers may prefer to withhold applicable disclosures."[38]  Although the Commission provides citations to published academic papers to support these possibilities, no evidence is offered to support the conclusion that these possible impediments to voluntary disclosure have actually occurred or how extensive these impediments might be in practice.  As researchers have pointed out, the "net effects of a mandate are largely an empirical matter on which we currently do not have much research:"[39]

> Much of the prior evidence in the CSR literature focuses on the valuation and performance effects of CSR activities, not on CSR reporting.  The key challenge therefore is to disentangle the reporting effects from the effects of the underlying CSR activities, especially when both are largely voluntary.  In light of this dual selection problem, it is not surprising that studies on voluntary CSR reporting find more favorable results than studies on mandatory CSR reporting. Research on the latter is still relatively scarce and, if anything, focuses on traditional capital-market outcomes (and investors).  Thus, aside from better identification that lets researchers separate the effects of CSR disclosures from CSR activities, <u>we need more research on whether *mandated* CSR reporting mitigates information asymmetries, forces out unfavorable CSR information, generates positive spillovers, provides market-wide cost savings, or generates comparability benefits (all of which would be central to justifying a mandate)</u>.[40]

---

[36] Proposing Release, page 21427.

[37] Proposing Release, page 21427 ("Impediments to climate-related disclosures may be exacerbated due to agency problems related to potential conflicts between short-term profitability and long-term climate risk horizons.").

[38] Proposing Release, pages 21427-21428.

[39] Hans B. Christensen, Luzi Hail, and Christian Leuz, "Mandatory CSR and sustainability reporting: economic analysis and literature review" *Review of Accounting Studies*, Vol. 26, 2021, pages 1176-1248 ("Christensen, Hail, and Leuz (2021)"), page 1231.

[40] Christensen, Hail, and Leuz (2021), page 1231 (emphasis added, italics in original).

### 2. Topic-specific disclosure prescriptively deems ESG factors to be material when they may not be.

#### a) ESG factors are one set of factors among many factors that investors consider in their valuation assessments.

34.     The Commission fails to show that climate-related information is often material to investors.  To the extent climate-related information is relevant to an investor's decision at all, such information is just one piece of information among many other factors that inform an investment decision, such as cash flows, profitability, industry segment, company size, and the like.  The Commission does not consider the incremental (marginal) value of climate-related information as compared to other available information; nor does the Commission explain why climate-related information would often be material to investors when other information, such as cash flows, profitability and industry, are likely to be much more relevant to an investment decision.

35.     Objective evidence undercuts the notion that climate-related information is often material.  For example, in a recently completed survey by the Boston Consulting Group of leading investment industry executives and institutions, just one in 20 (or 5%) investors polled by the consulting firm said that climate and ESG-related issues were among their three top concerns.  The survey also noted "most of the investors BCG recently surveyed indicated that ESG is not currently a primary consideration in day-to-day investment decisions and recommendations."[41]  This survey was concluded after the proposed rule was acted upon by the Commission and is not included as part of the Proposing Release.

36.     Moreover, evidence of the retail investors' reaction to climate-related and ESG disclosure is inconsistent with the Commission's view regarding the importance of such disclosures to investors.  Moss, et al. (2020) use an hourly dataset on retail investor trading positions from Robinhood Markets and find that ESG disclosures are irrelevant to retail investors' portfolio allocation decisions.  The authors' conclusions, based on evidence from observed market dynamics, is inconsistent with evidence cited by the

---

[41] See Boston Consulting Group, "BCG Investor Perspectives Series Pulse Check #19" March 18–22, 2022, footnote 1.

Appellate Case: 24-1628     Page: 1097     Date Filed: 03/26/2024 Entry ID: 5377362

Commission that retail investors respond favorably to ESG disclosures. In addition, the authors conclude that it is important to distinguish between retail and institutional investors.[42]

37. In evaluating the extent that ESG disclosures are material to investors, the Commission could have reviewed analyst reports to gauge the significance of ESG factors relative to other factors for determining the value of securities in analysts' determinations. However, the Commission failed to consider this potentially important source of evidence in its analysis of the proposed rule.[43] The proposed rule recognizes the role of analysts as intermediaries between firms and investors and regards them as "affected parties,"[44] but otherwise their role in the disclosure process is ignored. The Commission, likewise, could have employed well-known "event study" techniques to assess the price or volume responses to climate-related disclosures, but the Commission did not conduct any such analysis, even though event studies are a standard method of assessing financial materiality.

38. The Commission's failure to cite evidence showing that climate-related information is often material is unsurprising. As discussed, because climate-related information is just one factor among many other (potentially more relevant) factors, climate-related information is often not material. Moreover, to the extent climate-related information is material, such information could largely be extracted from publicly-observable information such as industry sector, company size and the like, without a need for company-specific climate reporting. In fact, in conjunction with its cost-benefit analysis and before requiring the detailed company-specific disclosure requirements of the proposal, the Commission should assess the extent to which sufficient climate-related information for investors' purposes is available from such sources. This is appropriate in

---

[42] Austin Moss, James P. Naughton, and Clare Wang, "The Irrelevance of ESG Disclosure to Retail Investors: Evidence from Robinhood," May 19, 2020. Available at SSRN: https://ssrn.com/abstract=3604847 or http://dx.doi.org/10.2139/ssrn.3604847.

[43] See, for example, Jill E. Fisch, "The Role and Regulation of the Research Analyst," Research Handbook on the Economics of Corporate Law, Edgar Elgar Publishing, 2012, pages 315, 317 ("The role of the research analyst…is to provide information to the marketplace. Analysts enhance capital market efficiency by enabling stock prices to reflect information and by reducing the need for each investor individually to gather and analyze that information. … Research analysts collect information about specific firms and the overall market. They then package that information for use by investors in trading decisions." (emphasis added)).

[44] Proposing Release, page 21413.

part because the rule as proposed is quite costly, yet climate-related impacts are at best one among a large number of factors considered in investment decision-making.

### a) The present value of ESG factors may not be material to investors if the effects of climate change are uncertain and far in the future.

39.    The stock price of a firm reflects the present value of its discounted expected future cash flows.  If the effects of climate change are far into the future, have a low probability of occurring, are associated with an uncertain discount rate, or if the economic effects are uncertain, the present value of such effects may not be large enough to be economically material to investors, especially when one considers that climate-related information is, if relevant, just one factor among many others in an investment decision. The Commission recognizes that "as the Supreme Court has articulated, the materiality determination with regard to potential future events requires an assessment of both the probability of the event occurring and its potential magnitude, or significance to the registrant."[45]  Yet, the Proposing Release appears to bypass the requirement of materiality to the registrant by imposing a one-size-fits-all reporting mandate.

40.    The Proposing Release notes, "[a]s defined by the Commission and consistent with Supreme Court precedent, a matter is material if there is a substantial likelihood that a reasonable <u>investor</u> would consider it important when determining whether to buy or sell securities or how to vote."[46]  If materiality is solely focused on the information content relevant for investors, then because the current laws already require companies to disclose material information, arguably no further mandates should be required to satisfy this definition of materiality *per se*.  This basic premise is recognized by researchers:

> In response to this challenge, one could consider reducing  the scope of the CSR standards and focus exclusively on the information needs of investors.  Under such an approach (sometimes referred to as single materiality), the standards would prescribe reporting only on CSR topics that are financially material to investors.  This narrow materiality concept is consistent with the goal of giving investors the information they demand or need for decision making, assuming that they care only about the financial

---

[45] Proposing Release, page 21351 (footnote omitted).
[46] Proposing Release, page 21351 (emphasis added, footnote omitted).

Appellate Case: 24-1628     Page: 1099     Date Filed: 03/26/2024  Entry ID: 5377362

consequences (or NPV) of firm activities. With this assumption and goal in mind, it conceptually makes sense to narrow the scope of CSR disclosures to issues that are relevant to investors' decision making and potentially affect firms' long-term value creation. Notably, this narrow approach excludes CSR disclosures on externalities that firms impose on society. One could make an argument that this narrow approach is essentially already prescribed by the financial materiality definition of the SEC (and the FASB).[47]

41.     On the other hand, if a reporting mandate goes beyond the information desired by investors that is specific to a company and instead covers a broader group of stakeholders and focuses not only on the financial consequences for investors but has a broader social goal unmoored from information relevant for investors, then such a mandate would be inconsistent with the definition of materiality put forth by the Supreme Court and apparently adopted by the SEC.

42.     A key factor in determining materiality of information about future events is the discount rate applied to the present value calculation. From an individual's subjective political or moral perspective, the discount rate for future climate-related events may be low, meaning that this information would be given greater weight today. However, for investment purposes, the market-determined discount rate is appropriate in determining materiality for investors who are allocating capital today.

43.     As researchers have noted, a deviation from the standard definition of materiality to a broader definition can have nontrivial tradeoffs in terms of increased compliance costs and pressures from various parties:

> The tradeoffs are nontrivial. … A broad approach with double materiality is likely to attract external pressures from various (and potentially unforeseen) parties and also requires that standard setters apply political and moral judgments about the underlying CSR activities. For these reasons, a narrow, single materiality approach could have a certain appeal for accounting standard setters and securities regulators as it is closer to their expertise. One could also argue that a narrow approach should make it easier for reporting entities to determine what type of CSR information has to be reported and, hence, has lower compliance costs.[48]

---

[47] Christensen, Hail, and Leuz (2021), page 1221.

[48] Christensen, Hail, and Leuz (2021), page 1222. The authors define financial materiality as single materiality and a "broader approach of informing stakeholders about corporate impacts" as double materiality. Christensen, Hail, and Leuz (2021), page 1179.

### 3. The Commission does not adequately address voluntary disclosure.

#### a) Voluntary disclosure of ESG factors has been working

44.     The Commission has failed to demonstrate a market failure with respect to the current voluntary disclosure regime for ESG factors. As the Commission notes, voluntary disclosure of ESG factors has been widely practiced and has been increasing with respect to the types of disclosures. These voluntary disclosures are consistent with the types of disclosures to which the SEC has shown favor.

45.     The Commission's staff reviewed 6,644 recent annual reports (Forms 10-K, 40-F, and 20-F) and found that 33% of them contained disclosures related to climate change, the majority of which discussed information related to business impact, emissions, international climate accords, and physical risks.[49]  The Commission's review found that firms with "most ample climate-related discussion, on average: Electric services, oil and gas, steel manufacturing, passenger air and airfreight, and maritime transportation. The majority of the discussion is on business impact, followed by emissions, international climate accords, and physical risks."[50]

46.     The Commission observed that many companies voluntarily chose to follow existing third-party reporting frameworks when developing climate-related disclosures for SEC filings or to be included in CSR, sustainability, ESG, or similar reports. For instance, the CCMC Survey finds that 59% of the respondents follow one or more such frameworks like the one developed by the Task Force on Climate-related Financial Disclosures ("TCFD").[51]  The Commission notes that: "Several industry reports also document how a sizeable portion of U.S. companies report climate-related information under one or more third-party frameworks that are either fully or partially aligned with the TCFD disclosure elements."[52]

47.     The Commission also cites relevant academic research showing that voluntary ESG disclosures have been increasing. For example, the Commission cited the work of Bolstad et al. (2020) who systematically reviewed Form 10-K filings from Russell 3000

---

[49] Proposing Release, page 21415.
[50] Proposing Release, page 21419.
[51] Proposing Release, page 21422.
[52] Proposing Release, pages 21422-21443.

firms over the last 12 years and found that while 35% of Russell 3000 firms provided climate-related information in 2009, this figure grew to 60% in 2020, representing a significant increase. They also found that the extent of disclosure for a given report has increased. In 2009, firms mentioned climate risks 8.4 times on average in their Form 10-K. This figure grew to 19.1 times in 2020.[53]

48.     The Commission also cites a number of industry and advocacy groups that show a growing trend for voluntary ESG disclosure though not necessarily through their regulatory filings. As the Commission notes, the Governance & Accountability Institute ("G&A") analyzed sustainability reports by the companies belonging to the Russell 1000 Index and found that, in 2020, 70% published sustainability reports − up from 65% in 2019 and 60% in 2018.[54] The Commission also cites a report from the CDP (formerly the Carbon Disclosure Project) finding that out of the 524 U.S. companies in their Climate High Impact Sample, 402 disclosed through the CDP system in 2021, up from 379 in 2020, and 364 in 2019. Out of the sample of reviewed companies, 22.1% (89 out of 402 companies) reported Scope 3 emissions in 2021. This reflects an increase from the previous two years, during which 18% (67 out of 379 companies) reported such information in 2020, and 17% (62 out of 364 companies) in 2019.[55]

49.     The Commission concludes from its review that they "expect that the number of registrants committed to preparing climate-related disclosures will increase in the future, independently from our proposed rules."[56]

50.     The significant increase in voluntary climate-related disclosures notwithstanding, the Commission appears to be conflicted about the role of voluntary disclosure. On the one hand, they allege a market failure requiring government intervention to correct. On the other hand, they argue that because of the recent trends showing steady growth in voluntary ESG disclosure − trends that the SEC concludes will continue to increase into

---

[53] Proposing Release, page 21421; see also Parker Bolstad, Sadie Frank, Eric Gesick, and David Victor, "Flying Blind: What Do Investors Really Know About Climate Change Risks in the U.S. Equity and Municipal Debt Markets," Hutchins Center Working Paper 67, 2020, pages 1-49.
[54] Proposing Release, page 21422, citing to "G & A Inc., Sustainability Reporting in Focus (2021)," available at https://www.gainstitute.com/research/ga-research-collection/sustainability-reporting-trends/2021-sustainability-reporting-infocus.html.
[55] Proposing Release, page 21422, citing to Letter from CDP North America (Dec. 13, 2021).
[56] Proposing Release, page 21443.

Appellate Case: 24-1628     Page: 1102     Date Filed: 03/26/2024 Entry ID: 5377362

the future independently from the proposed rule – that the expected incremental costs for complying with the proposed rules will be lower for an increasing number of firms.[57]

51.     By mandating climate-related disclosure and codifying its form, the SEC is short circuiting the natural evolution of disclosure standards in the private market, which will ossify developments and likely result in an inflexible and suboptimal standard. The Commission argues that "theoretically, in the absence of mandated disclosure requirements, registrants fully internalize the costs of disclosure but not the benefits, which may lead them to rationally under-disclose relative to what is optimal from the investors' perspective."[58] However, the evidence cited by the Commission with respect to trends in voluntary ESG reporting seems to contradict this view. Moreover, "what is optimal from the investors' perspective"[59] is best left for market forces to sort out and should not be subject to a reporting mandate that is driven not necessarily with the investor in mind but with a larger social goal in mind.

52.     Voluntary disclosure is likely to be more helpful than mandatory disclosure when there is variation in demand across industries. The Commission's review of filings "finds significant heterogeneity, both within the quantity and content of climate-related disclosures across industries…"[60] The variation in disclosure practices observed by the Commission may simply be a reflection of a principles-based approach successfully operating in response to market forces as opposed to a market failure requiring a prescriptive, rules-based solution offered by the Commission given that it is likely that voluntary disclosures are driven by the carbon footprint of particular industries.

53.     Voluntary disclosure takes several forms. Some firms may choose to disclose climate-related information in their filings with the SEC. Indeed, to the extent this information is material, there is already a requirement to supply this information in regulatory filings. As the Commission has noted, an increasing number of firms use third party reporting formats to report climate-related risks. Firms can also choose the level of disclosure to provide by choosing from among the various state disclosure requirements when making their incorporation decisions. Firms can also choose from among the

---

[57] Proposing Release, page 21443.
[58] Proposing Release, page 21426.
[59] Proposing Release, page 21426.
[60] Proposing Release, page 21419.

various initial and continuous listing requirements when choosing where to list their stock − both domestically and internationally.

### b) The Commission fails to address academic literature on voluntary disclosures.

54.　　*A priori*, it is not obvious that a mandatory disclosure regime can achieve a more effective and efficient outcome than a voluntary disclosure regime.  A justification offered by the Commission for the proposed rule is that "disclosure of this information would provide consistent, comparable, and reliable—and therefore decision-useful—information to investors."[61]  However, these benefits should not be enough to justify a disclosure mandate that: (1) is costly to implement with no evidence that the marginal reporting benefits exceed marginal costs; (2) can have unintended consequences for the entry and exit decision of firms; and (3) involves concerns about the revelation of proprietary information that can harm competition.  The Commission has failed to address the relevant academic literature in this regard.  For example, the Financial Economist Roundtable ("FER")[62] released a statement on "SEC Regulation of ESG Issues" in October 2021 which has been subsequently published in the *Financial Analysts Journal* ("FER Statement").[63]  In its statement, the FER recommends "that the SEC should <u>not</u> mandate disclosure of the firm's impacts on environmental and social (E&S) outcomes."[64]  In addition, the FER Statement suggests quantitative disclosures, but that these should be based on "principles-based guidance."[65]  The FER Statement says: "We

---

[61] Proposing Release, page 21335.

[62] "The Financial Economists Roundtable (FER) is a group of senior financial economists who have made significant contributions to the finance literature and seek to apply their knowledge and experience to current policy debates.  FER encourages spirited interaction and intellectual discussion around a broad range of scholarly and policy topics related to financial markets and institutions.  We seek to develop careful analyses that contribute to important policy debates and decisions.

FER members meet annually to discuss a current U.S. or international policy topic related to financial markets and institutions.  The FER's statements summarize the FER's consensus views of these policy issues and are intended to increase awareness and understanding of the issues among  public policy makers, the financial economics profession, and the general public."

https://www.financialeconomistsroundtable.com/about (last accessed April 27, 2022).

[63] Jonathan M. Karpoff, Robert Litan, Catherine Schrand, and Roman L. Weil, "What ESG-Related Disclosures Should the SEC Mandate?" *Financial Analysts Journal*, Vol. 78, No. 2, 2022, pages 8-18 ("FER Statement"); Financial Economists Roundtable, *Statement on SEC Regulation of SEC Issues: "SEC Should Mandate ESG Disclosure Limited to Matters that Directly Affect the Firm's Cash Flow*," October 2021 (link available at https://www.financialeconomistsroundtable.com/statements/sec-should-mandate-esg-disclosure-limited-to-matters-that-directly-affect-the-firms-cash-flows; last accessed April 27, 2022).

[64] FER Statement, page 9 (emphasis added).

[65] FER Statement, page 14.

recommend that the SEC do not require firms to produce any particular E&S metrics. Disclosure costs increase with each additional required metric, but selecting metrics leads to the what-gets-measured-gets-managed problem, and the SEC would end up prioritizing the E&S agenda."[66]

55.     The FER Statement notes that a principles-based approach could be exploited by some firms, but that investors would review the disclosures, stating: "The power of capital-market pressure to disclosure information should not be underestimated."[67]

56.     The FER Statement makes the economic case that the SEC should not mandate ESG disclosure as a tool to achieve broader policy outcomes.[68]  The FER Statement clarifies:

> To be clear, we do not propose that the SEC forbid disclosures of societal impacts or even discourage them.  But it should not *require* such disclosures.  In contrast, the SEC should require that any disclosures that firms voluntarily make about their impact on E&S matters use clearly defined E- and S-related terms.  The SEC should focus on disclosures that reflect firms' cash-flow related E&S activities and risks, and put faith in the capital markets to regulate voluntary disclosure of firm's impacts on E&S outcomes.  To the extent that investors need information on E&S outcomes to facilitate raising and allocating funds between competing demands, investors will punish firms that do not provide it.[69]

## V.     The SEC Fails to Adequately Consider the Costs Associated with the Proposed Rule

57.     The Commission discusses anticipated costs from the proposed rule in the Economic Analysis section of the Proposing Release.  The Commission's analysis of costs includes estimates of some direct costs contained in the section of the Proposing Release devoted to the Paperwork Reduction Act ("PRA").  Much of the analysis of costs is preliminary, as the Commission acknowledges, with several questions about costs posed for input from public commenters.

---

[66] FER Statement, page 14.
[67] FER Statement, p. 14, citing for a discussion of capital market pressure and disclosure to Frank H. Easterbrook and Daniel R. Fischel, "Mandatory Disclosure and the Protection of Investors." *Virginia Law Review*, Vol. 70 No. 4, 1984, pages 669–715.
[68] FER Statement, page 16.
[69] FER Statement, pages 16-17 (emphasis in original).

58.    The Commission's analysis considers both direct costs (such as compliance costs), and indirect costs (such as litigation risk and disclosure of proprietary information) associated with the proposed rule.   The Commission's analysis offers a starting point for estimating costs associated with the proposed rule.   However, the analysis is incomplete and excludes several potentially significant drivers of cost related to the proposed rule.

## A.    Direct Costs

59.    With respect to direct costs, the Commission acknowledges that the proposed rules impose compliance costs of varying magnitude on registrants due to the "need to re-allocate in-house personnel, hire additional staff, and/or secure third-party consultancy services.  Registrants may also need to conduct climate-related risk assessments, collect information or data, measure emissions (or, with respect to Scope 3 emissions, gather data from relevant upstream and downstream entities), integrate new software or reporting systems, seek legal counsel, and obtain assurance on applicable disclosures (i.e., Scopes 1 and 2 emissions)."[70]

60.    To estimate these direct costs, the Commission reviews several sources, including industry surveys and information contained in selected comment letters received by the Commission.  The Commission acknowledges that the scope of costs included in various surveys are limited and may not reflect the compliance costs likely to be faced by registrants under the proposed rule.[71]  The anecdotal cost estimates estimated by selected commenters are also incomplete because they mostly pertain to costs associated with preparing voluntary disclosures under various voluntarily-selected reporting formats. However, the Commission includes these anecdotal cost estimates for reference purposes. The main inference the Commission takes from the surveys and public comments with respect to direct costs is that initial costs of preparing disclosures are likely to be higher than for ongoing costs, that incremental costs may be higher for smaller firms than for larger firms due to the fixed cost components of compliance, and that compliance costs are likely to be lower for firms that already disclose significant amounts of information on climate-related risks and use third party attestation to their disclosures.   The Commission

---

[70] Proposing Release, page 21439.
[71] Proposing Release, page 21439.

concludes its analysis of direct costs by acknowledging that the likely magnitude of these costs is unknown and that additional information needs to be provided to the Commission through the public comment process.

61.     The Commission's inference that incremental costs may be higher for smaller firms is consistent with what the Commission staff found with respect to another Commission disclosure rule that required auditor attestation: the Sarbanes Oxley 404 Internal Control and Financial Control Requirements.  In the Commission's study of that rule, staff found that compliance costs vary with company size (increasing with size), compliance history, and compliance regime.  Larger companies tended to incur higher compliance costs in dollar terms ("absolute cost"), while smaller companies incurred a higher cost as a fraction of asset value ("scaled cost").  The study found that some start-up costs were not scalable.  Some costs are recurring fixed costs, while others were one-time start-up costs borne in the first years of compliance that tended to dissipate over time.[72]  The Commission's staff study is relevant to evaluating the proposed rule because of the similar features contained in each rule.

62.     The Commission's PRA estimates costs to registrants over the first six years of compliance with the proposed rule.  For non-SRC registrants, the costs in the first year of compliance are estimated to be $640,000 ($180,000 for internal costs and $460,000 for outside professional costs), while annual costs in subsequent years are estimated to be $530,000 ($150,000 for internal costs and $380,000 for outside professional costs).[73]

63.      For SRC registrants, the costs in the first year of compliance are estimated to be $490,000 ($140,000 for internal costs and $350,000 for outside professional costs), while annual costs in subsequent years are estimated to be $420,000 ($120,000 for internal costs and $300,000 for outside professional costs).[74]

64.     The Commission acknowledges that registrants that are accelerated filers and large accelerated filers will incur additional costs in obtaining assurance of Scopes 1 and 2 emissions disclosures.  The Commission estimates these costs starting with data on

---

[72] "Study of the Sarbanes-Oxley Act of 2002: Section 404 Internal Control over Financial Reporting Requirements," Office of Economic Analysis, U. S. Securities and Exchange Commission, September, 2009, page 2.  Available online at: https://www.sec.gov/news/studies/2009/sox-404_study.pdf.
[73] Proposing Release, page 21439.
[74] Proposing Release, page 21439.

these filers' median audit fees in fiscal year 2020, which is $989,566 and $2,781,962 for accelerated filers and large accelerated filers, respectively.[75]

65. The Commission then asserts that "[t]hese costs are expected to decrease over time for various reasons, including increased institutional knowledge, operational efficiency, and competition within the market for relevant services." This assertion is offered without any analytical or empirical support.[76] In addition, this assertion ignores anecdotal evidence that market demand for ESG specialists in the fields of compliance, auditing, and legal services is likely to increase as a result of the proposed rule and other climate-related initiatives, thus likely raising the costs to firms when contracting for these services.[77]

66. The Commission also includes estimates of the incremental change in the paperwork burden of complying with various SEC disclosure requirements if the proposed rule is adopted. For example, the Commission estimates that with respect to 10-K disclosures, 8,292 firms would be affected by the proposed rules and that the "Change in Internal Burden Hours" for these firms would increase by nearly 150 percent.[78] The "External Cost Burden" for these firms is projected to rise by nearly 173 percent.[79]

67. The table below summarizes the percentage increase in the estimated internal and external burden of preparing various SEC disclosures if the proposed rule is adopted. These figures are calculated based on the numbers in PRA Table 4.[80]

---

[75] Proposing Release, page 21442.
[76] Proposing Release, pages 21439-21440.
[77] See, for example, "PwC planning to hire 100,000 over five years in major ESG push," available at: https://www.reuters.com/business/sustainable-business/pwc-planning-hire-100000-over-five-years-major-esg-push-2021-06-15/.
[78] Proposing Release, PRA Table 4, page 21461. The Commission estimates that the internal burden hours for preparing 10-K reports would increase from 14,188,040 hours to 35,167,837 hours. This represents a 147.87 percent increase in the internal cost burden over the current baseline.
[79] Proposing Release, PRA Table 4, page 21461. The Commission estimates that the external cost burden for preparing 10-K reports would increase from $1,893,793,119 to $5,166,632,876. This represents a 172.82 percent increase in the external cost burden over the current baseline.
[80] Proposing Release, page 21461.

| Form | Percentage Increase in Aggregate Internal Burden (Hours) Over Current Burden | Percentage Increase in Aggregate External Burden ($) Over Current Burden |
|---|---|---|
| S-1 | 516.19 | 534.31 |
| S-4 | 88.18 | 92.84 |
| S-11 | 462.94 | 480.42 |
| 10 | 1,536.64 | 1,639.30 |
| 10-K | 147.87 | 172.82 |
| 10-Q | 17.83 | 17.95 |

68.     The Commission's analysis of another rule, the Conflict Mineral Rule, may shed light on the Commission's current proposal. The Conflict Minerals Rule is similar to the current proposal in that it includes disclosure related to suppliers. In the Conflicts Mineral Rule, the Commission estimated startup costs in the aggregate to be between $3 billion and $4 billion with annual compliance costs ranging from $207 million to $609 million.[81] To calibrate the aggregate cost of the proposed rule with the Conflict Minerals Rule, one can look to the fact that the Commission's estimate of burden hours in the proposed rule for preparing a 10-K is 15 times higher than that estimated in the Conflicts Mineral rule. This would correspond with an aggregate cost for the proposed rule that is at least 15 times higher than for the Conflict Mineral Rule before accounting for inflation (that is, between $45 and $60 billion), although this proposal will likely be even more costly than that.

69.     The large percentage increases projected for preparing Commission-mandated disclosures under the proposed rule beg the question of whether the rule will provide commensurate benefits. Current Form 10-K disclosures include the cumulative disclosure requirements of the SEC since 1934 and contain a "wealth of information" and "offer a detailed picture of a company's business, the risks it faces, and the operating and financial results for the fiscal year."[82] The disclosures include: a description of the company's business; risk factors facing the company; audited financial statements including the company's income statement, balance sheet, statement of cash flows and statement of stockholders' equity, accompanied by notes that explain the information

---

[81] Conflict Mineral Rule, page 240. https://www.sec.gov/rules/final/2012/34-67716.pdf.
[82] "How to Read a 10-K/10-Q," The U.S. Securities and Exchange Commission, https://www.investor.gov/introduction-investing/general-resources/news-alerts/alerts-bulletins/investor-bulletins/how-read.

presented in the financial statements; and management's discussion and analysis of financial condition and results of operations. The disclosures also include information about: the company's significant physical properties; significant pending lawsuits or other legal proceedings; the company's exposure to market risk, such as interest rate risk, foreign currency exchange risk, commodity price risk or equity price risk; the company's disclosure controls and procedures and its internal control over financial reporting; background and experience of the company's directors and executive officers, the company's code of ethics, and certain qualifications for directors and committees of the board of directors; the company's compensation policies and programs and how much compensation was paid to the top executive officers of the company in the past year; shares owned by the company's directors, officers and certain large shareholders, and about shares covered by equity compensation plans; and relationships and transactions between the company and its directors, officers and their family members.[83] If the internal and external burden for preparing 10-K reports is expected to more than double under the proposed rule (147.87 percent increase in internal burden and 172.82 percent increase in external burden), what is the likelihood that the magnitude of the incremental benefits resulting from the proposed rule will exceed the increase in costs that the Commission estimates? The Commission has failed to support its view that the expected marginal benefits under the proposed rule will be greater than or equal to the expected marginal cost.

70.     The Commission's cost analysis fails to assess, at the margin, the breakout of costs and benefits associated with each particular disclosure element that would be required under the proposed rule. Disclosures have varying costs and varying benefits, and these must be viewed in relation to one another. If one category of information is disclosed, the disclosure of a second, related category of information may not convey much incremental information. The Commission fails to assess the marginal costs and benefits of each particular disclosure requirement, much less consider the marginal costs and benefits of each requirement when the other requirements are considered.

71.     Another indicator of the economic consequences of the proposed rule can be seen by the expected hiring by firms providing attestation services. For example, as of

---

[83] *Id.*

Appellate Case: 24-1628     Page: 1110     Date Filed: 03/26/2024 Entry ID: 5377362

October 2021, the firm PwC had 55,000 U.S. employees.[84]  However, according to press reports the firm expects to hire between 25,000 and 30,000 additional U.S. staff to meet the expected demand for ESG specialists.[85]  If the firm is successful in its hiring, nearly a third of its U.S. staff would be specialists in preparing or auditing ESG disclosures.  Such a large increase in resources devoted to ESG services that extend beyond the traditional financial accounting and auditing services that PwC has long provided begs the question of whether investors will see a proportional increase in the benefits from ESG disclosures.

72.     The academic accounting literature has also found that auditing assurance for corporate social responsibility in the US has not led to positive market effects, consistent with the conclusion that the benefits of assurance do not outweigh the costs:

> Overall, therefore, our findings support the argument that, consistent with evidence for firms from other regions, those US companies purchasing assurance on their CSR [Corporate Social Responsibility] reports appear to do so to enhance the credibility of the reporting package.  However, the lack of market impacts, in conjunction with the traditional managerial focus on shareholder interests in the USA, may explain the low level of take-up on CSR report assurance, and this suggests that market perceptions regarding the link between CSR report assurance and firm value may need to be developed before the CSR report assurance market in the USA can mature.[86]

> If managers presume, as our evidence appears to suggest, that investors do not value CSR report assurance, they likely would see its cost as not being justifiable unless there is substantial need for enhancing the credibility of the disclosure for other reasons.  If this is the case, more efforts on the part of the USA professional auditing community may be needed to legitimize the CSR assurance practice in the eyes of the market.[87]

---

[84] https://www.cnbc.com/2021/10/01/pwc-says-us-employees-can-work-from-anywhere-in-the-country.html#:~:text=PwC%2C%20a%20global%20network%20of,them%20to%20work%20in%2Dperson .

[85] "PwC planning to hire 100,000 over five years in major ESG push," available at: https://www.reuters.com/business/sustainable-business/pwc-planning-hire-100000-over-five-years-major-esg-push-2021-06-15/

[86] Charles H. Cho, Giovanna Michelon, Dennis M. Patten, and Robin W. Roberts, "CSR report assurance in the USA: an empirical investigation of determinants and effects," *Sustainability Accounting, Management and Policy Journal*, Vol. 5, No. 2, 2014, pages 130-148 ("Cho et al. (2014)"), page 131.

[87] Cho et al. (2014), page 142.

###### B. Indirect Costs

73.     With respect to indirect costs, the Commission highlights two forms: costs incurred from increased litigation risks, and cost incurred from disclosure of proprietary information about firms' operations and/or production processes.

74.     With respect to litigation risk, the Commission attributes this increased risk to the fact that the proposed climate-related disclosures may be new and unfamiliar to many registrants thus creating significant uncertainty and novel compliance challenges leading to inadvertent non-compliance that may create additional exposure to litigation or enforcement action.[88]  One consequence of this increased liability and litigation risk is that insurance costs to cover the costs of potential litigation are likely to increase as a result of the requirements in the proposed rule.

75.     However, other observers have argued that an increase in litigation risk may result from more than just inadvertent non-compliance risk.  The uncertain and novel challenges raised by the proposal create more opportunities for plaintiffs' lawyers to file non-meritorious, nuisance suits to extract settlements.  A recent *Wall Street Journal* article reports on concerns from lawyers representing corporations and investors that the proposed rule could be a potent source of securities fraud litigation.  The article quotes one attorney's observation that "[t]he plaintiffs lawyers are waiting in the wings" because the complexity of the proposed rules would fuel a "dispute machine" and increase the number of avenues for aggressive plaintiffs' lawyers to file lawsuits.  As an example, the article cited hypothetically the destruction of a corporate facility in California from a wildfire where plaintiffs could claim that they were misled by the company's climate risk management.  The article called private securities litigation tied to the disclosures contained in the proposed rule a "lurking threat" that may not be evident quickly but could materialize down the road.[89]

76.     Litigation risk applies also to auditors.  The attestation requirements of the proposed rule will increase the potential for litigation aimed at auditors because of the increased scope of what auditors are being asked to do.   One consequence of this

---

[88] Proposing Release, page 21444.
[89] "SEC Climate Disclosure Proposal Looms as Litigation Risk," by Richard Vanderford, *The Wall Street Journal*, March 26, 2022.  Available online at: https://www.wsj.com/articles/sec-climate-disclosure-proposal-looms-as-litigation-risk-11648299600.

increased liability and litigation risk is that insurance costs for auditors are likely to increase.

77.     With respect to the cost resulting from disclosure of proprietary information, the Commission acknowledges that "certain provisions of the proposed rules may force registrants to disclose proprietary information."[90]   The Commission observes that under the proposed rules, "registrants would be required to disclose a wide range of climate-related information, including potential impacts on its business operations or production processes, types and locations of its operations, products or services, supply chain and/or value chain.  Registrants would be further required to disclose whether they have emissions-related targets and metrics or an internal carbon price, and if they do, what they are.  To the extent that a registrant's business model or strategy relies on the confidentiality of such information, the required disclosures may put the registrant at a competitive disadvantage."[91]

78.     The Commission notes that proprietary cost estimates are generally relevant for reporting that involves information about a firm's business operations or production processes and disclosures that are specific, detailed and process-oriented.  The Commission cites relevant academic literature supporting the view that the magnitude of costs incurred from disclosing proprietary information in mandated disclosures can be significant enough to cause firms to deregister with the SEC.[92]   However, the Commission merely acknowledges this possibility and says nothing more about it with respect to its evaluation of the economic consequences of the proposed rule.  The Commission fails to measure the potential magnitude of this cost, an analysis that is necessary for the consideration of whether there is a reasoned basis for the Commission to exercise its rulemaking authority with respect to disclosure of climate-related risks.

79.     Here, the proposed rule assumes that by requiring information producers (that is, registrants who produce valuable information as part of their operations) to publicly disclose their proprietary information to information consumers (that is, investors who

---

[90] Proposing Release, page 21444 (footnote omitted).

[91] Proposing Release, page 21444.

[92] Proposing Release, page 21444.  The Commission cites two academic papers supporting this view.  See, e.g., Christian Leuz, Alexander Triantis, and Tracey Yue Wang, "Why Do Firms Go Dark? Causes and Economic Consequences of Voluntary SEC Deregistrations," Vol. 45, No. 2, *Journal of Accounting and Economics*, 2008, pages 181-208; Daniel A. Bens, Phillip G. Berger, and Steven J. Monahan, "Discretionary Disclosure in Financial Reporting: An Examination Comparing Internal Firm Data to Externally Reported Segment Data," *The Accounting Review* Vol. 86, No. 2, 2011, pages 417-449.

rely only on public disclosures of information), the result will be more "efficient." But the effect of the rule is likely to involve a tradeoff: even if information consumers may be better off, information producers would be worse off. This tradeoff is referred to in the economics profession as a "distributional effect" or "wealth transfer," which is not by itself efficiency enhancing. All else equal, the mandated disclosure of the proposed rule, when it involves proprietary information, will leave information producers worse off, even if information consumers benefit from the public disclosure. To conclude that the proposed rule enhances efficiency by redistributing the benefits of proprietary information from one group of investors to another group of investors would require the Commission to evaluate the welfare impact of these tradeoffs – a task which the Commission has not performed.

80.     In addition to the indirect costs noted in the Proposing Release, there are other potential costs with respect to the proposed rule that are worthy of consideration by the Commission. For example, by vastly expanding the scope of disclosure requirements, there is the potential for disclosures to obfuscate rather than inform. The costs associated by this over-inclusive disclosure have been noted by the U.S. Supreme Court when Justice Thurgood Marshall wrote that "[s]ome information is of such dubious significance that insistence on its disclosure may accomplish more harm than good." Where materiality is over-inclusive, he observed, "not only may the corporation and its management be subjected to liability for insignificant omissions or misstatements, but also management's fear of exposing itself to substantial liability may cause it to bury the shareholders in an avalanche of trivial information—a result that is hardly conducive to informed decision-making."[93] Former SEC commissioner Troy Paredes has also recognized the potential costs from over-inclusive and voluminous disclosure that makes it more difficult for investors to find relevant information.[94]

81.     Another potential cost associated with the proposed rule comes from the opportunity cost the Commission faces from diverting resources from other Commission objectives. Imposing these requirements and developing the expertise to monitor and enforce the climate disclosures of issuers will involve the expenditure of very substantial

---

[93]Cited in Katz and McIntosh (2021a), citing to TSC v. Northway
https://www.wlrk.com/docs/TSC_Industries_v._Northway_Inc.pdf.
[94] Troy A. Paredes, "Blinded by the Light: Information Overload and its Consequences for Securities Regulation," *Washington University Law Quarterly*, Vo. 81, No. 2, Summer 2003, pages 417-485.

resources.  Absent the rule, these resources could otherwise be devoted to furthering other aspects of the Commission's mission.  To the extent that the Commission faces budget constraints, this opportunity cost should be explicitly recognized and considered in evaluating the economic consequences of the proposed rule.  If the Commission requires a bigger budget to hire the specialized expertise it needs to monitor, investigate, and enforce compliance with the proposed rule, these additional costs should be explicitly accounted for in evaluating the economic consequences of the proposed rule.

82.     The opportunity cost faced by the Commission may also be faced by the board of directors and the managers of companies subject to the proposed rule.   The requirements of the proposed rule mean that registrants must develop the expertise necessary to comply with the mandated climate-related disclosures.  This will likely involve the expenditure of substantial corporate resources that would otherwise be available to meet other corporate objectives.  Absent the proposed rule, these resources would not be diverted and could otherwise be devoted to furthering higher-value corporate objectives.

83.     Another indirect cost from the proposed rule is the cost associated with the risk that the Commission's disclosure requirements end up failing to be useful to investors. The Commission has considered market failure in evaluating the economic consequences of the proposed rule, but equally important is for the Commission to evaluate the risk of government failure if it turns out the Commission has acted in error.  The costs of government failure include not only the costs imposed on registrants of implementing a disclosure regime that becomes dated or not useful (such as reduced stock returns), but also includes the costs borne by the Commission in the form of resources that must be reallocated to other purposes.

> **C.     The Commission Fails to Jointly Consider the Possible Impact of Other Proposed Rules with Potentially Similar Indirect Costs**

84.     While the Proposing Release includes a discussion of potential indirect costs associated with the proposed rule, the Commission fails to comprehensively consider the potential unintended effects that may occur from the interaction costs resulting from the full slate of rules, including the ones discussed herein, being issued simultaneously (i.e., "knock-on effects").  In simultaneous rulemakings, the Commission is proposing several rules that will either directly impact issuers and securities markets, such as  a

Cybersecurity Risk Management, Strategy, Governance, and Incident Disclosure rule[95] and a Share Repurchase Disclosure Modernization Rule.[96] The Commission cannot consider these rules in isolation because of the potential costs of regulatory accumulation, the many forms of which Mandel and Carew define.[97]

85.     One type of regulatory accumulation is the interaction between regulations, in which "multiple regulations can interact in obvious or non-obvious ways that raise costs for businesses."[98]     For example, the Commission is already proposing to require a number of other disclosures, from cybersecurity risks to share repurchases. Firms will need to build or revise disclosure systems or processes to address each of these new requirements, often turning to the same personnel, consultants, or contractors. Addressing all of these (and other) rules changes at once will drain resources and likely lead to confusion as systems are updated in different ways simultaneously. However, the Commission does not consider these (or any other) potential impacts that its proposed climate-related disclosure rue might have on issuers in light of its other proposed rules.

86.     Further, by only considering these rules in isolation, the Commission is not providing a comprehensive picture of the compliance and other direct costs. Multiple simultaneous rule changes increase overall complexity, which in turn increases overall costs. These costs must be considered jointly and in the context of the direct costs of the proposed rules discussed here.

### D.     Impact of Mandated ESG Disclosure on Private Firms

87.     As the Commission acknowledges, one potential consequence of the proposed rule is that the costs associated with mandated ESG disclosure will reduce the attractiveness of going public and reinforce the trend for private firms to stay private.[99]

---

[95] 87 Fed. Reg. 16,590 (Mar. 23, 2022).

[96] 87 Fed. Reg. 8,443 (Feb. 15, 2022).

[97] Michael Mandel and Diana G. Carew, "Regulatory Improvement Commission: A Politically-Viable Approach to U.S. Regulatory Reform," *Progressive Policy Institute*, May 2013 ("Mandel and Carew (2013)"), pp. 1–3.

[98] Mandel and Carew (2013), p. 3.

[99] The Proposed Rule recognizes this but surmises that "it is unlikely that a significant number of firms would pursue this avoidance strategy given that it would come with significant disadvantages, such as higher costs of capital, limited access to capital markets, and limits to their growth potential." Proposing Release, page 21448. However, researchers note that "[i]t is very difficult to predict whether the described firm responses are net positive or negative from the perspective of investors, other stakeholders, or society. Stakeholder responses to CSR information can induce firm responses (or real effects) that reduce firm value

The Commission also acknowledges that the compliance costs of the proposed rules could influence the marginal firm's decision to exit public markets or refrain from going public in the first place with the intention of circumventing the proposed disclosure requirements. Firms may choose this circumvention strategy if they believe the potential compliance costs from the proposed rules outweigh the benefits of being a registered public company. However, the Commission argues that it is unlikely that a significant number of firms would pursue this circumvention strategy on the grounds that the "transparency gap" between private and public firms will be insufficiently wide to overcome the "higher costs of capital, limited access to capital markets, and limits to their growth potential"[100] for firms that choose to remain private in order to avoid incurring costly mandated ESG disclosures. Moreover, the Commission argues that the transparency gap between public and private firms is likely to narrow because "[t]he pressure on private companies to disclose information on climate-related risks is rapidly escalating within the private industry."[101]

88.      The Commission's downplaying of the argument that the proposed rule will result in firms remaining private is not supported. Instead, the Commission's proposed climate-related disclosures are likely to be complex and highly costly to public issuers because of the need to build in disclosure controls and create board, management and risk processes and procedures.[102] In addition, the proposed rule is likely to add significant costs to public issuers due to the need to make investments in talent and technology in order to track and verify the required data for Scope 1 and Scope 2 disclosures. Finally, compliance with the proposed rule will require public issuers to incur costs associated with engaging specialized professionals to prepare the disclosures and to incur costs from hiring third-

---

and, hence, have negative financial consequences for investors." Christensen, Hail, and Leuz (2021), page 1232.

[100] Proposing Release, page 21448.

[101] Proposing Release, page 21448.

[102] Past research has found that mandated disclosure rules can impose significant costs on companies. In studying the impact of the Sarbanes-Oxley Act, Zhang (2007) finds "U.S. firms experienced a statistically significant negative cumulative abnormal return around key SOX events. … Regression results are consistent with the non-audit services and governance provisions imposing net costs."[102] Ivy Xiying Zhang, "Economic consequences of the Sarbanes-Oxley Act of 2002," *Journal of Accounting & Economics*, Vol. 44, 2007, pages 74-115 ("Zhang (2007)"), page 74. In addition, Zhang (2007) finds that non-accelerated filers, who were able to defer the compliance of Section 404 of SOX, had significant cost savings. Zhang (2007), p. 74. Zhang (2007) does note that the study's results should be interpreted with caution (within the confines of the study's methodology and other interpretations) and does not include social benefits and costs. Zhang (2007), pages 110-111.

party attestation specialists and auditors.[103]  Much of the specialized reporting and audit assurance called for would need to be outsourced to consultants, accountants, and law firms with climate-focused practices.  Such requirements will likely disproportionately affect smaller firms.[104]

89.     To the extent that the proposed ESG disclosure regime applies only to public issuers and not private firms, the significant costs associated with the proposed rule will likely inhibit the willingness of some private companies to go public.[105]  This impact is most likely to be observed for private firms at the margin, i.e., for medium-sized, medium-growth, and maturing firms, where the added cost of going public may cause them to decide to stay private.  In addition, because the proposal does not include any incremental phase-in allowance for newly public companies, some private companies could delay plans to go public.

90.     The proposed climate-related mandated disclosures come on top of other additions to Commission mandated disclosures over the past decade with respect to executive compensation, cybersecurity risk, and conflict minerals.  All of these mandated disclosures are costly, as firms need to hire specialized lawyers and accountants to track them and write the disclosure.  To the extent that firms go private or remain private because of a widening transparency gap between public and private firms, the informational efficiency of capital markets will be negatively affected and potentially the size of the publicly traded stock market will be reduced (as the Commission acknowledges).[106]

---

[103] Proposing Release, page 21437 ("The proposed rules would require the attestation report to identify the criteria against which the subject matter was measured or evaluated, the level of assurance provided, the nature of the engagement, and the attestation standard used").

[104] "The constraining impact of uniform disclosure standards on diverse firms must be considered. Naturally, it is easier to derive optimal disclosure standards in an economy of identical and stable firms. However, in practice, firms differ and change over time (with respect to their underlying economics and the materiality threshold used to determine disclosure).  In order to improve our understanding of accounting standards, it is important that we consider how optimal disclosure regulation is designed when such regulation applies to a diverse set of firms." Anne Beyer, Daniel A. Cohen, Thomas Z. Lys, and Beverly R. Walther, "The financial reporting environment: Review of the recent literature," *Journal of Accounting and Economics*, Vol. 50, 210, pages 296-343, page 319.

[105] Gao, Wu, and Zimmerman (2009) find that small firms were incentivized to not go over the threshold that allowed them to stay as non-accelerated filers.  Feng Gao, Joanna Shuang Wu, and Jerold Zimmerman, "Unintended Consequences of Granting Small Firms Exemptions from Securities Regulation: Evidence from the Sarbanes-Oxley Act," *Journal of Accounting Research*, Vol. 47, No. 2, 2009, pages 459-506.

[106] Proposing Release, page 21448.

Appellate Case: 24-1628     Page: 1118     Date Filed: 03/26/2024  Entry ID: 5377362

91.     The additional cost of mandated climate-related disclosure, by influencing the decision of firms choosing whether to stay private or go public, will reinforce a trend in US equity markets of firms that choose to go public being bigger and older than they used to be.  Smaller private companies may choose to stay private until they become large enough or profitable enough so that they can afford the additional cost of mandated climate-related disclosure.  This means that when companies become public, they will be slower growing than they used to be.  In 1997, there were 174 tech IPOs with a mean and median market capitalization of $264 million and $113 million, respectively.[107]  In 2021, there were 118 tech IPOs with mean and median market caps of $6.3 billion and $3 billion, respectively.[108]  This trend, which will be reinforced by the added cost of going public as a result of mandated climate-related disclosure rules, is for fewer IPOs and for IPOs to include bigger companies with less growth ahead of them.

92.     To the extent that the costs imposed by the proposed rule reinforces this trend, the SEC would work against its own initiatives aimed at trying to reduce the cost of raising capital by going public and making markets more accessible to ordinary investors.  Increasing the burden on public companies directly conflicts with the goal of the 2012 JOBS Act and other legislation that seeks to increase the number of publicly traded companies.  This incentive for firms to remain private could inhibit capital formation and decrease the aggregate amount of corporate disclosure, contrary to the SEC's mandates to facilitate capital formation and efficient markets.  To the extent that the costs associated with mandated disclosures contained in the proposed rule reinforce the trend of firms going public later in their life cycle, fast-growing companies will be private and ordinary investors will be harmed because they will be denied the opportunity to invest in high-growth companies.  These investment opportunities will be unavailable to ordinary investors who will be unable to invest in these firms until most of the money has already been made by affluent accredited investors.

93.     The net result of the impact of the proposed rule on the decision to go public or stay private is that it will change the types of companies that go – or remain – public.  One type of company will appeal to ESG investors and will go public.  Companies that do not appeal to ESG investors may go or stay private.  The net result is that companies

---

[107]  https://site.warrington.ufl.edu/ritter/files/IPOs-Tech.pdf.
[108]  https://site.warrington.ufl.edu/ritter/files/IPOs-Tech.pdf.

whose climate risks may be most worrying to investors could end up being the ones who will not be disclosing them under an SEC-mandatory disclosure regime. A reporting mandate "therefore would likely widen the gap between public and private firms, both in terms of CSR activity and CSR transparency. Indeed, one concern is that harmful CSR activities could shift from public to private firms."[109] Under such a scenario, "observable CSR performance by publicly traded firms could increase, yet aggregate CSR in the entire economy could improve less or even decrease."[110] Similarly, under a stringent mandate environment for businesses, firms may choose to locate abroad with "unclear net effects on global CSR performance" and list their shares outside of the United States.[111]

### E. Costs for Private Firms

94.     Private firms will also need to care about mandated ESG disclosure even if they are not registrants. The mandated disclosure of Scope 3 emissions means that all the emissions in a registrant's value chain, including by customers and suppliers will need to be disclosed.[112] If a public company's customers and suppliers are private companies, the Commission requires the public company to work "with its suppliers and downstream distributors to take steps to reduce those entities' Scopes 1 and 2 emissions," so that it can report its Scope 3 emissions.[113] The emissions of suppliers (i.e., "upstream emissions") include emissions attributable to goods and services that the registrant acquires, the transportation of goods (for example, to the registrant), and employee business travel and commuting. The emissions of customers (i.e., "downstream emissions") include the use of the registrant's products, transportation of products (for example, to the registrant's

---

[109] Christensen, Hail, and Leuz (2021), page 1218.
[110] Christensen, Hail, and Leuz (2021), page 1218.
[111] Christensen, Hail, and Leuz (2021), page 1218.
[112] Proposing Release, page 21374. The Commission proposed requiring disclosure of emissions from supplier companies because "[o]ver the last few years, a number of studies have shown that firms try to reduce their local carbon footprints by outsourcing their carbon emissions to suppliers in states or countries with weaker environmental policies." Proposing Release, page 21435. "Subjecting these climate-related disclosures to reasonable assurance pursuant to an audit would require the auditor to assess the risk of material misstatement related to the estimates and judgments, including through evaluation of the method of measurement and reasonableness of the assumptions used, and to understand management's risk management processes, including the accuracy of the proposed disclosure, thereby alleviating possible concerns about the data's reliability and comparability, and improving investor confidence in such disclosure." Proposing Release, page 21433 (footnotes omitted).
[113] Proposing Release, page 21377. "We also recognize that obtaining the data necessary to calculate a registrant's Scope 3 emissions might prove challenging since much of the data is likely to be under the control of third parties." Proposing Release, page 21412.

customers), end of life treatment of sold products, and investments made by the registrant.[114]

95.     The Commission also argues that there is a trend in private markets for the leading firms to develop a standard set of metrics for tracking their portfolio companies' ESG progress.  The Commission argues that "pressure on private companies to disclose information on climate-related risks is rapidly escalating within the private industry, hence diminishing the potential incentive for registrants to go private in order to avoid climate-related disclosure requirements."[115]  However, an alternate interpretation of this trend that the Commission observes is that private firms are currently voluntarily choosing their own ESG disclosure levels to meet the needs of their investors.   A study from the Boston Consulting Group on private equity argues that private firms are looking to existing ESG frameworks in order to develop ESG metrics consistent enough to establish meaningful benchmarks but flexible enough to allow room for continuous improvement.[116]

96.     Although the direct cost of ESG disclosure is borne by the public market registrant, it will likely have economic consequences for private firms as well.  The Commission acknowledges these consequences but argues that these additional costs are welcome because they favor the adoption of the proposed rule on the grounds that the resulting costs to private firms will diminish the "transparency gap" between public and private firms and will reduce the potential incentive for registrants to go private in order to avoid climate-related disclosure requirements.   The Commission's argument ignores the plain fact that additional costs will be borne by private firms as a result of the proposed rule.  The economic consequences of the costs likely to be incurred by private firms are completely ignored in the Proposing Release.

## VI.    The SEC Fails to Adequately Consider Reasonable Alternatives

97.     The Proposing Release provides a list of 14 "reasonable alternatives" to the proposed rule.[117]  Although the Commission identifies tradeoffs that might be involved if

---

[114] Proposing Release, page 21374.
[115] Proposing Release, page 21448.
[116]    https://www.bcg.com/en-us/publications/2021/private-equity-convergence-on-esg-data.
[117] Proposing Release, pages 21448-21452.

any particular alternative were adopted, the Proposing Release does not provide any analysis to evaluate these tradeoffs to determine whether any of the alternatives provides a lower-cost means of meeting some of the Commission's objectives. Overall, the Commission fails to adequately consider the alternatives it lists and fails to consider additional reasonable alternatives.

98. Among the 14 alternatives discussed in the Proposing Release, there is a discussion of scenario analysis. The Commission notes that scenario analysis is beneficial to investors because it allows them to assess a range of potential threats and opportunities.[118] Scenario analysis could help investors assess issues that have high uncertainty by evaluating the impact on and the resiliency of the registrant under multiple plausible future scenarios. However, the Commission dismisses scenario analysis on the grounds that the methodologies "continue to advance and develop, which may pose significant challenges for some registrants" which the Commission argues are "undue burdens."[119] The fact that a promising technology is seen as evolving appears to support arguments made in favor of voluntary disclosure being flexible enough to evolve as conditions warrant. The Commission fails to discuss the possibility of using scenario analysis as a voluntary option for registrants that would choose to use the approach.

99. The Commission also discusses the possibility of climate-related disclosures being furnished as opposed to being filed.[120] The Commission notes that "[t]his may also benefit some registrants as their Scopes 1 and 2 emissions disclosures would not be automatically incorporated into Securities Act registration statements and thereby not be subject to Section 11 liability."[121] However, the Commission rejects this alternative on the grounds that there is a possibility that reduced liability may lead to the applicable disclosures being perceived as less reliable by investors.[122] This appears to be a tradeoff worthy of further analysis rather than rejection on the basis of a possibility that this may happen. It also bears repeating that to the extent the information is material, it should be disclosed under current law.

---

[118] Proposing Release, page 21449.
[119] Proposing Release, page 21449.
[120] Proposing Release, page 21449.
[121] Proposing Release, page 21449.
[122] Proposing Release, page 21449. Also at page 21429: "by requiring this information to be *filed* with the Commission as opposed to posted on company websites or *furnished* as exhibits to regulatory filings, the proposed rules are expected to improve the reliability of information..."

100.    There are other alternatives in the Proposing Release that are summarily rejected without any rigorous analysis being applied to determine whether the alternatives could provide lower cost means for achieving the Commission's objectives.

101.    The Commission argues that agency problems present a market failure that makes voluntary reporting unreliable, thus requiring prescriptive mandated disclosure.[123] However, if agency problems are indeed causing a market failure, there are alternative means of addressing these problems such as encouraging means for management and shareholders to achieve an alignment of interests through compensation contracts.

102.    One alternative has recently been proposed by the FER.  The FER suggests that firms that disclose their ESG rating information voluntarily using a third-party disclosure framework should include "information about the raters, factors used in the rating, and weights on the factors."[124]

103.    Finally, the Commission may wish to acknowledge that their objectives may be met more cost-effectively by other means besides securities laws.  For example, climate-related outcomes may be more cost-effectively supervised by the Environmental Protection Agency.

## VII.    The Commission Fails to Adequately Consider the Impact of the Proposed Rule on Efficiency, Competition and Capital Formation

To justify its exercise of rulemaking authority, the SEC has a duty under the Administrative Procedure Act ("APA"), as applied under the SEC's governing statutes, to adequately consider whether a regulatory action will promote efficiency, competition and capital formation.  I find that the Commission fails to adequately consider the impact of the proposed rule on efficiency, competition and capital formation.

### A.    Efficiency

104.    The Commission argues that the proposed rule will promote efficiency.  The Commission's argument is conditional on climate-related information being relevant for asset prices, i.e., if climate-related information is relevant for asset prices then the

---

[123] Proposing Release, page 21426.
[124] Jonathan M. Karpoff, Robert Litan, Catherine Schrand, and Roman L. Weil, "What ESG-Related Disclosures Should the SEC Mandate?" *Financial Analysts Journal*, Vol. 78, No. 2, 2022, pages 9-18, available online at: https://doi.org/10.1080/0015198X.2022.2044718.

proposed rule could improve market efficiency and price discovery by enabling climate-related information to be more fully incorporated into asset prices. The Commission then bootstraps this conditional argument to further claim that improved efficiency resulting from the proposed rule "could inform the flow of capital and allow climate-related risks to be borne by those who are most willing and able to bear them."[125]

105.    However, the Commission's argument could also be applied to current principles-based disclosure practices or to voluntary disclosures practices which have the advantage over rules-based prescriptive disclosure mandates in that the practices are flexible and able to evolve in order to provide investors with any decision-useful material information. Rules-based prescriptive disclosure mandates are subject to the risk of locking in registrants to ossified disclosure requirements that fail to disclose information that is truly useful to investors as financial conditions evolve.

106.    The Commission's discussion of efficiency focuses on the informational efficiency of asset prices. But as noted above in Sections IV and V, the proposed rule contains features that may impact efficiency in other ways. As the Commission has noted, "certain provisions of the proposed rules may force registrants to disclose proprietary information."[126] Disclosure of proprietary information may improve the informational efficiency of equity prices but can be harmful to efficiency in other respects.

107.    The proposed rule assumes that requiring information producers (i.e., registrants who produce valuable information as part of their operations) to publicly disclose their proprietary information to information consumers (i.e., investors who rely only on public disclosures of information) will lead to a more "efficient" outcome. But the effect of the rule is likely to involve a tradeoff: while information consumers may be better off, information producers will likely be worse off. This tradeoff is referred to in the economics profession as a "distributional effect" or "wealth transfer," which, is not by itself efficiency enhancing. All else equal, the mandated disclosure of the proposed rule, when it involves proprietary information, will leave information producers worse off, even if information consumers benefit from the public disclosure. To conclude that the proposed rule enhances efficiency by redistributing the benefits of proprietary

---

[125] Proposing Release, page 21445 (footnote omitted).
[126] Proposing Release, page 21444 (footnote omitted).

Appellate Case: 24-1628    Page: 1124    Date Filed: 03/26/2024 Entry ID: 5377362

information from one group to another group would require the Commission to evaluate the welfare impact of these tradeoffs – a task which the Commission has not performed.

108.  The Commission also argues that the proposed rule could promote efficiency by reducing systemic risk.  The Commission argues that "the financial system could be destabilized also by potentially rapid and unexpected losses to carbon-intensive assets caused by a disorderly transition to a low-carbon economy or a shift in the market's perception of climate risks."[127]  The Commission then argues that "[a] more efficient allocation of capital brought about the disclosure required by the proposed rules could reduce the probability and magnitude of disorderly price corrections or dislocations, thereby strengthening financial system resilience."[128]  However, the Commission has failed to analyze the cost-effectiveness of addressing systemic risk with securities disclosure requirements rather than through other means or by other regulators.  In any case, risks to systemically-important firms significant enough to cause the dislocations that concern the Commission are likely risks that would be disclosed under the current principle-based disclosure regime.

### B.    Competition

109.  With respect to the impact of the proposed rule on competition, the Commission focuses on one dimension of competition, that of similarly-situated firms that are presumably competing in the same product market.  With respect to this form of competition, the Commission argues that "[m]ore standardized reporting should also reduce investors' costs for acquiring and processing climate-related information by facilitating investors' analysis of a registrant's disclosure and assessing its climate-related risks against those of its competitors."[129]  The Commission also argues that "[o]verall, we expect that by standardizing reporting practices, the proposed rules would level the playing field among firms, making it easier for investors to assess the climate-related risks of a registrant against those of its competitors."[130]

110.  However, there are other dimensions to competition that the Commission fails to consider.  For example, the Commission fails to consider the impact of the proposed rule

---

[127] Proposing Release, page 21446 (footnote omitted).
[128] Proposing Release, page 21446 (footnote omitted).
[129] Proposing Release, page 21446.
[130] Proposing Release, page 21446.

on the competition for voluntary disclosure of information. Currently, there is a vibrant market for ESG disclosure with registrants able to select from a menu of competing formats that meet the demands of various investors for ESG information.

111. By mandating climate-related disclosure and codifying its form, the SEC runs the risk of short circuiting the natural evolution of disclosure standards in the private market, which will potentially ossify disclosure to an inflexible and suboptimal standard. If so, the Commission's claim with respect to competition would work in reverse, that is, competition between firms would be impaired.

112. The proposed rule may also impact the competition between listing venues for initial public offerings. One way listing venues compete is through the type and amount of public disclosure they require of issuers before listing their shares. Competition between domestic listing venues would be affected if this dimension of competition is superseded by mandated disclosure by the Commission. In addition, competition between U.S. listing venues and foreign listing venues would likely be impacted by mandated disclosure in the U.S. that may impact where issuers choose to publicly list their shares.

### C.    Capital Formation

113. With respect to capital formation, the Commission argues that mandatory ESG disclosures could reduce the cost of capital to firms because "[m]ore comparable, consistent, and reliable climate-related disclosures could reduce information asymmetries, both among investors and between firms and their investors."…"In the first case, less information asymmetry among investors could mitigate adverse selection problems by reducing the informational advantage of informed traders. This is likely to improve stock liquidity (i.e., narrower bid-ask spreads), which could attract more investors and reduce the cost of capital. In the second case, less information asymmetry between firms and their investors could allow investors to better estimate future cash flows, which could reduce investors' uncertainty, as well as the risk premium they demand, thus lowering the costs of capital."[131]

114. The first part of the Commission's argument on information asymmetry with respect to the size of the bid ask spread is misplaced. The role of information asymmetry

_____

[131] Proposing Release, page 21447 (footnote omitted).

and adverse selection in the formation of the bid ask spread is well known and refers not to corporate disclosure but to information about order flow faced by market making firms and other intermediaries. In that context, an informed trader is someone who has information about large, market moving order flow such as a large institution or an inside trader. The adverse selection that impacts the bid ask spread derives from market makers facing the risk of trading in the open market with other traders who have superior information about pending order flow or significant market moving news. Because market makers face the risk of having their open orders hit by order flow from traders with superior information, they mitigate this risk by adjusting their quotes (i.e., the bid-ask spread) or by reducing latency in order to revise quotes quickly. The trading context is not relevant to information disclosures about ESG. The impact of information asymmetries on the bid ask spread is much more likely to be caused by information about order flow as opposed to mandated ESG disclosures.

115.     With respect to the Commission's argument that less information asymmetry between firms and their investors could reduce investors' uncertainty and lower the cost of capital, this claim applies equally to voluntary disclosure. To the extent that firms can lower their cost of capital through disclosure, this benefit would also apply to firms under a voluntary disclosure regime since it is in the firm's best interest to obtain a lower cost of capital. In fact, the academic literature cited by the Commission to support its claim on how the proposed rule could aid capital formation comes from results obtained from research on voluntary disclosure.

116.     The Commission fails to consider other impacts of the proposed rule on capital formation. For example, as previously discussed, the proposed rule may cause private firms to stay private longer and delay becoming public if they ever become public at all. Or, as the Commission has acknowledged, public firms could choose to become private as a result of the proposed rule.

117.     The additional cost of mandated ESG disclosure, by influencing the decision of firms choosing whether to stay private or go public, will reinforce a trend in U.S. equity markets of firms that choose to go public being bigger and older than they used to be. To the extent that the costs imposed by the proposed rule reinforces this trend, the Commission would work against its own initiatives aimed at trying to reduce the cost of raising capital by going public and making markets more accessible to ordinary investors.

Increasing the burden on public companies directly conflicts with the goal of the 2012 JOBS Act and other legislation that seeks to increase the number of publicly traded companies.  This incentive for firms to remain private could inhibit capital formation and decrease the aggregate amount of corporate disclosure, contrary to the SEC's mandates to facilitate capital formation and efficient markets.

Respectfully submitted,

*James A. Overdahl*

James A. Overdahl, Ph.D.

June 16, 2022

App.1123



600 Pennsylvania Avenue SE   Suite 300   Washington, DC 20003   T  202.547.3035

# JAMES A. OVERDAHL, PH.D.
## PARTNER

Dr. Overdahl is a specialist in financial markets and the U.S. regulatory environment.  Prior to joining Delta Strategy Group as a partner in August 2013, Dr. Overdahl provided advisory and expert witness services through NERA Economic Consulting.  Dr. Overdahl's financial regulatory experience includes three years as Chief Economist for the US Securities and Exchange Commission (SEC) and five years as Chief Economist for the US Commodity Futures Trading Commission (CFTC).  He is experienced in preparing expert reports and in serving as a testifying expert in matters involving complex financial litigation.  In his positions at the SEC and CFTC, Dr. Overdahl testified before each Commission. He also testified before Congress on behalf of the SEC and CFTC, and provided staff support and briefings for members of the President's Working Group on Financial Markets.

While serving as Chief Economist of the SEC from 2007 to 2010, Dr. Overdahl directed the SEC's Office of Economic Analysis where he served as principal economic advisor on policy, rulemaking, and litigation support and supervised the SEC's economics program.  He advised the Commission on a wide range of policy matters, including, credit default swaps and other OTC derivatives, OTC clearing, algorithmic trading and related market structure issues, securities lending, short selling, and new products.   In addition, he advised the Commission and other government agencies on several matters related to the financial crisis of 2008.  He also advised the Commission on investigation matters, enforcement proceedings, civil monetary penalties, disgorgement, and fair-fund distribution plans.

While serving as Chief Economist of the CFTC from 2002 to 2007, Dr. Overdahl directed the CFTC's Office of the Chief Economist.  He advised the Commission on policy matters related to exchange-traded futures and options, OTC derivatives (particularly energy derivatives), commodity price speculation, risk management and hedging, new products and markets, algorithmic trading, position limits, clearing, commodity index investing, hedge funds, and error trade policies.  He also advised the Commission on enforcement matters related to commodity price manipulation and the alleged false reporting of natural gas transactions by several entities.  In addition, he advised the Commission on restitution and civil monetary penalties.

Dr. Overdahl has also served as a Senior Financial Economist for the Risk Analysis Division of the US Office of the Comptroller of the Currency (OCC). He performed on-site assessments of risk measurement models, including Monte Carlo simulation models, historical simulation models, variance-covariance models and stress testing models, employed by Tier 1 dealer banks, and assessments of model validation procedures within the risk management units of money center banks, of compliance with the Value-at-Risk requirements of the Basel Market Risk Capital Rule, and of the effectiveness of hedging and risk measurement techniques used to manage market risk in securitization conduits.

Prior to joining the OCC, Dr. Overdahl served as a Financial Economist in the CFTC's Division of Economic Analysis and the SEC's Office of Economic Analysis. He has taught as an Adjunct Professor of Finance at George Washington University, the University of Maryland, Johns Hopkins University, Georgetown University, Virginia Tech, and George Mason University. Dr. Overdahl also served as Assistant Professor of Finance at the University of Texas at Dallas School of Management.

Dr. Overdahl has published extensively in leading economics and finance journals, including the *Journal of Business, Journal of Law and Economics, Journal of Financial and Quantitative Analysis*, *Journal of Futures Markets*, *Journal of Derivatives,* and *Journal of Alternative Investments,* and has contributed numerous chapters to published volumes on finance and economics. In addition, he has co-edited and co-authored, with Robert Kolb, four books in multiple editions including *Financial Derivatives: Pricing and Risk Management* and *Futures, Options, and Swaps*.

## EDUCATION

Ph.D., Economics, Iowa State University, Ames, IA, 1984.

B.A., Economics, St. Olaf College, Northfield, MN, 1980.

## CURRENT POSITION

Partner, Delta Strategy Group, Washington, DC, August 2013–Present.

## PRIOR POSITION

Vice President, Securities and Finance Practice, National Economic Research Associates, Inc., April 2010 – August 2013, and Affiliated Industry Expert, August 2013–Present.

## GOVERNMENT POSITIONS

Chief Economist and Director of the Office of Economic Analysis, U.S. Securities and Exchange Commission, Washington, D.C. 2007-2010.

Served as principal economic advisor on policy, rulemaking, and litigation support. Supervised the economics program with a professional staff of approximately 40 Ph.D. economists, analysts, and consultants. Testified before the Commission and before Congress on behalf of the Commission. Provided staff support for President's Working Group on Financial Markets and for other interagency groups related to financial market reform and market developments.

Chief Economist and Director of the Office of the Chief Economist, U.S. Commodity Futures Trading Commission, Washington, D.C. 2002-2007.

Director of the CFTC's Office of the Chief Economist. Supervised the CFTC's economics program utilizing a staff of professional economists and support personnel performing economic research, policy analysis, expert testimony, education, and outreach (including congressional briefings). Served on the Commission's Executive Management Council. Testified before the Commission and before Congress on behalf of Commission. Provided staff support and briefings for members of the President's Working Group on Financial Markets on issues related to derivative markets and hedge funds.

Senior Financial Economist, Risk Analysis Division, Office of the Comptroller of the Currency, Washington D.C. 1995-2002.

Performed assessments of risk measurement models, valuation models, model validation procedures, and compliance with the Value-at-Risk requirements of the Basel Market Risk Capital Rule.

Senior Financial Economist, Research Section, Division of Economic Analysis, Commodity Futures Trading Commission, Washington D.C. 1992-1995.

Conducted empirical research on policy issues before the Commission relating to exchange-traded and privately-negotiated derivative instruments. Assisted the CFTC's Division of Enforcement both in developing economic evidence and in devising civil monetary penalties for use in CFTC enforcement proceedings. Assisted the Commission's Administrative Law Judges in devising sanctions.

Senior Financial Economist, Office of Economic Analysis, U.S. Securities and Exchange Commission, Washington D.C. 1989-1992.

Served as in-house economic consultant to the SEC's Division of Market Regulation on issues involving derivative instruments and capital markets. Assisted the SEC's Division of Enforcement in the development of economic evidence for use in civil cases brought before the Commission. Assisted U.S. Attorney's Office in developing evidence for criminal cases resulting from SEC referrals to the Justice Department.

## ACADEMIC POSITIONS

Adjunct Professor, University of Maryland, 2003-2007.

Adjunct Professor, George Washington University, 2002-2007.

Adjunct Professor, Johns Hopkins University, 2001.

Adjunct Professor, School of Business, Georgetown University, 1994-1995.

Adjunct Professor, School of Business Administration, George Mason University, Fairfax, Virginia, 1991-1994.

Adjunct Professor, Pamplin College of Business, Virginia Polytechnic Institute, Falls Church Virginia, 1990.

Assistant Professor of Finance, School of Management, The University of Texas at Dallas, 1984 - 1989.

PRIVATE POSITIONS

Consultant, Strategic Petroleum, Inc., Dallas, TX (a joint venture between the principals of Chicago Research and Trading and Tradelink, LLC). 1988-1989.

Applied option pricing theory to valuation decisions concerning drilling and abandonment of operating wells. Validated models used to analyze arbitrage strategies involving spot crude oil and exchange-traded crude oil futures and options.

LITIGATION AND ENFORCEMENT MATTERS

Dr. Overdahl has consulted on more than 50 enforcement matters before the CFTC and SEC over a 20-year period. He has performed work on establishing materiality of misstatements or omissions in disclosures surrounding the issuance of securities, estimating damages in issuer penalty cases, 10b-5 cases, insider trading, and commodity price manipulation. He has worked on matters involving the alleged false reporting of transactions to index providers in the natural gas industry, price manipulation in thinly traded cash markets with related futures markets, bidding misbehavior surrounding auctions of treasury debt, counterparty duties in over-the-counter derivatives transactions, alleged manipulation of propane and gasoline products, mutual fund late trading, valuation of swap contracts, calculation of margin amounts, dilution of mutual fund and hedge fund assets. He also assisted the U.S. Attorney's Office in developing evidence for criminal cases resulting from SEC referrals to the Justice Department, and he assisted the Division of Enforcement at both the SEC and CFTC in devising sanctions and evaluating settlement terms. He also has worked on evaluating fair-fund distribution plans. In private practice he has worked on matters involving alleged short-sale price manipulation, swap valuation, insider trading, futures block transactions, and market manipulation.
.

**BOARD AND ADVISORY POSITIONS**

Board of Directors, Futures Industry Association (Public Director).  (2016-2018).

Center for the Study of Financial Regulation, Mendoza College of Business, University of Notre Dame.  (2011-present).

SEC Historical Society Advisory Board (2013-2016)


**CONGRESSIONAL TESTIMONY**

"Implementing Dodd-Frank: A Review of the CFTC's Rulemaking Process," United States House of Representatives, Committee on Agriculture, Subcommittee on General Farm Commodities and Risk Management, April 13, 2011.

"The Costs of Implementing the Dodd-Frank Act: Budgetary and Economic," United States House of Representatives, Committee on Financial Services, Oversight and Investigations Subcommittee, March 30, 2011.

"Reducing Risks and Improving Oversight in the OTC Credit Derivatives Market," United States Senate, Committee on Banking, Housing, and Urban Affairs, Subcommittee on Securities, Insurance, and Investment, July 9, 2008.

"Hedge Funds and Systemic Risk: Perspectives of the President's Working Group on Financial Markets," United States House of Representatives Committee on Financial Services. July 11, 2007.

"The Role of Hedge Funds in our Capital Markets," United States Senate, Committee on Banking, Housing, and urban Affairs, Subcommittee on Securities, Insurance, and Investment. May 16, 2006.

"Global Oil Demand and Gasoline Prices," United States Senate Committee on Energy and Natural Resources, Full Committee Hearing. September 6, 2005.


**EXPERT WITNESS TESTIMONY**

In the matter of *Fairfax Financial Holdings Limited and Crum & Foster Holdings Corp.* v. *S.A.C Capital Management, LLC*, et. al. (July, 2011).

*Motors Liquidation Company GUC Trust* v. *Appaloosa Investment Limited Partnership I, et. al*. (summer and fall 2012).

App.1128

*CME Group Inc. Market Regulation Department, v. DRW Commodities, LLC*, NYMEX Docket No. 11-08379. Before the New York Mercantile Exchange Business Conduct Committee (January, 2014).

*In the Matter of Christopher M. Gibson, Securities and Exchange Commission Administrative Proceeding No. 3-17184*. (September, 2016).

*In the Matter of William Tirrell, Securities and Exchange Commission Administrative Proceeding No. 3-17313*. (September, 2017).

*In the Matter of Commodity Futures Trading Commission v. Kraft Foods Group, Inc. and Mondelez Global, LLC, Case No. 15 C 2881* (Ongoing).

*In the Matter of Harry Ploss, as Trustee for the Harry Ploss Trust Dated 8/16/1993, on behalf of Plaintiff and all others similarly situated v. Kraft Foods Group, Inc. and Mondelez Global LLC, Proceeding No. 15-cv-2937* United States District Court Northern District of Illinois (ongoing).

*Michael Schaufler v. Wells Fargo Bank, N.A., et al.* Superior Court of California—County of San Francisco. (Verdict returned on January 24, 2020).

*In the Matter of United States of America, Department of the Treasury, Office of the Comptroller of the Currency v. Rohan Ramchandani Former Head of European FX Spot Trading Citibank, N.A., Sioux Falls, South Dakota* (Case dismissed with prejudice, July 2021).

PUBLICATIONS

A.    Books

*Financial Derivatives: Pricing and Risk Management* (With Robert Kolb), Wiley-Blackwell Publishers, 2010.

*Futures, Options, and Swaps,* Fifth Edition (With Robert Kolb), Blackwell Publishers, Oxford: 2007.

*Understanding Futures Markets*, Sixth Edition (With Robert Kolb), Blackwell Publishers, Oxford: 2006.

*Financial Derivatives*, Third Edition (With Robert Kolb), Wiley Publishers, New York: 2003.

B.    <u>Journal Articles and Book Chapters</u>

"Automated Trading Systems and the Current Regulatory Framework," with Kwon Park, forthcoming, *Algorithmic Finance*, 2016.

"The Exercise of Anti-Spoofing Authority in U.S. Futures Markets: Policy and Compliance Consequences," with Kwon Park, *Futures and Derivatives Law Report*, Volume 36, Issue 5, May, 2016.

"Implied Matching Functionality in Futures Markets," *Futures Industry Magazine*, November, 2011.

"Derivative Contracts and Their Regulation," (with Robert Zwirb), in *Financial Product Fundamentals*, Clifford E. Kirsch, editor, Practicing Law Institute: New York, 2015.

"Evidence-Based Regulatory Policy Making for Financial Markets," (with Frederick H. DEB Harris, Michael J. Aitken, Alfred R. Berkeley, and Kumar Venkataraman), *Journal of Trading*, Institutional Investor Journals, Spring, 2011.

"Derivative Contracts: Futures, Options, and Swaps," in *Finance Ethics: Critical Issues in Financial Theory and Practice,* John Boatright, editor, Wiley-Blackwell Publishers, Spring 2010.

"Counterparty Credit Risk," in *Financial Derivatives: Insights and Analysis on Modern Risk Management and Pricing,* Wiley-Blackwell Publishers, Fall 2009.

"Hedge Funds, Volatility and Liquidity Provision in Energy Futures Market" (with Michael Haigh and Jana Hranaiova), *Journal of Alternative Investments,* Spring, 2007.

*Encyclopedia of Business, Ethics, and Society*, Sage Publishing Company. Articles in the *Encyclopedia*: "Ronald H. Coase," "Coase Theorem," "Market Transparency," "Barings Bank," "Metallgesellschaft," "Bankers Trust," "Comptroller of the Currency," and "Securities and Exchange Commission," 2008.

"Derivatives Market Innovation and the Commodity Futures Modernization Act," with Sharon Brown-Hruska, *The Euromoney Derivatives and Risk Management Handbook, 2005/2006.*

"Do Block Trades Harm Markets?" (with Jana Hranaiova and Michael Haigh), Futures Industry Magazine, (2004).

"Another Day, Another Collar: An Evaluation of the Effects of NYSE's Rule 80A on Trading Costs and Intermarket Arbitrage," (with Henry McMillan), *Journal of Business*, January, 1998.

Appellate Case: 24-1628    Page: 1135    Date Filed: 03/26/2024 Entry ID: 5377362

"The Licensing of Financial Indexes: Implications for the Development of New Index-Linked Products," in *Indexing for Maximum Investment Management Results*, Albert S. Neubert, editor, Glenlake Publishing Co., 1997.

"The Mechanics of Zero-Coupon Yield Curve Construction," (with Barry Schachter and Ian Lang), in *Controlling and Managing Interest Rate Risk*, Klein, Cornyn, and Lederman editors, New York Institute of Finance, 1997.

"Overview of Derivatives: Their Mechanics, Participants, Scope of Activity, and Benefits," (with Christopher Culp), in *The Financial Services Revolution: Understanding the Changing Roles of Banks, Mutual Funds and Insurance Companies,* Clifford Kirsch, editor, Irwin Professional Publishing, 1997.

"Derivatives Regulation and Financial Management," (with Barry Schachter), *Financial Management*, Spring, 1995, reprinted in *The Yearbook of Fixed Income Investing 1995*, Finnerty and Fridson, editors, Irwin Professional Publishing, 1996.

"The Exercise of Equity Options: Theory and Empirical Evidence," (with Peter Martin), *Journal of Derivatives*, Fall, 1994.

"Using Finance Theory to Measure Damages in Fraudulent Trade Allocation Schemes," (with Jeffry Davis and William Dale), *The Business Lawyer*, February, 1994.

"Prices Are Property: The Organization of Financial Exchanges From a Transaction Cost Perspective," (with J. Harold Mulherin and Jeffry Netter), *Journal of Law and Economics*, October, 1991.

"A Researcher's Guide to the Contracts of Firms Filing with the SEC," *Journal of Law and Economics*, October, 1991.

"Who Owns the Quotes: A Case Study into the Definition and Enforcement of Property Rights at The Chicago Board of Trade," (with J. Harold Mulherin and Jeffry Netter), *The Review of Futures Markets*, 1991.

"Option Exercises: Evidence From the Treasury Bond Futures Option Market," (with Jin Choi), *Advances in Futures and Options Research*, 1991.

"The Exercise of Options on Agricultural Commodity Futures," (with Andrew Chen), T*he Review of Futures Markets*, 1991.

"The Early Exercise of Options on Treasury Bond Futures," *Journal of Financial and Quantitative Analysis*, December 1988.

"The Use of NYMEX Options to Forecast Crude Oil Prices," *The Energy Journal*, Fall 1988.

"The Use of Crude Oil Futures by the Governments of Oil-Producing States," *Journal of Futures Markets*, Winter, 1987.

"The Hedging Performance of the CD Futures Markets," (with Dennis Starleaf), *Journal of Futures Markets*, Spring 1986.

"An Empirical Examination of the T-Bond Futures (Call) Options Market," (with Larry Merville), *Advances in Futures and Options Research*, 1986.


C.    <u>Other</u>

"SEC Settlements Trends: 1H10 Update," with Jan Larsen and Elaine Buckberg.  NERA publication, May 14, 2010.

"Economic Analysis in the Federal Rule-Making Process to Implement the Dodd-Frank Wall Street Reform and Consumer Protection Act," NERA Publication. August 30, 2010.

"SEC Settlements Trends: 2H10 Update," with Jan Larsen and Elaine Buckberg.  NERA publication, December 7, 2010.

"SEC Settlements Trends: 1H11 Update," with Jan Larsen and Elaine Buckberg.  NERA publication, June 27, 2011.

"SEC Settlements Trends: 2H11 Update," with Elaine Buckberg and Max Gulker.  NERA publication, January 23, 2012.

"SEC Settlements Trends: 1H12 Update," with Elaine Buckberg.  NERA publication, June 27, 2012.

"SEC Settlements Trends: 2H12 Update," with Elaine Buckberg and Jorge Bias.  NERA publication, January 14, 2013.

"Will court short-circuit Dodd Frank?"  With Jonathan Macey and Elaine Buckberg, *Politico*, August 15, 2011.

"ETFs: Overview and Recent Issues" NERA publication, October 3, 2011.

"SEC Settlements Trends: 2H11," with Max Gulker and Elaine Buckberg.  NERA publication, January 23, 2012.

"Economist Debates: High-Frequency Trading," *The Economist* online edition, March 18, 2012.

Via E-mail: rule-comments@sec.gov
Securities and Exchange Commission,
100 F Street, N.E., Washington, DC 20549-1090.
Attention: Vanessa Countryman, Secretary

June 16, 2022

Re: Proposal on The Enhancement and Standardization of Climate-Related Disclosures for Investors - File No. S7-10-22

Ladies and Gentlemen:

The Securities and Exchange Commission's (the "Commission") proposal The Enhancement and Standardization of Climate-Related Disclosures for Investors ("Proposal") is a watershed moment for the Commission. It expands considerably the scope of corporate disclosure and raises challenging questions of interest to academics and practitioners. I appreciate the opportunity to comment.

I have read the Proposal, the associated comment file for the Proposal (as of May 5), and attended many academic and practitioner seminars on various aspects of the Proposal. While there is an important debate about the rationales for the Proposal—including to facilitate policy objectives (e.g., achieve a "net zero economy") and compel companies to internalize externalities (e.g., externalities of pollution)—I will not discuss these. Instead, my comments seek to emphasize important issues that have either gone underappreciated or are lacking from the discussion.

My area of expertise is in corporate disclosure and enforcement-related matters. I have published extensively on these topics in leading academic journals; led seminars at dozens of top business schools across the globe; won numerous academic and industry awards; and regularly consult with practitioners on concerns about materiality (my vita appears at the end of this letter). As part of my expertise, I routinely conduct statistical analysis of price and trading data to assess the materiality of disclosures. Given my background, my comments will tend to focus on issues regarding materiality and enforcement/investor protection.

Part I of this letter introduces what it means for a risk to be "material" and provides comments and discussion on the broad concept of the risks posed by climate change ("climate-related risks"). It discusses how climate-related risks can be material, and when they are, they already fit within the scope of existing disclosure rules. Current rules require all material risks to be disclosed regardless of whether they are climate-related or non-climate-related. Thus, unless companies are withholding information on material risks, it seems unlikely that the additional climate disclosures required by the Proposal would reveal new material risks.

Part II of this letter discusses the academic evidence referenced in the Proposal, with a specific focus on the evidence surrounding the disclosure of greenhouse gas emissions (GHG disclosure). Most of the academic papers referenced by the Proposal do not study the implications of a company's GHG disclosures for that company's share price or other capital market outcomes. Indeed, the Proposal does not provide (or reference) any evidence on the materiality of GHG

i

disclosures using standard "event study" tests for materiality commonly employed and accepted by academics, legal practitioners, and US courts. Instead, the cited papers tend to focus on the relation between share prices and thirty-party Environmental, Social, and Governance (ESG) ratings (e.g., MSCI, Sustainalytics). I caution against extrapolating evidence from third-party ESG ratings to disclosure of GHG emissions.

Part III of this letter provides initial evidence on the materiality of GHG disclosures using standard event study tests commonly employed by academics and practitioners to assess materiality of a given disclosure. For the average company in the sample, I find <u>no evidence</u> of a statistically significant change in stock price or trading volume in response to GHG disclosures. The evidence suggests that—on average—the market behaves as if GHG disclosures are not material to the valuation of the company. Part III also discusses explanations for why this is the case, discusses related academic literature, and corroborates the evidence by discussing company's disclosure practices—many of which are at odds with the notion that GHG disclosures are material.

Part IV of this letter discusses the effect of the Proposal on investor protection. Unfortunately, the Commission's budget is inadequate to keep pace with changes in US capital markets. As a result, the substantial resources needed to implement and police the Proposal will necessarily come at the cost of other (non-climate) priorities. The Commissions' cost-benefit analysis should account for the effect of diminished resources in other (non-climate-related) areas on investors and markets. Depending on the source of resources used to fund the Proposal, individual investors could be harmed. Every dollar the Commission spends on the Proposal is a dollar that could be spent protecting individual investors from accounting fraud, rogue investment advisors, crypto scams, greenwashing, market manipulation, and other illicit activities that directly affect the day-to-day lives of individual investors.

Please feel free to contact me (███████████████) if you have any questions about this letter or associated analysis.

Sincerely,

Daniel Taylor
Arthur Andersen Professor
Director, Wharton Forensic Analytics Lab
The Wharton School

*A consulting client compensated me for the time it took to write this letter, but did not have input into its findings or conclusions.

Appellate Case: 24-1628    Page: 1139    Date Filed: 03/26/2024 Entry ID: 5377362

*Part I. Climate-Related Risks in the Context of Traditional Notions of Materiality*

In financial economics, a piece of information is traditionally considered material if knowledge of that information would alter a reasonable investors' valuation of the company or their proxy voting decision.[1] Material risks (and changes to these risks) must be disclosed as "risk factors" in a company's quarterly and annual filings with the SEC (i.e., 10-Qs and 10-Ks).

The Proposal states (p. 63): "*The proposed rules would require a registrant to disclose whether any climate-related risk is reasonably likely to have a material impact on a registrant, including its business or consolidated financial statements, which may manifest over the short, medium, and long term*."

Climate-related risks can be material; if and when they are, existing rules require these risks to be disclosed. Depending on the circumstances, the following hypothetical examples could theoretically be material:

(1) Despite more extreme weather in a particular region, a power company chooses to cut costs and not weatherize its equipment. In the event of extreme weather, this choice might cost the company significant damages either because the equipment freezes or contributes to forest fires. In this example, the choice not to weatherize could be material.

(2) A company operates offshore drilling equipment in an area that faces extreme weather events, and such events make work stoppages more frequent and increase the risk of catastrophic damage to the company's equipment. If climate change significantly increases the likelihood of extreme weather events, climate change could pose a material risk.

(3) A company anticipates very significant regulatory costs in the future because of its high levels of greenhouse gas emissions. If the expected value of these costs are sufficiently large, the company's emissions could pose a material risk.

(4) A company sells a single consumer product that runs on fossil fuels, and observes that significant trends in consumer purchasing of that product now prioritize products that use "green energy." Its competitors offer such products, but the company does not. These changes in consumer spending and competitive advantages could pose a material risk.

These examples illustrate several different scenarios that could give rise to material climate-related risks. When these risks are material (i.e., would alter a reasonable investor's valuation of the company), these risks are required to be disclosed under *existing* disclosure rules. In this regard, current SEC rules speak to material risks, and do not treat climate-related and non-climate-related risks differently.

Indeed, the Commission acknowledges that the determination of material climate-risk is similar to that for required risk factor disclosure (p. 65):

---

[1] Proposal, footnote 29.

App.1135

Appellate Case: 24-1628    Page: 1140    Date Filed: 03/26/2024 Entry ID: 5377362

> *"The materiality determination that a registrant would be required to make regarding climate-related risks under the proposed rules is similar to what is required when preparing the MD&A section in a registration statement or annual report. The Commission's rules require a registrant to disclose material events and uncertainties known to management that are reasonably likely to cause reported financial information not to be necessarily indicative of future operating results or of future financial condition. As the Commission has stated, MD&A should include descriptions and amounts of matters that have had a material impact on reported operations as well as matters that are reasonably likely to have a material impact on future operations."*

This makes me wonder whether the Commission believes some firms are not disclosing climate-related risks that are in fact material. If the Commission feels material climate-related risks are not being disclosed—such an omission violates existing rules—this suggests the need for additional guidance. Indeed, the Division of Corporation Finance's sample letter dated September 2021, demonstrates that climate-related risks fit into the existing disclosure rules and how additional guidance can sharpen disclosures under existing rules.[2] Tellingly, Bloomberg reports that 25 of 26 companies that received inquiries from the SEC reported that "climate risk wasn't a material issue...".[3] Thus, unless companies are withholding information on material risks, it seems unlikely that the additional climate disclosures required by the Proposal would reveal new material risks.

*Part II. Academic Evidence on Materiality of GHG Disclosures*

A core aspect of the Proposal is that it would require companies to report Scope 1, 2, and/or 3 GHG emissions, provide auditor attestation of the emissions, and disclose disaggregated emissions by constituent gas (e.g., methane, carbon dioxide, etc.). While the Proposal cites many academic studies, few (if any) papers provide an analysis of the relation between GHG disclosures and share price—the sort of analysis that is commonly used to assess materiality. Indeed, the section of the Commission's economic analysis that discusses the benefits to disclosing GHG emissions metrics (Section IV.C.1.e) does not reference any academic papers studying corporate disclosures of such metrics.[4] Nor does the Proposal provide or cite any evidence that investors use disaggregated emissions data in their valuation or voting decisions.

In many places the Proposal cites evidence from studies that examine the relation between third-party ESG ratings (e.g., MSCI, Bloomberg, etc.) and share prices or mutual fund flows to support the notion that disclosures of climate-related risks are material.[5] Third party ESG ratings—and by extension, the academic papers studying them—do not speak to GHG emissions. ESG ratings are a hodgepodge of various environmental, social, and governance factors. As a result, the Commission should exercise extreme caution in extrapolating inferences using research relying on

---

[2] "Sample Letter to Companies Regarding Climate Change Disclosures," *U.S. Securities and Exchange Commission*, September 22, 2021, available at https://www.sec.gov/corpfin/sample-letter-climate-change-disclosures.

[3] Nicola M. White, "SEC Drops Hints About ESG Rule in Retorts to Vague Disclosures," *Bloomberg*, March 18, 2022, available at https://news.bloomberglaw.com/financial-accounting/sec-scrutiny-of-big-companies-sheds-light-on-climate-priorities.

[4] For example, footnote 877 of the Proposal references a paper studying mine safety disclosures; footnotes 886 and 887 reference academic papers studying where multinationals emit: onshore or offshore; and footnote 888 references two papers that suggest long-run risks generally affect asset prices.

[5] See papers referenced in Proposal footnotes 802, 804, 839, and 987.

third-party ESG ratings to justify the materiality of GHG disclosures. Indeed, the Proposal does not provide (or reference) any evidence on the materiality of GHG disclosures using standard "event study" tests for materiality commonly employed and accepted by academics, legal practitioners, and US courts. This is an important oversight, as the market reaction to a given disclosure—specifically whether and how prices and trading volume change in response to the disclosure—is critical to inferring the materiality of the disclosure.

*Part III. Market Reaction to GHG Disclosures*

In this section, I provide initial evidence of the market reaction to GHG disclosures. In particular, I use standard event study tests commonly employed in the academic literature to examine whether there was a statistically significant change in the level of trading volume and/or stock prices in response to a disclosure.[6] If so, it suggests the disclosure was material (i.e., altered a reasonable investor's valuation of the company).

I begin by collecting the set of GHG disclosures posted on the SEC's EDGAR system. I focus on GHG disclosures posted on EDGAR because EDGAR provides machine-readable information on the precise date the disclosure was made public. This date is necessary to estimate the event study tests. By focusing only on GHG disclosures posted on EDGAR, the sample is weighted toward highly visible disclosures of GHG emissions. If anything, I expect disclosure of GHG emissions on EDGAR to have a greater economic impact on markets than GHG emissions disclosed via other less visible channels. By focusing on GHG disclosures on EDGAR, the sample is arguably biased *in favor* of finding such disclosures are material.

In conducting this analysis, I found two alternative disclosure strategies that are not considered in my analysis but are nonetheless worth discussing.

(1) Some companies provide GHG emissions in an "ESG report" provided on their corporate website, but do not file the ESG report as an exhibit to an EDGAR filing.[7] Only ESG reports explicitly included as an exhibit in an EDGAR filing are included in my analysis.

(2) Many companies appear to be privately disclosing detailed information on GHG emissions, mitigation strategies, and risks to the Carbon Disclosure Project (CDP) but *not* disclosing this information to shareholders. The CDP then makes this information accessible to accountholders and paid subscribers. For example, NetApp discusses data on GHG emissions in a single sentence in their 2020 ESG Report (p. 20):*"We continue to measure, monitor, and report our GHG emissions (Scopes 1, 2, and 3) and we voluntarily report*

---

[6] The tests used in this section are standard and have been repurposed from prior academic studies I have previously conducted. I refer interested readers to Taylor, Daniel, et al. (2022), "Audit Process, Private Information, and Insider Trading," available at SSRN: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3264424; Taylor, Daniel et al. (2020), "Undisclosed SEC Investigations," *Management Science*, 67(6), available at SSRN: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3507083; and Lynch, Bradford and Taylor, Daniel (2021), "The Information Content of Corporate Websites," available at SSRN: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3791474.

[7] See for example IBM's 2021 ESG report, located on IBM's investor relation website but never filed as an exhibit to an EDGAR filing. See, "Reports & Policies," *IBM*, available at https://www.ibm.com/impact/reports-and-policies.

App.1137

Appellate Case: 24-1628     Page: 1142     Date Filed: 03/26/2024 Entry ID: 5377362

*annually to CDP.*"[8] However, neither their 2020 ESG report, nor any document filed on EDGAR, discusses their 2020 Scope 1, 2, or 3 emissions, how they compare to 2011 base levels the company recorded, or provide disaggregated emissions data by facility. Nevertheless, NetApp disclosed all of this information in their 2020 report filed with the CDP.[9] This disclosure practice to CDP is commonplace. For example, one academic study estimated that 12.75% of the S&P 500 responded to the CDP's survey on climate-risks and GHG emissions but did not authorize CDP to make their responses publicly available.[10]

These two disclosure practices are not consistent with a view that GHG disclosures are material. For example, if information on GHG emissions is material—useful for valuation and voting decisions—then it would seem the widespread practice of selectively disclosing this information to a third-party (e.g., CDP) would violate Reg FD (which is supposed to prevent the selective disclosure of material non-public information). Thus, I infer from the prevalence of this disclosure strategy that companies and their counsel do not believe data on GHG emissions is material, otherwise they would not be selectively disclosing it. Regardless, I do not include GHG disclosures to the CDP in my analysis because (i) these disclosures are available only to CDP accountholders and paid subscribers; and (ii) the CDP does not have precise information on the date at which the company publicly disclosed their emissions data.

To compile the sample used in my analysis, I use the SEC's website to search EDGAR for all Form 8-Ks filed between January 2021 and March 2022 that include the keywords: "Scope 1," "Scope 2," or "Scope 3."[11] The search includes all Form 8-K exhibits and hyperlinked materials. I focus on keywords related to the various emission levels because I seek to identify disclosure related to emissions levels, not disclosures related to climate risk more broadly. I focus on Form 8-Ks, because alternative forms such as 10-Qs and 10-Ks include a wealth of financial statement information that would confound attributing changes in volume and price to the GHG disclosure itself.

This results in a sample of 371 Form 8-Ks. I then read each 8-K to determine whether the disclosure relates to emissions. I eliminate 46 that are parsing errors (e.g., a table of contents to a contract where the "Scope" is discussed on page 2), 115 that reference emissions but do not provide information about emissions levels (e.g., covenants on "green bonds"), and 94 that are duplicate disclosures of the same information (e.g., three different investor day presentations that all provide the same emissions levels). This suggests many companies either: (1) provide GHG emission data on their website as an ESG report without a corresponding 8-K, (2) disclose the information only to CDP, or (3) do not disclose GHG emission data. I interpret these findings as *prima facie* evidence that companies do not view the information as material for investors' valuation decisions.

I merge the sample of the remaining 116 8-Ks to price data from the Center for Research in Security Prices (CRSP), and focus on common stocks listed on the three major exchanges (e.g.,

---

[8] "NetApp 2020 ESG Report," *NetApp*, available at https://www.netapp.com/pdf.html?item=/media/11875-netapp-2020-esg-report.pdf.
[9] "NetApp Inc. - Climate Change 2020," *CDP*. See https://www.dropbox.com/s/iq4wopk7yms4uz2/CDP.pdf.
[10] Matsumura, Ella M., et al. (2015), "Firm-Value Effects of Carbon Emissions and Carbon Disclosures," The Accounting Review, (89)2, available at SSRN: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=1921809.
[11] "EDGAR Advanced Search," *U.S. Securities and Exchange Commission*, available at https://www.sec.gov/edgar/search/#.

Appellate Case: 24-1628     Page: 1143     Date Filed: 03/26/2024 Entry ID: 5377362

excluding Real-Estate Investment Trusts and Limited Partnerships).[12] This leaves a sample of 87 GHG disclosures. Of these, 52 are bundled with an earnings announcement (or merger announcement). Trading volume and shares prices respond to earnings announcements even in the absence of any GHG disclosures. Thus, without a more rigorous and deeper investigation, one cannot disentangle whether the change in trading volume and prices are attributable to the GHG disclosure or the quarterly financials. I remove these observations from the sample.

For each of the remaining 8-Ks, I calculate the first date at which the market could have traded on the information in the 8-K.[13] I refer to this as "day 0." I then collect data on stock returns and trading volume over the thirty calendar days before and after this date, i.e., the [-30, +30] window around day 0, and test for statistically abnormal changes in trading volume and stock price on day 0. The final sample consists of 1,493 daily observations.

I compute trading volume as a percentage of shares outstanding (*Volume*), and price change as the absolute value of stock return in excess of the respective industry benchmark (|*Return*|).[14] I use absolute value of returns, because these tests seek to estimate whether the price changed once the 8-K was disclosed—which could be a positive price change (i.e., good news), or a negative price change (i.e., bad news).[15]

Table 1 presents mean and median absolute price change and trading volume on the day the disclosure is made public (i.e., "Day 0") and on all other days in the [-30, +30] window excluding Day 0 (i.e., "[-30, +30] ex Day 0"). Table 1 shows that the average (median) return is slightly elevated (or depressed) on day 0, and both average and median trading volumes are elevated.

### Table 1. Difference in Mean and Median Price Change and Trading Volume

|  | Day 0 | | [-30, +30] ex Day 0 | | Diff in | Diff in |
|---|---|---|---|---|---|---|
|  | Mean | Median | Mean | Median | Means | Medians |
| \|*Return*\| | 2.43 | 1.00 | 1.83 | 1.20 | 0.60 | -0.20 |
| *Volume* | 1.63 | 0.92 | 1.42 | 0.79 | 0.21 | 0.13 |

Table 2 presents statistical tests for whether the change in price and trading volume on day 0 is statistically abnormal (i.e., statistically different from all other days in the [-30, +30] window).

---

[12] I restrict the sample to CRSP share code 10 or 11.

[13] For 8-Ks filed during market hours, this is the date of the filing. For 8-Ks filed after hours, this is the next trading date.

[14] I use the 48 industry portfolios available from Ken French as the industry benchmark. Kenneth R. French, "Detail for 48 Industry Portfolios," 2022, available at
https://mba.tuck.dartmouth.edu/pages/faculty/ken french/Data_Library/det_48_ind_port.html.

[15] Focusing on whether price changed, not the direction of the change, is common in the literature that seeks to examine whether a disclosure provides the market with information. See e.g., Lynch, Bradford and Taylor, Daniel (2021), "The Information Content of Corporate Websites," available at SSRN:
https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3791474.

Appellate Case: 24-1628     Page: 1144     Date Filed: 03/26/2024 Entry ID: 5377362

**Table 2. Statistical Tests for Changes in Price and Trading Volume**

|  | Dependent Variable: |Return| | | Dependent Variable: Volume | |
|---|---|---|---|---|
|  | (1) Coeff. | (2) Coeff. | (3) Coeff. | (4) Coeff. |
| *Day 0* | 0.60 | 0.46 | 0.21 | 0.05 |
| *p*-value | (0.20) | (0.33) | (0.47) | (0.77) |
| Date FE | No | Yes | No | Yes |
| Company-Year-Qtr FE | No | Yes | No | Yes |
| S.E. Cluster | Date | Date | Date | Date |
| *N* | 1,493 | 1,493 | 1,493 | 1,493 |

Column 1 presents results from a regression of the price change on an indicator variable for whether a given observation is day 0. Column 2 includes date and company-year-quarter fixed effects which adjust for the average price change on the respective date and during the respective company-fiscal quarter (e.g., average price change in Intel's Q1-2021). Columns 3 and 4 present analogous results using trading volume. The *p*-values (two-tailed) that indicate whether a given regression coefficient is statistically different from zero appear in parentheses. In the academic literature, *p*-values of 0.05 and below are traditionally considered "statistically significant." Across all tests, *p*-values are routinely above 0.05. Thus, there is no statistical evidence of a price or trading volume response to the GHG disclosures. In the academic literature, this would be interpreted as evidence that the average GHG disclosure did not contain material information.

Taken at face value, the evidence from this analysis suggests that—on average—investors do not update their beliefs about value (upward or downward) in light of the GHG emissions data. These findings are consistent with two other academic studies that use a similar event study design, and find no evidence of a price or volume response to the disclosure of corporate sustainability reports and no evidence of a price response to corporate press releases related to ESG.[16] The Proposal does not reference these studies, nor does it provide (or reference) any evidence on the materiality of GHG disclosures using standard "event study" tests for materiality.

I caution that this evidence does *not* suggest climate risk is immaterial, but rather it suggests that GHG emissions are not material. To highlight this distinction, consider the following. Suppose GHG emissions are relevant to investors because it helps them assess the risk the company will incur substantial regulatory costs in the future. If this risk is already adequately disclosed as a material risk factor in the company's 10-K, then GHG emissions data will not cause shareholders to update their beliefs about that risk. To trigger a market reaction, GHG emissions have to contain new information that is not already reflected elsewhere in the company's many disclosures (e.g., the risk factors in annual filings). If GHG emissions measure climate risks, and a company is

---

[16] For evidence on lack of price or volume response to corporate sustainability reports, see Burzillo, Suzanne, et al. (2022), "Who Uses Corporate Sustainability Reports?" available at SSRN: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3976550. For evidence on lack of price response to corporate press releases related to ESG, see Moss, Austin, et al. (2020), "The Irrelevance of ESG Disclosure to Retail Investors: Evidence from Robinhood," available at SSRN: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3604847.

Appellate Case: 24-1628    Page: 1145    Date Filed: 03/26/2024    Entry ID: 5377362

already (appropriately) disclosing these climate risks elsewhere in their annual filings, then I would not expect GHG disclosures to be material.

One potential explanation for the above findings is that GHG emissions are highly correlated with other observable aspects of a company's operations that are already reflected in stock prices. For example, one academic study estimates that GHG emissions are extremely highly correlated over time (e.g., autocorrelation coefficient of 0.977).[17] This means that, on average, next year's GHG emissions will be almost the same as this year. This study also finds that 90% of GHG emissions are explained by observable aspects of a company's operations including industry membership; company size; sales growth; earnings growth; the value of plant, property, and equipment; capital expenditures; and profitability. Thus, 90% of the variation in GHG emissions can be inferred from information that is already publicly available. This information will already be reflected in stock prices, such that the level of GHG emissions itself (and potentially other climate-related information) may provide little *new* information beyond what can be inferred from observable aspects of the company's operations. This could explain why GHG disclosures examined above are not material to a company's valuation. It could also explain why two academic studies find no evidence of a price or volume response to the disclosure of corporate sustainability reports and no evidence of a price response to corporate press releases related to ESG.[18] Another academic study compares the market's valuation of actual GHG emissions and GHG emissions inferred from information on the company's balance sheet and income statement. This study finds no evidence of a difference in valuation between GHG emissions voluntarily disclosed by the company (to the CDP) and the valuation of GHG emissions inferred from publicly-observable information.[19]

The preceding analysis and discussion is subject to the caveat that the event study analysis is based on traditional notions of materiality embraced by academics and legal scholars. These tests are shareholder-centric and consider whether prices or trading volume in the company's stock changed as a result of the company's disclosure. The tests do not consider other stakeholders or other non-valuation uses of the information.

*Part IV. Investor Protections*

The Commission has recently made tremendous strides on investor protections. I commend the Commission for this progress and the Commission's renewed focus on robust enforcement. The Commission's budget has grown on average at 4% over the past five years (2017-2021).[20] This growth has not kept pace with the explosive growth in trading volume and recent capital markets developments (e.g., special purpose acquisition companies, high frequency trading, crypto, and non-fungible tokens). As a result, the Commission is being asked to regulate and police increasingly large portions of the economy with relatively less resources.

[17] Bolton, Patrick and Kacperczyk, Marcin T. (2019), "Do Investors Care about Carbon Risk?" *Journal of Financial Economics*, 142(2), available at SSRN: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3398441.
[18] See footnote 17 for references.
[19] Griffin, Paul A., et al. (2015), "The Relevance to Investors of Greenhouse Gas Emission Disclosures," *Contemporary Accounting Research*, 34(2), available at SSRN: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=1735555.
[20] "Budget History – BA vs. Actual Obligations ($ in 000s)," *U.S. Securities and Exchange Commission*, November 13, 2019, available at https://www.sec.gov/foia/docs/budgetact htm.

Given its resource constraints, the Commission is already incapable of policing every violation of federal securities laws that it learns about. It routinely disregards enforcement of some violations of securities laws in favor of enforcing others. Against this backdrop, the Proposal dramatically expands the amount of resources the Commission would need to invest in implementing and policing disclosures of GHG emissions. The Commission's scarce resources dictate that this investment would necessarily come at the cost of other priorities. I am particularly concerned about the consequences for enforcement, and investor protections. Stretched resources imply less effectively policing of markets. Less effective policing implies reduced compliance with securities laws. Reduced compliance with laws erodes Americans' trust in markets and institutions.[21]

Mandatory GHG disclosures will undoubtedly benefit Blackrock, Ceres, and those niche funds that invest based on GHG levels. Rather than spend considerable effort and money researching what a company's GHG emissions are, they will be able to get such data directly from the company's mandatory SEC disclosures. Indeed, the Proposal will transfer the burden of calculating GHG emissions from the funds to the companies themselves. To the extent that such calculations are costly, even investors in the company who do not use such information will effectively be paying for the information to be produced. Indeed, research suggests most individual investors generally ignore such factors in their investment decisions.[22] It is this latter group that may suffer from the reallocation of Commission resources. In this regard, the Proposal nicely illustrates the distinction between the interests of the average dollar (e.g., those of certain high-profile institutional investors) and the interests of the average investor (e.g., those of the individual investors). In prioritizing the interests of the average dollar, the Commission may be acting against the interest of the average investor. Every dollar the Commission spends on the Proposal is a dollar that could be spent protecting individual investors from accounting fraud, rogue investment advisors, crypto scams, greenwashing, market manipulation, and other illicit activities that directly affect the day-to-day lives of individual investors.

Currently the Proposal's cost-benefit analysis does not speak to where the resources to implement the Proposal will come from, and what priorities might face fewer resources as a result of implementing the Proposal. The Commission's cost-benefit analysis should articulate what specific functions will be diminished as a result of the resources needed to implement the Proposal, and should account for the effect of diminished resources in other (non-climate-related) areas on investors and markets. This is a potential hidden cost of the Proposal that does not feature in the economic analysis.

---

[21] Gurbir S. Grewal, "PLI Broker/Dealer Regulation and Enforcement 2021," *U.S. Securities and Exchange Commission*, October 6, 2021, available at https://www.sec.gov/news/speech/grewal-pli-broker-dealer-regulation-and-enforcement-100621.

[22] For academic evidence see Moss, Austin, et al. (2020), "The Irrelevance of ESG Disclosure to Retail Investors: Evidence from Robinhood," available at SSRN: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3604847; and for survey evidence see Gary Mottola et al., "Consumer Insights: Money & Investing," FINRA Investor Education and NORC at the University of Chicago, March 2022, available at https://www.finrafoundation.org/sites/finrafoundation/files/Consumer-Insights-Money-and-Investing.pdf.

**Professional Profile for Dr. Daniel Taylor:**

Daniel Taylor is the Arthur Andersen Chaired Professor at The Wharton School, and is director of the Wharton Forensic Analytics Lab. He is an award-winning researcher and teacher with extensive expertise on corporate disclosures, insider trading, fraud prediction, and corporate governance. He has published extensively on these topics in leading academic journals; led seminars at dozens of top business schools across the globe; and won numerous academic and industry awards.

Professor Taylor's research targets practitioners and regulators, and aims to have direct relevance to current issues facing boards, shareholders, and enforcement agencies. His research frequently appears in the business media and has been cited in rules and regulations promulgated by the SEC. Most recently, his research on insider trading was the impetus behind proposed rule changes to 10B5-1 trading plans; Form 144 filings; the Holding Foreign Insiders Accountable Act; and multiple investigations by the SEC, FBI, Treasury, and DoJ.

Professor Taylor enjoys putting his research into practice and has provided expert and consulting services related to best practices in corporate disclosure, 10B5-1 trading plans, statistical analysis of trading activity, and fraud prediction, and has co-developed and licensed intellectual property related to parsing SEC filings. His consulting clients include the DoJ, hedge funds, plaintiff and defense firms, and a Big 4 auditor.

Professor Taylor teaches a cutting-edge undergraduate course—Forensic Analytics—that applies state-of-the-art analytics to corporate disclosures, and teaches a doctoral seminar on data analysis. His doctoral students have gone on to become faculty at a variety of leading business schools, including Stanford, MIT, and Chicago. Professor Taylor received his bachelor's degree from University of Delaware, his master's from Duke University, and his PhD from Stanford University.

# Daniel J. Taylor

www.danieltayloranalytics.com

Arthur Andersen Professor
The Wharton School
University of Pennsylvania

dtayl@wharton.upenn.edu
Cell: 302.897.0644
Fax: 215.573.2054

## EDUCATION

Stanford University
   *Ph.D. Business, 2010*

Duke University
   *M.A. Economics*, 2005

University of Delaware
   *B.S. Economics*, 2003
   *Minor: Information Systems; Cum Laude*

## ACADEMIC POSITIONS

The Wharton School of the University of Pennsylvania

| | |
|---|---|
| *Professor* | 2022 – present |

   Arthur Andersen Chair, 2020 – present
   Founder & Director, Wharton Forensic Analytics Lab, 2021 – present
   Wharton Teaching Excellence Award, 2019, 2020, 2021
   Analytics @Wharton Teaching Grant, 2020, 2021
   Analytics @Wharton Fellow, 2020 – present
   Wharton Faculty Fellow, 2019
   Dean's Research Grant, 2011-2013, 2019-2021
   Harold C. Stott Chair, 2013-2017

| | |
|---|---|
| *Associate Professor* | 2017 – 2022 |
| *Assistant Professor* | 2011 – 2017 |
| *Lecturer* | 2010 – 2011 |

## RESEARCH INTERESTS

insider trading, financial misreporting, corporate disclosure, corporate governance

App.1144

Appellate Case: 24-1628   Page: 1149   Date Filed: 03/26/2024 Entry ID: 5377362

**Causality Redux: The Evolution of Empirical Methods in Accounting Research**
(with C. Armstrong, J. Kepler, and D. Samuels) <u>Journal of Accounting and Economics</u>, forthcoming [invited, not peer reviewed]

**Disclosure Substitution**
(with M. Heinle and D. Samuels) <u>Management Science</u>, forthcoming

**Audit Process, Private Information, and Insider Trading**
(with S. Arif, J. Kepler, and J. Schroeder) <u>Review of Accounting Studies</u>, September 2022

- Winner, *Best Academic Paper Award,* Weinberg Corporate Governance Symposium (Mar 2019)

- Featured in *Harvard Law School Forum on Corporate Governance and Financial Regulation* (Nov 2018); *Marketwatch* (Mar 2019); *Council of Institutional Investors, The Voice of Corporate Governance* (May, 2019); *Marketwatch* (Jun 2019);

**Voluntary Disclosure when Private Information and Disclosure Costs are Jointly Determined**
(with J.M. Kim and R. Verrecchia) <u>Review of Accounting Studies</u>, June 2021

**Undisclosed SEC Investigations**
(with T. Blackburne, J. Kepler, and P. Quinn) <u>Management Science</u>, June 2021

- Winner, *Outstanding Research Paper Award*, Jacobs Levy Center for Quantitative Financial Research (2020)

- Cited in the SEC's final ruling on exemptions to 404(b) of SOX "Amendments to the Accelerated Filer and Large Accelerated Filer Definitions" *SEC Release No. 34–88365*

- Featured in Columbia Law School Blue Sky Blog (Feb 2020); *Bloomberg Money Stuff* (Feb 2020), *Securities Regulation Daily* (Feb 2020); *Corporate Counsel* (Mar 2020); *Wall Street Journal* (Sept 2021)

**The Economics of Misreporting and the Role of Public Scrutiny**
(with D. Samuels and R. Verrecchia) <u>Journal of Accounting and Economics</u>, February 2021

- Featured in *CFO* (May 2018); *Barron's* (Jun 2018)

**Political Connections and the Informativeness of Insider Trades**
(with A. Jagolinzer, D. Larcker, and G. Ormazabal) <u>Journal of Finance</u>, August 2020

- Winner, *Outstanding Research Paper Award*, Jacobs Levy Center for Quantitative Financial Research (2019)

- Synopsis printed in *CATO Institute Research Briefs in Economic Policy* (Jan 2018)

- Featured in *Harvard Law School Forum on Corporate Governance and Financial Regulation* (Sept 2016); *The Economist* (Feb 2018); *CNBC* (Feb 2018); *Apple News* (Mar 2020); *Bloomberg Law* (Mar 2020); *Bloomberg Money Stuff* (Mar 2020), *DailyMail* (Mar 2020); *Fox Business* (Mar 2020); *Law.com* (Mar 2020); *Reuters* (Mar 2020); *Securities Docket* (Mar 2020); *Yahoo Finance* (Mar 2020); *Yahoo News* (Mar 2020); *The Week* (Mar 2020); *US News and World Report* (Mar 2020), *Reuters* (Apr 2020), *New York Times* (Apr 2020); *US News and World Report* (Apr 2020); lead story on news aggregator *Drudgereport* (Mar 26-27, 2020)

- Almetrics media influence score in the top 5% of all academic research, ranked in top 0.5% within Journal of Finance.

## Economics of Managerial Taxes and Corporate Risk-Taking

(with C. Armstrong, S. Glaeser, and S. Huang) <u>The Accounting Review</u>, January 2019

- Featured in *Columbia Law School Blue Sky Blog* (Dec 2017)

## Linguistic Complexity in Firm Disclosures: Obfuscation or Information

(with B. Bushee and I. Gow) <u>Journal of Accounting Research</u>, March 2018

- Top five most highly-cited papers published in the journal since 2018

- A widely-used Perl command to calculate Fog Index, *Lingua:EN:Fathom*, was revised as a direct result of the computational errors identified in this paper (see v1.22 of this command)

- Synopsis printed in *CFA Digest* (December 2018)

## JOBS Act and Information Uncertainty in IPO Firms

(with M. Barth and W. Landsman) <u>The Accounting Review</u>, Nov 2017

- Winner, *AICPA Notable Contribution to Accounting Literature Award* (2020)

- Cited in the SEC's final ruling on amendments to Regulation A of the Securities Act, "Amendments for Small and Additional Issues Exemptions Under the Securities Act" *SEC Release No. 33–9741, 34–74578, 39–2501*

- Featured in *Harvard Law School Forum on Corporate Governance and Financial Regulation* (Aug 2014); speech by SEC Commissioner Kara Stein (Dec 2016); *CFO* (Oct 2017); *CPA Practice Advisor* (Oct 2017); *MarketWatch* (Oct 2017); *The Intercept* (Feb 2018); speech by SEC Commissioner Kara Stein (Jun 2018); *Xconomy* (Apr 2019); *Accounting Today* (Aug 2020) *CPA Practice Advisor* (2020)

Appellate Case: 24-1628     Page: 1151     Date Filed: 03/26/2024 Entry ID: 5377362

- Almetrics media influence score in the top 25% of all academic research, ranked in top 10% within The Accounting Review.

**Guiding Through the Fog: Financial Statement Complexity and Voluntary Disclosure**
(with W. Guay and D. Samuels) Journal of Accounting and Economics, Nov 2016

- Top five most highly-cited papers published in the journal since 2016
- Featured in *Columbia Law School Blue Sky Blog* (Mar 2015)

**Thoughts on the Divide Between Theoretical and Empirical Research in Accounting**
(with Q. Chen, J. Gerakos, and V. Glode) Journal of Financial Reporting, Fall 2016 [invited, not peer reviewed]

**From Casual to Causal Inference in Accounting Research: The Need for Theoretical Foundations**
(with J. Bertomeu and A. Beyer) Foundations and Trends in Accounting, Fall 2016

**Abnormal Accruals in Newly Public Companies: Misreporting or Economic Activity?**
(with C. Armstrong and G. Foster) Management Science, May 2016

**Asymmetric Reporting**
(with C. Armstrong and R. Verrecchia) Journal of Financial Reporting, Spring 2016

**Delegated Trade and the Pricing of Public and Private Information**
(with R. Verrecchia) Journal of Accounting and Economics, Dec 2015

**The Relation Between Equity Incentives and Misreporting: The Role of Risk-Taking Incentives**
(with C. Armstrong, D. Larcker, and G. Ormazabal) Journal of Financial Economics, Aug 2013

- Featured in Keynote Address by PCAOB Chair James Doty at *AICPA National Conference on Current SEC and PCAOB Developments* (Dec 2012); *Wall Street Journal* (May 2013); *Harvard Law School Forum on Corporate Governance and Financial Regulation* (May 2013)

**Why Do Pro Forma and Street Earnings Not Reflect Changes in GAAP?**
(with M. Barth and I. Gow) Review of Accounting Studies, Sep 2012

4

- Featured in *Harvard Law School Forum on Corporate Governance and Financial Regulation* (Nov 2010); *Wall Street Journal* (May 2015)


## Asset Securitizations and Credit Risk
(with M. Barth and G. Ormazabal) <u>The Accounting Review,</u> Mar 2012


## Frictions in the CEO Labor Market: The Role of Talent Agents in CEO Compensation
(with S. Rajgopal and M. Venkatachalam) <u>Contemporary Accounting Research,</u> Spring 2012


## Corporate Governance and the Information Content of Insider Trades
(with A. Jagolinzer and D. Larcker) <u>Journal of Accounting Research,</u> Dec 2011

- Featured in *Harvard Law School Forum on Corporate Governance and Financial Regulation* (Oct 2011); *Marketwatch* (Mar 2019);


## The Market Reaction to Corporate Governance Regulation
(with D. Larcker and G. Ormazabal) <u>Journal of Financial Economics</u>, Aug 2011

- Cited in the SEC's final ruling on proxy access (SEC Rules 14a-8 and 14a-11), "Facilitating Shareholder Director Nominations" *SEC Release No. 33-9136*

- Synopses printed in *CFA Digest* (Aug 2011)

- Featured in *Wall Street Journal* (Jul 2010); *New York Times* (Nov 2010); *Harvard Law School Forum on Corporate Governance and Financial Regulation* (Sep 2010); *CFA Institute* (Aug 2014)


## When Does Information Asymmetry Affect the Cost of Capital?
(with C. Armstrong, J. Core, and R. Verrecchia) <u>Journal of Accounting Research</u>, Mar 2011

- Cited in the SEC's proposed rule regarding mandatory clawbacks "Listing Standards for Recovery of Erroneously Awarded Compensation" *SEC Release No. 33-9861, 34-75342*

- Cited in the SEC's proposed exemptions to Section 404(b) of SOX "Amendments to the Accelerated Filer and Large Accelerated Filer Definitions" *SEC Release No. 34–85814*


## Correcting for Cross-Sectional and Time-Series Dependence in Accounting Research
(with I. Gow and G. Ormazabal) <u>The Accounting Review</u>, Mar 2010

- Top 5 most highly-cited paper published in the journal since 2010

[In Defense of Fair Value: Weighing the Evidence on Earnings Management and Asset Securitizations](#)
(with M. Barth) <u>Journal of Accounting and Economics</u>, Feb 2010 [invited, not peer reviewed]

[The Stock Market's Pricing of Customer Satisfaction](#)
(with C. Ittner and D. Larcker) <u>Marketing Science</u>, Oct 2009 [invited, not peer reviewed]

## CURRENT ACADEMIC WORKING PAPERS

[Dark Side of Investor Conferences: Evidence of Managerial Opportunism](#)
(with B. Bushee and C. Zhu)

- Featured in Columbia Law School Blue Sky Blog (Jan 2021); *Bloomberg Money Stuff* (Jan 2021)

[Long-Term Information in the Decision to Provide a Short-Term Forecast](#)
(with M. Heinle, C. Kim, and F. Zhou)

[Measurement Error, Fixed Effects, and False Positives in Accounting Research](#)
(with J. Jennings, J.M. Kim, and J. Lee)

[The Information Content of Corporate Websites](#)
(with B. Lynch)

- Featured in 2021 NBER Big Data and Securities Markets Conference

[Holding Foreign Insiders Accountable](#)
(with R. Jackson and B. Lynch)

- Featured in *Wall Street Journal* (April 2022); *Bloomberg Money Stuff* (April 2022); congressional testimony before the Senate Banking Committee (April 2022); *Council of Institutional Investors, The Voice of Corporate Governance* (June 2022); Harvard Law School Forum on Corporate Governance and Financial Regulation (June 2022)

- Based on this paper, Sen. Kennedy introduced the "Holding Foreign Insiders Accountable Act" into the US Senate in May 2022

## PRACTITIONER PUBLICATIONS AND REGULATORY COMMENT LETTERS

[**Amicus Curiae in Support of Claims that Engineered Short Squeezes are a Form of Market Manipulation**](co-authored with six other academics authoring in support) <u>US Court of Appeals, Tenth Circuit</u>, Case 21-4126, Feb 2022.

[**Amicus Curiae in Support of Claims that SPACs are Not Valued as Operating Companies**](lead author; 30 academics authoring in support) <u>US District Court for the Southern District of New York</u>, Case 1:21-cv-07072-JPO, Nov 2021.

[**Amicus Curiae in Support of Claims that 10B5-1 Trading Plans Can Be Probative of Scienter**](lead coauthor with Joshua Mitts, 7 academics authoring in support) <u>US Court of Appeals for the 10th Circuit</u>, Case 21-4058, Sept 2021.

[**OpEd: Insider Trading Loopholes Need to be Closed**](with SEC Commissioner Caroline Crenshaw) <u>Bloomberg</u>, Mar 2021.

[**Comment Letter on the SEC's Proposed Rule 144 Holding Period and Form 144 Filings**](with David Larcker and Bradford Lynch), Mar 2021

- Featured in Harvard Law School Forum on Corporate Governance and Financial Regulation (Mar 2021); Council of Institutional Investor's Comment Letter to the SEC (Mar 2021)

- Cited in the SEC's Proposed Rule Changes on Rule 10B5-1 "Rule 10B5-1 and Insider Trading" *SEC Release No. 34-93782*, Dec 2021

- Cited in the SEC's Final Rule "EDGAR Filing Requirements and Form 144 Filings" *SEC Release No. 33-11070*, June 2022

[**Gaming the System: Three Red Flags of Potential 10B5-1 Abuse**](with D. Larcker, B. Lynch, P. Quinn, and B. Tayan) <u>Stanford Closer Look Series</u>, Jan 2021: 1-17. Stanford University Press.

- Presented to the *SEC's Investor Advisory Committee* (June 2021); presentation covered in *Law360* (June 2021)

- Featured in Harvard Law School Forum on Corporate Governance and Financial Regulation (Jan 2021); *Cooley PubCo* (Feb 2021); Council of Institutional Investor's Comment Letter to the SEC (Mar 2021); speech by Chairman Gensler at WSJ-CFO Summit (June 2021); speech by SEC Commissioner Allison Herren Lee (Dec 2021); *Reuters* (June 2021, Dec 2021); *Bloomberg* (June 2021, Dec 2021); *Bloomberg Money Stuff* (June 2021, Sept 2021); *Financial Times* (June 2021, July 2021, Dec 2021); *Law360* (June 2021 x4; July 2021); *Wall Street Journal* (June 2021, Aug 2021, Dec 2021 x2); *Forbes* (Aug 2021); and letters to the SEC by the AFL-CIO (April 2022),

App.1150

Council of Institutional Investor's (April 2022), and New York City Employee
Retirement System (April 2022);

- Cited extensively in the SEC's Proposed Rule Changes on Rule 10B5-1 "Rule 10B5-1
  and Insider Trading" *SEC Release No. 34-93782*, Dec 2021

- Cited in New York City Comptroller's proxy challenge to Abbott Labs on 10b5-1
  plans, supported by ISS and GlassLewis with 49% of the vote

## OpEd: How the SEC Can and Should Fix Insider Trading Rules
(with A. Jagolinzer and D. Larcker) <u>The Hill</u>, Dec 2020.

- Our policy recommendations were adopted by Senators Brown, Van Hollen, and
  Warren in their Feb 10, 2021 letter to the SEC urging changes in insider trading rules

- Cited in the SEC's Proposed Rule Changes on Rule 10B5-1 "Rule 10B5-1 and Insider
  Trading" *SEC Release No. 34-93782*, Dec 2021

## Comment Letter on the SEC's Proposed Reporting Threshold for Institutional Investment Managers
(with M. Barth, T. Dyer, and W. Landsman), Sept 2020

- Featured in *IR Magazine* (Sept 2020); *Harvard Law School Forum on Corporate
  Governance and Financial Regulation* (Oct 2020); *Council of Institutional Investor's
  Comment Letter to the SEC* (Oct 2020)

## OpEd: The Covid-19 Economic War: Congress Must Open a Second Front
(with Y. Gopalan and T. Lys) <u>The Hill</u>, July 2020.

## The Spread of Covid-19 Disclosures
(with D. Larcker, B. Lynch, and B. Tayan) in <u>Stanford Closer Look Series</u>, June 2020: 1-5.
Stanford University Press.

- Featured in *Bloomberg Money Stuff* (June 2020); *Cooley PubCo* (June 2020); *Harvard
  Law School Forum on Corporate Governance and Financial Regulation* (July 2020);
  included in NIRI's Covid-19 Crisis Response Library (July 2020)

- Private staff briefing to *House Financial Services Committee* (July 2020)

- Presented to the *SEC's Investor Advisory Committee* (Dec 2020); presentation
  covered in *Law360* (Dec 2020)

## OpEd: Are You Angry with the Fed? You Should Be
(with T. Lys) <u>The Hill</u>, June 22, 2020.

- Fed President Mary Daly responded to our arguments regarding Fed-fueled income inequality in "The Fed Isn't Fueling US Inequality," (*Reuters* June 23, 2020).

### Governance of Corporate Insiders' Equity Trades

(with D. Larcker, J.Kepler, and B. Tayan) in <u>Stanford Closer Look Series</u>, Jan 2020: 1-5. Stanford University Press.

- Featured in *Harvard Law School Forum on Corporate Governance and Financial Regulation* (Jan 2020)

### Comment Letter on the SEC's Proposed Exemption to Internal Control Audits under SOX 404(b)

(with M. Barth, W. Landsman, and J. Schroeder), Jul 2019

- Featured in *Wall Street Journal* (Jul 2019); *Harvard Law School Forum on Corporate Governance and Financial Regulation* (Jul 2019); *Council of Institutional Investor's Comment Letter to the SEC* (Jul 2019); *Better Market's Comment Letter to the SEC*; *Wall Street Journal* (Aug 2019); *CFA Institute's Comment Letter to the SEC*; *Corporate Secretary* (Aug 2019); *Internal Audit 360* (Aug 2019); *Wall Street Journal* (Mar 2020)

- Cited in the SEC's final ruling on exemptions to 404(b) of SOX "Amendments to the Accelerated Filer and Large Accelerated Filer Definitions" *SEC Release No. 34–88365*

- Cited in SEC Commissioner Allison Herren Lee's "Statement on the Rollback of Auditor Attestation Requirements"

### Follow the Money: Compensation, Risk, and the Financial Crisis

(with D. Larcker, G. Ormazabal, and B. Tayan) in <u>Stanford Closer Look Series</u>, Sept 2014: 1-5. Stanford University Press.

**Post-Earnings Announcement Drift and Related Anomalies**

in <u>Handbook of Equity Market Anomalies</u> (2011): 91-115. Wiley Publishing. Ed. Len Zacks.

## CONFERENCE DISCUSSIONS AND PANELS

"Research on Forensic Finance and Accounting" *2021 UT Symposium on Financial Market Policy Development & Research*

"How policy-makers use academic research on disclosure and governance," *2020 UT Symposium on Financial Market Policy Development & Research*

"Theory and Inference in Accounting Research," *2019 Stanford Theory & Inference Conference*

App.1152

Appellate Case: 24-1628    Page: 1157    Date Filed: 03/26/2024 Entry ID: 5377362

"Surviving and Thriving in the Profession," *2019, 2020, 2021 AAA Doctoral Consortium*

"Change in Capitol: How a 60 Minutes Expose and the STOCK Act Affected the Investment Activity of U.S. Senators," *2017 FEA Conference*

"When and Why do IPO Firms Manage Earnings," *2017 Review of Accounting Studies Conference*
  - Winner, Morgan-Stanley Best Discussant Prize *2017 Review of Accounting Studies Conference*

"Pre-IPO Communication and Analyst Research: Evidence Surrounding the JOBS Act," *2017 NYU/SEC Changing Role of Stock Markets in Capital Formation*

"Increased Creditor Rights, Institutional Investors, and Corporate Myopia," *2016 Harvard IMO Conference*

"Payoffs to Aggressiveness," *2015 AAA Annual Meeting*

"The Unification of Theory and Empirical Research and the Path toward Knowledge," *2015 Junior Accounting Theory Conference*

"Corporate Governance and Securitization Quality: The Impact of Shareholder Rights in the Banking Industry," *2014 AAA Annual Meeting*

"Earnings Co-Movement and Earnings Manipulation in Different Economic States," *2014 FARS Mid-year Conference*

"Managerial Incentives to Increase Firm Volatility Provided by Debt, Stock, and Options," *2013 Washington University St. Louis Nick Dopuch Conference*

"The Association Between Audit Committee Characteristics and Information Asymmetry," *2013 AAA Annual Meeting*

"Accounting Experts, Information Cost, and Implied Cost of Equity Capital," *2013 AAA Annual Meeting*

"Management Team Incentive Alignment and Firm Value," *2013 FARS Mid-year Conference*

## INVITED PRESENTATIONS

2022:  UT-Austin Law; Yale; Stanford

2021: SEC Investor Advisory Committee; UT Symposium on Financial Market Policy Development & Research; Michigan State; Chinese Univ of Hong Kong; University of Maryland; SEC Enforcement; DoJ Fraud Unit; Northwestern; Minnesota; Baruch; Tilburg; UT-Dallas; SEC Division of Economic and Risk Analysis; Journal of Accounting and Economics Conference; Florida State; SEC Chair's Office

2020: SEC Commission-wide seminar; Accounting Theory Group; Univ of Miami; staff of House Financial Services Committee; UT Symposium on Financial Market Policy Development & Research; NYU; Georgia; SEC Investor Advisory Committee; Iowa; Review of Accounting Studies Conference

2019: Stanford; Michigan; PCAOB; SEC Commissioner's Office (x2); Washington Univ; Weinberg Corporate Governance Symposium; Florida; Carnegie-Mellon; Miami; Stanford Theory and Inference; Notre Dame Conference; Columbia; Indiana; Hawaii

2018: MIT; Toronto

2017: UC-Davis; Minnesota Spring Conference; NYU/SEC Changing Role of Stock Markets in Capital Formation; Review of Accounting Studies conference; FEA conference

2016: Temple; Utah; Chicago; Cornell; Harvard IMO Conference; Securities & Exchange Commission; Texas A&M; Treasury; Southern District of New York; FBI

2015: Rochester; AAA Mid-Atlantic Doctoral Consortium; Delaware; Penn State Accounting Research Conference; Colorado Summer Camp; Junior Accounting Theory Conference; AAA Annual Meeting

2014: FARS Mid-year Meeting; University of Texas Corporate Governance conference; Junior Accounting Theory Conference; AAA Annual Meeting; Stanford Summer Camp; USC; SUNY-Binghamton; Northwestern

2013: FARS Mid-year Meeting; Duke; AAA Annual Meeting; Duke/UNC Fall Camp; LBS; Washington University St. Louis Nick Dopuch Conference

## *INVITED CONFERENCES*

2021: UT Symposium on Financial Market Policy Development & Research (panelist); JAE conference (presenter); RAST conference (invited participant)

2020: UT Symposium on Financial Market Policy Development & Research (panelist); Stanford Virtual Summer Camp (invited participant); JAR conference (invited participant); NYU Institute for Corporate Governance (invited participant); JAE conference (invited participant); RAST conference (presenter)

2019: Weinberg Corporate Governance Symposium (presenter); Theory and Inference in Accounting Research (moderator); Notre Dame Accounting Conference (presenter); Miami Winter Warm-Up Conference (invited participant)

App.1154

Appellate Case: 24-1628    Page: 1159    Date Filed: 03/26/2024 Entry ID: 5377362

2018: JAR conference (invited participant); NYU Summer Camp (invited participant); Harvard IMO conference (invited participant); Wharton Spring Conference (invited participant); Harvard IMO conference (invited participant); NYU Summer Camp (invited participant); Stanford Summer Camp (invited participant); Junior Accounting Theory Conference (invited participant); Toronto Summer Camp (presenter); JAR/PCAOB conference (invited participant); JAE conference (invited participant)

2017: Minnesota Empirical Conference (presenter); NYU/SEC Changing Role of Stock Markets in Capital Formation (discussant); JAR conference (invited participant); Wharton Spring Conference (invited participant); Review of Accounting Studies conference (discussant); JAR/PCAOB conference (invited participant); JAE conference (invited participant); FEA conference (discussant);

2016: JAR conference (invited participant); Harvard IMO conference (discussant); Wharton Spring Conference (invited participant); Colorado Summer Camp (invited participant); Stanford Summer Camp (invited participant); RAST conference (invited participant); JAR/PCAOB conference (invited participant); JAE conference (invited participant);

2015: AAA Mid-Atlantic Doctoral Consortium (presenter); Penn State Accounting Research Conference (presenter); JAR conference (invited participant); Colorado Summer Camp (presenter); Junior Accounting Theory Conference (moderator); AAA Annual Meeting (discussant); JAE conference (presenter); JAR/PCAOB conference (invited participant); Washington University Nick Dopuch Conference (invited participant);

2014: FARS Mid-year Meeting (presenter, discussant); University of Texas Corporate Governance conference (presenter); JAR conference (invited participant); Junior Accounting Theory Conference (presenter); AAA Annual Meeting (discussant); Stanford Summer Camp (presenter); JAE conference (presenter); Causality Conference (invited participant)

2013: FARS Mid-year Meeting (discussant); JAE/HBS Social Responsibility conference (invited participant); Colorado Summer Camp (invited participant); Stanford Summer Camp (invited participant); UNC Global Issues in Accounting conference (invited participant); NYU-Stern Summer Camp (invited participant); AAA Annual Meeting (discussant); Duke/UNC Fall Camp (presenter); Washington University Nick Dopuch Conference (discussant); JAE conference (invited participant)


## INTERNAL AND EXTERNAL SERVICE

Editorial Positions

| | | |
|---|---|---|
| Management Science | *Associate Editor* | 2018 – present |
| The Accounting Review | *Editor* | 2018 – present |
| The Accounting Review | *Editorial Board* | 2017 – 2018 |
| Review of Accounting Studies | *Editorial Board* | 2018 – present |

| | | |
|---|---|---|
| SSRN Accounting Theory eJournal | *Editorial Board* | 2018 – present |
| Journal of Financial Reporting | *Editorial Board* | 2016 – present |
| Journal of Accounting and Economics | *Editorial Board* | 2015 – present |
| Journal of Accounting Research | *Editorial Board* | 2016 – 2021 |
| | *Reviewer of the Year* | 2019 |

DISSERTATION COMMITTEES & PLACEMENTS

| | | |
|---|---|---|
| Bradford Lynch | (on the market, 2022-2023) | 2023 |
| Jung Min Kim | (Northwestern) | 2022 |
| John Kepler | (Stanford) | 2019 |
| Delphine Samuels | (MIT) | 2017 |
| Michael Carniol | (Rutgers) | 2017 |
| Jason Xiao | (University of Rochester) | 2016 |
| David Tsui | (USC) | 2015 |
| Terrence Blackburne | (University of Washington) | 2013 |

PROFESSIONAL SERVICE

| | |
|---|---|
| Member, WRDS Advisory Board, | 2020 – present |
| Member, Wharton IT Steering Committee | 2017 – present |
| Member, Wharton Rookie Recruiting Committee | 2015 – present |
| Member, Wharton PhD Qualifying Exam Committee | 2012 – present |
| Member, Wharton Curriculum Innovation & Review Committee | 2020 – 2021 |
| Leader, AAA/Deloitte Doctoral Consortium | 2019 – 2021 |
| Organizer & Founder, Wharton Theory Boot Camp for Empiricists | 2018 – 2020 |
| Leader, AAA New Faculty Consortium | 2019 |
| Member, FARS Meeting Editorial Committee | 2017 |
| Member, FARS Best Dissertation Award Committee | 2016 |
| Member, Wharton PhD Curriculum Committee | 2016 |
| Organizer, Wharton Seminar Series | 2013 – 2015 |
| Member, AAA Meeting Editorial Committee | 2013 |

## *COURSE DEVELOPMENT*

FORENSIC ANALYTICS (Spring 2019 – present)

Created this experiential course for undergraduates interested in learning how to manipulate Big Data and mine SEC filings to predict earnings, detect fraud, and flag suspicious trading behavior. The course draws on cutting-edge academic research in each topic; features industry guest speakers; introduces basic SQL coding skills; and leverages the computing power of AWS and the datasets at Wharton Research Data Services.

Appellate Case: 24-1628   Page: 1161   Date Filed: 03/26/2024 Entry ID: 5377362

<u>Empirical Design in Accounting Research</u> (Spring 2014 – present)

Created this course for Ph.D. students looking for an advanced course on empirical methodology and research design with application to the accounting literature. The course emphasizes applied econometrics and research design rather than topical coverage of the literature [mini-versions taught at Northwestern, Stanford, and Washington University].

<u>Introduction to Financial Accounting</u> (Fall 2010 – Fall 2017)

Designed a custom course pack for ~800 students.

## *Additional Information*

Citizenship: United States
Hobbies/Other: hiking, home renovations, landscaping, Eagle Scout

Appellate Case: 24-1628    Page: 1162    Date Filed: 03/26/2024 Entry ID: 5377362

**BlackRock**

June 17, 2022

Ms. Vanessa A. Countryman
Secretary
U.S. Securities and Exchange Commission
100 F Street, NE
Washington, D.C. 20549-1090

Submitted online via https://www.sec.gov/rules/submitcomments.htm.

**RE:     The Enhancement and Standardization of Climate-Related Disclosures for Investors (File Number S7-10-22)**

Dear Ms. Countryman:

BlackRock, Inc. (together with its subsidiaries, "BlackRock") respectfully submits the following response to the Securities and Exchange Commission's ("SEC" or the "Commission") proposed rule, "Enhancement and Standardization of Climate-Related Disclosures for Investors" (the "proposal").[1] We appreciate the Commission's consideration of our views expressed in our response (our "2021 Letter") to Commissioner Allison Herren Lee's March 2021 Request for Input ("RFI") on "Climate Change Disclosure" in issuing the proposal – including our support for mandatory climate-related disclosures aligned with the Taskforce on Climate-related Financial Disclosures ("TCFD") framework and our affirmation of the relevance of climate risk to investors' decision-making processes. Moreover, because we firmly believe that climate risk is investment risk, we also write to express our strong support for the Commission's goal of implementing a framework for public issuers to provide investors with more comparable and consistent climate-related disclosures.

As a publicly traded asset management firm, we write this letter from two perspectives: (i) as a fiduciary investor that uses climate-related data and disclosures in our investment and stewardship processes on behalf of our investment clients; and (ii) as a public corporate issuer responsible for making disclosures to our own shareholders and other stakeholders. Because we invest on behalf of clients with a variety of long-term financial objectives, in our role as a fiduciary, we engage in investment processes that weigh a variety of investment factors, risks, and opportunities, including those related to climate. As a publicly traded issuer, we are committed to providing meaningful climate-related information to all our stakeholders. Our climate-related reporting, which is aligned with the recommendations of the TCFD, can be found in BlackRock's 2021 TCFD

---

[1]     "The Enhancement and Standardization of Climate-Related Disclosures for Investors", Securities Act Release No. 11042 and Securities Exchange Act No. 94476, 87 FR 69 (April 11, 2022), 21334 ("2022 Proposing Release").

Report.[2] As both an investor and an issuer, we are guided by our fundamental conviction that reliable, comparable, and consistent climate-related disclosures by public issuers are essential for investors to accurately integrate climate risks and opportunities into their investment decision-making processes.[3]

## **Introduction**

Investors on behalf of clients are not just looking for more data on climate risk, they need *high-quality* climate-related information that is (1) relevant to understanding climate-related risks and opportunities, and (2) reliable, timely, and comparable across jurisdictions.

Investors also recognize that climate data and risk methodologies are still evolving. As a fiduciary to our clients, BlackRock has engaged with public companies on climate disclosure in recent years. We have observed these companies continually developing and adapting their climate reporting tools, leading to improved quality of disclosure over time.

Therefore, we applaud the Commission for taking this important first step of proposing a framework that, generally speaking, incorporates the Commission's existing guidance on climate-related disclosures[4] while aligning with the core tenets of the TCFD framework.[5] We view the Commission's proposal as an important contribution to a multi-year, multi-jurisdiction effort for improving the availability, quality, comparability, timeliness, and interoperability of climate-related disclosures.

Our comments below are intended to align the Commission's proposal with the following principles, which we believe will provide investors with high-quality climate-related disclosures, while creating the flexibility necessary for continuing development of creative, pragmatic best practices.

---

[2]   Further, our 2020 Sustainability Disclosure includes reporting aligned with the SASB Standards for Asset Management & Custody Activities, as well as reporting on additional sustainability topics that matter most to our stakeholders. The SASB Standards provide a roadmap for reporting to investors focused on achieving disclosure that is useful, cost-effective, industry-specific, evidence-based, and informed by market practitioners. We see the TCFD Recommendations and the SASB Standards as complementary. For more information, see our Investment Stewardship Commentary: Sustainability Reporting: Convergence to Accelerate Progress.

[3]   At present, climate-related information with respect to private issuers is lacking in comparison to what is increasingly available from public issuers. To avoid regulatory arbitrage between public and private market climate-related disclosures, we believe that climate-related disclosure mandates should not be limited to public issuers. Therefore, we encourage the SEC to explore its existing regulatory authority to mandate climate-related disclosures with respect to large private issuers.

[4]   *See* Commission Guidance Regarding Disclosure Related to Climate Change, Release No. 33-9106 (Feb. 2, 2010) [75 FR 6290 (Feb. 8, 2010)]; SEC Climate Change Disclosure-Sample Letter, *available at* https://www.sec.gov/corpfin/sample-letter-climate-change-disclosures.

[5]   *See* TCFD, Recommendations of the Task Force on Climate-Related Disclosures (June 2017); *see also* TCFD, Implementing the Recommendations of the Task Force on Climate-Related Financial Disclosures (Oct. 2021) (the "TCFD Implementing Recommendations").

2

*Principles for High-Quality Climate-Related Disclosures*

- **TCFD alignment**: We support disclosure frameworks aligned with the TCFD framework and sector-specific metrics, such as those that will be taken forward by the International Sustainability Standards Board ("ISSB"). The TCFD framework has incorporated market feedback and attracted widespread support because of its relative simplicity and consistency. Our experience is that it results in clear disclosures that allow investors to assess how companies are adapting their business models to respond to climate-related risks and would provide an effective global framework.

- **Global baseline standards with industry-specific guidance**: We strongly support a global baseline of climate-related disclosure standards to enable investors to make more informed decisions. We urge regulators to work with market participants and standard setters, like the ISSB, to continue developing industry-specific guidance.

- **Flexible approach to improving disclosures:** We believe that regulators should allow for a "comply or explain" regime (consistent with the TCFD framework) for disclosure areas, such as certain metrics and targets, that are still actively evolving. This regime will allow companies to provide the disclosures or explain why they cannot. A flexible approach to disclosure will likely encourage more and more companies to provide such disclosures.

- **Distinction between Scope 1 & 2, and Scope 3 disclosures**: We support quantitative disclosure aligned with the Greenhouse Gas Protocol ("GHG Protocol"). As investors, we use GHG emissions estimates to size an issuer's climate-related exposure. Specifically, we look to companies to provide Scope 1 and 2 GHG emissions disclosures, and meaningful short-, medium-, and long-term science-based reductions targets, where available for their sector.

  As investors, we use Scope 3 emissions as a proxy metric (among others) for the degree of exposure companies have to carbon-intensive business models and technologies. However, we do not believe the purpose of Scope 3 disclosure requirements should be to push publicly traded companies into the role of enforcing emission reduction targets outside of their control. Given methodological complexity for Scope 3 emissions and the lack of direct control by companies over the requisite data, our investors believe the usefulness of this disclosure varies significantly right now across industries and Scope 3 emissions categories. We encourage regulators to adopt a disclosure framework that accounts for this significant variation. Under this framework, companies would disclose emissions estimates for any of the fifteen Scope 3 categories that are material to them. If none of the fifteen categories are material, or if companies are not yet capable of estimating their Scope 3 emissions, they would have the option of explaining why that is the case.

- **Consistency across public and private markets**: Mandating reporting by companies across both public and private markets is critical to averting unintended consequences in the capital markets such as (1) the sale of physical

assets to private companies to avoid disclosure, and (2) private companies being potentially disincentivized from going public, decreasing choice for public market investors. Uniform disclosures would also provide market participants with a clearer understanding of how the transition to a lower carbon economy is progressing across the entire economy. The absence of consistent private and public market disclosure standards forces public companies to step into the role of policing their value chain partners and clients through negotiating the implementation and monitoring of the data they need for their own disclosures, such as private companies' GHG emissions reporting.

- **Protections from liability**: The liability attached to climate-related disclosure should be commensurate with the evolving nature of that disclosure to encourage rather than discourage higher-quality disclosure. We urge regulators to adopt a liability framework that provides meaningful protection from legal liability for disclosures provided in good faith while standards continue to evolve, and that gives companies the flexibility they need to develop their disclosures without imposing a chilling effect.

- **Adequate time for companies to develop high-quality disclosures**: Climate-related disclosures often require companies to collect and aggregate data from various internal and external sources. Practical realities of data-collection and reporting do not cleanly line up with financial reporting cycles. Giving companies adequate time (e.g., 120 days) after their fiscal year-end to accurately collect and analyze this data will increase the quality of the climate-related information investors receive. This timeline should still result in companies producing climate-related data in advance of their annual meetings, giving investors time to assess it before making proxy voting decisions**.**

- **Adhering to relevant materiality thresholds**: Finally, we believe companies' climate-related disclosure obligations in their annual and quarterly reports should be linked to relevant materiality thresholds. Materiality thresholds will assist investors in identifying those companies that consider climate-related risks material to their operations and in evaluating the impact of those risks on companies.

**<u>Executive Summary</u>**

While we applaud the Commission's efforts, both as an investor and as an issuer, we are concerned that certain elements of the proposal, which go beyond or differ from the recommendations of the TCFD, will decrease the effectiveness of the Commission's overarching goal of providing reliable, comparable, and consistent climate-related information to investors. As discussed in our 2021 Letter, we strongly advocate for mandatory disclosures aligned with the TCFD framework, which we believe serves to provide investors with comparable and consistent information to assess issuers' long-term transition plans and near-term actions to mitigate climate risks, and to ultimately make better informed investment decisions. As an investor, we have been pleased to observe that an increasing number of issuers are using the TCFD framework to provide more detail to investors

Appellate Case: 24-1628     Page: 1166     Date Filed: 03/26/2024 Entry ID: 5377362

in disclosures that are becoming increasingly robust over time.[6] If the Commission's rulemaking were to require companies to disclose significantly more information than what is currently called for under the TCFD framework or TCFD-aligned international standards, particularly information that is not material, we are concerned that the resulting disclosure would obscure what information is material, have limited value to investors, heighten compliance costs and reduce the ability to compare across companies and regions.

Therefore, in offering our support for the Commission's initial efforts to mandate climate-related disclosures for investors and to offer much-needed guidance to issuers on the range of climate-related factors they should incorporate into their disclosures, we are submitting the following specific recommendations to the Commission, which we believe will allow the final rules to address the concerns outlined above and promote reliable, comparable, and consistent disclosures.

**Disclosure of Material Climate-Related Information in SEC Filings:** We respectfully request that the Commission link an issuer's climate risk disclosure obligations in its annual reports and registration statements ("SEC filings") to the well-established definition of materiality established by the Supreme Court in *TSC Industries, Inc. v. Northway, Inc.*[7] We also encourage the Commission to more closely align elements of the proposal to the TCFD framework. In particular, we respectfully request that the Commission (i) tie the proposed disclosure requirements pertaining to climate-related strategy[8] to materiality, including the disclosures related to internal carbon pricing, scenario analyses, transition plans and climate-related targets or goals (collectively, the "Analytical and Planning Measures"),[9] and (ii) further align the proposal with the TCFD framework by permitting issuers to disclose only relevant information under the proposed governance and risk management rules,[10] rather than mandating disclosure against each prescribed element, as would be required under the proposal. We believe these changes will assist us and other investors in evaluating the material impact of climate risk on particular issuers and in identifying those issuers that consider climate-related risks and risk oversight material to their operations. We believe that the proposal sets forth an important roadmap to inform disclosure decisions on climate-risk oversight, strategy, governance, and risk management and will compel issuers to conduct a more thorough analysis than currently

---

[6] As long-term investors on behalf of our clients, we look to companies to help their investors understand how climate risks and opportunities are integrated into their governance, strategy, and risk management, as well as to provide Scope 1 and 2 GHG emissions disclosures, and meaningful short-, medium-, and long-term science-based reductions targets, where available for their sector. While recognizing the measurement challenges, we also look for disclosures on how companies are considering Scope 3 GHG emissions, particularly where these are material. We consider these disclosures in our qualitative and quantitative assessments of companies' risk return profiles and in our voting analysis.

[7] *See TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438 (1976) (holding that a fact is material "if there is a substantial likelihood that a reasonable shareholder would consider it important" in making an investment decision or if it "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available" to the shareholder).

[8] *See* proposed Item 1502.

[9] *See* proposed Items 1502(e), 1502(f), 1503(c)(3) and 1506.

[10] *See* proposed Items 1501 and 1503.

App.1162

Appellate Case: 24-1628    Page: 1167    Date Filed: 03/26/2024 Entry ID: 5377362

undertaken under the existing voluntary framework alone. Under our proposed approach, although issuers would ultimately only disclose in their SEC filings the climate-related strategy information that is material to their investors in making investment and voting decisions, and the governance and risk management information relevant to their climate oversight framework, they would have assessed each of the potential disclosure elements of these proposed items.

From an investor perspective, we believe that this approach would prompt many issuers to adopt the necessary capabilities for assessing the materiality of climate-related considerations outlined in the proposal, while reducing the likelihood that SEC filings become diluted by non-material climate-related information that obfuscates and distracts investors from information that is material. From an issuer perspective, we believe our recommendation would reduce the undue burdens and liability implications associated with mandatory disclosure of non-material information in SEC filings, which could have unintended consequences on issuers' willingness to take actions that would advance their climate-related efforts and reporting practices. Without a materiality threshold and closer alignment to the TCFD framework, disclosures on "Analytical and Planning Measures" required by the proposal may discourage issuers from initiating an assessment of their climate-related risks and opportunities under these measures, and then disclosing this information. In contrast, if the SEC's rulemaking requires a more narrowly tailored set of information to be included in annual reports and registration statements, we believe more issuers would be catalyzed to make climate-related disclosures for the first time in a furnished report, as further discussed below.

**Disclosure of Specified Climate-Related Information in a Furnished Report:** We strongly agree with the Commission that certain climate-related information may not be material but may nevertheless be useful to investors who are looking to understand issuers' climate-related exposure. As such, we recommend that the SEC provide guidance requiring issuers to supplement the mandatory climate-related disclosures in their SEC filings by furnishing a report, on an annual basis, that captures useful climate-related information regardless of whether such information is uniformly material. To that end, we respectfully request that the Commission develop an alternative disclosure form (the "New Form") for issuers to provide (i) their Scope 1 and 2 GHG emissions estimates and (ii) on a "comply or explain" basis (consistent with the TCFD framework), disclosures related to Analytical and Planning Measures and, under the circumstances described below, material Scope 3 GHG emissions estimates.

- ***Timing.*** The New Form would be furnished, rather than filed, within 120 days after an issuer's fiscal year-end, similar to the delayed reporting approach permitted with respect to the Commission's Form SD under the Securities Exchange Act of 1934 (the "Exchange Act") Rules 13p-1 and 13q-1. The New Form will allow issuers additional time to collect and analyze quantitative climate-related data, which often requires companies to collect and aggregate data from various internal and external sources and thus cannot be completed on the same timeline as issuers' annual reports. By giving reporting issuers more time after the annual report deadline to prepare the information required on the New Form, the SEC will also increase the quality

and accuracy of the climate-related information investors receive. This timeline would still result in companies producing the New Form in advance of their annual meetings, giving investors time to assess the material before making proxy voting determinations, both on director elections and shareholder proposals.

- ***Furnished Disclosure.*** As noted, we believe that requiring issuers to disclose GHG emissions estimates and Analytical and Planning Measures on the New Form will serve the SEC's goal of increasing the availability of useful climate-related information. In order to have an appropriate liability standard and avoid discouraging the disclosure of information that may be useful to investors, while the relevant science, standards and methodologies for GHG emissions and Analytical and Planning Measures are still evolving, we believe it is necessary and appropriate for the SEC to (1) provide that the information on the New Form be "furnished" rather than filed, and (2) provide a robust safe harbor that affords meaningful protection from liability when such information is incorporated by reference into SEC filings under the circumstances described below. We believe that this approach strikes the appropriate balance between providing investors with protection against materially misleading disclosures, on the one hand, and mitigating the chilling effects on issuers that would result from imposing a stricter liability standard on "filed" disclosures where the underlying analytical frameworks are still actively evolving, on the other hand.

- ***Analytical and Planning Measures.*** The New Form will also establish a more flexible framework for issuers to disclose their Analytical and Planning Measures by allowing issuers that choose to undertake the relevant action to "comply" (*i.e.*, make the required disclosures) or explain why certain items are not relevant to their business or cannot yet be reliably disclosed. Issuers' determinations of whether to comply or explain will inevitably change as standards and methodologies mature and become more widely adopted, leading to increasingly more comprehensive climate disclosures over time. We are concerned that adopting a regime with prescriptive requirements that are immediately triggered upon initial usage of an Analytical and Planning Measure could have the unintended consequence of chilling the implementation of such measures by subjecting early adopters to premature and onerous disclosures. In addition, these companies would be exposed to ongoing liability exposure as scientific and methodological underpinnings continue to evolve. By allowing issuers to take a "comply or explain" approach, the SEC will provide issuers with greater flexibility, which we believe will lead to greater transparency and more robust climate-related disclosures in a cost-effective way. Mitigating the chilling effect for early adopters will allow us and other investors to encourage issuers and their boards to take climate action that may be in their long-term financial interests.

**GHG Emissions Disclosures:**[11] As investors, we believe that climate risk is investment risk, and we strive to help our clients make the most informed choices to improve their investment outcomes. As we stated in our 2021 Letter, we support the Commission's objective to require mandatory qualitative and quantitative reporting across all issuers as soon as practicable. However, unlike the qualitative elements of the proposal described above, we believe that the quantitative disclosure requirements related to GHG emissions are impracticable as currently proposed. Consistent with our 2021 Letter, recognizing that relevant data and methodologies are still emerging, we recommend that the Commission take a flexible approach to GHG emissions disclosures under proposed Item 1504.

- ***Scope 1 and 2 GHG Emissions.*** We recommend that the SEC require issuers to disclose their Scope 1 and 2 GHG emissions estimates on the New Form regardless of materiality, as this information helps investors assess exposure to climate-related risks and opportunities across a variety of sectors. Given the methodological and estimation challenges issuers face today in collecting Scope 1 and 2 data on a timely basis, we are of the view that it is impracticable to require this information to be disclosed in SEC filings on the annual report timeline, even if material, although that may change over time as these challenges abate. If the SEC provides for a robust safe harbor that affords meaningful protection from liability for Scope 1 and 2 disclosures made on a "filed" basis, we would support the SEC requiring material Scope 1 and 2 disclosures to be incorporated by reference from the New Form into issuers' SEC filings. We encourage the SEC to provide industry-specific guidance on when Scope 1 and 2 GHG emissions estimates could be material to investors in making voting and investment decisions. Alternatively, if the SEC does not provide a meaningful safe harbor from liability, we recommend that material Scope 1 and 2 GHG emission disclosures be furnished on the New Form until methodologies and industry practices have evolved sufficiently.

- ***Scope 3 GHG Emissions.*** As we have said previously, at this stage, we view Scope 3 emissions differently from Scope 1 and 2, given the methodological complexity and lack of direct control by companies over the requisite data to assess Scope 3 emissions. In our experience as investors, these issues, and the usefulness of Scope 3 disclosures more generally, vary significantly across industries and the 15 categories of Scope 3 emissions. For these reasons, while we are generally supportive of the Commission's proposal to require disclosure of Scope 1 and Scope 2 emissions, we respectfully disagree with the Commission's approach to requiring disclosure of Scope 3 emissions in SEC filings.

  This disagreement is not to minimize Scope 3 emissions. As investors, we believe it is important to be able to evaluate companies' assessments of their emissions across their value chain, or Scope 3 emissions, as such emissions could affect the economic viability of issuers' business models. Climate risk and the economic opportunities from the transition are a top

---

[11]    *See* proposed Item 1504.

App.1165

Appellate Case: 24-1628    Page: 1170    Date Filed: 03/26/2024 Entry ID: 5377362

concern for our clients and a rapidly growing share of them have already committed to net-zero aligned portfolios. As investors, we use Scope 3 emissions as a proxy metric (among others) for the degree of exposure companies have to carbon-intensive business models and technologies. However, we do not believe the purpose of Scope 3 disclosure requirements should be to push publicly traded companies into the role of enforcing emission reduction targets outside of their control.

Further, as the Commission recognized in its proposal, "the methodologies pertaining to the measurement of GHG emissions, particularly Scope 3 emissions, are evolving," and with the broader adoption of reporting standards, datasets, and methodologies, they will improve meaningfully further.[12] Over time, we believe that Scope 3 emissions could become a routine part of material risk disclosure. This evolution will require effort on the part of the Commission to provide the further guidance necessary for these disclosures to be reliable and consistent for investors, including with respect to materiality and the appropriate calculation methodology for each category of Scope 3 emissions.

Therefore, we recommend that the Commission require material Scope 3 disclosures to be furnished in the New Form on a "comply or explain" basis, which allows issuers to either disclose material Scope 3 emissions or explain why certain emissions categories are not relevant to the issuer or not subject to reasonable estimation. The Commission should not mandate Scope 3 emissions in SEC filings as proposed. A flexible approach to rulemaking based on a "comply or explain" approach, compared to mandating complete Scope 3 disclosures in SEC filings before most issuers have the requisite capability, will provide issuers the opportunity to develop the resources necessary to comply with industry standards and best practices as they emerge.[13]

**Omit Proposed Article 14 of Regulation S-X:** Proposed Article 14 of Regulation S-X requires financial statement disclosures on a disaggregated, line-item basis without regard to materiality, which is likely to yield uneven and inaccurate disclosures, while the proposed 1% threshold is arbitrarily low and inconsistent with any materiality thresholds that currently apply to SEC disclosures.[14] We do not believe these new disclosures are practicable for issuers, and do not believe they are necessary, considering that issuers are already subject to Financial Accounting Standards Board ("FASB") standards that require them to consider changes in their business and operating environment when those changes have a material direct or

---

[12]   *See* 2022 Proposing Release, p. 159.

[13]   While the Commission's proposal is ambiguous, a reasonable reading is that it requires issuers to furnish aggregate Scope 3 emissions across all categories, as well as the Scope 3 emissions for any category that is significant to the registrant.

[14]   There are a limited number of SEC disclosure requirements that apply a 1% threshold (e.g., under 17 CFR 210.5-03.1(a) with respect to excise taxes that exceed 1% of the total of sales and revenue; under 17 CFR 210.12-13 with respect to open option contracts with notional amounts exceeding 1% of net asset value; and under 17 CFR 229.404(d) with respect to related party transactions that exceed 1% of total assets). However, these are not "materiality" thresholds and do not apply a line-item level of granularity.

App.1166

Appellate Case: 24-1628     Page: 1171     Date Filed: 03/26/2024  Entry ID: 5377362

indirect effect on their financial statements and related notes. Therefore, we respectfully recommend that the SEC omit the proposed requirement related to financial statement disclosures from the final rules. In making this recommendation, we considered (and urge the Commission to consider) the substantial costs issuers would incur in connection with developing the appropriate disclosure infrastructure and reporting controls required for financial statement disclosures and auditing such disclosures to obtain reasonable assurance, as well as the limited usefulness of the resulting disclosures to investors as they are currently proposed.

Below, we provide further details on these recommendations, as well as why we believe they will enhance the effectiveness of the Commission's rulemaking. We stand ready to assist the Commission in its rulemaking process and would welcome the opportunity to discuss these recommendations with the Commission and provide additional information.

## Discussion of Our Recommendations

We believe that, by taking a comprehensive approach in its rulemaking, the Commission has provided an important roadmap of potential disclosures that could help issuers refine their process for identifying and disclosing material climate-related risks. Compared to the existing voluntary framework, the Commission's detailed analytical and disclosure roadmap—which, subject to certain exceptions, is generally aligned with the disclosures recommended under the TCFD framework—is more likely to increase the comparability and consistency of issuers' climate-related disclosures.[15]

However, like the Commission, we recognize that the methodologies and procedures for corporate issuers to collect, analyze, and report climate information are still evolving. Therefore, we urge the Commission to provide issuers with the flexibility they need to scale up their disclosures against the SEC's roadmap. Requiring companies to create disclosures before standards and methodologies are sufficiently mature, and before companies can develop mechanisms necessary to produce robust climate-related disclosures, will result in climate-related disclosures across companies and industries that are costly, inconsistent, unreliable, and difficult to compare. That is why we propose a more flexible application of the Commission's proposal, where an issuer would:

- file as part of its SEC filings the climate-strategy information that is material to investors (*e.g.*, material climate-related risks and material business impacts);

- file as part of its SEC filings, with the option to incorporate by reference from the proxy statement, certain of the climate-related governance and risk management information as noted below;

---

[15] In addition, we urge the Commission to continue to participate in the ISSB's efforts in developing industry-specific guidance, including with respect to Scope 3 GHG emissions, in order to ensure that its final rule is aligned with a global baseline. We strongly support a global baseline of climate-related disclosure standards to enable investors to make more informed decisions.

App.1167

Appellate Case: 24-1628    Page: 1172    Date Filed: 03/26/2024 Entry ID: 5377362

- furnish on the New Form Scope 1 and 2 GHG emissions disclosures (which, if material and subject to a robust safe harbor that affords meaningful protection from liability, could be incorporated by reference into the issuer's SEC filings);

- furnish on the New Form, on a "comply or explain" basis, information on Analytical and Planning Measures to the extent relevant to the issuer and sufficiently ripe for disclosure (which, if material and subject to a robust safe harbor that affords meaningful protection from liability, could be incorporated by reference into the issuer's SEC filings);

- furnish material Scope 3 GHG emissions disclosure on a "comply or explain" basis on the New Form (provided the Commission issues further guidance, as described below, necessary for these disclosures to be reliable and consistent for investors); and

- not be required to disclose other information under the proposal that meaningfully exceeds the scope of the TCFD framework (*e.g.*, Regulation S-X requirements and certain granular disclosure requirements) where such disclosures are unlikely to be useful to investors and cannot be made in a reliable and cost-effective manner.

We firmly believe that the above approach will better enable the Commission to accomplish its goals in the near term. By allowing issuers to use proposed subpart 1500 of Regulation S-K as an analytical and disclosure roadmap in evaluating the materiality of climate-related information, we believe the Commission will enhance climate-related disclosures by providing a clearer, universal framework that outlines the climate-related issues that companies need to consider to make disclosure decisions. Requiring companies to identify and disclose material, TCFD-aligned information in their SEC filings will increase the comparability and consistency of the resulting disclosures across companies and enable investors to make informed investment decisions. Permitting issuers to use a furnished form to disclose GHG emissions and useful information regarding applicable Analytical and Planning Measures will lessen the disproportionate compliance burden and litigation exposure that would result from mandating in SEC filings non-material climate-related disclosures or climate-related disclosures in areas where the underlying analytical frameworks are still actively evolving.

Our recommendations promote a flexible approach to climate-related disclosures, which is both necessary and appropriate given the current limitations in climate disclosure methodologies and procedures. Under a flexible approach guided by the SEC's comprehensive disclosure roadmap, the TCFD framework and the SEC's further engagement with market participants and standard setters, we are confident that the climate disclosure landscape will continue to improve with more high-quality, useful information provided on an accurate and reliable basis over time.

App.1168

Appellate Case: 24-1628    Page: 1173    Date Filed: 03/26/2024 Entry ID: 5377362

**Disclosure of Material Climate-Related Information in SEC Filings**

**The SEC should require disclosure of material climate information in issuers' SEC filings, applying the well-established definition of materiality.** Investors have come to expect that the risk factor and business impact disclosures included on Form 10-K and other SEC filings will be appropriately limited by the well-established definition of materiality established by the Supreme Court in *TSC Industries, Inc.* v. *Northway, Inc.* Requiring disclosure of climate information that is not material to investors' investment or voting decisions in the Form 10-K and other SEC filings would create uneven disclosures that dilute and distract investors from the material information included in these filings.

For example, today, with respect to disclosure requirements related to issuers' climate strategy, issuers are required to disclose material climate-related information in their SEC filings, which is consistent with the requirement to disclose material climate risks under proposed Item 1502(a).[16] We recommend that the remainder of proposed Items 1502(a) through (d) be qualified in their entirety by materiality in a similar manner. Otherwise, the disclosure of any and all actual and potential impacts of potential climate-related risks[17] could create voluminous disclosure that ultimately makes it more difficult for investors to distinguish material impacts from those that are unlikely to either occur or significantly affect the business of an issuer.

In connection with linking all of proposed Items 1502(a) through (d) to materiality, we urge the Commission to provide industry-specific guidance on when the detailed information required under proposed Item 1502(a) should be considered material and included in SEC filings (*e.g.*, when disclosure of physical risks on a zip-code-by-zip-code basis and the percentage of assets located in flood hazard or high water stress areas would be material).[18]

**The SEC should require most but not all of the governance and risk management information required under proposed Items 1501, 1503(a) and 1503(b) to be included in SEC filings.** As a general matter, we believe that the oversight of climate-related risks and opportunities by an issuer's board of directors[19] and management[20] is important to the investment and voting decisions of investors. We believe that an issuer's risk management process[21] and the integration of such process into an issuer's overall risk management systems[22] are important to the investment and voting decisions of investors as well. The nature of

---

[16] *See* Commission Guidance Regarding Disclosure Related to Climate Change, Release No. 33-9106 (Feb. 2, 2010), 75 FR 6290 (Feb. 8, 2010); SEC Climate Change Disclosure-Sample Letter, *available at* https://www.sec.gov/corpfin/sample-letter-climate-change-disclosures.

[17] *See* proposed Item 1502(b).

[18] *See* proposed Item 1502(a)(1)(i).

[19] *See* proposed Items 1501(a)(1) and (2).

[20] *See* proposed Items 1501(b)(1) and (2).

[21] *See* proposed Item 1503(a).

[22] *See* proposed Item 1503(b).

Appellate Case: 24-1628     Page: 1174     Date Filed: 03/26/2024 Entry ID: 5377362

these disclosures may better lend themselves to inclusion in issuers' proxy statements, where issuers currently report their governance and risk management procedures. Therefore, we recommend that these disclosures be placed in Part III of Form 10-K, which, as permitted by Instruction G(3), can be incorporated by reference into the Form 10-K from the issuer's definitive proxy statement filed within 120 days after the end of the fiscal year covered by the Form 10-K. In addition, issuers should be allowed to make the relevant disclosures about the board of directors' oversight role and management's role in assessing and managing climate-related risks[23] in their proxy statement, and incorporate such disclosures by reference into Part III of Form 10-K.

However, we do not think it is necessary or, in some cases, appropriate to require issuers to disclose the identity of directors who are responsible for such oversight,[24] or to identify "climate expert" directors.[25] We believe that robust board oversight with respect to climate requires a whole-of-the-board approach, and the identification of "specialist" directors is not conducive to a holistic undertaking by the board. We also respectfully disagree with the proposal to require issuers to describe whether and how a board sets climate-related targets and goals, as it implies that climate target- or goal-setting is an appropriate board responsibility. Setting climate targets and goals is the purview of management, subject to appropriate board oversight.

Finally, we believe that specified descriptions of members with climate expertise on a board of directors or in management and specific details regarding management's process for overseeing climate risk[26] should not be required disclosure, but should instead serve as items to consider when an issuer is determining which elements of its climate-related governance and risk oversight processes are relevant to its investors. Prescribing such a granular level of required disclosures under these proposed items would likely require issuers to disclose a large volume of information that is, on the one hand, unlikely to be material for investors, and on the other hand, may be competitively sensitive for issuers.

**The SEC should more closely align the proposal with the TCFD framework.** As discussed, we believe that proposed subpart 1500 of Regulation S-K, when appropriately limited to material information, will enhance issuers' disclosure practices compared to the existing voluntary framework by providing issuers with a concrete, comprehensive, and detailed disclosure roadmap against which they will evaluate their climate-related reporting. Although subpart 1500 is generally aligned with the TCFD framework, there are several important deviations that we believe will lead to confusion and result in inconsistent disclosures. Therefore, we urge the SEC to align the disclosure elements under subpart 1500 with the TCFD framework.

---

[23] *See* proposed Items 1501(a)(1), 1501(a)(2), 1501(b)(1) and 1501(b)(2).

[24] *See* proposed Item 1501(a)(1)(i).

[25] *See* proposed Item 1501(a)(1)(ii).

[26] Specifically, we are referring to disclosures required under proposed Items 1501(b)(1)(i) through (iii), 1503(a)(1) and (2), and the second sentence of 1503(b).

App.1170

Appellate Case: 24-1628     Page: 1175     Date Filed: 03/26/2024 Entry ID: 5377362

For example, the proposal would require issuers to disclose how they determine the relative significance of climate-related risks compared to other risks,[27] which would require issuers to undertake an apples to oranges comparison of climate and other types of risks; (*e.g.*, credit risks, inflation, geopolitical, etc.) that will likely be both meandering and distracting for investors. In contrast, we believe investors will be better served by TCFD's recommendation that issuers "describe their processes for prioritizing climate-related risks,"[28] which aligns with how issuers generally prioritize risk disclosures in their SEC filings today. Therefore, an approach that is consistent with the TCFD's recommendations will be less confusing for issuers to implement and will result in more targeted disclosure that helps investors understand how a company prioritizes its various climate-related risks without soliciting less precise comparisons among all categories of risks.

### Disclosure of Specified Climate-Related Information in a Furnished Report

We recommend that Scope 1 and 2 GHG emissions estimates and Analytical and Planning Measures be disclosed on a New Form to facilitate and incentivize the disclosure of useful climate-related information. As further discussed below, we recommend that the New Form include (i) Scope 1 and 2 GHG emissions information, which many issuers cannot produce on an accurate or reliable basis today on the same reporting timeline as their annual report, and (ii) on a "comply or explain" basis, relevant information on Analytical and Planning Measures. With respect to Scope 3 GHG emissions estimates, under the circumstances discussed below in "Phased-In GHG Emissions Disclosures", we believe that material Scope 3 GHG emissions disclosure should be furnished on a "comply or explain" basis on the New Form.

The information disclosable on the New Form should be provided by issuers annually on a delayed basis after the annual report deadline. We recommend that the New Form be furnished within 120 days after an issuer's fiscal year-end, in a fashion similar to the delayed reporting approach permitted with respect to the Commission's Form SD under Exchange Act Rules 13p-1 and 13q-1. We recommend that the New Form be furnished subsequent to the annual report to give issuers enough time to collect relevant data, including third-party data, as further discussed below. We note that this timeline should allow the New Form to be produced simultaneous to a corporate issuer's proxy statement, allowing investors time to absorb the information contained within before voting on annual meeting items.

**The information on the New Form should generally be furnished.** Allowing the information on the New Form to be furnished (rather than filed) will limit liability (including under Sections 11 and 12(a)(2) of the Securities Act of 1933) with respect to GHG emissions estimates and information on Analytical and Planning Measures, which we believe will encourage companies to provide increasingly detailed climate disclosure notwithstanding the foreseeable disclosure challenges. Absent such limitations, the foreseeable, meaningful expansion of litigation

---

[27] *See* proposed Item 1503(a)(1)(i).

[28] *See* TCFD Implementing Recommendations, Guidance for All Sectors 3(b), p. 20.

App.1171

Appellate Case: 24-1628    Page: 1176    Date Filed: 03/26/2024    Entry ID: 5377362

exposure will deter issuers from providing information that is useful to investors where the underlying frameworks are at a stage of particularly active evolution. Because the primary constraints on disclosure quality for issuers in the near future are beyond their control, such litigation exposure is unlikely to improve the quality of disclosure on these topics. As new best practices evolve, it is likely that many issuers would be forced to expend significant energy and resources defending their disclosures on GHG emissions and Analytical and Planning Measures, even though such disclosures were made in good faith based on the information and standards available at the time.

We would support the SEC requiring material disclosures on Scope 1 and 2 emissions estimates and Analytical and Planning Measures to be incorporated by reference from the New Form into issuers' SEC filings,[29] subject to a robust safe harbor that affords meaningful protection from liability for disclosures on GHG estimates and Analytical and Planning Measures made on a "filed" basis.

**Issuers should be required to disclose Scope 1 and 2 emissions estimates on the New Form.** We support the SEC's efforts to require all issuers to report quantitative GHG emissions estimates as soon as such estimates can be reported with appropriate accuracy and consistency. As the SEC notes in the Proposing Release, GHG emissions estimates are key to sizing an issuer's climate-related exposure and GHG emissions footprint, and serve as an important internal risk measurement tool. Thus, we support the Commission's decision to require all issuers to report their Scope 1 and 2 GHG emissions estimates under proposed Items 1504(a) and (b) of Regulation S-K, although we recommend that, at this time, such disclosure be made on the New Form, on a delayed basis. Requiring disclosure of Scope 1 and 2 GHG emissions estimates will ensure all issuers develop this essential reporting functionality, and that investors have access to consistent and comparable Scope 1 and 2 GHG emissions estimates for all issuers.

While issuers, including BlackRock, have made significant strides in developing the appropriate data collection tools and disclosure controls, many others still face substantial methodological challenges in reporting this information on a consistent, reliable, and timely basis. First, global standards and methodologies for the calculation of GHG emissions are still evolving, and issuers applying different methodologies will generate inconsistent Scope 1 and 2 GHG emissions estimates while broad methodological consensus is emerging.[30] Second, issuers must rely on estimates from third parties to make their own Scope 1 and 2 GHG emissions

---

[29]  For example, by including an instruction to Form 10-K analogous to Instruction G(3) of Form 10-K, the information disclosed with respect to Scope 1 and 2 GHG emissions estimates and Analytical and Planning Measures, to the extent material to investors' investment or voting decisions, could be incorporated by reference from the New Form so long as such information is filed within 120 days after the end of the period covered by the Form 10-K.

[30]  For example, the GHG Protocol, which is one of the most widely-accepted GHG accounting standards, applies different organizational and operational boundaries in calculating GHG emissions than the proposal does, which is based on U.S. GAAP and would include all of the emissions of consolidated subsidiaries and a proportionate share of emissions from equity investees. In our view, so long as issuers sufficiently describe the organizational and operational boundaries used, it would be beneficial to give them flexibility to choose those boundaries that are best suited to their emissions data rather than forcing the use of boundaries consistent with U.S. GAAP.

estimates (although to a lesser degree than Scope 3 GHG emissions). Third, current lags in GHG emissions data reporting, including data collection from third parties, make it impractical for most companies to collect, analyze and disclose their GHG emissions estimates on the same timeline as the annual reporting obligations.[31]

Requiring Scope 1 and 2 disclosures in a separate report furnished subsequent to the annual report will give issuers more time to collect accurate GHG emissions information. In addition, while we believe that it is useful for investors to have access to Scope 1 and 2 GHG emissions estimates, we think it is important for such information to be subject to meaningful protection from liability while methodologies and industry practices are emerging. Therefore, we would support the SEC requiring incorporation of Scope 1 and 2 disclosures by reference into SEC filings if such disclosures are material under the Supreme Court's long-standing definition of materiality under a robust safe harbor that affords meaningful protection from liability for GHG emissions disclosures made on a "filed" basis. To be effective, the safe harbor must extend to both historical and forward-looking information in recognition of the challenges of disclosing either type of information based on standards and methodologies that are not yet well established, have changed and thus are likely to continue to change over time, which may cause prior disclosures to be second-guessed. We also believe it would be appropriate to explicitly recognize that all GHG emissions disclosures are good faith estimates. Furthermore, we urge the SEC to engage with market participants and standard setters to develop industry-specific guidance on applicable methodologies and on when Scope 1 and 2 disclosures could be material. Alternatively, if the SEC does not provide such guidance or safe harbor, we recommend that all Scope 1 and 2 disclosures be furnished on the New Form until methodologies and industry practices have evolved sufficiently.

In addition, we respectfully request that the Commission require the disclosure of Scope 1 and 2 GHG emissions on an aggregated basis together with detail on only the *material* constituent gases[32] and *material* offsets.[33] Moreover, we encourage the Commission to engage with market participants and work closely with a standard setter like ISSB to provide additional industry-specific guidance on which gases are likely to be material and how materiality should be evaluated in light of the long-standing definition of materiality. We also encourage the Commission to provide industry-specific guidance on how GHG intensity[34] should be calculated, including the appropriate unit of production.

---

[31] BlackRock agrees with the SEC that attestation of Scope 1 and 2 disclosures can help provide investors with accurate and comparable disclosures. In addition to the challenges of requiring attestation on an annual report timing, we are concerned that, today, the attestation procedures for climate-related disclosures are not sufficiently mature. We recommend that the Commission further engage with issuers, investors, attestation providers and other market participants to evaluate whether the attestation requirement should be included in the final rules as proposed (including with respect to the implementation timeline and level of assurance). If attestation is required by the final rules as proposed, we suggest that the SEC delay implementation to allow for more robust standards to develop and qualified providers to emerge.

[32] *See* proposed Item 1504(a)(1).

[33] *See* proposed Item 1504(a)(2).

[34] *See* proposed Item 1504(d).

App.1173

Appellate Case: 24-1628     Page: 1178     Date Filed: 03/26/2024 Entry ID: 5377362

Finally, proposed Item 1504(e) would require issuers to describe the methodology, significant inputs and significant assumptions used to calculate GHG emissions, in many cases without regard to materiality and beyond the scope of the TCFD framework. We urge the SEC to permit issuers to use the prescriptive list of disclosure elements under proposed Item 1504(e) as an illustrative roadmap rather than to mandate disclosure against each element. For instance, the TCFD framework recommends that issuers "provide a description of the methodologies used to calculate targets and measures" where not apparent,[35] which gives issuers the flexibility to disclose what they deem to be appropriate and necessary for investors to understand how their GHG emissions metrics are calculated. We believe that using proposed Item 1504(e) as an illustrative roadmap will enhance the quality of TCFD-aligned reporting by prompting issuers to clearly and satisfactorily explain to their investors such useful information as the organizational and operational boundaries used in estimating GHG emissions.

Issuers should be permitted, on the New Form, to "comply or explain" with respect to any applicable disclosure requirements on Analytical and Planning Measures. As currently proposed, the disclosure requirements on internal carbon price,[36] scenario analysis,[37] transition plans[38] and targets and goals[39] are only triggered if an issuer chooses to take the relevant Analytical and Planning Measure. However, the proposal would require granular disclosures which relate to processes that involve emerging standards and methodologies. If such disclosures are required to be included in SEC filings as soon as an issuer takes the relevant action, issuers would likely be deterred from implementing Analytical and Planning Measures until standards and methodologies have sufficiently evolved. This could have the unintended consequence of delaying issuers' widespread use of these Analytical and Planning Measures.

We believe that the Commission can reduce this potential chilling effect by permitting issuers to disclose their evolving efforts with respect to Analytical and Planning Measures in a furnished form on a "comply or explain" basis (which is consistent with the TCFD framework). In other words, we recommend that the Commission require issuers to make good faith determinations as to which items under proposed Items 1502(e), 1502(f), 1503(c) and 1506 they are able to disclose, and which items are not relevant to their business or cannot yet be reliably disclosed. For example, if an issuer is deciding whether to conduct scenario analysis, such issuer may worry less about increasing its disclosure burden if, instead of having to provide detailed disclosures in the first year it decides to conduct scenario analysis,[40] it has the option to explain why such details are not yet relevant or cannot be disclosed in an accurate way given current limitations. A "comply or explain" regime will provide investors greater transparency into the

---

[35] *See* TCFD Implementing Recommendations, Guidance for All Sectors 4(c), p. 22.

[36] *See* proposed Item 1502(e).

[37] *See* proposed Item 1502(f).

[38] *See* proposed Item 1503(c).

[39] *See* proposed Item 1506.

[40] *See* proposed Item 1502(f).

measures taken or planned by a company to mitigate their climate risks, while also allowing issuers to progress their disclosures at a responsible pace as methodologies and market practices evolve.

To the extent that any information disclosed on the New Form with respect to the Analytical and Planning Measures is material and not otherwise captured in an issuer's SEC filings, we believe that an issuer should be required to incorporate such information by reference into its SEC filings, subject to a robust safe harbor that provides meaningful protection from liability for such disclosures that are made on a "filed" basis. In addition, we urge the SEC to provide industry-specific guidance on when information with respect to any Analytical or Planning Measure could be considered material under the SEC's long-standing definition of materiality.

## Phased-In GHG Emissions Disclosure

Consistent with our 2021 Letter, recognizing that relevant data and methodologies are still emerging, we recommend that the Commission take a phased approach to GHG emissions disclosures under proposed Item 1504.

Disclosure of material Scope 3 emissions should be furnished on the New Form on a "comply or explain" basis. Although methodologies pertaining to the measurement of GHG emissions continue to evolve, with broader adoption of reporting standards, datasets, and methodologies they will further improve, in turn creating a cycle of positive reinforcement whereby better and more easily measurable metrics can be introduced. Further, we do not believe Scope 3 disclosures should be predicated on whether a company sets or discloses GHG reduction targets, as we are concerned about disincentivizing targets that could be in the long-term economic interests of our clients on whose behalf we invest.

Until comparable GHG disclosure requirements are directly imposed on private companies, mandating that public companies disclose Scope 3 emissions without the flexibility to "comply or explain" also means that they must require the private companies in their value chains to prepare GHG disclosures in order for the public companies to ensure high-quality disclosure of upstream (*i.e.*, supply chain) Scope 3 emissions. This would effectively force public companies to step into the inappropriate role of policing their private, commercial counterparties through negotiating the implementation and monitoring of the ongoing compliance of such private companies' GHG emissions reporting.

Our recommendation with respect to Scope 3 will encourage an issuer to disclose the categories of Scope 3 emissions that are material to them, if, when and to the extent that such information is capable of being reliably estimated. We believe that the SEC needs to continue to engage with market participants and standard setters to develop the necessary industry-specific guidance, including with respect to (i) the appropriate calculation methodology for each category of Scope 3 emissions, (ii) the categories or subcategories of Scope 3 emissions that are likely to be material for a company in a particular industry, (iii) categories or subcategories that

an issuer cannot disclose without unreasonable effort or expense, and (iv) appropriate GHG accounting standards applicable to a particular industry.

We think that this phased approach of allowing reporting of Scope 3 to develop over time through a "comply or explain" approach is the best way to encourage issuers to provide the most accurate and complete GHG emissions disclosures they can as soon as practicable, while market participants continue to work through current procedural and methodological limitations, and standard-setting bodies apply the necessary, deliberative process to bring standards and methodologies to maturity. We urge the SEC to continue to engage with market participants and standard setters in this process.

### **Disclosure Requirements That Should Be Excluded**

The SEC should consider the evolving nature of climate data reporting when determining the scope of data issuers must report under the proposed rules. Issuers should not be required to report on metrics that are likely to be imprecise, misleading, and cumbersome for market participants. Consistent with our 2021 Letter, we believe that the SEC's rulemaking should focus on data that can be accurately and consistently reported. Through BlackRock's engagement, as a fiduciary, with issuers on climate disclosure in recent years, we have observed issuers' tendency to develop and adopt climate reporting tools through a flexible process as climate science and risk analysis methodologies evolve. Notwithstanding the rapid progress we have observed, we believe that the SEC should not require the disclosures under proposed new Article 14 of Regulation S-X or the other unduly burdensome disclosures described below.

The disclosures required under proposed new Article 14 of Regulation S-X would add substantial cost, burden and complexity to the public company reporting process and are unlikely to yield new material information. We are particularly concerned that the proposed requirements to provide disaggregated disclosures on a line-item basis without regard to materiality would result in highly inaccurate disclosures and unduly burdensome compliance costs. Further, the 1% reporting threshold is arbitrarily low, not aligned with the SAB 99 materiality standard and would result in the disclosure of immaterial and hard-to-calculate data, which would be subject to numerous estimates, assumptions, and judgments. As a result, the disclosures would dilute the materiality of climate-related financial disclosures and potentially mislead investors into assuming that such data is more relevant or reliable than it actually is. Moreover, the proposed financial statement disclosures are beyond the scope of the TCFD framework and other TCFD-aligned regulatory frameworks. For these reasons, we respectfully recommend that the SEC omit the proposed requirements under Regulation S-X from its rulemaking.

It would be more appropriate for a recognized standard setter subject to the SEC's oversight, like the FASB, to determine the appropriateness and necessity of any financial statement climate-related disclosures beyond the current GAAP standards that call for climate-related metrics in an issuer's financial statements and related notes under certain circumstances. Importantly, any new pronouncement or standard should be subject to a flexible process among key

stakeholders as part of the rulemaking process, consistent with FASB practice. Further, we believe that the Commission's existing MD&A guidance provides a robust roadmap for how issuers should think of discussing the financial impact of material climate-related risks and events.

**The SEC should eliminate other disclosure requirements that are unduly burdensome and would not yield useful information.** BlackRock is mindful that the costs of unduly burdensome disclosure requirements that do not yield useful information are ultimately borne by an issuer's investors. We and other investors want more robust climate reporting, but only if such reporting yields high-quality information that can be compared across issuers and over time. Inaccurate or cumbersome information that dilutes reliability does not help investors make investment and voting decisions, and instead has the potential to be costly, obfuscating, confusing and misleading.

Therefore, in addition to eliminating the financial statements disclosure requirements, we recommend that the SEC eliminate the requirement to provide GHG emissions disclosures and other climate-related information for historical periods. Many issuers do not currently collect or report the information required under the proposal and thus will have to retroactively estimate their historical data, which process is both burdensome and unlikely to produce reliable and consistent disclosures for investors.

Furthermore, we recommend that the Commission exclude consolidated entities and equity investees from the application of the final rules. Under the proposal, an issuer will be required to obtain all Scope 1 and 2 emissions for consolidated subsidiaries and the issuer's share of GHG emissions for investments for which it applies either the equity method of accounting or proportionate consolidation. On the one hand, this proposed requirement could deter potential investees from engaging with U.S. public investors in favor of private U.S. companies or non-U.S. public companies. On the other hand, this proposed requirement will negatively affect the access to capital of smaller private companies, because U.S. public company investors may be concerned with these investees' GHG emissions reporting capabilities.

We also recommend that the SEC exclude pooled investment vehicles, exchange-traded products and business development companies from the application of the final rules. Pooled vehicles, business development companies and exchange-traded products often have few employees or operations, and primarily exist to invest in other companies. Although certain of these entities also make SEC filings, the climate-related disclosures by these entities should not be subject to the same rules that would apply to public company registrants given the unique nature of their business and operations.

<u>Conclusion</u>

While we agree with the Commission's goal of providing a robust framework for climate disclosures under the proposal, we believe that the Commission's rulemaking should provide issuers with more flexibility. We believe that our

App.1177
Appellate Case: 24-1628    Page: 1182    Date Filed: 03/26/2024 Entry ID: 5377362

recommendations, which are consistent with the principles for high-quality climate-related disclosures we outlined above, will allow the Commission to strike the appropriate balance between providing issuers with flexibility and establishing a framework that provides market participants with the information they need to evaluate a company's climate-related exposure.

We believe that limiting reporting of climate-related information in SEC filings to information that is material to an issuer's business and financial performance will reduce the compliance burden for companies and ensure that material climate risks and opportunities are clearly identified for market participants alongside the discussion of an issuer's other material risks. Omitting certain elements of the proposal that require premature disclosure of quantitative and financial statement metrics will reduce the risk of uneven and inaccurate disclosures. Allowing the underlying methodologies and procedures to ripen before the Commission mandates disclosure will allow issuers to continue the voluntary engagement required to advance the development of the necessary methodologies and procedures, without being subject to high reporting and litigation costs before issuers' efforts are likely to yield useful information.

Furthermore, as an asset manager that invests in U.S. capital markets on behalf of our clients in order to deliver on our purpose of helping more and more people achieve financial well-being, we encourage the Commission to take greater consideration of the impacts the proposal could have on U.S. capital markets.[41] We are concerned that the impact of onerous disclosure requirements on U.S. public issuers could (i) encourage U.S. public issuers to sell assets that could harm their climate-related disclosure to opaque private issuers,[42] (ii) incentivize such assets to stay in the hands of opaque private companies, (iii) disincentivize initial public offerings by private companies or U.S. listing by non-U.S. companies, thereby potentially excluding public market investors from accessing pockets of U.S. capital markets and capital formation processes, and (iv) discourage merger activity between publicly listed U.S. companies and either private U.S. companies or non-U.S. companies.[43] Therefore, we urge the Commission to consider ways to extend greater transparency of climate-related considerations to U.S. private issuers.

Finally, we encourage the Commission to continue to closely align its rules around climate disclosure with emerging global standards, including under the ISSB. With our recommendations as discussed in this letter, we believe the SEC proposal would create a robust framework for climate disclosures and help set a global benchmark for efficient, informed capital markets.

---

[41] Of note, the UK and EU regulators are evaluating climate disclosure requirements, which would apply to both public companies and private companies over a certain size.

[42] This is already occurring. See recent New York Times article: "Oil Giants Sell Dirty Wells to Buyers With Looser Climate Goals, Study Finds."

[43] Particularly for jurisdictions where such data is not required by local regulatory disclosure regimes, needing to report data immediately at the time of a merger without any phase-in period or safe harbor would be extremely difficult for non-U.S. companies and therefore create a significant barrier to M&A activity for U.S. listed issuers looking to acquire targets in foreign markets.

App.1178

\*\*\*\*\*

We thank you for taking the time to review our input and are happy to be of further assistance as this endeavor proceeds. Should you have any questions about our views, please reach out to Robert Dunbar ██████████████████████.

Sincerely,

Paul Bodnar
Managing Director, Global Head of Sustainable Investing

Kathryn Fulton
Managing Director, Head of US Public Policy Group

Elizabeth Kent
Managing Director, Global Public Policy Group

OFFICE COPY

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMIBA CIRCUIT

United States Court of Appeals
for the District of Columbia Circuit

FILED OCT 17 1977

GEORGE A. FISHER
CLERK

No. 77-1761

NATURAL RESOURCES DEFENSE COUNCIL,
INC., et al.,

Plaintiffs-Appellees,

v.

SECURITIES AND EXCHANGE COMMISSION,
et al.,

Defendants-Appellants.

Appeal From the United States District Court
for the District of Columbia

OPENING BRIEF OF THE SECURITIES AND EXCHANGE COMMISSION

276-81-3
67
3-78-2-30-4-1

HARVEY L. PITT
General Counsel

JACOB H. STILLMAN
Principal Assistant General Counsel

DANIEL L. GOELZER
Special Counsel

LINDA W. JARETT
Attorney

Securities and Exchange Commission
Washington, D.C. 20549

App.1180

Copied at the National Archives at Kansas City

INDEX

Appellate Case: 24-1628     Page: 1186     Date Filed: 03/26/2024     Entry ID: 5377362

|  | | Page |
|---|---|---|
| CITATIONS | | iv |
| PRELIMINARY STATEMENT | | 1 |
| QUESTIONS PRESENTED | | 4 |
| RELATED CASES PREVIOUSLY BEFORE THIS COURT | | 5 |
| STATUTES AND RULES INVOLVED | | 5 |
| REFERENCES TO PARTIES AND RULINGS | | 5 |
| STATEMENT OF THE CASE | | 6 |
| A. Facts | | 6 |
| 1. | The Plaintiffs' Petition for Rulemaking | 8 |
| 2. | The Commission's Adoption of Environmental Disclosure Rules | 10 |
| 3. | The Plaintiffs' Attempt to Obtain Judicial Substitution of Their Disclosure Rules for the Commission's | 11 |
| 4. | The Commission's Renewed Consideration of Environmental and Employment Disclosure | 13 |
| | a. Public proceeding | 13 |
| | b. Securities Act Release No. 5627 | 16 |
| | (1) Consideration of the plaintiffs' proposal -- comprehensive disclosure of the environmental effects of corporate activities | 19 |
| | (2) Consideration of requiring publicly-held companies to disclose all pending environmental litigation | 20 |
| | (3) Consideration of requiring public companies to set forth a statement of corporate environmental policy | 20 |

i

**App.1181**

Copied at the National Archives at Kansas City

       (4)  Consideration of requiring disclosure of all
           capital expenditures and expenses for
           environmental purposes ....................... 20

       (5)  Consideration of requiring disclosure of
           instances of noncompliance with existing
           standards as reflected in any environmental
           compliance report filed pursuant to a
           federal statute ............................. 21

      c.  Securities Act Release No. 5704 .................. 22

  B.  Proceedings Below ....................................... 24

SUMMARY OF ARGUMENT .................................................. 28

ARGUMENT ............................................................. 29

I.    THE PLAINTIFFS LACK STANDING TO PURSUE THIS LITIGATION ... 29

II.   THE MERITS OF THE COMMISSION'S DECISION NOT TO ADOPT
      THE RULES SOUGHT BY THE PLAINTIFFS ARE NOT SUBJECT
      TO JUDICIAL REVIEW ...................................... 37

  A.  The Commission Is Vested with Discretion Not to
      Expand the Disclosure Requirements Set Forth in
      the Federal Securities Laws ............................. 40

  B.  The Legislative History of the APA and of the
      Federal Securities Laws Demonstrates that
      Congress Intended to Preclude Judicial Review
      of the Commission's Non-action Here ..................... 44

III.  EVEN ASSUMING, ARGUENDO, THAT THE COMMISSION'S
      DETERMINATION NOT TO ADOPT THE PLAINTIFFS' PROPOSED
      RULES WERE SUBJECT TO SOME JUDICIAL REVIEW, THE
      DISTRICT COURT APPLIED AN ERRONEOUS STANDARD OF REVIEW ... 47

  A.  The District Court Erred in Faulting the Commission's
      Determination Not To Adopt the Rulemaking Philosophy
      Sought by the Plaintiffs on the Ground That It Was
      "Not Sustainable On The Record." ........................ 48

App.1182

Copied at the National Archives at Kansas City

Appellate Case: 24-1628   Page: 1187   Date Filed: 03/26/2024   Entry ID: 5377362

B.   The District Court Improperly Placed upon the Commission
     The Burden of Justifying Its Determination Not to
     Adopt the Disclosure Policy Sought by the Plaintiffs ....   53

IV.  THE COMMISSION'S DETERMINATION NOT TO ADOPT THE
     PLAINTIFFS' PROPOSED RULES WAS A REASONED EXERCISE
     OF THE COMMISSION'S BROAD DISCRETION .....................   56

     A.   The Commission Is Not Required to Conduct a Statistical
          Cost-Benefit Analysis before it Can Decline to Adopt
          Disclosure Rules; the Commission's Conclusions concerning
          the Costs and Benefits of Various Disclosure Alternatives
          were Rational and Reflected the Commission's Expertise
          in Administering the Disclosure Provisions of the
          Federal Securities Laws ................................   57

     B.   The Commission Complied With NEPA's
          "Procedural Mandate" ...................................   60

     C.   The District Court Erred in Holding that
          the Commission Had Improperly Failed to
          Consider Adopting Certain Environmental
          Disclosure Requirements Solely in Connection
          with Proxy Solicitations ..............................   63

     D.   The District Court Erred in Concluding that the
          Commission Was Arbitrary and Capricious in
          Not Adopting the Plaintiffs' Suggestions for
          Additional Disclosure of Employment Information ........   66

CONCLUSION .........................................................   69

STATUTORY APPENDIX .................................................   A-1

App.1183

Copied at the National Archives at Kansas City

Appellate Case: 24-1628    Page: 1188    Date Filed: 03/26/2024 Entry ID: 5377362

TABLE OF CITATIONS

Cases:                                                                    Page

* Action for Children's Television v. Federal Communications
    Commission, 41 Ad. L. 2d 469 (C.A. D.C., July 1, 1977) .....    42,46,47,52

Abbott Laboratories v. Gardner, 387 U.S. 136 (1967) ..........    40,47

American Public Gas Association v. Federal Power Commission,
    166 U.S. App. D.C. 276, 552 F.2d 142 (1975) ...............    54

* Amoco Oil Co. v. Environmental Protection Agency,
    163 U.S. App. D.C. 162, 501 F.2d 722 (1974) ..............    50,52,53,64

Atchison, Topeka and Santa Fe Railroad Co. v.
    Callaway, 431 F. Supp. 722 (D. D.C., 1977) ...............    32

Automotive Parts & Accessories Ass'n v. Boyd, 132 U.S.
    App. D.C. 200, 407 F.2d 330 (1968) .......................    52

Barlow v. Collins, 397 U.S.. 159 (1969) ....................    30

Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 721 (1975) ...    31

California Bankers Association v. Schultz, 416 U.S. 21
    (1974) .. .................................................    30,31

Calvert Cliffs' Coordinating Committee v. Atomic Energy
    Commission, 146 U.S. App. D.C. 33, 449 F.2d
    1109 (1971) ..............................................    18,27,61

Camp v. Pitts, 411 U.S. 138 (1973) ...........................    52

Carolina Action v. Simon, 389 F. Supp. 1244 (M.D. N.C., 1975),
    affirmed, 512 F.2d 295 (C.A. 4, 1975) .....................    34

J. I. Case Co. v. Borak, 377 U.S. 426 (1964) .................    32

Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402
    (1971) ...................................................    43

City of Chicago v. Federal Power Commission 147 U.S. App.
    D.C. 312, 458 F.2d 731 (1971), certiorari denied,
    405 U.S. 1074 (1972) .....................................    52

Civic Improvement Committee v. Volpe, 459 F.2d 957
    (C.A. 4, 1972) ...........................................    35

Columbia Broadcasting Co., Inc. v. United States, 316
    U.S. 407 (1942) ..........................................    55

App.1184

Copied at the National Archives at Kansas City

Appellate Case: 24-1628    Page: 1189    Date Filed: 03/26/2024    Entry ID: 5377362

Appellate Case: 24-1628   Page: 1190   Date Filed: 03/26/2024 Entry ID: 5377362

Cases: (cont'd)                                                    Page

Columbia Broadcasting System, Inc. v. Federal Communications
    Commission, 147 U.S. App. D.C. 175, 454 F.2d 1018 (1971) ...    46

Crooker v. Securities and Exchange Commission, 160 U.S.
    App. D.C. 375, 161 F.2d 944 (C.A. 1, 1947) ................    42

Data Processing Service v. Camp, 397 U.S. 150 (1969) ........    30

Dyer v. Securities and Exchange Commission, 291 F.2d
    774 (C.A. 8, 1961) .......................................    42

* Dunlop v. Bachowski, 421 U.S. 560 (1975) ...................  37, passim

E. I. Du Pont de Nemours & Co. v. Collins, 429 U.S.
    815 (1977) ...............................................    61

Ethyl Corp. v. EPA, 176 U.S. App. D.C. 373, 541 F. 2d 1,
    certiorari denied, 426 U.S. 941 (1976)                      48, 50

Federal Communications Commission v. RCA Communications,
    Inc., 346 U.S. 86 (1953) .................................    59

Federal Power Commission v. Hope Natural Gas Co., 320
    U.S. 591 (1944) ..........................................    54

Forester v. Consumer Product Safety Commission, No. 75-1292,
    (C.A. D.C., June 1, 1977) ................................    59

Flast v. Cohen, 392 U.S. 83 (1968) ..........................    30

Flint Ridge Development Co. v. Scenic Rivers Association,
    426 U.S. 776 (1976) ......................................    34

Flying Tiger Lines, Inc. v. Boyd, 244 F. Supp. 889
    (D. D.C., 1965) ..........................................    53

* Gage v. Atomic Energy Commission, 156 U.S. App. D.C. 231,
    479 F.2d 1214 (1973) .....................................    61

General Telephone Company of the Southwest v.
    United States, 449 F.2d 846 (C.A. 5, 1971) ...............    59

Golden v. Zwickler, 394 U.S. 103 (1969) .....................    30

Greater Boston Television Corporation v. Federal
    Communications Commission, 143 U.S. App. D.C. 383,
    444 F.2d 841 (1970) ......................................    55

Hahn v. Gottlieb, 430 F.2d 1243 (C.A. 1, 1970) ..............    44

* Harrington v. Bush, __ U.S. App. D.C. __, 553 F.2d 190
    (1977) ...................................................  30, 33

v

Copied at the National Archives at Kansas City

Cases: (cont'd)                                                 Page

Home Box Office, Inc. v. Federal Communications Commission, et al., 40 Ad. L. 2d 1007 (C.A. D.C., Mar. 25, 1977), certiorari denied, 46 U.S.L.W. 1390 (U.S., Oct. 4, 1977) ... 55

Industrial Union Department, AFL-CIO v. Hodgson, 162 App. D.C. 331, 499 F.2d 467 (1974) ..................... 50,58

Kendler v. Wirtz, 388 F.2d 381 (C.A. 3, 1968) ............... 44

Kixmiller v. Securities and Exchange Commission, 160 U.S. App. D.C. 375, 492 F.2d 641 (1974) ............... 42

Laird v. Tatum, 408 U.S. 1 (1972) .......................... 32

Leighton v. Securities and Exchange Commission, 95 U.S. App. D.C. 217, 221 F. 2d 1 (1955) ............................. 43

Linda R.S. v. Richard D., 410 U.S. 614 (1973) ............... 36

Machinery Dealers National Association v. Lockheed Aircraft Corporation, et al. No. 74-535 (C.A. D.C. August 25, 1977) ........................................... 31,34,36

Mackey v. United States, 103 U.S. App. D.C., 255 F. 2d 898 (1958) ................................................ 47

* Metcalf v. National Petroleum Council, __ U.S. App. D.C. __, 553 F.2d 176 (1977) ...................................... 31,32,343

Movement Against Destruction v. Volpe, 361 F. Supp. 1360 (D. Md., 1973), affirmed, 500 F. 2d 29 (C.A. 4, 1974) ...... 34

* National Association for the Advancement of Colored People v. Federal Power Commission, 172 U.S. App. D.C. 32, 520 F.2d 432 (1975), affirmed, 425 U.S. 662 (1976) ............. 17,passim

Natural Resources Defense Council, Inc. v. Securities and Exchange Commission, No. 72-1148 (C.A.D.C., February 8, 1973) ......................................... 5,10,37

Natural Resources Defense Council, Inc. v. Securities and Exchange Commission, No. 73-1591 (C.A. D.C., June 17, 1974) ............................................. 5,12

Natural Resources Defense Council, Inc. v. Securities and Exchange Commission, 389 F. Supp 689 (D. D.C., 1974) ..................................................... 12,passim

Office of Communication of the United Church of Christ v. Federal Communication Commission, No.76-4187 (C.A. 2, Aug. 5, 1977) ........................... 67

App.1186

Appellate Case: 24-1628    Page: 1191    Date Filed: 03/26/2024    Entry ID: 5377362

Copied at the National Archives at Kansas City

Cases (cont'd):                                                    Page

Office Employees International Union v. National Labor
    Relations Board, 353 U.S. 313 (1957) .....................    37

Permian Basin Area Rate Cases, 390 U.S. 747 (1968) ...........    54

Portland Cement Association v. Ruckelshaus, 158 U.S. App.
    D.C. 308, 486 F.2d 375 (1973) .............................    60

Schilling v. Rogers, 363 U.S. 666 (1960) .....................    41

Schlesinger v. Reservists to Stop the War, 418 U.S. 208,
    (1974) ....................................................    30

Scientists' Institute for Public Information, Inc. v.
    Atomic Energy Commission, 156 U.S. App. D.C. 395,
    481 F.2d 1079 (1973) ......................................    32

Securities and Exchange Commission v. Allied Chemical
    Corporation, No. 77-373 (D. D.C., March 4, 1977) ..........    43

* Securities and Exchange Commission v. Chenery Corp., 332
    U.S. 194 (1947) ...........................................    41,42

Securities and Exchange Commission v. National Securities,
    Inc., 393 U.S. 453 (1968) .................................    64

Securities and Exchange Commission v. Torr, 15 F. Supp.
    144 (S.D. N.Y., 1936) .....................................    42

Sierra Club v. Morton, 405 U.S. 727 (1972) ...............    29,30

* Simon v. Eastern Kentucky Welfare Rights Organization,
    426 U.S. 26 (1976) ........................................    30,31,33,34

Silentman v. Federal Power Commission, No. 76-1192 (C.A. D.C.,
    August 26, 1977) ..........................................    63

TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438 (1976) ..    64-65

United Housing Foundation, Inc. v. Forman, 421 U.S. 837
    (1975) ....................................................    16

United States v. Allegheny-Ludlum Steel, 406 U.S. 742
    (1972) ....................................................    52

United States v. Florida East Coast R. Co., 410 U.S. 224
    (1973) ....................................................    52

United States v. Richardson, 418 U.S. 166 (1974) .............    31

United States v. SCRAP, 412 U.S. 669 (1973) ..................    30

App.1187

Copied at the National Archives at Kansas City

Appellate Case: 24-1628      Page: 1192      Date Filed: 03/26/2024 Entry ID: 5377362

Appellate Case: 24-1628    Page: 1193    Date Filed: 03/26/2024 Entry ID: 5377362

<u>Cases</u> (cont'd):                                                      Page

United States v. Stoeco Homes, Inc., 498 F. 2d 597 (C.A. 3,
    1974) .......................................................    34

Warth v. Seldin, 422 U.S. 490 (1975) ...........................    32,33,35

West Helena Savings & Loan Association v. Federal Home Loan
    Bank Board, 553 F.2d 1175 (C.A. 8, 1977) ...................    63


<u>Statutes and Rules</u>:

Administrative Procedure Act, 5 U.S.C. <u>et seq</u>.:
    Section 553, 5 U.S.C. 553 ..................................    48
    Section 553(c), 5 U.S.C. 553(c) ...........................    5,12
    Section 553(e), 5 U.S.C. 553(e) ...........................    5,43,44,53
  * Section 555(e), 5 U.S.C. 555(e) ...........................    5
    Section 556, 5 U.S.C. 556 .................................    48
    Section 557, 5 U.S.C. 557 .................................    48
    Section 701(a), 5 U.S.C. 701(a) ...........................    5
  * Section 701(a)(1), 5 U.S.C. 701(a)(1) .....................    39
  * Section 701(a)(2), 5 U.S.C. 701(a)(2) .....................    39
    Sections 701-706, 5 U.S.C. 701-706 ........................    45


Communications Act of 1934:
    47 U.S.C. 402(a) ..........................................    46


Labor-Management Reporting and Disclosure Act of 1959 .........    53


National Environmental Policy Act of  1969,
42 U.S.C. 4321, <u>et seq</u>. ......................................    5,10
    42 U.S.C. 4332(c) .........................................    62


Securities Act of 1933, 15 U.S.C. 77a <u>et seq</u>.:
    Section 5(a), 15 U.S.C. 77e(a) ............................    6
    Section 5(c), 15 U.S.C. 77e(c) ............................    6
    Section 6, 15 U.S.C. 77f .................................    6
    Section 7, 15 U.S.C. 77g .................................    5,6,40
    Section 10, 15 U.S.C. 77j ................................    6
    Section 10(c), 15 U.S.C. 77j(c) ..........................    5,40
    Section 19(a), 15 U.S.C. 77s(a) ..........................    5,41
    Schedule A, 15 U.S.C. 77aa ...............................    6

Rules under the Securities Act:
    Rule 405(1), 17 CFR 230.405(1) ...........................    5,7
    Rule 408, 17 CFR 230.408 .................................    5,7

App.1188

Copied at the National Archives at Kansas City

Appellate Case: 24-1628   Page: 1194   Date Filed: 03/26/2024 Entry ID: 5377362

Statutes and Rules: (cont'd):                      Page

\* Securities Acts Amendments of 1975, Pub. L. 94-29,
   89 Stat. 97 (June 4, 1975) ................................. 46,51


Securities Exchange Act of 1934, 15 U.S.C. 78a, et seq.
   Section 11A(a)(2), 15 U.S.C. 78k-1(a)(2) .................... 41
   Section 12, 15 U.S.C. 78l ................................... 7,40
   Section 12(b), 15 U.S.C. 78l(b) ............................. 5,40
   Section 13(a), 15 U.S.C. 78m(a) ............................. 5,7,40
   Section 14(a) 15 U.S.C. 78n(a) .............................. 5,40
   Section 15(b)(4), 15 U.S.C. 78o(b)(4) ....................... 51
   Section 15(d), 15 U.S.C. 78o(d) ............................. 5,7
   Section 19(h)(1), 15 U.S.C. 78s(h)(1) ....................... 51
   Section 23(a), 15 U.S.C. 78w(a) ............................. 5,40
   Section 25(b), 15 U.S.C. 78y(b) ............................. 5,51-52

Rules under the Securities Exchange Act:
   Rule 10b-5, 17 CFR 240.10b-5 ................................ 31
   Rule 12b-20, 17 CFR 240.12b-20 .............................. 5,7
   Rule 14a-8, 17 CFR 240.14a-8 ................................ 5,32,66
   Rule 14a-9(a), 17 CFR 240.14a-9(a) .......................... 5,7

Securities and Exchange Commission, Rules of Practice:
   Rule 4(a), 17 CFR 201.4(a) .................................. 5,44

Forms:
   Form S-1, 17 CFR 239.11 ..................................... 11
   Form S-7, 17 CFR 239.26 ..................................... 11
   Form S-9, 17 CFR 239.22 ..................................... 11
   Form 10, 17 CFR 249.210 ..................................... 11
   Form 8-K, 17 CFR 249.308 .................................... 11
   Form 10-K, 17 CFR 249.310 ................................... 11

Miscellaneous:

\* Administrative Procedure Act:  Legislative History, S. Doc.
   No. 248, 79th Cong., 2d Sess (1946) ......................... 43,45,46

78 Cong. Rec. 7696 (1940) ...................................... 40

115 Cong. Rec. 40418 (1969).................................... 62

115 Cong. Rec. 40425 (1969) ................................... 62

App.1189

Copied at the National Archives at Kansas City

Appellate Case: 24-1628    Page: 1195    Date Filed: 03/26/2024    Entry ID: 5377362

Miscellaneous: (cont'd)                                                          Page

H.R. Rep. 85, 73d Cong., 1st Sess. (1933) .......................  16

H.R. Rep. 1383, 73d Cong., 2d Sess (1934) .......................  40

Securities Act Release No. 3154 (1946) ..........................  44

Securities Act Release No. 4242 (1960) ..........................  44

Securities Act Release No. 5170 (1971) ..........................  9,10

Securities Act Release No. 5235 (1973) ..........................  10,12,14

Securities Act Release No. 5386 (1973) ..........................  10,12,56

Securities Act Release No. 5569 (1975) ..........................  13,14

Securities Act Release No. 5627 (1975) ..........................  16,passim

Securities Act Release No. 5704 (1976) ..........................  22,passim

Securities Exchange Act Release No. 12999 (1967) ...............  66

Securities Exchange Act Release No. 13482 (1977) ...............  65

Securities Exchange Act Release No. 13901 (1977) ...............  65

* S. Rep. No. 792, 73d Cong., 1st Sess. (1934) ..................  16,41,55

S. Rep. No. 752, 79th Cong., 1st Sess. (1945) ..................  43

S. Rep. No. 91-296, 91st Cong., 1st Sess. (1969) ..............  62

S. Rep. 94-75, 94th Cong., 1st Sess (1975) ....................  47

* Cases or authorities chiefly relied upon are marked by asterisks.

x

Copied at the National Archives at Kansas City

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

————————————————

No. 77-1761

————————————————

NATURAL RESOURCES DEFENSE COUNCIL, et al.,

Plaintiffs-Appellees,

v.

SECURITIES AND EXCHANGE COMMISSION, et al.,

Defendants-Appellants.

————————————————————————————————

Appeal from the United States District Court
for the District of Columbia

————————————————————————————————

OPENING BRIEF OF THE SECURITIES AND EXCHANGE COMMISSION

————————————————————————————————

PRELIMINARY STATEMENT

This is an appeal by the Securities and Exchange Commission (the
"Commission"), the defendant in the court below, from a final judgment,
entered on May 19, 1977, by the District Court for the District of Columbia
(Richey, J.).

In the proceeding below, the plaintiffs -- several public interest groups
dedicated to improving the environment or promoting equal employment oppor-
tunity -- sought judicial review of the Commission's disposition of a petition
for rulemaking the plaintiffs had filed with the Commission. In essence,
the plaintiffs sought to compel the Commission to amend its existing rules
to require companies whose securities are publicly held to disclose certain
environmental and equal employment information, whether or not that information

Copied at the National Archives at Kansas City

is economically relevant to investors. 1/  The rules proposed by the plaintiffs
were designed to elicit a mass of environmental data and employment statistics
that would satisfy the plaintiffs' notions of public policy.

The Commission carefully considered the plaintiffs' rulemaking petition
and was responsive to it, although the Commission declined to adopt the precise
rules requested by the plaintiffs.  Three notice-and-comment proceedings,
nineteen days of oral hearings, the issuance of general guidelines to corporate
issuers of securities, the establishment of a rulemaking file exceeding
15,000 pages in length, and the adoption of rules pertaining specifically
to the disclosure of environmental information relevant to investors, ensued.
And, the Commission's quasi-legislative conclusions, while at variance with
the wishes of the plaintiffs, reflected a reasoned determination of policy.

Nevertheless, for five years the Commission has been involved in cumber-
some litigation at the behest of the plaintiffs, who seek to compel the
promulgation of the rules they have drafted.  The order of the district court
from which this appeal is taken carefully avoids requiring the Commission
to adopt the rules the plaintiffs have proposed.  Rather, the district court's
decision effectively holds that, when requested to adopt rules, the Commission,
as a prerequisite to deciding not to adopt the rules, is required to conduct
extensive proceedings, complete with statistical analyses, and to prepare a virtual
treatise explaining in minute detail the reasons for its determination not to
adopt rules as well as its underlying reasoning process.  And, the decision
effectively holds that, if the Commission is challenged in court, the burden
does not rest with those requesting the adoption of rules, but rather the
Commission must establish that its discretionary judgment not to adopt rules
is conclusively supported by "record" evidence.  Accordingly, as it did once

---

1/    If environmental or equal employment information is material to investors,
      the Commission's rules already require the disclosure of such informa-
      tion.

Copied at the National Archives at Kansas City

Appellate Case: 24-1628   Page: 1197   Date Filed: 03/26/2024   Entry ID: 5377362

before, the district court has compelled the Commission to undertake yet additional rulemaking procedures, despite the district court's explicit recognition that

-- the plaintiffs have conceded that the Commission complied with the Administrative Procedure Act;

-- the Commission interpreted the operative statutes correctly; and

-- the Commission was under no legal obligation to promulgate the rules sought by the plaintiffs, nor was the Commission found to have any legal obligations to adopt rules similar to the ones proposed by the plaintiffs.

While there is a strong presumption of reviewability of administrative agency action, the Congress recognized that there are certain areas of agency action, including the denial of a rulemaking petition and the reasons therefor, that should not be the subject of judicial intervention, at least in the absence of extraordinary circumstances not present here. The district court's decision here, however, failed to recognize that the Commission's determination not to promulgate rules preferred by the plaintiffs, where it was not required by any statute to promulgate such rules, epitomizes the type of determination that Congress intended to confide to the Commission's discretion.

The Commission administers six statutes, each of which gives the Commission the authority to promulgate rules through informal, notice-and-comment, rulemaking. It adopts hundreds of rules each year, and there are an infinite number of possible rules that the Commission does not adopt. Permitting private parties to utilize judicial processes to place a heavy burden of proof on the Commission (to be met only by unrebuttable statistical and factual evidence) whenever it declines to take some rule-making action, could engender unnecessary and harmful litigation, diverting the agency from its statutory mission.

For these reasons, the Commission has taken this appeal.

Copied at the National Archives at Kansas City

Appellate Case: 24-1628    Page: 1198    Date Filed: 03/26/2024    Entry ID: 5377362

## QUESTIONS PRESENTED

1.  Whether the merits of the determination of the Securities and Exchange Commission not to adopt specific disclosure rules recommended by private parties are subject to judicial review, where:

    (a)  it is conceded that the Commission complied with the Administrative Procedure Act in its rulemaking proceedings;

    (b)  the Commission has complete discretion not to promulgate disclosure rules; and

    (c)  the legislative history of the federal securities laws and the Administrative Procedure Act demonstrates Congress' intention to preclude judicial review of the merits of Commission determinations not to promulgate rules.

2.  Whether, even assuming *arguendo* that the merits of the Commission's determination not to adopt the rules sought by the plaintiffs were subject to judicial review, the district court applied an erroneous standard of review by

    (a)  requiring the Commission to support its quasi-legislative determinations of policy reached in informal, notice-and-comment rulemaking with factual support "on-the-record," and

    (b)  requiring the Commission to provide a justification for not adopting rules that could not be disagreed with, rather than properly placing the burden of justifying the plaintiffs' proposed rules upon the plaintiffs.

3.  Whether the plaintiffs, who merely sought to vindicate their personal value preferences, had standing to sue the Commission for its failure to adopt the disclosure rules they sought, where the plaintiffs did not establish any injury in fact resulting from the Commission's decision not to promulgate their rules.

4.  Whether the Commission gave adequate consideration to environmental values in its decision-making, where it conducted three notice-and-comment rulemaking proceedings, held nineteen days of hearings, and amassed a file of over fifteen thousand pages of views, data and arguments concerning environmental disclosure and related matters.

Copied at the National Archives at Kansas City

Appellate Case: 24-1628   Page: 1199   Date Filed: 03/26/2024   Entry ID: 5377362

5. Whether the district court erred in holding that the Commission was arbitrary and capricious in determining to continue to elicit information from publicly-held companies, concerning environmental and employment matters, through its existing environmental disclosure rules and through its general rules requiring that all material information be disclosed, rather than through another disclosure scheme the plaintiffs would have preferred, where the Commission fully articulated the reasons for its decision.

## RELATED CASES PREVIOUSLY BEFORE THIS COURT

_Natural Resources Defense Council, Inc._ v. _Securities and Exchange Commission_, No. 72-1148 (February 8, 1973).

_Natural Resources Defense Council, Inc._ v. _Securities and Exchange Commission_, No. 73-1591 ( June 17, 1974).

## STATUTES AND RULES INVOLVED

The relevant portions of the following statutes and rules are set forth in the Statutory Appendix at pages A-1 - A-12, _infra_: Sections 7, 10(c) and 19(a) of the Securities Act of 1933, 15 U.S.C. 77g, 77j(c) and 77s(a); Securities Act Rules 405(1) and 408, 17 C.F.R. 230.405(1), 230.408; Sections 12(b), 13(a), 14(a), 15(d), 23(a) and 25(b) of the Securities Exchange Act of 1934, 15 U.S.C. 78l(b), 78m(a), 78n(a), 78o(d), 78w(a) and 78y(b); Securities Exchange Act Rules 12b-20, 14a-8 and 14a-9, 17 C.F.R. 240.12b-20, 240.14a-8 and 240.14a-9; The National Environmental Policy Act of 1969, 42 U.S.C. 4321, _et_ seq.; Sections 553(c), 553(e), 555(e) and 701(a) of the Administrative Procedure Act, 5 U.S.C. 553(c), 553(e), 555(e) and 701(a); and Rule 4(a) of the Commission Rules of Practice, 17 C.F.R. 201.4(a).

## REFERENCES TO PARTIES AND RULINGS

The plaintiffs are the Natural Resources Defense Council, Inc., the Center on Corporate Responsibility, Inc., the Project on Corporate

Appellate Case: 24-1628    Page: 1200    Date Filed: 03/26/2024   Entry ID: 5377362

Appellate Case: 24-1628   Page: 1201   Date Filed: 03/26/2024   Entry ID: 5377362

Responsibility, Inc., the National Organization for Women, the Unitarian
Universalist Association, the American Baptist Home Mission Society, and
the Province of St. Joseph of the Capuchin Order.

     The defendants are the Securities and Exchange Commission and its
individual members.

     The decision below, rendered by the Honorable Charles R. Richey
on May 19, 1977, is set forth in the Appendix at pages 170 to 207, and is
reported at 432 F. Supp. 1190. 2/

<div align="center">STATEMENT OF THE CASE</div>

A.  Facts

     As reflected in the Securities Act of 1933, 15 U.S.C. 77a, et seq., and the
Securities Exchange Act of 1934, 15 U.S.C. 78a, et seq., the federal securities laws
embody a philosophy of full disclosure by corporations whose securities are publicly-
held.  Before a corporation may distribute its securities to the public, it must
first register those securities with the Commission, 3/ and furnish investors with
a prospectus 4/ setting forth material facts about the corporation, its officers

--------------------------------------------------------------------

2/   "A. __ " refers to the pages of the record Appendix filed with this
    Court.  "Ex. A. __ " refers to Exhibit A, the "Appendix in lieu of
    a Record" which was filed with the complaint in the district court.
    "Ex. B. __ " and "Ex. C __ " refer to the pages of Vol. I and Vol. II
    respectively of the Joint Appendix that was filed in the district
    court on October 8, 1976.  Exhibits A, B, and C have been filed with
    this Court with the Commission's Brief and the record Appendix,
    pursuant to Rule 30(e) of the Federal Rules of Appellate Procedure.

3/   Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. 77e(a) and 77e(c),
    broadly prohibit the use of the mails or any means or instruments of
    interstate commerce to offer for sale, sell or distribute any security
    unless a registration statement for such a security, filed with the
    Commission pursuant to Section 6 of the Securities Act, 15 U.S.C. 77f,
    is in effect.  Section 7 and Schedule A of the Securities Act, 15 U.S.C.
    77g and 77aa, require that a registration statement set forth at least
    32 different categories of information. Section 7 of the Act authorizes
    the Commission to require additional disclosures "by rules or regulations
    * * *" where such additions appear to the Commission to be "necessary
    or appropriate in the public interest or for the protection of investors."

4/   See Section 10 of the Securities Act, 15 U.S.C. 77j.

App.1196

Copied at the National Archives at Kansas City

and directors and the use that will be made of the funds received from the sale of the securities. Similarly, corporations whose securities are publicly-owned must file periodic reports with the Commission describing the results of the corporation's operations for distinct periods of time. 5/ To implement these provisions, the Commission has promulgated a number of rules requiring material disclosures of specific categories of information and the Commission has constructed a number of forms for these purposes. And, the Commission has also adopted general disclosure requirements, mandating that publicly-held companies apprise investors of any other facts material to investors even if those facts are not specifically the subject of a Commission rule. 6/

_____

5/ See Sections 13(a) and 15(d) of the Securities Exchange Act, 15 U.S.C. 78n(a) and 78o(d). A company's obligation to file periodic reports may arise as a result of either or both of two corporate events -- (1) the filing by the corporation of a Securities Act registration statement for the public sale or distribution of securities (see n. 3, supra); or (2) the registration of stock by the corporation pursuant to Section 12 of the Securities Exchange Act, 15 U.S.C. 78l. The Commission is given authority to determine what information it should require to be reported on a periodic basis "as necessary or appropriate for the proper protection of investors and to insure fair dealing in the security * * *." Section 13(a).

6/ Rule 405(1) under the Securities Act, 17 CFR 230.405(1), defines material information as that information of "which an average prudent investor ought reasonably be informed before purchasing the security * * *."

Rule 408 under the Securities Act, 17 CFR 230.408, provides that registration statements must include "such further material information, if any, as may be necessary to make the required statements, in the light of the circumstances under which they are made, not misleading." And, Rule 12b-20 under the Securities Exchange Act, 17 CFR 240.12b-20, imposes substantially the same requirement with respect to reports filed with the Commission under that Act.

Rule 14a-9(a) under the Securities Exchange Act, 17 CFR 240.14a-9(a), provides:

"No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading."

Appellate Case: 24-1628    Page: 1202    Date Filed: 03/26/2024    Entry ID: 5377362

Copied at the National Archives at Kansas City

1. <u>The Plaintiffs' Petition for Rulemaking</u>

This action had its antecedents in a rulemaking petition filed with the Commission on June 7, 1971, by the Natural Resources Defense Council ("NRDC") and the Project on Corporate Responsibility. 7/ These parties requested revisions in (1) certain of the Commission's disclosure forms upon which corporations must register securities prior to their public sale or distribution and (2) the forms which certain corporate issuers of securities are required to file periodically with the Commission to report on their operations. The plaintiffs requested that the Commission require publicly-owned corporations to disclose detailed information concerning the "present and potential environmental effects of * * * [the corporation's] activities * * *" (Ex. A, 1a), including the "nature and extent" of the pollution caused by their activities, the "feasibility of curbing such pollution," and the "plans and prospects for improving [relevant] technology" (Ex. A, 9a). 8/ The plaintiffs' petition also separately requested that the Commission amend its disclosure forms to require certain corporations to disclose statistics revealing the percentages of minority and female employment in each of specified job categories and to disclose litigation involving civil rights matters (Ex. A, 4a-7a).

_____

7/    The original plaintiffs in this litigation were the Natural Resources
      Defense Council, Inc.; the Project on Corporate Responsibility, Inc.; and
      the Center on Corporate Responsibility, Inc.

      On September 7, 1976, shortly before the district court entered the order
      from which this appeal is taken, and over the objection of the Commission,
      the following parties were added as plaintiffs: the National Organization
      for Women; the Unitarian Universalist Association; the American Baptist
      Home Mission Society; and the Province of St. Joseph of Capuchin Order.

8/    Although the plaintiffs proposed certain limitations on the categories
      of companies to which the rule changes they sought would apply, the
      applicability of the proposals was not contingent upon the effect of
      environmentally significant conduct on a company's business or on
      its financial condition (as are the Commission's current rules).
      Likewise, the plaintiffs' proposal did not relate disclosures of
      "pollution" to noncompliance by a company with existing environmental
      standards.

Copied at the National Archives at Kansas City

Appellate Case: 24-1628    Page: 1203    Date Filed: 03/26/2024    Entry ID: 5377362

At the time the plaintiffs filed their rulemaking petition, the Commission was already actively considering the obligations of publicly-held companies to disclose certain environmental and employment matters pursuant to the Commission's existing disclosure rules (Ex. A, 112a). In that connection, the Commission sought the views of various federal agencies concerning the form changes requested by the petitioners (Ex. A., 39a, 40a). Pending responses to these inquiries and further consideration of the petition, the Commission issued Securities Act Release No. 5170 (July 19, 1971) (Ex. A, 55a), to alert publicly-held companies that the Commission's existing rules required the disclosure of material information with respect to environmental and civil rights matters.

The release warned corporations that they were already required to disclose "when compliance with statutory requirements with respect to environmental quality, e.g., various air, water and other anti-pollution laws, may necessitate significant capital outlays, may materially affect the earning power of the business, or cause material changes in registrant's business done or intended to be done" (Ex. A, 55a). It also admonished registrants that they were required to disclose, where material, pending or threatened environmental or civil rights litigation or sanctions imposed for civil rights violations (Ex. A, 55a). 9/

After issuing this release, the Commission and its staff began monitoring the resulting disclosure for the purpose of determining the effectiveness of the release (Ex. A, 84a), and, pending that monitoring, on December 2, 1971, the Commission determined to deny the plaintiffs' petition because it "believe[d] that it should

---

9/    The release went on to explain:

> "If such litigation is pending or known to be contemplated but disclosure thereof is omitted on the ground that it is not material, it will be the practice of the Division of Corporation Finance to request registrants to furnish as supplemental information and not as part of the filing, (1) a description of the omitted information and (2) a statement of the reasons for its omission" (Ex. A, 55a).

Copied at the National Archives at Kansas City

Appellate Case: 24-1628    Page: 1204    Date Filed: 03/26/2024   Entry ID: 5377362

evaluate the results of the guidelines [set forth in Release 5170] for a longer period of time" (Ex. A, 84a). In denying the petition, the Commission informed the plaintiffs that, after reviewing the disclosure made in response to Release 5170, it would actively consider amendments to its forms (Ex. A, 84a). It is the denial of that petition which triggered the plaintiffs' campaign to compel the Commission to promulgate their rules.

2. The Commission's Adoption of Environmental Disclosure Rules

Early in 1972, the Commission determined that more specific rules governing disclosures of the type sought by the plaintiffs might be necessary and, on February 16, 1972, issued Securities Act Release No. 5235 (Ex. A, 92a), announcing proposed amendments to certain of the Commission's registration and reporting forms. These proposals would have required disclosure of the effect on an issuer's business of compliance with federal, state and local laws relating to the protection of the environment, and solicited public comment on the proposals. Release 5235 advised the public that the proposals "emphasize the effect of environmental statutes and regulations, and enforcement proceedings thereunder, which may be felt in the future by the issuer * * *" (Ex. A, 92a). 10/

Public comments were received in response to Release 5235 and, on April 20, 1973, the Commission issued Securities Act Release No. 5386, adopting specific amendments to its registration and reporting forms designed to "promote investor protection and at the same time promote the purposes of NEPA [the National Environmental Policy Act of 1969, 42 U.S.C. 4321 et seq.]" (Ex. B, 1).

These amendments, which have continued in effect thoughout this litigation, specifically require:

---

10/ On February 18, 1972, two days after the publication of the Commission's rule proposals in Release 5235, and before the receipt of comments thereon, the plaintiffs sought judicial review in this Court of the denial of their rulemaking petition. That action was dismissed on the ground that, under the circumstances, the Commission's action on the petition was not final agency action subject to judicial review. Natural Resources Defense Council, Inc. v. Securities and Exchange Commission, No. 72-1148 (Feb. 8, 1973).

App.1200

Copied at the National Archives at Kansas City

Appellate Case: 24-1628    Page: 1205    Date Filed: 03/26/2024    Entry ID: 5377362

(1) disclosure of the material effects that compliance
with federal, state and local provisions which have
been enacted regulating the discharge of materials
into the environment, or otherwise relating to the
protection of the environment, may have upon the
capital expenditures, earnings and competitive position
of the registrant and its subsidiaries 11/; and

(2) disclosure of any administrative or judicial proceedings
pending or known to be contemplated by governmental
authorities and arising under federal, state or local
provisions which have been enacted or adopted regulating
the discharge of materials into the environment, or
otherwise relating to the protection of the environment. 12/

3. The plaintiffs' attempt to obtain judicial substitution
   of their disclosure rules for the Commission s

On March 2, 1973, even before the Commission promulgated its environmental

disclosure rules, the plaintiffs instituted the district court action from which this

---

11/    The amendments were made to Securities Act registration Forms S-1, Item
       9(a), Instruction 5, 17 CFR 239.11; S-7, Item 5(a), 17 CFR 239.26; S-9,
       Item 3(c), 17 CFR 239.22; to Securities Exchange Act registration Form 10,
       Item 1(b), Instruction G, 17 CFR 249.210; and to periodic reporting Form 10-K,
       Item 1(b)(7), 17 CFR 249.310.

12/    These amendments were made to Securities Act registration Forms S-1, Item
       12, Instruction 4, 17 CFR 239.11; S-7, Item 5(e), 17 CFR 239.26; to Securities
       Exchange Act registration Form 10, Item 10, Instruction 4, 17 CFR 249.210;
       and to periodic reporting Forms 10-K, Item 5, Instruction 4, 17 CFR 249.310;
       and 8-K, Item 3, Instruction 4, 17 CFR 249.308. See 17 CFR 239.0-1, 249.01.

       In adopting these rules, the Commission significantly deviated from
       the standards by which it generally determines whether legal proceedings
       must be disclosed, since registrants may not exclude disclosure of
       pending or contemplated government environmental proceedings as "ordinary
       routine litigation incidental to the business," although such exclusion
       is permitted with respect to non-environmental litigation.  In this
       regard, the basic registration forms, Form S-1 and Form 10, expressly
       admonish registrants that

            "proceedings arising under any Federal, State or local
            provisions which have been enacted or adopted regulating
            the discharge of materials into the environment or
            otherwise relating to the protection of the environment,
            shall not be deemed 'ordinary routine litigation incidental
            to the business' and shall be described if such proceeding
            is material to the business or financial condition of the
            registrant or if it involves primarily a claim for damages
            exceed[ing] 10 percent of the current assets * * *." Form
            10, supra, Item 10, Instruction 4; Form S-1, supra, Item
            12, Instruction 4.

Copied at the National Archives at Kansas City

Appellate Case: 24-1628     Page: 1206     Date Filed: 03/26/2024   Entry ID: 5377362

appeal arises, challenging the denial of their rulemaking petition and asking the court to order the Commission to adopt rules more to their liking. 13/

On December 9, 1974, after extensive briefing and argument, the district court issued a decision ("1974 order"), 389 F. Supp. 689, in which it held that the Commission had failed to comply with the procedural requirements of the Administrative Procedure Act ("APA"), 5 U.S.C. 551, et seq., in adopting the rules published in Release 5386. The court based its holding on the Commission's failure explicitly to state, in Release 5235 (announcing the Commission's proposed environmental disclosure rules), that "it was considering additional disclosure rules which would fully satisfy the mandate of Congress expressed in NEPA", 389 F. Supp. at 700. The district court also stated its belief that the Commission should have set forth, in the course of the rulemaking proceedings, the Commission's view of its obligation under the federal securities laws and NEPA, the alternatives which it considered in its rulemaking action, and its reasons for rejecting "substantial alternatives which may be proposed by interested parties." Id. at 701. 14/ The court also held that the Commission, in denying the equal employment portion of the plaintiffs' petition, had failed adequately to state the reasons for the denial of the suggestion that additional employment information be disclosed. Id. at 702. In light of its conclusion that the Commission had made procedural errors, the court ordered the Commission to undertake further rulemaking action.

The court also directed the Commission to inquire into what it characterized as two "overriding factual issues": (1) the extent of interest among "ethical investors"

---

13/ Shortly thereafter, on May 25, 1973, the plaintiffs filed a second proceeding in this Court, seeking review of the promulgation of the rules announced in Release 5386. This Court dismissed that proceeding for lack of jurisdiction. Natural Resources Defense Council, Inc. v. Securities and Exchange Commission, No. 73-1591 (June 17, 1974).

14/ The district court relied on Section 553(c) of the APA, 5 U.S.C. 553(c), which requires agencies adopting rules to set forth "a concise general statement of their basis and purpose," as the statutory authority for requiring the Commission to set forth its view of its legal authority, the alternatives it considered, and its reasons for rejecting alternatives.

Copied at the National Archives at Kansas City

Appellate Case: 24-1628    Page: 1207    Date Filed: 03/26/2024    Entry ID: 5377362

in the disclosure by corporations of the environmental impact of corporate activities and of their employment practices, and (2) the avenues open to such investors to "eliminate corporate practices that are inimical to the environment and equal employment opportunity." Id. at 701-702.

Although the Commission disagreed with the district court's decision, it determined to "attemp[t] fully to comply with [the] order" (Ex. B., 12).

4. The Commission's renewed consideration of environmental and employment disclosure

a. Public proceeding

Pursuant to the district court's 1974 order, on February 11, 1975, the Commission announced a further public proceeding concerning disclosure of environmental and other social matters, and specifically requested comments on the various issues suggested in the district court's opinion (see page 13, supra). See Securities Act Release No. 5569 (Ex. B, 11). 15/ The Commission also sought the views of interested persons on a number of alternative disclosure proposals, including, in substance, the plaintiffs' proposals.

---

15/    These issues were:

   "(1)   The advisability of [the Commission] requiring disclosure
          of socially significant matters,

   "(2)   Whether and on what basis these disclosures might be
          viewed as being material,

   "(3)   The basis and extent, if any, of the Commission's authority
          to require disclosure of matters primarily of social concern
          but of doubtful economic significance, and

   "(4)   The probable impact, if any, of such disclosure on corporate
          behavior."

(Ex. B, 12).

Copied at the National Archives at Kansas City

Appellate Case: 24-1628    Page: 1208    Date Filed: 03/26/2024    Entry ID: 5377362

In order to insure the fullest possible notice to interested persons,
in addition to publication in the Federal Register, the SEC Docket 16/ and other
routine methods of distribution, the Commission provided 500 free copies of
Release 5569 to the plaintiffs for such distribution as they saw fit. The
Commission itself mailed copies of the release, together with letters inviting
comment, to various interested governmental agencies, to persons who had responded
to two earlier releases requesting comment on certain matters of social significance
and to persons who commented on the environmental disclosure rules the Commission
previously proposed in Securities Act Release No. 5235 (Ex. B, 28) (see page 10,
supra).

Interest in this proceeding was intense. Public hearings commenced on
April 14, 1975, and continued for 19 days through May 14, 1975. The Commission
heard fifty-four oral presentations and received 353 written comments. The entire
file, consisting of letters of comment, transcripts of testimony received at the
hearing, and exhibits presented in the course of testimony in response to this
release, exceeds 10,000 pages.

The views expressed by participants in this proceeding were highly
diverse. Some investor participants and many industry representatives indicated
strong opposition to any further environmental or equal employment disclosure
requirements 17/. Many commentators specifically expressed the concern that
the proposed disclosure would be very costly and burdensome to reporting com-

---

16/ The SEC Docket is a weekly compilation of the releases issued by the
Commission. It is a public document and may be purchased by subscription
from the Superintendent of Documents of the United States Government
Printing Office, Washington, D. C. At the present time, there are
5,557 institutional and individual subscribers to the SEC Docket.

17/ See, e.g., comments of the Machinery and Allied Products Institute (Ex. C,
469) and the United States Chamber of Commerce (Ex. C, 702).

Appellate Case: 24-1628     Page: 1209     Date Filed: 03/26/2024     Entry ID: 5377362

**App.1204**

Copied at the National Archives at Kansas City

panies. 18/ In addition, many commentators raised objections to portions of the

rulemaking petition that sought disclosure of employment statistics. 19/

---

18/ For example, the Committee on Securities Regulation of the American
Bar Association noted the danger of social disclosure obscuring
"fundamental economic information" (Ex. B, 111), and stated that "[i]t is
difficult to imagine that the kinds of additional disclosures being
propounded by the ethical investors * * * could do anything except
further obscure the Commission's goal" (Ex. B, 112).

The Chamber of Commerce of the United States stated that environmental
disclosures would be costly, voluminous and misleading to investors
(Ex. B, 351-352). With respect to listing environmental compliance reports,
it stated:

"The cost to the registrant as the Chamber projects it is pro-
hibitive. The registrant must first expend sums compiling
applicable federal standards. Next, the registrant must expend
sums analyzing, in some instances, hundreds of voluminous and
complex reports to evaluate applicability and compliance or
noncompliance with those complex federal environmental standards.
It must then compile a list of those reports which in its own
judgment indicate noncompliance and then keep copies of those
reports available to be sent out on demand and expend sums
sending copies out if so demanded. A registrant would expend
sums in explanation and vindication of its reported excesses.
It is the Chamber's position that the cost to be borne by the
registrant and inevitably the shareholder and the consumer far
outweighs any benefit to a few interested investors and voters.
Further, a substantial disbenefit would accrue to the public
through the amount of litigation which would be generated by
the amendments as they are now proposed." (Ex. B, 354).

19/ For example, Theodore V. Purcell, S. J., a research professor at Georgetown
University and Chairman of the National Jesuit Advisory Committee on Investor
Responsibility, testified that, although he saw "a symbolic value" in
disclosure of equal employment opportunity data, such disclosure had "pit-
falls." First, "such data could easily be misinterpreted" (Ex. C, 585),
since they are a function of (1) the number of qualified minority persons
for a job; (2) the number of job openings; (3) the economic growth or
decline of the business; (4) internal promotion practices and recruiting
efforts; and (5) the problems of "backlash" from non-minority employees
(Ex. C, 585-586). Further, Father Purcell concluded that, "[s]ince the
amount of competent academic or consultant EEO research is limited generally
the institutional investor will need to rely on the expertise of the appro-
priate federal EEO agencies. Neither the institutional investor nor various
public interest watchdog groups can possibly hope to set themselves up
as private regulatory agencies with research expertise, time, money and full
access to the data" (Ex. C, 588). In addition, Father Purcell expressed
concern that excessive litigation could be engendered by such disclosure,
stating that "private civil rights lawyers are trying to broaden individual
claims into class action suits based on sheer, raw statistics not adequately
analyzed" (Ex. C, 589). Father Purcell concluded that the Commission should
not require such disclosure (Ex. C, 592).

Appellate Case: 24-1628    Page: 1210    Date Filed: 03/26/2024    Entry ID: 5377362

Copied at the National Archives at Kansas City

On the other hand, some participants expressed support for broad environmental and equal employment disclosure. For example, the plaintiffs themselves appeared twice during the hearings to advocate the adoption of their petition (Ex. C, 379, 836). Moreover, numerous persons urged the adoption of "social" disclosure requirements in areas other than environment or employment information. In total, the Commission identified over 100 different "social matters" in which one or more participants claimed to be interested (Ex. B, 66). 20/

b. Securities Act Release No. 5627

On October 14, 1975, the Commission issued Securities Act Release No. 5627, a fifty-six page release setting forth the general conclusions it had reached after its latest round of proceedings, and requesting additional public comment on certain possible rules (Ex. B, 20-77). The Commission first analyzed those provisions of the securities laws that provide it with the authority to promulgate disclosure rules (Ex. B, 30-31) and noted that "the Acts and the relevant legislative history * * * suggest that a prime expectation of Congress was that the Commission's disclosure authority would be used to require the dissemination of information which is or may become economically significant." 21/

---

20/ Included among these 100 "social matters" were: "good things a company has done"; commitment to the "human community"; "commerciogenic" malnutrition; food production; any activities likely to lead to litigation; expenditures in the land grant college system; and discrimination against persons less than six feet tall (Ex. B, 66-67 n. 72).

21/ The Commission found support in the Supreme Court's recent decision in United Housing Foundation, Inc. v. Forman, 421 U.S. 837, 858 (1975), for the view "that economic matters were the primary concern of the Congress in prescribing the Commission's disclosure authority * * *." (Ex. B, 34). And, it cited the legislative history of the Securities Act:

> "The bill provides that * * * a condition of such registration shall be the furnishing of complete information relative to the financial condition of the issuer, which information shall be kept up to date by adequate periodic reports" (emphasis added).

H.R. Rep. No. 85, 73d Cong., 1st Sess. (1933) at 2; see also S. Rep. No. 792, 73d Cong., 2d Sess. (1934) at 10.

App. 1206

Copied at the National Archives at Kansas City

Appellate Case: 24-1628    Page: 1211    Date Filed: 03/26/2024    Entry ID: 5377362

The Commission then analyzed the scope of its discretionary disclosure authority (Ex. B, 32). Citing the need for "a balancing of competing factors" to determine "whether particular disclosure requirements are necessary to permit the Commission to discharge its obligations under the Securities Act and the Securities Exchange Act or are necessary or appropriate in the public interest or for the protection of investors * * *," the Commission specifically recognized that,

> "[a]s a practical matter, it is impossible to provide every item of information that might be of interest to some investors. * * * [C]ertain types of disclosure might be so voluminous as to render disclosure documents as a whole significantly less readable and thus, less useful to investors generally. In addition, disclosure to serve the needs or desires of limited segments of the investing public, even if otherwise desirable, may be inappropriate, since the cost to registrants, which ultimately must be borne by their shareholders would be likely to outweigh the benefits to most investors." 22/

Thus, the Commission stated that it

> "has generally resolved these various competing interests by requiring disclosure only of such information as the Commission believes is important to the reasonable investor -- 'material information.' * * * This limitation is believed necessary in order to insure meaningful and useful disclosure documents of benefit to investors generally without unreasonable costs to registrants and their shareholders." 23/

Finally, the Commission determined that its authority under the federal securities laws to require disclosure which is necessary or appropriate "in the public interest" "does not generally permit the Commission to require disclosure for the sole purpose of promoting social goals unrelated to those underlying these Acts." 24/

The Commission then turned to an analysis of the applicability of NEPA to its authority to promulgate disclosure rules. It concluded that "NEPA authorizes and

---

22/  Ex. B, 38-39.

23/  Id., at 39.

24/  In reaching this conclusion the Commission relied, in part, on this Court's decision in National Association for the Advancement of Colored People v. Federal Power Commission, 172 U.S. App. D.C. 32, 520 F.2d 432 (1975), subsequently affirmed, 425 U.S. 662 (1976). (Ex. B, 40).

App.1207

Copied at the National Archives at Kansas City

Appellate Case: 24-1628   Page: 1212   Date Filed: 03/26/2024   Entry ID: 5377362

requires the Commission to consider the promotion of environmental protection 'along with other considerations'," citing Calvert Cliffs' Coordinating Committee v. Atomic Energy Commission, 146 U.S. App. D.C. 33, 36, 449 F.2d 1109, 1112 (1971), but that the fundamental purpose of the Commission's disclosure scheme had not basically been changed. The Commission noted that its proceeding had revealed that investor interest in environmental matters was primarily economic in nature (Ex. B, 49-50), premised on the potential costs and liabilities which could result from noncompliance with environmental laws; the possible relationship between environmental responsibility and the quality of management; and the effect of environmental behavior on corporate public relations and on the regulatory framework in which a company operates (Ex. B, 50).

The Commission also explored the "factual" issues which the district court directed it to resolve. Concerning the extent of investor interest in social information, the Commission determined that only a small number of investors, compared to the universe of investors as a whole, were interested in social information of the type sought by the plaintiffs. Concerning the uses to which investors put social information and the avenues available to interested investors to affect corporate behavior, the Commission concluded that, while many investors saw such information as having generalized long-run economic significance, most who actually sought such information used it in connection with voting decisions rather than purchases or sales of securities (Ex. B, 54-62). Although the Commission dealt with these issues in response to the court's suggestion, the Commission expressed "serious reservations as to whether Commission rulemaking can be premised upon an attempt to quantify investor interest" (Ex. B, 54). 25/

_____

25/    And the Commission noted (Ex. B, 38):

>     "If the Commission were required to promulgate rules by
>     plebiscite at the behest of any member of the public its
>     functions would be purely ministerial, a result clearly not
>     intended by Congress in 1934 or 1975 when it last reviewed
>     the workings of the Commission and the securities laws."

App.1208

Appellate Case: 24-1628    Page: 1213    Date Filed: 03/26/2024    Entry ID: 5377362

Copied at the National Archives at Kansas City

The Commission proceeded to examine five major disclosure alternatives presented during the course of the rulemaking proceeding in light of its conclusions set forth above. It determined that two of these alternatives warranted further exploration while the other three should be rejected.

### (1) Consideration of the plaintiffs' proposal -- comprehensive disclosure of the environmental effects of corporate activities

The Commission viewed the plaintiffs' proposals as one alternative environmental disclosure scheme. It observed that the plaintiffs' suggestions were not directed to disclosure of whether corporations were in compliance with governmental environmental standards and requirements, but rather were directed much more broadly at the general environmental effects of corporate behavior, whether lawful or unlawful (Ex. B, 50). The Commission determined, however, that noncompliance with environmental laws, rather than disclosure of environmental effects generally, should be, and was, of relevance to investors. Moreover, the Commission determined that administering an environmental disclosure program revolving around environmental "effects" that did not use existing environmental standards and regulations as a reference point would engender excessive costs to corporations, would require the Commission to make highly subjective judgments beyond its competence, and would impose undue administrative burdens on the Commission. 26/

The Commission rejected the possibility of developing its own environmental pollution standards and then requiring disclosure of deviations from those standards (Ex. B, 51), believing such an effort would involve it in scientific areas in which it had no expertise and, in light of the Congressional delegation of responsibility

---

26/ The Commission noted (Ex. B, 50):

> "[T]here [does not] appear to be scientific agreement as to the harmfulness to the environment of many of the activities. It appears therefore that the [plaintiffs'] proposed disclosures would be extremely voluminous, subjective and costly to all concerned. They also would not lend themselves to comparison among different companies, which is of great importance to investors since investment decisions essentially involve a choice between competing investment alternatives."

Copied at the National Archives at Kansas City

Appellate Case: 24-1628    Page: 1214    Date Filed: 03/26/2024    Entry ID: 5377362

in this area to the Environmental Protection Agency, would be "duplicative and of questionable propriety" (Ex. B, 51 n. 44).

### (2) Consideration of requiring publicly-held companies to disclose all pending environmental litigation

The Commission rejected the rulemaking alternative of requiring publicly-held companies to disclose all pending environmental litigation. Three years earlier, in Release 5386 (page 11, supra), the Commission had already required disclosure of all governmental environmental proceedings. The Commission concluded (Ex. B, 53) that

> "expanding these requirements further to include all nongovernmental proceedings would not provide meaningful information to investors. Nor are we convinced that it would contribute significantly to the protection of the environment. There appears to be no method by which to screen out nongovernmental actions which are substantially without merit or to ascertain whether any damages sought have been substantially inflated."

### (3) Consideration of requiring public companies to set forth a statement of corporate environmental policy

The Commission determined that requiring corporations to set forth a statement of their environmental policy would elicit material that would be subjective, incapable of verification, and susceptible to presentations that were essentially of a public relations nature (Ex. B, 54).

### (4) Consideration of requiring disclosure of all capital expenditures and expenses for environmental purposes

The Commission observed that its existing rules already required registrants to disclose material expenditures for environmental purposes (Ex. B, 54). The Commission determined that these requirements should, in light of its analysis of its disclosure obligations under the federal securities laws and NEPA, be retained. Moreover, it proposed to modify the existing requirements regarding the material effects on capital expenditures, earnings, and competitive position

Copied at the National Archives at Kansas City

Appellate Case: 24-1628   Page: 1215   Date Filed: 03/26/2024 Entry ID: 5377362

of environmental compliance by specifying the time periods for which material capital expenditures must be disclosed (Ex. B, 70).

    (5) Consideration of requiring disclosure of
        instances of noncompliance with existing standards
        as reflected in any environmental compliance report
        filed pursuant to a federal statute

The Commission concluded that an additional disclosure program which appeared feasible was one which would elicit information in reports which publicly-held companies already were required to prepare pursuant to the requirements and standards of agencies with primary responsibility in the environmental area. The Commission observed that certain types of noncompliance with environmental standards might be material to investors within the meaning of the Commission's existing rules (see pages 7, 11, supra) and, thus, that the disclosure of such information was already required. While the Commission expressed reservations as to the wisdom of requiring the disclosure of nonmaterial information, it ultimately determined to propose for comment amendments to certain of its disclosure forms which would have required a registrant to provide a list of its most recently filed environmental compliance reports where these indicated that the registrant had failed to satisfy, at any time within the previous twelve months, environmental standards established pursuant to a federal statute (Ex. B, 51-53).

The Commission also determined to deny the employment information portion of the plaintiffs' petition. The Commission recognized that, in some cases, employment statistics could provide evidence of unlawful discrimination and thus of potentially material contingent liabilities or exposure to adverse publicity. In light of the existing requirement that issuers disclose all material information generally, however, the Commission concluded that a general requirement that all registrants disclose employment statistics was unwarranted. The Commission observed that the meaningful interpretation of such statistics is dependent upon sophisticated analysis

App.1211

Copied at the National Archives at Kansas City

Appellate Case: 24-1628    Page: 1216    Date Filed: 03/26/2024    Entry ID: 5377362

and on other information, such as the available labor pool from which a particular employer draws its employees, and a comparison of existing hiring and promotion practices against historical practices. The Commission also determined not to adopt the plaintiffs' suggestion that it require disclosure of nonmaterial equal employment litigation. The Commission's rules already required disclosure of all material legal proceedings, and, with respect to nonmaterial proceedings, the Commission stated that there was no "useful reliable method by which to screen out actions which are without merit and to ascertain whether any damages sought have been substantially inflated" (Ex. B., 67). While the Commission thus denied the employment information portion of the petition, it did state that it would continue to reevaluate the need for such requirements from time to time (Ex. B, 63-69).

### c. Securities Act Release No. 5704

On May 6, 1976, the Commission issued Securities Act Release No. 5704, announcing its conclusions concerning the proposals announced in Release 5627, and completing its compliance with the district court's 1974 order after more than a year of intensive public proceedings.

The Commission noted that a significant number of interested persons commenting on the rule proposals set forth in Release 5627, including the plaintiffs, had strongly criticized the proposed requirement of listing environmental compliance reports (Ex. B, 281). In this regard, it was asserted that

> (1) environmental compliance reports generally consist of listings of detailed, technical information which cannot readily be understood without a comprehensive level of environmental expertise not possessed by the average investor;
>
> (2) because of inconsistencies both in the application and interpretation of environmental standards and in the reporting requirements thereunder, and because there are no environmental laws presently existing with respect to some types of conduct that might be environmentally significant, the proposals would not provide investors with information necessary to compare the total environmental performance of different companies; and
>
> (3) the various types of environmental compliance reports actually filed usually do not contain comparable information and normally

Appellate Case: 24-1628     Page: 1217     Date Filed: 03/26/2024     Entry ID: 5377362

Copied at the National Archives at Kansas City

do not provide complete information with respect to the non-complying conduct (Ex. B, 87-90).

Thus, the Commission found persuasive the fact that the rule proposals could elicit disclosure which was inherently misleading, and determined that it should not responsibly adopt the report-listing disclosure proposals announced in Release 5627. Further, the Commission -- adhering to its conclusion in Release 5627 that any disclosure requirement would have to be based on the existing regulations of agencies with primary environmental responsibility -- was aware of no alternative to that proposal that would permit the disclosure of meaningful, but nonmaterial, information. 27/

----------------------------------------------------------------

27/  The Commission devoted specific consideration to the views of the Council on Environmental Quality ("CEQ") (Ex. B, 374) and of the Environmental Protection Agency ("EPA") (Ex. B, 373). The CEQ concurred in the Commission's view that the Commission should not impose any new monitoring requirements, but should limit any disclosure it sought to information already gathered. The CEQ suggested that the Commission require public companies to summarize and file information gathered in order to obtain federal, state, and local environmental licenses, permits, or for similar corporate purposes, even though such information was not calculated to produce information of use to investors. The Commission rejected this suggestion, since it was admittedly designed to further purposes outside the scope of the Commission's mandate.

The Commission also stated:

"Furthermore, if the availability of summaries and condensations of this type would promote environmental goals, we believe that it is the responsibility of the government authorities which receive such information in the first instance to see that summaries and condensations are made publicly available. In any event, in the absence of any indication that the substantial costs involved in such summarization would be outweighed by the resulting benefits, a determination which appears to be totally beyond the scope of our expertise, any such undertaking would clearly be inappropriate" (Ex. B, 91) (footnote omitted).

The EPA, on the other hand, declined to express a view concerning whether the proposals in Release 5627 would provide meaningful information to investors or would enhance citizen participation in environmental affairs. That agency also stated that no proposal pursuant to the Commission's disclosure authority would aid the EPA in fulfilling its own responsibilities, since the EPA already had authority to obtain necessary information (Ex. B, 371).

Appellate Case: 24-1628    Page: 1218    Date Filed: 03/26/2024    Entry ID: 5377362

Copied at the National Archives at Kansas City

The Commission did, however, adhere to its prior rulemaking action, announced in Release 5386, promulgating specific environmental disclosure rules (Ex. B, 92) (see page 11, supra). Further, the Commission determined to adopt the disclosure proposal in Release 5627 which required disclosure of estimated capital expenditures for environmental control facilities for specified periods of time (Ex. B, 86). The Commission concluded that this modification would make disclosure more uniform and comparable between registrants. Id.

B. Proceedings Below

On July 16, 1976, the plaintiffs filed a motion for summary judgment which renewed their request that the district court order the Commission to promulgate rules that would be, in substance, the rules that the plaintiffs had requested in their rulemaking petition. Although the plaintiffs conceded that the Commission had complied with the APA in denying the plaintiffs' petition for rulemaking (A. 173), in support of their motion for summary judgment they argued that "NEPA and the securities laws require the Commission to undertake a substantial program of corporate disclosures which will provide investors the information needed to make environmentally responsible decisions and to deter corporate activities that adversely affect the environment." 28/ The plaintiffs also alleged that the Commission's reasons for not adopting the employment disclosure they had proposed were "invalid" and "unsupported" by the "record." 29/ The plaintiffs asked the court below to order the Commission to undertake further rulemaking to comply with NEPA and with the declarations set forth in their proposed order and "to require disclosure of equal employment opportunity information wholly consistent with the disclosures requested

--------------------------------------------------------------------------

28/ See Plaintiffs' Memorandum in Support of Motion for Summary Judgment, July 16, 1976, at page 13.

29/ Plaintiffs' Memorandum in Support of Motion for Summary Judgment, July 16, 1976, at pages 64 and 68.

Copied at the National Archives at Kansas City

Appellate Case: 24-1628    Page: 1219    Date Filed: 03/26/2024    Entry ID: 5377362

by plaintiffs" (Proposed Order, at 6). 30/

    The Commission opposed the plaintiffs' motion for summary judgment and cross-moved for summary judgment. In support of its motion, the Commission argued that NEPA does not compel the Commission to adopt particular rules, but rather requires it to consider environmental factors in exercising its discretionary rulemaking authority, and that it had fully satisfied that obligation. The Commission pointed out that the disposition of petitions seeking quasi-legislative rulemaking proceedings such as is here involved was "not subject to judicial review 'on the merits'," and that it had satisfied its obligations under the APA in the disposition of the plaintiffs' rule-making petition. Finally, the Commission reiterated its argument, strongly pressed since the beginning of this litigation, that the plaintiffs lacked standing to sue the Commission concerning the non-adoption of rules.

---

30/    In their proposed order, filed with their Motion for Summary Judgement on July 16, 1976, the plaintiffs asked the district court to declare, inter alia, that

      (1)  NEPA made environmental protection a fundamental part of the Commission's mandate;

      (2)  the Commission's disclosure authority is not limited to requiring registrants to disclose matters which have economic relevance to investors;

      (3)  NEPA requires the Commission to promulgate substantial environmental disclosure rules;

      (4)  the Commission must require that registrants "describe the nature and extent of the impacts of their activities upon the environment and describe what is being done to minimize or eliminate any adverse environmental effects";

      (5)  the Commission's rulemaking action set forth in Release 5627 was arbitrary and capricious; and

      (6)  the Commission's decision not to require disclosure of equal employment information "as requested by plaintiffs was arbitrary and not in accordance with law."

Copied at the National Archives at Kansas City

Appellate Case: 24-1628    Page: 1220    Date Filed: 03/26/2024    Entry ID: 5377362

On January 4, 1977, the district court heard oral argument on these cross-motions for summary judgment. The district judge expressed his personal support for the plaintiffs' rulemaking petition, stating to counsel for the plaintiffs (A. 167):

> "I think you have made a very persuasive argument, were I sitting as a member of the legislative branch. In that event, I would adopt everything you have said in toto. But I am not sitting as a legislator, unfortunately."

> "I think it is pretty clear from what this court said in 1974 -- and I have not changed my opinion one scintilla -- that it would like to have the agency do what the petition requested."

The court also recognized, however, the Commission's good faith efforts to comply with its 1974 order: "I think that in this case you [the Commission] obviously have taken it seriously, and it has involved a great deal of the Commission's resources and money" (A. 162).

The court also indicated that it had not found the pleadings of the plaintiffs persuasive, stating that "you have not pointed to me one single statutory mandate that requires the Commission to do what you seek in your petition" (A. 165). Accordingly, it informed the plaintiffs (A. 167-168):

> "[Y]ou have not convinced the court -- and I am ready, willing and able to be convinced -- that they [the Commission] have not taken into account the relevant factors; or, to put it in different terms that they have acted contrary to law or abused their discretion."

> \*        \*        \*

> "Unless you can find something wrong with what they did -- and I am not sure that you have convinced the court or have shown me one single, solitary thing that I can find to indicate that they have done something wrong -- as the law compels me to do, then I think I am just going to have to grant their motion for summary judgment."

The Court allowed the plaintiffs five days in which to file a supplemental memorandum to convince the Court that the Commission had committed an "error of law" (A. 169) (emphasis supplied).

The district court took both motions under advisement and on May 19, 1977, issued its decision. Although the court rejected the plaintiffs' legal argument

Appellate Case: 24-1628     Page: 1221     Date Filed: 03/26/2024     Entry ID: 5377362

Copied at the National Archives at Kansas City

that NEPA requires the Commission to adopt substantial environmental disclosure rules, or any specific rules at all, holding that "NEPA does not mandate that the Commission require additional corporate disclosure of environmental information" (A. 179), the court nevertheless concluded that "the Commission's decisionmaking process as a whole was marred by serious and fundamental defects" and that its rejection of certain specific disclosure arguments was "not rationally based" and, hence, "arbitrary and capricious" (A. 193). 31/

First, the court expressed its belief that "a fundamental premise of the Commission's decision-making appears to have been that any disclosure requirement must apply equally to all filings with the Commission and/or communications with shareholders and the public" (A. 193, 205). The court stated that the Commission should have considered separately the costs and benefits of environmental and other social disclosure in proxy materials. Second, the court stated that the Commission's balancing of costs and benefits was "not based on a consideration of the relevant factors and * * * not sustainable on the administrative record" (A. 196, 205). Third, the court found that NEPA imposed a "procedural mandate" upon the Commission to consider "to the fullest extent possible under its statutory obligation[,] * * * alternatives to its actions which would reduce environmental damage" (A. 196), citing Calvert Cliffs' v. Atomic Energy Commission, supra, 449 F.2d at 1128. The court held that the Commission did not comply with this "procedural mandate." The court, in addition, stated that the Commission's "explanation" of some of its reasons for not adopting certain environmental disclosure alternatives was insufficient.

The court also concluded that the Commission's failure to adopt disclosure requirements for employment information was "not rationally based and is not sustainable on the present administrative record" (A. 174).

---

31/ The court rejected the Commission's argument that the plaintiffs lacked standing, holding that the plaintiffs' "alleged injuries to their informational interests' * * * are sufficient to establish their standing to bring this action." Id. at 178.

Copied at the National Archives at Kansas City

Appellate Case: 24-1628    Page: 1222    Date Filed: 03/26/2024 Entry ID: 5377362

While the court identified the above-mentioned "flaws" in the Commission's decisionmaking, it suggested that there might be others that it had not set forth (A. 199 n. 77):

> "By focusing on particular findings, conclusions,
> reasons and omissions of the Commission, the Court
> does not intend to suggest that no other parts of
> the decisionmaking process should be reconsidered
> by the Commission in the course of the further
> proceedings required by the Court's decision."

In conclusion, the district court conceded that "this proposal has already consumed a substantial, and perhaps even an unprecedented amount of the Commission's time," but ordered the Commission to undertake further rulemaking, to be concluded within six months, in accordance with its opinion (A. 206). On September 8, 1977, the district court entered a stay of its order pending review in this Court.

## SUMMARY OF ARGUMENT

Although the plaintiffs may be disappointed that the Commission declined to exercise its quasi-legislative rulemaking authority in accordance with their organizational value preferences and notions of proper public policy, they have not alleged a single instance in which they have been, or will be, injured by the lack of the disclosure rules they seek, nor could they do so. The plaintiffs do not have standing to pursue this litigation because they have not established injury in fact -- a prerequisite for standing.

But, even if it were assumed, _arguendo_, that the plaintiffs had standing, the Commission's decision not to adopt the rules they have proposed is not subject to judicial review on the merits. The language and the legislative history of the federal securities laws demonstrate clearly that the Commission's decision not to promulgate rules expanding the disclosure requirements set forth in the federal securities laws is committed to its discretion by law. And, the legislative

Copied at the National Archives at Kansas City

Appellate Case: 24-1628    Page: 1223    Date Filed: 03/26/2024    Entry ID: 5377362

history of the Administrative Procedure Act demonstrates that the merits of the reasons for a denial of a rulemaking petition are not subject to judicial review.

In any event, even if limited judicial review of the Commission's decision not to adopt the rules sought by the plaintiffs were permissible, such review would not properly extend to the factual predicate of the Commission's policy choices. And, the Commission was not, as the court below held, required to set forth, in minute detail, a justification for its decision not to adopt the disclosure philosophy favored by the plaintiffs that could not be disagreed with.

Finally, we submit that the Commission's policy choices being challenged in this proceeding were within the Commission's broad discretion, and the Commission's reasons for not adopting, at this time, rules requiring additional disclosure of environmental and employment information were rational.

### ARGUMENT

I. THE PLAINTIFFS LACK STANDING TO PURSUE THIS LITIGATION.

The Commission does not question the sincerity of the plaintiffs' interest in obtaining environmental and employment information concerning American corporations. The Supreme Court has held, however, that a

> "mere 'interest in a problem' no matter how longstanding the interest and no matter how qualified the organization is in evaluating the problem, is not sufficient by itself to render the organization 'injured' or 'aggrieved' within the meaning of the APA."

Sierra Club v. Morton, 405 U.S. 727, 739 (1972).

Merely because the plaintiffs allege that they are, or would like to become, investors, and merely because they assert that they are unhappy with the Commission's disclosure rules, does not, ipso facto, entitle them to enmesh the Commission in litigation to compel it to excercise its quasi-legislative power to promulgate rules which, in the plaintiffs' opinion, would foster the plaintiffs' notions of proper policy. Indeed, the Supreme Court has refused

Appellate Case: 24-1628    Page: 1224    Date Filed: 03/26/2024    Entry ID: 5377362

**App.1219**

Copied at the National Archives at Kansas City

"to construe the APA to authorize judicial review at the behest of organizations or individuals who seek to do no more than vindicate their own value preferences through the judicial process." Id. at 740. 32/

The constitutional limitation of federal court jurisdiction to actual cases or controversies requires that there be an injury in fact to the person or persons seeking to prosecute their claims. "If the court finds there is no injury in fact, 'no other inquiry is relevant to the consideration of * * * standing.'" Harrington v. Bush, ___ U.S. App. D.C. ___, 553 F.2d 190, 205 n.68 (1977), quoting from Schlesinger v. Reservists to Stop the War, 418 U.S. 208, 227, n.16 (1974). 33/

The plaintiffs' assertions that they have been injured by the Commission's determination not to promulgate the disclosure rules they seek are based on two generalized allegations: (1) they wish to invest in and vote securities "prudently," in accordance with their social goals; and (2) they have an interest in using and enjoying natural resources and securing employment, but that interest is adversely affected by the non-existence of the rules they wish the Commission would adopt. 34/

A "generalized grievance about the conduct of government," however, is not sufficient injury to establish standing. Flast v. Cohen, 392 U.S. 83, 106 (1968). 35/ Instead, the alleged injury "must be perceptible, concrete

---

32/ See also, United States v. SCRAP, 412 U.S. 669, 687 (1973), where the Court held that standing is a requirement that "prevents the judicial process from becoming no more than a vehicle for the vindication of the value interests of concerned bystanders."

33/ Accord, Simon v. Eastern Kentucky Welfare Rights Organization, 426 U.S. 26,39 n. 19 (1976); Sierra Club v. Morton, supra, 405 U.S. at 733; Data Processing Service v. Camp, 397 U.S. 150 (1969); Barlow v. Collins, 397 U.S. 159 (1969).

34/ See plaintiffs' statement of material facts, July 16, 1976, at p. 1-6.

35/ Accord, United States v. SCRAP, supra, 412 U.S. 669; California Bankers Association v. Schultz, 416 U.S. 21, 69 (1974); Golden v. Zwickler, 394 U.S. 103, 108-10 (1969); Schlesinger v. Reservists to Stop the War, supra, 418 U.S. at 217.

App.1220

Appellate Case: 24-1628   Page: 1225   Date Filed: 03/26/2024   Entry ID: 5377362

Copied at the National Archives at Kansas City

and specific, * * * and real and immediate rather than conjectural or hypothetical." <u>Machinery Dealers National Association</u> v. <u>Lockheed Aircraft Corporation</u>, No. 74-535 (C.A. D.C., Aug. 25, 1977), slip op. at 11. 36/ The relationship between the two interests asserted by the plaintiffs and the "injury in fact" required for standing is completely speculative, and "unadorned specu- lation will not serve to invoke federal judicial power." <u>Simon</u> v. <u>Eastern Kentucky Welfare Rights Organization</u>, 426 U.S. 26, 44 (1976). To establish standing, "[i]t is the injury which must be specific, <u>not</u> merely the interest on which the injury has been inflicted." <u>Metcalf</u> v. <u>National Petroleum Council</u>, ___ U.S. App. D.C. ___, 553 F.2d 176, 188 (1977).

Here, the plaintiffs have failed to, and cannot, describe any instance in which the absence of the disclosure rules they seek has prevented them from making "prudent" investments or from making investments that are consonant with their organizational or individual objectives. They have not explained how they would convert non-material information into "prudent" investment decisions, 37/ and, even if they could, standing to maintain this action does not flow from an articulated desire for more perfect statutes and rules in the absence of statutory or other authority for such an action. 38/ Similarly, the plaintiffs have failed to allege any specific manner in which the disclosure they seek in proxy materials would either enable them to vote their shares differently than they now do or would enable them to muster greater support from other shareholders for their

---

36/ <u>Accord</u>, <u>United States</u> v. <u>Richardson</u>, 418 U.S. 166 (1974); <u>Laird</u> v. <u>Tatum</u>, 408 U.S. 1, 4 (1972); <u>California Bankers Association</u> v. <u>Schultz</u>, <u>supra</u>, 416 U.S. at 68.

37/ As we have noted (p. 7-11, <u>supra</u>), to the extent environmental data or equal employment information is material, disclosure of such information is already required under the Commission's existing rules.

38/ <u>Cf</u>. <u>Blue Chip Stamps</u> v. <u>Manor Drug Stores</u>, 421 U.S. 723 (1975), which held that only actual purchasers and sellers of securities have standing to maintain a private damage action under the Securities Exchange Act Rule 10b-5, 17 CFR 240.10b-5. That Court noted the dangers in permitting such actions to be premised on speculative allegations that the plaintiffs there refrained from purchasing a security.

Appellate Case: 24-1628    Page: 1226    Date Filed: 03/26/2024    Entry ID: 5377362

Copied at the National Archives at Kansas City

goals than has existed previously. 39/

A similar assertion of standing was rejected by this Court in Metcalf
v. National Petroleum Council, supra, 553 F.2d at 188. The plaintiff, a
United States Senator, attempted to establish the injury required for standing
by alleging that, because of asserted illegal government action, "a particular
source of information which is relied upon by those who appear before his
subcommittee is not of the quality it should be." But, this Court held that the
plaintiff had not established the requisite injury and thus had no standing,
observing that "[any] detrimental effects of this allegedly biased information
will occur at some unspecified and indeterminate time in the future; in addition
the nature of any prospective impact is equally unspecified and undeterminate." 40/

---

39/ Pursuant to Securities Exchange Act Rule 14a-8, 17 CFR 240.14a-8, the plain-
tiffs, as well as any other shareholders, have the right to submit proposals
to issuers to be included in proxy statements. If the issuer's management
improperly excludes a proposal, the plaintiffs may have a cause of action
against the issuer. J.I. Case Co. v. Borak, 377 U.S. 426 (1964).

40/ In sharp contrast here, the district court based its finding that the
plantiffs have standing on Scientists' Institute for Public Information,
Inc. v. Atomic Energy Commission, 156 U.S. App. D.C. 395, 481 F.2d 1079,
(1973), stating (A. 178, n.17) that the plaintiffs'

> "alleged injury to their 'informational interests' as
> investors under the securities laws * * * and/or as users
> of environmental information under NEPA * * * are sufficient
> to establish their standing."

But Scientists' Institute involved the obligation to prepare an environ-
mental impact statement on the part of an agency which itself was undertaking
a program that would have a major environmental impact — a liquid metal
fast breeder reaction program. Thus, unlike the situation in this case,
the plaintiffs in Scientists' Institute were concerned about the environmental
activities of the agency, while here the plaintiffs are concerned about
the environmental activities of third parties. Similarly, in Scientists'
Institute, the Atomic Energy Commission was under a legal obligation to
prepare an environmental impact statement, while here the Commission was under
no legal obligation to promulgate environmental disclosure rules. See p. 27,
supra. Since, in Scientists' Institute, the agency had a statutory
obligation to prepare the impact statement, the deprivation of information
to which plaintiffs had a statutory entitlement conferred on the plaintiffs
in that case "standing to sue even where the [plaintiffs] would have
suffered no judicially cognizable injury in the absence of statute."
Warth v. Seldin, 422 U.S. at 514. See Atchison, Topeka and Santa Fe Railroad
Co. v. Callaway, 431 F. Supp 722 (D. D.C., 1977).

Copied at the National Archives at Kansas City

Appellate Case: 24-1628    Page: 1227    Date Filed: 03/26/2024    Entry ID: 5377362

And, in Harrington v. Bush, supra, 553 F.2d at 212, this Court determined that an allegation by a member of the United States House of Representatives amounting to "subjective injury to his overall effectiveness which flows from his lack of information * * *" did not establish standing. Noting that the plaintiff drew no "connection between his past and future votes but relie[d] on an impairment of unspecified votes standing alone," this Court stated (id. at 213):

> "It may be true that, upon learning that the CIA has engaged in activities which he believes to be illegal, appellant may feel that he has been severely injured when casting his votes or that he would have cast his vote differently. Such feelings of injury are subjective in nature * * * ."

Moreover, injury in fact is not established by the plaintiffs' allegations concerning their interests in the environment and in securing equal employment opportunity. It is purely a matter of speculation whether or to what extent any conceivable exercise of the Commission's disclosure authority would cause corporations to alter their environmental behavior or employment practices. The plaintiffs' theory that the specific Commission disclosure action they requested would benefit the social goals they seek to advance relies "on little more than the remote possibility, unsubstantiated by allegations of fact, that their situation might have been better had [the agency] acted otherwise and might improve were the Court to afford relief." Simon v. Eastern Kentucky Rights Organization, supra, 426 U.S. at 44, citing Warth v. Seldin, 422 U.S. 490, 507 (1975).

The plaintiffs' allegations of injury to their interests in the environment and equal employment opportunity are also defective because they have failed to explain how their interests will be harmed absent the Commission action they seek. They have not alleged any specific instance of a causal relationship between the Commission's present rules and any injury to the

Appellate Case: 24-1628    Page: 1228    Date Filed: 03/26/2024    Entry ID: 5377362

Copied at the National Archives at Kansas City

plaintiffs or their members. 41/ As this Court has previously held, "[t]he mere occurrence of the type of environmental dangers and risks which concern appellants does not necessarily mean that appellants will suffer a particularized, injurious impact as a result." Metcalf, supra, 553 F.2d at 187. 42/

The plaintiffs' real controversy is not with the Commission but with those corporations which are alleged to engage in activities which may be harmful to the environment. 43/ As the Supreme Court stated in Simon v. Eastern Kentucky Welfare Rights Organization, supra, 426 U.S. at 41-42:

> "But injury at the hands of a [corporation] is insufficient
> by itself to establish a case or controversy in the context
> of this suit, for no [corporation] is a defendant. * * *
> [T]he 'case or controversy' limitation of Art. III still
> requires that a federal court act only to redress injury

---

41/ It is undisputed that the Commission neither "regulates" corporate environmental conduct, nor itself engages in any environmentally injurious conduct.

42/ The plaintiffs' unsubstantiated allegations that their interests will be harmed are insufficient to establish injury. As this Court recently has stated, "[n]ormally, mere allegation [of injury] will suffice, but, if controverted by the defendant, the plaintiff must demonstrate facts supporting his allegations." Machinery Dealers National Association, supra, slip op. at 10.

43/ NEPA, on which the plaintiffs rely, does not address the activities of private entities. See United States v. Stoeco Homes, Inc., 498 F.2d 597, 607 (C.A. 3, 1974) (NEPA does not apply to state or private activities); Movement Against Destruction v. Volpe, 361 F. Supp. 1360, 1383 (D. Md., 1973), affirmed, 500 F.2d 29 (C.A. 4, 1974) ("Despite the breadth of the NEPA, its application is only to the decision making processes of the Federal government."); Carolina Action v. Simon, 389 F. Supp. 1244 (M.D.N.C., 1975), affirmed, 512 F.2d 295 (C.A. 4, 1975) (NEPA is inapplicable to federal disbursements of general revenue sharing funds despite environmental impact of state use of such funds); Cf. Flint Ridge Development Co. v. Scenic Rivers Association, 426 U.S. 776 (1976).

Copied at the National Archives at Kansas City

Appellate Case: 24-1628    Page: 1229    Date Filed: 03/26/2024    Entry ID: 5377362

> that fairly can be traced to the challenged action of the
> defendant, and not injury that results from the independent
> action of some third party not before the court." 44/

In that case, the Supreme Court held that certain organizations which alleged

that they were dedicated to promoting the access of the poor to health care

services lacked standing to challenge the validity of an Internal Revenue

Service ruling which allegedly encouraged hospitals to refuse free treatment

to indigents. Moreover, the Court also held that allegations in the complaint

asserting that the individual plaintiffs, and members of the plaintiff

organizations, had personally been denied hospital services, failed to satisfy the

case or controversy requirement of Article III of the Constitution. The Court,

noting that no hospital was a party to the action, stated (426 U.S. at 42-43):

> "It is purely speculative whether the denials of
> service specified in the complaint fairly can be
> traced to petitioners' 'encouragement' or instead
> result from decisions made by the hospitals without
> regard to the tax implications. [Thus, it] is
> equally speculative whether the desired exercise of
> the court's remedial powers in this suit would result
> in the availability to respondents of such services."

These decisions are contrary to the primary thrust of the plaintiffs'

standing allegations -- that, if the Commission were to promulgate additional

specific environmental disclosure rules, the plaintiffs and their members would

then be able to invest "prudently and with a minimum adverse impact on the

environment."

---

44/  See also, Warth v. Seldin, supra, 422 U.S. 490, which, like the present
case, involved an effort to redress injury arising from private conduct
allegedly fostered by governmental action. In that case, various low-
income individuals, property taxpayers, and organizations interested in
housing matters, challenged a zoning program which was alleged to operate
to preclude low-income persons from living in a particular area. The
Court concluded that the relationship between the plaintiffs' alleged
injury and the defendants' actions was entirely speculative. "In short,
the facts alleged fail to support an actionable causal relationship
between [defendants'] practices and petitioners' asserted injury."
422 U.S. at 506-507.

Copied at the National Archives at Kansas City

Appellate Case: 24-1628    Page: 1230    Date Filed: 03/26/2024 Entry ID: 5377362

Thus, to establish standing, the plaintiffs must show that the injury they allege is capable of direct redress by the court through the requested remedy. Machinery Dealers, supra, slip op. at 11. See also, Linda R.S. v. Richard D., 410 U.S. 614, 617-19 (1973). But, as the district court held, nothing in the federal securities laws or NEPA compels the Commission to adopt the rules the plaintiffs seek, or any substantial environmental disclosure rules.

If the plaintiffs believe that existing environmental or equal employment laws are inadequate, their controversy is properly with Congress. If the plaintiffs believe that existing environmental and equal employment laws are not adequately enforced, their controversy is properly with the agencies that enforce those laws. If the plaintiffs believe that a corporation has damaged them by environmentally undesirable behavior or by employment discrimination, they may have a cause of action against that corporation. But, as the plaintiffs have conceded, the court "cannot substitute its judgment on questions of social policy for that of the Securities and Exchange Commission or write new corporate disclosure rules for that agency," 45/ a theme that was echoed by the district court judge when he acknowledged that he was "not sitting as a legislator" (see page 26, supra).

And yet, despite their recognition of this fact, the plaintiffs were granted standing that can only be characterized as permitting them to utilize the judiciary to vindicate their own value preferences. As intriguing as the questions they seek to raise may be, the plaintiffs simply could not raise the issues they seek to litigate, even if those issues were otherwise justiciable, which, as we show below, they are not.

---

45/ The plaintiffs' post-argument memorandum, January 11, 1977, at 7.

App.1226

Copied at the National Archives at Kansas City

Appellate Case: 24-1628   Page: 1231   Date Filed: 03/26/2024   Entry ID: 5377362

II. THE MERITS OF THE COMMISSION'S DECISION NOT TO ADOPT THE RULES
SOUGHT BY THE PLAINTIFFS ARE NOT SUBJECT TO JUDICIAL REVIEW.

The Commission's determination not to adopt the specific disclosure
rules sought by the plaintiffs (or similar rules) was committed to its
discretion by law, and the filing of a rulemaking petition does not, except
in extraordinary circumstances not present here, comprehend any right to
compel rulemaking or seek judicial review of the denial of the rulemaking
petition. 46/ Accordingly, the plaintiffs were not entitled to judicial
review on the merits of the Commission's denial of their rulemaking petition,
or of the Commission's determination to implement the goals of NEPA through
rules different from those the plaintiffs would have preferred. In view of the
district court's determination that the Commission was correct in its conclusion
that NEPA did not require it to adopt the rules sought by the plaintiffs,

---

46/ Extraordinary circumstances might warrant limited judicial review of
an agency determination not to take rulemaking action, for example,
where the agency's denial is clearly predicated upon constitutionally
impermissible considerations, cf. Dunlop v. Bachowski, 421 U.S. 560
(1975), or where an agency has acted solely and unequivocally under a
mistake of law, cf. Office Employees International Union v. National
Labor Relations Board, 353 U.S. 313 (1957). Here, however, the Commis-
sion's denial of the plaintiffs' rulemaking petition raises no constitu-
tional issues. And, no error of law occurred, since, as the district
court held, the Commission's interpretation of NEPA was correct (A. 179).

In its January, 1974, opinion, the district court, in determining
that judicial review was not precluded, relied on this court's state-
ment that, "[w]hether the Commission has improperly delayed its ac-
tion under NEPA or has improperly interpreted that Act are issues
which may be resolved in the United States District Court * * *,"
389 F. Supp. at 697, citing Natural Resources Defense Council, Inc.
v. Securities Exchange Commission, No. 72-1148, supra. But the
matter of statutory interpretation appears to be one of the limited
exceptions to the general rule of non-reviewability, and the question
of improper delay does not go to the merits of the Commission's
decision. This Court did not hold, or even suggest, that review
should extend to the merits.

Copied at the National Archives at Kansas City

Appellate Case: 24-1628    Page: 1232    Date Filed: 03/26/2024 Entry ID: 5377362

or similar rules, the court's further inquiry into the merits of the Commission's decision not to take the action sought — its reasoning process, its reasons, and the "record" support therefor — was contrary to law.

The principles of judicial review established by the district court decision have far reaching policy ramifications which transcend the matters involved in this litigation. Subjecting agency decisions not to promulgate rules to judicial review, and particularly judicial review that seeks to import laboratory conditions into the quasi-legislative process as occurred here, would seriously hamper administrative effectiveness. The Commission, for example, is an agency with limited resources and a multiplicity of functions to perform. If every disappointed rulemaking petitioner could challenge the Commission's non-action and the reasons therefor in court, "endless litigation" 47/ concerning the special interests of private organizations and individuals would be encouraged.

We are aware that there is a strong presumption of reviewability of administrative agency action. Still, Congress recognized that there are certain areas of agency action that are totally discretionary and not subject to judicial intervention. And, the Commission's decision not to promulgate certain rules, where it is not required by any statute to promulgate such rules, epitomizes the type of decision that Congress intended to delegate solely to the Commission — the expert agency it created to administer the federal securities laws. The Commission's determinations respecting adoption of disclosure rules involve neither findings of facts nor adjudication of disputes between private individuals, but instead require the Commission to balance a number of policy considerations. Which classes of information should be the subject of a specific disclosure rule and which classes of information should not be the subject of a specific rule but required to be

_____

47/ Dunlop v. Bachowski, supra, 421 U.S. at 575.

Copied at the National Archives at Kansas City

Appellate Case: 24-1628    Page: 1233    Date Filed: 03/26/2024    Entry ID: 5377362

disclosed only pursuant to the rules relating generally to all material information, are precisely the type of matters for which Congress intended the Commission to make a policy judgment.

The Commission set forth, in great detail, its reasons for declining to adopt the type of disclosure sought. The district court may not have found the Commission's reasons persuasive; indeed, had decision-making authority concerning disclosure rules been vested in that court, it apparently would have found completely different factors dispositive of the issues raised in the Commission's rulemaking proceedings (see page 26, supra). But, the district court was not empowered to hold that the Commission's action was erroneous because it would have reacted to the views expressed during the rulemaking proceedings differently from the way the Commission did, or because the factors that persuaded the Commission not to take the action sought would not have persuaded the court. The background and philosophy of the individual Commissioners, appointed by the President with the consent of the Senate to administer the securities laws, were intended to be determinative as to the decisions of what, if any, discretionary rules should be adopted.

The district court premised its review of the Commission's rejection of the plaintiffs' proposed rules on the APA, but Section 701(a)(2) of that Act, 5 U.S.C. 701(a)(2), precludes judicial review of "agency action committed to agency discretion by law." The decision of the Commission not to adopt the disclosure philosophy sought by the plaintiffs is so committed to its discretion. Nor do the APA judicial review provisions apply where statutes preclude judicial review. 5 U.S.C. 701(a)(1). And, the legislative history of both the APA and the federal securities laws shows the intent of Congress that Commission determinations not to adopt rules be unreviewable. "[U]pon a showing of 'clear and convincing' evidence of a contrary legislative intent * * * the

Copied at the National Archives at Kansas City

Appellate Case: 24-1628    Page: 1234    Date Filed: 03/26/2024 Entry ID: 5377362

courts [should] restrict access to judicial review." Abbott Laboratories
v. Gardner, 387 U.S. 136, 141 (1967).

### A. The Commission Is Vested with Discretion Not to Expand the Disclosure Requirements Set Forth in the Federal Securities Laws.

In enacting the federal securities laws, Congress did not set forth,
for all time, every item of information that publicly-held corporations must
disclose. Instead, Congress vested "broad discretionary powers * * *" 48/
in the Commission to promulgate rules requiring the disclosure of informa-
tion in addition to the specific requirements set forth in the statutes.

The language of the various provisions by which Congress conferred
authority on the Commission to require disclosure reveals that Congress
desired to rely on the expertise and discretion of the new agency it had
created rather than on either its own ability to formulate a definitive
body of disclosure requirements or on mechanical tests, such as a polling
of investor opinions. 49/ And, the legislative history of the Commission's

---

48/  H.R. Rep. No. 1383, 73d Cong., 2d Sess. 7 (1934), see also, 78 Cong.
     Rec. 7696 (1934) (Remarks of Rep. Rayburn).

49/  For example, Sections 7 and 10(c) of the Securities Act, 15 U.S.C. 77g
     and 77j(c), prescribe certain specific types of information to be
     disclosed in registration statements and prospectuses, respectively,
     and authorize the Commission to require disclosure of such other
     information "as the Commission may, by rules or regulations, require
     as being necessary or appropriate in the public interest or for the
     protection of investors." Similarly, under Section 12(b)
     of the Securities Exchange Act, 15 U.S.C. 78l(b), "the Commission
     may require", in applications for the registration of a class of secu-
     rities, such information respecting the issuer's organization, financial
     structure, nature of business, and financial statements as it deems
     "necessary or appropriate in the public interest or for the protection
     of investors."

(continued)

App.1230

Copied at the National Archives at Kansas City

Appellate Case: 24-1628   Page: 1235   Date Filed: 03/26/2024   Entry ID: 5377362

reporting authority confirms the breadth of the Commission's discretion

in determining what disclosure rules to promulgate:

> "The Commission is given <u>complete</u> discretion * * *
> to require in corporate reports <u>only</u> such information
> as <u>it</u> deems necessary or appropriate in the public
> interest or for the protection of investors."

S. Rep. 792, 73d Cong., 2nd Sess. 9 (1934) (emphasis supplied).

The courts, too, have recognized the Commission's discretion to decide

not to adopt rules. In <u>Securities and Exchange Commission</u> v. <u>Chenery Corp.,</u>

332 U.S. 194, 209 (1947), the Supreme Court held that the Commission's decision

---

<u>49/</u>    (Footnote continued)

The periodic reporting and proxy solicitation provisions of the
Securities Exchange Act repose a still greater measure of discretion
in the Commission. In those sections, Congress did not even set forth
minimum disclosure requirements, preferring instead to leave the
formulation of the proper approach to these matters to the Commission's
expert judgment and prevailing circumstances. Thus, Section 13(a),
15 U.S.C. 78m(a), requires each issuer of a security registered
under Section 12 to keep current the information in its application
or registration statement and to file annual and quarterly reports
in accordance with rules "the Commission may prescribe as necessary
or appropriate for the proper protection of investors and to insure
fair dealing in the security." And, Section 14(a) of the Securities
Exchange Act, 15 U.S.C. 78n(a), merely prohibits the solicitation
of proxies "in contravention of such rules and regulations as the
Commission may prescribe as necessary or appropriate in the public
interest or for the protection of investors."

The Commission's general rulemaking authority is contained in Section
19(a) of the Securities Act, 15 U.S.C. 77s(a), and Section 23(a)
of the Securities Exchange Act, 15 U.S.C. 78w(a), which authorize
the Commission to promulgate such rules "as may be necessary or
appropriate to implement the provisions of this title", and "as
may be necessary or appropriate to implement the provisions of this
title for which [it is] responsible or for the execution of the
functions vested in [it] by this title * * *," respectively.

The fact that Congress used the word "may" and not the word "shall"
(<u>compare</u>, <u>e.g.</u> with Section 11A(a)(2) of the Securities Exchange Act,
15 U.S.C. 78k-1(a)(2)) in the sections of the securities laws involved
herein is significant. <u>See</u> <u>e.g.</u>, <u>Schilling</u> v. <u>Rogers,</u> 363 U.S. 666 (1960).

Copied at the National Archives at Kansas City

Appellate Case: 24-1628    Page: 1236    Date Filed: 03/26/2024    Entry ID: 5377362

to forego general rulemaking "rests squarely in the area where administrative

judgments are entitled to the greatest amount of weight * * *" and is one

"which we cannot disturb." 50/ The Supreme Court there noted, id. at 209,

that the determination whether, and when, to adopt general rules "is a

judgment based upon public policy, a judgment which Congress has indicated

is of the type for the Commission to make." 51/ This is so, the Court

there held, because

> "[n]ot every principle essential to the effective
> administration of a statute can or should be cast
> immediately into the mold of a general rule. Some
> principles must await their own development, while
> others must be adjusted to meet particular, un-
> foreseeable situations * * *. Or the problem may be
> so specialized and varying in nature as to be impossible
> of capture within the boundaries of a general rule."

Id. at 202-203. For similar reasons, this Court long ago held that the

Commission's refusal to investigate and regulate the issuance and sale of

travellers' checks was within the Commission's discretion, and not reviewable.

---

50/ Accord, e.g., National Association for the Advancement of Colored
People, supra, 425 U.S. at 668; National Labor Relations Board v.
Bell Aerospace Co. Division of Textron, Inc., 416 U.S. 267 (1974).

51/ The courts consistently have declined to review the Commission's
decision not to exercise its authority in other, equally discretionary,
areas. See, e.g., Kixmiller v. Securities and Exchange Commission, 160 U.S.
App. D.C. 375, 492 F.2d 641 (1974); Dyer v. Securities and Exchange
Commission, 291 F.2d 774 (C.A. 8, 1961); Crooker v. Securities and
Exchange Commission, 161 F.2d 944 (C.A. 1, 1947); Securities and Exchange
Commission v. Torr, 15 F. Supp. 144 (S.D. N.Y., 1936). And, this Court
has stated with respect to another agency:

> "As a corollary of this broad general discretion [to
> choose regulatory tools] the [agency] has considerable
> latitude in responding to requests to institute proceedings
> or to promulgate rules, even though it possesses the
> authority to do so if it sees fit."

Action for Children's Television v. Federal Communications Commission,
41 Ad. L. 2d 469, 497 (C.A. D.C., Jul. 1, 1977).

Appellate Case: 24-1628    Page: 1237    Date Filed: 03/26/2024    Entry ID: 5377362

Copied at the National Archives at Kansas City

Leighton v. Securities and Exchange Commission, 95 U.S. App. D.C. 217, 221 F.2d 1 (1955). 52/

Moreover, the section of the APA that permits interested persons to petition for rulemaking, 5 U.S.C. 553(e), was not intended to compel administrative agencies to take any rulemaking action. As the Congressional Committee considering the APA reported:

> "The mere filing of a petition [for rulemaking] does not require an agency to grant it, or to hold a hearing, or to engage in other public rulemaking proceedings." 53/

Decisions involving statutes other than the federal securities laws also underscore the inappropriateness of judicial review here. Thus, the provisions of the securities laws giving rulemaking discretion to the Commission are "drawn in such broad terms that in a given case there is no law to apply." Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 410 (1971), citing the legislative history of the APA, S. Rep. No. 752, 79th Cong., 1st Sess., 26 (1945). Congress did not require the Commission

---

52/ Of course, as the district court recognized, the Commission can and does institute enforcement proceedings pursuant to existing standards and rules against companies that fail to disclose material environmental information. For example, in Securities and Exchange Commission v. Allied Chemical Corporation, No. 77-373 (D. D.C., Mar. 4, 1977), the Commission charged Allied Chemical with violations of the anti-fraud and reporting sections of the Securities Exchange Act for failing to disclose that it was subject to material financial liability for discharging Kepone into the James River. Allied consented to the entry of a permanent injunction without admitting or denying the allegations of the complaint.

53/ Administrative Procedure Act: Legislative History, S. Doc. No. 248, 79th Cong., 2d Sess. (1946) at pp. 260 (Report of the House Committee on the Judiciary) and 201 (Senate Judiciary Committee Report). References to this compilation are cited hereinafter as "Legislative History, S. Doc. No. 248 at p. ___."

Copied at the National Archives at Kansas City

Appellate Case: 24-1628   Page: 1238   Date Filed: 03/26/2024   Entry ID: 5377362

to adopt disclosure rules when any particular showing is made. "The statutory
standard is expressed in such general concepts that it requires and must
contemplate the exercise of discretion in the choice among rational alternatives
none of which can fully satisfy all demands of competing interests." Kendler
v. Wirtz, 388 F.2d 381, 383 (C.A. 3, 1968). Commission determinations respect-
ing the most appropriate method of effecting congressional goals reflect broad
discretionary judgments on matters of policy which courts are ill-equipped to
make because they cannot "be resolved by judicial application of canons of
statutory construction." Hahn v. Gottlieb, 430 F.2d 1243, 1249 (C.A. 1, 1970).

   B.  The Legislative History of the APA and of the
       Federal Securities Laws Demonstrates that
       Congress Intended to Preclude Judicial Review
       of the Commission's Non-action Here.

     The plaintiffs' rulemaking petition was predicated on Rule 4(a) of the
Commission's Rules of Practice, which prescribes the procedure by which per-
sons may seek the issuance, amendment or repeal of a rule. That rule was
adopted by the Commission "to accord with the legal requirements and the
spirit of the federal Administrative Procedure Act * * *." 54/ The applicable
requirement was contained in former Section 4(d) of that Act, now codified as
5 U.S.C. 553(e), which was enacted to provide an opportunity for "interested
persons" to bring to the attention of administrative agencies salient facts and

---

54/  See Securities Act Release No. 3154 at p. 1 (Sept. 4, 1946). As
     originally promulgated, this Commission rule was designated Rule
     19(a) (id.). In 1960, the rule was renumbered as Rule 4(a).
     Securities Act Release No. 4242 (June 30, 1960), 25 Fed. Reg. 6728
     (Jul. 15, 1960).

Copied at the National Archives at Kansas City

Appellate Case: 24-1628   Page: 1239   Date Filed: 03/26/2024   Entry ID: 5377362

considerations which might induce the agency to issue, amend or repeal any rule. 55/

That the determination by an administrative agency not to adopt rules or hold proceedings in response to a rulemaking petition was not to be subject to judicial review was specifically noted in the Senate report:

> "The refusal of an agency to grant the petition or to hold rulemaking proceedings * * * would not per se be subject to judicial reversal." 56/

Similarly, the Report of the Attorney General, annexed to the Senate Committee Report, in discussing former Section 10, the judicial review section of the Administrative Procedure Act, now codified as 5 U.S.C. 701-706, states that that section

> "provides for judicial review except insofar as statutues preclude it, or insofar as agency action is by law committed to agency discretion. A statute may in terms preclude judicial review or be interpreted as manifesting a congressional intention to preclude judicial review * * *. In this act, for example, the failure to grant a petition filed under section 4(d) would be similarly unreviewable" (citations omitted,

---

55/   See Legislative History, S. Doc. No. 248, at pp. 201 (Senate Judiciary Committee Report), 230 (Attorney General's Statement), 260 (House Judiciary Committee Report) and 359 (House debates, remarks of Rep. Walters, May 24, 1946).

56/   Legislative History, S. Doc. No. 248, at p. 201 (Senate Judiciary Committee Report). The Senate Committee Report did point out that "the facts or considerations brought to the attention of an agency by such a [rulemaking] petition might * * *" appropriately be implemented by the agency to prevent its "rule[s] from continuing or becoming vulnerable upon [such] judicial review * * *," as might be available, of any rule actually adopted by the agency or allowed to remain in existence. Id. at 201-202.

Copied at the National Archives at Kansas City

Appellate Case: 24-1628    Page: 1240    Date Filed: 03/26/2024   Entry ID: 5377362

emphasis supplied.) 57/

And, when Congress revisited the securities laws in adopting the Securities Acts Amendments of 1975, 89 Stat. 97, it clearly recognized that, even when the Commission does adopt rules, judicial review is not always available. As the Senate Report accompanying that bill stated:

"[R]eview of rules, to the extent it is available is pursuant to the

---

57/ Legislative History, S. Doc. No. 248, at pp. 229-230. The inter-
pretations in the Attorney General's Report are of importance, since
the Attorney General's acquiescence in the final draft of the bill
which became the Administrative Procedure Act was based on his
interpretation of that bill as set forth in this Report (id. at p.224),
and special reference to this acquiescence was made by the bill's
sponsor prior to the Senate vote to ensure full Senate support
(id. at p. 301) (Senate debates, remarks of Sen. McCarran, March 12,
1946).

The only case of which we are aware that involves any form of judicial
review of an agency determination not to adopt rules is Action for
Children's Television v. Federal Communications Commission, 41 Ad. L.
2d 469 (C.A. D.C., Jul. 1, 1977). In that case, however, so far as
appears from this Court's opinion, the issue of non-reviewability
was not raised. Moreover, the Federal Communications Commission acted
by "order," and the Communications Act of 1934 specifically vests the
Court of Appeals with jurisdiction to review all "orders" issued by that
agency. 47 U.S.C. 402(a). The distinctive mode of adopting rules
utilized by the Federal Communications Commission long ago was held
to be significant by the Supreme Court. Columbia Broadcasting Co., Inc.
v. United States, 316 U.S. 407, 417-419 (1942). And, as we discuss
infra, pp. 52-53, this Court narrowly circumscribed the permissible
range of judicial review even in that limited situation.

The district court in this case erroneously relied on Dunlop v. Bachowski,
421 U.S. 560 (1975), in reaching its determination that the Commission's
decision not to take the rulemaking action sought by the plaintiffs is
judicially reviewable, under an "arbitrary and capricious" standard of
review (A. 182). In Dunlop, the plaintiff sought a judicial declaration
that the decision of the Secretary of Labor not to bring a civil action
under the Labor-Management Reporting and Disclosure Act of 1959 ("LMRDA")
to set aside a union election was arbitrary and capricious. But, under
the LMRDA, the Secretary of Labor is under a mandatory duty to investi-
gate complaints concerning union elections. The Commission, however,
has no obligation even to conduct rulemaking proceedings in response to a
rulemaking petition and, indeed, has broad discretion not to adopt any
disclosure rules. Moreover, in Dunlop, the Supreme Court analyzed the
legislative history of the LMRDA and determined that there was no
congressional purpose to prohibit judicial review. Id. at 567. In
contrast, the legislative history of both the APA and the federal
securities laws manifests the congressional intent that the Commission's
determinations not to adopt rules are not subject to judicial review.

App.1236

Copied at the National Archives at Kansas City

Appellate Case: 24-1628    Page: 1241    Date Filed: 03/26/2024    Entry ID: 5377362

Administrative Procedure Act * * *."  S. Rep. 94-75, 94th Cong., 1st Sess., at 36. 58/

This Court has also recognized the general principle that private parties may not compel an administrative agency to institute rulemaking proceedings.  As it recently noted:

> "Administrative rulemaking does not ordinarily comprehend any rights in private parties to compel an agency to institute such proceedings or promulgate rules.  Rhode Island Television Corp. v. FCC, 320 F.2d 762, 766 (C.A. D.C. 1963); see NAACP v. FPC, 520 F.2d 432, 447 n. 53 (C.A. D.C. 1975), aff'd, 425 U.S. 663 (1976); Mackey v. United States, 255 F.2d 898, 899 (C.A. D.C. 1958)."

Action for Children's Television, supra, 41 Ad. L. 2d at 497.

III. EVEN ASSUMING, ARGUENDO, THAT THE COMMISSION'S DETERMINATION NOT TO ADOPT THE PLAINTIFFS' PROPOSED RULES WERE SUBJECT TO SOME JUDICIAL REVIEW, THE DISTRICT COURT APPLIED AN ERRONEOUS STANDARD OF REVIEW.

As the foregoing discussion demonstrates, Congress did not intend that there be judicial review of the merits of the Commission's determination not to adopt the disclosure rules proposed by the plaintiffs. 59/  But, even if it were assumed, arguendo, that some review of the merits of the Commission's decision not to adopt the disclosure rules sought by the plaintiffs was appropriate, we submit that the district court applied

---

58/  Of course, judicial review of a rule is available, at the behest of an alleged violator, in defending an action brought against him by the agency to enforce the rule.  Pre-enforecment review, on the other hand, is available only in limited situations.  See Abbott Laboratories v. Gardner, supra, 387 U.S. 136.

59/  Of course, the Commission did adopt some environmental disclosure rules. See p. 11, supra.  But, there is no question in this case that the environmental disclosure rules the Commission did adopt are rational and within the scope of its authority.  As the district court properly recognized in its December, 1974, opinion, these rules "are within the SEC rulemaking authority as provided by the federal securities laws." 389 F. Supp. at 696.  Instead, the plaintiffs brought this suit because the Commission did not adopt different disclosure rules that they would have preferred.

Copied at the National Archives at Kansas City

Appellate Case: 24-1628     Page: 1242     Date Filed: 03/26/2024 Entry ID: 5377362

an erroneous standard of review by treating this case as if it were a review of a rulemaking proceeding required to be conducted "on-the-record," and as if the Commission's quasi-legislative policy judgments were instead "facts" that had to be supported by record evidence. 60/ The district court further erred when, characterizing the Commission's decision as not being "the product of the 'imaginative exercise' of its rulemaking authority" (A. 199-200), it placed upon the Commission the burden of justifying, with minute detailed "explanation" (A. 198-199), its policy choices.

A.  The District Court Erred in Faulting the Commission's Determination Not To Adopt the Rulemaking Philosophy Sought by the Plaintiffs on the Ground That It Was "Not Sustainable On The Record."

The district court attempted to justify its inquiry into the factual pre-dicate of the Commission's policy decision not to adopt rules by citing language in Ethyl Corp. v. Environmental Protection Agency, 176 U.S. App. D.C. 373, 541 F.2d 1, certiorari denied, 426 U.S. 941 (1976) (A. 182). That case, however, involved review, under an "arbitrary and capricious" standard, of regulations promulgated by the Environmental Protection Agency that would require a reduction in the lead content of leaded gasoline. In promulgating these regulations, the Administrator of that agency was required to make a factual finding as to whether emissions from leaded gasoline present a health danger.

Perhaps recognizing that Ethyl, which involved review of rules that had been adopted, was inapposite in a case involving a determination, as here, not to adopt rules, the district court relied on Dunlop v. Bachowski, 421 U.S. 560 (1975), in stating that "it is clear that the 'arbitrary and capricious'

_____

60/  The APA differentiates informal, notice-and-comment rulemaking proceedings of the type involved here from formal on-the-record rulemaking proceedings where a factual record is developed. See 5 U.S.C. 553, 556, 557.

Copied at the National Archives at Kansas City

Appellate Case: 24-1628    Page: 1243    Date Filed: 03/26/2024 Entry ID: 5377362

- 49 -

standard is also the appropriate standard in viewing agency decisions <u>not</u> to take action" (A 182). But <u>Dunlop</u> explicitly held that, even in cases in which judicial review of agency non-action is permissible, the factual predicate for such non-action is not subject to judicial inquiry. Instead, a court's role is limited to determining whether the reasons the agency gives for its non-action, <u>on their face</u>, demonstrate that the agency's "decision was reached for an impermissible reason or for no reason at all." <u>Id</u>. at 573, 575. The Supreme Court explicity held that the factual basis for the reasons articulated by the agency was not itself to be subjected to judicial inquiry. It stated (<u>id</u>. at 572-573):

> "The necessity that the reviewing court refrain from substituting its judgment for that of the Secretary thus helps define the scope of judicial review. Except in what must be the rare case, the Court's review must be confined to an examination of the 'reasons' statement and the determination whether <u>the reasons statement</u>, <u>without more</u>, evinces that the Secretary's decision is so irrational as to constitute the decision arbitrary and capricious. Thus, <u>review may not extend to</u> <u>cognizance or trial of a complaining member's challenges</u> <u>to the factual bases</u> for the Secretary's conclusion * * *." (emphasis supplied). 61/

Thus, insofar as the district court looked beyond the reasons the Commission gave for its policy choices and concluded that the Commission's decision was "not sustainable on the administrative record" (A. 194), the district court far exceeded even the limited scope of judicial review set forth by the Supreme Court in <u>Dunlop</u>.

There are important considerations of policy that underlie the distinction between a court's role in reviewing agency non-action as opposed to agency action. A requirement that the Commission provide an encyclopedic justification, complete

---

61/ The "rare case" referred to by the Court, where judicial inquiry beyond the face of the reasons statement might be appropriate, would arise: (1) if the Secretary declared he would no longer enforce the relevant statute; (2) "if the Secretary prosecuted complaints in a constitutionally discriminatory manner", and (3) where the Secretary's decision exceeded his statutory authority or was "clearly defiant of the Act." 421 U.S. at 574. None of these exceptions apply to this case.

App.1239

Appellate Case: 24-1628    Page: 1244    Date Filed: 03/26/2024 Entry ID: 5377362

Copied at the National Archives at Kansas City

with "record" support, for each instance of its failure to exercise quasi-legislative authority would impose a staggering administrative burden. Constraints, imposed by the time and the resources available, limit the number of rulemaking proceedings which an agency may pursue and the number of rules an agency may actually adopt. There are, however, an infinite number of possible rulemaking actions — limited only, as this case well illustrates, by the fertility of private counsel's imagination — which the Commission might be authorized to undertake pursuant to its broad, discretionary disclosure authority. To require, as did the court below, that the Commission prepare a virtual treatise in any case of the non-adoption of rules, when the case happens to attract the attention of any private interest group, would seriously hamper the administrative process.

Ethyl Corp. v. Environmental Protection Agency, supra, is also inapplicable because, even though it involved informal — not "on-the-record" — rulemaking, the Administrator of the Environmental Protection Agency was required to make his determination, whether to ban certain privately produced products from the marketplace, in part, on the basis of statutorily specified, clearly defined facts — the effects of those products on the human body. In contrast, the Commission's decision not to adopt the plaintiffs' proposed disclosure rules involved determinations of policy and predictions of the possible future effects of hypothetical rules — an area "where explicit factual findings are not possible, and the act of decision is essentially a prediction based upon pure legislative judgments." Industrial Union Department AFL-CIO v. Hodgson, 162 U.S. App. D.C., 331, 338, 499 F.2d 467, 474 (1974). 62/

---

62/ And, in Ethyl, this Court recognized (541 F.2d at 1):

"The Administrator may apply his expertise to draw conclusions from suspected, but not completely substantiated, relationships between fact * * * from theoretical projections, from imperfect data * * * and the like. * * * Ultimately, he may act, in part on 'factual issues' but largely 'on choices of policy, on an assessment of risk, [and] on predictions dealing with matters on the frontiers of scientific knowledge * * *" [citing Amoco Oil Co. v. Environmental Protection Agency, 163 U.S. App. 162, F.2d 722, 741 (1974)].

App.1240

Copied at the National Archives at Kansas City

Appellate Case: 24-1628    Page: 1245    Date Filed: 03/26/2024    Entry ID: 5377362

Moreover, there is clear evidence in the federal securities laws that Congress intended, even when the Commission does adopt rules pursuant to the sections of the securities laws involved in this proceeding, that the Commission not be required to develop a "record." In 1975, Congress revisited the federal securities laws in their entirety, culminating in the passage of the Securities Act Amendments of 1975, 88 Stat. 146. In doing so, Congress specifically directed itself to the question of the difference between on-the-record and informal proceedings, and carefully inserted the phrase "on the record" only in those sections where it intended the Commission to hold that type of proceeding. See, e.g. Sections 15(b)(4) and 19(h)(1) of the Securities Exchange Act, 15 U.S.C. 78o(b)(4), 78s(h)(1). In other sections, including those involved in this case, Congress intentionally refrained from requiring on-the-record proceedings. See S. Rep. No. 75, 94th Cong., 1st Sess. (1972), at 37-38.

Also of significance here are the changes made in 1975 to the Securities Exchange Act's judicial review provisions. These changes show that, with respect to the sections of the securities laws involved here, Congress intended that such judicial review as might be permissible should not include review of whether the Commission's rulemaking was based on "record" evidence. Prior to 1975, the Securities Exchange Act did not contain any provisions relating to judicial review of Commission rules. The Amendments created a new Section 25(b) of the Securities Exchange Act, 15 U.S.C. 78y(b), which provides for direct review, in a court of appeals, of a limited class of Commission rules promulgated pursuant to certain enumerated sections of the Act, none of which are involved in this case. For these rules, and these rules only, Congress provided that "the facts identified by the Commission as the basis, in whole or in part, of the rule" must be sustained if supported by "substantial

Copied at the National Archives at Kansas City

Appellate Case: 24-1628    Page: 1246    Date Filed: 03/26/2024    Entry ID: 5377362

15 U.S.C. 78y(b)(4) (emphasis supplied). 63/ Had Congress wished to subject Commission rules promulgated pursuant to the sections involved in the present case to "substantial evidence" review, it could have done so. It did not. Cf. United States v. Florida East Coast R. Co., 410 U.S. 224 (1973); United States v. Allegheny Ludlum Steel Co., 406 U.S. 742 (1972).

Informal rulemaking is quasi-legislative in nature. It involves the exercise, by administrative agencies, of "delegated power to make, within certain limits, decisions that Congress normally makes itself." Amoco Oil Co. v. Environmental Protection Agency, 163 U.S. App. D.C. 162, 175; 501 F.2d 722, 735 (1974). Accord, Action for Children's Television v. Federal Communications Commission, 41 Ad.L. 2d 469 (C.A. D.C., Jul. 1, 1977), citing Automotive Parts & Accessories Ass'n v. Boyd, 132 U.S. App. D.C. 200, 407 F.2d 330, 338 (1968). In reviewing informal rulemaking by an administrative agency, a court

> "need not determine whether the Commission's action is
> supported by substantial evidence * * * [. T]he proper
> standard is the far less demanding one * * * which
> requires a reviewing court to set aside agency action
> deemed to be 'arbitrary, capricious, an abuse of
> discretion or not in accordance with law."

Action for Children's Television v. Federal Communications Commission, supra, 41 Ad. L. 2d at 495 (emphasis supplied). 64/ Accordingly, contrary to the holding of the court below (A. 193), an agency is not required to justify

---

63/ And yet, even in subjecting certain Commisssion rules to a "substantial evidence" test, Congress recognized (S. Rep. No. 75, 94th Cong., 1st Sess. (1975) at 37):

> "In the exercise of its quasi-legislative functions, the
> Commission's action may be based upon policy considerations
> and administrative expertise which cannot be reduced to
> specific evidentiary facts."

64/ Except in the case of statutes providing otherwise, the requirement that an agency's findings be supported by "substantial evidence" applies only to adjudicatory proceedings and formal, on-the-record, rulemaking. See, e.g., Camp v. Pitts, 411 U.S. 138 (1973); City of Chicago v. Federal Power Commission, 147 U.S. App. D.C. 312, 458 F.2d 731, 744 (1971), certiorari denied, 405 U.S. 1074 (1972).

App.1242

Copied at the National Archives at Kansas City

Appellate Case: 24-1628     Page: 1247     Date Filed: 03/26/2024 Entry ID: 5377362

informal rulemaking action basis of a "record". As this Court has held, id.
at 485:

> "[W]hile the ageny must consider, analyze and rely
> on these factual matters which are in the public
> domain, the agency may draw upon its own expertise
> in interpreting the facts or upon broader policy
> considerations not present in the record."

In articulating this conclusion, this Court cited Flying Tiger Lines, Inc. v.
Boyd, 244 F. Supp. 889, 892 (D. D.C., 1965), which explained:

> "[T]he purposes of rulemaking hearings are to give an
> opportunity to interested parties to submit data and
> facts, and to present their views * * *. Such hearings
> are analogous to hearings conducted by Congressional
> Committees. An Act of Congress need not be supported
> by formal evidence introduced at hearings." 65/

B. The District Court Improperly Placed upon the
Commission the Burden of Justifying its Determina-
tion Not to Adopt the Disclosure Policy Sought
by the Plaintiffs.

The only requirement imposed by the APA on an agency that decides to

deny a rulemaking petition is that the agency provide the petitioner with

"a brief statement of the grounds for denial." 5 U.S.C. 555(e). 66/ Moreover,

this Court has held that, when an administrative agency promulgates rules,

it is not required to state its reasons for rejecting alternative rules it

does not adopt. Amoco Oil Co. v. Environmental Protection Agency, supra, 501

F.2d at 743 n. 53 (1974). This Court there stated:

---

65/ Of course, an Act of Congress may be set aside by a court if it is
unconstitutional. But, the judiciary has never purported to assert the
power to set aside a Congressional determination not to pass a bill.

66/ In Dunlop v. Bachowski, supra, the Secretary of Labor denied a petition
requesting him to set aside a union election with a letter stating
"[b]ased on the investigative findings it has been determined * * *
that civil action to set aside the challenged election is not warranted."
421 U.S. at 563 (deletion in original).

While the Court found this statement troublesome under the Labor-Management
Reporting and Disclosure Act of 1959, for reasons not relevant here, it
observed that the letter "may have sufficed as 'a brief statement of the
grounds for denial' for the purposes of the Administrative Procedure Act,
5 U.S.C. § 553(e)."

App.1243

Copied at the National Archives at Kansas City

Appellate Case: 24-1628 · Page: 1248 · Date Filed: 03/26/2024 Entry ID: 5377362

"We do not think a rulemaking agency needs to
justify its rejection of each possible alternative
to each provision of its regulations. A contrary
rule would require * * * statements of uncon-
scionable length."

Thus, the district court's determination that the Commission's "rejection of

certain specific disclosure alternatives was not rationally based, at least

insofar as appears from the Commission's statement of reasons in support of

its decision * * *" (A. 193), is contrary to law.

As this Court has previously held, the results of informal rulemaking

are "presumptively valid," and those challenging such rulemaking "bear 'the

heavy burden of making a convincing showing that it is unjust and unreason-

able in its consequences'." American Public Gas Association v. Federal

Power Commission, 166 U.S. App. D.C. 276, 280, 552 F.2d 142, 146 (1975),

quoting from Permian Basin Area Rate Cases, 390 U.S. 747, 767 (1968), and

Federal Power Commission v. Hope Natural Gas Co., 320 U.S. 591, 602 (1944).

But, in this case, instead of placing the burden of demonstrating any

arbitrariness of the Commission's non-action on the plaintiffs, in accordance

with the legal precedents established by the Supreme Court and this Court,

the district court, in effect, imposed on the Commission a requirement that

it provide an encyclopedic explanation for every one of its quasi-legislative

policy judgments in order to establish an airtight justification for its every

decision not to take action. This approach to judicial review is not only

unprecedented, but also, as a matter of policy, is untenable. In the past,

even when agencies have adopted rules, the courts have generally required

administrative agencies to develop justifications for rulemaking actions only

when an agency's decision represents an "abrupt departure from past policies."

Copied at the National Archives at Kansas City

Appellate Case: 24-1628    Page: 1249    Date Filed: 03/26/2024    Entry ID: 5377362

See _Action for Children's Television,_ _supra,_ 41 Ad. L. 2d at 498. 67/ We are
aware of no requirement that an agency must provide a justification for a
policy decision to adhere to its own precedents -- for example, where, as
here, the Commission adhered to its 40 year tradition of considering economic
materiality the touchstone of disclosure policy. 68/

---

67/     See also, Home Box Office, Inc. v. Federal Communications Commission,
        40 Ad. L. 2d 1007 (C.A. D.C., Mar. 25, 1977) certiorari denied, 46 U.S.L.W.
        1390 (U.S., Oct. 4, 1977); Greater Boston Television Corp. v. Federal
        Communications Commission, 143 U.S. App. D. C. 383, 444 F.2d 841 (1970);
        Columbia Broadcasting System, Inc. v. Federal Communications Commission,
        147 U.S. App. D.C. 147, 454 F.2d 1018, 1026 (1971).

68/     An example of the district court's erroneous attempt to require the
        Commission to provide a detailed explanation for its policy judgment
        was the Court's statement that it was "unable to assess," "on the basis
        of the record," whether the relative lack of "direct" investor interest
        in environmental and employment information (as opposed to investor
        interest in professional analysis of such information) was a relevant
        consideration (A. 199, 205).  The court apparently desired an explanation
        which would compare the amount of "direct" investor interest in en-
        vironmental and social matters with the amount of "direct" investor
        interest in financial matters.  But, providing investors with financial
        information concerning publicly-held corporations is the raison d'etre
        of the disclosure provisions of the securities laws.  As the legislative
        history of the Securities Exchange Act explained:  "The bill provides
        that * * * a condition of such registration shall be the furnishing
        of complete information relative to the financial condition of the issuer,
        * * *" S. Rep. No. 792, 73d Cong., 2d Sess. at 10 (1934) (emphasis added).

        The provisions of the securities laws require disclosure of financial
        information, irrespective of whether there is "direct" investor interest
        in such information.  Thus, it does not follow that the Commission may
        not consider, in deciding what disclosure rules to adopt, the nature
        of investor interest in various types of information.

        The court below also suggested that the Commission should "probably"
        reconsider the amount of investor interest in non-material environmental
        and employment information because the court believed that the Commission
        may have been "influenced in its ultimate decision by its conclusion
        that only an insignificant number of investors are interested in such
        disclosures" (A. 199).  Stating its belief that "the Commission derived
        this conclusion [as to the amount of investor interest in such disclosures]
        solely from the number of investors that participated in the rulemaking
        proceeding", the court was of the view that this "basis for determination
        appears to be arbitrary" (A. 199).  The Commission did not, however, reach
        a conclusion concerning the amount of investor interest solely on the
        basis the number of investors who participated in the proceeding.  Rather,
        the Commission relied on its "experience over the years in proposing
        and framing disclosure requirements" (Ex. B, 58).  Indeed, the Commission
        explicitly disclaimed employing a "plebescite," to determine what, if
        any, disclosures to require (see p. 18, n. 25, supra).

App.1245

Copied at the National Archives at Kansas City

IV.   THE COMISSION"S DETERMINATION NOT TO ADOPT THE PLAINTIFFS'
      PROPOSED RULES WAS A REASONED EXERCISE OF THE COMMISSION'S
      BROAD DISCRETION.

As we have seen, the Commission determined not to adopt the plaintiffs'
proposed rules or certain other alternative disclosure schemes discussed in Release
5627 (see pages 19-21, supra) for reasons directly related to its mandate of in-
vestor protection.  First, it was concerned that rules requiring disclosure
of particular catagories of information that would only be material with
respect to some companies and only of interest to some investors would result
in disclosure documents that would be so voluminous as to be of less use to
investors generally (see page 17, supra).  Second, it was concerned that disclosure
documents not contain misleading material (see page 20, supra). Third, it was
concerned that disclosure requirements not impose an unreasonable administrative
burden on the Commission or excessive costs on publicly-held corporations (see
page 19, supra).

The Commission was not unmindful, however, that in certain instances
environmental and employment information might be material to investors.  And,
it recognized that NEPA imposed upon it an obligation to give careful considera-
tion to environmental factors in its decision-making.  Thus, the Commission, in
Release 5386, promulgated specific environmental disclosure rules, and these
rules require disclosure of environmental litigation even in instances where
disclosure of non-environmental litigation would not be required.  See page 11,
supra.  Moreover, the Commission's existing rules have the effect of requiring
disclosure of all material environmental and employment information.  Publicly-
held companies which fail to disclose such information are subject to enforcement
actions by the Commission (see note 52, infra) and private damage actions by
investors (see note 39, supra).

The Commission's consideration of the plaintiffs' proposals spanned a
period of five years.  The Commission's releases set forth in great detail the

Appellate Case: 24-1628     Page: 1251     Date Filed: 03/26/2024 Entry ID: 5377362

Copied at the National Archives at Kansas City

reasons for its ultimate policy judgment. While the court below did not agree with the Commission's reasoning, we submit that the Commission's choice of policy reflected a rational exercise of the Commission's broad discretion.

A. The Commission Is Not Required to Conduct a Statistical Cost-Benefit Analysis before it Can Decline to Adopt Disclosure Rules; the Commission's Conclusions concerning the Costs and Benefits of Various Disclosure Alternatives were Rational and Reflected the Commission's Expertise in Administering the Disclosure Provisions of the Federal Securities Laws.

The district court held that the Commission's "balancing of costs and benefits" was "not based on a consideration of the relevant factors and not sustainable on the adminsitrative record" (A. 196). In so holding, the court suggested that the Commission should have:

(1) sought "cost/benefit studies conducted * * * outside the Commission" (A. 196);

(2) worked with corporations, interested individuals and organizations, and "outside experts" to develop guidelines and standards for the disclosure of environmental information (A. 196);

(3) assessed separately the costs of requiring environmental disclosure in proxy statements (A. 195);

(4) assessed separately the costs of requiring publicly held corporations to file environmental information with the Commission instead of including such information in disclosure documents (A. 195);

(5) analyzed the costs and benefits of requiring disclosure of "each" of the more-than-100 categories of social information in which at least one participant in the Commission's proceedings expressed an interest (A. 205); and

(6) "analyze[d] the benefits and costs of equal employment opportunity disclosure in connection with proxy solicitations and information statements alone * * *" (A. 205).

The district court cited no authority for its view that the Commission should have undertaken a single one of the steps it suggested, and we are aware of none. There is nothing in the federal securities laws, the APA, NEPA, or any other statute that requires the Commission to conduct "cost/benefit studies" for each rule it promulgates, let alone for the infinite number of rules it does not

Copied at the National Archives at Kansas City

Appellate Case: 24-1628    Page: 1252    Date Filed: 03/26/2024    Entry ID: 5377362

promulgate. Such a requirement would be contrary to the very nature of informal rulemaking.

Moreover, the determination of the probable future impact of hypothetical disclosure rules is not a matter that can be reduced to record evidence. It is, instead, "essentially a prediction based upon pure legislative judgment." Industrial Union Department, AFL-CIO v. Hodgson, supra, 162 U.S. App. D.C. at 338, 499 F.2d at 474. The Commission, in reaching its determination not to promulgate additional environmental disclosure rules, identified a number of potential costs and burdens that could be associated with such disclosure:

(1) an attempt to incorporate into disclosure documents all matters of interest to some investors would elicit information of excessive and confusing detail, making disclosure documents too voluminous and less useful to investors generally (Ex. B, 39);

(2) unfairness would be engendered by the fact that, even though only a limited number of investors would be interested in such information, all would bear the costs (Ex. B, 39);

(3) adopting the plaintiffs' proposed rules could be the equivalent of requiring corporations to prepare an environmental impact statement for each of their facilities, and would dwarf the disclosure which the Commission currently required (Ex. B, 39);

(4) the plaintiffs' rulemaking petition sought disclosure unrelated to existing environmental laws; but, if the Commission formulated standards unrelated to existing environmental standards, excessive costs to publicly held corporations and administrative burdens to the Commission would result (Ex. B, 50);

(5) disclosure elicited in response to the plaintiffs' proposed rules would be subjective since there is no scientific agreement on what is harmful to the environment (Ex. B, 50);

(6) the information that would be elicited in response to the plaintiffs' proposed rules would not easily lend itself to making inter-corporate comparison (Ex. B, 50); and

(7) there is a potential for misleading investors because some of the disclosure elicited would be incapable of verification and susceptible to public relations statements (Ex. B, 54).

The potential benefits identified by the Commission were:

(1) some investors are interested in such information (Ex. B, 54);

(2) even investors who may not be interested in such information directly, would have access to the views of analysts who might study the additional disclosure elicited (Ex. B, 51); and

Appellate Case: 24-1628    Page: 1253    Date Filed: 03/26/2024    Entry ID: 5377362

App.1248

Copied at the National Archives at Kansas City

    (3) requiring additional disclosure of environmental information might have
        an indirect effect on corporate practices in the environmental
        area (Ex. B, 52).

These factors do not lend themselves to "cost/benefit studies." 69/ And,

as this Court has recently stated in a case in which an attack was levied

against sixteen provisions of regulations promulgated by the Consumer Product

Safety Commission on the basis, inter alia, that the agency had not shown

the benefits of the regulations:

> "There is no indication in the language of the Act or
> its legislative history that the Commission was bound
> to develop a precise 'body count' of actual injuries
> that will be reduced by each regulatory provision
> * * *. We conclude that no precise statistical study
> is required."

Forester v. Consumer Product Safety Commission, No. 75-1292 (C.A. D.C., June

1, 1977) slip op. at 21-22. In a similar vein, Mr. Justice Powell stated in

his concurring opinion in National Association for the Advancement of Colored

People v. Federal Power Commission, 425 U.S. 662, 672 (1975):

> "In view of the inherently amorphous nature of these cate-
> gories of costs, it would not be in the public interest to
> allow intervenors to delay the orderly progress of rate pro-
> ceedings in the vain hope that such costs might, after pro-
> tracted litigation, be quantified. I do not read this Court's
> opinion as requiring any such encumbering of the Commission's
> prescribed statutory authority and discretion."

Moreover, the plaintiffs, who had the heavy burden of justifying the rule-

making action they wished the Commission to take (see pages 54-55, supra), did

not come forward with cost/benefit studies either in support of their rule-

making petition or at any of the Commission's proceedings concerning environmental

rules, despite the fact that the Commission specifically requested comments on

---

69/    As was stated in a case where rules promulgated by the Federal Communica-
      tions Commission were challenged on the grounds that the rules were
      "unsupported by concrete factual data demonstrating the beneficial effects
      of the rules," the benefits "d[o] not lend themselves to detailed forecast"
      and "the Commission is not required to make specific findings of tangible
      benefit." General Telephone Company of the Southwest, v. United States,
      449 F.2d 846, 858 (C.A. 5, 1971) citing Federal Communications Commission v.
      RCA Communications, Inc., 346 U.S. 86, 96-97 (1953).

Appellate Case: 24-1628   Page: 1254   Date Filed: 03/26/2024   Entry ID: 5377362

App.1249

Copied at the National Archives at Kansas City

on the costs of disclosure alternatives (Ex. B, 72, 79). In Portland Cement Association v. Ruckelshaus, 158 U.S. App. D.C. 308, 486 F.2d 375, (1973), petitioners seeking review of certain rules of the Environmental Protection Agency argued that the Administrator of that agency should have conducted a cost-benefit analysis. Noting that the benefits would be "difficul[t], if not impossible to quantif[y]," this Court held that "[s]uch studies should be considered by the Administrator, if adduced in comments, but we do not inject them as a necessary condition of action." 70/

The Commission's ultimate balancing of costs and benefits here was rational and reflected its policy judgment, based upon its expertise in administering the disclosure provisions of the federal securities laws, on how best to further its statutory mandate for investor protection.

B. The Commission Complied With NEPA's "Procedural Mandate".

In spite of its recognition that "this proceeding has already consumed a substantial, and perhaps even unprecedented amount of the Commission's time * * *," the district court held that the Commission did not comply with NEPA's "procedural mandate" to consider, "to the fullest extent possible under its

---

70/ We find it completely incomprehensible that the district court criticized the Commission because the court believed the Commission had not sought outside advice, either from "experts" or "registrants" or "interested individuals" with regard to the "costs and feasibility of developing guidelines and standards for the disclosure of environmental information." (A. 96).

As we have seen, the Commission conducted three notice-and-comment proceedings and held nineteen days of hearings concerning the standards it should impose for environmental disclosure. The Commission specifically inquired about benefits, costs and burdens. "In all, the Commission * * * compiled an estimated 15,000 pages of comments, testimony, memoranda, data and arguments over a five-year period as a result of the [plaintiffs'] proposals" (Ex. B, 86). Most, if not all, of the testimony and comments dealt with the benefits, costs or burdens of the proposed disclosure. The Commission's staff also had discussions with the CEQ and the EPA, "the two federal agencies having primary responsibility respecting environmental matters" (Ex. B, 86), but concluded that, "[w]hile helpful, those discussions have not engendered any workable proposals beyond those which the Commission had adopted * * *" (Ex. B, 86).

App. 1250

Copied at the National Archives at Kansas City

Appellate Case: 24-1628    Page: 1255    Date Filed: 03/26/2024   Entry ID: 5377362

statutory obligation[,] * * * alternatives to its actions which would reduce environmental damage" (quoting from Calvert Cliffs Coordinating Committee, Inc. v. United States Atomic Energy Commission, supra, 449 F.2d at 1128 (A. 196)). In so holding, the district court stated that the Commission (1) should not have based its decision not to adopt the plaintiffs' rules on its belief that other federal agencies having the necessary expertise should take the initiative in requiring environmental disclosure (A. 197); and (2) could not consider its own lack of expertise concerning environmental matters "as one reason for not developing fully a factual record * * *" (A. 195).

The court failed to heed the quoted language from Calvert Cliffs' which qualified an agency's duty under NEPA with the limiting phrase, "under its statutory obligation." As this Court has held, "NEPA does not mandate action which goes beyond an agency's organic jurisdiction." Gage v. Atomic Energy Commission, 156 U.S. App. D.C. 231, 479 F.2d 1214, 1220 n. 19 (1973). And, NEPA does not require agencies, such as this Commission, to take extraordinary procedural measures in its rulemaking activities, but only to "* * * consider environmental issues just as they consider other matters within their mandates." Calvert Cliffs Coordinating Committee, Inc. v. United States Atomic Energy Commission, supra, 449 F.2d at 1112 (emphasis supplied).

The Commission is not an environmental agency. The vast majority of its professional employees are accountants and attorneys; as the Supreme Court recently stated, the Commission is "an agency with great experience in the [securities] industry." E. I. Du Pont de Nemours & Co. v. Collins, 97 S. Ct 2229, 2233 (1977). The primary thrust of NEPA is directed at agencies which, unlike the Commission,

Copied at the National Archives at Kansas City

Appellate Case: 24-1628   Page: 1256   Date Filed: 03/26/2024   Entry ID: 5377362

engage in activity directly affecting the environment. 71/ Those agencies must prepare environmental impact statememts before they can carry out projects that will "significantly affect the quality of the human environment." 42 U.S.C. 4332(c). But Congress did not require an agency like the Commission —which neither regulates corporate environmental or technological conduct, nor itself undertakes projects with a significant impact on the environment -- to convert itself into an environmental agency in the conduct of its general rulemaking authority or otherwise. 72/

----

71/ As Senator Muskie noted in response to a question during the Senate debates on NEPA (115 Cong. Rec. 40425), NEPA's purpose is

> "to apply strong pressures on those agencies that have an impact on the environment -- the Bureau of Public Roads, for example, the Atomic Energy Commission, and others. This strong language * * * [is] intended to bring pressure on those agencies to become environment conscious, to bring pressure upon them to the needs of environmental quality * * * ."

According to the Senate Committee Report accompanying the bill that ultimately became NEPA, S. Rep. No. 91-296, 91st Cong., 1st Sess. 8 (1969), NEPA establishes

> "a national policy to guide Federal activities which are involved with or related to the management of the environment or which have an impact on the quality of the environment."

See also 115 Cong. Rec. 40418 (remarks of Senator Jackson):

> "Federal agencies whose activities have an adverse effect on the quality of the environment [must] conduct their activities in accordance with the provisions of this bill unless to do so would violate their existing statutory authorizations."

72/ The district court's statement that the Commission should have sought the advice of such "other federal agencies as have the requisite expertise" on this matter is puzzling. The Commission expressly sought the advice of the EPA and the CEQ. See p. 23 n. 27, supra.

Appellate Case: 24-1628    Page: 1257    Date Filed: 03/26/2024    Entry ID: 5377362

App.1252

Copied at the National Archives at Kansas City

Contrary to the district court's statement that the Commission has "shunted aside environmental factors in the bureaucratic shuffle" (A. 197), the courts have criticized "needless duplication of administrative effort." See, e.g., West Helena Savings & Loan Association v. Federal Home Loan Bank Board, 553 F.2d 1175 (C.A. 8, 1977). As Mr. Chief Justice Burger has stated:

> "If Congress had mandated duplicative regulation, the result, however inefficient, would be none of our concern. But Congress did not do so. It centralized responsibility in the EEOC. To the extent that the judiciary orders administrative responsibility to be diffused, congressional intent is frustrated, regulated industries are subjected to the commands of different voices in the bureaucracy, and the agonizing long administrative process grinds even more slowly."

National Association for the Advancement of Colored People v. Federal Power Commission, supra, 425 U.S. at 672-673 (Burger, C. J., concurring) (emphasis supplied). 73/

C. The District Court Erred in Holding that the Commission Had Improperly Failed to Consider Adopting Certain Environmental Disclosure Requirements Solely in Connection with Proxy Solicitations.

The district court expressed the belief that "a fundamental premise of the Commission's decisionmaking appeared to be that any disclosure requirement must apply equally to all filings with the Commission or communications with shareholders and the public" (A. 193). The district court, however, recognized that the Commission had expressly stated in Release 5627 the factors that distinguish proxy disclosure from other types of disclosure (Ex. B, 35) (A. 193) and had expressly stated that the investors who had participated in its proceeding had indicated that they would use environmental and employment information more for voting purposes than in making investment decision (Ex. B, 57, A. 193). The

_____

73/ Cf., Silentman v. Federal Power Commission, No. 76-1192 (C.A. D.C., Aug. 26, 1977), slip op. at 6-9.

Copied at the National Archives at Kansas City

Appellate Case: 24-1628 Page: 1258 Date Filed: 03/26/2024 Entry ID: 5377362

court apparently thought, however, that although the Commission expressly stated the distinctions between proxy disclosure and other types of disclosure, it nevertheless failed to consider the possibility of requiring additional environmental and employment information only in proxy statements and not in other disclosure forms. There is no basis for this assumption by the district court. The Commission determined, in light of various considerations (see pages 19-21, supra), that it would be inappropriate to adopt additional disclosure rules for any of the disclosure documents under consideration, including proxy materials. Although the Commission was not required to state separately its reasons for not adopting the plaintiffs' rules for each of its forms, see discussion of Amoco Oil Co. v. Environment Protection Agency, page 53-54, supra, reasons set forth by the Commission in its release had considerable import for proxy materials. And, it is of no legal consequence that one of the Commission's reasons for not adopting the rules — that the disclosure elicited would not lend itself to inter-corporate comparison — was viewed, by the district court, as having lesser significance for proxy materials than for other disclosure documents. 74/

The Commission's decision not to impose additional disclosure requirements was based, in part, on the concern that additional requirements would elicit such voluminous responses that disclosure documents, including proxy materials, would be of less use to investors generally. The Supreme Court has explicitly recognized the validity of this concern, with respect to proxy disclosures, in TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 448-449 (1976). The Court there stated:

> "[T]he disclosure policy embodied in the proxy regulations
> is not without limit * * *. Some information is of such
> dubious significance that insistence on its disclosure may
> accomplish more harm than good. The potential liability
> for a Rule 14a-9 violation can be great indeed, and if the
> standard of materiality is unnecessarily low, not only
> may the corporation and its management be subjected to
> liability for insignificant omissions or misstatements,

---

74/ We note, however, that proxy materials also may be used in making investment decisions. Cf. Securities and Exchange Commission v. National Securities, Inc., 393 U.S. 453 (1968). Thus, the problems the Commission identified with respect to intercorporate comparison have significance in the case of proxy materials.

Copied at the National Archives at Kansas City

Appellate Case: 24-1628   Page: 1259   Date Filed: 03/26/2024   Entry ID: 5377362

but also the management's fear of substantial liability
may cause it simply to bury the shareholders in an
avalanche of trivial information -- a result that is
hardly conducive to informed decisionmaking." 75/

---

75/   Moreover, the Commission is involved in an ongoing examination of the
shareholder democracy process -- an examination which is, of course, much
broader than the matters involved herein.  In Securities Exchange Act
Release No. 13482 (Apr. 28, 1977), 42 Fed. Reg. 23901 (May 11, 1977),
the Commission announced that it would hold public hearings concerning
shareholder communications, shareholder participation in the corporate
electoral process and corporate governance.

Three of the issues being addressed are (Securities Exchange
Act Release No. 34-13901 (Aug. 29, 1977) (footnote omitted)):

"(1) what types of socially significant matters, if
any, are material (within the meaning of Rule 14a-9)
to shareholders in making informed voting decisions?
In this regard, is there a difference between information
necessary to an informed voting decision and information
necessary to an informed investment decision?

(2) whether or not information relating to socially
significant matters, including matters relating to the
environment and employment practices, is material within
the meaning of Rule 14a-9, would it be appropriate for the
Commission to exercise its rulemaking authority under
Section 14(a) to require disclosure of such information
in proxy statements and/or annual reports to shareholders?

*     *     *

(7) what would be the costs and benefits of [the above]?
Can these costs and benefits be quantified?  If not,
why?"

The Commission announced that, at the conclusion of these hearings, it
would determine "whether it is necessary or appropriate in the public
interest or for the protection of investors to propose amendments to
Regulation 14A, to propose amendments to other applicable rules or to
recommend legislation to Congress."  Thus, judicial review of the Commis-
sion's decision concerning proxy disclosure, if such review may be
appropriate, lies properly in the context of the Commission's proceedings
concerning that issue.

The Commission also spoke concerning the relationship between "ethical"
matters and its proxy rules in Securities Exchange Act Release No. 12999
(Nov. 2, 1976), 41 Fed. Reg. 52994 (Dec. 3, 1976).  In that release, the Commis-
sion announced amendments to its rules that allow shareholders to submit
proposals to management for inclusion in proxy statements.  Securities
Exchange Act Rule 14a-8, 17 CFR 240.14a8.  In adopting the amendments, the
Commission rejected the suggestion made by some commentators that the rule
should allow management to omit a proposal "wherever the matter involved
therein does not bear a significant economic relation to an issuers
business," recognizing the potential significance in that context
of "ethical issues."

App.1255

Appellate Case: 24-1628    Page: 1260    Date Filed: 03/26/2024 Entry ID: 5377362

Copied at the National Archives at Kansas City

D. The District Court Erred in Concluding that the
Commission Was Arbitrary and Capricious in
Not Adopting the Plaintiffs' Suggestions for
Additional Disclosure of Employment Information.

In faulting the Commission's determination not to adopt the plaintiffs'

suggestion that it require additional disclosure of employment informa-

tion, the district court believed that

(1) the Commission did not analyze the economic significance
of employment statistics (A. 204);

(2) the Commission did not analyze the cost of devising
disclosure guidelines for employment information (A. 204);

(3) the Commission did not analyze the costs and benefits of
requiring employment disclosure only in proxy materials
(A. 204) (see pages 56-60, supra); and

(4) the Commission did not sufficiently explain the significance
of its conclusion that disclosure of statistical data
would require sophisticated analysis to be meaningful
(A. 205). 76/

The court cited no authority to support its view that the Commission should have

undertaken any of the above steps.

The Commission was under no obligation to promulgate disclosure rules

concerning equal employment opportunity, or even to undertake rulemaking proceedings,

in this area; and, in fact, it has no authority to promulgate such rules except in

---

76/ The court suggested the Commission should have compared the need for sophisti-
cated analysis of employment statistics with the need for sophisticated analysis
of various financial disclosures. This suggestion misconceives the purposes
of the federal securities laws. See p. 55, n. 68 supra.

Copied at the National Archives at Kansas City

Appellate Case: 24-1628   Page: 1261   Date Filed: 03/26/2024   Entry ID: 5377362

furtherance of its mandate under the federal securities laws. As stated by the
Court of Appeals for the Second Circuit in a proceeding for review of certain rules
of the Federal Communications Commission:

> "EEO enforcement is not the FCC's mission.
> Thus it has no obligation to promulgate EEO
> regulations. But it does possess the power to
> issue such regulations in furtherance of its
> statutory mandate."

Office of Communication of the United Church of Christ v. Federal Communication
Commission, No. 76-4187 (C.A. 2, Aug. 5, 1977).

The Commission's obligation with respect to that portion of the plaintiffs'
rulemaking petition that sought disclosure of employment information was merely
to state its reasons for denying the petition. See page 53, supra. The Com-
mission stated its reasons at length; and yet, the district court set aside
the Commission's decision not to require equal employment information apparently
because it was not satisfied, or did not agree, with the Commission's reasons.

The district court stated that, since employment information was economically
significant, it was arbitrary of the Commission not to promulgate additional rules
requiring further disclosure of such information. The Commission, however, concluded
that, since such information was not of equal significance for all companies, it
would continue to elicit disclosure of such information in specific cases pursuant
to its general requirement that all material information be disclosed, rather than

Copied at the National Archives at Kansas City

Appellate Case: 24-1628    Page: 1262    Date Filed: 03/26/2024    Entry ID: 5377362

by promulgating a rule. 77/  In National Association for the Advancement of

Colored People v. Federal Power Commission, supra, 425 U.S. at 668, the Supreme

Court expressly reaffirmed the validity of this type of approach:

> "[I]t is clear that the Commission has the discretion
> to decide whether to approach these problems through
> rulemaking, individual adjudication or a combination
> of the two procedures. SEC v. Chenery Corp., 332 U.S.
> 194, 202-203." 78/

---

77/  Ironically, the district court noted that the Commission has initiated
enforcement actions against corporations that have failed to disclose
information concerning illegal political payments and foreign bribes,
and expressed a concern that there might be more investor interest in
environmental and employment data than in bribery (A. 199 n. 77).  But the
Commission also has initiated enforcement action against a corporation
which failed to disclose material information concerning environmental
activities. See p. 43, n. 52, supra. Since the Commission does not have
specific rules requiring the disclosure of illegal payments and bribes,
the examples cited by the court below serve to demonstrate the effectiveness
of the Commission's general materiality rules.

78/  The district court stated that "[t]he Commission decided not to impose any
additional disclosure requirements for any 'nonenvironmental' matters of
social concern because 'over 100 different 'social matters' were submitted
in which 'ethical investors were said to be interested" (p. 201).  The
court viewed the Commission as having concluded that "equal employment
information could not be distinguished from" 'over 100' other matters
of social concern" identified by participants in its proceeding. (A. 202)
In so stating, the court apparently misunderstood the Commission's
reasoning.  The Commission did not equate employment information with
the "over 100" other matters raised.  Instead, the Commission noted that

> "it has been suggested that investors are at least
> entitled to information regarding matters which embody
> fundamental national social principles as reflected in
> federal legislation or court decisions.  We believe
> that a persuasive argument can be made, however, that
> a substantial amount of federal legislation to some
> extent embodies fundamental national social principles,
> and, accordingly, many topics of social concern will
> remain" (Ex. B, 66-67).

Furthermore, apart form the Commission's observation concerning the numerous
matters of social concern, the Commission set forth particular reasons
for declining to adopt the plaintiffs' employment disclosure rules.  See
pages 21-22, supra.

Copied at the National Archives at Kansas City

Appellate Case: 24-1628    Page: 1263    Date Filed: 03/26/2024   Entry ID: 5377362

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be reversed, and the district court should be directed to grant the Commission's motion for summary judgment.

Respectfully submitted,

HARVEY L. PITT
General Counsel

JACOB H. STILLMAN
Principal Assistant General Counsel

DANIEL L. GOELZER
Special Counsel

LINDA W. JARETT
Attorney

Securities and Exchange Commission*
Washington, D. C. 20549

October 1977

---

\* Jeanne A. Calderon, a third year student at the Georgetown University Law Center, assisted in the preparation of this brief.

Copied at the National Archives at Kansas City

Appellate Case: 24-1628    Page: 1264    Date Filed: 03/26/2024 Entry ID: 5377362

Appellate Case: 24-1628　　　Page: 1265　　　Date Filed: 03/26/2024　　　Entry ID: 5377362

STATUTORY APPENDIX

Copied at the National Archives at Kansas City

## Section 7 of the Securities Act

SEC. 7. The registration statement, when relating to a security other than a security issued by a foreign government, or political subdivision thereof, shall contain the information, and be accompanied by the documents specified in Schedule A, and when relating to a security issued by a foreign government, or political subdivision thereof, shall contain the information, and be accompanied by the documents, specified in Schedule B; except that the Commission may by rules or regulations provide that any such information or document need not be included in respect of any class of issuers or securities if it finds that the requirement of such information or document is inapplicable to such class and that disclosure fully adequate for the protection of investors is otherwise required to be included within the registration statement. If any accountant, engineer, or appraiser, or any person whose profession gives authority to a statement made by him, is named as having prepared or certified any part of the registration statement, or is named as having prepared or certified a report or valuation for use in connection with the registration statement, the written consent of such person shall be filed with the registration statement. If any such person is named as having prepared or certified a report or valuation (other than a public official document or statement) which is used in connection with the registration statement, but is not named as having prepared or certified such report or valuation for use in connection with the registration statement, the written consent of such person shall be filed with the registration statement unless the Commission dispenses with such filing as impracticable or as involving undue hardship on the person filing the registration statement. Any such registration statement shall contain such other information, and be accompanied by such other documents, as the Commission may by rules or regulations require as being necessary or appropriate in the public interest or for the protection of investors.

## Section 10(c) of the Securities Act

(c) Any prospectus shall contain such other information as the Commission may by rules or regulations require as being necessary or appropriate in the public interest or for the protection of investors.

App.1261

Copied at the National Archives at Kansas City

Appellate Case: 24-1628　Page: 1266　Date Filed: 03/26/2024 Entry ID: 5377362

## Section 19(a) of the Securities Act

**SEC. 19.** (a) The Commission shall have authority from time to time to make, amend, and rescind such rules and regulations as may be necessary to carry out the provisions of this title, including rules and regulations governing registration statements and prospectuses for various classes of securities and issuers, and defining accounting, technical, and trade terms used in this title. Among other things, the Commission shall have authority, for the purposes of this title, to prescribe the form or forms in which required information shall be set forth, the items or details to be shown in the balance sheet and earning statement, and the methods to be followed in the preparation of accounts, in the appraisal or valuation of assets and liabilities, in the determination of depreciation and depletion, in the differentiation of recurring and nonrecurring income, in the differentiation of investment and operating income, and in the preparation, where the Commission deems it necessary or desirable, of consolidated balance sheets or income accounts of any person directly or indirectly controlling or controlled by the issuer, or any person under direct or indirect common control with the issuer. The rules and regulations of the Commission shall be effective upon publication in the manner which the Commission shall prescribe. No provision of this title imposing any liability shall apply to any act done or omitted in good faith in conformity with any rule or regulation of the Commission, notwithstanding that such rule or regulation may, after such act or omission, be amended or rescinded or be determined by judicial or other authority to be invalid for any reason.

## Securities Act Rule 405(1)

(1) *Material.* The term "material", when used to qualify a requirement for the furnishing of information as to any subject, limits the information required to those matters as to which an average prudent investor ought reasonably to be informed before purchasing the security registered.

## Securities Act Rule 408

§ 230.408  Additional information.

In addition to the information expressly required to be included in a registration statement, there shall be added such further material information, if any, as may be necessary to make the required statements, in the light of the circumstances under which they are made, not misleading.

App. 1262

Copied at the National Archives at Kansas City

Appellate Case: 24-1628     Page: 1267     Date Filed: 03/26/2024 Entry ID: 5377362

(b) A security may be registered on a national securities exchange by the issuer filing an application with the exchange (and filing with the Commission such duplicate originals thereof as the Commission may require), which application shall contain—

(1) Such information, in such detail, as to the issuer and any person directly or indirectly controlling or controlled by, or under direct or indirect common control with, the issuer, and any guarantor of the security as to principal or interest or both, as the Commission may by rules and regulations require, as necessary or appropriate in the public interest or for the protection of investors, in respect of the following:

(A) the organization, financial structure and nature of the business;

(B) the terms, position, rights, and privileges of the different classes of securities outstanding;

(C) the terms on which their securities are to be, and during the preceding three years have been, offered to the public or otherwise;

(D) the directors, officers, and underwriters, and each security holder of record holding more than 10 per centum of any class of any equity security of the issuer (other than an exempted security), their remuneration and their interests in the securities of, and their material contracts with, the issuer and any person directly or indirectly controlling or controlled by, or under direct or indirect common control with, the issuer;

(E) remuneration to others than directors and officers exceeding $20,000 per annum;

(F) bonus and profit-sharing arrangements;

(G) management and service contracts;

(H) options existing or to be created in respect of their securities;

(I) material contracts, not made in the ordinary course of business, which are to be executed in whole or in part at or after the filing of the application or which were made not more than 2 years before such filing, and every material patent or contract for a material patent right shall be deemed a material contract;

(J) balance sheets for not more than the three preceding fiscal years, certified if required by the rules and regulations of the Commission by independent public accountants;

(K) profit and loss statements for not more than the three preceding fiscal years, certified if required by the rules and regulations of the Commission by independent public accountants; and

(L) any further financial statements which the Commission may deem necessary or appropriate for the protection of investors.

(2) Such copies of articles of incorporation, by-laws, trust indentures, or corresponding documents by whatever name known, underwriting arrangements, and other similar documents of, and voting trust agreements with respect to, the issuer and any person directly or indirectly controlling or controlled by, or under direct or indirect common control with, the issuer as the Commission may require as necessary or appropriate for the proper protection of investors and to insure fair dealing in the security.

(3) Such copies of material contracts, referred to in paragraph (1)(I) above, as the Commission may require as necessary or appropriate for the proper protection of investors and to insure fair dealing in the security.

App.1263

Copied at the National Archives at Kansas City

Appellate Case: 24-1628    Page: 1268    Date Filed: 03/26/2024    Entry ID: 5377362

SEC. 13. (a) Every issuer of a security registered pursuant to section 12 of this title shall file with the Commission, in accordance with such rules and regulations as the Commission may prescribe as necessary or appropriate for the proper protection of investors and to insure fair dealing in the security—

(1) such information and documents (and such copies thereof) as the Commission shall require to keep reasonably current the information and documents required to be included in or filed with an application or registration statement filed pursuant to section 12, except that the Commission may not require the filing of any material contract wholly executed before July 1, 1962.

(2) such annual reports (and such copies thereof), certified if required by the rules and regulations of the Commission by independent public accountants, and such quarterly reports (and such copies thereof), as the Commission may prescribe.

Every issuer of a security registered on a national securities exchange shall also file a duplicate original of such information, documents, and reports with the exchange.

SEC. 14. (a) It shall be unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title.

(d) Each issuer which has filed a registration statement containing an undertaking which is or becomes operative under this subsection as in effect prior to the date of enactment of the Securities Acts Amendments of 1964, and each issuer which shall after such date file a registration statement which has become effective pursuant to the Securities Act of 1933, as amended, shall file with the Commission, in accordance with such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, such supplementary and periodic information, documents, and reports as may be required pursuant to section 13 of this title in respect of a security registered pursuant to section 12 of this title. The duty to file under this subsection shall be automatically suspended if and so long as any issue of securities of such issuer is registered pursuant to section 12 of this title. The duty to file under this subsection shall also be automatically suspended as to any fiscal year, other than the fiscal year within which such registration statement became effective, if, at the beginning of such fiscal year, the securities of each class to which the registration statement relates are held of record by less than three hundred persons. For the purposes of this subsection, the term "class" shall be construed to include all securities of an issuer which are of substantially similar character and the holders of which enjoy substantially similar rights and privileges. Nothing in this subsection shall apply to securities issued by a foreign government or political subdivision thereof.

App. 1264

Copied at the National Archives at Kansas City

SEC. 23. (a)(1) The Commission, the Board of Governors of the Federal Reserve System, and the other agencies enumerated in section 3(a)(34) of this title shall each have power to make such rules and regulations as may be necessary or appropriate to implement the provisions of this title for which they are responsible or for the execution of the functions vested in them by this title, and may for such purposes classify persons, securities, transactions, statements, applications, reports, and other matters within their respective jurisdictions, and prescribe greater, lesser, or different requirements for different classes thereof. No provision of this title imposing any liability shall apply to any act done or omitted in good faith in conformity with a rule, regulation, or order of the Commission, the Board of Governors of the Federal Reserve System, other agency enumerated in section 3(a)(34) of this title, any self-regulatory organization, notwithstanding that such rule, regulation, or order may thereafter be amended or rescinded or determined by judicial or other authority to be invalid for any reason.

(2) The Commission, in making rules and regulations pursuant to any provisions of this title, shall consider among other matters the impact any such rule or regulation would have on competition. The Commission shall not adopt any such rule or regulation which would impose a burden on competition not necessary or appropriate in furtherance of the purposes of this title. The Commission shall include in the statement of basis and purpose incorporated in any rule or regulation adopted under this title, the reasons for the Commission's determination that any burden on competition imposed by such rule or regulation is necessary or appropriate in furtherance of the purposes of this title.

(3) The Commission, in making rules and regulations pursuant to any provision of this title, considering any application for registration in accordance with section 19(a) of this title, or reviewing any proposed rule change of a self-regulatory organization in accordance with section 19(b) of this title, keep in a public file and make available for copying all written statements filed with the Commission and all written communications between the Commission and any person relating to the proposed rule, regulation, application, or proposed rule change; *Provided, however,* that the Commission shall not be required to keep in a public file or make available for copying any such statement or communication which it may withhold from the public in accordance with the provisions of section 552 of title 5, United States Code.

App.1265

Copied at the National Archives at Kansas City

(b)(1) A person adversely affected by a rule of the Commission promulgated pursuant to section 6, 11, 11A, 15(c)(5) or (6), 15A, 17, 17A, or 19 of this title may obtain review of this rule in the United States Court of Appeals for the circuit in which he resides or has his principal place of business or for the District of Columbia Circuit, by filing in such court, within sixty days after the promulgation of the rule, a written petition requesting that the rule be set aside.

(2) A copy of the petition shall be transmitted forthwith by the clerk of the court to a member of the Commission or an officer designated for that purpose. Thereupon, the Commission shall file in the court the rule under review and any documents referred to therein, the Commission's notice of proposed rulemaking and any documents referred to therein, all written submissions and the transcript of any oral presentations in the rulemaking, factual information not included in the foregoing that was considered by the Commission in the promulgation of the rule or proffered by the Commission as pertinent to the rule, the report of any advisory committee received or considered by the Commission in the rulemaking, and any other materials prescribed by the court.

(3) On the filing of the petition, the court has jurisdiction, which becomes exclusive on the filing of the materials set forth in paragraph (2) of this subsection, to affirm and enforce or to set aside the rule.

(4) The findings of the Commission as to the facts identified by the Commission as the basis, in whole or in part, of the rule, if supported by substantial evidence, are conclusive. The court shall affirm and enforce the rule unless the Commission's action in promulgating the rule is found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right, power, privilege or immunity; in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; or without observance of procedure required by law.

(5) If proceedings have been instituted under this subsection in two or more courts of appeals with respect to the same rule, the Commission shall file the materials set forth in paragraph (2) of this subsection in that court in which a proceeding was first instituted. The other courts shall thereupon transfer all such proceedings to the court in which the materials have been filed. For the convenience of the parties in the interest of justice that court may thereafter transfer all the proceedings to any other court of appeals.

Securities Exchange Act Rule 12b-20

§ 240.12b-20  Additional information.
In addition to the information expressly required to be included in a statement or report, there shall be added such further material information, if any, as may be necessary to make the required statements, in the light of the circumstances under which they are made not misleading.

App.1266

Copied at the National Archives at Kansas City

Appellate Case: 24-1628    Page: 1271    Date Filed: 03/26/2024    Entry ID: 5377362

Appellate Case: 24-1628    Page: 1272    Date Filed: 03/26/2024    Entry ID: 5377362

§ 240.14a–8  Proposals of security holders.

(a) If any security holder of an issuer notifies the management of the issuer of his intention to present a proposal for action at a forthcoming meeting of the issuer's security holders, the management shall set forth the proposal in its proxy statement and identify it in its form of proxy and provide means by which security holders can make the specification required by Rule 14a–4(b) (17 CFR 240.14a–4(b)). Notwithstanding the foregoing, the management shall not be required to include the proposal in its proxy statement or form of proxy unless the security holder (hereinafter, the "proponent") has complied with the requirements of this paragraph and paragraphs (b) and (c) of this section:

(1) *Eligibility.* At the time he submits the proposal, the proponent shall be a record or beneficial owner of a security entitled to be voted at the meeting on his proposal, and he shall continue to own such security through the date on which the meeting is held. If the management requests documentary support for a proponent's claim that he is a beneficial owner of a voting security of the issuer, the proponent shall furnish appropriate documentation within 10 business days after receiving the request. In the event the management includes the proponent's proposal in its proxy soliciting materials for the meeting and the proponent fails to comply with the requirement that he continuously be a voting security holder through the meeting date, the management shall not be required to include any proposals submitted by the proponent in its proxy soliciting materials for any meeting held in the following two calendar years.

(2) *Notice.* The proponent shall notify the management in writing of his intention to appear personally at the meeting to present his proposal for action. The proponent shall furnish the requisite notice at the time he submits the proposal, except that if he was unaware of the notice requirement at that time he shall comply with it within 10 business days after being informed of it by the management. If the proponent, after furnishing in good faith the notice required by this provision, subsequently determines that he will be unable to appear personally at the meeting, he shall arrange to have another security holder of the issuer present his proposal on his behalf at the meeting. In the event the proponent or his proxy fails, without good cause, to present the proposal for action at the meeting, the management shall not be required to include any proposals submitted by the proponent in its proxy soliciting materials for any meeting held in the following two calendar years.

(3) *Timeliness.* The proponent shall submit his proposal sufficiently far in advance of the meeting so that it is received by the management within the following time periods:

(i) *Annual Meetings.* A proposal to be presented at an annual meeting shall be received by the management at the issuer's principal executive offices not less than 90 days in advance of a date corresponding to the date set forth on the management's proxy statement released to security holders in connection with the previous year's annual meeting of security holders, except that if no annual meeting was held in the previous year or the date of the annual meeting has been changed by more than 30 calendar days from the date of the previous year's annual meeting a proposal shall be received by the management a reasonable time before the solicitation is made.

(ii) *Other Meetings.* A proposal to be presented at any meeting other than an annual meeting shall be received a reasonable time before the solicitation is made.

NOTE.—In order to curtail controversy as to the date on which a proposal was received by the management, it is suggested that proponents submit their proposals by Certified Mail-Return Receipt Requested.

(4) *Number and Length of Proposals.* The proponent may submit a maximum of two proposals of not more than 300 words each for inclusion in the management's proxy materials for a meeting of security holders. If the proponent fails to comply with either of these requirements, or if he fails to comply with the 200-word limit on supporting statements mentioned in paragraph (b) of this section, he shall be provided the opportunity by the management to reduce, within 10 business days, the items submitted by him to the limits required by this rule.

App.1267

Copied at the National Archives at Kansas City

Appellate Case: 24-1628 · Page: 1273 · Date Filed: 03/26/2024 Entry ID: 5377362

(b) If the management opposes any proposal received from a proponent, it shall also, at the request of the proponent, include in its proxy statement a statement of the proponent of not more than 200 words in support of the proposal, which statement shall not include the name and address of the proponent. The statement and request of the proponent shall be furnished to the management at the time that the proposal is furnished, and neither the management nor the issuer shall be responsible for such statement. The proxy statement shall also include either the name and address of the proponent or a statement that such information will be furnished by the issuer or by the Commission to any person, orally or in writing as requested, promptly upon the receipt of any oral or written request therefor. If the name and address of the proponent are omitted from the proxy statement, they shall be furnished to the Commission at the time of filing the management's preliminary proxy material pursuant to Rule 14a–6(a) (17 CFR 240.14a–6(a)).

(c) The management may omit a proposal and any statement in support thereof from its proxy statement and form of proxy under any of the following circumstances:

(1) the proposal is, under the laws of the issuer's domicile, not a proper subject for action by security holders;

NOTE.—A proposal that may be improper under the applicable state law when framed as a mandate or directive may be proper when framed as a recommendation or request.

(2) If the proposal would, if implemented, require the issuer to violate any state law or federal law of the United States, or any law of any foreign jurisdiction, to which the issuer is subject, except that this provision shall not apply with respect to any foreign law compliance with which would be violative of any state law or federal law of the United States;

(3) If the proposal or the supporting statement is contrary to any of the Commission's proxy rules and regulations, including Rule 14a–9 (17 CFR 240.14a–9), which prohibits false or misleading statements in proxy soliciting materials;

(4) If the proposal relates to the enforcement of a personal claim or the redress of a personal grievance against the issuer, its management, or any other person;

(5) If the proposal deals with a matter that is not significantly related to the issuer's business;

(6) If the proposal deals with a matter that is beyond the issuer's power to effectuate;

(7) If the proposal deals with a matter relating to the conduct of the ordinary business operations of the issuer;

(8) If the proposal relates to an election to office;

(9) If the proposal is counter to a proposal to be submitted by the management at the meeting;

(10) If the proposal has been rendered moot;

(11) If the proposal is substantially duplicative of a proposal previously submitted to the management by another proponent, which proposal will be included in the management's proxy materials for the meeting;

(12) If substantially the same proposal has previously been submitted to security holders in the management's proxy statement and form of proxy relating to any annual or special meeting of security holders held within the preceding 5 calendar years, it may be omitted from the management's proxy materials relating to any meeting of security holders held within 3 calendar years after the latest such previous submission:

*Provided,* That—(i) If the proposal was submitted at only one meeting during such preceding period, it received less than 3 percent of the total number of votes cast in regard thereto; or

(ii) If the proposal was submitted at only two meetings during such preceding period, it received at the time of its second submission less than 6 percent of the total number of votes cast in regard thereto; or

(iii) If the proposal was submitted at three or more meetings during such preceding period, it received at the time of its latest submission less than 10 percent of the total number of votes cast in regard thereto; and

(13) If the proposal relates to specific amounts of cash or stock dividends.

(d) Whenever the management asserts, for any reason, that a proposal and any statement in support thereof received from a proponent may properly be omitted from its proxy statement and form of proxy, it shall file with the Commission, not later than 50 days prior to the date the preliminary copies of the proxy statement and form of proxy are filed pursuant to Rule 14a–6(a), or such

A–8

Copied at the National Archives at Kansas City

Appellate Case: 24-1628    Page: 1274    Date Filed: 03/26/2024    Entry ID: 5377362

shorter period prior to such date as the Commission or its staff may permit, five copies of the following items: (1) The proposal; (2) any statement in support thereof as received from the proponent; (3) a statement of the reasons why the management deems such omission to be proper in the particular case; and (4) where such reasons are based on matters of law, a supporting opinion of counsel. The management shall at the same time, if it has not already done so, notify the proponent of its intention to omit the proposal from its proxy statement and form of proxy and shall forward to him a copy of the statement of reasons why the management deems the omission of the proposal to be proper and a copy of such supporting opinion of counsel.

## Securities Exchange Act Rule 14a-9

### § 240.14a-9  False or misleading statements.

(a) No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

(b) The fact that a proxy statement, form of proxy or other soliciting material has been filed with or examined by the Commission shall not be deemed a finding by the Commission that such material is accurate or complete or not false or misleading, or that the Commission has passed upon the merits of or approved any statement contained therein or any matter to be acted upon by security holders. No representation contrary to the foregoing shall be made.

A-9

Copied at the National Archives at Kansas City

Appellate Case: 24-1628      Page: 1275      Date Filed: 03/26/2024      Entry ID: 5377362

*The National Environment Policy Act of 1969*

An Act to establish a national policy for the environment, to provide for the establishment of a Council on Environmental Quality, and for other purposes.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled.* That this Act may be cited as the "National Environmental Policy Act of 1969."

## PURPOSE

Sec. 2. The purposes of this Act are: To declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; to enrich the understanding of the ecological systems and natural resources important to the Nation; and to establish a Council on Environmental Quality.

## TITLE I

*Declaration of National Environmental Policy*

Sec. 101. (a) The Congress, recognizing the profound impact of man's activity on the interrelations of all components of the natural environment, particularly the profound influences of population growth, high-density urbanization, industrial expansion, resource exploitation, and new and expanding technological advances and recognizing further the critical importance of restoring and maintaining environmental quality to the overall welfare and development of man, declares that it is the continuing policy of the Federal Government, in cooperation with State and local governments, and other concerned public and private organizations, to use all practicable means and measures, including financial and technical assistance, in a manner calculated to foster and promote the general welfare, to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and oth-

er requirements of present and future generations of Americans.

(b) In order to carry out the policy set forth in this Act, it is the continuing responsibility of the Federal Government to use all practicable means, consistent with other essential considerations of national policy, to improve and coordinate Federal plans, functions, programs, and resources to the end that the Nation may—

(1) Fulfill the responsibilities of each generation as trustee of the environment for succeeding generations;

(2) Assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings;

(3) Attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences;

(4) Preserve important historic, cultural, and natural aspects of our national heritage, and maintain, wherever possible, an environment which supports diversity, and variety of individual choice;

(5) Achieve a balance between population and resource use which will permit high standards of living and a wide sharing of life's amenities; and

(6) Enhance the quality of renewable resources and approach the maximum attainable recycling of depletable resources.

(c) The Congress recognizes that each person should enjoy a healthful environment and that each person has a responsibility to contribute to the preservation and enhancement of the environment.

Sec. 102. The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this Act, and (2) all agencies of the Federal Government shall—

(A) Utilize a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts in planning and in decisionmaking which may have an impact on man's environment;

App.1270

Copied at the National Archives at Kansas City

Appellate Case: 24-1628    Page: 1276    Date Filed: 03/26/2024    Entry ID: 5377362

(B) Identify and develop methods and procedures, in consultation with the Council on Environmental Quality established by title II of this Act, which will insure that presently unquantified environmental amenities and values may be given appropriate consideration in decisionmaking along with economic and technical considerations;

(C) Include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) The environmental impact of the proposed action,

(ii) Any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) Alternatives to the proposed action,

(iv) The relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) Any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Prior to making any detailed statement, the responsible Federal Official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of title 5, United States Code, and shall accompany the proposal through the existing agency review processes;

(D) Study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources;

(E) Recognize the worldwide and long-range character of environmental problems and, where consistent with the foreign policy of the United States, lend appropriate support to initiatives, resolutions, and programs designed to maximize international cooperation in anticipating and preventing a decline in the quality of mankind's world environment;

(F) Make available to States, counties, municipalities, institutions, and individuals, advice and information useful in restoring, maintaining, and enhancing the quality of the environment;

(G) Initiate and utilize ecological information in the planning and development of resource-oriented projects; and

(H) Assist the Council on Environmental Quality established by title II of this Act.

Sec. 103. All agencies of the Federal Government shall review their present statutory authority, administrative regulations, and current policies and procedures for the purpose of determining whether there are any deficiencies or inconsistencies therein which prohibit full compliance with the purposes and provisions of this Act and shall propose to the President not later than July 1, 1971, such measures as may be necessary to bring their authority and policies into conformity with the intent, purposes, and procedures set forth in this Act.

Sec. 104. Nothing in section 102 or 103 shall in any way affect the specific statutory obligations of any Federal agency (1) to comply with criteria or standards of environmental quality, (2) to coordinate or consult with any other Federal or State agency, or (3) to act, or refrain from acting contingent upon the recommendations or certification of any other Federal or State Agency.

Sec. 105. The policies and goals set forth in this Act are supplementary to those set forth in existing authorizations of Federal agencies.

App.1271

Copied at the National Archives at Kansas City

Section 553(e) of the Administration Procedure Act

(e) Each agency shall give an interested person the right to petition for the issuance, amendment, or repeal of a rule.

Section 553(c) of the Administration Procedure Act

(c) After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation. After consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose. When rules are required by statute to be made on the record after opportunity for an agency hearing, sections 556 and 557 of this title apply instead of this subsection.

Section 555(e) of the Administration Procedure Act

(e) Prompt notice shall be given of the denial in whole or in part of a written application, petition, or other request of an interested person made in connection with any agency proceeding. Except in affirming a prior denial or when the denial is self-explanatory, the notice shall be accompanied by a brief statement of the grounds for denial.

Section 701(a) of the Administration Procedure Act

(a) This chapter applies, according to the provisions thereof, except to the extent that—

(1) statutes preclude judicial review; or

(2) agency action is committed to agency discretion by law.

Rule 4(a) of the Commission's Rules of Practice

(a) *By petition.* Any person desiring the issuance, amendment or repeal of a rule of general application may file a petition therefor with the Secretary of the Commission. Such petition shall include a statement setting forth the text of any proposed rule or amendment desired or specifying the rule, the repeal of which is desired and stating the nature of his interest and his reasons for seeking the issuance, amendment or repeal of the rule. The Secretary shall acknowledge receipt of the petition and refer it to the Commission for such action as the Commission deems appropriate, and shall notify the petitioner of the action taken by the Commission.

Appellate Case: 24-1628    Page: 1277    Date Filed: 03/26/2024    Entry ID: 5377362

App.1272

Copied at the National Archives at Kansas City

No. 24-60109

UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

LIBERTY ENERGY, INC., NOMAD PROPPANT SERVICES L.L.C.,

*Petitioners*,

v.

SECURITIES AND EXCHANGE COMMISSION,

*Respondent*.

SECURITIES AND EXCHANGE COMMISSION'S OPPOSITION TO PETITIONERS' EMERGENCY MOTION FOR ADMINISTRATIVE STAY AND STAY PENDING JUDICIAL REVIEW

MEGAN BARBERO
General Counsel

MICHAEL A. CONLEY
Solicitor

TRACEY A. HARDIN
DANIEL STAROSELSKY
Assistant General Counsels

JOHN R. RADY
Appellate Counsel
Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549
(202) 551-4997 (Rady)

**CERTIFICATE OF INTERESTED PERSONS**

*Liberty Energy Inc. et al. v. SEC*, No. 24-60109

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case.  These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

1.  The Securities and Exchange Commission is a federal agency.

2.  Liberty Energy, Inc.

3.  Nomad Proppant Services L.L.C.

4.  Megan Barbero, Michael A. Conley, Tracey A. Hardin, Daniel Staroselsky, and John R. Rady—*Counsel for Respondent Securities and Exchange Commission.*

5.  Katherine C. Yarger, R. Trent McCotter, Jonathan Berry, Michael Buschbacher, Jared M. Kelson, Caleb Orr—*Counsel for Petitioners*

/s/ John R. Rady

*Attorney of Record for Respondent Securities and Exchange Commission*

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ...................................................... ii

TABLE OF AUTHORITIES ................................................................. iv

INTRODUCTION .......................................................................... 1

BACKGROUND ............................................................................ 2

ARGUMENT .............................................................................. 6

I.      Petitioners' requests for relief are premature. ................................. 6

II.     Petitioners have not shown that a stay is warranted. ...................... 9

        A.      Petitioners are unlikely to succeed on the merits. ............... 9

                1.  The Final Rules are within the Commission's statutory
                    authority. ........................................................ 9

                2.  The Final Rules are consistent with the First Amendment. .......... 14

                3.  Petitioners' APA arguments are meritless. .................... 19

        B.      Petitioners will not be irreparably injured without a stay. ............... 21

        C.      The remaining factors weigh against a stay. ..................... 23

CONCLUSION ........................................................................... 24

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases**                                                                              **Page(s)**

*Alimi v. Ashcroft*,
   391 F.3d 888 (7th Cir. 2004) ............................................................. 6

*Am. Relay League, Inc. v. FCC*,
   524 F.3d 227 (D.C. Cir. 2008) ......................................................... 20

*AMI v. U.S. Dep't of Agric.*,
   760 F.3d 18 (D.C. Cir. 2014) ........................................................... 15

*Anibowei v. Morgan*,
   70 F.4th 898 (5th Cir. 2023) ............................................................ 21

*A. O. Smith Corp. v. FTC*,
   530 F.2d 515 (3d Cir. 1976) ............................................................ 21

*Basic Inc. v. Levinson*,
   485 U.S. 224 (1988) ....................................................................... 10

*BST Holdings, L.L.C. v. OSHA*,
   17 F.4th 604 (5th Cir. 2021) ............................................................ 21

*Bus. Roundtable v. SEC*,
   647 F.3d 1144 (D.C. Cir. 2011) ...................................................... 20

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*,
   447 U.S. 557 (1980) ....................................................................... 18

*Chamber of Com. v. SEC*,
   85 F.4th 760 (5th Cir. 2023) ............................................... 15, 17, 18

*FCC v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009) ....................................................................... 19

*Free Speech Coal. v. Paxton*,
   No. 23-50627, 2024 WL 982225 (5th Cir. Mar. 7, 2024) ................. 16

Appellate Case: 24-1628    Page: 1281    Date Filed: 03/26/2024 Entry ID: 5377362

*Full Value Advisors, LLC v. SEC*,
   633 F.3d 1101 (D.C. Cir. 2011) ........................................................ 15

*Ga. Repub. Party v. SEC*,
   888 F.3d 1198 (11th Cir. 2018) ........................................................ 8

*Lorenzo v. SEC*,
   139 S. Ct. 1094 (2019) ....................................................... 10, 14, 16

*NAACP v. Fed. Power Comm'n*,
   425 U.S. 662 (1976) ......................................................................... 10

*NAM v. SEC*,
   800 F.3d 518 (D.C. Cir. 2015) ................................................... 16, 17

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
   138 S. Ct. 2361 (2018) .............................................................. 16, 17

*Nken v. Holder*,
   556 U.S. 418 (2009) ......................................................................... 23

*Ohralik v. Ohio State Bar Ass'n*,
   436 U.S. 447 (1978) ......................................................................... 15

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
   575 U.S. 175 (2015) ......................................................................... 10

*Pac. Gas & Elec. Co. v. Pub. Utilities Comm'n of Cal.*,
   475 U.S. 1 (1986) ............................................................................. 22

*SEC v. Wall St. Publ'g Inst., Inc.*,
   851 F.2d 365 (D.C. Cir. 1988) ......................................................... 15

*United States v. Phillip Morris USA Inc.*,
   566 F.3d 1095 (D.C. Cir. 2009) ....................................................... 18

*United States v. Wenger*,
   427 F.3d 840 (10th Cir. 2005) ......................................................... 15

*Wages & White Lion Invs., L.L.C. v. FDA*,
   16 F.4th 1130 (5th Cir. 2021) ............................................................ 9

App.1277

Appellate Case: 24-1628   Page: 1282   Date Filed: 03/26/2024 Entry ID: 5377362

*West Gulf Mar. Ass'n v. ILA Deep Sea Local 24*,
  751 F.2d 721 (5th Cir. 1985) ........................................................... 7–8

*West Virginia v. EPA*,
  597 U.S. 697 (2022) ........................................................................... 9

*Zauderer v. Off. of Disciplinary Couns.*,
  471 U.S. 626 (1985) ................................................................... 16, 17

## **Statutes**

Securities Act of 1933, Pub. L. No. 73-22, 48 Stat. 74 .......................... 10

Securities Act of 1933, 15 U.S.C. 77a, et seq.

  Section 2(b), 15 U.S.C. 77b(b) ............................................................ 10

  Section 7(a)(1), 15 U.S.C. 77g(a)(1) ............................................... 2, 10

  Section 9(a) 15 U.S.C. 77*i*(a) ............................................................... 8

  Schedule A, 15 U.S.C. 77aa ................................................................. 2

Securities Exchange Act of 1934, 15 U.S.C. 78a, et seq.

  Section 2, 15 U.S.C. 78b ..................................................................... 10

  Section 3(f), 15 U.S.C. 78c(f) ............................................................. 10

  Section 10(b), 15 U.S.C. 78j(b) ........................................................... 13

  Section 11A(a)(1)(A), 15 U.S.C. 78k-1(a)(1)(A) ............................... 14

  Section 12(b), 15 U.S.C. 78*l*(b) ...................................................... 3, 10

  Section 12(g), 15 U.S.C. 78*l*(g) ...................................................... 3, 10

  Section 13(a), 15 U.S.C. 78m(a) ..................................................... 3, 10

  Section 14(a), 15 U.S.C. 78n(a) .......................................................... 13

  Section 25(c)(2), 15 U.S.C. 78y(c)(2) .................................................. 6

28 U.S.C. 2112(a) .................................................................................... 1

28 U.S.C. 2112(a)(4) ............................................................................... 7

App.1278

Appellate Case: 24-1628    Page: 1283    Date Filed: 03/26/2024 Entry ID: 5377362

## **Rules and Regulations**

17 C.F.R. 240.10b-5 ............................................................................ 13

17 C.F.R. 240.12b-2 ............................................................................ 5

17 C.F.R. 240.14a-9(a) ....................................................................... 13

5th Circuit Rule 27.3 ........................................................................ 7

Federal Rule of Appellate Procedure 18(a)(1) ................................ 6

Federal Rule of Appellate Procedure 18(a)(2)(A) ........................... 6

## **Commission Releases**

*Business and Financial Disclosure Required by Regulation S-K,*
     81 Fed. Reg. 23,916 (Apr. 22, 2016) .............................................. 12

*Environmental and Social Disclosure,*
     40 Fed. Reg. 51,656 (Nov. 6, 1975) ............................................... 12

## **Other Authorities**

EPA Comment on SEC Proposed Rule (June 18, 2022),
     https://www.sec.gov/comments/s7-10-22/s71022-20132508-302990.pdf ....... 13

H.R. Rep. No. 73-1383 (1934) ............................................................ 10

Appellate Case: 24-1628     Page: 1284     Date Filed: 03/26/2024 Entry ID: 5377362

# INTRODUCTION

Petitioners challenge rules adopted by the Securities and Exchange Commission that require the disclosure of certain climate-related information in registration statements and annual reports.  As the Commission explained in adopting the rules, climate-related risks—and a public company's response to those risks—can significantly affect a company's business and financial performance.  The Commission adopted the rules to provide consistent, comparable, and reliable information about these risks and thus to protect investors, promote market efficiency, and facilitate capital formation.  The Commission made it clear that it is agnostic about whether or how registrants consider or manage climate-related risks.

Petitioners seek emergency relief, but their asserted harms are not immediate.  The challenged rules, which have not yet been published in the Federal Register, have extended compliance dates that will not require any disclosures before March 2026 at the earliest.  And there is no reason to rule on petitioners' stay motion now, before the Judicial Panel on Multidistrict Litigation even assigns a court to hear the multiple pending challenges to the rules.  *See* 28 U.S.C. 2112(a).  Indeed, petitioners explain seeking emergency relief by noting that March 16 is the "tenth day after the issuance of the challenged rule." Pet. 1.  That fact does nothing to establish the need for a stay.  And to the extent petitioners intend to urge

this Court to act before venue is determined—in the absence of any immediate harm—the Court should reject such forum shopping.

Even if this Court considers petitioners' premature stay motion, it should be denied.  Petitioners are not likely to succeed on the merits because the rules fit comfortably within the Commission's long-standing authority to require the disclosure of information important to investors in making investment and voting decisions and are consistent with the Commission's prior exercise of that authority. The rules require factual disclosures tailored to each company's facts and circumstances.  A robust record supports the Commission's findings and the Commission's conclusions were both reasonable and reasonably explained.  Nor have petitioners shown that their claimed injuries—which are speculative and remote—outweigh the harm of staying rules that will provide significant benefits to the investing public.

## BACKGROUND

Disclosure of information to facilitate informed investment and voting decisions has been a central pillar of the federal securities laws since their enactment.  *See* Mot. Ex. A ("Final Rules") 59–72.  In the Securities Act of 1933, Congress authorized the Commission to require that issuers offering and selling securities include specified information in their registration statements—such as the general character of the issuer's business and certain financial information—as

Appellate Case: 24-1628     Page: 1286     Date Filed: 03/26/2024 Entry ID: 5377362

well as "such other information … as the Commission may by rules or regulations require as being necessary or appropriate in the public interest or for the protection of investors."  15 U.S.C. 77g(a)(1), 77aa.

Likewise under the Exchange Act, certain issuers must register securities with the Commission by filing a registration statement containing "[s]uch information, in such detail … as the Commission may … require[] as necessary or appropriate in the public interest or for the protection of investors, in respect of" certain topics, including "the organization, financial structure, and nature of the business."  15 U.S.C. 78*l*(b), (g); *see also* 15 U.S.C. 78m(a).

For decades, the Commission has advanced its core mission of protecting investors and facilitating efficient markets by requiring disclosure about risks companies face, including those posed by various environmental matters that affect those companies.  For example, in 1982 the Commission adopted rules requiring disclosure about litigation and business costs stemming from compliance with environmental protection laws.  *See* Final Rules 66–67.  And in 2010, the Commission issued guidance on applying existing disclosure requirements to climate-related risks and their impacts on an issuer's business or financial condition.  *See id.* at 13–14, 66–67.

But as the Commission determined in promulgating the Final Rules, these existing disclosures were inconsistent, fragmented, and difficult for investors to

compare across companies and reporting periods.  *Id.* at 12.  The Commission

accordingly adopted the rules to provide "more complete and decision-useful

information about the impacts of climate-related risks on registrants, improving the

consistency, comparability, and reliability of climate-related information for

investors." *Id.*

The Commission explained that these risks, and a company's response, "can

significantly affect the company's financial performance and position." *Id.* at 10.

And numerous comments from investors and registrants demonstrated that many

investors currently seek this information "so as to inform their investment and

voting decisions." *Id.*  The Commission found that the Final Rules will provide

investors with information that "will assist [them] in making decisions to buy,

hold, sell, or vote securities in their portfolio." *Id.* at 11.

In general terms, the rules require registrants to disclose four categories of

information in certain circumstances.  *See* Final Rules 24–35.

- A registrant must disclose climate-related risks that it determines have
  already or will likely have a material impact on its business, and how
  it considers those impacts as a part of its strategy and financial
  planning.  *Id.* at 853–55 (Item 1502(a)-(d)).

- *If* it has adopted or uses transition plans, scenario analysis, internal
  carbon prices, or climate-related targets and goals, it must disclose
  information about those metrics.  *Id.* at 846–47, 855–58 (Rule
  14-02(e) & (h) of Regulation S-X, Items 1502(e)-(g), 1504)).

- *If* a registrant's board of directors or managers play a role in
  overseeing these material climate risks, it must disclose that role.

4

Registrants must also disclose any processes they have for identifying and managing those risks.  *Id.* at 852–53, 856–57 (Items 1501 & 1503).

- *If* it is a "large accelerated filer" or an "accelerated filer" that is not a "smaller reporting company" or "emerging growth company," *see* 17 C.F.R. 240.12b-2, it must disclose its direct greenhouse gas ("GHG") emissions and indirect GHG emissions from purchased or acquired electricity, steam, heat, or cooling, but only if those emissions are material to investors.  Final Rules 858–67 (Items 1505–06).

The rules also require registrants to make certain disclosures in their audited financial statements regarding the effect of severe weather events and other natural conditions and describe how any estimates or assumptions used to produce their financial statements were materially impacted by these events and conditions.  *Id.* at 843–47 (Article 14 of Regulation S-X).

The Commission adopted "delayed and staggered compliance dates" for the Final Rules that "vary according to the filing status of the registrant."  Final Rules 588.  In no case, however, will any issuer be required to make any disclosures under the rule until 2026.  As a large accelerated filer with a fiscal year beginning on January 1, Mot. Ex. E, ¶¶ 7, 14, Liberty Energy will not be required to comply with any of these rules "until its Form 10-K for fiscal year ended December 31, 2025, due in March 2026."  Final Rules 590.  And it will not be required to disclose GHG emissions until 2027.  *Id.*  Accelerated filers need not make these disclosures until 2027 and 2029, respectively, and non-accelerated filers are not required to make any disclosures until 2028 at the earliest.  *Id.* at 589.

5

**App.1284**

## ARGUMENT

**I.     Petitioners' requests for relief are premature.**

 **A.** Petitioners failed to file a motion with the Commission seeking a stay, as required by Federal Rule of Appellate Procedure 18(a)(1), which provides that "[a] petitioner must ordinarily move first before the agency for a stay pending review of its decision or order." A motion seeking a judicial stay "must" show that moving before the Commission "would be impracticable," or "state that, a motion having been made, the agency denied the motion or failed to afford the relief requested." *Id.* 18(a)(2)(A); *see also* 15 U.S.C. 78y(c)(2). Petitioners' motion should be denied for failing to comply with these requirements.

 Petitioners insist that a comment letter submitted more than 17 months ago sufficed. Mot. 3 n.1. But that letter did not provide the Commission with an opportunity to address specific arguments for a stay of the Final Rules as adopted, including the impact of extended compliance dates. *See Alimi v. Ashcroft*, 391 F.3d 888, 893 (7th Cir. 2004). Nor can petitioners excuse their failure by pointing to counsel's statement (cited Mot. 3 n.1)—made before any motion was filed explaining the claimed basis for a stay—that the Commission would oppose improper and premature relief from this Court.

 **B.** Petitioners' request for relief before the process that Congress established for determining venue is premature. Petitioners ask this Court to rule

Appellate Case: 24-1628     Page: 1290     Date Filed: 03/26/2024 Entry ID: 5377362

by March 16, 2024, Pet. 1, asserting that they must "imminently" prepare internal processes for compliance with the Final Rules, *see* Mot. Ex. E, ¶¶ 14, 16, 24; *id.* Ex. F, ¶ 12.  But petitioners fail to demonstrate that they must take any action before March 16, and they do not identify any other imminent harm that would justify relief by that date.  5th Cir. R. 27.3.  Nor, given the compliance deadlines, could they reasonably do so.

Because petitions for review challenging the Final Rules have been filed in multiple circuits,[1] litigation concerning the Final Rules will soon be consolidated in one court of appeals.  That court will have sufficient time to rule on any preliminary motions.  Petitioners note that Section 2112(a)(4) allows a court to issue an order staying the effective date of an agency action, Mot. 3, which may thereafter be "modified, revoked, or extended," 28 U.S.C. 2112(a)(4).  But such orders may be issued only "to the extent authorized by law."  *Id.*  And, as discussed above, there is no justification for petitioners' request for emergency relief before the multi-circuit lottery occurs.  Because "considerations of comity" require "courts of coordinate jurisdiction and equal rank" to "avoid the waste of duplication" and "avoid rulings which may trench upon the authority of sister courts," this Court should decline to act in this emergency posture.  *West Gulf Mar.*

---

[1] *Ohio Bur. of Workers' Comp. v. SEC*, 24-3220 (6th Cir. Mar. 13, 2024); *Iowa v. SEC*, No. 24-1522 (8th Cir. Mar. 12, 2024); *West Virginia v. SEC*, 24-10679 (11th Cir. Mar. 6, 2024).

App.1286

Appellate Case: 24-1628    Page: 1291    Date Filed: 03/26/2024 Entry ID: 5377362

*Ass'n v. ILA Deep Sea Local 24*, 751 F.2d 721, 728–32 (5th Cir. 1985) (quotation omitted).

    **C.**    Additional venue concerns also militate against the early relief petitioners seek. Absent a showing by either petitioner that it is both a "person aggrieved" by the Final Rules and "resides" or has its "principal place of business" in the Fifth Circuit, 15 U.S.C. 77*i*(a), this Court may not adjudicate this petition. *See Ga. Repub. Party v. SEC*, 888 F.3d 1198, 1205 (11th Cir. 2018). Neither petitioner can make such a showing.

    Liberty Energy is subject to the Final Rules but does not claim to reside or have its principal place of business in this circuit. Nomad Proppant Services claims its principal place of business is in Texas, Pet. 3, but it is not required to make any disclosures under the Final Rules. Petitioners attempt to establish Nomad's standing by generally asserting that compliance with the Final Rules will require Liberty Energy to "investigate" Nomad to meet its own obligations, Mot. Ex. E, ¶ 32; *see id.* Ex. F, ¶ 10. But the assertion that the Final Rules will necessarily impose any costs on Nomad fundamentally misunderstands the rules' operation.

    The Final Rules require a description of climate-related risks "that have materially impacted or are reasonably likely to have a material impact on *the registrant*." Final Rules 853 (Item 1502(a)) (emphasis added). Because the

Appellate Case: 24-1628    Page: 1292    Date Filed: 03/26/2024 Entry ID: 5377362

"registrant" here is Liberty Energy, petitioners are incorrect that the Final Rules will require Nomad to "begin reporting [its] climate-related risks."  Mot. Ex. F, ¶ 11.  Nor do the rules necessarily require Liberty Energy to report Nomad's GHG emissions.  The Final Rules provide a registrant with the discretion to choose its organizational boundaries to calculate its emissions metrics, so long as it "describe[s] the method used to determine those boundaries."  Final Rules 252, 860 (Item 1505(b)(1)).

## II.    Petitioners have not shown that a stay is warranted.

Petitioners meet none of the stay requirements.  They are unlikely to succeed on the merits, there is no imminent irreparable harm, and the balance of the equities does not favor the imposition of such extraordinary relief.  *See Wages & White Lion Invs., L.L.C. v. FDA*, 16 F.4th 1130, 1135 (5th Cir. 2021).

### A.    Petitioners are unlikely to succeed on the merits.

#### 1.    The Final Rules are within the Commission's statutory authority.

Petitioners' argument (at 7–21) that the Final Rules violate the major-questions doctrine fails because the rules are authorized by the plain text of the federal securities laws and consistent with longstanding interpretations of the Commission's authority under those provisions.  *See West Virginia v. EPA*, 597 U.S. 697, 724 (2022).

9

The Commission's organic statutes authorize it to require certain companies to disclose—in connection with public offerings and periodic reports—not only certain enumerated information, but also other information that the Commission "may … require as being necessary or appropriate in the public interest or for the protection of investors."  15 U.S.C. 77g(a)(1); *see also* 15 U.S.C. 78*l*(b) & (g), 78m(a).  Read in the context of the enumerated disclosures and the objectives of the Securities Act and the Exchange Act, *see NAACP v. Fed. Power Comm'n*, 425 U.S. 662, 669–70 (1976), these provisions authorize the Commission to ensure that public company disclosures provide investors with not just "balance-book" information (*contra* Mot. 13–15), but with information important to making informed investment and voting decisions.  *See, e.g.*, *Lorenzo v. SEC*, 139 S. Ct. 1094, 1103 (2019); *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 178 (2015); *Basic Inc. v. Levinson*, 485 U.S. 224, 230 (1988); Securities Act of 1933, Pub. L. No. 73-22, 48 Stat. 74, 74 (preamble); 15 U.S.C. 78b; H.R. Rep. No. 73-1383, at 6–7 (1934).  Such disclosure facilitates the securities laws' core objectives of protecting investors, facilitating capital formation, and promoting market efficiency.  *See, e.g.*, 15 U.S.C. 77b(b), 78c(f).

Relying on the authority that Congress provided in the Securities Act and the Exchange Act, the Commission has amended its disclosure requirements dozens of times over the last 90 years based on its reasoned determination that the required

information, including disclosures about material risks, would be important to investment and voting decisions.  *See* Final Rules 62–67.  And, here, evidence before the Commission strongly supported the findings that "climate-related risks can affect a company's business and its financial performance and position in a number of ways," and that investors "expressed the need for more reliable information about the effects of climate-related and other severe weather events or other natural conditions on issuers' businesses, as well as information about how registrants have considered and addressed climate-related risks when conducting operations and developing business strategy and financial plans." *Id.* at 67.  This was underscored by the fact that many investors, including some with hundreds of billions of dollars invested, are already using information regarding climate-related risks to inform their investment and voting decisions and many registrants voluntarily provide such information. *See, e.g.*, *id.* at 641–43.  Responding to investors' needs, the Final Rules provide "more reliable and decision-useful disclosure of strategies and risks that a registrant has determined will likely materially impact its business, results of operations, or financial condition."  Final Rules 67–68.

Contrary to petitioners' claim (Mot. 9), the Commission has never disclaimed statutory authority to require disclosure of the type of information required by the Final Rules.  While the Commission has declined to require

disclosure of "public policy and sustainability matters," "political spending," or various types of "social information" or "social practices," *see Business and Financial Disclosure Required by Regulation S-K*, 81 Fed. Reg. 23,916, 23,970 (Apr. 22, 2016); *Environmental and Social Disclosure*, 40 Fed. Reg. 51,656, 51,656 (Nov. 6, 1975), as discussed above, pp. 3, 10–11, *supra*, it has required certain disclosures related to environmental matters that impact registrants for decades. And it has further exercised its statutory authority to require disclosures regarding risks facing registrants on numerous occasions. *See* Final Rules 63–65. Consistent with that approach, the Commission here did not "consider the promotion of social goals unrelated to the objectives of the federal securities laws." 81 Fed. Reg. at 23,971. Rather, it promulgated the Final Rules to facilitate informed investment and voting decisions. For similar reasons, petitioners are wrong in arguing that the Commission claimed the authority to "demand almost anything [it] wants" or to require disclosure "just for disclosure's sake," Mot. 13, 15.

Petitioners ignore the Commission's clear explanation in the release when they assert that the Final Rules purport to "resolve one of today's most hotly debated political issues." Mot. 9 (quotation omitted). The Commission emphasized that it adopted the rules to protect investors, promote market efficiency, and to facilitate capital formation, "not to address climate-related issues

more generally," and that the Commission "has been and remains agnostic about whether or how registrants consider or manage climate-related risks." Final Rules 18–19.

For the same reasons, petitioners are incorrect that the Final Rules involve matters outside of the Commission's "core competencies." Mot. 9–10 (quotations omitted). Petitioners note that the Environmental Protection Agency requires certain disclosures related to GHG emissions, Mot. 10–12, but the EPA's Greenhouse Gas Reporting Program and the Final Rules "have different statutory authorizations and purposes, regulate different entities, collect different information, and would use that data in different ways." EPA Comment on SEC Proposed Rule (June 18, 2022).[2]

Finally, petitioners incorrectly claim that the Commission may only require disclosure of "information that is *actually* material to the particular company." Mot. 15. Although a material misrepresentation or omission is an element of certain antifraud claims under the Exchange Act and Commission rules, *see* 15 U.S.C. 78j(b), 78n(a); 17 C.F.R. 240.10b-5, 240.14a-9(a), the word "material" is nowhere to be found in the provisions granting the Commission authority to require disclosures. Rather, the "fundamental purpose" of the securities laws is substituting "a philosophy of full disclosure for the philosophy of caveat emptor,"

---

[2] https://www.sec.gov/comments/s7-10-22/s71022-20132508-302990.pdf.

13

**App.1292**

*Lorenzo*, 139 S. Ct. at 1103, not just the disclosure of information that, if omitted, would be sufficient to state a securities fraud claim.

Petitioners' argument that the rules' materiality limits are illusory (Mot. 18–20) misunderstands the operation of certain provisions of the Final Rules, most prominently disclosures related to GHG emissions. Large accelerated filers are not required to disclose such emissions whenever they "face[] climate-change transition risk," Mot. 18 (quotation omitted), but rather are required to do so only "if such emissions are material." Final Rules 859 (Item 1505(a)(1)). And the Commission did not "effectively deem[] materiality triggered when a company faces climate-change transition risk," Mot. 18 (quotation omitted). In fact, there are circumstances in which those emissions would not be material despite such a risk, as the Commission explained: "the fact that a registrant is exposed to a material transition risk does not necessarily result in its … emissions being de facto material to the registrant." Final Rules 246–47.

### 2. The Final Rules are consistent with the First Amendment.

Nor are petitioners likely to succeed on their First Amendment claim. Mot. 24–27. Congress has deemed the securities markets "an important national asset which must be preserved and strengthened." 15 U.S.C. 78k-1(a)(1)(A). The Commission, therefore, "has a substantial interest through the securities laws in making capital markets more open and efficient" by giving "all investors equal

14

**App.1293**

access to all relevant information." *United States v. Wenger*, 427 F.3d 840, 850–51 (10th Cir. 2005); *Chamber of Com. v. SEC*, 85 F.4th 760, 771 (5th Cir. 2023) ("The SEC has a legitimate interest in promoting the free flow of commercial information." (citation omitted)).  Here, the Commission reasonably found that the Final Rules ensure that investors have access to consistent, comparable information important to their investment and voting decisions, and tailored the rules to serve those interests. *See* Final Rules 72.  The resulting disclosures survive scrutiny.

Petitioners invoke a concurring opinion's statement in a different context that "consumer curiosity alone is not a strong enough state interest to sustain a compelled commercial disclosure."  Mot. 26 (citing *AMI v. U.S. Dep't of Agric.*, 760 F.3d 18, 33 (D.C. Cir. 2014) (Kavanaugh, J., concurring)).  But the strong evidence before the Commission of investor need for, and use of, information regarding climate-related risks belies the notion that the Final Rules simply sate curiosity.  Moreover, courts have long recognized that securities regulation "involves a different balance of concerns and calls for different applications of First Amendment principles." *Full Value Advisors, LLC v. SEC*, 633 F.3d 1101, 1109 (D.C. Cir. 2011) (quotation omitted); *see also Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 456 (1978); *SEC v. Wall St. Publ'g Inst., Inc.*, 851 F.2d 365, 373 (D.C. Cir. 1988).  And the disclosure of important, decision-useful information

15

Appellate Case: 24-1628     Page: 1299     Date Filed: 03/26/2024 Entry ID: 5377362

furthers Congress's "basic purpose … to substitute a philosophy of full disclosure for the philosophy of caveat emptor." *Lorenzo*, 139 S. Ct. at 1103.

Petitioners erroneously assert that the Final Rules require "disclosure of political issues under the guise of disclosure requirements" and are therefore subject to strict scrutiny. Mot. 24 (citing *NAM v. SEC*, 800 F.3d 518 (D.C. Cir. 2015)). This argument mischaracterizes the disclosures required under the Final Rules for the reasons discussed above. The disclosures are not "an *integral* part of a live, contentious political or moral debate." *Free Speech Coal. v. Paxton*, No. 23-50627, 2024 WL 982225, at *14 (5th Cir. Mar. 7, 2024) (emphasis added).

Moreover, *National Institute of Family & Life Advocates v. Becerra* ("*NIFLA*"), 138 S. Ct. 2361 (2018), does not dictate the application of strict scrutiny to all disclosure requirements that do not fall within two narrowly construed categories, as petitioners argue. Mot. 24. *NIFLA* held that less-stringent review under *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 650 (1985), did not apply to a regulation that required pregnancy clinics to deliver a "government-drafted" message that was unrelated to their services and fundamentally at odds with their mission. 138 S. Ct. at 2371–72. But the Court did not purport to narrow or overrule prior cases "appl[ying] a lower level of scrutiny to laws that compel disclosures in certain contexts." *Id*. at 2372. Nor did

Appellate Case: 24-1628    Page: 1300    Date Filed: 03/26/2024 Entry ID: 5377362

it decide that disclosures that fall outside of *Zauderer*'s ambit are subject to strict scrutiny. *Id*. at 2375.

Petitioners also contend that *NIFLA* requires strict scrutiny because "climate change in general is a politically charged matter." Mot. 24. But the rules require disclosure not about climate change, but about material climate-related *risks* and impacts that companies face. Nor does *NIFLA* say that every factual statement about a potentially controversial issue is necessarily controversial. *Chamber of Com.*, 85 F.4th at 770.

The Final Rules require the disclosure of factual, non-controversial information in the context of commercial speech, and thus merit less stringent *Zauderer* review. Unlike in *NAM*, companies subject to the Final Rules are not required to utter any government-dictated language, much less language that conveys "moral responsibility" or an "ethical[] taint[]." 800 F.3d at 530. Companies themselves determine, for example, if they are subject to material climate-related risks, whether any targets or goals they have set have a material effect on their business, and whether certain GHG emissions are material. If, and only if, they so determine, companies then disclose factual information regarding those impacts. *See* Final Rules 853–61 (Items 1501–05). Moreover, the Final Rules do not force companies to take a side in the climate debate by "expressly demand[ing] that companies '[d]escribe the board of directors' oversight of

Appellate Case: 24-1628    Page: 1301    Date Filed: 03/26/2024 Entry ID: 5377362

climate-related risks.'"  Mot. 25.  In fact, *no* disclosure of any board oversight is required if companies do not already engage in such oversight.

Petitioners similarly misdescribe the Final Rules in asserting that the required disclosures are controversial because they somehow favor so-called "green" companies.  Mot. 25.  Depending on the circumstances, the scenario petitioners posit—the potential loss of subsidies for "green technology"—might require disclosures, for example if a registrant adopted a transition plan based on such subsidies.  *See* Final Rules 855 (Item 1502(e)).

Even if the intermediate scrutiny for commercial speech described in *Central Hudson Gas & Electric Corp. v. Public Service Commission*, 447 U.S. 557, 566 (1980), were to apply, the Final Rules would withstand scrutiny because they "are 'narrowly tailored' to achieve a substantial government goal."  *United States v. Phillip Morris USA Inc.*, 566 F.3d 1095, 1143 (D.C. Cir. 2009) (quotations omitted).  This Court's recent decision in *Chamber of Commerce* forecloses petitioners' argument that the disclosures do not implicate commercial speech.  85 F.4th at 770–71.  Although petitioners suggest that the rules are insufficiently tailored (Mot. 27), the rules minimize any potential impact on the registrant's pre-existing practices or views by triggering disclosures based on decisions registrants have already made in managing their business—in many

instances requiring disclosure only if the registrant has already decided to utilize certain metrics, targets, goals, or courses of business.

### 3. Petitioners' APA arguments are meritless.

The Final Rules are reasonable, reasonably explained, and supported by a robust record.

As discussed, the Final Rules are consistent with the Commission's historical understanding of its authority and therefore there is no "switch in its position" on this point requiring an explanation. *Contra* Mot. 22 (citing *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)). And the Commission thoroughly explained its rationale for expanding the disclosures as compared with the status quo. *E.g.*, Final Rules 13–14.

The Commission also reasonably concluded—based upon "dozens of articles" (Mot. 22) that studied tens of thousands of issuers—that the academic literature shows a "well-established link between climate-related risks and firm fundamentals." Final Rules 646. Petitioners selectively quote a footnote that they claim "admits" that there are "'contradictory empirical results' regarding 'climate-related risks and asset prices.'" Mot. 23. In fact, the Commission found "contradictory" evidence about a single issue: "stock returns and carbon emissions." Final Rules 648 n.2745. That single study does not detract from the Commission's finding that, "[c]ollectively," the research indicates that "disclosures

19

about climate-related risks, when they are made, become priced into the value of a firm." *Id.* at 649. This is a far cry from the Commission failing to make "tough choices" or relying "exclusively and heavily upon two relatively unpersuasive studies." *Bus. Roundtable v. SEC*, 647 F.3d 1144, 1150–51 (D.C. Cir. 2011) (cited at Mot. 22–23).

Petitioners are on no firmer ground in arguing that the Rules are unlawful because the "vast majority" of the cited articles "were never mentioned in the proposed rule." Mot. 22–23. The only example of such a cite (Mot. 23) was provided during the notice-and-comment period by a commenter who was *critical* of the proposal. Final Rules 646–47 n.2737. Far from crediting that article, the Commission identified its "limitations"—including, as petitioners agree, that the article did not "specifically address climate risk but instead looked only at 'social issues more generally.'" Mot. 23 (quoting Final Rules 647 n.23). Further, that article was publicly available, and the agency did not base its conclusion on redacted, staff-prepared studies available "only to the agency." *Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 237 (D.C. Cir. 2008) (cited at Mot. 23).

Finally, the Rules do not mandate "highly subjective and speculative" disclosures. Mot. 23. To the contrary, registrants must make "objective" determinations about climate-related risks (Final Rules 106), and the Commission

20

"confirm[ed] that the final rules do not require registrants to speculate in their disclosures" (Final Rules 197).  *See also id.* at 106 n.383, 584.

### B.    Petitioners will not be irreparably injured without a stay.

To demonstrate irreparable harm, petitioners must demonstrate both a "significant threat of injury from the impending action" and that "the injury is imminent." *Anibowei v. Morgan*, 70 F.4th 898, 902 (5th Cir. 2023).  Petitioners have not made either showing.

The Final Rules will not require Liberty Energy to make any disclosures until 2026 at the earliest, and many of the disclosures will not be required until 2027 or later.  *See* Final Rules 588–92.  Anticipatory efforts to comply with regulations that are not effective and require no disclosures for years do not demonstrate irreparable harm.  *See A. O. Smith Corp. v. FTC*, 530 F.2d 515, 527 (3d Cir. 1976).  This case thus stands in sharp contrast to the sole case petitioners cite (Mot. 27), *BST Holdings, L.L.C. v. OSHA*, 17 F.4th 604 (5th Cir. 2021), which focused on the "immediate and irreversible" effects of a mandate to develop and implement COVID-19 vaccination and testing policies within 30 or 60 days: the "liberty interests of reluctant individual recipients to put a choice between their job(s) and their jab(s)," the "effects of a lost or suspended employee," "compliance and monitoring costs," the "diversion of resources," or the possibilities of penalties.  *Id.* at 618.

App.1300

Appellate Case: 24-1628    Page: 1305    Date Filed: 03/26/2024 Entry ID: 5377362

Petitioners also claim they will imminently suffer First Amendment harms because their boards will be "forced to engage in the climate-change dialogue." Mot. 28. But nothing in the Final Rules requires boards to engage in any public debates about climate change. Rather, the rules focus on identifying material climate-related risks to the company and the impacts those risks have or will likely have on its business. *See, e.g.*, Final Rules 850 (defining climate-related risk), 853–54 (Item 1502). And the rules require disclosure of board oversight of climate-related risks only if that oversight already occurs. *Id.* at 168–69 (rules do not seek to "influence registrants' decisions about how to manage climate-related risk" and instead "focus on disclosure of registrants' existing or developing climate-relate risk governance practices"), 852 (Item 1501(a)). Even if the rules required the board to engage in some discussion, a corporation does not suffer First Amendment harm when its board is required to engage in internal dialogue about an issue. Indeed, the Supreme Court has distinguished regulations that burden a "right to freely … speak to the public at large" from those that "define how corporations govern themselves," which instead "govern speech by a corporation to *itself*." *Pac. Gas & Elec. Co. v. Pub. Utilities Comm'n of Cal.*, 475 U.S. 1, 15 n.10 (1986). Finally, even if there were a colorable First Amendment harm—which there is not—petitioners have not shown that it is imminent.

22

Appellate Case: 24-1628    Page: 1306    Date Filed: 03/26/2024 Entry ID: 5377362

**C.**     **The remaining factors weigh against a stay.**

Petitioners' speculative and remote assertions of harm do not outweigh the injuries to the government and public interest—which merge in this context, *see Nken v. Holder*, 556 U.S. 418, 435 (2009)—that a stay would cause. The information provided by the Final Rules "will enable investors to better assess material risks in climate-related reporting and facilitate comparisons across firms and over time." Final Rules 646. These informational benefits will also "improve liquidity and reduce transaction costs for investors … and may lower firms' cost of capital." *Id.* at 649. Investors will still make decisions on whether to buy or sell securities or vote on matters based on the risks implicated by the Final Rules even if they are delayed, but they will not have benefit of the information the rules provide.

23

## CONCLUSION

For these reasons, a stay should be denied.

Respectfully submitted,

MEGAN BARBERO
General Counsel

MICHAEL A. CONLEY
Solicitor

TRACEY A. HARDIN
DANIEL STAROSELSKY
Assistant General Counsels

/s/ John R. Rady
JOHN R. RADY
Appellate Counsel
Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549
(202) 551-4997 (Rady)

March 13, 2024

24

## CERTIFICATE OF COMPLIANCE

I certify that this opposition complies with the type-volume limitation of 5th Cir. Rule 27.4 and Fed. R. App. P. 27(d)(2) because it contains 5,153 words, excluding the parts exempted by Fed. R. App. P. 27(a)(2)(B).

I also certify that this opposition complies with the typeface requirements of Fed. R. App. P. 27(d)(1)(E) and 32(a)(5) and the type-style requirements of Fed. R. App. P. 27(d)(1)(E) and 32(a)(6) because it has been prepared in a proportionally spaced typeface—Times New Roman, 14 point—using Microsoft Word.

/s/ John R. Rady
John R. Rady

March 13, 2024



State of California
## Office of the Attorney General

### ROB BONTA
*ATTORNEY GENERAL*

June 17, 2022

<u>**VIA ELECTRONIC SUBMISSION**</u>

Vanessa A. Countryman
Secretary
Securities and Exchange Commission
100 F Street NE
Washington, DC 20549-1090

RE:     <u>The Enhancement and Standardization of Climate-Related Disclosures for Investors,
Release Nos. 33-11042, 34-94478; File No. S7-10-22</u>

Dear Secretary Countryman:

On behalf of the undersigned Attorneys General, we submit this letter in response to the Securities and Exchange Commission's ("SEC") proposed rule, titled *The Enhancement and Standardization of Climate-Related Disclosures for Investors*, File Number S7-10-22 ("Proposed Rule"). Many of the undersigned Attorneys General wrote in support of climate-related disclosures in a June 14, 2021 comment letter to the SEC ("June 2021 Attorney General Letter").[1] We write again to support the Proposed Rule, which will ensure that investors have specific, comparable disclosures about publicly-registered companies' climate-related risks and impacts. We provide general comments supporting the Proposed Rule, as well as responses to specific requests for comment.

## I.     SUMMARY

We write in support of the Proposed Rule not only for the protection of our state residents who invest their retirement savings, college funds, and life savings, but also for the benefit of states as investors that safeguard the pensions under their control. With the Proposed Rule, the SEC has offered a solution to the long-standing and critical problem of registered companies

---

[1] Letter from Rob Bonta, Cal. Atty. Gen., et al., to Gary Gensler, Chair, SEC (June 14, 2021), https://www.sec.gov/comments/climate-disclosure/cll12-8915221-244800.pdf ("Atty. Gen. Letter").

facing material climate-related impacts to their business operations that are not transparent to investors.

The physical risks and impacts of climate change already threaten registered companies and their operations. Extreme weather events caused or exacerbated by climate change, such as hurricanes, wildfires, extreme heat, and extreme drought, have caused a number of material and costly impacts on company operations. As those events increase in intensity and frequency, their effects on companies will only grow. To head off the worst climate change outcomes, as well as to mitigate the unavoidable effects, governments at all levels are already regulating to reduce greenhouse gas ("GHG") emissions and to bolster climate resilience. Those transition risks are not a future hypothetical; registered companies face those risks and are incurring related costs right now. The Proposed Rule's mandatory disclosures are necessary to ensure investors, and the market broadly, can price in those risks.

Investors have been clear that for their decision-making they need specific, comparable disclosures about climate-related risks, as well as about registered companies' management of those risks. In the absence of a mandatory disclosure regime, investors have been left to piece together climate-related information from a variety of sources that does not allow them to meaningfully compare companies. They are also vulnerable to the effects of greenwashing,[2] which the Proposed Rule promises to address through its mandatory disclosures. In short, we believe the Proposed Rule is well-structured to deliver to investors what they need to make informed investment decisions.

The Proposed Rule falls well within the SEC's statutory authority, in light of these circumstances and given the impact that climate-related disclosures will have on market stability, which underpins capital formation and investor protection. The Proposed Rule's mandatory disclosures address harmful informational imbalances to protect investors, markets, and the third parties that rely on market efficiency.[3]

We encourage the SEC to consider strengthening the Proposed Rule in the final regulations to ensure a sufficiently robust disclosure regime. We have the following specific recommendations: 1) define certain undefined terms; 2) require smaller reporting companies ("SRCs") that have adopted transition plans with "Scope 3" greenhouse gas ("GHG") emissions reductions to report on those emissions; 3) require all registered companies to have independent

---

[2] For purposes of this comment letter, we consider "greenwashing" to be the exaggeration of climate change-addressing and/or environmentally friendly actions, as well as the obscuring of climate change-causing and/or environmentally harming actions, with the goal of appealing to investors. *See* Miriam Cherry, *The Law & Econ. of Corp. Social Responsibility & Greenwashing*, 14 UCDBLJ 281, 284-87 (2014) (attempting to define "greenwashing"); *see also* SEC, *Prop. Rule: Enhanced Disclosures by Certain Inv. Advisors & Inv. Cos. About Env'l, Social, & Governance Inv. Practices* 8 (May 25, 2022) (describing greenwashing in context of investment funds).

[3] Notably, in addition to investors, Congress explicitly sought to protect third parties who rely on market efficiency in their operations (such as lenders that use securities as collateral) through the Securities Act of 1933 ("Securities Act") and the Securities Exchange Act of 1934 ("Exchange Act").

attestations for their "Scope 1" and "Scope 2" GHG emissions disclosures; and 4) shorten the compliance dates.

We appreciate the work and thought that the SEC put into the Proposed Rule, and we support its adoption.

## II.  GENERAL COMMENTS

### A.  States Have an Interest in Registered Companies Making the Climate-Related Disclosures the SEC Has Proposed.

We support adoption of the Proposed Rule for the benefits it will provide to the vast numbers of our states' residents who rely on investment savings. As of 2019, approximately 53% of U.S. households had stock holdings with a per-household average value of $371,390.[4] Many state residents rely on investment plans for college savings, as evidenced by the approximately 13.8 million 529 plan accounts holding just under $400 billion.[5] A significant portion of Americans have investments through their health savings accounts ("HSAs"), with 25 million HSAs and $10 billion in investments in those accounts as of 2018.[6] Fifty-six percent of U.S. workers participate in employer-sponsored retirement savings, such as public and private pensions and 401(k) plans.[7] A significant percentage of U.S. households—37%—have individual retirement accounts ("IRAs").[8] In total, approximately 75% of all non-retired adults have at least some retirement savings, which are likely to constitute a significant portion of their future retirement income.[9]

---

[4] Fed. Rsrv., *Survey of Consumer Fin.*, Stock Holdings by All Families (2019), https://www.federalreserve.gov/econres/scf/dataviz/scf/table/#series:Stock_Holdings;demographic:all;population:all;units:have.

[5] Inv. Co. Inst., *529 Plan Program Stat., Dec. 2020* (Mar. 23, 2021), https://www.ici.org/research/stats/529s/529s_20_q4.

[6] Devenir Rsch., *2018 Year-End Devenir HSA Rsch. Rep.* (Feb. 27, 2019), https://www.devenir.com/research/2018-year-end-devenir-hsa-research-report/.

[7] Bureau of Lab. Stat., *Nat'l Comp. Surv.: Emp. Benefits in the U.S., Mar. 2021* 4 (Sept. 2021), https://www.bls.gov/ncs/ebs/benefits/2021/employee-benefits-in-the-united-states-march-2021.pdf.

[8] Inv. Co. Inst., *ICI Rsch. Persp.: The Role of IRAs in U.S. Households' Sav. for Ret., 2020* 1 (Jan. 2021), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3789270#:~:text=In%20mid-2020%2C%2037%20percent%20of%20US%20households%20owned,plan%20accumulations%20or%20had%20defined%20benefit%20plan%20coverage.

[9] Fed. Rsrv., *Rep. on the Econ. Well-Being of Ams. in 2020* (May 2021), https://www.federalreserve.gov/publications/2021-economic-well-being-of-us-households-in-2020-retirement.htm ("Fed. Rrv. Am. Well-Being Report"). Current retirees already rely on retirement savings, with 68% of current retirees receiving income from pensions. Retiree income from pensions and retirement accounts constitute at least 17% of total income for individuals 65 years and older. *Id.*; *see also* Daniel Thompson & Michael D. King, *U.S. Census Bur., Income Sources of Older Households: 2017* 6-7 (Feb. 2022), https://www.census.gov/content/dam/Census/library/publications/2022/demo/p70br-177.pdf.

The Proposed Rule, if adopted, will benefit states' residents by ensuring more transparency about registered companies' exposure to climate-related risks over both the short- and long-term. That transparency, in turn, will allow investors to more accurately price those risks and thereby improve market efficiency.[10] The Proposed Rule's disclosures will also allow investors to more effectively diversify their portfolios.[11] States will benefit from the Proposed Rule's impacts, as more efficient markets and better informed investors will likely result in improved financial outcomes for our residents. Those better financial outcomes will have tangible benefits for states by maintaining or increasing tax revenue from successful investment plans.[12]

The Proposed Rule's benefits will redound to states in another way: states are themselves investors. Our public pension funds having significant holdings in registered companies and stand to benefit from the Proposed Rule's mandatory climate-related disclosures. Among the undersigned states, for example, Oregon has $21.3 billion invested, Massachusetts has $95.7 billion invested, New York State has $136 billion invested, and California has $336 billion

---

[10] Create & BNY Mellon Inv. Mgmt., *Future 2024: Future-Proofing Your Asset Allocation in the Age of Mega Trends* 4 (2019), https://www.bnymellonim.com/uploads/2019/09/9d78652e263adc2110ae32f544157770/bny-mellon-full-report-future-24-whitepaper.pdf (93% of institutional investors in survey "regard climate change as an investment 'risk' that has yet to be priced in by all the key financial markets globally"); CFTC, *Managing Clim. Risk in the U.S. Fin. Sys.: Rep. of the Clim.-Related Mkt. Risk Subcomm., Mkt. Risk Advisory Comm. of the U.S. CFTC* 87 (Sept. 2020), https://www.cftc.gov/sites/default/files/2020-09/9-9-20%20Report%20of%20the%20Subcommittee%20on%20Climate-Related%20Market%20Risk%20-%20Managing%20Climate%20Risk%20in%20the%20U.S.%20Financial%20System%20for%20posting.pdf ("comprehensive climate disclosure" allows investors to "better assess a more refined measure of the long-term cost of capital, as well as risks to firms, margins, cash flow and valuations") ("CFTC Report").

[11] Mercer, *Inv. in a Time of Clim. Change* 7 (2015), https://www.ifc.org/wps/wcm/connect/news_ext_content/ifc_external_corporate_site/news+and+events/news/climate-change-to-affect-investment-returns; Fred Wellington & Amanda Sauer, Ceres & World Resources Inst., *Framing Clim. Risk in Portfolio Mgmt.* 3 (May 2005), https://www.wri.org/framing-climate-change-risk-portfolio-management.

[12] John Waggoner, Am. Ass'n of Retired People, *12 States that Won't Tax Your Ret. Distribs.*, AARP.org (Mar. 29, 2022), https://www.aarp.org/money/taxes/info-2020/states-that-dont-tax-retirement-distributions.html (thirty-eight states tax retirement distributions in some form). When retirement income is insufficient, states often step in to protect residents with social safety net programs. *See* N.Y. State Assemb., Comm. on Aging, *2020 Ann. Rep.* 2 (Dec. 15, 2021), https://nyassembly.gov/comm/?id=1&sec=story&story=100691 ($143 million for services for elderly residents); State of California, *Cal. State Budget: 2021-2022* 85-88 (2021), https://ebudget.ca.gov/2021-22/pdf/Enacted/BudgetSummary/FullBudgetSummary.pdf ($233 million for services for elderly residents); D.C., Dep't of Aging & Cmty. Living, *Fiscal Year 2021 Budget* 1 (2020), https://cfo.dc.gov/sites/default/files/dc/sites/ocfo/publication/attachments/by_dacl_chapter_2021a.pdf ($53 million for services for elderly residents).

invested through their respective pension programs.[13]  And those pension funds have articulated
their need for the climate-related information the Proposed Rule will require.[14]

### B.   Physical and Economic Impacts from Climate Change Are Already Occurring and Will Increase as Climate Change Accelerates.

Fifteen years ago, the U.S. Supreme Court stated that "the harms associated with climate
change are serious and well-recognized."[15]  Two years later, the Environmental Protection
Agency ("EPA") determined that greenhouse gases endanger public health and welfare by
significantly contributing to global warming.[16]  Since that time, the scientific evidence has
become only more concrete that climate change is already occurring and will accelerate unless
GHG emissions are dramatically reduced.

The 2022 report from the United Nations' Intergovernmental Panel on Climate Change
("IPCC") was blunt: "Human-induced climate change, including more frequent and intense
extreme events, has caused widespread adverse impacts and related losses and damages to nature

---

[13] *See* Ore. Inv. Council, *Ore. Pub. Emp. Ret. Fund Monthly Rep.* (Apr. 2022),
https://www.oregon.gov/treasury/invested-for-oregon/Documents/Invested-for-OR-Performance-and-Holdings/2022/OPERF-04302022.pdf; N.Y. State & Local Ret. Sys., *2020 Comprehensive Ann. Fin. Rep. for Fiscal Year Ended Mar. 31, 2021* 90 (Sept. 30, 2021),
https://www.osc.state.ny.us/files/retirement/resources/pdf/comprehensive-annual-financial-report-2021.pdf; Mass. Pension Rsrv. Inv. Trust Fund, *Ann. Comprehensive Fin. Rep. for Fiscal Year 2021* 4
(Dec. 2021), https://www.mapension.com/wp-content/uploads/2021/12/ACFR_Fiscal_Year_2021.pdf;
Cal. Pub. Emp. Ret. Sys., *PERF Monthly Update*, https://www.calpers.ca.gov/docs/perf-monthly-update.pdf (Apr. 30, 2022); Cal. State Tchr. Ret. Sys., *Inv. Portfolio*, https://www.calstrs.com/investment-portfolio#:~:text=Investment%20Portfolio%20%20%20Asset%20%20,%20%201.41%25%20%206%20more%20rows%20 (Apr. 30, 2022).

[14] *See, e.g.*, Letter from Marcie Frost, CEO, Cal. Pub. Empl. Ret. Sys. to Vanessa Countryman,
Secretary, SEC (June 12, 2021), https://www.sec.gov/comments/climate-disclosure/cll12-8916192-245002.pdf ("CalPERS Letter"); Letter from Scott Stringer, N.Y.C. Comptroller to Vanessa Countryman,
Secretary, SEC (June 14, 2021), https://www.sec.gov/comments/climate-disclosure/cll12-8916910-245044.pdf ("N.Y.C. Comptroller Letter"); Letter from Thomas DiNapoli, N.Y. State Comptroller to
Vanessa Countryman, Secretary, SEC (June 8, 2021), https://www.sec.gov/comments/climate-disclosure/cll12-8895795-241275.pdf ("N.Y. State Comptroller Letter"); Letter from Tobias Read, Ore.
State Treasurer to Vanessa Countryman, Secretary, SEC (June 3, 2021),
https://www.sec.gov/comments/climate-disclosure/cll12-8882891-240188.pdf ("Ore. State Treasurer
Letter").

[15] *Mass. v. EPA*, 549 U.S. 497, 521 (2007).

[16] 74 Fed. Reg. 66,496 (Dec. 15, 2009). EPA's determination was upheld by the D.C. Circuit, and
the Supreme Court denied petitions for review of that decision in 2012. *Coal'n for Responsible Reg. v.
EPA*, 684 F.3d 102 (D.C. Cir. 2012), cert. denied in relevant part, 571 U.S. 951 (2013).

and people, beyond natural climate variability."[17]  The IPCC's assessment is supported by data showing that the number and intensity of extreme weather events has increased over the last several decades. According to the National Oceanic and Atmospheric Administration's ("NOAA") calculations, in 2021, there were twenty extreme weather disasters that had economic costs of $1 billion or more, a significant increase from an average of 3.1 events per year in the 1980s.[18]  The average cost per year from these climate disasters has significantly increased, even when adjusted for inflation: the average cost per year in the 1980s was $19.5 billion; the average cost per year in the 2010s was $89.2 billion; and the cost in 2021 was $148 billion.[19]

The economic impacts from the changing climate go beyond the primarily physical economic costs that NOAA calculates.[20]  Wildfires, for example, often result not only in massive costs from physical destruction, but also in considerable healthcare costs from the impact of wildfire smoke on respiratory and cardiovascular health. In 2017, the EPA estimated that for wildfires between 2008 and 2012, the short-term exposure healthcare costs were $63 billion and the long-term exposure healthcare costs were $450 billion (both in 2016 dollars).[21]  Those numbers have likely grown in the ensuing decade as the number and size of wildfires has increased.[22]  Chronic weather events, like drought and increased heat, similarly have impacts that reverberate through the U.S. economy, including from higher healthcare costs, reduced labor

---

[17] IPCC, *Clim. Change 2022: Impacts, Adapt. & Vulner'y Summ. for Pol'ymakers* 11 (2022), https://www.ipcc.ch/report/ar6/wg2/downloads/report/IPCC_AR6_WGII_SummaryForPolicymakers.pdf ("IPCC 2022 Clim. Change Impacts Report").

[18] NOAA, *Billion-Dollar Weather & Clim. Disasters*, Nat'l Ctrs. for Env't Info. (2021), https://www.ncdc.noaa.gov/billions/summary-stats.  NOAA defines "weather and climate disasters" as drought, flooding, freeze, severe storm, tropical cyclone, wildfire, and winter storm.

[19] *Id.*; *see also* Jessica Whitt & Scott Gordon, Barclays, *Gloomy Forecast: The Econ. Costs of Extreme Weather* (May 4, 2022), https://www.cib.barclays/our-insights/extreme-weather/The-economic-costs-of-extreme-weather.html ("While extreme events have increased more than five times over the same number of decades, our Research analysts note the cost of extreme events has increased nearly eight times globally, inflation-adjusted, since the 1970s.").

[20] NOAA's calculations include "physical damage to residential, commercial, and municipal buildings; material assets (content) within buildings; time element losses such as business interruption or loss of living quarters; damage to vehicles and boats; public assets including roads, bridges, levees; electrical infrastructure and offshore energy platforms; agricultural assets including crops, livestock, and commercial timber; and wildfire suppression costs, among others."  NOAA, *Billion-Dollar Weather & Clim. Disasters: Overview*, https://www.ncei.noaa.gov/access/monitoring/billions/ (last visited May 23, 2022). They do not include "natural capital or environmental degradation; mental or physical healthcare related costs, the value of a statistical life (VSL); or supply chain, contingent business interruption costs." *Id.*

[21] EPA, *Rsch. Shows Health Impacts & Econ. Costs of Wildland Fires* (Sept. 28, 2017), https://www.epa.gov/sciencematters/research-shows-health-impacts-and-economic-costs-wildland-fires.

[22] Nat'l Interagency Fire Ctr., *Wildfires & Acres*, https://www.nifc.gov/fire-information/statistics/wildfires (last visited May 23, 2022).

Appellate Case: 24-1628     Page: 1315     Date Filed: 03/26/2024 Entry ID: 5377362

productivity, and crop failures.[23]  In this context, the physical impacts of climate change have a range of economic consequences for registered companies, from destruction and damage at their facilities, to increased insurance or self-insurance costs, to added energy expenses, to diminishment of worker health, safety, and productivity, to adverse macroeconomic conditions that threaten market demand and stability.[24]  In short, climate change is here, and so are its economic impacts.

The physical and economic impacts of climate change will worsen in the coming years, even if societies take further, dramatic actions to reduce GHG emissions. The IPCC's 2022 report made clear: "Global warming, reaching 1.5°C in the near-term, would cause unavoidable increases in multiple climate hazards and present multiple risks to ecosystems and humans (very high confidence)."[25]  Capping global warming at 1.5°C will require momentous changes to reduce GHG emissions, and every degree over 1.5°C will result in far more destructive acute and chronic weather events.[26]  In light of the IPCC's projections about the impacts of climate change on human health, municipal infrastructure, and climate-related displacement, the economic impacts from future climate change are expected to be staggering.[27]  Investors need information about whether and how registered companies are managing these enormous risks.

**C.    As Governments at All Levels Address Climate Change, New Regulations and Policies, as well as Related Technological and Market Transformations, Present Risks for Registered Companies.**

Climate change also poses transition risks, which arise from policy, technology, market, and reputational changes as part of the move toward a low-carbon economy as well as legislation and regulation to mitigate the effects of climate change.[28]  These changes present substantial risks for registered companies as their operations may face new costs and economic impacts from GHG emissions reduction requirements, clean energy mandates, and related market shifts.

---

[23] Atl. Council, *Extreme Heat: The Econ. & Soc. Conseq. for the U.S.* 2 (Aug. 2021), https://www.atlanticcouncil.org/wp-content/uploads/2021/08/Extreme-Heat-Report-2021.pdf ("Extreme heat-related labor productivity losses already affect all regions and sectors of the US economy."); EPA, *Clim. Change Indicators: Heat Waves*, https://www.epa.gov/climate-indicators/climate-change-indicators-heat-waves (last visited May 23, 2022); Dale Manning, et al., *An Analysis of the Impact of Drought on Agric., Local Econ., Pub. Health, & Crime Across the W. U.S.* 2 (Sept. 2021), https://www.drought.gov/sites/default/files/2021-09/Analysis-Drought-Impacts-Western-US-September2021.pdf ("Prolonged drought has a negative and statistically significant impact on corn, hay, sorghum and wheat production.").

[24] *See generally* CFTC Report at 25-39; Task Force on Clim.-Related Fin. Discl. ("TCFD"), *Final Rep.: Recomms. of the Task Force on Clim.-Related Fin. Discl.* 10 (2017) ("TCFD Recommendations"), https://tinyurl.com/5m9ncwa2.

[25] IPCC 2022 Clim. Change Impacts Report at 17.

[26] *Id.* at 16.

[27] *Id.* at 17.

[28] *See* TCFD Recommendations at 5-6.

Transition risks from policy changes at all levels, from the international to the municipal, are already occurring and are likely to continue.

### 1. State and Municipal Policy

States are dramatically changing the regulatory landscape through legislation and regulation that, among other things, require significant reductions in GHG emissions; create incentives for low- and zero-emission industries, products, and services; and mandate that the permitting of major facilities take into account physical risks from climate change.

Over the past few years, a growing number of states have passed legislation requiring economy-wide GHG emissions reductions between 80 to 100 percent (thereby virtually eliminating such emissions) by 2045 to 2050.[29] Over half of U.S. states have already released climate action plans, detailing high-level approaches to meeting GHG and clean energy targets, as well as laying out strategies to increase clean energy, energy efficiency, and climate resilience.[30] To meet these targets, states are implementing—and will continue to implement—new suites of regulations to achieve target reductions. These proposed regulations include, for example, sector-specific GHG emissions reduction requirements.[31] Similarly, California, as well

---

[29] *See* Colo. Clim. Action Plan to Reduce Pollution, H.B. 19-1261 (2019), http://leg.colorado.gov/sites/default/files/2019a_1261_signed.pdf (requiring 50% reduction in statewide GHG emissions by 2030, 90% reduction in statewide GHG emissions by 2050); Act Concerning Conn. Global Warming Solutions, 2008 Conn. Acts 98 (Reg. Sess.), https://www.cga.ct.gov/2008/ACT/PA/2008PA-00098-R00HB-05600-PA.htm (80% GHG emissions reduction by 2050); 2021 Mass. Acts. Ch. 8 §§ 8–10, https://malegislature.gov/Laws/SessionLaws/Acts/2021/Chapter8 (net zero economy-wide GHG emissions by 2050); Clim. Solutions Now Act of 2022, 2022 Md. Laws Ch. 38, https://mgaleg.maryland.gov/2022RS/Chapters_noln/CH_38_sb0528e.pdf (net-zero GHG emissions by 2045); New Jersey Global Warming Response Act, N.J. Stat. Ann. § 26:2C-37 *et seq.* (West 2007), https://www.nj.gov/dep/aqes/docs/gw-responseact-07.pdf (reduce GHG emissions by 80% by 2050); N.Y. Env't. Conserv. Law § 75-0107 (McKinney 2020), https://www.nysenate.gov/legislation/laws/ENV/75-0107 (reduce GHG emissions by 85% from 1990 levels by 2050); 42 R.I. Gen. Laws § 42-6.2-9 (West 2021), webserver.rilin.state.ri.us/Statutes/TITLE42/42-6.2/42-6.2-9.htm (achieve net-zero emissions by 2050); Wash. Rev. Code § 70A.45.020 (2020), https://apps.leg.wa.gov/rcw/default.aspx?cite=70A.45.020#:~:text=RCW%2070A.45.020%20Greenhouse%20gas%20emissions%20reductions%20%E2%80%94%20Reporting,achieve%20the%20following%20emission%20reductions%20for%20Washington%20state%3A (reduce overall GHG emissions in the state by 95% from 1990 levels by 2050).

[30] Ctr. For Clim. & Energy Solutions, *State Clim. Policy Maps* (May 5, 2022), https://www.c2es.org/content/state-climate-policy/; *see also, e.g.*, Mont. Clim. Solutions Council, *Mont. Clim. Solutions Plan* (Aug. 2020), https://deq.mt.gov/files/DEQAdmin/Climate/2020-09-09_MontanaClimateSolutions_Final.pdf; Ore. Exec. Order No. 20-04, *Directing State Agencies to Take Actions to Reduce & Regulate GHG Emissions ("Ore. Clim. Action Plan")* (2020), https://www.oregon.gov/gov/Documents/executive_orders/eo_20-04.pdf.

[31] *See, e.g.*, Mass. Exec. Off. of Energy & Env't Affairs, *Mass. Clean Energy & Clim. Plan for 2025 & 2030* (Dec. 30, 2020), https://www.mass.gov/doc/interim-clean-energy-and-climate-plan-for-2030-december-30-2020/download (proposing regulatory and other strategies for each major sector of

as seventeen other states, have adopted stringent emissions caps for light-duty vehicles,[32] and California, Oregon, and Washington have adopted standards that require fuel producers to reduce the carbon intensity of their fuels.[33]

Many states are working to rapidly decarbonize the electric sector. New York and Oregon have passed laws requiring that their states' entire electricity sector be free of carbon in less than two decades, by 2040.[34] New Jersey Governor Murphy issued an executive order in 2018 directing the completion of a 2019 Energy Master Plan that provides a comprehensive blueprint to convert New Jersey's energy production profile to 100% clean energy sources by 2050.[35] Thirty-eight states and the District of Columbia have adopted renewable portfolio standards, which are "designed to increase the use of renewable energy sources for electricity generation."[36]

Multiple states now operate in carbon cap and trade markets, which further impact markets and make climate disclosures critical. The states of Connecticut, Delaware, Maine, Maryland, Massachusetts, New Hampshire, New Jersey, New York, Pennsylvania, Rhode Island, Vermont, and Virginia participate in the Regional Greenhouse Gas Initiative ("RGGI") to "cap and reduce $CO_2$ emissions from the power sector."[37] California operates an economy-wide cap and trade program for GHG emissions.[38] Washington's new Climate Commitment Act

---

economy to move toward 2050 net-zero GHG emissions target); Cal. Exec. Order N-79-20 (Sept. 2020), https://www.gov.ca.gov/wp-content/uploads/2020/09/9.23.20-EO-N-79-20-Climate.pdf (setting goal of zero sales of combustion engine vehicles in California by 2035).

[32] Cal. Air Res. Bd., *Advanced Clean Cars Prog.* (last visited June 3, 2022), https://ww2.arb.ca.gov/our-work/programs/advanced-clean-cars-program; Cal. Air. Res. Bd., *States That Have Adopted Cal.'s Veh. Stds. Under Section 177 of the Fed. Clean Air Act* (May 13, 2022), https://ww2.arb.ca.gov/sites/default/files/2022-05/%C2%A7177_states_05132022_NADA_sales_r2_ac.pdf

[33] Cal. Air Res. Bd., *Low Carbon Fuel Std.* (last visited June 3, 2022), https://ww2.arb.ca.gov/our-work/programs/low-carbon-fuel-standard/about; Wash. Dep't of Ecology, *Clean Fuel Std.*, (last visited June 3, 2022), https://ecology.wa.gov/Air-Climate/Climate-change/Reducing-greenhouse-gases/Clean-Fuel-Standard; Ore. Dep't of Env'l Quality, *Clean Fuels Program Overview* (last visited June 3, 2022), https://www.oregon.gov/deq/ghgp/cfp/Pages/CFP-Overview.aspx.

[34] Press Release, State of Ore., *Gov. Kate Brown Signs Clean Energy Bills, Sets Goal for 100% Clean Energy by 2040* (July 27, 2021), https://www.oregon.gov/newsroom/pages/newsdetail.aspx?newsid=64162.

[35] N.J. Exec. Order No. 28 (May 23, 2018) https://www.nj.gov/infobank/eo/056murphy/pdf/EO-28.pdf.

[36] U.S. Energy Info. Admin., *Renewable Energy Explained: Portfolio Stds* (last visited June 3, 2022), https://www.eia.gov/energyexplained/renewable-sources/portfolio-standards.php.

[37] *See* Reg'l GHG Initiative, https://www.rggi.org/ (last visited May 24, 2022).

[38] Cal. Air Res. Bd., *Cap-and-Trade Program* (2022), https://ww2.arb.ca.gov/our-work/programs/cap-and-trade-program/about.

establishes a "cap-and-invest" program that sets a cap on all entities that emit at least 25,000 metric tons of greenhouse gases per year, and then distributes a declining number of emissions allowances to those entities each year.[39] Revenue generated by this program will go to the state's climate mitigation and adaptation efforts, including electrification of public transit.[40]

Heavily emitting companies face increasing competitive disadvantages as state government incentives and investments move to climate-friendly businesses. For example, Connecticut (like many other states) offers rebates for the purchase or lease of zero-emitting vehicles[41] and offers rebates and favorable financing for home energy upgrades.[42] Similarly, Delaware offers tax incentives for businesses and industry to transition away from high-emitting refrigerants, such as hydrofluorocarbons.[43]

In addition to laws requiring GHG emissions reduction, states have begun to mandate that permitting entities consider the physical risks of climate change when deciding whether to issue (or renew) facility permits. For example, New York requires consideration of threats from sea-level rise, flooding,[44] and severe weather to facilities in its environmental permitting requirements.[45] Connecticut requires flood and disaster analysis in permitting some kinds of

---

[39] *See* Wash. Rev. Code § 70A.65 *et seq.* (2021); *see also* Wash. Dep't Ecol., *Clim. Commitment Act* (last visited May 24, 2022), https://ecology.wa.gov/Air-Climate/Climate-change/Reducing-greenhouse-gases/Climate-Commitment-Act; David Roberts, *Wash. State Now Has the Nation's Most Ambitious Clim. Pol'y*, Canary Media (May 6, 2022), https://www.canarymedia.com/articles/policy-regulation/washington-state-now-has-the-nations-most-ambitious-climate-policy ("Roberts, *Wash. State Now Has the Nation's Most Ambitious Clim. Pol'y*").

[40] Roberts, *Wash. State Now Has the Nation's Most Ambitious Clim. Pol'y.*

[41] Conn. Dep't of Energy & Env't Prot., *Elec. Vehicle & Charging Equip. Incentives* (Feb. 16, 2022), https://portal.ct.gov/DEEP/Air/Mobile-Sources/EVConnecticut/EVConnecticut---Incentives#:~:text=The%20Connecticut%20Hydrogen%20and%20Electric,cell%20electric%20vehicle%20(EV).

[42] Energize Conn., *List of Fin. Options* (last visited May 24, 2022), https://www.energizect.com/your-home/solutions-list/home-energy-solutions-core-services.

[43] Press Release, Del. Dep't Nat. Res. & Env't Control, *DNREC to Launch Refrigerant Incentive Program* (Feb. 24, 2020), https://news.delaware.gov/2020/02/24/dnrec-to-launch-refrigerant-incentive-program/.

[44] 6 N.Y. Comp. R. & Regs. tit 6, § 502.2 (2021).

[45] Section 17-b of the recently-passed Climate Leadership and Community Protection Act ("CLCPA") provides that "major permits for the regulatory programs of . . . the Environmental Conservation Law shall require applicants to demonstrate that future physical climate risk has been considered. In reviewing such information, [DEC] may require the applicant to mitigate significant risks to public infrastructure and/or services, private property not owned by the applicant, adverse impacts on disadvantaged communities, and/or natural resources in the vicinity of the project." S. 6599 (New York 2019).

hazardous waste facilities.[46]  New Jersey is developing regulations pursuant to an executive order that will require certain major facilities to prepare climate resiliency plans that evaluate mitigation measures to prevent accidents resulting from climate change.[47]  Connecticut, New Hampshire, and Oregon have state-level hazard mitigation elements in state land-use planning legislation.[48]  A majority of states (32 in total) have either optional or mandatory hazard-mitigation components in state or local land-use planning legislation,[49] and 14 states require natural hazard planning to be integrated into local comprehensive plans (include collecting data on or mapping disaster-prone areas).[50]

Like states, municipalities throughout the country are adopting ambitious GHG emissions reduction policies, laws, and regulations. New York City, for example, has committed to citywide GHG emissions reduction of 40 percent by 2030 and 80 percent by 2050.[51]  In pursuit of that goal, the city requires most buildings over 25,000 square feet to meet energy efficiency

---

[46] Dep't Emergency Servs. & Pub. Prot., *2019 Conn. Nat. Hazards Mitigation Plan Update*, Dep't Energy & Env't Prot. 429 (Jan. 2019), https://portal.ct.gov/-/media/DEMHS/_docs/Plans-and-Publications/EHSP0023--NaturalHazardMitPlan.pdf; *see Hazardous Waste Facility*, CT.GOV (June 2017), https://portal.ct.gov/DEMHS/Emergency-Management/Resources-For-Officials/Hazard-Mitigation.

[47] *See* N.J. Exec. Order No. 100 (Jan. 27, 2020), ¶ 1.c, https://nj.gov/infobank/eo/056murphy/pdf/EO-100.pdf (directing the New Jersey Department of Environmental Protection to adopt regulations protecting against climate threats, including by "integrat[ing] climate change considerations, including sea level rise, into its regulatory and permitting programs.").

[48] Am. Plan. Ass'n, *Survey of State Land Use & Nat. Hazards Laws* 7 (2017), https://planning-org-uploaded-media.s3.amazonaws.com/publication/download_pdf/Survey-of-State-Land-Use-and-Natural-Hazards-Planning-Laws.pdf.

[49] *Id.*

[50] *See, e.g.*, Ore. Rev. Stat. § 197.230(c)(H), *Id.* §§ 455.447(1)(a)-(e), 455.447(4) & Ore. Admin. R. 660-015-0000(7) (requiring natural hazard analysis considering floods (both coastal and riverine), landslides, earthquakes and related hazards, tsunamis, coastal erosion, and wildfires and recommending local governments identify and plan for other natural hazards when siting facilities storing hazardous materials); Cal. Gov. Code § 65302(g)(1) (explicitly contemplating risks from climate change in land use planning); Haw. Rev. Stat. § 226-13(b)(5) (same); Wash. Rev. Code Ann. §§ 36.70.330, 36.70A.070(1), (5)(c)(iv), 365-196-445 (recommending counties and cities "give strong consideration" to including several additional elements, including "natural hazard reduction," in their plans); Utah Code Ann. § 79-3-202(1); Idaho Code Ann. § 67-6508 (g); Ariz. Rev. Stat. Ann. § 9-461.05 (E)(8); Vt. Stat. Ann., tit. 24, § 4382(a)(12)(A) (considering risks stemming from flooding); Md. Code Ann., Land Use §§ 3-102(a)(1)(vi) a, § 3-102(b)(iii); Va. Code Ann. §§ 15.2-2223.2, 15.2-2223.3, 15.2-2223.2 (requiring local consideration of sea level rise and flooding in coastal areas); Conn. Gen. Stat. Ann. § 8-23(d) (same); N.C. Gen. Stat. Ann. § 113A-110 (same); S.C. Code Ann. § 163.3178 (same).

[51] N.Y.C., N.Y., Local Law 97 (Apr. 2019), https://www1.nyc.gov/assets/buildings/local_laws/ll97of2019.pdf.

Appellate Case: 24-1628      Page: 1320      Date Filed: 03/26/2024 Entry ID: 5377362

and GHG emissions limits by 2024, with stricter limits imposed in 2030.[52]  In Massachusetts, the Green Communities Act authorizes towns and cities to be designated "Green Communities" if they commit to various municipal energy efficiency and emissions reduction targets.[53]  The overwhelming majority of municipalities in the Commonwealth have opted into this program, with some now clamoring for a net-zero building code option.[54]  And multiple jurisdictions, including Washington State, New York City, and the City of Berkeley, have banned natural gas hookups in new construction in an effort to transition away from use of those fuels.[55]

As these examples reflect, states and municipalities have already taken concrete regulatory and legislative steps to address climate change, and those steps are having and will continue to have impacts on registered companies.

### 2.  Federal Policy

Within the United States, the federal government is also acting to reduce emissions in ways that will impact registered companies. In May 2021, President Biden issued an executive order acknowledging "the global shift away from carbon-intensive energy sources and industrial processes" and directing the development of a "comprehensive, Government-wide" climate risk financial strategy for a net-zero economy by 2050.[56]  This executive order reinforces the low-carbon future signaled by the United States having rejoined the Paris Agreement[57] and the

---

[52] *See* N.Y.C. Sustainable Blds., *Local Law 97* (last visited May 24, 2022), https://www1.nyc.gov/site/sustainablebuildings/ll97/local-law-97.page.

[53] *See* Green Cmties. Div., Mass. Dep't of Energy Res., *Becoming a Designated Green Cmty.*, Mass.gov, https://www.mass.gov/guides/becoming-a-designated-green-community, (last visited May 24, 2022).

[54] *See* Energy Efficiency Div., Mass. Dep't of Energy Res., *Stretch Energy Code Dev. 2022*, Mass.gov, https://www.mass.gov/info-details/stretch-energy-code-development-2022 (last visited May 24, 2022).

[55] David Iaconangelo, *Bldg. Codes: The New Natural Gas Battlefront?*, Energy Wire (May 3, 2022), https://www.eenews.net/articles/building-codes-the-new-natural-gas-battlefront/; Emma Newburger, *N.Y.C. Is Banning Natural Gas Hookups for New Bldgs. to Fight Clim. Change*, CNBC (Dec. 15, 2021), https://www.cnbc.com/2021/12/15/new-york-city-is-banning-natural-gas-hookups-for-new-buildings.html; City of Berkeley, *Green Bldg. Reqts.*, https://berkeleyca.gov/construction-development/permits-design-parameters/design-parameters/green-building-requirements (last visited May 24, 2022).

[56] Exec. Order No. 14,030, 86 Fed. Reg. 27,967 (May 25, 2021), https://www.whitehouse.gov/briefing-room/presidential-actions/2021/05/20/executive-order-on-climate-related-financial-risk/.

[57] Antony J. Blinken, *The U.S. Officially Rejoins the Paris Agmt.*, U.S. Dep't of State (Feb. 19, 2021), https://www.state.gov/the-united-states-officially-rejoins-the-paris-agreement/.

International Energy Agency's dramatic net-zero transition framework,[58] among other developments.

The United States has introduced several new regulations over the last year to address climate change and as part of its obligations under the Paris Climate Agreement,[59] including restrictions on hydrofluorocarbon and methane emissions; stricter federal standards on GHG emissions for light-duty vehicles starting with model year 2023; and explicitly permitting ERISA plan administrators to consider environmental, social, and governance ("ESG") factors in selecting retirement plan funds.[60] The federal government has also "significantly reformed" its oil and gas leasing program, including by reducing leasable acreage and increasing the royalty rate for new competitive leases.[61] In addition, Congress passed an infrastructure bill last year that includes billions in funds to improve the climate resiliency of American infrastructure.[62]

### 3. International Policy

In response to climate change, the international community has adopted policies that, if successful, will result in "nothing less than a complete transformation of how we produce, transport, and consume energy."[63] Legislation and regulation advancing those goals are likely to increase costs for some companies, reduce demand for high-emission products and services, and

---

[58] *See generally* Int'l Energy Agency, *Net Zero by 2050: A Roadmap for the Glob. Energy Sector* 13 (2021), https://www.iea.org/reports/net-zero-by-2050 ("IEA Roadmap Report").

[59] The U.S. recently submitted its "Nationally Determined Contribution," which outlines how the U.S. will reduce its GHG emissions in line with the goals of the Paris Climate Agreement. *See* U.S., *The U.S. Nat'l Determined Contrib.* 1, 6 (2021), https://www4.unfccc.int/sites/ndcstaging/PublishedDocuments/United%20States%20of%20America%20First/United%20States%20NDC%20April%2021%202021%20Final.pdf.

[60] *See* 86 Fed. Reg. 55,116 (Oct. 5, 2021) (final rule mandating phasedown of hydrofluorocarbon emissions through an allowance-trading program); 86 Fed. Reg. 63,110 (Nov. 15, 2021) (proposed federal standards limiting methane pollution from oil and gas sector sources); 86 Fed. Reg. 74,434 (Feb. 28, 2022) (final rule increasing stringency of limits on greenhouse gas emissions from light-duty vehicles for 2023 and later model years); 86 Fed. Reg. 57,272 (Oct. 14, 2021) (proposed rule allowing ERISA fiduciaries to consider ESG factors in plan selection).

[61] U.S. Dep't of Int., *Int. Dep't Announces Significantly Reformed Onshore Oil & Gas Lease Sales* (April 15, 2022), https://www.doi.gov/pressreleases/interior-department-announces-significantly-reformed-onshore-oil-and-gas-lease-sales.

[62] Coral Davenport & Christopher Flavelle, *Infrastr. Bill Makes First Major U.S. Inv. in Clim. Resilience*, N.Y. Times (Nov. 6, 2021), https://www.nytimes.com/2021/11/06/climate/infrastructure-bill-climate.html; The White House, *Fact Sheet: The Bipartisan Infrastr. Deal* (Nov. 6, 2021), https://www.whitehouse.gov/briefing-room/statements-releases/2021/11/06/fact-sheet-the-bipartisan-infrastructure-deal/.

[63] IEA Roadmap Report.

diminish available capital.[64]  These regulatory changes—and shifting market expectations around them—are likely to trigger asset re-pricing, write-offs, and impairments, as well as early retirement of existing facilities—all of which impact registered companies and the value of their securities.

Broadly, the warming limits in the 2015 Paris Climate Agreement effectively necessitate global GHG emissions to reach net zero by 2050.[65]  The 2021 Glasgow Climate Change Conference resulted in new global agreements on emissions reductions, climate change adaptation, and regulations regarding carbon-emissions credit trading.[66]  To meet these targets, national and supranational governments are increasingly legislating, regulating, and investing toward a low- and zero-carbon future.

At the supranational level, the European Union ("EU") is moving aggressively to address climate change. In June 2021, the EU adopted the European Climate Law, which creates a framework for the EU to reach net-zero carbon emissions by 2050.[67]  This was followed in July 2021 by an ambitious package of proposed changes to the EU's climate, energy, transport and taxation policies.[68]  Among these, the EU adopted a proposal for a Carbon Border Adjustment Mechanism that would impose fees on imports from countries with less aggressive climate-mitigation policies.[69]

---

[64] *See* Kenneth Gillingham, *Carbon Calculus*, Int'l Monetary Fund Fin. & Development (Dec. 2019), https://www.imf.org/Publications/fandd/issues/2019/12/the-true-cost-of-reducing-greenhouse-gas-emissions-gillingham#:~:text=The%20short%2Dterm%20cost%20of,various%20ways%20of%20reducing%20emissions; CDP, *Transparency to Transformation: A Chain Reaction, CDP Global Supply Chain Rep. 2020* 4 (Feb. 2019), https://cdn.cdp.net/cdp-production/cms/reports/documents/000/005/554/original/CDP_SC_Report_2020.pdf?1614160765.

[65] U.N. Framework Convention on Clim. Change ("UNFCCC"), *Adoption of the Paris Agmt., U.N. Doc. FCC/CP/2015/L.9/Rev.1* (Dec. 12, 2015), https://unfccc.int/process-and-meetings/the-paris-agreement/the-paris-agreement; IEA Roadmap Report.

[66] UNFCCC, *COP26 Reaches Consensus on Key Actions to Address Clim. Change* (Nov. 13, 2021), https://unfccc.int/news/cop26-reaches-consensus-on-key-actions-to-address-climate-change; *The Glasgow Clim. Pact, Annotated*, Wash. Post (Nov. 13, 2021), https://www.washingtonpost.com/climate-environment/interactive/2021/glasgow-climate-pact-full-text-cop26/.

[67] Regul. (EU) 2021/1119, of the Eur. Parl. & of the Council of 30 June 2021 Establishing the Framework for Achieving Clim. Neutrality & Amending Reguls. (EC No 401/2009 and (EU) 2018/1999, https://eur-lex.europa.eu/legal-content/EN/TXT/PDF/?uri=CELEX:32021R1119&from=EN ("Eur. Clim. Law").

[68] Eur. Comm'n, *Delivering the Eur. Green Deal*, https://ec.europa.eu/clima/eu-action/european-green-deal/delivering-european-green-deal_en (last visited May 24, 2022).

[69] Eur. Clim. Law; Eur. Comm'n, *Carbon Border Adjustment Mechanism*, https://ec.europa.eu/taxation_customs/green-taxation-0/carbon-border-adjustment-mechanism_en (last visited May 24, 2022).

The national governments of the world's largest economies have also set ambitious benchmarks toward decarbonization. The United Kingdom ("UK") passed binding legislation in 2019 that commits to achieving net zero emissions by 2050.[70]  In October 2021, the UK released its plan to achieve net zero GHG emissions, which incorporates key principles including "ensur[ing] the biggest polluters pay the most for the transition through fair carbon pricing."[71] Japan also committed in October 2020 to achieving net zero GHG emissions by 2050, which it enshrined into law in May 2021.[72] China—the country with the highest emissions as well as the largest developing economy—aims to achieve carbon neutrality before 2060,[73] including through its first national emissions trading scheme, which it launched in July 2021.[74]

These examples highlight the steps governments at all levels are taking right now to incorporate climate change into regulations, policies, and market transformations affecting all sectors of the economy. Those steps are impacting and will continue to impact registered companies' operations.

### D. Investors Consider the Information in the SEC's Proposed Rule Material to Their Investment Decisions.

There is no question that the disclosures mandated by the Proposed Rule are material to investor decisions. Investors, both institutional and individual, are pursuing climate-responsive investing in increasing numbers and are increasingly considering ESG factors like climate risk when making their investment decisions. According to one study, as of 2021, 51% of American retail investors said they have been influenced by ESG factors in making investments (versus

---

[70] Clim. Change Act 2008 (2050 Target Amend.) Order 2019, 2019 No. 1056 (UK), https://www.legislation.gov.uk/uksi/2019/1056/contents/made.

[71] Dept. for Bus., Energy & Indus. Strategy, *Net Zero Strategy: Build Back Greener, Presented to U.K. Parliament pursuant to Section 14 of the Clim. Change Act 2008* 16 (Oct. 2021), https://assets.publishing.service.gov.uk/government/uploads/system/uploads/attachment_data/file/1033990/net-zero-strategy-beis.pdf.

[72] Ministry of Econ., Trade & Indus., *Japan's 2050 Carbon Neutral Goal* (Nov. 11, 2020), https://www.meti.go.jp/english/policy/energy_environment/global_warming/roadmap/report/20201111.html; Gov. of Japan, The Long-Term Strategy Under the Paris Agmt. 3-4 (Oct. 2021), https://unfccc.int/sites/default/files/resource/Japan_LTS2021.pdf.

[73] People's Rep. of China, *China's Achievements, New Goals & New Measures for Nat'ly Determined Contributions* 2 (Oct. 28, 2021), https://www4.unfccc.int/sites/ndcstaging/PublishedDocuments/China%20First/China%E2%80%99s%20Achievements,%20New%20Goals%20and%20New%20Measures%20for%20Nationally%20Determined%20Contributions.pdf.

[74] Int'l Inst. for Sustainable Dev., *Trading Begins under China's Nat'l ETS* (July 19, 2021), https://sdg.iisd.org/news/trading-begins-under-chinas-national-ets/.

26% in 2003).[75]  Retail investor engagement with ESG investing is expected to increase,[76] with one study estimating that half of retail investors will move some of their investments (including pensions) into ESG vehicles this year.[77]

Institutional investors likewise seek out ESG data, such as climate-related risk information, in their decision-making. Morningstar reported in 2020 that to "meet investor demand," it was formally integrating ESG factors into its analysis of stocks, funds, and asset managers, using a matrix that includes climate-related metrics.[78]  Fitch Ratings announced a similar ESG rating system in 2019 following engagement with investors.[79]  More broadly, institutional investors consider climate change to be a material factor in their investment decisions, with a majority viewing climate as a material risk or opportunity across their total investment portfolio.[80]

Both institutional and individual investors have a significant stake in ensuring they have access to information they deem material to their decision-making. At the end of 2021, Americans held $7.3 trillion in 401(k) plans and $13.2 trillion in IRAs,[81] and pension funds

---

[75] GlobeScan, *Retail Invs. Show Strong & Growing Interest in ESG* (Dec. 14, 2021), https://globescan.com/2021/12/14/retail-investors-show-strong-and-growing-interest-in-esg/.

[76] Carolyn Bao, *When It Comes to ESG Inv'g, There's No Going Back*, NASDAQ (Mar. 16, 2022), https://www.nasdaq.com/articles/when-it-comes-to-esg-investing-theres-no-going-back.

[77] FinTech Global, *50% of Retail Invs. to Shift Funds into ESG in 2022* (Mar. 7, 2022), https://member.fintech.global/2022/03/07/50-of-retail-investors-to-shift-funds-into-esg-in-2022/.

[78] Press Release, Morningstar, *Morningstar Formally Integrates ESG into Its Analysis of Stocks, Funds, & Asset Managers* (Nov. 17, 2020), https://newsroom.morningstar.com/newsroom/news-archive/press-release-details/2020/Morningstar-Formally-Integrates-ESG-into-Its-Analysis-of-Stocks-Funds-and-Asset-Managers/default.aspx.

[79] Press Release, Fitch Ratings, *Fitch Ratings Launches ESG Relevance Scores to Show Impact of ESG on Credit* (Jan. 7, 2019), https://www.fitchratings.com/research/corporate-finance/fitch-ratings-launches-esg-relevance-scores-to-show-impact-of-esg-on-credit-07-01-2019.

[80] Geraldine Ang & Hannah Copeland, OECD, *Integrating Clim. Change-Related Factors in Instit. Inv.* 13 (Feb. 2018), https://www.oecd.org/sd-roundtable/papersandpublications/Integrating%20Climate%20Change-related%20Factors%20in%20Institutional%20Investment.pdf ("[T]he majority of [] asset owners (81%) and asset managers (68%) already view climate change as a material risk or opportunity across their entire investment portfolio."); *see also* CalPERS Letter; Letter from Sandra Boss, et al, BlackRock to Vanessa Countryman, Secretary, SEC (June 11, 2021), https://www.sec.gov/comments/climate-disclosure/cll12-8906794-244146.pdf ("BlackRock Letter").

[81] Ted Godbout, *U.S. Ret. Assets Held Steady in Third Quarter*, Nat'l Ass'n of Plan Advisors (Dec. 29, 2021), https://www.napa-net.org/news-info/daily-news/us-retirement-assets-held-steady-third-quarter#:~:text=Assets%20in%20individual%20retirement%20accounts,the%20second%20quarter%20of%202021.

provided income to 68% of retirees aged 65 or older as of 2021.[82]  As we described above,[83] a significant proportion of Americans have investment savings in college savings plans and HSAs as well. Given these stakes, investors are entitled to greater transparency and more reliable and consistent disclosures about information they deem material—and investors consider climate-related information material.

Institutional investors' desire for climate-related information is particularly relevant.[84] Those investors inhabit a powerful position that makes them integral to the market's efficiency—their role means they can "improve price discovery [and] increase allocative efficiency," but only with "access to complete and reliable information."[85]  Ensuring institutional investors have access to the reliable, comparable climate-related information they seek not only will help in their investment decisions but, critically, will improve market accuracy and efficiency. Access to meaningful climate-related information is relevant not only to the return of a given company but to the overall risk management strategy of investors and the market as a whole.

E.    **The Proposed Mandatory Disclosures Provide Key Information About Registered Companies' Consideration, or Lack Thereof, of the Physical and Transition Risks from Climate Change in Their Business Strategies.**

We support the Proposed Rule as an effective means of ensuring that investors receive specific, comparable details about registered companies' climate-related risks and impacts. Only 20% of North American companies make any climate-related disclosures, and a bare majority of companies around the world—52%—disclose their climate-related risks and opportunities.[86] With the information the Proposed Rule promises, investors and the market broadly can more readily assess the risks of holdings, price that risk, and make better-informed investment decisions. As such, the Proposed Rule aligns with the SEC's congressionally-mandated goal of protecting investors and ensuring efficient markets.[87]

We believe the disclosure regime that the SEC has proposed strikes a balance between providing investors with specific, reliable information they consider material while not overburdening either investors or companies with unnecessary details. As we explain in more detail below, we support the Proposed Rule's requirements for companies to disclose 1) climate-related financial impacts in their audited financial statements; 2) narrative descriptions of risk management, risk assessment, and material risks; and 3) Scope 1, Scope 2, and Scope 3 GHG

---

[82] Fed. Rsrv. Am. Well-Being Rep.

[83] *See*, *supra*, Section I.A.

[84] *See, e.g.*, CalPERS Letter; N.Y.C. Comptroller Letter; N.Y. State Comptroller Letter; Ore. State Treasurer Letter; BlackRock Letter.

[85] Luis A. Aguilar, Comm'r, SEC, *Instit. Invs.: Power & Responsibility* (Apr. 19, 2013), https://www.sec.gov/news/speech/2013-spch041913laahtm#P35_6851.

[86] TCFD, *2021 Status Report* 30 (Oct. 2021), https://www.fsb.org/wp-content/uploads/P141021-1.pdf.

[87] *See, e.g.*, 15 U.S.C. § 78b.

Appellate Case: 24-1628      Page: 1326      Date Filed: 03/26/2024 Entry ID: 5377362

emissions. We also support the proposal to require these disclosures from all industries and from companies of all sizes.

We support the proposal to require financial statement disclosures of climate-related financial impacts and expenditures above a one-percent aggregate threshold because it will provide investors with information about whether and how climate change has meaningfully affected registered companies.[88] That the proposed disclosures will appear in registered companies' audited financial statements will provide investors with additional confidence in that information.

We consider the Proposed Rule's narrative disclosures likewise to be structured to provide investors with the necessary details to assess the climate-related risk profile of investing in a particular company. The governance and risk management disclosures inform investors whether and how registered companies are evaluating climate-related risks, which is essential context for investors to assess the reliability of registered companies' other climate-related disclosures.[89] The strategy, business model, and outlook disclosures are appropriately principles-based, allowing registered companies to determine whether climate-related risks are "reasonably likely to have a material impact," and if so, to provide details about those material impacts.[90] We also consider it appropriate for the SEC to require registered companies to disclose details about transition plans they have adopted and internal metrics they use for their own climate-related risk assessments, such as internal carbon prices and scenario analyses.[91] These details contextualize companies' determinations about what climate-related information is material and help investors assess the reliability of those determinations.

We agree with the SEC's determination that registered companies' Scope 1 and Scope 2 GHG emissions represent material information that investors need to assess registered companies' climate-related transition risks.[92] As discussed above, transition risks will arise from regulation of GHG emissions from company operations, as well as regulation of registered companies' upstream suppliers and downstream customers. We also agree with the SEC's decision to require large accelerated filers to have an independent expert attest to the calculation of their Scope 1 and Scope 2 GHG emissions; that attestation will provide investors with additional certainty about the risks these large registered companies face.[93]

We support the SEC's decision to require large accelerated filers to disclose their Scope 3 GHG emissions if those emissions are material or if those emissions are part of a transition plan. Many registrants' Scope 3 GHG emissions are by far the most significant portion of the GHG

---

[88] 87 Fed. Reg. at 21,363.

[89] *Id.* at 21,359.

[90] *Id.* at 21,353.

[91] *Id.* at 21,355-56, 21,361.

[92] *Id.* at 21,373-77.

[93] *Id.* at 21,392.

Appellate Case: 24-1628     Page: 1327     Date Filed: 03/26/2024 Entry ID: 5377362

emissions associated with their business.[94]  The disclosure of Scope 3 GHG emissions will help inform investment decisions by permitting meaningful comparisons and benchmarking among companies, especially those in the same industry. Scope 3 GHG emissions disclosures also will help investors understand registered companies' progress in achieving their climate risk management strategies and emission reductions plans and targets, including any net-zero goal that encompasses Scope 3 emissions. And Scope 3 GHG emissions disclosures will help avoid gamesmanship and greenwashing by registrants that artificially limit their Scope 1 and 2 GHG emissions by transferring higher-emission activities and their climate-related risks to third parties.

Scope 3 GHG emissions already present substantial transition risks based on national, regional, and state limitations on GHG emissions. The RGGI, for example, has had an adverse effect on coal mining companies, which have substantial Scope 3 GHG emissions based on the ordinary use of their products by power generation facilities and other industrial customers. The RGGI's region-wide limits on power plant $CO_2$ emissions, along with other market and regulatory forces, is reducing power plant demand for coal throughout the region.[95]  Similarly, the New York Legislature is considering a bill that would require apparel and footwear companies to determine the GHG emissions of at least 50% of their supply chain and develop plans to reduce those emissions in line with the 2015 Paris Climate Accords.[96]  If passed, this legislation will require numerous companies to reduce their Scope 3 GHG emissions, likely resulting in financial and operational impacts. The Proposed Rule's Scope 3 GHG emissions disclosure requirements are key to ensuring that investors have information about these types of material risks and impacts.[97]

---

[94] *See, e.g.*, Apple, *Env'l Progress Report* 13 (2022), https://www.apple.com/environment/pdf/Apple_Environmental_Progress_Report_2022.pdf (Scope 1 and 2 GHG emissions account for 0.02% of their emissions from operations; Scope 3 GHG emissions account for 99.98% of their emissions from operations); ExxonMobil, *Scope 3 Emissions* (2022), https://corporate.exxonmobil.com/-/media/Global/Files/Advancing-Climate-Solutions-Progress-Report/2022/Scope-3-emissions.pdf#:~:text=Scope%203%20emissions%20primarily%20refer%20to%20the%20indirect,IPIECA%E2%80%99s%20Category%2011%20were%20540%20million%20metric%20tons (Scope 3 GHG emissions were 540 million metric tons); ExxonMobil, *Mitigating Emissions in Co. Operations* (2021), https://corporate.exxonmobil.com/Sustainability/Energy-and-Carbon-Summary/Strategy/Mitigating-emissions-in-our-operations (Scope 1 and Scope 2 GHG emissions were 112 million tons).

[95] *See, e.g.*, Jared Anderson, *U.S. Coal-Fired Power Output Decline Continues with last PSEG Coal Plant Ret.*, S&P Global (June 11, 2021), https://www.spglobal.com/commodityinsights/en/market-insights/latest-news/electric-power/060121-us-coal-fired-power-output-decline-continues-with-last-pseg-coal-plant-retirement; Jonathan Randles, *Coal Bankrs. Pile Up as Utils. Embrace Gas, Renewables*, Wall St. J. (Oct. 13, 2019), https://www.wsj.com/articles/coal-bankruptcies-pile-up-as-utilities-embrace-gas-renewables-11570971602.

[96] Vanessa Friedman, *N.Y. Could Make History with a Fashion Sustainability Act*, N.Y. Times (Jan. 7, 2022), https://www.nytimes.com/2022/01/07/style/new-york-fashion-sustainability-act.html.

[97] The Proposed Rule's Scope 3 GHG emissions requirements do not present a meaningful "double-counting" concern. Scope 3 GHG emissions disclosures are not intended to capture or

We also endorse the SEC's overall approach of requiring climate change-related disclosures from all industries. As noted in the June 2021 Attorney General Letter and reiterated here, physical and transition risks from climate change are already impacting and will continue to impact all industries in various ways. Although the climate change challenges confronting certain industries, such as the oil and gas industry and the utility sector, are obvious,[98] many other industries also are facing significant transition and physical risks from climate change. The airline industry, for example, must address how to transition away from a carbon-intensive technology, and adjust to the impact of extreme weather events on scheduling and routes.[99] The tourism and hospitality industries similarly are evaluating how chronic and acute severe weather are already affecting leisure and business travel and how they will account for larger and more numerous disruptions in the future.[100] And the technology sector, often considered an industry at low risk from climate change,[101] has considerable exposure to climate change risks, such as from the electricity necessary to power data centers and GHG emissions in their upstream and downstream supply chains.[102]

---

characterize all economy-wide emissions or to provide aggregated numbers for a regulatory purpose. Although there are certain situations where double-counting could be a concern, such as the financed emissions of investment firms, the Proposed Rule requires that any overlaps within a registered company's reported Scope 3 GHG emissions be identified and explained, so that investors and other registrants can incorporate that information into their assessments. 87 Fed. Reg. at 21,388. Registered companies can also look to the GHG Protocol and other systems for determining Scope 3 GHG emissions as a resource for methodologies for developing accurate emission estimates and avoiding double-counting issues. *See, e.g.*, Greenhouse Gas Protocol, *Corp. Value Chain (Scope 3) Acct. & Rep. Standard, Suppl. to the GHG Protocol Corp. Acct. & Rep. Standard* (Sept. 2011), https://ghgprotocol.org/sites/default/files/standards/Corporate-Value-Chain-AccountingReporing-Standard_041613_2.pdf; P'ship for Carbon Acct. Fins., *Global GHG Acct. & Rep. Standard for the Fin. Indus.* (2020), https://carbonaccountingfinancials.com/files/downloads/PCAF-Global-GHG-Standard.pdf; *see also* Press Release, GHG Protocol, *New Std. Dev. to Help Fin. Indus. Measure & Rep. Emissions* (Mar. 18, 2021), https://ghgprotocol.org/blog/new-standard-developed-help-financial-industrymeasure-and-report-emissions.

[98] *See* TCFD Recommendations at 16 (listing sectors TCFD identified as highest risk for financial impact from climate change).

[99] Niraj Chokshi & Clifford Krauss, *A Big Clim. Problem with Few Easy Solutions: Planes*, N.Y. Times (June 2, 2021), https://www.nytimes.com/2021/05/28/business/energy-environment/airlines-climate-planes-emissions.html; Shibao Pek & Ben Caldecott, Univ. of Oxford Sustainable Fin. Prog., *Physical Clim.-Related Risks Facing Airports: An Assessment of the World's Largest 100 Airports* 4-6 (Sept. 2020), https://www.smithschool.ox.ac.uk/sites/default/files/2022-04/Physical-climate-risks-facing-airports-briefing-paper-September-2020.pdf.

[100] World Travel & Tourism Council, *A Net Zero Roadmap for Travel & Tourism: Proposing a New Target Framework for the Travel & Tourism Sector* 8 (Nov. 2021), https://wttc.org/Portals/0/Documents/Reports/2021/WTTC_Net_Zero_Roadmap.pdf.

[101] *See* TCFD Recommendations at 16.

[102] *See, e.g.,* Off. of Energy Efficiency & Renewable Energy, *Data Centers & Servers*, https://www.energy.gov/eere/buildings/data-centers-and-servers (last visited June 6, 2022); Amazon,

We also support the SEC's proposal to require the mandatory disclosures for registered companies of all sizes. Climate change-related risks pose unique challenges to small companies.[103]  Small companies may have fewer resources to absorb the impact of physical impacts from climate change or to research and develop mitigation methods or lower-carbon-intensive solutions.[104]  Conversely, smaller companies may have smaller carbon footprints or may be adopting innovative technologies to address climate-related risks and therefore be at lower transition risk—information that is of substantial value to investors in comparing firms.[105]  Requiring registered companies of all sizes to disclose whether and how they are addressing climate change-related risks is critical to enabling investors to understand their investment risks.

### F. The Proposed Disclosures Will Help Prevent Greenwashing.

Given the significant interest in sustainable investing, the Proposed Rule promises not only to provide all investors with material information about climate-related risks but also to counter greenwashing by registered companies.

The SEC's action against Volkswagen, which alleged that Volkswagen misleadingly omitted to disclose in statements to its investors that it had equipped its diesel engine cars with a "defeat device" that lowered their reported emissions, illustrates that risk.[106]  According to the SEC's complaint, the alleged securities fraud started in earnest after Volkswagen's then-CEO "announced a bold and aggressive plan to make VW the biggest, most profitable, and most environmentally-friendly car company in the world by 2018."[107]  As part of that campaign, Volkswagen raised money through bond sales in which the company allegedly "touted its

---

*Carbon Footprint*, https://sustainability.aboutamazon.com/environment/sustainable-operations/carbon-footprint (last visited May 24, 2022) (absolute carbon emissions grew 19%, emissions sources include transportation, electricity, packaging, devices sold); Don Anair, et al., Union of Concerned Scientists, *Ride-Hailing Climate Risks: Steering a Growing Indus. Toward a Clean Transp. Future* 7 (Feb. 25, 2020), https://www.ucsusa.org/sites/default/files/2020-02/Ride-Hailing%27s-Climate-Risks.pdf ("A typical ride-hailing trip is about 69 percent more polluting than the trips its replaces, and can increase congestion during peak periods.").

[103] *See SBA's Role in Clim. Solutions: Hearing Before the Subcomm. On Oversight, Investigations, & Reg. of the H. Comm. on Small Bus.*, 117th Cong. (2021) (hearing memorandum, testimony of Lynn Abramson, President, Clean Energy Business Network), https://smallbusiness.house.gov/calendar/eventsingle.aspx?EventID=3842 ("SBA's Role in Clim. Solutions Hrg."); Small Bus. Majority, *Clim. Change Preparedness & the Small Bus. Sector* 3 (July 2013), https://smallbusinessmajority.org/sites/default/files/research-reports/072513-Climate-Change-Preparedness-and-the-Small-Business-Sector.pdf ("Clim. Change Preparedness & the Small Bus. Sector").

[104] Clim. Change Preparedness & the Small Bus. Sector at 3.

[105] SBA's Role in Clim. Solutions Hrg.

[106] Am. Compl., *SEC v. Volkswagen*, 3:19-cv-01391-CRB (N.D. Cal. Sept. 4, 2020) (*VW* Am. Compl.).

[107] *Id.* at ¶5.

Appellate Case: 24-1628    Page: 1330    Date Filed: 03/26/2024 Entry ID: 5377362

continuing commitment to and dependence on developing energy-efficient vehicles and the reduction of vehicle emissions."[108]  Only years later—and after Volkswagen had sold billions in bonds—did regulators uncover the existence of the defeat devices on Volkswagen cars.[109]  Nor was Volkswagen the only culpable automobile manufacturer; both Daimler AG and Fiat Chrysler Automobiles have reached settlements for similarly using defeat devices to mislead regulators about automobile emissions.[110]

The *Volkswagen* case is an egregious example, but more insidious are instances of subtle greenwashing, in which registered companies tout their commitment to addressing climate change, while operating in ways that contradict those pronouncements. In one recent study of climate change-related language from BP, Shell, Exxon, and Chevron, the authors observed an increase in such language among all four companies.[111]  The authors found, however, that "[t]he analysis of financial behavior [by the four companies] generated a picture even more sharply misaligned with tendencies toward increased green discourse."[112]  In sum, the analysis "failed to show any major [oil company] comprehensively transitioning its core business model away from fossil fuels."[113]  Registered companies that overstate their commitment to transitioning to lower carbon emissions—or omit contradictory facts about their businesses—may mislead investors into believing they are better positioned to deal with transition risks like current and proposed climate change regulations or market transformation. This kind of greenwashing also confuses the market by undermining the value to investors of similar commitments by registered companies that actually follow through on those commitments.[114]

We believe the Proposed Rule is well-structured to combat both greenwashing and the skepticism it engenders even around registered companies' legitimate commitments. The proposed mandatory disclosures about the use of carbon offsets, renewable energy offsets, and internal carbon pricing will provide investors with insight into the degree to which registered

---

[108] *Id.* at ¶9.

[109] *Id.* at ¶¶147-48.

[110] Press Release, Dept. of Justice, *The U.S. Reaches $1.5 Billion Settlement with Daimler AG Over Emissions Cheating in Mercedes-Benz Diesel Vehicles* (Sept. 14, 2020), https://www.justice.gov/opa/pr/us-reaches-15-billion-settlement-daimler-ag-over-emissions-cheating-mercedes-benz-diesel; CNBC, *Stellantis Fiat Chrysler Auto. Unit Reaches Plea Deal in U.S. Emissions Probe* (May 25, 2022), https://www.cnbc.com/2022/05/25/stellantis-fiat-chrysler-automobiles-unit-reaches-plea-deal-in-us-emissions-probe.html.

[111] Mei Li, et al., *The Clean Energy Claims of BP, Chevron, ExxonMobil & Shell: A Mismatch Between Discourse, Actions & Inv.*, PLOS ONE (Feb. 16, 2022), https://journals.plos.org/plosone/article?id=10.1371/journal.pone.0263596#sec023.

[112] *Id.*

[113] *Id.*

[114] Daniel C. Esty, Quentin Karpilow, *Harnessing Inv. Interest in Sustainability: The Next Frontier in Env'l Info. Reg.*, 36 Yale J. on Reg. 625, 664-65 (2019) ("Harnessing Inv. Interest in Sustainability").

companies are changing their operations versus simply changing their emissions accounting. Likewise, the proposed requirement that registered companies disclose their progress on transition plans, including Scope 3 GHG emissions, is a meaningful way not only to hold registered companies accountable for those plans, but also to provide investors with details about how those plans are affecting registered companies' operations and financial status.

### G. The Proposed Rules Fall Within the SEC's Statutory Authority.

The SEC has ample statutory authority to adopt the Proposed Rule.[115] In each of the statutory provisions delineating the SEC's authority to require disclosures from registered companies, the lodestar is the SEC's determination that the rule is "necessary or appropriate in the public interest or for the protection of investors" or "to insure fair dealing in the security."[116] As explained in this letter, and as the SEC recognized in its Proposed Rule, mandatory disclosures of climate-related risks and related risk management are necessary and appropriate for investor protection. Registered companies already face numerous physical and transition risks and impacts from climate change; those risks will only grow in number and intensity as climate change accelerates. Numerous sophisticated investors, as well as many retail investors, have indicated that they consider the information in the Proposed Rule to be key to their investment decision-making.[117] This record is more than sufficient to establish that these disclosures are "necessary" and "appropriate" for investor protection.

In passing the Securities Act and the Exchange Act and creating the SEC, Congress identified a problem: information asymmetries in securities sales created circumstances where markets could be manipulated and investors could be injured, and those effects had spillover consequences in the broader economy.[118] Notably, in addition to investor protection, Congress identified as one of the reasons for the legislation:

> The prices established and offered in [securities] transactions are generally disseminated and quoted throughout the United States and foreign countries and constitute a basis for determining and establishing the prices at which securities are bought and sold, the

---

[115] *See, e.g.*, 15 U.S.C. § 77g(a)(1) (SEC can mandate "such other information…as the Commission may by rules or regulations require as being necessary or appropriate in the public interest or for the protection of investors."); 15 U.S.C. § 78l(b)(1) (For companies registered with a national exchange, SEC can mandate disclosure of "[s]uch information, in such detail, as to the issuer…as the Commission may by rules and regulations require, as necessary or appropriate in the public interest or for the protection of investors" with respect to the "organization, financial structure, and nature of the business."); 15 U.S.C. § 78m(a) (for issuers registered to trade on national exchanges, the SEC can mandate ongoing reporting of "such information and documents…as the Commission shall require to keep reasonably current the information and documents" required under the Section 12, "as necessary or appropriate for the proper protection of investors and to insure fair dealing in the security.").

[116] *See, e.g.*, 15 U.S.C. § 77g(a)(1); 15 U.S.C. § 78l(b)(1).

[117] *See, supra*, Section II.D.

[118] 15 U.S.C. § 78b(2).

Appellate Case: 24-1628   Page: 1332   Date Filed: 03/26/2024 Entry ID: 5377362

amount of certain taxes owing to the United States and to the several States by owners, buyers, and sellers of securities, and the value of collateral for bank loans.[119]

With this provision, Congress made clear that securities pricing and market efficiency have implications beyond investor transactions, meaning Congress intended for the registration regime for securities transactions to have broader implications.

Congress created a solution to the problem it identified: to sell securities, registered companies would be required to satisfy a disclosure regime that aimed to alleviate these information asymmetries.[120] Congress tasked the SEC with filling in the details of that disclosure regime, as well as using its expertise to adjust disclosures to achieve Congress's ultimate goal of protecting investors, markets, and affected third parties through adequate registered company disclosures in response to a changing landscape.[121]

The SEC has recognized for many years that pollution from companies' operations can have material impacts on its business. Nearly fifty years ago, the SEC adopted a rule that required the disclosure of "material effects that compliance with federal, state, or local provisions regulating the discharge of materials into the environment or otherwise relating to protection of the environment, may have upon the capital expenditures, earnings, and competitive position of the registrant."[122] This and related actions were "based on the recognition of the importance of environmental information to informed investment and voting decisions and the unique mandate to consider the environment which was imposed on all federal agencies by NEPA."[123] In 1982, following enforcement taken by the Division of Corporation Finance against Occidental Petroleum for its failure to disclose environmental liabilities associated with its cleanup obligations at Love Canal in New York and other sites,[124] the SEC expanded disclosure requirements for legal proceedings arising under laws regulating the discharge of materials into the environment.[125] And after the Supreme Court's decision in

---

[119] *Id.*

[120] *See generally* 15 U.S.C. §§ 77f, 77g, 78l.

[121] *See, e.g.,* 15 U.S.C. § 77g(a)(1); 15 U.S.C. § 78l(b)(1).

[122] *See* 38 Fed. Reg. 12,100 (Apr. 20, 1973) (Release No. 5386); *see generally Nat. Res. Def. Council, Inc. v. SEC*, 606 F.2d 1031 (D.C. Cir. 1979) (discussing history).

[123] 46 Fed. Reg. 25,638, 25,639 (May 8, 1981).

[124] *In re Occidental Petroleum Corp.*, Release No. 34-16590 (July 2, 1980); *see Occidental Told to List Liabilities*, Wash. Post (July 3, 1980), https://www.washingtonpost.com/archive/business/1980/07/03/occidental-told-to-list-liabilities/72fc05e1-05da-4587-9e07-583d9fa633d1/.

[125] *See* 47 Fed. Reg. 11,380 (Mar. 3, 1982) (Release No. 33-6383), which adopted 17 C.F.R. § 229.103. In that same rulemaking, the SEC adopted 17 C.F.R. § 229.101(c)(1)(xii), which required registrants to discuss, as part of their business description, material effects that compliance with federal, state, or local provisions regulating the discharge of materials into the environment (or otherwise related to the environment) has upon the registrant's capital expenditures, earnings and competitive position.

*Massachusetts v. EPA* and in recognition of investor demand for additional information related to risks associated with worsening climate change, the SEC issued guidance in 2010 acknowledging that registered companies' GHG emissions could result in material impacts on operations.[126]  The Proposed Rule thus logically flows from long-standing SEC precedent to ensure that investors have sufficient information regarding material risks associated with pollution from companies' operations. And, as with these examples of earlier SEC disclosure mandates, it is imperative that investors and the markets have the information the Proposed Rule will require to price in climate-related risks to registered companies—information they currently lack.[127]

### H.    The Proposed Rule Does Not Implicate the "Major Questions Doctrine."

Critics of the Proposed Rule incorrectly suggest that it runs afoul of the "major questions doctrine,"[128] which they claim prohibits federal agencies from promulgating regulations "of vast economic and political significance" without a clear congressional mandate.[129]  The doctrine's purpose is to ensure that agencies do not "assume responsibilities far beyond [their] initial assignment."[130]

The "major questions doctrine" does not apply here because the Proposed Rule deals with *disclosure* obligations, which, as we explained above, are central to the SEC's mandate. Nor does the Proposed Rule's technically complex obligations—such as quantification of GHG emissions—suggest that the SEC exceeded its authority. While it is true that it is not the SEC's responsibility to provide independent scientific assessment of risks that are beyond its technical expertise, the SEC *is* responsible for ensuring corporations disclose material information that will allow investors to make their own assessments. The Proposed Rule reflects nothing more than the SEC acting on that responsibility. Nor is it the first time that the SEC has required disclosure of material risks in areas of technical complexity. For example, the SEC has longstanding regulations—most recently updated in 2009—that set forth a specialized disclosure

---

[126] *See Comm'n Guidance Re: Disclosures Related to Clim. Change*, Release No. 33-9106 (Feb. 2, 2010), 75 Fed. Reg. 6,290 (Feb. 8, 2010).

[127] CFTC Report at 26; Madison Condon, *Market Myopia's Clim. Bubble*, 1 Utah L. Rev. 63, 73 (2022) ("Market Myopia"); *see also* Renato Faccini, et al, *Dissecting Clim. Risks: Are They Reflected in Stock Prices?* 29 (Sept. 30, 2021), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3795964.

[128] *See, e.g.,* Jacqueline M. Vallette & Kathryne M. Gray, Mayer Brown, *U.S. SEC's Clim. Risk Disclosure Proposal Likely to Face Legal Challenges* (Apr. 21, 2022), https://www.mayerbrown.com/en/perspectives-events/publications/2022/04/us-secs-climate-risk-disclosure-proposal-likely-to-face-legal-challenges ("Clim. Risk Disclosure Proposal Likely to Face Legal Challenges").

[129] *Nat'l Fed'n of Indep. Bus. v. DOL*, 595 U.S. ---, 142 S. Ct. 661, 668 (2022) (Gorsuch, J., concurring).

[130] *Id.*

framework for oil and gas extraction activities.[131]  The fact that the SEC is not an energy regulator has not prevented it from crafting regulations that provide investors with a more meaningful and comprehensive understanding of oil and gas reserves to help them evaluate the relative value of oil and gas companies. Similarly here, the SEC is not setting emission limits as an environmental regulator would, but requiring registrants to disclose levels of pollution that directly affect the value of their business.

## I.    The Proposed Rule Does Not Offend the First Amendment.

Critics of the Proposed Rule have also suggested that the proposal compels speech in a manner that runs afoul of the First Amendment.[132]  We reject that premise. The U.S. Supreme Court has stated that "the State does not lose its power to regulate commercial activity deemed harmful to the public whenever speech is a component of that activity," and the "exchange of information about securities" is the type of "communication[] that [is] regulated without offending the First Amendment."[133]  As the D.C. Circuit aptly stated: "If speech employed directly or indirectly to sell securities were totally protected [under the First Amendment], any regulation of the securities market would be infeasible—and that result has long since been rejected."[134]

As an exercise of the SEC's statutory authority to mandate the "exchange of information about securities,"[135] the Proposed Rule is permissible because it requires disclosure only of "factual and uncontroversial" information that is not "unjustified or unduly burdensome."[136]  Although there may be debate about the best way to address climate change, there is no scientific controversy about its existence or the physical impacts it is having and will continue to have and the resulting impacts on companies.[137]  The Proposed Rule requires disclosure of accurate, factual information about companies' climate-related impacts, the risks they face, and the risk management steps they have taken. This type of disclosure is not subject to heightened First

---

[131] *See* SEC, *Modernization of Oil & Gas Reporting; Final Rule*, 74 Fed. Reg. 2,158 (Jan. 14, 2009).

[132] *See, e.g.,* Letter from Patrick Morissey, W.V. Atty. Gen., et al., to Gary Gensler, Chair, SEC (June 14, 2021), https://www.sec.gov/comments/climate-disclosure/cll12-8915606-244835.pdf; Hester Peirce, Comm'r, SEC, *We Are Not the Sec. & Env't Comm'n—At Least Not Yet* (Mar. 21, 2022), https://www.sec.gov/news/statement/peirce-climate-disclosure-20220321; Clim. Risk Disclosure Proposal Likely to Face Legal Challenges.

[133] *Ohralik v. Ohio State Bar Assn.*, 436 U.S. 447, 456 (1978).

[134] *SEC v. Wall Street Pub. Instit., Inc.*, 851 F.2d 365, 372-73 (1988).

[135] *Ohralik*, 436 U.S. at 456.

[136] *See Zauderer v. Office of Disciplinary Counsel of Supreme Ct. of Ohio*, 471 U.S. 626, 651 (1985).

[137] CFTC Report at 25-39 (detailing current and likely future economic impacts from climate change); IPCC 2022 Clim. Change Impacts Report at 11.

Amendment protection: "The right of a commercial speaker not to divulge accurate information regarding [their] services is not…a fundamental right."[138]

Nor is the Proposed Rule "unjustified or unduly burdensome." The economic impact to companies from climate change already is significant and is only likely to grow as climate change accelerates.[139] As we noted above, millions of Americans have investment savings that they rely on for college savings, healthcare costs, retirement savings, and life savings.[140] The only way for those investors to get comparable, specific information about the risks that their investments face is to require disclosure of that information.

Even if the Supreme Court's more rigorous "exacting scrutiny" standard applied (and it should not),[141] the Proposed Rule would easily satisfy it. Under that standard, "disclosure regimes" need only have a "substantial relation" to a "sufficiently important" government interest and must be "narrowly tailored to the government's asserted interest."[142] The government's interests in requiring registered companies to disclose the climate-related risks they face and whether and how they are evaluating these risks[143] are to help protect investors from fraudulent misrepresentations and omissions, promote efficiency in national markets, and help protect additional parties, such as banks that use securities as loan collateral, that rely on market efficiency as part of their economic actions. These interests are "sufficiently important" to satisfy the "exacting scrutiny" standard.[144]

The Proposed Rule's mandatory disclosures bear a "substantial relation" to those important government interests. As discussed above, the disclosures provide investors with factual information about registered companies' climate-related governance and risk management as well as information about material climate-related risks and impacts. The GHG

---

[138] *Zauderer*, 471 U.S. at 651 n.14.

[139] CFTC Report at 25-39.

[140] *See, supra,* Section I.A.

[141] In *Americans for Prosperity Foundation v. Bonta*, in an opinion joined by only two other justices, Chief Justice Roberts stated that the standard for "compelled disclosures" is "exacting scrutiny." 594 U.S. ---, 141 S. Ct. 2373, 2383 (2021). The remaining six justices were split on this issue, with Justice Thomas asserting that strict scrutiny should apply to compelled disclosures; Justices Alito and Gorsuch finding that there was no need to establish that standard because the compelled disclosures at issue (disclosures of donors to charitable organizations) did not satisfy either exacting or strict scrutiny; and Justices Sotomayor, Breyer, and Kagan disagreeing with Justice Roberts' formulation of the "exacting scrutiny" standard. *Id.* at 2390, 2391-92, 2396.

[142] *Id.* at 2383.

[143] As discussed, *supra*, Sections II.B and II.C, issuers are already facing significant climate-related physical and transition risks that will increase in number and intensity in the future.

[144] *Ams. for Prosperity Found.*, 141 S. Ct. at 2386 ("It goes without saying that there is a substantial governmental interest[] in protecting the public from fraud.") (internal citations and quotations omitted); *see also Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 568 (1980) (energy conservation was "substantial" state interest).

emissions disclosures are necessary to assist investors and the market in understanding the physical and transition impacts and risks that registered companies face from current and future government regulation, as well as preventing greenwashing by registered companies. The proposed disclosures will help alleviate the information asymmetry between investors and registered companies, thereby aiding in preventing fraudulent misrepresentations and omissions, supporting broader investor trust in the national markets, and promoting efficient national markets that price in risks from climate change.

The Proposed Rule also is narrowly tailored to address the government's important interests. The only means of alleviating climate-related information asymmetries between investors and registered companies is by requiring registered companies to disclose information. Without mandatory disclosures, registered companies are incentivized to selectively disclose only information that supports an appearance of preparedness for climate-related risks, or to not disclose anything at all.[145] Selective disclosure (or worse, greenwashing) undermines investor confidence in registered companies' voluntary statements.[146] Notably, for the past decade, the SEC has attempted to incentivize registered companies to disclose climate-related information through guidance; but this resulted in inadequate and inconsistent disclosures and a failure of the market more broadly to sufficiently price in climate-related risks.[147]

The SEC therefore is well within its authority to adopt the Proposed Rule, and it should do so.

## III.   RESPONSES TO SPECIFIC REQUESTS FOR COMMENT

In addition to our general comments in support of the Proposed Rule, we also have responses to several of the SEC's specific requests for comment. Although we support the Proposed Rule and encourage the SEC to adopt it, as reflected below, we believe the SEC should strengthen the rule in certain respects to protect investors and the broader market consistent with the SEC's statutory duties. We also respond to requests for comment where we believe the SEC should not amend the Proposed Rule for alternatives that the SEC identifies.

### A.   The SEC Should Add a New Subpart to Regulation S-K and a New Article to Regulation S-X as Proposed. (Request for Comment No. 1)

We believe the SEC's proposal to include the Proposed Rule's provisions within Regulation S-K and Regulation S-X, as applicable, reflects the fact that information about climate-related risks is essential to investors' decision-making. As we explained in detail above, climate-related risks—both physical and transition risks—already are affecting registered companies and will continue to do so. In addition, presentation of climate-related disclosures alongside registered companies' other mandatory disclosures allows investors to contextualize the information. For example, whether an investor considers a registered company's climate-

---

[145] Harnessing Inv. Interest in Sustainability at 664-65.

[146] *Id.*

[147] Market Myopia at 73.

related governance structure to be adequate may turn on the company's operations and other risk factors. By consolidating this information into a single filing—rather than including it in multiple publications from the company—investors can more easily access all relevant details.

**B. Current SEC Reporting Requirements Are Not Providing Investors with Specific, Comparable Information About Registered Companies' Climate Change-Related Risks. (Request for Comment No. 4)**

As noted in the June 2021 Attorney General Letter, despite the SEC's 2010 guidance to registered companies about climate-related disclosures, the majority of registered companies were not making any climate-related disclosures at all.[148] Although the Task Force on Climate-Related Financial Disclosures ("TCFD") reports that the number of companies making climate-related disclosures has increased in the past year, the SEC's current disclosure regime is not producing adequate disclosures. The TCFD found that, as of 2020, the most common climate-related disclosure was risks and opportunities, with only 52% of companies disclosing that category.[149] No other category of the TCFD's recommended disclosures exceeded 50%; most hovered between 30% and 45%.[150] North American registered companies remained the least likely to make any climate-related disclosures, with only 20% of companies making such disclosures in 2020.[151]

Given these statistics, the SEC should move forward with its proposed mandatory climate-related disclosures rather than offering additional administrative guidance as a substitute.

**C. The SEC Should Define "Flood Hazard Area" and "High Water Stressed Region." (Requests for Comment Nos. 13, 14)**

Although the Proposed Rule instructs registered companies to determine if they are exposed to material physical risks from a "flood hazard area" and/or a "high water stressed region," the rule does not define those terms. It is critical that investors have information about how those terms are defined both to compare between registered companies and to understand registered companies' materiality determinations. The SEC can solve this issue by defining the term in an amendment to the Proposed Rule.

**D. The SEC Should Not Provide Additional Liability Safe Harbors for Internal Carbon Pricing, Scenario Analyses, and Transition Plan Disclosures. (Requests for Comment Nos. 28, 31, 51)**

The Private Securities Litigation Reform Act ("PSLRA") would protect from liability forward-looking statements within the proposed internal carbon pricing, scenario analysis, and transition plan disclosures. We do not believe that additional safe harbors for these disclosures

---

[148] Atty. Gen. Letter.

[149] TCFD, *2021 Status Report* 30 (Oct. 2021), https://www.fsb.org/wp-content/uploads/P141021-1.pdf.

[150] *Id.*

[151] *Id.*

Appellate Case: 24-1628    Page: 1338    Date Filed: 03/26/2024 Entry ID: 5377362

are warranted. Additional safe harbors would essentially insulate registered companies from liability for statements about whether they are in fact using internal carbon prices or scenario analyses, or whether they are making progress on their transition plan. We believe false or misleading statements in those circumstances should remain subject to liability.[152]  As we noted above, key benefits of the Proposed Rule are preventing greenwashing and providing confidence to investors that climate-related disclosures are reliable; adding safe harbors for these three types of disclosures would undermine those benefits.

### E.  The SEC Should Require SRCs that Have Set Targets or Goals for Reducing Emissions that Include Scope 3 GHG Emissions to Disclose Their Scope 3 GHG Emissions. (Request for Comment No. 134)

Similarly, to prevent greenwashing, we believe the SEC should amend the Proposed Rule to require SRCs that have set emissions reduction targets or goals that include Scope 3 GHG emissions to monitor and disclose their Scope 3 GHG emissions. By setting Scope 3 GHG emissions targets or goals, SRCs have essentially committed themselves to monitoring those emissions; having them report those emissions should not result in significant additional cost. And if SRCs have made such commitments but are not monitoring and disclosing their Scope 3 GHG emissions, those commitments may constitute unlawful greenwashing. Under those circumstances, the additional monitoring and disclosure requirement we recommend would help deter SRCs from greenwashing or expose SRCs that have already engaged in it.

### F.  The SEC Should Require All Registered Companies to Include Independent Attestations for Their Scope 1 and 2 GHG Emissions. (Request for Comment No. 138)

Although we appreciate the SEC's concerns about the impact on SRCs, we nevertheless believe the SEC should require all registered companies to include independent attestations for Scope 1 and 2 GHG emissions, instead of limiting it to large accelerated filers as proposed. As we explained above, GHG emissions are a key metric for determining climate-related transition risks, and those risks are likely to impact small companies as well as large companies.[153]  As such, we do not believe that exempting SRCs from an independent attestation requirement is logical.

---

[152] Notably, Section 18(a) of the Exchange Act provides a defense to liability if defendants show that they "acted in good faith and had no knowledge that such statement was false or misleading." 15 U.S.C. § 78r(a).

[153] Small- and medium-sized companies often appear in the supply chains of larger companies, meaning their Scope 1 and Scope 2 GHG emissions may be part of a larger company's Scope 3 GHG emissions. *See* SME Clim. Hub, *New Data Reveals Two-Thirds of Surveyed Small Bus. Concerned Over Navigating Clim. Action* (Feb. 23, 2022), https://smeclimatehub.org/new-survey-reveals-small-business-barriers-climate-action/. Those larger companies face transition requirements to lower their Scope 3 GHG emissions, which in turn adds transition risks to small- and medium-sized companies regarding their Scope 1 and Scope 2 GHG emissions.

To address burdens on SRCs, we recommend a longer phase-in period for SRCs than for large accelerated filers, with the expectation that as independent attestation services become more mainstream, competition will increase and costs will come down.

### G. The SEC Should Require Scope 1 and Scope 2 GHG Emissions Attestations from Independent Third Parties. (Requests for Comment Nos. 146, 165)

We support the Proposed Rule's requirement that the third party attesting to registered companies' Scope 1 and Scope 2 GHG emissions be independent from the issuer. There is already a proliferation of potentially and actually conflicted operators in this space. Companies that rate registered companies on their climate-related policies are also offering consulting services about how registered companies can improve those ratings.[154] A mandatory independent third party attestation protects against further conflicts of interest and provides investors with better assurances of accuracy in registered companies' filings.

### H. The SEC Should Not Exempt SRCs from All Climate-Related Disclosures. (Request for Comment No. 175)

We discourage the SEC from amending the Proposed Rule to exempt SRCs from all climate-related disclosures. As noted above,[155] climate-related risks and impacts do not and will not discriminate based on company size, and such risks for SRCs may be substantial. Notably, SRCs are not necessarily "small" companies, given that companies with a public float up to $700 million and annual revenues up to $100 million qualify.[156] In this context, we strongly support the SEC's current approach of requiring climate-related disclosures from all public companies.

### I. The SEC Should Not Exempt Companies Going Through IPOs from Climate Change-Related Disclosures. (Request for Comment No. 179)

We also discourage the SEC from amending the Proposed Rule to exempt companies going through IPOs. The SEC asks whether mandatory climate-related disclosures might dissuade private companies from going public or incentivize them to delay going public. While we acknowledge and share the SEC's concerns about the relative sizes of the private and public markets, we do not believe that exempting companies going through IPOs is the solution. First, as a logical matter, an exemption for companies going through IPOs merely delays when they have to report; assuming the SEC adopts the Proposed Rule, it does not change the overall difference in disclosure requirements between the private and public markets. Second, and importantly, lowering investor and market protections in the public markets is counterproductive

---

[154] *See* Jean Eaglesham, *Wall St.'s Green Push Exposes New Conflicts of Interest*, Wall St. J. (Jan. 29, 2022), https://www.wsj.com/articles/wall-streets-green-push-exposes-new-conflicts-of-interest-11643452202.

[155] *See, supra*, Section II.E.

[156] *See* 17 C.F.R. § 229.10(f)(1).

Appellate Case: 24-1628     Page: 1340     Date Filed: 03/26/2024 Entry ID: 5377362

and contrary to the SEC's mission and purpose. We therefore encourage the SEC to maintain the Proposed Rule's applicability to companies going through IPOs.

### J. The SEC Should Require that Climate Change-Related Disclosures Be "Filed" for Purposes of Liability. (Request for Comment No. 194)

By requiring the mandatory disclosures in the Proposed Rule to be "filed" rather than "furnished," the SEC appropriately equates climate-related disclosures with other disclosures the SEC already mandates for investor protection. That treatment is warranted as a means of deterring greenwashing as well as of promoting trust in climate-related disclosures.

Registered companies may be concerned about litigation risks related to having climate-related disclosures "filed" rather than "furnished," but, as we explain below, we do not believe those risks will increase under the Proposed Rule. Even if there is an increase in litigation risk, we believe the deterrent effects from requiring climate-related disclosures to be "filed" justifies the additional risk. Investors need this information to better assess their investment risks in light of the impact climate change already is having. Allowing liability under Section 18(a) to attach to false or misleading statements under the Proposed Rule's mandatory disclosures is a way not only to build trust in those disclosures among investors but also communicate to registered companies the importance of those disclosures and deter them from greenwashing or otherwise making misleading statements.

### K. The SEC Should Set Earlier Compliance Dates. (Request for Comment No. 197)

In light of the importance of these disclosures to investors as well as the immediacy of current climate-related risks and impacts, we recommend that the SEC shorten the compliance phase-in periods. Assuming that the Proposed Rule is adopted by December 2022, we propose that the SEC move up by one year all of the compliance dates (other than the compliance date for large accelerated filers for the proposed disclosures other than Scope 3 GHG emissions, which the SEC already proposes for reporting in 2024 for fiscal year 2023).

Specifically, we encourage the SEC to require accelerated and non-accelerated filers to start their climate-related disclosures (other than Scope 3 GHG emissions) in their 2024 filings for fiscal year 2023; and for SRCs to start their climate-related disclosures in 2025 for fiscal year 2024. We further propose that large accelerated filers, accelerated filers, and non-accelerated filers that need to report their Scope 3 GHG emissions under the Proposed Rule should have to disclose their Scope 3 GHG emissions in their 2025 filings for fiscal year 2024. To the extent the SEC adopts our recommendation to require SRCs that have included Scope 3 GHG emissions in a transition plan to disclose their Scope 3 GHG emissions, we encourage the SEC to require those SRCs to begin disclosure of their Scope 3 GHG emissions in 2026 for fiscal year 2025.

We believe this timetable is more appropriate than the one in the Proposed Rule, given the importance of these disclosures to investor protection and market efficiency.

**L.**   **The SEC Should Reassess Registered Companies' Litigation Risks in the Economic Analysis. (Request for Comment on Economic Analysis)**

We believe the SEC's baseline for registered companies' litigation risks fails to account for the litigation risks that companies already face regarding climate-related risks and impacts, as well as the effect that bright-line rules and the proposed safe harbor will have on potentially reducing litigation risk. Securities fraud lawsuits alleging misleading representations regarding preparedness in the face of severe weather events have already emerged against registered companies.[157]   The economic analysis does not account for current litigation risks and the degree to which additional disclosures and bright line rules may actually lessen such risks.

The economic analysis also attributes heightened litigation risk to the risk of "inadvertent non-compliance."[158]   In addition to the PSLRA safe harbor and the Proposed Rule's additional safe harbor, the economic analysis should consider the degree to which the affirmative defense in Section 18(a) of the Exchange Act could alleviate increased litigation risk for such "inadvertent non-compliance." That section has an affirmative defense where registered companies can show a statement was made "in good faith" and with "no knowledge that such statement was false and misleading."[159]   The SEC should consider how this affirmative defense may shield registered companies concerned about litigation over good faith but ultimately mistakenly inaccurate statements in their filings.

**IV.   CONCLUSION**

We appreciate the opportunity to comment on this important proposal. For all of the reasons discussed above, we support the Proposed Rule and encourage the SEC to adopt it, along with the recommended improvements.

Sincerely,

ROB BONTA
California Attorney General

PHILIP J. WEISER
Colorado Attorney General

---

[157] *See, e.g., Barnes v. Edison Int'l, et al*, No. 2:18-cv-09690-CBM-FFM (C.D. Cal. May 10, 2019) (shareholder lawsuit regarding defendants' role in California wildfires); *Vataj v. Johnson, et al*, No. 4:19-cv-06996-HSG (N.D. Cal. Apr. 17, 2020) (shareholder lawsuit regarding PG&E's wildfire preparation); *Mass. v. ExxonMobil Corp.*, 187 N.E.3d 393 (Mass. 2022).

[158] 87 Fed. Reg. at 21,444.

[159] 15 U.S.C. § 78r(a).

WILLIAM TONG
Connecticut Attorney General

KATHLEEN JENNINGS
Delaware Attorney General

KARL A. RACINE
District of Columbia Attorney General

HOLLY T. SHIKADA
Hawaii Attorney General

KWAME RAOUL
Illinois Attorney General

AARON M. FREY
Maine Attorney General

BRIAN E. FROSH
Maryland Attorney General

MAURA HEALEY
Massachusetts Attorney General

DANA NESSEL
Michigan Attorney General

KEITH ELLISON
Minnesota Attorney General

AARON D. FORD
Nevada Attorney General

HECTOR BALDERAS
New Mexico Attorney General

LETITIA JAMES
New York Attorney General

ELLEN F. ROSENBLUM
Oregon Attorney General

PETER F. NERONHA
Rhode Island Attorney General

THOMAS J. DONOVAN, JR.
Vermont Attorney General

BOB FERGUSON
Washington State Attorney General

JOSH KAUL
Wisconsin Attorney General



November 1, 2022

Vanessa A. Countryman
Secretary
US Securities and Exchange Commission
100 F Street NE
Washington, DC 20549

*Via email:* [rule-comments@sec.gov](mailto:rule-comments@sec.gov)

Re:    Proposed Rule, Supplemental Comments, Securities and Exchange Commission; The Enhancement and Standardization of Climate-Related Disclosures for Investors; 87 Fed. Reg. 21334; File Number S7-10-22 (May 12, 2022)

Dear Ms. Countryman:

The U.S. Chamber of Commerce writes to supplement its comments[1] on the Commission's proposed rules regarding climate-related disclosures (the "Proposed Rules").[2]  As we previously explained, the Chamber supports policy solutions that serve the goal of reducing greenhouse gas ("GHG") emissions as much and as quickly as reasonably possible based on what the pace of innovation allows and the feasibility of implementing technical solutions at scale.  The Chamber, likewise, supports policies that provide for the disclosure of material information, including climate-related information, as necessary to protect investors.  At the same time, policies must always be informed by the best science and a careful analysis of the available alternatives, outcomes, and cost-benefit tradeoffs to ensure that optimal policies are implemented.  We are concerned that the Proposed Rules fail to strike the right balance.  The Proposed Rules are vast and unprecedented in their scope, complexity, rigidity, and prescriptive particularity.  Moreover, as is explained not only in the Chamber's initial comments, but

---

[1] Comments of the U.S. Chamber of Commerce, File No. S7-10-22 (June 16, 2022), https://www.sec.gov/comments/s7-10-22/s71022-20131892-302347.pdf ("Chamber Comments").

[2] *The Enhancement and Standardization of Climate-Related Disclosures for Investors*, 87 Fed. Reg. 21,334 (Apr. 11, 2022).  The Commission reopened the comment period until November 1, 2022.  *See Resubmission of Comments and Reopening of Comment Periods*, 87 Fed. Reg. 63,016 (Oct. 18, 2022).  In addition, "consistent with the Commission's Informal and Other Procedures," the Commission considers comments submitted "before adoption of a final rule."  *Procedural Requirements and Resubmission Thresholds Under Exchange Act Rule 14a-8*, 85 Fed. Reg. 70,240, 70,268 n.312 (Nov. 4, 2020).

also in this letter, the Proposed Rules would saddle the U.S. economy with *billions* of dollars in added costs—often for little discernible benefit.

The Chamber's June 16, 2022 comments offered constructive feedback to help the SEC improve the Proposed Rules to better serve the interests of investors and the U.S. capital markets without impeding the progress the business community has already made in providing climate-related disclosures to investors and in developing strategies and technologies to reduce climate risk and its potential adverse impacts on society. This letter supplements the Chamber's initial comments in three respects. *First*, the Chamber submits this supplemental letter to note the unusually widespread concerns expressed about the Proposed Rules to date. Seemingly every segment of the market that will be subject to the Proposed Rules—from the public companies who will be forced to make extensive disclosures,[3] to the auditors who will need to review them[4]—warns that significant aspects of the Commission's proposal are massively costly and unworkable. Even more noteworthy, however, is the degree to which the investors that the Commission intends to serve—large institutional investors cited throughout the Proposing Release[5]—have vocalized opposition to the rules as proposed and have asserted that the Commission has gone too far.[6] While these investors support aspects of the Proposed Rules and the Commission's broader policy objectives, it is extraordinary for a proposal's intended beneficiaries to express concerns about so many aspects of the proposal. This broad range of concerns—from investors and public companies alike—is a powerful indication that the rules as proposed rest on an incomplete understanding of investor needs and market capabilities and are not justified on cost-benefit grounds.

*Second*, the Chamber submits this supplemental letter to highlight significant flaws in the Commission's cost-benefit analysis; the cost estimates are too low, and the anticipated benefits are too high. The Chamber already explained that the Commission grossly underestimated the costs of the Proposed Rules,[7] and the record bears this out.

---

[3] *See, e.g.*, Chamber Comments; Comments of the Society for Corporate Governance (June 17, 2022), https://www.sec.gov/comments/s7-10-22/s71022-20132044-302525.pdf ("Society for Corporate Governance Comments"); Comments of the American Petroleum Institute (June 17, 2022), https://www.sec.gov/comments/s7-10-22/s71022-20131819-302262.pdf ("API Comments"); Comments of the National Association of Manufacturers (June 6, 2022), https://www.sec.gov/comments/s7-10-22/s71022-20130306-296969.pdf ("NAM Comments"); Comments of the Business Roundtable (June 17, 2022), https://www.sec.gov/comments/s7-10-22/s71022-20132191-302705.pdf.

[4] *See, e.g.*, Comments of the Center for Audit Quality 9-13 (June 17, 2022), https://www.sec.gov/comments/s7-10-22/s71022-20131819-302262.pdf ("Center for Audit Quality Comments").

[5] *See, e.g.*, Proposing Release, 87 Fed. Reg. at 21,338 n.38.

[6] *See, e.g.*, Comments from State Street Global Advisors 2-3 (June 17, 2022), https://www.sec.gov/comments/s7-10-22/s71022-20131965-302424.pdf ("State Street Comments") ("We are … concerned that multiple aspects of the Commission's proposal do not reflect the nascent state of climate data, methodologies and reporting capabilities. … The detailed and prescriptive nature of the Commission's proposal at this juncture, coupled with increased costs and potential liability that companies will assume when providing such disclosures, would more than likely constrain, rather than encourage, effective climate disclosures by U.S. registrants now and in the future.").

[7] *See* Chamber Comments 15-17, 71, 80-82.

**App.1341**

Appellate Case: 24-1628    Page: 1346    Date Filed: 03/26/2024 Entry ID: 5377362

According to the Commission, all companies other than smaller reporting companies would (excluding assurance costs) incur initial compliance costs of $640,000 and annual ongoing compliance costs of $530,000.[8] That is not even close to the likely reality. As one large reporting company details in the record, its initial implementation costs would likely exceed $100 million, and its ongoing annual costs would likely range from $10 to $25 million[9]—orders of magnitude more than the Commission estimated. Other companies documented similarly large cost estimates.[10] The Commission's numbers are grievously understated. Indeed, some of the very sources the Commission cited in the Proposing Release to support the agency's estimates[11] have since disavowed the Commission's analysis, explaining that the actual compliance costs would exceed the Commission's estimates many times over.[12] In light of this evidence, the Chamber emphasizes the findings of three former SEC chief economists who have reviewed the Commission's work: the cost-benefit calculus must go back to the drawing board.[13]

In reevaluating the cost-benefit tradeoffs, the Commission must also confront other issues raised in the record. The Commission, for example, not only underestimated certain costs; it failed to consider other costs altogether. The Commission made no "attempt to understand the effect[s]" of the proposal on the broader economy[14]—a massive oversight in this case: using the Commission's own cost estimates, one commenter reports that standard economic models predict the "enduring economic impact" of the Proposed Rules to be "approximately $25 *billion*" in forgone GDP and *200,000* fewer jobs *per year*—which "translates to the U.S. economy missing *a month of job creation annually*."[15] The Commission must include such costs in the analysis. At the same time, the Commission must properly account for and assess the purported benefits. Empirical evidence demonstrates that many investors do not find GHG disclosures to be material,[16] undermining a significant plank (and source of alleged benefits) of the Proposed Rules.

*Third*, and finally, the Chamber submits this supplemental letter to note recent developments that cast further doubt on the Commission's legal authority to finalize

---

[8] *See* Proposing Release, 87 Fed. Reg. at 21,439.

[9] *See* Comments of ConocoPhillips 2 (June 17, 2022), https://www.sec.gov/comments/s7-10-22/s71022-20131839-302285.pdf ("ConocoPhillips Comments").

[10] *See, e.g.*, Society for Corporate Governance Comments 40.

[11] *See, e.g.*, Proposing Release, 87 Fed. Reg. at 21,440-41 & n.925 (citing Letter from Williams Companies, Inc. (June 12, 2021)).

[12] *See* Comments from The Williams Companies, Inc. 14-15 (June 17, 2022), https://www.sec.gov/comments/s7-10-22/s71022-20132208-302726.pdf ("Williams Companies Comments").

[13] *See* Chamber Comments, Annex A, Report of James A. Overdahl, Ph.D. ¶ 58 (June 16, 2022) ("Overdahl Report"); Comments of S.P. Kothari & Craig Lewis 7 (June 17, 2022), https://www.sec.gov/comments/s7-10-22/s71022-20132332-302895.pdf ("Kothari & Lewis Comments").

[14] Kothari & Lewis Comments 7.

[15] Comments of Matthew Winden, Ph.D. 7 (June 17, 2022), https://www.sec.gov/comments/s7-10-22/s71022-20132304-302836.pdf ("Winden Report") (emphases added).

[16] *See* Comments of Daniel Taylor (June 16, 2022), https://www.sec.gov/comments/s7-10-22/s71022-20131668-302058.pdf ("Taylor Comments").

**App.1342**

Appellate Case: 24-1628     Page: 1347     Date Filed: 03/26/2024 Entry ID: 5377362

the rules as proposed. Perhaps most significantly, the Supreme Court's decision in *West Virginia v. EPA*[17] emphasized a "common sense" principle of statutory interpretation that readily applies here: the major questions doctrine. That doctrine instructs that Congress does not delegate to agencies highly consequential powers—including the power to resolve the types of "major questions" addressed in the Proposed Rules—in "modest words, vague terms, or subtle devices."[18] Rather, when Congress "wishes to assign to an agency decisions of vast economic and political significance," Congress "speak[s] clearly"[19]—but, as the Chamber has previously explained,[20] here, Congress did not. While the Commission may have some latitude in requiring the disclosure of certain types of material, financial information, Congress never delegated to the Commission the comprehensive statutory power to reorder the market as the Commission claims. Nor did Congress delegate to the Commission the authority to regulate air emissions that contribute to climate change, which the Environmental Protection Agency (EPA) regulates pursuant to the Clean Air Act. Moreover, as the record indicates, the Proposed Rules would compel speech on controversial issues fraught with uncertainty and reasonable grounds for debate—a clear violation of the First Amendment.

For these and a multitude of other reasons documented in the record, the Commission should abandon the overly prescriptive, unduly burdensome approach of the Proposed Rules and should instead work with stakeholders to craft a more practical, durable approach to climate disclosures that builds on the work that the Commission and American businesses have already been doing. The Chamber, in its initial comments, laid forth a constructive path forward, and we urge the Commission to take it.

The flaws in the Commission's proposal are not just errors of substance, but of process. Simply put, the Commission is moving too quickly. As the Chamber previously warned, the speed at which the Commission has been seeking to push through a huge volume of proposals has risked depriving even the Commission's own staff of the time needed to develop thoughtful, properly tailored rule proposals.[21] The Chamber's warnings have borne out. The Commission recently reported that its own systems have been unable even to *capture* all of the public comments the Commission has received,[22] let alone facilitate a thorough review of those comments. The Commission's Inspector General has identified other difficulties still. In a report attached as Exhibit A, the Inspector General highlighted concerns from managers in numerous SEC divisions that the Commission's "more aggressive [rulemaking] agenda" has "limit[ed] the time available for staff research and analysis."[23] The staff has not "received as much feedback during the

---

[17] 142 S. Ct. 2587 (2022).

[18] *Id.* at 2609 (cleaned up).

[19] *Id.* at 2605 (quoting *Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 324 (2014)).

[20] *See* Chamber Comments 25.

[21] *See* Chamber Comments 83.

[22] *See* Resubmission of Comments, 87 Fed. Reg. 63,016, 63,016 (Oct. 18, 2022).

[23] The Inspector General's Statement on the SEC's Management and Performance Challenges 3 (Oct. 13, 2022), https://www.sec.gov/files/inspector-generals-statement-sec-mgmt-and-perf-challenges-october-2022.pdf.

Appellate Case: 24-1628     Page: 1348     Date Filed: 03/26/2024 Entry ID: 5377362

rulemaking process, either as a result of shortened timelines during the drafting process or because of shortened public comment periods."[24]  The staff is also shorthanded, and thus has been "relying on detailees, in some cases with little or no experience in rulemaking."[25]  The Commission should proceed at a more manageable pace that ensures stakeholders are able to provide the input the Commission needs, and which gives the Commission the time it requires to do its important job properly.

## I.  THE PROPOSAL IS SUBJECT TO UNUSUALLY WIDESPREAD CRITICISM.

Perhaps the best evidence that the Commission failed to strike the right balance in the proposal is the degree to which virtually every segment of the market agrees that the Proposed Rules present a number of significant concerns.  From investors the Commission cited in support of its proposal, to corporate governance professionals who will implement it, to auditors who will opine on the required disclosures, a broad range of key commenters agree that the Proposed Rules go too far.

### A.  Investors the Commission cited in support of the proposal agree that aspects of the Proposed Rules are overly costly.

In support of the Proposed Rules, the Commission repeatedly cited a demand for climate-related disclosure from select institutional investors.[26]  Many of those same investors, however, after having weighed the Proposed Rules, agree that aspects of the Commission's rules are unreasonably costly.

Proposed Article 14 of Regulation S-X is a prime example of the Commission's overreach.  Among other things, Article 14 would require companies to calculate the impacts of severe weather events, transition activities, and other climate-related risks *on every line item on their financial statements*, and then disclose, on a line-by-line basis, any impacts that aggregated to 1% or more of a line item.[27]  This would be a massively costly undertaking,[28] but offers no discernible benefit to investors.  State Street, for example, explained that the line-by-line reporting contemplated by the proposal would be a huge "operational burden" for companies, yet would produce information that is "far too granular to inform investment decisions."[29] Numerous other investors agree.  T. Rowe Price stated that Article 14 would not "result in meaningful or

---

[24] *Id.*
[25] *Id.*
[26] *See, e.g.*, Proposing Release, 87 Fed. Reg. at 21,338 n.38 (citing letters from BlackRock, Ceres, Council of Institutional Investors, Investment Adviser Association, Investment Company Institute, State Street Global Advisors).
[27] *Id.* at 21,366.
[28] *See, e.g.*, Chamber Comments 53-54; Society for Corporate Governance Comments 65-67; ConocoPhillips Comments 2; NAM Comments 29-31.
[29] State Street Comments 5.

**App.1344**
Appellate Case: 24-1628     Page: 1349     Date Filed: 03/26/2024 Entry ID: 5377362

comparable climate disclosures."[30]  The Investment Company Institute warned that the information would "not be useful to investors" and would risk "overloading" them with "inconsequential information that [would] complicate their analysis of [a] company's operations and financial condition."[31]  BlackRock cautioned that the resulting disclosures would "dilute the materiality of [other] climate-related financial disclosures and potentially mislead investors into assuming that [the] data [were] more relevant or reliable than it actually [would be]."[32]  This broad range of concerns—from the same investors the Commission intends to serve—is a strong indication that the Commission has not proposed a rule aligned with the type of information investors need, and that the factual predicate and asserted rationale for the Proposed Rules are legally inadequate.[33]

That misalignment is also evident in other significant aspects of the Proposed Rules.  For instance, investors agree that, at least for now, disclosure of Scope 3 emissions data would be of limited use, and yet the Commission has proposed a Scope 3 disclosure requirement that would impose enormous burdens on public companies.[34]  According to T. Rowe Price, for example, "the reality is that [Scope 3] methodologies continue to be under development and, in its current state, Scope 3 GHG data is of limited reliability."[35]  There is simply "no uniform methodology or approach" to calculating Scope 3 emissions, and thus, T. Rowe Price explained, it would be "highly unlikely that Scope 3 GHG disclosures [would] provide comparable, useful, material, climate-related information" to investors.[36]  For that reason, T. Rowe Price[37] and many other investors,[38] including a "large majority" of the Investment Company Institute's

---

[30] Comments of T. Rowe Price 8 (June 16, 2022), https://www.sec.gov/comments/s7-10-22/s71022-20131721-302138.pdf ("T. Rowe Price Comments").

[31] Comments of the Investment Company Institute 28 (June 16, 2022), https://www.sec.gov/comments/s7-10-22/s71022-20131852-302300.pdf ("ICI Comments"); *see also* Comments of Investment Adviser Association 23 (June 17, 2022), https://www.sec.gov/comments/s7-10-22/s71022-20132612-303149.pdf ("IAA Comments") (explaining that the Commission "has not provided an adequate justification" for a 1% line-item materiality standard).

[32] BlackRock Comments 19.

[33] *See also, e.g.*, Comments of Scott Fitzpatrick, Missouri State Treasurer 2 (June 17, 2022), https://www.sec.gov/comments/s7-10-22/s71022-20132271-302800.pdf (explaining that proposed Article 14 is not "likely to be financially material to a reasonable investor"); Comments of Council of Institutional Investors 20 (May 19, 2022), https://www.sec.gov/comments/s7-10-22/s71022-20129121-294979.pdf (acknowledging that the "SEC has failed to justify a 1% threshold for" line-item reporting); Comments of State Financial Officers Foundation 2 (June 17, 2022), https://www.sec.gov/comments/s7-17-22/s71722-20132175-302672.pdf (stating that the "increased costs of compliance" will be "borne by issuers, with no clear benefits to the issuers or investors").

[34] *See, e.g.*, Chamber Comments 71; NAM Comments 21-23; ConocoPhillips Comments 10; Society for Corporate Governance Comments 45-46.

[35] T. Rowe Price Comments 4.

[36] *Id.*

[37] *Id.*

[38] *See, e.g.*, State Street Comments 4 ("[W]e urge the Commission to refrain from mandating Scope 3 emissions disclosures, and consult further with a range of constituencies regarding the path forward on Scope 3 GHG reporting."); IAA Comments 15 ("We believe it is premature at this point to require disclosure of Scope 3 GHG emissions due to data gaps and the absence of agreed-upon measurement methodologies.").

members, agree that the "Commission should *not* require companies to report Scope 3 emissions at this time."[39]

Investors similarly agree that the Commission should not require firms to file Scope 1 and 2 GHG emissions data in their annual reports. As BlackRock acknowledged, the collection and analysis of "quantitative climate-related data ... often requires companies to collect and aggregate data from various internal and external sources."[40] This "cannot be completed on the same timeline as issuers' annual reports."[41] Accordingly, as BlackRock and others recommended, the Commission should, at the very least, give public companies "more time after the annual report deadline to prepare the information required" to be disclosed.[42, 43] Only then will the information even possibly be of the level of "quality and accuracy" that investors need.[44] Moreover, as investors have confirmed, there is no reason to require (as the Commission proposes) that the disclosures be filed with the Commission, rather than furnished. Furnishing the information strikes the right balance; it provides information to investors without unnecessarily subjecting companies to the stricter liability associated with "filed" disclosures.[45] Once again, the Commission's more burdensome approach goes too far and would impose enormous burdens for little benefit.

The Commission's proposal also includes requirements that may ultimately affirmatively harm investors' interests. For example, the Commission proposes to require detailed disclosures regarding a board of directors' oversight of climate-related risks, including the identity of any board member who has climate-related expertise.[46] The value of such detailed disclosures is questionable[47] and may operate "to the

---

[39] ICI Comments 15 (emphasis added) ("A large majority of our members believe that the Commission should not require companies to report Scope 3 emissions at this time, because of significant data gaps and the absence of agreed-upon methodologies to measure Scope 3 emissions. These deficiencies seriously undermine the ability of most companies to report consistent, comparable, and verifiably reliable data.").

[40] BlackRock Comments 6.

[41] *Id.*

[42] *Id.*

[43] BlackRock notes that this timeline should allow the disclosure to be produced simultaneous to a corporate issuer's proxy statement, allowing investors time to absorb the information contained within before voting on annual meeting items. BlackRock Comments 6, 13.

[44] *Id.* at 6-7; *see also* T. Rowe Price Comments 6 ("To allow registrants the opportunity to provide accurate and reliable data, which will be more useful for investors, we recommend that Scope 1 and 2 GHG emissions be disclosed in a furnished form due within 120 days of the fiscal year end ....").

[45] *See, e.g.*, T. Rowe Price Comments 6 ("[W]e recommend that Scope 1 and 2 GHG emissions be disclosed in a furnished form ...."); State Street Comments 5 ("The Commission should allow registrants to provide any additional climate disclosures in a furnished, rather than field, format on a *comply* or *explain* basis.").

[46] Proposing Release, 87 Fed. Reg. at 21,359.

[47] *See, e.g.*, BlackRock Comments 13 ("Prescribing such a granular level of required disclosures under these proposed items would likely require issuers to disclose a large volume of information that is, on the one hand, unlikely to be material for investors, and on the other hand, may be competitively sensitive for issuers."); IAA Comments 10 ("For example, the Proposal requires disclosure of whether any member of a registrant's board of directors has expertise in climate-related risks, with disclosure required in sufficient detail to fully describe the nature of the expertise. It is unclear to us what metrics would be used to determine what qualifies as expertise in climate-related risks or how it would be measured .... We also generally believe that the board's experience and expertise as a

detriment of the company's investors."[48]  As the Investment Company Institute warned, the detailed disclosure requirements regarding board composition and expertise "may cause companies to create larger, and possibly less cohesive, boards."[49]  Or as T. Rowe Price cautioned, the pressure to find board members with "[s]ingle-issue expertise" will come at the expense of the more "well-rounded candidates" investors prefer—the type of board members who are "able to contribute in multiple ways to a company's governance."[50]  This range of concerns over the detrimental effects of the Commission's proposal is widely held in the investment community.[51]

As the above discussion indicates, the rules as proposed do not accurately reflect or advance the needs of the investors whom the rules are intended to benefit.

### B. People who would implement the Proposed Rules agree that they are unworkable.

The Commission's rules as proposed are not only unwarranted, but unworkable. At every level of implementation, commenters explained that the Proposed Rules cannot reasonably be implemented and that significant aspects of the proposal are not feasible.

The public companies who would be directly subject to the Proposed Rules will not be able to operationalize key parts of the Commission's proposal.  Regulation S-X, for example, would require public companies to calculate the impacts of severe weather events, transition activities, and other climate-related risks on every line item on their financial statements.[52]  As the National Association of Manufacturers explained, "[f]rom a practical standpoint, the processes and procedures necessary to conduct the financial statement analysis that would be required under the proposed rule simply do not exist."[53]  The detailed analysis required by Regulation S-X "would effectively require detailed tagging of financial impacts at the invoice level."[54]  "Companies would be required to count every single financial impact that could plausibly be attributable to climate risks, weather events, or transition activities, somehow determine the degree of climate causation associated with each, and then aggregate these impacts to determine

---

collective whole may be more important than having individual members with specific expertise and it is not clear how this experience would be treated.").
[48] ICI Comments 25.
[49] *Id.*
[50] T. Rowe Price Comments 7.
[51] *See, e.g.*, State Street Comments 6 ("Investors do not expect companies to focus climate risk expertise within a designated director, as it could impact their ability to identify and appoint directors with other experience."); BlackRock Comments 13 ("We believe that robust board oversight with respect to climate requires a whole-of-the-board approach, and the identification of 'specialist' directors is not conducive to a holistic undertaking by the board.").
[52] *See* Proposing Release, 87 Fed. Reg. at 21,366.
[53] NAM Comments 29.
[54] *Id.*

App.1347

Appellate Case: 24-1628     Page: 1352     Date Filed: 03/26/2024 Entry ID: 5377362

if they meet the proposed 1% threshold—for each line item in the consolidated financial statements."[55] As a multitude of commenters explained, "[c]ompanies' existing systems do not currently track data at such a granular level."[56]

The deadlines the Commission is proposing are similarly unworkable. For example, the Proposed Rules would require public companies to disclose Scope 1, 2, and 3 emissions data in their annual reports on Form 10-K.[57] Again, that is not doable. Companies must file annual reports on Form 10-K within ninety days of the end of their fiscal year[58] (and often sooner[59]). That is not enough time to produce GHG disclosures. According to the Society for Corporate Governance—an association of more than 3,600 corporate and assistant secretaries, in-house counsel, outside counsel, and other governance professionals—Scope 1 and 2 GHG emissions would generally take about six months to produce.[60] Scope 3 GHG emissions would take even more time.[61] These estimates are well supported in the record. A recent review, for example, found that more than 80% of sustainability reports are not published until the second quarter of the following year or later.[62] That is likely why the deadlines for other GHG reporting schemes—for example, the Carbon Disclosure Project—are not until late July.[63] The Commission's 90-day-or-less proposal is simply unworkable.

Public companies are not alone in objecting to significant aspects of the Commission's proposal. Auditors agree that the Proposed Rules "will result in various practical implementation challenges."[64] As discussed, public companies do not

---

[55] *Id.*

[56] *Id.* at 29-30; *see also* Society for Corporate Governance Comments 64 ("[W]e do not believe that registrants can operationalize the portions of the Proposed Rule that would amend Regulation S-X. To comply with these portions of the Proposed Rule, registrants would be forced to spend a significant period of time and inordinate amounts of money to develop and implement controls to estimate and model outputs built on several disparate judgments and assumptions."); ConocoPhillips Comments 7-8 ("There are several elements of this disclosure that will be particularly difficult, if not impossible, to implement …. We, along with many other companies, do not segregate and track in our systems the costs and benefits of climate-related risks or events, the costs of mitigating such risks, or the estimates and assumptions underlying such metrics. Compliance with the proposed rules, and particularly at the level of granularity required for financial statement line items under the proposed rules, will require registrants to implement an entirely separate and additional set of books or ledgers of activity-based costing, which will be costly and time-consuming. For instance, systems and processes for tagging and tracking costs across our entire supply chain would need to be redesigned. There will also be reporting lags for discrete events that cannot be tagged until they have concluded."); Comments of Exxon Mobil Corporation 5 (June 17, 2022), https://www.sec.gov/comments/s7-10-22/s71022-20132323-302882.pdf ("ExxonMobil Comments") (explaining that the "Proposal's amendments to Reg. S-X to include line-item disclosures in a note to the financial statements would, in our view, pose significant challenges in real-world application for many registrants").

[57] Proposing Release, 87 Fed. Reg. at 21,448.

[58] *See* 17 C.F.R. § 249.310(b)(3).

[59] *See id.* § 249.310(b)(1)-(2).

[60] Society for Corporate Governance Comments 52.

[61] *Id.*

[62] NAM Comments 8.

[63] Society for Corporate Governance Comments 52; NAM Comments 8.

[64] Comments of Center for Audit Quality 2 (June 17, 2022), https://www.sec.gov/comments/s7-10-22/s71022-20131819-302262.pdf ("CAQ Comments").

currently have systems in place to tag and aggregate the information needed to disclose the impacts of severe weather events and other natural conditions on each line item of a company's financial statements. Moreover, and as Ernst & Young explained, once costs and other expenditures are recorded in an IT system, they are often "pooled by the system in various intermediate accounts and departments" before ultimately being "allocated to the appropriate financial statement line items."[65] This would make it "difficult to know precisely which line item includes the climate-related expenditures or portions of the climate-related expenditures."[66] As a result, an independent auditor would not have sufficient information to "be able to perform sufficient procedures to audit" a company's disclosures and related internal controls.[67] These and related concerns are shared broadly by the audit community[68] and are a further indication that the Commission's proposal is misaligned with the current preferences and capabilities of the market.

## II. THE RECORD REFUTES THE COMMISSION'S COST-BENEFIT ANALYSIS, WHICH CONTAINS FUNDAMENTAL FLAWS.

By the Commission's own estimate, the Proposed Rules are among the most costly in its history, yet the Commission's cost-benefit analysis is fundamentally flawed.

### A. The Commission underestimated the proposal's costs.

Although the Commission has a "unique obligation" to "apprise itself—and hence the public and the Congress—of the economic consequences of proposed regulation,"[69] the record demonstrates that the Commission has failed to adequately consider the costs of its proposal. Indeed, the record refutes the Commission's cost-benefit analysis.

The Commission's cost estimates are far too low. The Commission estimated that, excluding assurance costs, companies other than smaller reporting companies would incur initial compliance costs of $640,000 and annual ongoing compliance costs of $530,000.[70] The record does not support those estimates. To the contrary, record evidence indicates that the "cost of implementation and compliance for issuers [would] be orders of magnitude greater than the estimates in the Proposal."[71] Companies would

---

[65] Comments of Ernst & Young LLP, Appendix 3 (June 17, 2022), https://www.sec.gov/comments/s7-10-22/s71022-20131957-302416.pdf ("Ernst & Young Comments").

[66] *Id.*

[67] *Id.*

[68] *See, e.g.*, CAQ Comments 12; Comments of KPMG LLP 4 (June 16, 2022), https://www.sec.gov/comments/s7-10-22/s71022-20131616-301992.pdf; Comments of Deloitte & Touche LLP 4 (May 31, 2022), https://www.sec.gov/comments/s7-10-22/s71022-20129946-296218.pdf.

[69] *Business Roundtable v. SEC*, 647 F.3d 1144, 1148 (D.C. Cir. 2011).

[70] *See* Proposing Release, 87 Fed. Reg. at 21,439.

[71] ExxonMobil Comments 12; *see also* Society for Corporate Governance Comments 41 ("[A]ll of the members who participated in the comment letter process and that specifically weighed in on this issue indicated that

need to "rework [their] accounting and financial reporting systems and processes to allow tagging and aggregate reporting of climate-related effects, by [financial statement] line-item."[72]  For a large corporation, this would cost a "multiple of the combined costs required to implement two recent FASB Standards—*Leases* and *Revenue from Contracts with Customers*"—both of which "were multi-year projects that cost tens of millions of dollars."[73]  Thus, systems changes alone could "easily reach into the hundreds of millions of dollars."[74]  In addition, companies would need to increase staffing and training on climate-related issues,[75] and also amend contracts with third-parties to require the sharing of climate-related data—a process that could impact thousands of contracts and require "tens of thousands of hours" of employee time.[76]  All in all, the implementation costs for some large companies would likely exceed $100 million.[77]

Ongoing compliance costs also would be substantial.  Far from the Commission's $530,000 estimate,[78] some large companies would spend at least $4 to $5 million per year on ongoing compliance costs,[79] with many spending a lot more—up to $25 million per year.[80]  To comply with the Proposed Rules, companies would need to spend millions of dollars on added headcount,[81] yet the Commission's estimate for annual internal costs of $150,000[82] "is likely insufficient to cover the cost of adding a *single* qualified full-time employee."[83]    External costs would rise as well—and far above the Commission's estimates.[84]    The Commission estimates assurance and added audit

_____

their company believes that the Proposing Release grossly or significantly underestimates the implementation and ongoing compliance costs.  By way of example, some comments we received include:  The company thinks that the SEC's estimated costs 'are off by an order of magnitude.'  'The cost of complying with the SEC rule is expected to be several times of order of magnitude greater than preparing voluntary disclosures.'  The company believes that the Proposing Release 'grossly underestimates the implementation and compliance costs.'").

[72] ExxonMobil Comments 12; *see also* ConocoPhillips Comments 14; NAM Comments 29; API Comments 24-25; Williams Companies Comments 14.  Companies in the energy sector are among the companies most experienced with making climate-related disclosures; their cost estimates are therefore particularly credible.

[73] ExxonMobil Comments 12.

[74] *Id.*

[75] *Id.*; ConocoPhillips Comments 14.

[76] ConocoPhillips Comments 14.

[77] *See id.* ("[W]e expect implementation costs for our company to be in the $100-500 million range ...."); ExxonMobil Comments 12 ("The cost of significant structural changes to existing enterprise resource planning systems for large corporations can easily reach into the hundreds of millions of dollars.")

[78] Proposing Release, 87 Fed. Reg. at 21,439.

[79] *See* Society for Corporate Governance Comments 40.

[80] *See* ConocoPhillips Comments 14.

[81] *See* Society for Corporate Governance Comments 89.

[82] Proposing Release, 87 Fed. Reg. at 21,439.

[83] Williams Companies Comments 15 (emphasis added).

[84] The Commission's estimates are outdated and fail to account for inflation.  For example, the Commission estimates "that the average cost of retaining outside professionals [would be] $400 per hour."  Proposing Release, 87 Fed. Reg. at 21,458.  The Commission has used that estimate "for about 16 years."  Comm'r Mark T. Uyeda, Statement on the Final Rule Related to Listing Standards for Recovery of Erroneously Awarded Compensation (Oct. 26, 2022), https://www.sec.gov/news/statement/uyeda-statement-102622.  It is far too low.  In a different rulemaking, the Commission recently "revised that number to $600 per hour—a 50% increase, to reflect an inflation adjustment."

App.1350

Appellate Case: 24-1628     Page: 1355     Date Filed: 03/26/2024 Entry ID: 5377362

costs for large companies at around $110,000[85] and $15,000,[86] respectively, per year, but commenters agree that those numbers are too low. Ernst & Young expressed concern that the Commission's estimate may not "appropriately reflect the time and expertise required to meet ... auditor's obligations."[87] Some public companies have estimated these costs at $1 to $2 million per year,[88] nearly ten to twenty times the Commission's estimate.

The record does not support the Commission's estimate. In support of its estimate, the Commission cited a June 2021 letter from the Williams Companies, which stated that a management level director spends about 25% of his time on sustainability reports and ESG issues and that the firm pays a third-party consultant more than $250,000 per year to assist with sustainability reports and ESG issues.[89] As Williams has since explained, those costs are not indicative of what the firm would pay to comply under the Proposed Rules. The compliance costs for the rules as proposed would be much higher. For example, Williams would "be unable to leverage its prior efforts to disclose both Scope 1 and 2 GHG emissions because the SEC is [proposing to] requir[e] emissions disclosures on a different timeline, using different methodologies, and requiring different levels of attestation."[90] The cost to the company of voluntarily reporting Scope 3 GHG emissions would add more than $1 million alone, not including the costs of the "accounting personnel [needed] to incorporate Scope 3 emissions reporting into [the] Form 10-K or any commercial efforts needed to amend contracts or attempt to gather and verify Scope 3 emissions data across [the company's] value chain."[91] As Williams concluded, the Commission's cost estimates are "woefully low."[92]

In an attempt to bolster the Commission's estimates, activist groups cite a survey by ERM,[93] which claims that the "SEC's estimated annual costs after the first year of compliance are generally comparable to corporate issuers' current average spend."[94]

*Id.*; *see Listing Standards for Recovery of Erroneously Awarded Compensation*, Securities Act Release No. 11,126, Exchange Act Release No. 96,159, Investment Company Act Release No. 34,732 (October 26, 2022). The Commission should make similar adjustments here before it even begins to reevaluate the other deficiencies in its cost estimates.

[85] Proposing Release, 87 Fed. Reg. at 21,442.

[86] *Id.* at 21,455.

[87] Ernst & Young Comments, Appendix 4.

[88] *See* Society for Corporate Governance Comments 89.

[89] *See* Proposing Release, 87 Fed. Reg. at 21,440-41 & n.925.

[90] Williams Companies Comments 14; *see also* Society for Corporate Governance Comments 23 (explaining that the Proposed Rules would require more and different disclosures than companies are currently voluntarily providing).

[91] Williams Companies Comments 14.

[92] *Id.* at 15.

[93] *See* Comments of Ceres 48 (June 17, 2022), https://www.sec.gov/comments/s7-10-22/s71022-20132097-302580.pdf; Comments of Persefoni AI Inc. 2 (June 17, 2022), https://www.sec.gov/comments/s7-10-22/s71022-20132512-302998.pdf.

[94] Costs and Benefits of Climate-Related Disclosure Activities by Corporate Issuers and Institutional Investors 8, https://www.sustainability.com/globalassets/sustainability.com/thinking/pdfs/2022/costs-and-benefits-

App.1351

Appellate Case: 24-1628     Page: 1356     Date Filed: 03/26/2024 Entry ID: 5377362

Yet, the ERM survey does not support the Commission's estimates and is flawed. As an initial matter, public companies' "current average spend" is not indicative of what their average spend would be under the Proposed Rules. As numerous commenters have explained, from virtually every vantage point—from public companies,[95] to auditors,[96] to investors[97]—the rules as proposed require more and different disclosures than companies are currently making. Thus, if the Proposed Rules were adopted as constructed, public companies would spend substantially more than they spend today.[98] ERM's estimate of a "*current* average spend" of $533,000[99] is further evidence that the Commission's estimate of *future* compliance costs of $530,000 is far too low.[100] That is especially true given a fundamental flaw in ERM's analysis. Buried in a footnote, ERM reveals that it calculated average costs by including responses of "zero."[101] That serves only to artificially depress ERM's calculations, as is confirmed by review of the "zero" responses. For example, one respondent "marked zero for 'internal climate-related investment analysis' noting that '[t]his does not reflect hours of FTE time'"[102]—but employee hours *should* be included; the "zero" response is misleading and biases the results. Thus, by its own admission, ERM's estimates are flawed.

The record also reveals other costs that the Commission failed to consider. As explained by the Office of Advocacy of the U.S. Small Business Administration,[103] the Commission's own Small Business Capital Formation Advisory Committee,[104] and the

---

of-climate-related-disclosure-activities-by-corporate-issuers-and-institutional-investors-17-may-22.pdf ("ERM Survey").

[95] *See, e.g.*, Society for Corporate Governance Comments 23-43; Williams Companies Comments 14-15; Chamber Comments 61-63.

[96] *See, e.g.*, CAQ Comments 2 ("[W]e think it's important to acknowledge that many companies are voluntarily reporting under different organizational boundaries than proposed. As a result, companies could encounter reporting challenges and burdens as they move toward reporting under a different boundary.").

[97] *See, e.g.*, BlackRock Comments 4 ("[W]e are concerned that certain elements of the proposal, which go beyond or differ from the recommendations of the TCFD, will decrease the effectiveness of the Commission's overarching goal of providing reliable, comparable, and consistent climate-related information to investors."); State Street Comments 5 ("We do not agree with the Commission's proposal to require registrants to include quantitative information about climate-related financial risks and climate-related financial metrics in their financial statements. The introduction of any percentage threshold for such disclosure—particularly calibrated at 1%, on a line-by-line basis—would be a huge operational burden given registrants have to monitor and perform the calculation on a quarterly basis. Such a low threshold would be a significant departure from the well-established U.S. GAAP accounting definition of materiality, and also has no premise in TCFD.").

[98] *See, e.g.*, Williams Companies Comments 14-15.

[99] ERM Survey 5.

[100] Proposing Release, 87 Fed. Reg. at 21,439.

[101] ERM Survey 18 n.20.

[102] *Id.* at 11.

[103] *See* Comments of the Office of Advocacy, U.S. Small Business Administration (June 17, 2022), https://www.sec.gov/comments/s7-10-22/s71022-20131758-302192.pdf ("Small Business Administration Advocate Comments").

[104] *See* Comments of the SEC Small Business Capital Formation Advisory Committee 1 (July 13, 2022), https://www.sec.gov/comments/s7-10-22/s71022-20134360-304077.pdf (urging the Commission to provide "a more detailed cost-benefit analysis, including the impact that the proposed rules would have on smaller public and private companies").

App.1352

Appellate Case: 24-1628     Page: 1357     Date Filed: 03/26/2024 Entry ID: 5377362

Ranking Member of the House Committee on Small Business,[105] the Commission failed to adequately consider the toll that the Proposed Rules would take on the United States' small businesses. In the Proposing Release, the Commission stated that the "nature of any benefits or costs associated with the [Proposed Rules] would be similar for large and small entities"[106]—but that is untrue. Small businesses would need to "allocate larger shares of their technological, financial, and staff resources" to come into compliance with the Proposed Rules than larger firms;[107] and many small businesses have less developed climate-disclosure programs than their larger peers. "Representatives from the biotechnology, plastics, and equipment manufacturing industries," for example, have reported to the Office of Advocacy "that small businesses in their industries have not traditionally tracked GHG emissions or other climate-related metrics," and would thus need to build out reporting programs from scratch.[108] This will be a massive undertaking that the Commission must factor into its cost-benefit analysis.

The Commission also must consider the effects the Proposed Rules would have "across the economy," "beyond the costs" imposed directly on public companies.[109] As former SEC chief economists S.P Kothari and Craig Lewis explained, the Commission "does not attempt to understand" those indirect costs and costs on non-public companies.[110] This was a multi-billion-dollar oversight. To plug the hole in the Commission's analysis, and to determine the Proposed Rules' impact on U.S. economic activity more broadly, Professor Matthew Winden employed the Regional Economic Models, Inc.'s ("REMI") model of the U.S. economy.[111] REMI is an "economic and demographic model in wide use throughout federal agencies, individual states, academic institutions, and consulting firms" to "model the impact policy changes [will]

---

[105] *See* Comments of Blaine Luetkemeyer, Ranking Member, House Committee on Small Business et al. 2 (July 20, 2022), https://www.sec.gov/comments/s7-10-22/s71022-20134840-305978.pdf ("As the U.S. economy struggles to recover, unleashing a devastating and an unrealistic climate disclosure regime that goes well beyond the publicly traded companies, impacting nearly every small business, is irresponsible. Small firms simply cannot afford the additional burdens of the proposed rule.").

[106] Proposing Release, 87 Fed. Reg. at 21,462.

[107] Small Business Administration Advocate Comments 5.

[108] *Id.*

[109] Kothari & Lewis Comments 7.

[110] *Id.*

[111] Winden Report 4.

have on the economy."[112]  Using the Commission's own cost estimates,[113] Professor Winden found that the Proposed Rules would cost the U.S. economy $25 billion in forgone GDP and 200,000 fewer jobs *per year*.[114]  To put those numbers in perspective, 200,000 fewer jobs per year would be the equivalent of the U.S. losing an entire month of job creation every year under normal growth.[115]  The Commission must consider these major costs and consequences of the Proposed Rules.

Opportunity costs need to enter the equation as well.  Money spent on implementing (and enforcing) a vast, mandatory reporting program has to come from somewhere.  Companies and the Commission alike would need to reallocate their budgets and priorities—potentially taking funding and effort away from more valuable activities.  As Professor Taylor explained, the "Commission's cost-benefit analysis should articulate what specific functions will be diminished as a result of the resources needed to implement the Proposal and should account for the effect of diminished resources in other (non-climate-related) areas on investors and markets."[116]  The Commission has not performed this analysis, either with regard to the Commission or with regard to the private sector.  For example, studies show that additional compliance spending on public reporting hampers innovation.[117]  As companies spend more money on mandatory reporting, they spend less on research and development—a dynamic that could very well slow the type of innovation needed to address climate change.[118]  The Commission must factor these opportunity costs into its analysis.

---

[112] *Id.*; *see, e.g.*, *DOT Hours of Service of Drivers*, 68 Fed. Reg. 22,456, 22,484 (Apr. 28, 2003) (utilizing the REMI model to "give an approximate picture of the relative effects of the alternatives on economic growth and employment across the country"); *EPA Effluent Limitations Guidelines and Standards for the Construction and Development Point Source Category*, 73 Fed. Reg. 72,562, 72,591 (Nov. 28, 2008) (using the REMI model to "derive a more comprehensive estimate of the potential long-term effects on the national economy"); *Fixing Our Broken Immigration System: The Economic Benefits to Agriculture and Rural Communities*, 2013 WL 3874832, at *2 (White House July 29, 2013) ("According to an economic analysis by the Regional Economic Models, Inc. (REMI), an expanded H-2A visa program … would raise GDP by approximately $2 billion in 2014 and $9.79 billion in 2045."); *Petition of Champlain VT, LLC*, 2016 WL 146200, at *30 (Vt. Pub. Serv. Bd. Jan. 5, 2016) ("REMI offers one of the more sophisticated regional economic models for impact analysis.  The model is well-documented, regularly updated, and has been widely used in Vermont and the nation, including use by the [Vermont] Department [of Public Service]."); George I. Treyz, *Regional Economic Modeling: A Systematic Approach to Economic Forecasting and Policy Analysis* (1993) (employing REMI models).

[113] *See* Winden Report 5.

[114] *Id.* at 7.

[115] *Id.*

[116] Taylor Comments 8.

[117] Martin Daks, *Mandated Financial Disclosures Leads to Fewer Innovative Companies*, Chicago Booth Review (June 6, 2022), https://www.chicagobooth.edu/review/mandated-financial-disclosure-leads-fewer-innovative-companies.

[118] The private sector is continually innovating.  For example, at the recent White House Summit for Advanced Air Mobility, government officials noted that 20% of CO2 emissions are generated from wildfires and that, on the day of the summit, there were 53 active wildfires in the United States.  Unmanned Aircraft Systems (UAS), being developed by the private sector, provide an important step forward in combatting wildfires.  Unlike current aircraft and helicopters, whose fire-fighting operations are hampered by smoke, fog and darkness, advances in UAS

App.1354

B.     The Commission overstated the proposal's benefits.

The Commission erred on both sides of the ledger:  just as its cost estimates were too low, its benefits estimates were too high.  The Chamber has already shown that many investors do not believe that certain significant aspects of the proposal will produce valuable information.[119]  The Commission's benefits analysis is flawed in other important respects as well.

The Commission did not adequately evaluate an important aspect of its proposal: a notable plank of the Proposed Rules is the requirement to disclose GHG emissions, which the Commission defended by asserting that "GHG emissions information is important to investment decisions."[120]  However, as former SEC chief economist James Overdahl explained, the Commission failed to show that this assertion was actually true.[121]  The Commission could, for example, "have employed well-known 'event study' techniques to assess the price or volume responses to climate-related disclosures, but the Commission did not conduct any such analysis, even though event studies are a standard method of assessing financial materiality."[122]  Had the Commission conducted this analysis, it would have found that GHG emissions are generally *not* material to investors, and that a major plank of the Commission's proposal would offer little benefits.

Professor Daniel Taylor conducted the study the Commission did not.[123]  Professor Taylor is an expert in corporate disclosure and routinely conducts statistical analysis of price and trading data to assess the materiality of disclosures.[124]  In this case, Professor Taylor compiled a sample of all Form 8-Ks filed between January 2021 and March 2022 that disclosed GHG emissions.[125]  Form 8-K disclosures are "highly visible disclosures," so if *any* GHG disclosures are material, it would be these.[126]  Using standard event study techniques, Professor Taylor then analyzed whether there was a statistically significant change in stock price or trading volume in response to the GHG disclosures.[127]  His study revealed that no such correlation existed—a powerful indication that "investors do not update their beliefs about value (upward or downward) in light of GHG emissions data."[128]  Professor Taylor's study is direct empirical evidence that GHG emissions disclosures—the exact type of disclosures the Commission

---

may allow for firefighting against wildfires to operate continuously in a 24-hour period.  This innovation will help to mitigate CO2 emissions and the impact of wildfires on the environment.

[119] *Supra* pp. 5-7.
[120] Proposing Release, 87 Fed. Reg. at 21,373.
[121] *See* Overdahl Report ¶ 34.
[122] *Id.* ¶ 37.
[123] *See* Taylor Comments.  Professor Taylor's comments are hereby incorporated by reference.
[124] *Id.* at i.
[125] *Id.* at 4.
[126] *Id.* at 3.
[127] *Id.* at 6.
[128] *Id.*

App.1355
Appellate Case: 24-1628     Page: 1360     Date Filed: 03/26/2024 Entry ID: 5377362

proposes to require in its Proposed Rules—typically do "not contain material information" for investors.[129]  Thus, the Commission's blanket assertion about investor benefits linked to GHG emissions for all public companies is false.

Professor Taylor's findings undermine the Commission's benefits analysis in other ways, as well.  Professor Taylor finds "GHG emissions are extremely highly correlated over time (e.g., autocorrelation coefficient of 0.977)."[130]  This means that, on average, one year's GHG emissions will be "almost the same" as the prior year's GHG emissions.[131]  If that is the case, the Commission can claim little benefit to requiring every company to disclose GHG emissions every year.  Such frequent and broad disclosures provide little marginal value.

Indeed, the record contains little evidence on how investors would actually use the disclosures that are proposed to be mandated.  Investors confirm that much of the information would, in many respects, not be useful.[132] While some investors state, for example, that they would use the GHG emissions data as a proxy for climate-risk exposure,[133] nothing in the record indicates what additional value the required disclosures would provide beyond what is already readily available (or could be made available through reasonable, less-burdensome alternatives).  As Dr. Overdahl explained—and as Professor Taylor confirmed[134]—much climate-related information can be "extracted from publicly-observable information such as industry sector, company size and the like, without a need for company-specific climate reporting."[135] To take just one example, a full "90% of the variation in [a company's] GHG emissions can be inferred from information that is already publicly available," including "industry membership; company size; sales growth; earnings growth; the value of plant, property, and equipment; capital expenditures; and profitability."[136]  The record does not indicate what benefit, if any, the remaining 10% would add[137]—a question the Commission does not address.[138]

---

[129] *Id.*

[130] *Id.* at 7.

[131] *Id.*

[132] *Supra* pp. 5-7.

[133] *See, e.g.*, Comments of California State Teachers' Retirement System 2 (June 17, 2022), https://www.sec.gov/comments/s7-10-22/s71022-20132337-302902.pdf ("CalSTRS Comments").

[134] *See* Taylor Comments 7.

[135] Overdahl Report ¶ 38.

[136] Taylor Comments 7.

[137] It is important to recall that climate-related information "is just one piece of information among many other factors that inform an investment decision."  Overdahl Report ¶ 34.  So determining the final 10% of variation in a company's GHG emissions is just a small part of a company's overall valuation, with other factors, such as "cash flows, profitability, industry segment, company size, and the like" informing the analysis.  *Id.*

[138] *See* Kothari & Lewis Report 7 ("[T]he Commission does not even attempt to assess the benefits of the Proposal qualitatively, much less quantitatively.")

17

C.      Recent events have already overtaken the Commission's analysis.

Just a few months ago, the Commission proposed another climate-related rule: "Enhanced Disclosures by Certain Investment Advisers and Investment Companies About Environmental, Social, and Governance Investment Practices."[139] That proposal fundamentally changes the cost-benefit landscape.  If adopted, the new proposal would require certain investment funds to make disclosures about their portfolio companies' GHG disclosures[140]—the same types of disclosures that the Commission proposes to require public companies to make here.  These rules cannot be considered in a vacuum.  The Commission should analyze the costs and benefits of both rules together and then re-open the comment files; only then can the public meaningfully comment on the Commission's interrelated rule proposals.

III.   THE RECORD AND RECENT SUPREME COURT PRECEDENT CONFIRM THAT THE COMMISSION LACKS AUTHORITY TO FINALIZE THE RULES AS PROPOSED.

On top of everything else, the rules as proposed suffer from a fatal flaw: the Commission does not have the authority to finalize them.  Numerous commenters, including respected legal scholars representing a wide range of perspectives, have detailed the legal flaws in the Proposed Rules.[141]  Record evidence and recent Supreme Court precedent confirm those conclusions.

A.      The major questions doctrine confirms the Commission's lack of statutory authority.

What the text and structure of the securities laws already establish,[142] the major questions doctrine confirms:   the Commission is a financial regulator, not an environmental agency; it does not have the authority to direct environmental policy for American businesses or to resolve major questions relating to climate change.[143]

In *West Virginia v. EPA*, the Supreme Court emphasized a "common sense" principle of statutory interpretation known as the major questions doctrine:  Congress does not delegate to agencies highly consequential powers—including the power to resolve "major questions"—in "modest words, vague terms, or subtle devices."[144]  To the

---

[139] 87 Fed. Reg. 36,654 (June 17, 2022).  *See generally* Comments of the U.S. Chamber of Commerce, File No. S7-12-22 (Aug. 12, 2022), https://www.sec.gov/comments/s7-17-22/s71722-20137309-307871.pdf.

[140] *See* 87 Fed. Reg. 36,715-16.

[141] *See, e.g.*, Law and Finance Professors Comments (Apr. 25, 2022), https://www.sec.gov/comments/s7-10-22/s71022-20126528-287180.pdf.

[142] *See* Chamber Comments 25-30.

[143] *See generally* Comments of Attorney General of West Virginia et al. (July 13, 2022), https://www.sec.gov/comments/s7-10-22/s71022-20134128-303943.pdf; Comments of Amb. C. Boyden Gray (July 8, 2022), https://www.sec.gov/comments/s7-10-22/s71022-20133906-303832.pdf.

[144] *West Virginia*, 142 S. Ct. at 2609 (cleaned up).

18

contrary, when Congress "wishes to assign to an agency decisions of vast economic and political significance," Congress "speak[s] clearly."[145]

The SEC should consider the major questions doctrine before moving forward on a rule. In arguing that the Securities Act and the Exchange Act empower the Commission to impose an incredibly burdensome reporting regime for the disclosure of non-financial climate-related information, regardless of materiality, the Commission claims to have "'discovered in [ ] long-extant statute[s] an unheralded power' representing a 'transformative expansion in its regulatory authority.'"[146] As the Chamber and others have explained, the Commission's authority has traditionally been understood to be limited to requiring the disclosure of information that is both financial in nature and necessary for investors to assess a security's value to avoid fraud or other undue risk.[147] The rules as proposed would turn this regulatory regime on its head. Instead of requiring the disclosure of core financial information, such as a profit and loss statement[148]—information that is "indispensable to any accurate judgment upon the value of a security"[149]—the Commission would require a firm to disclose, every year, among other things, the level of sulfur hexafluoride released, not just by the firm itself, but by the utility provider supplying energy for the firm's operations.[150] There are many reasons to be "skeptic[al]" of the Commission's claim to authority.[151]

The sheer magnitude of the economic consequences of the Proposed Rules provides reason for concern. As the Supreme Court has emphasized, Congress does not lightly confer on an agency an extravagant statutory power to regulate a "significant portion of the American economy"[152] or to require "billions of dollars in spending" by private entities.[153] However, that is the exact power the Commission has claimed in its rules as proposed. By its own estimate, the Commission estimates that the Proposed Rules would hit the economy with $6.38 billion in direct costs per year—and that is not including the 24 million "internal" hours people would spend that the Commission states that companies will need to devote to compliance on an annual basis,[154] nor the burden on non-public companies. There is reason to doubt that a power of this magnitude has gone unrecognized by the Commission since its inception. The better explanation is that the rules as proposed go beyond the SEC's statutory authority as a securities regulator, and that the rules venture into areas within the domain of other

---

[145] *Id.* at 2605 (quoting *Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 324 (2014)).

[146] *Id.* at 2610 (cleaned up) (quoting *Util. Air*, 573 U.S. at 324).

[147] *See* Chamber Comments 26; API Comments 6.

[148] *See* 15 U.S.C. § 77aa sched. A(26).

[149] *Business and Financial Disclosure Required By Regulation S-K*, 81 Fed. Reg. 23,916, 23,921 (Apr. 22, 2016) (quoting H.R. Rep. No. 73-85, at 3 (1933), 1933 WL 983, at *4).

[150] Proposing Release, 87 Fed. Reg. at 21,375.

[151] *West Virginia*, 142 S. Ct. at 2609 (quoting Util. Air, 573 U.S. at 324).

[152] *Id.* at 2608 (quoting *Util. Air*, 573 U.S. at 324).

[153] *King v. Burwell*, 576 U.S. 473, 485 (2015); *accord West Virginia*, 142 S. Ct. at 2621 (Gorsuch, J., concurring).

[154] *See* Proposing Release, 87 Fed. Reg. at 21,461.

agencies, such as the EPA and the Department of Energy, to which Congress has explicitly assigned the authority to protect the environment and to regulate the energy sector. It bears emphasis that, as discussed in the Chamber's initial comments, EPA already requires reporting of greenhouse gas emissions pursuant to sections 114 and 208 of the Clean Air Act.[155]

The "political significance" of the rules as proposed is cause for additional skepticism.[156] The comment file in this rulemaking is likely among the largest in Commission history. Commenters from trade associations,[157] individual companies,[158] public interest organizations,[159] environmental groups,[160] individual investors,[161] activists,[162] other governmental agencies,[163] state and local governments,[164] and members of Congress,[165] have an opinion on the proper handling of the climate-related issues addressed in the Commission's proposal. However, if Congress intended to empower the Commission to resolve issues of such "'earnest and profound debate'

---

[155] *See generally* Revisions and Confidentiality Determinations for Data Elements Under the Greenhouse Gas Reporting Rule, 87 Fed. Reg. 36,920, 36,924-25, 37,016 (Jun. 21, 2022) (proposed rule); Mandatory Reporting of Greenhouse Gases, 74 Fed. Reg. 56,260, 56,260, 56,264-65, 56,286-87 (Oct. 30, 2009) (final rule) ("comprehensive reporting rule," "requir[ing] reporting of greenhouse gas emissions from all sectors of the economy").

[156] *West Virginia*, 142 S. Ct. at 2605 (quoting *Util. Air*, 573 U.S. at 324); *accord id.* at 2620 (Gorsuch, J., concurring) (quoting *NFIB v. OSHA*, 142 S. Ct. 661, 665 (2022)).

[157] *See, e.g.*, Chamber Comments; API Comments; NAM Comments.

[158] *See, e.g.*, ConocoPhillips Comments; ExxonMobil Comments.

[159] *See, e.g.*, Comments of the American Enterprise Institute (June 17, 2022), https://www.sec.gov/comments/s7-10-22/s71022-20132286-302818.pdf.

[160] *See, e.g.*, Sierra Club Comments (June 16, 2022), https://www.sec.gov/comments/s7-10-22/s71022-20131996-302457.pdf.

[161] *See, e.g.*, Chris Paladino Comments (May 17, 2022), https://www.sec.gov/comments/s7-10-22/s71022-294617.htm.

[162] *See, e.g.*, Nora Coyle Comments (Mar. 28, 2022), https://www.sec.gov/comments/s7-10-22/s71022-273590.htm.

[163] *See, e.g.*, Small Business Administration Advocate Comments.

[164] *See, e.g.*, West Virginia Attorney General et al. Comments (June 15, 2022), https://www.sec.gov/comments/s7-10-22/s71022-20131409-301574.pdf; California Attorney General et al. Comments (June 17, 2022), https://www.sec.gov/comments/s7-10-22/s71022-20131887-302340.pdf ("California AG Comments")

[165] *See, e.g.*, Rep. John Rose et al. Comments (May 25, 2022), https://www.sec.gov/comments/s7-10-22/s71022-20131193-301363.pdf; Rep. Patrick McHenry et al. Comments (June 15, 2022), https://www.sec.gov/comments/s7-10-22/s71022-20131300-301417.pdf; Rep. Kathy Castor et al. Comments (June 28, 2022), https://www.sec.gov/comments/s7-10-22/s71022-20133259-303498.pdf; Sen. Edward J. Markey et al. Comments (June 17, 2022), https://www.sec.gov/comments/s7-10-22/s71022-20131934-302384.pdf; Sen. Brian Schatz et al. Comments (June 17, 2022), https://www.sec.gov/comments/s7-10-22/s71022-20131760-302194.pdf; Sen. Jack Reed et al. Comments (June 17, 2022), https://www.sec.gov/comments/s7-10-22/s71022-20132548-303088.pdf; Sen. Sheldon Whitehouse et al. Comments (Mar. 15, 2022), https://www.sec.gov/comments/s7-10-22/s71022-20126843-287556.pdf; Sen. John Hoeven et al. Comments (June 10, 2022), https://www.sec.gov/comments/s7-10-22/s71022-20131027-300525.pdf; Sen. Kevin Cramer et al. Comments (Apr. 5, 2022), https://www.sec.gov/comments/s7-10-22/s71022-20131192-301362.pdf; Sen. Joe Manchin III Comments (Apr. 4, 2022), https://www.sec.gov/comments/s7-10-22/s71022-20131155-301360.pdf.

App.1359

Appellate Case: 24-1628    Page: 1364    Date Filed: 03/26/2024 Entry ID: 5377362

across the country," it would have provided clear congressional authorization to that effect.[166]

Congress did not do so. The Commission cites a series of generic disclosure provisions tacked onto statutory sections concerning core financial information,[167] but these provisions do not amount to the "clear congressional authorization" the major questions doctrine demands.[168] Moreover, in claiming the broad climate power that is asserted here, the Commission "cannot ignore"[169] that a number of bills have been introduced in Congress to require climate-related disclosures, but that none have been enacted.[170] That is a "telling" indication that the Commission's "proposed course of action" reflected in the Proposed Rules is beyond the agency's legitimate reach.[171]

## B. The record reveals other statutory problems in the Commission's approach.

Comments submitted in support of the Commission's proposal highlight other statutory flaws in the Commission's approach.

At times echoing the Commission, a number of commenters argued that the Commission should adopt the Proposed Rules because the commenters will use the required disclosures to allocate risk across their "portfolios" or to track their "portfolio's progress in meeting [their] goal to achieve a net zero emissions portfolio."[172] These are not valid reasons for adopting the Proposed Rules. As the Chamber has previously explained, at the time Congress enacted the Securities Act and Exchange Act, the concept of materiality was a background assumption already baked into pre-existing common law.[173] As Commissioner Peirce has explained, materiality turns on the importance of information with respect to an investment decision in a particular company,[174] not "in terms of [a] security's effect on [a] portfolio as a whole."[175]

---

[166] *Gonzales v. Oregon*, 546 U.S. 243, 267 (2006); *accord West Virginia*, 142 S. Ct. at 2614; *id.* at 2620 (Gorsuch, J., concurring).

[167] *See* Chamber Comments 26-28.

[168] *West Virginia*, 142 S. Ct. at 2609 (quoting *Util. Air*, 573 U.S. at 324).

[169] *Id.* at 2614.

[170] *See, e.g.*, Climate Risk Disclosure Act of 2019, H.R. 3623; Climate Risk Disclosure Act of 2019, S. 2075.

[171] *West Virginia*, 142 S. Ct. at 2620-21 (Gorsuch, J., concurring).

[172] CalSTRS Comments 2-3.

[173] *See* Chamber Comments 29.

[174] *See, e.g.*, *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976) ("An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote.").

[175] Statement of Comm'r Hester M. Peirce (Mar. 21, 2022), https://www.sec.gov/news/statement/peirce-climate-disclosure-20220321; *accord* Society for Corporate Governance Comments 9 ("A critical aspect of this definition [of materiality] is that it focuses on whether information is important in the context of a reasonable investor's voting or investment determination with respect to a particular company, and not on whether the information may be useful to an investor for other reasons."); CAQ Comments 13 ("'[M]ateriality is an entity-specific aspect of relevance based on the nature or magnitude or both of the items to which the information relates in the context of an individual entity's financial report.'").

21

App.1360

Other commenters have urged the Commission to adopt the Proposed Rules on the ground that certain climate-related information, such as GHG emissions, are *always* material,[176] but that reasoning is legally flawed as well and is inconsistent with the comments summarized above from many investors. When the Supreme Court has addressed materiality, it has almost always done so in the context of claims of fraud, in which the concept of materiality is rooted.[177] The Court has never suggested that issuers have a general obligation to provide information of interest to investors, or information which might enable certain market participants to make even more remunerative investments. The concept of materiality itself does not usually lend itself to per se rules; rather, the principles-based approach on which the Commission has previously relied, and on which the MD&A rules are based, is typically the proper, statutorily-required approach.

## C. The record confirms the Chamber's First Amendment analysis.

As the Chamber previously explained, the Proposed Rules raise serious constitutional questions.[178] Recent Fifth Circuit precedent highlights the non-delegation concerns raised by the Chamber,[179] but perhaps even more clearly, the record confirms the Chamber's First Amendment analysis.[180]

The First Amendment "prohibits the government from telling people what they must say."[181] The Proposed Rules do exactly that and fail to survive standard strict-scrutiny analysis.[182] Thus, the Proposed Rules cannot stand.

A number of commenters try to avoid this reality by suggesting that the First Amendment does not apply to the financial markets at all,[183] but that is untrue. As Professors Tushnet et al. acknowledge, "the Supreme Court has *never* expressly held that securities regulation falls outside First Amendment coverage."[184] To the contrary, the Court has recognized that "[f]rom 1791 to the present," "the First Amendment has 'permitted restrictions upon the content of speech in [only] a few limited areas,'" including obscenity, defamation, and fraud.[185] The First Amendment has "never

---

[176] *See* California Public Employees' Retirement System Comments 19 (June 15, 2022), https://www.sec.gov/comments/s7-10-22/s71022-20131391-301546.pdf. *But see* Taylor Comments ii (finding "no evidence" that GHG emissions were material to investors).

[177] *See, e.g.*, *Basic Inc. v. Levinson*, 485 U.S. 224, 231 (1988); *TSC Indus.*, 426 U.S. at 449.

[178] *See* Chamber Comments 39-43.

[179] *See Jarkesy v. SEC*, 34 F.4th 446, 459-63 (5th Cir. 2022); Chamber Comments 42-43.

[180] *See* Chamber Comments 39-42.

[181] *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47, 61 (2006).

[182] *See* Chamber Comments 39-41.

[183] *See, e.g.*, Comments on Rebecca Tushnet 2 (June 17, 2022), https://www.sec.gov/comments/s7-10-22/s71022-20132173-302670.pdf ("Tushnet Comments") ("The regulation of securities-related speech has likewise traditionally been treated as outside the scope of protected speech.").

[184] *Id.* at 3 (emphasis added).

[185] *United States v. Stevens*, 559 U.S. 460, 468 (2010).

22

'include[d] a freedom to disregard those traditional limitations.'"[186]   Commenters suggest that the Proposed Rules may be lawful anyway, because the government has long required disclosures in the financial context.[187]   However, the D.C. Circuit has squarely rejected "this form of argumentation:  'Whatever is is right'; an aphorism that would be as final as it is lazy, did not include the troublesome consequence, that nothing that ever was, was wrong."[188]  Financial regulation is subject to the same First-Amendment analysis as any other form of regulation.

Turning to the customary First-Amendment analysis, some commenters assert that the Proposed Rules would be subject to a lesser degree of scrutiny, not strict scrutiny.  That would not save the rules anyway,[189] but given the record, it is plain that lesser scrutiny does not apply.  To the extent the Supreme Court has subjected some compelled disclosures to lesser scrutiny, it has done so, as the Chamber has previously explained,[190] only where the disclosures involved "commercial advertising" and were "purely factual and uncontroversial."[191]  Neither standard is met here.  The Proposed Rules do not regulate "commercial speech," as some commenters suggest.[192] Commercial speech "does no more than propose a commercial transaction."[193] While "an advertisement" that "refers to a specific product" may qualify as "commercial speech,"[194] the financial disclosures the Proposed Rules seek to regulate are not advertisements.  Moreover, the Proposed Rules plainly force companies to wade into controversial issues.  The comment file, in significant respects, has already turned into a debate about the likelihood of future climate regulation,[195] the connection between climate-change and certain severe weather events,[196] and much more—all controversial issues (outside the SEC's expertise) on which the Proposed Rules would require companies to speak.   The proposal would require anything but a purely factual disclosure of, say, a company's net income, but, rather, would require companies to make public statements regarding subjective judgment calls about future risks[197]—all in an environment where those statements would be used to "stigmatize" companies and

---

[186] *Id.*

[187] *See, e.g.*, Tushnet Comments 3-4; Comments of the Knight First Amendment Institute at Columbia University 2-3 (June 17, 2022), https://www.sec.gov/comments/s7-10-22/s71022-20131800-302235.pdf.

[188] *Nat'l Ass'n of Mfrs. v. SEC*, 800 F.3d 518, 521 (D.C. Cir. 2015).

[189] *See* Chamber Comments 41-42.

[190] *See id.* at 41.

[191] *Nat'l Ass'n of Mfrs.*, 800 F.3d at 522-23.

[192] *See, e.g.*, Tushnet Comments 4-5.

[193] *Id.* (quoting *United States v. United Foods, Inc.*, 533 U.S. 405, 409 (2001)).

[194] *Id.* at 5 (quoting *Spirit Airlines, Inc. v. U.S. Dep't of Transp.*, 687 F.3d 403, 412 (D.C. Cir. 2012)).

[195] *Compare, e.g.*, California AG Comments 7 (strict climate regulation is likely), *with* Competitive Enterprise Institute Comments 19 (June 2022), https://www.sec.gov/comments/s7-10-22/s71022-20131635-302011.pdf (strict climate regulation is not likely).

[196] *Compare, e.g.*, California AG Comments 2, 6 (wildfires are attributable to climate change and are increasing) *with* Ambassador C. Boyden Gray Comments 44-45 (June 2022), https://www.sec.gov/comments/s7-10-22/s71022-20132160-302652.pdf (there is no robust evidence that wildfires are increasing).

[197] *See, e.g.*, Proposing Release, 87 Fed. Reg. at 21,345.

App.1362

attempt to "shape their behavior."[198]  The First Amendment does not allow such compulsion.

* * *

The Chamber stands ready to work with the Commission to improve the Proposed Rules.  As we have repeatedly indicated, the Chamber supports policies that provide for the disclosure of material, climate-related information as necessary to protect investors. However, any such policy must be informed by the best science and a careful analysis of the economic tradeoffs.  As this letter details, the rules as proposed miss the mark.  In our initial comments, we laid out a more practical, durable approach for the Commission to follow, and we urge the Commission to take it.  American businesses are already doing significant work in this space, and the Commission can work with them to build on those efforts.

Sincerely,

Tom Quaadman
Executive Vice President
Center for Capital Markets
Competitiveness
U.S. Chamber of Commerce

---

[198] *Nat'l Ass'n of Mfrs.*, 800 F.3d at 530.

# Exhibit A

Appellate Case: 24-1628    Page: 1369    Date Filed: 03/26/2024 Entry ID: 5377362



**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
WASHINGTON, D.C. 20549

**OFFICE OF
INSPECTOR GENERAL**

# M E M O R A N D U M

October 13, 2022

**TO:**       Gary Gensler, Chair

**FROM:**   Nicholas Padilla, Jr., Acting Inspector General

**SUBJECT:**  *The Inspector General's Statement on the SEC's Management and Performance Challenges, October 2022*

The Reports Consolidation Act of 2000 requires the U.S. Securities and Exchange Commission's (SEC or agency) Office of Inspector General to identify and report annually on the most serious management and performance challenges facing the SEC.[1] In deciding whether to identify an area as a challenge, we consider its significance in relation to the SEC's mission; its susceptibility to fraud, waste, and abuse; and the SEC's progress in addressing the challenge. We compiled the attached statement on the basis of our past and ongoing audit, evaluation, investigation, and review work; our knowledge of the SEC's programs and operations; and information from the U.S. Government Accountability Office and SEC management and staff. We reviewed the agency's response to prior years' statements, and assessed its efforts to address recommendations for corrective action related to persistent challenges. We previously provided a draft of this statement to SEC officials and considered all comments received when finalizing the statement. As we begin fiscal year 2023, we again identified the following as areas where the SEC faces management and performance challenges to varying degrees:

- Meeting Regulatory Oversight Responsibilities
- Protecting Systems and Data
- Improving Contract Management
- Ensuring Effective Human Capital Management

Information on the challenge areas and the corresponding audit, evaluation, investigation, or review work are discussed in the attachment. If you have any questions, please contact me or Rebecca L. Sharek, Deputy Inspector General for Audits, Evaluations, and Special Projects.

---

[1] Pub. L. No. 106-531, § 3a, 114 Stat. 2537-38 (November 22, 2000).

Attachment

cc:  Prashant Yerramalli, Chief of Staff, Office of Chair Gensler
       Heather Slavkin Corzo, Policy Director, Office of Chair Gensler
       Kevin Burris, Counselor to the Chair and Director of Legislative and Intergovernmental
          Affairs
       Scott Schneider, Counselor to the Chair and Director of Public Affairs
       Ajay Sutaria, GC Counsel, Office of Chair Gensler
       Phillip Havenstein, Operations Counsel, Office of Chair Gensler
     Hester M. Peirce, Commissioner
       Benjamin Vetter, Counsel, Office of Commissioner Peirce
     Caroline A. Crenshaw, Commissioner
       Malgorzata Spangenberg, Counsel, Office of Commissioner Crenshaw
     Mark T. Uyeda, Commissioner
       Holly Hunter-Ceci, Counsel, Office of Commissioner Uyeda
     Jaime Lizárraga, Commissioner
       Laura D'Allaird, Counsel, Office of Commissioner Lizárraga
       Parisa Haghshenas, Counsel, Office of Commissioner Lizárraga
     Dan Berkovitz, General Counsel
       Elizabeth McFadden, Deputy General Counsel, General Litigation/Acting
          Managing Executive
       Lisa Helvin, Principal Deputy General Counsel for Adjudication and Oversight
     Kenneth Johnson, Chief Operating Officer
       Shelly Luisi, Chief Risk Officer
         Jim Lloyd, Audit Coordinator/Assistant Chief Risk Officer, Office of Chief Risk Officer

U.S. SECURITIES AND
EXCHANGE COMMISSION

October 13, 2022

OFFICE OF

# INSPECTOR GENERAL

# The Inspector General's Statement on the SEC's Management and Performance Challenges

# CONTENTS

ABBREVIATIONS ................................................................................................................ ii

CHALLENGE: Meeting Regulatory Oversight Responsibilities ............................................ 1

    Managing Resources While Meeting the Regulatory Agenda ........................................ 1

    Figure 1. Number of Rulemaking Activities on the SEC's Regulatory Agenda (Spring 2017 – Spring 2022) ................................................................................................................ 2

    Figure 2. Number of New SEC Rules Proposed (2017 – August 2022) ........................ 2

    Keeping Pace With Changing Markets and Innovations ................................................ 4

    Table 1. Number of RIAs (FY 2018 – July 2022) .......................................................... 5

    Use of Technology and Analytics to Meet Mission Requirements and Respond to Significant Developments and Trends ............................................................................................ 6

    Figure 3. Number of TCRs Received (2019, Quarter 2 – 2022, Quarter 3) ................... 7

CHALLENGE: Protecting Systems and Data .................................................................... 9

    Evaluating and Addressing the Cause(s) and Impact of a Material Weakness Related to Insufficient User Access Controls ............................................................................... 10

    Strengthening the SEC's Cybersecurity Posture ....................................................... 11

    Table 2. Certain Open Cybersecurity Recommendations as of October 2022 ............. 11

    Maturing the SEC's Information Security Program ...................................................... 12

    Table 3. Summary of SEC FISMA Ratings (FY 2020 and FY 2021) ........................... 13

CHALLENGE: Improving Contract Management ............................................................... 15

    Synopsis and Trends in SEC Contracting ................................................................... 15

    Figure 4. SEC Annual Contractual Services and Supplies Obligations, in Thousands, as a Percentage of Total Annual Budgetary Authority (FY 2017 – FY 2021) ....................... 15

    Figure 5. Top NAICS Codes Associated With the SEC's FY 2022 Contract Obligations ............. 16

    Focus on Diversity, Equity, and Inclusion ................................................................... 17

    T&M Contracts ............................................................................................................ 18

    Figure 6. Percentage of SEC T&M Award Obligations Compared to Total SEC Award Obligations (FY 2018 – FY 2022) ............................................................................... 19

CHALLENGE: Ensuring Effective Human Capital Management .......................................... 21

    Retention, Attrition, Recruitment, and Hiring ............................................................... 21

    Figure 7. Total SEC Attrition (in Number of Positions) and Attrition Rate (FY 2011 – FY 2022) ... 22

    Figure 8. SEC FY 2022 Expected Attrition by Paygrade and Position ......................... 22

    Responding to COVID-19: Workforce Perspectives .................................................... 25

App.1368

## ABBREVIATIONS

| | |
|---|---|
| **CAT** | Consolidated Audit Trail |
| **CISA** | Cybersecurity and Infrastructure Security Agency |
| **COVID-19** | Coronavirus Disease 2019 |
| **Enforcement** | Division of Enforcement |
| **EXAMS** | Division of Examinations |
| **FISMA** | Federal Information Security Modernization Act of 2014 |
| **FY** | fiscal year |
| **GAO** | U.S. Government Accountability Office |
| **IT** | information technology |
| **Kearney** | Kearney & Company, P.C. |
| **LH** | labor-hour |
| **NAICS** | North American Industry Classification System |
| **OA** | Office of Acquisitions |
| **OASB** | Office of the Advocate for Small Business Capital Formation |
| **OHR** | Office of Human Resources |
| **OIAD** | Office of the Investor Advocate |
| **OIG** | Office of Inspector General |
| **OIT** | Office of Information Technology |
| **OMB** | Office of Management and Budget |
| **OMWI** | Office of Minority and Women Inclusion |
| **RIA** | registered investment adviser |
| **SAM** | System for Award Management |
| **SEC, agency, or Commission** | U.S. Securities and Exchange Commission |
| **SLC** | Service Level Commitment |
| **T&M** | time-and-materials |
| **TCR** | tips, complaints, and referrals |
| **TRENDS** | Tracking and Reporting Examination National Documentation System |
| **WTTS** | Workforce Transformation and Tracking System |

Appellate Case: 24-1628     Page: 1374     Date Filed: 03/26/2024 Entry ID: 5377362

## CHALLENGE: Meeting Regulatory Oversight Responsibilities

The U.S. Securities and Exchange Commission (SEC, agency, or Commission) is charged with overseeing about $118 trillion in annual securities trading on the United States equity markets and the activities of more than 29,000 registered entities, including investment advisers, mutual funds, exchange-traded funds, broker-dealers, municipal advisors, and transfer agents. The agency also oversees 24 national securities exchanges, 95 alternative trading systems, 10 credit rating agencies, and 7 active registered clearing agencies, as well as the Public Company Accounting Oversight Board, the Financial Industry Regulatory Authority, the Municipal Securities Rulemaking Board, the Securities Investor Protection Corporation, and the Financial Accounting Standards Board. In addition, the SEC is responsible for selectively reviewing the disclosures and financial statements of more than 7,900 reporting companies.

As in previous years, agency management and the Office of Inspector General (OIG) recognize that the SEC's ability to meet its mission of protecting investors, maintaining fair, orderly, and efficient markets, and facilitating capital formation becomes more challenging as the markets, products, and participants within the SEC's purview increase in size, number, and complexity. The SEC's strategic plan establishes goals and initiatives to ensure that the agency focuses on the needs of investors, as well as its ability to adapt to rapidly changing markets, new technology, innovation, and evolving global risks.[1]

We describe below the challenges of (1) managing resources while meeting the SEC's regulatory agenda; (2) keeping pace with changing markets and innovations; and (3) leveraging technology and analytics to meet mission requirements and respond to significant developments and trends.

### Managing Resources While Meeting the Regulatory Agenda

Rulemaking is the process by which federal agencies implement legislation passed by Congress and signed into law by the President and, as part of its regulatory oversight responsibilities, the SEC creates or updates rules (also referred to as "regulations"). Legislation, such as the Securities Act of 1933,[2] the Securities Exchange Act of 1934,[3] the Investment Company Act of 1940,[4] the Sarbanes-Oxley Act of 2002,[5] and the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 (Dodd-Frank)[6] provide the framework for the SEC's oversight of the securities markets. The rulemaking process involves several steps that are designed to give the public an opportunity to provide their opinions on whether the agency should adopt or adopt with modifications a proposed rule. According to the Administrative Procedure Act,[7] agencies must follow an open process when issuing regulations, including publishing a

---

[1] On October 11, 2018, the SEC issued a strategic plan for fiscal years 2018 to 2022. On August 24, 2022, the SEC released for public comment a draft strategic plan for fiscal years 2022 to 2026. As of the date of this document, the new strategic plan had not been finalized.

[2] Pub. L. 73-22, 48 Stat. 74 (May 27, 1933).

[3] Pub. L. 73-291, 48 Stat. 881 (June 6, 1934).

[4] Pub. L. 76-768, 54 Stat. 789 (August 22, 1940).

[5] Pub. L. 107-204, 116 Stat. 745 (July 30, 2002).

[6] Pub. L. 111-203, 124 Stat. 1376 (July 21, 2010).

[7] Pub. L. 79-404, 60 Stat. 237, 239 (June 11, 1946).

Appellate Case: 24-1628    Page: 1375    Date Filed: 03/26/2024 Entry ID: 5377362

statement of rulemaking authority in the Federal Register for all proposed and final rules. Moreover, each fall and spring, regulatory agencies are required to publish a regulatory agenda,[8] which is how agencies announce future rulemaking activities and update the public on pending and completed regulatory actions. As Figure 1 shows, the number of rulemaking activities on the SEC's regulatory agenda between spring 2017 and spring 2022 increased overall.

**FIGURE 1. Number of Rulemaking Activities on the SEC's Regulatory Agenda (Spring 2017 – Spring 2022)**



*Source: OIG-generated based on data from the Office of Management and Budget's (OMB) Office of Information and Regulatory Affairs (https://www.reginfo.gov/public/) last accessed on September 8, 2022).*

Additionally, in only the first 8 months of 2022, the SEC proposed 26 new rules, which was more than twice as many new rules as proposed the preceding year and more than it had proposed in each of the previous 5 years. (See Figure 2.)

**FIGURE 2. Number of New SEC Rules Proposed (2017 – August 2022)**

*Source: OIG-generated based on data from the SEC (https://www.sec.gov/rules/proposed.shtml, as of August 29, 2022).*

---

[8] Pub. L. 96-354, 94 Stat. 1166 (September 19, 1980).

Appellate Case: 24-1628     Page: 1376     Date Filed: 03/26/2024 Entry ID: 5377362

We met with managers from the SEC's divisions of Trading and Markets, Investment Management, Corporation Finance, and Economic and Risk Analysis, some of whom raised concerns about increased risks and difficulties managing resources and other mission-related work because of the increase in the SEC's rulemaking activities. For example, some reported an overall increase in attrition (discussed further on page 21 of this document) and difficulties hiring individuals with rulemaking experience. In the interim, managers reported relying on detailees, in some cases with little or no experience in rulemaking. Others told us that they may have not received as much feedback during the rulemaking process, either as a result of shortened timelines the drafting process or because of shortened public comment periods. Although no one we met with identified errors that had been made, some believed that the more aggressive agenda—particularly as it relates to high-profile rules that significantly impact external stakeholders—potentially (1) limits the time available for staff research and analysis, and (2) increases litigation risk. Finally, some managers noted that fewer resources have been available to complete other mission-related work, as rulemaking teams have borrowed staff from other organizational areas to assist with rulemaking activities.

Furthermore, the SEC's rulemaking function relies on coordination and collaboration amongst several agency divisions and offices and, as we reported in our October 2021 statement on the SEC's management and performance challenges, agency leaders should take measures to strengthen communication and coordination across SEC components. Indeed, the SEC's fiscal year (FY) 2021 Agency Financial Report states that the SEC values teamwork and recognizes "that success depends on a skilled, diverse, coordinated team committed to the highest standards of trust, hard work, cooperation, and communication."[9] Additionally, the SEC's strategic plan identifies teamwork of the SEC's staff and its leaders, along with other elements, as the "foundation" of the agency.[10] To support the strategic plan's Goal 3 – "Elevate the SEC's performance by enhancing our analytical capabilities and human capital development" – the SEC committed to the following initiative:

> *3.5 Promote collaboration within and across SEC offices to ensure we are communicating effectively across the agency, including through evaluation of key internal processes that require significant collaboration.[11]*

In response to our October 2021 statement on the SEC's management and performance challenges, agency management re-affirmed its commitment to promoting effective and collaborative information-sharing across the agency.[12] Management's continued attention to strengthening communication and coordination across divisions and offices is instrumental to (1) preventing unintentional negative impacts to divisions and offices when modifying agency-wide processes, (2) maintaining positive trends in employee views on collaboration,[13] and (3) achieving the goals established in the SEC's strategic plan.

---

[9] U.S. Securities and Exchange Commission, *Fiscal Year 2021 Agency Financial Report*; November 15, 2021.

[10] U.S. Securities and Exchange Commission, *Strategic Plan Fiscal Years 2018-2022*, Goal 3; October 11, 2018.

[11] The agency's draft strategic plan for FY 2022 to FY 2026 (Goal 3) similarly emphasizes the importance of continually strengthening and promoting collaboration within and across SEC offices.

[12] U.S. Securities and Exchange Commission, *Fiscal Year 2021 Agency Financial Report*; November 15, 2021.

[13] With regards to the 2021 Federal Employee Viewpoint survey, 71 percent of agency respondents agreed that SEC managers promote communication among different work units (a 4 percentage point decrease from the previous year). In addition, 75 percent of agency respondents agreed that SEC managers support collaboration across work units to accomplish work objectives (a 3 percentage point decrease from the previous year).

App.1372

Despite management's commitment to cross-functional collaboration and communication, personnel we met with (including those from the Division of Economic and Risk Analysis, the Division of Enforcement [Enforcement], and the Office of the General Counsel, among others) identified coordination and communication as a persistent challenge in the rulemaking process, particularly given potential overlaps in jurisdiction and differences in opinions. We reported on such challenges in a management letter issued in September 2022.[14] Specifically, we reported that, around December 2021, the Office of the Chair modified the process for coordinating internal reviews of draft agency rules, resulting in the Office of the Advocate for Small Business Capital Formation (OASB)[15] and the Office of the Investor Advocate (OIAD)[16] receiving only fatal flaw drafts of proposed rules[17] for a brief period of time.[18] This change was not formally documented or communicated, and the then-directors of OASB and OIAD were not aware of the change until after it took effect. All parties involved acknowledged that the Office of the Chair has the authority to direct the agency's rulemaking process. Moreover, OASB and OIAD personnel stated that they were generally able to carry out their responsibilities. However, changes to internal processes likely to impact OASB's and OIAD's review and comment related to draft proposed agency rules may unintentionally limit their ability to fulfill their advocacy roles and carry out office functions, and may hinder effective collaboration and information sharing across the agency.[19] Although we did not make any formal recommendations, we encouraged the Office of the Chair to consider, as a management practice, notifying OASB and OIAD before future changes to the rulemaking process, potentially impacting these offices, are implemented.

## Keeping Pace With Changing Markets and Innovations

As securities markets continue to grow in size and complexity and technological advancements contribute to changes in how markets operate, the SEC's ability to remain an effective regulator requires that it continuously monitor the market environment, and as appropriate, adjust and modernize its expertise, rules, regulations, and oversight tools and activities.



*Technological advancements and commercial developments continue to change how our securities markets operate and spur the development of new products.*

Source: U.S. Securities and Exchange Commission, Fiscal Year 2021 Agency Financial Report; November 15, 2021.

Securities markets have experienced significant growth in recent years, with a record number of families holding direct and indirect stocks, and (as Table 1 shows) a record number of registered investment

---

[14] U.S. Securities and Exchange Commission, Office of Inspector General, *Final Management Letter: Changes to the Internal Review Process for Proposed Rules May Impact the Office of the Advocate for Small Business Capital Formation and the Office of the Investor Advocate* (September 29, 2022).

[15] The SEC Small Business Advocate Act of 2016 (Pub. L. No. 114-284, 130 Stat. 1447 [December 16, 2016]) requires OASB to advocate for small businesses and their investors by, among other things, analyzing the potential impact on small businesses and small business investors of Commission-proposed regulations that are likely to have a significant economic impact on small businesses and small business capital formation.

[16] Pursuant to Section 915 of Dodd-Frank and codified at Section 4(g) of the Exchange Act of 1934, OIAD is required to analyze the potential impact on investors from proposed rules and regulations of the Commission.

[17] A fatal flaw draft is the last draft circulated before the Commission votes on a proposed rule, often only a few days before the vote. It is typically the final version of the rule, to be reviewed only for critical issues, and will not incorporate policy revisions.

[18] According to agency officials, the change in the rulemaking process was reversed in early 2022.

[19] Other OIG work completed in FY 2022 also highlighted areas where collaboration and communication within the SEC could be improved. *See* U.S. Securities and Exchange Commission, Office of Inspector General, *The SEC Can Improve in Several Areas Related to Hiring* (Report No. 572; February 28, 2022).

Appellate Case: 24-1628      Page: 1378      Date Filed: 03/26/2024 Entry ID: 5377362

**TABLE 1. Number of RIAs (FY 2018 – July 2022)**

| Date | Number of RIAs |
|---|---|
| Beginning of FY 2018 | 12,616 |
| Beginning of FY 2019 | 13,222 |
| Beginning of FY 2020 | 13,458 |
| Beginning of FY 2021 | 13,810 |
| Beginning of FY 2022 | 14,719 |
| As of July 1, 2022 | 15,167 |

*Source: OIG-generated based on data provided by EXAMS.*

advisers (RIA), which represent the largest portion of the registered firm population overseen by the SEC's Division of Examinations (EXAMS).

In addition, as noted in a March 2022 White House fact sheet accompanying a new Executive Order, the crypto market is highly concentrated and has seen explosive growth in recent years, surpassing a $3 trillion market cap last November, up from $14 billion just 5 years ago.[20] The new Executive Order outlines a national policy for digital assets to include protecting consumers, investors, and businesses.[21]

In recognition of the need to protect investors and respond to the changing environment, the SEC is taking steps to address the increasing risks related to the crypto market such as (1) getting platforms registered and regulated much like exchanges; (2) coordinating with the Commodity Futures Trading Commission on determining how best to regulate platforms where trading of securities and non-securities is intertwined; and (3) identifying how to work with platforms and best ensure the protection of customers' assets. Additionally, the SEC recently announced the allocation of 20 additional positions for Enforcement's Crypto Assets and Cyber Unit, nearly doubling its size, as the volatile and speculative crypto marketplace has attracted tens of millions of American investors and traders.[22] As the SEC continues to increase its workforce and take other steps to protect investors, there is uncertainty about which agency—the SEC or the Commodity Futures Trading Commission—will have regulatory oversight responsibilities over the crypto market and what legal tools and authorities will be available. Such uncertainty can unsettle market factors and elevate risk for Main Street investors.

EXAMS also recognizes and strives to adapt to changing market factors. In its 2022 Examinations Priorities,[23] EXAMS noted significant focus areas that pose unique or emerging risks to investors or the markets, such as environmental, social, and governance investing; standards of conduct issues for broker-dealers and RIAs; and emerging technologies and crypto-assets, among others. EXAMS will continue to conduct examinations of broker-dealers and RIAs, many of which use developing financial technologies, and market participants engaged with crypto-assets, with a continued need to optimize its limited resources as it works to improve and promote compliance with regulatory requirements.

In a report we issued in January 2022, we noted steps EXAMS took to optimize its limited resources and increase efficiency and effectiveness, to include the following:

---

[20] The White House (March 9, 2022). *FACT SHEET: President Biden to Sign Executive Order on Ensuring Responsible Development of Digital Assets.*

[21] *Executive Order on Ensuring Responsible Development of Digital Assets;* March 9, 2022.

[22] Gurbir S. Grewal Director, Division of Enforcement, Testimony on "Oversight of the SEC's Division of Enforcement" Before the United States House of Representatives Committee on Financial Services Subcommittee on Investor Protection, Entrepreneurship, and Capital Markets; July 21, 2022.

[23] U.S. Securities and Exchange Commission, *Division of Examinations 2022 Examination Priorities;* March 30, 2022.

Appellate Case: 24-1628    Page: 1379    Date Filed: 03/26/2024 Entry ID: 5377362

- Moved its Tracking and Reporting Examination National Documentation System (TRENDS) to a new, cloud-based platform, which is expected to improve the system's adaptability, workflow capability, and data standardization;

- Launched a new examination support service, which among other things, assists examiners with data staging, cleansing, transformation, enrichment, and analysis; and

- Advanced its centralized asset verification program, which, according to EXAMS management, has enabled growth in the number of exams involving asset verification, as well as the amount of assets verified during these exams.[24]

Although EXAMS took these and other steps to increase efficiencies, we also reported that controls over the RIA examination planning processes needed improvement. Specifically, we found some staff commenced substantive RIA examination procedures before management approved the examination pre-fieldwork phase, and staff did not always consistently maintain key documents in TRENDS. In addition, we were unable to find documentation indicating that an examination supervisor notified registrants of non-EXAMS staff participation, as required.

We recommended that management (1) develop controls that help ensure timely supervisory approval of an examination's pre-fieldwork phase; (2) reiterate to examination staff and management the importance of and requirements for timely supervisory approval of each examination's pre-fieldwork phase; and (3) review examination documentation requirements regarding communications with registrants to ensure they are clear and examiners maintain such documentation in a consistent manner, and update examination policies as needed. Management concurred with our recommendations, which, as of the date of this document, are open and will be closed upon completion and verification of corrective action taken.

As we begin FY 2023, we will continue to monitor agency plans and actions to improve controls around supervisory approval of examinations' pre-fieldwork phase and documentation requirements regarding communications with registrants.

## Use of Technology and Analytics to Meet Mission Requirements and Respond to Significant Developments and Trends

As we reported in previous years, agency management and the OIG continue to recognize the importance of technology and analytics in the SEC's ability to efficiently and effectively meet mission requirements and respond to significant developments and trends in the evolving capital markets. The SEC's strategic plan (Goals 2 and 3, and related strategic initiatives) reflects the importance of these efforts.[25] Additionally, according to the SEC's FY 2023 Congressional Budget Justification, the economy's reliance on the rapidly changing field of data analytics is growing, and the Commission needs to adjust by

---

[24] U.S. Securities and Exchange Commission, Office of Inspector General, *Registered Investment Adviser Examinations: EXAMS Has Made Progress To Assess Risk and Optimize Limited Resources, But Could Further Improve Controls Over Some Processes* (Report No. 571, January 25, 2022).

[25] The agency's draft strategic plan for FY 2022 to FY 2026 (Goals 1, 2, and 3) similarly emphasizes that the SEC must effectively use technology and data.

App.1375

re-evaluating how it assesses data and incorporates machine learning and deep learning into its examination and enforcement functions.[26]

Notably, Enforcement analyzes a massive volume of data each year including thousands of tips, complaints, and referrals (TCR) related to allegations of possible violations of the federal securities laws or conduct that poses a risk of harm to investors. Enforcement receives TCRs from the public, self-regulatory organizations, other federal and local agencies, and other entities. As Figure 3 shows, the SEC received a record number of TCRs in the first quarter of 2022.

**FIGURE 3. Number of TCRs Received (2019, Quarter 2 – 2022, Quarter 3)**



*Source: OIG-generated based on data provided by Enforcement's Office of Market Intelligence. FY 2021 totals exclude 12,935 TCRs related to the market volatility event, and totals exclude TCRs submitted as test TCRs to validate the system.*

In an evaluation report we issued in February 2021, we reported on the SEC's process to plan and develop a future TCR system and we recommended actions to further strengthen the SEC's TCR program and TCR system management and development.[27] We also encouraged management to monitor the upward trend in TCRs, and determine whether additional actions, resources, or staff allocations were needed. Management has since taken actions to address our recommendations and is working to implement a new TCR management system. According to Enforcement's Office of Market Intelligence, the organization implemented a risk-based process to assess and triage TCRs through the use of analytics and automation, which will be incorporated into the new TCR system. In planning for the new system, the agency continues to assess the application and data, conduct market research on potential technologies, and prepare a strategic plan.

---

[26] U.S. Securities and Exchange Commission, *Fiscal Year 2023 Congressional Budget Justification and Annual Performance Plan; Fiscal Year 2021 Annual Performance Report*; March 28, 2022.

[27] U.S. Securities and Exchange Commission, Office of Inspector General, *The SEC Can Further Strengthen the Tips, Complaints, and Referrals Program* (Report No. 566; February 24, 2021).

App.1376

Appellate Case: 24-1628    Page: 1381    Date Filed: 03/26/2024 Entry ID: 5377362

Although we acknowledge the Office of Market Intelligence's use of analytics and implementation of a new TCR system, the TCR program—along with many other critical programs and systems within the SEC—must rely on personnel to correctly input data into systems. For example, with the handling of TCRs, agency staff from divisions and offices must be sure to correctly transfer TCRs to the Office of Market Intelligence. As noted in a management letter our office issued in May 2021, we identified 2 matters of 3,303 we reviewed that were not transferred from the Office of Investor Education and Advocacy to the TCR system.[28] Moreover, in FY 2022, we investigated the former SEC Ombudsman and found that the former Ombudsman failed to enter TCRs on investor matters received by the Office of the Ombudsman that warranted entry, as required by the SEC's *Commission-Wide Policies and Procedures for Handling TCRs.* Specifically, the agency's policy and corresponding administrative regulation[29] state that all SEC staff are responsible for entering TCRs into the TCR system or forwarding them to a TCR point of contact within specified timeframes, and "when in doubt, staff should err on the side of entering a TCR." Instead, the former Ombudsman directed staff within the Office of the Ombudsman to refer investors to enter their own TCRs on matters related to alleged securities law violations or fraud. As

*Improper handling of TCRs may impede SEC investor protection efforts*

previously noted, through the TCR program, the SEC receives and responds to credible allegations of possible violations of the federal securities laws. Improper handling of TCRs may impede the SEC's ability to timely and effectively protect investors.

***Ongoing and Anticipated OIG Work.*** In FY 2023, we will continue to assess how well the SEC effectively and efficiently meets its regulatory oversight responsibilities. We will follow-up on open recommendations intended to improve controls around the examination program, and we will complete an ongoing audit of the SEC's whistleblower program and an evaluation of Enforcement's efforts and goals to expedite investigations, where possible and appropriate. Finally, we will initiate a review of the SEC's oversight of entity compliance with Regulation Best Interest and Form CRS.[30]

---

[28] U.S. Securities and Exchange Commission, Office of Inspector General, *Final Management Letter: Actions May Be Needed To Improve Processes for Receiving and Coordinating Investor Submissions* (May 24, 2021).

[29] U.S. Securities and Exchange Commission, SEC Administrative Regulation 3-2, *Tips, Complaints, and Referrals (TCR) Intake Policy*; November 29, 2016.

[30] Regulation Best Interest, the new Form CRS Relationship Summary, and two separate interpretations under the Investment Advisers Act of 1940 are part of a package of rulemakings and interpretations adopted by the Commission on June 5, 2019, to enhance and clarify the standards of conduct applicable to broker-dealers and investment advisers, help retail investors better understand and compare the services offered and make an informed choice of the relationship best suited to their needs and circumstances, and foster greater consistency in the level of protections provided by each regime, particularly at the point in time that a recommendation is made.

App.1377

## CHALLENGE: Protecting Systems and Data

Because the work of the SEC touches nearly every part of the nation's capital markets and advances international regulatory, supervisory, and enforcement cooperation, it is critically important to protect agency systems and data. In 2022, the Administration along with the Cybersecurity and Infrastructure Security Agency (CISA) warned that malicious cyber activity against the United States homeland could have an impact on our nation's organizations, and threats are more pronounced because of international events.[31] The U.S. Government Accountability Office (GAO) also reported that cyber risks are growing, and cyberattacks targeting critical infrastructure—including financial services—could affect entire systems and result in catastrophic financial loss.[32] Individuals or groups with malicious intentions attempt to intrude into agency systems to obtain sensitive information, commit fraud and identity theft, disrupt agency operations, or launch attacks against other systems and networks. Even in the absence of those intentions, inadequate safeguards can lead to the unauthorized disclosure, modification, use, or disruption of information that can compromise the integrity of agency operations. Therefore, the SEC must continue to take steps to safeguard the security, integrity, and availability of its information systems and sensitive data.

SEC management has recognized that "efficient, effective, and responsible use of data and information technology (IT) is a crucial focus of the agency."[33] In its FY 2023 Congressional Budget Justification, the agency requested additional funds for IT initiatives to expand progress in key areas such as cybersecurity, secure cloud infrastructure, and data management. CISA is also continuing to publish guidance to make the federal civilian workforce more resilient to cyber threats.

The SEC's FY 2023 budget request addresses plans to hire additional personnel within the Office of Information Technology (OIT) who would provide expertise in cloud computing; strengthen security controls, policies, and procedures; and help the agency comply with requirements mandated in a recent Executive Order to move the agency toward a "zero trust" approach to cybersecurity.[34] Additionally, as we describe further below, opportunities exist to better protect SEC systems



> *A critical element of the SEC's strategy is to protect the agency's two most important assets, its people and its data, both of which are vital to executing the SEC's mission.*
>
> Source: U.S. Securities and Exchange Commission, Fiscal Year 2021 Agency Financial Report; November 15, 2021.

and data, including by evaluating and addressing the underlying cause(s) and impact of a material weakness related to insufficient user access controls, strengthening the agency's cybersecurity posture, and continuing to mature its information security program.

---

[31] The White House (March 21, 2022). *FACT SHEET: Act Now to Protect Against Potential Cyberattacks;* and CISA, *Shields Up* website (https://www.cisa.gov/shields-up, last accessed on September 9, 2022).

[32] U.S. Government Accountability Office, *CYBER INSURANCE Action Needed to Assess Potential Federal Response to Catastrophic Attacks* (GAO-22-104256, June 2022).

[33] U.S. Securities and Exchange Commission, *Fiscal Year 2023 Congressional Budget Justification and Annual Performance Plan; Fiscal Year 2021 Annual Performance Report;* March 28, 2022.

[34] Executive Order 10460, *Improving the Nation's Cybersecurity;* May 12, 2021.

Appellate Case: 24-1628    Page: 1383    Date Filed: 03/26/2024 Entry ID: 5377362

## Evaluating and Addressing the Cause(s) and Impact of a Material Weakness Related to Insufficient User Access Controls

In its FY 2021 Agency Financial Report, the SEC disclosed a newly discovered material weakness associated with lack of controls related to user access to a Commission system. Specifically, the SEC reported that the information tracking and document storage system for documents related to recommendations for certain Commission actions did not include controls sufficient to prevent access by staff who should not view such documents.[35] This is important because, while the Commission has both investigatory and adjudicatory responsibilities, the Administrative Procedure Act contemplates the separation of those functions among the agency staff who assist the Commission in each.[36] Therefore, agency employees who are investigating or prosecuting an adjudicatory matter before the Commission generally may not participate in the Commission's decision-making in that or a factually related matter. However, the identified user access control deficiency did not ensure the necessary separation of the Commission's enforcement and adjudicatory functions for administrative adjudications. The SEC's FY 2021 Agency Financial Report further noted that, while a review of the affected system was underway, action had been taken to remediate the control deficiency.

Then, in April 2022, the Commission released a statement that provided additional information about the control deficiency, along with the results of the SEC's review of the impact of the control deficiency on two ongoing federal court litigations: *SEC v. Cochran*, No. 21-1239 (S. Ct.), and *Jarkesy v. SEC*, No. 20-61007 (5th Cir.). The statement reads, in part:

> *The Commission has determined that, for a period of time, certain databases maintained by the Commission's Office of the Secretary were not configured to restrict access by Enforcement personnel to memoranda drafted by Adjudication staff. As a result, in a number of adjudicatory matters, administrative support personnel from Enforcement, who were responsible for maintaining Enforcement's case files, accessed Adjudication memoranda via the Office of the Secretary's databases. Those individuals then emailed Adjudication memoranda to other administrative staff who in many cases uploaded the files into Enforcement databases.[37]*

With respect to these two matters, according to the Commission's statement, agency enforcement staff had access to certain adjudicatory memoranda, but this access "did not impact the actions taken by the staff investigating and prosecuting the cases or the Commission's decision-making in the matters."

The SEC is continuing to review and has not yet disclosed the full impact the internal control deficiency caused by the insufficient user access controls had on the remaining affected adjudicatory matters. The Commission's statement indicated that the agency's review team will continue to assess the remaining

---

[35] U.S. Securities and Exchange Commission, *Agency Financial Report Fiscal Year 2021*; November 15, 2021.

[36] Pub. L. 79-404 60 Stat. 240 (June 11, 1946).

[37] U.S. Securities and Exchange Commission, *Commission Statement Relating to Certain Administrative Adjudications*; April 5, 2022.

affected adjudicatory matters, and additional findings will be published "in the near future." Furthermore, the Commission stated that, going forward, it will work to better protect the separation of adjudicatory work-product within the system for administrative adjudications, including by enhancing systems for controlling access to Adjudication memoranda.

In conjunction with the ongoing FY 2022 evaluation of the SEC's implementation of the Federal Information Security Modernization Act of 2014 (FISMA), we assessed the SEC's incident response related to this control deficiency, and found that the agency generally complied with applicable requirements. Nonetheless, the OIG will continue to independently review the control deficiency to understand and, as appropriate, report the full impact of this material weakness. We also will continue to monitor the agency's progress towards redesigning or replacing the systems in question.

## Strengthening the SEC's Cybersecurity Posture

The SEC is aware that protecting information systems and data is a priority, as cyber actors may exploit poor security configurations (either misconfigured or left unsecured), weak controls, and other poor cyber hygiene practices to gain initial access or as part of other tactics to compromise a system. In FY 2022, the SEC's OIT made progress by taking corrective action sufficient to close one cybersecurity-related recommendation from a previous OIG report.[38] However, as Table 2 summarizes, work remains to close other cybersecurity-related recommendations we issued before FY 2021.

**TABLE 2. Certain Open Cybersecurity Recommendations as of October 2022\***

| Report Title | Date Issued | Recommendation(s) |
|---|---|---|
| *Opportunities Exist To Improve the SEC's Management of Mobile Devices and Services* (Report No. 562) | 9/30/20 | Recommendations 5 and 6<br>Current estimated corrective action completion date: February 2023 |

*Source: OIG-generated based on recommendation tracking and follow-up records.*
*\* This does not include recommendations issued in connection with mandated annual information security evaluations, which we discuss on pages 13 and 14 of this document.*

Recognizing there is more work to be done, in FY 2023, the SEC plans to increase efforts to:

- Support the implementation of security services within agency-selected cloud capabilities.
- Enhance identity, access, and privilege management protocols and operations across platforms.
- Modernize security operations capabilities focusing on automation,
- integration of shared services and experts through managed services, and proactive capabilities to identify threats.
- Continue the implementation of a secure application development structure across all agency development teams and projects.[39]

---

[38] U.S. Securities and Exchange Commission, Office of Inspector General, *The SEC Can More Strategically and Securely Plan, Manage, and Implement Cloud Computing Services* (Report No. 556; Nov. 7, 2019), Recommendation 3.

[39] U.S. Securities and Exchange Commission, *Fiscal Year 2023 Congressional Budget Justification and Annual Performance Plan; Fiscal Year 2021 Annual Performance Report;* March 28, 2022.

Appellate Case: 24-1628   Page: 1385   Date Filed: 03/26/2024 Entry ID: 5377362

The SEC also has an open recommendation from a recent GAO report on assessing security controls related to telework. The CARES Act of 2020 contains a provision for GAO to monitor the federal response to the pandemic. Specifically, GAO was asked to examine federal agencies' preparedness to support expanded telework. In September 2021, GAO issued its report, which contained two recommendations for the SEC regarding the assessment and documentation of relevant IT security controls and enhancements.[40] Although the agency's comments to the report state that the SEC expected to complete actions to remediate the recommendations by the second quarter of FY 2022, as of September 15, 2022, remediation work was still underway for the recommendation related to ensuring that the agency documents relevant IT security controls and enhancements in the security plan for the system that provides remote access for telework. GAO concluded that if agencies do not sufficiently document relevant security controls, assess the controls, and fully document remedial actions for weaknesses identified in security controls, then agencies are at increased risk that vulnerabilities in their systems that provide remote access could be exploited.

The SEC also faces cybersecurity challenges with respect to its access, use, and security of data available through the Consolidated Audit Trail (CAT). Pursuant to an SEC rule (Rule 613), self-regulatory organizations have submitted a national market system plan to create, implement, and maintain a consolidated order tracking system, or CAT, that when fully implemented will capture customer and order event information for orders in national market system securities, across all markets, from the time of order inception through routing, cancellation, modification, or execution. In its FY 2023 budget request, the SEC noted that the CAT continues to roll out functionality as the phased launch of broker-dealer reporting and regulator functionality progresses. Because CAT data is highly sensitive, the SEC must continue working to establish an environment and applications to appropriately secure the data accessed and used by the SEC as it becomes available.

## Maturing the SEC's Information Security Program

Effective information security controls are essential to protecting the SEC's information systems and the data contained therein. To help the SEC establish and maintain effective information security controls and to comply with FISMA, the OIG annually evaluates the SEC's implementation of FISMA information security requirements and the effectiveness of the agency's information security program on a maturity model scale.[41] The OIG contracted with Kearney & Company, P.C. (Kearney) to conduct the FY 2021 independent evaluation and, on December 21, 2021, issued the report titled, *Fiscal Year 2021 Independent Evaluation of SEC's Implementation of the Federal Information Security Modernization Act of 2014* (Report No. 570).[42]

As stated in Report No. 570, since FY 2020, OIT improved aspects of the SEC's information security program. Among other actions taken, the SEC refined its management of security training roles and responsibilities, enhanced its security training strategy, implemented the agency's policy for specialized security training, optimized a vulnerability disclosure policy, refined its configuration management

---

[40] U.S. Government Accountability Office, *COVID-19: Selected Agencies Overcame Technology Challenges to Support Telework but Need to Fully Assess Security Controls* (GAO-21-583, September 2021).

[41] Pub. L. No. 113-283, § 3555, 128 Stat. 3073 (2014).

[42] As previously stated, the FY 2022 FISMA evaluation is ongoing and will be completed in the first quarter of FY 2023.

App.1381

processes related to reconciliation of software code in production, improved its incident response information-sharing capabilities, and improved its contingency planning capabilities. Notably, these improvements occurred despite the unique challenges presented by Coronavirus Disease 2019 (COVID-19).

Although the SEC strengthened its program, Kearney determined for FY 2021 that the agency's information security program did not meet annual Inspector General FISMA reporting metrics' definition of "effective," which requires the simple majority of domains to be rated as Level 4 ("Managed and Measurable").[43] As stated in

*In FY 2021, the SEC's maturity level was primarily "Consistently Implemented" or "Managed and Measurable"*

Report No. 570, the SEC's maturity level for the five Cybersecurity Framework security functions ("identify," "protect," "detect," "respond," and "recover") and related domains was primarily Level 3 ("Consistently Implemented") or Level 4 ("Managed and Measurable"). Although the SEC's program, as a whole, did not reach the level of an effective information security program, the agency showed significant improvement at the domain level. Specifically, the agency's assessed maturity level for the Security Training domain increased from Level 2 ("Defined") to Level 5 ("Optimized"). Table 3 shows the SEC's FISMA ratings in FY 2020 and FY 2021.

**TABLE 3. Summary of SEC FISMA Ratings (FY 2020 and FY 2021)**

| Domain | Assessed Rating By FY | |
|---|---|---|
| | 2021 | 2020 |
| Risk Management | Level 3: *Consistently Implemented* | Level 3: *Consistently Implemented* |
| Supply Chain Risk Management | Level 1: *Ad Hoc* | *Not Applicable* |
| Configuration Management | Level 2: *Defined* | Level 2: *Defined* |
| Identity and Access Management | Level 2: *Defined* | Level 2: *Defined* |
| Data Protection and Privacy | Level 3: *Consistently Implemented* | Level 3: *Consistently Implemented* |
| Security Training | Level 5: *Optimized* | Level 2: *Defined* |
| Information Security Continuous Monitoring | Level 3: *Consistently Implemented* | Level 3: *Consistently Implemented* |
| Incident Response | Level 4: *Managed and Measurable* | Level 4: *Managed and Measurable* |
| Contingency Planning | Level 4: *Managed and Measurable* | Level 4: *Managed and Measurable* |

*Source: OIG-generated based on Exhibit 1 from Report No. 570.*

Report No. 570 included eight new recommendations to strengthen the SEC's information security program, and highlighted opportunities to improve in all nine FY 2021 Inspector General FISMA reporting metric areas. To date, the SEC has taken corrective action sufficient to close three of these eight recommendations. However, five recommendations from prior year FISMA reports remain open (two from

---

[43] *FY 2021 Inspector General Federal Information Security Modernization Act of 2014 (FISMA) Reporting Metrics, Version 1.1*; May 12, 2021.

Appellate Case: 24-1628     Page: 1387     Date Filed: 03/26/2024 Entry ID: 5377362

FY 2017,[44] one from FY 2018,[45] and two from FY 2020[46]). We commend agency management for the actions taken to date, and encourage management to promptly act on all opportunities for improvement identified in previous FISMA reports to help minimize the risk of unauthorized disclosure, modification, use, and disruption of the SEC's sensitive, non-public information, and to assist the agency's information security program reach the next maturity level.

Finally, we continue to track the agency's progress related to an audit of the SEC's enterprise architecture (*Additional Steps Are Needed For the SEC To Implement a Well-Defined Enterprise Architecture*; Report No. 568, issued September 29, 2021). In our report, we highlighted six recommendations to improve the SEC's implementation of a well-defined enterprise architecture (four of which remain open), and one recommendation to improve the SEC's oversight of enterprise architecture support services contracts (which is closed). We understand that the agency has efforts underway to develop an enterprise roadmap for future years, and the remaining four recommendations will be closed upon completion and verification of corrective action taken.

Fully implementing recommended corrective actions from these audits and evaluations may assist the SEC as it seeks to mature aspects of its information security program, generally, and its IT program and program management, specifically.

***Ongoing and Anticipated OIG Work.*** In FY 2023, we will continue to assess the SEC's efforts to secure its systems and data and mature its information security program. Specifically, we will continue to assess the reported user access control deficiency matter, follow-up on open recommendations, complete the ongoing FY 2022 FISMA evaluation, and initiate the FY 2023 FISMA evaluation. We will also review the SEC's efforts to establish a secure environment and applications to use CAT data, determine whether the SEC implemented adequate security controls to safeguard information and IT resources during maximum telework, and assess steps the SEC has planned or taken to address "zero trust" requirements.

---

[44] U.S. Securities and Exchange Commission, Office of Inspector General, *Audit of the SEC's Compliance With the Federal Information Security Modernization Act for Fiscal Year 2017* (Report No. 546; March 30, 2018).

[45] U.S. Securities and Exchange Commission, Office of Inspector General, *Fiscal Year 2018 Independent Evaluation of SEC's Implementation of the Federal Information Security Modernization Act of 2014* (Report No. 552; December 17, 2018).

[46] U.S. Securities and Exchange Commission, Office of Inspector General, *Fiscal Year 2020 Independent Evaluation of SEC's Implementation of the Federal Information Security Modernization Act of 2014* (Report No. 563; December 21, 2020).

## CHALLENGE: Improving Contract Management

### Synopsis and Trends in SEC Contracting

The SEC substantially relies on contractor support to accomplish its mission. Contractor support is obtained through a variety of methods, including enterprise-wide contracts, U.S. General Services Administration multiple award schedule contracts, government-wide acquisition contracts, and multi-agency contracts. As markets are ever evolving and increasing in complexity, the SEC relies on contractors for technical and subject matter expertise including, but not limited to, professional legal and investigation-related services; support in areas of accounting, analytics, and examinations; and human resources support services.

To fund its contract requirements, the SEC's FY 2023 budget request included nearly $610 million for contractual services and supplies,[47] which represents about 28 percent of the total $2.149 billion requested for agency operations. As we reported in last year's statement on the SEC's management and performance challenges, annual obligations for contractual services and supplies, when expressed as a percentage of the SEC's total annual budget authority, has been increasing. This trend continued in FY 2021, with annual obligations for contractual services and supplies equaling about 32 percent of the SEC's total annual budget authority. (See Figure 4.)

**FIGURE 4. SEC Annual Contractual Services and Supplies Obligations, in Thousands, as a Percentage of Total Annual Budgetary Authority (FY 2017 – FY 2021)**



*Source: OIG-generated based on annual actual obligations by object class as reported in the SEC's Congressional Budget Justifications for FY 2019 through FY 2023.*

---

[47] According to OMB Circular No. A-11, *Preparation, Submission, and Execution of the Budget* (August 2022), the contractual services and supplies object class covers purchases in object classes 21.0 through 26.0 (Travel and transportation of persons; Transportation of things; Rent, Communications, and Utilities; Printing and reproduction; Other contractual services; and Supplies and materials).

Appellate Case: 24-1628    Page: 1389    Date Filed: 03/26/2024 Entry ID: 5377362

As contract obligations are approaching nearly a third of the agency's annual budget authority, it is essential that the SEC's acquisition workforce effectively manage these resources. Government contracts continue to be an attractive target for fraudsters. In 2021, GAO issued two reports related to contract fraud schemes within the government, focusing on programs within the Department of Defense and the Department of Energy.[48] The SEC is not invulnerable to such schemes and must remain vigilant, closely monitoring areas of risk. For example, GAO identified fraudulent billing schemes as a risk to the procurement process, and the SEC OIG has participated in cross-agency investigative efforts to fight fraudsters who impersonate government officials and submit false purchase orders associated with real government contracts, the terms of which are publicly available.

### FIGURE 5. Top NAICS Codes Associated With the SEC's FY 2022 Contract Obligations



**NAICS Codes and Descriptions:**

- *5415 – Computer Systems Design and Related Services ($377.4 million)*
- 5416 – Management, Scientific, and Technical Consulting Services ($76.1 million)
- 5182 – Data Processing, Hosting, and Related Services ($26.2 million)
- 5191 – Other Information Services ($21.6 million)
- All Other NAICS Codes ($57.5 million)

Source: OIG-generated from data retrieved from *SAM.gov* on October 6, 2022.

Although the SEC procures a wide range of services and supplies, the majority of the agency's contract support by dollars obligated is for IT services. These services include, among others, application management, business solutions delivery, IT infrastructure and support services, information security, IT governance and program strategy, data management, and software services. We reviewed the top North American Industry Classification System (NAICS) codes[49] associated with SEC contracts in FY 2022, as reported through the System for Award Management (*SAM.gov*),[50] and noted that, of the nearly $560 million obligated to contract actions that year and included in the system, the SEC obligated about 72 percent (or about $404 million) to vendors doing business under just two IT service-related NAICS codes: one for computer systems design and related services, and another for data processing, hosting, and related services. (See Figure 5.) This represents a slight increase over FY 2021 and a more significant increase over FY 2020 (when obligations under the same two NAICS codes totaled about $401 million and $351 million, respectively).[51]

---

[48] U.S. Government Accountability Office, *DOD FRAUD RISK MANAGEMENT Actions Needed to Enhance Department-Wide Approach, Focusing on Procurement Fraud Risks* (GAO-21-309, August 2021); and *DEPARTMENT OF ENERGY CONTRACTING Improvements Needed to Ensure DOE Assesses Its Full Range of Contracting Fraud Risks* (GAO-21-44, January 2021).

[49] NAICS is a comprehensive industry classification system that covers all economic activities and groups establishments into industries based on the similarity of their production processes. Among other things, U.S. statistical agencies use NAICS to provide uniformity and comparability in the presentation of statistical data describing the U.S. economy. Federal Acquisition Regulation 19.102(b) requires contracting officers to assign one NAICS code to all government solicitations, contracts, and task and delivery orders based on the product or service being acquired and its principal purpose. In this document, "top NAICS codes" refers to those codes that represent the largest amounts in terms of total annual amounts obligated.

[50] SAM is a U.S. General Services Administration Federal Government computer system that, among other things, allows users to create and run reports of detailed information on contract actions that are required to be reported by federal agencies. These are actions with an estimated value of $10,000 or more.

[51] Based on data retrieved from *SAM.gov* on October 6, 2022.

Appellate Case: 24-1628    Page: 1390    Date Filed: 03/26/2024 Entry ID: 5377362

A growing majority of contract support concentrated in IT services—and, therefore, in those segments of the agency's acquisition workforce that procure, administer, and oversee contracts for such services—potentially increases the risk to the SEC. Indeed, since 2015, GAO has reported that management of IT acquisitions and operations is a high risk area needing attention by the executive branch and Congress, stating, "federal IT investments too frequently fail or incur cost overruns and schedule slippages while contributing little to mission-related outcomes. These investments often suffer from a lack of disciplined and effective management, such as project planning, requirements definition, and program oversight and governance."[52] We have previously reported on needed improvements in the SEC's management of IT

> *Management of IT acquisitions and operations is a high risk area across the executive branch*

investments.[53] And while last July the SEC completed efforts sufficient to close our remaining recommendations for corrective action stemming from that report, the agency has also increased its investments (and, therefore, its potential risk) related to IT service contracts.

Notably, the SEC procures many of its IT services through its OneIT enterprise contract vehicle, which has a 10-year ordering period and a contract ceiling of $2.5 billion. In September 2018, the SEC began awarding time-and-material (T&M), labor-hour (LH), and firm-fixed price task orders under the OneIT contract vehicle, which included separate pools for small businesses only (restricted) and all awardees, including large businesses (unrestricted). As of June 2022, the agency had awarded task orders to 27 companies, including 5 large businesses and 22 small businesses, obligating a total of almost $450 million for task orders under this vehicle. The SEC's Office of Minority and Women Inclusion (OMWI) collaborated with key stakeholders to advertise to vendors opportunities and specifics of the OneIT program. This advertising included a publically available brochure targeted to minority-owned and women-owned businesses. OMWI received positive feedback and is looking to expand the concept to other large SEC contracts being awarded. As such, the SEC's Office of Acquisitions (OA) and OMWI are continuing to work collaboratively to increase outreach to minority-owned and women-owned businesses and continue efforts to increase the SEC's vendor diversity.

## Focus on Diversity, Equity, and Inclusion

OA and OMWI are collaborating to voluntarily implement the requirements of Executive Order 13895, which states that the federal government should pursue a comprehensive approach to advancing equity for all, including people of color and others who have been historically underserved, marginalized, and adversely affected by persistent poverty and inequality.[54] This advancing of equality includes promoting equitable delivery of government benefits and equitable opportunities, such as government contracting and procurement opportunities, which should be available on an equal basis to all eligible providers of goods and services.

---

[52] U.S. Government Accountability Office, *HIGH-RISK SERIES Dedicated Leadership Needed to Address Limited Progress in Most High-Risk Areas* (GAO-21-119SP, March 2021).

[53] U.S. Securities and Exchange Commission, Office of Inspector General, *The SEC Has Processes To Manage Information Technology Investments But Improvements Are Needed* (Report No. 555; September 19, 2019).

[54] Executive Order 13895, *Advancing Racial Equity and Support for Underserved Communities through the Federal Government*; January 20, 2021. Independent agencies are strongly encouraged to comply with the provisions of this Executive Order.

App.1386

Additionally, recent OMB guidance implements commitments to increase the share of contracts awarded to small disadvantaged businesses to 15 percent by 2025.[55] To do this, OMB directs federal agencies to take specific management actions, including increasing the number of new entrants to the federal marketplace and reversing the general decline in the small business supplier base.

Diversity, equity, and inclusion is a focus of OA and, in its FY 2023 budget request, OA requested two additional positions to support a number of priorities, including support for workload increases to review and expand diversity, equity, and inclusion efforts in contracting opportunities. Furthermore, OMWI continues to collaborate with OA to promote access to contracting and sub-contracting opportunities for minority-owned and women-owned businesses, through outreach activities. In March 2022, we initiated an audit to (1) assess the SEC's processes for encouraging small business participation in agency contracting, in accordance with federal laws and regulations; and (2) determine whether, in FYs 2020 and 2021, the SEC accurately reported small business awards. The audit is ongoing and will be completed in FY 2023.

## T&M Contracts

Since our 2019 statement on the SEC's management and performance challenges, we have reported that T&M contracts (including LH contracts) lack incentives for contractors to control costs or use labor efficiently and, therefore, are considered higher-risk.[56] Last year, we noted again that the SEC's use of T&M contracts has continued to increase. We encouraged management to assess the SEC's use of these contracts and to formulate actions to reduce their use whenever possible. In response, agency management committed to continuing to closely monitor its use of T&M contracts and "exercise rigorous oversight of these types of contracts."[57] Management further noted that OA has made a number of improvements to better manage T&M contracts, including a new independent government cost estimate guide, contract compliance reviews, information sharing on T&M invoicing, and an automated determination and findings workflow for "more robust and consistent support for the use of T&M" contracts. To date, we have not fully assessed the effectiveness of management's reported additional controls;[58] however, the annual amount obligated to T&M contracts continues to raise concerns about risk to the SEC. As Figure 6 shows, according to data from *usaspending.gov*, the total amount obligated to T&M contracts increased since FY 2018 from about 40 percent to about 53 percent of all SEC contract obligations (which are declining).[59] In addition, as of October 7, 2022, 476 of the SEC's 1,055 total active contracts (or about 45 percent) were T&M contracts.

---

[55] Office of Management and Budget, Memorandum M-22-03, *Advancing Equity in Federal Procurement*, December 2, 2021.

[56] As stated in Federal Acquisition Regulation 16.602, *Labor-hour contracts*, LH contracts are a variation of T&M contracts and differ only in that materials are not supplied by the contractor.

[57] U.S. Securities and Exchange Commission, *Fiscal Year 2021 Agency Financial Report*, November 15, 2021.

[58] We plan to initiate an audit of this issue in FY 2023.

[59] According to *usaspending.gov*, total (that is, cumulative) award obligations for all active SEC contracts as of October 7, 2022, was about $2.40 billion, of which total award obligations for T&M contracts was about $1.28 billion.

App.1387

**FIGURE 6. Percentage of SEC T&M Award Obligations Compared to Total SEC Award Obligations (FY 2018 – FY 2022)**



*Source: OIG-generated based on data retrieved from usaspending.gov on October 7, 2022.*

As we have reported in prior years' statements on the SEC's management and performance challenges, Federal Acquisition Regulation Subpart 16.6, *Time-and-Materials, Labor-Hour, and Letter Contracts*, states, a T&M contract:

- ". . . provides no positive profit incentive to the contractor for cost control or labor efficiency."

- ". . . may be used only when it is not possible at the time of placing the contract to estimate accurately the extent or duration of the work or to anticipate costs with any reasonable degree of confidence."

Furthermore, in June 2022, GAO reported that T&M and LH contracts are considered riskier than fixed price contracts because contractors bill the government by the hour and could conceivably work less efficiently so that they could charge more hours. As a result, GAO recommended that selected agencies assess steps they can take to use lower-risk contract types, and highlighted potential opportunities for agencies to assess ongoing use of T&M contracts in their acquisition portfolios.[60] Moreover, the Federal Acquisition Regulation encourages contracting officers to assess contract types periodically, after experience obtained during the performance of a T&M contract provides a basis for firmer pricing. A January 2021 OMB memorandum also discourages agency reliance on high-risk contracts, such as T&M contracts, stating that, "By managing contract types effectively, agencies have better leverage to ensure timely, efficient, and cost-effective completion of contractor work supporting critical and high priority goals."[61]

---

[60] U.S. Government Accountability Office, *Opportunities Exist to Reduce Use of Time-and-Materials Contracts* (GAO-22-104806, June 2022). GAO included in its review four Department of Defense agencies and field activities (the Air Force, Army, Defense Finance and Accounting Service, and Washington Headquarters Services), and three civilian agencies (the Social Security Administration, the Department of Homeland Security, and the Department of State).

[61] Office of Management and Budget, Memorandum M-21-11, *Increasing Attention to Federal Contract Type Decisions* (January 5, 2021).

App.1388

***Ongoing and Anticipated OIG Work.*** In FY 2023, we will continue to assess the SEC's contract management and acquisition processes through audits and evaluations and the work of our Acquisitions Working Group. We will complete an ongoing audit of the SEC's small business contracting program. In addition, we will assess the SEC's use of T&M contracts to help ensure such contracts are used only when appropriate and effective controls are in place to minimize the risk to the government. Lastly, we will report on any acquisition-related matters identified as a result of other ongoing and planned reviews of SEC programs and operations, and continue to support the SEC's efforts to train contracting officers and contracting officer's representatives about the potential for procurement-related fraud.

## CHALLENGE: Ensuring Effective Human Capital Management

Although each component within the SEC is critical to achieving effective human capital management, the Office of Human Resources (OHR) is ultimately responsible for the strategic management of the SEC's human capital. OHR consults with management, establishes and administers human capital programs and policies, and ensures compliance with federal laws and regulations and negotiated agreements. It is critical that OHR develops and maintains the knowledge, skillsets, and expertise to guide the SEC through the challenges that inevitability arise in the management of a large professional workforce.

Indeed, retention, attrition, recruitment, and hiring of skilled personnel have all emerged as challenges within the SEC, along with the challenges associated with managing the agency's workforce throughout the COVID-19 pandemic.

### Retention, Attrition, Recruitment, and Hiring

The SEC recognizes the importance of an effective, highly-skilled, and diverse workforce. As such, in its strategic plan, the SEC states that it "will focus on recruiting, retaining, and training staff with the right mix of skills and expertise."[62] Moreover, Goal 1 of OHR's Human Capital Strategic Plan is to "Attract Diverse and Highly Talented People to the Agency."[63]



*Effective management of an entity's workforce, its human capital, is essential to achieving results and an important part of internal control.*

Source: U.S. Government Accountability Office, Standards for Internal Control in the Federal Government (GAO-14-704G, September 2014), Principle 10 - Design Control Activities, section 10.03.

OMWI also plays an important part in the agency's recruitment and retention efforts by providing leadership and guidance in ensuring diversity and inclusion with respect to the SEC workforce. In its Diversity and Inclusion Strategic Plan, the SEC highlights the importance of diversity, equity, and inclusion in the workplace, stating, "we recognize that our people are our most important asset. We also recognize that diversity, inclusion, and opportunity are essential to the agency's ability to effectively carry out its mission. These fundamental and value-enhancing tenets of our mission-oriented culture dictate that we continuously work to attract, hire, develop, and retain high-quality, diverse talent."[64]

### *Retention and Attrition*

Despite OHR's and OMWI's efforts and the SEC being recognized as one of the best places to work in the federal government,[65] the SEC seems to be facing challenges to its retention efforts. As the figures below demonstrate, the SEC has seen a significant increase in attrition over the last few years, from 3.8 percent in FY 2020 to an estimated 6.4 percent in FY 2022 (as of September 20, 2022)—the highest attrition rate in 10 years. Most concerning is the increased attrition in Senior Officer and attorney positions, expected to be about 20.8 percent and about 8.4 percent for FY 2022, respectively.

---

[62] U.S. Securities and Exchange Commission, *Strategic Plan Fiscal Years 2018-2022*, Strategic Initiative 3.1; October 11, 2018. The agency's draft strategic plan for FY 2022 to FY 2026 (Goal 3) similarly emphasizes the importance of attracting, hiring, developing, and retaining high-quality, diverse talent.

[63] U.S. Securities and Exchange Commission, Office of Human Resources, *FY 2020-2022 Human Capital Strategic Plan*; March 2020.

[64] U.S. Securities and Exchange Commission, *Diversity and Inclusion Strategic Plan*, Fiscal Years 2020-2022, Introduction.

[65] Partnership for Public Service, *2021 Best Places to Work in the Federal Government Rankings*.

Appellate Case: 24-1628        Page: 1395        Date Filed: 03/26/2024 Entry ID: 5377362

**FIGURE 7. Total SEC Attrition (in Number of Positions) and Attrition Rate (FY 2011 – FY 2022)**



Source: OIG-generated based on data provided by OHR.

**FIGURE 8. SEC FY 2022 Expected Attrition by Paygrade and Position**

Source: OIG-generated based on data provided by OHR.

The SEC is not alone in facing a crisis to retain mission-critical talent during what has been dubbed "The Great Resignation." Critical elements of the federal workforce are in a state of stress. For example, according to the Partnership for Public Service, FY 2021 government-wide attrition rates averaged 6.1 percent, with certain groups experiencing even higher rates, such as women (6.4 percent) and executives (9.2 percent).[66]

The SEC may be able to address some of the concerns surrounding attrition by ensuring that it provides for succession planning through robust employee development and performance management. For example, in August 2022, the SEC launched a new program called LEAD (Leadership, Evaluation, Accession, and Development) to help SEC employees develop the leadership skills necessary to apply for future Senior Officer opportunities. However, performance management remains an area of opportunity for growth. For example, the SEC has discontinued the Performance Incentive Bonus program it implemented just 1 year ago. In addition, one recommendation from our 2018 report entitled, *The SEC Made Progress But Work Remains To Address Human Capital Management Challenges and Align With the Human Capital Framework,* remains open.[67] This recommendation—for the SEC to finalize standard operating procedures for the agency's performance management program—is an important component of the SEC's effort to ensure effective performance management. Agency management has reported that remediation work is underway, yet limited resources and competing priorities have created delays. In FY 2023, GAO is set to issue its triennial report on personnel management within the SEC,[68] which should provide further guidance to the SEC in this area.

### Recruitment and Hiring

Recruitment is a major area of interest to both OHR and OMWI. Recruitment efforts are critical to ensuring a skilled and diverse candidate pool from which to fill SEC vacancies. In its FY 2023 Congressional Budget Justification, the SEC requested a total of 5,261 positions, an increase of 454 positions from FY 2022, in which the SEC was authorized 4,807 positions. With FY 2022 attrition rates estimated to be at 6.4 percent—or about 289 positions—efforts to recruit and hire an additional 454 new positions in FY 2023 could present challenges for OHR, OMWI, and SEC management. Moreover, the federal government is facing stiff competition from the private sector as increased wages and workforce engagement make private sector positions attractive to both new and seasoned professionals. The federal government hiring process also has been cited as a detriment when attracting talent to the federal government. For example, the federal government takes on average 98 days—more than twice as long as the private sector—to hire a new employee.[69] During our recent audit of the SEC's hiring process, discussed in more detail below, we found that of the 438 external hiring actions that we included in our analysis, nearly 50 percent took 100 business days or more to complete.[70]

---

[66] Partnership for Public Service. "Who Is Quitting and Retiring: Important Fiscal 2021 Trends in the Federal Government."

[67] U.S. Securities and Exchange Commission, Office of Inspector General, *The SEC Made Progress But Work Remains To Address Human Capital Management Challenges and Align With the Human Capital Framework* (Report No. 549; September 11, 2018).

[68] Section 962 of Dodd-Frank includes a provision for GAO to report triennially on the SEC's personnel management, including the competence of professional staff; the effectiveness of supervisors; and issues related to employee performance assessments, promotion, and intra-agency communication. *See* Pub. L. No. 111-203, 124 Stat. 1376, 1908-1909 (2010) (codified at 15 U.S.C. § 78d-7).

[69] Partnership for Public Service. "Roadmap for Renewing Our Federal Government."

[70] U.S. Securities and Exchange Commission, Office of Inspector General, *The SEC Can Improve in Several Areas Related to Hiring* (Report No. 572; February 28, 2022).

App.1392

To address some of these recruitment concerns, OHR recently issued its FY 2022-2024 Recruitment and Outreach Strategic Plan, which identifies strategies to attract diverse talent and to aid in filling mission critical occupations that have been deemed hard-to-fill. Such strategies include creating branding and marketing that speaks to prospective applicants; developing and implementing a multi-media recruitment and agency branding campaign that highlights the successes of current SEC employees; developing a comprehensive internal communications strategy; and creating an overarching recruitment, outreach, and engagement tool to enhance the recruitment process.

Given the importance of an effective process when recruiting and hiring new employees, and the likelihood that the SEC will be heading into an intensive hiring effort, the OIG recently reviewed the SEC's hiring process and identified areas for improvement. The OIG's audit report, *The SEC Can Improve in Several Areas Related to Hiring*, addressed a number of critical areas related to the SEC's hiring process.[71] First, we determined that management can improve its controls to ensure Workforce Transformation and Tracking System (WTTS) data fields are accurate, consistent, and complete. We found that:

- 83 of the 91 hiring actions sampled (or about 91 percent) had at least one data entry issue in the WTTS data fields we reviewed, and almost 9 percent of the WTTS data entries we reviewed were either inaccurate, inconsistent, or incomplete;

- the SEC's WTTS data continued to include unannotated anomalies; and

- certain hiring actions were not consistently identified in WTTS.

These conditions occurred because (1) OHR's WTTS job aid did not include sufficient instructions regarding the dates and information expected in key WTTS data fields, and (2) some data fields were not included on the WTTS reports used by OHR staff to ensure the SEC's hiring action data was accurate, complete, and consistently recorded. As a result, OHR can further improve the reliability of the SEC's WTTS data to assist in workforce management and internal and external reporting of agency hiring information.

In addition, our assessment of OHR's quarterly Service Level Commitment (SLC) reviews found that (1) OHR did not perform SLC reviews in a consistent manner, (2) the review process was inefficient and prone to inaccuracies, and (3) SLC reviews did not align with the SLC presented to and agreed upon by the other SEC divisions and offices. This occurred because OHR did not establish clear guidance, including in the SLC itself, for the variety of hiring types and scenarios that can occur, or how to measure each one. The organization also did not ensure it could measure the SLC steps, as presented, in WTTS and did not effectively use the WTTS reporting capabilities in its SLC reviews. As a result, OHR limited its ability to rely on the SLC and SLC reviews as key controls for efficiently and effectively identifying areas of needed improvement in the SEC's hiring process, and for collaborating with the divisions and offices OHR serves.

Furthermore, we found that the SEC's pay-setting guidance needed improvement and OHR could clarify the new hire pay-setting information shared both internally and externally. Specifically, (1) the pay-setting

---

[71] Id.

information available to SEC employees and hiring officials was not comprehensive, (2) the internally published pay matrices were outdated, and (3) publicly advertised SEC salary information was misleading for new hires. We also identified inaccuracies in some of the underlying pay band information included in the 2021 pay matrices, and other pay-setting concerns. Incomplete, outdated, and misleading new hire pay-setting guidance and information have caused confusion and may have limited hiring officials' ability to review and respond to pay-setting requests. Although it does not appear that inaccurate information in the 2021 pay matrices impacted any newly hired SEC employee's pay, it could have had certain hiring scenarios occurred. We also concluded that OHR generally complied with the key hiring authority requirements tested; however, staffing case files for 18 of 32 attorney hiring actions we reviewed (about 56 percent) lacked supporting documentation, including proof of law degrees and/or bar membership. This occurred because OHR did not clarify review processes and documentation requirements for attorney qualifications. In addition, OHR's internal reviews of staffing case files needed improvement. As a result, the SEC risked hiring attorneys who did not meet all qualifications required for their position.

Lastly, we identified a matter that did not warrant recommendations related to (1) the SEC's SLC as compared to the Office of Personnel Management's end-to-end hiring process model timelines, and (2) feedback from the SEC divisions and offices OHR serves. We discussed this matter with agency management for their consideration.

We made 11 recommendations to further strengthen the SEC's controls over hiring actions, including recommendations to improve (1) the reliability of WTTS data, (2) assessments of the agency's hiring timelines, (3) the agency's compensation program, and (4) staffing case file documentation requirements. Management concurred with all 11 of our recommendations and, as of the date of this document, had taken action sufficient to close 5 of them. The remaining recommendations are open and will be closed by the OIG upon completion and verification of corrective action.

## Responding to COVID-19: Workforce Perspectives

Responding to the COVID-19 pandemic has been a central concern of the SEC, and the federal government as a whole, throughout FY 2022. Since the outset of the national public health crisis and economic threats caused by COVID-19, the SEC's operational efforts have centered, first and foremost, on the health and safety of its employees, the employees and customers of its registrants, and individuals generally. From March 2020 through August 8, 2021, the SEC was in a mandatory telework posture, which aligned with other federal government agencies. Indeed, the federal government workforce quickly increased from 3 percent of employees teleworking every day to nearly 60 percent, as the 2020 Office of Personnel Management Federal Employee Viewpoint Survey shows.[72] However, as vaccines became more widely available, the SEC shifted its focus to how to best and most safely allow employees to return to the workplace.

---

[72] Office of Personnel Management, *Government-wide Management Report: Results from the 2020 OPM Federal Employee Viewpoint Survey*, April 26, 2021.

Appellate Case: 24-1628    Page: 1399    Date Filed: 03/26/2024 Entry ID: 5377362

*Safety remains a top priority when planning for employee return to the workplace*

On August 9, 2021, the agency began to allow vaccinated employees to voluntarily return to the workplace. In calendar year 2022, peak occupancy across all SEC building locations has averaged around 7 percent. The SEC has not yet mandated that its employees return to the office in pre-COVID-19 levels. On July 25, 2022, the agency announced that, because of the recent uptick in COVID-19 community levels, the planned return-to-office date was shifted from September 6, 2022, to January 9, 2023. Occurring alongside the agency's monitoring of community levels, the SEC is also negotiating a new collective bargaining agreement with the National Treasury Employees Union, which will include updated provisions related to telework and remote work. The parties are also engaged in bargaining related to the mandatory return-to-office plan. While these negotiations are ongoing, both the National Treasury Employees Union and SEC leadership make regular announcements to staff and management, respectively, about their progress. At this point, further negotiations require assistance from the Federal Mediation and Conciliation Service as the parties endeavor to avoid invoking the Federal Services Impasse Panel for a final decision on the terms of the new collective bargaining agreement and return-to-office plan. The uncertainty surrounding the plans for return-to-office and the potential for expanded telework and/or workplace flexibilities makes it more difficult to plan for future human capital management solutions.

***Ongoing and Anticipated OIG Work.*** In FY 2023, we plan to evaluate the agency's workplace safety protocols developed in response to the COVID-19 pandemic, including the COVID-19 workplace safety plan and related measures, such as those established pursuant to OMB Memorandum M-21-15, Executive Order 13991, and other applicable guidance. We also will complete a review of the agency's upward mobility program. Furthermore, we will monitor the SEC's progress in addressing prior open audit recommendations related to human capital management. To assess the SEC's efforts to promote diversity, equity, inclusion, accessibility, and opportunity, we will complete an ongoing audit of the agency's small business contracting. We will also assess the operations and controls over the agency's equal employment opportunity program.

## OIG General Office Contact Information

### EMPLOYEE SUGGESTION PROGRAM

The OIG SEC Employee Suggestion Program, established under the Dodd-Frank Wall Street Reform and Consumer Protection Act, welcomes suggestions by all SEC employees for improvements in the SEC's work efficiency, effectiveness, productivity, and use of resources. The OIG evaluates all suggestions received and forwards them to agency management for implementation, as appropriate. SEC employees may submit suggestions by calling (202) 551-6062 or sending an e-mail to OIGESProgram@sec.gov.

### COMMENTS AND IDEAS

The SEC OIG also seeks ideas for possible future audits, evaluations, or reviews. We will focus on high-risk programs, operations, and areas where substantial economies and efficiencies can be achieved. Please send your input to AUDPlanning@sec.gov.

---

## TO REPORT

# fraud, waste, and abuse

Involving SEC programs, operations, employees, or contractors

FILE A COMPLAINT ONLINE AT

# www.sec.gov/oig



CALL THE 24/7 TOLL-FREE OIG HOTLINE

# 833-SEC-OIG1

CONTACT US BY MAIL AT
**U.S. Securities and Exchange Commission**
**Office of Inspector General**
**100 F Street, N.E.**
**Washington, DC 20549**

App.1396

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE EIGHTH CIRCUIT

I, Edward J. Shoen, hereby declare as follows:

1.     I am over the age of eighteen, of sound mind, and capable of making this declaration. The facts stated in this declaration are within my personal knowledge and are true and correct.

2.     I am the President and Chairman of U-Haul Holding Company, the parent company of U-Haul International, Inc. (NYSE- UHAL and UHAL.B) (hereinafter "U-Haul" or "the Company").

3.     U-Haul was started in 1945 by my mother and father as they returned from military service. U-Haul remains family managed today, and we view the communities in which we operate as partners. U-Haul's community partnership model enables it to collaborate to reduce vehicle registrations and greenhouse gas ("GHG") emissions. U-Haul has pioneered starch-based packing peanuts, permeable ground cover, cardboard-box reuse, moving pads from discarded fabrics, reuse of obsolete buildings, improved fuel economy, and a long list of other award-winning sustainable business practices. See U-Haul, "News and Recognition," uhaul.com/Articles/Sustainability/News-And-Recognition-350/. U-Haul is in the shared-use business. The rental concept itself is one of good stewardship and careful management of the Earth's resources, while making these resources readily available

1

Appellate Case: 24-1628     Page: 1402     Date Filed: 03/26/2024 Entry ID: 5377362

to more of the Earth's inhabitants. Done well, U-Haul's rentals enhance sustainability.

4. Independent businesses that partner with U-Haul, also known as Dealers, are critical to U-Haul's shared-use model and its commitment to sustainability and the environment. The number of locations that U-Haul itself owns and operates is dwarfed by independent businesses who contract with U-Haul to be in U-Haul's Dealer network. U-Haul itself owns and operates 2,288 locations. This is compared to 21,302 independent Dealers in the U-Haul network—5,510 of which are sole proprietorships. Such independent Dealers account for nearly half of U-Haul's entire rental business.

5. By leveraging partnerships with independent businesses, U-Haul is able to reduce GHG emissions by having rental equipment within a short distance of its customers rather than requiring customers to travel long distances to rent and return rental equipment from company owned locations. This is especially true in rural areas.

6. U-Haul's independent Dealers often do not solely (or even primarily) rent or sell U-Haul products. Instead, they take the form of a variety of businesses for whom U-Haul rentals and sales are just a component of their business. To get a sense of the size and variety of businesses who are Dealers, Dealers include: self-storage facilities, auto repair garages, gas stations, convenience stores, used car

Appellate Case: 24-1628    Page: 1403    Date Filed: 03/26/2024 Entry ID: 5377362

dealerships, hardware stores, tire shops, furniture stores, grocery stores, repair shops, car washes, auto parts stores, motels, hotels, restaurants, wireless phone stores, appliance stores, nurseries, and office supply stores—just to name a few.

7.      It takes significant time for a company the size of U-Haul to implement compliance measures for new regulations. U-Haul knows from past experiences that there is not an on-off switch that can be flipped even for compliance with a minor new regulation. Rather, as discussed extensively below, new systems must be built, new personnel hired, and new data collected. For example, U-Haul adopted Accounting Standards Codification ("ASC") Topic 842, Leases ("ASC 842"). Adoption and implementation of ASC 842 was relatively simple, as only resources within the accounting department were required to implement the change. This included the development of a tool that could provide the calculation to determine required accounting entries and financial statement disclosures and staff to evaluate the guidance and implement the change. This relatively simple adoption and implementation of ASC 842 took approximately 7 to 9 months.

8.      U-Haul adopted the somewhat more complex Accounting Standard Update ("ASU") 2018-12, Financial Services – Insurance (Topic 944): Targeted Improvements to the Accounting for Long Duration Contracts ("ASU 2018-12"), which is applicable to one of its subsidiaries. ASU 2018-12 required changes to the measurement and disclosure of long-duration contracts. Prior to adopting ASU 2018-

Appellate Case: 24-1628      Page: 1404      Date Filed: 03/26/2024 Entry ID: 5377362

12, U-Haul spent years researching the standard and its effects, educating accounting and actuarial team members with respect to the new requirements, gathering the necessary data, creating the necessary models, and working with U-Haul's IT team to implement and test the changes. U-Haul estimates the cost in work hours alone exceeded $500,000.

9.     This Rule is more complex and difficult to comply with by many orders of magnitude than anything the Company has faced, including ASC 842 and ASU 2018-12. Building the apparatus necessary to comply will take years, not months.

10.     To be in a position to begin tracking the required climate-related information at the beginning of fiscal year 2025 (as the Rule requires), U-Haul will need to determine where the required information is located, both within its own operations and those of its independent Dealers; it will need to develop systems and processes to collect, store, and analyze this information; it will need to hire additional employees and retain external consultants; it will need to develop policies and internal controls to analyze the vast quantity of data collected (including determining which of that data is "material" under the Rule); and it will need time to test its internal processes before they go live at the beginning of 2025. With respect to IT alone, U-Haul preliminarily estimates that this would require approximately 30 dedicated team members to build and then support these processes on an ongoing basis at an estimated cost exceeding $3,000,000 per year, which would rise as

4

personnel costs increase over time. This cost estimate does not include costs outside of U-Haul's IT team.

**Climate-Related Financial Impacts and Expenditures**

11.     The Securities and Exchange Commission's ("SEC") final rule entitled, "The Enhancement and Standardization of Climate-Related Disclosures for Investors" (the "Rule") seems to require U-Haul to disclose certain costs and expenditures related to "severe weather events and other natural conditions" if they exceed certain thresholds. *See* RIN 3235-AM87, at 457–67. U-Haul's analysis reveals that it likely has to take multiple complex, timely, and costly steps to comply with this requirement. Due to the complexity of the Rule, U-Haul would have to begin taking these steps immediately to ensure these systems are in place by the time the Rule takes effect. Indeed, U-Haul has already begun evaluating what steps must be taken, resulting in many hours of Company resources currently being expended on figuring out how to comply with the Rule.

12.     *First*, U-Haul would have to develop an IT system to track climate-expenditures, losses, and costs attributable to severe weather events or other natural conditions across the organization. U-Haul would seemingly need to assess whether any general ledger entry concerns a cost or expense covered by the Rule. No U-Haul accounting system currently permits the tracking of costs or expenditures

5

attributable to severe weather events in its general ledger entries. If the Rule is not stayed, U-Haul will have to begin developing this system immediately.

13.     *Second*, once the new IT system is developed, U-Haul would need to calculate the relevant costs and expenditures for each general ledger entry (i.e., each of U-Haul's individual transactions). For large companies like U-Haul, this will be millions of entries. Determining the relevant costs and expenditures for even one general ledger entry could require U-Haul to isolate and quantify the portion of impacts and expenditures that qualify as severe-weather-related. Given the difficulty of these tasks, U-Haul would be required to engage in significant estimation to arrive at the precise dollar figures demanded by the Rule. The Rule is far from the realities on the ground, requiring calculations that inevitably become guesswork.

14.     *Third*, after U-Haul identifies and quantifies the financial impacts and expenditures that qualify under the Rule, it would then have to determine whether they exceed the Rule's 1% and other thresholds.

15.     U-Haul cannot at this time precisely estimate the total cost that it will be required to incur immediately and on an ongoing basis. Even making such estimations will take a significant amount of time and resources because U-Haul will have to determine the precise changes that will be required throughout its systems and to its way of doing business. What is certain is that the cost will be substantial,

6

far beyond the SEC estimates, many millions of dollars, and will begin to be incurred immediately if the Rule is not stayed.

**GHG Emissions Disclosures**

16.     The Rule would require U-Haul to disclose, if "material," its total Scope 1 emissions, defined as "direct GHG emissions from operations that are owned or controlled by a registrant," and its total Scope 2 emissions, defined as "indirect GHG emissions from the generation of purchased or acquired electricity, steam, heat, or cooling that is consumed by operations owned or controlled by a registrant." *See* RIN 3235-AM87 at 852. But the Rule does not explain how this "materiality" determination would be made (or how much it would cost), even though it "expect[s] most, if not all" companies subject to the GHG emissions requirement "will need to assess or estimate their Scope 1 and 2 emissions to reach a materiality determination." *See* RIN 3235-AM87 at 684. The Rule also indicates that materiality may be judged on a standard that is inconsistent with the traditional conception of materiality. For example, the Rule states that a "registrant's GHG emissions may also be material if their calculation and disclosure are necessary to enable investors to understand whether the registrant has made progress toward achieving a target or goal or a transition plan that the registrant is required to disclose under the final rules." *See* RIN 3235-AM87 at 247.

<u>Scope 1 Emissions</u>

17.    *First*, it appears that the Rule may require U-Haul to somehow ensure that all its sources of emissions are equipped with devices that measure the amount of greenhouse gases they emit. Given the likely impossibility of such a measure, the Company would also have to consider industry-wide average emissions factors. Either way, this imposes a tremendous burden. Moreover, U-Haul may have to do this for any source of GHG emissions anywhere in its global operations, including sources at factories, office buildings, and vehicles owned or controlled by U-Haul. If any of these sources of GHG emissions are not equipped with measuring devices, U-Haul might be forced to either (A) install devices to measure emissions from any such sources; or (B) select an industry-wide average emission factor for that source.

18.    *Second*, U-Haul would likely have to check each of its pipe gauges and perform mathematical calculations based on the measurement on the pipe gauge and the pipe's flow rate to determine the total amount of emissions. U-Haul would also have to periodically test its pipes and measuring devices to ensure that they are accurately recording the volume of gas. For any sources that are not equipped with a measuring device, U-Haul would have to multiply the selected emission factor by either the amount of activity at the source (*e.g.*, quantity of fuel used, hours of operation of equipment, variability of operation), or, if no activity data is available,

8

multiply the emission factor by applicable economic data (*e.g.*, economic value of goods produced).

19.     *Third*, once U-Haul has obtained emissions data, it would have to create a system for recording and compiling these measurements and calculations from each of its sources of emissions around the globe. Such a system does not currently exist, so, in the absence of a stay, U-Haul would have to immediately begin developing, at great expense, IT infrastructure, databases, and computer systems that enable each site to record its emissions.

20.     *Fourth*, after each source's GHG emissions data is recorded in the new system, management would have to review the raw data collected and compile it into the format required for disclosure in U-Haul's annual reports.

21.     *Fifth*, U-Haul will have to retain a third-party expert that is qualified under the Rule to review its Scope 1 emissions and prepare a report in compliance with the SEC's requirements. Coincidentally, Kristina Wyatt, former SEC Senior Counsel on Climate and ESG who led the rulemaking team through drafting proposed climate disclosure rules, is now with a firm in Mesa, Arizona who claims to be willing and able to review and certify such reports.

22.     Due to the enormity of these undertakings, U-Haul will have to begin compliance preparation immediately if the Rule is not stayed.

<u>Scope 2 Emissions</u>

23.    *First*, every facility in a company's global operations would have to collect its total purchases of electricity, steam, heat, or cooling in terms of kilowatt-hours. It would have to gather this information from its utility bills or electrical meters.

24.    *Second*, the facility would then have to gather the best available evidence of the emissions per kilowatt-hour for each unit of energy it purchased. Emissions per kilowatt-hour will vary depending on the fuel source of the electricity produced (*e.g.*, oil, coal, natural gas) and, even within the same type of source, will vary based on the particular characteristics of suppliers and local utility grids. U-Haul must either obtain this information from its over 800 individual utility providers (some of which don't even accept electronic payment and are unlikely to be able to provide U-Haul the required information) or use the most appropriate average emission factor for energy generation on the grids that provided it energy.

25.    *Third*, each facility would then have to calculate its individual Scope 2 emissions by multiplying the emissions per kilowatt-hour for each of its sources of purchased energy by the amount of kilowatt-hours purchased from that source. U-Haul would then have to record and compile those emissions in IT infrastructure. As with Scope 1 emissions, that infrastructure does not currently exist, and U-Haul would have to begin developing it immediately absent a stay.

App.1406

Appellate Case: 24-1628    Page: 1411    Date Filed: 03/26/2024 Entry ID: 5377362

26.     *Fourth*, once the Scope 2 data is recorded in the system, U-Haul's management would need to review the raw data and compile it into the format required for disclosure in its annual reports.

27.     *Fifth*, U-Haul will have to retain a third-party expert that is qualified under the Rule to review its Scope 2 emissions and prepare a report in compliance with the SEC's requirements.

28.     Due to the enormity of these undertakings, U-Haul will have to begin compliance preparation immediately unless the Rule is stayed.

**Climate-Related Risks**

29.     The Rule requires U-Haul to disclose in narrative format the climate-related risks that "have materially impacted or are reasonably likely to have a material impact" on the Company, "including on its business strategy, results of operations, or financial condition." *See* RIN 3235-AM87 at 89.

30.     There are two categories of climate-related risks that a company must disclose under the Rule.

31.     The first category, "physical risks," includes "event-driven risks" that "may relate to shorter-term severe weather events, such as hurricanes, floods, tornadoes, and wildfires," and "chronic risks" that "the business may face as a result of longer term weather patterns, such as sustained higher temperatures, sea level rise, and drought, as well as related effects such as decreased arability of farmland,

11

decreased habitability of land, and decreased availability of fresh water." *See* RIN 3235-AM87 at 91–92. For every physical risk facing the Company, including over 21,000 Dealers, U-Haul must identify "the geographic location and nature of the properties, processes, or operations subject to the identified physical risk." *Id.* at 97. Making these disclosures for over 24,000 locations would require significant time, effort, and expense.

32.     *First*, U-Haul would likely have to identify every source in its global operations that is subject to either acute or chronic climate-related physical risks. It would have to identify not only sites in its own operations but also its Dealers, which requires a company to request this information (which may not be available) from potentially tens of thousands of entities.

33.     *Second*, for sites that might be subject to acute physical risks (*e.g.*, hurricanes, floods, tornadoes), the Rule may require U-Haul to determine the portion of that risk that is climate-related. For example, if a tornado or hurricane impacts (or may impact) a Company facility—or the facility of a Dealer—U-Haul would have to determine not only the effect (or potential effect) of the storm on the facility's operations; U-Haul would also have to determine what portion of that effect is climate-related—in other words, how much of the frequency, intensity, and duration of storms is attributable to global climate change. U-Haul does not have a dedicated team of climatologists capable of performing these complex operations, let alone

with the level of reliability required for a company's annual reports. So, U-Haul will have to hire additional employees or retain outside consultants to perform these complex calculations.

34.     *Third*, U-Haul would have to develop an internal infrastructure (which does not currently exist) and hire additional personnel to collect and analyze this information. And the Company would be pressured to drop Dealers that do not collect information concerning their climate-related risks (which are likely to disproportionately be small businesses) to ensure that it does not misleadingly understate its climate-related risks in its annual reports.

35.     *Fourth*, after reviewing the information compiled, U-Haul would have to prepare the narrative disclosure required by the Rule, describing every "geographic location" subject to the described physical climate-related risks.

36.     The second category of climate-related risks that a company must disclose under the Rule is "transition risks," which include "increased costs attributable to climate-related changes in law or policy, reduced market demand for carbon-intensive products leading to decreased sales, prices, or profits for such products, the devaluation or abandonment of assets, risk of legal liability and litigation defense costs, competitive pressures associated with the adoption of new technologies, reputational impacts (including those stemming from a registrant's customers or business counterparties) that might trigger changes to market behavior,

changes in consumer preferences or behavior, or changes in a registrant's behavior." *See* RIN 3235-AM87 at 92–93.

37.     Making these disclosures would also require significant time, effort, and expense. The Rule looks as if it requires U-Haul to predict future climate-related changes in law and policy, consumer preferences and behavior, and legal-liability risk. U-Haul would then have to determine how these anticipated changes might impact its business or operations, as well as those of its over 21,000 Dealers. And U-Haul would have to present these findings in a narrative format to comply with the Rule. The Rule itself will create legal liability risks that I estimate will require two full time in-house attorneys and outside counsel as required.

38.     U-Haul would have to begin compliance preparation for these disclosures immediately unless the Rule was stayed.

**The Timing of the Requirements**

39.     The timing of these required annual disclosures would impose substantial and imminent burdens on companies in terms of both resources and labor. The Rule would require U-Haul to disclose in its annual financial reports costs and expenditures attributable to severe weather events or other natural conditions, its Scope 1 and Scope 2 GHG emissions, and assessment of its climate-related risks. The period after a company's fiscal year-end is one of the busiest for a company, as it works to compile all the necessary financial and business-related information for

14

the fiscal year that must be disclosed in the annual report. Requiring companies to also gather, review, and analyze large amounts of climate data during the same period would require additional personnel and impose a massive cost on companies, which are already stretched thin after the end of a fiscal year.

40. Because U-Haul does not presently have IT or accounting systems to record GHG emissions or costs and expenditures attributable to severe weather events on a transaction-by-transaction basis, it must begin constructing those systems immediately in the absence of a stay. And U-Haul must simultaneously begin developing ways to analyze whether a cost or expenditure is attributable to severe weather events, as well as its climate-related risks generally. If the Rule is not stayed, U-Haul would need to begin onboarding staff, consultants, and other experts immediately to ensure it is in compliance with the Rule if and when it goes into effect. This involves large costs that cannot feasibly be recouped. As noted above, U-Haul cannot at this time precisely estimate the total cost that it will be required to incur immediately and on an ongoing basis. Even making such estimations takes a significant amount of time and resources because U-Haul will have to determine the precise changes that will be required throughout its systems and to its way of doing business. What is certain is that the cost will be substantial, many millions of dollars, and will begin to be incurred immediately if the Rule is not stayed. The SEC suggested range of cost is off by several multiples at least.

**Failure to Consider Impossibility of Compliance for Independent Dealer-Based Business Models**

41.     The Rule does not take into account or appreciate the realities of a large, independent dealer-based company like U-Haul, which contracts with over 21,000 independent Dealers in the U-Haul network—5,510 of which are sole proprietorships. Such independent dealers account for nearly half of U-Haul's entire rental business.

42.     Under the Rule, U-Haul is likely responsible for reporting climate risks from all of these sources. *E.g.*, RIN 3235-AM87 at 91–92. This is a practical impossibility. It does not reflect the reality of business models such as U-Haul's that rely on a network of independent small businesses as Dealers.

43.     The costs of obtaining this data from U-Haul's Dealer network are simply incalculable. As an initial matter, many of these businesses, which include things like individually owned convenience stores, are simply unable to collect this data. And if U-Haul included a requirement to collect this data in its contracts, it would risk losing a very substantial portion of its Dealer network. Dealers would cease working with U-Haul either because they are unable to collect the data required by the Rule, or because the cost of such collection would outweigh the revenue of the U-Haul portion of their businesses. As noted above, 5,510 of U-Haul's Dealer network are sole proprietorships. Many, likely most, of these small businesses cannot

collect, or cannot affordably collect, the data required by the Rule. The Rule threatens the very essence of U-Haul's business model, and any other company that relies upon similar dealer-based networks. And it strikes at the core of any dealership-based model based on small, independent dealers.

44. The Rule ignores the nature of business models such as U-Haul's. As noted above, it ignores the realities of a dealership-based structure. At the individual dealer level, it also ignores how these businesses function. U-Haul's Dealers do not solely rent or sell U-Haul products. Rather, they are multi-service businesses. A common example is a gas station. A gas station sells gas, it sells a variety of goods in the convenience store, it sometimes provides car washes and auto services. And it sometimes provides U-Haul truck rentals. It is impractical if not impossible for a sole-proprietor of such a business to separate out the U-Haul component of the business from the non-U-Haul components of the business. Under the Rule, only the U-Haul component of the gas station can be attributed to U-Haul. The business owner has no way of tracking climate impacts from the U-Haul rental side of the business as opposed to those from selling gasoline, nor would the business owner otherwise be required to do so under the Rule for its own business purposes.

45. The Rule assumes that all companies are national monoliths, capable of tracking climate impacts from all aspects of their business with the snap of a finger at a centralized headquarters. That is not how U-Haul works and it is not how many

Appellate Case: 24-1628    Page: 1418    Date Filed: 03/26/2024 Entry ID: 5377362

dealership-based businesses work. The Rule is based on business-model assumptions that do not reflect reality.

46.    The threat to U-Haul's business model is imminent. Given the large number of U-Haul Dealers, U-Haul is constantly entering into new contracts and renewing existing contracts. If U-Haul has to include contractual terms mandating the sharing of the information required by the Rule, it has to begin revising contracts and otherwise collecting this information immediately. How many Dealers U-Haul loses due to these requirements is not specifically calculable at this time, but U-Haul anticipates massive damage to its Dealer network from the Rule.

**Costs to Consumers**

47.    The Rule fails to account for the potentially massive cost increase to consumers that the Rule will cause. As U-Haul's compliance costs demonstrate, many companies and industries never anticipated anything of this kind ever being required under the Exchange Act. Companies price in the normal uncertainties of the regulatory environment, but they do not factor in fundamental changes to the nature of regulation itself.

48.    U-Haul's rentals give the freedom of mobility to millions of Americans who otherwise could not afford to move. The associated costs of compliance with the Rule will not only affect U-Haul and its independent Dealers but will certainly

Appellate Case: 24-1628     Page: 1419     Date Filed: 03/26/2024 Entry ID: 5377362

impact U-Haul's customers' ability to afford U-Haul's services and products. Consequently, the Rule will harm consumers and result in a less mobile society.

49.   Conversely, if a company refuses to pass its higher costs onto consumers, then the company's profitability will be negatively impacted. This has secondary impacts on the economy by reducing returns for investors and stockholders.

50.   Ironically, the Rule will also have the effect of decreasing the feasibility of rentals for many Americans resulting in the increased use of older, less safe private vehicles and their accompanying increased GHG emissions. U-Haul's rental business allows millions of Americans each year to utilize its fleet of safe, modern vehicles. By increasing costs and decreasing choice to the consumer through this disclosure regime, the SEC is harming consumer welfare, safety, and the environment.

**U-Haul's Reasonable Reliance on the Previous Regime**

51.   As the costs and effort required to change U-Haul's reporting mechanisms demonstrates, U-Haul has created its entire disclosure apparatus in reliance on the previous well-settled regime. The Rule's precipitous break from decades of agency requirements has upset U-Haul's reasonable reliance on the SEC's longstanding requirements and forces it to fundamentally reconfigure its approach to disclosure.

Appellate Case: 24-1628    Page: 1420    Date Filed: 03/26/2024 Entry ID: 5377362

52.     Although agencies often tweak regulations, this change is different in kind, not degree from the previous rules. It is a change that threatens U-Haul's entire business model, and the business models of other similarly situated companies. U-Haul's dealer-based business model, created in reliance on the decades-old disclosure regime, is simply not equipped for this form of reporting requirement.

53.     Based on U-Haul's review of the Securities laws, bolstered by the SEC's longstanding interpretation and implementation, the Company never thought that such a radical change could be implemented under the Exchange Act. Had anyone predicted this, it would have materially affected decades of U-Haul's business decisions.

54.     The Rule represents a seismic shift in the regulatory regime and a fundamentally new approach to disclosure. U-Haul has reasonably and in good faith relied on the prior reporting regime. The Rule imminently threatens to upset U-Haul's reliance on what was a fundamentally stable regulatory regime.

55.     Furthermore, the new regime would require me to attest to disclosures that, while based on a good faith effort and great expense, will be based on high priced guesswork (assumptions and prognostications multiplied by industry-wide average emissions factors or average emission factors for energy generation) which ultimately yield inaccurate data compared to reality. Due to the inherent inaccuracies in calculating the data required for reporting, disclosures will require updates as

methodologies and calculations become more advanced and accurate. These inaccuracies and updates will undoubtedly lead to litigation from investors the SEC claims to be protecting with the Rule for claimed losses based on reliance on the very same information the Rule is requiring companies to disclose, all whilst the SEC knows the information is inaccurate.

56.     Why would the SEC want me to disclose data that is fraught with inaccuracies? Just like I don't mislead U-Haul's customers regarding fuel economy of U-Haul trucks which varies depending on driving style, routes driven, and weather conditions, I am unwilling to mislead investors with respect to inaccurate climate-related financial risk or emissions information.


Pursuant to 28 U.S.C. §1746, I, Edward J. Shoen, declare under penalty of perjury that the foregoing is true and correct. EXECUTED on this 26th day of March, 2024.

*Joe Shoen*

_____
Edward J. Shoen
U-Haul Holding Company
5555 Kietzke Lane, Ste. 100
Reno, Nevada 89511