# In the United States Court of Appeals for the Eighth Circuit

CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, ET AL.,
*Petitioners*,

v.

UNITED STATES SECURITIES AND EXCHANGE COMMISSION,
*Respondent*,

DISTRICT OF COLUMBIA, ET AL.,
*Intervenors*.

_____

NATIONAL CENTER FOR PUBLIC POLICY RESEARCH,
*Petitioner*,

v.

UNITED STATES SECURITIES AND EXCHANGE COMMISSION,
*Respondent*.

_____

On Petitions for Review of an Order of the
Securities & Exchange Commission

## PETITIONERS' FINAL JOINT OPENING BRIEF

| | |
|---|---|
| Brian A. Richman | Eugene Scalia |
| GIBSON, DUNN & CRUTCHER LLP | Jonathan C. Bond |
| 2001 Ross Avenue, Suite 2100 | Max E. Schulman |
| Dallas, TX 75201 | Brian C. McCarty |
| (214) 698-3100 | GIBSON, DUNN & CRUTCHER LLP |
| | 1700 M Street, N.W. |
| | Washington, D.C. 20036 |
| | (202) 955-8500 |
| | EScalia@gibsondunn.com |

*Counsel for Petitioners*
*Chamber of Commerce of the United States of America, Texas Association*
*of Business, and Longview Chamber of Commerce*
(*Additional counsel on inside cover*)

Daryl Joseffer
Tyler S. Badgley
Kevin R. Palmer
U.S. CHAMBER LITIGATION
    CENTER
1615 H Street, N.W.
Washington, D.C.  20062
(202) 463-5337

*Counsel for Chamber of Commerce of the United States of America*

Andrew J. Morris
Sheng Li
NEW CIVIL LIBERTIES ALLIANCE
1225 19th St. N.W., Suite 450
Washington, D.C.  20036
(202) 869-5210
Andrew.Morris@ncla.legal

*Counsel for National Center for Public Policy Research*

## SUMMARY OF THE CASE

These consolidated cases challenge the most expensive disclosure requirement the Securities and Exchange Commission has ever adopted. The climate rule creates an entirely new regulatory scheme for one topic—climate change. It requires companies to provide prescriptive, forward-looking disclosures of the risks of climate change to the company's strategy, business model, and outlook. And it demands an explanation of climate-related expenses that exceed one percent of income before taxes and an analysis of significant contributing factors to those expenses. The rule requires disclosure of climate-related targets and goals and, in many instances, a company's greenhouse-gas emissions—requirements with no analogue in the existing securities-disclosure regime. The rule is unlawful several times over. It is arbitrary and capricious under the Administrative Procedure Act, exceeds the SEC's statutory authority, and violates the First Amendment. It should be vacated.

Given the significance of the SEC's rule, the many weighty issues, and the number of parties involved, petitioners respectfully submit that oral argument would be beneficial and that 45 minutes per side would be adequate to address the issues.

i

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, petitioners the Chamber of Commerce of the United States of America, Texas Association of Business, Longview Chamber of Commerce, and National Center for Public Policy Research make the following disclosures:

The Chamber of Commerce of the United States of America has no parent corporation, and no publicly held company owns 10% or more of its stock.

The Texas Association of Business has no parent corporation, and no publicly held company owns 10% or more of its stock.

The Longview Chamber of Commerce has no parent corporation, and no publicly held company owns 10% or more of its stock.

The National Center for Public Policy Research has no parent corporation, and no publicly held company owns 10% or more of its stock.

Appellate Case: 24-1628    Page: 4    Date Filed: 10/01/2024 Entry ID: 5441541

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................... 1

STATEMENT OF JURISDICTION ............................................. 4

STATEMENT OF ISSUES ........................................................ 5

STATEMENT OF THE CASE ................................................... 6

    A.    The Administration Announces "We Don't Need Congress" To Implement A Climate-Change Agenda And Launches A "Government-Wide Approach" ................... 6

    B.    The SEC Answers The Administration's Call ....................... 8

    C.    Commenters Urge The SEC To Reconsider ........................... 9

    D.    The SEC Adopts A Final Rule That Differs Dramatically From The Proposal Yet Still Suffers The Same Fundamental Flaws .................................................... 13

SUMMARY OF ARGUMENT .................................................. 16

STANDARD OF REVIEW ....................................................... 18

ARGUMENT ......................................................................... 19

I.    The Climate Rule Is Arbitrary And Capricious ........................... 19

    A.    The Rule Is Irrational Because It Purports To Solve A Problem That The SEC Failed To Show Exists ................... 20

    B.    The SEC Failed To Explain Its Departure From Decades Of SEC Precedent ..................................................... 33

    C.    The SEC Failed Adequately To Consider The Rule's Economic Effects ..................................................... 38

    D.    The SEC Ignored Reasonable, Less-Burdensome Alternatives ..................................................... 44

Appellate Case: 24-1628    Page: 5    Date Filed: 10/01/2024    Entry ID: 5441541

II.   The Rule Is Contrary To Law And The Constitution....................47

    A.    The Rule Exceeds The SEC's Statutory Authority .............47

        1.   The Securities Laws Authorize The SEC To
             Require Disclosure Only Of Material, Financially
             Related Information......................................................47

        2.   The Major-Questions Doctrine And
             Constitutional Avoidance Also Weigh Strongly
             Against The SEC's Overbroad Statutory Reading......55

    B.    The Rule Violates The First Amendment.............................60

III.  The Rule Should Be Vacated ........................................................67

CONCLUSION .................................................................................68

iv

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*303 Creative LLC* v. *Elenis*,
  600 U.S. 570 (2023) ............................................................. 60

*American Equity Investment Life Insurance Co.* v. *SEC*,
  613 F.3d 166 (D.C. Cir. 2010) ............................................ 5, 21, 32, 38

*American Farm Bureau Federation* v. *EPA*,
  836 F.3d 963 (8th Cir. 2016) ............................................... 5

*American Meat Institute* v. *USDA*,
  760 F.3d 18 (D.C. Cir. 2014) ............................................... 62

*Americans for Prosperity Foundation* v. *Bonta*,
  594 U.S. 595 (2021) ........................................................... 53, 66

*Basic Inc.* v. *Levinson*,
  485 U.S. 224 (1988) ........................................................... 34, 35

*Biden* v. *Nebraska*,
  143 S. Ct. 2355 (2023) ....................................................... 57

*Book People, Inc.* v. *Wong*,
  91 F.4th 318 (5th Cir. 2024) .............................................. 64, 65

*Bruni* v. *City of Pittsburgh*,
  824 F.3d 353 (3d Cir. 2016) ............................................... 63

*BST Holdings, LLC* v. *OSHA*,
  17 F.4th 604 (5th Cir. 2021) .............................................. 58

*Business Roundtable* v. *SEC*,
  647 F.3d 1144 (D.C. Cir. 2011) .................... 5, 20, 23, 26, 27, 28, 31
    32, 37, 38, 39, 41, 42, 44

*Calzone* v. *Summers*,
  942 F.3d 415 (8th Cir. 2019) (en banc) ............................. 66

v

Appellate Case: 24-1628    Page: 7    Date Filed: 10/01/2024 Entry ID: 5441541

## TABLE OF AUTHORITIES
*(continued)*

**Page(s)**

*Chamber of Commerce of United States* v. *SEC*,
    412 F.3d 133 (D.C. Cir. 2005) .................................................. 38, 44, 46

*Chamber of Commerce of United States* v. *SEC*,
    443 F.3d 890 (D.C. Cir. 2006) ........................................................... 24

*Chamber of Commerce of United States* v. *SEC*,
    85 F.4th 760 (5th Cir. 2023) ............................................. 20, 31, 32, 43

*Checkosky* v. *SEC*,
    23 F.3d 452 (D.C. Cir. 1994) ............................................................. 49

*Circuit City Stores, Inc.* v. *Adams*,
    532 U.S. 105 (2001) .......................................................................... 48

*Citizens to Preserve Overton Park, Inc.* v. *Volpe*,
    401 U.S. 402 (1971) ................................................................. 6, 18, 67

*Citizens United* v. *FEC*,
    558 U.S. 310 (2010) .......................................................................... 61

*City of Brookings Municipal Telephone Co.* v. *FCC*,
    822 F.2d 1153 (D.C. Cir. 1987) ......................................................... 44

*Dakotans for Health* v. *Noem*,
    52 F.4th 381 (8th Cir. 2022) .............................................................. 66

*Defenders of Wildlife* v. *U.S. Department of Interior*,
    931 F.3d 339 (4th Cir. 2019) ............................................................. 24

*Dura Pharmaceutical, Inc.* v. *Broudo*,
    544 U.S. 336 (2005) .......................................................................... 51

*Edenfield* v. *Fane*,
    507 U.S. 761 (1993) .......................................................................... 62

Appellate Case: 24-1628    Page: 8    Date Filed: 10/01/2024 Entry ID: 5441541

# TABLE OF AUTHORITIES

*(continued)*

Page(s)

*Edward J. DeBartolo Corp.* v. *Florida Gulf Coast Building & Construction Trades Council*, 485 U.S. 568 (1988) ............................ 59

*FCC* v. *Fox Television Stations, Inc.*,
556 U.S. 502 (2009) ................................................................ 34

*Fox Television Stations, Inc.* v. *FCC*,
280 F.3d 1027 (D.C. Cir. 2002) ............................................ 24

*Friends of Boundary Waters Wilderness* v. *Bosworth*,
437 F.3d 815 (8th Cir. 2006) ................................................ 40

*Grace Healthcare of Benton* v. *HHS*,
603 F.3d 412 (8th Cir. 2009) ................................................ 23

*Gralike* v. *Cook*,
191 F.3d 911 (8th Cir. 1999) ............................... 60, 61, 64

*Grayscale Investments, LLC* v. *SEC*,
82 F.4th 1239 (D.C. Cir. 2023) ............................................ 18

*Hennepin County Medical Center* v. *Shalala*,
81 F.3d 743 (8th Cir. 1996) ................................................ 18

*Hurley* v. *Irish-American Gay, Lesbian & Bisexual Group of Boston*, 515 U.S. 557 (1995) ............................................. 60

*International Dairy Foods Ass'n* v. *Amestoy*,
92 F.3d 67 (2d Cir. 1996) .................................................... 62

*Janus* v. *AFSCME*,
585 U.S. 878 (2018) ......................................................... 61, 65

*Junior Sports Magazines Inc.* v. *Bonta*,
80 F.4th 1109 (9th Cir. 2023) ............................................. 63

Appellate Case: 24-1628     Page: 9     Date Filed: 10/01/2024 Entry ID: 5441541

# TABLE OF AUTHORITIES

*(continued)*

**Page(s)**

*King* v. *Burwell*,
576 U.S. 473 (2015)................................................................55

*Lowe* v. *SEC*,
472 U.S. 181 (1985)..............................................................65

*Lucas* v. *Alexander*,
279 U.S. 573 (1929)..............................................................59

*Mandan, Hidatsa & Arikara Nation* v. *U.S. Department of
Interior*, 95 F.4th 573 (8th Cir. 2024).................................56

*Massachusetts* v. *EPA*,
549 U.S. 497 (2007)..............................................................50

*McIntyre* v. *Ohio Elections Commission*,
514 U.S. 334 (1995)..............................................................62

*In re MCP No. 165*,
21 F.4th 357 (6th Cir. 2021) .................................................58

*Menorah Medical Center* v. *Heckler*,
768 F.2d 292 (8th Cir. 1985)..................5, 22, 23, 25, 28, 31, 41, 44, 46

*Mock* v. *Garland*,
75 F.4th 563 (5th Cir. 2023) .................................................38

*Motor Vehicle Manufacturers Ass'n of United States* v. *State
Farm Mutual Automobile Insurance Co.*,
463 U.S. 29 (1983)............................................... 5, 20, 25, 34

*NASDAQ Stock Market, LLC* v. *SEC*,
961 F.3d 421 (D.C. Cir. 2020) .............................................30

*National Ass'n of Manufacturers* v. *SEC*,
800 F.3d 518 (D.C. Cir. 2015).................................. 6, 53, 62, 64, 65, 66

Appellate Case: 24-1628   Page: 10   Date Filed: 10/01/2024 Entry ID: 5441541

*National Ass'n of Private Fund Managers* v. *SEC*,
103 F.4th 1097 (5th Cir. 2024) .................................... 6, 19, 40, 57, 67

*National Federation of Independent Business* v. *Department
of Labor*, 595 U.S. 109 (2022) (per curiam) ........................... 56, 57, 58

*National Fuel Gas Supply Corp.* v. *FERC*,
468 F.3d 831 (D.C. Cir. 2006) .................................... 3, 22, 23

*National Institute of Family & Life Advocates* v. *Becerra*,
585 U.S. 755 (2018) ........................................... 6, 62, 64, 67

*North Dakota* v. *EPA*,
730 F.3d 750 (8th Cir. 2013) ........................................ 6, 67

*In re NVIDIA Corp. Securities Litigation*,
768 F.3d 1046 (9th Cir. 2014) ........................................ 35

*NYSE LLC* v. *SEC*,
962 F.3d 541 (D.C. Cir. 2020) ......................................... 2

*Pacific Gas & Electric Co.* v. *Public Utilities Comm'n*,
475 U.S. 1 (1986) .................................................. 60

*Phelps-Roper* v. *Koster*,
713 F.3d 942 (8th Cir. 2013) ......................................... 59

*PhRMA* v. *Williams*,
64 F.4th 932 (8th Cir. 2023) .......................................... 5

*Reed* v. *Town of Gilbert*,
576 U.S. 155 (2015) ................................................ 61

*Riley* v. *National Federation of the Blind of
North Carolina, Inc.*, 487 U.S. 781 (1988) ............................. 60

Appellate Case: 24-1628   Page: 11   Date Filed: 10/01/2024 Entry ID: 5441541

# TABLE OF AUTHORITIES

*(continued)*

**Page(s)**

*Rumsfeld* v. *FAIR*,
    547 U.S. 47 (2006) ................................................................. 4

*Spirit Airlines, Inc.* v. *U.S. Department of Transportation*,
    997 F.3d 1247 (D.C. Cir. 2021) ........................................... 44

*St. James Hospital* v. *Heckler*,
    760 F.2d 1460 (7th Cir. 1985) ............................................ 41

*Telescope Media Group* v. *Lucero*,
    936 F.3d 740 (8th Cir. 2019) .............................................. 61

*Town of Chester* v. *Laroe Estates, Inc.*,
    581 U.S. 433 (2017) ............................................................. 5

*TSC Industries, Inc.* v. *Northway, Inc.*,
    426 U.S. 438 (1976) ................................................... 34, 50

*Twin Rivers Paper Co.* v. *SEC*,
    934 F.3d 607 (D.C. Cir. 2019) .............................................. 4

*United States* v. *Playboy Entertainment Group, Inc.*,
    529 U.S. 803 (2000) ........................................................... 63

*Universal Health Services, Inc.* v. *United States*,
    579 U.S. 176 (2016) ........................................................... 51

*Washington State Department of Social & Health Services* v.
    *Guardianship Estate of Keffeler*, 537 U.S. 371 (2003) ....... 47

*West Virginia* v. *EPA*,
    597 U.S. 697 (2022) .......................... 1, 6, 18, 47, 55, 56, 57

*Wollschlaeger* v. *Governor*,
    848 F.3d 1293 (11th Cir. 2017) (en banc) ......................... 63

Appellate Case: 24-1628   Page: 12   Date Filed: 10/01/2024   Entry ID: 5441541

# TABLE OF AUTHORITIES
*(continued)*

**Page(s)**

*Wooley* v. *Maynard*,
430 U.S. 705 (1977) ................................................................. 59

*Zauderer* v. *Office of Disciplinary Counsel of Supreme Court
of Ohio*, 471 U.S. 626 (1985) ................................................ 64

**Constitutional Provisions**

U.S. Const. amend. I ............................................................... 59

**Statutes**

5 U.S.C. § 706 ................................................................. 18, 67

15 U.S.C.
    § 77aa .......................................................................... 48
    § 77b .......................................................... 18, 20, 37, 51
    § 77g ................................................................. 47, 48, 51
    § 77i ...................................................................... 4, 67
    § 77s .......................................................................... 49
    § 78c ..................................................................... 18, 20
    § 78*l* ...................................................................... 48, 51
    § 78m ..................................................................... 49, 50
    § 78w .......................................................................... 20

28 U.S.C. § 2112 ....................................................................... 4

42 U.S.C. § 7414 .................................................................... 50

FAST Act, Pub. L. No. 114-94, 129 Stat. 1312 (2015) ............................ 33

**Regulations**

17 C.F.R. § 201.140(c) ................................................................ 4

Appellate Case: 24-1628    Page: 13    Date Filed: 10/01/2024 Entry ID: 5441541

# TABLE OF AUTHORITIES
*(continued)*

**Page(s)**

**Other Authorities**

41 Fed. Reg. 21,632 (May 27, 1976) .......................................................... 21

54 Fed. Reg. 22,427 (May 24, 1989) .......................................................... 35

67 Fed. Reg. 44,964 (July 5, 2002) ............................................................ 57

75 Fed. Reg. 49,234 (Aug. 12, 2010) ......................................................... 22

75 Fed. Reg. 6290 (Feb. 8, 2010) ......................................................... 21, 33

81 Fed. Reg. 23,916 (Apr. 22, 2016) ..................................... 33, 48, 50, 51

81 Fed. Reg. 49,360 (July 27, 2016) .......................................................... 30

81 Fed. Reg. 7928 (Feb. 16, 2016) ............................................................ 30

83 Fed. Reg. 66,344 (Dec. 26, 2018) ......................................................... 30

84 Fed. Reg. 44,358 (Aug. 23, 2019) ......................................................... 33

84 Fed. Reg. 5202 (Feb. 20, 2019) ............................................................ 30

87 Fed. Reg. 68,312 (Nov. 14, 2022) ......................................................... 58

88 Fed. Reg. 38,146 (June 12, 2023) ......................................................... 22

88 Fed. Reg. 63,206 (Sept. 14, 2023) ........................................................ 22

*In re Application of Securities Industry &*
   *Financial Markets Ass'n,*
   2018 WL 5023228 (SEC Oct. 16, 2018) ............................................. 30

Hans B. Christensen et al., *Mandatory CSR and*
   *Sustainability Reporting,*
   26 Review of Accounting Studies 1176 (2021) ................................... 25

Appellate Case: 24-1628    Page: 14    Date Filed: 10/01/2024 Entry ID: 5441541

Climate Risk Disclosure Act of 2019, H.R. 3623 ....................................57

Climate Risk Disclosure Act of 2019, S. 2075..........................................58

Dissent of Commissioner Uyeda Regarding Proposed Rule on
    Conflicts of Interest Associated with Predictive Data
    Analytics (July 26, 2023), bit.ly/3U5G95e...........................................39

Exec. Order No. 14,008, 86 Fed. Reg. 7619 (Jan. 27, 2021) ....................6

Exec. Order No. 14,030, 86 Fed. Reg. 27,967 (May 20, 2021) .................7

*FAQ*, Follow This, bit.ly/45tJZZt ...........................................................28

*For Investors*, Follow This, bit.ly/3VIghwL ...........................................28

H.R. Rep. No. 73-85 (1933),
    1933 WL 983 .......................................................................................8

*Laurie Bebo*,
    2020 WL 4784633 (SEC ALJ Aug. 13, 2020).....................................30

Ann M. Lipton, *Not Everything Is About Investors*,
    37 Yale Journal on Regulation 499 (2020).........................................54

*Resolution at 2020 AGM of Royal Duty Shell plc*, As You Sow
    (Jan. 13, 2020), bit.ly/45mpyOd .......................................................28

U.S. Chamber of Commerce, *The Chamber's Climate
    Position: 'Inaction is Not an Option'* (Oct. 27, 2021),
    bit.ly/3RnChKv .....................................................................................9

Appellate Case: 24-1628    Page: 15    Date Filed: 10/01/2024 Entry ID: 5441541

## INTRODUCTION

The Executive Branch has repeatedly vowed to make national climate-change policy with or "without Congress," 24-1628 Stay Mot. Appendix (Stay App.) 893 (Mar. 26, 2024), and has repeatedly overstepped limits on its authority under environmental laws, *e.g.*, *West Virginia* v. *EPA*, 597 U.S. 697 (2022). Unable to achieve its "climate agenda" that way, the Executive promised to advance its environmental aims "using every tool at [its] disposal"—and has resorted to other, increasingly inapt legal frameworks to make climate policy through the back door. Stay App. 892.

While there are many responsible and lawful ways to combat climate change, this is not one of them. The Securities and Exchange Commission's climate rule is the latest, most egregious example of the Executive's no-holds-barred, "we don't need Congress" (Stay App. 893) approach. Under the guise of investor protection, the SEC invoked 90-year-old securities statutes to mandate sweeping, unprecedented disclosures on a single topic: climate. This effort to micromanage businesses looks nothing like the traditional disclosures required of public companies, advances no recognizable *securities*-law objective, and represents a clear departure from settled corporate-governance precedent. Far from filling

1

any genuine information gap, the climate rule would inundate investors with data that the Commission has not shown is needed by anyone, let alone Main Street investors, all while making it more difficult for investors to make informed investment decisions.  It is the quintessential rule "in search of [a] regulatory proble[m]."  *NYSE LLC* v. *SEC*, 962 F.3d 541, 556 (D.C. Cir. 2020).

This overreaching climate rule is unlawful several times over.  It is arbitrary and capricious under the Administrative Procedure Act (APA).  The rule requires businesses to spend billions of dollars gathering, processing, and reporting massive amounts of non-material climate-related information that the SEC claims just some investors want.  But companies *already* must disclose climate-related information material to investors' decisions, and the Commission utterly failed to show that forcing companies to disclose massive amounts of additional, often-immaterial climate data would yield any securities-law benefit.

The Commission does not and cannot cite a single example of an investor who was defrauded because a public company failed to disclose climate-related information—nor any case it has brought against a company for failing to disclose material climate-related risks.  As then-Judge

2

Kavanaugh put it, "[p]rofessing that an order ameliorates a real industry problem but then citing no evidence demonstrating that there is in fact an industry problem is not reasoned decisionmaking." *National Fuel Gas Supply Corp.* v. *FERC*, 468 F.3d 831, 843 (D.C. Cir. 2006).

Yet despite the demonstrated lack of benefits, the SEC's climate rule imposes the most expensive disclosure mandate in the SEC's history. Even by the SEC's own understated estimate, the rule would cost public companies more than $2.3 *billion* each year. See App. 681 (Certified List 4 at 21,908). But the record is replete with data establishing that the true costs of compliance would be orders of magnitude greater. The SEC cannot and does not come close to justifying that extraordinary burden.

The rule is independently unlawful both because Congress never authorized the SEC to mandate sweeping climate-related disclosures, and because the First Amendment forbids it. The securities laws concern information that is financial in nature and *material* to an investor's investment and voting decisions. The Commission conflates the securities laws' objective of "*protect*[*ing*] investors" with mollifying some "investors' * * * *demand*[*s*]." App. 457 (Certified List 4 at 21,684) (emphases added). Those are different things. And the First Amendment "prohibits the gov-

3

ernment from telling people what they must say." *Rumsfeld* v. *FAIR*, 547 U.S. 47, 61 (2006). Yet that is exactly what the rule does, by design—forcing companies to engage in costly speech against their will on matters of contentious societal debate.

The SEC's misconceived climate rule is irredeemable. This Court should set it aside in its entirety.

## STATEMENT OF JURISDICTION

This Court has jurisdiction to review the SEC's climate rule under 15 U.S.C. § 77i(a). *Twin Rivers Paper Co.* v. *SEC*, 934 F.3d 607, 617 & n.1 (D.C. Cir. 2019). On March 14 and April 29, 2024, respectively, petitioners timely petitioned for review within 60 days of the entry of the Commission's March 6, 2024, order adopting the rule. See 24-1628 Pet. for Review (Mar. 22, 2024); 24-2173 Pet. for Review (Apr. 29, 2024); 89 Fed. Reg. 21,668, 21,920 (Mar. 28, 2024); 17 C.F.R. § 201.140(c). The petitions were transferred to and consolidated in this Court under 28 U.S.C. § 2112(a). 24-1628 Consolidation Order (Mar. 22, 2024); 24-2173 Transfer Order (June 10, 2024).

Article III jurisdiction exists because "[a]t least one" petitioner—the Chamber of Commerce of the United States of America—undisputedly

Appellate Case: 24-1628     Page: 19     Date Filed: 10/01/2024 Entry ID: 5441541

has standing to challenge the rule. *Town of Chester* v. *Laroe Estates, Inc.*, 581 U.S. 433, 439 (2017). Many Chamber members are public companies directly subject to the rule's requirements. App. 1368, 1377 (Certified List 3688 at 1, 10); see, *e.g.*, Stay App. 1397-1417. Those members would have standing to challenge the rule in their own right. *American Farm Bureau Federation* v. *EPA*, 836 F.3d 963, 968 (8th Cir. 2016). The Chamber's purpose is to protect the legal and economic interests of its members, and neither the claims asserted nor the relief requested requires the participation of individual members, as petitioners seek only equitable relief. *PhRMA* v. *Williams*, 64 F.4th 932, 946, 948 (8th Cir. 2023).

## STATEMENT OF ISSUES

I.　　Whether the rule is arbitrary and capricious.

– *Motor Vehicle Manufacturers Ass'n of United States* v. *State Farm Mutual Automobile Insurance Co.*,
463 U.S. 29 (1983)

– *Menorah Medical Center* v. *Heckler*,
768 F.2d 292 (8th Cir. 1985)

– *Business Roundtable* v. *SEC*,
647 F.3d 1144 (D.C. Cir. 2011)

– *American Equity Investment Life Insurance Co.* v. *SEC*,
613 F.3d 166 (D.C. Cir. 2010)

5

II.    Whether the rule exceeds the Commission's statutory and constitutional authority.

- *West Virginia* v. *EPA*,
  597 U.S. 697 (2022)

- *National Institute of Family & Life Advocates* v. *Becerra*,
  585 U.S. 755 (2018)

- *National Ass'n of Manufacturers* v. *SEC*,
  800 F.3d 518 (D.C. Cir. 2015)

III.    Whether the rule should be vacated.

- *Citizens to Preserve Overton Park, Inc.* v. *Volpe*,
  401 U.S. 402 (1971)

- *North Dakota* v. *EPA*,
  730 F.3d 750 (8th Cir. 2013)

- *National Ass'n of Private Fund Managers* v. *SEC*,
  103 F.4th 1097 (5th Cir. 2024)

## STATEMENT OF THE CASE

### A.    The Administration Announces "We Don't Need Congress" To Implement A Climate-Change Agenda And Launches A "Government-Wide Approach"

Within days of taking office, the President announced his Administration's "policy" to "deploy the full capacity of its agencies to combat the climate crisis" through "a Government-wide approach."  Exec. Order No. 14,008, 86 Fed. Reg. 7619, 7622 (Jan. 27, 2021).  The President prom-

6

ised foreign leaders that "the United States will continue to push" on climate-change issues, Stay App. 924, and he unilaterally adopted a "target of a net-zero emissions economy by no later than 2050," Exec. Order No. 14,030, 86 Fed. Reg. 27,967, 27,967 (May 20, 2021).

The Administration has made clear that Congress's cooperation is irrelevant. White House officials explained that "[t]he President will advance his climate agenda using * * * every tool at his disposal" and that, if Congress declines to authorize the President's climate agenda, "we'll just continue to do the whole-of-government approach * * * without Congress" because "we don't need Congress." Stay App. 892-893, 904. The President specifically instructed agencies to pursue his 2050 net-zero-emissions goal by mandating "climate-related" disclosures. 86 Fed. Reg. at 27,967. And by committing the United States to the Glasgow Climate Pact, the Administration endorsed that Pact's assertion that urgent action is needed "to make finance flows consistent with a pathway towards low greenhouse gas emission and climate-resilient development in a transparent and inclusive manner." Stay App. 933. The United States agreed with other countries to "accelerate the alignment of their financing activities with the goals of the Paris Agreement." *Ibid.*

7

**B.  The SEC Answers The Administration's Call**

In 2022, the SEC proposed an unprecedented new regulation that would require companies to disclose massive amounts of non-financial climate information.  App. 281-420 (Certified List 1).

The proposed rule would have required companies to calculate the impacts of severe weather events, transition activities, and other climate-related risks on every line item on their financial statements, and then disclose, on a line-by-line basis, any impacts that aggregated to 1% or more of a line item.  App. 411-412 (Certified List 1 at 21,464-21,465).  And it would have required each company to report all emissions from the company itself ("scope 1"); its utility providers ("scope 2"); and, in many instances, its customers and suppliers ("scope 3").  App. 415-416 (Certified List 1 at 21,468-21,469).  Rather than requiring the disclosure of core financial information, such as a profit and loss statement, that is "indispensable to any accurate judgment upon the value of a security," H.R. Rep. No. 73-85, at 3 (1933), 1933 WL 983, at *4, the proposal would have required companies to disclose environmental information—such as the level of sulfur hexafluoride released, not just by the firm itself, but by the utility provider supplying energy for the firm's operations, or even the

8

firm's customers and suppliers.  App. 413, 415-416 (Certified List 1 at 21,466, 21,468-21,469).

## C.    Commenters Urge The SEC To Reconsider

A groundswell of comments from stakeholders urged the SEC to retreat from its proposal.  *E.g.*, App. 2250-2262 (Certified List 4413 at 5-17).  As the Chamber explained in its comments, the Chamber supports policies that reduce greenhouse-gas emissions as much and as quickly as reasonably possible, consistent with the pace of innovation and the feasibility of implementing large-scale technical change.  App. 1368 (Certified List 3688 at 1); U.S. Chamber of Commerce, *The Chamber's Climate Position: 'Inaction is Not an Option'* (Oct. 27, 2021), bit.ly/3RnChKv.

1.    Commenters told the SEC that the proposed rule was entirely unnecessary, as additional climate-related information is immaterial to investors.  The SEC's own former chief economist James Overdahl explained that climate-related information can already "be extracted from publicly-available information," App. 1469 (Certified List 3688, Annex A ¶ 38); see App. 1064 (Certified List 3381 at 7), and suggested the use of "well-known 'event study' techniques to assess the price or volume responses to climate-related disclosures" to see if such information even

9

informed investors' decisions, App. 1469 (Certified List 3688, Annex A ¶ 37).

Professor Daniel Taylor, a leading expert in corporate disclosure who routinely performs that kind of statistical analysis of price and trading data, conducted such a study. App. 1056-1057 (Certified List 3381 at i-ii). Professor Taylor compiled a sample of all Forms 8-K filed between January 2021 and March 2022 that disclosed greenhouse-gas emissions. App. 1061 (Certified List 3381 at 4). Form 8-K disclosures are "highly visible disclosures," so if *any* greenhouse-gas disclosures are material, it would be these. App. 1060 (Certified List 3381 at 3). Using well-established event-study techniques, Professor Taylor analyzed whether there was a statistically significant change in stock price or trading volume in response to the greenhouse-gas disclosures. App. 1060 (Certified List 3381 at 3). His study revealed that no such correlation existed—a powerful indication that "investors do not update their beliefs about value (upward or downward) in light of [greenhouse-gas] emissions data." App. 1063 (Certified List 3381 at 6). Professor Taylor submitted his study to the SEC as direct empirical evidence that greenhouse-gas emissions disclosures—the exact type of disclosures the Commission proposed to re-

10

quire—typically do "not contain material information" for investors. App. 1063 (Certified List 3381 at 6).

Moreover, although the SEC's proposal repeatedly cited demands for climate-related disclosure made by select institutional investors, App. 287-288, 371-372 (Certified List 1 at 21,340-21,341, 21,424-21,425), many of those same investors, after reviewing the proposed rule, warned in comments that key aspects of it were unnecessary. One institutional investor, for example, explained that the line-by-line reporting contemplated by the proposal would produce information that is "far too granular to inform investment decisions" and would be a huge "operational burden" for companies. App. 1556 (Certified List 3726 at 5).

Numerous other investors agreed. One stated that the requirement would not "result in meaningful or comparable climate disclosures." App. 1193 (Certified List 3479 at 8). Others warned that the information would "not be useful to investors" and would risk "overloading" them with "inconsequential information that [would] complicate their analysis of [a] company's operations and financial condition." App. 1319 (Certified List 3657 at 28). The resulting disclosures would "dilute the materiality of [other] climate-related financial disclosures and potentially mislead in-

11

vestors into assuming that [the] data [were] more relevant or reliable than [they] actually [would be]." App. 2093 (Certified List 4021 at 19).

**2.**     Commenters further explained that the proposed rule could not reasonably be implemented and that significant aspects of the proposal were infeasible and unduly costly.  Public companies that would be directly subject to the proposal, for example, explained that they would not be able to calculate the impacts of severe weather events, transition activities, and other climate-related risks on every line item on their financial statements, as the Commission proposed.  App. 2253-2254 (Certified List 4413 at 8-9).  "From a practical standpoint," they explained, "the processes and procedures necessary to conduct the financial statement analysis that would be required under the proposed rule simply do not exist."  App. 856 (Certified List 2378 at 29).

Commenters also showed that the detailed analysis required by the proposal "would effectively require detailed tagging of financial impacts at the invoice level."  App. 856 (Certified List 2378 at 29).  "Companies would be required to count every single financial impact that could plausibly be attributable to climate risks, weather events, or transition activities, somehow determine the degree of climate causation associated with

12

each, and then aggregate these impacts to determine if they meet the proposed 1% threshold—for *each* line item in the consolidated financial statements." App. 856 (Certified List 2378 at 29). "Companies' existing systems do not currently track data at such a granular level." App. 856-857 (Certified List 2378 at 29-30). And independent auditors warned that they would not have sufficient information to "be able to perform sufficient procedures to audit" the company's resulting disclosures anyway. App. 1549 (Certified List 3695, Appendix at 3).

### D. The SEC Adopts A Final Rule That Differs Dramatically From The Proposal Yet Still Suffers The Same Fundamental Flaws

Confronted with objections from nearly every quarter, the Commission re-tooled its proposal. But as its own Inspector General reported, the Commission has been relying on "shortened timelines" to rush through an "aggressive" agenda. App. 2278 (Certified List 4413, Exhibit A at 3). So, rather than design proposed fixes and put them out for public comment, the Commission jammed through an 886-page final rule—over two vigorous dissents—that preserved the proposal's fundamental flaws. See Stay App. 1-886; App. 441-694 (Certified List 4 at 21,668-21,921); see App. 695-709 (Peirce, dissenting); App. 710-714 (Uyeda, dissenting).

13

**1.** Although the rule diverges in various ways from the proposal and omits some of the most extreme features, it adheres to the proposal's basic approach of dictating climate-related disclosures far beyond what existing law requires on any other topic and disregarding core corporate governance precedents.

The final rule adopts "entirely new" parts of SEC regulations "for one topic—climate change—applicable to all public companies." App. 711 (Uyeda, dissenting); see App. 685-694 (Certified List 4 at 21,912-21,921). "In no other context is a company required to provide an explanation of expenses that exceed one percent of income before taxes and analyze the significant contributing factor to the expense." App. 711 (Uyeda, dissenting); see App. 685-686 (Certified List 4 at 21,912-21,913). And for "no other risk does the Commission require prescriptive, forward-looking disclosure of the risk's impacts on the company's strategy, business model, outlook, financial planning, and capital allocation." App. 711 (Uyeda, dissenting); see App. 687-689 (Certified List 4 at 21,914-21,916). The climate rule "requires disclosure of climate-related targets and goals"— which the SEC has never required, even for far more salient, bread-and-butter issues like "financial performance" and "market expansion." App.

711 (Uyeda, dissenting); see App. 689 (Certified List 4 at 21,916). And "the requirement to disclose [greenhouse-gas] emissions and obtain an attestation report on such disclosure is in a class of its own without comparison in the Commission's disclosure regime." App. 711-712 (Uyeda, dissenting); see App. 689-691 (Certified List 4 at 21,916-21,918).

    **2.**    Commissioners Peirce and Uyeda dissented.

    Commissioner Uyeda warned that the rule's purported "emphasis" on investor concerns was a sham: "By the time you finish reading all 886 pages of today's release, you will conclude that this rule is climate regulation promulgated under the Commission's seal." App. 710.

    The rule, Commissioner Uyeda explained, "elevates climate above nearly all other issues facing public companies"; it "is the culmination of efforts by various interests to hijack and use the federal securities laws for their climate-related goals." App. 710-711. The Commission lacked statutory authority for this "extraordinary exercise of regulatory authority," Commissioner Uyeda warned, and had failed adequately to consider the rule's effects on dictating to "companies' boards and management" a requirement to "spend more time and resources to think about, assess,

and discuss climate change," at the expense of other, more central business concerns. App. 711-712.

Commissioner Peirce agreed that the Commission lacked authority for the new rule. App. 695-709. And she criticized the rule's "insistence that climate issues deserve special treatment and disproportionate space in Commission disclosures." App. 695. According to Commissioner Peirce, the "existing disclosure regime already requires companies to inform investors about material risks and trends—including those related to climate—by empowering companies to tell their unique story to investors." App. 695. And the Commission, she explained, lacked a "persuasive reason to reject [this] existing principles-based, materiality focused approach to climate risk." App. 695.

## SUMMARY OF ARGUMENT

I.    The climate rule does not reflect reasoned decisionmaking and is arbitrary and capricious under the APA. The rule is irrational because it purports to solve a 'securities' problem that the SEC failed to show exists. In reality, it is a climate rule, not a securities regulation. The securities laws *already* require the disclosure of material information, so the rule is necessarily duplicative and of no value. The SEC

16

has not shown that investors need additional climate-related information, and it arbitrarily ignored significant evidence that they do not.

The Commission also failed to justify, or even acknowledge, its departure from decades of agency precedent limiting disclosures to "material" information. And it had no serious response to the rule's massive costs. Instead, the SEC cooked its own books, relying on biased, flawed information from environmental activists to slash its estimate of the rule's costs. Further confirming that providing material information to investors was not the rule's objective, the Commission failed to consider reasonable, less-burdensome alternatives that would have achieved that purported aim at far less cost.

II. The rule is independently unlawful because it exceeds the SEC's statutory and constitutional authority. Congress never authorized the Securities and Exchange Commission to mandate *climate* disclosures in this fashion. The rule sweeps far beyond the type of material, financial disclosures Congress authorized the Commission to require. And it does not advance the only objectives that the SEC is authorized to pursue. Further, the rule abridges the freedom of speech by forcing thousands of companies to speak against their will on a contentious political issue. If

17

the SEC can press-gang all of corporate America into a discussion about climate change, it can do so for virtually anything.

III.   This Court should vacate this deeply flawed rule.

## STANDARD OF REVIEW

Under the APA, this Court "shall  * * *  hold unlawful and set aside agency action" that is "in excess of statutory jurisdiction, authority, or limitations," or "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A), (C).

APA review is "searching and careful."  *Citizens to Preserve Overton Park, Inc.* v. *Volpe*, 401 U.S. 402, 416 (1971).  It reviews legal issues de novo, *Hennepin County Medical Center* v. *Shalala*, 81 F.3d 743, 748 (8th Cir. 1996), and is skeptical of agency reaches for "'transformative expansion in [their] regulatory authority'" without clear congressional authorization, *West Virginia* v. *EPA*, 597 U.S. 697, 724 (2022).  The Court must ensure agency decisions are "'reasonable and reasonably explained,'" *Grayscale Investments, LLC* v. *SEC*, 82 F.4th 1239, 1245 (D.C. Cir. 2023), and that the Commission fulfills its special statutory duty to account for rules' effects on "efficiency, competition, and capital formation," 15 U.S.C. §§ 77b(b), 78c(f).

18

## ARGUMENT

The climate rule is the most expensive disclosure requirement the Commission has ever adopted. Yet the alleged justification—that investors need more climate-related information—is "pretextual." *National Ass'n of Private Fund Managers* v. *SEC*, 103 F.4th 1097, 1113 (5th Cir. 2024). The SEC's solution to this problem it never substantiated exceeds its statutory authority. And the rule flouts the First Amendment by compelling thousands of companies to make controversial, opinion-laden statements on the hotly contested, politically salient issue of climate change.

## I. THE CLIMATE RULE IS ARBITRARY AND CAPRICIOUS

The SEC's climate rule "elevates climate above nearly all other issues facing public companies" and imposes unprecedented obligations— all to address a purported investor-information problem that the Commission failed to show exists. App. 711 (Uyeda, dissenting). The complete disconnect between the agency's approach and that ersatz problem—and the SEC's abrupt, unexplained departure from its approach to other issues—is textbook arbitrary action under the APA.

Appellate Case: 24-1628    Page: 34    Date Filed: 10/01/2024 Entry ID: 5441541

## A. The Rule Is Irrational Because It Purports To Solve A Problem That The SEC Failed To Show Exists

Under the APA, an agency issuing a new rule must show a "genuine proble[m] * * * warrant[ing] the rule." *Chamber of Commerce of United States* v. *SEC* (*Chamber III*), 85 F.4th 760, 777 (5th Cir. 2023). It must overcome "a presumption * * * *against* changes in current policy that are not justified by the rulemaking record." *Motor Vehicle Manufacturers Ass'n of United States* v. *State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 42 (1983). And under the SEC's organic statutes, the agency must use rigorous economic analysis to overcome that presumption. See 15 U.S.C. §§ 77b(b), 78c(f), 78w(a)(2); *Business Roundtable* v. *SEC*, 647 F.3d 1144, 1148-1149 (D.C. Cir. 2011).

1. Here, the Commission insisted that there was a securities-law justification for the rule because investors have a "need" for "more" information related to climate change. *E.g.*, App. 446 (Certified List 4 at 21,673/2). But the SEC could not show that the rule was needed to fill any alleged gap because companies are "already require[d]" to disclose material information under "existing" law. *Business Roundtable*, 647 F.3d at 1155; see App. 695-696 (Peirce, dissenting); App. 1387-1390, 1470-1471 (Certified List 3688 at 20-23, Annex A ¶ 40); App. 1058-1059

20

(Certified List 3381 at 1-2); App. 2126 (Certified List 4090 at 3); cf. *American Equity Investment Life Insurance Co.* v. *SEC*, 613 F.3d 166, 178-179 (D.C. Cir. 2010) (SEC's analysis was "incomplete because it fail[ed] to determine whether, under the existing regime, sufficient protections existed").

As the Commission previously recognized in rejecting similar proposals from the same environmental groups that advocated the present rule (*e.g.*, App. 2108 (Certified List 4062 at 2)), "[i]f environmental * * * information is material to investors, the Commission's rules *already* require the disclosure of such information." Stay App. 1192 n.1 (emphasis added); see 41 Fed. Reg. 21,632, 21,635/2 (May 27, 1976). It has acknowledged, for example, that "registrants are already required to disclose the financial statement effect of material climate risks under existing rules" and have an "ongoing responsibility to consider material impacts, whether climate-related or not, when preparing their financial statements and related disclosures." App. 570-571 (Certified List 4 at 21,797/3-21,798/1); see 86 Fed. Reg. 2080, 2081/2 n.9 (Jan. 11, 2021); 75 Fed. Reg. 6290 (Feb. 8, 2010).

But in adopting the climate rule, the Commission glossed over these "existing" requirements. *American Equity*, 613 F.3d at 179. And, unsurprisingly, it cited "no evidence" that any investor has ever been harmed by a lack of climate-related disclosures—a hallmark of irrational agency action, see, *e.g.*, *National Fuel Gas Supply Corp.* v. *FERC*, 468 F.3d 831, 843 (D.C. Cir. 2006) (Kavanaugh, J.), and a stark deviation from the Commission's usual practice, cf. 88 Fed. Reg. 63,206, 63,226/2-3 (Sept. 14, 2023) (justifying disclosure rule based on "enforcement actions related to ⁎⁎⁎ disclosure"); 75 Fed. Reg. 49,234, 49,237/3 & n.48 (Aug. 12, 2010) (similar); 88 Fed. Reg. 38,146, 38,172/3 (June 12, 2023) (similar).

**2.** The Commission speculated that climate-related information is nevertheless "underreported," App. 470 (Certified List 4 at 21,697/1), but the Commission's evidence "failed to substantiate [the] conclusion" that this supposed underreporting is "a problem [that] ever existed," *Menorah Medical Center* v. *Heckler*, 768 F.2d 292, 295 (8th Cir. 1985).

**a.** The Commission suggested that "many companies do not discuss any climate-related risks in response to existing disclosure requirements." App. 471 (Certified List 4 at 21,698/3). But that suggestion does not mean that climate information is *under*reported. "This would

22

follow only if the [Commission] showed that" the unreported information was *material* to investors. *Menorah Medical*, 768 F.2d at 296. But the Commission "made no attempt * * * to examine" the materiality of that information. *Ibid.*

All the Commission could muster was conjecture about the "*potential*" for "underreporting"—*i.e.*, companies "*may* strategically omit information." App. 614 (Certified List 4 at 21,841/1) (emphases added). But that is "pure speculation," *Grace Healthcare of Benton* v. *HHS*, 603 F.3d 412, 422 (8th Cir. 2009); the Commission "presented no evidence that such [underreporting] is ever seen in practice," *Business Roundtable*, 647 F.3d at 1150.

To the contrary, if "underreporting of material climate-related information" were a regular occurrence, App. 614 (Certified List 4 at 21,841/1), the Commission "likely would have been inundated" with enforcement matters, *National Fuel*, 468 F.3d at 844, as it has in other contexts, see p. 22, *supra*. Yet despite "regularly evaluat[ing]" climate-related disclosures under existing rules, App. 423 (Peirce, dissenting), the Commission apparently has never brought a *single* case against *any* company for failing to disclose material climate-related risks, App. 1407 (Certified List 3688 at 40); App. 1879 (Certified List 3902 at 44). It has not

cited a single penny lost, nor a single shareholder harmed, to warrant this new multi-billion-dollar burden. The Commission made no effort to "explain [this] discrepancy." *Defenders of Wildlife* v. *U.S. Department of Interior*, 931 F.3d 339, 359 (4th Cir. 2019); see *Fox Television Stations, Inc.* v. *FCC*, 280 F.3d 1027, 1050 (D.C. Cir. 2002).

**b.** Instead, the Commission pointed to existing "literature," which (the Commission said) showed that climate-related information was "importan[t] * * * to investors." App. 614 (Certified List 4 at 21,841/3). But most of that literature is not in the record, and all of it suffers significant defects ignored by the Commission and undermines the agency's position anyway.

Of the 41 putatively relevant articles the SEC cited, App. 614 n.2659 (Certified List 4 at 21,841/3), 30 are outside the administrative record, as the Commission failed to expose them to public comment, see App. 619 n.2721, 620 nn.2728-29, 621-622 nn.2738-46 (Certified List 4 at 21,846/3, 21,847/2, 21,848/2-21,849/1). Most of the SEC's academic support is thus disqualified as legitimate support for the rule. See, *e.g.*, *Chamber of Commerce of United States* v. *SEC* (*Chamber II*), 443 F.3d 890, 901 (D.C. Cir. 2006).

24

The articles are flawed, too. As experts warned, the existing literature does not use event studies, the "standard" test "for materiality commonly employed and accepted by academics, legal practitioners, and US courts"—and by the SEC itself. App. 1060 (Certified List 3381 at 3); see App. 1469 (Certified List 3688, Annex A ¶ 37); App. 2261-2262 (Certified List 4413 at 16-17). It relies instead on data concerning irrelevancies such as mine safety, App. 1059 (Certified List 3381 at 2 & n.4); see, *e.g.*, Hans B. Christensen et al., *Mandatory CSR and Sustainability Reporting*, 26 Review of Accounting Studies 1176, 1214 (2021), cited in App. 622 (Certified List 4 at 21,849/2 n.2748)—or "[t]hird party ESG ratings," which are a "hodgepodge of various environmental, social, and governance factors," App. 1059 (Certified List 3381 at 2); see, *e.g.*, App. 621 (Certified List 4 at 21,848/3 n.2743) ("nonpecuniary preferences")—largely unrelated to climate change. The Commission ignored these deficiencies. See *Menorah Medical*, 768 F.2d at 295-296 (failure to respond to "significant criticism" of study is arbitrary and capricious).

The SEC also disregarded an "important aspect of the problem" that rebuts its conclusion. *State Farm*, 463 U.S. at 43. The Commission stated that, "[c]ollectively," this existing literature showed that climate-

Appellate Case: 24-1628     Page: 40     Date Filed: 10/01/2024 Entry ID: 5441541

related risks are "priced into the value of a firm." App. 622 (Certified List 4 at 21,849/1). But that literature is based on information that is *already* publicly available, proof that sufficient information is already at investors' fingertips. See App. 1577 (Certified List 3787 at 6). For example, the Commission cites "research [that] finds an increase in stock price volatility around the day when [greenhouse-gas] or carbon emissions are disclosed" as evidence that "investors find such disclosures to be informative." App. 614 (Certified List 4 at 21,841/3). But the Commission misses the relevant point: "This study finds *no evidence of a difference in valuation* between [greenhouse-gas] emissions voluntarily disclosed by the company * * * *and the valuation of* [*greenhouse-gas*] *emissions inferred from publicly-observable information*." App. 1064 (Certified List 3381 at 7) (emphases added); cf. *ibid.* ("90% of the variation in [greenhouse-gas] emissions can be inferred from information that is already publicly available"); App. 1381, 1469 (Certified List 3688 at 14, Annex A ¶ 38) (similar). Thus, the Commission's own evidence shows that, if the SEC's true objective were to provide investors with material climate-related information, this rule would not be needed.

26

**c.**     The Commission looked, too, to "investo[r]" statements of a "need" for more climate-related information.  See, *e.g.*, App. 552 & n.1741 (Certified List 4 at 21,779/2).   But in doing so, and as in *Business Roundtable*, the Commission repeatedly relied on investors who are "motivated *differently*" and not interested "in seeking to increase shareholder value over the long term," App. 1413 (Certified List 3688 at 46) (emphasis added); see also App. 1374, 1379, 1398 (Certified List 3688 at 7, 12, 31); cf. *Business Roundtable*, 647 F.3d at 1151-1152 (faulting the Commission for failing to recognize that "union and state pension funds" had interests "unrelated to shareholder value").

The Commission admitted begrudgingly, and with considerable understatement, that "there coexist investors who exhibit *nonpecuniary* preferences involving this type of information."  App. 621 (Certified List 4 at 21,848/3 n.2743) (emphasis added).  But the Commission neglected to acknowledge that, in justifying the rule, it relied repeatedly on comments from precisely that group of investors.  Its principal example of investor demand was a letter from "climate activist 'As You Sow,'" App. 798-799 (Certified List 671 at 7-8), whose "stated aim" is nonpecuniary and unrelated to shareholder value, App. 1674 n.45 (Certified List 3814

27

at 19); see App. 547, 550, 552, 564, 577 (Certified List 4 at 21,774/2 nn.1664-1665, 21,777/2 n.1715, 21,779/2 n.1741, 21,791/1 n.1961, 21,804/1 n.2132). As You Sow is notorious for filing climate-related shareholder proposals, see App. 798 (Certified List 671 at 7), that are "[c]oordinated by" the climate-activist group "Follow This," *Resolution at 2020 AGM of Royal Duty Shell plc*, As You Sow (Jan. 13, 2020), bit.ly/45mpyOd. In its own words, this effort is a "Trojan Horse," *For Investors*, Follow This, bit.ly/3VIghwL, contrived to "stop climate change, *not to make a financial profit*," *FAQ*, Follow This, bit.ly/45tJZZt (emphasis added) (click "Can I buy more than one share?"). These "nonpecuniary" preferences are outside the Commission's purview, but the Commission relied on As You Sow nonetheless. And it cited and relied on the "Climate Action 100+," which concededly has "'always been" about "'actio[n]'"—"'*more than disclosure*.'" App. 2349 (Certified List 4536 at 2) (emphasis altered); see App. 446, 480, 627 (Certified List 4 at 21,673/2 n.44, 21,707/1 n.562, 21,854/3 n.2798).

**3.** Finally, the Commission "completely discounted" contrary evidence. *Business Roundtable*, 647 F.3d at 1151; see *Menorah Medical*, 768 F.2d at 295-296. For example, the Commission ignored companies'

28

responses to Commission inquiries explaining that certain climate-related information was not included in SEC disclosures because it was "largely immaterial" and thus "inappropriate for inclusion."  App. 423 (Peirce, dissenting); see App. 1059 (Certified List 3381 at 2) (noting companies' explanation "that 'climate risk *wasn't* a material issue'" (emphasis added)); App. 1769 (Certified List 3852 at 6) ("In each of these situations, the subject company appears to have provided justification to the Staff for its belief that the type of additional information alluded to in the Staff's comments  * * *  was not material.").  And it had no serious answer to expert analysis indicating that industry sectors leading in climate disclosures are the ones "where climate-related factors are more likely to have a material impact"—strong evidence that the existing regime "is working successfully."  App. 1462 (Certified List 3688, Annex A ¶ 20); see App. 800 (Certified List 671 at 9).

The Commission ignored evidence from Dr. Daniel Taylor, a leading expert on public-company disclosure, who examined the market reaction to corporate disclosures of climate-related information—the exact type of information the rule requires to be disclosed.  He did so by performing an event study—the "standard" method of testing whether information

would have "altered a reasonable investor's valuation of the company." App. 1060 (Certified List 3381 at 3); see App. 1469 (Certified List 3688, Annex A ¶ 37); App. 772 (Certified List 450, attachment at 35). "Event studies are often used to establish materiality" because "the market 'is the most accurate and unbiased measure of whether reasonable investors found the information to be material.'" *Laurie Bebo*, 2020 WL 4784633, at *87 (SEC ALJ Aug. 13, 2020). The Commission itself routinely relies on event studies to assess the materiality of information subject to proposed disclosure requirements. See, *e.g.*, 81 Fed. Reg. 49,360, 49,405/1 (July 27, 2016) ("We carefully considered each of these [event] studies[.]"); 81 Fed. Reg. 7928, 7949/1 (Feb. 16, 2016); 83 Fed. Reg. 66,344, 66,422/1 n.1262 (Dec. 26, 2018).

Dr. Taylor's event study reported "*no evidence*" of a stock-price or trading-volume response. App. 1057 (Certified List 3381 at ii). In any other SEC rulemaking, that empirical result would have weighed heavily against adoption of the proposed rule. Cf., *e.g.*, 84 Fed. Reg. 5202, 5290/1 (Feb. 20, 2019) (SEC event study "suggest[ed] that the market did not expect" event "to affect stock prices of companies"); *In re Application of Securities Industry & Financial Markets Ass'n*, 2018 WL 5023228, at *25

30

(SEC Oct. 16, 2018) (rejecting proposal where proponent did "not offer an event study"), vacated on other grounds sub nom. *NASDAQ Stock Market, LLC* v. *SEC*, 961 F.3d 421 (D.C. Cir. 2020).

But the Commission inexplicably—and arbitrarily—failed even to *consider* Dr. Taylor's findings, or those in other event studies that were consistent with his results. See, *e.g.*, App. 736 (Certified List 450 at 2). The Commission's "complet[e] discount[ing]" of studies "that reached the opposite result" is the quintessence of arbitrariness and caprice. *Business Roundtable*, 647 F.3d at 1150-1151; see *Chamber III*, 85 F.4th at 776; *Menorah Medical*, 768 F.2d at 295-296 ("Since these criticisms cast serious doubt on the premise grounding the [agency's] explanation, [its] failure to respond to them was arbitrary and capricious.").

The Commission, likewise, ignored comments from other investors that should have been given weight. Unaddressed empirical evidence showed that environmental disclosures are "irrelevant to retail investors' portfolio allocation decisions." App. 1468 (Certified List 3688, Annex A ¶ 36); see App. 797 (Certified List 671 at 6); App. 1870 (Certified List 3902 at 35). "[L]ess than 2% of mutual fund money is invested in [environmental, social, governance] funds," and environmental issues, accord-

ing to surveys, are retail investors' *least important consideration*." App. 1576 (Certified List 3787 at 5); cf. App. 797 (Certified List 671 at 6) (a quarter of investors think "ESG" [(environmental, social, governance)] "stands for 'earnings stock growth'").

The Commission failed to address evidence that, when professional investment analysts "determin[e] the value of securities," App. 1469 (Certified List 3688, Annex A ¶ 37), "other information, such as cash flows, profitability and industry," is "much more relevant to an investment decision," App. 1468 (Certified List 3688, Annex A ¶ 34), than information related to climate change, which the SEC acknowledged "very few" analysts even discuss, App. 614 (Certified List 4 at 21,841/2). The Commission nowhere reconciled these comments with its decision to adopt the rule.

\* \* \*

Although the SEC's approach to climate disclosures is singular, its failures to substantiate the problem it purports to address and to confront contrary evidence are familiar. SEC regulations have repeatedly been invalidated on those grounds before. See, *e.g.*, *Chamber III*, 85 F.4th at

32

777; *Business Roundtable*, 647 F.3d at 1148; *American Equity*, 613 F.3d at 177-179.

## B. The SEC Failed To Explain Its Departure From Decades Of SEC Precedent

The Commission's failure to show that there is a legitimate "securities" need for more climate-related information is particularly troubling because the rule marks an unexplained departure from SEC precedent. As the Commission admitted, the "existing framework of U.S. securities laws ＊ ＊ ＊ call for disclosure about the *material* risks that companies face." App. 454 (Certified List 4 at 21,681/3) (emphasis added). Thus, for years, the Commission has stressed that companies should "eliminate immaterial information," 75 Fed. Reg. at 6294/3, because "high levels of immaterial disclosure can obscure important information" for investors, 81 Fed. Reg. 23,916, 23,919/1 (Apr. 22, 2016). See App. 1767 (Certified List 3852 at 4 n.3); see also 84 Fed. Reg. 44,358, 44,383/2 (Aug. 23, 2019) ("amendments may reduce search costs for certain investors by eliminating information that is not material"); FAST Act, Pub. L. No. 114-94, § 72003, 129 Stat. 1312, 1785 (2015) (directing Commission to "explore methods for discouraging ＊ ＊ ＊ disclosure of immaterial information").

33

But the climate rule demands disclosure of information that is *not* material under well-settled standards. The Commission, therefore, needed to "display awareness" that it was departing from its prior position and "provide [a] reasoned explanation" for doing so. *FCC* v. *Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). But nowhere did the Commission offer a "satisfactory explanation" for its novel approach. *State Farm*, 463 U.S. at 43. Instead, the Commission simply purported to follow "traditional" materiality principles and "decorated the final rule with materiality ribbons." App. 696 (Peirce, dissenting). But the rule "embraces materiality in name only." *Ibid.*

Traditional materiality concerns the importance of information to investors' voting or investment decisions. See *Basic Inc.* v. *Levinson*, 485 U.S. 224, 231 (1988); *TSC Industries, Inc.* v. *Northway, Inc.*, 426 U.S. 438, 449 (1976); App. 1397-1398 (Certified List 3688 at 30-31); App. 1664 (Certified List 3814 at 9). The final rule eschews that standard in several ways.

*First*, the rule imposes *no* materiality limitation for certain disclosures, including those about board oversight of climate-related risks and

34

financial-statement disclosure related to severe weather events. App. 685-686, 688 (Certified List 4 at 21,912-21,913, 21,915).

*Second*, other parts of the rule require disclosure not only of risks that are *actually* material, but also climate-related risks that are "*reasonably likely* to have a material impact." App. 468 (Certified List 4 at 21,695/2) (emphasis added). The Commission describes this standard, and the attendant "materiality determination that a registrant will be required to make," as "the same as what is generally required when preparing the [management-discussion-and-analysis] section in a registration statement or annual report." App. 468 (Certified List 4 at 21,695/3). But the management-discussion-and-analysis rule "specifies its own standard" for disclosure, which the Commission has acknowledged for decades is *not* the "test for materiality approved by the Supreme Court in *Basic, Inc.* v. *Levinson*." 54 Fed. Reg. 22,427, 22,430/2 n.27 (May 24, 1989). The "reasonably likely" standard is "much broader." *In re NVIDIA Corp. Securities Litigation*, 768 F.3d 1046, 1055 (9th Cir. 2014).

*Third,* the rule demands disclosure of other information that is "material" to subordinate company plans and activities, regardless whether that information would affect a reasonable *investor's* decisions. It re-

35

quires disclosures, for example, if an internal carbon price is "material to" how a company evaluates or manages a climate-related risk, App. 689 (Certified List 4 at 21,916/1); if a carbon offset is a "material component" of a company's plan to achieve climate-related targets or goals, App. 689 (Certified List 4 at 21,916/3); if climate-related risks "material[ly] impact[ed]" the activities a company undertakes to mitigate or adapt to climate-related risks, App. 688 (Certified List 4 at 21,915/3); and if the estimates and assumptions a company used to produce its financial statements were "materially impacted" by severe weather events, App. 686 (Certified List 4 at 21,913/3).  In these circumstances and others, "material" is used in a different, more granular sense that will require disclosing a range of information that is unlikely to be material in the conventional sense.

*Finally*, the rule announces a presumption that "any risks elevated to the board level *will be* material to the company."  App. 486 (Certified List 4 at 21,713/3) (emphasis added).  This is problematic in ways the Commission failed to consider.  By forcing companies to "[d]escribe" the board's "oversight of climate-related risks," regardless of materiality (see pp. 22-37, *supra*), the rule "prompt[s]" companies to consider climate-re-

lated issues in circumstances, and at a level, where otherwise they typically would not. App. 629 (Certified List 4 at 21,856/1) ("recogniz[ing]" this "may" happen); see App. 711-712 (Uyeda, dissenting); App. 1711-1715 (Certified List 3814 at 56-60); App. 1850 (Certified List 3902 at 15); App. 2252-2253 (Certified List 4413 at 7-8). And then—having pressured boards to consider those climate-related issues—the rule *deems* them to be material. Through this bootstrapping the rule will compel companies to disclose vast swaths of information that is not material under settled law.

The rule thus refutes the SEC's claimed adherence to traditional notions of materiality. Indeed, in an earlier filing in a consolidated case, the SEC gave the game away. In attempting to show that the climate rule lies within its statutory authority, the SEC insisted that it is *not* limited to requiring disclosure of material information. See Stay App. 1292-1293. That is incorrect, see pp. 46-54, *infra*, but in any event, it only confirms that the disclosures the climate rule demands are unnecessary.

37

### C. The SEC Failed Adequately To Consider The Rule's Economic Effects

The Commission had a statutory duty to justify the rule in light of its huge costs, and to consider whether the rule "will" promote "efficiency, competition, and capital formation." 15 U.S.C. § 77b(b). But the Commission fudged its figures to minimize the costs attributable to the rule—and thereby "failed once again" to fulfil its duty to adequately "'apprise itself'" of the "'economic consequences'" of its rules. *Business Roundtable*, 647 F.3d at 1148; see, *e.g.*, *American Equity*, 613 F.3d at 179; *Chamber of Commerce of United States* v. *SEC* (*Chamber I*), 412 F.3d 133, 140-144 (D.C. Cir. 2005).

On balance, the rule cuts *against* efficiency, competition, and capital formation. Its massive costs will deter companies from going (or staying) public, App. 1412-1413 (Certified List 3688 at 45-46), and will fall disproportionally on smaller firms, App. 1259 (Certified List 3645 at 1).

The Commission conceded that compliance with the proposed rule would cost more than double the costs of compliance with all major existing SEC disclosures *combined*. App. 2130 (Certified List 4090 at 7); see App. 1480-1481 (Certified List 3688, Annex A ¶ 69). The Commission claimed that the final rule reduced those costs "by almost 90%." App. 697

38

(Peirce, dissenting).  But that calculation "duck[ed] serious evaluation of the costs," *Business Roundtable*, 647 F.3d at 1152, and rested on an economic analysis riddled with errors that public comments would have laid bare—had the SEC, as required, invited input on its massively revised final rule before adopting it, cf. *Mock* v. *Garland*, 75 F.4th 563, 584 (5th Cir. 2023) (where "comments indicated" proposal was "unworkable" and needed to be "replaced," "the proper process" was "to start the notice-and-comment process again"); App. 712 (Uyeda, dissenting) ("the Commission should have re-proposed this rule with an updated economic analysis and solicited additional public feedback"); Dissent of Commissioner Uyeda Regarding Proposed Rule on Conflicts of Interest Associated with Predictive Data Analytics (July 26, 2023), bit.ly/3U5G95e (objecting to the Commission's broader "pattern" of releasing proposals with "outlandish components," only to "pivo[t] to a different approach" without public input).

*First*, instead of grappling with the economic consequences of its action "'as best it can,'" *Business Roundtable*, 647 F.3d at 1148, the Commission utilized flawed, unvetted, and demonstrably biased data to knock hundreds of millions of dollars off its estimates arbitrarily.

39

For example, actual companies subject to this rule reported that scopes-1-and-2-emissions disclosures could cost up to $4 million per year for a single large company. See App. 652 (Certified List 4 at 21,879, tbl. 10 & n.5) (citing App. 909-913 (Certified List 3040)). But rather than rely on real-world estimates, the Commission turned to nonprofit environmental groups, padding the agency's data with activists' flawed surveys, see App. 652 (Certified List 4 at 21,879, tbl. 10 & nn.4, 6), and "telephonically" solicited lowball estimates, App. 2372-2380 (Certified List 4577); App. 2352-2371 (Certified List 4575), cited in App. 652-653 (Certified List 4 at 21,879-21,880, tbl. 10 & nn.7-8). Through this process, the Commission added estimates of $23,184, $40,000, and $50,000—a 99% savings compared to the public company's estimate—and then simply selected the "median" number. See App. 652 (Certified List 4 at 21,879 & tbl. 10).

The Commission's approach has no validity. The inputs are plainly biased and engineered to reach a preordained outcome. Cf. *National Ass'n of Private Fund Managers*, 103 F.4th at 1113 (SEC acted "pretextual[ly]"). And the SEC had no reason to believe that such data were representative of public companies subject to the rule. See *Friends of Boundary Waters Wilderness* v. *Bosworth*, 437 F.3d 815, 825-826 (8th Cir.

40

2006) ("we find it unreasonable to rely exclusively upon survey results, without analyzing the potential for bias" and where "there is no record evidence the [agency] * * * [tried] to determine which respondents, if any, would provide accurate and representative results").

In the face of clear errors, the Commission nonetheless rushed forward. For example, the Commission drew one datapoint from a survey touted by activist groups, see, *e.g.*, App. 645 (Certified List 4 at 21,872/2); App. 1635 (Certified List 3807 at 48), that purported to report "issuers' current average spend," App. 1018 (Certified List 3278 at 8). But, as commenters warned, "'*current* average spend'" is too low a benchmark, as the rule requires more and different disclosures than companies are currently making. App. 2258 (Certified List 4413 at 13) (emphasis added). Buried in a footnote, moreover, the same survey revealed that it calculated average costs by including responses of "'zero.'" *Ibid.* That, however, served only to depress artificially the survey's calculations. *Ibid.* Again, as commenters explained, survey respondents evidently "'marked zero'" to indicate that their responses did not "'reflect'" certain costs—even though those costs *should* have been included; the "'zero'" responses thus biased the results. *Ibid.* Yet the Commission ignored

41

these deficiencies. That is arbitrary, and warrants vacatur. See *Menorah Medical*, 768 F.2d at 295-296 (failure to respond to criticisms that survey was untrustworthy makes reliance upon the survey arbitrary and capricious); *St. James Hospital* v. *Heckler*, 760 F.2d 1460, 1467 n.5 (7th Cir. 1985) (agency has "duty to establish the statistical validity of the evidence prior to reaching conclusions based on that evidence").

*Second*, the Commission "neglected to support its predictive judgments." *Business Roundtable*, 647 F.3d at 1148-1149. For example, the Commission assumed that, given the rule's "materiality qualifiers," only 65% of large accelerated filers and 35% of accelerated filers would have to comply with the scopes-1-and-2-disclosure requirements. App. 676-677 (Certified List 4 at 21,903-21,904). But as covered companies would have shown if allowed to comment on this new provision, companies will still incur costs to determine "whether" scopes-1-and-2 emissions are "material" and thus required, "even in cases where registrants ultimately determine they do not need to make disclosure." App. 648 (Certified List 4 at 21,875/3). The Commission failed even "'to hazard a guess'" as to that cost, which affects *every* public company—ignoring altogether an

42

"'important aspect of the problem.'" *Business Roundtable*, 647 F.3d at 1150-1151.

*Third*, the Commission "inconsistently and opportunistically framed the costs and benefits of the rule." *Business Roundtable*, 647 F.3d at 1148-1149. In discounting the percentage of companies who would be required to report scopes-1-and-2 emissions, the Commission relied on "surveys of *current* climate-related disclosure practices." App. 675 (Certified List 4 at 21,902/2) (emphasis added). But it makes no sense to extrapolate the percentage of companies that would be affected by the rule from *current* reporting, when (in the Commission's view) "the current landscape * * * is inadequate." App. 603 (Certified List 4 at 21,830/1). "The SEC cannot have it both ways." *Chamber III*, 85 F.4th at 778. It is illogical for the rule simultaneously to *discount* the costs of the rule based on current reporting practices and claim as a benefit of the rule an *expansion* of those practices.

*Finally*, the Commission made no "attempt to understand the effect of the [rule] across the economy," or to "quantify these costs or even discuss what the impact might be." App. 2130 (Certified List 4090 at 7). It had no response to expert analysis showing that, each year, the rule

43

would cost the broader economy billions of dollars in lost GDP, and hundreds of thousands of jobs. App. 2045 (Certified List 3981 at 7).

In addition, the SEC acknowledged that the rule *could* "lead companies to alter their governance structures in ways that are less efficient (*e.g.*, by diverting board or management attention from other pressing corporate matters or devoting internal resources and expertise to climate-related risks at the expense of other concerns)." App. 629 (Certified List 4 at 21,856/1). But the Commission made no attempt to estimate the "costs in the form of diminished shareholder value." *Ibid.* The Commission failed even to predict *whether* the rule would "prompt" companies to consider climate risks in inefficient ways, *ibid.*; cf., *e.g.*, App. 1715 (Certified List 3814 at 60) (it would), in clear violation of the Commission's duty to "make tough choices about which of the competing estimates is most plausible," *Business Roundtable*, 647 F.3d at 1150.

## D. The SEC Ignored Reasonable, Less-Burdensome Alternatives

Confirming that providing investors with material information was not its real objective, the Commission failed to consider reasonable alternatives that would have furthered that aim at far less cost. This failure "violated the APA," *Chamber I*, 412 F.3d at 144, since "'[a]n agency is

44

required to consider responsible alternatives to its chosen policy and to give a reasoned explanation for its rejection of such alternatives,'" *Spirit Airlines, Inc.* v. *U.S. Department of Transportation*, 997 F.3d 1247, 1255 (D.C. Cir. 2021). "This principle goes to the heart of reasoned decisionmaking," *ibid.*, and an agency's failure to consider reasonable "'alternatives has led uniformly to reversal,'" *City of Brookings Municipal Telephone Co.* v. *FCC*, 822 F.2d 1153, 1169 (D.C. Cir. 1987); see, *e.g.*, *Menorah Medical*, 768 F.2d at 296-297.

Here, for example, the Commission could have required the reporting of greenhouse-gas emissions "at less frequency than annually," *e.g.*, "once every five years," as commenters suggested. App. 923 (Certified List 3162 at 10). By the Commission's own understated estimate, annual Form 10-K reporting of scopes-1-and-2 emissions would cost approximately $100,000,000 *per year*. See App. 654, 677 (Certified List 4 at 21,881, 21,904). But unrebutted expert evidence showed that the marginal, incremental benefit of *annual* disclosure, relative to, say, once every five years, was practically zero. See App. 2262 (Certified List 4413 at 17); App. 1064 (Certified List 3381 at 7). Greenhouse-gas "emissions are extremely highly correlated over time." App. 1064 (Certified List

45

3381 at 7). So if a company disclosed emissions in year one, the emissions in year two would be "almost the same," *ibid.*, and the second disclosure would yield "little" useful information, App. 2262 (Certified List 4413 at 17). Thus, as commenters explained, the Commission could have substantially eliminated a "huge burden"—a hundred million dollars a year—while still providing the same amount of potentially useful information, by simply requiring greenhouse-gas-emissions disclosures "less * * * than annually." App. 923 (Certified List 3162 at 10).

The Commission, however, "did not discuss" this "promising suggestion," in clear violation of the APA. *Menorah Medical*, 768 F.2d at 296; see, *e.g.*, *Chamber I*, 412 F.3d at 145 (where the "alternative was neither frivolous nor out of bounds," the Commission "had an obligation to consider it").

*　　　*　　　*

Ultimately, the SEC did not, and *cannot*, rationally justify its decision to impose billions of dollars of additional costs on companies, shareholders, and the broader economy. The SEC's current disclosure regime already requires the disclosure of material financial risks—climate or otherwise—and the SEC has not justified its idiosyncratic elevation of

46

climate-related financial risks above all others.  The rule should be vacated.

## II.   THE RULE IS CONTRARY TO LAW AND THE CONSTITUTION

### A.   The Rule Exceeds The SEC's Statutory Authority

The rule is independently unlawful because Congress never authorized the SEC to mandate climate disclosures in this fashion.  The rule sweeps far beyond the type of material, financial disclosures Congress authorized the Commission to require.  And it does not advance the only objectives that the SEC *is* authorized to pursue.

#### 1.   The Securities Laws Authorize The SEC To Require Disclosure Only Of Material, Financially Related Information

**a.**   The Commission claims "'very broad'" authority to require unprecedently expansive climate-related disclosures based on generic provisions of 1930s-era securities statutes that authorize "'necessary or appropriate'" financial disclosures.  App. 456-457 (Certified List 4 at 21,683-21,684 & n.181).  But those provisions, "'read in their context,'" underscore the *limits* on the Commission's authority.  *West Virginia*, 597 U.S. at 721.

47

The Commission relies primarily on a residual clause in Section 7(a)(1) of the Securities Act. App. 456 (Certified List 4 at 21,683). But that clause follows a list of enumerated disclosures and merely authorizes the Commission to require "such other information" it deems "necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 77g(a)(1). Such residual clauses are used "restrictively," *Washington State Department of Social & Health Services* v. *Guardianship Estate of Keffeler*, 537 U.S. 371, 384 (2003), and reach "'only objects similar in nature to those objects enumerated by the preceding specific words,'" *Circuit City Stores, Inc.* v. *Adams*, 532 U.S. 105, 114-115 (2001). The Commission's reading fails in two important ways.

*First*, as the Commission itself has previously acknowledged, the disclosures authorized by the Securities Act concern information that is both "financial in nature" and material to an investor's evaluation of "'a security.'" 81 Fed. Reg. at 23,921/3; see 15 U.S.C. §§ 77g(a)(1), 77aa; see also App. 454 (Certified List 4 at 21,681/3) (acknowledging that "the existing framework of U.S. securities laws  * * *  call for disclosure about the material risks that companies face"). That is worlds away from the

Appellate Case: 24-1628    Page: 63    Date Filed: 10/01/2024 Entry ID: 5441541

rule's climate-related disclosures, which are not financial in nature and are largely unrelated to assessing the value of a security.

Other provisions the SEC invokes (App. 456, 458-459 (Certified List 4 at 21,683, 21,685-21,686)) reinforce the financially focused limits on its authority. Exchange Act Section 12(b), for example, authorizes the Commission to require disclosure of "information" "as necessary or appropriate in the public interest or for the protection of investors"—but only "*in respect of*" specific categories of information that are (again) *financial* and materially related to the company's financial condition. 15 U.S.C. § 78*l*(b)(1) (emphasis added). Likewise, Exchange Act Section 13(a)(2) addresses annual and quarterly "reports," *id.* § 78m(a)(2)—meaning companies' *financial* reports: It requires reports certified by "independent public accountants," which makes sense only in the financial-reporting context. *Ibid.* The statute presupposes that these "reports" concern "the balance sheet and the earnings statement," "the appraisal or valuation of assets and liabilities," and "depreciation and depletion," *id.* § 78m(b)(1)— again, all material financial information.

Securities Act Section 19(a), meanwhile, addresses "details to be shown in the balance sheet and earning statement," 15 U.S.C. § 77s(a),

matters so far afield from the type of climate-related information in the rule that the Commission did not even mention this Section in the proposed rule. Balance sheets and earnings statements are "financial statements," *Checkosky* v. *SEC*, 23 F.3d 452, 470 (D.C. Cir. 1994); this ancillary provision about their "details" does not authorize transforming them into non-financial, climate-related reports.

Tellingly, when Congress *has* permitted the SEC to require disclosures outside that traditional, financial-information domain, it has expressly directed the SEC to require such disclosures. In 2010, for example, Congress directed the Commission to require companies to disclose use of "conflict minerals." 15 U.S.C. § 78m(p). Congress thus knows how to confer disclosure-requiring power outside the SEC's traditional ambit (though doing so may pose First Amendment problems, as the conflict-minerals rule demonstrates, see pp. 65-67, *infra*). But Congress conspicuously did *not* grant the SEC such authority in the provisions on which the climate rule relies. To the extent Congress has authorized regulations of climate-related matters—such as emissions reductions, the avowed goal of many of the rule's proponents, App. 1340-1344 (Certified List 3661 at 8-12)—Congress reserved those issues to the Environmental

50

Protection Agency. See 42 U.S.C. § 7414(a)(1); *Massachusetts* v. *EPA*, 549 U.S. 497, 528 (2007).

*Second*, in attempting to shoehorn its rule into the securities statutes' limitations, the Commission conflates the objective of "protect[ing] investors" with responding to "investors' * * * demand[s]." App. 457 (Certified List 4 at 21,684/1-2). Those things are not the same. Certain investors "might" *demand* information for many reasons. *TSC Industries*, 426 U.S. at 449. But investors need *protection* only from fraud and latent material risks. See 81 Fed. Reg. at 23,924/3 ("materiality" is the "'cornerstone'" of the "securities laws"). The securities laws do not address every matter of "investor interest," Stay App. 1245 n.68; they echo their common-law antecedents, *Dura Pharmaceutical, Inc.* v. *Broudo*, 544 U.S. 336, 344 (2005), which "'could not have conceived'" of imposing legal obligations "'without proof of materiality,'" *Universal Health Services, Inc.* v. *United States*, 579 U.S. 176, 193 (2016). As discussed above, the rule departs from traditional materiality principles, and the SEC has not shown the rule's disclosures are material. See pp. 22-37, *supra*.

The SEC similarly confuses the "public interest" under the securities laws, *e.g.*, 15 U.S.C. § 77g(a)(1), with promoting *any* social goal the

51

Commission favors. The public interest in this statutory context encompasses things like promotion of capital formation, *e.g.*, *id.* § 77b(b), but excludes ambitions "unrelated to the objectives of the federal securities laws," 81 Fed. Reg. at 23,970 n.663. The SEC cannot invoke abstract policy goals to aggrandize its authority beyond disclosure of "financial" information material to investors. *E.g.*, 15 U.S.C. § 78*l*(b)(1)(L).

**b.** Nor can the SEC draw support from past agency practice. Retreating from the statutory text, the Commission spends most of its "authority" section listing previous rulemakings that, it claims, shore up its claim of authority. App. 456-459 (Certified List 4 at 21,683-21,686). But this laundry-list argument is unpersuasive, misleading, and non-responsive to the lack of statutory authority for *this* rule. Indeed, it only underscores the aberrant nature of the climate rule.

The SEC cannot cite a *single* example of another disclosure requirement, among the "dozens" adopted "over the last 90 years," App. 456-457 (Certified List 4 at 21,683/3-21,684/1), that breaches the financially focused statutory guardrails on Commission authority the way this rule does. To the contrary, the new climate-related disclosures are different in kind from the 1933 form requiring disclosure of issuers' place and du-

52

ration of business, or a 1982 rule requiring disclosure of investments' "risk factors," or a 1997 rule requiring quantitative disclosure of "'interest rate risk,'" for example. See App. 457 (Certified List 4 at 21,684). Every one of the previous disclosures—including those touching incidentally on "environmental matters," App. 458 (Certified List 4 at 21,685/1)—respected the bedrock statutory requirements that the information disclosed must be both "financial in nature" and material to an investor's evaluation of "'a security.'" See pp. 48-51, *supra*. In contrast, the climate rule flouts those requirements, and the SEC's failure to appreciate that fundamental distinction renders irrelevant its laundry list of old rules.

c.     In short, this is a climate rule, not an investor rule. It unites two weapons that activists have long sought to deploy in the climate battle—the financial system and compulsory disclosure. Thus, the rule is a direct outgrowth of an Administration agreement with other nations "to make finance flows consistent with a pathway towards low greenhouse gas emission" and to "alig[n] * * * their financing activities with the goals of the Paris Agreement"—all without working through Congress to achieve this legislative objective. Stay App. 933; see App. 950-

53

951 (Certified List 3162 at 37-38) ("UN Principles for Responsible Invest-ment" call for investors to "'engage on an explicit net-zero agenda'" and "'deliver real-world outcomes'").

Compulsory disclosure laws, meantime, are a familiar mechanism for deterring politically-disfavored activities. See, *e.g.*, *Americans for Prosperity Foundation* v. *Bonta*, 594 U.S. 595 (2021); *National Ass'n of Manufacturers* v. *SEC*, 800 F.3d 518 (D.C. Cir. 2015); see also App. 950 (Certified List 3162 at 37) (activists use disclosures to "pressur[e] finan-cial institutions to divest" from oil companies). Shortly before this rule was adopted, California enacted two laws with many of the same require-ments and applied them to all large companies, *regardless* whether they have public investors. See App. 2319 (Certified List 4522 at 2); App. 2313 (Certified List 4518 at 1). An author of one of those laws openly admitted that the climate "report[s]" were designed to pressure corporations "'to significantly decrease corporate emissions.'" App. 2319 (Certified List 4522 at 2).

As even some environmental activists have admitted, the securities laws are the wrong vehicle for fighting climate change. See, *e.g.*, Ann M. Lipton, *Not Everything Is About Investors*, 37 Yale Journal on Regulation

499, 572 (2020) (advocating a new "system of corporate transparency," "[r]ather than warp[ing] the securities laws to serve purposes for which they were never intended"), cited in App. 804 n.58 (Certified List 671 at 13). That battle should be fought elsewhere.

### 2. The Major-Questions Doctrine And Constitutional Avoidance Also Weigh Strongly Against The SEC's Overbroad Statutory Reading

Even if the securities laws could plausibly be construed to authorize the climate disclosures mandated here, the Court should still reject the Commission's strained reading under the major-questions doctrine, and to avoid the First Amendment problems inherent in compelling corporate speech on such a controversial policy matter.

**a.** Congress does not authorize agencies to resolve major questions, and to work "transformative expansion[s] in [their] regulatory authority," through "modest words, vague terms, or subtle devices." *West Virginia*, 597 U.S. at 723-724 (brackets and internal quotation marks omitted). Such readings should be met with "'skepticism.'" *Id.* at 724. Yet that is precisely what the Commission claims Congress authorized here. The climate rule attempts to regulate a "'significant portion of the American economy,'" *id.* at 722, and would require "billions of dollars in

Appellate Case: 24-1628     Page: 70     Date Filed: 10/01/2024 Entry ID: 5441541

[private] spending," *King* v. *Burwell*, 576 U.S. 473, 485 (2015).  By the Commission's own estimate, the rule will impose $2.33 billion in direct costs *per year*—including three million "internal" hours of annual compliance work, plus numerous other costs, see pp. 37-44, *supra*.

The rule's "'political significance'" also makes it a major question. *West Virginia*, 597 U.S. at 716.  The comment file may be the largest in SEC history.  Commenters from trade associations, individual companies, public-interest organizations, environmental groups, individual investors, other governmental agencies, state and local governments, and members of Congress have an opinion on the proper handling of the climate-related issues addressed in the Commission's proposal.  App. 2250-2255 (Certified List 4413 at 5-10).  And 43 States are participating in this litigation.  See Nos. 24-1522, 24-1627, 24-1631, 24-1634.  All of this concerns a policy issue—climate—that is a flagrant "'mismatch'" with the SEC's expertise as a financial regulator.  *Mandan, Hidatsa & Arikara Nation* v. *U.S. Department of Interior*, 95 F.4th 573, 580 (8th Cir. 2024); cf. *National Federation of Independent Business* v. *Department of Labor*, 595 U.S. 109, 117 (2022) (per curiam) (OSHA regulates "workplace safety," not "public health").

Appellate Case: 24-1628     Page: 71     Date Filed: 10/01/2024 Entry ID: 5441541

Had Congress intended the SEC to regulate issues of such "'earnest and profound debate across the country,'" it would have said so clearly. *West Virginia*, 597 U.S. at 732. But it did not. As explained above, the 1930s-era securities statutes on which the SEC relies are best read not to support its claim of power at all. They certainly do not *clearly* authorize the disclosures the climate rule demands.

Those statutes also have never been construed to confer such power. As the SEC once recognized, these laws ensure "that issuers provide investors with 'complete information relative to the *financial condition* of the issuer.'" 67 Fed. Reg. 44,964, 44,966 (July 5, 2002) (emphasis added). In the SEC's words, "providing investors with financial information concerning publicly-held corporations is the *raison d'etre* of the disclosure provisions of the securities laws." Stay App. 1245 n.68. The enormous power the SEC now asserts to mandate disclosures on other, non-financial topics has not been sitting in its back pocket—unused—for 90 years.

The circumstances surrounding the rule's adoption confirm that the SEC is not wielding authority clearly conferred by Congress, but seeks instead to circumvent Congress. Cf. *National Ass'n of Private Fund Managers*, 103 F.4th at 1113-1114 (the Commission cannot use "the guise" of

57

the securities laws to circumvent "congressional design").  Like OSHA in adopting its unlawful vaccine mandate, *National Federation of Independent Business*, 595 U.S. at 113, and the Department of Education in adopting its equally unlawful student-loan forgiveness program, *Biden* v. *Nebraska*, 143 S. Ct. 2355, 2373 (2023), the Administration could not muster congressional support for its climate agenda.

On "multiple" occasions, Congress has "'considered and rejected'" bills that would do exactly what the rule attempts.  *West Virginia*, 597 U.S. at 731; see, *e.g.*, Climate Risk Disclosure Act of 2019, H.R. 3623; Climate Risk Disclosure Act of 2019, S. 2075.  So the Administration once again "pored over the U.S. Code in search of authority, or a 'workaround,'" to "impos[e]" the desired measures unilaterally.  *BST Holdings, LLC* v. *OSHA*, 17 F.4th 604, 612 (5th Cir. 2021), stay dissolved sub nom. *In re MCP No. 165*, 21 F.4th 357 (6th Cir. 2021), stay granted sub nom. *National Federation of Independent Business*, 595 U.S. 109.  The Administration has been unabashed in this approach, vowing to advance its "climate agenda using every tool at [its] disposal"—with or "without Congress"—and to "continue to do the whole-of-government approach" on its own if Congress does not cooperate.  Stay App. 892-893.  The vaccine-

58

mandate, student-loan-forgiveness pattern is thus repeating: In response to Congress's decisions not to act, climate regulations are now "pop[ping] up" across the federal bureaucracy. Tr. of Oral Arg. 81, *National Federation of Independent Business*, *supra* (No. 21A244); see, *e.g.*, 87 Fed. Reg. 68,312 (Nov. 14, 2022) (proposing mandatory climate disclosures for federal contractors).

This illegitimate "work-around" did not work for COVID or student loans, and it does not work for climate. *BST*, 17 F.4th at 612. The Constitution does not permit the Executive to regulate "without Congress," Stay App. 892, merely because that co-equal Branch has not advanced the President's policy goals in the manner or at the pace he prefers.

**b.** The Court should also reject the Commission's reading of its disclosure authority to avoid weighty First Amendment issues. Federal law "must be construed with an eye to possible constitutional limitations so as to avoid doubts as to its validity." *Lucas* v. *Alexander*, 279 U.S. 573, 577 (1929). This Court and the Supreme Court thus routinely construe statutes to "obviat[e] deciding whether" the law "would violate the First Amendment." *Edward J. DeBartolo Corp.* v. *Florida Gulf Coast Building & Construction Trades Council*, 485 U.S. 568, 578 (1988); see *Phelps-*

59

*Roper* v. *Koster*, 713 F.3d 942, 952 (8th Cir. 2013). Accordingly, the Court should avoid a construction of the Commission's disclosure authority that would raise the grave First Amendment concerns discussed below. See pp. 59-67, *infra*.

### B.    The Rule Violates The First Amendment

The SEC's climate rule "abridge[s] the freedom of speech." U.S. Const. amend. I. This freedom "includes both the right to speak freely and the right to refrain from speaking at all," *Wooley* v. *Maynard*, 430 U.S. 705, 714 (1977), and it "applies not only to expressions of value, opinion, or endorsement, but equally to statements of fact the speaker would rather avoid," *Hurley* v. *Irish-American Gay, Lesbian & Bisexual Group of Boston*, 515 U.S. 557, 573 (1995). "For corporations as for individuals, the choice to speak includes within it the choice of what not to say." *Pacific Gas & Electric Co.* v. *Public Utilities Comm'n*, 475 U.S. 1, 16 (1986) (plurality). The rule flouts that foundational principle by forcing companies to engage in costly speech against their will on matters of contentious political debate.

1. By requiring companies to wade into this debate, the rule infringes on companies' freedom "to remain silent," triggering strict scrutiny twice over. *303 Creative LLC* v. *Elenis*, 600 U.S. 570, 586 (2023).

*First*, by "[m]andating speech that a speaker would not otherwise make," the rule "necessarily alters the content of the speech" and thus qualifies as "content-based regulation." *Riley* v. *National Federation of the Blind of North Carolina, Inc.*, 487 U.S. 781, 795 (1988); see *Gralike* v. *Cook*, 191 F.3d 911 (8th Cir. 1999), aff'd, 531 U.S. 510 (2001). The rule requires companies to announce publicly their subjective judgments about future risks—requiring, for example, "determination[s] of" which risks to their businesses are "climate-related." App. 465 (Certified List 4 at 21,692/1). It thereby forces them into politically charged discussions about why they do or do not have certain climate-related policies or expertise. See, *e.g.*, App. 631 (Certified List 4 at 21,858/2) (predicting that these disclosures will be scrutinized and used to "deter potential greenwashing"). By treating companies' participation in public markets "as a trigger for compelling them to talk about a topic they would rather avoid"—climate change—the rule merits strict First Amendment scrutiny. *Telescope Media Group* v. *Lucero*, 936 F.3d 740, 753 (8th Cir. 2019).

61

*Second*, the rule more specifically compels "political speech." *Citizens United* v. *FEC*, 558 U.S. 310, 340 (2010). Climate change is a "sensitive political topi[c]" subject to robust debate and raises many contested questions, including climate change's long-term consequences and corporations' responsibilities to address it. *Janus* v. *AFSCME*, 585 U.S. 878, 914 (2018). The First Amendment protects each person's right to speak, or not, as that person chooses on climate change; the government can no more compel than prohibit speech on this matter of public debate. *Gralike*, 191 F.3d at 919. For this reason, too, the rule is subject "to strict scrutiny regardless of the government's" claim of "benign motive." *Reed* v. *Town of Gilbert*, 576 U.S. 155, 165 (2015).

The rule cannot survive strict scrutiny. The Commission cannot "rest on 'speculation or conjecture.'" *National Ass'n of Manufacturers*, 800 F.3d at 526. It must prove that a compelling problem exists and that this restriction is essential to solve it. *Edenfield* v. *Fane*, 507 U.S. 761, 770-771 (1993). But the Commission failed to substantiate that a problem ever existed, see pp. 19-32, *supra*, or that the rule furthers any "compelling" government interest, *National Institute of Family & Life Advocates* v. *Becerra*, 585 U.S. 755, 766 (2018) (*NIFLA*).

Appellate Case: 24-1628    Page: 77    Date Filed: 10/01/2024 Entry ID: 5441541

The only arguably compelling interest the Commission could identify was protecting investors from fraud or other material risks; there is no compelling interest "simpl[y]" in providing "additional relevant information" for its own sake. *McIntyre* v. *Ohio Elections Commission*, 514 U.S. 334, 348 (1995); see *American Meat Institute* v. *USDA*, 760 F.3d 18, 31 (D.C. Cir. 2014) (Kavanaugh, J., concurring) ("it is plainly not enough for the Government to say simply that is has a substantial interest in giving consumers information"); *International Dairy Foods Ass'n* v. *Amestoy*, 92 F.3d 67, 73 (2d Cir. 1996) ("We are aware of no case in which consumer interest alone was sufficient[.]"). But the SEC failed to show that investors are not *already* receiving climate-related information when material or that they are harmed by a lack of additional disclosures, let alone that the rule is necessary to fill any gap. Indeed, the rule is not even designed to supply missing *material* information. The securities laws "already" require disclosure of material climate-related information, and "there is no evidence"—the Commission has *never* found— that a company has "improperly" failed to disclose such information. *Wollschlaeger* v. *Governor*, 848 F.3d 1293, 1314 (11th Cir. 2017) (en banc); see pp. 19-32, *supra*. Nor has the Commission identified a single

shareholder harmed by a lack of climate disclosure. Cf. *Junior Sports Magazines Inc.* v. *Bonta*, 80 F.4th 1109, 1117 (9th Cir. 2023) (the government may not burden speech "to prevent something that does not appear to occur").

Regardless, the rule is not narrowly tailored to that purported compelling interest. *United States* v. *Playboy Entertainment Group, Inc.*, 529 U.S. 803, 813 (2000). The SEC failed to show why disclosure requirements cannot be limited by traditional conceptions of materiality, or why Commission guidance and enforcement authority cannot suffice for its purposes. The Commission has not even "tried" these and other less-restrictive alternatives. *Bruni* v. *City of Pittsburgh*, 824 F.3d 353, 370 (3d Cir. 2016). And the SEC's singling out of purported climate risks for heightened disclosure requirements, while "neglecting every other issue," also "fails strict scrutiny review because it is not narrowly tailored to achieve" the purported goal of investor protection. *Gralike*, 191 F.3d at 921.

**2.** Less stringent First Amendment standards have no application and cannot save the climate rule anyway.

64

The Supreme Court has subjected certain disclosure requirements to lesser scrutiny only in "exception[al]" circumstances, *Book People, Inc.* v. *Wong*, 91 F.4th 318, 338 (5th Cir. 2024), where disclosures involved (1) "commercial advertising" and (2) "purely factual and uncontroversial information," *National Ass'n of Manufacturers*, 800 F.3d at 522-523 (internal quotation marks omitted); see *NIFLA*, 585 U.S. at 768. Neither requirement is met here. The rule goes far beyond advertising or "commercial speech" that merely "propos[es] a commercial transaction." *Zauderer* v. *Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626, 637 (1985). And the required disclosures "are neither factual nor uncontroversial"; they require "[companies] to undertake contextual analyses, weighing and balancing many factors" that "ha[ve] already proven controversial" and are subject to vigorous debate. *Book People*, 91 F.4th at 338-340. The SEC is forcing companies to opine on hypothetical future risks, draw controversial connections between weather events and global climate change, and report misleading, inaccurate emissions figures. See, *e.g.*, pp. 13-16, *supra*; App. 2268-2269 (Certified List 4413 at 23-24); Stay App. 1416-1417 ¶ 55. As the Supreme Court has previously held in rebuffing another attempt by the SEC to regulate speech, "there

65

can be no doubt" that market participants' "commentary on general market conditions" is constitutionally "protected." *Lowe* v. *SEC*, 472 U.S. 181, 210 (1985).

Moreover, "climate change" is the paradigmatic "controversial subjec[t]" requiring "'special protection'" at "'the highest rung of'" the First Amendment ladder. *Janus*, 585 U.S. at 913-914. Speech that the rule compels inevitably will be used to "stigmatize" companies and attempt to "shape [their] behavior"—the very features that doomed the Commission's compulsory conflict-minerals disclosure. *National Ass'n of Manufacturers*, 800 F.3d at 520, 530; see App. 1574 (Certified List 3787 at 3); App. 917-919 (Certified List 3162 at 4-6); App. 1108-1114 (Certified List 3461 at 6-12). Indeed, the SEC acknowledges that its rule is partly designed to reveal "greenwashing," anticipating that environmental activists will flyspeck the disclosures to criticize companies and call for increased regulation or other concerted action. *E.g.*, App. 630-631 (Certified List 4 at 21,857-21,858); see App. 2268 (Certified List 4413 at 23); App. 1408 & n.125 (Certified List 3688 at 41). The SEC's attempt to skew the debate by arming one side with ammunition for "'publi[c] con-

demn[ation]'" makes it even "'more constitutionally offensive.'" *National Ass'n of Manufacturers*, 800 F.3d at 530.

Regardless, the climate rule fails intermediate or "exacting" scrutiny because the Commission has not shown "narro[w] tailor[ing] to the government's asserted interest." *Americans for Prosperity*, 594 U.S. at 608; see *National Ass'n of Manufacturers*, 800 F.3d at 556; *Calzone* v. *Summers*, 942 F.3d 415, 423 n.6 (8th Cir. 2019) (en banc). "Exacting scrutiny is just what its name says—exacting," *Dakotans for Health* v. *Noem*, 52 F.4th 381, 389 (8th Cir. 2022), and for all the reasons discussed above, the rule is far more extensive than necessary for the Commission's purpose, see pp. 44-46, *supra*. This "'dramatic mismatch'" between private burdens and asserted governmental interests, *Dakotans for Health*, 52 F.4th at 391, shows that the rule is "'unjustified,'" "'unduly burdensome,'" and "'broader than reasonably necessary'" to survive even lesser scrutiny, *NIFLA*, 585 U.S. at 776.

## III. The Rule Should Be Vacated

In light of the climate rule's manifold defects, this Court should vacate it in its entirety. The APA directs that courts "*shall  \* \* \*  hold unlawful and set aside agency action*" that is "arbitrary, capricious," or

67

"contrary to law." 5 U.S.C. § 706(2)(A), (C) (emphasis added); see also 15 U.S.C. § 77i(a). The APA's plain text requires that "[i]n *all* cases," unlawful "agency action *must* be set aside." *Citizens to Preserve Overton Park*, 401 U.S. at 413-414 (emphases added); see *National Ass'n of Private Fund Managers*, 103 F.4th at 1113-1114; *North Dakota* v. *EPA*, 730 F.3d 750, 764 (8th Cir. 2013) (because agency's analysis "was arbitrary and capricious," its action "[wa]s therefore vacated"). The APA mandates the same remedy here: The climate rule must be vacated.

## CONCLUSION

The Court should grant the petitions for review and vacate the climate rule.

Dated: September 17, 2024

Respectfully submitted,

/s/ *Eugene Scalia*

Eugene Scalia
  *Counsel of Record*
Jonathan C. Bond
Max E. Schulman
Brian C. McCarty
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
(202) 955-8500
EScalia@gibsondunn.com

Brian A. Richman
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, TX 75201
(214) 698-3100

*Counsel for Petitioners*
*Chamber of Commerce of the United States of America,*
*Texas Association of Business, and Longview Chamber of Commerce*

Daryl Joseffer
Tyler S. Badgley
Kevin R. Palmer
U.S. CHAMBER LITIGATION CENTER
1615 H Street, N.W.
Washington, D.C. 20062
(202) 463-5337

Andrew J. Morris
Sheng Li
NEW CIVIL LIBERTIES ALLIANCE
1225 19th St. NW, Suite 450
Washington, D.C. 20036
(202) 869-5210
Andrew.Morris@ncla.legal

*Counsel for Chamber of Commerce*
*of the United States of America*

*Counsel for National Center for*
*Public Policy Research*

69

## CERTIFICATE OF SERVICE

I hereby certify that on September 17, 2024, an electronic copy of the foregoing brief was filed with the Clerk of Court for the United States Court of Appeals for the Eighth Circuit using the appellate CM/ECF system, and service will be accomplished on all registered counsel by the appellate CM/ECF system.

*/s/ Eugene Scalia*

Eugene Scalia
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
(202) 955-8500
EScalia@gibsondunn.com

*Counsel of Record for Petitioners*
*Chamber of Commerce of the*
*United States of America, Texas*
*Association of Business, and*
*Longview Chamber of Commerce*

# CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7) because, excluding the parts exempted under Federal Rule of Appellate Procedure 32(f), it contains 12,893 words.

I certify that this motion complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this motion has been prepared in a proportionally spaced typeface using Microsoft Word 2019 in 14-point New Century Schoolbook LT.

I further certify that this motion has been scanned for viruses and is virus-free.

Dated: September 17, 2024

*/s/ Eugene Scalia*
Eugene Scalia
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
(202) 955-8500
EScalia@gibsondunn.com

*Counsel of Record for Petitioners*
*Chamber of Commerce of the*
*United States of America, Texas*
*Association of Business, and*
*Longview Chamber of Commerce*