# In the United States Court of Appeals for the Eighth Circuit

---

CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, ET AL.,
*Petitioners*,

v.

UNITED STATES SECURITIES AND EXCHANGE COMMISSION,
*Respondent*,

DISTRICT OF COLUMBIA, ET AL.,
*Intervenors*.

---

NATIONAL CENTER FOR PUBLIC POLICY RESEARCH,
*Petitioner*,

v.

UNITED STATES SECURITIES AND EXCHANGE COMMISSION,
*Respondent*.

---

On Petitions for Review of an Order of the
Securities & Exchange Commission

## PETITIONERS' FINAL JOINT REPLY BRIEF

| | |
|---|---|
| Brian A. Richman | Eugene Scalia |
| GIBSON, DUNN & CRUTCHER LLP | Jonathan C. Bond |
| 2001 Ross Avenue, Suite 2100 | Max E. Schulman |
| Dallas, TX 75201 | Brian C. McCarty |
| (214) 698-3100 | GIBSON, DUNN & CRUTCHER LLP |
| | 1700 M Street, N.W. |
| | Washington, D.C. 20036 |
| | (202) 955-8500 |
| | EScalia@gibsondunn.com |

*Counsel for Petitioners*
*Chamber of Commerce of the United States of America, Texas Association
of Business, and Longview Chamber of Commerce*
(*Additional counsel on inside cover*)

Daryl Joseffer
Tyler S. Badgley
Kevin R. Palmer
U.S. CHAMBER LITIGATION
    CENTER
1615 H Street, N.W.
Washington, D.C. 20062
(202) 463-5337

*Counsel for Chamber of Commerce of the United States of America*

Andrew J. Morris
Sheng Li
NEW CIVIL LIBERTIES ALLIANCE
4250 N. Fairfax Drive
Suite 300
Arlington, VA 22203
(202) 869-5210
Andrew.Morris@ncla.legal

*Counsel for National Center for Public Policy Research*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................... 1

ARGUMENT .......................................................................... 4

I.  The Commission Fails To Show That The Rule Is The Product Of Reasoned Decisionmaking ................................ 4

    A.  The Commission Does Not And Cannot Reasonably Explain Why The Rule Was Necessary ................................... 5

    B.  The Commission Cannot Square Its Position With Agency Precedent ...................................................... 13

    C.  Any Arguable Benefit Is Dwarfed By The Rule's Costs. ...... 16

    D.  There Are Reasonable, Less-Burdensome Alternatives ....... 21

II.  The Commission Misreads The Law And The Constitution ......... 22

    A.  The Commission Does Not Have The Boundless Authority It Claims ................................................. 22

        1.  The SEC Ignores The Securities Laws' Material, Financially Related Limits ........................................ 23

        2.  The Major-Questions Doctrine And Principles Of Constitutional Avoidance Apply .................................. 25

    B.  The Rule Violates The First Amendment ............................ 28

III.  The Rule Should Be Vacated .......................................... 33

CONCLUSION ....................................................................... 34

Appellate Case: 24-1628     Page: 3     Date Filed: 10/01/2024 Entry ID: 5441554

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Alabama Ass'n of Realtors* v. *Department of Health & Human Services*, 594 U.S. 758 (2021) .................................................... 26

*American Equity Investment Life Insurance Co.* v. *SEC*, 613 F.3d 166 (D.C. Cir. 2010) .................................................. 11

*American Meat Institute* v. *U.S. Department of Agriculture*, 760 F.3d 18 (D.C. Cir. 2014) (en banc) ................................. 32

*Basic, Inc.* v. *Levinson*, 485 U.S. 224 (1988) .................................................................. 15

*Board of Trustees of State University of New York* v. *Fox*, 492 U.S. 469 (1989) ................................................................ 29

*Book People, Inc.* v. *Wong*, 91 F.4th 318 (5th Cir. 2024) ................................................... 30

*Business Roundtable* v. *SEC*, 647 F.3d 1144 (D.C. Cir. 2011) ...........................................11, 13, 17, 21

*Chamber of Commerce of United States* v. *SEC*, 412 F.3d 133 (D.C. Cir. 2005) .................................................. 19

*Chamber of Commerce of United States* v. *SEC*, 85 F.4th 760 (5th Cir. 2023) ........................................................ 14, 15

*Chamber of Commerce of United States* v. *SEC*, 88 F.4th 1115 (5th Cir. 2023) ................................................... 33

*Church of Lukumi Babalu Aye, Inc.* v. *City of Hialeah*, 508 U.S. 520 (1993) ................................................................ 32

*Circuit City Stores, Inc.* v. *Adams*, 532 U.S. 105 (2001) ................................................................ 22

ii

# TABLE OF AUTHORITIES
*(continued)*

**Page(s)**

*City of Cincinnati* v. *Discovery Network, Inc.*,
507 U.S. 410 (1993)......................................................... 29

*Corner Post, Inc.* v. *Board of Governors of Federal
Reserve System*, 144 S. Ct. 2440 (2024) ................................ 33

*Department of Commerce* v. *New York*,
588 U.S. 752 (2019)......................................................... 24

*Edward J. DeBartolo Corp.* v. *Florida Gulf Coast Building &
Construction Trades Council*, 485 U.S. 568 (1988) ............................ 28

*Entertainment Software Ass'n* v. *Blagojevich*,
469 F.3d 641 (7th Cir. 2006)................................................ 28

*FCC* v. *Fox Television Stations, Inc.*,
556 U.S. 502 (2009)......................................................... 13

*Food Marketing Institute* v. *Argus Leader Media*,
588 U.S. 427 (2019)......................................................... 24

*Friends of Boundary Waters Wilderness* v. *Bosworth*,
437 F.3d 815 (8th Cir. 2006)................................................ 17

*Gralike* v. *Cook*,
191 F.3d 911 (8th Cir. 1999)................................................ 32

*Menorah Medical Center* v. *Heckler*,
768 F.2d 292 (8th Cir. 1985)........................................... 7, 8, 9

*Motor Vehicle Manufacturers Ass'n of United States, Inc.* v.
*State Farm Mutual Automobile Insurance Co.*,
463 U.S. 29 (1983).................................................4, 6, 18, 20

*National Ass'n of Manufacturers* v. *SEC*,
800 F.3d 518 (D.C. Cir. 2015)............................................... 32

Appellate Case: 24-1628     Page: 5     Date Filed: 10/01/2024 Entry ID: 5441554

# TABLE OF AUTHORITIES
*(continued)*

**Page(s)**

*National Ass'n of Manufacturers* v. *SEC*,
105 F.4th 802 (5th Cir. 2024) ............................................................. 6, 7

*National Ass'n of Private Fund Managers* v. *SEC*,
103 F.4th 1097 (5th Cir. 2024) ............................................................. 33

*National Institute of Family & Life Advocates* v. *Becerra*,
585 U.S. 755 (2018)..............................................29, 30, 31, 32

*NetChoice, LLC* v. *Bonta*,
__ F.4th __, 2024 WL 3838423 (9th Cir. 2024) ................................... 30

*In re NVIDIA Corp. Securities Litigation*,
768 F.3d 1046 (9th Cir. 2014)................................................................. 15

*Ohio* v. *EPA*,
144 S. Ct. 2040 (2024)................................................................. 8, 13, 18

*SEC* v. *Chenery Corp.*,
318 U.S. 80 (1943)..................................................................................... 6

*Spirit Airlines, Inc.* v. *U.S. Department of Transportation*,
997 F.3d 1247 (D.C. Cir. 2021) .............................................................. 21

*St. James Hospital* v. *Heckler*,
760 F.2d 1460 (7th Cir. 1985)................................................................. 17

*TSC Industries, Inc.* v. *Northway, Inc.*,
426 U.S. 438 (1976)......................................................................... 11, 22

*United States* v. *Home Concrete & Supply, LLC*,
566 U.S. 478 (2012)................................................................................. 23

*West Virginia* v. *EPA*,
597 U.S. 697 (2022)......................................................................... 26, 27

Appellate Case: 24-1628     Page: 6     Date Filed: 10/01/2024 Entry ID: 5441554

# TABLE OF AUTHORITIES
*(continued)*

**Page(s)**

*Whitman* v. *American Trucking Ass'ns*,
531 U.S. 457 (2001).................................................................... 27

*X Corp.* v. *Bonta*,
__ F.4th __, 2024 WL 4033063 (9th Cir. 2024) ..................................... 30

*Zauderer* v. *Office of Disciplinary Counsel*,
471 U.S. 626 (1985)...........................................................28, 30, 31

**Statutes**

15 U.S.C.
§ 77aa ..........................................................................23, 27
§ 77b ............................................................................... 21
§ 77g ............................................................................... 27
§ 78c ............................................................................... 21

Cal. Health & Safety Code § 38562.2 ............................................. 12

**Other Authorities**

40 Fed. Reg. 51,656 (Nov. 6, 1975).............................................. 24

41 Fed. Reg. 21,632 (May 27, 1976)............................................... 5

54 Fed. Reg. 22,427 (May 24, 1989)............................................. 15

63 Fed. Reg. 67,174 (Dec. 4, 1998) .............................................. 5

75 Fed. Reg. 6290 (Feb. 8, 2010) ................................................. 6

81 Fed. Reg. 23,916 (Apr. 22, 2016)............................................. 22

CalPERS Letter (June 12, 2021),
https://tinyurl.com/45ay5ed6 .................................................. 12

Appellate Case: 24-1628     Page: 7     Date Filed: 10/01/2024 Entry ID: 5441554

**Page(s)**

*Combating Climate Change by Investing in Innovation*,
  Wellington Management, https://tinyurl.com/mvamnkvv ................ 12

H.R. Rep. No. 73-85 (1933),
  1933 WL 983 ........................................................................ 25

Andrew Ramonas, *SEC Abandons ESG Enforcement Group
  Amid Broader Backlash*, Bloomberg Law (Sept. 12, 2024),
  https://tinyurl.com/3t97xdc9 .................................................. 10

*Sample Letter to Companies Regarding Climate Change
  Disclosures*, SEC, https://tinyurl.com/38hxes8s ................................. 10

Appellate Case: 24-1628   Page: 8   Date Filed: 10/01/2024 Entry ID: 5441554

# INTRODUCTION

The SEC's brief confirms the fundamental flaw in its climate rule: its failure to justify the most expensive disclosure mandate in SEC history. The SEC claims (Br. 2) that the rule is about protecting investors, but it concedes (Br. 66) the rule is "not" about protecting investors from "[f]raud." The agency does not cite a single investor who was harmed, or a single penny lost, because a company did not disclose climate-related information, or even a single class action brought (much less won) on this ground.

Instead, the SEC stakes everything on its assertion that the mandated disclosures fill a gap in information investors need. But that rationale is refuted by the SEC's longstanding recognition that companies *already* must disclose material climate-related information—a position the SEC abruptly, and arbitrarily, abandons here. Its justification boils down to the fact that an unspecified subset of investors *want* more climate information—even information *not* material under existing law—and would prefer not to spend their own funds acquiring it. But that investor-curiosity justification contradicts the SEC's own precedent, and like the final rule, the SEC's brief does not acknowledge—much less ex-

1

plain—that swerve. And in any event, the SEC does not and cannot show that any purported benefit (SEC Br. 66-67) of sparing some investors supposed six-figure costs of obtaining climate information can justify the undisputed multi-*billion*-dollar burden the rule foists onto public companies.

The SEC's abandonment of its past positions and practice makes its appeal to "longstanding" practice (Br. 1) to support its claimed statutory authority perplexing. And the argument is unpersuasive even on its own terms, because the SEC never engages with the central flaw in its reading of the statute: The snippets of statutory language it clips from across the securities laws are *residual* clauses that under settled precedent must be construed in light of the enumerated items they follow. The SEC ignores that context and cites its prior disclosure rules. But those examples backfire; none required the disclosure of nonfinancial information immaterial to evaluating a security.

Those prior rules underscore how far the SEC has strayed in seeking to expand its authority here, confirming that the major-questions doctrine applies. But the SEC makes no serious effort to show that the securities statutes *clearly* authorize its climate rule. In truth, its interpre-

2

tation flouts the Supreme Court's major-questions cases and puts the climate rule on a collision course with the First Amendment, which petitioners' reading properly avoids. The SEC bridles at the suggestion that the First Amendment limits its ability to compel speech—but when agencies take unprecedented liberties with powers granted by Congress, learning the Constitution's constraints on their ambitions is the price they sometimes pay.

In short, this rule fails because it obviously is *not* what the SEC proffers as its defense—a rule "about protecting investors," "consistent" with "decades" of "historical" SEC practice. Br. 2, 26, 43-44. The rule is in truth a sharp, unjustified, unauthorized, and ultimately unconstitutional deviation from that practice. Its mandates are *seven times* lengthier than those for other risks, such as cybersecurity, that the SEC and its *amici* cite. That is because this is a climate-policy rule, not an investor-protection rule. This Court should vacate the rule in its entirety.

3

# ARGUMENT

## I. THE COMMISSION FAILS TO SHOW THAT THE RULE IS THE PRODUCT OF REASONED DECISIONMAKING

The SEC's brief confirms the lack of justification for this rule. The SEC disclaims (Br. 19) making climate policy, and tacitly admits this is not a permissible rationale. Instead, the SEC invokes "the protection of investors," but it concedes (Br. 66) the rule is "not" about protecting investors from "[f]raud." The agency has "'no evidence' that any investor has ever been harmed by a lack of climate-related disclosures." *Ibid.* Its entire defense of the rule thus rests on the assertion that an unspecified subset of investors *wants* climate information. But that justification collapses because the SEC does not and cannot show that investors actually *need* it. The rule is arbitrary and capricious and falters on the "presumption * * * *against* changes in current policy that are not justified by the rulemaking record." *Motor Vehicle Manufacturers Ass'n of United States, Inc.* v. *State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 42 (1983).

4

## A. The Commission Does Not And Cannot Reasonably Explain Why The Rule Was Necessary

**1.** As petitioners demonstrated, the Commission has long recognized that "[i]f environmental * * * information is material to investors, the Commission's [existing] rules already require the disclosure of such information." Stay App. 1192 n.1. There is no informational gap for the climate rule to close. Chamber Br. 20-21.

Sacrificing its own longstanding, pro-investor position, the Commission asserts (Br. 66) that "existing rules" do *not* require disclosure "of all material information." But the Commission has long said the opposite. *E.g.*, 63 Fed. Reg. 67,174, 67,254/3 (Dec. 4, 1998) (discussing "our statutory mandate to require prospectuses to disclose fully and fairly all material information"). And though the regulations the Commission cites (Br. 66) call for "specific" disclosures, the agency has long acknowledged that to prevent those disclosures "from being misleading" (*ibid.*), companies *also* must disclose other information, "not otherwise specifically required, of which the average prudent investor ought reasonably to be informed," 41 Fed. Reg. 21,632, 21,635/2 (May 27, 1976). This includes—the Commission has said—"information concerning environmental compliance, impact, expenditures, plans, or violations." *Ibid.*

5

The Commission's *post hoc*, 180-degree reversal, that "no such requirement" exists (Br. 66), improperly contradicts what "the Commission itself" said in adopting the rule. *SEC* v. *Chenery Corp.*, 318 U.S. 80, 88 (1943) (rejecting *post hoc* rationalizations); see *State Farm*, 463 U.S. at 50 ("[A]n agency's action must be upheld, if at all, on the basis articulated by the agency itself."). In the adopting release, the agency "agree[d] with * * * commenters who asserted that registrants are already required to disclose the financial statement effect of material climate risks under existing rules." App. 570 (Certified List 4 at 21,797/3). And it pointed, repeatedly, to its "2010 Guidance," *e.g.*, App. 554 (Certified List 4 at 21,781/1 n.1756), which detailed the "climate change related matters" that must be disclosed, "in addition to the information expressly required by Commission regulation," 75 Fed. Reg. 6290, 6293/1-2 (Feb. 8, 2010). The SEC until recently believed that existing rules offered robust investor protections—requiring all material information to be fully disclosed—but its litigating position now treats those same rules as narrow and inadequate.

The Commission's brief fails even to *acknowledge* these prior positions, let alone "explain *why* it * * * changed its mind." *National Ass'n of*

6

*Manufacturers* v. *SEC*, 105 F.4th 802, 812 (5th Cir. 2024).  That the Commission must toss aside its own longstanding, pro-investor position confirms that providing investors with material information is not the Commission's true objective here.  If it were, no new rule, and no position reversal, would be required.

**2.**  The SEC fails to justify the rule anyway because as petitioners demonstrated (Chamber Br. 22-32), record evidence "cast[s] serious doubt" on the materiality of the rule's mandates, and the agency has no serious response to that evidence.  *Menorah Medical Center* v. *Heckler*, 768 F.2d 292, 295 (8th Cir. 1985).

The Commission tacitly admits (Br. 70-71) it failed to respond to Dr. Daniel Taylor's study.  Using the same event-study techniques the Commission usually does, Dr. Taylor found "*no evidence*" greenhouse-gas emissions were material to investors.  App. 1057 (Certified List 3381 at ii); see Chamber Br. 30-31.  The Commission concedes (Br. 71) that its adopting release failed even to "identify Professor Taylor by name," let alone mention his study.  But nevertheless, the Commission asserts (Br. 70-71), it "address[ed] [Dr. Taylor's] concern[s]" *sub silentio* by "modif[ying]" the rule.

The Supreme Court rejected precisely this defense last Term—a change in a final rule may reflect "aware[ness]" of an adverse comment, but "awareness is not * * * an explanation" responsive to the commenter's evidence. *Ohio* v. *EPA*, 144 S. Ct. 2040, 2054 (2024). As in that case, moreover, the Commission rule change did not resolve the concern. If emissions are "not material," App. 1063 (Certified List 3381 at 6), the Commission cannot justify a rule *requiring* disclosure of such emissions, even with a "materiality qualifier," SEC Br. 71. The antecedent step of "assess[ing] and monitor[ing] the materiality of [companies'] emissions," App. 506 (Certified List 4 at 21,733/3), would *still* be pointlessly burdensome, and could be justified—the Commission itself said—only if emissions are often material, see App. 505-507 (Certified List 4 at 21,732-21,734). But Dr. Taylor's study—using a method ordinarily used by the Commission—"cast serious doubt on the premise" that emissions are often, if ever, material. The Commission's "failure to respond" to his findings is arbitrary and capricious. *Menorah Medical*, 768 F.2d at 295-296 & n.7.

The Commission asserts (Br. 88) event studies, such as Dr. Taylor's, are "unnecessary" anyway, given "support" in "peer-reviewed literature

Appellate Case: 24-1628     Page: 16     Date Filed: 10/01/2024 Entry ID: 5441554

for the importance of climate-related disclosures to investors." But as in the adopting release, the Commission never engages with the flaws in those studies, Chamber Br. 25, many of which, the Commission concedes (Br. 93-94), were not cited in the proposing release, Chamber Br. 24. The Commission's continued failure to respond to "significant criticisms" of its cited studies is arbitrary and capricious. *Menorah Medical*, 768 F.2d at 295-296.

More fundamentally, the Commission continues to miss the larger point: Yes, "[e]xisting research find[s] an increase in stock price volatility around the day when [greenhouse-gas] or carbon emissions are disclosed." SEC Br. 88. But that volatility is the same as that observed from emissions "*inferred* from publicly-observable information." App. 1064 (Certified List 3381 at 7) (emphasis added). Thus, as petitioners explained, the Commission's own evidence shows the rule will "provide little *new* information beyond what can be inferred from observable aspects of the company's operations." *Ibid.*; see Chamber Br. 26. Aside from a conclusory assertion in its brief (Br. 68), the Commission has no response to this flaw in its justification for the rule.

9

Similarly, the Commission never engages with its own prior interactions with public companies on the materiality of climate-related information. Chamber Br. 28-29. The SEC does not dispute that it previously asked numerous companies *why* they did not make certain "disclosure[s] related to climate change," *Sample Letter to Companies Regarding Climate Change Disclosures*, SEC, https://tinyurl.com/38hxes8s (last updated June 26, 2024), and that each company told the Commission that such information was not material, Chamber Br. 28-29. If the Commission disagreed—if it thought that climate information *was* material—it surely would have demanded *some* additional climate disclosures from those companies, or pursued enforcement actions. But it did not, App. 1769 (Certified List 3852 at 6), and has since abandoned its ESG enforcement group, see Andrew Ramonas, *SEC Abandons ESG Enforcement Group Amid Broader Backlash*, Bloomberg Law (Sept. 12, 2024), https://tinyurl.com/3t97xdc9—discrepancies the Commission does not and cannot explain.

**3.** All the Commission has is its assertion (Br. 66-67) that some investors *want* more climate-related information—and would prefer not to spend their own money getting it. But investors might *demand* infor-

mation for many reasons; that does not make it material. See *TSC Industries, Inc.* v. *Northway, Inc.*, 426 U.S. 438, 449 (1976). And "consistency" and "comparability" (SEC Br. 65) is a one-way ratchet the SEC could cite for "*any* rule." *American Equity Investment Life Insurance Co.* v. *SEC*, 613 F.3d 166, 178 (D.C. Cir. 2010). The SEC does not exist to compel one set of institutions to prepare reports that another group of institutions believes would be profitable to obtain. (See the First Amendment discussion *infra.*) Regardless, the Commission cannot show that any purported benefit of sparing some investors the supposed six-figure costs of obtaining climate information (SEC Br. 66-67) can justify the rule's multi-*billion*-dollar mandate.

The Commission's own evidence shows (again) that the agency inappropriately relies on interests "unrelated to shareholder value." *Business Roundtable* v. *SEC*, 647 F.3d 1144, 1151 (D.C. Cir. 2011); see Chamber Br. 26-27. For example, the Commission cites (Br. 66) a survey reporting institutional investors' costs "collecting climate data." But that survey *confirms* "[r]educ[ing] risk" and "[i]mprov[ing] financial performance"—*i.e.*, financial goals—are secondary to those survey respondents' "climate * * * goals." App. 1022 (Certified List 3278 at 12).

11

The Commission's "numerous commenters" (Br. 66), and virtually all its *amici*, reveal a similar mismatch. The Center for Climate and Energy Solutions' (Amicus Br. i) "mission is to secure a safe and stable climate." CalSTRS (App. 623 (Certified List 4 at 21,850/1 n.2754)) is operated by the State of California, whose "policy" is to "[a]chieve net zero greenhouse gas emissions," Cal. Health & Safety Code § 38562.2(c)(1); and CalPERS *admits* it wants to use disclosures to pressure companies to combat climate change, see CalPERS Letter 5-6 (June 12, 2021), https://tinyurl.com/45ay5ed6. Trillium (App. 453 (Certified List 4 at 21,680/1 n.138)), too, is "exclusively focused on sustainable and responsible investing." App. 2238 (Certified List 4390 at 1). "[A]dvanc[ing] humankind towards a global sustainable economy" may be a laudable goal, *ibid.*, but it is not a *securities*-law goal. Nor is there a legitimate, securities-law interest in compelling disclosures to help asset managers market ESG funds, cf. *Combating Climate Change by Investing in Innovation*, Wellington Management, https://tinyurl.com/mvamnkvv, or "construct efficient hedging portfolios" (SEC Br. 63). Yet *that* is the "demand" the Commission cites, repeatedly. Compare, *e.g.*, SEC Br. 63 (citing App. 445-446 (Certified List 4 at 21,672-21,673)), with App. 446 (Certified List

12

4 at 21,673 n.38) (citing Trillium and Wellington); see Law & Finance Professors Amicus Br. 11-12.  The Commission never reckons with the fact those "narrow interests," "unrelated to shareholder value," underlie it all.  *Business Roundtable*, 647 F.3d at 1151-1152; see Manhattan Institute Amicus Br. 18-19.

"Perhaps there is some explanation why" the cited demand supports the rule.  *Ohio*, 144 S. Ct. at 2054.  "But if there is an explanation, it does not appear in the final rule."  *Ibid.*  And particularly given the constitutional constraints at issue in this case, that shortfall is fatal.

## B.    The Commission Cannot Square Its Position With Agency Precedent

The Commission's investor-curiosity rationale is not only wrong and unsupported, but also conflicts with Commission precedent.  Chamber Br. 33-37.  Yet the Commission nowhere even "display[s] awareness" that it is departing from that precedent.  *FCC* v. *Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).  On the contrary, it proffers the rule's supposed consistency with historical practice as the standard by which it should be judged (Br. 26, 43-44), a test it fails dismally.

The Commission *still* claims (Br. 76) adherence to "traditional materiality standards," even as it acknowledges (Br. 77) key aspects of the

13

rule "contain [no] express materiality qualifiers" whatsoever. That is nonsensical, and the Commission's explanation makes it no less so. The agency insists (Br. 50-51), for example, that a board's consideration of an issue is *always* material, so a "materiality qualifier [is] not necessary." But the Commission never seriously engages with the reality that by forcing companies to "descri[be]" the board's "oversight of climate-related risks," regardless of materiality, App. 485 (Certified List 4 at 21,712/3), the rule pressures boards to consider climate-related issues that otherwise they typically would not—and then *deems* those immaterial issues to be material, Chamber Br. 36-37.

The Commission's lawyers deny (Br. 77) this pressure exists, but the adopting release *itself* conceded the rule may "prompt * * * companies [to] overse[e] climate-related risks" in "less efficient" ways, including "by diverting board * * * attention." App. 629 (Certified List 4 at 21,856/1). The Commission, to be sure, projected that such inefficiency would obtain only "[t]*o the extent that*" boards alter their oversight in response to the rule. *Ibid.* (emphasis added). But the Commission failed to then exercise its judgment to predict whether boards *would* do that. "The SEC cannot have it both ways," *Chamber of Commerce of United States* v. *SEC*, 85

14

F.4th 760, 778 (5th Cir. 2023), *refusing* in the rule to come to ground on whether boards will be pressured to consider immaterial information, and then *assuring* the Court they will *not*.

In the rule, the Commission also adopted a standard of materiality—"*reasonably likely* to have a material impact"—that it mischaracterized as consistent with traditional notions of materiality. App. 468 (Certified List 4 at 21,695/2) (emphasis added). But as petitioners demonstrated (Br. 34-35), the "reasonably likely" standard is "much broader." *In re NVIDIA Corp. Securities Litigation*, 768 F.3d 1046, 1055 (9th Cir. 2014). Here, the Commission simply repeats (Br. 78-79) its conflation of the two standards, without addressing their differences. It thus invokes (Br. 78) the "traditional notions of materiality" in "*Basic*[, *Inc.* v. *Levinson*, 485 U.S. 224 (1988)]," but nowhere addresses its concession elsewhere that the "test for materiality approved * * * in *Basic* * * * is inapposite" to the Commission's "reasonably likely" standard, 54 Fed. Reg. 22,427, 22,430 n.27 (May 24, 1989).

Lastly, the Commission tacitly admits (Br. 79) that the rule *would* exceed traditional bounds of materiality if it required companies to disclose information that was "material" to subordinate company plans and

15

activities, *regardless* whether that information would affect a reasonable investor's decisions. And the rule does exactly that. Chamber Br. 35-36. Disclosure is required, for example, "[i]f a registrant's use of an internal carbon price is material to how *it*," *i.e.*, the registrant, "evaluates and manages a climate-related risk." App. 482, 689 (Certified List 4 at 21,709/2, 21,916/1) (emphasis added). The rule itself refutes the SEC's claimed adherence to traditional notions of materiality.

## C. Any Arguable Benefit Is Dwarfed By The Rule's Costs.

In all events, the Commission cannot show that the purported benefit (SEC Br. 66-67) of sparing some unspecified subset of institutional investors a supposed six-figure cost of obtaining climate information can possibly justify *this* rule.

**1.** The Commission denies (Br. 83) it artificially drove down the estimated costs, because it took "account of all cost estimates it received." But that is *how* the Commission cooked its books.

The Commission does not deny that after the comment period closed, "staff from the Chair's Office" conveniently "met telephonically" with environmental activists (App. 2352-2371 (Certified List 4575)) and sustainability-product vendors (App. 2372-2380 (Certified List 4577)),

16

and then incorporated their low-ball cost estimates into memos to the file. Chamber Br. 39-40. Those unusual phone calls alone cut the "median" cost nearly in half, slicing it from $133,229 to $79,236. See App. 652 (Certified List 4 at 21,879, tbl. 10). But there is no "statistical validity," *St. James Hospital* v. *Heckler*, 760 F.2d 1460, 1467 n.5 (7th Cir. 1985), to loading up a tally with allies' responses and then "us[ing] [the] media[n]," SEC Br. 83. The Commission must "analyz[e] the potential for bias," and decide "which" commenters, "if any, would provide accurate and representative results." *Friends of Boundary Waters Wilderness* v. *Bosworth*, 437 F.3d 815, 825-826 (8th Cir. 2006). Simply estimating that everyone in America is retired because you selectively poll your grandparents and take the "median" age is not reasoned decisionmaking. Yet that is effectively what the Commission did here.

The Commission states (Br. 84) it "made adjustments" to the data it cited, but those adjustments were insufficient, "inconsisten[t]," and "opportunisti[c]." *Business Roundtable*, 647 F.3d at 1148-1149. They failed to account for commenters' "bias," discussed above. *Friends of Boundary Waters*, 437 F.3d at 826; see Chamber Br. 40-41. And the Commission "adjust[ed]" in only one direction: down. It "subtract[ed]" dollars

17

from a survey's estimate. App. 652 (Certified List 4 at 21,879, tbl. 10 n.4). That is no answer to petitioners' objection (Br. 41) that the Commission failed to adjust for the fact that the cost estimate relied on "*current* average spend," whereas the rule requires *more* disclosure than companies currently make. The Commission never explains why it did not make an *upward* adjustment to account for this. And although the Commission denies (Br. 83-84) other data irregularities infected its work, none of its explanations "appear in the final rule," *Ohio*, 144 S. Ct. at 2054; see Chamber Br. 41.

**2.** In addition to fudging its figures, the Commission ignored other costs entirely. The SEC concedes (Br. 88) it did not consider expert estimates of the billions of dollars in lost GDP, and hundreds of thousands of jobs, the rule would cost across the broader economy. In no world is that an *unimportant* "aspect of the problem." *State Farm*, 463 U.S. at 43. And although the Commission downplays these negative effects, arguing (Br. 89) it "change[d]" the proposal to "lowe[r] the [overall] burdens," the costs and benefits of a rule must be "justified" against "current policy," *State Farm*, 463 U.S. at 42, not proposed policy. The SEC cannot justify

18

a wasteful rule by pointing out it was even more wasteful when first proposed.

Likewise, the Commission's contention (Br. 85-86) that it was "[l]ogical" to limit its estimate of the number of companies that would be swept up by the rule to those "currently" providing climate-related disclosures falls short. The Commission complains (Br. 86) that it doesn't know what "other * * * methodolog[y]" to use, but the Commission must assess "the economic implications" of its rules "as best it can," *Chamber of Commerce of United States* v. *SEC*, 412 F.3d 133, 143 (D.C. Cir. 2005). Using "curren[t]" (Br. 86) providers to estimate the number of filers that "*will* be required to provide the climate-related disclosures" (State Intervenors Br. 54 (emphasis added)) is *definitely* wrong, because the real number must be higher; the rule requires *more* disclosure. The Commission may not know precisely how much more, but "uncertainty" does "not excuse the Commission" from even "hazard[ing] a guess" as to the necessary adjustment, *Chamber of Commerce*, 412 F.3d at 143. Whatever it is, it is more than *zero*. Increasing disclosure is the rule's whole purpose.

**3.** The Commission arbitrarily wields uncertainty in its favor. How many *more* companies will the rule require to make climate-related dis-

19

closures than currently are?  Chamber Br. 42-43.  And what will be the cost to those companies of assessing whether information is "material"? *Id.* at 41-42.  The Commission admits (Br. 85-86) it does not know any of this, and more, see Chamber Br. 43-44; SEC Br. 89-90.  Unable to account for this uncertainty, it simply rammed through a rule anyway.  Because the SEC must start from a "presumption * * * *against* changes in current policy that are not justified by the rulemaking record," *State Farm*, 463 U.S. at 42, it should instead have stayed its hand until it could determine from the record that the rule would *not* be catastrophically costly.

Simply "recogniz[ing]" (Br. 90) that "[t]o the extent" that predicate X obtains, good- or bad-thing Y "may" follow—as the Commission projected in the adopting release no fewer than 40 times—is not reasoned analysis.  Such analysis requires assessing whether the predicate *actually exists*.  The statement "to the extent pigs have wings, they could fly" does not invite the conclusion that pigs fly; it invites consideration of whether pigs have wings.  The Commission repeatedly identified things it should estimate and substantiate, yet did not proceed to do so.  Its conjecture, therefore, that the rule is "unlikely" (Br. 81) to deter companies from going public is unsupported.  Its vague, indeterminate statements

reflect an agency purposely dodging key issues and failing to come to ground on what the impact of its action "will" be. 15 U.S.C. §§ 77b(b), 78c(f).

### D.   There Are Reasonable, Less-Burdensome Alternatives

Although the Commission insists (Br. 19) that providing investors with material information is its objective, the agency fails to explain why it did not adopt reasonable alternatives that could have furthered that aim at far less cost.

The Commission does not dispute that requiring disclosure less frequently than annually would have saved hundreds of millions of dollars a year. Chamber Br. 45. The Commission says simply (Br. 73) that annual disclosure allows for "better" across-time comparisons than disclosure on "multi-year intervals." But that "single sentence * * * falls well short of what is needed to demonstrate the agency * * * [actually] considered" the alternative. *Spirit Airlines, Inc.* v. *U.S. Department of Transportation*, 997 F.3d 1247, 1255 (D.C. Cir. 2021). The SEC's explanation fails to weigh costs and benefits "at the margin"—*how much* better is annual disclosure, and at what cost? *Business Roundtable*, 647 F.3d at 1151. This "is illogical and, in an economic analysis, unacceptable." *Ibid.*

## II. THE COMMISSION MISREADS THE LAW AND THE CONSTITUTION

### A. The Commission Does Not Have The Boundless Authority It Claims

In claiming (Br. 28) virtually unbounded authority to require disclosure of anything the Commission determines is "necessary or appropriate" in "the public interest" or for the "protection of investors," the SEC embraces the central flaw in its reading of the statute: The snippets of statutory language it plucks (Br. 26-28) are *residual* clauses that, under settled precedent, cannot satisfy the major-questions doctrine and must in any event be construed in light of the enumerated items they follow, see *Circuit City Stores, Inc.* v. *Adams*, 532 U.S. 105, 114-115 (2001).

The clauses here cannot escape their context. They follow items that, even if not needed to combat "misleading" conduct (State Intervenors Br. 25 (quoting *TSC*, 426 U.S. at 463)), are all, as the SEC itself has said, both "financial in nature" and material to reasonable investors' evaluation of "'a security,'" 81 Fed. Reg. 23,916, 23,921/3 (Apr. 22, 2016). *That* is the type of disclosure the laws authorize, but the climate rule's mandates are anything but.

22

### 1. The SEC Ignores The Securities Laws' Material, Financially Related Limits

That there may be *some* ambiguity around whether the laws' enumerated disclosures are strictly "financial" (SEC Br. 47) does not give the Commission free rein to compel the disclosure of anything it wants. The "general character of the business," 15 U.S.C. § 77aa(8), or its "material contract[s]," *id.* § 77aa(24), may go "beyond 'financial figures'" (SEC Br. 47), strictly speaking, but they are simple, one-line disclosures that put the company's finances in context. The climate rule is something else entirely. And just as "[i]t does not matter whether the word 'yellow' is ambiguous when the agency has interpreted it to mean 'purple,'" the SEC's interpretation here "is clearly beyond the scope of any conceivable ambiguity." *United States* v. *Home Concrete & Supply, LLC*, 566 U.S. 478, 493 n.1 (2012) (Scalia, J., concurring). While a reasonable investor may need to know what a company *does* to get a handle on its income and assets, few need to know what the company *emits*, or review detailed breakdowns of the costs of "weather" on its operations (SEC Br. 38).

The SEC's appeal (Br. 32-36) to past agency practice only underscores how far it has strayed in seeking to expand its authority here. None of its prior examples concerns reams of nonfinancial information,

23

immaterial to evaluating a security. On the contrary, the closest the Commission has come to adopting anything resembling the climate rule was in 1975 when it proposed certain environmental disclosures. But, tellingly, the Commission "declined to adopt" them precisely because that "information would not be useful in 'investment decisions.'" SEC Br. 35. The Commission had it right then. The "record" (*ibid.*) now may be larger, but the bottom line is the same: The securities laws do not "permit the Commission to require disclosure for the sole purpose of promoting social goals unrelated to those underlying [the] Acts," 40 Fed. Reg. 51,656, 51,660/1 (Nov. 6, 1975), which is precisely what the Commission is doing here, cf. *Department of Commerce* v. *New York*, 588 U.S. 752, 785 (2019) (courts "are 'not required to exhibit a naiveté from which ordinary citizens are free'"); Law & Finance Professors Amicus Br. 11 (detailing SEC's reliance on "environmental activists" intending to use disclosures to address climate change).

The Commission retreats (Br. 29) to legislative "purposes," but the decades-old cases it cites are "from a 'bygone era of statutory construction'" in which courts *improperly* focused on "legislative purpose," *Food Marketing Institute* v. *Argus Leader Media*, 588 U.S. 427, 436-437 (2019).

24

Further, the purpose of the securities laws is to "protec[t]" investors, *i.e.*, from fraud—to ensure that material information is not "concealed from the buying public." H.R. Rep. No. 73-85, at *2 (1933), 1933 WL 983. The Commission, however, concedes the rule is "intended to serve informational, *not* antifraud, goals." Br. 66 (emphasis added). This is not what the securities laws are for. See Stay App. 1246 (SEC conceding that its "mandate of investor protection" does not include requiring disclosure of information "only of interest to some investors").

### 2. The Major-Questions Doctrine And Principles Of Constitutional Avoidance Apply

**a.** The SEC disputes (Br. 53-57) this is a major-questions case. But, here, a *securities* regulator is attempting to compel speech on a nonfinancial, nonmaterial, and politically charged topic—to the tune of billions of dollars a year—while forcing thousands of companies into a discussion about climate change, all against their will. That presents a major question, which is why virtually every State in the Union is participating in this litigation—and why Congress has been actively considering the issue (see Chamber Br. 57-58).

The SEC objects (Br. 56) that recently proposed bills would not have done *precisely* what the Commission does here. But that is the point.

25

*Congress* is tasked with making this policy choice. And the Court should be "skeptic[al]" of the SEC's claim that the securities laws have always meant something *different* from the status quo Congress recently and repeatedly declined to disturb. *West Virginia* v. *EPA*, 597 U.S. 697, 732 (2022). That is so, even *if* the specific alterations Congress rejected were slightly different from the one now being urged by the Commission. If Congress expected the SEC to speak to "decisions of [such] vast economic and political significance," it would have said so "clearly." *Id.* at 716.

But Congress did not. The SEC (again) points to its favorite residual clauses (Br. 57-58), and (again) tries to stretch them further than they can withstand. These are the exact type of "ancillary," or "modest," provisions that do *not* provide "clear" regulatory authority. *West Virginia*, 597 U.S. at 722-725. Indeed, the Supreme Court applied the major-questions doctrine to invalidate an agency's reliance on a similar, "other measures" residual clause in *Alabama Ass'n of Realtors* v. *Department of Health & Human Services*, 594 U.S. 758, 761 (2021) (per curiam). It was "a stretch" to read into such language a "breathtaking amount of authority," *id.* at 764-765; the same is true here.

Make no mistake, the SEC's theory would "effect a 'transformative expansion in [its] regulatory authority.'" SEC Br. 54-55 (quoting *West Virginia*, 597 U.S. at 724). The Commission purports to respect "'limit[s]'" on its newly claimed authority, *ibid.*, but those limits dissolve on examination of the rule's reasoning. What matters under the Supreme Court's major-questions cases is the "breadth of the Government's claimed authority" on its view of the governing statute, not any particular exercise thereof. *West Virginia*, 597 U.S. at 729. The Commission's claimed authority here necessarily implies a sweeping power to order speech on a range of topics, in furtherance of whatever other social causes next strike the Commission's fancy.

Congress did not specify thirty-two categories of narrow, tailored disclosures, see 15 U.S.C. § 77aa, only to hide in the mousehole of an "other information" clause, *id.* § 77g(a)(1), a vast power to compel disclosure of virtually anything the Commission wants, without even showing shareholder harm. Cf. *Whitman* v. *American Trucking Ass'ns*, 531 U.S. 457, 468 (2001) ("Congress * * * does not * * * hide elephants in mouseholes."). That is not a realistic "understanding of legislative intent." *West Virginia*, 597 U.S. at 723.

Appellate Case: 24-1628    Page: 35    Date Filed: 10/01/2024 Entry ID: 5441554

**b.** Regardless, the SEC does not dispute the Court must construe the securities laws to "obviat[e] deciding whether" the law "would violate the First Amendment." *Edward J. DeBartolo Corp.* v. *Florida Gulf Coast Building & Construction Trades Council*, 485 U.S. 568, 578 (1988). Whether or not the SEC's strained reading of its disclosure authority could survive the double gauntlet of ordinary statutory interpretation *and* the major-questions doctrine, the Court should reject it to avoid the grave First Amendment concerns it raises. See pp. 28-32, *infra*.

## B.    The Rule Violates The First Amendment

The Commission's defense (Br. 95-111) of the rule's constitutionality turns entirely on avoiding strict scrutiny. It cannot.

**1.** The SEC invokes (Br. 96-109) the lesser standard of *Zauderer* v. *Office of Disciplinary Counsel*, 471 U.S. 626 (1985). But *Zauderer* applies only to mundane factual disclosures appended to existing commercial advertising, such as "whether a particular chemical is within any given product." *Entertainment Software Ass'n* v. *Blagojevich*, 469 F.3d 641, 652 (7th Cir. 2006). In *Zauderer* itself, a State required attorneys advertising contingent-fee arrangements to disclose simply "that the client may have to bear certain expenses even if he loses." 471 U.S. at 650. *Zauderer* is

28

inapplicable here, where the rule applies outside the context of "only 'commercial advertising,'" and requires speech that goes well beyond "'purely factual and uncontroversial information about the terms under which * * * services will be available.'" *National Institute of Family & Life Advocates* v. *Becerra*, 585 U.S. 755, 768 (2018) (*NIFLA*).

The Commission fails to show that the rule governs only commercial speech, let alone "only 'commercial advertising.'" *NIFLA*, 585 U.S. at 768. As petitioners explained (Br. 65), the rule does not involve "speech that *proposes* a commercial transaction, which is what defines commercial speech." *Board of Trustees of State University of New York* v. *Fox*, 492 U.S. 469, 482 (1989). The SEC does not contest that, instead retreating to a definition of commercial speech as "'expression related *solely* to the economic interests of the speaker and its audience.'" SEC Br. 98 (emphasis added). But the Supreme Court has declined to apply that "broader definition" because "'*the test* for identifying commercial speech'" is "the proposal of a commercial transaction." *City of Cincinnati* v. *Discovery Network, Inc.*, 507 U.S. 410, 423 (1993). The rule here "regulates far more than mere commercial speech" because "a covered business must do far 'more than propose a commercial transaction.'"

29

*NetChoice, LLC* v. *Bonta*, __ F.4th __, 2024 WL 3838423, at *12 (9th Cir. 2024). And the rule does not relate "solely" to "economic interests" anyway—it has been championed for its perceived environmental benefits, as Commission *amici* such as the Sierra Club and Natural Resources Defense Council reflect. The rule concerns "sensitive, constitutionally protected speech" that the government cannot compel "without satisfying strict scrutiny." *X Corp.* v. *Bonta*, __ F.4th __, 2024 WL 4033063, at *8 (9th Cir. 2024).

The SEC fares no better in asserting (Br. 100) the rule requires only "'purely factual'" statements under *Zauderer*. As petitioners explained (Br. 64-65), the SEC is forcing companies to opine on hypothetical future risks (which would necessarily require predicting policy decisions of government officials) and drawing controversial connections between weather events and climate change. This "[b]alancing [of] a myriad of factors" is "anything but the mere disclosure of factual information." *Book People, Inc.* v. *Wong*, 91 F.4th 318, 340 (5th Cir. 2024). And all this is far afield from the "pur[e]," rote factual disclosures *Zauderer* permits. *NIFLA*, 585 U.S. at 768; cf. *NetChoice*, 2024 WL 3838423, at *12 ("a busi-

ness's opinion about" how children might be exposed to harmful content "is not 'purely factual and uncontroversial'").

*Zauderer* also "has no application" because a company's climate-related risks and emissions are "anything but an 'uncontroversial' topic." *NIFLA*, 585 U.S. at 769. By design, the rule is "'an integral part of a live, contentious political or moral debate,'" SEC Br. 103 (emphasis deleted), designed to "facilitat[e] product boycotts" and "activist protests," Law & Finance Professors Amicus Br. 6. Strict scrutiny applies.

**2.** The Commission cannot show the requisite tailoring, or government interest, to withstand lesser scrutiny, anyway. A tailored rule would require companies to disclose material climate risks on the same terms as all others, as the law currently does with admirable success: not a single company is known to have violated this duty; not a single shareholder is known to have been harmed. But tailoring is the antithesis of this rule's purpose, which is to force companies' prolix engagement with a hot-button topic. As for governmental interest, the Commission concedes (Br. 107) the rule is not designed to "'protec[t] investors from fraud' or similar risks." The rule serves "informational" (SEC Br. 66) purposes. But "it is plainly not enough for the Government to say simply that it has

31

a substantial interest in giving [individuals] information. After all, that would be true of any and all disclosure requirements." *American Meat Institute* v. *U.S. Department of Agriculture*, 760 F.3d 18, 31 (D.C. Cir. 2014) (en banc) (Kavanaugh, J., concurring). And the Commission's rule is too "underinclusive" anyway for there to be a "serious claim" that providing material information is the Commission's true goal. *Church of Lukumi Babalu Aye, Inc.* v. *City of Hialeah*, 508 U.S. 520, 547 (1993). There is *a lot* of information investors could want, but the SEC's "curiously narrow" rule applies *only* to climate, *NIFLA*, 585 U.S. at 777, "neglecting every other issue," *Gralike* v. *Cook*, 191 F.3d 911, 921 (8th Cir. 1999), aff'd, 531 U.S. 510 (2001).

That is because this rule is really about "convey[ing] moral responsibility" for climate change and "skew[ing] [the] public debate" in the government's preferred direction. *National Ass'n of Manufacturers* v. *SEC*, 800 F.3d 518, 530 (D.C. Cir. 2015). This is "obviously repugnant to the First Amendment," and "should not face relaxed review just because [the Commission] use[s] the 'securities' label." *Id.* at 555.

## III. The Rule Should Be Vacated

The Commission does not dispute that the APA's default remedy is vacatur. See Chamber Br. 67. Instead, the Commission argues (Br. 111-113) the Court should vacate only portions of the rule, or remand without vacatur. But "when a court holds that an agency rule violates the APA, it shall—not may—hold unlawful and set aside the agency action." *National Ass'n of Private Fund Managers* v. *SEC*, 103 F.4th 1097, 1114 (5th Cir. 2024) (alteration and quotation marks omitted); see *Corner Post, Inc.* v. *Board of Governors of Federal Reserve System*, 144 S. Ct. 2440, 2469 (2024) (Kavanaugh, J., concurring).

The Commission argues (Br. 111) for remand without vacatur if this Court concludes the Commission "did not adequately consider an issue or explain its choices," but that exceptional course "is justifiable," if at all, "only in 'rare cases'" under "conditions" the Commission fails to satisfy here, *Chamber of Commerce of United States* v. *SEC*, 88 F.4th 1115, 1118 (5th Cir. 2023). There is no "'serious possibility' the agency will be able to correct the rule's defects on remand" given the fundamental and far-reaching problems undermining the Commission's reasoning at every step. *Ibid.*

33

Nor is there anything to "sever." SEC Br. 112. The Commission overlooks multiple overarching errors petitioners raised: The *entire* rule purports to solve a problem the SEC never substantiated and imposes burdens that dwarf purported benefits. Chamber Br. 20-33. And the rule as a whole exceeds the Commission's authority because neither the securities laws nor the First Amendment permit the Securities and Exchange Commission to make climate policy by dictating the terms of public debate. *Id.* at 46-67.

## CONCLUSION

The rule should be vacated in whole.

Appellate Case: 24-1628    Page: 42    Date Filed: 10/01/2024 Entry ID: 5441554

Dated:  September 24, 2024

Respectfully submitted,

/s/ *Eugene Scalia*

Brian A. Richman
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, TX  75201
(214) 698-3100

Eugene Scalia
  *Counsel of Record*
Jonathan C. Bond
Max E. Schulman
Brian C. McCarty
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C.  20036
(202) 955-8500
EScalia@gibsondunn.com

*Counsel for Petitioners*
*Chamber of Commerce of the United States of America,*
*Texas Association of Business, and Longview Chamber of Commerce*

Daryl Joseffer
Tyler S. Badgley
Kevin R. Palmer
U.S. CHAMBER LITIGATION CENTER
1615 H Street, N.W.
Washington, D.C.  20062
(202) 463-5337

*Counsel for Chamber of Commerce*
*of the United States of America*

Andrew J. Morris
Sheng Li
NEW CIVIL LIBERTIES ALLIANCE
4250 N. Fairfax Drive
Suite 300
Arlington, VA  22203
(202) 869-5210
Andrew.Morris@ncla.legal

*Counsel for National Center for*
*Public Policy Research*

## CERTIFICATE OF SERVICE

I hereby certify that on September 24, 2024, an electronic copy of the foregoing brief was filed with the Clerk of Court for the United States Court of Appeals for the Eighth Circuit using the appellate CM/ECF system, and service will be accomplished on all registered counsel by the appellate CM/ECF system.

> */s/ Eugene Scalia*
> Eugene Scalia
> GIBSON, DUNN & CRUTCHER LLP
> 1700 M Street, N.W.
> Washington, D.C.  20036
> (202) 955-8500
> EScalia@gibsondunn.com
>
> *Counsel of Record for Petitioners*
> *Chamber of Commerce of the*
> *United States of America, Texas*
> *Association of Business, and*
> *Longview Chamber of Commerce*

# CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7) because, excluding the parts exempted under Federal Rule of Appellate Procedure 32(f), it contains 6,500 words.

I certify that this brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2019 in 14-point New Century Schoolbook LT.

I further certify that this brief has been scanned for viruses and is virus-free.

Dated: September 24, 2024

*/s/ Eugene Scalia*

Eugene Scalia
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
(202) 955-8500
EScalia@gibsondunn.com

*Counsel of Record for Petitioners*
*Chamber of Commerce of the*
*United States of America, Texas*
*Association of Business, and*
*Longview Chamber of Commerce*